# 22-1048-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SYLVIA ASH, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT**
**Volume 1 of 5 (Pages A-1 to A-255)**

JUSTINE A. HARRIS
NOAM BIALE
MAYA BRODZIAK
SHER TREMONTE, LLP
*Attorneys for Defendant-Appellant*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

**TABLE OF CONTENTS**

| | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Ash's Memorandum of Law in Support of Motion to Suppress, dated March 20, 2020 | A-26 |
| Declaration of Carrie H. Cohen, for Ash, in Support of Motion to Suppress, dated March 20, 2020 | A-53 |
| Exhibit A to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated February 20, 2020 | A-59 |
| Exhibit C to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated March 11, 2020 | A-61 |
| Exhibit D to Cohen Declaration - E-mail from Carrie H. Cohen to Janie C. Buckley, dated March 16, 2020 | A-63 |
| Exhibit E to Cohen Declaration - Affidavit of Lavale Jackson, in Support of Application for Search Warrants for Stored Electronic Communications, filed March 18, 2019 [Redacted] | A-66 |
| Exhibit G to Cohen Declaration - Consent to Search – Devices | A-115 |
| Exhibit Q to Cohen Declaration - Document entitled "Reset Device Chain of Custody – DRAFT," dated February 4, 2019 [Redacted] | A-119 |

**Page**

Exhibit S to Cohen Declaration - Department of Financial Services Press Release: "Department of Financial Services Takes Possession of Municipal Credit Union and Names NUCA as Conservator" ............................ A-122

Memorandum Opinion of the Honorable Lewis A. Kaplan, dated June 2, 2020.................................... A-126

Superseding Indictment, filed July 21, 2021 ............ A-145

Ash's Memorandum of Law in Opposition to Government's Proposed 404(b) Evidence and in Support of Ash's Motion *in Limine*, dated October 29, 2021 .................................................. A-153

The Government's Motions *in Limine,* dated October 29, 2021 .................................................. A-181

Proposed Jury Instructions on behalf of Ash, dated November 9, 2021 ................................................ A-224

The Government's Request to Charge, dated November 9, 2021 ................................................ A-256

Ash's Memorandum of Law in Opposition to Government's Motions *in Limine*, dated November 12, 2021 .............................................. A-343

Exhibit A to Memorandum of Law - Copies of Judicial Documents .............................. A-363

Oral Argument Transcript, dated November 18, 2021 .............................................. A-381

Trial Transcript, dated November 30, 2021 .............. A-443

Trial Transcript, dated December 1, 2021 ................ A-471

Trial Transcript, dated December 2, 2021 ................ A-543

**Page**

Trial Transcript, dated December 6, 2021 ................. A-613

Trial Transcript, dated December 7, 2021 ................. A-667

Trial Transcript, dated December 8, 2021 ................. A-753

Trial Transcript, dated December 9, 2021 ................. A-803

Trial Transcript, dated December 13, 2021 ............... A-880

Government Exhibit 112 -
Letter from Eli J. Mark, dated June 18, 2018,
with Attachment..................................................... A-891

Government Exhibit 113 -
Letter from Norman Kohn to the Honorable
Sylvia Ash, dated June 19, 2018............................ A-896

Government Exhibit 114 -
Letter from Norman Kohn to the Honorable
Sylvia Ash, dated July 13, 2018............................. A-897

Government Exhibit 117 -
E-mail from LaVale Jackson to
sylviaash@aol.com, dated March 15, 2018, with
Attachments [Redacted]......................................... A-898

Government Exhibit 401 -
MCU's Policy Manual ........................................... A-902

Government Exhibit 751 -
E-mail Chain from the Honorable Sylvia Ash to
Monique Smith, dated May 15, 2018 .................... A-1190

Government Exhibit 769 -
E-mail Chain from the Honorable Sylvia Ash to
RFarley@nymcu.org, dated February 20, 2018..... A-1192

**Page**

Government Exhibit 801 -
Department of Justice Press Release “CEO and President of New York Credit Union Charged with Embezzlement and Fraud,” dated May 8, 2018 ........................................................ A-1193

Government Exhibit 901 -
Sylvia Ash’s Use of MCU Park Suites, 2010 through 2017 ................................................ A-1196

Sentencing Transcript, dated April 20, 2022.............. A-1197

Notice of Appeal, filed May 10, 2022 ....................... A-1237

Letter from Carrie H. Cohen to the Honorable Lewis A. Kaplan, dated June 10, 2022 .................. A- 1239

Query Reports Utilities Help Log Out

CLOSED,APPEAL,ECF,PRIOR

# U.S. District Court
# Southern District of New York (Foley Square)
# CRIMINAL DOCKET FOR CASE #: 1:19-cr-00780-LAK-1

| | |
|---|---|
| Case title: USA v. Ash | Date Filed: 10/31/2019 |
| Magistrate judge case number: 1:19-mj-09341-UA | Date Terminated: 04/26/2022 |

---

Assigned to: Judge Lewis A. Kaplan

**Defendant (1)**

| | | |
|---|---|---|
| **Sylvia Ash**<br>*TERMINATED: 04/26/2022*<br>*also known as*<br>Sealed Defendant 1<br>*TERMINATED: 04/26/2022* | represented by | **Carrie Heather Cohen**<br>Morrison & Foerster LLP (NYC)<br>250 West 55th Street<br>New York, NY 10019<br>(212) 468-8000<br>Fax: (212) 468-7900<br>Email: ccohen@mofo.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**G. Michael Bellinger**<br>Schiff Hardin LLP<br>1185 Avenue of the Americas<br>Suite 3000<br>New York, NY 10036<br>212-753-5000<br>Email: MBellinger@SchiffHardin.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Roger V. Archibald**<br>Roger Victor Archibald, PLLC<br>26 Court Street<br>Ste 711<br>Brooklyn, NY 11242<br>718-237-1111<br>Fax: 718-237-1425<br>Email: brooklynatty@hotmail.com<br>*TERMINATED: 11/25/2019*<br>*LEAD ATTORNEY*<br>*Designation: Retained*<br><br>**Janie C. Buckley**<br>Morrison & Foerster LLP<br>250 West 55th Street |

New York, NY 10019
(212)-468-8000
Fax: (212)-468-7900
Email: jbuckley@mofo.com
*ATTORNEY TO BE NOTICED*

**Nathan Daniel Reilly**
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
212-336-4080
Email: nreilly@mofo.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO OBSTRUCT JUSTICE (1s) | IMPRISONMENT: 15 Months on each of Counts (S1)One, (S1)Three, and (S1)Four, the terms to run concurrently. SUPERVISED RELEASE: Two years subject to the mandatory and the standard conditions of supervision, as well as the following special conditions. FINE: $80,000.00 |
| 18:1512C.F TAMPERING WITH A WITNESS, VICTIM OR INFORMANT (OBSTRUCTION OF JUSTICE) (3s) | IMPRISONMENT: 15 Months on each of Counts (S1)One, (S1)Three, and (S1)Four, the terms to run concurrently. SUPERVISED RELEASE: Two years subject to the mandatory and the standard conditions of supervision, as well as the following special conditions. FINE: $80,000.00 |
| 18:1001.F STATEMENTS OR ENTRIES GENERALLY (4s) | IMPRISONMENT: 15 Months on each of Counts (S1)One, (S1)Three, and (S1)Four, the terms to run concurrently. SUPERVISED RELEASE: Two years subject to the mandatory and the standard conditions of supervision, as well as the following special conditions. FINE: $80,000.00 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO OBSTRUCT JUSTICE (1) | Dismissed |
| 18:1519.F OBSTRUCTION OF JUSTICE - DESTRUCTION, ALTERATION OR | Dismissed |

| | |
|---|---|
| FALSIFICATION OF RECORDS IN FEDERAL INVESTIGATIONS<br>(2) | |
| 18:1519.F DESTRUCTION, ALTERATION OR FALSIFICATION OF RECORDS IN FEDERAL INVESTIGATIONS (OBSTRUCTION OF JUSTICE)<br>(2s) | Acquitted by Jury. |
| 18:1512C.F OBSTRUCTION OF JUSTICE - TAMPERING WITH A WITNESS, VICTIM OR INFORMANT<br>(3) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1519.F CONSPIRACY TO OBSTRUCT JUSTICE, 18:1512A.F TAMPER/WITNESS, VICTIM, INFORMANT , 18:371.F CONSPIRACY TO DEFRAUD THE UNITED STATES | |

---

**Plaintiff**

**USA** represented by

**Alona Sarah Katz**
DOJ-USAO
80 Centre Steet
Ste 4th Floor
New York, NY 10013
212-335-9617
Email: alona.katz@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Daniel Charles Richenthal**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2109
Fax: (212) 637-2615
Email: daniel.richenthal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Eli Jacob Mark**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza

New York, NY 10007
(212)-637-2431
Fax: (212)-637-2443
Email: eli.mark@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Jonathan Rebold**
U.S. Attorney's Office For The Southern District of Ne
1 Saint Andrew's Plaza
New York, NY 10007
(212)-637-2512
Email: jonathan.rebold@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2019 | | SEALED ORAL ORDER as to Sealed Defendant 1. (Signed by Magistrate Judge Kevin Nathaniel Fox on 10/4/2019)(dif) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/04/2019 | 1 | COMPLAINT as to Sylvia Ash (1). In Violation of 18 U.S.C. 371, 1512, 1519, and 2 (Signed by Magistrate Judge Kevin Nathaniel Fox) (dif) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/11/2019 | | Arrest of Sylvia Ash. (dif) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/11/2019 | 3 | NOTICE OF ATTORNEY APPEARANCE: Retained Attorney Roger V. Archibald appearing for Sylvia Ash. (dif) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/11/2019 | | Attorney update in case as to Sylvia Ash. Attorney Roger V. Archibald for Sylvia Ash added.. (dif) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/11/2019 | 4 | Minute Entry for proceedings held before Magistrate Judge Ona T. Wang: Initial Appearance as to Sylvia Ash held on 10/11/2019., Deft Appears with Retained Attorney Roger V. Archibald and AUSA Eli Mark for the government. $500,000 PRB; 3 FRP'S; Secured by $100,000 or Residence in Brooklyn; Travel Limited to SDNY/EDNY; Surrender Travel Documents (& No New Applications); Pretrial Supervision As Directed by PTS; Electronic Monitoring; GPS; Deft to Pay All of Part of cost of Location Monitoring; Deft to Continue or Seek Employment; Deft to Be Released on Own Signature, Plus the Following Conditions; No Contact with Any Current or Former MCU Board Members, Supervisory Committee Members or Officers, Except in the Presence of Counsel; No Contact with Any Other Witnesses Except in Presence of Counsel; Location Monitoring Supported by Stand Alone GPS; Deft Can Be Released on (1) FRP Signature or Posting of the Security for the Bond, and (2) Fitting of the Ankle Bracelet; Remaining Conditions to Be Met by 10/18/19; ( Preliminary Hearing 11/1/2019 (dif) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/15/2019 | | Attorney update in case as to Sylvia Ash. Attorney Alona Sarah Katz for USA added. (jm) [1:19-mj-09341-UA] (Entered: 10/15/2019) |
| 10/15/2019 | 5 | AGREEMENT TO FORFEIT REAL PROPERTY by Sylvia Ash. Personal Recognizance Bond in the amount of $ 500,000 PRB, 3 FRP'S; Secured by $100,000 Cash or Residence in Brooklyn; Travel Limited to SDNY/EDNY; Surrender Travel Documents (& No New Applications); Pretrial Supervision As Directed by PTS; Electronic Monitoring; GPS; |

| | | |
|---|---|---|
| | | Deft to Pay All or Part of Cost of Location Monitoring; Deft to Continue or Seek Employment; Deft to Be Released on Own Signature, Plus the Following Conditions; See Below; Remaining Conditions to Be Met by 10/18/19; No Contact with Any Current of Former MCI Board Members, Supervisory Committee Members or Officers, Except in the Presence of Counsel; No Contact with Any Other Witnesses Except in Presence of Counsel; Location Monitoring Supported by Stand Alone GPS; Deft Can Be Released on (1) FRP Signature or Posting of the Security for the Bond; and (2) Fitting of the Ankle Bracelet; remaining Conditions to Be Met by 10/18/19. *** BOND CONDITIONS MODIFIED BY USDJ KAPLAN ON 12/16/2019: Removing electronic monitoring bracelet upon the signing of the new bond and filing of an amended confession of judgment. (dif)[1:19-mj-09341-UA]; Modified on 12/17/2019 (bw). (Main Document 5 replaced on 12/18/2019) (bw). (Entered: 10/15/2019) |
| 10/28/2019 | 6 | LETTER by Sylvia Ash addressed to Magistrate Judge Ona T. Wang from Roger V. Archibald, Esq. dated October 28, 2019 re: United States v. Ash Case No. 19 MJ 9341 (Archibald, Roger) [1:19-mj-09341-UA] (Entered: 10/28/2019) |
| 10/30/2019 | 7 | LETTER by Sylvia Ash addressed to Magistrate Judge Ona T. Wang from Roger V. Archibald, Esq. dated October 30, 2019 re: United States v. Ash, Case No. 19 MJ 9341 (Archibald, Roger) [1:19-mj-09341-UA] (Entered: 10/30/2019) |
| 10/31/2019 | 8 | MEMO ENDORSEMENT as to Sylvia Ash on 7 LETTER by Sylvia Ash addressed to Magistrate Judge Ona T. Wang from Roger V. Archibald, Esq. dated October 30, 2019 re: United States v. Ash, Case No. 19 MJ 9341. ENDORSEMENT: Granted. So Ordered. (Signed by Magistrate Judge Ona T. Wang on 10/31/2019) (lnl) [1:19-mj-09341-UA] (Entered: 10/31/2019) |
| 10/31/2019 | 9 | INDICTMENT FILED as to Sylvia Ash (1) count(s) 1, 2, 3. (jbo) (Entered: 10/31/2019) |
| 10/31/2019 | | Case Designated ECF as to Sylvia Ash. (jbo) (Entered: 10/31/2019) |
| 11/04/2019 | 10 | LETTER by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant United States Attorneys Daniel C. Richenthal and Eli J. Mark and Special Assistant United States Attorney Alona Katz dated November 4, 2019 re: Transcript of Presentment and Bail Argument in Magistrate Court Document filed by USA. (Richenthal, Daniel) (Entered: 11/04/2019) |
| 11/04/2019 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Arraignment as to Sylvia Ash (1) Count 1,2,3 held on 11/4/2019. Defendant Ash present with attorney Roger Archibald. AUSA Daniel C. Richenthal and Eli J. Mark present. Court reporter Stever Greenblum present. Defendant arraigned an entered a plea of not guilty. Government to make discovery by 12/10/2019. Defendant's motions due by 1/24/2020; Government opposition due by 2/14/2020; oral argument scheduled for 3/3/2020 at 10:00 AM. Trial scheduled to commence on 5/18/2020 at 9:30 AM. Time from today through 3/3/2020 is excluded from speedy trial calculations in the interests of justice. Defendant remained released on bail. (jbo) (Entered: 11/04/2019) |
| 11/04/2019 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Plea entered by Sylvia Ash (1) Count 1,2,3 Not Guilty. (jbo) (Entered: 11/04/2019) |
| 11/05/2019 | 11 | CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Assistant United States Attorneys Daniel C. Richenthal and Eli J. Mark and Special Assistant United States Attorney Alona Katz dated November 5, 2019 re: Entry of Protective Order . Document filed by USA as to Sylvia Ash. (Attachments: # 1 Text of Proposed Order Proposed Protective Order)(Richenthal, Daniel) (Entered: 11/05/2019) |
| 11/05/2019 | 12 | LETTER by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant United States Attorneys Eli J. Mark and Daniel C. Richenthal and Special Assistant |

| | | |
|---|---|---|
| | | United States Attorney Alona Katz dated November 5, 2019 re: Transcript of Presentment and Bail Argument Document filed by USA. (Attachments: # 1 Exhibit (Transcript of Presentment and Bail Argument))(Richenthal, Daniel) (Entered: 11/05/2019) |
| 11/06/2019 | 13 | PROTECTIVE ORDER as to Sylvia Ash...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Lewis A. Kaplan on 11/6/2019) (ap) (Entered: 11/06/2019) |
| 11/12/2019 | 14 | NOTICE OF ATTORNEY APPEARANCE: G. Michael Bellinger appearing for Sylvia Ash. Appearance Type: Retained. (Bellinger, G.) (Entered: 11/12/2019) |
| 11/22/2019 | 15 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Conference held on 11/4/19 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/13/2019. Redacted Transcript Deadline set for 12/23/2019. Release of Transcript Restriction set for 2/20/2020. (McGuirk, Kelly) (Entered: 11/22/2019) |
| 11/22/2019 | 16 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Conference proceeding held on 11/4/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/22/2019) |
| 11/22/2019 | 17 | DECLARATION of Roger V. Archibald by Sylvia Ash. (Archibald, Roger) (Entered: 11/22/2019) |
| 11/25/2019 | 18 | STIPULATION AND ORDER as to Sylvia Ash. Follows oral order of STIPULATION AND ORDER SUBSTITUTING ATTORNEY. ENDORSEMENT: SO ORDERED. (Signed by Judge Lewis A. Kaplan on 11/25/2019) (lnl) (Entered: 11/25/2019) |
| 12/06/2019 | 19 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Conference held on 11/4/19 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/27/2019. Redacted Transcript Deadline set for 1/6/2020. Release of Transcript Restriction set for 3/5/2020. (McGuirk, Kelly) (Entered: 12/06/2019) |
| 12/06/2019 | 20 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Conference proceeding held on 11/4/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/06/2019) |
| 12/13/2019 | 21 | LETTER MOTION addressed to Judge Lewis A. Kaplan from G. Michael Bellinger dated December 13, 2019 re: to modify Ms. Ash's bail conditions . Document filed by Sylvia Ash. (Bellinger, G.) (Entered: 12/13/2019) |
| 12/16/2019 | 22 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 21 LETTER MOTION addressed to Judge Lewis A. Kaplan from G. Michael Bellinger dated December 13, |

| | | |
|---|---|---|
| | | 2019 re: to modify Ms. Ash's bail conditions. ENDORSEMENT" Granted on consent. So Ordered. (Signed by Judge Lewis A. Kaplan on 12/16*2019) (lnl) (Entered: 12/16/2019) |
| 01/16/2020 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Bond Hearing as to Sylvia Ash held on 1/16/2020. Defendant Sylvia Ash present with attorney G. Michael Bellinger. AUSAs Daniel C. Richenthal, Eli J. Mark, and Alona S. Katz present. US Pretrial Services Officer Lea Harmon present. Government's oral application for a bail modification denied by the Court. Defendant remained released on bail. (Court Reporter Martha Martin) (Mohan, Andrew) (Entered: 01/16/2020) |
| 01/21/2020 | 23 | LETTER MOTION addressed to Judge Lewis A. Kaplan from G. Michael Bellinger dated January 21, 2020 re: Extension . Document filed by Sylvia Ash. (Bellinger, G.) (Entered: 01/21/2020) |
| 01/22/2020 | 24 | LETTER RESPONSE in Opposition by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorney Eli J. Mark dated January 22, 2020 re: 23 LETTER MOTION addressed to Judge Lewis A. Kaplan from G. Michael Bellinger dated January 21, 2020 re: Extension .. (Mark, Eli) (Entered: 01/22/2020) |
| 01/24/2020 | 25 | ORDER as to Sylvia Ash (1). Defendant's letter motion to adjust the motion schedule and adjourn the trial [Dkt 23] is granted to the extent that the deadline for the filing of any motions by defendant shall be March 6, 2020, the government's reply shall be filed on or before March 20, 2020, and oral argument and a conference will be held on April 1, 2020 at 10 am. It is denied in all other respects. Unless otherwise ordered, trial will commence on May 18, 2020 as scheduled. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/24/20) (jbo) (Entered: 01/24/2020) |
| 01/24/2020 | | Set/Reset Deadlines/Hearings as to Sylvia Ash: Motions due by 3/6/2020. Replies due by 3/20/2020. Oral Argument set for 4/1/2020 at 10:00 AM before Judge Lewis A. Kaplan. (jbo) (Entered: 01/24/2020) |
| 02/04/2020 | 26 | NOTICE OF ATTORNEY APPEARANCE: Carrie Heather Cohen appearing for Sylvia Ash. Appearance Type: Retained. (Cohen, Carrie) (Entered: 02/04/2020) |
| 02/12/2020 | 27 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Conference held on 1/16/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Martha Martin, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/4/2020. Redacted Transcript Deadline set for 3/16/2020. Release of Transcript Restriction set for 5/12/2020. (McGuirk, Kelly) (Entered: 02/12/2020) |
| 02/12/2020 | 28 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Conference proceeding held on 1/16/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/12/2020) |
| 03/03/2020 | 29 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION for Extension of Time *to Submit Motions*. Document filed by Sylvia Ash. (Cohen, Carrie) Modified on 3/4/2020 (ka). (Entered: 03/03/2020) |
| 03/04/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Sylvia Ash: Notice to Attorney Cohen, Carrie to RE-FILE Document 29 MOTION for Extension of Time *to Submit Motions*.. Use the event type Letter Motion found under the event list Motions. (ka)** (Entered: 03/04/2020) |

| | | |
|---|---|---|
| 03/04/2020 | 30 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated March 3, 2020 re: Extension of Time to Submit Motions . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 03/04/2020) |
| 03/04/2020 | 31 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 30 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated March 3, 2020 re: Extension of Time to Submit Motions. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 3/4/2020) (ap) (Entered: 03/04/2020) |
| 03/04/2020 | | Set/Reset Deadlines as to Sylvia Ash: Motions due by 3/20/2020. Responses due by 4/3/2020. (ap) (Entered: 03/04/2020) |
| 03/13/2020 | 32 | CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan dated March 13, 2020 re: Exclusion of Time under the Speedy Trial Act . Document filed by USA as to Sylvia Ash. (Richenthal, Daniel) (Entered: 03/13/2020) |
| 03/16/2020 | 33 | ENDORSED LETTER as to Sylvia Ash addressed to Judge Lewis A. Kaplan from USA dated March 13, 2020 re: Accordingly, for the reasons previously discussed with the Court, and in light of the uncertainty posed by Corona virus Disease 2019 (COVID-19), the Government, with consent of the defendant, requests that time be excluded under the Speedy Trial Act between today and May 18, 2020, the date of trial. ENDORSEMENT: Granted. For the reasons and referred to above, time is excluded from today to and including May 18, 2020. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/13/2020)(bw) (Entered: 03/16/2020) |
| 03/20/2020 | 34 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION to Suppress . Document filed by Sylvia Ash. (Attachments: # 1 Memorandum of Law in Support of her Motions to Suppress, # 2 Declaration of Carrie H. Cohen in Support of Motion to Suppress, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U)(Cohen, Carrie) Modified on 3/23/2020 (ka). (Entered: 03/20/2020) |
| 03/23/2020 | | *****NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR as to Sylvia Ash: Notice to Attorney Cohen, Carrie to RE-FILE Document 34 MOTION to Suppress. ERROR(S): Filing Error of Attachment. Supporting documents must be filed individually. Event code located under Replies, Opposition and Supporting documents.***NOTE: Separate docket entry for each. (ka)** (Entered: 03/23/2020) |
| 03/23/2020 | 35 | MOTION to Suppress . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 03/23/2020) |
| 03/23/2020 | 36 | MEMORANDUM in Support by Sylvia Ash re 35 MOTION to Suppress .. (Cohen, Carrie) (Entered: 03/23/2020) |
| 03/23/2020 | 37 | DECLARATION of Carrie H. Cohen in Support as to Sylvia Ash re: 35 MOTION to Suppress .. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit K, # 11 Exhibit L, # 12 Exhibit M, # 13 Exhibit N, # 14 Exhibit O, # 15 Exhibit P, # 16 Exhibit Q, # 17 Exhibit R, # 18 Exhibit S, # 19 Exhibit T, # 20 Exhibit U)(Cohen, Carrie) (Entered: 03/23/2020) |
| 03/24/2020 | 38 | NOTICE OF ATTORNEY APPEARANCE: Janie C. Buckley appearing for Sylvia Ash. Appearance Type: Retained. (Buckley, Janie) (Entered: 03/24/2020) |
| 03/31/2020 | 39 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION |

| | | |
|---|---|---|
| | | to Continue *Trial Date (on Consent)*. Document filed by Sylvia Ash. (Cohen, Carrie) Modified on 4/1/2020 (ka). (Entered: 03/31/2020) |
| 04/01/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Sylvia Ash: Notice to Attorney Cohen, Carrie to RE-FILE Document 39 MOTION to Continue Trial Date (on Consent). Use the event type Letter Motion found under the event list Motions. (ka)** (Entered: 04/01/2020) |
| 04/01/2020 | 40 | CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated March 31, 2020 re: Request to Reschedule Trial and Exclude Time Under the Speedy Trial Act . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 04/01/2020) |
| 04/01/2020 | 41 | MEMO ENDORSEMENT 40 LETTER MOTION Reschedule Trial and Exclude Time as to Sylvia Ash...ENDORSEMENT...Trial adjourned until 10/19/2020 at 9:30 although that date may have to be adjusted. As the interests of justices served thereby outweigh the interests of the defendant and the public in a speedy trial in light of the COVID-19 crisis and the limitations on the conduct of jury trials and trial preparation, time is excluded to and including 10/19/20. (Signed by Judge Lewis A. Kaplan on 4/1/20) (jw) (Entered: 04/01/2020) |
| 04/03/2020 | 42 | MEMORANDUM in Opposition by USA as to Sylvia Ash re 35 MOTION to Suppress .. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Richenthal, Daniel) (Entered: 04/03/2020) |
| 04/07/2020 | 43 | JOINT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated April 7, 2020 re: Request for Leave to File Reply and Sur-Reply . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 04/07/2020) |
| 04/08/2020 | 44 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 43 JOINT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated April 7, 2020 re: Request for Leave to File Reply and Sur-Reply. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 4/8/2020) (ap) (Entered: 04/08/2020) |
| 04/08/2020 | | Set/Reset Deadlines as to Sylvia Ash: Replies due by 4/10/2020. Surreplies due by 4/15/2020. (ap) (Entered: 04/08/2020) |
| 04/10/2020 | 45 | REPLY MEMORANDUM OF LAW in Support as to Sylvia Ash re: 35 MOTION to Suppress . . (Cohen, Carrie) (Entered: 04/10/2020) |
| 04/15/2020 | 46 | REPLY MEMORANDUM OF LAW in Opposition by USA as to Sylvia Ash re: 35 MOTION to Suppress . . (Richenthal, Daniel) (Entered: 04/15/2020) |
| 06/02/2020 | 47 | MEMORANDUM OPINION 35 Motion to Suppress. Sylvia Ash, a New York State judge, has been charged with conspiring to obstruct, and obstructing, a federal investigation into the embezzlement and fraud perpetrated by the chief executive officer and president of the Municipal Credit Union (MCU), Kam Wong. (Signed by Judge Lewis A. Kaplan on 6/2/20) (jw) (Entered: 06/02/2020) |
| 07/15/2020 | 48 | CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated July 15, 2020 re: Modify Terms of Bond . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 07/15/2020) |
| 08/10/2020 | 49 | LETTER RESPONSE to Motion by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorneys Eli J. Mark and Daniel C. Richenthal dated August 10, 2020 re: 48 CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated July 15, 2020 re: Modify Terms of Bond .. (Mark, Eli) (Entered: 08/10/2020) |

| | | |
|---|---|---|
| 08/10/2020 | 50 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 48 CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated July 15, 2020 re: Modify Terms of Bond. ENDORSEMENT: Granted on consent. (Signed by Judge Lewis A. Kaplan on 8/10/2020) (ap) (Entered: 08/10/2020) |
| 08/24/2020 | 51 | JOINT MOTION for Extension of Time *for the Trial Date*. Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 08/24/2020) |
| 08/25/2020 | 52 | ORDER denying without prejudice 51 Motion for Extension of Time as to Sylvia Ash (1). (Signed by Judge Lewis A. Kaplan on 8/25/2020) (Kaplan, Lewis) (Entered: 08/25/2020) |
| 08/27/2020 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Telephone Conference as to Sylvia Ash held on 8/27/2020. Teleconference held before Hon. Lewis A. Kaplan. Defendant Sylvia Ash participated with her attorney Carrie Cohen. AUSAs Daniel C. Richenthal and Eli J. Mark participated. Case status discussed. No trial date was set. Time from today through 1/4/2021 is excluded from speedy trial calculations in the interests of justice. Defendant remained released on bail. (Court Reporter Lisa Franco) (ap) Modified on 8/27/2020 (Mohan, Andrew). (Entered: 08/27/2020) |
| 09/21/2020 | 53 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Conference held on 8/27/20 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Lisa Picciano Franko, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/13/2020. Redacted Transcript Deadline set for 10/22/2020. Release of Transcript Restriction set for 12/21/2020. (McGuirk, Kelly) (Entered: 09/21/2020) |
| 09/21/2020 | 54 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Conference proceeding held on 8/27/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/21/2020) |
| 11/02/2020 | 55 | SEALED DOCUMENT placed in vault. (jus) (Entered: 11/02/2020) |
| 11/05/2020 | 56 | ENDORSED LETTER as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated 11/4/2020 re: Defense counsel writes regarding exclusion of time. ENDORSEMENT: Granted. Time excluded for Speedy Trial Act purposes runs until 4/1/2021 for reasons stated above. The interests of justice outweigh the interests of the def. and the public in a speedy trial. (Signed by Judge Lewis A. Kaplan on 11/5/2020) (ap) (Entered: 11/05/2020) |
| 12/11/2020 | 57 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 12/11/2020) |
| 12/14/2020 | 58 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 12/14/2020) |
| 02/20/2021 | | Pretrial video-conference set for 2/22/2021 at 02:00 PM before Judge Lewis A. Kaplan. Public and press may call in for audio +1 917-933-2166, Phone Conference ID: 407 436 285# (Mohan, Andrew) (Entered: 02/20/2021) |
| 02/22/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Video/Teleconference Pretrial Conference as to Sylvia Ash held on 2/22/2021. Defendant Sylvia Ash present by phone while her attorneys Carrie Cohen and Janie C. Buckley participated by video. AUSAs Alona S. Katz, Daniel C. Richenthal, and Eli J. Mark participated by video. Court reporter Lisa Frankel present by telephone. The contemplated 4/12/2021 trial date |

| | | |
|---|---|---|
| | | is adjourned until a control date of 10/4/2021. Time from today through and including 10/4/2021 is excluded from speedy trial calculations in the interests of justice. (lnl) (Entered: 02/23/2021) |
| 03/19/2021 | 59 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Conference held on 2/22/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Lisa Picciano Franko, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/9/2021. Redacted Transcript Deadline set for 4/19/2021. Release of Transcript Restriction set for 6/17/2021. (McGuirk, Kelly) (Entered: 03/19/2021) |
| 03/19/2021 | 60 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Conference proceeding held on 2/22/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 03/19/2021) |
| 04/09/2021 | 61 | SEALED DOCUMENT placed in vault. (jus) (Entered: 04/09/2021) |
| 04/21/2021 | 62 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 04/21/2021) |
| 04/22/2021 | 63 | SEALED DOCUMENT placed in vault. (jus) (Entered: 04/22/2021) |
| 05/17/2021 | 64 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 05/17/2021) |
| 05/25/2021 | 65 | SEALED DOCUMENT placed in vault. (jus) (Entered: 05/25/2021) |
| 05/25/2021 | 66 | SEALED DOCUMENT placed in vault. (jus) (Entered: 05/25/2021) |
| 05/25/2021 | 67 | SEALED DOCUMENT placed in vault. (jus) (Entered: 05/25/2021) |
| 05/25/2021 | 68 | SEALED DOCUMENT placed in vault. (jus) (Entered: 05/25/2021) |
| 05/26/2021 | 69 | SEALED DOCUMENT placed in vault. (jus) (Entered: 05/26/2021) |
| 06/14/2021 | 70 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 06/14/2021) |
| 06/29/2021 | 71 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated June 29, 2021 re: 5 Agreement to Forfeit Property,,,,, re: Seek permission for Defendant Sylvia G. Ash to travel to visit with family out of state on July 4, 2021 . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 06/29/2021) |
| 06/30/2021 | 72 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 71 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated June 29, 2021 re: Seek permission for Defendant Sylvia G. Ash to travel to visit with family out of state on July 4, 2021. ENDORSEMENT: Granted on consent. (Signed by Judge Lewis A. Kaplan on 6/30/2021) (lnl) (Entered: 06/30/2021) |
| 07/07/2021 | 73 | SEALED DOCUMENT placed in vault. (jus) (Entered: 07/07/2021) |
| 07/07/2021 | 74 | SEALED DOCUMENT placed in vault. (jus) (Entered: 07/07/2021) |
| 07/12/2021 | 75 | CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated July 12, 2021 re: Request to Move Trial Ready Date . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 07/12/2021) |
| 07/21/2021 | 77 | (S1) SUPERSEDING INDICTMENT FILED as to Sylvia Ash (1) count(s) 1s, 2s, 3s, 4s. (jm) (Main Document 77 replaced on 7/22/2021) (jm). (Entered: 07/22/2021) |

| | | |
|---|---|---|
| 07/22/2021 | 76 | MEMO ENDORSEMENT as to Sylvia Ash (1) on 75 CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated July 12, 2021 re: Request to Move Trial Ready Date. ENDORSEMENT: Subject to courtroom and venire availability under COVID protocols, case set for trial 11/30/21. (Signed by Judge Lewis A. Kaplan on 7/22/2021) (ap) (Entered: 07/22/2021) |
| 07/22/2021 | 78 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorney Eli J. Mark dated July 22, 2021 re: Superseding Indictment and Exclusion of Time Under the Speedy Trial Act . Document filed by USA as to Sylvia Ash. (Attachments: # 1 Superseding Indictment)(Mark, Eli) (Entered: 07/22/2021) |
| 07/26/2021 | 79 | LETTER by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated July 26, 2021 re: Response to Government's 7/22/21 Letter Motion re Superseding Indictment (Cohen, Carrie) (Entered: 07/26/2021) |
| 08/10/2021 | 80 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated August 10, 2021 re: Request To Allow Sylvia Ash To Travel . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 08/10/2021) |
| 08/11/2021 | 81 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 80 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated August 10, 2021 re: Request To Allow Sylvia Ash To Travel. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 8/11/2021) (ap) (Entered: 08/11/2021) |
| 08/30/2021 | 82 | MEMO ENDORSEMENT as to Sylvia Ash (1) on 78 LETTER MOTION addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorney Eli J. Mark dated July 22, 2021 re: Superseding Indictment and Exclusion of Time Under the Speedy Trial Act. ENDORSEMENT: Time excluded through 11/30/21 on consent. The interests of justice thereby including the defendant's need to prepare to meet the new indictment outweigh the interests in a speedy trial (Signed by Judge Lewis A. Kaplan on 8/29/2021) (ap) (Entered: 08/30/2021) |
| 09/01/2021 | 83 | ORDER as to Sylvia Ash: This case is set for trial commencing on November 30, 2021. Counsel should assume that it will not be postponed further. Proposed voir dire questions and requests to charge shall be filed no later than November 9, 2021. (Signed by Judge Lewis A. Kaplan on 9/1/2021) (ap) (Entered: 09/01/2021) |
| 09/22/2021 | 84 | NOTICE OF ATTORNEY APPEARANCE Jonathan Rebold appearing for USA. *Jonathan E. Rebold* (Rebold, Jonathan) (Entered: 09/22/2021) |
| 09/23/2021 | 85 | SEALED DOCUMENT placed in vault. (jus) (Entered: 09/23/2021) |
| 10/04/2021 | 86 | MEMO ENDORSEMENT as to Sylvia Ash on re: 78 LETTER MOTION addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorney Eli J. Mark dated July 22, 2021 re: Superseding Indictment and Exclusion of Time Under the Speedy Trial Act. ENDORSEMENT: Time excluded through Nov. 30, 2021. For reasons stated, the interests of justice outweigh the interests of the public and the defendant in a speedy trial. (Signed by Judge Lewis A. Kaplan on 7/23/2021)(ap) (Entered: 10/04/2021) |
| 10/05/2021 | 87 | ENDORSED LETTER as to Sylvia Ash addressed to Judge Lewis A. Kaplan from counsel Michael Bellinger dated 9/30/21 re: I no longer represent Judge Sylvia Ash, and neither does Schiff Hardin LLP nor Carter Ledyard & Milburn LLP. Currently, Carrie H. Cohen, Esq. and Morrison & Foerster LLP represent Judge Ash... ENDORSEMENT: Counsel must move for leave to withdraw. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/5/21)(jbo) (Entered: 10/05/2021) |
| 10/07/2021 | 88 | LETTER MOTION addressed to Judge Lewis A. Kaplan from G. Michael Bellinger dated 10/7/2021 re: G. Michael Bellingers withdrawal as counsel. . Document filed by |

| | | |
|---|---|---|
| | | Sylvia Ash. (Bellinger, G.) (Entered: 10/07/2021) |
| 10/08/2021 | 89 | NOTICE OF ATTORNEY APPEARANCE: Nathan Daniel Reilly appearing for Sylvia Ash. Appearance Type: Retained. (Reilly, Nathan) (Entered: 10/08/2021) |
| 10/15/2021 | 90 | LETTER by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from USA dated October 15, 2021 re: Schedule of Pretrial Disclosures Document filed by USA. (Rebold, Jonathan) (Entered: 10/15/2021) |
| 10/22/2021 | 91 | MOTION for G. Michael Bellinger to Withdraw as Attorney . Document filed by Sylvia Ash. (Attachments: # 1 Affidavit Declaration.Notice of Motion to Withdraw, # 2 Text of Proposed Order)(Bellinger, G.) (Entered: 10/22/2021) |
| 10/22/2021 | 92 | ORDER granting 88 LETTER MOTION withdrawal as attorney re: 88 LETTER MOTION addressed to Judge Lewis A. Kaplan from G. Michael Bellinger dated 10/7/2021 re: G. Michael Bellingers withdrawal as counsel. . as to Sylvia Ash (1). (Signed by Judge Lewis A. Kaplan on 10/22/2021) (Kaplan, Lewis) (Entered: 10/22/2021) |
| 10/22/2021 | 93 | ORDER denying as moot 91 Motion to Withdraw as Attorney. as to Sylvia Ash (1). (Signed by Judge Lewis A. Kaplan on 10/22/2021) (Kaplan, Lewis) (Entered: 10/22/2021) |
| 10/29/2021 | 94 | MOTION in Limine . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 10/29/2021) |
| 10/29/2021 | 95 | MEMORANDUM in Support by Sylvia Ash re 94 MOTION in Limine .. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Cohen, Carrie) (Entered: 10/29/2021) |
| 10/29/2021 | 96 | MOTION in Limine . Document filed by USA as to Sylvia Ash. (Mark, Eli) (Entered: 10/29/2021) |
| 10/29/2021 | 97 | LETTER by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated 10/29/2021 re: Advising the Court of Additional Potential Pre-trial Issues (Cohen, Carrie) (Entered: 10/29/2021) |
| 11/09/2021 | 98 | Proposed Voir Dire Questions by Sylvia Ash. (Cohen, Carrie) (Entered: 11/09/2021) |
| 11/09/2021 | 99 | Proposed Jury Instructions by Sylvia Ash. (Cohen, Carrie) (Entered: 11/09/2021) |
| 11/09/2021 | 100 | Request To Charge by USA as to Sylvia Ash. (Mark, Eli) (Entered: 11/09/2021) |
| 11/09/2021 | 101 | Proposed Voir Dire Questions by USA as to Sylvia Ash. (Mark, Eli) (Entered: 11/09/2021) |
| 11/12/2021 | 102 | MEMORANDUM in Opposition by Sylvia Ash re 96 MOTION in Limine .. (Attachments: # 1 Exhibit A)(Cohen, Carrie) (Entered: 11/12/2021) |
| 11/12/2021 | 103 | MEMORANDUM in Opposition by USA as to Sylvia Ash re 94 MOTION in Limine .. (Mark, Eli) (Entered: 11/12/2021) |
| 11/12/2021 | 104 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorney Eli J. Mark dated November 12, 2021 re: 97 Letter re: Response to Defendant's Letter and Request for Orders regarding Privilege Matters and Advice-of-Counsel Defense . Document filed by USA as to Sylvia Ash. (Mark, Eli) (Entered: 11/12/2021) |
| 11/15/2021 | 105 | ORDER as to Sylvia Ash: Having reviewed the parties' letters of October 29 and November 12, 2021 (Dkts 97, 104), it is hereby ORDERED, as follows: 1. On or before November 19, 2021, defendant shall provide the government with (a) written notice and the contours (including the bases and scope of, and the count or counts to which it is said to apply) of any advice of counsel defense that she will raise at trial, and, if so, (b) all |

| | | |
|---|---|---|
| | | documents (including attorney-client and attorney work product documents) that support or might impeach or undermine any such defense, 2, The Clerk shall terminate Dkt. 104. (Signed by Judge Lewis A. Kaplan on 11/15/2021) (ap) (Entered: 11/15/2021) |
| 11/15/2021 | 106 | LETTER by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 15, 2021 re: Objections and Proposed Amendments to the Governments Proposed Voir Dire Requests (Cohen, Carrie) (Entered: 11/15/2021) |
| 11/15/2021 | 107 | LETTER by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 15, 2021 re: Objections to the Government's Proposed Requests to Charge (Attachments: # 1 Exhibit A)(Cohen, Carrie) (Entered: 11/15/2021) |
| 11/15/2021 | 108 | REPLY MEMORANDUM OF LAW in Support by USA as to Sylvia Ash re: 96 MOTION in Limine . . (Mark, Eli) (Entered: 11/15/2021) |
| 11/16/2021 | 109 | ORDER as to Sylvia Ash: Following argument of the in limine motions, counsel should be prepared to discuss whether the vaccine status of prospective jurors should be ascertained during voir dire, whether unvaccinated prospective jurors should be excused on that basis, and more generally the role, if any, that vaccination status ought to play in selecting and seating a jury in this case. (Signed by Judge Lewis A. Kaplan on 11/16/2021) (ap) (Entered: 11/16/2021) |
| 11/16/2021 | 110 | ORDER as to Sylvia Ash: The Court will hear oral argument on the pending motions in limine on November 18, 2021 at 2 pm. (Oral Argument set for 11/18/2021 at 02:00 PM before Judge Lewis A. Kaplan) (Signed by Judge Lewis A. Kaplan on 11/16/2021) (ap) (Entered: 11/16/2021) |
| 11/16/2021 | 111 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorney Eli J. Mark dated November 16, 2021 re: Courtroom Connect Access . Document filed by USA as to Sylvia Ash. (Attachments: # 1 Text of Proposed Order)(Mark, Eli) (Entered: 11/16/2021) |
| 11/16/2021 | 112 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 16, 2021 re: Leave to Appear Virtually at the November 18 Conference and to Waive Ms. Ash's Appearance . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 11/16/2021) |
| 11/17/2021 | 113 | ORDER as to Sylvia Ash: IT IS HEREBY ORDERED THAT Courtroom Connect, a Southern District of New York contracted vendor, may provide the Government in the United States v. Sylvia Ash, SI 19 Cr. 780 (LAK), with an Internet connectivity feed for the duration of the trial proceedings, set to begin on Tuesday, November 30, 2021. Courtroom Connect should make proper arrangements with the District Executive Office of the Court and the official court reporter. (Signed by Judge Lewis A. Kaplan on 11/17/2021) (ap) (Entered: 11/17/2021) |
| 11/17/2021 | 114 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 112 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 16, 2021 re: Leave to Appear Virtually at the November 18 Conference and to Waive Ms. Ash's Appearance. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 11/17/2021) (ap) (Entered: 11/17/2021) |
| 11/18/2021 | 115 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 18,2021 re: Trial logistics and permissions . Document filed by Sylvia Ash. (Attachments: # 1 Text of Proposed Order)(Cohen, Carrie) (Entered: 11/18/2021) |
| 11/22/2021 | 116 | ORDER as to Sylvia Ash. It is hereby ORDERED, as follows Any application by defendant to compel MCU to produce any such material shall be filed no later than 1 p.m. on November 24, 2021. Defendant shall provide MCU with a copy of this order today |

| | | |
|---|---|---|
| | | and advise MCU as promptly as possible whether defendant will make any such motion. Defendant shall not present evidence or argument to the jury regarding MCU's assertion of privilege and/or work product protection, including in opening statement, absent prior permission of the Court. SO ORDERED (Signed by Judge Lewis A. Kaplan on 11/22/21) (jw) (Entered: 11/22/2021) |
| 11/22/2021 | 117 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 22, 2021 re: to authorize SDNY Jury Administrator to produce records pursuant to 28 U.S.C. Sec. 1867(f) . Document filed by Sylvia Ash. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Cohen, Carrie) (Entered: 11/22/2021) |
| 11/22/2021 | 118 | ORDER ON IN LIMINE MOTIONS - The Court substantially resolved them during oral argument on November 18, 2021. It notes here in summary fashion its disposition of the points raised although noting that the transcript of its rulings on November 18 shall govern in the event of any conflict with this order. The references below to the government's and the defendant's motions are to the argument headings in their respective memoranda, Dkts 96 and 95, respectively. The Clerk shall terminate Dkts 94 and 96. (Signed by Judge Lewis A. Kaplan on 11/22/21) (jw) (Entered: 11/22/2021) |
| 11/23/2021 | 119 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 23, 2021 re: Stipulation and Proposed Order Pursuant to Fed. R. Evid. 502 . Document filed by Sylvia Ash. (Attachments: # 1 Stipulation and [Proposed] Order) (Cohen, Carrie) (Entered: 11/23/2021) |
| 11/23/2021 | 120 | STIPULATION AND ORDER 119 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 23, 2021 re: Stipulation and Proposed Order Pursuant to Fed. R. Evid. 502. It is hereby ORDERED In the course of the above-captioned matter and any related investigation by the USAO, and subject to the parties' Stipulation as set forth supra, MCU's potential waiver of the attorney-client privilege and/or the work-product doctrine with respect to the Covered Documents produced by MCU to counsel for Defendant Sylvia Ash and the USAO does not constitute a waiver with respect to those privileges and protections that may apply to other MCU documents, or records, or a categorical waiver of such privileges and protections. Nothing in the parties' Stipulation set forth supra shall constitute or be construed as a waiver of the attorney-client privilege, work product doctrine, or any other privilege or protection in any other federal or state proceeding (Signed by Judge Lewis A. Kaplan on 11/23/21) (jw) (Entered: 11/23/2021) |
| 11/23/2021 | 121 | SECOND MOTION in Limine . Document filed by USA as to Sylvia Ash. (Attachments: # 1 Exhibit (Defense Letter re Advice-of-Counsel))(Richenthal, Daniel) (Entered: 11/23/2021) |
| 11/23/2021 | 122 | ORDER as to Sylvia Ash.. (Signed by Judge Lewis A. Kaplan on 11/23/2021)(Kaplan, Lewis) (Entered: 11/23/2021) |
| 11/23/2021 | 123 | ORDER as to Sylvia Ash.. (Signed by Judge Lewis A. Kaplan on 11/23/2021)(Kaplan, Lewis) (Entered: 11/23/2021) |
| 11/23/2021 | 124 | SCHEDULING ORDER ON SUPPLEMENTAL IN LIMINE MOTIONS as to Sylvia Ash. The government late today filed additional supplemental in limine motions. While the Court deeply regrets possibly interfering with the holiday weekend plans of all concerned, it has no practical alternative given the November 30 trial date. Accordingly, unless counsel can reach a written agreement resolving the open issues, defendant shall file any responses to the government's latest filings no later than 5 pm on Friday, November 26, 2021. If an agreement is reached, it shall be filed no later than that time (Defendant Responses due by 11/26/2021) (Signed by Judge Lewis A. Kaplan on |

| | | |
|---|---|---|
| | | 11/23/21)(jw) (Main Document 124 replaced on 11/24/2021) (Mohan, Andrew). (Entered: 11/24/2021) |
| 11/24/2021 | 125 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 24, 2021 re: Relating Additional In Limine Motion Re Co-Conspirator Statements . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 11/24/2021) |
| 11/26/2021 | 126 | LETTER RESPONSE in Opposition by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant United States Attorneys Eli J. Mark, Daniel C. Richenthal, and Jonathan E. Rebold, and Special Assistant United States Attorney Alona Katz dated November 26, 2021 re: 125 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 24, 2021 re: Relating Additional In Limine Motion Re Co-Conspirator Statements .. (Richenthal, Daniel) (Entered: 11/26/2021) |
| 11/26/2021 | 127 | LETTER RESPONSE in Opposition by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 26, 2021 re: 121 SECOND MOTION in Limine .. (Cohen, Carrie) (Entered: 11/26/2021) |
| 11/27/2021 | 128 | ORDER granting in part and denying in part 117 LETTER MOTION granting access to certain jury records re: 117 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 22, 2021 re: to authorize SDNY Jury Administrator to produce records pursuant to 28 U.S.C. Sec. 1867(f) . as to Sylvia Ash (1). (Signed by Judge Lewis A. Kaplan on 11/27/2021) (Kaplan, Lewis) (Entered: 11/27/2021) |
| 11/28/2021 | 129 | ORDER denying 125 LETTER MOTION exclusion of evidence of co-conspirator declarations and other relief re: 125 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 24, 2021 re: Relating Additional In Limine Motion Re Co-Conspirator Statements . as to Sylvia Ash (1). (Signed by Judge Lewis A. Kaplan on 11/28/2021) (Kaplan, Lewis) (Entered: 11/28/2021) |
| 11/28/2021 | 130 | ORDER granting in part and denying in part 121 Motion in Limine as to Sylvia Ash (1). (Signed by Judge Lewis A. Kaplan on 11/28/2021) (Kaplan, Lewis) (Entered: 11/28/2021) |
| 11/29/2021 | 131 | THIRD MOTION in Limine . Document filed by USA as to Sylvia Ash. (Richenthal, Daniel) (Entered: 11/29/2021) |
| 11/29/2021 | 132 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated 11/29/21 re: to Compel Production of Documents and Adjourn Commencement of Trial . Document filed by Sylvia Ash. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Cohen, Carrie) (Entered: 11/29/2021) |
| 11/30/2021 | 133 | THIRD MOTION in Limine *[Typographical Error Corrected]*. Document filed by USA as to Sylvia Ash. (Richenthal, Daniel) (Entered: 11/30/2021) |
| 11/30/2021 | 134 | LETTER by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant United States Attorneys Eli J. Mark, Daniel C. Richenthal, and Jonathan E. Rebold, and Special Assistant United States Attorney Alona Katz dated November 30, 2021 re: Public Filing of Government's Supplemental Motions in Limine of November 23, 2021 Document filed by USA. (Attachments: # 1 Exhibit (Government Motions in Limine Concerning (a) Municipal Credit Union and (b) a Certain Lay Witness (Witness-1), # 2 Exhibit (Government Letter Correcting Statement in Defense Opposition to Government Motion in Limine Concerning Witness-1))(Richenthal, Daniel) (Entered: 11/30/2021) |
| 11/30/2021 | 135 | LETTER by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated November 30, 2021 re: Public Filing of Sylvia Ash's Opposition to Government's |

| | | |
|---|---|---|
| | | Supplemental Motions in Limine of November 23, 2021 (Attachments: # 1 Letter Submitted in Opposition to Motions in Limine)(Cohen, Carrie) (Entered: 11/30/2021) |
| 11/30/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Voir Dire Held and Jury Trial Begun on 11/30/2021 as to Sylvia Ash. Voir Dire and trial begun concerning defendant Sylvia Ash before the Hon. Lewis A. Kaplan. Defendant Ash present with attorneys Carrie Heather Cohen, Janie C. Buckley, and Nathan Daniel Reilly. AUSs Eli J. Mark, Alona S. Katz, and Jonathan Rebold present. Court reporters Rebecca Forman and Andrew Walker present. Jury voir dire held. A jury of 12 and 6 alternates selected and sworn. Opening arguments heard. Trial adjourned until 12/1/2021 at 9:30 AM. Defendant remained released on bail. (lnl) (Entered: 12/01/2021) |
| 12/01/2021 | 136 | FOURTH MOTION in Limine . Document filed by USA as to Sylvia Ash. (Attachments: # 1 Exhibit A (November 18, 2021 Pretrial Conference Transcript), # 2 Exhibit B (November 30, 2021 Trial Transcript), # 3 Exhibit C (Kam Wong Plea Agreement), # 4 Exhibit D (Joseph Guagliardo Plea Agreement))(Richenthal, Daniel) (Entered: 12/01/2021) |
| 12/01/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Sylvia Ash held on 12/1/2021. (Court Reporter Rebecca Forman and Andrew Walker)(Mohan, Andrew) (Entered: 12/02/2021) |
| 12/02/2021 | 137 | LETTER RESPONSE in Opposition by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated December 2, 2021 re: 136 FOURTH MOTION in Limine .. (Cohen, Carrie) (Entered: 12/02/2021) |
| 12/02/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan:Jury Trial as to Sylvia Ash held on 12/2/2021. Trial to resume on Monday, 12/6/2021 at 12:30 PM in Courtroom 23B. (Court Reporter Rebecca Forman and Andrew Walker) (Mohan, Andrew) (Entered: 12/02/2021) |
| 12/06/2021 | 138 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated December 6, 2021 re: further Response to 4th Motion in Limine and to Preclude Introduction of Exhibits . Document filed by Sylvia Ash. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Cohen, Carrie) (Entered: 12/06/2021) |
| 12/06/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan:Jury Trial as to Sylvia Ash held on 12/6/2021 (Court Reporter Rebecca Forman and Andrew Walker) (Mohan, Andrew) (Entered: 12/07/2021) |
| 12/07/2021 | 139 | LETTER by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant United States Attorneys Eli J. Mark, Daniel C. Richenthal, and Jonathan E. Rebold, and Special Assistant United States Attorney Alona Katz dated December 7, 2021 re: Defendant's Proposed Defense Exhibits and Certain Testimony Document filed by USA. (Richenthal, Daniel) (Entered: 12/07/2021) |
| 12/07/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Sylvia Ash held on 12/7/2021. Trial continued and Government rested. Defendant moved under Rule 29 to dismiss the indictment, which was denied by the Court. The Defendant moved for a mistrial, which was denied by the Court. The Defendant's case will begin on 12/8/2021 at 10:00 AM. (Court Reporter Rebecca Forman and Andrew Walker) (Mohan, Andrew) (Entered: 12/08/2021) |
| 12/08/2021 | 140 | LETTER by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated December 8, 2021 re: Additional Materials in Support of December 7, 2021 Motion (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Cohen, Carrie) (Entered: 12/08/2021) |

| | | |
|---|---|---|
| 12/08/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Sylvia Ash held on 12/8/2021. Defendant's case begun and defendant rested. Jury excused and told to return on 12/9/2021 at 9:30 AM. Defendant renewed her Rule 29 motion for acquittal, which was denied by the Court. Charge conference held with counsel. (Court Reporter Rebecca Forman and Andrew Walker) (Mohan, Andrew) (Entered: 12/08/2021) |
| 12/09/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Sylvia Ash held on 12/9/2021. Closing arguments heard, jury charged, deliberations begun and continued to Monday, 12/13/2021 at 9:30 AM. (Court Reporter Rebecca Forman and Andrew Walker) (Mohan, Andrew) (Entered: 12/09/2021) |
| 12/10/2021 | 141 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Oral Argument held on 11/18/2021 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Carol Ganley, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/3/2022. Redacted Transcript Deadline set for 1/10/2022. Release of Transcript Restriction set for 3/10/2022. (Moya, Goretti) (Entered: 12/10/2021) |
| 12/10/2021 | 142 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Oral Argument proceeding held on 11/18/2021 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/10/2021) |
| 12/13/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial as to Sylvia Ash held on 12/13/2021. Trial continued from 12/9/2021 concerning defendant Sylvia Ash before the Hon. Lewis A. Kaplan. Jury deliberations continued and concluded. A verdict of guilty as to counts (S1)One, (S1)Three, and (S1)Four was returned. Defendant found not guilty of Count (S1)Two. Sentencing scheduled for 4/20/2022 at 3:00 PM. PSI Ordered. Counsel to submit a letter proposing a post-trial briefing schedule. Defendant remained released on bail. (jbo) (Entered: 12/14/2021) |
| 12/13/2021 | | JURY VERDICT as to Sylvia Ash (1) Guilty on Count 1s,3s,4s; Sylvia Ash (1) Not Guilty on Count 2s. (jbo) (Entered: 12/14/2021) |
| 12/13/2021 | | Set/Reset Hearings as to Sylvia Ash: Sentencing set for 4/20/2022 at 03:00 PM before Judge Lewis A. Kaplan. (jbo) (Entered: 12/14/2021) |
| 12/13/2021 | | Order of Referral to Probation for Presentence Investigation and Report as to Sylvia Ash. (Signed by Judge Lewis A. Kaplan on 12/13/21)(jbo) (Entered: 12/14/2021) |
| 12/14/2021 | 143 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 11/30/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 144 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 11/30/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically |

| | | |
|---|---|---|
| | | available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 145 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 12/1/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 146 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 12/1/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 147 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 12/2/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 148 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 12/2/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 149 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 12/6/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 150 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 12/6/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 151 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 12/7/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 152 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 12/7/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 153 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 12/8/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 154 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 12/8/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 155 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Trial held on 12/13/21 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2022. Redacted Transcript Deadline set for 1/14/2022. Release of Transcript Restriction set for 3/14/2022. (Moya, Goretti) (Entered: 12/14/2021) |
| 12/14/2021 | 156 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Trial proceeding held on 12/13/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/14/2021) |
| 12/21/2021 | 157 | ORDER as to Sylvia Ash. IT IS HEREBY ORDERED that the Clerk of Court shall pay invoices conforming with the travel policy proscribed by the Administrative Office of the United States Court, submitted by juror number 4 in connection with his lodging and subsistence. (Signed by Judge Lewis A. Kaplan on 12/2/2021)(jw) (Entered: 12/21/2021) |
| 12/22/2021 | 158 | MOTION for New Trial . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 12/22/2021) |
| 12/22/2021 | 159 | JOINT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated December 22, 2021 re: 158 MOTION for New Trial . re: Proposed Briefing Schedule for Defendant's FRCrP 33 Motion . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 12/22/2021) |
| 01/13/2022 | 160 | CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. |

| | | |
|---|---|---|
| | | Cohen dated January 13, 2022 re: Request for Permission to Travel . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 01/13/2022) |
| 01/13/2022 | 161 | MEMO ENDORSEMENT 160 CONSENT LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated January 13, 2022 re: Request for Permission to Travel...ENDORSEMENT..Application granted. SO ORDERED (Signed by Judge Lewis A. Kaplan on 1/13/22) (jw) (Entered: 01/13/2022) |
| 01/21/2022 | 162 | MEMORANDUM in Support by Sylvia Ash re 158 MOTION for New Trial .. (Cohen, Carrie) (Entered: 01/21/2022) |
| 02/11/2022 | 164 | MEMORANDUM in Opposition by USA as to Sylvia Ash re 158 MOTION for New Trial .. (Mark, Eli) (Entered: 02/11/2022) |
| 02/16/2022 | 165 | CONSENT MOTION for Extension of Time to File Response/Reply as to 163 Initial Disclosure Presentence Report, *to February 25, 2022*. Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 02/16/2022) |
| 02/18/2022 | 166 | MEMO ENDORSEMENT 165 Motion for Extension of Time to File Response/Reply re: 165 CONSENT MOTION for Extension of Time to File Response/Reply as to 163 Initial Disclosure Presentence Report...ENDORSEMENT...Granted. SO ORDERED (Signed by Judge Lewis A. Kaplan on 2/16/22) (jw) (Entered: 02/18/2022) |
| 02/18/2022 | 167 | REPLY MEMORANDUM OF LAW in Support as to Sylvia Ash re: 158 MOTION for New Trial . . (Cohen, Carrie) (Entered: 02/18/2022) |
| 02/23/2022 | 168 | ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL as to Sylvia Ash. Defendant was convicted after a seven-day jury trial of conspiring to obstruct justice in violation of 18 U.S.C. § 371, obstruction of justice in violation of 18 U.S.C. 1512(c), and making a false statement to federal investigators in violation of 18 U.S.C. § 1001. She was acquitted of one count of obstruction of justice. She now moves for a new trial under Fed. R. Crim. P. 33 on the basis of claimed evidentiary errors and an allegedly erroneous ruling on a motion to suppress. Motions for a new trial are strongly disfavored. "[T]he standard for granting such a motion is strict." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995). Such a motion should be granted only in extraordinary circumstances." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009). Defendant, who bears the burden of showing entitlement to a new trial, id., has not done so. In the Court's view, she has not even demonstrated that any of the evidentiary rulings presented a particularly difficult question, let alone that any of the Court's rulings abused its broad discretion. Her attack in the suppression ruling, which is reported at United States v. Ash, 464 F. Supp.3d 621 (S.D.N.Y. 2020), is without merit. The motion for a new trial (Dkt 158) is denied in all respects. (Signed by Judge Lewis A. Kaplan on 2/23/2022) (ap) (Entered: 02/23/2022) |
| 03/25/2022 | 170 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 03/25/2022) |
| 04/04/2022 | 171 | LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated April 4, 2022 re: Request for Extension of Time to Make Sentencing Submissions *(on Consent)*. Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 04/04/2022) |
| 04/04/2022 | 172 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 171 LETTER MOTION addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated April 4, 2022 re: Request for Extension of Time to Make Sentencing Submissions (on Consent). ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 4/4/2022) (lnl) (Entered: 04/04/2022) |
| 04/08/2022 | 173 | SENTENCING SUBMISSION by Sylvia Ash. (Attachments: # 1 Ex. A-1 through Ex. A-9 (WIth Redactions), # 2 Ex. B-1 through Ex. B-6 (With Redactions), # 3 Ex. C-1 |

| | | |
|---|---|---|
| | | through Ex. C-23 (With Redactions), # 4 Ex. D-1 through Ex. D-31 (With Redactions)) (Cohen, Carrie) (Entered: 04/08/2022) |
| 04/15/2022 | 174 | SENTENCING SUBMISSION by USA as to Sylvia Ash. (Attachments: # 1 Exhibit A (Letter from Municipal Credit Union))(Mark, Eli) (Entered: 04/15/2022) |
| 04/16/2022 | 176 | Sentencing Letter by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Municipal Credit Union dated April 13, 2022 re: Sentencing. (Attachments: # 1 Exhibits A-E)(Mark, Eli) (Entered: 04/16/2022) |
| 04/19/2022 | 177 | Sentencing Letter by Sylvia Ash addressed to Judge Lewis A. Kaplan from Carrie H. Cohen dated April 19, 2022 re: Sentencing. (Attachments: # 1 Exhibit E)(Cohen, Carrie) (Entered: 04/19/2022) |
| 04/20/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Sentencing held on 4/20/2022 for Sylvia Ash (1) Count 1s,3s,4s. Defendant Sylvia Ash present with attorneys Carrie Cohen and Nathan D. Reilly. AUSAs Alona S. Katz, Daniel C. Richenthal, and Eli J. Mark present. Court reporter Raquel Robles present. The Government shall submit a brief regarding whether or not MCU deserves restitution within 30 days from today; Defendant shall respond within 14 days thereafter; an argument or hearing will be scheduled if the court determines it necessary after receiving the briefs. It is the judgment of this Court that defendant Ash be committed to the custody of the Attorney General of the United States or his designee for a term of imprisonment of 15 months. That she thereafter serve a term of supervised release of two years, and that she pay the mandatory special assessment of $300. It's further adjudged that she pay a fine of $80,000, and that she pay restitution in such amount, if any, and on such terms as the Court hereafter may direct on or before 90 days from the date of the entry of judgment in this case. The fine shall be payable in installments, $10,000 on or before May 1, 2022; $35,000 on or about November 1, 2022; and $35,000 on or before May 1, 2023. The term of supervised release shall be subject to the mandatory and the standard conditions of supervision two additional special conditions. * The first is that you perform at least 20 hours per week of community service specified by the probation officer during each week of your term of supervised release. * The second is that you remain in compliance with the payment schedule in respect of the fine The mandatory drug testing condition is suspended because the Court finds a low risk of substance abuse. The Court recommends to the BOP that the defendant be designated to a low security facility as close to the New York Metropolitan area as possible. Defendant. Ash shall surrender to the Bureau of Prisons at the institution designated by it for the service of your sentence on the date and by the time it directs, which shall not be any earlier than July 20, 2022. Compliance with that condition is also a bail condition. (jbo) (Entered: 04/21/2022) |
| 04/20/2022 | 179 | DISMISSAL OF COUNTS on Government Motion as to Sylvia Ash (1) Count 1,2,3. (bw) (Entered: 04/26/2022) |
| 04/21/2022 | 178 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 04/21/2022) |
| 04/26/2022 | 180 | JUDGMENT In A Criminal Case (S1 19-Cr-780). Date of Imposition of Judgment: 4/20/2022. Defendant Sylvia Ash (1) was found guilty on Count(s) 1s, 3s, and 4s; (S1)One, (S1)Three, and (S1)Four, after a plea of not guilty. The defendant has been found not guilty on Count(s) S1(Two). Count(s) Underlying Indictment is dismissed on the motion of the United States. IMPRISONMENT: 15 Months on each of Counts (S1)One, (S1)Three, and (S1)Four, the terms to run concurrently. - The court makes the following recommendations to the Bureau of Prisons: That the defendant be designated to a low security facility as close to the New York metropolitan area as possible. - The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons: before 2 p.m. no sooner than 7/20/2022. SUPERVISED RELEASE: |

| | | |
|---|---|---|
| | | Two years subject to the mandatory and the standard conditions of supervision, as well as the following special conditions. The first is that you perform at least 20 hours per week of community service specified by the probation officer during each week of your term of supervised release. The second is that you remain in compliance with the payment schedule in respect of the fine. Standard Conditions of Supervision (See page 4 of Judgment). ASSESSMENT: $300.00, due immediately. FINE: $80,000.00. The determination of restitution is deferred until 7/19/2022. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination. - Special instructions regarding the payment of criminal monetary penalties: The fine shall be payable in installments, $10,000 on or before May 1, 2022; $35,000 on or about November 1, 2022; and $35,000 on or before May 1, 2023. (Signed by Judge Lewis A. Kaplan on 4/25/2022) (bw) (Entered: 04/26/2022) |
| 04/28/2022 | 181 | TRANSCRIPT of Proceedings as to Sylvia Ash re: Conference held on 4/20/22 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Raquel Robles, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2022. Redacted Transcript Deadline set for 5/31/2022. Release of Transcript Restriction set for 7/27/2022. (Moya, Goretti) (Entered: 04/28/2022) |
| 04/28/2022 | 182 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sylvia Ash. Notice is hereby given that an official transcript of a Conference proceeding held on 4/20/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 04/28/2022) |
| 05/02/2022 | 183 | MOTION to Continue *Date to Make Initial Payment of Fine*. Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 05/02/2022) |
| 05/03/2022 | 184 | MEMO ENDORSEMENT as to Sylvia Ash (1) granting 183 MOTION to Continue Date to Make Initial Payment of Fine. ENDORSEMENT: GRANTED. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/3/2022) (lnl) (Entered: 05/03/2022) |
| 05/10/2022 | 185 | NOTICE OF APPEAL by Sylvia Ash from 180 Judgment. Filing fee $ 505.00, receipt number 465401298079. (tp) (Entered: 05/10/2022) |
| 05/10/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Sylvia Ash to US Court of Appeals re: 185 Notice of Appeal - Final Judgment. (tp) (Entered: 05/10/2022) |
| 05/10/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Sylvia Ash re: 185 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 05/10/2022) |
| 05/20/2022 | 186 | MEMORANDUM OF LAW by USA as to Sylvia Ash *In Support of Municipal Credit Union's Request for Restitution*. (Mark, Eli) (Entered: 05/20/2022) |
| 05/25/2022 | 187 | SEALED DOCUMENT placed in vault. (jus) (Entered: 05/25/2022) |
| 05/31/2022 | 188 | SECOND MOTION to Continue *Date to Make Initial Payment of Fine*. Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 05/31/2022) |
| 06/01/2022 | 189 | MEMO ENDORSEMENT 188 Motion to Continue as to Sylvia Ash. We respectfully submit this letter on behalf of defendant Sylvia Ash in connection with the above-referenced matter. We hereby request an adjournment of the date on which Ms. Ash must |

| | | |
|---|---|---|
| | | complete the initial payment of the fine imposed by the Court. Accordingly, Ms. Ash respectfully requests that the Court grant her a brief extension of the deadline for her to make the balance of the initial fine payment. The requested extension of time would make payment of the remaining $5,000 balance of her initial $10,000 payment due on July 15, 2022. The remaining two $35,000 installments would remain due, as set f01th in the Judgment, on or before November I, 2022 and May 1, 2023, respectively...ENDORSEMENT...Granted. SO ORDERED (Signed by Judge Lewis A. Kaplan on 5/31/22) (jw) (Entered: 06/01/2022) |
| 06/03/2022 | 190 | MEMORANDUM OF LAW in Opposition by Sylvia Ash re: 186 Memorandum of Law filed by USA . (Cohen, Carrie) (Entered: 06/03/2022) |
| 06/10/2022 | 191 | MOTION to Modify Conditions of Release . Document filed by Sylvia Ash. (Cohen, Carrie) (Entered: 06/10/2022) |
| 06/24/2022 | 192 | MEMORANDUM in Opposition by USA as to Sylvia Ash re 191 MOTION to Modify Conditions of Release .. (Mark, Eli) (Entered: 06/24/2022) |
| 06/30/2022 | 193 | MEMORANDUM AND ORDER ON MOTION FOR BAIL PENDING APPEAL: denying 191 Motion to as to Sylvia Ash (1)....[*** See this Memorandum And Order On Motion For Bail Pending Appeal ***]... I have considered defendant's other arguments, including those relating to the fine, and find them to be insubstantial. Accordingly, the motion for release on bail pending appeal (Dkt. 191) is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 6/30/2022) (bw) (Entered: 06/30/2022) |
| 07/19/2022 | 194 | LETTER by USA as to Sylvia Ash addressed to Judge Lewis A. Kaplan from Assistant U.S. Attorneys Eli J. Mark, Daniel C. Richenthal, Jonathan E. Rebold, and Special Assistant U.S. Attorney Alona Katz dated July 19, 2022 re: Restitution Document filed by USA. (Mark, Eli) (Entered: 07/19/2022) |
| 07/19/2022 | 195 | ORDER of USCA (Certified Copy) as to Sylvia Ash re: 185 Notice of Appeal - Final Judgment USCA Case Number 22-1048. Appellant seeks an emergency stay of the surrender date of July 20, 2022, and for bail pending appeal. IT IS HEREBY ORDERED that the request to stay the surrender date is DENIED. The request for bail pending appeal is REFERRED to a three-judge motions panel. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit, Clerk USCA. Certified: 7/19/2022. (tp) (Entered: 07/19/2022) |
| 07/21/2022 | 196 | MEMORANDUM AND ORDER as to Sylvia Ash: In sum, the Court concludes that MCU is not a VWPA-eligible "victim" of any of the three offenses of conviction. Even if it were, the connection between the offense conduct and MCU' s alleged losses is too attenuated to favor an exercise of discretion to award restitution in this case. MCU's request for restitution and, to whatever extent the government may be deemed to have made such a request, that request (Dkt. 174-1, Dkt 186) are denied in all respects. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 7/21/2022) (lnl) (Entered: 07/21/2022) |
| 08/01/2022 | 197 | ORDER of USCA (certified copy) re: 185 Notice of Appeal by Sylvia Ash. USCA Case Number 22-1048. Defendant-Appellant Sylvia Ash moves for bail pending appeal, for a stay pending appeal of the portion of the district court's judgment requiring her to make payments toward an $80,000 fine, and for leave to file her pre-sentence report ("PSR") under seal as an exhibit to her motion to stay. Upon due consideration, it is hereby ORDERED that the motions for bail and for a stay pending appeal are DENIED. See 18 U.S.C. § 3143(b); United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985); see also Nken v. Holder, 556 U.S. 418, 434 (2009). The motion to file the PSR under seal is GRANTED. It is further ORDERED that this appeal will be expedited. Appellant's brief is due 21 days from the date of this order; Appellee's brief is due 21 days after service of Appellant's brief; and Appellant may submit a reply within 7 days of service of |

| | | |
|---|---|---|
| | | Appellee's brief. The Clerk's Office is directed to schedule argument at the earliest opportunity after briefing is complete. Catherine O'Hagan Wolfe, Clerk USCA. Certified: 08/01/2022. (nd) (Entered: 08/02/2022) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/11/2022 22:51:23 | | | |
| **PACER Login:** | cpnycpara17 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cr-00780-LAK |
| **Billable Pages:** | 24 | **Cost:** | 2.40 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SYLVIA G. ASH,<br>Defendant. | Case No. 1:19-cr-00780-LAK |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SYLVIA G. ASH'S MOTIONS TO SUPPRESS**

MORRISON & FOERSTER LLP

Carrie H. Cohen
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com

*Counsel for Defendant*
*Sylvia G. Ash*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1
FACTUAL BACKGOUND ..... 2
A. The iPhone ..... 3
B. The Email Search Warrants ..... 6
C. The April 6, 2018 and June 8, 2018 Interviews ..... 7
D. The July 9, 2018 Proffer and August 16, 2018 Grand Jury Testimony ..... 7
ARGUMENT ..... 8
I. THE iPHONE SHOULD BE SUPPRESSED ..... 8
A. Relevant Legal Standard ..... 8
B. MCU's Actions Are Fairly Attributable to the Government ..... 9
C. In the Alternative, Discovery and a Hearing Should be Granted ..... 13
II. EVIDENCE DERIVED FROM THE SEARCH WARRANTS FOR STORED ELECTRONIC COMMUNICATIONS MAINTAINED BY OATH AND GOOGLE SHOULD BE SUPPRESSED AS FRUITS OF THE POISONOUS TREE ..... 14
A. Relevant Legal Standard ..... 14
B. The Results of the Email Search Warrants Are Fruits of the Poisonous Tree ..... 14
III. STATEMENTS MADE IN THE APRIL 6, 2018 AND JUNE 8, 2018 IMPERMISSABLE INTERVIEWS SHOULD BE SUPPRESSED ..... 16
A. Relevant Legal Standard ..... 16
B. The Government Instructed Ms. Ash to Retain Counsel But Impermissably Continued to Question Her Outside the Presence of Counsel ..... 17
C. The Government's Actions Violated Ms. Ash's Due Process Rights and the Statements Made During the April 8 and June 2, 2018 Interviews Should Be Suppressed ..... 19
IV. MS. ASH'S ALLEGED STATEMENTS ON JULY 9, 2018 AND IN THE GRAND JURY ON AUGUST 16, 2018 SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT VIOLATED MS. ASH'S DUE PROCESS RIGHTS ..... 20
A. Relevant Legal Standard ..... 20
B. The Government Knew an Unwaivable Conflict Existed by the Time of the July 9, 2018 Proffer and August 16, 2018 Grand Jury Testimony ..... 21
CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Desiderio v. Nat'l Ass'n of Sec .Dealers, Inc.*
191 F.3d 198 (2d Cir. 1999)....9

*Garrity v. State of N.J.*
385 U.S. 493, 87 S. Ct. 616 (1967)....9

*United States v. Chin*,
934 F. 2d 393 (2d Cir. 1991)....16

*United States v. Connolly*,
No. 16 Cr. 0370 (CM), 2019 U.S. Dist. LEXIS 76233, at *3 (S.D.N.Y May 2, 2019)....12

*United States v. DiGregorio*,
795 F. Supp. 630 (S.D.N.Y 1992)....16

*United States v. Eggers*,
21 F. Supp. 2d 261 (S.D.N.Y 1998)....14, 15

*United States v. Fox*,
721 F.2d 32 (2d Cir. 1983)....9

*United States v. Fulton*,
5 F.3d 605 (2d Cir. 1993)....20, 21

*United States v. Morrison*,
449 U.S. 361, 101 S. Ct. 665 (1981)....16, 20

*United States v. Russell*,
411 U.S. 423, 93 S. Ct. 1637 (1973)....16, 20

*United States v. Scrushy*,
366 F. Supp. 2d 1134 (N.D. Ala. 2005)....12

*United States v. Stein*,
435 F. Supp. 2d. 330 (S.D.N.Y 2006)....20

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008)....9, 11

*United States v. Stringer*,
535 F.3d 929 (9th Cir. 2008)....13

**Other Authorities**

Unitd States Constituion, Fifth Amendment ............................................................................ *passim*

U.S. Department of Justice Manual § 9-11.151 ................................................................................19

## PRELIMINARY STATEMENT

Defendant Sylvia G. Ash respectfully submits this Memorandum of Law in support of her pretrial motions to suppress certain evidence. For the reasons discussed more fully below, the Court should suppress the following:

(1) All evidence based on or derived from the silver Apple iPhone X (the "iPhone") that Ms. Ash provided to the Municipal Credit Union ("MCU");

(2) All evidence obtained via search warrants for stored electronic communications maintained by Oath, Inc. ("Oath") and Google LLC ("Google") for Ms. Ash's personal email accounts, namely, s[redacted]@aol.com and h[redacted]@gmail.com, respectively (collectively, the "Email Search Warrants");

(3) All evidence derived from the April 6, 2018 and June 8, 2018 interviews of Ms. Ash by the government; and

(4) All evidence from the July 9, 2018 proffer of Ms. Ash and her August 16, 2018 grand jury testimony.[1]

Items 1 and 2 above should be suppressed because the sufficiently close nexus between the MCU and the government renders the production of the iPhone a violation of Ms. Ash's Fifth Amendment Rights and evidence obtained via the Email Search Warrants are fruits of this poisonous tree. Ms. Ash also moves, in the alternative, for discovery and an evidentiary hearing related to the government's involvement in the MCU's request for Ms. Ash's iPhone to more fully develop the factual basis to suppress all evidence obtained from the iPhone and, in turn, the Email Search Warrants.

With respect to items 3 and 4 above, Ms. Ash's statements to the United States Attorney's Office for the Southern District of New York ("USAO"), they too should be suppressed due to government misconduct in connection with those interviews and the grand

[1] The above motions to suppress are based on discovery provided to date. Undersigned counsel was recently retained and has requested but not yet received additional discovery from the government, which may result in supplemental or additional motion practice.

jury testimony that was taken in violation of Ms. Ash's Due Process rights under the Fifth Amendment.

**FACTUAL BACKGOUND**

The charges of obstruction of justice against Ms. Ash derive from an investigation by the USAO and in the Manhattan District Attorney's Office (collectively, the "government") into instances of fraud and embezzlement at the MCU by former MCU Chief Executive Officer and President Kam Wong. (Indictment ¶ 3.) Mr. Wong pled guilty to embezzlement from the MCU on December 2, 2018. (Declaration of Carrie H. Cohen, dated March 20, 2020, ("Cohen Decl.") Ex. P, Compl. ¶ 11g.)[2] Joseph Guagliardo, a member of the Supervisory Committee of the MCU, also recently pled guilty to embezzlement from the MCU on January 10, 2020. (*See* 1/10/2020 Minute Entry Case No. 1:20-cr-00023 (DLC).)

Ms. Ash served as Chair of MCU's Board of Directors (the "MCU Board") from May 2015 until August 2016, when she resigned from the Board. (Ex. P, Compl. ¶ 11f.) The government does not allege that Ms. Ash participated in the fraud and embezzlement committed by Mr. Wong or Mr. Guagliardo and no evidence suggests that she could have been so charged. Rather, the government charged Ms. Ash with three counts of obstructing its investigation into Mr. Wong's fraud.

Specifically, Ms. Ash is charged in the Indictment as follows: (1) in Count One, with conspiring to obstruct justice by knowingly signing a false document related to Mr. Wong's compensation and impeding a federal investigation via the concealment and deletion of emails and text messages, "wiping" of the iPhone, and making false and misleading statements to

[2] Hereinafter all citations to exhibits ("Ex.") are citations to exhibits of the Cohen Declaration.

federal law enforcement officers; (2) in Count Two, with knowingly signing a false document related to Mr. Wong's compensation with the intent to obstruct a federal investigation; and (3) in Count Three, with knowingly concealing and deleting text messages and emails, "wiping" the iPhone, and making false and misleading statements to federal law enforcement officers with the intent to obstruct a federal investigation. Ms. Ash has entered a plea of not guilty to all three Counts and maintains her innocence.

### A. **The iPhone**

As alleged by the government, in January 2018, Mr. Wong gave Ms. Ash the iPhone (Ex. P, Compl. ¶ 33e), which she registered to her personal account with Apple. (Ex. P, Compl. ¶ 25.) After Ms. Ash had been interviewed several times by the government, on June 18, 2018, Ms. Ash was served with a grand jury subpoena that called for, among other things, the production of all correspondence with Mr. Wong, all documents regarding any criminal investigation, internal investigation or audit related to Mr. Wong, and all documents regarding any items of value Ms. Ash received from Mr. Wong, the MCU, or "Member-1" (the "June (Second) Subpoena"). (Ex. P, Compl. ¶ 35.) One day later, on June 19, 2018, the MCU sent Ms. Ash a letter requesting the return of any electronic devices "issued" to her by the MCU or Mr. Wong and instructing her not to "wipe, delete, reset, factory restore" the devices (the "June 19 MCU Letter"). (Ex. P, Compl. ¶ 36; Ex. O, SDNY_00000042.) Upon information and belief, at the time MCU sent the June 19 MCU Letter to Ms. Ash, it was cooperating with the government.[3]

[3] More than one month prior, in May 2018, the New York State Department of Financial Services ("DFS") removed MCU's supervisory committee due to severe deficiencies in its oversight of the management of the affairs of the credit union. The MCU Board of Directors was removed in June 2018. DFS then designated an on-premises Administrator to oversee the general management of the credit union. (Ex. S) To the extent the government disputes that the MCU was cooperating with the government in its investigation as of June 19, 2018 or earlier, and to the extent this fact is germane to the disposition of these motions, Ms. Ash respectfully requests that the Court order the USAO to produce discovery regarding the chronology of the MCU's cooperation with the government.

The June 19 MCU Letter did not inform Ms. Ash that the MCU sought the devices in connection with an investigation by the government or in response to any subpoena served on the MCU. The letter did not include any warning regarding the possible use of the iPhone or its contents in criminal proceedings. The letter also did not include any warning or notice regarding Ms. Ash's Fifth Amendment rights.[4]

As alleged by the government in the Complaint, approximately two days following receipt of the June 19 MCU Letter, Ms. Ash made an appointment at the Apple Genius Bar to transfer the contents of the iPhone to another iPhone. (Ex. P, Compl. ¶ 37.) Specifically, Apple customer service notes state that "customer came in with two iPhones [and] would like to set one up with iCloud restore and the second to clear completely." (*Id.*)[5]

On July 13, 2018, the MCU sent Ms. Ash another letter demanding the return of electronic devices in her possession that had be "issued" to her by the MCU and/or Mr. Wong and again instructing her not to "wipe, delete, reset, factory restore" the devices (the "July 13 MCU Letter"). (*Id.*¶ 45.) On or about July 17, 2018, Ms. Ash through her prior counsel, who later withdrew as a result of the conflict of interest discussed below, provided the iPhone and an Apple watch to the MCU via courier service. (*Id.*)[6] The iPhone was delivered to Stroz

The government to date has confirmed only that the MCU did not enter into any type of non-prosecution or other agreement with the government (Ex. T.)

[4] The MCU's request for the return of the devices is further suspect as an administrative assistant had sent a prior request to Ms. Ash to return the devices on May 14, 2018 without any instruction regarding deletion and then retracted that request a day later. (Ex. U.)

[5] Despite the government's claims to the contrary, the alleged facts, as described by the government in the Complaint, do not show that Ms. Ash's actions in "wiping" the iPhone resulted in any destruction of data. In fact, the notes from Apple customer service indicate that Ms. Ash wanted to *transfer*, not destroy, the data housed on the iPhone, and discovery demonstrates that the data was transferred to a new iPhone. (Ex. P, Compl. ¶ 37.) That iPhone (the "iPhone6S") was seized from Ms. Ash at the time of her arrest and then searched pursuant to a Search Warrant. (Cohen Decl. ¶ 9.)

[6] The government to date has only alleged obstruction as it relates to the iPhone and not to the Apple watch but the rationale for suppression of the iPhone applies with equal force to the Apple watch.

Friedberg (presumably the forensic firm hired by the MCU or its outside counsel) the same day. (Ex. Q, SDNY_00032680-32681.)

On October 30, 2018, Stella Mendes, the administrator appointed by DFS to oversee operations at MCU following the removal of the Board and Supervisory Committee of the MCU, executed a "Consent to Search" for the government. (Ex. G.) Included on the list of devices Ms. Mendes purportedly consented to be searched by the government is an iPhone identified as "An iPhone X (Sylvia Ash)." (*Id.*) Special Agent Jackson took possession of the iPhone on November 9, 2018, and the government processed it into evidence. (Ex. P, Compl. ¶ 46.) As alleged by the government, on November 14, 2018, a forensic analyst assigned to the High Technology Analysis Unit of the New York County District Attorney's Office attempted to perform a forensic extraction of the iPhone, but discovered it had been factory reset and user saved contents deleted. (Ex. P, Compl. ¶ 35.) The iPhone apparently retained a timeline of powering events, which showed power events on June 23, 2018 and again on July 16, 2018. (*Id.*)

The facts as they are currently understood based on the discovery provided to date support an inference that the government was directly involved in the June 19 MCU Letter and the July 13 MCU Letter. On February 20, 2020, undersigned counsel requested that the USAO provide all correspondence between the MCU and the government that relates in any way to the MCU's request that Ms. Ash provide any electronic devices in her possession to which MCU claimed ownership, including the iPhone. (Cohen Decl. ¶ 3.) The USAO responded that the government did not believe that Ms. Ash was entitled to any such correspondence but produced certain chain of custody records—records that should have been but were not provided in the regular course of the government's discovery disclosures, but in any event, were not responsive to the request. (*Id.* ¶ 4.) Thereafter, the undersigned counsel reiterated its request for such

discovery by letter to the government on March 11, 2020. (*Id.* ¶ 5.) The March 11, 2020 letter stated that it was clear from the limited disclosures received from the government to date that the MCU and the government were in contact related to the request to Ms. Ash for the return of electronic devices, including the iPhone. (*Id.*) The letter further asked the USAO to confirm either that the government declined to provide the requested information or that no such communications existed or occurred. (*Id.*) The USAO responded that it would not provide the requested communications but did not deny that such communications existed or had occurred. (*Id.* ¶ 6.)

Undersigned counsel made a similar request for communications between the government and the MCU to outside counsel for MCU who, the USAO told undersigned counsel informed it of the request, and to date has not provided any information. (*Id.* ¶ 7.)

**B. <u>The Email Search Warrants</u>**

On March 18, 2019, approximately four months after the government received the iPhone from the MCU and obtained a forensic analysis of it,[7] the USAO applied for and obtained search warrants for stored electronic communications maintained by Oath and Google on Ms. Ash's personal email accounts. (Ex. E, SDNY_00000474; Ex. F, SDNY_00000496; Ex. H SDNY_00000501; Ex. I, SDNY_00032690). Special Agent Jackson submitted a single affidavit in support of these applications ("SW Affidavit"). (Ex. E.) The USAO relied on evidence derived from its search of the iPhone, which had been obtained from Ms. Ash via the request from the MCU, to support its showing of probable cause for the Search Warrants. (*Id.* ¶¶ 37, 46.)

[7] No later than November 9, 2018, the USAO had possession of the iPhone, and only a few days later had information regarding the results of forensic analysis of the iPhone, which purportedly showed that the iPhone had been factory reset and the user saved contents deleted. (Ex. E, SW Affidavit ¶ 35.)

### C. The April 6, 2018 and June 8, 2018 Interviews

The USAO first interviewed Ms. Ash on March 1, 2018 at the offices of the U.S. Attorney in Manhattan. (Ex. P, Compl. ¶ 29.) AUSA Eli Mark and Special Agent Jackson were present on behalf of the government. Ms. Ash was not represented by counsel at this interview. At this conclusion of the interview, AUSA Mark advised Ms. Ash to retain counsel.

Despite the conclusion by the USAO that Ms. Ash was a target of the investigation and AUSA Mark's advice to Ms. Ash to retain counsel, Special Agent Jackson impermissibly interviewed Ms. Ash on two additional occasions thereafter—April 6, 2018 and June 8, 2018—both by telephone with AUSAs Mark and Daniel Richenthal present for the June 8, 2018 telephone interview. During both interviews, Ms. Ash was not represented by counsel and the government failed to advise her that she was a target of the investigation and had a right to counsel. Nevertheless, during both the April 6, 2018 and June 8, 2018 telephone interviews, Special Agent Jackson questioned Ms. Ash about her response to the First Subpoena. (Ex. P, Compl. ¶¶ 31-32) and her responses form part of the bases for the allegations charged in Counts One and Three of the Indictment. (Ex. P, Compl. ¶ 33.)

### D. The July 9, 2018 Proffer and August 16, 2018 Grand Jury Testimony

At the November 4, 2019 appearance following Ms. Ash's Indictment, the government notified the Court that it believed Ms. Ash's then counsel, Roger Archibald, had a conflict of interest because he was either a witness to or participant in at least three overt acts listed in the Indictment, specifically overt acts e, f, and g. (ECF No. 15, 11/4/2019 Hr'g Tr. at 8:21-9:4.) The government thus requested a *Curcio* hearing. (*Id.* at 11:11-12.)

The facts, as they are currently understood to be, show that the government waited more than a year from when it first had knowledge that Mr. Archibald had an unwaivable conflict of

interest because he was either a witness to or participant in suspected criminal activity to raise the conflict issue with Mr. Archibald and request a *Curcio* hearing. Specifically, based on its access to documents from other sources, the government had knowledge prior to the July 9, 2018 proffer, at which Mr. Archibald represented Ms. Ash, that Mr. Archibald was a witness to or participant in the allegedly incomplete production Ms. Ash provided in response to the June (Second) Subpoena.

The government also had knowledge prior to Ms. Ash's August 16, 2018 grand jury testimony, for which Mr. Archibald again represented her, that Mr. Archibald had an unwaivable conflict of interest. At the time of Ms. Ash's August 16, 2018 grand jury testimony, the government already had knowledge that it believed Ms. Ash's July 6, 2018 production was allegedly incomplete *and* knew that Mr. Archibald was a witness or participant in Ms. Ash's allegedly false statements made at the July 9, 2018 proffer, including the allegedly false statement that Ms. Ash discussed MCU CEO Kam Wong's interest in receiving monetary payments in lieu of long-term disability insurance with MCU's General Counsel and the General Counsel advised that such payments were permissible, but not advisable. (Indictment ¶ 4f.)

## ARGUMENT

### I. THE iPHONE SHOULD BE SUPPRESSED

Evidence of and derived from the iPhone should be suppressed because it was obtained by the government in violation of Ms. Ash's right against self-incrimination as protected by the Fifth Amendment.

#### A. Relevant Legal Standard

The Fifth Amendment provides that "No person…shall be compelled in any criminal case to be a witnesses against himself. " U.S. Const., amend. V. It is well established that the Fifth

Amendment privilege against self-incrimination applies to the act of production. *See United States v. Fox,* 721 F.2d 32, 36 (2d Cir. 1983). To claim a violation of the privilege, an individual must prove that the statements were the product of coercion and attributable to the government. *See Garrity v. State of N.J.* 385 U.S. 493, 497, 87 S. Ct. 616, 618-19 (1967). Private conduct is attributed to the government when "there is a sufficiently close nexus between the state and the challenged action." *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008). A close nexus of state action exists between a private entity and the state when a governmental actor: (i) exercises coercive power; (ii) is entwined in the management or control of the private actor: (iii) provides the private actor with significant encouragement, either overt or covert; (iv) engages in a joint activity in which the private actor is a willful participant; (v) delegates a public function to the private actor; or (vi) entwines the private actor in governmental policies. *Stein* 541 F.3d at 147. Private action is attributable to the state if the state influences the specific conduct of which the individual complains. *See Desiderio v. Nat'l Ass'n of Sec .Dealers, Inc.* 191 F.3d 198, 206-207 (2d Cir. 1999).

**B. <u>MCU's Actions Are Fairly Attributable to the Government</u>**

The circumstances that give rise to the MCU's demand that Ms. Ash provide to it any electronics given to her by the MCU,[8] including by Kam Wong, are fairly attributable to the government. Although the USAO has thus far refused to provide any discovery regarding its communications with the MCU regarding the request to Ms. Ash from the MCU, the facts strongly support a reasonable inference that the MCU's actions are fairly attributed to the

[8]Although Ms. Ash provided the iPhone to MCU in response to this request, Ms. Ash does not concede that the iPhone was, in fact, issued to her by the MCU or that the iPhone is the MCU's property. Rather, the iPhone is the personal property of Ms. Ash, to which the MCU had no claim of ownership. Thus, the MCU did not have the authority to consent to a search of the iPhone.

government, thereby violating Ms. Ash's Fifth Amendment rights and requiring suppression of the iPhone.

First, the MCU specifically requested that any "returned" products not be wiped and/or factory reset. The iPhone was given to Ms. Ash by Mr. Wong in January 2018 when Ms. Ash no longer served on the MCU Board and was used by her as her personal phone with cellular service paid for and provided by Ms. Ash. (Cohen Decl, ¶ 8.) The situation thus is remarkably different from when an employer requests the return of its electronic devices from an employee. The MCU had no conceivable interest in Ms. Ash's personal data on the iPhone, thus strongly supporting the inference that the only reason for the strong warning by the MCU in its letter not to "wipe, delete, reset, factory restore, image or copy" the devices was because the government wanted access to such data for its investigation. The government has produced no evidence that the MCU made any similar requests in prior years even though, upon information and belief, the MCU and/or Mr. Wong provided upgraded Apple and other electronic devices and/or computers on an annual basis to Board members (past and present).

Accordingly, absent the government's desire for access to the iPhone data and the MCU's strong desire to cooperate with the government in an attempt to avoid any corporate criminal charges against it, the MCU would not have had an interest in the preservation of data on the iPhone. Indeed, by the time of the June 19 MCU Letter (and the July 13 MCU Letter), the DFS had taken possession and control of the MCU thus any internal investigation conducted by the MCU would have been long been completed by then. In fact, it was the DFS-appointed administrator, Stella Mendes, who purportedly provided consent for the government to search the iPhone, further illustrating that the government's access to the iPhone was the result of state action.

Second, the MCU's request for return of the devices occurred nearly simultaneously with the service of a grand jury subpoena on Ms. Ash requesting, among other things, all communications between Ms. Ash and Mr. Wong. Finally, despite repeated opportunities to do so, and an explicit request from undersigned counsel, the USAO has never denied the existence or occurrences of correspondence and communications between the government and the MCU regarding the request to Ms. Ash for the devices. Tellingly, the USAO instead refused to provide such communications or correspondence because the USAO took the unsupported position that Ms. Ash was not entitled to such information.

The inferences from these facts show a sufficiently close nexus between the government and the MCU to attribute the MCU's request that Ms. Ash provide her electronics to the MCU to the government. *Stein,* 541 F.3d at 152 n.11. The facts further support that the government, which at the time was in the midst of an investigation regarding financial irregularities, fraud, and embezzlement at the MCU, used its coercive power, including any implied threat that less than total cooperation by the MCU could result in criminal prosecution of it, to cause the MCU to issue the request for electronics to Ms. Ash. This is sufficient to attribute MCU's actions to the state. *See Stein* 541 F.3d at 147. Additionally, and in the alternative, the facts show that, at a minimum, the government offered significant encouragement to the MCU to cooperate with the government's investigation and specifically seek access to the iPhone and Ms. Ash's other electronics, including the preservation of data on any such devices. This alone is enough to attribute MCU's action to the state, *id.*, and require suppression of the iPhone.

Moreover, rather than seek access to Ms. Ash's electronics directly—for example, by asking for her voluntary consent to search and, if refused, applying for a search warrant—the government used its power to cause a private party to gain access to the device and wrongfully

failed to alert Ms. Ash to the potential use of the iPhone against her in a criminal case. Further, Ms. Ash was not provided with notice of the Fifth Amendment privileges applicable in the context of production of the iPhone.

Evidence provided to the government has been excluded in similar circumstances. In *United States v. Scrushy*, the United States Attorney's Office, without advising the defendant at the time that he was a target of investigation and without providing any notice to the defendant regarding the potential use of his testimony or his Fifth Amendment privileges, covertly interceded in a civil investigation by the United States Securities and Exchange Commission ("SEC"), including by causing the SEC to change the location of the defendant's deposition for venue purposes. 366 F. Supp. 2d 1134 (N.D. Ala. 2005). The Court excluded evidence of the defendant's perjury, which derived only from the deposition the United States Attorney's Office manipulated. *Id.* at 1140. The government has engaged in similar duplicity here, hiding the true nature and intended purpose of the MCU's request to Ms. Ash, and, by outsourcing its investigation of Ms. Ash to the MCU, has engaged in the type of conduct Chief Judge McMahon found "deeply troubl[ing]" in *United States v. Connolly*, No. 16 Cr. 0370 (CM), 2019 U.S. Dist. LEXIS 76233, at *3 (S.D.N.Y May 2, 2019).

Further, just as in *Scrushy*, Ms. Ash was not advised of the potential use of her response to the request against her in a criminal investigation or prosecution and of the Fifth Amendment privilege against self-incrimination that may (and in fact did) apply to her response thereto. That the MCU signed a consent to search the iPhone is irrelevant because the MCU's possession of the iPhone was the result of a violation of the Fifth Amendment. Further, the MCU's consent, executed by the DFS-appointed administrator of the MCU, is invalid, as the MCU did not own the iPhone or its contents. Rather, the iPhone had been given to Ms. Ash and used for her

personal use with her own cellular service and thus belonged to her and only she could consent to its search. Her provision of the iPhone to the MCU does not invalidate in any way her right to object to the search of that iPhone by the government.

Thus, because Ms. Ash's production of the iPhone was the result of state action and she was not properly informed of her rights or the potential use of her production in a criminal investigation, the iPhone, and any evidence derived from the iPhone, must be suppressed. *Cf. United States v. Stringer*, 535 F.3d 929 (9th Cir. 2008) (order suppressing evidence obtained in civil SEC investigation reversed when the government fully disclosed the possibility that information received during the civil investigation could be used for criminal proceeding, there was no deceit by the government, and the government advised the defendants of their Fifth Amendment rights).

### C. <u>In the Alternative, Discovery and a Hearing Should be Granted</u>

In the alternative, discovery regarding the government's involvement in the June 19 and July 13 MCU Letters should be granted in order to permit the development of a more complete factual record on this issue. Further, the Court should grant an evidentiary hearing regarding the circumstances that led to the June 19 and July 13 MCU Letters, including the involvement, if any, of the government in the MCU's conduct. The Court should order the government to disclose all correspondence and communications between the MCU and the government regarding the June 19 and July 13 MCU Letters, as well as disclose information regarding the date when the MCU began to cooperate with the government in its investigation.

## II. EVIDENCE DERIVED FROM THE SEARCH WARRANTS FOR STORED ELECTRONIC COMMUNICATIONS MAINTAINED BY OATH AND GOOGLE SHOULD BE SUPPRESSED AS FRUITS OF THE POISONOUS TREE

Because the evidence obtained from the iPhone should be suppressed, the evidence obtained through the Email Search Warrants should be suppressed as the applications for those warrants relied on the iPhone and information derived from the iPhone to establish probable cause and thus are impermissible fruits of the poisonous tree.

### A. Relevant Legal Standard

The "fruit of the poisonous tree" doctrine forbids the use of evidence obtained as a result of a constitutional violation. *See United States v. Eggers*, 21 F. Supp. 2d 261, 266 (S.D.N.Y 1998) (Kaplan, J.) Derivative evidence is suppressed when the Fifth Amendment itself is violated. *Id.* Thus, if the Court finds that the Ms. Ash's Fifth Amendment right against self-incrimination was violated regarding the production of the iPhone, as outlined in § I, *supra*, then evidence derived from this violation must be suppressed.

### B. The Results of the Email Search Warrants Are Fruits of the Poisonous Tree

The government cannot deny that it had access to, analyzed, and relied on evidence derived from the iPhone in its application for the Email Search Warrants. (*See, e.g.,* Ex. E, SW Affidavit ¶ 35.) Among other things, Special Agent Jackson's Affidavit cites and relies on the results of the forensic analysis of the iPhone to justify probable cause for the Email Search Warrants.[9] In his affidavit, Special Agent Jackson relies on the factory reset of the iPhone to

[9] On November 14, 2018, a forensic analyst assigned to the High Technology Analysis Unit of the New York County District Attorney's Office attempted to perform a forensic extraction of the iPhone and purportedly discovered that the device had been factory reset and saved contents deleted from the devices. (Ex. E, SW Affidavit ¶ 35.)

justify searching stored electronic communications maintained by Oath and Google for Ms. Ash's personal email accounts. (Ex. E, SW Affidavit ¶ 46 (Ms. Ash "directed Apple factory reset her iPhone X to seek to destroy and/or conceal evidence being sought pursuant to a grand jury subpoena. I believe the Subject Accounts will contain records of communications between ASH, WONG, GUAGLIARDO, and/or other members of the Credit Union that were intentionally deleted or not produced by ASH"); ¶ 47b (Special Agent Jackson further states that he believes the subject accounts will contain "Apple deletion and restore logs, records, communications, and correspondence with Apple relating to the factory reset of the iPhone X.").) Because the basis for probable cause for the Email Search Warrants relied, at least in large part, on information illegally obtained from the iPhone, the evidence derived from the Email Search Warrants should be suppressed. *See Eggers*, 21 F. Supp. at 266.

Significant portions of the Indictment rely on evidence derived from the Email Search Warrants. All such evidence should be suppressed, including but not limited to, the following evidence specifically relied upon by the government in the Complaint:

- Any evidence of the Internet Protocol logs for the Ash Gmail Account (Ex. P, Compl. ¶ 40c);
- Any evidence regarding emails deleted from the Ash Gmail account, including the deletions subsequent to the first preservation notice to Gmail and subsequent to the second grand jury subpoena served on Ms. Ash (Ex. P, Compl. ¶ 41);
- The contents of any emails allegedly deleted from the Gmail account, including but not limited to emails regarding the federal investigation, the MCU's internal investigation, allegations of misconduct against MCU board members and the MCU general counsel (Ex. P, Compl. ¶¶ 41a-b);

- Analysis of the rate or number of emails deleted from the Gmail account (Ex. P, Compl. ¶ 41c); and
- The contents of any specific emails found in the Gmail account, including but not limited to the contents purportedly disclosed in the Complaint. (Ex. P, Compl. ¶¶ 41c(i)-(iv).)

## III. <u>STATEMENTS MADE IN THE APRIL 6, 2018 AND JUNE 8, 2018 IMPERMISSABLE INTERVIEWS SHOULD BE SUPPRESSED</u>

The USAO violated Ms. Ash's due process rights by continuing to interview Ms. Ash outside the presence of counsel, despite informing her immediately following her March 1, 2018 interview that she should retain counsel, presumably because the government believed she made misrepresentations to the government during that interview and had become a target of its investigation. Because the interviews on April 6, 2018 and June 8, 2018 generated evidence as a result of a violation of Ms. Ash's due process rights, any evidence derived from them must be suppressed, including alleged misrepresentations to the government made by Ms. Ash on April 6, 2018 and June 8, 2018 that form the bases of Counts One and Three of the Indictment.

### A. <u>Relevant Legal Standard</u>

The Court may suppress evidence obtained as the result of a violation of the defendant's due process rights. *See United States v. DiGregorio*, 795 F. Supp. 630, 635 (S.D.N.Y 1992); *United States v. Morrison*, 449 U.S. 361, 101 S. Ct. 665 (1981). The right to due process is violated where "the governmental conduct, standing alone, is so offensive that it shocks the conscience." *United States v. Chin*, 934 F. 2d 393, 398 (2d Cir. 1991) (quoting *Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205 (1952)). Government conduct is outrageous when it violates "that 'fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment. *United States v. Russell*, 411 U.S. 423, 432, 93 S.

Ct. 1637, 1643 (1973) (*quoting Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80S. Ct. 297, 304 (1960)).

**B. The Government Instructed Ms. Ash to Retain Counsel But Impermissibly Continued to Question Her Outside the Presence of Counsel**

On March 1, 2018, Special Agent Jackson and AUSA Mark interviewed Ms. Ash. Ms. Ash agreed to answer questions from the USAO on a voluntary basis and without counsel present, although at time the USAO had not informed her that she needed an attorney or that she was a target of its investigation. (Ex. P, Compl. ¶ 29; Ex. K, March 1, 2018 Interview Mem.)[10] According to the Complaint, during that interview, Ms. Ash provided information regarding her tenure as Chair of the MCU Board, information regarding Kam Wong's employment contract, including information regarding payments to Mr. Wong in lieu of long-term disability insurance, and information regarding a January 2018 memorandum prepared by Mr. Wong regarding the payments made to Mr. Wong and which Ms. Ash signed. (Ex. P, Compl. ¶ 29a-i.) Although omitted from the Complaint, the March 1, 2018 Interview Memorandum discloses that at the end of the interview, AUSA Mark specifically advised Ms. Ash to retain counsel. (Ex. K, March 1, 2018 Interview Mem. at SDNY_0000003.)

Despite advising Ms. Ash to retain counsel, and despite knowing that Ms. Ash was a target of the USAO's investigation presumably based, at least in part, on her alleged statements during the March 1, 2018 interview, the government continued to question Ms. Ash outside the presence of counsel, in violation of Department of Justice policy and Ms. Ash's due process rights. Specifically, on April 6, 2018, Special Agent Jackson interviewed Ms. Ash by telephone

[10] Depending on the outcome of this motion, Ms. Ash may request discovery as to when she became a target of the investigation and make any appropriate motions based on such discovery.

regarding her response to the grand jury subpoena dated March 13, 2018 (the "March Subpoena"). (Ex. P, Compl. ¶ 32.) Allegedly, Ms. Ash represented to Special Agent Jackson that she did not have any records responsive to the March Subpoena. (*Id.*) Ms. Ash's statements to Special Agent Jackson during the April 6, 2018 interview are specifically cited as overt acts in furtherance of the alleged conspiracy to obstruct justice as charged in Count One of the Indictment. (Indictment ¶ 4c). Further, the alleged misrepresentations underlie Count Three of the Indictment, which alleges that Ms. Ash "made false and misleading statements to federal law enforcement officers in connection with a federal investigation of the CEO [of MCU] and others." (*Id.* ¶ 6.)

The government violated Ms. Ash's due process rights on June 8, 2018 by interviewing Ms. Ash *again* outside the presence of counsel and without informing her that she had become a target of its investigation. Special Agent Jackson and AUSAs Mark and Richenthal conducted the June 8, 2018 telephonic interview. (Ex. L, June 8, 2018 Interview Mem. at SDNY_00000004.) Misleadingly, the Complaint does not refer to this "interview" and represents that the USAO only interviewed Ms. Ash twice – on March 1, 2018 and July 9, 2018. (*See* Ex. P, Compl. at page. 23 describing the July 9, 2018 interview as the "second" interview.) However, the June 8, 2018 Interview Memorandum prepared by Special Agent Jackson clearly states that AUSAs Mark and Richenthal and he "conducted a telephonic *interview*" of Ms. Ash. (Ex. L, June 8, 2018 Interview Mem.) (emphasis added.)

During the June 8, 2018 interview, Ms. Ash allegedly stated that she did not have any records responsive to the March Subpoena. She allegedly made further statements that she had deleted text messages between herself and Mr. Wong after she had been served with the March Subpoena. She also allegedly made statements surrounding her receipt of the iPhone and

discussed the January memorandum regarding cash payments to Mr. Wong in lieu of long-term insurance. (Ex. P, Compl. ¶¶ 33a-g.) Ms. Ash's alleged misrepresentations in this June 8 interview underlie, at a minimum, Count Three of the Indictment, which charges that Ms. Ash "made false and misleading statements to federal law enforcement officers in connection with a federal investigation of the CEO [of MCU] and others." (Indictment ¶ 6.)

### C. **The Government's Actions Violated Ms. Ash's Due Process Rights and the Statements Made During the April 8 and June 2, 2018 Interviews Should Be Suppressed**

As described above, the government had affirmatively instructed Ms. Ash to retain counsel as it had identified her as a target, not merely a witness or subject of investigation, at least as early as March 1, 2018. In violation of Department of Justice policy, the USAO continued to interview Ms. Ash outside the presence of counsel in an effort to lull Ms. Ash into a false sense of security regarding her status in the investigation and obtain potentially incriminating statements from her. (*See* United States Department of Justice Manual § 9-11.151 ("The Department of Justice continues its longstanding policy to advise witnesses who are known "targets" of the investigation that their conduct is being investigated for possible violation of Federal criminal law.").) Here, by failing to properly inform Ms. Ash of her status as a target of investigation, the USAO tacitly convinced Ms. Ash that she was safe and secure and that she was merely cooperating with the investigation into Mr. Wong and others at MCU when, in truth and in fact, she had become a target of its investigation. Further, the USAO elicited answers to its questions during the April 6, 2018 and June 8, 2018 interviews without an attorney present and without any proffer protection.

The government acted unfairly and in violation of Department of Justice policy when it continued to question Ms. Ash outside the presence of counsel, despite affirmatively advising her

to retain counsel and determining that she had become a target of its investigation. Such conduct violated Ms. Ash's due process rights under the Fifth Amendment and all evidence derived from the April 6, 2018 and June 8, 2018 interviews should be suppressed.

## IV. MS. ASH'S ALLEGED STATEMENTS ON JULY 9, 2018 AND IN THE GRAND JURY ON AUGUST 16, 2018 SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT VIOLATED MS. ASH'S DUE PROCESS RIGHTS

Any alleged statements by Judge Ash made at the July 9, 2018 proffer or in her August 16, 2018 grand jury testimony should be suppressed because the government knew that Ms. Ash was represented by counsel that had an unwaivable conflict of interest, yet failed to seek a *Curcio* hearing. This conduct by the government violated Ms. Ash's due process rights, the remedy for which is suppression of the evidence obtained as a result of such violation.

### A. Relevant Legal Standard

As discussed in Section III.A, *supra*, the Court may suppress evidence obtained as the *Morrison*, 449 U.S. at 361, 101 S. Ct. at 665. Such violation may be found if the government engages in conduct that violates the fundamental sense of fairness mandated by the Due Process Clause of the Fifth Amendment. *Russell*, 411 U.S. at 432, 93 S. Ct. at 1643 (*quoting Kinsell*, 361 U.S. at 432, 80 S. Ct. at 304). As this Court has held, structural defects in the administration of justice exist—and prejudice to the defendant may be presumed—when defense counsel is burdened by an actual conflict of interest. *See United States v. Stein*, 435 F. Supp. 2d. 330, 371 (S.D.N.Y 2006) (Kaplan, J.)

"It is well-settled in this circuit that an actual conflict of interest exists when an attorney engages in wrongful conduct related to the charge for which the client is on trial." *United States v. Fulton*, 5 F.3d 605, 609 (2d Cir. 1993). Moreover, a conflict arises from the accusation of wrongful conduct even if the attorney is demonstrably innocent of the wrongful conduct. *Id.* at

610. When defense counsel is implicated in a related crime, "the resultant conflict so permeates the defense that no meaningful waiver can be obtained." *Id.* at 613.

### B. The Government Knew an Unwaivable Conflict Existed by the Time of the July 9, 2018 Proffer and August 16, 2018 Grand Jury Testimony

The government knew that Ms. Ash's then attorney Roger Archibald had an unwaivable conflict of interest by July 6, 2018—the date Ms. Ash, through her attorney Mr. Archibald, made an allegedly incomplete production in response to the First Subpoena. The government alleges that this production was incomplete because, among other things, it did not contain any text messages, of which the government was aware based on its review of text messages from Mr, Wong and "Member-1's" cellphones. (Ex. P, Compl. ¶ 37b.) The government obtained a search warrant for Mr. Wong's cellphone on May 7, 2018 and seized Mr. Wong's cellphone on May 8, 2018—nearly two months before Ms. Ash's production. (Ex. M, May 8, 2018 Search Warrant Inventory at SDNY_00004941.) Shortly thereafter, on May 22, 2018, the government obtained a search warrant for Mr. Guagliardo's devices and seized them. (Ex. N, May 23, 2018 Search Warrant Inventory at SDNY_00004912-4913.)

Accordingly, as soon as the production was made by Ms. Ash via Mr. Archibald on July 6, 2018, which the government alleges was incomplete and an overt act in furtherance of a conspiracy to obstruct justice (Indictment ¶ 4e), the government knew that Mr. Archibald was either a witness to or a participant in the precise conduct that forms the basis of the charges against Ms. Ash. The government, as soon as it was made aware that Mr. Archibald was planning to represent Ms. Ash at the July 9, 2018 proffer, should have so informed Mr. Archibald and asked for a *Curcio* hearing and should not have gone forward with the proffer session unless and until Ms. Ash, at a minimum, consulted with independent counsel regarding

Mr. Archibald's conflict of interest. The government's failure to do so violated Ms. Ash's due process rights.

The government violated Ms. Ash's due process rights a second time when it yet again failed to request a *Curcio* hearing and permitted Ms. Ash to testify to the grand jury represented only by Mr. Archibald. At this point, in addition to its knowledge regarding Mr. Archibald's witnessing of or participation in the allegedly incomplete production, the government also had knowledge that Mr. Archibald was witness to or participant in the alleged misrepresentations Ms. Ash made to the USAO at the July 9, 2018 proffer. The Indictment charges that in furtherance of a conspiracy to obstruct justice, Ms. Ash, at the July 9, 2018 proffer, falsely stated that she had discussed Mr. Wong's interest in receiving monetary payments in lieu of any long-term disability insurance policy, and the MCU General Counsel advised that such payments were permissible, though not advisable. (Indictment ¶ 4f.) It is undisputed that Mr. Archibald attended that proffer in his capacity as Ms. Ash's attorney. But again, the government failed to request a *Curcio* hearing (or even raise the issue with Mr. Archibald) and permitted Ms. Ash to testify while represented by an attorney with a serious, unwaivable, and disqualifying conflict of interest of which it had undisputed knowledge. Based on this violation of Ms. Ash's due process rights, Ms. Ash's statements during her July 8, 2018 and in the grand jury on August 16, 2018 should be suppressed.

## CONCLUSION

For the foregoing reasons, Sylvia G. Ash respectfully requests that the Court grant the relief requested herein.

Dated: New York, New York
March 20, 2020

MORRISON & FOERSTER LLP

By: s/ Carrie H. Cohen
Carrie H. Cohen
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com

*Counsel for Defendant*
*Sylvia G. Ash*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SYLVIA G. ASH,<br>Defendant. | Case No. 1:19-cr-00780-LAK |

**DECLARATION OF CARRIE H. COHEN IN SUPPORT OF DEFENDANT SYLVIA G. ASH'S MOTIONS TO SUPPRESS**

MORRISON & FOERSTER LLP

Carrie H. Cohen
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com

*Counsel for Defendant Sylvia*

**NITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SYLVIA G. ASH,<br>Defendant. | Case No. 1:19-cr-00780-LAK |

I, Carrie H. Cohen, declare as follows:

1. This declaration is based on my personal knowledge and knowledge of discovery produced in this case.

2. I am a partner at the law firm of Morrison & Foerster LLP, counsel for defendant Sylvia G. Ash and submit this Declaration in support of the Memorandum of Law in Support of Defendant Sylvia G. Ash's Motions to Suppress.

3. On February 20, 2020, I requested that the United States Attorney's Office for the Southern District of New York ("USAO") provide all correspondence between the Municipal Credit Union (the "MCU") and the government that in any way relates to the MCU's request that Ms. Ash provide to it any electronic devices in her possession of which the MCU claimed ownership, including an iPhone X (the "iPhone"). Attached as **Exhibit A** is a true and correct copy of this correspondence.

4. The USAO responded that the government did not believe that Ms. Ash is entitled to any such correspondence but produced certain chain of custody records that should have been but

were not provided in the regular course of the government's discovery disclosures. Attached as **Exhibit B** is a true and correct copy of this correspondence.

5. On March 11, 2020, I again requested discovery of any communications or correspondence between the MCU and the government that in any way relates to the MCU's request that Ms. Ash provide to it any electronic devices in her possession of which the MCU claimed ownership, including the iPhone. This letter stated that it was clear from the limited disclosures to date from the government that the MCU and the government were in contact related to this request. The letter further asked the USAO to confirm that the government either declines to provide the requested information or that no such communications existed or occurred. Attached as **Exhibit C** is a true and correct copy of this correspondence.

6. The USAO responded to the March 11, 2020 letter that it would not provide the requested communications but did not deny that such communications existed or occurred. Attached as **Exhibit D** is a true and correct copy of this correspondence.

7. I made a similar request for communications between the government and the MCU to outside counsel for the MCU who, the USAO informed me, had informed the USAO of the request, and has to date not provided it.

8. I have reviewed documents produced in this case that demonstrate that the telephone and other cellular services associated with the iPhone account were paid for by Ms. Ash and that the account on the iPhone was set up as her personal cellular account.

9. Based on my knowledge of discovery in this case, I know that Ms. Ash's iPhone 6S was seized from her at the time of her arrest and then searched pursuant to a search warrant.

10. Attached as **Exhibit E** is a true and correct copy of Special Agent LaVale Jackson's Affidavit in Support of Application for Search Warrants for Stored Electronic Communications, with Bates numbers SDNY_00000441-488.

11. Attached as **Exhibit F** is a true and correct copy of the Search Warrant and Non-Disclosure Order issued on March 18, 2019 for all content and other information associated with the email account [redacted]@gmail.com, directed to Google LLC, with Bates numbers SDNY_00000495-499.

12. Attached as **Exhibit G** is a true and correct copy of a document titled "CONSENT TO SEARCH – DEVICES" signed by Stella Mendes on October 30, 2018, with Bates numbers SDNY_00032682-00032684.

13. Attached as **Exhibit H** is a true and correct copy of the Search Warrant and Non-Disclosure Order issued on March 18, 2019 for all content and other information associated with the email account [redacted]@aol.com, directed to Oath, Inc., with Bates numbers SDNY_00000500-504.

14. Attached as **Exhibit I** is a true and correct copy of a New York City District Attorney laboratory intake log showing the intake date of the iPhone, which was assigned the IMEI 359411085759641, with Bates number SDNY_00032690.

15. Attached as **Exhibit K** is a true and correct copy of the March 1, 2018 Interview Memorandum of Ms. Ash prepared by Special Agent LaVale Jackson, with Bates numbers SDNY_00000001-3.

16. Attached as **Exhibit L** is a true and correct copy of the June 8, 2018 Interview Memorandum of Ms. Ash prepared by Special Agent LaVale Jackson, with Bates number SDNY_00000004.

17. Attached as **Exhibit M** is true and correct copy of an excerpt of a May 8, 2018 Search Warrant Inventory, with Bates number SDNY_00004941.

18. Attached as **Exhibit N** is a true and correct copy of an excerpt of a May 23, 2018 Search Warrant Inventory, with Bates numbers SDNY_00004912-4913.

19. Attached as **Exhibit O** is a true and correct copy of a June 19, 2018 letter from the MCU to Ms. Ash demanding that Ms. Ash provide her electronic devices to it, with Bates number SDNY_000000042.

20. Attached as **Exhibit P** is a true and correct copy of the Compliant, dated October 4, 2019.

21. Attached as **Exhibit Q** is a true and correct copy of a document entitled "Reset Device Chain of Custody – DRAFT," with Bate numbers SDNY_00032680-32681.

22. Attached as **Exhibit R** is a true and correct copy of a July 13, 2018 letter from the MCU to Ms. Ash demanding that Ms. Ash provide her electronic devices to it, with Bates number MCU-00018053.

23. Attached as **Exhibit S** is a true and correct copy of a New York State Department of Financial Services press release announcing that it had taken possession of the MCU.

24. Attached as **Exhibit T** is a true and correct copy of enamel correspondence from AUSA Daniel Richenthal advising me that the MCU does not have a non-prosecution or other agreement with the government.

25. Attached as **Exhibit U** is a true and correct copy of email correspondence between [redacted] and [redacted], with Bates numbers SDNY_0000037-38.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of March 2020, in New York, New York

s/ Carrie H. Cohen
Carrie H. Cohen

# Exhibit A

MORRISON | FOERSTER

250 WEST 55TH STREET
NEW YORK, NY 10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BOSTON, BRUSSELS, DENVER, HONG KONG, LONDON, LOS ANGELES, NEW YORK, NORTHERN VIRGINIA, PALO ALTO, SAN DIEGO, SAN FRANCISCO, SHANGHAI SINGAPORE, TOKYO, WASHINGTON, D.C.

February 20, 2020

Writer's Direct Contact
+1 (212) 468.8049
CCohen@mofo.com

*By email*

AUSA Daniel C. Richenthal and Eli Mark
Daniel.Richenthal@usdoj.gov
Eli.Mark@usdoj.gov
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re: *United States v. Sylvia Ash*, 19 Cr. 6780 (LAK)

Dear Dan and Eli:

On behalf of my client, Sylvia Ash, I hereby request all correspondence between your office and the Municipal Credit Union ("MCU") that relates in any way to the MCU's request that Ms. Ash return any electronic devices in her possession over which MCU claimed ownership, including, without limitation, an iPhone.

Sincerely yours,

Carrie H. Cohen

# Exhibit C

MORRISON | FOERSTER

250 WEST 55TH STREET
NEW YORK, NY 10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BOSTON, BRUSSELS, DENVER, HONG KONG, LONDON, LOS ANGELES, NEW YORK, NORTHERN VIRGINIA, PALO ALTO, SAN DIEGO, SAN FRANCISCO, SHANGHAI SINGAPORE, TOKYO, WASHINGTON, D.C.

March 11, 2020

Writer's Direct Contact
+1 (212) 468.8049
CCohen@mofo.com

*By email*
AUSA Daniel C. Richenthal and AUSA Eli Mark
Daniel.Richenthal@usdoj.gov and Eli.Mark@usdoj.gov
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re: *United States v. Sylvia Ash*, 19 Cr. 780 (LAK)

Dear Dan and Eli:

On February 20, 2020 by telephone confirmed by a follow-up letter, we requested on behalf of our client, Sylvia Ash, all correspondence between your office and the Municipal Credit Union ("MCU") that relates in any way to the MCU's request that Ms. Ash return any electronic devices in her possession over which MCU claimed ownership, including, without limitation, an iPhone (the "Requested Information"). In response, on March 2, 2020, you provided certain chain of custody documents that should have been but were not included in the Government's initial disclosures but failed to provide any of the Requested Information.

As is evident from the limited disclosures to date, the Government (defined to include your office as well as the Manhattan District Attorney's Office with whom your office is working on this matter) and the MCU were in contact related to the request by the MCU to Ms. Ash for the return of certain electronic devices. The timing and substance of those communications (defined to include email, text, telephone, or in person conversations) are relevant to whether there are legitimate bases for certain pretrial motions, which are due March 20, 2020. As you are aware, we also have requested the Requested Information from the MCU through its outside counsel, who is considering our request.

Before seeking Court intervention, please confirm that the Government declines to provide the Requested Information or that no such communications exist or occurred.

Sincerely yours,

Carrie H. Cohen

cc: Michael Bellinger, Esq. (by email)

# Exhibit D

**Stephenson, Ashley M.**

| | |
|---|---|
| **From:** | Cohen, Carrie H. |
| **Sent:** | Monday, March 16, 2020 9:01 PM |
| **To:** | Buckley, Janie C. |
| **Cc:** | Stephenson, Ashley M. |
| **Subject:** | FW: U.S. v. Ash - letter attached |

**CARRIE COHEN**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**P:** +1 (212) 468-8049
mofo.com | LinkedIn | Twitter

---

**From:** Richenthal, Daniel (USANYS) <Daniel.Richenthal@usdoj.gov>
**Sent:** Thursday, March 12, 2020 12:42 PM
**To:** Cohen, Carrie H. <CCohen@mofo.com>
**Cc:** G. Michael Bellinger <bellinger@clm.com>; Mark, Eli (USANYS) <Eli.Mark@usdoj.gov>
**Subject:** RE: U.S. v. Ash - letter attached

**- External Email -**

---

As we discussed on February 20, and stated in our email of February 29, we do not believe that the defendant is entitled to the correspondence you requested, although we would be happy to consider any authority that you may provide or to confer further if you believe that would be worthwhile.

Daniel C. Richenthal
Senior Trial Counsel
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
Tel: (212) 637-2109
Fax: (212) 637-2615
Daniel.Richenthal@usdoj.gov

---

**From:** Cohen, Carrie H. <CCohen@mofo.com>
**Sent:** Wednesday, March 11, 2020 3:19 PM
**To:** Richenthal, Daniel (USANYS) <DRichenthal@usa.doj.gov>; Mark, Eli (USANYS) <EMark@usa.doj.gov>
**Cc:** G. Michael Bellinger <bellinger@clm.com>
**Subject:** U.S. v. Ash - letter attached

==========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

# Exhibit E

19MAG2676

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of Search Warrants for Content and Other Information Associated with:

1. The Apple Account associated with Apple ID S[redacted]@AOL.COM, Maintained at Premises Controlled by Apple Inc.;

2. The Google account associated with H[redacted]@GMAIL.COM, Maintained at Premises Controlled by Google LLC;

3. The AOL account associated with S[redacted]@AOL.COM, Maintained at Premises Controlled by Oath, Inc.

USAO Reference No. 2017R00567

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for Search Warrants for Stored Electronic Communications**

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

LAVALE JACKSON, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), and have been in that position for approximately four and a half years. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Previously I was

a Special Agent with the U.S. Department of Labor, Office of Inspector General ("DOL-OIG") for over nine years. While with the USAO-SDNY and DOL-OIG, I have participated in dozens of investigations of public corruption and fraud offenses, including involving non-profit institutions, and am familiar with the means and methods used to commit such offenses, including the use of emails. Based on my training and experience, I am familiar with the use of electronically stored information in such investigations. I have participated in the execution of search warrants involving electronic evidence.

**B. The Providers, the Subject Accounts, and the Subject Offenses**

2. I make this affidavit in support of an application for search warrants pursuant to 18 U.S.C. § 2703 for content and other information associated with (1) the Apple Inc. ("Apple") account associated with Apple User ID S[redacted]@AOL.COM, (2) the Google LLC ("Google") account associated with H[redacted]@GMAIL.COM, and (3) the Oath, Inc. (formerly known as AOL) ("AOL") account associated with S[redacted]@AOL.COM (collectively, the "Subject Accounts"). The information to be searched is described in the following.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 657 (embezzlement from or misapplication of the funds of a financial institution), 1001 (making a false statement in the jurisdiction of the executive branch), 1512 (witness tampering), and 1519 (destruction or covering up of documents with intent to obstruct a federal investigation), and/or a conspiracy to commit one or more of the same (collectively, the "Subject Offenses"), among other statutes. This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with witnesses and targets of the investigation, as well as my training and experience concerning the use of email and instant messaging in criminal activity.

Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Providers**

4. Based on my training, experience, and participation in this investigation, I know the following about Apple:

a. Apple designs, manufactures, and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications. Apple's products and services include Mac, iPhone, iPad, iPod, Apple TV, a portfolio of consumer and professional software applications, the iOS and Mac OS X operating systems, iCloud, and a variety of accessory, service and support offerings. Apple also sells and delivers digital content and applications through the iTunes Store, App Store, iBookstore, and Mac App Store.

b. The iPhone is a line of smartphones designed and marketed by Apple. It runs Apple's iOS mobile operating system. The user interface is built around the iPhone's multi-touch screen, including a virtual keyboard. The iPhone has wireless internet capabilities and can connect to many cellular networks around the world. The iPhone can shoot video, send and receive email, browse the Internet, send text messages, provide navigation services via Global Positioning Satellite location technology, record notes, do mathematical calculations, and receive visual and audio voicemail. Other functions such as video games, reference works, social networking—including Facebook and Twitter—can be enabled by downloading application programs ("apps"

or, singular, "app"). Apple operates an App Store which offers numerous apps by Apple and third parties.

c. iCloud is Apple's cloud storage and cloud computing service. iCloud allows a user to store data such as text messages, documents, photos, videos, and music on remote servers that can be downloaded or accessed from the user's electronic devices, to share and send data to other users, to manage the user's Apple devices if lost or stolen, and to wirelessly back up a user's electronic devices directly to iCloud. The following information may be available from iCloud:

i. **Subscriber Information.** When a customer sets up an iCloud account, basic subscriber information such as name, physical address, email address, and telephone number may be provided to Apple. Additionally, information regarding iCloud feature connections may also be available. iCloud subscriber information and connection logs with Internet Protocol ("IP") addresses can be obtained with a subpoena or greater legal process.

ii. **Mail and Text Message Logs.** Mail logs include records of incoming and outgoing communications such as time, date, sender email addresses, and recipient email addresses.

iii. **Email Content.** iCloud stores the email a subscriber has elected to maintain in the account while the subscriber's account remains active.

iv. **Other iCloud Content. Photo Stream, Docs, Contacts, Calendars, Bookmarks, iOS, Device Backups, Text Messaging Records and Saved Chat Logs, and Encryption Keys.** iCloud stores content for the services that the subscriber has elected to maintain in the account while the subscriber's account remains active. Apple does not retain deleted content once it is cleared from Apple's servers. iCloud content may include stored photos, documents, contacts, calendars, bookmarks and iOS device backups. iOS device backups may include photos

and videos in the users' camera roll, device settings, app data, iMessage, SMS, and MMS messages and voicemail. iCloud backups for all operating systems are encrypted by default. However, an iCloud account may include encryption keys – contained in "keybag" and "FileInfoList.txt" files – enabling law enforcement to decrypt the contents of these backups.

v. **Find My iPhone and Remote Deletion Activity**: Find My iPhone is a user-enabled feature by which an iCloud subscriber is able to locate his/her lost or misplaced iPhone, iPad, iPod touch or Mac and/or take certain actions, including putting the device in lost mode, locking or wiping the device.

d. Apple typically maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).

5. Based on my training, experience, and participation in this investigation, I know the following about Google and AOL (together, the "Email Providers"):

a. The Email Providers offer email services to the public. In particular, the Email Providers allow subscribers to maintain email accounts under the domain name gmail.com or aol.com. A subscriber using the Email Providers' services can access his or her email account from any computer connected to the Internet.

b. The Email Providers maintain the following records and information with respect to every subscriber account:

i. **Email contents**. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Email Providers' servers unless and until the subscriber deletes the email. If the subscriber

does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Email Providers' servers for a certain period of time.

ii. **Address book**. The Email Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. **Subscriber and billing information**. The Email Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Email Providers also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Email Providers maintain records of the subscriber's means and source of payment, including any credit card or bank account number.

iv. **Transactional information**. The Email Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through each of the Email Providers' websites).

v. **Customer correspondence**. The Email Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

vi. **Preserved and backup records.** The Email Providers also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Email Providers may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

**D. Jurisdiction and Authority to Issue Warrants**

6. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as Apple and the Email Providers, to disclose stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7. A search warrant under Section 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8. When the Government obtains records under Section 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Summary of Bases To Believe That The Subject Accounts Contain Evidence, Fruits, And/Or Instrumentalities Of The Subject Offenses

*The Credit Union Investigation*

9. On or about May 7, 2018, KAM WONG ("WONG") was charged in United States District Court for the Southern District of New York in a Complaint with embezzlement from a federally-insured credit union, in violation of Title 18, United States Code, Section 657, wire fraud, in violation of Title 18, United States Code, Section 1343, fraud on a financial institution, in violation of Title 18, United States Code, Section 1344, and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A. The Complaint is attached as Exhibit 1 to this Affidavit and is incorporated by reference as if fully set forth herein.

10. As explained in the Complaint, at all pertinent times described in the Complaint, WONG was the Chief Executive Officer ("CEO") and President of the Municipal Credit Union (referred to in the Complaint and herein as the "Credit Union"), a non-profit financial institution headquartered in New York, New York. (*See* Complaint ("Compl.") ¶ 8.) The Credit Union is federally insured by the National Credit Union Association. (*See id.*) On or about February 22, 2018, the Credit Union's Board of Directors suspended WONG and placed him on paid administrative leave. After WONG was charged, WONG was terminated from his position at the Credit Union.

11. An ongoing criminal investigation has uncovered that WONG abused his authority as CEO to defraud the Credit Union and embezzle money from it through requests for various benefits that were not provided for under his employment contract, some of which were based on fake invoices for reimbursement. (*See id.* ¶¶ 9-13.) WONG requested and received reimbursements related to dental expenses, long-term disability insurance offset payments ("LTD Offset Payments"), taxes, and vehicle expenses, among others, and also directed the

Credit Union to pay for personal expenses for two individuals related to a friend of his family, who, at times, were management interns at the Credit Union. WONG primarily deposited the proceeds of the scheme into an account he had at the Credit Union, and then withdrew the money in cash, including through more than 2,500 ATM withdrawals, or spent it on lottery tickets. (*See id.* ¶¶ 14-24.)

12. On November 19, 2018, WONG pled guilty to one count of embezzlement from the Credit Union, as charged in 18 Cr. 737 (JGK), pursuant to a plea agreement with the Government, wherein WONG agreed to forfeit to the United States a sum of money equal to at least $9,890,375 in United States currency, representing proceeds traceable to the commission of the offense.

*The Evidence of Obstruction*

13. As described in greater detail below, in January 2018, after WONG learned about the criminal investigation into payments he received from the Credit Union, including the LTD Offset Payments, among other things, WONG (a) made misrepresentations to me and another law enforcement agent about whether the Credit Union's Board of Directors approved the LTD Offset Payments, and (b) provided me and another law enforcement agent with written statements from members of the Credit Union's Board that misleadingly suggested that the full amount of the LTD Offset Payments – approximately $3.7 million (net of taxes) – had been approved in June 2015. Specifically, WONG provided such written statements from the former Chair of the Credit Union's Board of Directors, SYLVIA ASH ("ASH"), the [redacted] and [redacted] As detailed in the Complaint, although in June 2015, WONG apparently discussed the option of the LTD Offset Payments with

these individuals, WONG appears to have only proposed to receive only a one-time lump-sum LTD Offset Payment of $200,000, or far less than the approximately at least $3.6 million he received, as well as the more than $3.1 million he received to cover his personal taxes on the sum. (*See* Compl. ¶ 14.) In addition, as detailed in the Complaint, the escalating LTD Offset Payment amounts were based on the apparently false and misleading models—models ostensibly calculating what it would cost the Credit Union to obtain LTD insurance for WONG—that WONG submitted to the Credit Union in seeking those payments. (*Id.*)

14. As explained in the Complaint, on or about January 18, 2018, I and another law enforcement agent questioned WONG about, among other things, checks he received from the Credit Union. (Compl. ¶ 16.) During that meeting, WONG informed us that the checks were for LTD Offset Payments, which were provided for in his employment contract, and had been approved by the Credit Union's Board of Directors. During that meeting, WONG provided me with a model for the LTD Offset Payments that stated "total liability to be reimbursed ** Note: Net of all Taxes" was $3,700,994." The model appeared to have been signed by WONG and the Credit Union's then-current Treasurer, [redacted]. While I understand that [redacted] did sign the models, I have interviewed several former Credit Union Board members, each of whom has informed me, in sum, that WONG did not request approval from the Board for the LTD Offset Payments prior to January 18, 2018. During this meeting, WONG also provided me with the contact information for his insurance broker, [redacted] who is referred to in the Complaint as "Broker-1."

15. Based on my interviews of [redacted], I know that shortly after I interviewed WONG about the LTD Offset Payments, WONG contacted [redacted] in an apparent attempt, for the first time, to obtain support for WONG's "models." In response, [redacted] told WONG that

"if I'm an athlete I want you as my agent," by which I understand that [redacted] meant that, in [redacted] view, the models requested an amount of money not justified by the actual insurance market. [redacted] also stated that WONG had informed him, in sum and substance, that WONG had been contacted by federal law enforcement agents from the Treasury Department (apparently misidentifying myself and another law enforcement agent as from the Treasury Department instead of USAO-SDNY).

16. On or about January 19, 2018, I called WONG at his office to request WONG's complete employment contract (referred to in the Complaint as the "Contract"), and the Board meeting minutes approving the Contract. At that point, contrary to what he had told me the previous day, WONG informed me that the arrangement to pay the LTD Offset Payments was not in his Contract or in a Board resolution, but that it had been approved orally by ASH, the former Chair of the Credit Union's Board of Directors. WONG further provided me with ASH's cellphone number ((917) [redacted], so that I could contact her to confirm this information.

17. As explained in the Complaint, on or about January 22, 2018, approximately four days later, WONG attended a Credit Union Board of Directors' committee meeting and requested that the committee "retroactively" recommend that the Board approve the LTD Offset Payments, which the committee did recommend. (Compl ¶ 16.) During that committee meeting, WONG did not disclose that he had recently been approached by law enforcement regarding the LTD Offset Payments.

18. Between on or about January 23, 2018 and on or about January 25, 2018, WONG provided me with three nearly identical memoranda, dated on or about January 22, 2018, each with the Subject "Long Term Disability Insurance for the CEO" (each of which is referred to herein as a "January Memorandum" or collectively as the "January Memoranda"). These memoranda were

addressed from WONG to [redacted], ASH, and [redacted] respectively, regarding the LTD Offset Payments and recounted a supposed June 2015 meeting during which the three recipients of the memoranda purportedly agreed to the payout of "approximately $3.7 million (net of applicable taxes)" in order to cancel and void a provision in WONG's Contract that provided WONG with LTD insurance coverage. The memoranda each requested that the recipient sign the respective memorandum if the memorandum was "accurate" and that they had "agreed" with the "payout approach" detailed in the memorandum. Each of the memoranda I received bore the signature of the recipient of the memorandum, including one signed by ASH.

19. I have separately interviewed [redacted], ASH, and [redacted]. Based on my interviews of [redacted], ASH and [redacted], I have learned that each of them stated that WONG asked him or her to sign versions of the January Memorandum, that each reviewed the memorandum, and that each signed the memorandum. Each of them also stated, in sum and substance, that the memorandum he or she signed was not entirely accurate. In particular, none of them recalled a conversation in June 2015 during which they purportedly agreed to the payout of "approximately $3.7 million (net of applicable taxes)" from the Credit Union to WONG, but each had nonetheless signed the memorandum at WONG's request.

20. In connection with my initial interview of ASH, which took place on or about March 1, 2018, ASH further informed me that, in sum and in substance, WONG asked ASH to sign the January Memorandum because WONG was being investigated, although ASH claimed that WONG did not specify that it was a federal criminal investigation. However, as noted above, based on my conversations with [redacted], I know that, at least as to [redacted], WONG informed him that he had been contacted by federal law enforcement agents.

*Ongoing Investigation into Sylvia Ash*

21. As detailed further herein, the Government's ongoing investigation concerns not only the conduct with which WONG was charged, but also potential obstruction of justice by former Credit Union Board and Supervisory Committee members, including ASH. Specifically, as discussed above, at a time when I believe ASH knew WONG was under investigation, ASH signed a false and misleading memorandum (the January Memorandum), which WONG then gave to law enforcement in an attempt to obstruct the investigation. Moreover, as discussed further below, ASH was offered, solicited, and/or received gifts from WONG and/or JOSEPH GUAGLIARDO (a former Credit Union supervisory committee member) at around the same time she agreed to sign the January Memorandum. There is also probable cause to believe that ASH then, despite having received multiple grand jury subpoenas, deleted and wiped text messages, including with WONG, thus avoiding producing to the grand jury text messages that were relevant to the investigation.

22. Based on my review of Credit Union, New York State Unified Court System, and New York State Commission on Judicial Conduct records, and publically available information, I have learned, among other things, the following:

a. ASH has served as a judge in the New York State court system since at least approximately 2006. In 2005, ASH was elected as a Kings County Civil Court Judge, and took office in 2006. In 2010, ASH was elected as a Kings County Supreme Court Judge, and assumed that role in 2011. In or about January 2016, ASH was appointed to be the presiding judge in the Kings County Supreme Court's Commercial Division. On or about April 1, 2016, ASH was appointed to the New York State Commission on Judicial Conduct.

b. On or about February 16, 2007, ASH asked the New York State Advisory Committee on Judicial Ethics (the "Committee"), in writing, whether she could serve on the Credit Union's Board of Directors, noting that the "no monetary compensation in any form is given" for such board service.[1] On or about March 18, 2008, the Committee responded that ASH could serve on the Board, but not "if it is likely" that the Credit Union "will be engaged regularly in adversary proceedings in any court," citing 22 NYCRR 100.4[C][3][a][ii].

c. ASH began serving on the Credit Union Board of Directors in or about May 2008, and in or about May 2015, ASH assumed the role of Chair of the Board of Directors of the Credit Union.

d. Between approximately 2005 and 2010, while serving as a Civil Court judge, ASH presided over or issued an order or opinion in at least 30 cases involving the Credit Union; and between 2011 and present, while serving as a Supreme Court judge, ASH presided over or issued an order or opinion in at least 2 cases involving the Credit Union. At least some of these cases were while ASH was a director on the Board of the Credit Union.

e. Although required, as a New York State judge, to disclose annually on financial disclosure forms with the New York State Ethics Commission "any . . . directorship, . . . or position of any nature whether compensated or not, held by the reporting individual with any firm, corporation, . . . or other organization other

[1] Based on review of its website (http://ww2.nycourts.gov/ip/acje/whatis.shtml)), I understand that the Committee provides ethics advice to judges, justices, and quasi-judicial officials of the NYS Unified Court System about their own conduct. The Committee treats judges' requests for advice as confidential.

than the State of New York," ASH did not disclose her position with the Credit Union. The annual financial disclosure forms that judges must file are available for public inspection upon request to the New York State Ethics Commission.

f. On or about April 6, 2015, ASH asked the Committee, in writing, whether she could serve as a Chair the Board of Directors of the Credit Union, noting that her board service was "unpaid." After emailing on May 2, 2015, from her judicial email account "my fingers, toes and eyes are still crossed ;)," on July 1, 2015, she emailed from her judicial email account to withdraw her inquiry ("I am hereby withdrawing my inquiry"), and copied the email account at S[redacted]@AOL.COM (the "TARGET AOL ACCOUNT").

g. In August 2016, the New York State Commission on Judicial Conduct filed a complaint, alleging that ASH was chairing the Board of the Credit Union notwithstanding that the Credit Union was regularly engaged in adversary proceedings in the courts of New York.[2] Prior to this complaint, ASH met with the Administrator and Counsel to the Commission, and claimed to not have knowledge that the Credit Union was engaged regularly in adversary proceedings, during which meeting she did not disclose that she had previously presided over cases where the Credit Union was a party. Shortly after the complaint was filed, ASH resigned from the Board of Directors of the Credit Union, and also from her position on the New York State Commission on Judicial Conduct. On August 11,

[2] Based on my review of records from the New York State Commission on Judicial Conduct, between 2012 and June 2016, in the five boroughs of New York City, Nassau County, Suffolk County, and Westchester County, the Credit Union was a party to a total of at least 2,075 cases, of which 543 were in Kings County Civil Court and 10 were in Kings County Supreme Court.

2016, ASH sent an email, from the TARGET AOL ACCOUNT, resigning from the Commission.

23. Based on my review of Credit Union records, I have learned that, although the Credit Union board positions are volunteer and ostensibly unpaid positions, in 2015 alone, the Credit Union spent approximately $63,408.47, for the benefit of ASH, the most of any Board director. These expenses included, among other things, Apple devices, airfare, and hotels for multiple conferences for her and a guest (including to Cancun, San Diego, San Juan, and the Greek Isles), tickets to sporting events, and use of the Credit Union's suite at MCU Park (a baseball stadium in Brooklyn), among other things.

24. Despite her resignation from the Board, based on my view of Credit Union records and correspondence, I have learned that ASH continued to receive benefits, such as trips and Apple devices, from WONG and/or the Credit Union. These records indicate that the Credit Union spent approximately $4,283.68 on ASH in the year 2017, which, as noted, was after her tenure at the Credit Union was completed. These expenses included:

a. As recently as December 2016, ASH had three Verizon phone numbers paid for by the Credit Union.
b. ASH continued to participate in out-of-state and international events and conferences at the expense of the Credit Union. For example, in October 2016, ASH attended a Credit Union conference in Las Vegas, Nevada, for which the Credit Union paid the hotel and airfare. And in June 2017, ASH was a guest of a Credit Union board member in Cuba at the Caribbean Confederation of Credit Union Conference. Her expenses for this trip were paid for by the Credit Union..
c. On or about August 5, 2017, ASH used the Credit Union's suite at MCU Park (a

baseball stadium), during which she spent $1,740.82 in food, management fees, and gratuities.

d. In July 2017 and June 2018, the Credit Union paid to ship packages, containing unknown items, from the Credit Union to ASH at her home address.

25. Based on my review of New York State court records, I know that each year ASH was required to disclose the source of reimbursement of expenses and/or gifts exceeding $1,000, but ASH did not disclose any expenses or gifts, including from the Credit Union, during any year since 2012 (which is the earliest year for which the court still keeps records).

26. Based on my participation in the investigation and my review of documents, I know that on March 13, 2018, as part of the ongoing federal investigation, ASH was served, via email to the TARGET AOL ACCOUNT, with a grand jury subpoena calling for the production of any and all documents related to (1) long term disability insurance for WONG, (2) WONG's income, compensation, bonuses, executive benefits, and/or other money or benefits received from the Credit Union; (3) amendments to WONG's employment agreement; and (4) all correspondence, including but not limited to emails and text messages with WONG between January 1, 2015 and the date of the subpoena. On or about April 6, 2018, I spoke with ASH over the telephone regarding her response to the above mentioned subpoena, and ASH stated, in sum and substance, that she did not have any responsive records to produce.

27. Based on my review of emails obtained from the Credit Union, I have learned that, approximately two months later, on May 14, 2018 [redacted] sent an email to ASH, at the TARGET AOL ACCOUNT, requesting that ASH return Credit Union issued electronic devices that the Credit Union had failed to collect at the time of ASH's departure from the Board in 2016. Using the

TARGET AOL ACCOUNT, ASH responded, "Nicely written letter. Call me." The following day, [redacted] sent a second email to ASH stating, "As per the Acting CEO, since you've had the devices for 3 years or more, there is no need to return them. Therefore, please disregard my original email."

28. On June 8, 2018, I spoke with ASH over the telephone again regarding her response to the above mentioned subpoena, to which ASH had previously stated she had no responsive records. ASH stated, in sum and substance, that she did not have any responsive records to produce and she had lost access to all Credit Union-related correspondence after she had resigned from the Board of Directors. ASH acknowledged that she had continued to communicate with WONG following her departure from the Credit Union but, claimed that aside from inquiring whether she could host her birthday party at "MCU Park," their conversations did not involve MCU business. ASH further stated that she had deleted her text messages with WONG after she had been served with the grand jury subpoena because there was, in her view, no need for her to keep such communications.

29. Based on my participation in the investigation and my review of documents, I know that, approximately ten days later, on June 18, 2018, ASH was served, via email at the TARGET AOL ACCOUNT, with a second grand jury subpoena calling for the production of, among other things, (1) all correspondence with WONG, [redacted] [redacted], GUAGLIARDO and certain other current or former Credit Union employees and board members, (2) all documents to money and/or benefits WONG received from the Credit Union, (3) all documents regarding any criminal investigation, internal investigation or audit related to WONG, and (4) all documents regarding any gifts, presents, donations, and/or items of value received from or given to WONG, GUAGLIARDO, [redacted] and/or the Credit Union.

30. Based on my review of Credit Union documents, I have learned that, the next day, on or about June 19, 2018, the Credit Union sent to ASH a letter, via Federal Express and email to the TARGET AOL ACCOUNT, requesting the return of any electronic devices owned by the Credit Union that were issued to ASH by the Credit Union, including by WONG. The letter also "advised that you do not have MCU's permission or authority to wipe, delete, reset, factory restore, image or copy any of MCU's electronic devices," and cited the Credit Union's policy manual and previous electronics agreements signed by ASH.

31. On July 6, 2018, via her counsel, ASH produced documents deemed responsive to the subpoenas. These included copies of emails between her and members of the Credit Union that were sent and received at the TARGET AOL ACCOUNT between April 2015 and May 2018. ASH did not provide any records of text messages or any emails from H[redacted]@GMAIL.COM (the "TARGET GMAIL ACCOUNT").

32. On July 9, 2018, in the presence of her counsel, I spoke with ASH regarding Credit Union issued Apple devices she had personally received from WONG. During the interview, ASH provided the following information, in substance and in part:

e. ASH recalled travelling to the Credit Union to receive an iPhone X from WONG in his office. After receiving the iPhone X, WONG asked her to sign the January Memorandum described above.

f. Following WONG's removal from the Credit Union, bur prior to his arrest, ASH sent him uplifting text messages to keep his spirits up and also discussed what defense attorney WONG might retain.

g. ASH stopped using the iPhone X subsequent to Wong's arrest and deleted all her text messages with WONG. ASH now uses an iPhone 6 Plus. In preparation of

returning the iPhone X to the Credit Union, she travelled to an Apple store and had the phone reset. She did not recall exactly when that happened.

h. During her tenure at the Credit Union, ASH forwarded or copied certain Credit Union emails to her personal email account (although she did not specify which one) so that she could access and read them while at work.

33. Based on my review of documents, I have learned that, a few days later, on July 13, 2018, ASH was sent, via Federal Express and via email to the TARGET AOL ACCOUNT, a second letter from the Credit Union this one from [redacted], again advising her that she was requested to return any and all Credit Union issued Apple devices still in her possession, including devices issued to her by WONG. The letter again cautioned that she did not have the Credit Union's permission or authority to wipe, delete, reset, factory restore, image or copy any data saved within the devices.

34. Based on my review of documents, I have learned that Credit Union records show that approximately four days later, on July 17, 2018, ASH's iPhone X and an Apple watch were returned to the Credit Union via a courier service arranged by her counsel, who sent a letter to the Credit Union along with the devices. Contrary to ASH's statements to me on July 9, 2018, the letter to the Credit Union stated that ASH "has not wiped, deleted, reset, factory restored, imaged or copied any of MCU's electronic devices."

35. Based on my participation in the investigation, I know that on or about November 9, 2018, I took possession of ASH's iPhoneX and Apple Watch from Stroz Friedberg, a cyber security services firm retained by the Credit Union, and delivered them to the New York County District Attorney's device analysis laboratory, which subsequently informed me that the iPhoneX had been reset, and that, accordingly, content on the phone, including any previously stored text

messages or emails, could not be retrieved. Specifically, a forensic analyst assigned to the High Technology Analysis Unit of the New York County District Attorney's Office has informed that, (1) on November 14, 2018, he attempted to performed a forensic extraction of the iPhone X and Apple Watch, but discovered that both devices had been factory reset and the user saved contents deleted; and (2) despite the factory reset, the iPhone X had retained a timeline of powering events which showed power events on June 23, 2018 (the date of ASH's service appointment with Apple), and again on July 16, 2018 at 9:40 am (the day before the iPhone X and Apple watch were returned to MCU).

*Analysis to Date of Apple Records and Devices*

36. Based on my review of Apple registration records, I have learned that, since at least approximately April 2013, ASH has used an Apple account associated with S[redacted]@AOL.COM (the "TARGET APPLE ACCOUNT"). Apple records indicate that the she lists her daytime phone number as (917) [redacted], which was the number ASH used to engage in text messages with WONG and GUAGLIARDO. Apple records further show that the devices described below have been linked to the TARGET APPLE ACCOUNT, which is registered for full iCloud services.

a. In June 2015, ASH used iCloud to register an Apple Watch assigned serial number FHLPQ13QG9HM (the "Apple Watch"). I believe that this is the watch referred to in the June 6, 2015 text message exchange between WONG and ASH detailed below.

b. In October 2015, ASH used iCloud to register a rose gold colored iPhone 6S Plus with Apple. The records reflect the mobile phone number was (917) [redacted], the same number listed above.

c. In November and December 2017, ASH used iCloud to register a gold colored iPhone 6 Plus with Apple. The records reflect the mobile phone number was again (917) 6[redacted]

d. On January 20, 2018, ASH used iCloud to register a silver colored iPhone X (the "iPhone X"). The iPhone X was assigned IMEI 359411085759641. I believe this is the same iPhone X that ASH stated she received from WONG in January 2018, prior to being asked to sign the January Memorandum described above. The records reflect the mobile phone number was again (917) 6[redacted]

37. Based on my review of Apple customer service records associated with ASH, I have learned the following:

a. On June 21, 2018 (approximately three days after receiving the second grand jury subpoena), ASH phoned Apple support to seek assistance in erasing the contents of an Apple device and to schedule an appointment at an Apple Genius Bar location. Specifically, she stated that she wished to transfer the contents of an iPhone X to another Apple device because she wished to give someone the iPhone X as a gift. (As noted above, during my July 9, 2018 meeting with ASH, she stated that the iPhone X was wiped to return to the Credit Union, which appears to be contrary to what she told Apple, and which had not even occurred by that date.)

b. On June 23, 2018, ASH appeared in person an Apple store Genius Bar. Apple customer service notes from the visit show that the "customer came in with two iPhones [and] would like to set one up with iCloud restore and the second to clear completely. Also unpairing watch." The customer service notes additionally

show that the Apple watch was unpaired and an iPhone 6 Plus was one of the phones presented by ASH.

38. A review of T-Mobile records for the phone number (917) 6[redacted] associated with ASH, as described above, show that on January 20, 2018, the IMEI of the cellular device associated with that phone number switched to the IMEI, which according to Apple records, was associated with the iPhone X, and on June 23, 2018, the IMEI of the cellular device associated with that phone number switched from the IMEI associated with the iPhone X back to an IMEI associated with a different cellphone that she had used previously, which indicates that she started using the iPhone X on January 20, 2018 and on June 23, 2018, she stopped using her iPhone X and commenced using a cellular device she had used before she started using the iPhone X.

*Ash's Exchange of Text Messages with Wong*

39. Although, as noted above, ASH claimed that she did not have any text messages responsive to either of the grand jury subpoenas described above, based on a review of text messages obtained from WONG's work cellphones, which were provided to law enforcement by the Credit Union, I know that WONG and ASH corresponded over text message regarding, among other things, certain gifts and benefits, such as Apple devices, provided to ASH by WONG, including an iPhone X that WONG gave to ASH at around the same time he asked her to sign the January Memorandum, which WONG in turn provided to law enforcement. I also know that ASH texted WONG from a phone with the number (917) 6[redacted] the same phone number associated with her, as described above (and all such messages described below are with that number, unless otherwise specified). For example:

a. On January 21, 2015, ASH texted WONG, "Good morning Kam, The Laptop I would like is the Mac Air…Thanks." WONG responded, "Yes, I wouldn't give you any cheap stuff. I'll order the bigger one which is still compact and light. I don't think you'll want the smaller 11" inch display one." ASH then responded, "I will rely on your recommendation as the Apple expert. Lastly, I did not know that the word 'cheap' was in your vocabulary."

b. On June 6, 2015, WONG texted ASH, "Sylvia: I just found out that the watch style and model that I gave you they only come in 38mm (same surface) . . . Besides the new watch, I also ordered one more band for you. I think you'll like it. See the picture in my next message. ASH responded, "Love it. It looks very rich and elegant…Just like me (lol)."

c. On June 8, 2015, ASH texted WONG via the TARGET GMAIL ACCOUNT regarding the appointment of a new chair of the Credit Union coordinating committee. The following day, WONG texted ASH at the TARGET GMAIL ACCOUNT, "Hi Sylvia, I received the MCU Park tickets. I will send you the schedule via email. You're the first to select the suite tickets before I offer to the other board and supervisory members." Using the TARGET GMAIL ACCOUNT, ASH later responded, "Just emailed you my preferred dates." On or about June 11, 2015, WONG again texted ASH at the TARGET GMAIL ACCOUNT regarding a recent Credit Union reorganization meeting and committee assignments, and ASH replied, via text by the TARGET GMAIL ACCOUNT, among other things, "I love the watch band. It is adjustable and the stainless steel band looks like a million bucks."

d. On August 13, 2015, ASH texted WONG, via the TARGET AOL ACCOUNT, "Do you have access to any U.S. Open tickets? Sylvia." WONG replied to ASH at the TARGET AOL ACCOUNT, "What's going on? You have a six-sense or something! Our chemistry is kicking in. I placed an order yesterday. Hopefully I can get at least one game, and the tickets will be yours." ASH replied via the TARGET AOL ACCOUNT, "Great minds think alike."[3]

e. On August 26, 2015, WONG texted ASH, via the TARGET AOL ACCOUNT, "Sylvia: great new! I'm able to get two tickets for the women's final for the U.S. Open-tennis.....but....hush....hush....." ASH replied, via the TARGET AOL ACCOUNT, "My lips are sealed."

f. On September 18, 2015, WONG texted ASH at the TARGET AOL ACCOUNT, "Sylvia, good morning. I was able to secure ONE iPhone 6S ROSE GOLD!! You can have that." ASH later replied by text, via the TARGET AOL ACCOUNT, "Can't wait to get it. I am going to read up on its features today."

g. On January 26, 2016, WONG texted ASH that a Credit Union director had requested an iPad Pro and Apple pencil and WONG planned to tell him he had ASH's approval.

h. On January 26, 2016, WONG texted ASH, "I hope you are flying with style: at a minimum – business class and preferably – first class. Like you said, we are a $2.3 billion financial institution. We have to have class and not a CIS (cheap institutional services) organization!" ASH replied, "Jet blue only have Business

[3] Based on training and experience, I understand a cellphone can be configured to exchange a text message with an email address.

class and they are completely booked. I will be traveling with the 'little people' today (lol)".[4]

i. On January 18, 2018, WONG texted ASH, "Hi Sylvia: I have the silver X that you may like. Do you want to come in to pick it up tomorrow? ASH responded that she would come in the next morning to pick it up.

j. On January 19, 2018, WONG texted ASH, "Oh, Sylvia: I forgot to tell you the AirPod which is the Apple's Bluetooth wireless earphones are very good!!! I'll get you one because they go really nice and work great with the X." ASH responded, "You're the Best." On January 24, 2018, WONG texted ASH, "I have the Airpods. Do you want me to send someone to bring that to you?"

40. I also know, based on a review of text messages obtained from a device seized from WONG's residence pursuant to a judicially-authorized search warrant, that ASH (from telephone number (917) 6[redacted], the same number described above) texted WONG about the investigation. For example, on February 23, 2018, ASH texted WONG, "Hi Kam, So sorry to hear the sad unbelievable news for which there is clearly no legal justification. Please know that you have a true friend in me and I am keeping you and Ruby in my Prayers for God to give you the strength to get through this difficult time. I am also praying that this terrible ordeal will soon be over and that you will be right back where you belong, running MCU as it's [*sic*] CEO/President once again."[5]

*Ash's Exchange of a Text Message with Guagliardo*

41. Although, as noted above, ASH also did not produce any text messages with

---

[4] I understand "lol" to mean "laugh out loud."

[5] Based on my review of documents and my participation in the investigation, I understand "Ruby" to be the first name of WONG's wife.

GUAGLIARDO in response to either grand jury subpoena, I know, based on my review of text messages from a phone believed to be used by GUAGLIARDO and obtained in connection with the execution of a judicially-authorized search warrant of GUAGLIARDO's residence and electronic devices, that ASH and GUAGLIARDO corresponded via text message. Specifically, on February 5, 2018, ASH, using a phone associated with number (917) 6[redacted], that is, the same number described above, sent a picture of multiple New York City Police Benevolent Association ("PBA") cards, and what appeared to be a parking placard and cards associated with New York 10-13 Association, an organization of retired New York City Police Department officers, for which the placard and cards identified GUAGLIARDO as its vice president.

42. Based on my review of text messages produced by the Credit Union from a phone believed to be used by WONG , I know that prior to the above text message, on January 19, 2018, WONG texted with GUAGLIARDO about ASH and PBA cards. Specifically, in relevant part, WONG texted, "I had a good conversation with Sylvia [ASH]." GUAGLIARDO responded, "Good. If you want me. I'm in Staten Island for a few more ours [*sic*]. I'm working and waiting for my friend." GUAGLIARDO also texted, "Hopefully I'll hear from her. Today. I'd like to give you some peace of mind ASAP." The conversation continued:

> WONG: Hear fro [*sic*] Sylvia?
>
> GUAGLIARDO: Yes. Of course. She's looking for PBA cards[[6]]
>
> GUAGLIARDO: Hahahhaha
>
> WONG: Sylvia remembers our conversation. She said if anyone asks for an affidavit for our conversation, she'll sign it.

---

[6] Based on my review of GUAGLIARDO's LinkedIn profile, I know that GUAGLIARDO lists himself as retired from the New York City Police Department, having served from 1982-1989.

GUAGLIARDO: It's all good Kam.

GUAGLIARDO: She understands

WONG: I just said to her that someone is giving me trouble for the LTD insurance offsets.

GUAGLIARDO: She and I have a good enough relationship that if you can't talk to her or anyone else. I'll be able to intervene without a problem.

GUAGLIARDO: Eisner [the Credit Union's outside auditors] is also in a good place with this.

WONG: Ok, that's great.

GUAGLIARDO: Thank you for the trust. !

*Probable Cause Justifying Search of the Subject Accounts*

The TARGET APPLE ACCOUNT

43. As noted above, during our July 9, 2018 meeting, ASH informed me that she had deleted all of her text message exchanges with WONG from her iPhone X. However, Apple records show that Apple's iCloud service was used to restore ASH's user settings and data to her iPhone 6 Plus after the iPhone X was factory reset on June 23, 2018. Accordingly, while ASH's text message exchanges with WONG and/or other Credit Union employees and board members and committee members that were stored in her iPhone X may have been manually deleted by her or wiped by Apple, I submit there is probable cause to believe that at least certain of these same text messages still exist, backed up to the TARGET APPLE ACCOUNT.

44. Moreover, even if such messages are not themselves retained within the TARGET APPLE ACCOUNT, there is probable cause to believe that the content in and data concerning that account—which ASH took the time to restore to her new phone—will nevertheless

constitute evidence, fruits, or instrumentalities of the Subject Offenses, because it will (1) help to demonstrate whether ASH deleted text messages with WONG, or other messages of relevance, while retaining messages with others or on other subjects, thus indicating consciousness of guilt, and (2) assist in establishing nature and pattern of ASH's use of her devices and her use of text messages.

The TARGET GMAIL ACCOUNT and the TARGET AOL ACCOUNT

45. Based on ASH's own production in response to the grand jury subpoenas and her statement to me that she regularly forwarded or copied Credit Union emails to her personal account (although she did not say which one), as well as the text messages detailed above, I further submit that there is probable cause to believe communications between ASH, WONG, and/or other Credit Union employees, board members, or officers are within the TARGET GMAIL ACCOUNT and the TARGET AOL ACCOUNT. Additionally, my review of correspondence and documents produced by the Credit Union revealed that ASH regularly sent, received, forwarded, and/or copied emails about Credit Union business from the TARGET GMAIL ACCOUNT and the TARGET AOL ACCOUNT, and both of these email accounts were listed on a Board member contact list for her. For example, on January 29, 2015, ASH, using the TARGET AOL ACCOUNT, emailed other Board members about WONG's contract extension; and, on April 26, 2016, ASH, using the TARGET AOL ACCOUNT, emailed WONG and others about renegotiating a contribution on behalf of the Credit Union for an event. Similarly, on April 16, 2015, ASH, using her Credit Union email account, emailed BONSU and another Board member, Mark Brantley, about a request from the Credit Union's audit department, and ASH copied the TARGET GMAIL ACCOUNT on the email, and on May 28, 2015, ASH, using her Credit Union email account, forwarded an email she sent to another Credit

Union Board member, [redacted] to the TARGET GMAIL ACCOUNT, along with an attached letter concerning what appears to have been an audit of Board member donations.[7] There is thus probable cause to believe that the content of these accounts will also constitute evidence, fruits, or instrumentalities of the Subject Offenses.

The Subject Accounts Generally

46. In sum, for the reasons described herein, I submit there is probable cause to believe that information stored on Apple and the Email Providers' servers associated with the Subject Accounts will contain evidence, fruits, and/or instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to each of the proposed warrants. Specifically, I believe that there is probable cause to believe that ASH knowingly deleted and/or concealed text messages between her and WONG, and her and GUAGLIARDO rather than produce the same to law enforcement in response to grand jury subpoenas served upon her, and directed Apple to factory reset her iPhone X to seek to destroy and/or conceal evidence being sought pursuant to a grand jury subpoena. I further believe the Subject Accounts will contain records of communications between ASH, WONG, GUAGLIARDO, and/or other members of the Credit Union that were intentionally deleted or not produced by ASH as well as evidence concerning the circumstances surrounding the creation of the January Memorandum, the deletion of ASH's communications, and that, in any event, content of the Subject Accounts will help to establish the nature of and pattern of ASH's use of electronic devices and services, a subject she discussed with law enforcement.

47. In particular, I believe that there is probable cause to believe that the Subject Accounts

[7] Based on my review of documents, I know that Mark Brantley and James Durrah were among the Credit Union Board members with whom communications were requested by the June 18, 2018 grand jury subpoena to ASH.

contain the following information:

a. Communications, including emails, text backed up chat logs, and text messages between ASH, WONG, GUAGLIARDO and other Credit Union employees, board members, and committee members, concerning gifts, payments, service on the Credit Union Board, the January Memorandum, and/or responses to an investigation by law enforcement;

b. Apple deletion and restore logs, records, communications, and correspondence with Apple relating to the factory reset of the iPhone X and/or Apple watch.

c. Transactional information of activity of the Subject Accounts, including log files, account deletion and restore dates, IP addresses, dates, times, methods of connecting, ports, dial-ups, and/or locations.

d. Evidence concerning the location of other evidence of the Subject Offenses, including but not limited to information concerning other email, social media accounts, and electronic storage accounts and clouds capable of backing up and storing data in which records of ASH's communications with WONG and other Credit Union employees are saved or backed up; and

e. Passwords or other information needed to access a user's electronic device(s) or other online accounts that may contain evidence of the Subject Offenses.

**Review of the Information Obtained Pursuant to the Warrants**

48. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under Section 2703, or for the collection or production of responsive records. Accordingly, the warrants requested herein will be transmitted to the pertinent providers, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 14 days from the date of service. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the

nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, and outside vendors or technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrants.

49. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all communications, including emails or text messages, within each of the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords for which an agent is likely to search.

**Request for Non-Disclosure and Sealing Order**

50. Although ASH is aware that she has been subpoenaed and questioned, and is aware of the prosecution of WONG, there no reason to believe that ASH is aware that the Government suspects her having engaged in obstruction of justice, or that she is aware of many of the specific investigative steps or conclusions discussed herein. As a result, premature public disclosure of

this affidavit or the requested warrants could alert ASH that she is under investigation, causing her to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. In particular, given that ASH has already been known to delete or conceal electronic evidence from the Subject Accounts, she could easily delete, encrypt, or otherwise conceal additional digital evidence from law enforcement were she to learn of the scope of the Government's investigation.

51. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrants, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrants for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

52. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**Conclusion**

53. Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

LAVALE JACKSON
SPECIAL AGENT
USAO-SDNY

Sworn to before me this
18th day of March 2019.

Honorable James L. Cott
United States Magistrate Judge
Southern District of New York

# Exhibit 1
(Complaint Against Kam Wong)

Approved: [signature]
Eli J. Mark/Daniel C. Richenthal
Assistant United States Attorneys

Before: THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

18 MAG 3876

| | |
|---|---|
| UNITED STATES OF AMERICA | : **SEALED COMPLAINT** |
| - v. - | : Violations of 18 U.S.C. §§ 657, 1028A, 1343, and 1344 |
| KAM WONG, | : |
| Defendant. | : COUNTY OF OFFENSE: NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

LAVALE JACKSON, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), and charges as follows:

**COUNT ONE**
**(Embezzlement from a Credit Union)**

1. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, an officer, agent and employee of an institution, the accounts of which are insured by the National Credit Union Administration Board ("NCUA"), embezzled, abstracted, purloined and willfully misapplied money, funds, credits, securities, and other things of value belonging to such institution, to wit, WONG, the chief executive officer and president of an NCUA-insured credit union (the "Credit Union") embezzled and willfully misapplied money from the Credit Union by providing false and fraudulent information in connection with sham dental care reimbursements ostensibly owed to him, with the intent to injure and defraud the Credit Union.

(Title 18, United States Code, Section 657.)

COUNT TWO
(Defrauding a Financial Institution)

2. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, knowingly executed a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, WONG perpetrated a fraudulent scheme to obtain, by means of false pretenses and representations, money from the Credit Union in connection with sham dental care reimbursement requests.

(Title 18, United States Code, Section 1344.)

COUNT THREE
(Wire Fraud)

3. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WONG, including by the use of interstate emails, perpetrated a fraudulent scheme to obtain, by means of false pretenses and representations, money from the Credit Union in connection with dental care reimbursement requests.

(Title 18, United States Code, Section 1343.)

COUNT FOUR
(Aggravated Identity Theft)

4. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, WONG possessed,

used, and transferred the name of a dentist in connection with sham dental care reimbursement requests, as charged in Counts Two and Three of this Complaint.

(Title 18, United States Code, Section 1028A.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Special Agent with the USAO-SDNY, and have been in that position for approximately four years. For over the past year, I have been personally involved in the investigation of this matter, along with other Special Agents of the USAO-SDNY. Previously, I was a Special Agent with the U.S. Department of Labor-Office of Inspector General ("DOL-OIG") for over nine years. While with the USAO-SDNY and DOL-OIG, I have participated in multiple investigations of fraud and corruption offenses, including involving non-profit institutions.

6. I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, from my conversations with other law enforcement agents and personnel, and witnesses, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. In addition, this investigation is ongoing, and the monetary calculations are based on the records obtained to date and are approximates, unless otherwise noted. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

7. As described in greater detail below, an ongoing investigation has revealed, to date, that KAM WONG, the defendant, Chief Executive Officer ("CEO") and President of the Credit Union, has engaged in a long-running multi-faceted scheme to obtain money from the Credit Union to which he was not entitled, and has taken steps to seek to conceal what he has done. Among other things, WONG has defrauded and embezzled from the Credit Union by submitting invoices for dental work never performed on him or paid by him, and, as a result, obtained reimbursement for hundreds of thousands of dollars of such nonexistent dental work, as well as for his alleged personal tax liability for these and other payments or benefits. In addition

to committing fraud in connection with dental reimbursements, as set forth below, the ongoing investigation has revealed that WONG has obtained numerous other payments from the Credit Union under suspicious or questionable circumstances. WONG's scheme has harmed the non-profit Credit Union and its members, by stealing earnings that are intended to go back to its members in the form of more favorable rates and fewer and lower fees for products and services.

## Relevant Parties

8. I have learned the following based on my interviews of current and former employees of the Credit Union, my review of records obtained from the Credit Union, and my review of publicly-available information:

**KAM WONG**

a. KAM WONG, the defendant, is the CEO of the Credit Union, and has been since 2007. He has also held the title of President of the Credit Union since 2006. WONG has been employed by the Credit Union since 1981, and previously served as its Chief Financial Officer.

b. Since becoming CEO, WONG has been the highest paid employee of the Credit Union. His annual salary as of January 1, 2018 was $684,137. WONG's employment with the Credit Union is governed by a written employment contract (the "Contract") entered into between himself and the Credit Union's Board of Directors. The Contract provides for a salary, a bonus (to be determined annually by the Board of Directors), and several benefits, including various forms of insurance and a leased automobile. Pursuant to the Contract, WONG caused the Credit Union to lease multiple high-end luxury vehicles for him, including a late model Mercedes Benz, a Maserati Gran Turismo, and, most recently, a 2018 Ferrari California T.

c. On or about February 22, 2018, WONG was placed on paid administrative leave by the Credit Union's Board of Directors upon the recommendation of a Special Committee overseeing an internal investigation prompted by this criminal investigation.

**The Credit Union**

d. Credit unions are not-for-profit financial institutions that are cooperatively owned by their customers, who are known as "members." As the Credit Union explains on its

publicly accessible website, credit unions, in contrast to banks, "focus on serving members, rather than on maximizing profit." As a result, a credit union's "[e]arnings [are intended to] go back to members in the form of more favorable rates and fewer and lower fees for products and services."

e. The Credit Union, with headquarters in downtown Manhattan where WONG had an office and worked, is the oldest credit union in New York State and one of the oldest and largest in the country. The Credit Union provides banking services to its more than 425,000 members. Membership is available to employees of New York City and its agencies, employees of the federal and New York state governments who work in New York City, employees of hospitals, nursing homes and similar facilities located within New York State, and others who are eligible as specified in the Credit Union's bylaws.

f. The Credit Union is overseen by a Board of Directors and a Supervisory Committee, which are both composed of volunteer, uncompensated members of the Credit Union.

g. The Credit Union has more than $2.4 billion in member accounts, each of which is federally insured for at least $250,000 by the National Credit Union Share Insurance Fund, administered by the NCUA, a United States government agency. The Credit Union has branches in the five boroughs of New York City, Long Island, and Westchester.

## Dental Reimbursement Scheme

9. As described in greater detail below, the investigation, which is ongoing, has revealed that KAM WONG, the defendant, defrauded and embezzled from the Credit Union by requesting and receiving reimbursement for dental work that he never received and for which he did not pay. In furtherance of this scheme, WONG submitted sham invoices to the Credit Union for purported dental expenses, fraudulently obtaining more than $280,000 from the Credit Union, as well as additional money to pay his personal tax liability on his purported dental reimbursements.

10. Based on my review of records obtained from the Credit Union, I have learned that defendant KAM WONG's Contract with the Credit Union, which is dated February 2, 2005, and was subsequently amended five times, provides that the Credit Union will provide to WONG several forms of insurance. With respect to expenses for dental care, at all relevant times, the Contract provided not only for WONG to receive dental insurance for

himself and his spouse (which they obtained), but also, pursuant to the Fourth Amendment to the Contract, for WONG to receive reimbursement for "all uninsured medical/dental costs." The Contract does not provide--and has never provided--that the Credit Union will pay the personal taxes that WONG owes on these dental benefits to the extent that they might be deemed taxable income.

11. Based on my interviews of current and former senior management of the Credit Union, and my review of records obtained from the Credit Union to date, including accounting files, I have learned the following:

a. Between at least August 2013 and January 2018, KAM WONG, the defendant, requested and received reimbursement from the Credit Union for approximately $440,000 in dental expenses purportedly provided by two dentists ("Dentist-1" and "Dentist-2," together, the "Dentists"), allegedly paid for by WONG, and not covered by insurance.

b. WONG arranged for the Credit Union to make these dental reimbursement payments immediately upon his request, and directed that they be paid through the issuance of handwritten checks, instead of through the normal payroll system, which would have taken additional time to process. In so doing, WONG did not explain why such speed was necessary.

c. In connection with his requests for reimbursement of alleged dental expenses, WONG submitted to the Credit Union, including by emails to the Credit Union's Chief Financial Officer ("CFO") and Chief Human Resources Officer (the "HR Officer"), invoices purporting to be from the Dentists indicating services rendered and paid for by WONG. As described below, at least two dozen of these invoices were shams.

d. In addition, when the Credit Union reimbursed WONG for his purported dental expenses, WONG directed that the Credit Union pay additional money for WONG's purported personal federal and state tax liability associated with these payments, in the amount of an additional approximately $247,000.

12. Based on my interviews of the Dentists, my review of the Dentists' records, including billing records, which each of Dentist-1 and Dentist-2 has separately provided to the Government, and my comparison of those records with records provided by the Credit Union, I have learned the following:

a. Between approximately January 2013 and January 2018, KAM WONG, the defendant, in fact paid Dentist-1 approximately $145,675 for dental services, and WONG in fact paid Dentist-2 approximately $8,595 for dental services, resulting in approximately $154,370, in total, for services rendered during this time period.

b. During this same time period, at least two dozen invoices that WONG provided to the Credit Union in connection with WONG's dental reimbursement requests were not contained in Dentist-1's and Dentist-2's complete billing records, and each of Dentist-1 and Dentist-2 has separately confirmed that these invoices (the "Sham Invoices") are not legitimate invoices from his or her practice.

c. The Sham Invoices that WONG submitted to the Credit Union closely resemble real invoices prepared for WONG by Dentist-1 and Dentist-2. The Sham Invoices list dates of services, fees for services, billing codes, and a description of services allegedly provided. The Sham Invoices for Dentist-1 also include Dentist-1's name, office address, a stamp with his or her name and address, and Dentist-1's purported signature. However, the Sham Invoices have minor differences from the legitimate invoices prepared by the Dentists and their respective staffs, including with respect to font, formatting, spacing, and/or spelling. The Sham Invoices include, for example, fake signatures, fake stamps, misspellings of certain words, and/or improper billing codes. Dentist-1 also informed me that several of the Sham Invoices that purported to be for services provided by Dentist-1 were for services rendered during a time period when Dentist-1 was in the hospital and no longer practicing dentistry, and thus could not be real.

<u>Additional Payments Requested and Received by WONG</u>

13. The investigation into KAM WONG, the defendant, is ongoing, and it has revealed multiple additional instances in which WONG requested and received substantial payments from the Credit Union based on what appear to be false or misleading representations, as set forth in greater detail below. Based on my review of Credit Union records and interviews performed during the investigation, I have learned that, beginning in about 2015, those payments--purportedly relating to, most significantly, long-term disability as well as payments that WONG directed the Credit Union pay for taxes on these payments--more than doubled WONG's annual compensation from the Credit Union.

## Long-Term Disability Insurance

14. *First*, based on my review of Credit Union records, and my interviews of Credit Union officers and board members, I have learned that, as set forth in greater detail below, between approximately June 2015 and January 2018, KAM WONG, the defendant, requested and obtained more than $3.6 million from the Credit Union in lieu of the Credit Union providing him with supplemental long term disability ("LTD") insurance, as well as more than $3.1 million to cover WONG's personal taxes on this sum. The Contract entitled WONG to LTD insurance, to be paid for by the Credit Union, beginning in or about 2007, but WONG did not elect for the Credit Union to obtain such insurance (nor did WONG do so on behalf of the Credit Union). Instead, beginning in or about June 2015, WONG sought for the Credit Union to pay him directly, in lieu of the Credit Union obtaining such insurance (the "LTD Offset Payments"), by representing to the Credit Union officials that LTD insurance would be too costly for the Credit Union. The investigation to date has revealed the following:

a. WONG discussed the option of LTD Offset Payments with certain officials from the Credit Union and its Board of Directors in or about June 2015. In connection with that discussion, WONG represented that LTD insurance dating back to the time he became CEO (2007) and forward to the conclusion of his contract (2023) would cost or would have cost the Credit Union roughly $1 million, and proposed that WONG instead receive one lump-sum LTD Offset Payment of $200,000. Although the Credit Union's Board of Directors did not formally approve the LTD Offset Payment arrangement or modify the Contract in this regard, at or about this time, WONG began receiving LTD Offset Payments by directing the CFO to write him handwritten checks, which the CFO did.

b. Over time, WONG directed the issuance of far more than $200,000 in LTD Offset Payments, i.e., the figure he originally requested from Credit Union officials. Between approximately June 2015 and January 2018, WONG directed the CFO to issue LTD Offset Payments to him totaling more than $3.6 million. In seeking and obtaining these payments, over time, WONG provided the CFO, as well as the Treasurer of the Board of Directors, with numerous "models" indicating the allegedly escalating cost of insuring WONG, as a measure of what WONG

should receive in LTD Offset Payments.[1] Ultimately, these models estimated that the premiums for insuring WONG would have been $119,000 for the year 2007, and up to $364,673 for the year 2023.

15. Based on my interviews performed in the investigation and my review of Credit Union records to date, I believe the insurance premium calculations in the models that KAM WONG, the defendant, presented to Credit Union officials were substantially inflated by WONG. Among other things, I have learned the only estimate that WONG appears to have received from an insurance broker ("Broker-1") for LTD insurance indicated that such insurance would cost the Credit Union between $20,000 to $30,000 per year. I also know, based on my interview of Broker-1, that after in or about January 2018 – after I had interviewed WONG about the LTD Offset Payments – WONG contacted Broker-1 in an apparent attempt, for the first time, to obtain support for his "models" and the premium estimates that they were based upon. In response, Broker-1 told WONG that "if I'm an athlete I want you as my agent," by which Broker-1 meant that, in Broker-1's view, the models requested an amount of money not justified by the actual insurance market.

16. On or about January 18, 2018, after identifying ourselves and informing KAM WONG, the defendant, that there was an investigation into payments he had received, I and other law enforcement agents questioned WONG about, among other things, the LTD Offset Payments. WONG informed me that the LTD Offset Payments had been approved by the Board of Directors, which, as set forth herein, does not appear to have happened, at least in any formal manner. On or about January 22, 2018, approximately four days later, however, WONG attended a Credit Union Board committee meeting and requested that the committee "retroactively" recommend that the Board approve the LTD Offset Payments, which the committee did recommend. Based on my review of Credit Union records and interviews with Credit Union board

[1] Before submitting these models to the CFO to direct the payment of LTD Offset Payments, KAM WONG, the defendant, obtained the signature of the Treasurer on the models. Based on my participation in this investigation, I do not believe that the Treasurer was aware of the substantially inflated nature of the premium calculations set forth in the models. In addition, the models, on their face, do not purport to relate to LTD insurance, nor do they indicate that they relate to payments to WONG at all.

members and officials, I believe that in seeking and obtaining this retroactive "approval," WONG made false and misleading statements to the Board committee, including with respect to the inflated costs of LTD insurance, as discussed herein.

**Vehicle Repairs**

17. *Second,* based on my review of Credit Union records and interviews performed during the investigation, I have learned that KAM WONG, the defendant, requested and received reimbursement from the Credit Union for certain damage to vehicles that the Credit Union leased for him, for which it appears WONG did not pay and thus did not need reimbursement. This included that, in or about 2011, WONG requested and received reimbursement from the Credit Union in connection with a May 20, 2011 estimate from an auto body shop ("Shop-1") for repair work of $25,333.26 on a 2011 Mercedes Benz E550 (the "2011 Mercedes"). Based on my interview of a representative of Shop-1 and my review of records received from Shop-1, I have learned that WONG did not personally pay for repair work on the vehicle, and that, instead, WONG submitted an insurance claim for the repair for damage to the 2011 Mercedes, and the insurance company paid for the repair work.

**ATM Withdrawals**

18. *Third,* based on my review of Credit Union records and interviews performed in the investigation, I have learned that, between in or about July 2013 and September 2013, KAM WONG, the defendant, withdrew cash from ATMs on numerous occasions, in amounts of approximately $500 each time, using a Credit Union credit card he was issued for business expenses. WONG continued to withdraw these cash advances until he was questioned by the Credit Union accounting department about this activity, and then claimed that he was conducting "tests" of the ATMs. WONG agreed to reimburse the Credit Union for the money, totaling more than $8,000. Based on my interviews with the then-current Vice President of Finance and the then-current CFO, neither had been aware, at that time, of WONG engaging in any "testing" of the Credit Union's ATMs, or having any reason to do so as CEO.

**Payment of Expenses for a Friend's Relatives**

19. *Fourth,* based on my interviews of current and former Credit Union senior management and my review of Credit Union records, I am have learned that, beginning in or about 2010 and continuing until at least on or about January 2018, KAM

WONG, the defendant, directed the HR Officer and the Credit Union's CFOs (both its current and former one) to have the Credit Union pay for visas, tuition, textbooks, housing, and various living expenses for two young relatives of a family friend of WONG in Hong Kong, who served initially as interns to the Credit Union. These expenses totaled more than a hundred thousand dollars, and included, most recently, a luxury downtown rental of $5,245 per month, which WONG directed the HR Officer to pay, for which the HR Officer then received reimbursement from the Credit Union.

**Cash Advances**

20. *Fifth*, based on my interviews of the current and former Credit Union CFO, and my review of Credit Union records, I have learned that, from at least 2011 through 2017, KAM WONG, the defendant, annually requested and received tens of thousands of dollars of cash advances from the Credit Union under what appears to be suspicious or questionable circumstances. Specifically, I have learned that:

a. WONG did not supply any invoices or other documentation detailing what these cash advances were spent on.

b. In approximately 2011, after the then-current CFO ("CFO-1") questioned approximately $30,000 in cash advances, WONG told CFO-1 that WONG was too busy to provide supporting documentation, and requested a personal loan from CFO-1 in order to reimburse the Credit Union for this money. CFO-1 then provided a $30,000 personal loan to WONG (in cash), and WONG then reimbursed the Credit Union.[2]

c. In or about November 2013, CFO-1 again questioned WONG about the lack of supporting documentation for cash advances, because the Credit Union's auditors were planning to come to the Credit Union. WONG then reimbursed the Credit Union, by an official check, approximately $24,900, for cash advances. However, even after this date, WONG continued to request tens of thousands of dollars annually for cash advances, for which he did not provide supporting documentation.

---

[2] Based on my interview of CFO-1, I have learned that WONG did not repay this loan for at least approximately two years. In approximately 2014, a few weeks after he repaid the loan, WONG asked CFO-1 to borrow $5,000 in cash, which he or she provided. WONG never repaid CFO-1 that money.

**Payments Relating to Sick Leave**

21. *Sixth,* based on my review of Credit Union records and interviews of current and former Credit Union senior management, I have learned that between 2009 and 2012, KAM WONG, the defendant, took cash payments in lieu of 320 sick days that he purportedly had not used, which exceeded the limits set in the Contract and Credit Union policy, which limits provided, during the relevant period, that an employee could accrue a maximum total of 70 days of unused sick leave during his or her tenure at the Credit Union.[3]

<u>Wong's Apparent Lottery Habit and His Use of Criminal Proceeds</u>

22. Based on my review of Credit Union records and interviews performed during the investigation, I have learned that KAM WONG, the defendant, spent at least approximately $3.55 million on the New York State Lottery between July 2013 and January 2018, as described further below. In addition, at the same time when WONG was defrauding and embezzling from the Credit Union, as described above, WONG also sought and borrowed money from several sources, including from CFO-1 and Broker-1, which he used, at least in part, to purchase lottery tickets.

23. Based on my review of records obtained from the Credit Union and my conversations with other law enforcement personnel, I have learned the following:

a. Between July 2013 and January 2018, KAM WONG, the defendant, received and deposited almost $6 million of hand-written checks from the Credit Union into his account at the Credit Union. Much, but not all, of this money was proceeds of the conduct described above. From that account, WONG wrote more than approximately 278 checks, totaling approximately $3.9 million, between July 2013 and January 2018. WONG wrote approximately 52 checks, totaling approximately $272,500, to a

---

[3] In connection with obtaining payment for some of these requests for sick leave, KAM WONG, the defendant, submitted to Credit Union senior management memoranda signed by the then-current chair of the Board of Directors purportedly approving these requests. Based on my review of Credit Union records and interviews conduct in the investigation, I believe that in seeking and obtaining this approval, WONG made false and misleading statements to the chair of the Board, including with respect to the number of days of sick leave that he had accrued and to which he was entitled.

convenience store located a few blocks from WONG's office ("Store-1"), and approximately 131 checks, totaling approximately $3,076,000, to a convenience store in Elmont, New York ("Store-2"), located within a mile of WONG's home, as well as 33 checks, totaling approximately $200,000, to the owners of Store-2.

b. In addition, between July 2013 and January 2018, WONG withdrew from his Credit Union accounts more than $1.9 million via ATMs over the course of approximately 2,592 transactions, sometimes occurring multiple times a day.

24. Based on my interviews of the owners of Store-1 and Store-2, and my review of bank records, I have learned that the checks KAM WONG, the defendant, wrote to Store-1 and Store-2 – totaling more than $3.3 million – were primarily for the purchase of New York State Lottery tickets, and that, on the weekends, at times, KAM WONG, the defendant, spent hours at Store-2 purchasing and playing lottery tickets.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of KAM WONG, the defendant, and that he be imprisoned or bailed, as the case may be.

LaVale Jackson
Special Agent
United States Attorney's Office
Southern District of New York

Sworn to before me this
7th day of May 2018

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit G

# CONSENT TO SEARCH - DEVICES

I, _______Stella Mendes, Administrator___, of __Municipal Credit Union__________________,

voluntarily consent to a complete search of the following devices:

1. An iPhone 5 with IMEI 990002737556421 (Kam Wong);
2. An iPhone 5 with IMEI 990002788815353 (Kam Wong);
3. A MacBook Pro with serial number C02JJ0UFDKQ5 (Kam Wong);
4. An iPad Air 2 with serial number DMPPQ3SEG5YN (Giovanni Porcelli);
5. An iPhone X with serial number F18VN3YCJCL8 (Giovanni Porcelli);
6. An iPhone 6 Plus with IMEI 354385063280322 (Pauline Tse);
7. An iPhone 6S Plus, Model A1687 (Pauline Tse);
8. An iPhone 5 with IMEI 990002753574274 (Pauline Tse);
9. An iPad Pro with serial number DLXR52E8GMW5 (Pauline Tse);
10. A Spectre laptop with serial number 5CD6224H2Z (Pratik Desai);
11. An iPad Pro with serial number DLXR5X66GMW3 (Pratik Desai);
12. An iPhone 6S Plus, Model A1687, FCC ID BCG-E2944A, IC 579C-E2944A (Nana Osei-Bonsu);
13. An iPad Air 2 with serial number DMPPQ3Q5G5YN (Nana Osei-Bonsu);
14. An HP Probook 470 G4 laptop with serial number 5CD6374Y2G (Beryl Major);
15. An iPhone 7 Plus, Model A1661 (Carrol Duncanson);
16. An iPad Pro with serial number DLXSM47RGMW3 (Carrol Duncanson);
17. An iPad Air 2 with serial number DMPPQ3UFG5YN (Mario Matos);
18. An iPad Pro with serial number DLXSM4GLGMW3 (Mario Matos);
19. An iPhone X (Sylvia Ash);
20. An Apple watch with serial number FHLPQ13QG9HM (Sylvia Ash);
21. An iPhone 6 with IMEI 35930906872945 (James Durrah);
22. A Spectre laptop with serial number 5CD5268390 (Mark Brantley);
23. An iPad Mini with serial number F4LjPCTBF196 (Mark Brantley);
24. An iPad with serial number DMPLK664F4YK (Mark Brantley); and
25. An iPad Pro with serial number DLXSM3WHGMW3 (Mark Brantley).

by members of the New York County District Attorney's Office, including the High Technology Analysis Unit ("HTAU"), for information, including electronic or electronically stored items, which may constitute evidence. I understand that any recovered data contained within the above listed devices may be downloaded, extracted, copied, printed, or otherwise reproduced by converting it or copying it into storage in another form or device. I also consent to members of the New York County District Attorney's Office ("DANY"), including HTAU personnel, sharing the recovered data with members of the United States Attorney's Office, Southern District of New York (USAO-SDNY"). Moreover, I understand that Rule 502 of the Federal Rules of Evidence will cover communications or information covered by the attorney-client privilege or work-product protection recovered from the below-listed devices, and that DANY and USAO-SDNY consent to the clawback of communications or information pursuant to the Federal Rules of Evidence.

I am a legal owner or lawful custodian of the devices being searched. I understand that I have the right to refuse to consent to this search and that I can request that a search warrant be obtained before any search is conducted.

I am giving my consent voluntarily and without threats or promises of any kind being made to me.

Stella Mendes

*Name of person consenting [PRINT]*

Stella M. Mendes

*Signature of person consenting*

10/30/18

*Date and time*

Witness: Gigi Taliaferro *Print Name* *Signature*

# Exhibit Q

A-120

Reset Device Chain of Custody -- DRAFT
As of February 4, 2019

| | Device | IMEI/Serial Number | MCU Assignee of the Device | Person at MCU to whom device was returned | Date of Return to MCU | Method of Return to MCU | Date of Delivery to MCU Legal Department | Person in MCU Legal Department to whom device was | Date of Delivery to EBG and EBG Custodian | Date of Delivery to Stroz Friedberg |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | iPhone 5 | IMEI: 990002737556421 | [redacted] | | | | | | | |
| 2 | iPhone 5 | IMEI: 990002788815353 | | | | | | | | |
| 3 | MacBook Pro | SN: C02JJ0UFDKQ5 | | | | | | | | |
| 4 | iPad Air 2 | SN: DMPPQ3SEG5YN | | | | | | | | |
| 5 | iPhone X | SN: F18VN3YCJCL8 | | | | | | | | |
| 6 | iPhone 6 Plus | IMEI: 354385063280322 | | | | | | | | |
| 7 | iPhone 6S Plus, Model A1687 | IMEI: 353337071687981 | | | | | | | | |
| 8 | iPhone 5 | IMEI: 990002753574274 | | | | | | | | |
| 9 | iPad | IMEI: DLXR52E8GMW5 | | | | | | | | |
| 10 | Spectre laptop | SN: 5CD6224H2Z | | | | | | | | |
| 11 | iPad Pro | SN: DLXR5X66GMW3 | | | | | | | | |
| 12 | iPhone 6S Plus, Model A1687 | SN: F2LQLEBJGRX2 | | | | | | | | |
| 13 | iPad Air 2 | SN: DMPPQ3Q5G5YN | | | | | | | | |
| 14 | HP Probook 470 G4 | SN: 5CD6374Y2G | | | | | | | | |
| 15 | iPhone 7 Plus, Model A1661 | SN: FCLTN23HHFXY | | | | | | | | |
| 16 | iPad Pro | SN: DLXSM47RGMW3 | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | iPad Air 2 | SN: DMPPQ3UFG5YN | [redacted] | | | | | | | | |
| 18 | iPad Pro | SN: DLXSM4GLGMW3 | | | | | | | | | |
| 19 | iPhone X | SN: DNPVPAQSJCL9 | Sylvia Ash | Bridget Cisneroz | July 17, 2018 | Picked up from Sylvia's attorney by MCU courier | July 17, 2018 | CarolAnn Cocchiere | -- | | September 17, 2018 |
| 20 | Apple Watch | SN: FHLPQ13QG9HM | Sylvia Ash | Bridget Cisneroz | July 17, 2018 | Picked up from Sylvia's attorney by MCU courier | July 17, 2018 | CarolAnn Cocchiere | -- | | September 17, 2018 |
| 21 | iPhone 6 | IMEI: 35930906972945 | [redacted] | | | | | | | | |
| 22 | Spectre laptop | SN: 5CD5268390 | | | | | | | | | |
| 23 | iPad Mini | SN: F4LjPCTBF196 | | | | | | | | | |
| 24 | iPad | SN: DMPLK664F4YK | | | | | | | | | |
| 25 | iPad Pro | SN: DLXSM3WHGMW3 | | | | | | | | | |

A-121

# Exhibit S

Department of Financial Services

Reports and Publications

# DEPARTMENT OF FINANCIAL SERVICES TAKES POSSESSION OF MUNICIPAL CREDIT UNION AND NAMES NCUA AS CONSERVATOR

Acting Financial Services Superintendent Linda A. Lacewell today announced the Department of Financial Services (DFS) has taken possession of Municipal Credit Union (MCU) because of unsafe and unsound conditions and has appointed the National Credit Union Administration (NCUA) as conservator.

Member accounts at MCU are protected by the National Credit Union Share Insurance Fund, which is administered by the NCUA. The Share Insurance Fund insures individual accounts up to $250,000; a member's interest in all joint accounts combined is insured up to $250,000. The NCUA Share Insurance Fund also separately protects IRA and KEOGH retirement accounts up to $250,000. The Fund has the backing of the full faith and credit of the United States.

"DFS is taking possession of MCU and appointing the NCUA as conservator in order to continue the close joint DFS/NCUA monitoring of the credit union's condition, operations, and controls, to ensure that member funds are protected and that member services continue without interruption," **Acting Superintendent Lacewell said.**

In 2017 DFS had uncovered deficiencies in board oversight that had facilitated the multi-million-dollar embezzlement by the former CEO, Kam Wong. Wong was charged by the Manhattan

U.S. Attorney with embezzlement and banned from the credit union industry by the NCUA in May 2018. He pleaded guilty to embezzling nearly $10 million from MCU in November 2018.

The Department removed MCU's Supervisory Committee in May 2018, and its board of directors in June 2018 due to severe deficiencies in their oversight of the over-all management of the affairs of the credit union and designated an on-premises Administrator to oversee the general management of the credit union. Based on ongoing supervision by DFS and NCUA, DFS made the decision today to appoint NCUA as conservator and terminate the Administrator's engagement.

While continuing normal member services, NCUA will work to resolve issues affecting the credit union's operations. Members can continue to conduct normal financial transactions, deposit, access funds, make loan payments, and use shares. MCU is a New York State-chartered credit union.

For answers to frequently asked questions that MCU members may have, please click here.

###

## Contact NYDFS Press Office

Contact us by phone:
(212) 709 - 1691

Contact us by email:
public-affairs@dfs.ny.gov

Who We Supervise

Institutions That We Supervise

The Department of Financial Services supervises many different types of institutions. Supervision by DFS may entail chartering, licensing, registration requirements, examination, and more.

Learn More

**Department of Financial Services**

**About Us**

Our History

Mission and Leadership

Careers With DFS

Procurement

Advisory Boards

**State Laws & Regulations**

State Codes, Rules & Regulations

State Laws (LBDC)

State Bills & Laws (Senate)

**Website**

Accessibility & Reasonable Accommodations

Disclaimer

Language Access

Privacy Policy

Site Map

**Language Assistance**

English

Español

Kreyòl ayisyen

Polski

Русский

বাঙালি

中文

한국어

**Connect With Us**

Facebook Instagram Twitter

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
UNITED STATES OF AMERICA,

Plaintiff,

-against- 19-cr-0780 (LAK)

SYLVIA ASH,

Defendant.
------------------------------------------x

**MEMORANDUM OPINION**

Appearances:

Eli J. Mark
Daniel C. Richenthal
Assistant United States Attorneys
Alona Katz
Special Assistant United States Attorney
GEOFFREY S. BERMAN
UNITED STATES ATTORNEY
*Attorneys for Plaintiff*

Carrie H. Cohen
MORRISON & FOERSTER LLP
*Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

Sylvia Ash, a New York State judge, has been charged with conspiring to obstruct, and obstructing, a federal investigation into the embezzlement and fraud perpetrated by the chief executive officer and president of the Municipal Credit Union ("MCU"), Kam Wong.[1] Ash had served on the MCU's board of directors from 2008 until August 2016, the last fifteen

1 Complaint [DI 1] [hereinafter "Compl."] ¶¶ 9-10.

months as its chair.[2] From at least 2012 until 2016, Ash received thousands of dollars in reimbursements and other benefits from the MCU, such as Apple devices, tickets to sporting events, and airfare.[3] The government alleges that in 2015 alone, the MCU spent approximately $63,408 for the benefit, or at the direction, of Ash, the most of any director that year.[4] After her resignation, Ash allegedly continued to receive gifts from the MCU and/or Wong, who obtained items from, or charged them to, the MCU.[5] It further alleges that in 2017, even though she had resigned from the board, the MCU spent approximately $4,284 for Ash's benefit.[6] Among the items Ash received was an iPhone, in January 2018, from Wong.[7]

The government charges that in January 2018, Ash signed a false and misleading memorandum purporting to justify millions of dollars that Wong had received from the MCU.[8] It alleges also that she later concealed and deleted text messages and emails, wiped the iPhone's contents, and made false and misleading statements to federal investigators.[9] Based on this alleged conduct, Ash was indicted on one count of conspiracy to obstruct justice and two substantive counts of obstruction.

The matter is before the Court on Ash's motion to suppress: (1) all evidence based on or derived from the iPhone, (2) all evidence obtained by search warrants executed on

---

2 *Id.* ¶ 11(f).

3 *Id.* ¶ 12(b).

4 *Id.*

5 *Id.* ¶¶ 12(b)-(c).

6 *Id.* ¶ 12(c).

7 *Id.* ¶¶ 21-25, 33(e).

8 *Id.* ¶¶ 10, 14-28; *see also* Indictment [DI 9] ¶¶ 2, 4-5.

9 Compl. ¶¶ 29-46; *see also* Indictment ¶¶ 2-4, 6.

two of Ash's personal email accounts, (3) statements made in interviews with the government, and (4) her grand jury testimony. In the alternative, Ash seeks discovery and an evidentiary hearing related to this evidence. For the reasons set forth below, the motion is denied in its entirety.

## *Facts*

### *I. The Government's Investigation and Ash's Alleged False and Misleading Statements*

During his tenure as chief executive officer and president, Wong embezzled approximately $9.9 million dollars from the MCU by submitting requests for various employment benefits to which he was not entitled.[10] These included reimbursements for dental work, vehicle expenses, and payments in lieu of long-term disability insurance ("LTD Offset Payments").[11]

In January 2018, upon learning of the criminal investigation, Wong sought to obstruct justice by making misleading statements to federal investigators and by creating false documents related to the LTD Offset Payments, one of which Ash signed.[12] That same month, Wong provided Ash with an Apple iPhone.[13]

The government continued its investigation into Wong throughout 2018. As part of the investigation, it served Ash with subpoenas on March 13, 2018 and June 18, 2018 that requested various documents related to and communications with Wong.[14] Ash did not produce

---

10 Declaration of Carrie H. Cohen [DI 37] [hereinafter "Cohen Decl."] Ex. E at ECF 9-10, 39- 40.

11 *Id.* at ECF 9-11.

12 *Id.* at ECF 10-13; Compl. ¶¶ 4-5.

13 Compl. ¶¶ 20-21, 25, 33(e).

14 *Id.* ¶¶ 31, 35.

any materials in response to the first subpoena.[15] On or about July 6, 2018, Ash produced documents responsive to the second subpoena through her then-retained counsel, Roger Archibald.[16] The government alleges that this production was incomplete.[17]

Between March 1, 2018 and July 9, 2018, the government conducted four interviews of Ash in which she allegedly made false and misleading statements.[18] She was represented by counsel (Archibald) only for her July 9, 2018 interview. On August 16, 2018, Ash appeared before the grand jury, again represented by Archibald.[19]

## *II. The MCU's Investigation and Ash's Alleged Destruction of Evidence from the iPhone*

The MCU also investigated Wong's misconduct.[20] In connection with its internal investigation, the MCU on June 19, 2018 sent Ash a letter requesting the return of any electronic devices issued to her by the MCU, or by any current or former MCU employees, and instructed her not to "wipe, delete, reset, factory restore, image or copy" any such devices.[21] The letter did not include any information about the MCU's – or government's – possible uses of the iPhone or

---

15 *Id.* ¶¶ 32-34.

16 *Id.* ¶ 39.

17 *Id.*

18 *Id.* ¶¶ 29, 32-33, 42-43.

19 *Id.*

20 Cohen Decl. Ex. E at ECF 40.

21 *Id.* ¶ 36; Cohen Decl. Ex. O.

The MCU previously had requested that Ash return all MCU-issued devices via an email from the MCU operations manager on May 14, 2018. Compl. ¶ 36 n.10; Cohen Decl. U. The following day, the operations manager instructed Ash to disregard the earlier email "since you've had the devices for 3 years or more." Cohen Decl. U. at ECF 2. Ash did not inform the operations manager that she had received an iPhone from Wong four months earlier, and instead responded: "No comment!!!" *Id.*

its contents.[22]

On June 23, 2018, Ash went to an Apple store to have the contents of the iPhone transferred to another device.[23] According to Apple's customer service notes, "[the] customer came in with two iPhones [and] would like to set one up with iCloud restore and the second to clear completely."[24]

On July 13, 2018, the MCU sent Ash another letter with substantially the same request and instructions as in its June letter.[25] This time, the letter cited the iPhone explicitly as an example of a "MCU-owned device[]" in Ash's possession.[26] In response, Ash returned the iPhone and an Apple watch to the MCU through Archibald.[27] A letter accompanying the electronics stated that Ash "had not wiped, deleted, reset, factory restored, imaged or copied any of MCU's devices."[28] The government alleges that this statement was false.[29]

Several months later, the MCU's outside counsel delivered the iPhone to a cyber services firm.[30] On October 30, 2018, the MCU executed a "Consent to Search" form with

---

22 *See* Cohen Decl. Ex. O.

23 Compl. ¶ 37.

24 *Id.*

25 *Id.* ¶ 45; Cohen Decl. Ex. R.

26 Cohen Decl. Ex. R.

27 Compl. ¶ 45.

Ash, again through Archibald, returned two iPads four months later. Government's Opposition to the Motion to Suppress [DI 42] [hereinafter "Gov't. Op."] Ex. 3. The cover letter accompanying the iPads stated that they were previously "delivered to [Archibald's] office by Judge Ash," and "were apparently mislaid and not returned to MCU per their request." *Id.*

28 Gov't. Op. Ex. 1.

29 Compl. ¶ 46.

30 *Id.*

respect to the iPhone and other MCU-issued devices.[31] The government took possession of the iPhone on November 9, 2018 and transferred it to the New York County District Attorney's device laboratory.[32] A forensic analyst subsequently discovered that the phone had been wiped, precluding the recovery of previously stored text messages or emails.[33]

## *III. Wong's Guilty Plea and the Charges Against Ash*

On December 2, 2018, Wong pled guilty to embezzlement from the MCU.[34] In his plea agreement, he acknowledged "endeavoring to obstruct and impede and obstructing and impeding the administration of justice with respect to the criminal investigation into this matter, and agreeing with one or more others to do the same[.]"[35]

On October 4, 2019, the government filed a criminal complaint against Ash alleging that she was one of the individuals with whom Wong conspired to obstruct justice and that she had committed the substantive offense of obstruction.[36] She was indicted later that month.[37]

---

31 Cohen Decl. Ex G.

32 Compl. ¶ 46.

33 *Id.*

34 *Id.* ¶ 11(g).

35 *Id.*

36 DI 1.

37 DI 9.

*Discussion*

*I. The iPhone*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."[38] This privilege against self-incrimination extends to the production of records when the act of production – independent of the record's contents – is "(1) compelled, (2) testimonial, and (3) incriminating."[39] The individual claiming a violation of the privilege by compulsory production must demonstrate that the production was the result of coercion by or attributable to the government.[40]

Ash contends that any evidence based on or derived from the iPhone should be suppressed because it was obtained in violation of her Fifth Amendment right against self-incrimination. Her argument is premised on the assertion that government was directly involved in the MCU's June 19, 2018 and July 13, 2018 letters requesting the iPhone's return. She would have the Court infer this based on the premise that the government – and not the MCU – would have had an interest in her iPhone data as of June 2018, as Ash no longer was an MCU board member and the device had been used for personal, rather than business, purposes. She contends that this inference is bolstered by the "near[] simultaneous[]" timing of the letters and the June 18, 2018 subpoena requesting communications between Ash and Wong, that the MCU's internal investigation would have "long been completed" by June 2018, and that the government did not explicitly deny that it was involved with the request and is otherwise unwilling to provide its

---

38 U.S. Const. amend. V.

39 *In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173, 176 (2d Cir. 1999).

40 *United States v. Stein*, 541 F.3d 130, 146-47 (2d Cir. 2008).

communications with the MCU regarding the return of the iPhone.[41] Taken together, Ash argues that the MCU's actions were attributable to the government.

The government responds that "it informed the defendant . . . that . . . the Government did not ask or direct MCU to request the defendant to return the iPhoneX (or any other device) to MCU."[42] This arguably falls short of an unambiguous assertion that the government was not involved, even indirectly, with the MCU's request for the phone. Just the same, the facts relied on by Ash to support an inference of government involvement are far from compelling.

First, it seems quite reasonable that the MCU, when investigating Wong's fraudulent spending and reimbursements, would have been interested in Ash's MCU-issued devices. Ash had received thousands of dollars in gifts and benefits from the organization, often at Wong's behest, both before and after her resignation from the board of directors.[43]

Second, while the June subpoena and June MCU letter were sent one day apart, Ash's argument ignores the fact that the first subpoena was sent three months prior to the MCU's June letter.[44]

Third, the MCU's June 13, 2018 press release in which it announced that it was "conducting its own internal investigation led by outside counsel" undermines Ash's claim that

41 Defendant's Memorandum in Support of the Motion to Suppress [DI 36] [hereinafter "Def.'s Mem."] at 10-11.

42 Gov't. Op. at 15.

43 *See* Compl. ¶ 12.

44 *Id.* ¶ 31.

the internal investigation had "long" been completed by the time the MCU sent its June 19, 2018 letter requesting the return of Ash's MCU-issued devices.[45]

Finally, Ash overlooks the fact that the government did not gain possession of her phone until November 2018, approximately four months after the MCU had received it, an unlikely delay if the government had directed the MCU's request.[46]

In the last analysis, however, it is unnecessary to resolve the question whether there was "a sufficiently close nexus between the State and the challenged action of the [MCU] so that the action of the latter may be 'fairly treated' as that of the State itself,"[47] or even to hold a hearing. Ash's argument fails regardless of whether the government somehow instigated the MCU's request.

Suppression is unwarranted where, as here, a defendant is unable to demonstrate that the production was compelled. In the context of records production, the Second Circuit has held that the compulsion element was met in a case in which the defendant was ordered to sign a consent form after he had refused to do so.[48] In contrast, there is no evidence to suggest that the MCU exerted any pressure on Ash, much less pressure sufficient to "deprive[] [Ash] of [her] free choice" to return the phone.[49] Rather, Ash simply complied with the organization's request to return the phone.

---

45 Press Release, MCU, *Municipal Credit Union Board Terminates Kam Wong* (Jun. 13, 2018), https://www.nymcu.org/aboutmcu/mcu-board-terminates-kam-wong.aspx.

46 Compl. ¶ 46.

47 *Stein*, 541 F.3d at 146 (citation omitted).

48 *In re Grand Jury Subpoena,* 826 F.2d 1166, 1168-69 (2d Cir. 1987).

49 *See Garrity v. State of New Jersey,* 385 U.S. 493, 496 (1967) (internal quotation marks and citation omitted).

Ash nevertheless argues that she was coerced into turning over the iPhone. The coercion is said to have consisted of the failure to inform her that the government would search her phone or that it could be used against her in a criminal prosecution. By failing to do so, she contends that the government "engaged in . . . duplicity [by] hiding the true nature and intended purpose of the MCU's request"[50]

Ash's theory of coercion by deception is unavailing, and would be so even if the government put the MCU up to asking for the iPhone. "Inculpatory statements are not involuntary when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent."[51] The privilege against self-incrimination is not violated where the individual responds to a request without knowledge that he or she is the subject of an ongoing criminal investigation.[52] Nor is it violated by duplicitous conduct – whether that conduct is "false, misleading, or intended to trick" – unless the defendant's will was "overborne" by the deception.[53]

Ash has failed to adduce evidence from which it might be inferred that her will was overborne. As the government observes,

> "At the time when the defendant—an experienced lawyer and judge—returned the iPhone X, among other things, (a) Wong had been arrested, and the Government had publicly stated that its investigation was ongoing; (b) MCU had publicly announced that it was cooperating in that investigation; (c) the defendant had been served with two grand jury subpoenas, each of which called for communications with Wong; and (d) the defendant had been questioned by the

---

50 Def.'s Mem. at 12.

51 *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992).

52 *See United States v. Okwumabua*, 828 F.2d 950, 953-54 (2d Cir. 1987) (finding that there was "no legal or moral duty to inform the defendant that [a special agent of the Inspector General's Office] was conducting a criminal investigation" when he interviewed the defendant).

53 *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citations omitted); *see also United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018).

> Government about those communications and her receipt of the iPhone X from Wong. . . . She also failed to return all devices [requested in the MCU's letter], further belying any suggestion that she felt coerced."[54]

In the totality of the circumstances, the evidence that Ash was compelled to produce the iPhone is insufficient to warrant a hearing, much less to suppress the phone.

*United States v. Scrushy*[55] – which Ash claims involved "similar circumstances"– does not warrant a different result. There, the government gave the SEC "advice or 'preferences' regarding the content of [an SEC] deposition and its location" in an attempt to gather evidence for its criminal investigation, of which the deponent unknowingly was a target.[56] The court excluded the deposition testimony as evidence of the defendant's alleged perjury because the government "manipulated the simultaneous [criminal and civil] investigations for its own purposes" in order to procure it.[57] But that ruling rested on the contours of the bounds of the "proper administration of justice," not on the Fifth Amendment.[58] Though, as in *Scrushy*, Ash was not advised of the potential use of her iPhone, unlike in *Scrushy*, her claim rests upon whether the production as compelled. For the reasons above, it was not. As Ash's privilege against self-incrimination therefore was not violated, suppression of the iPhone would be unwarranted.

---

54 Gov't. Op. at 20 (citing Exs. 2-3).

55 366 F. Supp. 2d 1134 (N.D. Ala. 2005).

56 *Id*. at 1137.

57 *Id*. at 1140.

58 *Id*. at 1137.

*II. The Emails*

The government concedes that the search warrants for Ash's personal email addresses were predicated, at least in some part, on the forensic analysis of the iPhone.[59] Ash argues that, because the iPhone should be suppressed, so too should any evidence obtained through these search warrants. However, since the procurement of the iPhone did not infringe upon Ash's privilege against self-incrimination, there was no "poisonous tree" of which any evidence was fruit. The motion to suppress insofar as it relates to evidence obtained by the search warrants therefore is denied.

*III. Interview Statements and Grand Jury Testimony*

*A. Statements Made Prior to Retaining Counsel: April 6, 2018 and June 8, 2018 Interviews*

Evidence obtained in violation of a defendant's right to substantive due process may be suppressed. That right is violated when government misconduct is so egregious that it "shocks the conscience." [60]

The boundaries of this standard are "necessarily imprecise."[61] As this Court has explained, "'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process' while 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'"[62] Examples of behavior falling within this range include: six days of intense

---

59 Cohen Decl. Ex E.

60 *Rochin v. California*, 342 U.S. 165, 172 (1952); *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005).

61 *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005).

62 *United States v. Stein*, 495 F. Supp. 2d 390, 415 (S.D.N.Y. 2007) (quoting *County of Sacramento*

interrogation,[63] forcible extraction of capsules from a suspect's mouth followed by pumping his stomach against his will,[64] and undue governmental pressure that caused an employer to cease payment of its employees' legal fees and thus impairing their right to counsel.[65] "In short, to shock the conscience and trigger a violation of substantive due process, official conduct must not only be wrong; it must be extremely so, truly brutal and offensive to human dignity."[66]

Ash argues that the two voluntary interviews conducted while she allegedly was an unknowing "target" of the government's investigation were "outrageous" government misconduct.[67] That argument is unpersuasive, especially when taken in the full factual context.

Prior to the these two interviews, which occurred on April 6, 2018 and June 8, 2018, Ash had met with an Assistant United States Attorney ("AUSA") and a special agent with the office on March 1, 2018.[68] During that meeting, Ash discussed her tenure as the chair of the MCU board and information related to Wong, including the January 2018 memorandum that she had signed regarding payments that he had received from the MCU.[69] At the end of that March meeting, the AUSA informed Ash that it would be advisable to retain counsel.[70] Two weeks later, on March 13, 2018, Ash was served with a grand jury subpoena requesting, among other

---

*v. Lewis*, 523 U.S. 833, 849 (1998)).

63 *Watts v. Indiana*, 338 U.S. 49, 52-55 (1949).

64 *Rochin*, 342 U.S. at 172.

65 *Stein*, 495 F. Supp. 2d at 413-15.

66 *Mara v. Rilling*, 921 F.3d 48, 78-79 (2d Cir. 2019) (internal quotation marks and citation omitted).

67 "A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." UNITED STATES DEPARTMENT OF JUSTICE MANUAL § 9-11.151.

68 Compl. ¶ 29.

69 *Id.*

70 Cohen Decl. Ex. K at ECF 4.

items, all documents related to Wong's compensation, long-term disability payments, and any communications with Wong.[71] Ash did not produce any materials in response.[72]

On April 6, 2018, the AUSA interviewed Ash by telephone.[73] The government alleges that Ash then stated falsely that she did not have any documents responsive to the March subpoena.[74] She was not represented by counsel on the call and the government did not inform her as to whether she was a target of an investigation.

On June 8, 2018, Ash (unrepresented by counsel), two AUSAs, and the special agent spoke again by phone.[75] And again, Ash allegedly made false and misleading statements.[76] The government did not inform her as to whether she was a target of an investigation.

Ash argues that she was a target of the investigation when the April 6 and June 8 interviews were conducted, that she should have been told that she was a target, and that failure to do so violated guidance from the Department of Justice ("DOJ") Manual to "advise witnesses who are known 'targets' of the investigation that their conduct is being investigated for possible violation of Federal criminal law."[77] She claims also that the government acted "unfairly" by questioning her outside the presence of counsel after she had become a target. The government denies that Ash was a target as of the April and June 2018 phone interviews. But even if she were, the statements made during these interviews need not be suppressed.

---

71 Compl. ¶ 31.

72 *Id.* ¶¶ 32-33.

73 *Id.* ¶ 32.

74 *Id.*

75 *Id.* ¶ 33.

76 *Id.*

77 UNITED STATES DEPARTMENT OF JUSTICE MANUAL § 9-11.151.

The Supreme Court has rejected the argument that it is "fundamentally unfair to elicit incriminating testimony from a potential defendant without first informing him of his target status."[78] The DOJ Manual – which "provides internal DOJ guidance" and "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law"[79] – acknowledges this.[80] At most, Ash alleges that the government did not adhere to a DOJ policy that provided "supplemental advice" of a grand jury witness's status.[81] Yet, government action that is merely "incorrect or ill-advised" does not violate an individual's substantive due process right.[82] Failure to adhere to this DOJ policy does not rise to the level of governmental misconduct that is "so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction."[83] That is particularly so here, given the fact that Ash is a lawyer and a judge, had several contacts with the government about the Wong investigation, and had even been advised by the AUSA to retain counsel. She could have been under no illusion that she was not at some risk of criminal exposure.

78 *United States v. Washington*, 431 U.S. 181, 190 n.6 (1977); *see also Okwumabua,* 828 F.2d at 953.

79 UNITED STATES DEPARTMENT OF JUSTICE MANUAL § 1-1.200.

80 *Id.* § 9-11.151 ("Although the Court in *Washington*, supra, held that 'targets' of the grand jury's investigation are entitled to no special warnings relative to their status as 'potential defendant(s),' the Department of Justice continues its longstanding policy to advise witnesses" of their target status.).

81 *Id.*

82 *See Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citation omitted).

83 *United States v. Al-Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (internal quotation marks and citation omitted).

*B. Statements Made After Retaining Counsel: July 9, 2018 Interview and August 16, 2018 Grand Jury Testimony*

The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[84] "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."[85] The government must "honor" this right."[86] Yet, there may be a sufficient reason to inquire into or even disturb a defendant's choice of counsel if there is an actual or potential conflict of interest. In a case of potential conflict, "the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government. The district court, however, must ensure that this choice is made knowingly and intelligently." [87] To do so, the court first must conduct a "*Curcio* hearing" to determine "whether the attorney has an actual conflict, a potential conflict, or no conflict at all."[88]

As the government stated to this Court at the November 4, 2019 pretrial conference, Archibald had an actual or potential conflict because he appeared to have been involved in the conduct charged to Ash. The involvement was as follows: On July 6, 2018 Ash, through Archibald, made an allegedly incomplete production in response to the June 18, 2018 subpoena, which had required that she produce, among other items, all correspondence with Wong and all documents regarding any items of value received from Wong or the MCU.[89]

---

84 U.S. Const. amend. VI.

85 *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006).

86 *Stein*, 541 F.3d at 154.

87 *United States v. Stein*, 410 F.Supp.2d 316, 323 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

88 *Id.* at 323-24 (internal quotation marks and citations omitted).

89 Compl. ¶¶ 35, 39.

Among other records, the production did not contain certain text messages between Ash and Wong.[90] The incomplete production is charged as an overt act in furtherance of the alleged conspiracy to obstruct justice.[91] During a July 9, 2018 interview with the government, at which Archibald was present, Ash allegedly made false or misleading statements, conduct charged as an overt act in furtherance of the alleged conspiracy to obstruct justice and which underlie one charge of obstruction of justice.[92] On August 16, 2018, Ash testified in front of the grand jury. According to the government's papers, Ash answered certain questions but generally invoked the Fifth Amendment.[93] Archibald represented her for this testimony.

Ash argues that because Wong's cell phone had been seized in May, the government knew as of July 6, 2018 that her production was incomplete and thus that Archibald was implicated in a crime later charged to his client, an unwaivable conflict.[94] Accordingly, she contends that the government violated her due process rights by failing both to inform her about the potential conflict and to ask for a *Curcio* hearing prior to the July 9, 2018 interview.[95] She

90 *Id.* ¶ 39.

91 Indictment ¶ 4(e).

92 *Id.* ¶¶ 4(f), 6.

93 Gov't. Op. at 27.

94 *See United States v. Fulton*, 5 F.3d 605, 609, 613 (2d Cir. 1993) ("It is well-settled in this circuit that an actual conflict of interest exists when an attorney engages in wrongful conduct related to the charge for which the client is on trial. . . . [In this situation,] the resultant conflict so permeates the defense that no meaningful waiver can be obtained.").

95 The government argues that it could not have sought a *Curcio* hearing before Ash was indicted, at which point the Sixth Amendment right to counsel attaches. *See Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) (internal quotation marks omitted). Yet, the government's hands were not tied. The Court is not aware of any reason, nor does the government cite any, as to why the government would have been prohibited from informing the defendant of a potential or actual conflict, had it believed one existed. However, the government's ability to request a *Curcio* hearing is ultimately irrelevant here. Ash's argument is based on an alleged violation of substantive due process, and for the reasons below, her claim fails under the "shock the conscious standard," irrespective of whether the Sixth Amendment right to counsel had attached.

argues also that the government should have requested a *Curcio* hearing prior to her August 16, 2018 grand jury testimony because the government knew that Archibald was a witness or participant to the allegedly false or misleading statements made during the July 9 interview.. The government's failure to do so, she argues, further violated her due process rights.

Ash's argument hinges on the dubious contention that the government must have known of the actual or potential conflict prior to the July interview and the August grand jury testimony. As Ash explains, this would have required that the government have known that "Archibald was either a witness to or a participant" in the conduct underlying the charges against her.[96] But knowledge that a production may have been incomplete does not necessarily equate to a conclusion that the producing party was conspiring to or had obstructed justice. Nor does knowledge that a statement may have been untrue, though it is not readily apparent to the Court at what point the government came to the belief that the statements made during the July interview were false. But these factual issues need not be resolved. Even if the government was aware of a potential or actual conflict, its failure to alert Ash to this or to request a *Curcio* hearing would not "shock the conscious" such that due process mandates suppression. Accordingly, there is no basis on which to suppress Ash's statements made during her July 9, 2018 interview or during her August 16, 2018 grand jury testimony.

### *IV. Alternative Relief: Discovery and Evidentiary Hearing*

As an alternative to suppression, Ash requests discovery and an evidentiary hearing on the following: (1) the government's involvement, if any, with the MCU's internal investigation and request for the iPhone, (2) information regarding Ash's status during the government's investigation, including any decisions as to whether to designate her as a target of

---

96 Def.'s Mem. at 7, 21-22.

investigation, and whether to inform her of such a designation, and (3) information regarding when the government became aware of Archibald's potential or actual conflict.

This request is denied. As to the first request, the court's denial of the motion to suppress evidence based on or derived from the iPhone does not depend on whether the MCU's actions were attributable to the government. The court's decision would remain unchanged irrespective of any information gleaned through discovery or a hearing. Nor would the relief sought rescue Ash's remaining motions. As explained above, even if Ash was a target of an investigation during the April 6 and June 8 interviews, and even if the government was aware of a potential conflict between her and Archibald, the government's conduct did not "shock the conscious." The resolution of any genuine factual questions therefore would not alter the court's conclusions, rendering discovery and an evidentiary hearing unnecessary.

*Conclusion*

Defendant's motion to suppress [DI 35] is denied.

SO ORDERED.

Dated: June 2, 2020

Lewis A. Kaplan
United States District Judge

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | SUPERSEDING INDICTMENT |
| -v.- | : | S1 19 Cr. 780 (LAK) |
| SYLVIA ASH, | : | |
| Defendant. | : | |

**COUNT ONE**

(Conspiracy to Obstruct Justice)

The Grand Jury charges:

1. From at least in or about January 2018, up to and including at least in or about July 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, obstruction of justice, in violation of Title 18, United States Code, Sections 1519 and 1512(c).

2. It was a part and object of the conspiracy that SYLVIA ASH, the defendant, would and did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a

department and agency of the United States and in relation to and contemplation of such a matter, to wit, ASH agreed to sign a false and misleading document in an attempt to impede, obstruct, and influence a federal investigation of the now-former Chief Executive Officer ("CEO") of Municipal Credit Union (the "Credit Union") and others, in violation of Title 18, United States Code, Section 1519.

3. It was a further part and object of the conspiracy that SYLVIA ASH, the defendant, would and did corruptly alter, destroy, mutilate, and conceal a record, document, and other object and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise would and did corruptly obstruct, influence, and impede an official proceeding, and attempt to do so, to wit, ASH agreed to obstruct, influence, and impede a federal investigation of the former CEO of the Credit Union and others, in violation of Title 18, United States Code, Section 1512(c), and sought to carry the scheme out, by among other things, (i) concealing and deleting text messages and email messages and wiping an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and (ii)

making false and misleading statements to federal law enforcement officers.

Overt Acts

4. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a. In or about January 2018, in New York, New York, SYLVIA ASH, the defendant, signed a false and misleading memorandum regarding millions of dollars that the CEO had obtained from the Credit Union.

b. On or about March 1, 2018, in New York, New York, ASH falsely stated to a Special Agent with the United States Attorney's Office for the Southern District of New York (the "Special Agent" with the "USAO-SDNY") that, after ASH became Chair of the Board of Directors of the Credit Union (the "Board"), the Credit Union's then-General Counsel (the "General Counsel") informed ASH that the CEO had the option under his employment contract of receiving monetary payments to obtain long-term disability insurance ("LTD insurance") instead of having the Credit Union purchase LTD insurance for the CEO,

although the General Counsel did not consider that approach advisable.

c. On or about April 6, 2018, ASH informed the Special Agent, who was in New York, New York, that ASH did not have any materials to produce in response to a federal grand jury subpoena served on her on or about March 13, 2018.

d. On or about June 8, 2018, ASH again informed the Special Agent that ASH did not have any materials to produce in response to the federal grand jury subpoena served on her on or about March 13, 2018.

e. On or about June 23, 2018, ASH caused an Apple iPhone X, which had been provided to her by the Credit Union, to be wiped.

f. On or about July 6, 2018, ASH caused an incomplete set of materials in response to a federal grand jury subpoena served on her on or about June 18, 2018 to be produced to the USAO-SDNY.

g. On or about July 9, 2018, in New York, New York, ASH falsely stated to the Special Agent that, after she became Chair of the Board, she discussed with the General Counsel the CEO's interest in receiving monetary payments in lieu of a long-

term disability insurance policy, and the General Counsel advised that this was permissible but not advisable.

(Title 18, United States Code, Section 371.)

**COUNT TWO**

(Obstruction of Justice)

The Grand Jury further charges:

5. In or about January 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States and in relation to and contemplation of such a matter, to wit, ASH signed a false and misleading memorandum regarding millions of dollars that the CEO obtained from the Credit Union, in an attempt to obstruct and influence a federal investigation of the CEO and others.

(Title 18, United States Code, Sections 1519 and 2.)

## COUNT THREE

(Obstruction of Justice)

The Grand Jury further charges:

6. From at least in or about January 2018, up to and including at least in or about July 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, corruptly altered, destroyed, mutilated, and concealed a record, document, and other object, and attempted to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise obstructed, influenced, and impeded an official proceeding, and attempted to do so, to wit, ASH (i) concealed and deleted text messages and email messages and wiped an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and (ii) made false and misleading statements to federal law enforcement officers in connection with a federal investigation of the CEO and others.

(Title 18, United States Code, Sections 1512(c) and 2.)

**COUNT FOUR**

(False Statements to Federal Officers)

The Grand Jury further charges:

7. On or about June 8, 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit, ASH participated in a telephonic interview with the U.S. Attorney's Office for the Southern District of New York, in which ASH falsely stated that she did not have any responsive records to the subpoena served on her on or about March 13, 2018.

(Title 18, United States Code, Section 1001(a)).

FOREPERSON

AUDREY STRAUSS
UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

SYLVIA ASH,

Defendant.

**SUPERSEDING INDICTMENT**

S1 19 Cr. 780 (LAK)

(18 U.S.C. §§ 2, 371, 1001, 1512, 1519)

AUDREY STRAUSS
United States Attorney

FOREPERSON

07/21/21
(CA)

Superseding Indictment Filed
KH Parker
USMJ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SYLVIA ASH,<br>Defendant. | Case No. 1:19-cr-00780-LAK |

**MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S PROPOSED 404(b) EVIDENCE AND IN SUPPORT OF DEFENDANT SYLVIA G. ASH'S MOTIONS IN LIMINE**

Dated: New York, New York
October 29, 2021

MORRISON & FOERSTER LLP

By: */s/ Carrie H. Cohen*
Carrie H. Cohen
Nathan D. Reilly
Janie C. Buckley
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com
NReilly@mofo.com
JBuckley@mofo.com

*Counsel for Defendant Sylvia Ash*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1
FACTUAL BACKGROUND ..... 3
THE GOVERNMENT'S FACTUAL ALLEGATIONS ..... 6
A. Ms. Ash's Status as an Attorney and New York State Judge and Allegations Regarding Her Judicial Conduct ..... 7
B. Allegations Regarding Gifts and Benefits Provided to Ms. Ash ..... 8
C. The iPhone Data Transfer ..... 10
ARGUMENT ..... 11
I. THe GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING EVIDENCE RELATING TO MS. ASH'S EMPLOYMENT HISTORY AND TO CERTAIN UNCHARGED CONDUCT ..... 11
A. Relevant Legal Standards ..... 12
B. The Government Should Be Precluded From Offering Evidence That Ms. Ash is Judge and an Attorney ..... 13
C. The Government Should Be Precluded From Offering Evidence Relating to Ms. Ash's Conduct as a Judge ..... 15
D. The Government Should Be Precluded From Offering Evidence Relating to the Board Benefits Allegations ..... 17
E. The Government Should Be Precluded From Offering Evidence Relating to Ms. Ash's Tax Returns ..... 20
II. THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING EVIDENCE RELATING TO MS. ASH'S ARREST ..... 21
A. Relevant Law ..... 21
B. Ms. Ash's Conduct Does Not Reflect Any Evidence of Flight ..... 22
III. THE GOVERNMENT SHOULD BE PRECLUDED FROM REFERRING TO THE TRANSFER OF DATA FROM THE IPHONE X AS "WIPING" ..... 22
A. Applicable Law ..... 23
B. The Government Should Not be Permitted to Use the Term "Wipe" or "Wiping" in Reference to the iPhone Data Transfer ..... 23
CONCLUSION ..... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992)....................12, 13

*In re Initial Public Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001)....................13

*In re Rezulin Prod. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................12

*Saenger v. Montefiore Med. Ctr.*,
706 F. Supp. 2d 494 (S.D.N.Y. 2010)....................13

*United States v. Al-Sadawi*,
432 F.3d 419 (2d Cir. 2005)....................21

*United States v. Crowley*,
318 F.3d 401 (2d Cir. 2003)....................12

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003)....................13

*United States v. Lumpkin*,
192 F.3d 280 (2d Cir. 1999)....................12, 16

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006)....................12

*United States v. Taubman*,
297 F.3d 161 (2d Cir. 2002)....................12

*United States v. Torres*,
435 F. Supp. 3d 526 (S.D.N.Y. 2020)....................17

**Statutes**

18 U.S.C. § 371....................4

18 U.S.C. § 1001....................5

18 U.S.C. § 1512(c)....................4

18 U.S.C. § 1519....................4

**Other Authorities**

Fed. R. Evid. 401 ....................................................................................................................12

Fed. R. Evid. 402 ........................................................................................................2, 11, 15, 18

Fed. R. Evid. 403 ............................................................................................................ *passim*

Fed. R. Evid. 404(b)......................................................................................................... *passim*

Fed. R. Evid. 702 ....................................................................................................................12

**PRELIMINARY STATEMENT**

Defendant Sylvia G. Ash respectfully submits this Memorandum of Law (i) in opposition to the government's letter, dated October 22, 2021, outlining evidence it intends to offer as direct evidence and/or pursuant to Rule 404(b) of the Federal Rules of Evidence (the "404(b) Letter"); [1] and (ii) in support of her *motions in limine* in advance of trial in this matter, which is set for November 30, 2021.

Ms. Ash seeks to preclude the introduction of evidence at trial which, if admitted, would convert the government's prosecution of Ms. Ash for allegedly obstructive conduct into a trial about state judicial ethics and disclosure and not-for-profit board governance, none of which is chargeable conduct under the federal criminal code. The government has signaled its intent to offer evidence of purported violations of judicial ethics rules and New York State not-for-profit regulations and laws, as well as tax evasion. The proposed evidence is irrelevant to the charged conduct, unfairly prejudicial to Ms. Ash, and highly likely to confuse the jury with unnecessary detours into arcane and unclear areas of New York State not-for-profit laws, judicial conduct standards, and the state and federal tax codes. The government had the ability to choose what charges it would bring and in what courthouse it would proceed. Having chosen to prosecute Ms. Ash for federal obstruction, it should not be permitted to throw the proverbial "kitchen sink" at Ms. Ash under the guise of Rule 404(b) and turn the trial on the obstruction charges into a set of mini-trials on non-charged, non-federal criminal conduct. .

For the reasons discussed more fully below, the Court should preclude the government from introducing at trial the following evidence, identified in the 404(b) Letter as follows:

(1) Ms. Ash's alleged failure to disclose certain gifts or other benefits on financial disclosure statements relating to her employment as a New York

[1] A copy of the 404(b) Letter is attached hereto as Exhibit A.

State Judge that were filed with the New York State Unified Court System (the "Disclosure Statements");

(2) Ms. Ash's resignation from the Municipal Credit Unit ("MCU") Board of Directors (the "MCU Board") subsequent to her receipt of a complaint from the New York State Commission on Judicial Conduct (the "Judicial Commission");

(3) Benefits or gifts that Ms. Ash received in connection with her service on the MCU Board, including evidence that such benefits or gifts were fraudulently obtained; and

(4) Ms. Ash's alleged failure to report the value of benefits she allegedly received from the MCU on her personal income taxes.

Additionally, Ms. Ash moves to preclude the government from introducing (5) evidence that Ms. Ash is an attorney and serves as a New York State Judge; and (6) evidence relating to the circumstances of Ms. Ash's arrest. Further, Ms. Ash moves to preclude the government from inaccurately and prejudicially referring (7) to the transfer of data from Ms. Ash's iPhone X to her iPhone 6S (the "iPhone Data Transfer") as "wiping" that iPhone X.

With respect to Items 1 through 6 above, the evidence at issue is not relevant to the charged conduct and thus is inadmissible pursuant to Rule 402 of the Federal Rules of Evidence. In an effort to unfairly prejudice the jury against Ms. Ash, the government seeks to offer evidence of alleged violations of disclosure regulations and not-for-profit board governance laws that are neither related to nor probative of Ms. Ash's purported obstructive conduct. Further, with respect to Items 1 through 4 identified above and by the government in the 404(b) Letter, the introduction of evidence relating to these matters would necessarily result in a "trial within a trial" as it would require the parties to present witnesses and evidence relating to state laws and regulations governing the conduct of judicial officers, New York State's judicial disclosure regime, and not-for-profit governance. Ms. Ash's federal criminal trial would become, in essence, a proxy for state civil actions, regulatory inquiries, and administrative proceedings that

are more appropriately addressed by the Judicial Commission, the New York State Attorney General and other regulators. This irrelevant and unnecessary sideshow also would present a grave risk of confusion to the jury.

Even were the Court to decide that evidence relating to any of the issues identified in Items 1 through 6 above were relevant, the Court should nonetheless preclude such evidence as the probative value thereof is far outweighed by the risk of unfair prejudice to the defendant, confusion for the jury, and the potential for undue delay of the trial. Fed. R. Evid. 403. The government, through the evidence identified in the 404(b) Letter, seeks to convert this obstruction trial into something entirely different through allegations that Ms. Ash engaged in, among other things, alleged fraud, unjust personal enrichment, and tax evasion. The government should not be permitted to fundamentally alter the scope of its case, and the nature of the charges Ms. Ash is confronting, in the name of establishing the "background of the conspiracy" or motive, knowledge and intent. With respect to Item 7, while the facts surrounding the iPhone Data Transfer are relevant, allowing the government to refer to this transfer of data from the iPhone X to another iPhone as the "wiping" of data would also be unfairly prejudicial and likely to confuse the jury.

## **FACTUAL BACKGROUND**

The charges of obstruction of justice and false statements against Ms. Ash relate to an investigation by the United States Attorney's Office for the Southern District of New York ("SDNY") and the Manhattan District Attorney's Office ("DANY") (collectively, the "government") into instances of fraud and embezzlement at the MCU by former MCU Chief Executive Officer and President Kam Wong ("Wong"). Ms. Ash served as a member of the MCU Board from in or about May 2008 until on or about August 15, 2016, serving as the MCU

Board Chair from May 2015 until her resignation in August 2016. (*See* "Complaint" or "Compl." ¶ 11f.)

On November 19, 2018, Wong pled guilty to one count of embezzlement from the MCU. (*See* 11/19/2018 Minute Entry, Case No. 18-CR-737 (JGK).)[2] Joseph Guagliardo ("Guagliardo"), a member of the Supervisory Committee of the MCU, also pled guilty to embezzlement from the MCU. (*See* 1/10/2020 Minute Entry, Case No. 20-CR-023 (DLC).)[3]

The government does not allege that Ms. Ash participated in or was aware of the fraud and embezzlement committed by Wong or Guagliardo. In fact, it is now undisputed that despite years of investigation and numerous search warrants and grand jury subpoenas delving into every aspect of Ms. Ash's finances and personal life, there is not one scintilla of evidence that Ms. Ash had any knowledge of or participation in Wong's or Guagliardo's fraudulent schemes.

After expending countless resources to investigate Ms. Ash, Ms. Ash was initially arrested pursuant to a criminal Complaint, dated October 4, 2019, alleging two counts of obstruction of justice and one count of conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(c), 1519, and 371. On October 10, 2019, the government attempted to arrest Ms. Ash at her residence in New York. (October 11, 2019 detention hearing (the "October 11 Tr.") at 9, attached hereto as Exhibit B.) When she was not at home, an investigator from the SDNY, despite his awareness that Ms. Ash was represented by counsel, contacted her directly by telephone and informed her that he possessed a warrant for her arrest. (*Id.*) She requested that the government contact her attorney. (*Id.*) Ms. Ash's then-counsel unsuccessfully sought to arrange a surrender date and time with the government and was told by the government that Ms.

[2] On June 13, 2019, Wong was sentenced to a term of incarceration of 66 months and ordered to pay restitution in the amount of approximately $9.8 million. (Docket Entry No. 55 in Case No. 18-CR-737 (JGK).)
[3] On July 23, 2020, Guagliardo was sentenced to a term of incarceration of 27 months and ordered to pay restitution in the amount of approximately $ 468,000. (Docket Entry No. 54 in Case No. 20-CR-23 (DLC).)

Ash needed to surrender the evening of October 10, 2019 or the following morning. (*Id.*) Ms. Ash, who had traveled to Miami on October 10, 2019 on a preplanned trip to visit a family member, (*id.* at 12), voluntarily returned to New York the following morning. At the detention hearing in this matter, her then-counsel indicated that his offer to have Ms. Ash surrender at noon on October 11, 2019 was un-responded to by the government (*id.*) and she was arrested upon her arrival on the plane at LaGuardia Airport at approximately 10:30 a.m. (*Id.*) She was released on a $500,000 bond by the Honorable Ona Wang later that day.

Ms. Ash was subsequently charged on October 31, 2019 in a three count Indictment, alleging obstruction of justice and conspiracy to commit the same. On July 21, 2021, the grand jury returned a four count Superseding Indictment, which again charged Ms. Ash with obstruction of justice and conspiracy to obstruct justice and further charged her with making material false statements to a federal officer in violation of 18 U.S.C. § 1001.

Specifically, Ms. Ash is charged in the Superseding Indictment as follows: (1) in Count One with conspiring to obstruct justice by knowingly signing a false document related to Wong's compensation and impeding a federal investigation via the concealment and deletion of emails and text messages, "wiping" the contents of an iPhone X, and making false and misleading statements to federal law enforcement officers; (2) in Count Two with knowingly signing a false document related to Wong's compensation with the intent to obstruct a federal investigation; (3) in Count Three with knowingly concealing and deleting text messages and emails, "wiping" the contents of an iPhone X, and making false and misleading statements to federal law enforcement officers with the intent to obstruct a federal investigation; and (4) in Count Four with making false statements on or about June 8, 2018, about the lack of responsive records in her possession.

On October 22, 2021, pursuant to agreement between the government and Ms. Ash as to the schedule for certain pretrial disclosures, (ECF No. 90), the government sent to counsel for Ms. Ash the 404(b) Letter. In the 404(b) Letter, the government indicates that it may offer evidence at trial on certain topics that it claims constitute direct evidence of the charged crime but which, in the alternative, it claims should be admitted under Rule 404(b) of the Federal Rules of Evidence as probative of Ms. Ash's intent, motive, knowledge and/or lack of mistake. The 404(b) Letter indicates the government's intent to offer evidence relating to:

(1) Ms. Ash's receipt of benefits or gifts from the MCU or Wong;

(2) the allegation that things of value Ms. Ash received from the MCU or Wong were provided in violation of MCU policy and/or otherwise fraudulently obtained;

(3) Ms. Ash's failure to disclose things of value she received from the MCU and/or Wong on the Disclosure Statements;

(4) Ms. Ash's resignation from the MCU Board subsequent to her receipt of "misconduct complaint from the New York State Commission on Judicial Misconduct [sic];"[4] and

(5) Ms. Ash's purported attempt to evade personal income taxes on things of value she received from the MCU.

**THE GOVERNMENT'S FACTUAL ALLEGATIONS**

The Complaint details much, if not all, of the conduct that the government has indicated in the 404(b) Letter that it will seek to prove at trial. The allegations relevant to the instant motions are set forth below.

---

[4] The government appears to be referring to a complaint filed on or about August 11, 2016 by the Administrator for the Judicial Commission. The complaint notes that it "is not an accusatory instrument" but rather "provides a basis to commence an investigation." (August 11, 2016 Administrator's Complaint, SDNY 00013368.) On or about September 20, 2016, the Judicial Commission dismissed the complaint against Ms. Ash as moot based on her resignation from the MCU Board.

### A. Ms. Ash's Status as an Attorney and New York State Judge and Allegations Regarding Her Judicial Conduct

In the Complaint, the government identifies Ms. Ash as a Judge and alleges various facts relating to Ms. Ash's employment as a Judge. Specifically, Ms. Ash served as a Kings County Civil Court Judge, and subsequently, beginning in 2011, as a New York State Supreme Justice. (Compl. ¶¶ 10, 11e.) In January 2016, Ms. Ash was appointed the presiding Judge in the King's County Supreme Court's Commercial Division. (Compl. ¶ 11e.)[5] Additionally, in or about May 2015, Ms. Ash sought an opinion from the Advisory Committee on Judicial Ethics (the "Committee") as to whether she could serve as the Chair of the MCU Board. The Committee informed Ms. Ash that she could not serve as the MCU Board's Chair. Ms. Ash informed the Committee she would resign from the MCU Board, but did not do so until in or about August 2016. Ms. Ash's resignation occurred subsequent to the filing by the Judicial Commission of a complaint relating to her service on the MCU Board. (Compl. ¶ 11f n.2.)[6]

The government further alleges and seeks to introduce the following related to Ms. Ash's judicial service:

- Prior to Ms. Ash's resignation from the MCU Board, she allegedly presided over and, in certain instances, issued opinions or orders in cases in which the MCU was a party. (Compl. ¶ 11f.)
- Ms. Ash did not disclose her role as a Director on the MCU Board, or the gifts and reimbursements she received, discussed at greater length below, on the Disclosure Statements. (Compl. ¶ 13b.)

The government does not allege that Ms. Ash used her status as a Judge and attorney to engage in the alleged obstruction with which she is charged or that she employed any skill

---

[5] Ms. Ash was suspended with pay from her position as a New York State Supreme Court Justice on October 11, 2019 – shortly after her arrest in this matter – and has remained suspended with pay since that time.
[6] Ms. Ash does not dispute that she served as a Judge in the Kings County Civil Court or King County's Supreme Court or that she sought an advisory opinion regarding her potential role as the MCU Board's Chairperson. Rather, as set forth below, Ms. Ash believes that these facts are not relevant to the charged conduct and that their introduction at trial would be unfairly prejudicial.

particular to her legal background to facilitate her purported wrongdoing. Nor does the government allege that the timing of Ms. Ash's resignation from the MCU Board, nor her purportedly inaccurate Disclosure Statements, were obstructive to the government's investigation or otherwise constituted violations of federal law. Rather, the government makes the conclusory (and erroneous) claim that that the allegations relating to Ms. Ash's judicial conduct are relevant to establishing her relationship with Wong or, alternatively, are indicative of motive, intent, knowledge or absence of mistake. Yet the evidence that the government seeks to offer regarding Ms. Ash's judicial conduct relates to events that occurred well before the charged conduct in this case and do not relate to the core of the government's investigation into the MCU – the embezzlement and fraud by Wong and Guagliardo. As such, the probative value of the evidence proffered by the government as to intent, motive, knowledge or absence of mistake is, at best, minimal, and as further discussed below, the government's assertions that the evidence should be admitted is in error. Similarly, her status as Judge (and attorney) is not relevant to the charged conduct. Presenting the jury with evidence her status as Judge (and an attorney) will be enormously and unfairly prejudicial as it will cause the jurors to make erroneous assumptions about her knowledge of the criminal law and create a serious risk that she will improperly be held to a higher standard, inconsistent with the law, when the jury considers her conduct and her intent.

**B. Allegations Regarding Gifts and Benefits Provided to Ms. Ash**

The government also alleges facts in the Complaint relating to gifts and other benefits provided to Ms. Ash in connection with her MCU Board service. In the 404(b) Letter, the government further indicates that it may seek to introduce evidence that these gifts and other benefits were fraudulently obtained and/or obtained contrary to MCU policy and that Ms. Ash sought to evade federal personal income taxes with respect to at least some of these benefits.

The allegations relating to benefits Ms. Ash may have received from the MCU and/or Wong (hereinafter the "Board Benefits Allegations") are, again, not relevant to the charged criminal conduct nor admissible under Rule 404(b) of the Federal Rules of Evidence. Notably, Ms. Ash received the vast majority of the gifts and benefits that underpin the Board Benefits Allegations at least a year before the alleged obstructive conduct and false statement. The significant time lapse between the date of the charged criminal conduct and the prior conduct that the government seeks to admit again undercuts the argument that the proffered evidence tends to establish motive, intent, knowledge or lack of mistake by Ms. Ash. Specifically, the government has alleged the following:

- During her MCU Board service from 2012 through 2016, Ms. Ash received reimbursement and other benefits from the MCU, including travel, food and entertainment expenses associated with conference attendance, payments of telephone and cable bills, and provision of electronic devices. (Compl. ¶ 12b.) The government further alleges "many" of these benefits were obtained in violation of MCU policy and/or were "fraudulently obtained." (404(b) Letter at 1.)

- More specifically, in 2015 the MCU spent approximately $63,408 for the benefit of or at the direction of Ms. Ash, including for, among other things, to provide her electronic devices, for conference-related travel, and for the use of the MCU's suite at a minor league baseball stadium (and related expenses). (Compl. ¶ 12b.)

- Subsequent to her resignation from the MCU Board in 2016, Ms. Ash continued to receive certain benefits from the MCU. In 2017, the MCU spent $4,284 to benefit Ms. Ash. (Compl. ¶ 12c.) These expenses included travel and entertainment expenses at conferences in October 2016 and June 2017 and expenses associated with the use of the MCU's minor league baseball suite in August 2017. (Compl. ¶¶ 12c(i), 12c(ii).)

- Ms. Ash stated in a June 9, 2018 interview with the SDNY that the MCU had paid for her travel expenses in October 2016 because those expenses had been incurred before Ms. Ash resigned from the MCU Board. (Compl. ¶ 42h.) However, the government alleges that Ms. Ash had incurred those expenses after leaving the MCU Board on August 15, 2016, and that one of the expense reports submitted by Ms. Ash for reimbursement, in the amount of $2,736.40, had been inaccurately dated on August 1, 2016. The purchase associated with that expense had actually occurred on August 24, 2016. (Compl. ¶ 44c.)

- Ms. Ash may have attempted to evade federal personal income taxes on these benefits by claiming improper expenses. (404(b) Letter at 2.)

The government does not allege that the MCU's (or Wong's) payment of the benefits to Ms. Ash was *per se* illegal or improper. Instead, the government alleges that "many" of these payments violated MCU policy and/or were fraudulently obtained. Notably, the government has not alleged that Ms. Ash was the only member of the MCU Board to receive such benefits. Further, the government does not allege that either Ms. Ash's receipt of various gifts and benefits, or the timing thereof, were obstructive to the government's investigation or otherwise constituted violations of federal law. Rather, the government contends that they are relevant to establish the nature of her relationship with Wong or are otherwise admissible under Rule 404(b) of the Federal Rules of Evidence.[7]

### C. The iPhone Data Transfer

As alleged in the Complaint, on or about June 21, 2018, in response to a request from the MCU to return an iPhone X that had been provided to her by Wong (the "iPhone X"), Ms. Ash made an appointment at the Apple Genius Bar to transfer the contents of the "iPhone X to another Apple device." (Compl. ¶ 37.) Specifically, Apple customer service notes state that "customer came in with two iPhones [and] would like to set one up with iCloud restore and the second to clear completely." (*Id.*) Apple customer service notes further reflect that Ms. Ash appeared in person at an Apple location on June 23, 2018. (*Id.*) On or about July 17, 2018, Ms. Ash, through her prior counsel, provided the iPhone X to the MCU as the MCU had requested. However, the MCU never revealed that it was cooperating with the government or that it

---

[7] The government alleges that Ms. Ash "sought to evade" personal income taxes on the benefits she received from the MCU. (404(b) Letter at 2.) To date, Ms. Ash has not been charged with any violations of the Internal Revenue Code. Further, the government makes no allegation that Ms. Ash's putative co-conspirators aided and abetted or were even aware of her alleged tax evasion.

intended to turn the iPhone X over to the government. (*Id.*) Despite failing to so notify Ms. Ash, the MCU gave the iPhone X to the government, who took possession of it on November 9, 2018. (Compl. ¶ 46.) A forensic analyst assigned to the High Technology Analysis Unit at DANY attempted to perform a forensic extraction of the iPhone, but discovered it had been factory reset and user-saved contents could not be retrieved. (*Id.*)

## ARGUMENT

### I. THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING EVIDENCE RELATING TO MS. ASH'S EMPLOYMENT HISTORY AND TO CERTAIN UNCHARGED CONDUCT

The government should be precluded from offering evidence that is irrelevant to charged conduct and likely to unfairly prejudice Ms. Ash, confuse the jury, and lead to unnecessary delay. As a threshold matter, the government should not be permitted to offer evidence regarding Ms. Ash's status as an attorney and/or Judge because it is not germane to conduct with which she is charged and carries with it the grave risk of unfair prejudice and juror confusion. In addition, the government's proposed introduction of evidence relating to Ms. Ash's conduct while serving as a Judge is similarly irrelevant and would require, in effect, a second trial regarding the applicability of state judicial ethics and disclosure laws. This would serve solely to delay the trial and confuse the jury. Similarly, the introduction of evidence relating to the Board Benefits Allegations would raise issues of not-for-profit governance, including the appropriate means of providing benefits and expense reimbursement to board members and the internal controls that were or were not in place at the MCU – all of which are irrelevant to the question of whether Ms. Ash sought to obstruct the government's investigation or conspired with others to do so. Further assuming *arguendo* that any of the proffered evidence as to Ms. Ash's status as an attorney and Judge, her judicial conduct, or the Board Benefit Allegations is relevant, which it is

not, it should nonetheless be excluded pursuant to Rule 403 of the Federal Rules of Evidence as unfairly prejudicial, likely to confuse the members of the jury and to lead to undue delay.

### A. Relevant Legal Standards

Pursuant to Rule 402 of the Federal Rules of Evidence, only relevant evidence is admissible and evidence is relevant only if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Trial courts enjoy broad discretion to decide evidentiary issues and their evidentiary rulings may be reviewed only for abuse of discretion. *See*, *e.g.*, *United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002). Further, even if evidence meets the relevance standard, the court may exclude the evidence if the "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003).

When it comes to evaluating testimony regarding legal or ethical standards, courts will exclude evidence that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (applying Fed. R. Evid. 702) (internal quotation marks omitted). Similarly, evidence that "communicate[s] a legal standard - explicit or implicit - to the jury" is not admissible. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).

In the context of obstruction charges, courts have held that testimony about the propriety or legality of conduct that was the subject of the charged misrepresentations was not relevant in prosecuting the alleged obstruction. *See, e.g., United States v. Stewart*, 433 F.3d 273, 312, n.11 (2d Cir. 2006) (holding, in obstruction of justice case, that expert testimony concerning legality

of trades that were the subject of charged lies was properly excluded because, "[u]ltimately, the legality of [the trades] is irrelevant to the issue of whether [the defendant] later lied to investigators about having received [certain] information"). Here, as described in greater detail below, evidence of Ms. Ash's conduct while serving as a Judge and the Board Benefits Allegations would be even further removed from the core of the case against Ms. Ash. The misrepresentations and obstruction with which she is charged are entirely unrelated to her conduct as a New York State Judge, profession as a lawyer, or any benefits or expense reimbursement she received prior to (or shortly after) resigning from the MCU Board.

Courts have also excluded testimony that would seek to "communicate a legal standard - explicit or implicit - to the jury." *Hygh*, 961 F.2d at 364. Courts in this district have extended this prohibition to testimony that would articulate an ethical standard that would fall within the exclusive province of the court. *See In re Initial Public Offering Sec. Litig.,* 174 F. Supp. 2d 61, 65 (S.D.N.Y. 2001) (citing cases). Further, courts have barred efforts by parties to circumvent these prohibits by seeking to introduce evidence through lay witnesses, as opposed to experts. *See Saenger v. Montefiore Med. Ctr.,* 706 F. Supp. 2d 494, 518 (S.D.N.Y. 2010) (excluding evidence that would have amounted to "an end run around the hearsay rules"); *see also*, *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (precluding party from "circumvent[ing]" the Federal Rules of Evidence by introducing hearsay testimony).

### B. The Government Should Be Precluded From Offering Evidence That Ms. Ash is Judge and an Attorney

The government included Ms. Ash's history of judicial employment in the Complaint and the government's proffered evidence in the 404(b) Letter would necessarily identify her as a Judge and, by implication, as an attorney. The government seeks to introduce evidence relating to Ms. Ash's legal background notwithstanding that her status as a Judge is irrelevant to the

charged conduct.[8] Instead, the allegations seem largely designed to suggest that her legal and judicial background means that she should have known "better" how to respond to the government's investigation and that, as a result, she should be held to a different, higher legal standard in this case.

Ms. Ash is not alleged to have abused her role as a Judge (and attorney) either to impede or interfere with the government's investigation. Nor is there is any claim from the government that Ms. Ash misused her judicial office or her particular skills as an attorney to commit the crimes with which she is charged. As such, introducing evidence relating to her legal experience seems designed not provide context for Ms. Ash's actions, but rather to ensure that she is held to a higher standard. Here, her prior employment in the legal field and judicial service are simply not relevant to factual matters before the jury.

Moreover, the introduction of evidence relating to Ms. Ash's service as a Judge and, prior to that, work as a civil attorney, is highly likely to mislead and confuse the jury. Jurors may be led to incorrectly assume that her legal background conveyed special expertise in matters of criminal law and grand jury investigations. This, in turn, will cause the jury hold her to a standard that is inimical to the standard of proof to which the government must be held in this criminal prosecution and will effectively lower the government's burden of proof. The probative value of any evidence relating to Ms. Ash's work in the legal profession is substantially outweighed by the significant risk of unfair prejudice that she will suffer if jurors are led to believe that her judicial service and work history made her (or should have made her) an expert

[8] Although the 404(b) Letter does not expressly address Ms. Ash's status as attorney, the evidence that the government seeks to introduce identifying Ms. Ash as a Judge will, by implication, lead the jury to identify her as an attorney as well.

in being a witness in a criminal matter. Accordingly, the government should be precluded from offering evidence regarding Ms. Ash's professional history.

### C. The Government Should Be Precluded From Offering Evidence Relating to Ms. Ash's Conduct as a Judge

The government may also seek to introduce evidence regarding Ms. Ash's conduct as a Judge, including her resignation from the MCU Board after receipt of a complaint from the Judicial Commission and purported errors or omissions in connection with the Disclosure Statements. However, Ms. Ash's compliance (or purported lack thereof) with New York State laws and regulations regarding judicial conduct, recusal, and financial disclosures is wholly irrelevant to the question of whether she sought to obstruct the government's investigation or made false statements to the government. Significantly, these allegations focus on Ms. Ash's judicial conduct while she was a member of the MCU Board. Her MCU Board tenure ended in August 2016, more than 20 months before the commencement of her alleged obstructive conduct (as alleged by the government) in January 2018. As such, evidence about the Judicial Commission's complaint and her resignation from the MCU Board or about her Disclosure Statements is not germane to a "fact [that] is of consequence in determining the action" and is inadmissible under Rule 402 of the Federal Rules of Evidence.

Further, the core of these allegations about Ms. Ash's judicial conduct relates to whether she complied with New York State judicial ethics, recusal rules, and state disclosure rules with respect to potential conflicts and her finances. There has been no prior finding of fact or judicial or administrative determinations regarding these issues. As such, were the government to attempt to introduce evidence relating to this conduct, it would necessarily require testimony about the nature of the laws and regulations that Ms. Ash is alleged to have violated. Ms. Ash, would in turn, seek leave of the Court to present evidence, including a potential rebuttal expert,

to address the government's misconduct allegations and the applicable standards governing New York State judicial ethics and financial disclosure requirements. The jury unavoidably would be presented with a "trial within a trial" on the issue of whether Ms. Ash violated New York State laws or regulations—none of which she is charged with in this federal matter and all of which are complicated and subject to multiple interpretations. In addition, evidence in this area would inevitably run the risk of usurping the Court's role as the ultimate arbiter of the law to be considered by the jury. *See Lumpkin*, 192 F.3d at 289.

Finally, the government's proposed presentation of evidence relating to the Judicial Commission complaint, Ms. Ash's resignation from the MCU Board, and her purported disclosure violation on the Disclosure Statements would run afoul of the strictures of Rule 403 of the Federal Rules of Evidence in multiple ways. Presenting evidence about Ms. Ash's purported violations of judicial ethics and disclosure rules will necessarily confuse the jury, who will understandably wonder how those violations are relevant to the charged conduct in this case and how her role as Judge was relevant to her function as an MCU Board member (and most likely cause them to make inferences that she engaged in wrongdoing). Further, as the alleged misconduct occurred more than a year before the charged conduct and is unrelated to the focus of the government's investigation of the MCU – Wong's embezzlement – the proffered evidence will not inform the jury as to Ms. Ash's intent, motive or lack of mistake. Introduction of this evidence also will result in undue delay as the parties seek to introduce evidence to dispute whether or not Ms. Ash's uncharged conduct actually violated applicable judicial ethics and disclosure rules.

Finally, the government's proposed evidence relating to alleged judicial misconduct by Ms. Ash will be unfairly prejudicial. Permitting the government to introduce evidence relating to

Ms. Ash's interactions with the Judicial Commission, her resignation from the MCU Board, and her Disclosure Statements will draw jurors to precisely the type of predisposition inference that Rule 404(b) of the Federal Rules of Evidence is designed to avoid: that Ms. Ash's alleged conduct on the bench means they should assume she was disposed to wrongdoing and thus sought to obstruct the federal investigation. Indeed, the uncharged conduct that the government seeks to introduce—allegations that Ms. Ash abused her position as a Judge, filed false Disclosure Statements, or engaged in judicial misconduct to enrich herself—is fundamentally different from, and equally, if not more, serious than the crimes with which she is charged. *Cf. United States v. Torres,* 435 F. Supp. 3d 526, 530 (S.D.N.Y. 2020) (restating standard that in considering the admissibility of a prior conviction, the court will review whether the underlying conduct was "any more sensational or disturbing" than the charged offenses). The introduction of evidence relating to her purported misconduct as a Judge would create a significant risk that jurors may convict her not to hold her accountable for the charged crimes, but rather to punish her for the unrelated (and uncharged) conduct. Here, the government elected to proceed in federal court on obstruction charges. The Court should not allow the government to game that decision and transform the trial of Ms. Ash into a judicial ethics proceeding or a trial on matters of New York State law. Accordingly, the Court should preclude the Court from introducing evidence relating to Ms. Ash's interactions with the Commission, her resignation from the MCU Board, and the Disclosure Statements.

### D. The Government Should Be Precluded From Offering Evidence Relating to the Board Benefits Allegations

The government seeks to leverage evidence about benefits Ms. Ash received from the MCU and/or Wong to improperly transform its obstruction allegations into a fraud trial. The government does not allege that Ms. Ash received these benefits during the course of her

purportedly obstructive conduct or as a means of inducing her to enter the alleged conspiracy or to lie to the government. Instead, the government contends that her receipt of things of value from the MCU and/or Wong and her purported concealment thereof constitute a motive for her to obstruct the government's investigation into Wong or her own alleged wrongdoing. (404(b) Letter at 2.)

As with the allegations relating to Ms. Ash's judicial conduct, presentation of evidence relating to the Board Benefits Allegations will undoubtedly result in a lengthy evidentiary detour into areas that are irrelevant to the charged conduct. In the 404(b) Letter, the government makes sweeping allegations that Ms. Ash received things of value from the MCU and/or Wong and that many of these items were fraudulently obtained or contrary to MCU policy. The government's effort to establish these allegations would invite a mini-trial to address a host of questions about not-for-profit board governance and applicable ethics standards. Should the government present evidence relating to the Board Benefits Allegations, evidence relating to the MCU's policies and procedures for the provision of benefits to its directors, whether those policies and procedures were carried out, and how they were communicated to the MCU Board would all be highly relevant. Highly specific legal and factual questions about MCU's Board governance practices and not-for-profit law would risk overshadowing and unnecessarily complicating the questions of whether Ms. Ash intended to obstruct the government's investigation and/or make material false statement as the government alleges.

There is no dispute that Ms. Ash had a friendship with Wong. She served on the MCU Board, including as its Chair, while he was the Chief Executive of the MCU. And, the government will undoubtedly seek to introduce records of communications between them during the period of charged conduct as part of its case-in-chief. In contrast, evidence relating to the

things of value that Ms. Ash received from the MCU or Wong, in many instances multiple years before the charged conduct, is not relevant to the conduct with which Ms. Ash is charged in the Superseding Indictment.

Lastly, even if the Court finds that any of the Board Benefits Allegations constitute relevant material under Rule 402 of the Federal Rules of Evidence, they should still be precluded under Rule 403 of the Federal Rules of Evidence's balancing test. Uncharged allegations that Ms. Ash sought to unlawfully enrich herself through the MCU are fundamentally different in character from the obstructive conduct with which she is charged and as such, the admission of evidence related to these allegations would be unfairly prejudicial. As outlined above, the introduction of evidence relating to the Board Benefits Allegations will lead to jury confusion and undue delay as it will require fact-finding as to, *inter alia*, the MCU's policies and procedures, the applicable law governing not-for-profit boards and benefits and things of value provided to members thereof and the facts and circumstances surrounding how Ms. Ash and other members of the MCU Board received things of value. Regulators exist to address these issues. The Office of the New York State Attorney General is charged with original jurisdiction to regulate charities and not-for-profits under New York State law. The New York State Department of Financial Services heavily regulates credit unions and, indeed, placed the MCU in receivership based on, among other things, the crimes committed by Wong and Guagliardo and a basic lack of controls. The trial of Ms. Ash is not the appropriate forum to address these issues and the government should be precluded from offering evidence relating to the Board Benefit Allegations.[9]

---

[9] The government has given no indication in the 404(b) Letter that it will seek to introduce evidence regarding to New York State Department of Financial Service's decision to place the MCU in receivership. Should the government seek to introduce evidence, Ms. Ash reserves her right to seek to preclude it and seek leave of the Court to provide additional briefing on that issue.

### E. The Government Should Be Precluded From Offering Evidence Relating to Ms. Ash's Tax Returns

The government has also indicated that it may introduce evidence that Ms. Ash failed to appropriately disclose the value of benefits she received from the MCU on her personal income tax returns. (404(b) Letter at 2.) The government has not charged her with violations of the Internal Revenue Code. Instead, as a means of bolstering its obstruction allegations, it seeks to bootstrap its tax-related allegations that Ms. Ash sought to defraud the government of taxes it was owed. Yet, as described above, the government does not allege that Ms. Ash received the benefits that she allegedly failed to disclose on her tax filings during the course of her purportedly obstructive conduct or as a means of inducing her to enter the alleged conspiracy or to lie to the government. Nor does the government allege that any of Ms. Ash's alleged co-conspirators participated in or were aware of her purported misrepresentations on her income tax returns.

Here, the government seeks to offer evidence of uncharged conduct (relating to Ms. Ash's tax filings) that relates to other uncharged conduct (her receipt of the benefits from the MCU Board). The tax-related allegations are simply not relevant to the allegations that, more than a year later, she obstructed and/or lied to the government. Further, the proposed introduction of this evidence again runs afoul of the standard set forth in Rule 403 of the Federal Rules of Evidence 403. As an initial matter, the allegations of tax fraud are of a fundamentally different, and equal or more salacious, nature than the crimes with which she is charged, as Ms. Ash would be alleged to have engaged in tax fraud to enrich herself. As such, permitting evidence relating to these allegations would be unfairly prejudicial and contrary to Rule 403 of the Federal Rules of Evidence. The SDNY has the ability to bring federal criminal tax charges.

It has not done so here and should not be permitted to turn this obstruction prosecution into a tax evasion case under the guise of Rule 404(b) of the Federal Rules of Evidence.

Further, the chance for jury confusion and undue delay relating to these allegations is substantial. Offering evidence relating to Ms. Ash's taxes at trial would raise intricate issues relating to federal and state income tax laws and regulations and the appropriate treatment of business expenses on a federal and state income tax return. Again, a "trial within a trial" would emerge on issues far removed from the charged allegation in this matter. Accordingly, the government should be precluded from offering evidence relating to Ms. Ash's tax filings.

## II. THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING EVIDENCE RELATING TO MS. ASH'S ARREST

As described above (*see supra* at 3), an SDNY investigator contacted Ms. Ash to inform her of the warrant for her arrest on October 10, 2019 while she was in Miami, Florida. She voluntarily returned to New York the following morning and was arrested. She was released on bond that same day.

### A. Relevant Law

In *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005), the Second Circuit set forth the standard under which "evidence of flight" would be admissible as evidence of the defendant's consciousness of guilty. The *Al-Sadawi* court established a four part standard that requires that the evidence support four inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Id.* at 424. Here, the evidence supports no such inferences.

### B. Ms. Ash's Conduct Does Not Reflect Any Evidence of Flight

Here, there is no evidence that Ms. Ash sought to flee prosecution. She was in Florida when she learned, via a telephone call directly to her despite the government's knowledge of her representation by counsel, that the government had a warrant for her arrest. She did not attempt to flee or take other steps to avoid apprehension. Indeed, she directed the investigator to call her attorney and her attorney provided the agents who were on-site at her residence with the spare key to open her house and conduct the Court-authorized search of her residence. She then voluntarily boarded a flight the next day to return to New York while her attorney unsuccessfully sought to negotiate her surrender.[10] Notably, at Ms. Ash's detention hearing on the day of her arrest, the government did not seek her remand and the Honorable Ona Wang did not make a finding that Ms. Ash was a flight risk. As there was no "flight" after Ms. Ash learned that the government had a warrant for her arrest, there is no inference to be drawn that her conduct reflects the consciousness of her guilt relating to obstructive conduct which, as alleged, ended more than a year prior to the date of the attempted apprehension. Accordingly, the government should be precluded for offering evidence relating to the circumstances of Ms. Ash's arrest.

## III. THE GOVERNMENT SHOULD BE PRECLUDED FROM REFERRING TO THE TRANSFER OF DATA FROM THE IPHONE X AS "WIPING"

In the Superseding Indictment, the government alleges in Count Three that Ms. Ash obstructed justice or attempted to do by, among other things, the fact that she "wiped an Apple iPhone." (*Superseding Indictment* ¶ 6; emphasis supplied.) This allegation appears to relate to

[10] At the October 11, 2019 Detention hearing, Ms. Ash's then-counsel, Roger Archibald, acknowledged that he had erroneously informed the SDNY that Ms. Ash was en route to Africa (Oct. 11 Tr. at 11) and that he had decided not to provide more information to the government, including the fact that Ms. Ash was on a pre-planned trip to Florida, because he was not obliged to do so. (*Id.* at 12.) Mr. Archibald also noted that he had not responded as quickly to the inquiries from the SDNY as the SDNY would have liked due to his own scheduling issues. (*Id.* at 13). His error and strategic decisions, which may have frustrated the government, should not be imputed to Ms. Ash to suggest any intent to evade prosecution.

the iPhone Data Transfer described above. As set for the below, Ms. Ash does not dispute that evidence relating to the iPhone Data Transfer may be relevant at trial. However, the term "wipe" is inaccurate. Equally important here, it has an imprecise meaning and an unfairly prejudicial connotation. Accordingly, the government should be precluded from using that term in offering evidence with respect to the iPhone Data Transfer.

### A. Applicable Law

In considering the whether the government may use certain terms at trial, courts apply the balancing test set forth in Rule 403 of the Federal Rules of Evidence, to determine if the term at issue is unduly prejudicial or could be replaced using less inflammatory terms.

### B. The Government Should Not be Permitted to Use the Term "Wipe" or "Wiping" in Reference to the iPhone Data Transfer

The Court should preclude the government from using the term "wipe" in describing Ms. Ash's actions because it is unfairly inflammatory and because it mischaracterizes the nature of her conduct. As the government alleges in the Complaint, contemporaneous records from Apple indicate that Ms. Ash called Apple to inquire about how to transfer data from the iPhone X to another device and that, afterwards, the "customer came in with two iPhones [and] would like to set one up with iCloud restore and the second to clear completely." (Complaint ¶ 37.) As such, the evidence suggests that Ms. Ash sought to transfer the content of the iPhone X to another iPhone, rather than seeking simply to eradicate the data on the iPhone X, as the term "wipe" would incorrectly suggest.

The government will undoubtedly seek to introduce evidence regarding what occurred at the Apple store in connection with the iPhone Data Transfer. Further, it has noticed an expert for whom it seeks to elicit testimony regarding what data was or was not available on the iPhone X when it came into the government's possession. As such, the government will have ample

ability to describe the events surrounding the iPhone Data Transfer, the contents of the iPhone X, and to ask the jury to draw an inference from the facts that it presents. But, in so doing, the government should not be permitted to utilize colloquial terminology which is both highly inflammatory and which mischaracterizes the evidence. As such, the government should be precluded from referring to the transfer of data from the iPhone X as the "wiping" of that device.

## CONCLUSION

For the foregoing reasons, Sylvia Ash respectfully requests that the Court grant the relief requested herein.

Dated: New York, New York
October 29, 2021

MORRISON & FOERSTER LLP

By: */s/ Carrie H. Cohen*

Carrie H. Cohen
Nathan D. Reilly
Janie C. Buckley
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com
NReilly@mofo.com
JBuckley@mofo.com

*Counsel for Defendant Sylvia G. Ash*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA

- *v.* -

SYLVIA ASH,

Defendant.

-------------------------------------------------------x

S1 19 Cr. 780 (LAK)

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Eli J. Mark
Daniel C. Richenthal
Jonathan E. Rebold
Assistant United States Attorneys

Alona Katz
Special Assistant United States Attorney

- Of Counsel -

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ........ 2

ARGUMENT ........ 8

I. EVIDENCE OF THE DEFENDANT'S RECEIPT OF BENEFITS FROM MCU AND WONG IS ADMISSIBLE ........ 8

A. The Proffered Evidence ........ 8

B. Applicable Law ........ 10

1. Direct Evidence ........ 10

2. Evidence of Other Acts ........ 10

C. Discussion ........ 12

II. EVIDENCE OF THE DEFENDANT'S CONCEALMENT OF BENEFITS SHE RECEIVED FROM MCU ON HER ANNUAL JUDICIAL FINANCIAL DISCLOSURE FORMS IS ADMISSIBLE ........ 15

A. The Proffered Evidence ........ 15

B. Discussion ........ 15

III. EVIDENCE THAT THE DEFENDANT WAS ADVISED TO RESIGN HER BOARD POSITION AT MCU AND THAT A JUDICIAL MISCONDUCT COMPLAINT WAS FILED AGAINST HER ARISING FROM HER SERVICE ON MCU'S BOARD IS ADMISSIBLE ........ 17

A. The Proffered Evidence ........ 17

B. Discussion ........ 19

IV. EVIDENCE THAT THE DEFENDANT SOUGHT TO EVADE PERSONAL INCOME TAXES ON THE COMPENSATION SHE RECEIVED FROM MCU IS ADMISSIBLE ........ 20

A. The Proffered Evidence ........ 20

B. Discussion ........ 21

V. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S FAMILY BACKGROUND, MARITAL STATUS, ANCESTRY, HEALTH CONDITION, AGE, OR ANY OTHER PERSONAL FACTOR UNCONNECTED TO GUILT SHOULD BE PRECLUDED ........ 22

VI. EVIDENCE OR ARGUMENT CONCERNING THE POTENTIAL PUNISHMENT OR CONSEQUENCES, INCLUDING DISBARMENT, THAT THE DEFENDANT FACES IF CONVICTED SHOULD BE PRECLUDED ........ 22

VII. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S OR MCU'S PRIOR COMMISSION OF "GOOD ACTS" WHILE SHE WAS A BOARD MEMBER (OR OTHERWISE) OR NON-COMMISSION OF OTHER BAD ACTS SHOULD BE PRECLUDED ........ 23

VIII. EVIDENCE OR ARGUMENT CONCERNING WHETHER OTHER MCU BOARD MEMBERS AND SUPERVISORY COMMITTEE MEMBERS SIMILARLY MISAPPROPRIATED MONEY FROM MCU SHOULD BE PRECLUDED ................ 24

IX. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S PRIOR ALLEGATION THAT THE GOVERNMENT ENGAGED IN "OUTRAGEOUS" MISCONDUCT THAT VIOLATED THE CONSTITUTION, THE LAW, AND/OR THE JUSTICE MANUAL SHOULD BE PRECLUDED ................ 26

X. EVIDENCE OR ARGUMENT CONCERNING THE GOVERNMENT'S CHARGING DECISIONS SHOULD BE PRECLUDED ................ 27

XI. EVIDENCE OR ARGUMENT CONCERNING ANY ALLEGED RELIANCE ON ADVICE OR APPROVAL OF COUNSEL IN ENGAGING IN THE CHARGED CONDUCT SHOULD BE PRECLUDED, UNLESS AND UNTIL THE DEFENDANT ESTABLISHES AN ADMISSIBLE FACTUAL BASIS ................ 28

A. Relevant Background ................ 28

B. Applicable Law ................ 28

C. Notice of and Discovery Concerning an Advice-of-Counsel Defense ................ 30

D. Federal Rule of Evidence 104 ................ 31

E. Discussion ................ 33

1. The Defendant Should Be Ordered Promptly to Provide Written Notice and Discovery Concerning Any Alleged Advice-of-Counsel Defense .... 33

2. The Defendant Should Be Precluded From Offering Argument—Including in Her Opening Statement, If Any—Concerning an Alleged Advice-of-Counsel Defense Unless and Until She Establishes an Admissible Factual Basis for the Elements of the Defense ................ 33

3. The Defendant Should Be Precluded From Otherwise Offering Argument—Including in Her Opening Statement, If Any—Or Evidence Suggesting She Is Not Guilty Because Mr. Archibald or Any Other Attorney Purportedly "Approved" of the Lawfulness of the Defendant's Conduct or Did Not Warn Her Against Certain Conduct ................ 34

CONCLUSION ................ 36

## TABLE OF AUTHORITIES

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987) .......... 31, 32

*Lurie v. Wittner*, 228 F.3d 113 (2d Cir. 2000) .......... 30

*Rogers v. United States*, 422 U.S. 35 (1975) .......... 23

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) .......... 35, 36

*Shannon v. United States*, 512 U.S. 573 (1994) .......... 23

*United States v. Armstrong*, 517 U.S. 456 (1996) .......... 28

*United States v. Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978 (E.D.N.Y. Feb. 10, 2017) 30, 33, 35, 36

*United States v. Battaglia*, No. S9 05 Cr. 774, 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .......... 22

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) .......... 29, 33

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) .......... 24

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......... 30, 31

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) .......... 35

*United States v. Brady*, 26 F.3d 282 (2d Cir. 1994) .......... 12

*United States v. Brik*, No. 15 Cr. 78 (SRN), 2016 WL 3753080 (D. Minn. July 11, 2016) .......... 32

*United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2332371 (S.D.N.Y. June 4, 2008) .......... 31

*United States v. Camacho*, 353 F. Supp. 2d 524 (S.D.N.Y. 2005) .......... 32

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) .......... 10, 12, 15

*United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012) .......... 29, 34

*United States v. Colon*, 880 F.2d 650 (2d Cir. 1989) .......... 11

*United States v. Crowder*, 325 F. Supp. 3d 131 (D.D.C. 2018) .......... 31

*United States v. DeJesus*, 806 F.2d 31 (2d Cir. 1986) .......... 32

*United States v. Evangelista*, 122 F.3d 112 (2d Cir. 1997) ........................................................ 29

*United States v. Fazio*, No. S2 11 CR 873, 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012).......... 24

*United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021) ................................................................. 25

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ........................................................... 10

*United States v. Greenspan*, 923 F.3d 138 (3d Cir. 2019)......................................................... 28

*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) ............................................................ 22

*United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522 (E.D.N.Y. Jan. 8, 2010)... 30, 33

*United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012)..................................................................... 10

*United States v. Knox*, 687 F. App'x 51 (2d Cir. 2017)............................................................... 26

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ............................................................. 11

*United States v. Meyerson*, 18 F.3d 153 (2d Cir. 1994)............................................................... 10

*United States v. Muse*, No. 06 Cr. 600 (DLC), 2007 WL 1989313 (S.D.N.Y. July 3, 2017)....... 27

*United States v. Oldbear*, 568 F.3d 814 (10th Cir. 2009)............................................................ 25

*United States v. Oliviere*, 740 F. Supp. 2d 414 (S.D.N.Y. 2010) ............................................... 13

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991) ........................................................... 22

*United States v. Pascarella*, 84 F.3d 61 (2d Cir. 1996) ............................................................... 11

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997)...................................................................... 32

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006)................................................................ 10

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996)............................................................. 11, 12

*United States v. Quinones*, 417 F. App'x 65 (2d Cir. 2011).................................................. 29, 34

*United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) .............................................................. 11

*United States v. Re*, 401 F.3d 828 (7th Cir. 2005) ....................................................................... 27

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997) ................................................................ 27

*United States v. Rivera*, No. 13 Cr. 149, 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015)............. 24

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) .................................................. 14

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ........................................................................ 12

*United States v. Sabir*, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184 (S.D.N.Y. May 10, 2007) 31

*United States v. Saldarriaga*, 204 F.3d 50 (2d Cir. 2000) ......................................................... 26

*United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441 (S.D.N.Y. Jan. 18, 2018). 30, 32, 33

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) ................................................................. 23

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017).......................................................... 29, 34

*United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .. 27

*United States v. Thomas*, 54 F.3d 73 (2d Cir. 1995).................................................................... 10

*United States v. Valencia*, 826 F2d 169 (2d Cir. 1987) ............................................................. 31

*United States v. Van Allen*, 524 F.3d 814 (7th Cir. 2008) ......................................................... 28

*United States v. Villegas*, 899 F.2d 1324 (2d Cir. 1990) ........................................................... 32

*United States v. Wells Fargo Bank N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 3999074 (S.D.N.Y. June 20, 2015)................................................................................................................. 31

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ........................................................ 11, 14

*United States v. Willoughby*, 860 F.2d 15 (2d Cir. 1988)........................................................... 13

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993)...................................................... 11, 12

*Williamson v. United States*, 207 U.S. 425 (1908) ....................................................................... 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- *v.* -

SYLVIA ASH,

Defendant.

S1 19 Cr. 780 (LAK)

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

The Government respectfully seeks rulings on several issues prior to trial.

*First*, the Government seeks pretrial rulings that certain categories of evidence are admissible as direct evidence or, in the alternative, under Federal Rule of Evidence 404(b), namely:

- evidence of the defendant's receipt of benefits from Municipal Credit Union ("MCU") and its former Chief Executive Officer Kam Wong ("Wong");
- evidence of the defendant's concealment of benefits she received from MCU on her annual state judicial financial disclosure forms;
- evidence that the defendant was told to resign her MCU board position, declined to do so, and that a judicial misconduct complaint was thereafter filed against her arising from her service on MCU's board, only after which she resigned; and
- evidence that the defendant sought to evade personal income taxes on compensation she received from MCU.

*Second*, the Government seeks to preclude certain evidence or argument that is wholly irrelevant to the issues at trial, and/or for which any conceivable probative value is substantially outweighed by the risk of juror confusion, distraction from the evidence, unnecessary lengthening of the trial, and/or unfair prejudice to the Government. Specifically, the Government moves to preclude evidence or argument concerning:

- the defendant's family background, marital status, ancestry, health condition, age, or any other personal factor unconnected to guilt;

- the potential punishment or consequences, including disbarment, that the defendant faces if convicted;
- the defendant's or MCU's prior commission of "good acts" while the defendant was a board member (or otherwise) or non-commission of other bad acts;
- whether other MCU board members and supervisory committee members allegedly similarly misappropriated money from or engaged in misconduct at MCU;
- the defendant's prior allegation that the Government engaged in "outrageous" misconduct that violated the Constitution, the law, and/or the Department of Justice Manual; and
- the Government's charging decisions in or related to this matter.

*Third*, the Government moves (1) for an order that the defendant promptly provide written notice and discovery concerning any purported advice-of-counsel defense and (2) to preclude the defendant from offering argument—including in her opening statement, if any—concerning alleged reliance on the advice or approval of counsel in engaging in the charged conduct, unless and until the defendant establishes an admissible factual basis for the required elements of an advice-of-counsel defense.

**FACTUAL BACKGROUND**

The factual allegations against the defendant are set forth in detail in Complaint 19 Mag. 9341 (the "Complaint" or "Compl."), described in the Superseding Indictment, and described in prior submissions to the Court.

In sum, the defendant, Sylvia Ash, a now-suspended New York State Supreme Court Justice and former MCU board of directors' chair, is charged in a multiple-count superseding indictment (the "Indictment") with obstructing the government's investigation into misconduct by MCU's former chief executive officer Kam Wong and others at MCU, and making a false statement to federal investigators. Wong was charged with embezzlement, wire fraud, and other

federal crimes in May 2018, pled guilty to embezzlement in December 2018, and was sentenced to 66 months' imprisonment and ordered to pay more than $9 million in restitution. *See United States v. Wong*, 18 Cr. 737 (JGK).

As alleged, beginning in January 2018 and continuing until at least July 2018, the defendant agreed with one or more others to and did engage in a course of conduct to obstruct the government's investigation. During this time, the government interviewed the defendant four times (none pursuant to a proffer agreement) and served her with two federal grand jury subpoenas. As alleged in the Complaint and the Indictment, the defendant obstructed justice in a number of ways, including by signing a false and misleading memorandum about money Wong received (which he later admitted he embezzled), concealing and deleting emails and text messages, and making false statements to federal officials.

First, in January 2018, the defendant agreed to and did assist Wong in signing a false and misleading memorandum that was provided to law enforcement. After law enforcement first approached Wong about millions of dollars he had received by numerous hand-written checks from MCU, which he falsely told investigators he was entitled to under his employment contract, Wong turned to the defendant for assistance. At Wong's request, the defendant signed a false and misleading memorandum (which Wong referred to as an "affidavit") that purported to justify payments he received from MCU. The memorandum recounted a supposed meeting between the defendant and Wong in June 2015—when the defendant was chair of MCU's board of directors—at which the defendant purportedly approved more than $3.7 million in payments to Wong to cancel or moot a provision in his employment contract that had provided him long-term disability insurance (the "LTD Offset Payments"). After the defendant signed the false and misleading memorandum, Wong provided it to law enforcement in an (unsuccessful) attempt to hinder the

federal investigation. MCU also provided the memorandum to state and federal financial regulators.[1]

Next, on March 1, 2018, shortly after Wong was placed on administrative leave from his position at MCU, the defendant attended her first voluntary interview with the Government. At the interview, the defendant was questioned regarding her service as an MCU board member, Wong's compensation and contract, and the memorandum she signed for Wong. During that interview, she falsely stated that MCU's then-current general counsel had told her that Wong's employment contract gave him the option of receiving the LTD Offset Payments. The defendant conceded, however, in response to questioning, that the memorandum that she had signed for Wong about the LTD Offset Payments was not an accurate reflection of her meeting and discussion with Wong about long term disability insurance, any payments to him in lieu of the insurance, and his contract. During the interview, the defendant also misleadingly stated that she stepped down from her position at MCU after she was appointed as a judge for the state supreme court commercial division because MCU had foreclosures before that court.

Subsequently, the defendant sought to destroy and impair evidence—including evidence sought from her by federal grand jury subpoenas—by concealing and deleting emails and text messages with Wong and others and wiping an Apple iPhone that Wong had provided her at or around the time that he asked her to sign the false and misleading memorandum described above. The defendant concealed and deleted emails and text messages about MCU's internal investigation, the government's investigation, and her expressed sympathy and loyalty to Wong.

---

[1] Wong also obtained false and misleading memoranda from two other individuals, MCU's then-Treasurer and MCU's then-chair of the supervisory committee. The supervisory committee of a credit union is generally responsible for oversight of the credit union's board of directors and management.

On March 13, 2018, the defendant was served with her first federal grand jury subpoena (the "First Subpoena"), which requested the production of documents related to various matters, including long term disability insurance for Wong, Wong's compensation, and any communications with Wong through the date of the First Subpoena. On April 6, 2018, during a telephonic interview with federal officials, she falsely told the Government that she did not have any materials responsive to the First Subpoena.

On June 8, 2018—after Wong was charged with embezzlement from MCU and the government had executed a search warrant of the residence of Joseph Guagliardo, a member of MCU's supervisory committee (who later was also charged and convicted of embezzlement from MCU)—the defendant was interviewed, by telephone, again by the Government about the First Subpoena. During that interview, the defendant again falsely stated that she had no materials responsive to the First Subpoena. During the interview, the defendant further stated, among other things, that, since her departure from MCU, her communications with Wong did not involve MCU business, apart from her inquiring whether she could host her birthday at MCU Park, a minor league baseball stadium that MCU then-sponsored.

On June 18, 2018, the defendant was served with a second federal grand jury subpoena (the "Second Subpoena"), which requested the production of documents related to various matters, including all correspondence with Wong, Guagliardo, and multiple other individuals; all documents regarding any criminal investigation, internal investigation, or audit related to Wong; and all documents regarding any items of value received from MCU, Wong, or Guagliardo. Shortly afterward, the defendant went to an Apple store and caused an Apple employee to "clear completely" the iPhone X that Wong had recently provided her from MCU. In addition, the defendant deleted emails from her Gmail account, including all of her emails with Guagliardo,

many of which concerned Wong, the federal investigation, MCU's internal investigation, and allegations of misconduct against Board members and MCU's former general counsel, none of which she ultimately produced in response to either of the federal grand jury subpoenas directed to her.

On July 6, 2018, on the defendant's behalf, her then-counsel, Roger Archibald, Esq., produced materials to the Government in response to the Second Subpoena. This production was, the investigation revealed, incomplete, concealing text messages, emails, and other documents the defendant possessed or had under her custody or control that were responsive to the Second Subpoena. Among other things, the production did not include correspondence with Wong, Guagliardo, and others; documents regarding the criminal investigation and internal investigation related to Wong; and documents regarding items of value received from MCU, Wong, and Guagliardo.

On July 9, 2018, the defendant attended her final voluntary interview with the Government. During this interview, while accompanied by her then-counsel, the defendant made multiple false statements, including: she repeated false statements regarding her purported conversation with MCU's former general counsel about his supposed approval of Wong's receipt of cash payments in lieu of long-term disability insurance; she repeated her false claim about the reason for her resignation from MCU's board of directors; she falsely claimed that she deleted the contents of the iPhone X she received from Wong in preparation to return the phone to MCU, but that she did not return it because MCU was no longer seeking to retrieve any devices from her; and she falsely claimed she and her aunt took a trip to Las Vegas for an MCU event after she resigned because all of her travel arrangements were paid for by MCU before she resigned. In addition, the defendant

also repeated her false and misleading claim that she resigned from the board of MCU because she was elevated to be the presiding judge of the commercial division.

After the defendant's final interview, Mr. Archibald, her then-counsel, on her behalf, sent a letter, dated July 17, 2018, to MCU that falsely stated that the defendant had not wiped any MCU-issued devices when returning two of them, the iPhone X and an Apple watch, to MCU. In the July 17 letter, Archibald wrote that the defendant had "advised" Archibald that she had not "wiped, deleted, reset, factory restored, imaged or copied any of [MCU's] electronic devices." The letter also stated that the iPhone X and Apple watch were "the only two MCU electronic devices" possessed by the defendant at the time the letter was sent. Subsequently, the iPhone X was forensically examined and determined that the phone had been reset.

On or about October 10, 2019, the defendant's residence was searched, pursuant to a judicially-authorized search warrant, during which law enforcement officers located, among other things, additional MCU-issued devices. The next day, the defendant was arrested and her cellphone was seized incident to arrest. After obtaining a judicially-authorized search warrant, the defendant's phone was searched, which revealed, among other things, numerous text messages that were concealed in response to the subpoenas as well as evidence that the defendant had also deleted relevant text messages.

After the defendant was indicted, the defendant's new counsel provided to the Government two additional MCU-issued devices that had previously been concealed. Similar to the iPhone X and Apple Watch, upon analysis, these devices had also been reset.

## ARGUMENT

### I. EVIDENCE OF THE DEFENDANT'S RECEIPT OF BENEFITS FROM MCU AND WONG IS ADMISSIBLE

#### A. The Proffered Evidence

As described in the Complaint, the Indictment, and above, the defendant is charged with obstructing the federal investigation of Wong and others at or connected to MCU, including her own conduct, and conspiring to do so. The Government expects that the evidence will show that Wong and the defendant had a close—and, in relevant ways, corrupt—relationship that began and developed over the years when the defendant was serving as an MCU board member, and continued after she resigned from MCU.

As explained in the Complaint, although the defendant's position on MCU's board of directors was ostensibly a volunteer and unpaid one, she sought and obtained significant personal benefits from that position. (Compl. ¶ 12.) The evidence, in both the form of documentary evidence and testimony, is expected to show that the defendant received tens of thousands of dollars annually in reimbursements and other benefits from MCU (*id.* at ¶ 12(b)), some of which were personally authorized by Wong. Specifically, the Government expects to offer evidence that the defendant sought and received reimbursement for, and had MCU and/or Wong pay for, domestic and foreign trips (including airfare, lodging, meals, and entertainment), use of MCU Park (including food and beverages), personal expenses (including cellphone, cable, and internet service), Apple devices, sporting event tickets, contributions to organizations, and transportation to meetings (or money in the guise of reimbursement for such transportation), both during and after the defendant's service as an MCU board member (*id.* at ¶¶ 12, 44).

In addition, the Government intends to offer evidence that the defendant's receipt of many of the above payments and items violated MCU policy and/or were fraudulently obtained. This evidence is expected to include, among other things, MCU's policy manual (which the defendant was sent), expense reports and reimbursement requests for personal expenses for cable and phone charges (including requests that involved double-billing, as described in prior briefing, and expenses for the defendant's son's phone), and unsupported travel expenses for meetings. (*Id.* at ¶¶ 12, 44.)

In emails and text messages, at times, the defendant acknowledged the personal nature of these benefits. For example, in reference to an August 2015 ten-day cruise to the Mediterranean for a purported conference that MCU paid for her and a guest, costing more than approximately $14,000, the defendant emailed a friend, "I was in Rome on a Mediterranean cruise as part of my Birthday celebration." Similarly, in regard to MCU Park, the defendant repeatedly referred to hosting her birthday party there. For example, in 2015, she emailed an invitation to friends to MCU Park for "Sylvia's Annual Baseball Birthday Celebration," and for the event she requested a cake, paid for by MCU, saying "Happy Birthday." Wong continued to authorize the defendant's use of MCU's suite at MCU Park (including food and beverage service) for her birthday even after she resigned from MCU. After she resigned, she also took trips paid for by MCU to Las Vegas and to Cuba. (*Id.* at ¶¶ 12(c)(i), 44.)

Notably, the Second Subpoena called for the production of all documents regarding any items of value received from Wong and MCU. (*Id.* at ¶ 35.) But the defendant's production in response to that subpoena did not include numerous documents regarding items of value she received from Wong and MCU and expense reimbursements she submitted, including pertaining

to trips (with a few exceptions), the Apple devices she received, and her receipt of sporting tickets. (*Id.* at ¶ 39.)

### B. Applicable Law

#### 1. Direct Evidence

Direct evidence of a crime is not limited to "that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Rather, direct evidence also includes evidence that is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).

#### 2. Evidence of Other Acts

Rule 404(b) allows for the admission of uncharged crimes, wrongs, or other acts for purposes other than proving criminal propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted). Applying this approach, the Second Circuit has routinely approved of the admission of "other acts" evidence with respect to the issues of knowledge, intent, and/or motive. *See, e.g.*, *United States v. Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1995); *United States v. Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994). Where the defendant claims his or her conduct has an innocent explanation, the admission of such evidence of prior acts is particularly appropriate. *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182

(2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

The defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offenses with which he or she is charged. *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the Government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

Evidence of uncharged acts also is admissible as background evidence where it is used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141-42 (2d Cir. 2009); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (affirming admission of prior act evidence involving co-conspirators "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed" (internal quotation marks omitted)); *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.").

The Court has broad latitude in determining whether to admit evidence under Rule 404(b). *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994) ("A trial court's decision regarding the admissibility of evidence will be overturned only upon a showing of abuse of discretion."). Where evidence is offered for a proper purpose under Rule 404(b), it may only be excluded if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *Zackson*, 12 F.3d at 1182; Fed. R. Evid. 403. The Second Circuit has repeatedly held that evidence properly admissible under Rule 404(b) is not unduly prejudicial so long as the court gives a limiting instruction to the jury explaining the purpose for the evidence. *See Pipola*, 83 F.3d at 566; *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993).

**C. Discussion**

The above-proffered evidence is admissible for multiple reasons.

*First*, much of it is admissible as direct evidence because it is, at least in large part, "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial. *Carboni*, 204 F.3d at 44 (internal quotation marks omitted). Indeed, much of the evidence, which concerns benefits, gifts, and other items of value that were provided by MCU, generally, and Wong, in particular, to the defendant, was concealed by the defendant in furtherance of the charged obstruction scheme. For example, the Second Subpoena demanded all documents regarding items of value the defendant received from MCU and Wong. (Compl. ¶ 35.) Her response to that subpoena concealed numerous responsive documents, including bank records, credit card records, expense reports, emails, and cable and phone bills, reflecting the receipt of tens of thousands of dollars of benefits.

*Second*, with respect to much of this evidence, it is admissible as background evidence to show the development and nature of the relationship between Wong and the defendant.

*See, e.g.*, *United States v. Oliviere*, 740 F. Supp. 2d 414, 422 (S.D.N.Y. 2010) ("It is well established in the Second Circuit that uncharged evidence of other acts is admissible to show the background of a conspiracy or a relationship of trust."). Among other things, this evidence, including of other benefits Wong offered to the defendant after Wong was approached in the federal investigation—including an Apple iPhone, a $25,000 contribution to an organization of which the defendant served on the board, and Nets tickets—helps to demonstrate why Wong expected that the defendant would be willing to assist him to obstruct the investigation (and thus why he would ask her to do so), and why she would agree to do so.

*Third*, and in any event, the evidence is admissible under Rule 404(b) to prove both the defendant's intent and absence of mistake or accident. The Government expects that the central disputed issue at trial is likely to be not whether the memorandum the defendant signed was false, or whether she deleted and/or failed to produce to the Government materials demanded by grand jury subpoenas, or whether she made misstatements to the Government, but whether she did these things with the requisite intent. The proffered evidence shows that the defendant received significant benefits from Wong, in particular, and from MCU, generally, under his leadership, both during her board service and after, such that the defendant had a motive to assist Wong to avoid scrutiny and potential prosecution. Similarly, the proffered evidence shows that the defendant had her own, independent motive to conceal the significant benefits she received from Wong and MCU—because some of them violated MCU policy, were obtained fraudulently, had no business purpose for MCU, and/or involved a misappropriation of MCU assets—to avoid scrutiny and potential prosecution herself. *See United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988) ("When a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to

show the motive for [her] efforts to interfere with the judicial process."). Furthermore, this evidence is probative of the defendant's knowledge and/or absence of mistake or accident in obstructing the investigation and making a false statement as charged. Contrary to what the Government expects the defendant to assert at trial, it was no accident or mere coincidence that she concealed evidence of the benefits described above. The proffered evidence helps demonstrate why that is so, because it demonstrates that the defendant's receipt of these benefits was wrongful, and she knew that.

Nor is there a basis to preclude this evidence under Rule 403. The evidence is straightforward, non-sensational, and highly probative of the defendant's motive, intent, knowledge, and absence of mistake. There is no risk that this evidence will elicit a separate, heightened response from the jury that would prevent the jury's fair assessment of the evidence, particularly if an appropriate limiting instruction is given. *See, e.g.*, *Williams*, 205 F.3d at 34 (perceiving "no undue prejudice under Rule 403 [where] the evidence did not involve conduct more serious than the charged crime"); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence not unfairly prejudicial because it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").

Finally, the proffered evidence would not materially lengthen or complicate the trial, and much of the evidence the Government will seek to present in summary fashion, including through the use of summary charts, where possible.

## II. EVIDENCE OF THE DEFENDANT'S CONCEALMENT OF BENEFITS SHE RECEIVED FROM MCU ON HER ANNUAL JUDICIAL FINANCIAL DISCLOSURE FORMS IS ADMISSIBLE

As outlined in the Complaint, the defendant failed to disclose the benefits she received from MCU on her annual judicial financial disclosure forms that she filed with New York State. This evidence is admissible as direct evidence, or in the alternative under Rule 404(b).

### A. The Proffered Evidence

All New York State judges are required to file annual financial disclosure forms that identify, among other things, any directorship held by the reporting individual, whether compensated or not; any gifts, in excess of $1,000, received during the reporting period; and any reimbursements for expenditures, in excess of $1,000, received during the reporting period. (Compl. ¶ 13(a).) The financial disclosure forms are available to the public upon request. (*Id.*) In each form since 2012 (which is the earliest year for which the court system maintained records) through 2018, the defendant filed an annual financial disclosure statement that failed to disclose any directorships held, including MCU, and did not disclose any expenses reimbursed or gifts received, including from MCU, as required. (*Id.* at ¶ 13(b).) However, as noted above, the defendant received compensation, expenses reimbursed, and gifts received that far exceeded the reporting threshold during each of those years.

### B. Discussion

The above-proffered evidence is admissible for multiple reasons.

*First*, similar to evidence of the benefits themselves, the evidence is admissible as direct evidence because it is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (internal quotation marks omitted).

The defendant's concealment on her judicial disclosure forms of gifts, benefits, and items of value she received from Wong and MCU is relevant to show that the defendant—at the time she received them—wanted to hide the benefits, strongly suggesting that she understood that they were, at a minimum, inappropriate. Evidence that helps to show that she thought the gifts, benefits, and items of value she received from Wong and MCU were inappropriate both sheds light on the relationship she had with Wong and provides relevant background to her efforts to conceal these gifts from the federal investigation.

*Second*, and in any event, the evidence is admissible under Rule 404(b). As discussed above, the Government expects the defendant will argue that there was nothing inappropriate that she received from Wong and MCU, and thus she had no motive to conceal gifts, benefits, and items of value she received from Wong and MCU from the federal grand jury investigation. Evidence that the defendant already had hidden these same things directly rebuts that claim and demonstrates why the defendant would want to continue to hide what she received. Indeed, this evidence demonstrates that even if the defendant did *not* think that the benefits were in any way improper, she still had a motive to hide them, because she had failed repeatedly to disclose them in the past.

Lastly, there is no basis to preclude this evidence under Rule 403. This evidence is not sensational or inflammatory or complicated, and it is highly probative of the defendant's motive and intent. There is nothing unfair about the admission of this straightforward evidence.

## III. EVIDENCE THAT THE DEFENDANT WAS ADVISED TO RESIGN HER BOARD POSITION AT MCU AND THAT A JUDICIAL MISCONDUCT COMPLAINT WAS FILED AGAINST HER ARISING FROM HER SERVICE ON MCU'S BOARD IS ADMISSIBLE

As outlined in the Complaint, the defendant was told to resign her position on MCU's board, committed to resign upon being so told, but then continued to serve on the board until a judicial misconduct complaint was filed against her in August 2016. This evidence is admissible as direct evidence, or in the alternative under Rule 404(b).

### A. The Proffered Evidence

In or about April 2015, prior to becoming the chair of MCU's board, the defendant submitted an inquiry to the New York State Advisory Committee on Judicial Ethics (the "Committee") as to whether she could serve as the chair of the board.[2] (Compl. ¶ 11(f) n.2.) Her request was considered and denied, because it violated the rules governing judicial conduct for her to serve on MCU's board. Apparently not content with the Committee's determination, she sought reconsideration and also reached out to MCU's then-chair, Mark Brantley, who was stepping down, for assistance with responding.[3] Despite the Committee's decision that she was not permitted to serve as MCU's chair—and while she was attempting to seek reconsideration—she went forward anyway in assuming the chair position in May 2015.

---

[2] The Advisory Committee on Judicial Ethics provides ethics advice to judges, justices, and quasi-judicial officials of the New York State Unified Court System about their own conduct, and helps judges comply with the Rules Governing Judicial Conduct. A judge who takes any action in accordance with a formal written advisory opinion of the Advisory Committee on Judicial Ethics is "presumed proper" for purposes of any subsequent investigation by the New York State Commission on Judicial Conduct. *See* New York State Judiciary Law § 212(2)(l).

[3] The defendant concealed this email, along with many others, in response to the Second Subpoena, which had requested all correspondence with Brantley.

On or about July 1, 2015, after being told by a judge on the Committee and its chief counsel that the Committee would not reconsider its decision and the defendant should resign from MCU's board, she informed the Committee that she would resign and withdraw her inquiry to avoid a formal written decision on the matter. The defendant, however, did not do as she said.

On the contrary, the defendant did not resign until more than a year later, and then only after the New York State Commission on Judicial Conduct (the "Judicial Commission") filed a complaint against her. (*Id.*) In particular, on or about June 24, 2016, the Judicial Commission's Administrator met with the defendant, who was then herself serving as a member of the Judicial Commission, to discuss concerns about the defendant's service on MCU's board as a result of MCU regularly being engaged in adversary proceedings in New York courts.[4]

The defendant, however, still did not step down, and on August 9, 2016, the Judicial Commission's Administrator informed her that her continued service on the MCU board would compel him to recommend to the Judicial Commission that it investigate the matter. The defendant still did not resign from the MCU board, but instead requested a thirty-day leave of absence from her position at the Judicial Commission, and then resigned from the Judicial Commission on August 11, 2016.

On August 11, 2016, the same day the defendant resigned from the Judicial Commission, the Judicial Commission instituted a complaint that she chaired MCU's board notwithstanding that MCU was engaged regularly in adversary proceedings in New York courts. Only after the

---

[4] The defendant provided the Administrator an advisory opinion she received from the Committee in 2008, which stated that she could serve as long as MCU was not regularly engaged in adversary proceedings (which it was, and thus precluded her service). The defendant did not inform the Judicial Commission that, more recently, the Committee had advised her that she had to resign from MCU's board or that she had in 2015 withdrawn her request for a written opinion after learning that her continued service would be prohibited.

complaint was filed did the defendant, finally, resign from MCU's board, on August 16, 2016. As a result, the Judicial Commission dismissed the complaint. (*Id.* at ¶ 29(a) n.9.)

As discussed above, the defendant was questioned during multiple interviews by the Government about her service on MCU's board and during those interviews, she stated that she resigned because she was appointed as the presiding judge of the commercial division. (*Id.* at ¶¶ 29(a), 42(a).)

**B. Discussion**

The above-proffered evidence is admissible both as direct evidence and under Rule 404(b).

*First*, the evidence is direct evidence of the crimes charged because, as discussed above, in the course of the defendant's ongoing obstruction, among the multiple false and misleading statements she made to federal officials, she made false and misleading statements about the basis for her resignation from MCU's board. As such, the proffered evidence is necessary to prove that certain statements made were in fact false or misleading.[5]

*Second*, the evidence assists in demonstrating the defendant's understanding of the wrongfulness of the benefits she received from Wong and MCU after the defendant resigned.

*Third*, the evidence helps in demonstrating how close she was to Wong and vice-versa—so close that even after she was forced resign for serving on the board, she continued to seek and request benefits, gifts, and items of value from Wong, and that Wong continued to authorize them, notwithstanding that the resignation was prompted by a conflict of interest and that MCU continued to appear in state courts.

---

[5] Similarly, the evidence provides context for why the defendant sought to conceal the email with Brantley requesting his help in convincing the Committee not to bar her from continued service on MCU's board.

*Finally*, and in any event, the evidence is admissible under Rule 404(b), because it shows that the defendant had a motive to obstruct the federal investigation. The fact that she went to such great lengths to maintain her position on MCU's board, and her ability to receive gifts, benefits, and items of value from MCU in connection with that position, helps to demonstrate why she would agree to assist Wong, and in particular, to seek to frustrate the investigation of MCU and Wong, so that investigation would not uncover both Wong's misconduct and her own. Similarly, the evidence helps to demonstrate that it was not a mistake or accident that the defendant concealed evidence of her gifts, benefits, and items of value she had received.

Lastly, there is no basis to preclude this straightforward evidence under Rule 403, as it is highly probative of the defendant's motive and intent, and not sensational or inflammatory or complicated.

## IV. EVIDENCE THAT THE DEFENDANT SOUGHT TO EVADE PERSONAL INCOME TAXES ON THE COMPENSATION SHE RECEIVED FROM MCU IS ADMISSIBLE

As detailed in the Complaint and above, the defendant received significant benefits from MCU. For some of those benefits, MCU provided the defendant annually with an IRS Form 1099 reporting a portion of those benefits as taxable income. The defendant disclosed that income on her federal tax returns, but then evaded taxes by falsely claiming expenses against that compensation on the Schedule C to her IRS Form 1040 personal income tax return. This evidence is admissible as direct evidence or in the alternative under Rule 404(b).

### A. The Proffered Evidence

Every year while the defendant served as an MCU board member, she received a Form 1099 reporting a portion of the benefits she received as taxable income. That income generally related to certain domestic and foreign travel of the defendant's guests on trips paid for by MCU.

The defendant's practice, it appears, was to report that income as compensation from her service as a board member on the Schedule C to her Form 1040 personal income tax returns. However, instead of paying income tax on that compensation, as she should have, she falsely declared expenses for travel against that income—even though MCU paid for all of her travel, and thus she had no such expenses—in order to declare falsely no net income.

As noted above, the Second Subpoena requested all documents regarding any items of value the defendant received from MCU. In response to that subpoena, the defendant produced one email pertaining to a Form 1099. However, she did not produce any of her Form 1099s or her personal income tax returns that reflected the money she received from MCU, including the Schedule Cs that falsely claimed expenses.

**B. Discussion**

The above-proffered evidence is admissible both as direct evidence and under Rule 404(b).

*First*, the evidence is direct evidence of the crimes charged because, as discussed above, the defendant concealed her tax returns in response to a federal grand jury subpoena. As such, the tax returns that reflect compensation she received from MCU are necessary to prove that she concealed certain materials.

*Second*, and in any event, the evidence is admissible under Rule 404(b), because it shows that the defendant had a motive to obstruct the federal investigation, because she had already engaged in wrongdoing—and done so federally—in connection with certain of the same subjects about which she was being asked and from which documents were being sought from her.

Lastly, there is no basis to preclude this evidence under Rule 403. The evidence is straightforward, non-sensational, and highly probative of the defendant's motive, intent, knowledge, and absence of mistake. As with the evidence described above, there is no risk that

this evidence will elicit a separate, heightened response from the jury that would prevent the jury's fair assessment of the evidence. The defendant can also request an appropriate limiting instruction, to which the Government has no objection, that she is not on trial for tax or any other uncharged crimes.

## V. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S FAMILY BACKGROUND, MARITAL STATUS, ANCESTRY, HEALTH CONDITION, AGE, OR ANY OTHER PERSONAL FACTOR UNCONNECTED TO GUILT SHOULD BE PRECLUDED

The Government is unaware of any lawful basis for the defendant to offer evidence or argument concerning her family background, marital status, ancestry, health, age, or any other similar factors. She should be precluded from doing so, and from mentioning such subjects in her opening statement, absent a showing that such a factor bears on her guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. S9 05 Cr. 774, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

## VI. EVIDENCE OR ARGUMENT CONCERNING THE POTENTIAL PUNISHMENT OR CONSEQUENCES, INCLUDING DISBARMENT, THAT THE DEFENDANT FACES IF CONVICTED SHOULD BE PRECLUDED

The defendant should also be precluded from offering evidence or argument concerning the potential punishment or consequences, including disbarment or loss of her judicial position, that she faces if convicted. Where the jury has no role at sentencing—such as in this case—it

"should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* There is no proper basis for the defendant to put these issues before the jury in any form, and the defendant should not be permitted to offer evidence or argument inviting the jury to consider them.

Similarly, the defendant should be precluded from offering evidence or argument that she could have been, or will be, separately punished or sanctioned by state, local, bar, or judicial authorities for the conduct at issue in this case. Any such evidence or argument has no connection to her guilt and is improper.

## VII. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S OR MCU'S PRIOR COMMISSION OF "GOOD ACTS" WHILE SHE WAS A BOARD MEMBER (OR OTHERWISE) OR NON-COMMISSION OF OTHER BAD ACTS SHOULD BE PRECLUDED

To the extent that the defendant may seek to present evidence or argument concerning her or MCU's prior commission of "good acts" while she was a board member or otherwise, including any philanthropic giving or other good deeds, or to offer evidence of her non-criminal activities to seek to disprove her guilt of the crimes charged, she should be precluded from doing so. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about her reputation for a "pertinent trait of character," or the witness's opinion

of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. S2 11 CR 873, 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("a defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014); *United States v. Rivera*, No. 13 Cr. 149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving). The defendant should accordingly be precluded from offering evidence or argument, including in her opening statement, concerning any charity, philanthropy, or any other specific instance or instances of her prior good acts, or the lack of commission of other bad acts.

For the same reasons, the defendant should be precluded from offering this type of evidence or argument insofar as it relates to MCU, as any prior good acts by that or any other entity similarly have no bearing on the defendant's guilt. Nor should the defendant be permitted to suggest that her alleged prior achievements, whether in the judiciary or otherwise, make it less likely that she committed the charged crimes.

## VIII. EVIDENCE OR ARGUMENT CONCERNING WHETHER OTHER MCU BOARD MEMBERS AND SUPERVISORY COMMITTEE MEMBERS SIMILARLY MISAPPROPRIATED MONEY FROM MCU SHOULD BE PRECLUDED

As noted above, the defendant is free to argue that the reimbursements, benefits, and gifts that she obtained from MCU were appropriate based on admissible evidence probative of her intent at the time she received the items of value. However, she should not be permitted to offer evidence

in support of an argument that because other board members or supervisory committee members may have received payments or other benefits similar to those she received, hers must have been appropriate, any more than the Government would be permitted to offer evidence in support of an argument that because others may have committed embezzlement, she too must have engaged in embezzlement. *See, e.g.*, *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming preclusion of evidence in embezzlement case as to how persons other than the defendant used funds because "only [the defendant's] actions and state of mind were material to her guilt"); *United States v. Gatto*, 986 F.3d 104, 129 (2d Cir. 2021) ("[T]hat others are engaging in improper behavior does not make it lawful.")

Moreover, even were such evidence and argument relevant (and it is not), it should be barred under Rule 403. Evidence and argument of other board members receipt of benefits from MCU would necessarily lead to a trial within a trial as to whether the payments to others to which the defendant points were or were not analogous to those made by the defendant, and would be very likely both to confuse and distract the jury and unduly and materially lengthen the trial. Indeed, were the defendant to offer evidence suggesting that other board members received similar benefits, the Government would expect to offer evidence regarding, among other things, whether or not those payments also violated MCU policy, whether or not others committed fraud or instead merely accepted benefits, and whether or not others hid what they received, all of which would lengthen the trial, require additional documentary and likely testimonial evidence, and distract from the relevant issues. In such a circumstance, the Government also would expect to offer evidence about the comparative size and nature of the benefits received by the defendant, which would have the same effect.

## IX. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S PRIOR ALLEGATION THAT THE GOVERNMENT ENGAGED IN "OUTRAGEOUS" MISCONDUCT THAT VIOLATED THE CONSTITUTION, THE LAW, AND/OR THE JUSTICE MANUAL SHOULD BE PRECLUDED

As the Court is aware, in her motion to suppress, the defendant asserted that the Government engaged in "outrageous" government misconduct in conducting voluntary interviews with her on April 6, 2018 and June 8, 2018, prior to her retaining counsel, because it failed to inform her that she was allegedly a "target" of the investigation, and that this conduct continued after her retention of counsel, because the Government failed to apprise her of a conflict with her then-counsel, all of which warranted the suppression of all of her statements to investigators. (Dkt. No. 34.) Whatever the merits of those assertions—and they were both factually and legally meritless—they were for this Court in weighing the defendant's motion, which was denied. They are not for the jury in weighing the defendant's guilt. The sole question before the jury is the guilt of the defendant, not the decisions of federal prosecutors or the conformity of them with the Constitution, the law, or the Department of Justice Manual. Any evidence or argument concerning the Government's supposed violation of the Constitution, the law, or the Justice Manual, including regarding advice that, in the defendant's view, should be provided to witnesses or others, would serve no purpose other than to seek to distract the jury from evidence of the defendant's guilt or to seek to encourage jury nullification. It therefore should be precluded. *See, e.g.*, *United States v. Knox*, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that the "government is not on trial" is "appropriate" (internal quotation marks omitted)); *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) ("The Court properly charged the jury to base its decision on the evidence or lack of evidence that had been presented at trial, and to focus solely on whether, in light of that evidence

or lack of evidence, the jury was convinced beyond a reasonable doubt that the defendant was guilty of the crimes with which he was charged.").

## X. EVIDENCE OR ARGUMENT CONCERNING THE GOVERNMENT'S CHARGING DECISIONS SHOULD BE PRECLUDED

Juries are routinely and properly instructed that they should not consider persons not on trial. *See, e.g.*, *United States v. Muse*, No. 06 Cr. 600 (DLC), 2007 WL 1989313, at *22 (S.D.N.Y. July 3, 2017). That instruction should be given here. In addition, the defendant should be precluded from offering argument about what charges were brought or not brought against other MCU board members or others. *See United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *see also United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"). A prosecuting authority's motives or views underlying its "charging decisions are not proper subjects for cross-examination and argument." *United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005). Those subjects have nothing to do with the defendant's guilt, and introducing them would only serve to confuse or distract the jury.

Similarly, the defendant should be precluded from offering argument that the Government's decision to not charge her with embezzlement or other crimes means she did not engage in other misconduct, or that such misconduct must not have been serious, much less criminal. The Government's decision not to prosecute someone else, or not to bring certain charges against a defendant, is just as irrelevant to guilt as the Government's decision to bring certain charges against the defendant. *See generally United States v. Armstrong*, 517 U.S. 456,

464 (1996). The Government's charging decisions are irrelevant to the issues at trial, and introducing them would serve no purpose other than to confuse or distract the jury, or inappropriately suggest nullification.

## XI. EVIDENCE OR ARGUMENT CONCERNING ANY ALLEGED RELIANCE ON ADVICE OR APPROVAL OF COUNSEL IN ENGAGING IN THE CHARGED CONDUCT SHOULD BE PRECLUDED, UNLESS AND UNTIL THE DEFENDANT ESTABLISHES AN ADMISSIBLE FACTUAL BASIS

The Government also moves (1) for an order that the defendant promptly provide written notice and discovery concerning any purported advice-of-counsel defense and (2) to preclude the defendant from offering argument—including in her opening statement, if any—concerning alleged reliance on the advice or approval of counsel in engaging in the charged conduct, unless and until the defendant establishes an admissible factual basis for the required elements of an advice-of-counsel defense.

### A. Relevant Background

The Government previously inquired on multiple occasions whether the defendant intended to advance an advice-of-counsel defense, and the defendant failed to answer definitively that inquiry.

### B. Applicable Law

The advice-of-counsel (or reliance-on-counsel) defense is a more specific form of the defense of good faith, available in limited circumstances in which a good faith instruction may otherwise be applicable. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 146 (3d Cir. 2019); *see also* Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-04. Advice-of-counsel "is not a free-standing defense." *United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008) (internal quotation marks omitted).

To establish a colorable advice-of-counsel defense, and thus be entitled to a jury instruction with respect to those offenses to which it may apply, the defendant must be able to identify admissible evidence that:

> 1. Before taking action, [she] in good faith sought the advice of an attorney whom he considered competent to advise him on the matter; and
>
> 2. [She] consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct; and
>
> 3. [She] made a full and accurate report to his attorney of all material facts that he knew; and
>
> 4. [She] then acted strictly in accordance with the advice of this attorney.

*United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017) (In addition to the model instruction in Sand *et al.*, *Modern Federal Jury Instructions*, "[w]e also refer district courts to the model instructions drafted by our sister circuits, particularly the Seventh Circuit's model, which reads [as set forth above]."); *see also Williamson v. United States*, 207 U.S. 425, 453 (1908); *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012); *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989).

"Each requirement must be satisfied." *Colasuonno*, 697 F.3d at 181. Where the defendant fails to meet one or more requirement, she is not entitled to a jury instruction. *Id.*; *see also, e.g.*, *Greenspan*, 923 F.3d at 146-47; *Scully*, 877 F.3d at 476; *Evangelista*, 122 F.3d at 117. Nor is she entitled to argue, directly or indirectly, that she has such a defense. *See, e.g.*, *United States v. Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (affirming denial of instruction and order precluding defense from arguing advice of counsel; "defendants are not entitled to such an instruction unless there are sufficient facts in the record to support the defense," and "the defendants [in this case] have not shown the required factual predicate for an advice-of-counsel defense"); *United States v.*

*Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978, at *3 (E.D.N.Y. Feb. 10, 2017) ("All available information indicates that the [pertinent] attorney represented [another], not defendants. Accordingly, the term 'advice of counsel' should not be employed in referring to [the attorney]. Doing so would be legally inappropriate and likely to mislead the jury.").

In short, the "situations in which the advice-of-counsel defense may be employed are severely limited." *Lurie v. Wittner*, 228 F.3d 113, 134 (2d Cir. 2000).

**C. Notice of and Discovery Concerning an Advice-of-Counsel Defense**

Given the complexity and potential issues concerning an advice-of-counsel defense, courts routinely order defendants to provide notice of whether they intend to advance such a defense in advance of trial, and, if so, to provide discovery concerning the defense. *See, e.g.*, *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018). That "disclosure should include not only those documents which support [the] defense, but also all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense." *United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522, at *13 (E.D.N.Y. Jan. 8, 2010).

When a defendant asserts a defense based on her reliance on the advice of counsel, she waives any attorney-client privilege over her communications with the counsel. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes"). As a result, defendants asserting such a defense must disclose to the government "any communications or evidence defendants intend to use to establish the defense" and "even otherwise-privileged communications that defendants do *not* intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure in their

entirety." *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) (internal quotation marks omitted; emphasis in original) (collecting cases). Failure to make such a disclosure results in forfeiture of the defense. *See Bilzerian*, 926 F.2d at 1291 (affirming refusal to let the defendant testify about his "good faith regarding the legality" of the charged conduct unless he was also subject to cross-examination regarding communications with his attorney); *see also United States v. Wells Fargo Bank N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 3999074, at *1 (S.D.N.Y. June 20, 2015) (civil defendant asserting advice-of-counsel must "make a full disclosure during discovery and the failure to do so constitutes a waiver of that defense" (internal quotation marks omitted)).

**D. Federal Rule of Evidence 104**

Preliminary questions concerning the admissibility of evidence, including whether evidence is relevant or a privilege exists, are to be determined by the Court. Fed. R. Evid. 104(a). The Court has discretion to order a hearing to assist it in resolving such questions. Fed. R. Evid. 104(c)(3) (the court "must conduct a[] hearing" when "justice so requires"). The Court's authority to resolve such questions is rooted in its "inherent authority to manage the course of trials." *United States v. Valencia*, 826 F.2d 169, 171 (2d Cir. 1987) (internal quotation marks omitted). At such a hearing, and more generally, the proponent of evidence bears the burden of demonstrating its admissibility by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2332371, at *1 (S.D.N.Y. June 4, 2008) ("As the proponent of the proposed testimony, defendant has the burden of establishing admissibility by a preponderance of the evidence."); *United States v. Sabir*, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184, at *6 (S.D.N.Y. May 10, 2007) (the "burden of showing that proffered testimony is offered to negate the *mens rea* element of a crime and not in support of some improper defense theory falls squarely on the defendant" (internal quotation

marks omitted)); *United States v. Camacho*, 353 F. Supp. 2d 524, 536 (S.D.N.Y. 2005) ("defendants as proponents of the evidence bear the burden of [admissibility]").

The Federal Rules of Evidence, other than with respect to privileges, do not apply at a preliminary hearing. Fed. R. Evid. 104(a); Fed. R. Evid. 1101(d)(1). Accordingly, statements that would be inadmissible hearsay at trial are admissible at such a hearing. *See, e.g.*, *Bourjaily*, 483 U.S. at 178; *United States v. DeJesus*, 806 F.2d 31, 34 (2d Cir. 1986). One circumstance in which a preliminary hearing may be ordered is to determine the propriety of a proffered defense. *See, e.g.*, *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) ("[I]t is appropriate for a court to hold a pretrial evidentiary hearing to determine whether a defense fails as a matter of law."). This is so for good reason: "no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter." *United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990); *see also* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."). A preliminary hearing may be ordered to consider a proffered advice-of-counsel defense just as it may be ordered to consider any other defense. *See also Scali*, 2018 WL 461441, at *8 n.4 ("Guided by efficiency and judicial economy, it behooves the Court to address [advice of counsel] before trial.").

Alternatively, a court may order a defendant not to offer evidence in front of the jury in support of a proffered advice-of-counsel defense until such time as there is a sufficient basis in the record. *See, e.g.*, *United States v. Brik*, No. 15 Cr. 78 (SRN), 2016 WL 3753080, at *4 (D. Minn. July 11, 2016) ("Only after hearing witness testimony will the Court be in a position to determine whether such evidence is admissible. Defense counsel shall request a sidebar or hearing outside

the presence of the jury prior to eliciting any testimony that concerns legal communications . . . .").

**E. Discussion**

**1. The Defendant Should Be Ordered Promptly to Provide Written Notice and Discovery Concerning Any Alleged Advice-of-Counsel Defense**

As noted above, the defendant has failed to say firmly whether she plans to assert an advice-of-counsel defense. She has, however, suggested at times, through counsel, that her conduct may have been informed in some, unspecified way, by her then-counsel, Mr. Archibald. Accordingly—and particularly since there appears to be no valid basis for the defense—the defendant should be ordered promptly to provide (i) written notice of any alleged advice-of-counsel defense, including its bases, scope, and to which specific counts she believes it applies, and (ii) any discovery materials in support of this defense, to the extent not already in the Government's possession. *See Scali*, 2018 WL 461441, at *8; *Hatfield*, 2010 WL 183522, at *13.

**2. The Defendant Should Be Precluded From Offering Argument—Including in Her Opening Statement, If Any—Concerning an Alleged Advice-of-Counsel Defense Unless and Until She Establishes an Admissible Factual Basis for the Elements of the Defense**

The Government is unaware of any basis for the defendant to offer an advice-of-counsel defense. Indeed, the defendant appears unable to meet a single part of the rigorous four-part test. As an initial matter, Mr. Archibald was not retained until after the defendant was served with the Second Subpoena, and after she had already participated in obstruction of justice over the course of five months. That alone warrants preclusion. *See Atias*, 2017 WL 563978, at *3

In any event, "the thrust of [the advice-of-counsel defense] is that the defendant, on the basis of counsel's advice, believed h[er] conduct to be lawful and thus could not be found to have had unlawful intent." *Beech-Nut Nutrition Corp.*, 871 F.2d at 1194; *see also Scully*, 877 F.3d at

478 (defense requires that, "[b]efore taking action, he in good faith sought the advice of an attorney"). Here, the Government is unaware of any factual basis to find that, prior to engaging in the charged conduct, the defendant spoke with Mr. Archibald or any other attorney for the "purpose of securing advice on the lawfulness of [the defendant's] possible future conduct," *id.* Nor is there any factual basis of which the Government is aware to find that, before acting, the defendant "made a full and accurate report" to Mr. Archibald or any other attorney of all "material facts," *id.* And in any event, no lawyer, acting properly, would advise a client to withhold documents called for by a federal grand jury subpoena or to make false statement to federal officials.

In short, the defendant cannot come close to establishing a basis in admissible evidence for an advice-of-counsel defense. Until such time as she does so, any argument in support of such a defense—including in the defendant's opening statement, if any—should be precluded. *See, e.g.*, *Quinones*, 417 F. App'x at 67. For the same reasons, the defendant should be precluded from offering evidence for the purported purpose of attempting to satisfy any of the requirements of an advice-of-counsel defense, unless she first establishes, either in a preliminary hearing before or during trial, or by relying on evidence otherwise admissible at trial, that she has sufficient admissible evidence to satisfy all the defense's requirements. *See, e.g.*, *Colasuonno*, 697 F.3d at *4.

**3. The Defendant Should Be Precluded From Otherwise Offering Argument—Including in Her Opening Statement, If Any—Or Evidence Suggesting She Is Not Guilty Because Mr. Archibald or Any Other Attorney Purportedly "Approved" of the Lawfulness of the Defendant's Conduct or Did Not Warn Her Against Certain Conduct**

The defendant should not be permitted to advance through the back door what would amount to a quasi-advice-of-counsel defense—that is, having failed to meet the requirements for the defense, to argue nonetheless that she should not be found guilty because another lawyer

purportedly "approved" of, did not object to, or was involved in some way in the defendant's conduct—when she cannot advance an advice-of-counsel defense. That is precisely the kind of argument that is "likely to mislead the jury," *Atias*, 2017 WL 563978, at *3, into thinking that the defendant has a defense that the law says, in no uncertain terms, she does not have. The advice-of-counsel defense is subject to multiple and meaningful restrictions—including that a defendant seek the advice of lawyer acting as her lawyer, communicate all material facts to her lawyer, and strictly follow the advice of her lawyer—because a defense based on alleged legal advice or approval that does not meet these strictures is ripe for abuse. The defendant should not be permitted to engage in an end-run around the defense's requirements. *Cf. S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013) (The defendant "argues that the presence of lawyers is relevant to the overall context of the transaction, but that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury. A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. . . . This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense."); *see United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (There is no "advice-of-counsel defense without demonstrating advice of counsel.").

To be sure, the defendant, if she elects to testify, and within the bounds of the Federal Rules of Evidence, may talk about whether she believed herself to be acting wrongfully. But that this subject is generally proper does not mean that all testimony (or other evidence, if any exists) purportedly offered on this subject is admissible, or that the defendant may argue that evidence means something that, as a matter of law, it does not. On the contrary, as discussed above, a

defendant is not permitted to offer evidence of the involvement of lawyers or to suggest that she should be acquitted because they purportedly approved of or did not warn against certain conduct unless the defendant can satisfy each of the several requirements of an advice-of-counsel defense. Accordingly, before the defendant offers any purported such evidence, to the extent not otherwise admissible, or argument in the presence of the jury, the Court should order a hearing under Rule 104. At a minimum, the defendant should have to describe such evidence or argument fully to the Court and the Government, before it is heard by the jury, so that it may be cabined, as is likely to be necessary, and the jury instructed appropriately. And under no circumstance should the defendant be permitted to offer evidence or argument suggesting that the defendant relied on the "assistance" or "approv[al]" of another lawyer acting as a lawyer, a defense that has no apparent basis in fact, no basis in law (unless she can establish an advice-of-counsel defense, which she cannot), and in any event fails under Federal Rule of Evidence 403. *See Atias*, 2017 WL 563978, at *3; *Tourre*, 950 F. Supp. 2d at 684.

Similarly, the defendant should be precluded from offering evidence or argument concerning Mr. Archibald's background, experience, or abilities—whether designed to cast him in a positive or a negative light—because none of that is relevant to her guilt, and all of it would likely lead to a trial within a trial.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

DATED: October 29, 2021
New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/ Eli J. Mark
Eli J. Mark
Daniel C. Richenthal
Jonathan E. Rebold
Assistant United States Attorneys
(212) 637-2431/2109/2512
Alona Katz
Special Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SYLVIA ASH,<br><br>Defendant. | Case No. 1:19-cr-00780-LAK |

**PROPOSED JURY INSTRUCTIONS ON BEHALF OF DEFENDANT SYLVIA G. ASH**

Dated: New York, New York
November 9, 2021

MORRISON & FOERSTER LLP

By: s/ Carrie H. Cohen
Carrie H. Cohen
Nathan D. Reilly
Janie C. Buckley
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com
NReilly@mofo.com
JBuckley@mofo.com

*Counsel for Defendant Sylvia Ash*

## TABLE OF CONTENTS

**Page**

**General Requests** ........ 1

Proposed Instruction 1 (Count One: Conspiracy to Obstruct Justice) ........ 3

Proposed Instruction 2 (Count One: Elements of 18 U.S.C. §371) ........ 6

Proposed Instruction 3 (Count One: Element One – Existence of a Conspiracy) ........ 7

Proposed Instruction 4 (Count One: Element Two – Membership in Conspiracy) ........ 8

Proposed Instruction 5 (Count One: Element Three – Commission of an Overt Act) ........ 10

Proposed Instruction 6 (Count One: Element Four – Commission of Overt Act in Furtherance of the Conspiracy) ........ 11

Proposed Instruction 7 (Attempt to Obstruct Justice) ........ 12

Proposed Instruction 8 (Court Two: Obstruction of Justice) ........ 13

Proposed Instruction 9 (Court Two: Elements of 18 U.S.C. §1519) ........ 14

Proposed Instruction 10 (Court Two: Element One – Altering or Destroying Records) ........ 15

Proposed Instruction 11 (Court Two: Element Two – Knowing Conduct) ........ 16

Proposed Instruction 12 (Court Two: Element Three – Intent to Impede Investigation) ........ 17

Proposed Instruction 13 (Court Three: Obstruction of Justice) ........ 18

Proposed Instruction 14 (Court Three: Obstruction of Justice – 18 U.S.C. §1512(c)) ........ 19

Proposed Instruction 15 (Court Three: Element One and Two – Altering or Destroying Evidence with Intent to Impair) ........ 20

Proposed Instruction 16 (Court Three: Alternative Element One – Obstructing an Official Proceeding) ........ 21

Proposed Instruction 17 (Court Three: Element Three – Acted Corruptly) ........ 22

Proposed Instruction 18 (Court Four: False Statements) ........ 23

Proposed Instruction 19 (Count Four: Elements of 18 U.S.C. § 1001) ........ 24

Proposed Instruction 20 (Count Four: Element One – Statement or Representation ........ 25

Proposed Instruction 21 (Count Four: Element Two – Materiality) ........ 26

Proposed Instruction 22 (Count Four; Element Three – False, Fictitious or Fraudulent Statement) ........ 27

Proposed Instruction 23 (Count Four: Element Four – Knowing and Willful Conduct) ........ 28

Proposed Instruction 24 (Count Four: Element Five – Matter Within the Jurisdiction of the United States) ........ 29

**General Requests**

Ms. Ash respectfully requests that the Court charge the jury in its usual manner on the following subjects:

1. Role of the Court;
2. Role of the Jury;
3. Conduct of Counsel;
4. Presumption of Innocence and Burden of Proof;
5. Indictment is Not Evidence;
6. Reasonable Doubt;
7. Forms of Evidence;
8. Direct and Circumstantial Evidence;
9. Inferences;
10. Defendant's Right to Testify [if applicable];
11. Credibility of Witnesses;
12. Impeachment of Witnesses;
13. Testimony of Government Employees and Law Enforcement Witnesses;
14. Expert Witnesses;
15. Use of Charts and Summaries
16. Prior Inconsistent Statements;
17. Approximate Dates;
18. No Duty to Call Witnesses or Produce Evidence or Use Particular Investigative Techniques;

19. Witness's Non-Prosecution, Immunity or Cooperation Agreements with the Government [if applicable];
20. Witness's Interest in the Outcome;
21. Multiple Counts – Consider Each Count Separately;
22. Right to See Evidence; and
23. Need for Unanimity.

<u>Proposed Instruction 1</u>

(Count One: Conspiracy to Obstruct Justice)

The defendant is charged with conspiracy to violate federal law. The indictment reads:

> From at least in or about January 2018, up to and including at least in or about July 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, obstruction of justice, in violation of Title 18, United States Code, Sections 1519 and 1512(c).
>
> It was a part and object of the conspiracy that SYLVIA ASH, the defendant, would and did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States and in relation to and contemplation of such a matter, to wit, ASH agreed to sign a false and misleading document in an attempt to impede, obstruct, and influence a federal investigation of the now-former Chief Executive Officer ("CEO") of Municipal Credit Union (the "Credit Union") and others, in violation of Title 18, United States Code, Section 1519.
>
> It was a further part and object of the conspiracy that SYLVIA ASH, the defendant, would and did corruptly alter, destroy, mutilate, and conceal a record, document, and other object and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise would and did corruptly obstruct, influence, and impede an official proceeding, and attempt to do so, to wit, ASH agreed to obstruct, influence, and impede a federal investigation of the former CEO of the Credit Union and others, in violation of Title 18, United States Code, Section 1512(c), and sought to carry the scheme out, by among other things, (i) concealing and deleting text messages and email messages and wiping an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and (ii) making false and misleading statements to federal law enforcement officers.
>
> <u>Overt Acts</u>
>
> In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a. In or about January 2018, in New York, New York, SYLVIA ASH, the defendant, signed a false and misleading memorandum regarding millions of dollars that the CEO had obtained from the Credit Union.

b. On or about March 1, 2018, in New York, New York, ASH falsely stated to a Special Agent with the United States Attorney's Office for the Southern District of New York (the "Special Agent" with the "USAO-SDNY") that, after ASH became Chair of the Board of Directors of the Credit Union (the "Board"), the Credit Union's then-General Counsel (the "General Counsel") informed ASH that the CEO had the option under his employment contract of receiving monetary payments to obtain long-term disability insurance ("LTD insurance") instead of having the Credit Union purchase LTD insurance for the CEO, although the General Counsel did not consider that approach advisable.

c. On or about April 6, 2018, ASH informed the Special Agent, who was in New York, New York, that ASH did not have any materials to produce in response to a federal grand jury subpoena served on her on or about March 13, 2018.

d. On or about June 8, 2018, ASH again informed the Special Agent that ASH did not have any materials to produce in response to the federal grand jury subpoena served on her on or about March 13, 2018.

e. On or about June 23, 2018, ASH caused an Apple iPhone X, which had been provided to her by the Credit Union, to be wiped.

f. On or about July 6, 2018, ASH caused an incomplete set of materials in response to a federal grand jury subpoena served on her on or about June 18, 2018 to be produced to the USAO-SDNY.

g. On or about July 9, 2018, in New York, New York, ASH falsely stated to the Special Agent that, after she became Chair of the Board, she discussed with the General Counsel the CEO's interest in receiving monetary payments in lieu of a long-term disability insurance policy, and the General Counsel advised that this was permissible but not advisable.

The relevant statute on this subject is 18 U.S.C. § 371. It provides: "If two or more persons conspire … to commit any offense against the United States … , and one or more of such persons do any act to effect the object of the conspiracy, each [is guilty of an offense against the United States]."

Here, the government has accused the defendant of conspiring, or entering an illegal agreement to violate two obstruction of justice statutes, 18 U.S.C. §§ 1512(c) and 1519.

I will instruct you with respect to each of those statutes momentarily, but before I do so, I want to provide you some instructions with respect to law of criminal conspiracy.

Source: *Modern Federal Jury Instruction – Criminal*, 19-1

Proposed Instruction 2
(Count One: Elements of 18 U.S.C. § 371)

In order to satisfy its burden of proof, the government must establish each of the following four essential elements beyond a reasonable doubt:

First, that two or more persons entered the unlawful agreement charged in the indictment starting on or about January 2018;

Second, that the defendant knowingly and willfully became a member of the conspiracy;

Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and

Fourth, that the overt act(s) that you find to have been committed was or were committed to further some objective of the conspiracy.

Source: *Modern Federal Jury Instruction – Criminal*, 19-3

Proposed Instruction 3
(Count One: Element One – Existence of a Conspiracy)

The first element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the indictment.

In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly, you need not find that the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.

You may, of course, find that the existence of an agreement to disobey or disregard the law has been established by direct proof. However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties.

In a very real sense, then, in the context of conspiracy cases, actions often speak louder than words. In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a common design existed on the part of the persons charged to act together to accomplish an unlawful purpose.

Source: *Modern Federal Jury Instruction – Criminal*, 19-4

Proposed Instruction 4
(Count One: Element Two – Membership in Conspiracy)

The second element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendant knowingly, willfully and voluntarily became a member of the conspiracy.

If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourselves who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy. Did she participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective as an associate or worker?

In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, she must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor that you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendant can be found to have been a conspirator, you must first find that she knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of her own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not, by itself, make her a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a criminal herself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. She thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.

Source: *Modern Federal Jury Instruction – Criminal*, 19-5

<u>Proposed Instruction 5</u>

(Count One: Element Three – Commission of an Overt Act)

The third element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that at least one of the overt acts charged in the indictment was knowingly committed by at least one of the conspirators, at or about the time and place alleged.

The indictment charges that the overt acts alleged in the indictment were committed in the Southern District of New York. I have previously read for you the overt acts so I will not repeat them again.

Finally, you must find that either the agreement was formed or that an overt act was committed in the Southern District of New York, which includes Manhattan and the Bronx.

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 19-7

Proposed Instruction 6
(Count One: Element Four – Commission of Overt Act in Furtherance of the Conspiracy)

The fourth, and final, element that the government must prove beyond a reasonable doubt is that the overt act was committed for the purpose of carrying out the unlawful agreement.

In order for the government to satisfy this element, it must prove, beyond a reasonable doubt, that at least one overt act was knowingly and willfully done, by at least one conspirator, in furtherance of some object or purpose of the conspiracy, as charged in the indictment.

Source: *Modern Federal Jury Instruction – Criminal*, 19-8

<u>Proposed Instruction 7</u>
(Attempt to Obstruct Justice)

In Counts Two and Three of the indictment, the defendant is charged with obstruction of justice and with attempting to commit the obstruction of justice crimes set forth in those counts. I will provide you additional instruction regarding the crimes charged in Count Two and Count Three momentarily.

In order to prove the charges of attempting to commit obstruction of justice, the government must prove the following two elements beyond a reasonable doubt:

<u>First</u>, that the defendant intended to commit the crime of obstruction of justice as the government has charged her in Count Two and Count Three; and

<u>Second</u>, that the defendant did some act that was a substantial step in an effort to bring about or accomplish the crimes.

Mere intention to commit a specific crime does not amount to an attempt. In order to convict the defendant of an attempt, you must find beyond a reasonable doubt that the defendant intended to commit the crime charged, and that she took some action which was a substantial step toward the commission of that crime.

In determining whether the defendant's actions amounted to a substantial step toward the commission of the crime, it is necessary to distinguish between mere preparation on the one hand, and the actual doing of the criminal deed on the other. Mere preparation, which may consist of planning the offense, or of devising, obtaining or arranging a means for its commission, is not an attempt.

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 46-78

<u>Proposed Instruction 8</u>
(Court Two: Obstruction of Justice)

The defendant is charged in the Count Two of the indictment with tampering with destroying or altering evidence in a federal investigation. The indictment reads:

> In or about January 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States and in relation to and contemplation of such a matter, to wit, ASH signed a false and misleading memorandum regarding millions of dollars that the CEO obtained from the Credit Union, in an attempt to obstruct and influence a federal investigation of the CEO and others.

The relevant statute on this subject is 18 U.S.C. § 1519. It provides:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be [guilty of a crime].

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 46-78

<u>Proposed Instruction 9</u>

(Court Two: Elements of 18 U.S.C. § 1519)

In order to prove the defendant guilty of tampering with evidence in a federal investigation, the government must prove each of the following elements beyond a reasonable doubt:

<u>First</u>, that the defendant altered, falsified, destroyed, mutilated, concealed, covered up or made a false entry in any record, document, or object that can be used to record or preserve information as alleged in the indictment;

<u>Second</u>, that the defendant acted knowingly; and

<u>Third</u>, that the defendant acted with the intent to impede, obstruct or influence a matter within the jurisdiction of a department or agency of the United States Government.

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 46-79

Proposed Instruction 10
(Court Two: Element One – Altering or Destroying Records)

The first element the government must prove beyond a reasonable doubt is that the defendant altered (or falsified or destroyed or mutilated or concealed or covered up or made a false entry in) a false and misleading memorandum regarding millions of dollars that the Chief Executive Officer obtained from the Municipal Credit Union as alleged in the indictment.

Source: *Modern Federal Jury Instruction – Criminal*, 46-80

<u>Proposed Instruction 11</u>
(Court Two: Element Two – Knowing Conduct)

The second element the government must prove beyond a reasonable doubt is that the defendant acted knowingly.

A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness. Whether the defendant acted knowingly may be proven by the defendant's conduct and by all of the facts and circumstances surrounding the case.

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 46-81

Proposed Instruction 12

(Court Two: Element Three – Intent to Impede Investigation)

The third element the government must prove beyond a reasonable doubt is that the defendant acted with the intent to impede, obstruct or influence a matter within the jurisdiction of a department or agency of the United States Government.

The government is not required to prove that the defendant knew his conduct would obstruct a federal investigation, or that a federal investigation would take place, or that he knew of the limits of federal jurisdiction. However, the government is required to prove that the investigation that the defendant intended to impede, obstruct, or influence did, in fact, concern a matter within the jurisdiction of an agency of the United States.

Source: *Modern Federal Jury Instruction – Criminal*, 46-82

Proposed Instruction 13
(Court Three: Obstruction of Justice)

The defendant is charged in the Count Three of the indictment with tampering with evidence in a federal proceeding and attempting to do so and with obstructing an official federal proceeding and attempting to do so. The indictment reads:

> From at least in or about January 2018, up to and including at least in or about July 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, corruptly altered, destroyed, mutilated, and concealed a record, document, and other object, and attempted to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise obstructed, influenced, and impeded an official proceeding, and attempted to do so, to wit, ASH (i) concealed and deleted text messages and email messages and wiped an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and (ii) made false and misleading statements to federal law enforcement officers in connection with a federal investigation of the CEO and others.

The relevant statute on this subject is 18 U.S.C. § 1512(c). It provides: "Whoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be [guilty of a crime]."

Source: *Modern Federal Jury Instruction – Criminal*, 46-63 and 46-68

Proposed Instruction 14
(Court Three: Obstruction of Justice – 18 U.S.C. § 1512(c))

In order to prove the defendant guilty of tampering with evidence in a federal proceeding, the government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant altered (or destroyed or mutilated or concealed) any record, document or tangible object, as alleged in the Indictment and that the defendant acted with the intent to impair the object's integrity or availability in an official proceeding;

Alternatively, the government must prove that that the defendant obstructed, influenced, or impeded an official proceeding.

With respect to either alternative, the government must prove that that the defendant acted corruptly.

Source: Adapted from *Modern Federal Jury Instruction – Criminal*, 46-64 and 46-49.

Proposed Instruction 15

(Court Three: Element One and Two – Altering or Destroying Evidence with Intent to Impair)

The first element the government must prove beyond a reasonable doubt is that the defendant altered (or destroyed or mutilated or concealed) any record, document or tangible object, as alleged in the Indictment. The government must also prove beyond a reasonable doubt the defendant acted with the intent to impair the object's integrity or availability in an official proceeding.

Source: *Modern Federal Jury Instruction – Criminal*, 46-65 and 46-66

Proposed Instruction 16

(Court Three: Alternative Element One – Obstructing an Official Proceeding)

Alternatively, the government must prove beyond a reasonable doubt is that defendant obstructed, influenced or impeded an official proceeding.

An official proceeding means a proceeding before a federal agency. You are instructed that a federal grand jury investigation is an official proceeding.

The law does not require that the federal proceeding be pending at the time of defendant's actions as long as the proceeding was foreseeable such that defendant knew that her actions were likely to affect the proceeding.

Source: *Modern Federal Jury Instruction – Criminal*, 46-70

Proposed Instruction 17
(Court Three: Element Three – Acted Corruptly)

The third element the government must prove beyond a reasonable doubt is that the defendant acted corruptly.

To act corruptly means to act with an improper purpose and to engage in conduct knowingly and dishonestly and with the intent to obstruct, impede or influence the due administration of justice.

Source: *Modern Federal Jury Instruction – Criminal*, 46-71

<u>Proposed Instruction 18</u>
(Court Four: False Statements)

The defendant is charged with knowingly and willfully making false statements to the United States Attorney's Office for the Southern District of New York, a department of the United States. The indictment reads as follows:

> On or about June 8, 2018, in the Southern District of New York and elsewhere, SYLVIA ASH the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit, ASH participated in a telephonic interview with the U.S. Attorney's Office for the Southern District of New York, in which ASH falsely stated that she did not have any responsive records to the subpoena served on her on or about March 13, 2018.

The indictment charges that the defendant knowingly and willfully made a materially false, fictitious, or fraudulent statement or representation. In this case, the government contends that the evidence shows that on or about June 8, 2018, the defendant participated in a telephonic interview with the U.S. Attorney's Office for the Southern District of New York and falsely stated that she did not have any responsive records to the subpoena served on her on or about March 13, 2018.

The relevant statute on this subject is section 1001(a) of Title 18 of the United States Code. It provides:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry shall be [guilty of a crime].

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 36-1

Proposed Instruction 19
(Count Four: Elements of 18 U.S.C. § 1001)

In order to prove the defendant guilty of the crime of obstruction of justice, the government must establish beyond a reasonable doubt that:

First, on or about June 8, 2018, the defendant made a statement or representation;

Second, that this statement or representation was material;

Third, the statement or representation was false, fictitious or fraudulent;

Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; and

Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States.

Source: *Modern Federal Jury Instruction – Criminal*, 36-9

Proposed Instruction 20
(Count Four: Element One – Statement or Representation)

The first element that the government must prove beyond a reasonable doubt is that the defendant made a statement or representation. In this regard, the government need not prove that the defendant physically made or otherwise personally prepared the statement in question. It is sufficient if the defendant caused the statement charged in the indictment to have been made.

Source: *Modern Federal Jury Instruction – Criminal*, 36-10

Proposed Instruction 21
(Count Four: Element Two – Materiality)

The second element the government must prove beyond a reasonable doubt is that the defendant's statement or representation was material.

A fact is material if it was capable of influencing the government's decisions or activities.

Source: *Modern Federal Jury Instruction – Criminal*, 36-11

Proposed Instruction 22

(Count Four; Element Three – False, Fictitious, or Fraudulent Statement)

The third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious, or fraudulent. A statement or representation is "false" or "fictitious" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made. A statement or representation is "fraudulent" if it was untrue when made and was made or caused to be made with the intent to deceive the government agency to which it was submitted.

If you believe that the government's question was ambiguous, so that it reasonably could be interpreted in several ways, then the government must prove that defendant's answer was false under any reasonable interpretation of the question.

Source: *Modern Federal Jury Instruction – Criminal*, 36-12

<u>Proposed Instruction 23</u>
(Count Four: Element Four – Knowing and Willful Conduct)

The fourth element that the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully.

An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidently.

An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law.is done with an intention to do something the law forbids, a bad purpose to disobey the law.

<u>Source</u>: *Modern Federal Jury Instruction – Criminal*, 36-13

Proposed Instruction 24

(Count Four: Element Five – Matter Within the Jurisdiction of the United States)

As I have told you, the fifth element with respect to Count Four is that the statement (or representation) be made with regard to a matter within the jurisdiction of the government of the United States. I charge you that the United States Attorney's Office for the Southern District of New York is a department of the United States government.

To be within the jurisdiction of a department or agency of the United States government means that the statement must concern an authorized function of that department or agency.

Source: *Modern Federal Jury Instruction – Criminal*, 36-14

Dated: New York, New York
November 9, 2021

MORRISON & FOERSTER LLP

By: s/ Carrie H. Cohen

Carrie H. Cohen
Nathan D. Reilly
Janie C. Buckley
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com
NReilly@mofo.com
JBuckley@mofo.com

*Counsel for Defendant Sylvia Ash*