# 22-1048-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SYLVIA ASH, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT**
**Volume 2 of 5 (Pages A-256 to A-542)**


JUSTINE A. HARRIS
NOAM BIALE
MAYA BRODZIAK
SHER TREMONTE, LLP
*Attorneys for Defendant-Appellant*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

## TABLE OF CONTENTS

| | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Ash's Memorandum of Law in Support of Motion to Suppress, dated March 20, 2020 | A-26 |
| Declaration of Carrie H. Cohen, for Ash, in Support of Motion to Suppress, dated March 20, 2020 | A-53 |
| Exhibit A to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated February 20, 2020 | A-59 |
| Exhibit C to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated March 11, 2020 | A-61 |
| Exhibit D to Cohen Declaration - E-mail from Carrie H. Cohen to Janie C. Buckley, dated March 16, 2020 | A-63 |
| Exhibit E to Cohen Declaration - Affidavit of Lavale Jackson, in Support of Application for Search Warrants for Stored Electronic Communications, filed March 18, 2019 [Redacted] | A-66 |
| Exhibit G to Cohen Declaration - Consent to Search – Devices | A-115 |
| Exhibit Q to Cohen Declaration - Document entitled "Reset Device Chain of Custody – DRAFT," dated February 4, 2019 [Redacted] | A-119 |

**Page**

Exhibit S to Cohen Declaration - Department of Financial Services Press Release: "Department of Financial Services Takes Possession of Municipal Credit Union and Names NUCA as Conservator" ............................ A-122

Memorandum Opinion of the Honorable Lewis A. Kaplan, dated June 2, 2020 .................................... A-126

Superseding Indictment, filed July 21, 2021 ............ A-145

Ash's Memorandum of Law in Opposition to Government's Proposed 404(b) Evidence and in Support of Ash's Motion *in Limine*, dated October 29, 2021 .................................................. A-153

The Government's Motions *in Limine,* dated October 29, 2021 .................................................. A-181

Proposed Jury Instructions on behalf of Ash, dated November 9, 2021 ................................................ A-224

The Government's Request to Charge, dated November 9, 2021 ................................................ A-256

Ash's Memorandum of Law in Opposition to Government's Motions *in Limine*, dated November 12, 2021 .............................................. A-343

Exhibit A to Memorandum of Law - Copies of Judicial Documents .............................. A-363

Oral Argument Transcript, dated November 18, 2021 .............................................. A-381

Trial Transcript, dated November 30, 2021 .............. A-443

Trial Transcript, dated December 1, 2021 ................ A-471

Trial Transcript, dated December 2, 2021 ................ A-543

**Page**

Trial Transcript, dated December 6, 2021 ................. A-613

Trial Transcript, dated December 7, 2021 ................. A-667

Trial Transcript, dated December 8, 2021 ................. A-753

Trial Transcript, dated December 9, 2021 ................. A-803

Trial Transcript, dated December 13, 2021 ............... A-880

Government Exhibit 112 -
Letter from Eli J. Mark, dated June 18, 2018, with Attachment..................................................... A-891

Government Exhibit 113 -
Letter from Norman Kohn to the Honorable Sylvia Ash, dated June 19, 2018............................ A-896

Government Exhibit 114 -
Letter from Norman Kohn to the Honorable Sylvia Ash, dated July 13, 2018............................. A-897

Government Exhibit 117 -
E-mail from LaVale Jackson to sylviaash@aol.com, dated March 15, 2018, with Attachments [Redacted]......................................... A-898

Government Exhibit 401 -
MCU's Policy Manual ........................................... A-902

Government Exhibit 751 -
E-mail Chain from the Honorable Sylvia Ash to Monique Smith, dated May 15, 2018 .................... A-1190

Government Exhibit 769 -
E-mail Chain from the Honorable Sylvia Ash to RFarley@nymcu.org, dated February 20, 2018..... A-1192

**Page**

Government Exhibit 801 -
Department of Justice Press Release "CEO and President of New York Credit Union Charged with Embezzlement and Fraud," dated May 8, 2018 .......... A-1193

Government Exhibit 901 -
Sylvia Ash's Use of MCU Park Suites, 2010 through 2017 .......... A-1196

Sentencing Transcript, dated April 20, 2022 .......... A-1197

Notice of Appeal, filed May 10, 2022 .......... A-1237

Letter from Carrie H. Cohen to the Honorable Lewis A. Kaplan, dated June 10, 2022 .......... A- 1239

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| -v.- | : | S1 19 Cr. 780 (LAK) |
| SYLVIA ASH, | : | |
| Defendant. | : | |

---------------------------------------------------------------x

**THE GOVERNMENT'S REQUESTS TO CHARGE**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Eli J. Mark
Daniel C. Richenthal
Jonathan E. Rebold
Assistant United States Attorneys

Alona Katz
Special Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *-v.-* | : | S1 19 Cr. 780 (LAK) |
| SYLVIA ASH, | : | |
| Defendant. | : | |

THE GOVERNMENT'S REQUESTS TO CHARGE

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government respectfully requests that the Court include the following in its instructions to the jury.

**Table of Contents**

REQUEST NO. 1 ..... 1
General Requests ..... 1
REQUEST NO. 2 ..... 2
The Indictment ..... 2
REQUEST NO. 3 ..... 3
Conspiracy and Substantive Counts ..... 3
REQUEST NO. 4 ..... 6
Count Two: Obstruction of Justice ..... 6
REQUEST NO. 5 ..... 7
Count Two: Obstruction of Justice ..... 7
Element One – Falsification of a Document ..... 7
REQUEST NO. 6 ..... 8
Count Two: Obstruction of Justice ..... 8
Element Two – Knowing Participation ..... 8
REQUEST NO. 7 ..... 9
Count Two: Obstruction of Justice ..... 9
Element Three – Intent to Impede Investigation ..... 9
REQUEST NO. 8 ..... 11
Count Three: Obstruction of Justice ..... 11
REQUEST NO. 9 ..... 12
Count Three: Obstruction of Justice ..... 12
Section 1512(c)(1): Elements of the Offense ..... 12
REQUEST NO. 10 ..... 13
Counts Three: Evidence Tampering ..... 13
Element One – Concealing or Destroying a Document ..... 13
REQUEST NO. 11 ..... 14
Counts Three: Evidence Tampering ..... 14
Element Two – Intent to Impair Integrity of Evidence ..... 14
REQUEST NO. 12 ..... 16
Count Three: Evidence Tampering ..... 16
Element Three – Defendant Acted Corruptly ..... 16

REQUEST NO. 13 ........ 17
Count Three: Obstruction of Justice ........ 17
REQUEST NO. 14 ........ 18
Counts Three: Obstructing an Official Proceeding ........ 18
Element One – Obstructing an Official Proceeding ........ 18
REQUEST NO. 15 ........ 19
Count Three: Obstructing an Official Proceeding ........ 19
Element Two – Defendant Acted Corruptly ........ 19
REQUEST NO. 16 ........ 20
Count Four: False Statements ........ 20
Elements of the Offense ........ 20
REQUEST NO. 17 ........ 22
Counts Four: False Statement ........ 22
Element One – False Statement ........ 22
REQUEST NO. 18 ........ 23
Count Four – False Statements ........ 23
Element Two – Materiality ........ 23
REQUEST NO. 19 ........ 24
Count Four: False Statements ........ 24
Element Three – Statement Was False or Fradulent ........ 24
REQUEST NO. 20 ........ 25
Count Four – False Statements ........ 25
Element Four – Knowing and Willful Conduct ........ 25
REQUEST NO. 21 ........ 26
Count Four: False Statements ........ 26
Element Five – Matter within the Jurisdiction of the United States Government ........ 26
REQUEST NO. 22 ........ 27
Count One: Conspiracy to Obstruct Justice ........ 27
REQUEST NO. 23 ........ 29
Count One: Conspiracy to Obstruct Justice ........ 29
Elements of the Offense ........ 29
REQUEST NO. 24 ........ 30
Count One: Conspiracy to Obstruct Justice ........ 30

Element One - Existence of an Agreement .......... 30
REQUEST NO. 25 .......... 33
Count One: Conspiracy to Obstruct Justice .......... 33
Element One – Objects of the Conspiracy .......... 33
REQUEST NO. 26 .......... 35
Count One: Conspiracy to Obstruct Justice .......... 35
Second Element – Membership in the Conspiracy .......... 35
REQUEST NO. 27 .......... 38
Count One: Conspiracy to Obstruct Justice .......... 38
Third Element – Overt Act .......... 38
REQUEST NO. 28 .......... 41
Count One: Conspiracy to Obstruct Justice .......... 41
Time of Conspiracy .......... 41
REQUEST NO. 29 .......... 42
Count One .......... 42
Liability for Acts and Declarations of Co-Conspirators .......... 42
REQUEST NO. 30 .......... 44
Conscious Avoidance .......... 44
REQUEST NO. 31 .......... 47
Venue .......... 47
REQUEST NO. 32 .......... 49
Dual Intent No Defense .......... 49
REQUEST NO. 33 .......... 50
Aiding and Abetting and/or Willfully Causing a Crime .......... 50
REQUEST NO. 34 .......... 53
Motive .......... 53
REQUEST NO. 35 .......... 54
Variance in Dates .......... 54
REQUEST NO. 36 .......... 55
Law Enforcement or Government Witnesses .......... 55
REQUEST NO. 37 .......... 56
Accomplice Testimony .......... 56
REQUEST NO. 38 .......... 59

*Falsus In Uno* .......... 59
REQUEST NO. 39 .......... 60
Preparation of Witnesses .......... 60
REQUEST NO. 40 .......... 61
False Exculpatory Statements .......... 61
REQUEST NO. 41 .......... 62
Similar Acts .......... 62
REQUEST NO. 42 .......... 63
Particular Investigative Techniques .......... 63
REQUEST NO. 43 .......... 64
Use of Evidence Obtained Pursuant to Searches and Seizures .......... 64
REQUEST NO. 44 .......... 65
Charts and Summaries: Admitted as Evidence .......... 65
REQUEST NO. 45 .......... 66
Charts and Summaries: Not Admitted as Evidence .......... 66
REQUEST NO. 46 .......... 67
Stipulations of Testimony .......... 67
REQUEST NO. 47 .......... 68
Stipulations of Fact .......... 68
REQUEST NO. 48 .......... 69
Redaction of Evidentiary Items .......... 69
REQUEST NO. 49 .......... 70
Persons Not on Trial .......... 70
REQUEST NO. 50 .......... 71
Character Witnesses .......... 71
REQUEST NO. 51 .......... 72
Uncalled Witnesses – Equally Available or Unavailable .......... 72
REQUEST NO. 52 .......... 73
Defendant's Testimony .......... 73
REQUEST NO. 53 .......... 74
Defendant's Right Not to Testify .......... 74
REQUEST NO. 54 .......... 75
Improper Considerations: Race, Religion, Ancestry, National Origin, Sex, or Age .......... 75

REQUEST NO. 55 .......... 76
Punishment Is Not to Be Considered by the Jury .......... 76
REQUEST NO. 56 .......... 77
Sympathy: Oath as Jurors .......... 77
Conclusion .......... 78

**REQUEST NO. 1**

**General Requests**

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a. Function of Court and Jury
b. Jury's Recollection Governs
c. Note-Taking by Jurors
d. Duty to Base Verdict on Evidence
e. Improper Considerations
f. Statements of Court and Counsel Not Evidence
g. Duty to Weigh Evidence Without Prejudice
h. Government as a Party
i. Indictment Not Evidence
j. Burden of Proof
k. Punishment Not to be Considered By Jury
l. Presumption of Innocence
m. Reasonable Doubt
n. Direct and Circumstantial Evidence
o. Inferences
p. Credibility of Witnesses
q. Right to See Exhibits and Have Testimony Read During Deliberation

**REQUEST NO. 2**

**The Indictment**

The defendant, SYLVIA ASH, is formally charged in a Superseding Indictment. The Indictment itself is neither evidence nor proof of a defendant's guilt. I will not read the entire Indictment to you at this time. Rather, I will first summarize the offenses charged in the Indictment and then explain in detail the elements of each offense.

The Indictment contains four counts against defendant SYLVIA ASH. I am briefly going to summarize each count, and then will give you the law in greater detail.

Count One alleges that the defendant engaged in a conspiracy, that is, agreed with one or more other people, to commit obstruction of justice.

Count Two alleges that the defendant committed obstruction of justice, in connection with signing an allegedly false and misleading memorandum regarding millions of dollars that a person named Kam Wong obtained from the Municipal Credit Union.

Count Three alleges that the defendant committed obstruction of justice, in connection with concealing and deleting text messages and emails, including evidence that had been subpoenaed from her by federal grand jury subpoenas, and made false and misleading statements to federal law enforcement officers in connection with the federal investigation of Wong and others.

Count Four alleges that the defendant made a false statement to federal officials with the U.S. Attorney's Office of the Southern District of New York.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 3-1; 3-2, and the charge of the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK).

**REQUEST NO. 3**

**Conspiracy and Substantive Counts**

As I just mentioned, one of the counts of the Indictment charges the defendant with the crime of conspiracy. Other counts charge what we call substantive crimes.

A conspiracy count is different from a substantive count. A conspiracy charge, generally speaking, alleges that two or more persons agreed together to accomplish an unlawful objective or objectives. The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. There can be no conspiracy unless at least two people reached such an agreement, whether express or implied.

A substantive count, on the other hand, charges a defendant with the actual commission, or with aiding and abetting or causing the actual commission, of an offense. A substantive offense therefore may be committed by a single person, and it need not involve any agreement with or assistance from anyone.

A conspiracy to commit a crime is an entirely separate and different offense from a substantive crime, the commission of which may be an object of the conspiracy. And since the essence of the crime of conspiracy is an agreement or understanding to commit a crime, it does not matter if the crime, the commission of which was an objective of the conspiracy, ever was committed. In other words, if a conspiracy exists and certain other requirements are met, it is punishable as a crime even if its purpose is not accomplished. Consequently, in a conspiracy charge there is no need to prove that the crime or crimes that were the objective or objectives of the conspiracy actually were committed. To give you a simple example: if two people agree to hold up a liquor store and do something to put the agreement into motion, they have committed the crime of conspiracy to commit robbery even if they never rob the liquor store.

By contrast, conviction on a substantive count requires proof that the crime charged actually was committed or attempted, but does not require proof of an agreement. To take the liquor store example, there can be no substantive crime of robbery unless the liquor store actually is or attempted to be robbed. Of course, if a defendant both participates in a conspiracy and commits the crime or crimes that were the object or objects of the conspiracy, that defendant may be guilty of both the conspiracy and the substantive crime or crimes.

With respect to the substantive counts you should be aware that there are two ways in which you may find a defendant guilty. While I will explain both in more detail, I want to first take a moment to outline them briefly.

The first way is that you may find that the defendant either committed, or caused someone else to commit, the substantive crimes charged in the Indictment. I am going to refer to that way as a claim that a defendant is guilty of a crime as what we call a "principal."

The second theory way—which only applies to Counts Two and Three—is that you may find that someone other than the defendant committed the substantive crime at issue and the defendant aided and abetted or willfully caused the commission of that crime. I will refer to that as a claim that a defendant is guilty of a crime as an aider and abettor as having willfully caused the offense.

For the sake of convenience, I will instruct you first with respect to those counts that charge substantive crimes. I will instruct you initially on the first theory of liability—that is, that the defendant is guilty as a principal of the substantive crimes charged in the Indictment. I then will instruct you on the second theory of liability—that is, the theory that the defendant is guilty as an aider and abettor or as someone who willfully caused the offense. Finally, I will instruct you on the conspiracy count.

Adapted from the charge given by the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK), and in *United States v. Gatto*, 17 Cr. 686 (LAK).

**REQUEST NO. 4**

**Count Two: Obstruction of Justice**

**Elements of the Offense**

Count Two charges the defendant with obstruction of justice by signing a false or misleading document. Specifically, Count Two charges that in or about January 2018, the defendant signed a false and misleading memorandum regarding millions of dollars that Kam Wong obtained from the Credit Union, in an attempt to obstruct and influence a federal investigation of Wong and others.

This crime has three elements:

*First*, that the defendant knowingly made a false entry or statement in a document or caused a document to include a false entry or statement;

*Second*, that the defendant acted knowingly; and

*Third*, that the defendant acted with the intent to impede, obstruct, or influence an investigation of a matter within the jurisdiction of an agency of the United States, or in relation to or contemplation of any such matter or case.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 46-79; *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008) (setting forth elements); the charge given by Hon. Loretta A. Preska in *United States v. Coll*, 15 Cr. 360 (LAP); and the charge given by Hon. Ronnie Abrams in *United States v. Fitts*, 19 Cr. 341 (RA).

**REQUEST NO. 5**

**Count Two: Obstruction of Justice**

**Element One – Falsification of a Document**

The first element as to Count Two that the Government must prove beyond a reasonable doubt is that the defendant "falsified" a document. Falsifying a document just means knowingly including in the document any untrue statement of fact or knowingly omitting from the document any fact that is necessary to make the facts that are included not misleading. It does not require that the document itself be faked.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 46-80; the charge given by Hon. Loretta A. Preska in *United States v. Coll*, 15 Cr. 360 (LAP); the charge given by Hon. Ronnie Abrams in *United States v. Fitts*, 19 Cr. 341 (RA); and the charge given by the Hon. Valerie E. Caproni in *United States v. Calypso,* 17 Cr. 224 (VEC). *See also United States v. Rowland*, 826 F.3d 100, 104 (2d Cir. 2016) (section 1519 is meant to apply "broadly," and "[c]reating a new document can violate 18 U.S.C. § 1519").

**REQUEST NO. 6**

**Count Two: Obstruction of Justice**

**Element Two – Knowing Participation**

The second element as to Count Two that the Government must prove beyond a reasonable doubt is that the defendant acted knowingly. The term "knowingly" means voluntarily and intentionally and not because of mistake or accident. The Government is not required to prove that the defendant knew that her actions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 46-80; from the charge given by the charge given by Hon. Loretta A. Preska in *United States v. Coll*, 15 Cr. 360 (LAP); the charge given by Hon. Ronnie Abrams in *United States v. Fitts*, 19 Cr. 341 (RA); and the charge given by the Hon. Valerie E. Caproni in *United States v. Calypso,* 17 Cr. 224 (VEC); *see also United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011) ("The most natural grammatical reading of the statute is that the term 'knowingly' in § 1519 modifies only the surrounding verbs: alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry." (internal quotation marks omitted)); *United States v. Jackson*, 186 F. App'x 736 (9th Cir. 2006) (upholding instruction in section 1519 prosecution that defendant need not know actions were illegal); *United States v. Hassler*, 992 F.3d 243 (4th Cir. 2021) (upholding instruction in section 1519 that provided that "an act is done 'knowingly' if the defendant is aware of the act and does not act through ignorance, mistake, or accident.")

**REQUEST NO. 7**

**Count Two: Obstruction of Justice**

**Element Three – Intent to Impede Investigation**

The third element as to Count Two that the Government must prove beyond a reasonable doubt is that the defendant acted with the intent to impede, obstruct, or influence an investigation of a matter within the jurisdiction of an agency of the United States or in relation to or contemplation of any such matter or case. The United States Attorney's Office for the Southern District of New York is an agency of the United States.

Although the Government must prove that the defendant intended to impede, obstruct, or influence an investigation, it need not prove that a federal investigation was ongoing or imminent at the time the defendant acted or that she was aware that her conduct would impede, obstruct, or influence an investigation that was federal in nature. The Government is only required to prove that the defendant acted in contemplation of a potential investigation, whether federal or otherwise. If you find that the defendant acted with the intent to impede, obstruct, or influence an ongoing or potential investigation of a matter, and if you find that the matter was in fact within the jurisdiction of a federal agency, including the United States Attorney's Office for the Southern District of New York, then this element has been met.

> Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 46-82; from the charge given by the charge given by Hon. Loretta A. Preska in *United States v. Coll*, 15 Cr. 360 (LAP); the charge given by the Hon. Valerie E. Caproni in *United States v. Calypso,* 17 Cr. 224 (VEC); and the charge given by Hon. Ronnie Abrams in *United States v. Fitts*, 19 Cr. 341 (RA). *See also United States v. Scott*, 979 F.3d 986 (2d Cir. 2020) (section 1519 does not include a "nexus requirement"); *United States v. Gray*, 642 F.3d 371, 372 (2d Cir. 2011) ("By the plain terms of 18 U.S.C. § 1519, knowledge of a pending federal investigation or proceeding is not an element of the obstruction crime. In comparison to other obstruction statutes, § 1519 by its terms does not require the defendant to be aware of a

federal proceeding, or even that a proceeding be pending."); *United States v. Hassler*, 992 F.3d 243, 247 (4th Cir. 2021) ("Every circuit to address the issue presented in this appeal has concluded that knowledge of a federal investigation under § 1519 is a jurisdictional element," and "Government was not required to prove that [the defendant] knew or contemplated that the investigation he intended to impede was within the jurisdiction of a federal agency.")

**REQUEST NO. 8**

**Count Three: Obstruction of Justice**

Count Three also charges the defendant with obstruction of justice. Specifically, Count Three charges that from in or about January 2018 up to and including at least July 2018, the defendant (i) concealed and deleted text messages and email messages and wiped an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and (ii) made false and misleading statements to federal law enforcement officers in connection with a federal investigation of Kam Wong and others.

The Indictment charges the defendant under two sections of the obstruction-of-justice statute: one addresses evidence tampering, and the other addresses obstruction of what is known as an official proceeding. As I will explain, you are being asked to determine whether the Government has proved the elements of either or both ways of committing this crime.

This law is designed to protect the integrity of the evidence, and the presentation of that evidence, in federal proceedings, to prevent a miscarriage of justice resulting from corrupt methods. The integrity of the federal system of justice depends upon the availability of such evidence. If the integrity of evidence is not protected, the administration of justice will be illegitimately affected. This statute was devised to make it unlawful for anyone to tamper with evidence or obstruct an investigation in the manner described in the statute.

> Adapted from the charge given by Hon. George B. Daniels in *United States v. Vazquez-Soto*, 11 Cr. 986 (GBD); the charge given by Hon. Kenneth M. Karas in *United States v. Brega*, 17 Cr. 58 (KMK); and the charge given by Hon. Kenneth M. Karas in *United States v. Smith*, 13 Cr. 297 (KMK).

**REQUEST NO. 9**

**Count Three: Obstruction of Justice**

**Section 1512(c)(1): Elements of the Offense**

To sustain the charge as alleged in the Indictment under the first section I mentioned, evidence tampering, the Government must prove beyond a reasonable doubt three elements:

*First*, that the defendant destroyed or concealed a record, document or tangible object or attempted to do so;

*Second*, that the defendant acted with the intent to impair the object's integrity or availability in an official proceeding; and

*Third*, that the defendant acted corruptly.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 46-64.

**REQUEST NO. 10**

**Counts Three: Evidence Tampering**

**Element One – Concealing or Destroying a Document**

The first element as to Count Three under the first way of violating the statute I mentioned is that the Government must prove beyond a reasonable doubt is that the defendant destroyed or concealed a record, document or tangible object or attempted to do so.

The government is not required to prove that the defendant was successful in her attempt to destroy or conceal an object or that the object was material or important to the proceeding.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 46-65; adapted from the charge given by Hon. George B. Daniels, in *United States v. Vazquez-Soto*, 11 Cr. 986 (GBD) ("There is no need for the government to prove that the defendant was successful in his attempt"); *United States v. Ortiz*, 367 F. Supp. 2d 536, 543 (S.D.N.Y. 2005) (Stein, J.) (There is no requirement that the government must prove that the objection "constituted or contained relevant or material evidence pertaining to the crimes being investigated or tried at the official proceeding."); *United States v. Black*, 625 F.3d 386, 389 (7th Cir. 2010) ("[I]t is enough for conviction that a document was concealed in order to make it unavailable in an official proceeding.").

**REQUEST NO. 11**

**Counts Three: Evidence Tampering**

**Element Two – Intent to Impair Integrity of Evidence**

The second element as to Count Three under the first way of violating the statute is that the Government must prove beyond a reasonable doubt is that the defendant acted with the intent to impair the object's integrity or availability in an official proceeding.

An official proceeding means a proceeding before a court, judge or federal agency. The proceeding may be civil or criminal. You are instructed that a federal grand jury investigation is an official proceeding.

The law does not require that the federal proceeding be pending at the time of the defendant's actions as long as the proceeding was foreseeable such that the defendant knew that her actions were likely to affect the proceeding. It is not necessary for the defendant to know with certainty that his conduct would affect the official proceeding, nor is it necessary that the defendant's conduct actually obstructs or influences the official proceeding. It is sufficient that the defendant's actions would have the natural effect of interfering with the official proceeding. In addition, the Government does not have to prove that the defendant knew that the proceeding would be in federal court.

Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 46-66; adapted from the charge given by the Hon. Kenneth M. Karas in *United States v. Brega*, 17 Cr. 58 (KMK); the charge given by the Hon. Cathy Seibel in *United States v. Gayle*, 16 Cr. 361 (CS); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) (although an official proceeding "need not be pending or about to be instituted at the time of the offense, the defendant must have the knowledge that it is foreseeable (quoting 18 U.S.C. § 1512(e)(1))); *United States v. Pugh*, 945 F.3d 9, 15 (2d Cir. 2019) ("The government need not prove that a defendant knew that the proceeding was or would be federal."); *United States v. Reich*, 479

F.3d 179, 186–87 (2d Cir. 2007) (Section 1512(c) "encompasses all actions that 'corruptly . . . influence[ ]' a proceeding—or even attempt to do so—not merely those that affect its ultimate outcome.").

**REQUEST NO. 12**

**Count Three: Evidence Tampering**

**Element Three – Defendant Acted Corruptly**

The third element as to Count Three under the first way of violating the statute is that the Government must prove beyond a reasonable doubt is that the defendant acted corruptly. To act corruptly means to act with an improper purpose and to engage in conduct knowingly and dishonestly and with the intent to obstruct, impede or influence the due administration of justice.

The improper purpose need not be the sole motivation for the defendant's conduct as long as the defendant acted at least in part with the improper purpose.

> Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 46-67; from the charge given by Hon. Kenneth M. Karas in *United States v. Brega*, 17 Cr. 58 (KMK); the charge given by Hon. Kenneth M. Karas in *United States v. Smith*, 13 Cr. 297 (KMK); and the charge given by Hon. George B. Daniels, in *United States v. Vazquez-Soto*, 11 Cr. 986 (GBD) (giving dual intent instruction under section 1512(c); *see also United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) ("It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose.")

**REQUEST NO. 13**

**Count Three: Obstruction of Justice**

**Section 1512(c)(2): Elements of the Offense**

To sustain the charge as alleged in the Indictment under the second way of violating the statute by obstructing an official proceeding, the Government must prove beyond a reasonable doubt two elements:

*First*, that the defendant obstructed, influenced, or impeded an official proceeding, or attempted to do so; and

*Second*, that the defendant acted corruptly.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 46-69.

**REQUEST NO. 14**

**Counts Three: Obstructing an Official Proceeding**

**Element One – Obstructing an Official Proceeding**

The first element as to Count Three under the second way of violating the statute is that the Government must prove beyond a reasonable doubt is that the defendant obstructed, influenced or impeded an official proceeding, or attempted to do so.

I have already defined an "official proceeding" for you, and that definition applies here, too. In addition, as I previously instructed, the law does not require that the official proceeding be pending at the time of the defendant's actions as long as the proceeding was foreseeable such that the defendant knew her actions were likely to affect the proceeding.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 46-70; the charge given by Hon. Kenneth M. Karas in *United States v. Brega*, 17 Cr. 58 (KMK); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) (although an official proceeding "need not be pending or about to be instituted at the time of the offense, the defendant must have the knowledge that it is foreseeable (quoting 18 U.S.C. § 1512(e)(1))); *United States v. Pugh*, 945 F.3d 9, 15 (2d Cir. 2019) ("The government need not prove that a defendant knew that the proceeding was or would be federal.").

**REQUEST NO. 15**

**Count Three: Obstructing an Official Proceeding**

**Element Two – Defendant Acted Corruptly**

The second element as to Count Three under the second way of violating the statute is that the Government must prove beyond a reasonable doubt is that the defendant acted corruptly. I have already defined acting "corruptly" for you, and that definition applies here, too.

> Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 46-67; from the charge given by Hon. Kenneth M. Karas in *United States v. Brega*, 17 Cr. 58 (KMK); and the charge given by Hon. Kenneth M. Karas in *United States v. Smith*, 13 Cr. 297 (KMK).

**REQUEST NO. 16**

**Count Four: False Statements**

**Elements of the Offense**

Count Four charges the defendant with knowingly and willfully make a materially false, fictitious, or fraudulent statement or representation. Specifically, Count Four charges that on or about June 8, 2018, the defendant participated in a telephonic interview with the U.S. Attorney's Office for the Southern District of New York, in which she falsely stated that she did not have any responsive records to the subpoena served on her on or about March 13, 2018.

The purpose of the false statements statute is to protect the authorized functions of the various government departments from any type of misleading or deceptive practice and from the adverse consequences that might result from such deceptive practices.

To establish a violation of the statute, the Government must prove certain elements—which I will soon describe for you—beyond a reasonable doubt. However, the Government does not have to prove that any federal agency was, in fact, misled as a result of the defendant's action. It does not matter that the agency was not misled, or even that it knew of the misleading or deceptive act at the time it occurred, should you find that the act occurred. These circumstances would not excuse or justify the making of a false, fictitious, or fraudulent statement about a matter within the jurisdiction of the government of the United States.

The crime of making a false statement has five elements:

*First*, that, on or about the date specified, the defendant made a statement;

*Second*, that the statement was material;

*Third*, that the statement was false, fictitious or fraudulent;

*Fourth*, that the false, fictitious, or fraudulent statement was made knowingly and willfully; and

*Fifth*, that the statement was made in a matter within the jurisdiction of the government of the United States.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 36-2 and 36-9; and the charge given in *United States v. Dumitru*, 18 Cr. 243 (LAK).

**REQUEST NO. 17**

**Counts Four: False Statement**

**Element One – False Statement**

The first element as to Count Two that the Government must prove beyond a reasonable doubt is that the defendant made a statement. In this regard, the Government need not prove that the defendant made the statement under oath. It is sufficient if a defendant caused the statement charged in the Indictment to have been made. Under this statute, there is no distinction between written and oral statements.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 36-10; and the charge given in *United States v. Dumitru*, 18 Cr. 243 (LAK); *see United States v. Adler*, 380 F. 2d 917, 922 (2d Cir. 1967) ("The word 'statement' has been construed to include statements not required to be made by law, not under oath, and not in writing.").

**REQUEST NO. 18**

**Count Four – False Statements**

**Element Two – Materiality**

The second element as to Count Four that the Government must prove beyond a reasonable doubt is that the defendant's statement was material. A fact is material if it was capable of influencing the government's decisions or activities. However, proof of actual reliance on the statement by the government is not required. In other words, the government is not required to prove that anyone made a decision or took any action based upon the false statement charged in the Indictment.

Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 36-11; the charge given in *United States v. Dumitru*, 18 Cr. 243 (LAK); and the charge given by Hon. Valerie E. Caproni in *United States v. Percoco*, 16 Cr. 776 (VEC).

**REQUEST NO. 19**

**Count Four: False Statements**

**Element Three – Statement Was False or Fradulent**

The third element as to Count Four that the Government must prove beyond a reasonable doubt is that the statement was false, fictitious, or fraudulent. A statement or representation is "false" or "fictitious" if it was untrue when made, and if the person who made the statement knew at the time that it was untrue. A statement is "fraudulent" if it was untrue when made and was made with the intent to deceive the government agency to which it was made.

> Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 36-12; from the charge given by Hon. Valerie E. Caproni in *United States v. Percoco*, 16 Cr. 776 (VEC); and the charge given in *United States v. Dumitru*, 18 Cr. 243 (LAK).

**REQUEST NO. 20**

**Count Four – False Statements**

**Element Four – Knowing and Willful Conduct**

The fourth element as to Count Four that the Government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully.

An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidently.

An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law, although the defendant need not know of the precise law she was violating or that the law was federal.

> Adapted from Sand, *et al.*, *Modern Federal Jury Instruction*, 36-13; and the charge given by Hon. Valerie E. Caproni in *United States v. Percoco*, 16 Cr. 776 (VEC).

## REQUEST NO. 21

### Count Four: False Statements

### Element Five – Matter within the Jurisdiction of the United States Government

The fifth element as to Count Four that the Government must prove beyond a reasonable doubt is that the statement was made or undertaken with regard to a matter within the jurisdiction of the Government of the United States. For a statement to fall within the jurisdiction of the Government of the United States, the statement must concern an authorized function of a department or agency of the United States Government.

I charge you that the United States Attorney's Office for the Southern District of New York is an agency of the United States Government.

It is not necessary for the Government to prove that the defendant had actual knowledge that the false statement was to be utilized in a matter that was within the jurisdiction of the Government of the United States. It is sufficient to satisfy this element if you find that the false statement was made or taken with regard to a matter within the jurisdiction of the Government of the United States. I instruct you that presenting evidence to the federal grand jury is within the jurisdiction of the United States Attorney's Office for the Southern District of New York.

> Adapted from Sand, *et al.*, *Modern Federal Jury Instructions*, 36-14; from the charge given by Hon. Valerie E. Caproni in *United States v. Percoco*, 16 Cr. 776 (VEC); and the charge given in *United States v. Dumitru*, 18 Cr. 243 (LAK).

**REQUEST NO. 22**

**Count One: Conspiracy to Obstruct Justice**

Count One of the Indictment charges the defendant with conspiracy to commit obstruction of justice. Count One charges that from in or about January 2018 through at least in or about July 2018, the defendant agreed to obstruct justice by (1) signing a false and misleading memorandum regarding millions of dollars that Kam Wong obtained from the Credit Union, in an attempt to obstruct and influence a federal investigation of Kam Wong and others, and (2) by concealing and deleting text messages and email messages and wiping an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and making false and misleading statements to federal law enforcement officers.

As I mentioned, a conspiracy is a kind of criminal partnership, an agreement of two or more persons to join together to accomplish some unlawful purpose. It is not necessary for the Government to prove that the conspiracy lasted throughout the entire period alleged, but only that it existed for some period within that time frame.

The crime of conspiracy—or unlawful combination or agreement—to obstruct justice, as charged in Count One of the Indictment, is an independent offense, that is, a conspiracy is separate and distinct from the actual violation of any specific federal laws. As I said earlier, the actual violation of any specific federal laws is referred to as a "substantive crime." Counts Two, Three, and Four, which I described a few moments ago, are "substantive crimes."

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the object of the conspiracy is not achieved. This is because collective criminal activity

is believed to pose a greater threat to the public's safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

The defendant is charged both with a conspiracy to fabricate evidence, tamper with evidence, and obstruct an official proceeding, and with the substantive crimes of falsifying evidence, tampering with evidence, and obstructing an official justice. Given that a conspiracy and a substantive crime are distinct and independent offenses, you may find the defendant guilty of the crime of conspiracy—even if you find that she never actually committed the substantive crimes that were the object or goal, of the conspiracy. By the same token, you can find the defendant guilty of committing the substantive crime or crimes with which she is charged, here falsifying evidence, tampering with evidence, and obstructing an official proceeding, even if you find her not guilty of conspiracy to do these things.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 19-2.

**REQUEST NO. 23**

**Count One: Conspiracy to Obstruct Justice**

**Elements of the Offense**

Count One of the Indictment charges the defendant with conspiracy to commit obstruction of justice from in or about January 2018 through at least in or about July 2018.

In order for you to find the defendant guilty of the conspiracy charged in Count One, the Government must prove beyond a reasonable doubt the following elements:

*First*, the existence of the conspiracy charged, that is, an agreement or understanding to violate certain laws of the United States;

*Second*, that the defendant knowingly and willfully became a member of the conspiracy charged; and

*Third*, that any of the conspirators—not necessarily the defendant, but rather any member of the conspiracy—knowingly committed at least one action, known as an overt act, in furtherance of the conspiracy during the life of the conspiracy.

> Adapted from the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP); Sand *et al., Modern Federal Jury Instructions*, 19-2; and the charge of the Hon. Shira A. Scheindlin in *United States v. Preldakaj and Collazo*, 08 Cr. 1054 (SAS) (S.D.N.Y. 2010); *see United States v. Maldonado-Rivera*, 922 F.2d 934, 961-62 (2d Cir. 1990) (quoting district court charge setting forth three elements of conspiracy); *United States v. Ciambrone*, 787 F.2d 799, 810 (2d Cir. 1986) (discussing elements of conspiracy).

**REQUEST NO. 24**

**Count One: Conspiracy to Obstruct Justice**

**Element One - Existence of an Agreement**

The first element that the Government must prove beyond a reasonable doubt is the existence of the conspiracy. Simply defined, a conspiracy is an agreement by two or more persons to do something that violates the law. In this instance, the unlawful purposes alleged to have been the objects of the conspiracy charged in Count One is falsifying evidence, tampering with evidence, and obstructing an official proceeding.

The essence of the crime of conspiracy is the unlawful combination or agreement to violate the law. Remember, as I mentioned earlier, the ultimate success of the conspiracy, or the actual commission of the crimes that are the object of the conspiracy, is not required. The success or failure of a conspiracy is not material to the question of guilt or innocence of the conspirator, for a conspiracy is a crime entirely separate and distinct from the substantive crimes that may be the goal of the conspiracy.

To establish a conspiracy, the Government is not required to show that two or more persons sat around a table and entered into a solemn compact, orally or in writing, stating that they have formed a conspiracy to violate the law and setting forth all the details of the plans and the means by which the unlawful objects are to be carried out or the part to be played by each conspirator. Indeed, it would be extraordinary if there were such a formal document or specific oral agreement. When people agree to enter into a criminal conspiracy, much is left to unexpressed understanding. Since conspiracy, by its very nature, is characterized by secrecy, it is rare that a conspiracy can be proven by direct evidence of that explicit agreement. Thus, you may infer its existence from the circumstances and the conduct of the parties involved.

It is sufficient if two or more persons in some way or manner through any contrivance, impliedly or tacitly, come to a common understanding to violate the law. Express language or specific words are not required to indicate assent or attachment to a conspiracy. Nor is it required that you find that any particular number of alleged co-conspirators joined in the conspiracy in order to find that a conspiracy existed. You need only find that the defendant knowingly entered into the unlawful agreement alleged in Count One with one or more other persons in order to find that a conspiracy existed.

In determining whether there has been an unlawful agreement, you may judge acts and conduct of the alleged co-conspirators that are done to carry out an apparent criminal purpose. The saying “actions speak louder than words” is applicable here.

Often, the only evidence available is that of disconnected acts that, when taken together in connection with each other, show a conspiracy or agreement to secure a particular result as satisfactorily and conclusively as more direct proof.

Of course, proof concerning the accomplishment of the objects of the conspiracy may be the most persuasive evidence of the existence of the conspiracy itself. But it is not necessary that the conspiracy actually succeed in its purpose in order for you to conclude that the conspiracy existed.

In determining whether the conspiracy charged in Count One actually existed, you may consider all the evidence of the acts, conduct, and statements of the alleged conspirators and the reasonable inferences to be drawn from such evidence.

In order to establish the existence of the conspiracy you must find beyond a reasonable doubt, after considering all of the relevant evidence, that at least two alleged conspirators came to

a mutual understanding, either spoken or unspoken, to violate the law in the manner charged in Count One of the Indictment.

> Adapted from Sand et al., *Modern Federal Jury Instructions*, Instrs. 19-3S and 19-4; the charge of the Hon. Kimba M. Wood in *United States v. Cespedes-Pena*, 14 Cr. 520 (KMW); the charge of the Hon. Kimba M. Wood in *United States v. Catalano*, 12 Cr. 725 (KMW); the charge of the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK); and the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP). *See also United States v. Cassino*, 467 F.2d 610, 618-19 (2d Cir. 1972); *Radin v. United States*, 189 F. 568, 570 (2d Cir. 1911) ("The agreement was not reduced to writing and signed by the conspirators. It was not proved by direct oral evidence. From the nature of the case such proof was impossible. Conspiracies are not formed in that way. Conspirators do not go out upon the public highways and proclaim their intention. They accomplish their purpose by dark and sinister methods and must be judged by their acts."); *United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992) ("In order to prove conspiracy, the government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice. The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan, and their goals need not be congruent, so long as they are not at cross-purposes."); *United States v. Montour*, 944 F.2d 1019, 1025 (2d Cir. 1991) ("To prove the existence of an agreement, the government need not present evidence of a formal arrangement between the co-conspirators. Rather, it is sufficient if the government can demonstrate that the defendant acted together with others to realize a common goal") (citations omitted); *United States v. Rubin*, 844 F.2d 979, 983-84 (2d Cir. 1988) (generally discussing proof of agreement).

**REQUEST NO. 25**

**Count One: Conspiracy to Obstruct Justice**

**Element One – Objects of the Conspiracy**

The objects of a conspiracy are the illegal goal or goals that the co-conspirators agree or hope to achieve. In this case, there are two unlawful objects of the conspiracy charged in Count One, which are falsifying evidence and obstructing justice by evidence tampering or obstructing an official proceeding.

I have previously instructed you on the elements of falsifying evidence in describing Count Two and the elements of obstructing justice by evidence tampering or obstructing an official proceeding in describing Count Three, and you should apply those definitions here in considering whether the Government has proved beyond a reasonable doubt that the conspiracy charged in Count One existed.

However, because Count One charges a conspiracy, the Government does not have to prove that anyone actually committed the unlawful objects; it need only prove that there was an agreement to commit at least one object, that is either falsifying evidence or obstructing justice by evidence tampering or obstructing an official proceeding. If you find that two or more persons agreed to accomplish an object of the conspiracy charged in the Indictment, the illegal purpose element will be satisfied regardless of whether or not that object was in fact accomplished, that is, regardless of whether the goal succeeded. If your finding is based on one unlawful object, you must be unanimous on that one object in order to find guilty on Count One. You may also find that both objects were the goal.

> Adapted from the charge of the Hon. Lewis A. Kaplan in *United States v. Gatto*, 17 Cr. 686 (LAK); Sand et al., *Modern Federal Jury Instructions*, 19-4.

**REQUEST NO. 26**

**Count One: Conspiracy to Obstruct Justice**

**Second Element – Membership in the Conspiracy**

The second element that the Government must prove beyond a reasonable doubt is that the defendant knowingly and willfully became a member of the conspiracy charged. I have already instructed you on the definitions of "knowingly" and "willfully" and you should apply those definitions here.

In deciding whether the defendant was in fact a member of the conspiracy, you must consider whether the defendant knowingly and willfully joined the conspiracy intending to advance or achieve its goals. Did she participate in the conspiracy with knowledge of its unlawful purpose and with the specific intention of furthering its objective?

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of her own acts or statements as well as those of the other alleged co-conspirators and the reasonable inferences which may be drawn from them. A defendant's knowledge is a matter of inference from the facts proved. In that connection I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need she have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all the details or the scope of the conspiracy in order to justify an inference of knowledge on her part. The defendant must, however, have agreed to participate in the conspiracy charged with knowledge of at least one of its objects.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation.

Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw a defendant within the ambit of the conspiracy.

If you determine that the defendant became a member of the conspiracy, the duration and extent of the defendant's participation has no bearing on the issue of the defendant's guilt. She need not have joined the conspiracy at the outset. She may have joined it at any time -- at the beginning, in the middle, or at the end.

However, I want to caution you that a person's mere association with a member of the conspiracy does not make that person a member of the conspiracy, even when that association is coupled with knowledge that a conspiracy is occurring. In other words, knowledge of a conspiracy, without agreement to participate in it, is not sufficient. What is necessary is that the defendant participated in the conspiracy with knowledge of its unlawful purpose, and with an intent to aid in the accomplishment of its unlawful purpose or purposes.

In sum, the defendant, with an understanding of the unlawful nature of the conspiracy, must have intentionally engaged, advised, or assisted in the conspiracy for the purpose of furthering an illegal undertaking. The defendant thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.

A conspiracy, once formed, is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by its members. So, too, once a person is found to be a member of a conspiracy, she is presumed to continue her membership in the venture until its termination, unless it is shown by some affirmative proof that she withdrew and disassociated herself from it.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 19-6; the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP); and the charge of the Hon. J. Paul Oetken in *United States v. Middendorf*, 18 Cr. 36 (JPO).

**REQUEST NO. 27**

**Count One: Conspiracy to Obstruct Justice**

**Third Element – Overt Act**

The third element is the requirement of an overt act. To sustain its burden of proof with respect to the conspiracy charged in Count One of the Indictment, the Government must show beyond a reasonable doubt that at least one overt act was committed in furtherance of that conspiracy by at least one of the co-conspirators—not necessarily the defendant.

An overt act is any act intended to help achieve the object of the conspiracy. An overt act itself, need not be a criminal act, but it must contribute to the goals of the conspiracy.

Count One of the Indictment contains a section entitled "overt acts." These "overt acts" are examples of conduct alleged to have been undertaken by members of the conspiracy to promote the illegal objectives of the conspiracy. The overt acts alleged are as follows:

[The Court is respectfully requested to read the "overt acts" section of Count One of the Indictment.]

However, you need not find that all of these overt acts occurred or that any of them did, and you may find overt acts were committed that are not alleged in the Indictment. The only requirement is that one of the members of the conspiracy – again, not necessarily the defendant – has taken some step or action in furtherance of the conspiracy during the life of that conspiracy, regardless of whether that step is listed in the Indictment.

In other words, the overt act element is a requirement that the agreement went beyond the mere talking stage, the mere agreement stage. The requirement of an overt act is a requirement that some action be taken during the life of the conspiracy by one of the co-conspirators in order to further that conspiracy.

As I noted, in order for the Government to satisfy the overt act requirement, it is not necessary for the Government to prove any or all of the overt acts alleged in the Indictment. Nor do you need to find that the defendant herself committed any of the overt acts alleged. It is sufficient for the Government to show that one of the alleged co-conspirators knowingly committed some overt act in furtherance of the conspiracy.

You are further instructed that the overt act need not have been committed at precisely the times alleged in the Indictment. It is sufficient if you are convinced beyond a reasonable doubt that it occurred at or about the time and place stated, as long as it occurred while the conspiracy was still in existence.

In that regard, you should bear in mind that you need not reach unanimous agreement on whether a particular overt act was committed in furtherance of the conspiracy; you just need to all agree that at least one overt act was so committed, even if you do not all agree on which act or acts qualify.

You should also bear in mind that the overt act, standing alone, may be an innocent, lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that in and of itself is criminal or constitutes an objective of the conspiracy.

Adapted from the charge of the Hon. Richard J. Sullivan in *United States v. Peirce*, 06 Cr. 1032 (S.D.N.Y. 2008); the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP); and Sand et al., *Modern Federal Jury Instructions*, 19-7-8; *see United States v. Kozeny*, 667 F.3d 122, 131-32 (2d Cir. 2011) ("the jury need not agree on a single overt act to sustain a conspiracy conviction"; "[T]he government may plead one set of overt acts in the indictment and prove a different set of overt acts at trial without prejudice to the defendant. We conclude, therefore, that

although proof of at least one overt act is necessary to prove an element of the crime, which overt act among multiple such acts supports proof of a conspiracy conviction is a brute fact and not itself element of the crime. The jury need not reach unanimous agreement on which particular overt act was committed in furtherance of the conspiracy." (citation omitted)).

**REQUEST NO. 28**

**Count One: Conspiracy to Obstruct Justice**

**Time of Conspiracy**

The Indictment alleges that the conspiracy charged in Count One existed from at least in or about January 2018 up to and including about July 2018. It is not essential that the Government prove that the conspiracy alleged started and ended with this specific time period. It is sufficient if you find that a conspiracy was formed and that it existed for some time within the approximate period set forth in the Indictment.

> Adapted from the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP); Sand et al., *Modern Federal Jury Instructions*, Instr. 3-12.

**REQUEST NO. 29**

**Count One**

**Liability for Acts and Declarations of Co-Conspirators**

**[*If applicable*]**

With respect to the conspiracy charged in Count One of the Indictment, you will recall that I have admitted at this trial evidence of the acts and statements of other individuals who were not present because such acts were committed and such statements were made by a person who, the Government claims, was also a confederate or co-conspirator of the defendants.

The reason for allowing this evidence to be received against the defendant has to do in part with the nature of the crime of conspiracy. As I have said, a conspiracy is often referred to as a partnership in crime: as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements and omissions.

If you find, beyond a reasonable doubt, that the defendant was a member of the conspiracy charged in Count One of the Indictment, then, any acts done or statements made in furtherance of that conspiracy by persons also found by you to have been members of that conspiracy, may be considered against that defendant. This is so even if such acts were done and statements were made in that defendant's absence and without her knowledge.

However, before you may consider the statements or acts of a co-conspirator in deciding the issue of a defendant's guilt, you must first determine that the acts and statements were made during the existence, and in furtherance, of the unlawful scheme. If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy or if they were not done or said in furtherance of the conspiracy, they may be considered by you as evidence only against the member who did or said them.

> Adapted from the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP); the charge of the Hon. George B. Daniels in *United States v. Mazer*, 11 Cr. 121 (GBD); Sand, *et al.*, *Modern Federal Jury Instructions*, Instr. 19-9.

**REQUEST NO. 30**

**Conscious Avoidance**

[*If applicable*]

During my instructions on the law, I have charged you at various points that the Government must prove that the defendant acted knowingly. In determining whether the defendant acted knowingly, you may consider whether she deliberately closed her eyes to what otherwise would have been obvious.

As you all know, if a person is actually aware of a fact then she knows that fact. But the law also allows you to find that a defendant had knowledge of a fact when the evidence shows that she was aware of a high probability of that fact, but intentionally avoided confirming that fact. The law calls this "conscious avoidance" or "willful blindness."

In determining whether the Government has proven beyond a reasonable doubt that the defendant acted knowingly, you may consider whether the defendant deliberately closed her eyes to what would otherwise have been obvious to her. One may not willfully and intentionally remain ignorant of a fact important to her conduct in order to escape the consequences of criminal law. And a person cannot look at all sorts of things that make it obvious to any reasonable person what is going on and then claim in court that because she deliberately avoided learning explicitly what was obvious anyway, she did not know the incriminating fact.

Accordingly, for example if you find that the defendant under consideration was aware of a high probability that a material misrepresentation or omission was being made to conceal documents responsive to a subpoena, and that the defendant acted with deliberate disregard of the facts, you may find that the defendant acted knowingly. However, if you find

that a defendant actually believed that no documents existed responsive to a subpoena, then guilty knowledge may not be inferred.

Let me explain further what the concept of willful blindness or conscious avoidance means with respect to the conspiracy charge contained in Count of the indictment.

First, there is a difference between knowingly participating in a joint undertaking and knowing the object of that undertaking. "Conscious avoidance," as I have described it, cannot be used as a substitute for finding that a defendant knowingly agreed to a joint undertaking or knowingly attempted to commit a crime.

For example, it is logically impossible for a defendant to agree to join another person unless she knows that she has made such an agreement. However, if you find beyond a reasonable doubt that the defendant entered into such an agreement, in considering whether she knew that the object of the conspiracy was create a false document or conceal evidence, you may consider whether she deliberately avoided confirming otherwise obvious facts, that is, whether she deliberately closed her eyes to what otherwise would have been obvious.

However, you must remember that guilty knowledge may not be established by demonstrating that the defendant was merely negligent, reckless, foolish, or mistaken. It is entirely up to you whether you find that the defendant deliberately closed her eyes and any inferences to be drawn from the evidence on this issue.

> Adapted from the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP). *See United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995) ("A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."). The Second Circuit has cautioned that "the prosecutor should request that the 'high probability' and 'actual belief' language be incorporated into every conscious avoidance charge."

*United States v. Feroz*, 848 F.2d 359, 360 (2d Cir. 1988) (per curiam) ("[K]nowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist.").

**REQUEST NO. 31**

**Venue**

In addition to proving the essential elements of each crime beyond a reasonable doubt, the Government must also establish, as to each charge, what is called "venue"—that is, that some act in furtherance of the charge you are considering occurred in the Southern District of New York. The Southern District of New York includes all of Manhattan and the Bronx, as well as Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan Counties. The Government does not have to prove that the complete crime was committed within the Southern District of New York.

I should also note with respect to Counts One and Three, that is the conspiracy to commit obstruction of justice and obstruction of justice charges, the Government may also demonstrate venue by proving that the defendant intended to affect an official proceeding, whether or not that proceeding was pending or about to be instituted, in this district, regardless of whether any act in furtherance of these offenses occurred in this district. An "official proceeding" includes a federal grand jury.

Unlike the elements of the offenses that I have just discussed at length, each of which must be proved beyond a reasonable doubt, the Government is required to prove venue only by a preponderance of the evidence. A preponderance of the evidence means the greater weight of the evidence. To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true. If you find that the Government failed to prove venue by a preponderance of the evidence as to any count, you must return a verdict of not guilty as to that count.

Adapted from the charge of the Hon. Valerie E. Caproni in *United States v. Kaloyeros*, 16 Cr. 776 (VEC); and the charge of the Hon. Loretta A. Preska in *United States v. Tanner*, 17 Cr. 61 (LAP). *See also* 18 U.S.C. § 1512(i) (providing alternative means of demonstrating venue for witness tampering and obstruction of justice charges); *United States v. Gonzalez*, 922 F.2d 1044, 1054-55 (2d Cir. 1991) (discussing alternative means of proving venue for witness tampering charges and approving of preponderance standard with respect to alternative venue instructions).

**REQUEST NO. 32**

**Dual Intent No Defense**

[*If Applicable*]

During this trial, the defendant has contended that her actions were motivated by considerations that were not unlawful. However, even if true, it is not a defense to any count that the defendant may have been motivated by both proper and improper motives. A defendant may be found to have the requisite intent even if she possesses a dual intent – that is, an unlawful intent and also partly a proper or neutral intent.

> Adapted from the charge of the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317; and the charge of the Hon. Lewis A. Kaplan in *United States v. Gatto*, 17 Cr. 686 (LAK); *see also United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (a valid purpose that partially motivates a transaction that is corrupt in part "does not insulate participants in an unlawful transaction from criminal liability").

**REQUEST NO. 33**

**Aiding and Abetting and/or Willfully Causing a Crime**

With respect to Counts Two and Three, which charge the substantive offenses of falsifying evidence and obstructing justice, the defendant is also charged with having "aided and abetted" and/or "willfully caused" another person to commit each of those crimes. This is a different way of a committing a crime, and you need not find that the defendant did this if you find that she is guilty herself of committing the crime you are considering. I will take each of these concepts—aiding and abetting and willfully causing a crime—in turn.

**Aiding and Abetting**

The aiding and abetting statute provides, in relevant part, that: "[w]hoever commits an offense . . . or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." What that means is that, even if the defendant did not herself commit the offense, the Government may meet its burden of proof by: (1) proving that another person actually committed the offense with which the defendant is charged; and (2) proving that the defendant aided or abetted that person in the commission of that offense. A person who aids or abets another to commit an offense is just as guilty of that offense as if she committed the offense herself.

In order to prove the defendant guilty as an aider or abetter, the Government must prove beyond a reasonable doubt:

*First*, that one or more other persons committed the charged offense (that is, all of the elements of the crimes previously described in Counts Two or Three were committed by someone);

*Second*, that the defendant, knowing that such a crime was being committed, intentionally associated herself with that crime; and

*Third*, that the defendant intentionally took some action to help the crime succeed.

To act "intentionally" means to act deliberately and purposefully, rather than by mistake, accident, mere negligence, or for some other innocent reason.

Please note, however, that the mere presence of the defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or merely associating with others who were committing a crime is not sufficient to establish aiding and abetting. One who has no knowledge that a crime is being committed, or is about to be committed, but who inadvertently does something that aids in the commission of the crime is not an aider and abettor. An aider and abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture.

To determine whether the defendant aided or abetted the commission of the crime with which that defendant is charged, ask yourself these questions: Did the defendant participate in the crime charged as something she wished to bring about? Did the defendant associate herself with the criminal venture knowingly and willfully? Did the defendant seek, by her actions, to make the criminal venture succeed?

If the defendant did, then she is an aider and abettor, and therefore guilty of the offense. If the defendant did not, then the defendant is not an aider and abettor.

**Willfully Causing a Crime**

I will now describe what it means to "willfully cause" another to commit a crime. Federal law provides that:

> Whoever willfully causes an act to be done which, if directly performed by him, would be an offense against the United States, is punishable as a principal.

What does the term "willfully caused" mean? It does not mean that the defendant need have physically or personally committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment. The meaning of the term "willfully caused" can be found in the answers to the following questions:

Did the defendant intend the crime to occur?

Did the defendant intentionally cause another person or persons to engage in the conduct constituting the crime?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is "yes," then the defendant is guilty of the crime charged just as if the defendant herself had actually committed it.

To prove the defendant guilty in this way, the Government need not prove that she acted through a guilty person, that is, a defendant can be found liable even if she acted through someone who is entirely innocent of the crimes charged in the Indictment.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 11-1, 11-2, 11-3; the charge given by the Hon. Shira A. Scheindlin in *United States v. Vasilevsky*, 08 Cr. 903 (SAS); and the charge given by the Hon. Richard J. Sullivan in *United States v. Pierce*, 06 Cr. 1032 (RJS); *see United States v. Concepcion*, 983 F.2d 369, 383-84 (2d Cir. 1992) ("'an individual (with the necessary intent) may be held liable if he is a cause in fact of the criminal violation, even though the result which the law condemns is achieved through the actions of innocent intermediaries'" (citations omitted)); *United States v. Margiotta*, 688 F.2d 108, 131 (2d Cir. 1982) (defendant may be found guilty even if he acts through "innocent intermediaries" to "cause[] the commission of an indispensable element of the offense"); *United States v. Ordner*, 554 F.2d 24, 29 (2d Cir. 1977) (under the "willfully causes an act to be done" provision "the guilt or innocence of the intermediary is irrelevant"); *United States v. Jordan*, 927 F.2d 53, 55 (2d Cir. 1991) (jury properly instructed that defendant could be found guilty where the defendant caused government agent to ferry narcotics into the United States).

**REQUEST NO. 34**

**Motive**

Proof of motive is not a necessary element of any of the crimes with which the defendant is charged. Proof of motive does not establish guilt, nor does the lack of proof of motive establish that the defendant is not guilty. If the guilt of the defendant is shown beyond a reasonable doubt, it is immaterial what the defendant's motive for the crime or crimes may be, or whether the defendant's motive was shown at all. The presence or absence of motive is, however, a circumstance which you may consider as bearing on the intent of the defendant.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 6-18; the charge given by the Hon. Deborah A. Batts in *United States v. Gupta*, 07 Cr. 177.

**REQUEST NO. 35**

**Variance in Dates**

You will note that the Indictment alleges that certain acts occurred on or about various dates. It does not matter if the evidence you heard at trial indicates that a particular act occurred on a different date. The law requires only a substantial similarity between the dates alleged in the Indictment and the dates established by the evidence.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 3-12 and 3-13.

**REQUEST NO. 36**

**Law Enforcement or Government Witnesses**

[*If Applicable*]

You have heard the testimony of law enforcement or other Government witnesses. The fact that a witness may be employed as a law enforcement official or Government employee does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. At the same time, it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness or Government witnesses, as it is with every other type of witness, and to give to that testimony the weight you find it deserves.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 7-16; the charge given by the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317; and the charge given by the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK)

**REQUEST NO. 37**

**Accomplice Testimony**

[*If applicable*]

You have heard testimony from certain government witnesses who testified that they were actually involved in planning and carrying out certain of the crimes charged in the Indictment.

Experience will tell you that the Government frequently must rely on the testimony of witnesses who participated in the criminal activity about which they testified in a trial. For those very reasons, the law allows the use of the testimony of cooperating or accomplice witnesses. In fact, in federal courts, the law is that the testimony of a cooperating or accomplice witness in itself may be enough for conviction if the jury believes it proves guilt beyond a reasonable doubt.

Accordingly, the testimony of these accomplice or cooperating witnesses was properly before you. The Government argues, as it is entitled to do, that if such testimony could not be used, there would be many cases in which there was real guilt, and convictions could not be obtained. However, the testimony of cooperating or accomplice witnesses should be scrutinized with special care because such witnesses may believe that it is in their interest to give testimony favorable to the Government, and the fact that a witness is an accomplice can be considered by you in evaluating his credibility. It does not follow, however, that simply because a person has admitted to participating in one or more crimes, that he or she is incapable of giving you a truthful version of what happened.

Like the testimony of any other witness, accomplice witness testimony should be given the weight it deserves in light of the facts and circumstances before you, taking into account the witness' demeanor, candor, the strength and accuracy of the witness' recollection, their background, and the extent to which their testimony is or is not corroborated by other evidence in

the case. You may consider whether an accomplice witness – like any other witness called in this case – has an interest in the outcome of the case, and if so, whether it has affected his testimony.

You have also heard testimony about various agreements between the Government and the accomplice witnesses. I must caution you that it is no concern of yours why the government made an agreement with a particular witness. Your sole concern is whether a witness has given truthful testimony here in this courtroom before you.

In evaluating the testimony of these witnesses, you should ask yourselves whether these witnesses would benefit more by lying or more by telling you the truth. Was their testimony made up in some way because they believed or hoped that they would somehow receive favorable treatment by testifying falsely? Or did they believe that their interests would be best served telling you the truth? If you believe that a witness was motivated by hopes of personal gain, was the motivation one that would cause them to lie or one that would cause him to tell you the truth? Did the motivation color the witness' testimony?

If you find that testimony by such a witness is false, you should reject it. If, however, after giving cautious and careful consideration to that testimony, and to the witness' demeanor, and the other things that I mentioned, and you're satisfied that the witness told you the truth, you should accept it as credible and act accordingly.

As with any witness, let me emphasize that the issue of credibility doesn't have to be decided on an all-or-nothing basis. Even if you find that a witness testified falsely in one part, you're still entitled to accept that testimony in other respects, or you can throw it all out of your consideration. That's up to you.

You also heard testimony that certain of the accomplice witnesses pled guilty to certain crimes that are related to the allegations in this case. You are to draw no conclusions or

inferences of any kind about the guilt of any of the defendants on trial from the fact that a cooperating witness pled guilty to similar charges. The decisions of those witnesses to plead guilty were personal decisions that they made about their own guilt. It may not be used by you in any way as evidence against the defendant on trial.

> Adapted from the charge given by the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK); and the charge given by the Hon. Valerie E. Caproni in *United States v. Percoco*, 16 Cr. 776 (VEC).

**REQUEST NO. 38**

***Falsus In Uno***

If you find that any witness wilfully lied about any material matter, you may either disregard all of that witness' testimony, or you may accept whatever part of it you think deserves to be believed. In other words, if you find that a witness lied under oath about a material fact, you may treat it as a slice of toast which has been partially burned. You can either throw the whole piece out, or you can scrape off the burned part and eat the rest. Ultimately, the determination of whether and to what extent you accept the testimony of any witness is entirely up to you.

Adapted from the charge given by the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK).

**REQUEST NO. 39**

**Preparation of Witnesses**

[*If Applicable*]

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he will be questioned about, focus on those subjects and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. Indeed, it would be unusual and surprising for a lawyer to call a witness without such consultation.

The weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

> Adapted from the charge given by the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317; and the charge given by the Hon. Richard J. Sullivan in *United States v. Peirce*, 06 Cr. 1032 (RJS).

**REQUEST NO. 40**

**False Exculpatory Statements**

[*If Applicable*]

You have heard testimony that the defendant made statements in which she claimed that her conduct was consistent with innocence and not with guilt. The Government claims that these statements in which the defendant attempted to exculpate herself are false. If you find that the defendant gave a false statement in order to divert suspicion from herself, you may infer that the defendant believed that she was guilty. You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged.

Whether or not the evidence as to a defendant's statements shows that the defendant believed that she was guilty, and the significance, if any, to be attached to any such evidence, are matters for you, the jury, to decide.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 6-11.

**REQUEST NO. 41**

**Similar Acts**

[*If Applicable*]

There has been evidence received during the trial that the defendant engaged in conduct which was similar in nature to the conduct charged in the Indictment.

Let me remind you that the defendant is on trial only for committing the acts alleged in the Indictment. Accordingly, you may not consider this evidence of the similar act as a substitute for proof that the defendant committed the crimes charged. Nor may you consider this evidence as proof that the defendant has a criminal personality or bad character. This other-act evidence was admitted for a more limited purpose, namely, as potential evidence of the defendant's motive, opportunity, intent, knowledge, plan, and/or absence of mistake or accident, and/or to provide background for the alleged conspiracy and those alleged to have been involved in it, and you may consider it for those purposes only.

However, the evidence of similar conduct is to be considered by you only on these issues. It may not be considered by you for any other purpose. Specifically, you may not consider it as evidence that the defendant is of bad character or has a propensity to commit crimes.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-25, 5-26.

**REQUEST NO. 42**

**Particular Investigative Techniques**

[*If Applicable*]

You have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were or were not used by law enforcement authorities. There is no legal requirement that law enforcement agents investigate crimes in a particular way or that the Government prove its case through any particular means. While you are to carefully consider the evidence presented, you need not speculate as to why law enforcement used the techniques they did, or why they did not use other techniques. The Government is not on trial and law enforcement techniques are not your concern.

Your concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of the defendant has been proven beyond a reasonable doubt.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 4-4; the charge given by the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317.

**REQUEST NO. 43**

**Use of Evidence Obtained Pursuant to Searches and Seizures**

[*If Applicable*]

You have heard testimony about evidence seized in connection with certain searches or seizures conducted by law enforcement officers, and in particular, of email or other electronic evidence obtained pursuant to court-approved search warrants. I instruct you that all of the evidence in this case, including evidence obtained pursuant to searches, was lawfully obtained, that no one's rights were violated, and that the Government's use of this evidence is entirely lawful. Whether you approve or disapprove of the uses of searches to obtain evidence, should not enter into your deliberations, because I instruct you that the Government's use of this evidence is entirely lawful. Therefore, you must give this evidence your full consideration, along with all the other evidence in the case, as you determine whether the Government has proved each defendant's guilt beyond a reasonable doubt.

> Adapted from the charge given by the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317 (KMW); and the charge given by the Hon. Katherine B. Forrest in *United States v. Levin*, 15 Cr. 101 (KBF).

**REQUEST NO. 44**

**Charts and Summaries: Admitted as Evidence**

[*If Applicable*]

Some of the exhibits that were admitted into evidence were in the form of summary charts or summaries. I decided to admit these charts or summaries to save time and avoid unnecessary inconvenience. You should consider these charts and summaries as you would any other evidence.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-12.

**REQUEST NO. 45**

**Charts and Summaries: Not Admitted as Evidence**

[*If Applicable*]

There have also been charts and exhibits introduced merely as analyses of testimony and documents in the case. These charts and exhibits act as visual aids for you. They are not, however, evidence in themselves. They are graphic demonstrations of certain underlying evidence. It is the underlying evidence and the weight which you attribute to it that gives value and significance to these charts. To the extent that the charts conform to what you determine the underlying facts to be, you should accept them. To the extent that the charts differ from what you determine the underlying evidence to be, you may reject them.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-13; and the charge given by the Hon. Richard J. Sullivan in *United States v. Peirce*, 06 Cr. 1032 (RJS).

**REQUEST NO. 46**

**Stipulations of Testimony**

[*If Applicable*]

In this case you have heard evidence in the form of stipulations of testimony. A stipulation of testimony is an agreement between the parties that, if called as a witness, the person would have given certain testimony. You must accept as true the fact that the witness would have given that testimony. However, it is for you to determine the effect to be given that testimony

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-7; the charge given by the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK).

**REQUEST NO. 47**

**Stipulations of Fact**

[*If Applicable*]

In this case you have also heard evidence in the form of stipulations of fact. A stipulation of fact is an agreement between the parties that a certain fact is true. You must regard such agreed-upon facts as true.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-6; the charge given by the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK).

**REQUEST NO. 48**

**Redaction of Evidentiary Items**

[*If Applicable*]

Among the exhibits received in evidence, there are some documents that are redacted. "Redacted" means that part of the document was taken out or covered over. You are to concern yourself only with the part of the item that has been admitted into evidence. You should not consider any possible reason why the other part of it has been deleted or covered up.

> Adapted from the charge given by Hon. Kimba M. Wood in *United States v. Cespedes-Pena*, 14 Cr. 520.

**REQUEST NO. 49**

**Persons Not on Trial**

If you conclude that other persons may have been involved in criminal or other acts charged in the Indictment, you may not draw any inference, favorable or unfavorable, toward either the Government or the defendant from the fact that those persons are not named as defendants in the Indictment, or are not present at this trial. In addition, you may not speculate as to the reasons why other persons are not defendants in this trial. Those matters are wholly outside your concern and have no bearing on your function as jurors at this trial.

> Adapted from the charge given by the Hon. Kimba M. Wood in *United States v. Cespedes-Pena*, 14 Cr. 520; *see also United States v. Muse*, No. 06 Cr. 600 (DLC), 2007 WL 1989313, at *22 (S.D.N.Y. July 3, 2017).

**REQUEST NO. 50**

**Character Witnesses**

[*If Applicable*]

The defendant has called witnesses who have given their opinion of her character or reputation. This testimony is not to be taken as the witness's opinion as to whether the defendant is guilty or not guilty. That question is for you alone to determine. You should, however, consider this evidence together with all the other facts and evidence in the case in determining whether the defendant is guilty or not guilty of the charges.

Accordingly, if after considering all the evidence including the testimony regarding the witness's opinion of the defendant's character or reputation, you find a reasonable doubt has been created, you must acquit. On the other hand, if after considering all the evidence including the testimony regarding the witness's opinion of the defendant's character or reputation, you are satisfied beyond a reasonable doubt that the defendant is guilty, you should not acquit the defendant merely because you believe the defendant, or the witness believes the defendant, to be a person of good character or to have a good reputation.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-15; *see United States v. Pujana-Mena*, 949 F.2d 24, 27-32 (2d Cir. 1991) (criticizing instruction that character evidence "standing alone" is enough for acquittal as "potentially misleading and confusing").

**REQUEST NO. 51**

**Uncalled Witnesses – Equally Available or Unavailable**

There are several persons whose names you have heard during the course of the trial but who did not appear here to testify. I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 6-7; the charge of the Hon. Lewis A. Kaplan in *United States v. Blaszczak*, 17 Cr. 357 (LAK); *see United States v. Super*, 492 F.2d 319, 323 (2d Cir. 1974) (proper to instruct jury that no inference should be drawn from the absence of a witness who was equally unavailable to both sides); *accord United States v. Brown*, 511 F.2d 920, 925 (2d Cir. 1975).

**REQUEST NO. 52**

**Defendant's Testimony**

[*Requested Only if the Defendant Testifies*]

The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the Government at all times, and the defendant is presumed innocent. That burden remains with the Government throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that she is innocent.

In this case, the defendant did testify and she was subject to cross-examination like any other witness. You should examine and evaluate her testimony just as you would the testimony of any witness.

> Adapted from the charge given by the Hon. Kimba M. Wood in *United States v. Skelos*, 15 Cr. 317. *See United States v. Brutus*, 505 F.3d 80, 87-88 (2d Cir. 2007) (discussing appropriate charges when a defendant testifies); *see also United States v. Solano*, 966 F.3d 184 (2d Cir. 2020) (citing cases regarding appropriate charges when a defendant testifies).

**REQUEST NO. 53**

**Defendant's Right Not to Testify**

[*If Requested by the Defendant*]

The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove the defendant guilty beyond a reasonable doubt. That burden remains with the Government throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that he or she is innocent.

You may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because she did not take the witness stand. You may not consider this against the defendant in any way in your deliberations in the jury room.

Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-21.

**REQUEST NO. 54**

**Improper Considerations: Race, Religion, Ancestry, National Origin, Sex, or Age**

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. It would be improper for you to consider any personal feelings you have about the defendant's race, religion, national-origin, ancestry, gender, sexual orientation, or age. Similarly, it would be improper for you to consider any personal feelings you may have about the race, religion, national origin, gender, sexual orientation, or age of any other witness or anyone else involved in this case. The defendant is entitled to a trial free from prejudice and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Adapted from the charge given by the Hon. Kimba M. Wood in *United States v. Cespedes-Pena*, 14 Cr. 520.

**REQUEST NO. 55**

**Punishment Is Not to Be Considered by the Jury**

The question of possible punishment of the defendant or the potential consequence of conviction is no concern to the jury and should not, in any sense, enter into or influence your deliberations. The duty of imposing sentence rests exclusively with me. Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt, solely on the basis of such evidence. Under your oath as jurors, you cannot allow consideration of the punishment that may be imposed on the defendant, if convicted, to influence your verdict, in any way.

> Adapted from Sand *et al*., *Modern Federal Jury Instructions*, 9-1; *see Shannon v. United States*, 512 U.S. 573, 579 (1994); and the charge of the Hon. Lewis A. Kaplan in *United States v. Blacksands*, 17 Cr. 0155 (LAK)

**REQUEST NO. 56**

**Sympathy: Oath as Jurors**

Under your oath as jurors, you are not to be swayed by sympathy. You are to be guided solely by the evidence in the case. You are to determine the guilt or non-guilt of the defendant solely on the basis of the evidence and subject to the law as I have charged you.

I know you will try the issues that have been presented to you according to the oath which you have taken as jurors, in which you promised that you would well and truly try the issues joined in this case and render a true verdict. And I suggest to you that if you follow that oath without combining your thinking with any emotions, you will arrive at a just verdict. It must be clear to you that once you get into an emotional state and let fear or prejudice or bias or sympathy interfere with your thinking, then you don't arrive at a true and just verdict. Calm deliberation and good common sense are the qualities you should bring with you into the jury room.

The charges here, ladies and gentlemen, are serious, and the just determination of this case is important to both the defendant and the Government. Under your oath as jurors, you must decide the case without fear or favor and solely in accordance with the evidence and the law.

If the Government has failed to carry its burden, your sworn duty is to bring in a verdict of not guilty. If the Government has carried its burden, you must not flinch from your sworn duty, and you must bring in a verdict of guilty.

> Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 2-12; the charge given by the Hon. Irving Kaufman in *United States v. Davis*, Appellant's Appendix at pp. 15a-16a, *aff'd*, 353 F.2d 614 (2d Cir. 1965).

**Conclusion**

Your function now is to weigh the evidence in this case and to determine whether the prosecution has proven the defendant guilty beyond a reasonable doubt with respect to each count in the Indictment.

You must base your verdict solely on the evidence and these instructions as to the law, and you are obliged under your oath as jurors to follow the law as I have instructed you, whether you agree or disagree with the particular law in question.

The verdict as to the defendant on each count must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.

Let me also remind you that you took an oath to decide this case impartially, fairly, without prejudice or sympathy, and without fear, solely based on the evidence in the case and the applicable law. Under your oath as jurors, you are not to be swayed by sympathy. You are to be guided solely by the evidence presented during the trial and the law as I have given it to you, without regard to the consequences of your decision.

You have been chosen to try issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy interfere with clear thinking, there is a risk you will not come to a just result. Both sides are entitled to a fair trial. You are to make a fair and impartial decision so that you come to a just verdict.

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can possibly do so without violence to individual judgment. Each of you must decide the case for her or himself, but do so only after an impartial discussion and consideration of all the evidence in the case with your fellow jurors. In the course of your

deliberations, do not hesitate to re-examine your own views, and change an opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors.

If you are divided, do not report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court.

In conclusion, ladies and gentlemen, I am sure that, if you listen to the views of your fellow jurors and if you apply your own common sense, you will reach a fair verdict here. Do not deliberate unless all twelve of you are in the jury room.

Remember that your verdict must be rendered without fear, without favor, and without prejudice or sympathy.

You are free to select any foreperson you like. The foreperson will preside over your deliberations, and will be your spokesperson here in court. That is simply for convenience, and it gives him or her no greater authority, and his or her vote has no greater weight than that of any other juror.

I will give each of you a verdict form for your convenience; the foreperson will have a verdict form on which you should record any verdict you reach unanimously.

Members of the jury, I am going to ask you to remain seated briefly while I confer with counsel to see if there are any additional instructions that they would like to have me give to you. Because there is a possibility that I might find it proper to give you such additional instructions, I ask that you not discuss the case while seated in the jury box.

> Adapted from the charge given by the Hon. Kimba M. Wood in *United States v. Cespedes-Pena*, 14 Cr. 520.

* * *

The Government respectfully reserves the right to submit additional or modified requests at or near the close of evidence.

Dated: New York, New York
November 9, 2021

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/ Eli J Mark
Eli J. Mark
Daniel C. Richenthal
Jonathan E. Rebold
Assistant United States Attorneys
(212) 637-2431/2109/2512
Alona Katz
Special Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Plaintiff,

v.

SYLVIA ASH,

Defendant.

Case No. 1:19-cr-00780-LAK

**DEFENDANT SYLVIA G. ASH'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

Dated: New York, New York
November 12, 2021

MORRISON & FOERSTER LLP

By: /s/ Carrie H. Cohen
Carrie H. Cohen
Nathan D. Reilly
Janie C. Buckley
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com
NReilly@mofo.com
JBuckley@mofo.com

*Counsel for Defendant Sylvia Ash*

# TABLE OF CONTENTS

**Page**

ARGUMENT .......... 2

I. RESPONSE TO GOVERNMENT MOTIONS I THROUGH IV (OFFERING EVIDENCE OF CERTAIN UNCHARGED CONDUCT) .......... 2

A. Evidence Relating to Ms. Ash's Receipt of Items of Value .......... 3

B. Evidence Relating to Ms. Ash's Disclosure Statements .......... 4

C. Evidence Relating to Ms. Ash's Resignation from the MCU Board .......... 5

D. Evidence Relating to Ms. Ash's Personal Income Taxes .......... 6

E. Evidence Relating to Ms. Ash's Work as New York Supreme Court Justice .......... 7

II. RESPONSE TO GOVERNMENT MOTION V (EVIDENCE OF BACKGROUND AND PERSONAL STATUS) .......... 9

III. RESPONSE TO GOVERNMENT MOTION VI (EVIDENCE OF POTENTIAL PUNISHMENT OR COLLATERAL CONSEQUENCES) .......... 10

IV. RESPONSE TO GOVERNMENT MOTION VII (EVIDENCE OF GOOD ACTS OR ABSENCE OF BAD ACTS) .......... 10

V. RESPONSE TO GOVERNMENT MOTION VIII (EVIDENCE OF MISAPPROPRIATION BY TO OTHER MCU BOARD OR SUPERVISORY COMMITTEE MEMBERS) .......... 11

VI. RESPONSE TO GOVERNMENT MOTION IX (EVIDENCE OF "OUTRAGEOUS" GOVERNMENT CONDUCT) .......... 13

VII. RESPONSE TO GOVERNMENT MOTION X - (EVIDENCE OF THE GOVERNMENT'S CHARGING DECISIONS) .......... 13

VIII. RESPONSE TO GOVERNMENT MOTION XI ("ADVICE OF COUNSEL" DEFENSE) .......... 14

CONCLUSION .......... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*255 Butler Associates LLC v. 255 Butler LLC*,
2019 WL 3973874 (2019)........7

*Del Forte USA, Inc. v. Blue Beverage Group, Inc.*,
2017 WL 3047538 (2017)........8

*Gregory Gerisamov v. Westoil Ltd., et al.*
(Kings County Supreme Court, Index No. 18017/2014)........7

*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013.)........15, 16

*United States v. Atias*,
2017 WL 563978 (E.D.N.Y. Feb 10, 2017)........15, 16

*United States v. Scali*,
No. 16 Cr. 466 (NSR), 2018 WL 461441 (S.D.N.Y. Jan. 18, 2018)........15

**Other Authorities**

Federal Rules of Evidence Rule 402........3

Federal Rules of Evidence Rule 403........3, 7

Federal Rules of Evidence Rule 404(b)........8

## PRELIMINARY STATEMENT

Defendant Sylvia G. Ash respectfully submits this Memorandum of Law in support of her opposition to the government's motions *in limine* ("Government Motion" or "Gov't Mot." (ECF No. 96)) in advance of trial in this matter. For the reasons discussed more fully below and as set forth in Ms. Ash's pending motions *in limine* ("Ash Motion" or "Ash Mot." (ECF No. 95)), the Court should preclude the government from introducing the following evidence at trial:

(1) Benefits or gifts that Ms. Ash received in connection with her service on the MCU Board,[1] including evidence that such benefits or gifts were fraudulently obtained (Gov't Mot. at 8);

(2) Ms. Ash's alleged failure to disclose certain gifts or other benefits on the Disclosure Statements (Gov't Mot. at 15);

(3) Ms. Ash's resignation from the MCU Board subsequent to her receipt of a complaint from the Judicial Commission (Gov't Mot. at 17); and

(4) Ms. Ash's alleged failure to accurately report the value of benefits she allegedly received from the MCU on her personal income taxes. (Gov't Mot. at 20.)

Additionally, based on discovery materials received by Ms. Ash on November 8, 2021, Ms. Ash further seeks to preclude the government from introducing stipulations, orders, or other court documents from cases over which Ms. Ash presided as Judge in Kings County Supreme Court (the "Judicial Documents".)

Finally, as discussed further below, Ms. Ash will not seek to introduce evidence relating to potential punishments or collateral consequences she may face should she be convicted. (Gov't Mot. at 22.) Ms. Ash further agrees not to introduce evidence relating to (i) alleged "outrageous" conduct by the government (Gov't Mot. at 26); or (ii) the government's charging

[1] The defined terms herein have the same meaning as set forth in the Ash Motion.

decisions (Gov't Mot. at 27), although Ms. Ash reserves the right to cross examine witnesses as to these topics, as discussed below, if the topic is raised on direct examination or where the topic is relevant to the witness's credibility. With respect to (i) her "good acts" on the MCU Board or for other community groups and (ii) her personal circumstances or background, Ms. Ash does not intend to make arguments to the jury on these topics in any opening statement her counsel may make. (Gov't Mot. at 22, 23.) However, Ms. Ash reserves the right to seek leave to offer evidence on these topics based on the nature of the proof offered by the government in its case in chief. Further, if the Court does not grant Ms. Ash's *in limine* motion to preclude the government from offering evidence about the benefits that Ms. Ash received in connection with her service on the MCU Board, Ms. Ash requests that the Court deny the government's request that she be barred from introducing evidence relating to benefits received by the members of the MCU Board or Supervisory Committee. (Gov't Mot. at 24.)

Finally, Ms. Ash requests that the Court deny the government's motion to preclude an "advice of counsel" defense, (Gov't Mot. at 28), as premature, and requests that she be permitted to provide notice to the Court (and the government) of her intent to offer any "advice of counsel" defense or other evidence relating to communications with her prior counsel by Monday, November 29, 2021.

## ARGUMENT

### I. RESPONSE TO GOVERNMENT MOTIONS I THROUGH IV (OFFERING EVIDENCE OF CERTAIN UNCHARGED CONDUCT)

The government has indicated its intent to introduce evidence relating to certain uncharged conduct by Ms. Ash. (Gov't Mot. at 8-21.) More specifically, the government seeks to introduce evidence relating to: (i) Ms. Ash's alleged receipt of benefits or from the MCU and/or Wong in connection with her Board service (Gov't Mot. at 8); (ii) Ms. Ash's alleged

concealment of things of value she received from the MCU on the Disclosure Statements (Gov't Mot. at 15); (iii) her resignation from the MCU Board subsequent to the filing of a complaint by the Judicial Commission (Gov't Mot. at 17); and (iv) her alleged efforts to evade personal income taxes on compensation she received from the MCU (Gov't Mot. at 20.)

In the Ash Motion, Ms. Ash moved to preclude evidence that the government indicated in the Government Motion that it will seek to offer because the proffered evidence is not relevant and is unfairly prejudicial to Ms. Ash in contravention of Rules 402 and 403 of the Federal Rules of Evidence, respectively. As Ms. Ash has addressed each category of proffered evidence at length in the Ash Motion, those arguments are not repeated herein. Nonetheless, Ms. Ash briefly addresses certain arguments raised in the Government Motion.

**A. Evidence Relating to Ms. Ash's Receipt of Items of Value**

The government seeks to offer evidence of Board benefits Ms. Ash received from the MCU and/or Wong. The government argues that the Board Benefits Allegations are relevant to explaining the background of her relationship with her co-conspirator, Wong, and the documentation of these benefits is "inextricably intertwined" with the government's allegation that Ms. Ash failed to produce certain materials that were responsive to the second of two grand jury subpoenas (the "Subpoenas") issued to Ms. Ash in connection with the government's investigation. (Gov't Mot. at 12-13.) The government further seeks to introduce evidence that "many" of these items of value were obtained in violation of MCU policy and/or through fraud and were paid or given to benefit Ms. Ash personally. (Gov't Mot. at 9.)

As discussed in the Ash Motion, the Board Benefits Allegations are not relevant to the charged conduct and unnecessarily invite delay and confusion. (Ash. Mot. at 17-18.) Ms. Ash has previously acknowledged that there is documentary evidence establishing her friendship with

Wong. (Ash Mot. at 18.) Similarly, the government may seek to introduce records it believes were called for by the Subpoenas and that Ms. Ash allegedly possessed but failed to produce. But, seeking to establish that Ms. Ash received items of value to which she was not entitled will raise complicated questions of the applicability of New York State not-for-profit laws and MCU policies. It will also raise factual issues of how to determine whether a particular item of value was or was not fraudulently obtained. Further, none of the items are related to the crimes with which Ms. Ash was charged or even to the underlying embezzlement with which Wong was charged and ultimately convicted. Accordingly, and for the reason set forth in the Ash Motion, the government should be precluded from offering evidence of the Board Benefits Allegations.

### B. Evidence Relating to Ms. Ash's Disclosure Statements

The government argues that Ms. Ash's purported failure to disclose benefits she received from the MCU and/or Wong on the Disclosure Statements should be admitted in evidence because such failure (i) is "inextricably intertwined" with the rest of the evidence in this matter; (ii) is relevant to her relationship with Wong; and (iii) tends to show that Ms. Ash knows that the benefits she received from the MCU and/or Wong were, "at a minimum, inappropriate." (Gov't Mot. 16.)

These arguments are without merit. As an initial matter, there will be ample evidence before the jury, including documents, emails, and Ms. Ash's statements to the government, that will tend to show Ms. Ash's friendly relationship with Wong. Nothing will be made less clear or left unexplained for the jury if the government is precluded from offering the Disclosure Statements in evidence. In contrast, as Ms. Ash noted in the Ash Motion, the introduction of the Disclosure Statements will invite an extended detour into the New York State regulations underlying judicial disclosure rules and regulations, and how such statements are processed by

New York State. Far from being "inextricably intertwined" with the evidence in this matter, evidence regarding the Disclosure Statements is easily segregated from the government's case in chief and introduction of the Disclosure Statements is likely to introduce confusion, rather than clarity, to the jury.

### C. Evidence Relating to Ms. Ash's Resignation from the MCU Board

The government seeks to introduce evidence relating to Ms. Ash's interactions with the New York State Advisory Committee on Judicial Ethics (the "Committee") and the Judicial Commission regarding her service on the MCU Board. (Gov't Mot. at 17-20.) The government contends that Ms. Ash's interactions with the Committee and, subsequently, the Judicial Commission, regarding her role as the Chair of the MCU Board, reflect the "great lengths" she went to maintain her position on the MCU Board. (*Id.* at 20.) The government further claims that Ms. Ash sought to maintain her Board position because of the benefits she was receiving in connection with her Board service and that this, in turn, demonstrates why she would engage in obstructive conduct to frustrate investigators and assist Wong. (*Id.*)

Again, the government's argument falls short. Ms. Ash's interactions with the New York State judiciary's administrative arm are not "inextricably intertwined" with the underlying embezzlement scheme by Wong and Guagliardo, nor are they "inextricably intertwined" with Ms. Ash's alleged participation in a conspiracy to obstruct the government's investigation by not producing certain materials and/or by making false statements to the government.[2] As with the Disclosure Statements, evidence relating to Ms. Ash's judicial employment is not necessary to

[2] Notably, while the government indicates that Ms. Ash's allegedly false statements to the government about her resignation from the MCU Board constitute evidence of her course of purportedly obstructive conduct, the government did not allege any such statements as an enumerated overt act or as a basis for a substantive charge in the Superseding Indictment.

complete the evidentiary mosaic for the jury – instead it will serve to blur the picture and create an unnecessary and confusing distraction. To be complete, evidence relating to Ms. Ash's interactions with the Committee and the Judicial Commission would stretch back to Ms. Ash's original request for an advisory opinion from the Committee in 2008 upon joining the MCU Board. It will also require an explanation of the Committee and Judicial Commission's respective roles with respect to the New York State judiciary. Further, it will require evidence to reflect that the Judicial Commission's complaint in 2016 did not constitute a finding of fact, was concerned with potential of conflict of interest issues that might arise when the MCU was a litigant, and was not related to Ms. Ash's alleged MCU-related compensation. Nor does the government's characterization of the evidence as "straightforward," (Gov't Mot. at 20), accurately reflect the highly and unfairly prejudicial inference that the jury will draw upon learning the circumstances of the Judicial Commission's complaint, which jurors may incorrectly conflate with the government's later investigation. Accordingly, the government should be precluded from offering evidence with respect to Ms. Ash's resignation from the MCU Board.

**D. Evidence Relating to Ms. Ash's Personal Income Taxes**

The government also seeks to introduce evidence that Ms. Ash allegedly filed false federal personal income taxes by inaccurately claiming expenses relating to compensation she received from the MCU. (Gov't Mot. at 20.) The government again claims that this proffered evidence is both evidence of the charged crime based on Ms. Ash's purported failure to produce certain documents in response to the Subpoenas and evidence of her motive to obstruct an investigation that might have identified her false tax filings. (Gov't Mot. at 21.)

Once more, the government misses the mark. As an initial matter, the government can seek to introduce evidence of documents that it believes were both in Ms. Ash's possession and

responsive to its Subpoenas, which Ms. Ash then purportedly failed to produce. The government can do so without engaging in the sideshow of whether Ms. Ash's tax filings were accurate and whether her treatment of business expenses comported with Internal Revenue Service regulations and federal tax law. The government's proffered evidence is again likely to confuse the jury and result in a mini-trial on the intricacies of federal tax returns, which are irrelevant to the charged conduct here. Furthermore, the government's cursory assurance that "there is no risk that this evidence will elicit a separate, heightened response from the jury that would prevent the jury's fair assessment of the evidence," (Gov't. Mot. 21-22), is inconsistent with reality. The government seeks to introduce evidence of uncharged tax evasion – conduct which it plainly had the authority to prosecute and elected not to – in order to brand Ms. Ash as a tax cheat out to enrich herself at other taxpayers' expense. These types of inflammatory allegations, in a matter in which Ms. Ash is not alleged to have stolen or otherwise fraudulently enriched herself, are precisely the sort of unfair allegations that Rule 403 of the Federal Rules of Evidence is meant to preclude.

### E. Evidence Relating to Ms. Ash's Work as New York Supreme Court Justice

On November 8, 2021, the government produced additional discovery materials to Ms. Ash. These materials included the Judicial Documents, which appear to be orders issued by Ms. Ash in connection with her work as New York State Supreme Court Judge. The Judicial Documents are comprised of the following: (i) a Decision and Order issued by Ms. Ash in or about August 2019 in *255 Butler Associates LLC v. 255 Butler LLC*, 2019 WL 3973874 (2019) relating to discovery disputes between two civil parties and potential sanctions to one party for failure to produce documents (SDNY 00104698-00104702); (ii) a 2016 Stipulation and Order, signed by Ms. Ash on or about September 15, 2016 in *Gregory Gerisamov v. Westoil Ltd., et al.*,

(Kings County Supreme Court, Index No. 18017/2014) relating to an agreement to produce discovery between the parties (SDNY 00104703-00104709); and (iii) a 2017 Decision and Order issued by Ms. Ash on or about July 18, 2017 in *Del Forte USA, Inc. v. Blue Beverage Group, Inc.,* 2017 WL 3047538 (2017) which, among other things, granted a preliminary injunction sought by the defendant relating to the preservation of documents (SDNY 00104710-00104712.)[3]

While the government has not yet proffered if or how it intends to use the Judicial Documents at trial or through whom it will seek to admit them, Ms. Ash anticipates that the government may seek to introduce these documents (perhaps as self-authenticating) as relevant to Ms. Ash's intent, given her purported familiarity with the concept of document preservation and the need to produce documents in the context of litigation. The government should be precluded from attempting to introduce the Judicial Documents for this (or any) purpose.

As a threshold matter, the Judicial Documents do not relate to the MCU, its Board, its employees, or any investigation thereof. As such, none of the Judicial Documents are relevant to the conduct for which Ms. Ash is charged. Rather, Ms. Ash anticipates that the government will seek to introduce the Judicial Documents pursuant to Rule 404(b) of the Federal Rules of Evidence to show the absence of mistake, arguing that Ms. Ash's ability to adjudicate civil disputes in New York Supreme Court necessarily means that any incomplete production of records in response to the Subpoenas could not have been unintentional.

But, Ms. Ash's role in the Commercial Part of New York Supreme Court for Kings County did not convey upon her any particular expertise with respect to federal grand jury investigations. Ms. Ash has already moved to preclude the government's introduction of

[3] Copies of the Judicial Documents are attached hereto as Exhibit A.

evidence of her status as a Judge and attorney due to the well placed concern that it will confuse the jury and result in her being held to an impermissibly high standard. (Ash Mot. at 13-15.) The introduction of the Judicial Documents would compound that risk as jurors would be left with the misimpression that Ms. Ash was an expert in matters of criminal discovery.

Additionally, introduction of evidence relating to the Judicial Documents risks substantial delay at trial. Introduction of the Judicial Documents would require evidence relating to the procedural posture of the underlying New York Supreme Court matters, the applicable legal standards, and in what ways New York State civil procedure differs from federal grand jury practice. Beyond the inevitable delay this would engender, it would create a substantial risk of usurping the Court's role as the ultimate arbiter of the law. On their face, the Judicial Documents would be, at best, confusing and, at worst, misleading to the jury. Yet, providing context to the jury would require a witness to opine on the applicable New York law, thereby both muddying the waters as to what law ultimately applied in the case and as to who the jury should follow in receiving instructions on the law. These factors create a substantial risk of unfair prejudice to Ms. Ash, and accordingly, the government should be precluded from offering the Judicial Documents at trial.

## II. RESPONSE TO GOVERNMENT MOTION V (EVIDENCE OF BACKGROUND AND PERSONAL STATUS)

The government moves to preclude Ms. Ash from introducing evidence or argument at trial relating to her background and personnel traits that it contends are irrelevant to the question of her guilt or innocence. (Gov't Mot. at 22.)

Ms. Ash will not open on facts relating to her background or personnel traits but reserves the right to cross examine any government witnesses regarding the nature of his or her relationship with Ms. Ash. Such questions may be relevant to the witness's motive and bias for

testifying and thus ultimately be relevant to the witness's credibility. Additionally, Ms. Ash may seek leave to present evidence with respect to her background or personal traits, depending on the nature of the evidence that the government introduces through testimony and documents during its case in chief.

## III. RESPONSE TO GOVERNMENT MOTION VI (EVIDENCE OF POTENTIAL PUNISHMENT OR COLLATERAL CONSEQUENCES)

The government moves to preclude Ms. Ash from introducing evidence or argument at trial relating to potential punishments Ms. Ash may face should she be convicted at trial or to any collateral consequences, such as loss of her legal license, should could face. (Gov't Mot. at 22.)

Ms. Ash will not seek to introduce evidence at trial nor advance arguments to the jury relating to any potential punishments and/or collateral consequences relating to the government's prosecution of this matter.

## IV. RESPONSE TO GOVERNMENT MOTION VII (EVIDENCE OF GOOD ACTS OR ABSENCE OF BAD ACTS)

The government moves to preclude Ms. Ash from introducing evidence or argument at trial relating to "good acts" she performed as a member of the MCU Board or in connection with her numerous additional philanthropic engagements. (Gov't Mot. at 23.)

The Court should deny this motion to the extent that the government seeks to introduce evidence of Ms. Ash's solicitation of charitable donations from the MCU as part of its case in chief. In the Government's Motion, the government indicated that, to establish Ms. Ash's motive for her alleged obstruction, it expected to offer evidence that Ms. Ash "sought and received reimbursement for, and had MCU and/or Wong pay for […] contributions to organizations, […] both during and after the defendant's service as an MCU board member." (Gov't Mot. at 8.) Here the government seeks to both to have and to eat its proverbial cake, as it

aims to introduce evidence that Ms. Ash solicited charitable donations while simultaneously barring her from providing the jury with any context about the nature and history of her charitable work or the instances in which the MCU made charitable donations at the behest of Board members other than Ms. Ash.

Ms. Ash will not make argument with respect to her lengthy history of public service and community work in any opening statement. However, should the government, in its case in chief, present evidence which challenges or calls into question her history of service, Ms. Ash will seek leave of the Court to introduce evidence on this topic. For example, should the Court permit the government to introduce evidence of specific MCU donations (or Ms. Ash's solicitation thereof), Ms. Ash should be permitted, either through cross examination or her defense case (if any), to present evidence that will provide the jury with sufficient context about her and the MCU's charitable works to avoid leaving the jury with a misleadingly incomplete narrative. As such, the Ms. Ash respectfully submits that the government's motion to preclude her from offering any evidence relating her prior good works (or absence of bad actions) be denied.

## V. RESPONSE TO GOVERNMENT MOTION VIII (EVIDENCE OF MISAPPROPRIATION BY TO OTHER MCU BOARD OR SUPERVISORY COMMITTEE MEMBERS)

The government moves to preclude Ms. Ash from introducing evidence or argument at trial relating to the receipt of any potentially inappropriate items of value (including gifts, reimbursement or benefits) received by other MCU Board or Supervisory Committee Members. (Gov't Mot. at 24-25.) Again, the government unfairly endeavors to use its motions *in limine* as both as a shield and a sword, seeking to introduce evidence that Ms. Ash violated MCU policy in receiving certain things of value from the MCU while attempting to bar any evidence that MCU

"policy" may have interpreted differently, regularly been ignored without consequence, or even violated by the MCU itself or other Board members. For this reason, Ms. Ash has asked the Court to preclude evidence regarding the benefits she received from the MCU. (Ash Mot. at17.) However, , if the Court permits the government to present benefits and gifts that Ms. Ash received from the MCU and/or Wong, then the Court should deny the government's motion to preclude evidence relating to the MCU providing other things of value to other Board or Supervisory Committee members.

The government has noticed its intent to introduce evidence that Ms. Ash received payments or things of value that "violated MCU policy and/or were fraudulently obtained." (Gov't Mot. at 9.) The government further argues that Ms. Ash's receipt of these items and purported concealment thereof is evidence of the charged obstruction and further constitutes evidence of Ms. Ash's motive. (*Id.* at 12-13.) Yet, this argument pre-supposes Ms. Ash's awareness that the items of value she received were given in violation of MCU policy. Even assuming, *arguendo*, that Ms. Ash received items of value in a manner contrary to MCU's policies, the fact that other members of the MCU's Board and Supervisory Committee were receiving similar items would be highly relevant to Ms. Ash's *mens rea.*[4] Ms. Ash (and other Board members) may have possessed a well-founded belief that certain MCU policies had been set aside or otherwise altered if there was a consistent practice of non-enforcement with respect to those policies. The jury's understanding of whether Ms. Ash's belief about MCU policies was well-founded would plainly be informed by whether she was the only Board member who

[4] For example, as part of its Rule 16 Discovery, the government produced a review of the MCU Board members' expenses between January 1, 2015 and July 5, 2018 conducted by an outside investigative firm. (MCU 00018994.) This review reflected that over this period, MCU Board 13 members had spent roughly $1.145 million, of which approximately $108,000 was associated with Ms. Ash.

received things of value that were arguably improper or whether her conduct was consistent with those of other Board members. As such, evidence of the conduct of other members of the MCU Board and/or Supervisory Committee is highly probative of the government's assertion that Ms. Ash had an incentive to obstruct an investigation into what she had received from the MCU. Accordingly, the government's motion to preclude evidence regarding other things of value that other Board and Supervisory Committee members received should be denied.

## VI. RESPONSE TO GOVERNMENT MOTION IX (EVIDENCE OF "OUTRAGEOUS" GOVERNMENT CONDUCT)

The government moves to preclude Ms. Ash from introducing evidence or argument at trial relating to her previous claims that the government acted in a manner inconsistent with the constitution, the law, or the United States Department of Justice's Justice Manual. (Gov't Mot. at 26.)

Ms. Ash will not seek to introduce evidence at trial nor advance arguments before the jury relating to allegations that the government acted in a manner inconsistent with the constitution, the law, or the United States Department of Justice's Justice Manual. However, Ms. Ash reserves the right, as part of appropriate cross-examination of government witnesses, to inquire as to the matter that are relevant to the witness's credibility and recollection of events.[5]

## VII. RESPONSE TO GOVERNMENT MOTION X - (EVIDENCE OF THE GOVERNMENT'S CHARGING DECISIONS)

The government moves to preclude Ms. Ash from introducing evidence or argument at trial relating to its charging decisions with respect to both its charges (or lack thereof) as to

[5] For instance, given the Court's prior ruling, Ms. Ash will not advance arguments that her prior statements should not be presented to the jury. However, she should not be precluded from inquiring about the timing and manner in which, for instance, the content of those interviews was memorialized and the general practice and policies that govern memorializing certain statements, including the reasons for such practice and any instances where those policies were not followed.

individuals and with respect to charges that were not brought against Ms. Ash. (Gov't Mot. at 27.)

Ms. Ash will not seek to introduce evidence at trial nor advance arguments to the jury regarding the government's charging decisions. However, to the extent the government calls any witness whose conduct gives rise to potential criminal liability, Ms. Ash reserves the right, to inquire about any agreement that the witness has made with the government regarding his or her testimony. Similarly, while Ms. Ash will not comment on the government's charging decisions, she reserves the right to argue to the jury about what evidence the government has not introduced at trial.

## VIII. RESPONSE TO GOVERNMENT MOTION XI ("ADVICE OF_COUNSEL" DEFENSE)

The government requests that the Court direct Ms. Ash to promptly provide written notice as to her intent to invoke an "advice of counsel" defense and to provide discovery relating to her communications with her prior counsel, Roger Archibald, in connection with any such defense. (Gov't Mot. at 28.) The government further seeks an order from the Court precluding Ms. Ash from offering any argument to the jury relating to an "advice of counsel" defense until she had established an "admissible" factual basis for such a defense. (Gov't Mot. at 28.) As set forth below, Ms. Ash believes that this matter is still not ripe for judicial intervention.

In her October 29, 2021 letter to the Court (the "October 29 Letter" (ECF No. 97)), Ms. Ash advised the Court of two open pre-trial issues that were not yet ripe for the Court's review. With respect to the "advice of counsel" defense, Ms. Ash advised the Court that "she may assert an "advice of counsel defense" at trial with respect to, *inter alia*, her alleged non-compliance with grand jury subpoenas and, accordingly, waive her attorney-client privilege with respect to certain communications between herself and her former counsel, Mr. Archibald as relates to that

topic." (October 29 Letter at 2.) Ms. Ash further noted that while the government had produced a redacted version of Mr. Archibald's June 2, 2021 grand jury testimony and "certain exhibits" thereto, her decision as to whether or not to assert the "advice of counsel" defense was dependent upon receipt of the un-redacted testimony and full set of exhibits, as well as the nature of the government's presentation of its case in chief. (October 29 Letter at 2-3.) At the close of business on November 11, 2021, the government produced what it identified as an unredacted copy of Mr. Archibald's grand jury testimony and the exhibits thereto.

Ms. Ash understands that an assertion of the "advice of counsel" defense is premised on a waiver of attorney-client privilege with respect to the subject of the advice and a related production of discovery materials. *See United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018). Here, the government has suffered no prejudice, as the portion of Mr. Archibald's file that the government does not already possess (and to which it would be entitled if Ms. Ash asserted an "advice of counsel" defense) is *de minimis*. As the Court is aware, the government already possesses a substantial portion of Mr. Archibald's file relating to Ms. Ash as a result of prior litigation in this matter. The government has also obtained certain grand jury testimony from him. In a case whether the government has produced well over 100,000 pages of discovery (and numerous forensic images of electronic devices), the remaining portion of Mr. Archibald's file which the government does not possess but to which it may be entitled is limited to a small number of pages. The government will readily be able to review the materials which it does not already possess in a short time and will suffer no prejudice from its production on or before November 29. Further, Ms. Ash does not intend to argue the existence of an "advice of counsel" defense to the jury without having shown, to the Court's satisfaction, that a basis to advance such a defense exists.

The government further argues that, if Ms. Ash does not advance an "advice of counsel" defense, she should also be precluded from offering any evidence relating to assistance she sought (or received) from counsel. In support of this proposition, the government cites the decisions in *United States v. Atias*, 2017 WL 563978 (E.D.N.Y. Feb 10, 2017) and *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013.) However, neither *Atias* nor *Tourre* supports a bright line prohibition on the offering of evidence relating to counsel's role. In *Atias*, the court addressed whether a third party could testify with respect to statements made to defendants by an attorney when the defendants could not meet the "advice of counsel" standard. *Atias*, 2017 WL 563978 at *4-5. The *Atias* court held that the absence of the "advice of counsel" defense did not automatically bar the introduction of the statements, so long as the statements were offered for valid non-hearsay reasons, such as an effect on the defendants' state of mind. *Id.* In *Tourre*, the court expressed concern that, where the defendant had acknowledged that unavailability of an "advice of counsel" defense, undue focus on lawyer's mere presence on an email chain or in a meeting would tend to confuse the jury. 950 F. Supp. 2d at 684. Here, Ms. Ash believes that any such potential confusion or prejudice could be obviated in two distinct ways. First, undersigned counsel can provide a detailed evidentiary proffer to the Court in advance of any witness being called on this subject so that that Court can weigh questions of admissibility outside of the presence of the jury. Second, were, for example, Mr. Archibald to be called to testify by Ms. Ash, he would be subject to cross examination by the government and thus the concern expressed by Judge Forrest in *Tourre* that the jury would be misled by simply hearing about counsel's presence in a given meeting would be ameliorated.

Accordingly, Ms. Ash requests that she be permitted until November 29, 2021 to advise the Court of her intention to advance an "advice of counsel" defense or, in the alternative, to

otherwise seek to introduce admissible evidence relating to her communications with Mr. Archibald.

## CONCLUSION

For the foregoing reasons, Sylvia Ash respectfully requests that the Court grant the relief requested herein.

Dated: New York, New York
November 12, 2021

MORRISON & FOERSTER LLP

By: /s/ Carrie H. Cohen

Carrie H. Cohen
Nathan D. Reilly
Janie C. Buckley
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: CCohen@mofo.com
NReilly@mofo.com
JBuckley@mofo.com

*Counsel for Defendant Sylvia Ash*

# Exhibit A

2019 WL 3973874 (N.Y.Sup.), 2019 N.Y. Slip Op. 32484(U) (Trial Order)
Supreme Court of New York.
Kings County

**1 255 BUTLER ASSOCIATES LLC, Plaintiff(s),
v.
255 BUTLER LLC, et. al., Defendant(s).

No. 511560/2015.
August 22, 2019.

**Decision and Order**

Present: Hon. Sylvia Cash, Justice.

**At an IAS Term, Comm-11 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, at Civic Center, Brooklyn, New York, on the 14th day of August, 2019.**

**Mot. Seq. 22 & 23**

| *1 ***The following e-filed papers numbered 794 to 911 read herein*:** | ***Papers Numbered*** |
|---|---|
| Notice of Motion/Order to Show Cause/Petition/Cross Motion and Affidavits (Affirmations) Annexed ____________________ | *794-822; 860-884* |
| Opposing Affidavits (Affirmations) ____________________ | *823-845; 890-902* |
| Reply Affidavits (Affirmations) ____________________ | *906-911* |
| ______ Affidavit (Affirmation) *Oral Argument Transcript* | _______________ |

Before this Court are Plaintiff's two motions to strike Defendants' answer and counterclaims.

Pursuant to this Court's short form order dated June 26, 2018, Defendants were directed to produce "all documents collected to date by [Defendants'] ESI consultants and limited by agreed upon search terms....except for privileged documents or those which [Defendants] need not produce pursuant to Decision and Order dated June 7, 2018." The Court's direction stemmed from Defendants' failure to produce certain emails in the Plaintiff's possession that should have also been produced by the Defendants but for reasons unexplained by Defendants, [1] and despite their engagement of ESI experts, were not produced. The total number of emails that "hit" the parties' agreed upon search terms numbered 46,000. Defendants turned over approximately 37,000 emails J **2 withholding approximately 9,000 emails based on "presumptive" privilege or because they related to other properties, settlement discussions, financial statements and tax returns. Defendants also redacted certain information within the production of 37,000 emails.

By way of the instant motion to strike Defendants' pleadings, Plaintiff argues that Defendants were only permitted to withhold privileged documents and those subject to the Court's ruling in an order dated June 7, 2018 that certain categories of documents were irrelevant. Further, that Defendants are not permitted to redact financial and other business information within the 37,000 email production. Finally, it is Plaintiff's position that, because none of the so-called "missing emails" were found within the 37,000 email production, Defendants are deliberately withholding or have destroyed ESI evidence and, therefore, that their answer must be struck.

In response, Defendants contend that they have neither improperly withheld or destroyed any ESI evidence and that they have fully complied with the Court's previous order. Defendants argue that their production of the "hit emails" confirms the accuracy and truth of what Defendants have said all along-that the absence of these emails from their production has nothing to do with a sinister plot on the part of Defendants to conceal evidence and everything to do with the vagaries of Defendants' email system. Further, that in connection with Plaintiff's first motion to strike, Defendants submitted the affidavits of their two e-discovery experts, confirming that each had been instructed to perform a thorough search of the designated custodians' complete email accounts and not to conceal or withhold any documents relating to the Butler Street Property, and that Defendants' experts "did not see any indication that any emails were intentionally removed or deleted by any party to avoid the discovery obligations of this (or any) proceeding." In addition, with the instant motion, Defendants submit the affidavits of Ariel and Solmi Akkad, who each state that neither they nor any of their family members deliberately deleted or "destroyed" any emails from any of the accounts. Finally, Defendants contend that, while Plaintiff need not believe the truth of Defendants' statements, Plaintiff cannot seek to strike their answer and win on default because Plaintiff merely "believes" that Defendants are lying. Instead, that Plaintiff must convince the trier of fact that Defendants are lying.

***2** After orally arguing the instant motion, Plaintiff filed a second motion to strike arguing again that Defendants' pleadings should be struck because the "missing emails" were not located within Defendants' ESI production. In addition, Plaintiff argues that Defendants have failed to fully comply with their discovery obligations. Specifically, Plaintiff contends that a chain of 21 emails among the Akkads were deemed "hot" and privileged but that their counsel was not copied on these emails. ****3** Thus, that said emails cannot qualify as privileged communications. Second, that Defendants were to "provide documents sufficient to show prior transactions with shared office space providers similar to WeWork for the period prior to the notice to cure lease defaults, including date of transaction, terms, location and counterparty" pursuant to court order dated May 9, 2018 but that Defendants failed to do so. Third, that according to the parties' ESI agreement, Defendants were required to search all email accounts of all designated email custodians but that Defendants failed to search the personal email account ending in att.net for Margaux Levy ("Levy"), their counsel, and the gmail and hhequities email accounts for Solmi Akkad. Further, that Defendants did not provide any documents from a search of the email account of Michael Ghatalia ("Ghatalia"), the chief financial officer of Idea Nuovo. Fourth, that Defendants have not produced the cell phone data for Levy and Ghatalia as well as the call logs and metadata for the Akkads' cell phones, which are all required to be produced under the parties' ESI agreement. Fifth, that Defendants have not provided the metadata for a certain document referred to as the First Amendment to Operating Agreement which is required to be produced under the parties' ESI agreement. Fifth, that Defendants have failed to provide documents requested at the Akkads' deposition. And finally, that Defendants have not produced documents concerning Defendant 255 Butler LLC's liquidity.

In response, Defendants request that the Court curb what they view as Plaintiff's "discovery reign of terror." Defendants contend that they have fully complied with all of this Court's orders and addresses Plaintiff's contentions in turn. First, that they have only withheld emails from production that are either consistent with this court's previous orders or not subject to production under well the settled law of this State. And that while Plaintiff complains that Defendants have over-designated non-privileged documents, Plaintiff only gives one example of over-designation. Further, that the example given by Plaintiff is presumptively privileged because it is the forwarding of an attorney-client communication from one Akkad to another, and the discussion among the Akkads about that attorney communication. Second, Defendants contend they complied with the court order directing them to show prior transactions with shared office space providers similar to WeWork by producing a newspaper article that

summarized the transaction. Defendants state that they were not required to produce every document relating to The Yard. Third, that Levy is an attorney who maintains a practice outside of her work for the Defendants. That she is not an employee of the Defendants and has refused to permit her att.net email account to be searched and that the same goes for her cell phone. With regards to Solmi Akkad's other email accounts, that he testified, at his deposition, that he does not use his other email accounts for business purposes. As for ESI from Ghatalia, that only eight separate documents contained the relevant search terms which have been provided to Plaintiff. Fourth, that where, as here, the parties' ESI agreement provisions are subject to abuse and ****4** unreasonable requests, the agreement should not be dispositive of every discovery issue and request. While Ghatalia is a designated custodian and an Idea Nuova employee, absent any reason to believe that his cell phone contains relevant texts, that he should not be required to submit to his cell phone being searched. Further, that the First Amendment to Operating Agreement was obtained from Defendant landlord's transactional counsel in November 2018, so to the extent that Plaintiff wants the metadata associated with said document, Plaintiff should pursue it with said transactional counsel.

With regards to the outstanding requests from the Akkads' deposition, Defendants contend that some of Plaintiff's request call for legal conclusions and are not properly addressed to a fact witness. That Plaintiff's request for the owner of the domain name hhequities is irrelevant and that Defendants have provided the home addresses of the requested individuals.

Finally, Defendants submit that they have complied with their obligations concerning the Court's June 7, 2018 decision requiring Defendants to provide documents concerning landlord's “liquidity.” That said decision limited the scope of discovery on this issue to “bank statements, loan agreements, note and mortgage, default notices and notices of acceleration.” And that these documents were provided many months ago, including fully unredacted bank statements.

***3** Upon review of the foregoing arguments and the parties' submissions, the Court decides as follows:

Plaintiff's motion to strike Defendants' answer on the grounds that they have destroyed or withheld evidence is granted solely to the extent that Defendants shall be precluded from using for any purposes at trial documents that they failed to produce in discovery. Plaintiff's motion is otherwise denied (motion sequence 22). Plaintiff's only argument in support of striking Defendants' answer is the fact that the “missing emails” were not found within the 46,000 “hit emails” that Defendants were directed to produce. However, contrary to Plaintiff's assertion, the fact that the “missing emails” were not a part of the “hit emails” does not establish that Defendants willfully destroyed evidence. While the Court finds Defendants' explanation for the “missing emails” to be unsatisfactory, having since compelled Defendants to produce everything, the fact that the “missing emails” were not found merely indicates that they were never part of the 46,000 “hit emails” to begin with.

****5** With regards to Defendants' withholding of 9,000 emails and whether that is in violation of this Court's Order dated June 26, 2018, the Court finds that Plaintiff fails to establish that Defendants failed to comply with the Court's June 26, 2018 Order, which specifically carves out both privileged documents as well as those documents that Defendants need not produce as a result of this Court's Decision dated June 7, 2018.[2] It is well established that any party withholding discovery on the basis of privilege or on some other basis must provide a privilege log. If Defendants' privilege log is insufficient or reflects improper withholding, Plaintiff must provide specific examples so that the Court can address them. It is insufficient to merely point to the sheer number of documents withheld as evidence that Defendants are improperly withholding discovery.

By way of its subsequent motion to strike Defendants' answer (motion sequence 23), Plaintiff provided one example of a potentially improper withholding-the chain of 21 emails among the Akkads that were deemed “hot” and privileged but on which their counsel was not copied. With regards to this, the Court directs Defendants to submit these emails for in camera review within 30 days so that the Court can ascertain whether these emails are, in fact, privileged.

With regards to the remainder of Plaintiff's second motion to strike, the Court finds that, with the exception of the items covered by the parties' ESI agreement which are dealt with below, Defendants have substantially complied with their previous discovery obligations, and as such, Plaintiff's motion must be denied.

First, to the extent that Plaintiff requests **additional** documents concerning Defendants' transactions with shared office space providers, Plaintiff must make a further document demand. The same applies for Plaintiff's request for additional documents concerning 255 Butler LLC's liquidity. Plaintiff cannot bootstrap what are essentially new requests for specific documents to previous orders that resolved Plaintiff's previous (and specific) request for documents and thereafter complain that Defendants are not in compliance.

***4** With regards to compelling Defendants to search Levy's personal email account and cell phone, the Court finds that Plaintiff must pursue Levy directly as Levy is not an employee of the Akkads and therefore not under their control.

****6** With regards to that portion of Plaintiff's motion seeking to enforce the parties' ESI agreement, the Court finds that, absent good reason, the ESI agreement that the parties signed should be followed. To that end, Defendants fail to explain why they should be relieved from providing the call logs and metadata for the Akkads' cell phones and the First Amendment to Operating Agreement if same is called for in the parties' ESI agreement. Although Defendants claim that having to provide metadata is unreasonable, Defendants fail to explain why this is so. Defendants also fail to adequately explain why having to execute an ESI search for Solmi Akkad's gmail and hhequities accounts is unreasonable. If Defendants do not use these accounts for business, then the search will be simple since, presumably, the yield will be zero. However, in this adversarial proceeding, Plaintiff is not required to take Defendants at their word that they do not use their gmail accounts for business purposes. Accordingly, Defendants shall complete their obligations under the parties' ESI agreement within 45 days.

With regards to the remaining items in Plaintiff's motion, Defendants have asserted that they have provided all of the requested items. As such, the Court directs Plaintiff to provide a deficiency letter to Defendants if, by the date of this decision, Plaintiff believes that items are still outstanding.

A status conference shall be held on Tuesday, November 12, 2019 at 10:00 a.m.

This constitutes the Decision and Order of the Court.

ENTER,

<<signature>>

**SYLVIA G. ASH, J.S.C.**

## Footnotes

1 Defendants attributed the non-production of these emails as being due to the "vagaries" of Defendants' email system.

2 The June 7, 2018 Decision resolved a motion by Plaintiff to compel certain discovery denying in part and granting in part Plaintiff's motion.

Privalov, Veniamin 9/24/2021
For Educational Use Only



End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

FILED: KINGS COUNTY CLERK
NYSCEF DOC. NO. 82
INDEX NO. 18017/2014
RECEIVED NYSCEF: 09/16/2016
No. 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| GREGORY GERISAMOV, Plaintiff, - against - WESTOIL, LTD., ISAAC FAIVUSH, BEN ECKSTEIN, CPA, J.P. MORGAN CHASE and BNP PARIBAS (Suisse), Defendants. | Hon. Sylvia G. Ash, J.S.C. Commercial Division Part 11<br>Motion Seq. No. 003<br>Index No.: 18017/2014 |

**STIPULATION AND ORDER**

**IT IS HEREBY STIPULATED AND AGREED,** by and between the undersigned counsel of record for Plaintiff and Defendants Westoil, Ltd. ("Westoil"), Isaak Faivush ("Mr. Faivush") (collectively, "Defendants") that Plaintiff shall produce the documents set forth below at the offices of Duane Morris LLP in accordance with the terms set forth herein:

1. On or before October 6, 2016 ~~Within three days of the date of this Stipulation and Order,~~ Plaintiff will provide Defendants with an itemized list of all of Plaintiff's computers, email accounts, including his "ggerasimov@aol.com" and any other email accounts maintained by Plaintiff, including by way of example, "acommodity@aol.com" (hereinafter, "Plaintiff's Computerized Information").

2. On or before October 13, 2016 ~~Within seven days of the date of this Stipulation and Order,~~ Plaintiff shall retain a third-party electronic discovery provider to collect Plaintiff's Computerized Information in a forensically sound and defensible manner. Plaintiff's third-party electronic discovery provider shall mirror image the hard drives of Plaintiff's computers and shall preserve such mirror image(s) and all other of Plaintiff's Computerized Information.

On or before October 20, 2016,

3. ~~Within fourteen days of this Stipulation and Order~~, Plaintiff's third-party electronic discovery provider shall provide Defendants' counsel with a report detailing the results of the collection of Plaintiff's Computerized Information.

On or before October 27, 2016 or

4. Within seven days of the receipt of the report from Plaintiff's third-party electronic discovery provider, Defendants' counsel will provide Plaintiff's counsel and Plaintiff's third-party electronic discovery provider with a list of search terms to be run on the files and file fragments in Plaintiff's Computerized Information in order to identify the following relevant materials:

a. All emails and electronic documents concerning or with Westoil;

b. All emails and electronic documents concerning or with Mr. Isaak Faivush;

c. All emails and electronic documents concerning or with Mr. Mikhail Berkovsky;

d. All emails and electronic documents concerning or with Ms. Tamara Berkovskaia;

e. All emails and electronic documents concerning or with London Motors, Inc.;

f. All emails and electronic documents concerning or with Villa Italia Hotel;

g. All emails and electronic documents concerning or with Lamprey Realty, Inc.;

h. All emails and electronic documents concerning or with Lamprey Property LLC;

i. All emails and electronic documents concerning or with Ben Eckstein, CPA;

j. All emails and electronic documents concerning Plaintiff's affirmative defenses in the Verified Answer to Counterclaims.

5. Upon receipt of Defendants' list of search terms, Plaintiff's third-party electronic discovery provider will immediately apply Defendants' list of keywords and other searches on all of the extracted files and file fragments contained in Plaintiff's Computerized Information. On or before November 8, 2016 Within thirty days of the date of this Stipulation and Order, Plaintiff's third-party electronic discovery provider will export to CDs or DVDs a copy of the native format files and file fragments which were hit by such searches, together with extracted metadata as set forth below and will deliver such media to counsel for Plaintiff and Defendants. Plaintiff's third-party electronic discovery provider will concurrently deliver to counsel for Plaintiff and Defendants a report (i) detailing the results of its searches, (ii) listing the file types for all files hit by the searches, with the file extensions and number of files for each, and (iii) stating whether or not it found evidence of the use of a drive-wiping utility on any of the hard drive(s) of Plaintiff's computer(s).

**Extracted Metadata Fields for Plaintiff's Native File Format Production**

| Field | Sample Data | Comment |
|---|---|---|
| BegProduction [Key Value] | ABC000001 | Beginning production number |
| EndBates | ABC000008 | Ending production number |
| BegAttach | ABC000009 | Beginning production number of parent document in a family |
| EndAttach | ABC000015 | Ending production number of last page of the last attachment in a family |
| FileName | Document1.doc | Name of original electronic file as collected. |
| Custodian | Smith, John | Email: mailbox where the email resided Native: Individual from whom the document originated |

| Extracted Metadata Fields for Plaintiff's Native File Format Production | | |
|---|---|---|
| **Field** | **Sample Data** | **Comment** |
| EmailSubject | "In response to your inquiry" | "Subject" field extracted from email message |
| From | John Smith | "From" field extracted from email message |
| To | John Smith | "To" field extracted from email message |
| Cc | John Smith | "Cc" or "carbon copy" field extracted from email message |
| Bcc | John Smith | "Bcc" or "blind carbon copy" field extracted from email message |
| DateRcvd | 1/1/2000 | Received date of email message (mm/dd/yyyy format) |
| DateSent | 1/1/2000 | Sent date of email message (mm/dd/yyyy format) |
| DateModified | 1/1/2000 | Date that file was modified as extracted from file system metadata |
| Time Rcvd | 11:00 a.m. | Time email Rcvd as standardized |
| Time Sent | 11:00 a.m. | Time email Sent as standardized |
| FileExten | DOC | File extension for email or e-doc |
| TextPath | Text\001\ 001\ABC000001.txt | Path to *.txt file containing extracted or OCR text |
| NativeLink (only for those production volumes containing any documents produced in native form) | Natives\001\001\ABC 000001.xls | Path and file name for native file on production media |
| Date Created | 1/1/2000 | date document created |
| Record Type | E-mail; text message | Identifies E-Mail, E-Doc, or E-Mail Attachment |
| MD5hash | | MD5 hash value |
| Subject | | Native file subject |

6. Plaintiff's counsel will employ his best efforts to ensure that Plaintiff's third-party electronic discovery provider is readily available to Defendants' counsel and any designated agent of Defendants in order to obtain information as to the collection, processing, search and production of Plaintiff's Computerized Information under the terms of this Stipulation and Order.

6. (a). Defendants will produce electronic documents responsive to Plaintiff's September 6, 2016 document requests, subject to all appropriate objections.

things, whether in electronic, hard-copy, or any other form, that is subject to a claim of privilege or otherwise protected from disclosure, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a receiving party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the receiving party disclosed it before being notified; and may promptly present the information to the Court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

10. If any document produced by a party is on its face subject to a legally recognizable privilege or evidentiary protection, the receiving party shall: (a) refrain from reading the document any more closely than is necessary to ascertain that it is privileged; (b) immediately notify the producing party in writing that it has discovered documents believed



to be privileged or protected; and (c) where possible, return, sequester, or destroy all copies of such documents, along with any notes, abstracts or compilations of the content thereof.

11. If a producing party produces privileged information, documents or things, whether in electronic, hard-copy, or any other form, which it claims to be privileged or otherwise protected from disclosure, the disclosure of such information, documents or things, will not constitute or be deemed a waiver or forfeiture—in this or any other action or proceeding—of any claim of privilege or other protection from disclosure that the producing party would otherwise be entitled to assert with respect to the information, documents or things, and their subject matter.

12. On or before September 22, 2016, Plaintiff will file with the Court a complete copy of his untimely expert report with all documents referenced therein. (NYSCEF Doc. No. 90.) On or before September 22, 2016, Plaintiff will also file with the Court an affidavit of his expert, Donald Frangipani annexing a complete set of the documents referenced in his report in

14. Plaintiff shall appear for deposition on ~~November 6,~~ December 12 2016 at 10:30 a.m. at the offices of Duane Morris LLP, 1540 Broadway, New York, New York 10036. Plaintiff's deposition will be recorded by stenographic means and/or by audio/videotape and will continue from day-to-day until completed. Plaintiff's deposition may be adjourned to such date thereafter upon consent of the parties.

15. Plaintiff will produce his expert, Donald Frangipani, for deposition on ~~November~~ December 19 ~~X~~ 2016 at the offices of Duane Morris LLP, 1540 Broadway, New York, New York 10036. Mr. Frangipani's deposition will be recorded by stenographic means and/or by audio/videotape and will continue from day-to-day until completed. Mr. Frangipani's deposition may be adjourned to such date thereafter upon consent of the parties.

16. In the event that Plaintiff fails to timely comply with any of his discovery obligations set forth herein (except paragraphs 14 and 15 above), the Court will grant Defendants' motion to dismiss Plaintiff's Verified Complaint and strike the Verified Answer to Counterclaims, pursuant to N.Y. C.P.L.R. 3124 and 3126 in its entirety upon letter application by Defendants. Plaintiff shall have four business days to respond to Defendants' letter application, after which the Court will schedule a conference on Defendants' letter application.

17. Defendant Isaak Faivush shall appear for deposition on ~~December 12, 2016~~ January 12, 2017 at 10:30 a.m. at the offices of Duane Morris LLP, 1540 Broadway, New York, New York 10036, or at the Courthouse. Mr. Faivush's deposition will be recorded by stenographic means and/or by audio/videotape and will continue from day-to-day until completed. Mr. Faivush's deposition may be adjourned to such date thereafter upon consent of the parties.

18. Defendants will produce their expert, John Paul Osborn, for deposition on ~~December 19, 2016~~ at the offices of Duane Morris LLP, 1540 Broadway, New York, New York

January 19, 2017

10036. Mr. Osborn's deposition will be recorded by stenographic means and/or by audio/videotape and will continue from day-to-day until completed. Mr. Osborn's deposition may be adjourned to such date thereafter upon consent of the parties.

19. Plaintiff agrees to pay the reasonable costs of attendance and preparation for Mr. Osborn's deposition in advance of the deposition.

20. A compliance conference shall be held on ~~October 27, 2016~~ November 17, 2016 at 9:30 a.m.

21. The end date for all disclosure is January ~~15, 2016~~ 31, 2017.

22. A note of issue/certificate of readiness shall be filed on or before ~~January 31,~~ February 15, 2017.

23. Any dispositive motion shall be made on or before March 31, 2017.

Dated: September 15, 2016

MICHAEL A. DROBENARE

By: ______________________
Michael A. Drobenare
2203 Avenue X
Brooklyn, New York 11235
Phone: (718) 797-3030
Fax: (718) 648-0128
Email: mikedro1@yahoo.com

*Attorney for Plaintiff*

DUANE MORRIS LLP

By: ______________________
Anthony J. Costantini
Ralph Carter
1540 Broadway
New York, New York 10036
Phone: (212) 692-1000
Email: ajcostantini@duanemorris.com
rcarter@duanemorris.com

*Attorneys for Defendants Westoil, Ltd. and Isaak Faivush*

**SO ORDERED:**

______________________
J.S.C **HON. SYLVIA G. ASH, JSC**

DM1\7066399.3



SDNY_00104709

Privalov, Veniamin 9/24/2021
For Educational Use Only



2017 WL 3047538 (N.Y.Sup.), 2017 N.Y. Slip Op. 31525(U) (Trial Order)
Supreme Court of New York.
Kings County

**1 DEL FORTE USA, INC., Plaintiffs,
v.
BLUE BEVERAGE GROUP, INC., Joseph Goldberger,
Joseph Menczer and The Kuzari Group LLC, Defendant(s).

No. 518454/2016.
July 18, 2017.

**Decision and Order**

Present: Hon. Sylvia G. Ash, Justice.

**At an IAS Term, Comm-11 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, at Civic Center, Brooklyn, New York, on the 17th day of July, 2017.**

**Mot. Seq. 1, 2**

| | *Papers Numbered* |
|---|---|
| *1 ***The following papers numbered 1 to 10 read herein***: | |
| Notice of Motion/Order to Show Cause/Petition/ Cross Motion and Affidavits (Affirmation) Annexed ____________________ | *1-5* |
| Opposing Affidavits (Affirmations) ____________________ | *6, 7* |
| Reply Affidavits (Affirmations) ____________________ | *8-10* |

Upon the foregoing papers, Plaintiff's motion, brought by order to show cause, for a preliminary injunction pursuant to Debtor and Creditor Law ("DCL") 9279 enjoining Defendant BLUE BEVERAGE GROUP, INC. ("Blue Beverage"), from selling its assets to Defendant THE KUZARI GROUP, LLC ("Kuzari Group"), unless $500,000.00 is placed in escrow; appointing a receiver over Blue Beverage and its assets; or, in the alternative, for an order of attachment pursuant to CPLR 96201 attaching at least $500,000.00 from the proceeds of the sale of Blue Beverage's assets to Kuzari Group, is hereby DENIED.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

The motion by Defendants, Blue Beverage, JOSEPH GOLDBERGER ("Goldberger"), and JOSEPH MENCZER ("Menczer") (collectively the "Blue Beverage Defendants"), also brought by order to show cause, for a preliminary injunction enjoining Plaintiff and its agents from destroying, secreting, removing, damaging, changing or modifying any paper or electronic records relating to its account payable records is GRANTED to the extent that all parties herein are under an obligation ****2** to preserve physical and electronic records relevant to the claims and defenses in this case irrespective of whether a motion is made for such, and further, that a preliminary conference shall be held on **September 14, 2017**, at 10:00 a.m. in Room 541, to address discovery but that the motion is otherwise denied.

Plaintiff, DEL FORTE USA, INC., manufactures and sells cold coffee beverages in the New York metropolitan area. Blue Beverage, owned by Goldberger and Menczer, is one of only four facilities in the United States that has a post-closure, retort operation in which beverages are made sterile by processing aluminum cans at high heat. According to Plaintiff, the retort process enables beverages containing milk to remain on retail shelves unrefrigerated for about a year. Plaintiff brings this action against the Blue Beverage Defendants alleging, among other things, breach of contract and fraudulent inducement for Blue Beverage's alleged failure to carry out the retort process for Plaintiff's coffee beverages and falsely assuring that it could cure its deficient retort process. Based on Blue Beverage's alleged failures, Plaintiff asserts that it has sustained direct and consequential damages in excess of $500,000.00.

According to Plaintiff, Blue Beverage is insolvent and its assets are to be sold to Kuzari Group. Plaintiff proffers no less than nine separate complaints from various companies or individuals seeking money damages against the Blue Beverage Defendants. Plaintiff also alleges that Blue Beverage has encumbered its assets with collusive judgments filed by insiders including, but not limited to, a judgment in the amount of $6,098,210.20 recorded by Goldberger's wife. Plaintiff further alleges that Blue Beverage failed to pay multiple creditors resulting in numerous lawsuits and judgments. It is Plaintiff's position that, by favoring insiders with collusive judgments, the Blue Beverage Defendants have engaged in fraudulent conveyances and have demonstrated an intent to defraud creditors and frustrate a judgment that should be rendered in Plaintiff's favor. By reason of the foregoing, Plaintiff argues that it is entitled to an order of attachment pursuant to CPLR § 6201[3] attaching the sum of at least $500,000.00 of any sale proceeds paid by Kuzari Group and/or an order restraining Blue Beverage Defendants from selling its assets unless at least $500,000.00 of the sale proceeds is deposited in escrow for the purpose of paying genuine creditors pursuant to DCL 9279. Plaintiff also seeks the appointment of a receiver for Blue Beverage pursuant to DCL 9279.

***2** In response, the Blue Beverage Defendants state that Kuzari Group are investors contemplating investing in and then acquiring Blue Beverage as indicated by Kuzari Group's letter of intent which reflects that it seeks to acquire 60% of Blue Beverage's common and preferred shares ****3** for total consideration of $5 million in preferred capital. Blue Beverage Defendants argue that Kuzari Group's investment results in zero harm to Plaintiff who may continue to litigate its routine breach of contract claim. Blue Beverage Defendants further argue that Plaintiff is not, in any case, entitled to relief under CPLR 96201 or the DCL because Plaintiff has not satisfied its burden with regards to any claim of fraud or intent to defraud by Blue Beverage.

In order to be granted an order of attachment under CPLR 96201 [3], a "plaintiff must demonstrate that the defendant has concealed or is about to conceal property in one or more of several enumerated ways, and has acted or will act with the intent to defraud creditors, or to frustrate the enforcement of a judgment that might be rendered in favor of the plaintiff (*Benedict v Browne*, 289 AD2d 433, 433 [2d Dept 2001]). "Attachment is a provisional remedy designed to secure a debt by preliminary levy upon the property of the debtor to conserve it for eventual execution, and the courts have strictly construed the attachment statute in favor of those against whom it may be employed" (*Hume v 1 Prospect Park ALF, LLC*, 137 AD3d 1080, 1081 [2d Dept 2016]). Accordingly, fraud is not lightly inferred, and the intent to defraud creditors may not be presumed from the mere disposition or removal of property (*see Maitrejean v Levon Properties Corp.*, 45 AD2d 1020, 1020 [2d Dept 1974]).

Under DCL 9279, where a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not matured, the creditor may proceed in a court of competent jurisdiction against any person against whom he could have proceeded had his claim matured, and the court may, (a) restrain the defendant from disposing of his property; (b) appoint a receiver to take charge of the property; (c) set aside the conveyance or annul the obligation; or (d) make any order which the circumstances of the case may require. DCL 9276 provides that "[e]very conveyance made and every obligation incurred with actual intent... to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."; Because direct evidence of fraudulent intent is often elusive, courts consider certain "badges of fraud," the presence of which give rise to an inference of intent (*see* *Dempster v Overview Equities*, 4 AD3d 495, 498 [2d Dept 2004]). Badges of fraud include: (1) a close relationship between the parties to the transfer; (2) the inadequacy of consideration; (3) the transferor's knowledge of the creditor's claims and the transferor's inability to pay them; (4) the retention of control of the property by the transferor after the conveyance; (5) the fact that the transferred property was the only asset sufficient to pay the transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or ****4** course of conduct by the transferor after it incurred its obligation to the creditor (*see* *Cadle Co. v Organes Enters., Inc.*, 29 AD3d 927, 928 [2d Dept 2006]).

Here, upon consideration of the foregoing and the record before the Court, the Court finds that Plaintiff has not sufficiently satisfied its burden to obtain the relief that it seeks. Specifically, Plaintiff has not demonstrated that the Blue Beverage Defendants are entering into the subject transaction with the intent to defraud creditors. Plaintiff also fails to establish that $5 million constitutes inadequate consideration for what the Kuzari Group seeks to purchase from Blue Beverage and, further, what the value or worth of Blue Beverage is overall. Although Plaintiff provides plenty of evidence of potential judgment creditors of Blue Beverage, there is no evidence that the proposed transaction between the Kuzari Group and Blue Beverage is one that aims to defraud or frustrate potential creditors, nor is there any indication that the proposed sale will render Blue Beverage an "empty shell" of a corporation. Accordingly, the relief that Plaintiff seeks must be denied at this time.

***3** Accordingly, Plaintiff's motion is DENIED and the temporary restraining order granted by this Court's Order dated November 9, 2016, is hereby vacated. The Blue Beverage Defendants' motion for an injunction is granted to the extent granted herein and the parties are reminded to appear for a preliminary conference on **September 14, 2017**, at 10:00 a.m. in Room 541.

Any arguments not addressed explicitly herein were deemed to be without merit or procedurally improper.

This constitutes the Decision and Order of this Court.

**ENTER,**

<<signature>>

**Sylvia G. Ash, J.S.C.**

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Oral Argument

------------------------------x

New York, N.Y.
November 18, 2021
2:00 p.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN (appearing virtually)
NATHAN D. REILLY
JANIE C. BUCKLEY

(Case called)

MR. MARK: Good afternoon, your Honor. Eli Mark on behalf of the government. With me at counsel table is Jonathan Rebold of our office as well as Special Assistant U.S. Attorney Alona Katz.

THE COURT: Good afternoon.

Ms. Cohen, do you hear us?

MS. COHEN: Yes, your Honor. Good afternoon. Carrie Cohen for the defendant Sylvia Ash. Thank you for permitting me to appear virtually.

THE COURT: Yes. Look, I'm sorry it turned out that we needed to do it that way. I don't know how it happened that the order setting this down for argument never got on ECF, but it just didn't, and that was on our end.

OK. I want to deal with the *in limine* motions. I want to deal with the vaccination question as it relates to jury selection, and at the end, I will get a little insight from all of you about likely trial duration more reliably than I had a lot earlier.

I think the best way to do this on the *in limine* motions will be issue by issue instead of listening to an extensive presentation on one side on all the issues and then having the other side try to answer everything.

I'm just going to start with the table of contents in the memorandum submitted by the government in support of its

motion *in limine*, and we'll go through the issues in that order, and then we'll pick up issues that are raised in the table of contents to the defendant's memorandum. And there is overlap, and I understand that a couple of these things have dropped out.

We'll start with the subject of evidence of the defendant's receipt of benefits from MCU and Mr. Wong, and I think we'll hear from Mr. Mark first.

MR. MARK: Thank you, your Honor.

We litigated this quite a bit, and so I really don't want to belabor the issue since we both briefed it affirmatively in moving to admit it as well as responded to the defendant's motion seeking to preclude it.

The evidence here is admissible for multiple reasons, particularly the evidence of the defendant's receipt of benefits, and I'm using that term broadly, from the Municipal Credit Union as well as Kam Wong is direct evidence of the defendant's crime. She's charged with multiple offenses, including concerning deletion and concealment of relevant evidence in response to grand jury subpoenas.

In particular, one of the grand jury subpoenas requested all documents regarding items of value received from Kam Wong and MCU. That was one of the many categories that are requested there, and so evidence on this topic would be, includes materials that were concealed in response to that

grand jury subpoena.

The evidence related to benefits also is direct evidence --

THE COURT: Yes, but the simple fact that evidence responsive to that subpoena is in the documents doesn't in and of itself make it direct evidence of the crime of withholding it, right?

MR. MARK: Well, there's two parts, your Honor, and I think you're -- let's say bank records are being withheld, right, or concealed? One is the bank records themselves are evidence that should come in. Then I think your Honor's asking a second question, what did those bank records reflect; what is the nature of the money that she received and whether that should come in as well. Am I right that I'm going to the --

THE COURT: Essentially.

MR. MARK: And there, it's critically important to tell the whole story of what those, the documents are that are being withheld and the nature, critically, of the relationship between the defendant, Sylvia Ash, and Kam Wong, who is her coconspirator, who elicited her assistance in obstructing the investigation. And it's critically important to understand the nature of that relationship and the items of value that she received from him, both in the period of time when she was a board member and then the chairman of the board, including after she resigned, which is a matter of other motions *in*

*limine*.

But after she resigned, because there was a direct conflict, she continued to receive benefits from MCU and Kam Wong, and there was a particular exchange, receipts of multiple benefits right around the time that the defendant joined the conspiracy to obstruct the federal investigation. So it critically goes to the relationship between Kam Wong and Sylvia Ash, why he would turn to her in order to solicit her assistance, for instance, with signing a false memorandum that went to the government.

THE COURT: Well, is there going to be evidence that he solicited the actions or failure to act that she personally is responsible for? You have evidence that Wong induced her to do that?

MR. MARK: So, there's two parts, your Honor. One is the background to the conspiracy, right, which is the nature of the relationship between the two?

THE COURT: Right.

MR. MARK: And the second is, obviously, the details relating to the, right around the meeting of the minds happened, and at that critical point in time, as we briefed, there are several benefits that are offered to Ms. Ash.

THE COURT: Offered by Wong.

MR. MARK: Offered by Kam Wong himself. One is an iPhone X that the defendant wanted. It came with some AirPods.

This was 2018. An iPhone actually was a big deal at this point in time.

THE COURT: Who can remember that far back?

MR. MARK: I know, the prepandemic years seem like a lifetime ago.

So, those were offered right around that same time.

There was also, the defendant had wanted a large donation to a charity that she was affiliated with, and right before the defendant -- right before Kam Wong asked her to sign the memo, this false memo that went to the government, he agreed to a request for a large charitable donation, $25,000, that MCU would give to a charity that the defendant wanted.

So those are right around the time of her signing the memo. And then there's other things of benefit to the defendant that she received, like tickets for a Brooklyn Nets game, which in order to understand those, you have to understand the context of the relationship that the defendant had with Mr. Wong in the sense that she received 40 tickets and -- from him over a long period of time. She would want tickets for sporting events and go to him, asking for them. Those would be tickets to MCU Park, which was where the Brooklyn Cyclones played for many years. It was initially sponsored by MCU. It's no longer sponsored by MCU, but she would go there. She would spend her birthday there, and she would ask for other sporting events, like the U.S. Open.

So it's necessary to show that the meaningful impact of what those exchange of benefits were during the conspiracy and understand the relationship between Sylvia Ash and Kam Wong.

THE COURT: I may be the last person in the room not to know the answer to this question, but is Wong going to be a witness in this case?

MR. MARK: Mr. Wong is currently incarcerated and serving a sentence for embezzlement, and obviously, the relevant conduct there was the obstruction scheme that Ms. Ash is charged with.

Additionally -- we didn't talk about this -- this is direct evidence; it also goes to 404(b) purposes, such as intent, motive, there was absence of mistake. And those go to, critically, inform the defendant's conduct in making false statements to the government, to agreeing to concealing materials. And those were adequately briefed. I can obviously expound on them more, but I think we directly addressed them in our papers.

THE COURT: OK.

Let me please hear from Ms. Cohen.

MS. COHEN: Thank you, your Honor.

I think my colleague, Nathan Reilly, was going to argue this point.

THE COURT: All right.

MS. COHEN: I would just ask before he did that, the government, there were other things of value that the government alleged Ms. Ash received from being on the board or from the board, which are different from received directly from Kam Wong, and I'm wondering if the government, because they did not mention those benefits in their presentation today, is no longer trying to admit evidence of benefits that Ms. Ash received while she was on the board, the things they called benefits.

THE COURT: I'm sorry. I don't understand what you are --

MS. COHEN: Sure.

MR. MARK: Are you asking something or are you deferring?

MS. COHEN: I'm asking for the government to clarify whether they are no longer seeking to admit at trial evidence that Ms. Ash, when she served on the board, had certain personal expenses reimbursed by the board, such as her internet and cable service, and there was an annual board trip for which all the board members went and were reimbursed their expenses for. And I did not hear that, those two things listed as the type and the benefits that the government would want to seek to admit at trial (inaudible) or as 404(b).

THE COURT: Thank you.

Mr. Mark, what's the answer?

MR. MARK: Your Honor, we seek to admit all of the materials that we talked about in our papers. We stand by that. I can obviously go into more detail as to the particular relevance.

THE COURT: So the short answer is no, you're not dropping that.

MR. MARK: The short answer is no.

THE COURT: Then, Ms. Cohen or Mr. Reilly.

MR. REILLY: Thank you, your Honor.

Ms. Cohen started out --

THE COURT: I think we'll do better at the lectern.

MR. REILLY: The lectern. Yes, your Honor. OK.

THE COURT: Everything's a challenge with the masks.

MR. REILLY: Thank you, your Honor.

So, I think Ms. Cohen started down the road, which is an important, an important distinction, and I know that the Court wants to take it issue by issue, although I think these matters bleed over a little bit.

THE COURT: They do.

MR. REILLY: I think Ms. Ash's concern with respect to particularly the historical items, things like the annual or biannual provision of Apple devices to members of the board or trips to conferences for the MCU is -- the government has sought both to offer that but to preclude, for instance, any reference to the fact that other board members who were

similarly situated to Ms. Ash received those items. And we think that that leads to a significant misimpression with the jury, your Honor, in that it is, it will appear as if Ms. Ash was receiving these items from Mr. Wong or from the MCU at Mr. Wong's direction in a vacuum, or that she was in somehow, that this was the product of a special relationship between them. And I think particularly with respect to the historical items, obviously Ms. Ash was on the board for a number of years and, in fact, left the board two years before the charged conduct. Our belief is that the presentation of this evidence will be highly prejudicial and not probative to the relationship with Mr. Wong specifically because it was sort of part and parcel of what was received by the board.

THE COURT: Do you want to address that, Mr. Mark?

MR. MARK: Well, your Honor, first of all, the government doesn't seek to have its cake and eat it too. What the government sought is that to the extent that introduction of evidence related to other board members is irrelevant and there's no proffered basis for it -- and we acknowledge that there could be a particular evidentiary foundation for it, that could be proper. But largely, as your Honor knows, that just because somebody else received something doesn't mean that what the defendant received was appropriate. And there's some things we don't dispute from the defendant, that some items she got from MCU while Kam Wong was CEO are items that other people

got too. Those were obviously called for by the subpoenas. But then there's other things that she received and others didn't receive, so she is both similar to other people and she's also unique.

THE COURT: Right. But what I'm hearing from Mr. Reilly is that to the extent she received things that, shorthand, everybody got as directors, there's something to his point that if you offered that as against Ash to show the relationship, the motive, and so forth, without letting them go into the fact that everybody got particular types of benefits -- cell phones, for example -- it creates a misimpression.

MR. MARK: Your Honor, I think that there's a number of things at play to what you're saying, and we're not trying to seek to create any sort of the misimpression.

THE COURT: I'm not suggesting that that's your purpose. I'm suggesting that maybe it could be the effect.

MR. MARK: I understand that.

So, at MCU, as a relevant point in this case, there were a lot of problems at MCU, including oversight by the board, and the whole board during the course of this obstruction scheme was relieved of their obligations, and in fact, because -- so there were broad systemic issues with the board at MCU.

THE COURT: And this is not the only MCU in the city

as to which that was true.

MR. MARK: Yes, your Honor. That is correct.

So, we acknowledge that, and we don't seek to create a misimpression. In fact, the defendant herself authorized other people's expenditures at the time when she was chair. This is all part of what, you know, of what the defendant --

THE COURT: Is there anything she got that other directors got that she didn't authorize?

MR. MARK: You're saying is there anything -- I just want to understand the question. Is there anything she received that others didn't receive or that --

THE COURT: No. We've got several possible categories here, right? There's stuff everybody received and she had nothing to do with the decision-making with respect to the fact that all of the directors or most of the directors got benefit No. 1. OK? Now, that puts Mr. Reilly's point in the sharpest relief. In that circumstance, just to put in evidence that she received a cell phone and to foreclose the defense from showing that all the directors got cell phones may have an unfair prejudicial effect.

Now, let's go to the next category, and there may be other categories in between. You've got things that Wong may have approved for all the directors. Then you've got a category in which Ms. Ash approved things for herself and other directors. Now, let's break it down and let's address it one

by one.

MR. MARK: OK. So, let me start where your Honor started, which is cell phones. OK?

Is that all right?

THE COURT: It may be, but I didn't hear it.

MR. MARK: Oh, sorry. I said I'm happy to start where your Honor started, which is cell phones. Right? The defendant had not just her cell phone reimbursed but also her son's cell phone reimbursed by MCU. All right? Plainly personal, plainly inappropriate. That was something that --

THE COURT: Let's skip over the plainly inappropriate for a minute. We'll come back to that.

Did other members of the board get cell phones from MCU for themselves and family members?

MR. MARK: So, largely, they did not. There were -- she was not the only one who received something like that, but that was not something that was broadly provided to all of the board members by and authorized by Mr. Wong or MCU. And I want to go to two things. One is that that's particularly relevant, that he authorized that and that it got paid for. Two is --

THE COURT: Wong authorized, is that what you meant to say?

MR. MARK: I should say broadly relevant that she received that. I don't want to say that he particularly authorized that one as a particular example, but that was

authorized under -- by MCU. Obviously, he was the CEO of MCU at that time when she received that benefit, and it's relevant for two points, right, or multiple reasons?

One is it's relevant because documents related to her cell phone bills, right, are called for by the subpoena? And two, it's relevant for why those sorts of documents weren't broadly produced, because she understood -- obviously, the government's interpretation of and argument of the evidence is that those were personal expenses that she sought reimbursement from MCU. So that's, in particular, the cell phone, and as I said, that one is in sort of a category -- her full reimbursement of her cell phone and her son's cell phone distinguishes her from other board members. OK?

Should I move on from that one into another category?

THE COURT: Yes. And then we'll get back to Mr. Reilly.

I promise.

MR. REILLY: Thank you, your Honor.

MR. MARK: Second, and then I think this is sort of what was brought up by Mr. Reilly, are other benefits that board members broadly received from their service. I think Ms. Cohen brought up that there were trips that board members took. There were regular strategic planning trips that went to Las Vegas at the Wynn casino. There was also trips that board members, and this actually wasn't the only board member, took

either domestically or abroad that were paid for and reimbursed by MCU. And those are relevant, obviously, because we talked about -- there were, these related to the subpoena that was calling for this evidence, and too, they're relevant to, once again, why the defendant acted in the way that she acted.

THE COURT: Your position essentially is motive evidence.

MR. MARK: Well --

THE COURT: Look, the existence of a document showing the reimbursement and proof of her possession of the document at the time she was served with the subpoena and responded in whatever way she did to the subpoena but without turning over the documents, OK; that's proof of an element of the obstruction. But fundamentally, beyond the fact of existence, you're going for more. You're arguing that her motive in suppressing the documents is that MCU was a gravy train, she was on the gravy train, Wong was driving the gravy train, to the extent she wasn't herself, if indeed she ever was driving it, and she was covering that fact up. Yes?

MR. MARK: Yes, your Honor. That is a critical part of what we do plan to argue.

THE COURT: Right.

MR. MARK: And those are sort of all the 404(b) points as well as what is the fact, as you said, your Honor, of those benefits, and then I think there are a certain subcategory of

materials, which Wong specifically provided to the defendant --

THE COURT: OK.

MR. MARK: -- and the defendant solicited from him.

THE COURT: I got that. And your position with respect to the defense offering evidence that Ms. Ash was not the only passenger on the gravy train, that there were other directors who were too, is it doesn't matter. It doesn't matter that others were. It doesn't prove much, if anything, because the fact that one person is doing something wrong doesn't mean everybody can do the same thing.

To the extent you get into that, it doesn't help the government on her motive for not producing the documents pursuant to the subpoena. True?

MR. MARK: I don't think it doesn't help the government. I don't think, as you said, your Honor, each person's actions have to be informed particularly. And that's why when we made this motion, we sort of note that to the extent they call for an admissible basis as to others, there might be a reason that they could do so, but just the mere fact that somebody else is doing something wrong independently of what Ms. Ash is doing isn't relevant to the issues of her actions and her intentions.

THE COURT: OK. That's helpful. Thank you.

Back to you, Mr. Reilly.

MR. REILLY: Your Honor, I guess the first point I

would make is, and the government cites to the case law relating to the concept that, Well, listen, just because one person, just because ten people embezzled, that doesn't mean that it's OK that -- that doesn't excuse the person on trial from embezzlement. I think it's an important distinction here, which is to say the fundamental concept that anyone was doing anything wrong, listen, in hindsight, everybody know knows that the MCU had many, many, many problems and it's not simply limited to phones. Directors have children who were getting hired. People had housing allowances. Mr. Wong had, I think, three high-end luxury cars.

There's a host of issues that in 20/20 hindsight were enormously problematic. I think from Ms. Ash's point of view, the idea is to the extent that this is being offered to suggest that there was, she should have known in the front of her mind that this is all part of a nefarious scheme for Kam to keep her pliable, for Mr. Wong to keep her pliable, that is significantly undercut by the fact that basically all of the members of the board and MCU employees were receiving things of value and that -- and so when you're in that environment, it's not necessarily clear that this is not what the board is supposed to be doing.

THE COURT: Well, that's where, I think, you lose me, and the reason that I think you lose me, and I'll put it out there --

MR. REILLY: Sure.

THE COURT: -- and see what you have to say is really implicit in my characterization of the alleged circumstances as the gravy train with Wong in the locomotive. Everybody on the gravy train, in the government's estimation, had economic and other self-interests in seeing to it that what was going on at the credit union did not become known to authorities.

Now, it happened, the government suggests, in the case of Ms. Ash because she got the subpoena and she had, perhaps, a deeper or different kind or more extensive -- and I'm not suggesting anything salacious -- with Mr. Wong than some of the others, and she was a person of interest in the investigation of Wong and others may not have been. And I don't see how the fact that others were getting benefits really says anything at all about Ms. Ash's state of mind and motive. I don't see it.

What am I missing?

MR. REILLY: Your Honor, sure, and I take a step back to say that the reason that the government -- excuse me. The reason you're hearing -- I'm a recent transfer from the government, your Honor.

THE COURT: Everybody in these cases is.

MR. REILLY: The reason that Ms. Ash moved to preclude this evidence more generally is precisely so that we don't put in front of the jury a question that's -- this isn't an embezzlement case about who took what. Was this consistent

with fiduciary duties and just not a wise practice? Was it something deeper and more problematic and fraudulent, and how did Ms. Ash understand that as a result of whether the New York State not-for-profit laws or the bylaws of the MCU -- we think that it ends up being, quite frankly, a distracting sideshow, your Honor. And the reason --

THE COURT: I question whether we ever get there. That's got nothing to do with nothing or nothing to do with anything.

MR. REILLY: Well --

THE COURT: I think because whether it was a breach of fiduciary duty, it wasn't a breach of fiduciary duty, what the not-for-profit corporation law says, it's a sideshow because she's enjoying that flow of benefits. Whether it was lawful or not lawful matters relatively little. The juice was flowing, and she liked juice. That's the government's argument.

MR. REILLY: Your Honor, but I think that takes us back to the beginning of the argument, which is to say if it is then presented to the jury as if, to continue with the Court's analogy, she's the only person on the train, I think that fundamentally mischaracterizes the relationship with Mr. Wong. I mean part of why it's being offered is to suggest there is this background of their relationship, and it is one thing to be part of an institution where many individuals -- you don't think that the fact that you're getting, going to this planning

meeting, not to suggest that that's inappropriate, but that the planning meeting is in Las Vegas and you get a ticket there and so does everybody else on the board, it strikes me that if the jury is left with the impression that Ms. Ash is the only one who got that, that cuts -- that creates a very different impression than with respect to her relationship with Mr. Wong than would the fact that, Listen, this was just -- she was on the board. Was the board behaving suboptimally? Well, in retrospect, everybody believes yes. But at the time, there was no reason for her to think I'm being singled out for special treatment by Mr. Wong.

THE COURT: But her motive doesn't depend on her being singled out for special treatment. Her motive is dependent on the fact that she liked the benefits. And the fact that she didn't produce the documents to the grand jury --

MR. REILLY: Well --

THE COURT: Excuse me.

-- that evidence, the receipt of the benefits, is at least circumstantially probative of a belief on her part that there was something wrong with getting them.

MR. REILLY: I think that's where I respectfully disagree, your Honor, which is to say that I think the government's position is that she knew that this was improper, ergo, that was part of her rationale for hiding the benefits. And I think Ms. Ash's position is that that presenting that

evidence without context of other individuals receiving it makes it appear as if there's a motive to believe it was improper, which is not consistent with everyone else getting it.

Now, again -- so, I'll quit while I'm -- where I am.

THE COURT: There's no evidence that everybody else failed to comply with grand jury subpoenas, compliance with which would have revealed these facts.

MS. COHEN: Your Honor, if I could just jump in and try to put a finer point on your question?

THE COURT: Yes, but this will be the last time, because this is not a tag team wrestling match.

MS. COHEN: I appreciate that.

I'll take my lifeline now, because here, the government is saying that Ms. Ash lied to them or hid documents from them because she was fearful they would learn about the improper benefits. To the extent the benefits were not improper because they were the practice of the MCU and its board at the time has completely --

THE COURT: Let me interrupt for a minute.

The fact that they were the practice at MCU doesn't mean they weren't improper.

MS. COHEN: But it goes to Ms. Ash's state of mind as to whether she thought they were improper, and to the extent that was what the board members got as part of their board

service and that was the practice of the board, to receive these benefits, in her mind, she did not have criminal intent to hide anything, because --

THE COURT: This goes over into another point we're going to get to, and that is she's a lawyer. And lawyers pretty well understand that the payment by an employer of personal expenses is wrong unless it is a fully informed decision to do so, authorized by somebody who is unconflicted and has the power to authorize it.

Now, she is in that respect not similarly situated to everybody else, or at least to several of the others.

MS. COHEN: Well, your Honor, the defense has to be able to present a defense, and --

THE COURT: Well, I can understand that.

MS. COHEN: But letting the government parade a whole bunch of bad acts that have really very tangential, if any, relationship to the charged crime and then not allowing the defense to say she did not have a bad intent because she did not think there was anything bad about the benefits she received as part of being on the board, because that is how the board functioned, the defense has to be allowed to make those arguments, (inaudible) we can't present a defense because we can't (inaudible).

THE COURT: Of course you can present a defense. The hyperbole is well meant but unhelpful.

This sounds a lot like the defense in the NCAA basketball case, in which the argument was, on behalf of the defense, how could they have ever known that it was wrong to pay off prospective basketball stars and their families in circumstances where, quote, everybody knows that that's the way it's done in division 1 college basketball. And I pretty much kept that out, and the Court of Appeals affirmed that. So I'm not just off on an ice float here.

MS. COHEN: No, your Honor, but there's a critical difference here. That was against the rules. Here, the board rules allowed for the very expenses and gifts that were given to the board members, so it's actually the exact opposite.

THE COURT: What board rules? What board rules?

MS. COHEN: Board policy provided reimbursement to board members for the use of a phone. Every year, there was a holiday gift given to board members of a phone, or every other year, and an iPad. If stadium tickets weren't being used, board members could ask to use the seats in the box at the MCU field. These were part of (inaudible).

THE COURT: And who approved that policy?

MS. COHEN: The board and/or the CEO or the CFO, but it's not Ms. Ash, acting alone, unilaterally approving it. And for us not to be able to introduce that board policy either explicitly permitted it or did not expressly prohibit it and that that was the practice of the board, it negates her

criminal intent here.

THE COURT: Really? So if the MCU board --

MR. MARK: Your Honor --

THE COURT: Oh, did we lose you, Ms. Cohen? I fear we may have.

Oh, dear. Is Andy here?

No. Let's find Andy.

MR. REILLY: She's back, your Honor.

THE COURT: Oh, you're back.

MS. COHEN: I'm back.

THE COURT: OK. The hypothetical I was about to put to you is suppose that the board had adopted a resolution saying that whenever a board member is short of cash, she can go behind a teller's window and help him or herself to cash out of the teller's window. Now, do you think that would negate criminal intent here?

MS. COHEN: But your Honor, those aren't our facts. Our facts are about --

THE COURT: I know they're not, but I'm pressing the logic of your argument.

MS. COHEN: But I don't think it is, and I actually don't think that at all, because taking money from the teller is very different from there's an annual conference, strategic planning and all the board members go and it's paid for by the board. That is the trip that the government is referring to.

And as a holiday gift for being on the board, board members receive an iPad or a phone and board members have different expenses that they incur reimbursed.

THE COURT: Like the cost of a phone for a child.

MS. COHEN: There are a lot of children, brothers, siblings, all sorts of family members who got benefits paid for by the MCU. The fact that the MCU went into receivership, the fact that the New York Attorney General's Office might not like how the board was run from a not-for-profit board governance standpoint, I mean if this evidence comes in, your Honor, we'll spend a week talking about board governance and fiduciary duties, none of which has anything to do with whether Ms. Ash lied to the government about the memo or deleted emails that were called for by a grand jury subpoena. And if the government wants to go down the road of how the board operated and if right is wrong and why all these people got benefits they shouldn't have gotten, we have to be able to say that was not why Ms. Ash lied to you because that was how the board ran. And she did not think there was anything wrong with it because that's how it ran. It's quite different from taking money from a teller, your Honor.

THE COURT: Maybe not.

I'll let Mr. Reilly finish, and then I'll have something to say about this.

MR. REILLY: We'll rest there, your Honor.

THE COURT: OK.

The evidence that the government is proffering here comes in. I will reserve decision, at least for now, on what, if anything, the defense will be permitted to offer. I think I may be a lot better informed later on, maybe as late as the end of the government's case. And so in the absence of a favorable ruling from me to the defense on this point, the defense is not to open on the everybody-else-did-it theory.

OK. The second item is concealment of benefits received from MCU on the annual financial disclosure forms.

Mr. Mark.

MR. MARK: Yes, your Honor.

So, a lot of these motions are sort of tied up similarly, and so the one thing I just want to highlight, and I think your Honor mentioned it, in the context of all of our discussions, is that the defendant had multiple motives here that what the proffered evidence goes to, right, it obviously goes to, we talked a fair bit about, you know, assisting Wong and that relationship. But she also, as we have been really talking about, is she had an economic self-interest here and that she had an interest in the investigation essentially not proceeding, and there's a lot of text messages and emails that go to that. And the reason is, is because whether it was proper or improper, consistent with policy or not, these benefits were something that she received and, we argue, she

knew were wrongful because of who she was and the nature of the benefits, and they're wrongful as reflected by the fact that she was concealing them on her financial disclosure forms that she filed year after year. So this evidence is direct evidence of the defendant's not just concealment of evidence, but it's relevant to why she lied and why she attempted to thwart the government's investigation.

THE COURT: OK. Thank you.

Is this yours, Ms. Cohen, or is this Mr. Reilly?

MS. COHEN: It is mine, your Honor.

So, on this point, there is not one email, one text, anything, where Ms. Ash or anyone else talks about, Uh-oh, I never disclosed these benefits on the judicial disclosure. And whether or not she should have disclosed it on the judicial disclosure form requires you to interpret the form. It requires you to understand what it calls for on the form, and as we all know, the state forms are not a model of clarity. There are many arguments --

THE COURT: We don't all know that, because I've never laid eyes on one.

MS. COHEN: Sorry. I know this from having laid eyes on it and litigated it many different times both in the state and when I was with the federal government, and the forms are not, I would proffer to you, your Honor, or submit to you, a model of clarity in the questioning. And whether or not she

should have disclosed it on the form, or not, is an open question. And it is a question that is not -- she's not charged there with a false filing. She is not charged with lying on a public document. Those are all state court charges.

She is charged with lying to the government. She is not charged with her judicial disclosure form, and the reason the government wants to get it in is also because it makes her look bad. It makes her look like a liar. It is wildly prejudicial. It is conceivably worse than the conduct with which she is charged.

It is going to confuse the jury. It is going to require us to put on a lot of evidence about the forms and to interpret the forms and what do other judges put on the forms and do they all disclose gifts on the phone if they get phone and a holiday gift? I mean we could go down a very big rabbit hole.

THE COURT: You can be sure we're not going down a very big rabbit hole. What other judges do and all of that seems to me irrelevant. You have a form. If the state system is anything like the federal system, there is probably an instruction sheet or some equivalent. Maybe there isn't, but there's a form, and there is possibly some instruction, and there is her answer. And there is the fact, whatever the fact turns out to be. And it will be up to the jury to decide whether the form was ambiguous, whether the failure to disclose

there means anything. And the fact that 175 other people might have come to different conclusions is not a place we're going to go, nor is expert testimony or anything like that.

MS. COHEN: But your Honor, would we be -- I mean we have -- the defense has to be able to present evidence to the jury that the form by people who are charged with interpreting those forms is, A, they don't get instruction or the instruction they get is not clear, or B, it wasn't called for. I mean to your point exactly, your Honor, we would then have to present, I think, multiple witnesses about whether or not -- what instructions Ms. Ash got about how to fill out the form, to your point; whether the form -- what does the form language mean? How is it interpreted?

I mean that's all very relevant if the reason they're putting it in, as your Honor just said, is to say the form is unambiguous, she didn't disclose it, and that's the fact. But I don't think that is the fact, and at least we would be entitled to put on evidence and cross-examine their witnesses, if they call any on this, but put on our own evidence that the form, in fact, is not clear and that the judges don't get instructions.

THE COURT: Look, right now, the question is is it coming in on the government's case? The answer to that is yes. You're urging me not to allow it because if I allow it, you're going to try and bring down the parade of horribles. And maybe

you will and maybe you won't, but at least for the moment, I don't have to decide that to decide the issue I'm deciding now. We may get to that issue later today or we may get to it at trial, but we'll keep going down the list.

OK. The next item is the circumstances of Ms. Ash's resignation from the board and the complaint filed against her.

Just to spare any possible misunderstanding, assuming for the sake of argument I ultimately conclude that the misconduct complaint comes in, it surely is not going to come in as evidence of the proof of misconduct. It would come in as an event that happened, that arguably precipitated her resignation after more than a year had passed following her having been told she had to get off.

Now, it would be not for the jury to decide whether whoever told her to get off was right or wrong. It will not be for the jury to decide whether the misconduct complaint was well-founded or not. The jury will simply consider the circumstances for what they say with respect to the crimes charged.

Who is going to address it?

Now, that's the way I see it now, but I'll certainly hear the defendant on that point, on the broader point about whether it should come in at all.

MS. COHEN: So, this really should not come into evidence at all, even in the limited way you describe. Even if

you take the limited way you describe, the fact that the event happened, the fact that she resigned from the board is a fact we could stipulate to with a date. The reasons surrounding it are purely and highly prejudicial, and there is just a huge danger that the jury will use the facts surrounding the why and the complaint to conclude that Ms. Ash is a bad person, who lied, and it is just so wildly prejudicial. And there's no reason -- the relevance is also so minimal.

The point that she resigned, we can stipulate to that, I don't know why the context of it or the complaint or the decision -- there was no decision, actually, so it's also highly prejudicial. There was a complaint, and she agreed to resign. And the discussions with the judicial commission and what the judicial commission thought about it, again, is all going to be wildly confusing to the jury. The jury is now going to have her judicial form that the government's going to say is unambiguous and she failed to disclose it, so she lied about that. She was asked to resign.

They're going to paint her as this horrible, corrupt judge, and she is not charged with being a corrupt judge. She is not being charged with any conduct she did on the bench, and yet this trial is, I am very afraid, turning into an indictment of her on the bench and indictment of her board service rather than a trial about the facts, about what did she tell the government and what did she delete or not delete from her email

after receipt of a grand jury subpoena.

THE COURT: Mr. Mark.

MR. MARK: Thank you.

Well, your Honor, one of the things that Ms. Cohen said this trial is about is about false statements, and this goes directly to a false statement that she made, to two false statements she made during two particular interviews related to the circumstances of her resignation from the board. And the fact that she did make those lies, obviously we need to be able to prove that those were lies, and too, the fact that why she lied is clearly reflective of the fact that she understood the wrongfulness of her conduct, and it's reflective of all of her motive that we've been talking about in order to obstruct the investigation. And obviously to the extent that Ms. Cohen says that this case is not about, you know, violations, I mean, of judicial ethics and things like that, those can all be very simply addressed by limiting instructions, as we noted in our briefing.

THE COURT: And I would anticipate that I would address them right at the start of the trial, in the preliminary instructions, just as I instructed the jury in the basketball case, right at the outset, that the case was not about a violation of the NCAA rules. That was not the issue, and in my view, the jury followed that instruction.

MR. MARK: I agree, your Honor, having litigated that

case before your Honor.

THE COURT: I'd forgotten that.

MR. MARK: Both parties both agreed to those instructions and both parties thought that those were appropriate in that particular case.

THE COURT: And I would expect, Ms. Cohen, that you and the government ought to be able to agree on a comparable instruction for this case. I understand that it's an important issue for you, and I understand that you're absolutely right in saying that she's not being prosecuted here for misconduct in her capacity as a sitting judge. No question about that. And the jury should be told that in explicit terms, and I will. And if you can agree on an instruction, you would save me the effort, and I'd be appreciative.

MS. COHEN: Well, your Honor, I am sure the government and the defense can agree on an instruction, except, your Honor, this is very different from the case, the basketball case in that, there, the rules were -- all that was very essential to the charged crime. Here, whether or not she should have recused herself or should have stepped off the board earlier as a matter of judicial ethics is not related to the charged crime, really, in any way, and it is just being introduced -- well, I'm not going to put it that way, but I am certainly concerned that the jury, no matter what limiting instruction they get, because it does not need to come in,

there's no reason it has to come in, it is not relevant, it does not provide background. It's relevant that she was on the board, that she resigned from the board and the date, if the date is relevant for the government, that's relevant. But the circumstances surrounding it do not relate to the charged crime. They're not even contemporaneous in time with the charged crime.

THE COURT: OK. I have your point. Thank you.

The next item is the income tax point.

Now, Mr. Mark, this one bothers me some, and I want to understand how complicated the tax piece of this is.

You can rest, Mr. Reilly, for now. Or is this going to be yours?

MR. REILLY: It is mine.

THE COURT: Well, you can suit yourself, then. You can stand or sit, as you wish.

Mr. Mark.

MR. MARK: Sure, your Honor.

This is rather straightforward, and the government doesn't intend to spend much time on this point because it is rather straightforward. The conduct here, very simply, is that -- well, the conduct is that she concealed the tax returns, right? And then --

THE COURT: She concealed the tax return.

MR. MARK: The tax returns and then 1099 forms that,

you know, we argue were called for by the subpoena because they related to items of value that she received from MCU. So as a factual basis, she received 1099 forms for compensation from MCU for years that were called for.

THE COURT: But I thought the point we were on was tax returns.

MR. MARK: Oh, sorry. I was just trying to give the background facts.

THE COURT: OK. So let's get the background facts. That's fine.

MR. MARK: Oh. Yes, your Honor.

THE COURT: She got 1099s.

MR. MARK: She got 1099s. She filed returns that, on her schedule C, which is normally for, you know, a profit or loss from a business. She declared that income, but then what she did is she deducted all of that income, saying that she had expenses against that, which she didn't. Right? Because all of her expenses are reimbursed by MCU, so she avoided taxes on that.

THE COURT: Well, do we know that whatever deductions she took on schedule C are, each and every one of them, an expense that she was reimbursed by the credit union?

MR. MARK: So, the documents, right, you know, are that she received, let's say, $8,000 one year and she wrote off all of the $8,000 as expenses.

THE COURT: But I don't understand how that works. She wrote it off as expenses. She has to say I had gross revenues of $8,000, and then she has to itemize expenses. Right?

MR. MARK: You don't understand how it works because it doesn't make sense, essentially, because she wrote off her -- all of that income as travel expenses even though travel expenses are what's, you know, reimbursed by MCU.

THE COURT: But I do understand how it works.

MR. MARK: OK. Sorry, your Honor.

THE COURT: If somebody is, for argument's sake, doing consulting work for some company, the consulting, unless they're incorporated or something, the client company is going to pay them a fee, not to be confused, $10,000 for the year, and they're going to issue a 1099. Am I right so far?

MR. MARK: Completely right, your Honor.

THE COURT: OK. And now the consultant says, Well, I had to fly to Cleveland in March, and that was a $500 item, and I had to go somewhere else in May, and that was another $1,500, and so I've got $2,000 of those expenses, and then I had to buy a computer to type the report on, and that's 2,000 more. There's 4,000. And so your net income or loss at the bottom of schedule C is, in that hypothetical, $6,000. Right?

MR. MARK: Yes, your Honor.

THE COURT: OK. So what did she do?

MR. MARK: What did she do? Her position's different from the consultant because the consultant has the business. Here, it's a volunteer position, where it's uncompensated, but there's certain types of benefits that MCU, under, you know, under the law, characterized as compensation, and that's what they gave a 1099 for.

THE COURT: OK. So they gave her a 1099. How did MCU compute the amount of the 1099?

MR. MARK: The way they compute that amount has to do with their treatment of certain travel reimbursements that they pay for.

THE COURT: OK. And so the government's proof on this point will be the 1099, a witness to establish where the number on the 1099 came from -- yes?

MR. MARK: Yes.

THE COURT: And a witness, probably the same witness, who will say everything we put in the 1099 we actually reimbursed her for, and whatever she listed as deductions is something we already paid her; yes?

MR. MARK: Yes. That would be the intention. I mean I'm not going to say that the person who knows what the 1099 reflects knows what's in her head as to why she put the deductions.

THE COURT: We're not getting into her head. There's got to be something on the piece of paper, right?

MR. MARK: Exactly. It's the piece of paper -- what's this 1099 for? The 1099's for travel expenses that have to be considered as 1099 travel reimbursement as opposed to ones that we don't have to give a 1099.

THE COURT: And in the section of the schedule C that she filed, she indicates a number. Does the number match exactly the income on the 1099?

MR. MARK: It does. That's why we don't need --

(Indiscernible overlap)

MR. MARK: That's why we don't need testimony on it, because it matches exactly.

THE COURT: You don't know. What's the explanation on the 1099 as to what that number is in the position on the 1099 where it's deducted against the revenue?

MR. MARK: It says travel expenses.

(Indiscernible overlap)

MR. MARK: So that's self-explanatory. Right.

THE COURT: Well, yes, maybe so, and maybe not.

MR. MARK: Correct.

THE COURT: Maybe she's anything in her head some other travel expenses that weren't reimbursed. How are you going to prove beyond a reasonable doubt that's not what happened?

MR. MARK: Well, I think, there, your Honor is sort of going towards -- I mean I think we can present a witness who

can say, you know, the basis of why that form was filled out the way it was filled out, because she had this --

THE COURT: What witness can that be?

MR. MARK: She had the assistance of somebody else to fill out her forms. Right?

THE COURT: Did the paid preparer sign the form?

MR. MARK: The paid preparer did not sign the form, but she had the assistance of somebody who did fill out tax returns generally for her as a favor.

THE COURT: And do you know who that person is and are going to call that person?

MR. MARK: Your Honor, we definitely can call that person. Obviously it's going to be -- we're trying to minimize the evidence we present here, but we are going to -- we definitely can call that witness, who would be able to testify as to that, as to that fact. And I don't want to sort of say, because we're talking about length of trial -- part of it is this is rather straightforward, but there is a witness who would be able to say why the tax form was filled out in the way it was filled out. And that was based on the defendant's --

THE COURT: And this is going to be the witness testifying as to what information the witness was given by the defendant, right?

MR. MARK: Correct, your Honor.

THE COURT: I don't think I'm in a position to rule on

this now. We'll see what happens at trial.

MR. MARK: May I ask, your Honor, just one point of clarification?

THE COURT: Yes.

MR. MARK: Is it that the tax returns can't come in, or is it the explanation of the tax returns that your Honor's reserving decision on?

THE COURT: I'm reserving on both. If I were hearing a proffer that there was an unequivocal way of linking the expenses deducted on the schedule C to the precise items included in the revenue by virtue of the 1099, that would be one thing. I'm not hearing that yet.

MR. MARK: Well --

THE COURT: Other than --

MR. MARK: I don't want to interrupt, your Honor, but I've always tried to -- I want to be careful. But the one thing, when I'm proffering evidence, so, the first point of this response, and why I asked for clarity is because we obviously want to follow your Honor's ruling in how we open.

THE COURT: Yes.

MR. MARK: The first point is, obviously, she's not charged with tax crimes here.

THE COURT: Right.

MR. MARK: So to the extent what we're talking about is reflective of her intent in not turning over things, because

whether it was correct or whether it was wrong ultimately is not a decision for the jury. But the fact of what she did, right, informs her own conduct?

So what we see on those forms, and what I would proffer is that she received a 1099 for travel reimbursements. That went in as income on to a schedule C, and it was fully deducted in total as expenses for travel expenses, and she directed it be done in that way. There's no line by line, you know, marrying of the travel expense or the deduction to the income, but I do think the government has a very fair inference that we would argue, which is that a defendant who gets reimbursed for everything, right -- personal things that the government argues are personal expenditures -- doesn't have unreimbursed expenses from MCU? And so, hence, there's the very, I think, fair and reasonable and strong inference that those are inappropriate deductions to eliminate the income she received from MCU, your Honor.

THE COURT: OK.

Mr. Reilly, just briefly.

MR. REILLY: Very briefly, your Honor.

I think that the colloquy and the Court's questions inform the confusion that might likely ensue with the jury as to why are we being presented this tax evidence? What does this have to do -- what is the treatment of these expenses, whether they're properly treated, whether they're not properly

treated, the involvement of a tax preparer, the various pieces of the MCU? The Court has said earlier the documents are what the documents are, and so we understand that there is evidence that the government wants to present with respect to, for instance, the issuance of a 1099 about things of value. But it feels like this is two steps removed, either, unlike the arguments that were presented earlier with respect to things of benefit and the potential relationship that that may establish with Mr. Wong -- here, there's no inference that that was relevant, that her tax decisions had anything to do with her interactions with Mr. Wong. And we just think it ends up, again, your Honor, being a confusing piece for the jury that doesn't add much to the mosaic and tends to confuse instead of enlighten.

THE COURT: That may be true, but I'm not going to make a decision on that today. I think I will ultimately need to see the documents and see how it plays out.

OK. Do we have an issue anymore on the next topic on the list, which is evidence or argument concerning family background, marital status, ancestry, and so forth? Is there anything controversial about that anymore?

MS. COHEN: Your Honor, I don't think so, but I do want to reserve, depending on how the government opens and what questions it asks of its witnesses. Some of that may open the door to some of that. I don't know what they're going to say.

I don't know what evidence they're going to produce. I don't know their questions to their witnesses. So presently, I just want to reserve our right, and we would, of course, go to you first, your Honor, before --

THE COURT: Look, I don't need to make a ruling. My understanding is that the government is not planning on presenting this material.

Right, Mr. Mark?

MR. MARK: Correct, your Honor.

THE COURT: And so I have nothing to rule on on that point right now.

MS. COHEN: Except there is one (inaudible) evidence that the son got a phone, there was -- you know, there is some, and I don't know how far down the road and I don't know how much they're going to argue it relates to her relationship with Mr. Wong. Because they're being allowed a pretty wide breadth on that, I'm just reserving the right, depending on --

THE COURT: Yes, of course. What I've said is I'm not making an *in limine* ruling because I don't see a dispute at the moment. If something gets offered and the defense has an objection, I'll hear it.

I think the same is true on potential punishment, and so forth, is it not?

MS. COHEN: That is correct, your Honor.

THE COURT: OK. Same disposition.

Prior good acts or noncommission of other bad acts, are we in the same position on that? I think we are.

MS. COHEN: Well, your Honor, the argument about the board benefits and the gravy train and all that, there is also a lot of good that the board did and that the MCU did, and to the extent we're going to spend a lot of the trial talking about the proverbial gravy train --

THE COURT: Well, believe me, the jury's not here and they're not going to hear that from me during the trial.

MS. COHEN: I know that.

THE COURT: I was characterizing the government's argument.

MS. COHEN: And I would (inaudible).

But to the extent that the jury is going to hear from the government a lot about how corrupt the board was, I may want to put in evidence about the fact that the board and the MCU had good purposes and did good things and it was not just a vehicle to get benefits and go to trips and go to shows.

THE COURT: I don't think the government's argument is going to be that MCU did nothing of any social value or that it was a totally corrupt organization.

Right, Mr. Mark?

MR. MARK: No. Credit unions are very valuable and good institutions.

THE COURT: Obviously.

MS. COHEN: Your Honor, I'm not confident that the government's going to put on any evidence of that. They're not going to spend time with their witnesses talking about all the good work that the MCU did. They're going to spend time with the board, with the MCU witnesses that they are going to call to talk about what a lax board it was and how Ms. Ash received a litany of horribles from the board. And given that that is (inaudible) I think, a large amount of their proof, I think we have to be entitled, if the government has chosen to go that route, to put on some evidence that she did good work on the board and that the board did good work that she was part of.

THE COURT: Mr. Mark.

MR. MARK: I don't see how what Ms. Cohen's proffering is relevant.

THE COURT: I must say I don't either, but I'm not making a ruling now. We'll deal with that if, as, and when it arises in the context in which it arises.

Item No. 8, which is other board members being on what I characterized as the gravy train, I think I've already said my piece on that. I'm reserving on that. We'll see where we get.

Item 9, I think that's out of the case, right? We don't have to deal with that.

Ms. Cohen, I think you said in your papers that you're not going to claim the government engaged in outrageous

misconduct or violated the Constitution.

MS. COHEN: That is correct, your Honor, although I do -- I did note in our briefing that we do reserve the right to question particularly the investigators from the U.S. Attorney's Office about note-taking practices and the note-taking practices in this particular case, because they did not follow the correct practice in that there was no notes taken of one of the conversations with Ms. Ash on the phone, which serves as the basis for one full count of obstruction.

THE COURT: Well, if and to the extent it's appropriate cross, I'll allow it. And if I think it's not appropriate cross, no, I won't. I can't do anything about that right now.

We don't have an issue about charging decisions, right?

Ms. Cohen.

MS. COHEN: I don't believe we do, your Honor. I was a little confused to be, I was a little confused as to what the government thought the defense was arguing that they wanted to preclude on that.

THE COURT: Mr. Mark.

MS. COHEN: (inaudible) help clarify that for me.

MR. MARK: Sure, your Honor.

I think we laid it out in our brief, that the defense should be precluded from offering argument that the

government's decision not to charge her with embezzlement, for instance, means she didn't engage in this criminal conduct. That's one type of argument that the government seeks to preclude, and the second, obviously, deals with charging or not charging anybody else, and that should be precluded. So there's two types of issues here. I assume both are unobjectionable.

MS. COHEN: I assume, though, with that you are not trying to preclude or not asking the Court to preclude the defense from putting in evidence that she had no involvement in the embezzlement and was not charged with it.

THE COURT: Was not charged with it is exactly what he's trying to preclude, and you know what the standard charge will be when I instruct the jury. And I don't see why I should allow evidence or argument inconsistent with that charge.

Do you have any reason why I should?

MS. COHEN: No, your Honor, but I do think the defense has to be allowed to argue that she was not involved in the embezzlement, because she was not, and the government has not one piece of evidence that she was. And I'm very concerned that the jury will think maybe she was.

MR. MARK: Your Honor --

(Indiscernible overlap)

MS. COHEN: Not involved in the embezzlement, not about the charging decision but just the fact that she had

nothing to do with the embezzlement.

MR. MARK: Well, I guess there's two different things that I think Ms. Cohen introduced, and I just want to clarify. One is the charging. I mean to the extent that she wants to argue that she wasn't involved with Mr. Wong's embezzlement, that's not what we seek to preclude. And indeed, during this period of time, it is very clear that Mr. Wong was charged with embezzlement and the defendant wasn't, and there will be a complaint that would charge Mr. Wong with that embezzlement and it didn't charge her. That's not what we're seeking to preclude from her arguing, and I think that would be appropriate argument because it's focused on the events of the case.

We seek to preclude the other issues that we raised, your Honor.

If I may, your Honor, just for one second?

I should add that while we don't seek to preclude her from arguing or referencing that she wasn't charged in the complaint against Mr. Wong that happened between the first subpoena and the second subpoena, we do think that it's very problematic for her to argue that she wasn't charged with embezzlement related to her own receipt of benefits, because I think those are two separate issues.

THE COURT: So what's your position on that?

MR. MARK: Dealing with her own receipt of benefits,

it would be irrelevant and it would be inappropriate for her to make arguments on the fact that she wasn't charged with embezzlement for her receipt of benefits that were called for by the subpoenas.

THE COURT: Is that what you're trying to argue, Ms. Cohen?

MS. COHEN: No, it's not, your Honor.

THE COURT: OK.

The last item on this list is the advice-of-counsel defense. We're not ready to deal with that, I think.

Now I'll go over to Ms. Cohen's table of contents.

I think we've dealt with point No. 1.

Point No. 3, the use of the term "wiping," I'm not going to preclude. I think it's perfectly permissible.

Now, let's talk about the evidence concerning the arrest. Let me find out for sure from the government now what exactly it is that you propose to put in. And then I'll hear from Ms. Cohen.

MR. MARK: In terms of what we intend to offer in our case in chief would merely be the fact that she -- absent the defendant making arguments that we would need to, that we'd open the door to the circumstances of her arrest, it would be merely the fact that she was arrested and the phone was seized from her at that time, because that phone obviously contains relevant evidence, your Honor. We wouldn't seek to elicit the

circumstances of -- that are detailed in the papers. But obviously, we would reserve the right to rebut any argument that she might make that would suggest -- we would reserve the right to respond to any arguments that we think mischaracterize the evidence.

THE COURT: Ms. Cohen, is that satisfactory?

MS. COHEN: It is, your Honor. We do not intend to bring out any facts related to the circumstances surrounding her arrest, as laid out in the papers.

THE COURT: OK.

Now, are there any other *in limine* issues that I haven't gone through that we can do today?

MS. COHEN: So I believe, your Honor, 1(E), which is we had asked the Court to preclude evidence that Ms. Ash is both a lawyer and a judge.

THE COURT: Oh, yes, you're right.

I really see no basis for that. That one's denied. Obviously, I'm going to tell the jury that she's not charged with any breach of professional ethics, she's not charged with any judicial misconduct, and the evidence they hear is devoted to the question of whether the government proves beyond a reasonable doubt that she's guilty of those crimes with which she has been charged, or something very much like that.

MS. COHEN: One point of clarification on one of your rules, if I may?

THE COURT: Yes. Let's try.

MS. COHEN: So, I think you've prohibited the defense from opening on other board members also received benefits. Would the defense be permitted to open on the MCU policies or lack of policies related to receipt of those benefits?

It's a very different question, I think, your Honor.

THE COURT: Mr. Mark.

MR. MARK: I'm not sure I exactly understand what Ms. Cohen is suggesting, but to the extent that the government makes arguments that she received something inconsistent with the written policy of MCU, I guess I'm not sure that I -- I'm not seeking to preclude that she has a different interpretation of what the written policy is.

THE COURT: Now you've got me confused.

MR. MARK: I think my confusion stems from I'm not exactly sure what Ms. Cohen is seeking to do in her opening.

THE COURT: Neither am I.

MR. MARK: Yeah.

MS. COHEN: So, what I'm asking permission to do is without -- I understand that the Court has ruled we cannot open on other board members, you will learn, received similar types of benefits. What the defense would like to open on is that the MCU policies in effect at the time either permitted these types of benefits to be paid to Ms. Ash or did not expressly prohibit.

THE COURT: Thank you for the clarification.

Government.

MR. MARK: This is sort of difficult, because it's being raised for the first time, and I don't know what her evidence is going to be of those arguments. I mean -- and I think maybe it would help to understand what she's referring to in terms of documents and evidence that she's going to argue to support that so that we don't go down the same road that your Honor's ruling deals with.

THE COURT: I think you're going to have to make a specific proffer, Ms. Cohen, and the sooner the better.

MS. COHEN: Sure. I'm happy, if you want us, when we submit our letter -- I believe that is tomorrow, Friday -- on advice of counsel, we can add this point into it, if that's helpful.

THE COURT: It is very helpful. Thank you.

OK.

MR. MARK: Your Honor?

THE COURT: Yes.

MR. MARK: Sorry to interrupt, but I think you were asking if there are any other sort of motions or issues before the Court.

THE COURT: Yes.

MR. MARK: There's one more, which deals with our motion that dealt with both advice of counsel or, I guess, our

supplementary letter of November 12, 2021, that addressed both the advice of counsel, which I know your Honor ruled on; it also addressed preclusion of evidence or argument regarding MCU's assertion of privilege, of attorney-client privilege or work product protection.

The government intends to call the general counsel of, the former general counsel of MCU, and I know that the defendant and MCU have been in conversations regarding certain documents that they believe might or might not be privileged. It sounds like those issues have not been resolved yet, but particularly what this motion tees up is the fact that those issues should be resolved before the defendant testifies, because he should not be asked questions or put in the position of asserting privilege over any questions that the defendant poses to him, because both his answer of privilege would be irrelevant, and two, it would lead to substantial jury confusion.

THE COURT: Did you mean to say it should be resolved before the defendant testifies?

MR. MARK: I apologize. Before Mr. -- the former general counsel testifies, the witness testifies.

THE COURT: OK. I will look at those matters again, and I'll try to get you a ruling promptly.

MR. MARK: Thank you, your Honor.

THE COURT: OK.

MS. COHEN: Your Honor --

THE COURT: Yes.

MS. COHEN: -- to save you some time, we have been in discussions with MCU's counsel about the privilege, the scope of it, and whether it has been waived in trying to work through these issues so that the Court does not need to, and so -- and we have alerted the government to those discussions. I am concerned, though, that the government thinks that it can ask the general counsel questions that are privileged when the MCU's counsel is telling us that the answers, that they are not waiving privilege. So I don't know how the government's going to ask the questions, but I would just say, for the Court's benefit, I don't know that you need to look at them right now. We are trying to work through them in short order and will alert the Court, for the Court's assistance, early next week.

THE COURT: I appreciate that. So I won't do anything immediately.

OK. Now, I've raised the issue of vaccination status as a subject in voir dire. It could also be a subject once a jury has been stricken but before the trial starts, I imagine, but I would be grateful for anything you have to suggest or say on the subject.

I'll start with Ms. Cohen.

MS. COHEN: Your Honor, we do not want the Court to inquire about vaccination status either before the jury --

either in the jury selection process or after the jury is picked.

THE COURT: Why?

MS. COHEN: We are concerned, and the statistics on the New York City health website bear this out, that there is a great disparity that breaks down by race and ethnicity of people who are vaccinated and who are not vaccinated so that if the Court were to ask vaccination status and require vaccination, people who are vaccinated, that that would have a racial, potentially have an imbalanced racial composition of the jury venire or the jury pool that's brought up for questioning.

We're also concerned that if the Court were to permit the question but allow people that are unvaccinated to sit on the jury, that there would then be tensions within the jury and that those tensions also potentially could break down along racial and ethnic lines. And I think the Court has in place social distancing and masking and all of the things that are required to keep everyone safe, and so I don't think -- since jurors are not required to be vaccinated, I do not think it is appropriate to ask them about their vaccination status.

THE COURT: Suppose that it were the case that the case could be tried in a normal courtroom, without social distancing and with the jury functioning in a normal jury room, without social distancing, if unvaccinated jurors were excused,

does your position change any?

MS. COHEN: Not at all, your Honor. In fact, that would be of concern to me because I think that would result in a potential racial imbalance in the pool of jurors being questioned if you eliminate all the unvaccinated people, which statistically is more heavily dominated by people who are Black and Brown.

THE COURT: Of course, there's a presupposition, the accuracy of which neither one of us knows, about what the makeup of the venire would be.

MS. COHEN: Correct, your Honor, but I do believe that allowing only vaccinated people to sit on the jury could have a negative impact on Ms. Ash's right to a jury of her peers.

THE COURT: OK. Thank you.

Mr. Mark.

MR. MARK: Well, there seem to be two issues, or maybe there's more than that. One is the inquiry on vaccination status, and two is what to do about it.

So, first, obviously the Court has broad discretion to inquire on these matters, as they do on medical issues. We are at a point of rising Covid numbers, significantly rising, and I would expect that they're going to rise even more after Thanksgiving as people are indoors more frequently. We have quite a lot of experience with that. Obviously, vaccinations are the best line of defense against that for all of us, and

that is the best thing for a juror and for others who are around them.

The jurors here will be seated in a courtroom, whether it's a regular courtroom or not, together for several weeks in a room with many other people, and obviously, the vaccinations are the best line of defense against that. So there's many reasons that it's appropriate to consider and inquire on vaccination status.

As to the defendant's point about a disparate impact, I know that she hasn't submitted any materials on that disparate impact. Obviously, we're happy to look at any of that. The Court generally within its position is able to consider different bases for excusal under the rules to either excuse a juror because of an undue burden to them or to excuse a juror for disruption generally of proceedings that could potentially be implicated by somebody's vaccination status.

That said, we don't take any position on the defendant's request at this point in time not to seek or not to -- to prevent unvaccinated jurors to sit on the jury.

If I may, for one second?

THE COURT: What's your position on asking the question?

MR. MARK: Well, I think that's an appropriate question to be asked, and to the extent the defendant's arguing that it's going to lead to tensions on the jury, which I don't

think it necessarily will, that can be very easily mooted by just having a simple inquiry that is not in front of other people, because it's clearly a relevant -- just like medical, you know, sensitive medical information might not be discussed openly. To the extent that there's a concern that this is sensitive information, that could easily be done not in public but in some other way.

THE COURT: Well, that would involve sidebars with every prospective juror.

MR. MARK: Or it could just mean filling out a, information before they come in and just indicating whether they are vaccinated or not vaccinated, as they're obviously going to likely have to do when they're filling out the Covid forms to come into the building.

THE COURT: OK. I have your positions.

What's our estimate on trial duration at this point?

MR. MARK: Your Honor, I would expect two weeks, your Honor.

THE COURT: Do you mean ten days or eight days?

MR. MARK: I would say ten days, your Honor. And we obviously -- we're actually talking with defense tomorrow about stipulations, which I would hope will decrease the length of that trial. We submitted in our letters that both parties are looking forward to trying to work out a number of matters to avoid, decrease the number of witnesses here. I'm hopeful that

our conversations tomorrow will be productive and that that can decrease the amount of trial time that we anticipate before your Honor.

THE COURT: OK.

Ms. Cohen, what do you think?

MS. COHEN: So, I -- given, Judge, the Court's rulings today on the motions *in limine*, I do expect that we will have very lengthy cross-examinations. We may need to call witnesses on our defense to address all of the issues related to Ms. Ash's conduct on the board and judicial conduct and the form and her recusal. I was hoping to avoid that, but I accept the Court's ruling. But we may have to do that. You know, it's a little hard for me to tell whether the government's estimate of eight days, even given the Court's ruling, is accurate or not. But I think in terms of telling the jury what to expect, I know your Honor does not --

THE COURT: I'm sorry. You're going very fast. I'm having trouble following you.

MS. COHEN: I'm sorry, your Honor.

I know your Honor does not sit on Fridays, and we're starting on a Tuesday, so if you're asking how long we should be telling the jury pool, you know, perhaps through that third week of trial would be safer, and I'm not -- we might be able to finish it much faster. I just don't want to underpromise to the jury, potential jury.

THE COURT: Well, one of the things I'm trying to decide is whether or not to sit on Fridays. I don't want to. I know you would rather that I not. I'm counting the 30th as basically -- I mean we may get openings; we may not. So then we have two more days that week, four days the next week if we don't sit on Fridays, and we have available four days the week after that. So that's ten days plus the jury selection day, and we have conceivably two days the week of December 20 -- actually, maybe three. So that's three, eight, 13 -- sorry I don't have enough fingers on my hands -- 15.

You folks are confident, I take it, that we're going to have a verdict and be done on or before December 22. Is that right?

MR. MARK: Yes, your Honor. My family would be very upset if that wasn't the case.

THE COURT: Your what?

MR. MARK: My family.

THE COURT: Well, not only yours.

MR. MARK: Everybody's.

THE COURT: It's very important that I be able to tell the jury, or the whole panel during jury selection, that we're either going to be done before Christmas or that there's a risk they're going to be coming in on Boxing Day.

MR. MARK: Your Honor, I would say, and no matter how long Ms. Cohen's defense case might be, I don't see any way

that that is going to happen in this trial.

THE COURT: Ms. Cohen.

MS. COHEN: I think that's accurate, and I think Mr. Mark has a much better handle on how long at least the government's case will be, so I'll accept that as fair.

THE COURT: OK.

Well, then, I'm going to tell them that the lawyers on both sides have assured me that we're going to be done by Christmas barring something utterly unforeseen by anybody, counsel or the judge, and I think that will be of some material help in getting a jury selected.

OK. Anything else this afternoon?

MR. MARK: Your Honor, just one clarification, just because it deals with witness scheduling, which is, does your Honor intend to sit the Friday of the first week, or is your Honor not going to sit?

THE COURT: Given what I have just heard, no.

MR. MARK: OK. Thank you, your Honor. That's very helpful for witness scheduling purposes.

THE COURT: OK.

MR. REILLY: Your Honor, one more housekeeping matter.

The defense handed up and filed earlier today essentially a follow-on to the government's motion about Courtroom Connect just in terms of -- that's pending before the Court, your Honor.

THE COURT: In order to finish this afternoon, I have had to pledge to the District Executive that we're not going to discuss that today because there are forces more exalted than any of us dealing with that issue at the moment. I hope to have an answer for you soon. If it were purely up to me, you'd both get it. And it may ultimately be. So we'll see how that works.

OK. I thank you all. I appreciate it. Good to see you all.

(Adjourned)

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*SYLVIA ASH,*

---

*November 30, 2021*

---

*Southern District Court Reporters*

Original File LBUKASHF.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
November 30, 2021
9:30 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JAMIE C. BUCKLEY



(In open court)

THE COURT: Good morning.

THE DEPUTY CLERK: United States v. Sylvia Ash. Government, are you ready?

MR. MARK: Good morning, your Honor. The government is ready. Assistant United States Attorney Eli Mark along with Assistant U.S. Attorney Jonathan Rebold, and Special AUSA Alona Katz.

THE DEPUTY CLERK: Defendant, are you ready?

MS. COHEN: Yes. Good morning, your Honor. Carrie Cohen, Morrison & Foerster for defendant Sylvia Ash. With me at counsel table is my colleague Nathan Reilly at Morrison & Foerster, Ms. Sylvia Ash, and then behind me is my colleague Jamie Buckley from Morrison & Foerster and our paralegal Ashley Stephenson.

THE COURT: Good morning. I'm happy your tests of the weekend were all negative.

MS. COHEN: Thank you, your Honor. As was I.

THE COURT: I have no doubt.

Before we get to what seems to be the main event, before we pick a jury, I signed an order over the weekend granting the defense's motion for access to some of the jury information, and someone from the clerk's office just dropped off, without any explanation, a DVD or a CD for me, which I gather contains the information. But I don't know whether I'm



supposed to pass that on to you or whether you got it, Ms. Cohen.

MS. COHEN: Your Honor, we picked it up last night from the courthouse. There was perhaps an extra disc made because the clerk made a disc for Mr. Bellinger, Ms. Ash's prior counsel. So perhaps that's the disc that made its way to you.

THE COURT: Okay. So, I won't worry about it any longer.

So I got these letters about the agent, and before I hear more from each of you with respect to the letters, I had just a few basic questions myself.

Mr. Mark, would this agent be a witness in this case or not?

MR. MARK: Yes, he will be a witness in this matter, your Honor.

THE COURT: Now, will he be a person testifying to any false statements allegedly made by the defendant?

MR. MARK: He will, your Honor. And I have two updates for your Honor, but I am happy to answer your Honor's questions first and then provide the updates for your Honor afterwards.

THE COURT: Why don't we do the update first.

MR. MARK: First is obviously this was a filing late night. There was a typo I noticed with the letter. I think



the letter was clear, but there was a typo at the end that I wanted to clarify because I noticed it.

THE COURT: Go ahead.

MR. MARK: It is on page four of the letter. This is in making the argument of under Rule 403 for why any cross-examination or argument on this should be precluded. There was a typo in the second-to-last full sentence in the letter. It should read, and I'm sure your Honor read it -- is at the same time the probative value of what the defense seeks to do is low-to-non-existent because, as noted above, Agent-1 long ago advised government counsel that he had an account at MCU, and government counsel informed him that they did not believe that Agent-1 had a conflict of interest.

That's what the factual background said later in the letter, and I noticed that and wanted to correct the record.

THE COURT: I think it would behoove the government to file a corrected version of the letter online, because nobody ever knows what happens down the road.

MR. MARK: We will, your Honor. And that's what we were planning do, but wanted to note it immediately to your Honor.

Second is as an update since these letters were filed, the government, although we don't believe this is Brady or Giglio material otherwise discoverable, did make an additional disclosure late last night after the defense filed their letter

with additional details regarding the account statement, I guess the account balance that the agent had at MCU, which was small. I think approximate balance is around $7,000, and the amount of the loan, the personal loan that the agent had that also was not large, it is approximately $16,000 at the time. As we noted in our letter, the account predated and the loan predated the investigation.

THE COURT: Is there any balance outstanding now or was there during the investigation that led to this case as distinguished from the Wong case?

MR. MARK: I think it is hard to distinguish because this case arises from an obstruction of the other case. But the loan predated the Wong investigation. It was from 2016 was the loan. There were no new loans that were taken out. And as we argue, a loan is not a financial interest in this context.

THE COURT: Has the balance ever been higher than it is now? The loan balance. I imagine it was.

MR. MARK: I imagine it was. I don't know the facts, but just given that it was a loan, I don't know if it was higher or not.

THE COURT: Within what range has the account balance varied?

MR. MARK: I don't know that detail. I think it was lower at times because as even sort of further detailed, that more recently since the Wong investigation was over, the



defendant had a small -- or small contributions made per paycheck in the order of $250 per paycheck to that account. So I believe it increased by a small amount of money after the Wong prosecution.

THE COURT: Finally, nobody mentioned it in either of the letters, but my understanding is that member balances in federally insured credit unions, and I assume this is a federally insured credit union, are insured to the extent of a quarter of a million dollars per account.

MR. MARK: That's correct, your Honor. Just like FDIC insures banks, MCUA is the federal regulator that insures credit union accounts. For that exact reason, when the government and the prosecutors were notified by the agent that he had an account, it was similar to a bank account which one would consider no financial interest and we informed the agent of that at the time. Obviously, we didn't memorialize that at the time. It was early on in the investigation, before anybody was charged. And perhaps we should have in the benefit of hindsight. But this is not Brady or Giglio material for the reasons that we noted.

THE COURT: Okay. Thank you.

So, it's your nickel as they say, Ms. Cohen. I'll hear from you.

MS. COHEN: Thank you, your Honor. I think the additional information and your questions to the government



only highlight the extreme prejudice to Ms. Ash by this last-minute disclosure, and the fact that the case agent, who not only is going to be a witness in the case, but he is probably the key witness in the case, because he is the individual who I expect the government to call to testify about the alleged misstatements to the government by my client, Ms. Ash. He is the one --

THE COURT: The misstatement claim is one of four counts, right?

MS. COHEN: Your Honor, there is a conspiracy count related to the misstatement and then there is also misstatement. It is two of the four counts, and there is one count specifically, your Honor --

THE COURT: But someone could be convicted on a count of conspiracy to make a false statement even if the statement is never made. Right?

MS. COHEN: I don't actually think that's completely correct. But here, your Honor, this is the case agent that communicated with Ms. Ash from day one. He was the case agent that approached her, the case agent that called her, he was the case agent that she spoke to, and that the government claims she lied to and withheld information from.

This is a situation where the case agent on the case is the one who is going to be the key witness for the government. And here, Ms. Ash learns for the first time, 36



hours if not less before trial, that the case agent has an account at the MCU. We inquire more and then we learn not only he had an account, a bank account at the MCU, he also apparently has a loan at the MCU.

Sitting here today, AUSA Mark doesn't even know the facts of the loan, doesn't know the balance in the account during the time of the investigation of both the MCU, Mr. Wong, Ms. Ash, and all of the other individuals and alleged co-conspirators that the government investigated. The government still doesn't know the facts, they have decided for whatever reason not to learn them.

The defense, on the other hand, is completely entitled to full disclosure of the case agent's account, when it was opened, the balances on a monthly basis. I learned -- they sent over a piece of 3500, again, buried in all of the discovery, last night at 1:30 in the morning that apparently this case agent had a checking account, moved the direct deposit of his paycheck from that account somewhere else, but then during the investigation, put the direct deposit back into the MCU account.

Defense, your Honor, has to learn --

THE COURT: And that conceivably matters how?

MS. COHEN: Your Honor, the case agent could have been -- is completely biased in his investigation, he never should have been on this investigation, your Honor.

THE COURT: Look, Ms. Cohen, back up. The question I asked you is this matters how that the direct deposit went from the MCU account to another institution and then came back? How does that matter to this case? I understand the conclusion you'd like me to draw at the end. And, respectfully, repeating it is not an answer to my question.

MS. COHEN: So, your Honor, I don't know sitting here today, and I guess the government perhaps also doesn't know -- the government meaning the AUSAs in the courtroom -- don't know, I don't know the facts to tell you how exactly it is relevant. Without knowing the underlying facts, it is hard for me to decide how it is relevant. How we would want to cross-examine the witness about it. We don't have the facts to even do the cross-examination.

And I think it does go, your Honor, to the agent's credibility, what he disclosed, when he disclosed it. I take it that perhaps he disclosed the account but not the loan. I don't know when that occurred. I don't know if the disclosure on Sunday --

THE COURT: You're told, and I am told, that it was, if I remember the letters correctly and they're lengthy, long before the investigation started.

MS. COHEN: Your Honor, I respectfully believe that we are entitled to know how long before the investigation started. And what did the agent disclose, did the agent disclose the



account? What type of account, how much money was in the account? Did the agent disclose whether this is a municipal credit union, which I know your Honor understands, you are a member of? Did the agent vote? Did the agent give the proxy to vote? Did the agent have any involvement in the --

THE COURT: In what circumstances do members of a credit union like this have any right to vote? And on what?

MS. COHEN: They have a right to vote, your Honor, I believe on members of the board. They can give that proxy to someone else. I don't know anything about this account. It depends on what type of account. I'm just told it is an account. I don't know what type of account.

For example, your Honor, you are allowed dividends if you have a certain type of savings account. If the bank makes a profit, they give it back to you in the form of dividends if you have certain types of account. But I don't know anything about this account. I have no documents about the account. I have no documents about the loan. I don't know if he was -- he could be able to get more favorable interest rates on his loan, if he ever tried to refinance his loan during the course of the investigation. We have absolutely no information other than literally six lines on a piece of paper written, I assume, although I don't know, by the AUSAs, when they were interviewing the agent on this case. And we just don't have any information.



Your Honor, what we are trying to understand is the level of his bias. It also of course goes to credibility, what he disclosed, if he failed to fully disclose it. When he took out the loan, did he disclose that? Apparently, when, according to the 3500 turned over on Sunday, there is one line, "Agent has an account with MCU." I don't know if the agent disclosed on Sunday that he also had a loan that had an outstanding balance.

THE COURT: You're running through this for the second time now.

MS. COHEN: Your Honor, because we are totally bereft of all the types of information that we are entitled to.

THE COURT: I heard that the first several times you said it. What I have not yet heard is an answer to my question about how it matters. Not the conclusion you want me to draw. But facts, even theories, about how it matters.

Here's what I understand, at least in part.

Insofar as the man is a borrower from the credit union, I haven't heard anything that suggests that that benefits him in any way that could be relevant. He was a borrower before the investigation, he is a borrower now, and where I come from, borrowers owe the bank. The bank doesn't owe the borrowers. The bank doesn't pay the borrower interest on the loan. The borrower pays the bank. So that piece of it at a practical level I'm not impressed with yet.



Now, the fact that he is a member, which is analogous to be being a depositor in a savings and loan, well, that's different. Because if you are a depositor in a savings and loan, at least when I was a boy, you got interest. Now what you get is a penny a year. But you understand the point. So I get that.

But, I understand, also, and I don't hear a challenge to the proposition, that depositors in, also known as members of, federally insured credit unions have no financial risk whatsoever in the event even of a collapse and bankruptcy is not the right word, but everyone will understand what I mean of the credit union, up to $250,000. And we're told that the balance in this account was $7,000 now, and likely was lower during the period of the investigation.

So, I don't get the practicality of the argument. I get the rhetoric, I get the conclusions you want, but I just don't understand the practicality of it. And I'm giving you an opportunity to enlighten me.

MS. COHEN: Sure. Your Honor, members of the MCU, which may or may not be different from other credit unions, but the members of the MCU vote, they have right to vote on the board of directors. They have the right to vote on the supervisory board. And they have the right to vote on other member issues, and I don't know --

THE COURT: I'll let you save the rest in a minute but

let's pause on that.

They get to cast in one way or another a vote for those officials that is proportional to the amount of their deposit balance on the record date, the amount that that balance bears to the total balances in the credit union on that date. So that if this agent had a balance of say $10,000, and as I am told the assets of the credit union were in the billions, the strength of his vote would be $10,000 divided by billions of dollars, and in effect, it is a zero. Yes?

MS. COHEN: I don't agree with that, your Honor. I don't know what incentives and what is in the agent's head about the investigation he is doing, at the same time that he is voting. It is very different --

THE COURT: Ms. Cohen, I asked you a question that has to do with law and arithmetic. What they get to vote on is the officers you mention. I accept that for the moment. And they get a number of votes, which is equivalent to the account balance divided by the total account balances of everybody who has got accounts in the credit union. Is that right?

MS. COHEN: No, your Honor. I believe that is incorrect.

THE COURT: So enlighten me.

MS. COHEN: At the MCU each member gets one vote, regardless of the balance in the account. That is what I understand.



THE COURT: I stand corrected. How many members were there?

MS. COHEN: Your Honor, I don't know that information sitting here today. But this agent was able to vote on matters of the -- if this agent owned stock and was a voting member in the very company he was investigating.

THE COURT: I am not asking what the code of conduct for judges says. That's a separate statute. If he owned one share of General Motors stock, and there are for the sake of argument 250 million shares of General Motors stock, the stockholder in General Motors gets to cast one vote out of potentially 250 million. Is that right?

MS. COHEN: Under your hypothetical, I suppose that is right. But even if that shareholder had one vote, it does go to that witness's bias. When that witness disclosed it, in this situation when the case agent on the case disclosed it to the government, what he disclosed, the details of the account, the details of the loan. We are entitled to that information to decide how to make arguments and if there are arguments to be made. Right now we are sitting here basically with very little, almost no information about the account, about the loan, about this agent's voting record, about this agent's communication perhaps with the MCU as a member of the bank. I don't know that there are any. I don't know that there are not. The government refuses to provide us with any of this



information. And --

THE COURT: The government has already provided you with about half the information you asked for, because I know the answers and they are in the government's letter to you. But there are other things you've asked for that you haven't received. I acknowledge that. That's obviously true.

Let me hear from Mr. Mark, please.

MR. MARK: Yes. Ms. Cohen makes a number of arguments that I think really misstate what the record is, including that she says we decided not to learn the facts here. That we buried it in discovery disclosures. And that's simply not the case here. I mean, what we did is we went above and beyond what our obligations were. In the context that the disclosure we made --

THE COURT: Look, I have seen nothing up to now that remotely suggests that either the prosecutors, or -- assuming the truth of what I'm told by the prosecutors -- the agent did anything wrong at least in his or her own mind. Maybe a mistake was made, maybe not. But, I see no wrongdoing.

MR. MARK: Thank you, your Honor. And I won't belabor that issue in responding to Ms. Cohen's accusations on that.

As to I think the primary back and forth then becomes on this issue of voting, right. Which I think, and what she's asking for that she doesn't know right now is the question of whether the agent voted. and I don't understand how any of



that could be relevant to anything in this case. I think taking it to the logical conclusion, any agent couldn't investigate any politician because you can vote on politicians.

THE COURT: I don't know about this credit union in any factual way. Was there a contest for election to any board on which members had a right to vote in the last 25 years?

MR. MARK: In the last 25 years, I think there probably was a contest at some point in time over the last 25 years. But, does that matter? No. Your Honor --

THE COURT: Right. I say "right." I'm acknowledging what you say. Not saying it's right. But, maybe I've led a sheltered life, but I've never heard of a contested vote for election to the board of a credit union in my life. I've never even heard of one. So, and even if there had been, so what? Given the size of the account, and the likely number of members of a credit union with billions of dollars of assets, one vote plus or minus, to call that an interest or to suggest bias, I mean, it doesn't make practical sense to me.

MR. MARK: Exactly, your Honor. And here we have a credit union that's a very large credit union with hundreds of thousands of members, so there is no financial interest in this scenario.

THE COURT: Look, I go down the list of information that Ms. Cohen wants. It seems to me that there is no harm, probably no requirement, but no harm, and some benefit to the

government of providing the information that she asks for in paragraphs one through five quoted in the government's letter. To the extent you haven't given it to them already, and you've given some of it for sure.

As to number six, the amount of any loan identified, sure. I think you should provide that. And give the range of balances due during the period 2017 to the present and as of now.

Ms. Cohen asked for the terms of any loan. I imagine that could go on for 50 printed pages, and most of it would not at all be enlightening. But I imagine that the type of loan, for example, home mortgage, home equity loan, something like that would serve Ms. Cohen's purpose on it.

Would it not, Ms. Cohen?

MS. COHEN: It would, your Honor, along with the interest rate from 2017 on if it changed.

MR. MARK: Your Honor, we've already disclosed this is a personal loan. It is not a mortgage. It is not an auto loan. I think --

THE COURT: You can tell them again.

MR. MARK: We can tell them again.

THE COURT: What about the interest rates, are they floating which would require you to --

MR. MARK: We'll do our best. I don't know if they floated, if they changed every month. But we'll do our best to



fulfill that.

THE COURT: That seems reasonable.

Number seven. I'm not sure I understood number seven. But my understanding of it was that she's not asking about communications as an investigator on this case. She is asking about other communications.

Am I right, Ms. Cohen?

MS. COHEN: You're correct, your Honor.

THE COURT: Well, if there is anything in writing, I think it would be well to turn it over.

Number eight I don't understand. Any benefits that the agent received as a result of his membership. Maybe he slept better at night. I don't know. I don't know what it means.

MS. COHEN: Your Honor, if I can perhaps be helpful on what I meant by any benefits.

THE COURT: Yeah.

MS. COHEN: Your Honor, there are, for example, dividends if you have a certain type of account that are paid. There may be other types of benefits you get as a member of MCU. I don't know what they are.

THE COURT: What about a shopping bag if you make a deposit on Thursday? A toaster. When I was a kid you got a toaster.

MS. COHEN: I recall that as well, your Honor. There



may be --

THE COURT: You're not that old.

MS. COHEN: I recall my parents getting it, your Honor.

THE COURT: As long as we are clarified on that. I just don't see the need for that.

MS. COHEN: Although, I believe, and there were annual, there are annual membership meetings, of course, of the MCU, and I do believe there were gifts given out at those meetings. I don't know if the agent attended. I don't know if a member of his family attended or his proxy attended. And I would like to know if he received gifts at those annual meetings. It is an easy request. If the answer is no, it's no. If it is yes, I would like to know what that is.

THE COURT: What we are going to do on that is find out if he ever went. And if he did, whether he got a present or whatever you want to call it. And if the answer is no, the answer is no.

MS. COHEN: Just ask if members of his immediate family went or his proxy went as well.

THE COURT: I heard. But, there is some sense of proportionality here. If it turns out that other members of his family were big depositors, then we'll worry about it. You've already been told when he first disclosed the account. And I take it there has been no conflict of interest waiver



sought or received, apart from what's discussed in footnote two of the government's letter. Is that right?

MR. MARK: That's correct, your Honor. But what I will say is that, I mean, not only did the agent disclose, as we noted before we made our filing, we obviously, given the nature of the accusations that were against the agent and the assigned AUSAs, we raised it with the ethics official, we raised it with the chief of the criminal division, and both of those individuals, including the chief of the criminal division who were here earlier, agreed that there was no ethical violation here that was committed by the agent. So there was no conflict of interest waiver sought nor was there anything that was required.

THE COURT: So you can turn those over. I urge you to do so at to your earliest ability to do so. And in the meantime --

MS. COHEN: Your Honor?

THE COURT: Yes.

MS. COHEN: Sorry to interrupt. I think we also need to know when the agent first disclosed the loan, because, according to the government, the agent disclosed the fact that he had an account. I don't know when. But, he disclosed he had an account. I don't know when the agent disclosed that he also had what I am now hearing for the first time is a personal loan.

THE COURT: Provide that information Mr. Mark.

MR. MARK: Your Honor, I mean, we will do so voluntarily. Obviously going above and beyond here.

THE COURT: Yes. In view of the government's agreement to make these voluntary disclosures, I should not be construed as making any ruling that any of this is Brady or Giglio material. In the event it becomes necessary to do that, I will, but it's premature now.

In the meantime, we are not opening on this, Ms. Cohen. Once you have the information, you can take your best shot at proffering what you want to do with it during the trial and we'll deal with it then.

MS. COHEN: May I be heard on that, please?

THE COURT: Sure.

MS. COHEN: Thank you. So your Honor, I don't know what information I will receive or when I will receive it.

THE COURT: You are going to receive it quickly.

MS. COHEN: I'm hopeful I will receive it by the end of the day today at the latest. Depending on what that information says, we may have another application to the Court. We may not. We may need further information. We may not. But it very well may change the arguments that I would make on behalf of my client in my opening statement. It very well may change the entire tenor of the opening statement. I think it is highly relevant information. You may disagree. But that's



up for me to decide, and I do not believe that I should be precluded at all from opening on it. And I'm not suggesting I know I will, because I don't know the information to make that decision right now.

THE COURT: I understand your view. As of this moment, I understand your position. I understand that you think there has been a Brady or Giglio violation. I am by no means sure that there has been.

The net of it is, I have discretion with respect to what's in the opening, and as of now I've exercised it. If the facts change between now and when you open, I'll deal with it then.

MS. COHEN: Your Honor, may I ask though that openings be delayed until I get this material so I can review it? Given the timing of everything, that may work anyway, your Honor, but I really do --

THE COURT: Let's see where we are once we have a jury. I am very mindful of the time of the year. I'm very mindful of the fact that we have the Christmas holiday coming up. And it may, despite what you've told me, be a close call as to whether we have a result by then. We are every day at risk from losing trial participants, jurors, counsel, witnesses by virtue of the pandemic. And I'm not going to build in that sort of delay lightly.

MS. COHEN: And I don't ask for it lightly. I would



also add in this case where your Honor has permitted the government to introduce numerous instances of bad acts which relate to failure to disclose and relate to alleged failure to disclose, and alleged failure to recuse or to step off of the MCU board because of a potential conflict, that my ability to open on the case agent or the case agent's similar conduct, which goes to his credibility, is vital, your Honor.

THE COURT: Ms. Cohen, I understand that's your position. Lawyers take vigorous positions all the time. Judges rule on them all the time. That's my ruling for now.

And it should be borne in mind that even if there is a Brady violation, that's something best determined in the event of a conviction on a collateral attack. And it is extremely hard, as the Second Circuit has reminded us district judges, to make calls about what is and what isn't material before trial, even during trial. And I don't have enough right now to suggest that this is one of the unusual cases where I could make such a ruling in the defendant's favor.

MR. MARK: Your Honor, I just would note that there were two other motions that are pending before your Honor. Those were the motions in a sealed filing of last week relating to precluding cross or argument on two lines. One that related to a particular lay witness.

THE COURT: You did such a good job of sealing, this is the first time I'm hearing of it.



MR. MARK: I think, so, we filed those, defense has them and they responded as well. It seems probably premature to argue where your Honor hasn't done, but I wanted to note because I know we'll be before you apart from jury selection that those two matters were under submission. We can argue further and proffer additional facts to the extent your Honor wants them. Those included requests that the defendant not open on those matters. The defendant hasn't indicated one way or the other whether she would open on these two matters.

THE COURT: Can you in a public courtroom tell me what they are?

MR. MARK: Of course, your Honor. One deals with a lay witness's distribution of a small amount of pills to Kam Wong. That's the first one. And the second one deals with that MCU is a subject of an AML BSA violation's investigation that's still going on.

THE COURT: What is that?

MR. MARK: Anti-money laundering and bank secrecy act violation investigation that another unit in this office is conducting related to MCU because of control issues that MCU.

THE COURT: Because it's what?

MR. MARK: Because of anti-money laundering control issues they had that underlay some of the Kam Wong investigation. It's completely unrelated to anything here in this trial, but we asked defense whether they would go there

and they said they couldn't commit so we filed a motion with your Honor.

THE COURT: Are you in a position to commit yet, Ms. Cohen?

MS. COHEN: I'm not, your Honor.

THE COURT: What's the relevance of it?

MS. COHEN: The relevance of the bank secrecy act and money laundering ongoing investigation? Your Honor, I believe it is potentially relevant here because government here seeks to call numerous witnesses from the MCU. They have, we believe, an incentive to cooperate with the government and give testimony that's favorable to the government because they are concerned about the ongoing investigation. Some of them are current employees of the MCU. They have reputational risk to their professional reputation, if the MCU is indicted for money laundering or violation of the bank secrecy acts.

I mean, we laid out numerous reasons why, your Honor. Because the government is calling MCU current and former employees, it's relevant.

THE COURT: Mr. Mark, what's the answer?

MR. MARK: Two points, your Honor. First is we talked with MCU's counsel who said that they didn't inform any of -- there are four witnesses who are either current or former MCU employees, and counsel for MCU said that they didn't inform any of these individuals about the AML BSA violation investigation.



It was a closely held matter. So first of all, we don't see how this could go to any sort of bias on these witnesses.

Second of all, the largest issue that the defendant might be able to make would deal with the conservatorship of MCU that's going on right now, which is the fact is MCU is being run by MCUA, and that's something that defense counsel didn't want to us get into and we committed that we weren't going to go there in the first instance. So, this would be completely misleading in order to suggest that --

MS. COHEN: I just believe Mr. Mark misspoke. I am not aware we ever asked the government not to go into the receivership issue at all.

I would also add one of the witnesses that the government has informed the defense they intend to call is the former general counsel at the MCU, who particularly has potential liability if there is any bank secrecy act or money laundering allegations.

THE COURT: Before you go into the money laundering, I'm not going to foreclose it at this point. But before you go into that on cross, I'm going to ask you to make a proffer at sidebar as to your basis for believing that the witness has any awareness of it.

MS. COHEN: As your Honor knows, whether -- and I'm not doubting the representation by the MCU's outside counsel that the outside law firm has not informed these four witnesses



of the existence of an ongoing bank secrecy act money laundering investigation. But as we all know, employees, former and current, talk about what's going on. There is widespread discussions about what's happening at the MCU, both people who are there and people who are not there. So the mere fact that outside counsel has not told them is not dispositive of the fact that they don't know.

THE COURT: Did you hear what I said?

MS. COHEN: I did, your Honor. I wanted to make that point.

THE COURT: Thank you.

MS. COHEN: If I could, as relates to the witness who provided narcotics to Ms. Ash's alleged co-conspirator, Kam Wong. The reason why that's --

THE COURT: I'm not going to deal with that now. We have a panel ready.

MS. COHEN: If I could just raise one issue. On entering the courthouse today, there was a woman in a pink sweater who asked me which line to get on. I tried to turn away. She kept asking me if I was a lawyer. I tried to turn away but I don't know if she will be in the jury pool. I don't know her name. I only know she is a woman wearing a bright pink sweater. I'm sure she thought I was being rude. And I did say at one point I can't talk to you.

So I disclose that to the Court.



THE COURT: All right. Thank you, I appreciate it.

So I'll see you all in room 160. That is the lawyers I'll see in 160. Not anybody else. And of course the defendant.

(Continued on next page)

AFTERNOON SESSION
3:05 PM

(Trial resumed)

(In open court; jury not present)

THE COURT: While Andy is getting the jury, Ms. Cohen, I gather there's something you wanted?

MS. COHEN: Yes, your Honor.

We have not yet received the information your Honor ordered the government to produce to us related to the agent. And without that information, I am severely hampered in my opening statement because there may be things, based on the information I get, that would cause me to open differently, make different arguments on Ms. Ash's behalf; and without that information, I'm not in a position to know whether to make those arguments or not, given the late hour --

THE COURT: Well, indeed you are, because I have said that you aren't going to make the arguments relating to the agent on your opening.

MS. COHEN: For the record, I note my objection to that, your Honor.

THE COURT: Okay.

MR. MARK: And, your Honor, I'll just note that although your Honor did not order us to make any further disclosures, we have been preparing further disclosures, which will be made. Obviously, the lunch break was very short, so it



will go out by the end of today, but it's substantially similar to the disclosures we have already made previously.

THE COURT: And you will copy my chambers?

MR. MARK: We will send you a courtesy copy, your Honor.

THE COURT: Apropos of this, the government called to my attention that there were two open matters pending relating to in limine applications. The reason they are pending is because nobody filed them on ECF but thought that emailing them to a general chambers mailbox would suffice, which it doesn't. So I will deal with them, now that I'm aware of them, but that's what happened.

MR. MARK: Your Honor, just to note that I think we did that, requesting seal, in the letters, and obviously if your Honor doesn't grant that, we'll file it on ECF. But it was the nature of those, and I think that's probably not necessary now, given the discussions in court, so we will prepare to file those on the public docket.

THE COURT: Okay.

MS. COHEN: We will file our opposition. The only reason we sent it under seal was at the request of the government.

THE COURT: Every once in a while -- not once in a while. Andy, being the nice guy that he is, corresponds with counsel by email, but my chambers fundamentally does not do



business by email.

Mr. Mark, how long do you expect to be opening?

MR. MARK: It will be Ms. Katz who will do the opening, and I expect it will be approximately 15 minutes.

THE COURT: Thank you.

How long do you expect, Ms. Cohen?

MS. COHEN: Your Honor, probably about 20 minutes or so.

(Continued on next page)



(Jury present)

(A jury of 12 and 6 alternates was impanelled and sworn)

THE COURT: The trial has begun.

Before we hear opening statements, there are some preliminary instructions, some of which will sound familiar, that I'm obliged to give you.

It will be your duty to find, from the evidence, what the facts are. You, and you alone, will decide that, and you will apply to those facts the law as I give it to you in my instructions at the close of the case and occasionally on the way to the close.

You must follow the law as I give it to you, whether you agree with it or not. Please understand that nothing that I say or do should be taken by you as indicating any view on my part concerning how you should resolve the case or what the facts are.

The evidence from which you're going to find the facts will consist of the testimony of the witnesses, documents and any other things received as exhibits, and any facts that the lawyers agree to or, as we often say, stipulate to, or, in rare circumstances, that the Court may tell you you have to find.

Some things are not evidence and are not to be considered by you. Statements, arguments and questions by lawyers are not evidence. Objections to questions are not

evidence.

Lawyers, of course, have obligations to their clients to make objections when they believe evidence is being offered that is not appropriate under the rules of evidence. You shouldn't be influenced by the making of those objections or, unless I tell you otherwise, by my rulings on them.

If I sustain an objection, you'll ignore the question. If I overrule an objection, you'll treat the answer just like any other. If, as normally happens from time to time, I instruct you that some item of evidence is to be considered for a limited purpose only and not for others, then you must follow that instruction.

Third, testimony that I exclude or told you to disregard is not evidence and shall not be considered.

Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You must decide the case based solely on the evidence you see and hear in this courtroom.

There are two kinds of evidence, direct evidence and circumstantial evidence. Anybody who watches lawyer movies and TV has heard those terms. I'll talk to you more about that later in the case, but just, please, bear in mind that circumstantial evidence is of no less value than direct evidence.

It's going to be up to you to decide which witnesses



you believe; which, if any, witnesses you don't believe; and how much of any witness' testimony you accept or reject. I'll talk to you about that some more at the end of the case, but bear in mind that you're the ones who decide what the truth is.

This, of course, is a criminal case, and I have given you some basic rules about that in the selection process.

First of all, the defendant is presumed innocent unless and until proven guilty. The indictment is only an accusation, it's nothing more; it's not proof of guilt, it's not evidence. The defendant starts out here with a clean slate.

Second, the burden of proof always lies with the government until the end of the case. The defendant has no burden to prove her innocence or to present evidence or to testify. She has the right to remain silent, and if she exercises that right, you may not consider the fact that she has not testified in determining whether she's guilty as charged or not.

Finally, the burden of proof on the government is to prove guilt beyond a reasonable doubt. I'll talk to you more about what that means at the end of the case.

I have already told you what the charges are in general terms. I'll give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and your decisions. There are just one or



two things that I'm going to say about that.

You understand, I think, from what I've said before, that one of the counts charges a conspiracy to obstruct justice. A conspiracy is nothing more than an agreement. A conspiracy is reached, typically — not always but typically — when the agreement is reached, regardless of whether the unlawful objective of the agreement is ever carried out. If two guys agree to stick up a bank and one of them goes and buys a gun and the other one gets a getaway car and then they change their minds, they have conspired to rob the bank, even if they never robbed the bank. That's the distinction between the substantive offense — namely, bank robbery, which in my little example is the object of the conspiracy — and conspiracy as a crime. The object need not be achieved in order for the crime of conspiracy to have been committed.

Now, a few words about your conduct as jurors: You're not to discuss the case, either among yourselves or with anyone else, or to allow anyone else to discuss it with you. It's only when I finish giving you my instructions on the law and instruct you to go back into the jury room and deliberate, that you may discuss the case.

Second, don't read or listen to anything touching on this case in any way. If anyone tries to talk to you about it, please bring it to Andy's attention, and he will inform me, and I will do whatever is necessary.



Third, you're not to do any research or make any investigation about the case or anyone involved in it on your own. You will remember my comments about social media and electronic means of doing research. Stay away from it.

Finally, don't form any opinion until you've heard all the evidence. Keep an open mind, and do so until you start your deliberations at the end of the case.

You're welcome to take notes during the course of the trial if you want to. Bear in mind that's up to you each individually. Think about the fact that it can be difficult both to listen and take notes at the same time. Believe me, I have 20 years of experience trying do it, and it's very, very hard. So just be aware of that.

If you do take notes, be sure your note-taking doesn't interfere with listening and paying attention and considering all the evidence. If you do take notes, don't discuss them with anyone else prior to your deliberations. Do not take your notes home at the end of the day; leave them in the jury room. If you don't take notes, remember it's your individual responsibility to recall the evidence, and you can't sign over that responsibility to somebody else because they took notes. We depend on the judgment of all of you. That's the way the system works, and it's a tried and true system, and you need to remember the evidence yourselves.

The trial is now going to begin. The government will

make an opening statement. That is simply an outline to help you understand the evidence as it comes in. I analogize opening statements at a trial as like seeing a "Coming Attractions" trailer at the movies. You see the trailer, you think you know what the movie is all about, and you see the movie; sometimes the movie is just what you expected, and sometimes it isn't even close. So just bear in mind that the opening statement is what the lawyers hope they're going to prove, and sometimes they do, and sometimes they don't. And deciding whether they have or have not is up to you.

Once that opening statement is made by the government, the defendant's attorney has the right to make an opening statement if she wishes to do so. She also has the right not to do so, and if she elects not to do so, you're not to hold that against the defendant.

Once the opening statements are over, the government will call its witnesses. The defense has the right to cross-examine them. Once the government's principal part of its case is in, the defendant may, if she wishes to do so, call her own witnesses. The government in that event, would be entitled to cross-examine. After the presentation of evidence is completed — which in some criminal trials includes a rebuttal case from the government and in others it does not — the lawyers will get to make their closing arguments. I then will instruct you on the law, and you will deliberate.



We will try to keep the little conferences that happen in trials, between the lawyers and the judge at the sidebar, to an absolute minimum, because we're very much appreciative of your time and being here and want to use it as efficiently as we can.

It's even possible that there will be requests from lawyers for sidebars, and there are some times when I will say I don't think we need it, and just rule. Understand I'm not being rude to anybody; I'm just moving the trial along. And it's not a commentary on either the lawyer or the point the lawyer is trying to make.

I think that does it. And we're going to hear an opening statement on behalf of the government by Ms. Schwartz, if I remember your name correctly.

No, I don't.

MS. KATZ: Ms. Katz.

THE COURT: Ms. Katz. I'm sorry. This is the first time you've appeared before me. I ask for a little latitude.

THE COURT: You may proceed when you're ready.

MS. KATZ: This is a case about a coverup. It is about how the defendant, Sylvia Ash, deleted and hid evidence from a federal grand jury that was investigating a multimillion dollar fraud. It's about how she lied to a federal agent. It's about somehow she knowingly signed a false document, designed to mislead federal investigators. And it's about how



she tried to cover up the fraud and protect herself. We are here because the defendant obstructed justice.

Now, in this opening statement, I'm going to go over what the evidence at trial will show and the different ways we are going to prove to you what happened.

So what will the evidence show?

Well, the defendant was an experienced New York State court judge. She also spent years as a member on the board of directors at the Municipal Credit Union — or, as it's known, MCU — eventually becoming the board's chair in 2015.

MCU is a credit union based here in Downtown Manhattan. Now, a credit union is a lot like a bank; you can open a checking accounts there or a savings account, apply for a loan, make deposits. But it's different than a bank because it is not profit-driven. MCU's focus is supposed to be on its customers, who are actually called members. And MCU members are mostly state and city employees, like police officers, court officers, firefighters, sanitation workers. And MCU's mission, as a nonprofit, was to provide the best rates and services for its members.

And board members, like the defendant, were supposed to support that mission. But you'll learn that in the years the defendant was on the board, MCU's CEO, Kam Wong, was able to steal millions and millions of dollars from MCU. And he made sure that the defendant got plenty of perks and reimbursed



for any expense she submitted. After all, as chair of the board, the defendant was the one responsible for approving Wong's extravagant credit card bills each month.

While the defendant served on the board, she got tens and thousands of dollars of perks, flying around the world for conferences, all expenses paid to the Greek Islands, England and the Caribbean. MCU reimbursed her personal internet, cable and phone bill. Wong gave her the latest Apple devices, and, whenever she asked, tickets to all the sports games, even prime seats at the U.S. Open. The defendant regularly used the MCU suite at a baseball stadium to host her birthday parties, billing all the food and alcohol to MCU.

Now, to be clear, you will hear that those expenses didn't necessarily violate MCU policy, but this case is not about MCU policy. And you will learn that the defendant was required, because she was a judge, to report gifts and outside income to the state every year, and she didn't. That was New York State policy, not MCU.

In fact, the defendant shouldn't have even been serving on the MCU board because it was a conflict of interest with her position as a judge. When a state ethics committee found out, they told her to resign from the board. But she didn't. She stayed on until an ethics complaint was filed against her. Only then did she resign, in 2016.

But even when she was no longer on the board, the

perks continued, whether it was an all-expense paid trip to Las Vegas or more parties at MCU's suite at the stadium.

Now, in early 2018, Wong had become the focus of a federal investigation for stealing millions of dollars from MCU, and he needed a cover story for the federal agents who were questioning him, an explanation. And who did Wong turn to to help sell his cover story to federal agents? The defendant.

Now, the defendant is not charged with Wong's theft. That's not what this case is about. She is charged with what she did next. Faced with a federal grand jury investigation, and questioning by federal investigators, the defendant lied, concealed, and deleted evidence that had been demanded from her by federal grand jury subpoenas.

When federal agents pressed Wong about the millions of dollars he had taken from MCU, he wrote a memo. That memo claimed that in 2015, the defendant, while she was chair of the board, had told Wong that it was okay to take millions of dollars -- had told Wong, excuse me, that he was permitted to take cash from MCU instead of an insurance policy. Wong asked the defendant to sign this phony memo, but before she agreed to sign, he gave her one last freebie — a brand new Apple iPhone.

Once the defendant had signed that memo, Wong gave it directly to federal agents, claiming it showed that he was innocent. The memo was false, phony. That conversation never happened. And when federal investigators confronted the



defendant with her signature, she confessed that she knew the memo wasn't true.

The federal investigation continued, and so did the defendant's lies. You will learn that she was served with two grand jury subpoenas, the first in March 2018. And you will see that the first subpoena was not hard to understand. It simply ordered her to provide copies of her emails and text messages with Wong to the grand jury. That's it. But the defendant did not provide them. Instead, she claimed she didn't have anything to turn over — no text messages, no emails, nothing. That was not true.

Now, in June 2018, after Wong had been arrested by federal investigators, the defendant received a second grand jury subpoena. It asked for the same emails and text messages as before, as well as for anything of value that she had gotten from MCU and Wong, like all those perks I told you about — the sports tickets, the Apple products, the reimbursements — the same ones she had failed to list on the disclosure forms that she had to file as a judge. You will learn that her failure to do so could subject her to sanctions --

MS. COHEN: Objection.

THE COURT: Sustained.

Ladies and gentlemen, Ms. Ash is not charged with any crimes in her capacity as a state judge. There is no suggestion in the indictment that she violated her duties as a



state judge. And you are to keep that in mind during this case.

MS. KATZ: In response to the second subpoena, the defendant finally produced some emails she had and should have turned over in response to the first subpoena, but she did not produce everything, not all of her emails, no text messages, and she didn't disclose to the government the perks and reimbursements she had received from MCU. You'll also learn that the defendant didn't just fail to turn materials over to the grand jury, she also deleted and erased them.

Now, remember, the iPhone that Wong gave to her before she signed his phony memo? She erased everything on it days after receiving the second subpoena. She went to an Apple store and had the entire contents of the phone wiped clean.

Now, like I said, the subpoenas received in this investigation were not confusing. The questions the federal agents asked her were not complicated. The defendant was a lawyer and a judge, but she did not do what the subpoenas directed her to do. She obstructed justice, and she lied. That is what the evidence will show.

So how will we prove to you that that is what the defendant did?

Well, during the trial, you'll get to see the documents that I just told you about, the phony memo that the defendant signed for Wong, the subpoenas that the defendant



received, and the emails and text messages that the defendant tried to delete forever but the government was still able to find, documents that showed the defendant wanted the federal investigation to stop and that she told Wong, and I quote, she had his back.

You'll also see the disclosure forms she filed as a judge. And you will hear from witnesses. You'll hear testimony about the government's investigation into Wong and MCU, and what the defendant did and said to a federal agent when questioned, the lies she spun, how she claimed to be just confused but how, when confronted with some lies, she confessed.

You'll get to meet and hear from MCU employees. They'll tell you about the defendant's time on the board, all the perks she received, how she was reimbursed for every expense she submitted, tens and thousands of dollars that ranged from her personal cell phone bills to an all-expense paid two-week cruise in the Mediterranean at a cost of more than $10,000 to MCU.

You'll hear from state attorneys who will explain how the defendant was told multiple times to resign from MCU's board but she didn't step down.

And you will also hear from analysts who forensically examined phones that belonged to Wong and the defendant, and how they could not retrieve any data from the defendant's

iPhone that she had taken to the Apple store because it had been totally wiped. You'll also hear that they were able to find copies of text messages that she sent to Wong in his phone and in her own devices and accounts.

Now, for what she did, the defendant is charged with four crimes. You'll learn more about them at the end of the trial and will get instructions from Judge Kaplan on the law, but I expect that you will hear that the defendant is charged with one count of obstructing justice for signing Wong's memo; and with a second count of obstruction for concealing evidence from the grand jury, deleting evidence, and for lying to a federal investigator.

Third, she's charged in a conspiracy with Wong to do those things.

Finally, the defendant is charged with one count of making a false official statement, a false statement, for telling a federal agent she didn't have any materials responsive to the first subpoena when in fact she did; she had emails and text messages, including with Wong.

Now, before I finish, I'm just going to ask you, over the course of this trial, to do three simple things: First, pay close attention to the evidence; second, listen to Judge Kaplan's instructions on the law; and, third, use your common sense, the same common sense you use in your everyday lives as New Yorkers. If you do those three things, you will reach the



only conclusion that is consistent with the law, the evidence, and your common sense — the defendant, Sylvia Ash is guilty as charged.

THE COURT: Thank you.

Ms. Cohen, do you want to start now or do you want to wait until the morning?

MS. COHEN: I'll just confer with my client, your Honor.

(Pause)

MS. COHEN: Your Honor, we're ready to proceed now.

THE COURT: Okay. Go ahead.

MS. COHEN: Ladies and gentlemen, the government just got it wrong. I'm telling you flat out: Ms. Ash never lied to the government. Ms. Ash never deleted emails or withheld text messages to frustrate their investigation. Ms. Ash never wiped her phone in an effort to cover up anything.

Quite the opposite. You will learn Ms. Ash cooperated with the government's investigation. She spoke to them voluntarily. She answered their calls and met with them numerous times.

You will learn that, time and time again, over a span of months, Ms. Ash voluntarily answered the government's questions. Ms. Ash spoke to the government three times without even an attorney, and then several more times. No need to hide from the government because Ms. Ash had nothing to hide. She



did nothing illegal.

Ms. Ash told the government about the memo. Ms. Ash told the government about the emails she had deleted, and Ms. Ash told the government about the transfer of her data to a new iPhone. No lies to the government by Ms. Ash. No deletion of emails or withholding of text messages. No wiping of any phone. She told the government all about it. No lies, no coverup, no crime.

But, as you just heard from the government — and the government spent quite some time on it during the opening statement — Ms. Ash may have made some mistakes, mistakes related to certain benefits she got while on the MCU board, mistakes on forms she needed to fill out as a state judge; accepting certain gifts from a person she trusted, Kam Wong, who turned out to be a liar and a fraudster, mistakes that I expect the government will continue, during this trial, to spend a lot of time telling you about.

But please don't be confused. No matter how much of this trial is spent by the government on benefits Ms. Ash got for being on the MCU board, or whatever gifts she got from Kam Wong, and whatever you may think about how the board was run, whatever mistakes Ms. Ash made in trusting Kam Wong, and any supposed mistakes on state forms, none — and I repeat, none — none of those mistakes make Ms. Ash guilty of the crimes that she is charged here with.



As I expect Judge Kaplan to explain to you, you are not here to determine whether the board should have been run differently or better. You are not here to determine whether Ms. Ash should have gotten gifts from Kam Wong or whether she should have reported those gifts on her state forms.

And I also expect Judge Kaplan to instruct you the fact that Ms. Ash is a judge, the fact that she is a lawyer, does not make her guilty of the charged crimes. None of that is what this case is about.

Ms. Ash is charged here with lying to the government, and on the crimes charged by the government, the government, you will learn, just got it wrong. The government is wrong that she lied to them to cover up anything.

(Continued on next page)

MS. COHEN: (Continuing) She never lied to them, she never frustrated their investigation. And the government will not be able to prove that to you beyond a reasonable doubt.

Ladies and gentlemen, it is my privilege to represent Sylvia Ash. And on behalf of our team, Nathan Reilly, Jamie Buckley, Ashley Stephenson, and of course Ms. Ash, we want to thank you in advance for the attention that we are confident you will pay to the evidence presented to you and the instructions about the law that Judge Kaplan will explain to you.

Nothing could be more important to Ms. Ash than to have the truth come out in this courtroom and having a jury of her peers. Each of you, we chose you. We trusted when you took your oath as jurors and told us that you would take your duty as jurors seriously. Your duty not to assume that the government is right. Your duty to ensure that Ms. Ash is presumed innocent, not presumed guilty. And your duty to consider the evidence fairly and ask yourself if there are equally credible explanations for what happened and for the evidence you are about to hear.

We know you will do just that, and we trust you to do just that.

In telling you that the government got it wrong, we are not intending to minimize in any way what is happening in this courtroom. Nothing could be more important to Ms. Ash



than you being able to learn the facts, see and hear the evidence, apply the law as Judge Kaplan will explain it to you, and for you to get it right.

I will share with you that in preparing for this trial our team often felt frustrated, upset, mad. How could the government get it wrong when they knew Kam Wong was a fraudster? They knew that Kam Wong was a cheat. He was a thief. He is a manipulator and a liar.

You see, ladies and gentlemen, and you heard from the government, Kam Wong gave gifts to Ms. Ash. He got Ms. Ash to trust him. Wong here is the liar. Wong duped Ms. Ash. But the government wants you to make the wrong assumptions from those gifts, or "inferences" as they are called in a courtroom. As I expect Judge Kaplan to instruct you, it is for you to decide if Ms. Ash lied to the government to frustrate their investigation or to cover up Wong's crimes. And the facts here will show you that she did not.

There were some bad actors here. Kam Wong, and you'll also hear about his sidekick, Joseph Gagliardo. Wong, you will learn during the trial, was the president and CEO of the MCU. And he, not Ms. Ash, abused that trust in the most major way. He lied to everyone all the time, including to Ms. Ash. He lied to those around him, in order to steal and enrich himself.

Wong stole almost $10 million from the MCU, pocketed the money, lived a lavish lifestyle. No debate about those



facts. He pled guilty to those crimes. Admitted he was a liar and a thief.

Gagliardo, Wong's accomplice, he also stole from the MCU with Wong's help and committed other crimes. He distributed narcotics to Kam Wong. And his embezzlement, with Wong's help, he embezzled nearly half a million dollars. Gagliardo also pled guilty for that criminal conduct.

Both Wong and Gagliardo, they committed crimes, serious crimes of fraud like embezzlement. And like people sometimes do, when they've committed serious crimes, they lie to people, especially people who they had manipulated. People like Ms. Ash.

Let me be clear, and there is no dispute with the government on this fact, Wong is a fraudster, he lied to everyone. The government definitely got that right. And Ms. Ash, as you heard from the government, was not charged with Wong's or Gagliardo's embezzlement from the bank.

But Ms. Ash did not lie to the government. There was nothing for her to hide. You are going to hear evidence I expect during the trial about subpoenas and search warrants, interviews, e-mails and texts. Not one shred of evidence emerged that Ms. Ash knew or helped Wong steal money from the MCU. There is a simple reason no evidence emerged of that. Ms. Ash was not involved in Wong and Gagliardo's thefts from the MCU.



So this brings me back to why are we here? Ms. Ash, you will learn, like so many others, trusted Wong. She also is a victim of Wong's. He used her and used others to try to help cover up his crimes. Wong didn't admit his crimes to them. He just told lies to them to enlist their help. Ms. Ash was one of those people he lied to, to enlist her help to commit his crimes. She trusted him. She thought she knew him. She believed in him like so many others did. And boy, did she get that wrong.

Ms. Ash signed the memo for Wong about money he was supposedly owed by the bank, money that had been discussed by the board when Ms. Ash was on it. They think that Ms. Ash signed the memo to help cover up his crimes, but the evidence will show that is not correct. Yes, Ms. Ash was friendly with Wong, but she was duped by Wong. She didn't know about his crimes, didn't try to help him, didn't lie to the government about her interactions with Wong or communications with Wong, for any reason.

The government asked Ms. Ash a lot of questions. She answered them all voluntarily, not once, multiple times. She told them about the memo. She told them it wasn't accurate. She told them she had deleted e-mails. She explained to them how she had transferred data from one iPhone to a new iPhone. Trying to deceive the government? Not at all.

Let me talk briefly about what I expect the evidence

to show and how it will show that the government here got it wrong.

You are going to see that memo that Wong got Ms. Ash to sign. And you will learn about how she came to sign it. And you will see she wasn't a partner in Wong's crimes. She was another victim of Wong's manipulation and his lies.

You'll see the text messages and the e-mails that the government says Ms. Ash should have turned over to them or deleted, but she didn't try to hide the fact of them or that there were items she had deleted. She told the government that she deleted e-mails. She wasn't trying to obstruct their investigation. And these e-mails and texts, they had nothing to do with Wong's crimes. They were communications of a social nature between someone Ms. Ash was friendly with, someone she trusted. Nothing related to Wong's crimes or bank business.

And after the federal investigation came to light, and the MCU put Wong on suspension, Ms. Ash still didn't believe he could have done anything wrong. So there are texts you will see of support from Ms. Ash to Wong. Nothing strange there. She was duped by Wong. She believed in him.

And what the government characterized to you as the wiping or the erasing of the iPhone, that simply is not correct. You will hear that the MCU asked Ms. Ash to return the iPhone Wong had given her to the MCU. And that that phone, she did that, and that that phone was her personal phone, and



she told the government she went to the Apple store to get a new phone, and she transferred her data from the phone she was going to turn into the MCU, because they wanted it back, to her new phone. That's all that happened. And you will learn, or you may know from your own experience, that texts don't transfer over to a new phone when you go and switch phones. And that's all that happened here. No lies about the iPhone, no wiping, no erasing.

And ladies and gentlemen, about the benefits you heard from the government that Ms. Ash got while she was on the board of the MCU, and after, the government is telling you about that because they want you to think she did something wrong. She did something wrong by going to conferences, going to conferences that the MCU held for board members. They want you to think she did something wrong by getting reimbursed for certain things or using the MCU's box at a minor league baseball stadium in Brooklyn. But you'll see the board's policies, and you'll be able to decide for yourself.

And even if for some reason you think taking those benefits wasn't right, that is not the question you are being asked to decide beyond a reasonable doubt.

No one is perfect. On that, I'm sure we all can agree. But making mistakes does not make you a criminal. Sylvia Ash's biggest mistake was placing her trust and faith in Kam Wong, a man who turned out to be a fraudster, a huckster, a



liar, and a thief. But that serious error in judgment does not mean that the government has it right. It does not. No lies, no cover up, no crime by Ms. Ash.

We have placed our trust in you. And when you have seen all the evidence during this trial, I will have the chance to stand up here before you again and ask you to return the only verdict that will be consistent with the evidence and the law and your common sense. And we are confident you will do just that. That you will find Ms. Ash not guilty.

Thank you.

THE COURT: Thank you, Ms. Cohen.

Okay, members of the jury, I think you've had a very long day with great patience, so let's break here. We'll resume at 9:30 tomorrow morning. I'll ask counsel to stay. I have a couple of things to take up with them.

(Jury excused)

THE COURT: Is Juror Galvez still in the room? I have a note from him indicating he needs to bring an iPad into the building tomorrow because he teaches at 5:30.

Mr. Galvez? I have your note about the iPad.

A JUROR: Yes, sir.

THE COURT: You can bring it into the building. I am going to try to arrange through Andy to have you check it downstairs on the first floor, but if they can't check it for you, and they give you any trouble, just tell them to call



Andy.

A JUROR: Thank you, sir.

THE COURT: Thank you.

(Juror not present)

THE COURT: You may be seated, folks.

Ms. Katz, I was extremely surprised to hear you make the point to which Ms. Cohen objected. I thought I ruled on that.

MR. MARK: Your Honor, may I?

THE COURT: Yes.

MR. MARK: I didn't think that that was the point that your Honor ruled on. And obviously, she wasn't arguing that she was charged for any sanctions. She was explaining why she would not disclose the benefits she received in the board membership on her MCU forms. That was what her statement was there.

THE COURT: Well, I didn't take it that way. Obviously she didn't say that she was charged with that, but what she said was that she shouldn't have been serving on the board because it was a conflict of interest with her position as a judge.

MR. MARK: Right.

THE COURT: Which to me sounds like misconduct in her capacity as a judge.

MR. MARK: But this is what we briefed, your Honor,

that she was told one time to resign, and the explanation was it was a conflict of interest and that's what she was told, and she didn't step down. And then the second -- we weren't trying to thread the needle, your Honor, and I appreciate -- and Ms. Katz abided by your ruling and moved on. But, the mere -- what she was saying was that there was an explanation for why the disclosure --

THE COURT: I thought I was clear, and if I wasn't, it's on me. But I thought I was clear that I was going to allow you to prove that she was told to step down and the fact that she hadn't as a motive. I thought I was -- if anything, even clearer that you were not to go into any claim of judicial misconduct.

I'm sorry if there was a misunderstanding. But, it's troubling.

MR. MARK: Your Honor, I mean, I think there was a misunderstanding on the specific line that your Honor was drawing. And when we get to the witnesses, those witnesses aren't the ones who are going to testify at the beginning. I will confer and we can let your Honor know how we intend to present that evidence, because we don't want any misconception about what we were doing, and we thought we were abiding by your Honor's instructions.

THE COURT: I'll get to you in one second Ms. Cohen.

I marked Mr. Galvez' note about his iPad Court Exhibit



A.

I have a note from Ms. Ager, which I've marked Court Exhibit B, saying she somehow didn't realize she needed to tell us that she has plane tickets departing on the morning of December 22. I'm not proposing to do anything about that, because I am expecting we'll be done by then. I hope that doesn't prove to be a misguided expectation.

Ms. Cohen, did you have anything else you wanted to say?

MS. COHEN: Not only that reference Ms. Katz made to the conflict of interest that I believe was in violation of your Honor's very clear ruling. But she said, and I'm quoting from the transcript, it's at 3:49 time, I don't know what page, but it's line 20 to 21.

"Ms. Katz: You will learn that her failure to do so could subject her to sanctions."

THE COURT: I heard that too. Absolutely. Same point.

MS. COHEN: Correct. Although subjecting her to sanctions, your Honor, goes much closer to the heart of what the defense in our in limine motions was extremely concerned about happening here, which is that the evidence related to her disclosure forms and testimony by witnesses is going to confuse the jury. And the opening statement, even though I understand your Honor sustained my objection and gave an instruction, I



renew our motion to prevent the government from introducing any evidence about the disclosure forms or sanctions related. I think it is very confusing to the jury, I am very worried about it, especially given the comment in opening statement.

THE COURT: Look, I don't think it's confusing at all. And if there is some further instruction you want me to give, I will certainly consider it. But, there is just no need for it. It's really not rocket science to separate between a claim of judicial misconduct on the one hand, and this charge. And I'm confident the jury can and will do it. It's just not to me the big problem.

If I were defending the case, I would probably be upset too. I grant you that. But, I think I would be overreacting if I were. That's easy to say for me. I understand. Okay.

Anything else this evening? Who is the first witness?

MR. MARK: The first witness will be Louise Cogan-Rupani from MCU. And pursuant to the parties' agreement, we'll give a notice later this evening of the order of the next witnesses for tomorrow as well as the exhibits we plan to introduce. And as the defense has also agreed, I expect they will let us know what exhibits they plan to introduce through the witnesses as well.

THE COURT: Good. Thank you.

MS. COHEN: Thank you, your Honor.

## $

**$10 (1)** 50:24
**$10,000 (3)** 13:6,8;44:19
**$16,000 (1)** 5:5
**$250 (1)** 6:2
**$250,000 (1)** 12:12
**$7,000 (2)** 5:3;12:13

## A

**abided (1)** 57:5
**abiding (1)** 57:22
**ability (2)** 20:15;23:5
**able (9)** 10:19;14:4;26:4;39:23;44:2;45:2;49:3;50:1;54:18
**above (3)** 4:10;15:12;21:3
**absolute (1)** 38:3
**absolutely (2)** 10:21;58:17
**abused (1)** 50:21
**accept (2)** 13:16;34:2
**accepting (1)** 47:14
**access (1)** 2:22
**accomplice (1)** 51:3
**according (2)** 11:5;20:21
**account (43)** 4:11;5:1,2,6,21;6:2,9,14,14;8:2,3,3,6,13,17,18,20;9:3,17;10:1,1,2,10,11,12,12,14,16,17,17;11:6;12:13;13:17,18,24;14:17,21;16:15;18:19;19:24;20:22,23;39:13
**accounts (4)** 6:12;13:19;39:13;45:4
**accurate (1)** 52:21
**accusation (1)** 34:9
**accusations (2)** 15:21;20:6
**achieved (1)** 35:14
**acknowledge (1)** 15:6
**acknowledging (1)** 16:10
**act (4)** 24:18;25:7;26:16;27:1
**actors (1)** 50:18
**acts (2)** 23:2;25:16
**actually (2)** 7:17;39:16
**add (2)** 23:1;26:13
**additional (4)** 4:24;5:1;6:25;24:6
**admit (1)** 52:4
**Admitted (1)** 51:1
**advance (1)** 49:7
**advised (1)** 4:11
**AFTERNOON (1)** 29:1
**afterwards (1)** 3:22
**again (5)** 8:15;17:20,21;46:21;55:6
**against (3)** 20:6;37:15;40:24
**agent (45)** 3:10,13;5:2,4;6:13,15;7:2,18,19,20,21,23;8:1,17,23;9:25,25;10:2,4,4,5,24;11:6,6;13:6;14:4,5,16;15:17,25;16:2;18:12;19:10;20:4,6,11,20,21,23;23:6;29:9,18;38:23;44:9;45:17
**Agent-1 (2)** 4:10,13
**agents (5)** 41:5,7,14,23;43:17
**agent's (6)** 8:13;9:15;13:11;14:22,22;23:6
**Ager (1)** 58:2
**ago (1)** 4:11
**agree (5)** 13:10;32:14,21;35:8;54:23
**agreed (3)** 20:10;41:20;59:21
**agreement (5)** 21:5;35:4,6,7;59:18
**ahead (2)** 4:3;46:11
**alcohol (1)** 40:12
**allegations (1)** 26:17
**alleged (5)** 7:6;8:8;23:3,4;27:13
**allegedly (1)** 3:18
**all-expense (2)** 41:1;44:17
**allow (2)** 35:18;57:10
**allowed (1)** 10:13
**almost (2)** 14:21;50:24
**Alona (1)** 2:7
**alone (1)** 32:9
**along (3)** 2:6;17:15;38:9
**alternates (1)** 32:2
**although (5)** 4:23;10:23;19:7;29:23;58:19
**always (2)** 34:12;35:5
**AML (2)** 24:15;25:25
**among (1)** 35:17
**amount (6)** 5:4;6:3;13:3,4;17:5;24:13
**analogize (1)** 37:2
**analogous (1)** 12:1
**analysts (1)** 44:23
**Andy (4)** 29:5;30:24;55:23;56:1
**Andy's (1)** 35:24
**annual (3)** 19:8,8,12
**answered (3)** 46:19,22;52:20
**Anti-money (2)** 24:18,22
**apart (2)** 20:1;24:4
**apparently (3)** 8:4,16;11:4
**appeared (1)** 38:18
**Apple (6)** 40:8;41:21;42:17;43:13;45:1;54:1
**application (1)** 21:20
**applications (1)** 30:8
**apply (3)** 32:10;39:13;50:2
**appreciate (2)** 28:1;57:4
**appreciative (1)** 38:3
**approached (1)** 7:20
**appropriate (1)** 33:4
**approving (1)** 40:2
**approximate (1)** 5:3
**approximately (2)** 5:5;31:4
**Apropos (1)** 30:6
**argue (3)** 5:15;24:3,5
**arguing (1)** 56:12
**argument (5)** 4:5,6;12:15;14:10;23:22
**arguments (9)** 14:19,19;15:8;21:22;29:13,15,17;32:24;37:24
**arises (1)** 5:12
**arithmetic (1)** 13:15
**around (3)** 5:3;40:5;50:23
**arrange (1)** 55:23
**arrested (1)** 42:12
**Ash (61)** 2:3,11,13;7:1,7,19,25;8:8;38:21;42:23;46:2,13,14,15,17,22,23,25;47:2,2,4,5,11,19,22,24;48:4,7,10;49:5,6,11,16,25;50:10,10,11,15,21,22;51:12,16,18,22,24;52:1,5,10,12,12,14,19;53:3,8,14,17,19,23;54:10;55:3,9
**Ashley (2)** 2:14;49:6
**Ash's (4)** 3:5;27:13;29:13;54:24
**assets (2)** 13:7;16:16
**assigned (1)** 20:7
**Assistant (2)** 2:6,7
**assume (3)** 6:7;10:22;49:15
**assuming (1)** 15:16
**assumptions (1)** 50:12
**attack (1)** 23:13
**attended (3)** 19:10,11,11
**attention (5)** 30:7;35:24;36:15;45:22;49:7
**Attorney (4)** 2:6,7;37:12;46:24
**attorneys (1)** 44:20
**Attractions (1)** 37:4
**AUSA (2)** 2:7;8:5
**AUSAs (3)** 9:9;10:23;20:7
**auto (1)** 17:18
**aware (3)** 26:11;30:11;36:13
**awareness (1)** 26:22
**away (3)** 27:20,21;36:4

## B

**back (9)** 8:19;9:1,3;10:15;15:22;35:20;44:5;52:1;54:3
**background (1)** 4:14
**bad (2)** 23:2;50:18
**bag (1)** 18:22
**balance (14)** 5:2,3,8,16,17,21;8:6;11:8;12:13;13:4,5,6,18,24
**balances (5)** 6:6;8:14;13:5,18;17:7
**bank (22)** 6:14;8:3;10:14;11:22,22,23,24;14:23;24:18;25:7,16;26:16;27:1;35:8,10,11,12;39:12,14;51:17;52:11;53:15

**bankruptcy (1)**
12:10
**banks (1)**
6:11
**baseball (2)**
40:11;54:17
**based (3)**
29:11;33:17;39:11
**basic (2)**
3:12;34:6
**basically (1)**
14:20
**basis (2)**
8:14;26:21
**bear (4)**
33:22;34:4;36:9;
37:7
**bears (1)**
13:5
**become (1)**
41:3
**becomes (2)**
15:22;21:7
**becoming (1)**
39:10
**begin (1)**
36:25
**beginning (1)**
57:19
**begun (1)**
32:4
**behalf (4)**
21:23;29:13;38:13;
49:5
**behind (1)**
2:13
**behoove (1)**
4:16
**belabor (1)**
15:20
**believing (1)**
26:21
**Bellinger (1)**
3:5
**belonged (1)**
44:24
**benefit (2)**
6:18;16:25
**benefits (9)**
11:20;18:11,16,20;
47:12,19;54:9,20;
56:14
**bereft (1)**
11:11
**best (5)**
17:24,25;21:11;
23:12;39:19
**better (2)**
18:13;48:3
**beyond (5)**
15:12;21:3;34:20;
49:3;54:21
**bias (4)**
11:2;14:15;16:17;
26:2
**biased (1)**
8:24
**big (2)**
19:23;59:11
**biggest (1)**
54:24
**bill (1)**
40:8
**billing (1)**
40:12
**billions (3)**
13:8,9;16:16
**bills (2)**
40:3;44:17
**birthday (1)**
40:11
**board (26)**
10:9;12:22,23;16:5,
13;23:5;39:8,21,23;
40:2,4,20,22,25;41:17;
44:14,22;47:12,20,21;
48:2;52:12;54:10,14;
56:14,20
**board's (2)**
39:10;54:17
**borne (1)**
23:11
**borrower (5)**
11:18,21,21,23,24
**borrowers (2)**
11:22,23
**both (5)**
8:7;20:8;27:4;36:11;
51:8
**box (1)**
54:16
**boy (2)**
12:4;52:8
**Brady (5)**
4:23;6:19;21:6;22:7;
23:12
**brand (1)**
41:21
**break (2)**
29:25;55:13
**briefed (1)**
56:25
**briefly (1)**
52:25
**bright (1)**
27:22
**bring (3)**
35:24;55:18,22
**brings (1)**
52:1
**Brooklyn (1)**
54:17
**BSA (2)**
24:15;25:25
**Buckley (2)**
2:14;49:6
**build (1)**
22:23
**building (2)**
55:19,22
**burden (3)**
34:12,14,19
**buried (2)**
8:15;15:11
**business (2)**
31:1;53:15
**buys (1)**
35:8

## C

**cable (1)**
40:7
**call (9)**
7:5;16:17;19:17;
22:20;25:10;26:14;
37:17,19;55:25
**called (4)**
7:20;30:6;39:16;
50:13
**calling (1)**
25:18
**calls (2)**
23:15;46:19
**came (3)**
9:3;53:4,16
**can (17)**
10:9;16:3;17:20,21;
18:15;20:14;21:10;
22:14;24:5,10;36:10;
38:5;39:12;54:22;
55:22;57:20;59:10
**capacity (2)**
42:24;56:24
**car (1)**
35:9
**card (1)**
40:3
**Caribbean (1)**
40:7
**Carrie (1)**
2:10
**carried (1)**
35:7
**case (50)**
3:13;5:9,10,12,12;
7:2,3,4,18,19,20,21,23,
23;8:1,13,17,23;9:4;
10:24;14:16,16;15:12;
16:1;18:5;23:1,6,6;
32:11,16;33:17,22;
34:3,5,13,21,24;35:17,
21,23;36:2,7;37:19,23;
38:20;40:14;41:9;43:2;
48:9;59:12
**cases (1)**
23:17
**cash (1)**
41:19
**cast (2)**
13:2;14:11
**cause (1)**
29:12
**CD (1)**
2:24
**cell (1)**
44:17
**CEO (2)**
39:23;50:20
**certain (6)**
10:14,16;18:19;
47:12,14;54:16
**certainly (1)**
59:7
**chair (3)**
39:10;40:1;41:16
**challenge (1)**
12:7
**chambers (3)**
30:3,10,25
**chance (1)**
55:5
**change (4)**
21:22,24;22:11;35:9
**changed (2)**
17:16,25
**characterized (1)**
53:21
**charge (1)**
59:9
**charged (17)**
6:18;34:18;41:8,9;
42:23;45:5,8,13,15;
46:3;47:25;48:8,10,11;
51:16;56:13,18
**charges (2)**
34:22;35:3
**cheat (1)**
50:7
**check (2)**
55:23,24
**checking (2)**
8:17;39:13
**chief (2)**
20:8,9
**chose (1)**
49:13
**Christmas (1)**
22:19
**Circuit (1)**
23:14
**circumstances (2)**
10:6;32:22
**circumstantial (2)**
33:20,23
**city (1)**
39:17
**claim (3)**
7:8;57:12;59:8
**claimed (3)**
41:16;42:9;44:10
**claiming (1)**
41:23
**claims (1)**
7:21
**clarified (1)**
19:5
**clarify (1)**
4:2
**clean (2)**
34:10;43:14
**clear (6)**
4:1;40:13;51:13;
57:8,9;58:12
**clearer (1)**
57:12
**CLERK (3)**
2:3,9;3:5
**clerk's (1)**
2:23
**client (3)**
7:6;21:23;46:7
**clients (1)**
33:2
**close (5)**
22:20;32:11,12;37:7;
45:22
**closely (1)**
26:1
**closer (1)**
58:20
**closing (1)**
37:24
**co-conspirator (1)**
27:13
**co-conspirators (1)**
8:9
**code (1)**
14:7
**Cogan-Rupani (1)**
59:18
**COHEN (71)**
2:10,11,18;3:2,3;
6:22,24;7:10,17;8:23;
9:1,7,23;10:8;11:11;
12:19;13:10,14,20,23;
14:3,13;15:8;16:24;
17:9,14,15;18:7,8,15,
18,25;19:3,7,19;20:17,
19;21:10,13,15,18;
22:13,25;23:8;25:4,5,
7;26:10,23;27:9,12,17;
29:5,7,19;30:20;31:6,
7;42:21;46:5,7,10,12;
49:1;55:11;56:7;57:24;
58:8,10,19;59:25
**Cohen's (2)**
15:21;17:13
**collapse (1)**
12:10
**collateral (1)**
23:13
**colleague (2)**
2:12,13
**coming (2)**

22:19;37:3
**comment (1)**
59:4
**commentary (1)**
38:10
**comments (1)**
36:3
**commit (3)**
25:1,3;52:6
**committed (6)**
20:11;26:7;35:15;
51:4,8,10
**committee (1)**
40:21
**common (4)**
45:23,24;46:2;55:8
**communicated (1)**
7:19
**communication (1)**
14:23
**communications (4)**
18:5,6;52:17;53:13
**company (1)**
14:6
**complaint (1)**
40:23
**completed (1)**
37:22
**completely (5)**
7:17;8:12,24;24:24;
26:9
**complicated (1)**
43:17
**concealed (1)**
41:12
**concealing (1)**
45:10
**conceivably (1)**
8:22
**concerned (2)**
25:13;58:21
**concerning (1)**
32:16
**conclusion (4)**
9:4;11:15;16:2;46:1
**conclusions (1)**
12:16
**conduct (4)**
14:7;23:6;35:16;
51:7
**conducting (1)**
24:20
**confer (2)**
46:7;57:20
**conferences (4)**
38:1;40:6;54:13,14
**confessed (2)**
42:1;44:12
**confident (3)**
49:7;55:8;59:10
**conflict (8)**
4:13;19:25;20:12;
23:5;40:20;56:20;57:2;
58:11
**confronted (2)**
41:25;44:11
**confuse (1)**
58:23
**confused (2)**
44:11;47:18
**confusing (3)**
43:16;59:3,5
**conservatorship (1)**
26:4
**consider (4)**
6:15;34:16;49:18;
59:7
**considered (3)**
32:24;33:10,14
**considering (1)**
36:15
**consist (1)**
32:19
**consistent (2)**
46:1;55:7
**conspiracy (9)**
7:10,15;35:3,4,5,13,
13,15;45:13
**conspired (1)**
35:10
**construed (1)**
21:6
**contains (1)**
2:25
**contents (1)**
43:14
**contest (2)**
16:5,8
**contested (1)**
16:12
**context (2)**
5:15;15:13
**continue (1)**
47:16
**Continued (5)**
28:5;31:9;41:1;42:3;
48:14
**Continuing (1)**
49:1
**contributions (1)**
6:1
**control (3)**
24:20,22;34:24
**conversation (1)**
41:24
**convicted (1)**
7:14
**conviction (1)**
23:13
**cooperate (1)**
25:11
**cooperated (1)**
46:17
**copies (2)**
42:7;45:3
**copy (2)**
30:3,4
**corrected (2)**
4:17;14:1
**correctly (2)**
9:21;38:14
**corresponds (1)**
30:24
**cost (1)**
44:18
**counsel (13)**
2:12;3:6;4:11,12;
22:22;25:22,24;26:6,
15,24;27:6;30:25;
55:14
**count (6)**
7:10,13,14;45:9,10,
15
**counts (3)**
7:9,12;35:3
**couple (1)**
55:15
**course (10)**
10:20;11:2;19:8;
24:12;28:3;33:2;34:5;
36:8;45:21;49:6
**court (99)**
2:1,2,16,19;3:8,17,
23;4:3,16;5:8,16,21;
6:5,21;7:8,14;8:22;9:1,
20;10:6;11:9,13;12:25;
13:14,22;14:1,7;15:2,
15;16:4,10,23;17:20,
22;18:2,9,17,22;19:2,5,
15,21;20:14,18;21:1,4,
14,17,20;22:5,17;23:8,
24;24:10,17,21;25:3,6,
20;26:18;27:8,11,15,
25;28:1;29:4,5,16,21;
30:3,6,17,19,23;31:5;
32:4,22;38:17,19;39:8,
18;42:22;46:4,11;
55:11,17,22;56:3,5,10,
17,23;57:8,24,25;58:2,
17;59:5,24
**courtesy (1)**
30:4
**courthouse (2)**
3:4;27:18
**courtroom (7)**
9:9;24:10;33:16,18;
49:12,25;50:13
**cover (9)**
39:1;41:5,7;46:16;
48:13;50:16;52:4,13;
55:3
**coverup (2)**
38:20;47:8
**credibility (3)**
9:16;11:2;23:7
**credible (1)**
49:19
**credit (21)**
6:7,8,12;10:3,7;
11:18;12:9,12,20;13:5,
7,19;16:4,13,16,20,20;
39:9,11,12;40:3
**crime (4)**
35:14,14;47:8;55:3
**crimes (19)**
42:24;45:6;47:24;
48:8,11;50:16;51:1,4,8,
9,10;52:4,4,7,13,16;
53:5,13,15
**criminal (6)**
20:8,9;34:5;37:22;
51:7;54:23
**cross (2)**
23:22;26:20
**cross-examination (2)**
4:6;9:14
**cross-examine (3)**
9:13;37:18,21
**cruise (1)**
44:18
**current (4)**
25:14,18,23;27:3
**customers (1)**
39:16

**D**

**data (4)**
44:25;47:4;52:23;
54:2
**date (2)**
13:4,6
**day (5)**
7:19;21:19;22:21;
36:18;55:13
**days (1)**
43:12
**deal (5)**
21:12;22:11;26:4;
27:15;30:11
**deals (2)**
24:12,14
**debate (1)**
50:25
**deceive (1)**
52:24
**December (1)**
58:5
**decide (10)**
9:12;14:19;22:1;
32:9;33:17,25;34:4;
50:15;54:18,21
**decided (2)**
8:10;15:10
**deciding (1)**
37:10
**decision (1)**
22:4
**decisions (1)**
34:25
**Defendant (48)**
2:9,11;3:18;6:1;24:7,
8;26:3;28:4;34:7,10,
13;37:15,19;38:21;
39:2,7,21,23,25;40:2,4,
10,15,19;41:7,8,11,16,
20,22;42:1,9,13;43:4,9,
17,22,25,25;44:1,3,9,
21,24;45:5,8,15;46:2
**defendant's (5)**
23:18;37:12;42:4;
44:14,25
**defending (1)**
59:12
**defense (11)**
4:9,25;8:12,21;24:1,
25;26:6,14;37:17;
58:21;59:21
**defense's (1)**
2:22
**definitely (1)**
51:15
**delay (1)**
22:24
**delayed (1)**
22:14
**delete (1)**
44:2
**deleted (9)**
38:21;41:12;43:10;
46:14;47:3;52:22;53:9,
10,11
**deleting (1)**
45:11
**deletion (1)**
47:5
**deliberate (2)**
35:20;37:25
**deliberations (3)**
34:25;36:7,17
**demanded (1)**
41:12
**departing (1)**
58:4
**depend (1)**
36:22
**Depending (1)**
21:19
**depends (1)**
10:11
**deposit (5)**
8:18,19;9:2;13:4;
18:23
**depositor (2)**
12:2,3
**depositors (2)**
12:8;19:23
**deposits (1)**
39:14
**DEPUTY (2)**
2:3,9
**designed (1)**
38:25
**despite (1)**
22:20

**detail (1)**
5:23
**detailed (2)**
5:24;34:23
**details (3)**
5:1;14:17,18
**determine (2)**
48:2,3
**determined (1)**
23:12
**determining (1)**
34:17
**devices (2)**
40:8;45:4
**different (6)**
12:3,20;13:13;29:13;
39:4,14
**differently (2)**
29:12;48:3
**difficult (1)**
36:10
**direct (5)**
8:17,19;9:2;33:19,23
**directed (1)**
43:19
**directly (1)**
41:23
**directors (2)**
12:22;39:9
**disagree (1)**
21:25
**disc (3)**
3:4,5,6
**disclose (11)**
9:25,25;10:2;11:3,4;
20:4;23:3,4;27:25;
43:7;56:14
**disclosed (14)**
9:16,16,17;11:3,7;
14:15,16,17;17:17;
19:24;20:20,21,22,23
**disclosure (10)**
4:25;7:2;8:13;9:18;
15:13;42:18;44:6;57:7;
58:23;59:2
**disclosures (5)**
15:11;21:5;29:24,24;
30:2
**discoverable (1)**
4:24
**discovery (2)**
8:16;15:11
**discretion (1)**
22:9
**discuss (4)**
35:17,18,21;36:16
**discussed (2)**
20:1;52:11
**discussions (2)**
27:4;30:17
**dispositive (1)**
27:6
**dispute (1)**
51:13
**disregard (1)**
33:14
**disregarded (1)**
33:16
**distinction (1)**
35:11
**distinguish (1)**
5:11
**distinguished (1)**
5:10
**distributed (1)**
51:5
**distribution (1)**
24:13
**district (1)**
23:14
**divided (2)**
13:8,18
**dividends (3)**
10:13,15;18:19
**division (2)**
20:8,9
**docket (1)**
30:18
**document (1)**
38:24
**documents (5)**
10:17,18;32:19;
43:24;44:3
**dollar (1)**
38:23
**dollars (10)**
6:9;13:9;16:16;
39:24;40:5;41:4,15,18;
44:16;51:6
**done (3)**
24:3;53:18;58:6
**doubt (4)**
2:19;34:20;49:3;
54:21
**doubting (1)**
26:24
**down (5)**
4:18;16:23;44:22;
57:3,10
**downstairs (1)**
55:24
**Downtown (1)**
39:11
**draw (2)**
9:5;11:15
**drawing (1)**
57:18
**dropped (1)**
2:23
**due (1)**
17:7
**duped (3)**
50:11;52:15;53:20
**during (16)**
5:9;8:7,19;10:20;
12:14;17:7;21:11;
23:16;36:8;43:1,23;
47:10,16;50:20;51:20;
55:5
**duties (1)**
42:25
**duty (5)**
32:8;49:15,15,16,17
**DVD (1)**
2:24

## E

**earlier (1)**
20:10
**earliest (1)**
20:15
**early (2)**
6:17;41:3
**easy (2)**
19:13;59:14
**ECF (2)**
30:9,15
**effect (1)**
13:9
**efficiently (1)**
38:4
**effort (1)**
46:16
**eight (1)**
18:11
**either (5)**
6:5;15:16;25:23;
35:17;38:10
**election (2)**
16:5,13
**electronic (1)**
36:4
**elects (1)**
37:14
**Eli (1)**
2:6
**else (9)**
8:18;10:10;28:3;
35:18,18;36:17,21;
58:8;59:16
**email (2)**
30:25;31:1
**emailing (1)**
30:9
**emails (10)**
42:7,11,14;43:4,6;
44:1;45:19;46:14;47:3,
6
**e-mails (5)**
51:21;52:22;53:7,11,
12
**embezzled (1)**
51:6
**embezzlement (3)**
51:5,9,17
**emerged (2)**
51:22,23
**employees (6)**
25:14,19,24;27:2;
39:17;44:13
**end (11)**
4:1;9:5;21:18;30:1;
34:3,13,21,24;36:7,18;
45:6
**England (1)**
40:6
**enlighten (2)**
12:18;13:22
**enlightening (1)**
17:11
**enlist (2)**
52:5,6
**enough (1)**
23:16
**enrich (1)**
50:23
**ensure (1)**
49:16
**entering (1)**
27:18
**entire (2)**
21:24;43:14
**entitled (5)**
8:12;9:24;11:12;
14:18;37:21
**equally (1)**
49:19
**equity (1)**
17:12
**equivalent (1)**
13:17
**erased (2)**
43:10,12
**erasing (2)**
53:22;54:8
**error (1)**
55:1
**especially (2)**
51:11;59:4
**ethical (1)**
20:10
**ethics (3)**
20:7;40:21,23
**even (21)**
5:24;7:15;8:5;9:14;
11:16;12:10;14:14;
16:14,14;23:11,16;
35:10;37:7;38:6;40:9,
19,25;46:24;54:19;
57:12;58:24
**evening (2)**
59:16,19
**event (5)**
2:20;12:10;21:7;
23:12;37:20
**eventually (1)**
39:10
**everybody (1)**
13:18
**everyday (1)**
45:24
**everyone (3)**
12:11;50:22;51:15
**evidence (47)**
32:8,18,23,25;33:1,3,
4,10,14,16,17,19,19,20,
23,24;34:10,14;36:6,
16,20,24;37:2,21;
38:21;39:4,6;41:12;
43:20;45:10,11,22;
46:1;49:8,18,20;50:2;
51:19,21,23;52:13,25;
55:5,7;57:21;58:22;
59:2
**exact (1)**
6:12
**exactly (2)**
9:10;16:19
**examined (1)**
44:24
**example (4)**
10:13;17:12;18:18;
35:13
**exclude (1)**
33:13
**excuse (1)**
41:18
**excused (1)**
55:16
**exercised (1)**
22:10
**exercises (1)**
34:16
**Exhibit (2)**
57:25;58:3
**exhibits (3)**
32:20;59:20,22
**existence (1)**
27:1
**expect (12)**
7:5;31:2,4,6;45:8;
47:16;48:1,6;50:14;
51:20;52:25;59:21
**expectation (1)**
58:7
**expected (1)**
37:6
**expecting (1)**
58:6
**expense (2)**
40:1;44:16
**expenses (2)**
40:6,13
**experience (2)**
36:12;54:5
**experienced (1)**
39:7
**explain (4)**
44:20;48:1;49:9;
50:2
**explained (1)**
52:22
**explaining (1)**
56:13

explanation (4)
2:24;41:6;57:1,6
explanations (1)
49:19
extent (3)
6:8;17:3;24:6
extra (1)
3:4
extravagant (1)
40:3
extreme (1)
7:1
extremely (3)
23:13;56:6;58:21

F

Faced (1)
41:10
fact (16)
7:2;12:1;20:21;
22:19;26:5;27:6,7;
34:16;36:10;40:19;
45:18;48:7,7;51:14;
53:9;57:10
facts (18)
5:18;8:6,10;9:10,11,
13;11:16;15:10;22:11;
24:6;32:9,10,17,18,20;
50:1,16;51:1
factual (2)
4:14;16:5
fail (1)
43:9
failed (2)
11:3;42:18
failure (5)
23:3,3,4;42:19;58:15
fairly (1)
49:18
faith (1)
54:24
false (6)
3:18;7:15;38:24;
41:24;45:16,16
familiar (1)
32:6
family (3)
19:11,20,23
favor (1)
23:18
favorable (2)
10:19;25:12
FDIC (1)
6:10
federal (21)
6:11;38:22,23,25;
41:4,5,7,10,11,13,14,
23,25;42:3,13;43:16;
44:3,9;45:12,17;53:16
federally (3)
6:7,8;12:9
felt (1)
50:5
few (2)
3:12;35:16
file (5)
4:17;30:15,18,20;
42:19
filed (7)
4:22,25;24:1;25:1;
30:9;40:23;44:6
filing (3)
3:24;20:5;23:21
fill (1)
47:13
Finally (5)
6:5;34:19;36:5;43:4;
45:15
financial (4)
5:15;6:15;12:9;
16:21
find (7)
19:15;32:8,18,22;
44:3;45:3;55:9
finish (2)
35:19;45:20
firefighters (1)
39:18
firm (1)
26:25
first (23)
3:21,23,24;7:25;
11:13;19:24;20:20,24;
23:25;24:14;25:21;
26:1,8;34:7;38:17;
42:5,6;43:5;45:18,21;
55:24;59:16,17
five (1)
17:2
flat (1)
46:13
floated (1)
17:25
floating (1)
17:23
floor (1)
55:24
flying (1)
40:5
focus (2)
39:15;41:3
Foerster (3)
2:11,13,14
folks (1)
56:5
follow (2)
32:13;33:11
food (1)
40:12
footnote (1)
20:1
foreclose (1)
26:19
forensically (1)
44:23
forever (1)
44:2
form (2)
10:15;36:5
former (4)
25:18,23;26:15;27:3
forms (8)
42:18;44:6;47:13,23;
48:5;56:15;58:23;59:2
forth (1)
15:22
found (1)
40:22
four (6)
4:4;7:8,12;25:23;
26:25;45:6
fraud (3)
38:23;39:1;51:9
fraudster (4)
47:15;50:7;51:14;
54:25
freebie (1)
41:21
friendly (2)
52:14;53:14
frustrate (2)
46:15;50:15
frustrated (2)
49:2;50:5
fulfill (1)
18:1
full (2)
4:7;8:13
fully (1)
11:3
fundamentally (1)
30:25
further (6)
5:24;21:21;24:6;
29:23,24;59:6

G

Gagliardo (4)
50:19;51:3,7,8
Gagliardo's (2)
51:17,24
Galvez (2)
55:17,20
Galvez' (1)
57:25
games (1)
40:9
gather (2)
2:25;29:6
gave (6)
40:8;41:21,22;43:11;
50:10;58:25
General (6)
14:9,10,11;26:15;
30:10;34:23
gentlemen (5)
42:23;46:12;49:4;
50:9;54:9
getaway (1)
35:9
gets (3)
13:23;14:11;35:9
gifts (9)
19:9,12;40:16;47:14,
20;48:4,5;50:10,13
Giglio (4)
4:24;6:19;21:7;22:7
given (12)
5:19;16:15;17:3,4;
19:9;20:5;22:14;29:15;
30:17;34:5;53:24;59:4
giving (2)
12:17;35:19
goes (4)
11:2;23:7;35:8;
58:20
Good (6)
2:2,5,10,16;23:24;
59:24
Government (81)
2:4,5;4:11,12,16,23;
6:13,25;7:5,6,21,25;
8:9,10;9:8,9;14:17,25;
15:2;17:1;20:21;23:2;
25:9,11,12,18;26:11,
14;29:9;30:6,22;34:13,
19;36:25;37:11,16,20,
23;38:13;43:7;44:2;
46:12,14,23,25;47:2,3,
4,5,7,9,10,16,19;48:10,
11,11,12;49:2,16,23;
50:6,10,12,15;51:14,
15,16,18;52:16,19,24;
53:1,8,10,21;54:1,10,
11;55:2;59:1
government's (8)
15:4;17:2;20:2;21:4;
37:18;44:8;46:18,22
grand (8)
38:22;41:10,13;42:5,
8,13;43:10;45:11
grant (2)
30:15;59:13
granting (1)
2:22
great (1)
55:13
Greek (1)
40:6
guess (2)
5:2;9:8
guilt (2)
34:9,20
guilty (9)
34:8,17;46:2;47:24;
48:8;49:17;51:1,7;55:9
gun (1)
35:9
guy (1)
30:24
guys (1)
35:8

H

half (2)
15:3;51:6
hampered (1)
29:10
hand (2)
8:12;59:9
happen (1)
38:1
happened (6)
30:12;39:5;41:25;
49:19;54:4,7
happening (3)
27:4;49:24;58:22
happens (2)
4:18;33:9
happy (2)
2:16;3:20
hard (5)
5:11;9:11;23:14;
36:13;42:6
harm (2)
16:24,25
head (1)
13:11
hear (22)
3:11;6:23;12:7;15:7;
27:8;32:5;33:17;38:12;
40:13;44:7,7,13,20,23;
45:2,8;49:20;50:1,19;
51:19;53:23;56:6
heard (15)
11:13,14,19;16:12,
14;19:21;21:13;33:15,
21;36:5;47:9;50:9;
51:16;54:9;58:17
hearing (2)
20:24;23:25
heart (1)
58:20
held (2)
26:1;54:14
help (9)
37:1;41:7;51:4,6;
52:3,5,6,13,16
helped (1)
51:22
helpful (1)
18:15
Here's (1)
11:17
herself (1)
39:1
hid (1)
38:21
hide (4)
46:24,25;51:19;53:9
higher (2)
5:16,20

**highlight (1)**
7:1
**highly (1)**
21:25
**himself (1)**
50:23
**hindsight (1)**
6:19
**hold (1)**
37:14
**holiday (1)**
22:19
**home (3)**
17:12,12;36:18
**Honor (82)**
2:5,10,18;3:3,16,19,20,21;4:8,19,21;6:10,24;7:10,13,18;8:21,23,25;9:7,15,23;10:3,8,13;11:1,11;12:19;13:10,20;14:3;15:20;16:9,19;17:15,17;18:8,15,18,25;19:4;20:3,17;21:2,15;22:13,15;23:1,7,19,20;24:3,6,12;25:2,5,8,17,21;26:23;27:9;29:7,8,20,22,23;30:5,13,15;31:7;46:8,10;56:9,12,25;57:4,16,17,20;58:20,25;59:25
**Honor's (3)**
3:20;57:23;58:12
**hope (2)**
37:8;58:6
**hopeful (1)**
21:18
**host (1)**
40:11
**hour (1)**
29:15
**hours (1)**
8:1
**huckster (1)**
54:25
**hundreds (1)**
16:20
**hypothetical (1)**
14:13

## I

**identified (1)**
17:5
**ignore (1)**
33:7
**illegal (1)**
47:1
**imagine (4)**
5:17,18;17:9,11
**immediate (1)**
19:19
**immediately (1)**
4:20
**impanelled (1)**
32:2
**important (2)**
49:11,25
**impressed (1)**
11:25
**incentive (1)**
25:11
**incentives (1)**
13:11
**included (1)**
24:7
**includes (1)**
37:22
**including (4)**
15:9;20:9;45:19;50:22
**income (1)**
40:17
**incorrect (1)**
13:21
**increased (1)**
6:3
**indeed (1)**
29:16
**indicated (1)**
24:8
**indicating (2)**
32:15;55:18
**indicted (1)**
25:15
**indictment (2)**
34:8;42:25
**individual (2)**
7:5;36:19
**individually (1)**
36:10
**individuals (3)**
8:8;20:9;25:25
**inferences (1)**
50:13
**influenced (1)**
33:5
**inform (3)**
25:22,24;35:24
**information (25)**
2:23,25;6:25;7:22;10:21,25;11:12;14:3,18,21;15:1,3;16:23;17:1;21:1,10,16,20,21,25;22:3;29:8,10,12,14
**informed (4)**
4:12;6:15;26:14,25
**innocence (1)**
34:14
**innocent (3)**
34:7;41:24;49:17
**inquire (1)**
8:2
**Insofar (1)**
11:18
**instance (1)**
26:8
**instances (1)**
23:2
**instead (2)**
41:19;42:9
**institution (1)**
9:3
**instruct (5)**
33:10;35:20;37:25;48:6;50:14
**instruction (3)**
33:12;58:25;59:6
**instructions (9)**
32:6,11;34:23,24;35:19;45:7,23;49:9;57:23
**insurance (1)**
41:19
**insured (4)**
6:7,8,8;12:9
**insures (2)**
6:11,11
**intend (2)**
26:14;57:20
**intending (1)**
49:24
**interactions (1)**
52:17
**interest (16)**
4:13;5:15;6:15;10:19;11:23;12:4;16:17,21;17:16,22;19:25;20:12;40:20;56:20;57:2;58:11
**interfere (1)**
36:15
**internet (1)**
40:7
**interrupt (1)**
20:19
**interviewing (1)**
10:24
**interviews (1)**
51:21
**into (11)**
8:19;26:7,11,18,20;35:20;44:8;54:3;55:18,22;57:12
**introduce (3)**
23:2;59:21,22
**introducing (1)**
59:1
**investigate (1)**
16:3
**investigated (1)**
8:9
**investigating (2)**
14:6;38:22
**investigation (35)**
5:7,9,13,25;6:17;8:7,19,24,25;9:22,24;10:21;11:21;12:14;13:12;24:15,19,24;25:8,13,25;27:2;36:2;41:4,10;42:3;43:16;44:4,8;46:15,18;49:2;50:16;53:12,16
**investigator (2)**
18:5;45:12
**investigators (4)**
38:25;41:11,25;42:13
**involved (2)**
36:2;51:24
**involvement (1)**
10:5
**iPad (3)**
55:18,20;57:25
**iPhone (9)**
41:21;43:11;45:1;47:5;52:23,23;53:22,24;54:7
**Islands (1)**
40:6
**issue (5)**
15:21,23;26:3,12;27:17
**issues (3)**
12:24;24:20,23
**item (1)**
33:10
**items (1)**
53:10

## J

**Jamie (2)**
2:14;49:5
**job (1)**
23:24
**Jonathan (1)**
2:7
**Joseph (1)**
50:19
**judge (20)**
38:2;39:8;40:16,21;42:19,24;43:1,18;44:7;45:7,22;47:13;48:1,6,7;49:9;50:2,14;56:21,24
**judges (3)**
14:8;23:10,14
**judgment (2)**
36:22;55:1
**judicial (2)**
57:12;59:9
**June (1)**
42:12
**Juror (4)**
55:17,21;56:2,4
**jurors (4)**
22:22;35:16;49:14,15
**jury (25)**
2:21,22;22:18;24:4;27:21;29:4,5;32:1,2;35:20;36:18;38:22;41:10,13;42:5,8,14;43:10;45:11;49:12;55:12,16;58:24;59:3,10
**justice (4)**
35:4;39:2;43:19;45:9

## K

**Kam (14)**
24:13,23;27:13;39:23;47:14,20,22;48:4;50:6,7,10,18;51:5;54:25
**Kaplan (6)**
45:7;48:1,6;49:9;50:2,14
**Kaplan's (1)**
45:23
**Katz (11)**
2:8;31:3;38:16,16,17,20;43:3;56:6;57:5;58:10,15
**Keep (3)**
36:6;38:1;43:1
**kept (1)**
27:20
**key (2)**
7:4,24
**kid (1)**
18:23
**kinds (1)**
33:19
**knew (5)**
42:1;50:6,7;51:22;52:7
**knowing (1)**
9:11
**knowingly (1)**
38:24
**known (2)**
12:8;39:9
**knows (2)**
4:18;26:23

## L

**Ladies (5)**
42:23;46:12;49:4;50:9;54:9
**laid (1)**
25:17
**large (2)**
5:5;16:20
**largest (1)**
26:3
**Las (1)**
41:1
**last (8)**
3:3;4:25;8:16;16:6,7,8;23:21;41:21
**last-minute (1)**

7:2
**late (3)**
3:24;4:25;29:15
**later (3)**
4:14;33:22;59:19
**latest (2)**
21:19;40:8
**latitude (1)**
38:18
**laundering (7)**
24:18,22;25:8,16;
26:17,18;27:2
**lavish (1)**
50:25
**law (13)**
13:15;26:25;32:10,
13;34:23;35:19;37:25;
45:7,23;46:1;49:9;
50:2;55:8
**lawyer (6)**
27:20;33:20;38:10,
11;43:18;48:7
**Lawyers (9)**
23:9;28:2;32:21,25;
33:2;37:8,24;38:2,7
**lay (2)**
23:23;24:13
**league (1)**
54:16
**learn (19)**
8:2,11,21;15:10;
39:22;40:15;42:4,19;
43:8;45:6;46:17,21;
48:12;50:1,20;52:2;
53:4;54:4;58:15
**learned (1)**
8:14
**learns (1)**
7:25
**least (3)**
11:17;12:4;15:18
**leave (1)**
36:18
**led (2)**
5:9;16:11
**lengthy (1)**
9:21
**less (2)**
8:1;33:23
**letter (11)**
3:25;4:1,4,8,15,17,
25;5:6;15:4;17:2;20:2
**letters (6)**
3:10,11;4:22;6:6;
9:21;30:14
**level (2)**
11:2,25
**liability (1)**
26:16
**liar (5)**
47:15;50:8,11;51:1;
55:1
**lie (3)**
51:10,18;52:16
**lied (12)**
7:22;38:23;41:11;
43:19;46:13;48:13;
49:1;50:15,22,23;
51:14;52:6
**lies (10)**
34:12;42:4;44:10,11;
47:5,7;52:5;53:6;54:7;
55:2
**life (2)**
16:12,13
**lifestyle (1)**
50:25
**light (1)**
53:16
**lightly (2)**
22:24,25
**likely (2)**
12:13;16:15
**limine (2)**
30:8;58:21
**limited (1)**
33:11
**line (4)**
11:5;27:19;57:17;
58:14
**lines (2)**
10:22;23:22
**list (2)**
16:23;42:18
**listen (3)**
35:22;36:11;45:22
**listening (1)**
36:15
**literally (1)**
10:22
**little (4)**
14:21;35:12;38:1,18
**lived (1)**
50:25
**lives (1)**
45:24
**loan (30)**
5:4,4,6,13,14,15,17,
19;8:4,6;9:17;10:18,
19,20;11:4,7,24;12:2,4;
14:18,22;17:5,9,11,12,
18,19;20:20,25;39:14
**loans (1)**
5:14
**logical (1)**
16:2
**long (7)**
4:11;9:21,24;19:5;
31:2,6;55:13
**longer (2)**
3:9;40:25
**Look (4)**
9:1;15:15;16:23;
59:5
**losing (1)**
22:22
**lot (3)**
39:12;47:17;52:19
**Louise (1)**
59:17
**lower (2)**
5:24;12:13
**low-to-non-existent (1)**
4:10
**lunch (1)**
29:25
**lying (2)**
45:11;48:10

**M**

**mad (1)**
50:5
**mailbox (1)**
30:10
**main (1)**
2:20
**major (1)**
50:21
**makes (2)**
10:14;15:8
**making (5)**
4:5;21:6;33:5;45:16;
54:23
**man (2)**
11:18;54:25
**Manhattan (1)**
39:12
**manipulated (1)**
51:11
**manipulation (1)**
53:6
**manipulator (1)**
50:8
**many (3)**
14:1;52:2,8
**March (1)**
42:5
**MARK (43)**
2:5,6;3:13,15,19,24;
4:4,19;5:11,18,23;
6:10;8:5;15:7,8,20;
16:7,19;17:17,21,24;
20:3;21:1,2;23:19;
24:1,12,18,22;25:20,
21;26:10;29:22;30:4,
13;31:2,3;56:9,11,22,
25;57:16;59:17
**marked (2)**
57:25;58:2
**material (5)**
4:24;6:19;21:7;
22:14;23:15
**materials (2)**
43:9;45:17
**matter (5)**
3:15;9:4;16:9;26:1;
47:18
**matters (9)**
8:22;9:2;11:15,16;
14:4;24:5,8,9;30:7
**may (27)**
12:20,20;18:20;19:1;
21:13,20,21,21,21,22,
23,25;22:13,15,20;
29:11;32:22;33:15;
34:16;35:21;37:19;
38:19;47:11,21;54:5;
56:5,9
**Maybe (4)**
15:18,19;16:11;
18:12
**MCU (63)**
4:12;5:2;8:2,3,4,7,
20;9:3;11:6;12:19,21;
13:23;14:23;18:21;
19:9;23:5;24:15,20,20;
25:10,14,15,18,23,24;
26:5,5,15;27:4;39:10,
11,16,24;40:7,10,12,
14,15,18,20;41:5,15,
19;42:16;43:8;44:9,13,
19;47:12,20;50:20,24;
51:4,23,25;53:17,23,
24;54:3,11,14;56:15;
59:18
**MCUA (2)**
6:11;26:6
**MCU's (8)**
25:22;26:24;39:15,
18,23;41:2;44:21;
54:16
**mean (8)**
12:11;15:12;16:18;
20:4;21:2;25:17;55:2;
57:16
**meaning (1)**
9:9
**means (4)**
18:14;22:8;34:21;
36:4
**meant (1)**
18:16
**meantime (2)**
20:16;21:9
**media (1)**
36:3
**Mediterranean (1)**
44:18
**meet (1)**
44:13
**meetings (3)**
19:8,10,13
**member (10)**
6:6;10:4;12:1,24;
13:23;14:5,23;18:20;
19:11;39:8
**members (17)**
10:6,9;12:8,19,21;
14:1;16:6,15,21;19:19,
22;39:16,16,20,21;
54:14;55:12
**membership (3)**
18:12;19:8;56:15
**memo (14)**
41:15,15,20,22,24;
42:2;43:12,24;45:9;
47:2;52:10,13,21;53:3
**memorialize (1)**
6:16
**mention (1)**
13:16
**mentioned (1)**
6:5
**mere (2)**
27:5;57:5
**messages (10)**
42:8,10,14;43:6;
44:1;45:3,19;46:15;
47:6;53:7
**met (1)**
46:19
**might (1)**
26:4
**million (5)**
6:9;14:10,12;50:24;
51:6
**millions (5)**
39:24,24;41:4,14,17
**mind (8)**
15:18;23:11;33:22;
34:4;36:6,9;37:7;43:1
**mindful (2)**
22:18,19
**minds (1)**
35:10
**minimize (1)**
49:24
**minimum (1)**
38:3
**minor (1)**
54:16
**minus (1)**
16:17
**minute (1)**
12:25
**minutes (2)**
31:4,7
**misconception (1)**
57:21
**misconduct (3)**
56:23;57:13;59:9
**misguided (1)**
58:7
**mislead (1)**
38:25
**misleading (1)**
26:9
**mission (2)**
39:19,22
**misspoke (1)**
26:10
**misstate (1)**
15:9
**misstatement (3)**

7:8,11,12
**misstatements (1)**
7:6
**mistake (2)**
15:19;54:24
**mistakes (8)**
47:11,11,13,15,22,
23,24;54:23
**misunderstanding (2)**
57:14,17
**moment (2)**
13:16;22:6
**money (11)**
6:3;10:1;25:8,15;
26:16,18;27:1;50:25;
51:22;52:10,11
**month (2)**
17:25;40:3
**monthly (1)**
8:14
**months (1)**
46:22
**more (15)**
3:11;5:25;8:2;10:19;
33:21;34:3,9,20;35:4;
41:2;44:18;45:6;46:24;
49:11,25
**morning (8)**
2:2,5,10,16;8:16;
46:6;55:14;58:4
**Morrison (3)**
2:11,12,14
**mortgage (2)**
17:12,18
**most (2)**
17:10;50:21
**mostly (1)**
39:17
**motion (3)**
2:22;25:1;59:1
**motions (3)**
23:20,21;58:21
**motive (1)**
57:11
**Motors (3)**
14:9,10,11
**moved (2)**
8:17;57:5
**movie (3)**
37:5,6,6
**movies (2)**
33:20;37:4
**moving (1)**
38:9
**much (5)**
10:1;34:2;38:3;
47:18;58:20
**multimillion (1)**
38:22
**multiple (2)**
44:21;52:20
**municipal (2)**
10:2;39:9
**must (4)**
32:13;33:11,16,16
**myself (1)**
3:12

## N

**name (2)**
27:22;38:14
**namely (1)**
35:12
**narcotics (2)**
27:13;51:5
**Nathan (2)**
2:12;49:5
**nature (3)**
20:6;30:16;53:14
**nearly (1)**
51:6
**necessarily (1)**
40:14
**necessary (3)**
21:7;30:17;35:25
**need (8)**
19:6;20:19;21:21;
35:14;36:23;38:8;
46:24;59:7
**needed (3)**
41:5;47:13;58:3
**needle (1)**
57:4
**needs (1)**
55:18
**negative (1)**
2:17
**net (1)**
22:9
**new (10)**
5:14;39:7;40:17;
41:21;45:25;47:5;
52:23;54:2,4,6
**next (5)**
28:5;31:9;41:10;
48:14;59:19
**nice (1)**
30:24
**nickel (1)**
6:22
**night (5)**
3:3,25;4:25;8:16;
18:13
**nobody (3)**
4:17;6:5;30:9
**none (4)**
47:23,23,24;48:8
**nonprofit (1)**
39:19
**nor (1)**
20:12
**normally (1)**
33:9
**note (10)**
4:20;23:19;24:3;
29:19,22;30:13;55:18,
20;57:25;58:2
**noted (4)**
4:10;5:6;6:20;20:5
**notes (7)**
36:8,11,14,16,18,19,
21
**note-taking (1)**
36:14
**notice (1)**
59:19
**noticed (3)**
3:25;4:2,15
**notified (1)**
6:13
**number (7)**
13:17;15:8;16:15;
17:5;18:3,3,11
**numerous (4)**
23:2;25:10,17;46:20

## O

**oath (1)**
49:14
**object (2)**
35:13,14
**objected (1)**
56:7
**objection (5)**
29:19;33:7,8;42:21;
58:25
**Objections (3)**
32:25;33:3,5
**objective (1)**
35:7
**obligations (2)**
15:13;33:2
**obliged (1)**
32:7
**obstruct (2)**
35:3;53:11
**obstructed (2)**
39:2;43:19
**obstructing (1)**
45:9
**obstruction (2)**
5:12;45:10
**obviously (9)**
3:24;6:16;15:6;20:5;
21:3;29:25;30:14;
56:12,18
**occasionally (1)**
32:11
**occurred (1)**
9:18
**off (2)**
2:24;23:4
**offense (1)**
35:12
**offered (1)**
33:3
**office (2)**
2:23;24:19
**officers (3)**
13:16;39:17,18
**official (2)**
20:7;45:16
**officials (1)**
13:3
**often (2)**
32:21;50:5
**old (1)**
19:2
**Once (9)**
21:10;22:17;30:23,
23;37:11,16,18;41:22;
52:20
**one (39)**
6:14;7:7,8,12,19,24;
11:5;13:2,23;14:8,11,
14;16:14,16;17:2;
23:17,22;24:8,12,14,
14;26:13;27:17,24;
34:25;35:3,8,9;40:2;
41:21;45:9,15;51:21;
52:5,23;54:22;57:1,24;
59:9
**ones (3)**
34:4;42:18;57:19
**ongoing (3)**
25:8,13;27:1
**online (1)**
4:17
**only (13)**
7:1,3;8:2;20:4;
27:22;30:20;33:11;
34:8;35:19;40:24;46:1;
55:7;58:10
**open (11)**
2:1;22:11;23:6;24:8,
9;29:4,12;30:7;36:6;
39:13;40:10
**opened (1)**
8:14
**opening (21)**
21:9,23,24;22:2,10;
29:11,18;31:2,4;32:5;
37:1,3,8,11,12,16;
38:13;39:3;47:10;
58:24;59:4
**openings (1)**
22:13
**opinion (1)**
36:5
**opportunity (1)**
12:18
**opposite (1)**
46:17
**opposition (1)**
30:20
**order (7)**
2:21;6:2;26:9;29:23;
35:14;50:23;59:19
**ordered (2)**
29:9;42:7
**others (5)**
33:11;37:23;52:2,3,8
**otherwise (2)**
4:24;33:6
**out (16)**
5:14;11:4;14:11;
19:9,16,22;25:17;30:1;
34:10;35:7;40:22;
46:13;47:13,15;49:12;
54:25
**outline (1)**
37:1
**outside (5)**
26:24,25;27:6;33:15;
40:16
**outstanding (2)**
5:8;11:8
**over (17)**
2:21;5:25;8:15;11:5;
16:8;18:10;20:14;
36:20;37:16;39:3;
42:10;43:5,9;45:20;
46:21;53:8;54:6
**overreacting (1)**
59:14
**overrule (1)**
33:8
**owe (2)**
11:22,23
**owed (1)**
52:11
**own (5)**
15:18;36:3;37:20;
45:4;54:5
**owned (2)**
14:5,8

## P

**page (5)**
4:4;28:5;31:9;48:14;
58:13
**pages (1)**
17:10
**paid (4)**
18:19;40:6;41:1;
44:18
**pandemic (1)**
22:23
**panel (1)**
27:16
**paper (1)**
10:22
**paragraphs (1)**
17:2
**paralegal (1)**
2:14
**parents (1)**
19:3
**part (3)**
11:17;32:16;37:18
**participants (1)**
22:22

particular (1)
23:23
particularly (1)
26:15
parties (2)
40:11;41:2
parties' (1)
59:18
partner (1)
53:5
pass (1)
3:1
patience (1)
55:13
pause (2)
13:1;46:9
pay (3)
11:23;45:22;49:8
paycheck (3)
6:2,2;8:18
paying (1)
36:15
pays (1)
11:24
peers (1)
49:13
pending (3)
23:20;30:7,8
penny (1)
12:5
people (7)
27:5,5;51:9,11,11,
11;52:6
per (3)
6:1,2,9
perfect (1)
54:22
perhaps (7)
3:4,6;6:18;9:8,17;
14:23;18:15
period (2)
12:14;17:7
perks (6)
39:25;40:5;41:1;
42:16;43:7;44:15
permitted (2)
23:1;41:18
person (2)
3:17;47:14
personal (6)
5:4;17:18;20:24;
40:7;44:17;53:25
phone (13)
40:8;43:14;44:17;
45:3;46:16;47:7;53:24,
25,25;54:2,2,4,6
phones (2)
44:24;54:6
phony (4)
41:20,24;43:12,24
pick (1)
2:21
picked (1)
3:3
piece (3)
8:15;10:22;11:24
pills (1)
24:13
pink (2)
27:18,23
placed (1)
55:4
placing (1)
54:24
plan (2)
59:20,22
plane (1)
58:4
planning (1)
4:20
please (6)
15:7;21:13;32:14;
33:22;35:24;47:18
pled (2)
51:1,7
plenty (1)
39:25
plus (1)
16:17
PM (1)
29:2
pocketed (1)
50:24
point (9)
12:5;16:8;26:19;
27:10,24;38:10;56:7,
11;58:18
points (1)
25:21
police (1)
39:17
policies (1)
54:18
policy (4)
40:14,15,18;41:19
politician (1)
16:3
politicians (1)
16:3
pool (1)
27:21
position (6)
22:6;23:9;25:3;
29:14;40:21;56:20
positions (1)
23:9
possible (1)
38:6
potential (2)
23:5;26:16
potentially (2)
14:12;25:9
practical (2)
11:25;16:18
practicality (2)
12:15,17
precluded (2)
4:6;22:2
precluding (1)
23:22
predated (3)
5:6,7,13
prejudice (1)
7:1
preliminary (1)
32:6
premature (2)
21:8;24:2
prepare (1)
30:18
preparing (2)
29:24;50:4
present (7)
17:7;19:16;29:4;
32:1;34:14;56:4;57:21
presentation (1)
37:21
presented (1)
49:8
president (1)
50:20
pressed (1)
41:14
presumed (3)
34:7;49:17,17
prevent (1)
59:1
previously (1)
30:2
primary (1)
15:22
prime (1)
40:9
principal (1)
37:18
printed (1)
17:10
prior (2)
3:6;36:17
privilege (1)
49:4
probably (7)
7:4;16:8,25;24:2;
30:16;31:7;59:12
probative (1)
4:9
problem (1)
59:11
proceed (2)
38:19;46:10
process (1)
34:6
produce (2)
29:9;43:6
produced (1)
43:4
products (1)
42:17
professional (1)
25:15
proffer (2)
24:6;26:20
proffering (1)
21:11
profit (1)
10:15
profit-driven (1)
39:15
proof (3)
34:9,12,19
proportional (1)
13:3
proportionality (1)
19:22
proposing (1)
58:5
proposition (1)
12:8
prosecution (1)
6:4
prosecutors (3)
6:13;15:16,17
protect (1)
39:1
prove (8)
34:14,20;37:9;39:5;
43:21;49:3;57:10;58:7
proven (1)
34:8
provide (7)
3:21;14:25;17:6;
21:1;39:19;42:7,9
provided (2)
15:2;27:13
providing (1)
17:1
proxy (4)
10:4,9;19:11,20
public (2)
24:10;30:18
purpose (2)
17:13;33:11
pursuant (1)
59:18
put (2)
8:19;53:17

## Q

quarter (1)
6:9
quickly (1)
21:17
Quite (2)
46:17;47:10
quote (1)
44:4
quoted (1)
17:2
quoting (1)
58:12

## R

raise (1)
27:17
raised (2)
20:7,8
range (2)
5:21;17:6
ranged (1)
44:17
rare (1)
32:21
rate (1)
17:16
rates (3)
10:19;17:22;39:19
reach (1)
45:25
reached (2)
35:5,6
read (3)
4:8,8;35:22
ready (6)
2:4,6,9;27:16;38:19;
46:10
realize (1)
58:3
really (3)
15:9;22:16;59:8
reason (8)
6:12;8:11;27:14;
30:8,21;51:23;52:18;
54:19
reasonable (4)
18:2;34:20;49:3;
54:21
reasons (2)
6:20;25:17
Rebold (1)
2:7
rebuttal (1)
37:23
recall (3)
18:25;19:3;36:20
receive (4)
21:16,16,17,18
received (12)
15:6;18:12;19:12;
20:1;29:8;32:20;42:13;
43:8,15;44:1,15;56:14
receivership (1)
26:12
receiving (1)
43:13
recently (1)
5:25
record (5)
4:15;13:4;14:22;
15:9;29:19
recuse (1)
23:4
reference (1)

58:10
**refinance (1)**
10:20
**refuses (1)**
14:25
**regarding (1)**
5:1
**regardless (2)**
13:24;35:6
**regularly (1)**
40:10
**regulator (1)**
6:11
**Reilly (2)**
2:12;49:5
**reimbursed (4)**
39:25;40:7;44:15;
54:15
**reimbursements (2)**
42:17;43:8
**reject (1)**
34:2
**relate (2)**
23:3,3
**related (8)**
7:11;23:22;24:20;
29:9;47:12;53:15;
58:22;59:2
**relates (1)**
27:12
**relating (3)**
23:21;29:17;30:7
**relevance (2)**
25:6,7
**relevant (7)**
9:11,12;11:20;16:1;
21:25;25:9,19
**remain (1)**
34:15
**remember (6)**
9:21;36:3,19,24;
38:14;43:11
**reminded (1)**
23:14
**remotely (1)**
15:16
**renew (1)**
59:1
**repeat (1)**
47:23
**repeating (1)**
9:5
**report (1)**
40:16
**reported (1)**
48:5
**represent (1)**
49:4
**representation (1)**
26:24
**reputation (1)**
25:15
**reputational (1)**
25:14
**request (2)**
19:13;30:21
**requesting (1)**
30:14
**requests (2)**
24:7;38:6
**require (1)**
17:23
**required (2)**
20:13;40:16
**requirement (1)**
16:25
**research (2)**
36:1,4
**resign (4)**
40:22,24;44:21;57:1
**resolve (1)**
32:16
**respect (2)**
3:11;22:9
**respectfully (2)**
9:5,23
**responded (1)**
24:2
**responding (1)**
15:21
**response (2)**
43:3,5
**responsibility (2)**
36:20,21
**responsible (1)**
40:2
**responsive (1)**
45:18
**rest (1)**
12:25
**result (2)**
18:12;22:21
**resume (1)**
55:14
**resumed (1)**
29:3
**retrieve (1)**
44:25
**return (2)**
53:23;55:6
**review (1)**
22:14
**rhetoric (1)**
12:16
**right (35)**
7:9,16;10:7,8;12:11,
21,22,23;13:19;14:12,
14,20;15:23,24;16:6,
10,10,11;18:7;20:2;
22:4;23:16;26:5;28:1;
34:15,16;37:12,13,17;
49:16;50:3;51:15;
54:20;55:2;56:22
**risk (3)**
12:9;22:22;25:14
**road (1)**
4:18
**rob (1)**
35:10
**robbed (1)**
35:11
**robbery (1)**
35:12
**rocket (1)**
59:8
**room (4)**
28:2;35:20;36:18;
55:17
**rude (2)**
27:23;38:9
**Rule (3)**
4:5;23:10;38:8
**ruled (2)**
56:7,12
**rules (2)**
33:4;34:6
**ruling (5)**
21:6;23:10,18;57:5;
58:12
**rulings (1)**
33:6
**run (3)**
26:6;47:21;48:2
**running (1)**
11:9

## S

**sake (1)**
14:9
**same (7)**
4:9;13:12;36:11;
42:14,18;45:24;58:17
**sanctions (5)**
42:20;56:13;58:16,
20;59:2
**sanitation (1)**
39:18
**save (1)**
12:25
**savings (4)**
10:14;12:2,3;39:13
**saying (3)**
16:11;57:6;58:3
**scenario (1)**
16:22
**Schwartz (1)**
38:13
**science (1)**
59:8
**seal (2)**
30:14,21
**sealed (1)**
23:21
**sealing (1)**
23:24
**search (1)**
51:20
**seated (1)**
56:5
**seats (1)**
40:10
**Second (14)**
4:22;11:9;23:14;
24:14;26:3;34:12;
35:22;42:13;43:3,13;
45:10,22;57:3,24
**second-to-last (1)**
4:7
**secrecy (5)**
24:18;25:7,16;26:16;
27:1
**seeing (1)**
37:3
**seeks (2)**
4:9;25:9
**seems (4)**
2:20;16:24;18:2;
24:2
**selection (2)**
24:4;34:6
**sell (1)**
41:7
**send (1)**
30:4
**sense (6)**
16:18;19:21;45:24,
24;46:2;55:8
**sent (3)**
8:15;30:21;45:3
**sentence (1)**
4:7
**separate (2)**
14:8;59:8
**serious (3)**
51:9,10;55:1
**seriously (1)**
49:15
**serve (1)**
17:13
**served (2)**
40:4;42:4
**services (1)**
39:20
**serving (2)**
40:20;56:19
**SESSION (1)**
29:1
**seven (2)**
18:3,3
**several (2)**
11:13;46:24
**severely (1)**
29:10
**shall (1)**
33:14
**share (2)**
14:9;50:4
**shareholder (1)**
14:14
**shares (1)**
14:10
**sheltered (1)**
16:12
**shopping (1)**
18:22
**short (1)**
29:25
**shot (1)**
21:11
**show (7)**
39:4,6;43:20;50:17;
52:14;53:1,1
**showed (2)**
41:23;44:3
**shred (1)**
51:21
**sidebar (2)**
26:21;38:2
**sidebars (1)**
38:7
**sidekick (1)**
50:19
**sign (5)**
36:20;41:20,21;53:4,
4
**signature (1)**
42:1
**signed (7)**
2:21;38:24;41:22;
43:12,25;52:10,13
**signing (1)**
45:9
**silent (1)**
34:15
**similar (3)**
6:14;23:6;30:1
**simple (2)**
45:21;51:23
**simply (4)**
15:11;37:1;42:7;
53:22
**Sitting (4)**
8:5;9:7;14:4,20
**situation (2)**
7:23;14:16
**six (2)**
10:22;17:5
**size (1)**
16:15
**slate (1)**
34:11
**slept (1)**
18:13
**small (5)**
5:3;6:1,1,3;24:13
**social (2)**
36:3;53:13
**solely (1)**
33:17
**somebody (1)**
36:21
**somehow (2)**
38:24;58:3
**someone (5)**

2:23;7:14;10:10;
53:14,14
**sometimes (5)**
37:6,7,9,9;51:10
**somewhere (1)**
8:18
**Sorry (3)**
20:19;38:17;57:14
**sort (3)**
5:24;22:24;26:2
**sought (2)**
20:1,12
**sound (1)**
32:6
**sounds (1)**
56:23
**span (1)**
46:21
**Special (1)**
2:7
**specific (1)**
57:17
**specifically (1)**
7:13
**spend (1)**
47:17
**spent (3)**
39:8;47:10,19
**spoke (3)**
7:21;46:18,23
**sports (2)**
40:9;42:17
**spun (1)**
44:10
**stadium (3)**
40:11;41:2;54:17
**stand (2)**
14:1;55:6
**start (2)**
36:6;46:5
**started (2)**
9:22,24
**starts (1)**
34:10
**State (11)**
39:7,17;40:17,18,21;
42:24;43:1;44:20;
47:13,23;48:5
**statement (18)**
5:1;7:15,15;21:23,
24;29:11;37:1,8,11,13;
38:13;39:3;45:16,16;
47:11;56:15;58:24;
59:4
**statements (5)**
3:18;32:5,24;37:3,16
**States (2)**
2:3,6
**statute (1)**
14:8
**Stay (2)**
36:4;55:14
**stayed (1)**
40:23
**steal (3)**
39:24;50:23;51:22
**stealing (1)**
41:4
**step (4)**
23:4;44:22;57:3,10
**Stephenson (2)**
2:15;49:6
**stick (1)**
35:8
**still (5)**
8:10;24:16;44:2;
53:17;55:17
**stipulate (1)**
32:21
**stock (3)**
14:5,9,10
**stockholder (1)**
14:11
**stole (2)**
50:24;51:3
**stop (1)**
44:4
**store (3)**
43:14;45:1;54:1
**story (2)**
41:5,7
**strange (1)**
53:19
**strength (1)**
13:8
**subject (3)**
24:15;42:20;58:16
**subjecting (1)**
58:19
**submission (1)**
24:5
**submitted (2)**
40:1;44:16
**subpoena (6)**
42:6,14;43:3,5,13;
45:18
**subpoenas (6)**
41:13;42:5;43:15,18,
25;51:20
**substantially (1)**
30:1
**substantive (1)**
35:12
**suffice (1)**
30:10
**suggest (3)**
16:17;23:17;26:9
**suggesting (1)**
22:2
**suggestion (1)**
42:25
**suggests (2)**
11:19;15:16
**suite (2)**
40:11;41:2
**Sunday (3)**
9:19;11:5,7
**supervisory (1)**
12:23
**support (2)**
39:22;53:19
**suppose (1)**
14:13
**supposed (4)**
3:1;39:15,21;47:23
**supposedly (1)**
52:11
**sure (11)**
4:8;12:19;17:4,6;
18:3;21:14;22:8;27:23;
36:14;39:25;54:22
**surprised (1)**
56:6
**suspension (1)**
53:17
**sustain (1)**
33:7
**Sustained (2)**
42:22;58:25
**sweater (2)**
27:19,23
**switch (1)**
54:6
**sworn (1)**
32:3
**Sylvia (7)**
2:3,11,13;38:21;
46:2;49:5;54:24
**system (2)**
36:23,23

## T

**table (1)**
2:12
**talk (7)**
27:3,24;33:21;34:3,
20;35:23;52:25
**talked (1)**
25:21
**teaches (1)**
55:19
**team (2)**
49:5;50:5
**telling (5)**
45:17;46:13;47:17;
49:23;54:11
**tenor (1)**
21:24
**tens (2)**
40:4;44:16
**terms (3)**
17:9;33:21;34:23
**testified (1)**
34:17
**testify (3)**
7:5;34:15;57:19
**testifying (1)**
3:17
**testimony (6)**
25:12;32:19;33:13;
34:2;44:8;58:23
**tests (1)**
2:16
**texts (4)**
51:21;53:12,18;54:5
**theft (1)**
41:8
**thefts (1)**
51:24
**theories (1)**
11:16
**thief (3)**
50:8;51:2;55:1
**Third (4)**
33:13;36:1;45:13,23
**though (2)**
22:13;58:24
**thought (8)**
27:23;30:9;52:7;
56:7;57:8,9,11,22
**thousands (3)**
16:21;40:5;44:16
**thread (1)**
57:4
**three (3)**
45:21,25;46:23
**Thursday (1)**
18:23
**tickets (3)**
40:9;42:17;58:4
**times (8)**
5:24;11:13;38:7;
44:21;46:20,23,24;
52:20
**timing (1)**
22:15
**toaster (2)**
18:23,24
**today (6)**
8:5;9:8;14:4;21:19;
27:18;30:1
**told (32)**
9:20,20;10:11;12:12;
13:7;15:17;19:24;
22:20;27:6;33:13;
34:22;40:22;41:17,18;
42:16;43:24;44:4,21;
47:2,3,4,7;49:14;52:5,
21,21,22;53:10;54:1;
57:1,2,10
**tomorrow (3)**
55:14,19;59:20
**took (3)**
11:3;36:21;49:14
**total (2)**
13:5,18
**totally (2)**
11:11;45:2
**touching (1)**
35:22
**trailer (2)**
37:4,4
**transcript (1)**
58:13
**transfer (2)**
47:4;54:6
**transferred (2)**
52:23;54:2
**treat (1)**
33:8
**trial (22)**
8:1;21:12;22:22;
23:15,16;24:25;29:3;
32:4;36:9,25;37:3;
38:9;39:4;43:23;45:7,
21;47:16,19;50:4,20;
51:20;55:5
**trials (2)**
37:22;38:2
**tried (6)**
10:20;27:19,20;
36:23;39:1;44:2
**tries (1)**
35:23
**trip (1)**
41:1
**trouble (1)**
55:25
**troubling (1)**
57:15
**true (4)**
15:6;36:23;42:2,11
**trust (5)**
49:21;50:11,21;
54:24;55:4
**trusted (5)**
47:14;49:13;52:2,7;
53:15
**trusting (1)**
47:22
**truth (3)**
15:17;34:4;49:12
**try (5)**
38:1;52:3,16;53:9;
55:23
**trying (6)**
11:1;36:12;38:11;
52:24;53:11;57:3
**turn (8)**
18:10;20:14;27:19,
20;41:6;42:10;43:9;
54:3
**turned (5)**
11:5;43:5;47:15;
53:8;54:25
**turns (1)**
19:22
**TV (1)**
33:21
**two (13)**
3:19;7:12;20:1;
23:20,22;24:5,9;25:21;
30:7;33:19;35:1,8;42:4
**two-week (1)**

44:18
**type (6)**
10:1,11,12,14;17:11;
18:19
**types (3)**
10:16;11:12;18:20
**typically (2)**
35:5,5
**typo (3)**
3:25;4:1,7

**U**

**under (5)**
4:5;14:13;24:5;
30:21;33:4
**underlay (1)**
24:23
**underlying (1)**
9:11
**understands (1)**
10:3
**understood (1)**
18:3
**union (17)**
6:8,12;10:3,7;11:19;
12:12;13:5,7,19;16:4,
13,16,20,20;39:9,11,12
**unions (3)**
6:7;12:9,20
**unit (1)**
24:19
**United (2)**
2:3,6
**unlawful (1)**
35:7
**unless (2)**
33:6;34:8
**unrelated (1)**
24:24
**unusual (1)**
23:17
**up (19)**
3:3;9:1;12:12;15:15;
22:1,20;33:25;35:8;
36:9;37:10;39:1;46:16;
48:13;50:16;52:4,13;
55:3,6,15
**update (2)**
3:23;4:22
**updates (2)**
3:20,21
**upset (2)**
50:5;59:13
**urge (1)**
20:14
**use (3)**
38:4;45:23,24
**used (3)**
40:10;52:3,3
**using (1)**
54:16

**V**

**value (3)**
4:9;33:23;42:15
**varied (1)**
5:22
**Vegas (1)**
41:2
**verdict (1)**
55:7
**version (1)**
4:17
**victim (2)**
52:3;53:6
**view (3)**
21:4;22:5;32:15
**vigorous (1)**
23:9
**violate (1)**
40:14
**violated (1)**
42:25
**violation (7)**
20:11;22:7;23:12;
24:19;25:16,25;58:11
**violation's (1)**
24:15
**virtue (1)**
22:23
**vital (1)**
23:7
**voluntarily (4)**
21:3;46:19,22;52:20
**voluntary (1)**
21:5
**vote (19)**
10:4,5,7,8;12:21,21,
22,23;13:2,8,15,23;
14:4,11,14;16:3,6,12,
16
**voted (1)**
15:25
**votes (1)**
13:17
**voting (4)**
13:13;14:5,22;15:23

**W**

**wait (1)**
46:6
**waiver (2)**
19:25;20:12
**wants (3)**
16:24;24:7;50:12
**warrants (1)**
51:20
**watches (1)**
33:20
**way (11)**
3:6;11:20;13:2;16:5;
24:8;32:12;35:23;
36:22;49:24;50:21;
56:17
**ways (1)**
39:4
**wearing (1)**
27:22
**week (1)**
23:21
**weekend (2)**
2:17,21
**welcome (1)**
36:8
**weren't (2)**
26:7;57:3
**what's (6)**
20:1;22:10;25:6,20;
27:3,4
**whatsoever (1)**
12:10
**whenever (1)**
40:9
**widespread (1)**
27:4
**wiped (3)**
43:14;45:2;46:15
**wiping (3)**
47:6;53:22;54:8
**wishes (2)**
37:13,19
**withheld (2)**
7:22;46:14
**withholding (1)**
47:6
**Within (1)**
5:21
**without (5)**
2:24;9:11;29:10,13;
46:23
**witness (12)**
3:13,15;7:3,4,24;
9:13;14:15;23:23;
26:21;27:12;59:16,17
**witness' (1)**
34:2
**witnesses (17)**
22:22;25:10,23;26:2,
13,25;32:19;33:25;
34:1;37:17,20;44:7;
57:18,18;58:23;59:20,
23
**witness's (2)**
14:15;24:13
**woman (2)**
27:18,22
**Wong (58)**
5:10,13,25;6:4;8:7;
24:14,23;27:14;39:23;
40:8;41:3,6,14,17,18,
19,22;42:8,12,16;
43:11,25;44:4,8,24;
45:3,13,19;47:14,21,
22;48:4;50:6,7,10,11,
11,18,19,24;51:5,8,14,
22,24;52:2,4,10,15,15,
17,17;53:3,17,19,20,
24;54:25
**Wong's (13)**
40:3;41:8;45:9;
50:16;51:3,4,6,17;
52:3;53:5,6,13,15
**word (1)**
12:11
**words (1)**
35:16
**work (1)**
22:15
**workers (1)**
39:18
**works (1)**
36:23
**world (1)**
40:5
**worried (1)**
59:3
**worry (2)**
3:8;19:23
**writing (1)**
18:9
**written (1)**
10:22
**wrong (13)**
15:18;46:13;48:12,
12;49:23;50:6,12;52:9;
53:2,18;54:12,13,15
**wrongdoing (1)**
15:19
**wrote (1)**
41:15

**Y**

**year (3)**
12:5;22:18;40:17
**years (6)**
16:6,7,9;36:12;39:8,
22
**York (2)**
39:7;40:18
**Yorkers (1)**
45:25

**Z**

**zero (1)**
13:9

**1**

**1:30 (1)**
8:16
**12 (1)**
32:2
**15 (1)**
31:4
**160 (2)**
28:2,3

**2**

**20 (3)**
31:7;36:12;58:14
**2015 (2)**
39:10;41:16
**2016 (2)**
5:13;40:24
**2017 (2)**
17:7,16
**2018 (3)**
41:3;42:5,12
**21 (1)**
58:14
**22 (1)**
58:5
**25 (3)**
16:6,7,8
**250 (2)**
14:10,12

**3**

**3:05 (1)**
29:2
**3:49 (1)**
58:13
**3500 (2)**
8:15;11:5
**36 (1)**
7:25

**4**

**403 (1)**
4:5

**5**

**5:30 (1)**
55:19
**50 (1)**
17:10

**6**

**6 (1)**
32:2

**9**

**9:30 (1)**
55:14

**In The Matter Of:**
*UNITED STATES OF AMERICA, v.*
*SYLVIA ASH,*

---

*December 1, 2021*

---

*Southern District Court Reporters*

Original File LC13ASHF.txt
Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 1, 2021
9:35 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JAMIE C. BUCKLEY



(Trial resumed; in open court; jury not present)

THE COURT: Good morning. I've looked at the government's letter that came in last night in relation to Agent 1. That's out. That is to say, the defendant's proposal to cross-examine that agent with respect to the loan and the --

(Pause)

THE COURT: I read the letter that I received from the government, a copy of the letter you sent to Ms. Cohen last night, relating to the loan and bank account with Agent 1. I don't see any proper basis for allowing the defense to cross on this material, none at all. It's not even close.

On the other hand, I'm going to deny the government's application to preclude cross of Witness 1 with respect to the narcotics, on the assumption, which I think is correctly inferred from the letters, that the government has knowledge that Witness 1 engaged in this activity and has not charged him.

Am I right about that, Mr. Mark?

MR. MARK: Yes, your Honor.

THE COURT: Okay.

On that basis, I think it's proper cross on the theory of bias.

MS. COHEN: Your Honor, can I just note my objection to your ruling on the cross of Agent 1.

THE COURT: There is no need to do that.



MS. COHEN: And, your Honor, I think it is essential for the defense to be able to cross Agent 1 about what he told prosecutors and when he told them, because that does go to his credibility, because I believe the government's proffer is that Agent 1 told them he had an account at the MCU, and that Agent 1 does not --

THE COURT: Look.

MS. COHEN: -- recall telling them that he had a loan --

THE COURT: Ms. Cohen, we have devoted a great deal of time to repetitious argument on this, and I've made my ruling. Once I make a ruling, that's the end of the matter, right, wrong or indifferent; we don't start all over again.

Okay. Mr. Mark?

MR. MARK: Just a couple of quick housekeeping matters before the witnesses come up, which is:

One, I know there is the motion to preclude on the AML BSA violations investigation relating to MCU.

THE COURT: Yes, and my recollection is we dealt with that.

MR. MARK: And that is dealt with.

Also, MCU is currently in receivership under NCUA. We are not planning to go into that detail on direct examination. My understanding, from talking to Ms. Cohen, is she doesn't intend to cross on that.



MS. COHEN: That's correct, your Honor.

THE COURT: Okay.

MR. MARK: So I just wanted to make that known because it would affect how we would present the witnesses and their testimony.

Lastly, we understood that there's some clarification that we're going to be seeking from your Honor about some evidence that we're going to present based on how the opening arguments occurred, and we're putting together a letter to submit to your Honor on that matter. I'm just letting you know that there's going to be a letter that will come in about that.

THE COURT: You are both prodigious writers of letters. You get the prize.

MR. MARK: Well, I thought it would be more efficient than sort of having a lengthy argument --

THE COURT: Yes, maybe.

MR. MARK: Thank you, your Honor.

THE COURT: Okay.

MR. REBOLD: Good morning, your Honor.

One other issue I just wanted to flag for the Court before the first witness is called that relates to some exhibits we hope to admit into evidence through that witness: The government's first witness is Louise Cogan-Rupani. She is presently an employee at MCU and was --

THE COURT: I'm sorry, you could have a seat; you

know, he's speaking.
MR. REILLY: Yes, your Honor.
MR. REBOLD: She is presently an employee at MCU, and was during the years in question that are the focus of this trial, and was during the relevant years the head of the marketing department.
There are a number of records that we intend to offer through her that relate to the defendant's use of MCU's private suite at MCU Park, which was the name of the Brooklyn Cyclones baseball stadium for a period of years. We have conferred with defense counsel to see where we could agree and disagree on what that witness could authenticate and what we could stipulate to. And there's a stipulation to the authenticity of certain records. There's, I think, an agreement that as long as we lay a basic business records foundation, that there's not going to be much resistance on certain accounting paperwork, marketing paperwork and emails that Ms. Rupani --
THE COURT: Could we perhaps come to the point?
MR. REBOLD: So there is a subset of emails that relate to the defendant's use of MCU suite where the witness is not a participant on the email. We expect that the witness can authenticate those emails nevertheless because they all relate to MCU employees, they relate to events she was working on or aware of --
THE COURT: And the point is what?



MR. REBOLD: The point is, my understanding is, counsel is going to oppose admission of those records. We may need to spend a little more time on it. I just wanted to flag that for the Court as we were endeavoring to be as efficient as we can with the jury's time.
THE COURT: I appreciate endeavoring to be efficient.
THE DEPUTY CLERK: The jury is in the hallway.
THE COURT: Okay. Let's bring in the jury.
Unless I squelched you, Mr. Reilly?
MR. REILLY: I'm happy to be squelched, your Honor.
THE COURT: All right.
(Continued on next page)



(Jury present)
THE COURT: Good morning, everybody. The jurors were all present. The government will call its first witness.
MR. REBOLD: The government calls Louise Cogan-Rupani.
LOUISE COGAN-RUPANI,
called as a witness by the Government,
having been duly sworn, testified as follows:
THE WITNESS: My name is Louise Cogan-Rupani. You can spell my last name C-o-g-a-n hyphen R-u-p-a-n-i.
THE COURT: Thank you.
You may examine, counsel.
MR. REBOLD: Thank you, your Honor.
DIRECT EXAMINATION
BY MR. REBOLD:
Q. Good morning, Ms. Cogan-Rupani.
A. Good morning.
Q. Where do you work?
A. I work at Municipal Credit Union.
Q. Is that also commonly known as MCU?
A. Yes.
Q. How long have you been at MCU?
A. Since March 2008.
Q. What is your current title at MCU?
A. Director of digital channels.
Q. How long have you been the director of digital channels?



A. Since August 2021.
Q. Prior to August 2021, what department were you assigned to?
A. Marketing.
Q. During what years were you assigned to the marketing department?
A. Between March 2008 and August 2021.
Q. During the years from 2016 on, what was your title within the marketing department?
A. Vice president of marketing slash director of marketing.
Q. What were your duties and responsibilities as vice president or director of the marketing department at MCU?
A. Responsible for all functions of the marketing department and for Municipal Credit Union.
Q. Can you just expand a little bit more on what you mean by that?
A. That the marketing department is responsible for all of the advertising, the communications, websites, social media, all communications and advertising regarding products and services of the credit union.
Q. As part of the marketing department, did you interface with the management of MCU?
A. Yes.
Q. What is MCU?
A. Municipal Credit Union is a non-for-profit member-owned New York State credit union.

Q. What is a credit union?
A. A credit union is a non-for-profit financial institution which provides products and services to our members, including deposit products, loans, financial, education, digital banking.
Q. Is a credit union similar to a bank?
A. It is similar in the fact that we offer similar products and services but we differ in the fact that we are a non-for-profit organization.
Q. What would a bank be from your understanding?
A. A for-profit organization.
Q. Who owns MCU?
A. Our members do.
Q. When you say members, what does that mean?
A. A member is an individual who has what is called a primary share or a share in the credit union.
Q. Who can be a member at MCU?
A. The Municipal Credit Union is what is called a select employee group credit union. So our members consist of city workers, such as NYPD, FDNY; our membership is also open and available to hospitals, certain colleges, a lot of city workers.
Q. You said that MCU is a not-for-profit entity.
To the extent that MCU makes money, where does that money go?
A. It is returned to our members in the form of lower fees,



better loan rates, and higher deposit rates.
Q. Is MCU a federally insured institution?
A. Yes, it is.
Q. By whom?
A. By the National Credit Union Administration.
Q. Is MCU regulated?
A. Yes, it is.
Q. By whom?
A. The Department of Financial Services.
Q. Is it regulated by anyone else?
A. It's the NCUA and the DFS.
Q. Is the NCUA shorthand for the National Credit Union Administration?
A. Yes, it is.
Q. How many members are there at MCU?
A. Approximately 600,000.
Q. Are you familiar with the phrase "SEGs"?
A. Yes.
Q. Is that shorthand for something?
A. Yes.
Q. What is it shorthand for?
A. SEGs stands for select employee groups.
Q. Can you just explain the significance of SEGs to the members of the jury?
A. So a select employee group, as I mentioned before, there's



a list of specific categories, so, as a mentioned, NYPD, FDNY, sanitation, health and hospitals; depending on where you work, provides you with the eligibility to join the credit union.
Q. About how much money is there in member accounts presently at MCU?
A. Approximately $4.2 billion in assets.
Q. Ms. Cogan-Rupani, are you familiar with the leadership structure at MCU?
A. Yes.
Q. Has that been stable -- has the structure been the same over the last five to seven years?
A. It has evolved.
Q. Around when was there a shift in the structure of MCU?
A. 2018.
Q. What happened in 2018?
A. The supervisory committee and our board of directors were removed from the credit union.
Q. Prior to the removal of the supervisory committee and the board of directors, what was the structure of leadership and management at MCU?
A. We had a board of directors, a supervisory committee, a CEO, and then a management team.
Q. How, if at all, did the structure change after the board and supervisory committee were removed?
A. Can you just rephrase that for me, please?



Q. To the extent you can explain it, how did the structure of management change after the board and supervisory committee were removed in 2018?
A. We had an interim board -- an administrator was assigned to the credit union when the board of directors and supervisory committee was removed.
Q. Now, focusing on the years leading up to 2018, you mentioned the board of directors and a supervisory committee.
Starting with the board of directors, can you please explain, what was the board of directors?
A. The board of directors is a group of 12 individuals, 12 directors, at the credit union, whose responsibilities were the oversight and management of the funds, records and affairs of the credit union and our members.
Q. Are you familiar with who qualified to be a member of the board of directors at MCU in the years leading up to 2018?
A. Yes.
Q. Who qualified?
A. A member -- any member was eligible to put their name forth to run for a position on the board.
Q. How were board members chosen?
A. Through an election that took place every year at our annual meeting.
Q. You also mentioned the phrase "supervisory committee"?
A. Yes.

Q. Can you please explain what that was and how it differed from the board of directors?
A. The supervisory committee is a committee of five individuals whose responsibilities were the oversight and management of the audit functions of the credit union. They managed the internal audit team, and they were also responsible to guarantee that the financial reporting of the organization was accurate.
Q. Were the qualifications for membership on the supervisory committee and the way in which folks were selected to that committee the same as the board of directors?
A. Yes.
Q. Regarding both the board of directors' positions and the supervisory committee positions, were those salaried positions?
A. No.
Q. Were members of the board of directors or supervisory committee employees of MCU?
A. No.
Q. Are you familiar with -- are you aware of whether there was an MCU policy manual?
A. Yes.
Q. Are you aware of who sets the policies that are contained within the policy manual?
A. Yes.
Q. Who sets the policies?



A. The board of directors.
Q. What training, if any, have you personally received on the manual as it existed up to and including 2018?
A. None.
Q. How familiar are you with the individual provisions of the manual?
A. Not very detailed.
Q. Are you familiar with an individual named Sylvia Ash?
A. Yes.
Q. And who is Sylvia Ash?
A. Judge Sylvia Ash was a former member of the board of directors at Municipal Credit Union.
Q. Do you know what years she served on the board of directors?
A. Yes.
Q. What years?
A. From May 2008 until August 2016.
Q. Are you aware of what position she held during her last approximately one year on the board of directors?
A. Yes.
Q. What position did she hold?
A. Madam Chair of the board of directors.
Q. What happened on or about August 15th, 2016?
A. She stepped down as Madam Chair.
Q. How do you know that?



A. I was part of a group email that Judge Ash sent out.
Q. What, if anything, did Judge Ash communicate in that email?
A. That she was stepping down due to professional reasons.
Q. Did you work directly with Ms. Ash?
A. Yes.
Q. In what respect?
A. When it came to interacting with her at various different management meetings but also when it came to the preparation of our centennial celebration and gala that took place in 2016.
Q. What are some of the ways in which you would communicate with Judge Ash?
A. In person, via email, or over the phone.
Q. If you were to see Ms. Ash again, would you recognize her?
A. Yes.
Q. I'd like you to please look around the courtroom and tell us if you see Ms. Ash here today.
A. Judge Ash is sitting over there, to your left, in the gray suit.
MR. REBOLD: Your Honor, may the record reflect that the witness has identified the defendant?
THE COURT: Yes.
BY MR. REBOLD:
Q. You referred to the defendant as Judge Ash.
Why do you refer to her that way?
A. Because she is a judge.



Q. And how are you aware that she is a judge?
A. When she joined the credit union, it was included in her bio, but also when introducing and interacting, her emails were signed by Judge Sylvia Ash.
Q. Can you please describe your relationship with Judge Ash while she served on the board of directors at MCU?
A. Professional and amicable.
Q. Can you describe your relationship with her after she stepped down from the board of directors?
A. Professional and amicable.
Q. Are you familiar with an individual named Kam Wong?
A. Yes.
Q. Who is Kam Wong?
A. Mr. Kam Wong was the former CEO and president of Municipal Credit Union.
Q. If you know, what years did Kam Wong serve as CEO of Municipal Credit Union?
A. I believe he was appointed CEO in 2007 until 2018.
Q. What happened in or around June of 2018?
A. He was removed as president and CEO of Municipal Credit Union.
Q. Did there come a time where you learned that Kam Wong had been arrested by federal investigators?
A. Yes.
Q. And how did you learn that?

A. Based on a communication that had been published from the S.D.N.Y.
Q. Did there come a time where you learned that MCU generally was being investigated by federal investigators?
A. Yes.
Q. Did there come a time where you learned that there was also an internal investigation being conducted of MCU?
A. Yes.
Q. When did you learn that?
A. Approximately February/March of 2018.
Q. By the way, are you aware of who stepped in as interim CEO after Kam Wong stepped down?
A. Yes.
Q. Who was that?
A. Mr. Norman Kohn.
Q. Did you deal directly with Kam Wong?
A. Yes.
Q. Would you recognize him if you saw him again?
A. Yes.
MR. REBOLD: Mr. Charalambous, with the Court's permission, can you please pull up, for identification only, for the witness Government Exhibit 851.
Q. And, Ms. Cogan-Rupani, the technology sometimes is delayed, so if you can just let me know when that's displayed on your screen.



A. It's here.
Q. Do you know what you are looking here at in Government Exhibit 851?
A. Yes.
Q. What are you looking at?
A. A photo of Mr. Kam Wong and Judge Sylvia Ash.
Q. Does that photograph fairly and accurately depict the way that Kam Wong appears?
A. Yes.
MR. REBOLD: Your Honor, the government offers into evidence Government Exhibit 851.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 851 received in evidence)
MR. REBOLD: Mr. Charalambous, if you could now please, with the Court's permission, publish Government Exhibit 851.
I'll just wait a minute while the courtroom screen pops up.
BY MR. REBOLD:
Q. Ms. Cogan-Rupani, this may be self-evident from the photo, but just for the record, who's depicted on the right?
A. Mr. Kam Wong.
Q. Who is depicted on the left?
A. Judge Sylvia Ash.



Q. Ms. Cogan-Rupani, are you familiar with the strategic planning conference?
A. Yes.
Q. Is there a nickname for the strategic planning conference?
A. SP.
Q. What is the strategic planning conference, or SP?
A. The strategic planning conference is a conference in which the board of directors, supervisory committee, and the management team come together, in which the management team presents the strategic plan to the board of directors and supervisory committee.
Q. How frequently is the strategic planning conference held?
A. Every year.
Q. You mentioned that the board of directors attends that?
A. Yes.
Q. What role, if any, do you, or did you, when you served in the marketing department, have with the strategic planning conference?
A. In 2016 and 2017, I attended the strategic planning session.
Q. Why did you attend it?
A. To present the marketing strategic plan to the board of directors and supervisory committee.
Q. Do you know when it's typically held during the year?
A. In October of each year.



Q. Am I correct in saying that the October 2016 strategic planning conference occurred after the defendant stepped down from the board?
A. Yes.
Q. How long is the strategic planning conference?
A. Approximately four to five days.
Q. Where is it held?
A. Las Vegas.
Q. Is there a particular hotel that folks stay at every year?
A. Yes.
Q. What hotel?
A. The Wynn Hotel.
Q. Who pays for the airfare of attendees at the strategic planning conference?
A. Municipal Credit Union.
Q. Who pays for the hotel reservations at the Wynn Hotel in Las Vegas?
A. Municipal Credit Union.
Q. Have you ever seen the defendant at the strategic planning conference?
A. Yes.
Q. When did you see the defendant at the strategic planning conference?
A. In 2016 and 2017.
Q. Are you familiar with the Centennial Event?

A. Yes.
Q. What is the Centennial Event?
A. It was a celebration of the Municipal Credit Union turning a hundred years old.
Q. Did you have any role in the Centennial Event?
A. Yes.
Q. Can you please explain?
A. My role was the preparation of the yearlong celebration events that the marketing and PR departments ran, in addition to being the staff liaison for the preparation of our Centennial Gala.
Q. When was the Centennial Gala?
A. October 15, 2016.
Q. What was the Centennial Gala?
A. A gala or a celebration of Municipal Credit Union turning 100.
Q. Am I correct in saying that that gala postdated the defendant's resignation from the board?
A. Yes.
Q. Where was the gala held?
A. In the New York Hilton in Midtown.
Q. Who was permitted to attend the gala?
A. Board of directors attended, supervisory committee, employees were enabled to attend, and then there was a list of guests that were also invited as well.



Q. Are you aware of the cost per attendee for the event at the Centennial Gala?
A. Yes.
Q. What was the cost per attendee?
A. Approximately $250.
Q. Do you know whether Judge Ash, the defendant, was present at the Centennial Gala?
A. Yes.
Q. Did she bring any guests?
A. Yes.
Q. Approximately how many?
A. Ten.
Q. Approximately -- I'm sorry?
A. Ten.
Q. If you know, who were her guests?
A. I know that her son attended the gala. I don't have -- I can't remember the total list of everybody that attended.
Q. Just quickly, do you know what his name is?
A. Ashton.
Q. Who paid for the defendant's ticket to the gala?
A. Municipal Credit Union.
Q. And who paid for the tickets of the defendant's ten guests at the gala?
A. Municipal Credit Union.
Q. Ms. Cogan-Rupani, what were the primary ways, based on your



role as director of the marketing department, that MCU promoted itself in the span of years between 2010 and 2017?
A. Newspapers, radio, online advertising, TV, social media, naming rights agreements with local sports.
Q. In broad strokes, what is a naming rights agreement?
A. A naming rights agreement is simply an agreement between two partners; in our case, with Municipal Credit Union, it was an agreement between Municipal Credit Union and the Brooklyn Cyclones in Coney Island, Brooklyn.
Q. Is that a minor league baseball affiliate of the Mets?
A. Yes, it is.
Q. During what years did MCU have a naming rights agreement with the Brooklyn -- the stadium where the Brooklyn Cyclones play?
A. December 2009 and 2019.
Q. Was there a stagnant annual cost for that naming rights agreement, or did it fluctuate?
A. It fluctuated.
Q. What was the starting annual cost?
A. Approximately $600,000.
Q. To your knowledge, at the end of the agreement, how much did it cost?
A. Approximately somewhere between 800 to 900 thousand dollars.
Q. Whose money was used to pay for MCU's naming rights



agreement at that stadium?
A. Municipal Credit Union.
Q. Based on the naming rights agreement, what was that stadium named between 2010 and 2019?
A. MCU Park.
Q. Beyond naming rights, meaning being able to call the stadium MCU Park, what, if anything, did MCU receive as part of its agreement with that stadium?
A. Advertising within the park, ability to use co-branding, advertising components, we also received tickets to attend the approximately 40 different games that took place at MCU Park, in addition to the use of a dedicated suite at MCU Park.
Q. You mentioned the phrase "co-branding and advertising components."
To the extent that's not familiar phrase to the jury, can you just explain what that is?
A. Sure. As part of the deal, we -- with the MCU Park, there was a dedicated logo that was created. It also meant that when Municipal Credit Union advertised to the public, we had the right to use the rights of the MCU Park logo and the advertising components.
Q. You testified a moment ago that included in the agreements MCU had the right to use a private suite at MCU Park?
A. Yes.
Q. Can you explain, what does a private suite at MCU Park

consist of?
A. A suite at MCU Park consists of 18 tickets and it's a VIP suite on the third or fourth layer of MCU Park so that you can watch each game.
Q. Is that sort of just a section of seats in the general stadium, or is it a secluded area that's private to the users of the suite?
A. It's a secluded room that is private to the users of the suite.
Q. What, other than access to the physical premises of the suite for 18 participants, was included with the suite?
A. That was it. It was the tickets to go and use the suite.
Q. If somebody wanted to order food or drinks at the suite, could they do that?
A. Yes.
Q. Was that covered by the naming rights agreement?
A. No, it was additional costs.
Q. And to whom were those costs paid?
A. Municipal Credit Union.
Q. Sorry --
A. I apologize.
Q. Who paid for the costs, I guess?
A. Municipal Credit Union.
Q. And to whom did the Municipal Credit Union pay for food and drinks?



A. Aramark.
Q. And is Aramark a food vendor?
A. Yes.
Q. You mentioned that the naming rights agreement came with one suite.
Did MCU come to obtain additional suites at MCU Park over the years?
A. Yes, they did.
Q. Can you please explain what happened and when it happened?
A. In 2014, we added a second suite, and in 2016 we added a third suite.
Q. Were those included as part of the naming rights agreement?
A. No.
Q. How much, if you know, did those cost per year?
A. $20,000 each per year.
Q. Who paid the $20,000 a year for those suites?
A. Municipal Credit Union.
Q. Am I correct in assuming that it was the same deal where you got the suite and the 18 tickets and nothing else on top of it?
A. Correct.
Q. Who was in charge of distribution of tickets to the MCU suites?
A. Mr. Kam Wong.
Q. What was the role of the marketing department in



relationship to those suites?
A. In addition to the partnership with the naming rights, we also placed the food orders for the suites.
Q. To your knowledge, if you know, what was the original purpose of those suites?
A. For professional visits with our -- for the business development and marketing teams.
Q. Were the suites always used for that purpose?
A. No.
Q. Focusing specifically on the defendant, based on your work with the marketing department, how, if at all, did she use the private suites?
A. For personal use.
Q. Can you please explain?
A. To celebrate her birthday.
Q. How frequently did the defendant use the private suites to celebrate her birthday?
A. Anywhere between one to potentially four or five times a year.
Q. What year did that start in?
A. 2010.
Q. And what year did that end in?
A. 2017.
Q. Am I correct in saying 2017 postdated her resignation by over a year?



A. Yes.
Q. Who paid for the defendant's use of the MCU suite, of MCU's private suite or suites, when she made those reservations?
A. Municipal Credit Union.
Q. Did MCU pay for the food and beverages for those events?
A. Yes.
Q. What types of food are we talking about?
A. It could vary from hotdogs, hamburgers, to shrimp cocktail, and desserts.
Q. What types of beverages are we talking about?
A. It ranged from sodas to beer, wine, and a variety of different liquors.
Q. Did you personally work on, through your role in the marketing department, the reservation of the suites for these purposes?
A. Yes.
Q. What, if anything, did MCU do to record the costs of those events, meaning the specific events in which the defendant used the suite each year for private events, such as birthday parties?
A. The process with Aramark was that we always had to submit a food order, and there was a specific form that had to be submitted with the breakdown of the items that needed to be ordered for each game that an individual was attending.
Q. Were there other records maintained by the marketing and

accounting departments in connection with the use of the suites?
A. Yes.
Q. At a high level, can you just describe the categories of records that were maintained?
A. There was the food orders, spreadsheets, and the marketing department that we kept track of, and save a copy of all the food orders that were submitted, invoices then that we would have received back -- received from the Aramark to be paid, as well as copies of the actual orders, and then copies for the accounting department of what was actually paid and processed.
Q. When were the food and beverage orders placed, generally, in relation to the games?
A. Approximately 48 to 72 hours prior to each game.
Q. So that would be done through an advance order form?
A. Yes.
Q. Are there times where somebody at the suite could order additional items once they were at the event?
A. Yes.
Q. Were there times where the final invoice would be a little different from the event's order form?
A. Yes.
MR. REBOLD: Your Honor, at this time, with the Court's permission, I'd like to read into evidence a stipulation agreed to by the parties, which has been marked as



Government Exhibit 1007. I'd like to offer that stipulation into evidence.
THE COURT: First of all, it is received.
(Government's Exhibit 1007 received in evidence)
THE COURT: Members of the jury, a stipulation is an agreement between the government and the defendant as to certain facts. Anything to which they have stipulated you are bound to find; that is to say, they're established for the purposes of this case.
MR. REBOLD: Your Honor, while we will endeavor to not do this every single time that a stipulation is read into evidence, because this is the first one, with the Court's indulgence, I'm just going to read the full stipulation into evidence.
THE COURT: Okay. Now that I've gotten a glance at it here, let me make one other comment.
Sometimes a stipulation will be to the effect that a certain person, if that person came and testified here, would have said something, would have said X, would have said Y. With respect to a stipulation of that nature, you are obliged to accept that the witness, if the witness had come, would have said whatever the parties agreed the witness would have said. But it is up to you as to whether or not you accept that as true. It's up to you to decide what, if any, weight to give it.



Let's spare the boilerplate. Counsel will just read what is stipulated, without all the prefatory language.
MR. REBOLD: This is, just for the record, titled "MCU Records Stipulation." And jumping to paragraph 1:
"If called as a witness, a representative from Municipal Credit Union ("MCU") would testify that Government Exhibits 400 through 402, 403, 403A, 404, 404A, 420, 420A, 426, 452, 452A, 453, 457, 458, 458A, 460, 460A, 461, 463, 463A through 463N, 465, 467, 469, 469A, 472, 472A, 480, 481, 482A through 482L, 483, 483A, 484, 485, and any and all sub-exhibits thereof, are true and accurate copies of records maintained by MCU.
"It is further stipulated and agreed that no party will raise any objection under Federal Rule of Evidence 901 with respect to any of the exhibits referenced above."
I'm just turning to page 2.
"It's further stipulated and agreed that this stipulation, which is Government Exhibit 1007, may be received into evidence at trial."
And then it's dated and signed by the parties.
BY MR. REBOLD:
Q. Ms. Cogan-Rupani, prior to coming to court today, did you review several categories of records related to the defendant's use of the suites at MCU Park?
A. Yes.



Q. Can you, in broad strokes, summarize the categories of evidence that you reviewed?
A. Yes, of course. I reviewed order forms, preorder forms, copies of email communication with details of the food orders, review of invoices, documentation that we received back from Aramark, those categories.
Q. Are those records maintained by both the marketing and accounting departments?
A. Yes.
Q. Regarding the records maintained by those departments, did MCU make and keep these records in the regular course of its business?
A. Yes.
Q. Was it the regular course of business for MCU to make and keep these records?
A. Yes.
Q. Prior to coming into court, did you review the following exhibits, which should be in a binder in front of you: Government Exhibits 402, 403, 403A, 404, 404A --
THE COURT: Can we perhaps save some time: Is this the same list that was the subject of the stipulation that was just read out?
MR. REBOLD: It largely is, but a few exhibits were added since then.
Q. So was it the full list as well as Government Exhibits 954,

956, 960, 963, and 964?
A. Yes.
Q. And did you recognize those exhibits for identification?
A. Yes.
Q. And were those records the accounting and marketing records that you referred to?
A. Yes.
Q. Does MCU make and keep those records reflected in those exhibits in its regular course of business?
A. Yes.
Q. Is it the regular course of business for MCU to make and keep the records found in those exhibits?
A. Yes.
Q. And were those entries on those documents made at or around the time of the recorded transactions or within a reasonable time thereafter?
A. Yes.
Q. Was the person who made those entries under a business duty to do so accurately?
A. Yes.
MR. REBOLD: Your Honor, I now offer into evidence all of the records that I've just mentioned, that are both in the stipulation as well as Government Exhibits 954 -- excuse me, I'm not offering all of those in evidence, withdrawn. Just give me a moment.



Before I get there:
Q. Ms. Cogan-Rupani, did you also review emails prior to your coming in to testify?
A. Yes.
Q. Did those emails all relate to the defendant's use of MCU Park suites?
A. Yes.
Q. Was the defendant on most or all of those emails?
A. Yes.
Q. Were you and/or other MCU employees a participant in every one of those emails?
A. No.
Q. Sorry. Were you or another MCU employee a participant in all of those emails?
A. I didn't hear the second half.
Yes.
Q. Were you a participants in some of them?
A. Yes.
Q. And for others, were there other MCU employees who were participants of those emails?
A. Yes.
Q. Did you have one or more email addresses issued to you by MCU?
A. Yes.
Q. How many?



A. Two.
Q. What were your email addresses at MCU?
A. Lrupani@nymcu.org and lcogan-rupani@nymcu.org.
Q. The one commonality I note between those two is that they both ended in @nymcu.org; is that correct?
A. Yes.
Q. To your knowledge, are all employees at MCU issued email addresses with some combination of the letter of their names followed by @nymcu.org?
A. Yes.
Q. To your knowledge, are those emails maintained on MCU's servers?
A. Yes.
Q. To your knowledge, does MCU have a duty to maintain true and accurate copies of those emails?
A. Yes.
Q. Regarding the emails that you reviewed prior to coming to court where you were a participant, are those emails identical copies of the ones that you sent or received at the time?
A. Yes.
Q. And, to your knowledge, is the header information in those emails — including the categories of who was sending the email, who received it, when it was sent and the subject — all accurate?
A. Yes.



Q. And regarding the emails for which you were not a participant, did the employees on those emails also always have the nymcu.org email ending?
A. Yes.
Q. And, to your knowledge, did those emails come from MCU's servers?
A. Yes.
Q. The documents and records that you reviewed related to those emails, did they relate to the defendant's use of MCU Park on specific dates between 2010 and 2017?
A. Yes.
Q. And were they always sent at or around the time of events in which the defendant actually ended up reserving suites at MCU Park?
A. Yes.
Q. Prior to coming to court, did you review Government Exhibits 407, 413, 415, 416, 417, 418, 425, 428, 429, 439, 441, 444, 486, 487, 491, 493, 498, 499, 950, 951, 952, 955, 957, 959, and 962?
A. Yes.
Q. To your knowledge, are each of those emails maintained on MCU's servers?
A. Yes.
Q. Were you a participant in some of them?
A. Yes.

Q. When you were not a participant, were other MCU employees participants on those emails?
A. Yes.
Q. To your knowledge, are all of those emails maintained on MCU's -- sorry, withdrawn.
Do all of those emails relate to the defendant's use of MCU suites at or around times in which, through your experience with the marketing department and based on the other records we've already referenced, the suite was actually used by the defendant?
A. Yes.
MR. REBOLD: Your Honor, I'm now going to offer all of the records that I've mentioned, both the accounting and marketing department records and the email records, with the exception of the following Government Exhibits: 403, 404, 420, 452, 458, 483, 460, 469, 472, 445, and 485.
MR. REILLY: Your Honor --
THE COURT: First of all, I want to be sure, Andy, that you've got an accurate listing of everything he's offering, excluding the ones he just indicated would be excluded, because you read rather quickly, Mr. Rebold.
MR. REBOLD: Apologies, your Honor.
THE COURT: Sorry for this, ladies and gentlemen, but we have to be accurate.
The offer is of all of the exhibits identified on



Government Exhibit 1007, plus Government Exhibits 954, 956, 960, 963, and 964, Government Exhibits 407, 413, 415, 416 through 418, 425, 428 and 429, 431, 441, 444, 487, 493, 498, 499, 950 to 952, 955, 957, 959, 962 --
MR. REBOLD: Your Honor, I believe you inadvertently omitted two from the list, which are 439 — you said 429 — but also 439 and 486. And then, obviously, subtracting the others from the list --
THE COURT: Yes. So I amend my statement to include 439 and 486.
Now, before I deal with the exceptions, the exceptions are all documents identified on Government Exhibit 1007?
MR. REBOLD: I believe they are, but if you'll just bear with me one moment, your Honor, there may be one or two exceptions to that.
(Pause)
MR. REBOLD: So there are a few that are not reflected in that document, and they include --
THE COURT: Don't get it any more confused than it is.
By my inspection, the present offer does not include the following exhibits that are listed on Government Exhibit 1007. These are 403, 404, 420, 452, 458, 483, 460, 469, 472, and 485.
Now, Mr. Rebold, you said you were not offering 445?
MR. REBOLD: Yes.



THE COURT: And that is not included, unless I missed it --
MR. REBOLD: That's correct.
THE COURT: -- on Government Exhibit 1007, and it was not included in the list you read off a minute ago, and so there was no need to except it.
Now, Mr. Reilly?
MR. REILLY: Your Honor, we have no problem and do not object to the admission of all the documents identified in the stipulation. Our objection is to Ms. Cogan-Rupani's ability to authenticate emails that she is not a party to, which is a substantial subset of the email exhibits that Mr. Rebold identified.
THE COURT: Okay. Now, I don't see any reason why we can't do this with the jury present and do it quickly.
I take it your objection with respect to the emails on which she was not a party is sort of a categorical objection based on something like, or precisely, a proposition that one who is not a party to a communication is not competent to testify to the authenticity of that communication. Is that right?
MR. REILLY: Yes, your Honor.
THE COURT: Okay.
Now, of course — this is not my regular courtroom, folks, so I don't always know exactly where the book is — we



have testimony, to which there is no objection, that what I will call the nonparty emails have been said by the witness to reside on MCU servers.
Do I misunderstand that, Mr. Reilly?
MR. REILLY: Yes.
THE COURT: I do misunderstand?
MR. REILLY: No, I'm sorry, you have that correct, your Honor, I apologize.
THE COURT: Okay.
And I understand that the witness also has said that she has looked at all of them; is that right?
THE WITNESS: Yes, your Honor.
THE COURT: And do they appear to you to be in the form of authentic emails from within the MCU organization?
THE WITNESS: Yes, your Honor.
THE COURT: Do they all bear email addresses within the domain name mcu.org?
THE WITNESS: Yes, your Honor.
THE COURT: Are the names of the people listed as addressees and authors on all of those emails, to your knowledge, employees at the time of the emails?
THE WITNESS: Yes, your Honor.
THE COURT: The objection is overruled. They're all received.
Now, for the sake of moving along and not doing this

again, we can stop reading "It is hereby stipulated and agreed" and just read the stipulation, and you can shorthand that whole business records foundation, in the absence of an objection, a substantial objection, just by saying: Are these MCU business records?

Any problem with that, counsel?

MR. REILLY: No, your Honor.

THE COURT: Okay.

Let's go.

(Government's Exhibits 402, 403A, 404A, 420A, 426, 452A, 453, 457, 458A, 460A, 461, 463, 463A through 463N, 465, 467, 469A, 472A, 480, 481, 482A through 482L, 483A, 484, 954, 956, 960, 407, 413, 415 through 418, 425, 428, 429, 439, 441, 444, 486, 487, 491, 493, 498, 499, 950, 951, 954, 955, 956, 957, 959, 960, 962, 963, 964 received in evidence)

BY MR. REBOLD:

Q. Ms. Cogan-Rupani, prior to coming to court today, did you participate in the creation of a summary chart that reflected some of the dates that the defendant reserved an MCU suite for private use between 2010 and 2017?

A. Yes.

Q. And did that chart reflect the approximate cost to MCU for each date that the defendant reserved the suite?

A. Yes.

Q. Are there times where the cost is less than the actual cost



incurred by MCU?

A. Yes.

Q. And did you rely on many of the exhibits, but not all of the exhibits, that I've listed already?

A. Yes.

Q. Are those exhibits that you relied upon reflected in the summary chart itself?

A. Yes.

Q. Would that chart allow you to more efficiently inform the jury about the defendant's use of MCU suites during that period of years?

A. Yes.

MR. REBOLD: Mr. Charalambous, if you could please show the witness only what's been marked for identification as Government Exhibit 901.

Q. Do you recognize 901?

A. Yes.

Q. Is that the summary chart?

A. Yes.

Q. Does it fairly and accurately reflect the chart you participated in and the information contained therein?

A. Yes.

MR. REBOLD: Your Honor, I offer Government Exhibit 901 for identification into evidence.

MR. REILLY: No objection, your Honor.



THE COURT: Received.

(Government's Exhibit 901 received in evidence)

MR. REBOLD: Mr. Charalambous, can you please publish that so that the jury can see it.

Q. Ms. Cogan-Rupani, at a high-level, can you just categorize -- can you explain the categories of information here that are reflected in 901?

A. Sorry, could you repeat that last bit?

Q. Could you just summarize the categories of information that are contained here in Government Exhibit 901?

A. Yeah. It's a summary of the dates and the expenses that were incurred for the various games attended between 2010 and 2017.

Q. Without getting into every single event, that cost to MCU, what does that cost contemplate?

A. That includes food and beverages.

Q. Does it include the cost of the actual suite to MCU and the tickets that came with it?

A. No.

Q. Can you just tell us approximately how many times did Ms. Ash use the suite for personal use in 2010?

A. Once.

Q. How many times in 2011?

A. Twice.

Q. 2012?



A. Once.

Q. 2013?

A. Three -- sorry, apologies, four.

THE COURT: This is not a useful use of time.

MR. REBOLD: Yes, your Honor.

THE COURT: The jury can read this.

Q. Ms. Cogan-Rupani, do you see that the first few entries are of lower monetary amounts, all of them are below a thousand?

A. Yes.

Q. And then it increased to well over a thousand in most instances?

A. Yes.

Q. Are you aware of what accounts for that increase in cost?

A. The order of alcohol, of alcohol and beverages.

Q. Can you please explain?

A. Between 2010 and 2012, MCU implemented a process that you were not allowed to order alcohol to the suites. In 2013, that changed.

MR. REBOLD: Mr. Charalambous, I'd like to now go through just a sampling of some of the supporting, some of the other records in evidence that relate to the use of the suite. If you could please pull up 452A for identification, just so that the jury will understand what they're looking at.

Q. What is 452A?

A. It is a document from our accounting department stating the

amount of money paid to MCU Park on August 14th, 2013.
Q. If we could just jump to page 5, just tell me when you have had a chance to look at that, Ms. Rupani.
A. Yes.
Q. And page 6, does this specifically relate to the itemized bill for an event on August 11, 2013?
A. Yes.
Q. Do you recognize the signature at the bottom?
A. The signature is Judge Sylvia Ash.
Q. If you can turn to page 8.
A. Yes.
MR. REBOLD: Mr. Charalambous, if you can just focus on the bottom part, where it says Kam Wong. There we go.
Q. Can you just indicate, is this an email contained within the accounting paperwork?
A. Within the accounting paperwork? Yes.
Q. And does this relate to -- is this an email sent by the defendant to Kam Wong and Steven Kibitel?
A. Yes.
Q. To your knowledge, who was it at MCU that was responsible for board members' use of the MCU suite the private suite?
A. Mr. Kam Wong.
Q. Who is Steven Kibitel?
A. Former vice president of marketing of Municipal Credit Union.



Q. Does this portion of the email relate to the defendant's use of the MCU private suite on August 10th and 11th, including on the 11th a request for a personalized birthday cake with the inscription "Happy Birthday To Sylvia and All The Leo's"?
A. Yes.
Q. You indicated that Judge Ash resigned on or about August 15, 2016; is that correct?
A. Correct.
Q. Was that the last time that she made private use of the MCU suite?
A. No.
MR. REBOLD: Mr. Charalambous, can you please pull up Government Exhibit 441.
Q. Just starting at the header, just to orient us, can you just tell us who are the sender and recipient of this email?
A. The sender is Judge Sylvia Ash and the receiver is Mr. Kam Wong.
MR. REBOLD: Mr. Charalambous, if could you pull out of that, and then if you could start on the bottom half for the email that's dated August 15th at 10:01 p.m.
Q. Is this portion of the email chain an email from the defendant to a woman named Licette Mercado?
A. Yes.
Q. Who is Licette Mercado?
A. Marketing coordinator of the marketing department of



Municipal Credit Union.
Q. What is the defendant communicating in this email? Just please read from the document.
A. Sure. The document states: Licette, regretfully, I must inform you --
MR. REILLY: Objection, your Honor. These are obviously in evidence, but Ms. Cogan-Rupani isn't on the emails. The documents speak for themselves, but I'm not the sure that she's the appropriate individual to be commenting on a content of the email.
THE COURT: She hasn't been asked to comment on it; she's been asked to read it.
MR. REILLY: I think the document speaks for itself, your Honor.
THE COURT: I do too. Are we going to adopt a practice of no reading from documents for this trial, by anybody?
MR. REILLY: Your Honor, the objection is simply, she's not on the email.
THE COURT: And, therefore, she's incapable of reading it?
MR. REILLY: Obviously not, your Honor.
THE COURT: Okay. Your authenticity objection was overruled previously, so it's time we got past that notion.
So, overruled. I will regulate reading from documents



in a way that I think facilitates a clear presentation. And that goes for both sides.
MR. REILLY: Yes, your Honor.
THE COURT: Obviously, we're not going to have anybody read out loud something like the certificate of incorporation of the credit union. This is about a 50-word email.
Let's go.
A. Shall I continue?
Q. Yes, please.
A. "Licette, regrettably, I must inform you that, for personal reasons, I have tendered my resignation as director and board chair of MCU effective immediately. I have discussed the food order for my birthday celebration at MCU Park on April 24th with Kam and he has authorized the continuation of same. Thank you for your assistance and have a wonderful weekend. Judge A."
MR. REBOLD: Mr. Charalambous, can you please pull up what's in evidence as Government Exhibit 439. Focusing first on just the bottom half, zoom in on that.
Q. Is this an email from Mr. Kibitel to Mr. Wong regarding the upcoming baseball season in 2016?
A. Yes.
MR. REBOLD: Pull out of that, Mr. Charalambous, and just go immediately above that.
Q. Is this portion from Kam Wong to the defendant?

A. Yes.
Q. And, just quickly, can you please read that portion of the --
A. It says: "Hi, Sylvia. Please see the email below and the attached food menu for MCU Park. Thanks."
MR. REBOLD: Mr. Charalambous, if you can move up to where it says June 10th at 6:01 p.m.
Q. If you can read that?
A. "What available dates do you have in August? Sylvia."
Q. If we can pull up the June 11 at 12:02 a.m., this is a response from Kam Wong to the defendant?
A. "Madam Chair, I practically locked down the month of August for you!"
MR. REBOLD: Mr. Charalambous, if you could please pull back up Government Exhibit 901.
Q. Am I correct in saying Judge Ash resigned, based on that email and your recollection, on August 15, 2016?
A. Yes.
Q. Did she then use the suite on August 24, 2016?
A. Yes.
Q. To your knowledge, did she -- did that incur a cost of almost $2,000 to MCU for food and beverages?
A. Yes.
Q. Based on your review of the records, did she again use the suite for a birthday party a year later, in August of 2017?



A. Yes.
Q. And what did that -- did that incur a cost of over $1,700 to MCU?
A. Yes.
Q. Ms. Cogan-Rupani, based on your estimate and review of the records, approximately how much money in food and alcohol and other beverage costs was incurred by MCU for the defendant's private use of the MCU suites between August 10th and August -- August of 2010 and August of 2017?
A. Approximately $29,000.
MR. REBOLD: Your Honor, may I just briefly confer with my colleagues?
THE COURT: Okay.
(Pause)
MR. REBOLD: Your Honor, I have no further questions for this witness.
THE COURT: Thank you.
Okay, cross-examination?
MR. REILLY: May I inquire, your Honor?
THE COURT: You may.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good morning, Ms. Cogan-Rupani.
A. Good morning.
Q. My name is Nathan Reilly. I'm going to ask you a few



questions.
Ms. Cogan-Rupani, you and I haven't met before, right?
A. Correct.
Q. You did, prior to coming to court today, meet with members of the government's team; is that correct?
A. Correct.
Q. On multiple occasions?
A. Correct.
Q. Just to be clear, we haven't met, and you haven't met any of my colleagues who are representing Ms. Ash; is that right?
A. Correct.
Q. As part of that preparation, you were asked about your time at the MCU?
A. Correct.
Q. And told, generally speaking, the topics you were going to be asked about today; is that right?
A. Correct.
Q. Now, I think you testified on direct examination about the fact that you learned that Kam Wong had been arrested at some point, right?
A. Correct.
Q. In fact, as the marketing director, you had a role in the public relations work that MCU did around the arrest; is that right?
A. There was -- yes and no.



Q. Well, did you work with their public relations strategy at that time?
MR. REBOLD: Objection.
THE COURT: Ground?
MR. REBOLD: Relevance and --
THE COURT: Sustained.
Q. Ms. Cogan-Rupani, you also testified that you learned that there was a government investigation into the MCU; is that right?
A. Correct.
Q. In your role as an MCU employee, your desire is to be cooperative with the government; is that right?
A. Correct.
Q. Help them out with whatever they need, correct?
A. Answer questions and tell the truth.
Q. I want to turn your attention to the -- you testified briefly about the MCU centennial and also the strategic planning in 2016; is that right?
A. Correct.
Q. With respect to the strategic planning conference, I think you said it was in October of 2016; is that right?
A. The presentation to the board of directors and supervisory committee, yes.
Q. And I think you said it's referred to as the SP, the strategic planning; is that right?

A. "SP" was an abbreviation for strategic planning.
Q. And you traveled to it; is that right?
A. For two years, yes.
Q. And in 2016, Ms. Ash traveled to it as well; is that right?
A. She was in Las Vegas, yes.
Q. You saw her there?
A. Yes.
Q. And that was approximately two months after she left the board; is that right?
A. Correct.
Q. She had a role in planning that strategic planning conference prior to her leaving the board; is that right?
A. I'm not sure.
Q. But she was the board chair up until August of 2016; is that right?
A. Correct.
Q. Similarly, you mentioned the centennial in 2016, in October 2016, right?
A. Correct.
Q. I think you testified that Ms. Ash had a role in planning that Centennial Gala, right?
A. She was a member of one of the subcommittees for the Centennial Gala.
Q. I think you mentioned you worked on it as well, right?
A. Correct.



Q. Part of the goal of the centennial was to celebrate the MCU's hundredth anniversary; is that right?
A. Correct.
Q. Also to market it and make the community known -- or know about the MCU business more generally; is that right?
A. Correct.
Q. And so, as part of that -- excuse me.
As part of the centennial, the goal was to have well-known people attend the gala, is that right -- or people who were prominent in the community; is that right?
A. It was a variety of different individuals.
Q. And I think you mentioned that Ms. Ash attended and had, to your knowledge, guests attend with her; is that right?
A. Correct.
Q. And that her tickets were paid for, or at least she didn't pay for them, is that right, that the MCU paid for them?
A. Correct.
Q. Do you know, that wasn't in violation of any MCU policy, was it?
A. I'm not sure.
Q. Because I think you testified you didn't -- you were not familiar with MCU's -- the policy manual; is that right?
A. Not in detail.
Q. Now, I want to turn your attention to the MCU -- the testimony -- your testimony about the MCU suites.



I think you testified that the suite tickets were -- providing the suite tickets or determining who used the suites was done by Kam Wong; is that right?
A. Correct.
Q. I think on this topic, as well, you were not aware that there was any -- excuse me, of any MCU policy that governed how the suites should be used; is that right?
A. Correct.
Q. So, effectively, Kam Wong set the policy; is that right?
A. Correct.
Q. And I think you mentioned, in response to a question from Mr. Rebold, that you believed that the price increase over time was associated with the fact that alcohol could now be consumed at the park; is that right?
A. Correct.
Q. And that the MCU would pay for alcohol; is that right?
A. Correct.
Q. And, again, that policy change was instituted by Kam Wong; is that right?
A. Correct.
Q. Now, when you previously met with the government and talked about this topic, did you indicate that you understood that Kam Wong frequently gave suites out to friends and family?
MR. REBOLD: Objection.
THE COURT: Sustained.



Q. Ms. Cogan-Rupani, during your time in the marketing department, you reported to Kam Wong; is that right?
A. Directly from 2016 until the period of time that he was no longer at the credit union, yes.
Q. I see.
Did you ever raise concerns with him about the policy or, excuse me, the use of the MCU suites?
MR. REBOLD: Objection.
THE COURT: Ground?
MR. REBOLD: Relevance. The witness' perspective on the proper or misuse.
THE COURT: Sustained.
BY MR. REILLY:
Q. Now, I think you testified that in -- the judge left the board in August 15th, I believe, of 2016; is that right?
A. That's when I received a communication from Judge Ash.
Q. That's when you became aware of it; is that right?
A. Correct.
Q. Again, Mr. Rebold asked you on direct about Ms. Ash's use of the park subsequent to that, in August of 2016; is that right?
A. Sorry, can you re --
Q. Sure. Let me clarify.
The records reflected that after August 15th, in that same year, 2016, Ms. Ash used the park; is that right?

A. Correct.
Q. Or MCU's suite at the park; is that right?
A. Correct.
Q. And I believe that there were emails that reflected that that had been, planning for that day, had been had started in advance of August 15th. I think there was an email from June 2016.
Does that sound right to you?
A. June of 2016?
Q. Yes, that there was planning in advance of August 24th with respect to that event?
A. Yes.
Q. And, again, as you understood, Kam Wong had approved Ms. Ash's use of the park on that date; is that right?
A. Correct.
Q. And, similarly, in 2017, in August 2017, there was a reflection of Ms. Ash using the park; is that correct?
A. Correct.
Q. Again, to your understanding, that approved by Kam Wong; is that right?
A. Correct.
Q. And, to your knowledge, there was no limitation that somebody had to be an employee or board member of the MCU to use the suite; is that right?
A. Correct.



MR. REILLY: Your Honor, can I have one moment?
(Pause)
THE COURT: Anything else, Mr. Reilly?
MR. REILLY: Yes, very briefly, your Honor.
BY MR. REILLY:
Q. Ms. Cogan-Rupani, just for clarity, in case I was unclear, is it correct that you were not aware of any MCU policy that limited who Mr. Wong could allow to use the suites?
MR. REBOLD: Objection.
THE COURT: What's the objection?
MR. REBOLD: Asked and answered, your Honor.
THE COURT: Sustained.
BY MR. REILLY:
Q. Similarly, you're not aware of any policy that would prohibit --
THE COURT: Sorry, that wasn't clear.
MR. REILLY: I'm sorry, your Honor.
THE COURT: I couldn't make out what you were saying.
MR. REILLY: My apologies, your Honor.
BY MR. REILLY:
Q. Similarly, Ms. Cogan-Rupani, you weren't aware of any MCU policy that prohibited how tickets to the centennial gala could be distributed; is that right?
A. Not a policy, but a conversation took place at one of the meetings, one of the Centennial Gala meetings.



MR. REILLY: No further questions, your Honor.
THE COURT: Thank you.
Any redirect?
MR. REBOLD: No, your Honor.
THE COURT: All right.
Thank you, ma'am. You're excused.
(Witness excused)
THE WITNESS: Thank you very much, your Honor.
THE COURT: Next witness.
MR. REBOLD: Your Honor, since this is the first day of full court, what time does your Honor intend to take a break this morning?
THE COURT: Well, if that's a hint, I'll take one now.
Fifteen minutes.
MR. MARK: Thank you.
(Recess)
(Continued on next page)



(In open court; jury not present)
THE COURT: The jury is on its way.
MR. MARK: Before we start, I think there was one housekeeping issue because we had so many exhibits that went through. We conferred on the exhibits that went in with defense counsel so I think we're all on the same page. There was one correction we wanted to make so the record is clear on that.
MR. REBOLD: We are asking that 400 and 401 --
THE COURT: What?
MR. REBOLD: We are asking that Exhibits 400 and 401 be excepted from the list of exhibits that went into evidence. They are present on the stipulation, but they were not among the list of exhibits that the witness testified about reviewing, they do not relate to marketing or accounting paperwork or anything to do with the use of MCU suite. Our stipulation had just included those exhibits as true and accurate records maintained by MCU, but we did not intend to put those into evidence through this witness.
THE COURT: So this is 401 and?
MR. REBOLD: And 400.
THE COURT: 400 and 401 are not received in evidence. Okay. James, make sure you give Andy a note when he gets up to that effect. Anything else? No.
(Jury present)

THE COURT: Jury is present.
Who is the next witness, please.
MR. MARK: The government calls our next witness, Special Agent LaVale Jackson.
THE COURT: You may proceed, counselor.
LAVALE JACKSON,
called as a witness by the Government,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. MARK:
Q. Good morning, Mr. Jackson. Where do you currently work?
A. I work at the U.S. Attorney's Office for the Southern District of New York.
Q. Is the U.S. attorney's office part of the U.S. Department of Justice?
A. Yes, it is.
Q. Is that a federal, state or local agency?
A. It is a federal agency.
Q. What does the U.S. attorney's office do?
A. Investigate and prosecute federal crimes.
Q. What is your position at the U.S. attorney's office?
A. I'm a special agent.
Q. What do you do as a special agent?
A. I investigate financial crimes.
Q. Do you work with any particular unit?



A. Yes, I do.
Q. Which one?
A. The public corruption unit.
Q. Prior to joining the U.S. attorney's office, where did you work?
A. I worked for the U.S. Department of Labor, Office of Inspector General.
Q. How long have you been a federal investigator in total?
A. Over 16 years.
Q. What kinds of investigations have you participated in?
A. Various investigations which included, which include various frauds, obstruction cases, embezzlement cases, kickback, bribery cases, a host of cases.
Q. How far did you go in school?
A. Graduate school.
Q. Where did you graduate from?
A. John Jay College of Criminal Justice.
Q. What was the highest degree you obtained?
A. Master's degree.
Q. In what?
A. Public administration.
Q. In connection with your work as a federal agent, have you been involved with any grand jury investigations?
A. Yes.
Q. Approximately how many?



A. Hundreds.
Q. In general terms, what is a grand jury?
A. A grand jury is -- it's when a group of people meet in a room to review and look over evidence pertaining to a crime.
Q. Are there federal grand juries?
A. Yes, there is.
Q. Generally, what do federal grand juries investigate?
MS. COHEN: Objection, your Honor.
THE COURT: What's the objection?
MS. COHEN: Relevance, your Honor, among others.
THE COURT: Sustained.
Q. Is there a grand jury in this district?
A. Yes, there is.
Q. Where is it located?
A. In Manhattan.
Q. Does a grand jury have any role in indicting an individual or an entity?
MS. COHEN: Objection, your Honor.
THE COURT: This witness's role is not to give a first year course in criminal law. Let's get on with it. If there is any legal matter that the jury needs to be informed of, it will be in my instructions.
MR. MARK: Of course, your Honor. We'll proceed.
Q. What types of evidence does a grand jury use in making a decision whether to indict a person or an entity for a crime?



A. Documents and testimony.
Q. How, if at all, is a grand jury impacted -- are you familiar with grand jury subpoenas?
A. Yes, I am.
Q. Approximately how many grand jury subpoenas have you served in your career?
A. Hundreds probably, thousands.
Q. What does it mean to serve a subpoena?
A. Repeat that question, please.
THE COURT: We are wasting a lot of time here. Get on with it, please.
Q. What types of materials can a subpoena request?
THE COURT: I've already told the jury that. Let's get on with it.
MR. MARK: Okay.
Q. Did there come a time in 2017 when the U.S. Attorney's Office for the Southern District of New York became involved in investigation potential of misconduct at Municipal Credit Union?
A. Yes.
Q. Is Municipal Credit Union referred to sometimes as MCU?
A. Yes, it is.
Q. Where are MCU's offices?
A. Downtown Manhattan.
Q. What was your role in investigation of misconduct at MCU?

A. I was the case agent.
Q. What does it mean to be the case agent?
A. In charge of the investigation.
Q. What are some of the responsibilities of being the case agent?
A. Conducted interviews, served grand jury subpoenas, plan operations pertaining to search warrants.
Q. With regards to MCU, what did you begin investigating in 2017?
A. Money that Kam Wong received.
Q. Who was Kam Wong at the time?
A. He was the CEO of Municipal Credit Union.
Q. Is he still the CEO of MCU?
A. No, he's not.
Q. Were grand jury subpoenas issued in connection with this investigation?
A. Yes, there were.
Q. To whom or what entities were subpoenas issued to?
A. To MCU, to various banks, outside auditors, outside vendors that MCU used, supervisory committee members, board members, and senior management of MCU.
Q. Was your investigation focused only on Kam Wong or did you focus on others as well?
A. Focused on others as well.
Q. What were some of the investigative steps the U.S.



attorney's office took during the course of the investigation?
A. Interviews were conducted, grand jury subpoenas were served, search warrants were executed on residences, as well as electronics, e-mails were searched, iCloud accounts were searched.
Q. Did you participate in the investigatory steps that you just listed in the course of this investigation?
A. Yes.
Q. In the course of the investigation, did any of those investigatory steps come to involve Sylvia Ash?
A. Yes.
Q. What was her connection, if any, to MCU?
A. She was the former board chair.
Q. What investigatory steps did you or others at the U.S. attorney's office take in the investigation with respect to Sylvia Ash?
A. We conducted interviews of Sylvia Ash, served grand jury subpoenas to Ms. Ash, as well as conducted a search warrant on her residence and electronics.
Q. What is a search warrant?
A. Permission from the court to search someone's premises or electronics.
Q. Do you recognize Ms. Ash in the courtroom?
A. Yes, I do.
MS. COHEN: Objection. This is not an identification



case.
THE COURT: I can't hear you.
MS. COHEN: Objection, your Honor. This is not an identification case where each witness has to identify the defendant in court.
THE COURT: Overruled.
Q. Could you describe an article of clothing she's wearing.
A. Appears she is wearing a grayish colored blazer.
MR. MARK: May the record reflect that the witness identified the defendant.
THE COURT: Yes.
Q. So let me take you back to the beginning of the investigation of misconduct at Municipal Credit Union.
Approximately when did it start?
A. 2017.
Q. You mentioned it was initially focused on Kam Wong. Is that right?
A. Yes.
Q. What initially were you investigating?
A. Kam Wong's suspicious banking activity.
Q. What was suspicion about Mr. Wong's banking activity?
A. Mr. Wong received over 100 handwritten checks.
Q. Why was it suspicious to you?
A. In my experience, I never seen an executive or a head of a company received so many handwritten checks.



Q. When were those checks dated?
A. 2010 through 2017?
Q. How much were these checks for?
A. In the tens of thousands.
Q. In total, approximately how much did they account to?
A. In the millions.
Q. Were any of them written on the same date as each other?
A. Yes, they were.
Q. What bank were those checks from?
A. Citibank.
Q. What account were they with?
A. I'm sorry?
Q. Who was the account holder with that account at Citibank?
A. MCU.
Q. Where were those checks written to? To whom?
A. They were written to Kam Wong.
Q. Where were they deposited in?
A. In Kam Wong's bank account.
MR. MARK: At this time the government offers stipulation number 1004 into evidence.
THE COURT: Received.
(Government's Exhibit 1004 received in evidence)
MR. MARK: Your Honor, I am just going to go to the only relevant paragraph is paragraph 3 on the second page.
THE COURT: Read it, please.

MR. MARK: It provides that if called as a witness, a representative from Citibank N.A. would testify that Government Exhibits 604 through 609, and any and all sub-exhibits thereof, are true and correct copies of records maintained by Citibank for an account held by Municipal Credit Union. Government Exhibit 604 through 609 were created at or near the time the information became available to Citibank and were created and maintained by Citibank as part of its regularly conducted activities.
THE COURT: And the numbers were 604 to 609 or 601 through 609?
MR. MARK: The numbers are 604 through 609 for authenticity.
Q. And I am now asking the witness, could you take a look at what's been marked for identification as 604A, 605, 606, 607, 608A and 609A.
A. I have it.
Q. Do you recognize the documents in those exhibits that I just listed?
A. Yes.
Q. What are they generally?
A. These are handwritten checks to Kam Wong.
Q. Are those the ones you just testified about?
A. Yes.
MR. MARK: At this time we offer Government Exhibits



604A, 605, 606, 607, 608A, and 609A into evidence.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 604A, 605, 606, 607, 608A, 609A received in evidence)
MR. MARK: Mr. Charalambous, can we pull up one of those by way of example, say, Government Exhibit 608A. If you could publish that to the jury and initially scan through it quickly and we'll return to the first page.
Thank you. If we can return to the first page here of these checks.
Q. On the upper-left-hand-corner, does that say MCU?
A. Yes.
Q. And what's the date, for example, of this check?
A. July 1st, 2016.
Q. Who is it written to?
A. Kam Wong.
Q. What's --
THE COURT: This is pretty obvious, hmm?
Q. Does there appear to be any signature in the bottom-right-hand corner?
A. Yes.
Q. What does it appear to be?
A. Kam Wong and Ms. Ash.
Q. Did there come a time in the investigation that you sought



to interview Kam Wong?
A. Yes.
Q. When was that?
A. January 18, 2018.
Q. Why did you seek to interview Mr. Wong?
A. To get an understanding of the reason why he was receiving these checks from MCU.
Q. During the course of your investigation, did you ever in fact interview Mr. Wong?
A. Yes, I did.
Q. How many times?
THE COURT: Could we back up for one second and put 604A back there.
Q. Were there various signatures on these different checks?
A. Yes.
THE COURT: Can you go back to the one that the witness testified appeared to have Sylvia Ash's signature on them.
MR. MARK: Yes, your Honor. That was 608A.
THE COURT: Now, Agent, did you mean to convey that this appeared to be a manually affixed signature by Ms. Ash as opposed to a facsimile signature that had been attached or placed there with a machine or a rubber stamp or something else?
THE WITNESS: It appears to be some sort of stamp, not



a manual signature.
THE COURT: Thank you. Let's go on.
Q. On these checks, they dated from 2010 to 2017; is that right?
A. Yes.
Q. Were there various different signatures on the checks across those years?
A. Yes.
Q. Now, you're testifying that you engaged in -- did you in fact interview Kam Wong in this investigation?
A. Yes, I did.
Q. How many times?
A. Three times.
Q. When did you attempt to interview Kam Wong the first time in the investigation?
A. On January 17, 2018.
Q. Where did you attempt to interview him?
A. At his home.
Q. Where is his home?
A. In Long Island.
Q. Were you successful?
A. No, I was not.
Q. What happened?
A. Kam Wong was not home. So I left my business card with his wife and asked her if she can have him call me.

Q. How does your business card identify you?
A. As a special agent working for the United States attorney's office.
Q. After you left your card at his home, did Mr. Wong call you back?
A. Yes, he did.
Q. When did he call you back?
A. Later that evening.
Q. What number did he call you back from?
A. On my cell phone.
Q. What did you say to Mr. Wong in substance during that call?
A. I identified who I was, I told him I was a special agent for the U.S. attorney's office, and I wanted to talk to him in regards to these handwritten checks that he received.
Q. What did he say to you in substance during that call?
A. He agreed to meet with me the next day.
Q. Did you meet with Mr. Wong as planned the next day?
A. Yes, I did.
Q. Just so the record is clear, what date was that?
A. January 18, 2018.
Q. Where did you meet with him?
A. At MCU's offices.
Q. In downtown Manhattan?
A. Yes.
Q. Where in the offices did that meeting take place?



A. In one of the conference rooms.
Q. Approximately when in the day was that interview?
A. About 3:30 in the afternoon.
Q. Who participated in that interview with you?
A. Myself and my colleague Special Agent Antoinette Guzman.
Q. Where does Special Agent Guzman work?
A. She works for the U.S. attorney's office as well.
Q. Mr. Wong was present, and anybody else, was anybody else present as well?
A. Yes. The head of human resources, Miss Kim Thompson.
Q. Was she present for the whole meeting or only a portion?
A. Just a portion.
Q. Approximately how long did this interview of Mr. Wong last?
A. About a half an hour.
Q. Was anyone taking notes during the interview?
A. Yes, I was.
Q. What general subjects were discussed in that interview?
A. We briefly discussed his background and his longterm disability policy.
Q. What, if anything, did he say about his position at MCU?
A. At the time he said he was the CEO, since 2007, and he's been working for MCU for about 30 years.
Q. During the interview, did you ask him why he was receiving handwritten checks from MCU?
A. Yes, I did.



Q. What in sum did Mr. Wong say about what the money he received in the form of handwritten checks was for?
A. He said it was the premium cost for a policy he never received.
Q. What policy did he say he didn't take?
A. His longterm disability policy.
Q. Is that a type of insurance?
A. Yes.
Q. Are you familiar with that type of insurance?
A. Yes, I am.
Q. What is it?
A. It is an insurance that covers someone if they go out sick for an extended amount of time.
Q. Did you say he mentioned the word "premium"?
A. Yes, he did.
Q. What did he mention about the premium?
A. He said it was the premium cost for an insurance that he didn't receive.
Q. What is a premium, generally?
A. It is the cost for insurance.
Q. If you take it?
A. Yes.
Q. Prior to this conversation with Mr. Wong, in your experience, had you ever heard of someone receiving money from their employer instead of obtaining a longterm insurance



policy?
A. No, I have not.
MS. COHEN: Objection.
THE COURT: Sustained. Answer stricken. The jury will disregard the answer.
Q. Returning to what Mr. Wong said, when did he say he began receiving the money?
A. He said he began receiving the money when his contract renewed.
Q. Who, if anyone, did he say approved these payments?
A. He said the board approved the payments.
Q. The board of what?
A. MCU.
Q. Did you question him about why some of these check as we just looked at were written on the same date?
A. Yes, I did.
Q. What, if anything, did he say about why these checks were written to him on the same date?
A. He stated that it decreases the taxes paid.
Q. Who, if anyone, did he say paid the taxes on these payments?
A. He stated MCU paid the taxes.
Q. How long have you been a federal investigator again?
A. Over 16 years.
Q. How many of those years involved investigating financial

crimes?
A. Over 16 years.
Q. So, almost all of those years?
A. Yes.
Q. Did any of them relate to tax crimes?
A. Yes.
Q. In your experience, can dividing payments up into multiple checks decrease taxes?
A. No.
MS. COHEN: Objection, your Honor.
THE COURT: Sustained. Answer stricken.
Q. During this meeting, did Mr. Wong provide you with the contact information for anyone?
A. Yes, he did.
Q. For whom?
A. MacKoul & Associates.
Q. What, if anything, did Mr. Wong say about MacKoul & Associates?
A. He stated they were an insurance broker for MCU.
Q. Did Mr. Wong provide you with anything during this meeting?
A. Yes, he did.
Q. What did he provide you with?
A. With a page of his contract from his contract and a chart.
Q. During this interview, did you observe Mr. Wong's behavior?
A. Yes.



Q. How would you describe his behavior?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
MR. MARK: Your Honor, may I proffer at sidebar the relevance.
THE COURT: Quickly.
(Continued on next page)



(At the sidebar)
THE COURT: Was your objection relevance?
MS. COHEN: Yes, it was.
MR. MARK: The fact Mr. Wong's prepared for the interview, indeed we are going to try to establish and introduce evidence of communications Mr. Wong had prior to the interview, including with Ms. Ash. So, how he appeared in that meeting and his preparedness is relevant to the conduct at issue here.
MS. COHEN: Based on that proffer, it is also unduly prejudicial. It is not relevant to whether Ms. Ash lied to them. What Mr. Wong's demeanor was when interviewed by federal agents is unduly prejudicial because...
THE COURT: Because what?
MS. COHEN: Because it goes to the fact Mr. Wong may have felt prepared. Is that your proffer?
MR. MARK: Yes.
MS. COHEN: The fact Mr. Wong may have been prepared does not make it more or less likely that Ms. Ash lied to the government or he set up Mrs. Ash. It goes to Mr. Wong's state of mind. Not to her state of mind. Mr. Wong is not here.
THE COURT: The ruling stands.
MR. MARK: We are charged with conspiracy here.
THE COURT: I know. I actually got that part.
MR. MARK: I know you did.



(In open court)
BY MR. MARK:
Q. How did the interview of -- you were discussing towards the end of the interview Mr. Wong provided you with certain documents?
A. Yes, he did.
Q. What were those documents?
A. Page of his contract, and a chart.
Q. And I'm now showing you for identification only Government Exhibits 115A and 115B.
Do you recognize these documents?
A. Yes, I do.
Q. What are they?
A. Documents Mr. Wong provided me.
MR. MARK: Government offers Government Exhibit 115A and 115B into evidence.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 115A, 115B received in evidence)
Q. So, if we could first publish Government Exhibit 115A. What, if anything, did Mr. Wong say to you about this document?
A. He stated that these figures were payments broken down by year.
Q. Did he say what the payments were for?
A. No, he did not.

Q. Could you read just the first sentence of this document.
A. "This model is using a conservative interest discount rate where future value is using the lower rate of 1 percent where the future value is lower."
Q. Reviewing the document, does the document explain what this model is for?
A. No, it does not.
Q. What range of years are listed on the document?
A. From 2007 through 2023.
Q. What does the document say is the total liability to be reimbursed net of all taxes?
A. $3.7 million approximately.
Q. Are you familiar with the term "net of taxes"?
A. Yes, I am.
Q. What does that term mean?
A. After taxes.
Q. As opposed to taxes being taken out before?
A. Correct.
Q. In the course of the investigation, is this the only version of the model you've reviewed?
A. No, it's not.
Q. Have you reviewed other versions of the model?
A. Yes.
Q. From whom did you obtain them?
A. From MCU in response to a subpoena.



Q. How, if at all, did they vary?
A. The numbers varied. They got bigger and bigger over time.
Q. Turning next to Government Exhibit 115B. If we could publish that to the jury.
What, if anything, did Mr. Wong say about this document?
A. He didn't say anything specific about it.
Q. Did he identify what it was?
A. No, he did not.
Q. Did he discuss his contract with you during your interview?
A. Yes, he did.
Q. Did he mention whether any of the documents that he was providing you related to that?
A. He said this one page was related to his contract.
Q. Did you read this page?
A. Yes, I did.
Q. Did it say anything about Mr. Wong being able to receive the money that he talked about instead of a longterm disability insurance policy?
A. No, it did not.
Q. Did it say anything about MCU paying taxes on any insurance?
A. No, it did not.
Q. Did there come a time that you spoke again with Mr. Wong?
A. Yes, the next day.



Q. What date was that?
A. January 19, 2018.
Q. Why did you speak with Mr. Wong again?
A. I had additional questions in regards to the money he received from MCU.
Q. How did you contact him?
A. By phone.
Q. Where were you when you placed that call?
A. I was in my office at the U.S. attorney's office.
Q. How did your call with Mr. Wong begin?
A. Mr. Wong stated that he wanted to provide transparency for the reason why he received the money he received.
Q. Before he said that, did you ask him any questions?
A. Yes, I did. I just asked him if he received board approval for the payments he received.
Q. Is that how you started the interview on the phone?
A. I believe so.
Q. Once again, what did he say in response to your question about board approval?
A. He stated that he didn't receive full board approval. He stated that Ms. Ash orally approved him receiving these payments.
Q. Did he identify who Ms. Ash was on that call?
A. Yes, he did.
Q. How did he identify her?



A. He said she was the chair of the board.
Q. What, if any, documentation did he say about the conversation he had with Ms. Ash?
A. He said he had none.
Q. Did he discuss with you when he received approval from Ms. Ash?
A. He did not.
Q. What, if anything, did he say about whether the approval that he received from Ms. Ash was reflected in his contract?
A. He said it was not reflected.
Q. What, if anything, did Mr. Wong say about whether the approval received from Ms. Ash was reflected in any board documents?
A. He said it was not.
Q. During your conversation with Mr. Wong, did he provide you with any contact information?
A. Yes, he did.
Q. What did he provide you with?
A. With Ms. Ash's telephone number.
Q. During your conversation, you said you asked him for some documents. Did you ask him for some documents?
A. Yes, I did.
Q. What were those documents?
A. The board minutes reflecting the board approving the payments that he received as well as his full contract.

Q. Did he provide either of those two requested documents to you?
A. He provided his contract.
Q. How did he provide his contract?
A. By e-mail.
Q. To what e-mail address?
A. To my USDOJ.gov e-mail.
Q. I'm showing you has been marked for identification purposes as Government Exhibit 448.
Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. An e-mail that Mr. Wong sent to me on January 19, 2018, of his employment contract.
MR. MARK: The government offers Government Exhibit 448.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 448 received in evidence)
MR. MARK: Could you publish this, Mr. Charalambous.
Q. Who is this from?
A. Kam Wong.
THE COURT: The jury can see that.
Q. What did Mr. Wong write to you in this e-mail?
A. "Hi, Mr. Jackson. As per your request, I have enclosed my employment contract including five amendments for your review. If you should have any further questions, please feel free to contact me at my cell or office number."



Q. Did you review the attached contract?
A. Yes.
Q. Did any of the amendments to Mr. Wong's employment contract mention longterm disability insurance?
A. No, it did not.
Q. Did there come a time that you interviewed Mr. Wong again?
A. Yes.
Q. When was that?
A. On January 25, 2018.
Q. Where did that interview take place?
A. At the U.S. attorney's office.
Q. In Manhattan?
A. Yes.
Q. Who participated in that meeting?
A. Myself, and my colleague Special Agent Guzman.
Q. During this meeting what, if anything, did Mr. Wong say he planned to do?
A. To go to the full board to get approval for the payments he received.
Q. Did he provide you with any documents during that meeting?
A. Yes, he did.
Q. What did he provide you with?



A. A memo that Ms. Ash signed.
Q. I am going to ask you now for identification purposes only, could you show the witness Government Exhibit 116.
Do you recognize this document?
A. Yes.
Q. What is this?
A. The memo that Mr. Wong provided me.
MR. MARK: The government offers Government Exhibit 116 into evidence.
MS. COHEN: No objection.
THE COURT: I didn't hear.
MS. COHEN: No objection, your Honor.
THE COURT: It's received.
(Government's Exhibit 116 received in evidence)
MR. MARK: Mr. Charalambous, can you publish Government Exhibit 116.
Q. Directing your attention to the top of the document. Who does the document say it's from?
A. Kam Wong.
Q. Who is it to?
A. Sylvia G. Ash.
Q. And the subject?
A. Longterm disability insurance for the CEO.
Q. And what did this memo generally concern?
A. A conversation that Mr. Wong and Ms. Ash had in June 2015 regarding Mr. Wong longterm disability policy. Policy, you know, he wanted to take, he wanted to take cash in lieu of the policy.



MR. MARK: I understand the Court has limited reading the documents, but may the witness read this one?
THE COURT: Yes.
Q. Mr. Jackson, maybe I'll try to make this a little shorter.
What does the memo indicate is the cost of the premium for the insurance coverage discussed in the memo?
A. 100,000 -- 100,000, $130,000 per year.
Q. What does the memo say is the total amount of the cost for the premiums for the policy?
A. $3.7 million.
Q. Does it mention taxes?
A. Net of applicable taxes.
Q. How does the amount compare to the total amount in the model that Kam Wong gave you?
A. The same amount.
Q. What does the memo say is the CEO's opinion here?
A. That the cash payments method is more cost effective and easier to administer since premiums can fluctuate from year to year.
Q. What does the memo say about when Mr. Wong started receiving payments instead of insurance?
A. It should be noted that the CEO started receiving payments

in 2015.
Q. Did the memo have references to retroactive payments?
A. Yes.
Q. What does the second-to-the-last sentence in the memo say?
A. "Please sign below to confirm the above statement is accurate and you agreed with the above payout approach."
Q. Was this memo signed below?
A. Yes, it was.
Q. Can you read that signature.
A. Sylvia G. Ash.
Q. Did Mr. Wong also provide you with memorandum from any other people regarding longterm disability insurance?
A. Yes, he did.
Q. From whom?
A. Giovanni Porcelli and Nana Osei-Bonsu.
Q. Who did you understand Giovanni Porcelli to be?
A. He was the chair of the supervisory committee.
Q. Who at the time did you understand Nana Osei-Bonsu to be?
A. The treasurer of the board of MCU.
Q. Did Kam Wong provide you memorandum from the current chair of MCU's board?
A. No, he did not.
Q. Or MCU's general counsel?
A. No, he did not.
Q. After you received the memo from Mr. Wong that appeared to



be signed by the defendant, did anyone ask you for a copy of it?
A. Yes, Mr. Wong asked for a copy of it.
Q. I'm showing you if I may now what's been marked for identification purposes as Government Exhibit 126.
Do you recognize this document?
A. Yes.
Q. What is it?
A. An e-mail from Kam Wong's assistant asking for a copy of the memo.
MR. MARK: The government offers Government Exhibit 126 in evidence.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 126 received in evidence)
Q. What's the date of this e-mail?
A. January 25, 2018.
Q. Did you provide a copy of the memo in response to this request?
A. No, I did not.
Q. Why not?
A. Because it was evidence.
Q. Did receiving the document Mr. Wong gave you apparently signed by the defendant cause you to take any steps in furtherance of the investigation?



A. Yes. I requested additional documents from MCU and I contacted Ms. Ash.
Q. In the course of the investigation, were documents subpoenaed from MCU?
A. Yes, they were.
Q. Did MCU produce any materials in response to the subpoenas?
A. Yes, they did.
Q. Are you familiar with the firm Epstein Becker & Green?
A. Yes, I am.
Q. How are you familiar with them?
A. They are a law firm that MCU hired to assist with the investigation.
Q. So turning back to Ms. Ash. Did there come a time that you contacted her?
A. Yes.
Q. When was that?
A. January 31, 2018.
Q. How did that come about?
A. I contacted Ms. Ash, identified who I was, I told her I was a special agent working for the U.S. attorney's office, and I wanted to set up a time to meet with her.
Q. Did you discuss or did you tell her anything else?
A. Yes, I told her I wanted to speak to her in regards to payments Mr. Wong received.
Q. How did she respond?



A. She said she was traveling and she would contact me when she returned.
Q. What, if anything, did she say about who she was on that call?
A. She made a reference to her being a judge.
Q. When did you speak with Ms. Ash next?
A. Mid February 2018.
Q. How did that come about?
A. I contacted her because I hadn't heard anything back from her to set up a time to meet with her.
Q. Did you ultimately set up a time to meet with her?
A. Yes, I did.
Q. When did that interview take place?
A. March 1st, 2018.
Q. Where did it take place?
A. At the U.S. attorney's office in Manhattan.
Q. Who else, if anyone, participated in that interview?
A. An assistant United States attorney.
Q. Approximately how long did that interview last?
A. It was about an hour and a half.
Q. Who led the questioning of that interview?
A. The assistant United States attorney.
Q. Did he or she identify himself or herself by title or role at the beginning of the interview?
A. Yes.

Q. Did you take any notes?
A. Yes, I did.
Q. Did you do anything with those notes after the interview?
A. Yes, I prepared a formal report.
Q. What general subjects were discussed in that interview?
A. We discussed Ms. Ash's background, Kam Wong's contract, as it pertained to his longterm disability payments, policy, the payments Mr. Wong received, as well as at the memo Mr. Wong said Ms. Ash signed.
Q. Was the subject of Ms. Ash's service at MCU's board discussed?
A. Yes.
Q. What did she say about that?
A. She said she became -- she was board chair starting in 2015.
Q. How long did she say she was the chair?
A. For one year.
Q. What happened at the end of that year?
A. She resigned from the board.
Q. What, if any, reason did she give for resigning as MCU's chair of the board?
A. She stated that she was appointed commercial judge for the State of New York, and because MCU had foreclosure matters before the court, she resigned.
Q. When did she say she was appointed as that type of judge?



A. January 2016.
Q. Was the subject of Mr. Wong's longterm disability discussed?
A. Yes.
Q. Did she say she had any conversations with Mr. Wong about longterm disability insurance when she was MCU's chair?
A. Yes.
Q. How many conversations did she tell you about?
A. One.
Q. When did she say that conversation was?
A. In October of 2015.
Q. Who did she say was part of that conversation?
A. In addition to her and Mr. Wong, Thomas Siciliano or Kim Thompson, she wasn't sure, either one, Nana Osei-Bonsu and Giovanni Porcelli.
Q. What, in sum, did Ms. Ash say Mr. Wong stated in that meeting?
A. She stated Mr. Wong wanted to go out outside his contract and purchase insurance instead of taking the MCU longterm disability insurance.
Q. During this meeting, what, if anything, did Ms. Ash say about whether the cost of the premium for the disability insurance was discussed?
A. She said it was not discussed.
Q. What, if anything, did Ms. Ash say about whether Mr. Wong



said that the cost for what he was planning to do would be $3.7 million net of taxes?
A. Could you repeat that?
Q. Did Ms. Ash say anything about what the cost of what Mr. Wong planned to do was discussed?
A. No, she did not.
Q. No, she did not discuss that, or no, she didn't say whether that was discussed with Mr. Wong?
A. She didn't say it was discussed with Mr. Wong.
Q. During this meeting, did Ms. Ash discuss any conversations she said she had with a person named Thomas Siciliano?
A. Yes, she did.
Q. Who did you understand Mr. Siciliano to be at that time?
A. He was the general counsel for MCU.
Q. What is a general counsel?
A. It is a head of, head attorney for a company or entity.
Q. What did Ms. Ash say, in sum, about any conversations she had with Mr. Siciliano about longterm disability insurance?
A. She stated that she asked Mr. Siciliano if it was legal for what Mr. Wong wanted to do, and Mr. Siciliano stated that it was legal but not advisable.
Q. During this interview with Ms. Ash, was she asked questions about any documents?
A. Yes, she was.
Q. What documents?



A. The memo that Mr. Wong said she signed.
Q. Did she say anything about the circumstances of signing that document?
A. Yes.
Q. What, in sum, did she say about that?
A. She said Mr. Wong contacted her to sign the document. She said Mr. Wong stated that he was being investigated, and asked her if she recalled the conversation he had in 2015 regarding him -- Mr. Wong wanting to take cash in lieu of the longterm disability policy.
Q. What, if anything, did she say she did after being contacted by Mr. Wong?
A. She said she signed the document.
Q. During this interview, was Ms. Ash shown any documents?
A. Yes, she was.
Q. Was she shown the memo we looked at earlier?
A. Yes, she was.
Q. That's the one marked as Government Exhibit 116?
A. Yes.
Q. Was she asked any questions about that document?
A. Yes, she was.
Q. What, if anything, did she say about whether she signed that document?
A. She said she signed the document.
Q. Did you go through this document with her?

A. Yes.
Q. What did she say about that document?
A. She said the document was -- wasn't 100 percent accurate.
Q. In what ways did she say the document was not accurate?
A. She stated that she did not agree to the amounts listed in the document.
Q. Did she say it wasn't accurate in any other ways?
A. She stated that the -- the payouts, she did not agree to.
Q. Did you observe Ms. Ash's demeanor during this interview?
A. Yes.
Q. How did Ms. Ash appear at the beginning of the interview?
A. In the beginning she appeared very, just very arrogant and cocky.
Q. Why did you say that?
A. Just -- her answers were pretty short. She seemed a little annoyed.
Q. During this interview, did she discuss how she wanted to be addressed?
A. Yes.
Q. What did she say about that?
A. She wanted to be addressed as Judge Ash.
Q. In your experience, is it customary to address a non-law enforcement witness by their title in an interview?
MS. COHEN: Objection.
THE COURT: Sustained.



Q. Did Ms. Ash's demeanor change at all?
A. Yes, it did.
Q. How did this change?
A. After reviewing the memo, she appeared to be very concerned and worried.
Q. What leads you to say that?
A. Just from her demeanor. She sat up in her chair. The responses she was giving.
Q. After this interview, was Ms. Ash served with a grand jury subpoena?
A. Yes, she was.
Q. When was that?
A. In March 2018.
Q. What led to the issuance of a grand jury subpoena?
A. I wanted to understand the relationship between her and Mr. Wong.
Q. I am showing you what's been marked for identification as Government Exhibit 117.
Do you recognize this?
A. Yes.
Q. What is it?
A. It is an e-mail from myself to Ms. Ash serving her with the grand jury subpoena.
MR. MARK: Government offers Government Exhibit 117 into evidence.



THE COURT: Is that a one-page document or more?
MR. MARK: Both the cover e-mail and the attachment.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 117 received in evidence)
MR. MARK: Mr. Charalambous, can you publish that to the jury.
Q. Starting with the first page, what is this?
THE COURT: Please, come on. Move it.
Q. What's the date of this e-mail?
A. March 15, 2018.
Q. Did you speak with Ms. Ash before e-mailing this subpoena to her?
A. Yes, I did.
Q. What do you recall discussing with her?
A. Contacted Ms. Ash asking for her e-mail address and explaining to her the reason why I wanted her e-mail address. And I explained to her I wanted to send her a grand jury subpoena.
Q. Did she provide you her e-mail address?
A. Yes, she did.
Q. Let's briefly turn to the second page. What is this?
A. It is the cover letter for the grand jury subpoena.
Q. What does the first sentence of this letter say?
A. "Please be advised that the accompanying grand jury



subpoena has been issued in connection with an official criminal investigation of a suspected felony being conducted by a federal grand jury."
Q. Could we turn to the third page of this exhibit. If you could tell us what this is.
A. That's the grand jury subpoena.
Q. What is the date of this subpoena?
A. March 13, 2018.
Q. Who is it addressed to?
A. Sylvia Ash.
Q. What federal crimes does this grand jury subpoena indicate that the grand jury is investigating?
A. Title 18, United States Code, 657, 1001, and 1343.
Q. Are you familiar with those statutes?
A. Yes, I am.
Q. What does Section 657 concern?
MS. COHEN: Objection, your Honor.
THE COURT: What's the relevance of this?
MR. MARK: It pertains to the nature of this grand jury investigation.
THE COURT: All right. I'll allow it.
MS. COHEN: May I be heard at sidebar?
THE COURT: I don't see the need. If you want, I'll instruct the jury as to what these statutes provide.
MS. COHEN: Your Honor, two of three of these statutes

are nothing to do with what Ms. Ash is charged with here, and I think --

THE COURT: Well, I'm not sure that's the relevant point, counselor. But, if you would prefer, I will instruct the jury as to what those statutes pertain to.

MS. COHEN: Thank you, your Honor. That would be helpful.

THE COURT: Section 657 relates to various types of misconduct by officers, agents or employees in various kinds of credit unions.

Section 1001 involves offenses surrounding false statements to federal officers and investigators.

And 1343 relates to wire fraud which involves the use of the wires such as internet, but also others, in furtherance of a fraudulent scheme.

Is that adequate?

MS. COHEN: Thank you, your Honor.

THE COURT: Okay. Let's go on.

Q. What did this grand jury subpoena command Ms. Ash to do?
A. To produce documents and give testimony.
Q. By what date?
A. April 10, 2018.
Q. Where did it direct Ms. Ash to appear?
A. In the Southern District of New York.
Q. Please turn to the next page of the subpoena. What is



this?
A. A rider.
Q. What is a rider to a subpoena?
A. It lays out what Ms. Ash should produce.
Q. Did the subpoena have any instructions?
A. Yes, it did.
Q. What was the first instruction?
A. The subpoena covers all responsive documents, wherever they may be found, including on personal electronic devices, cell phones, laptop computers or flash drives.
Q. Did the subpoena define the term "documents"?
A. Yes, it did.
Q. How many categories of materials did the subpoena require production of?
A. Four.
Q. What was the first category?
A. Any and all documents related to any longterm disability insurance for Kam Wong.
Q. Going down to the last, the fourth category. What was the fourth category?
A. Any and all correspondence, including, but not limited to, e-mails and text messages with Kam Wong between January 1, 2015 and the present.
Q. Returning to page three the subpoena itself. Did it provide any warnings to Ms. Ash?



A. Yes, it did.
Q. Where in the subpoena?
A. Right above the date.

Failure to attend and produce any items hereby demanded will constitute contempt of court, and will subject you with civil sanctions and criminal penalties, in addition to other penalties of the law.

Q. After you served this grand jury subpoena on Ms. Ash, when did you speak with her next?
A. I spoke with her in June of 2018.
Q. Did you speak with her any times before June?
A. Yes. We exchanged phone calls, we didn't speak but we -- in April, April 2018.
Q. Just so the record is clear, when did you speak with her next?
A. April 2018.
Q. Was that in person or by phone?
A. By phone.
Q. Who called whom?
A. I called Ms. Ash.
Q. What was the purpose of that call?
A. To check the status of -- to check the status of the documents that she was supposed to produce in regard -- pertaining to the grand jury subpoena that she was served in March.



Q. Was this before the appearance date of April 10?
A. Yes.
Q. Is it part of your practice to contact a witness prior to the date of the appearance for a grand jury subpoena?
A. Yes, it is.
Q. Who participated in that call?
A. Myself and an assistant United States attorney.
Q. Where were you for that call?
A. I was at the U.S. attorney's office.
Q. During that call, was the March grand jury subpoena discussed?
A. Yes, it was.
Q. How did the call start?
A. Ms. Ash was asked if she had any responsive records pertaining to the grand jury subpoena.
Q. What did Ms. Ash say in sum?
A. She stated she did not have any responsive records to produce.
Q. Was there an appearance date before the grand jury discussed during that call?
A. Yes, it was.
Q. What, if anything, was she told about whether she would have to appear before the grand jury?
A. She was told she didn't have to appear at that time.

THE COURT: Was or was not?

THE WITNESS: She did not have to appear.
THE COURT: Did not have to?
THE WITNESS: Yes.
Q. Why was that?
A. Because she didn't have any documents to produce.
Q. Did you take notes of this call?
A. No, I did not.
Q. Why not?
A. It was a scheduling call, and I normally don't take notes for scheduling calls.
Q. What, if any, e-mails did the defendant later produce in response to this March subpoena?
A. She didn't produce any e-mails.
Q. What, if any, text messages did the defendant later produce in response to this March subpoena?
A. She didn't produce any text messages.
Q. What, if any, documents, apart from texts and e-mails, did the defendant later produce?
A. She did not produce any documents.
Q. When did you next interview the defendant?
A. In June 2018.
Q. Who participated in that interview?
A. Myself and two assistant United States attorneys.
Q. Was this in person or by phone?
A. By phone.



Q. Were you in the same room as the AUSAs?
A. No, I was not. I was in the field and the AUSAs were in their offices.
Q. How did you know they were in the office?
A. I contacted them in their office.
Q. What was the purpose of this call with Ms. Ash on June 8?
A. To ask more particular questions in regards to her response to the first subpoena.
Q. Did you take notes of this call?
A. Yes, I did.
Q. Why?
A. We planned to interview Ms. Ash.
Q. Who led the questioning during this interview?
A. The two assistant United States attorneys.
Q. What, in sum, was discussed during this phone call?
A. Ms. Ash's response to the March subpoena.
Q. What, if anything, did the defendant say about whether she had any documents in response to the March grand jury subpoena?
A. Ms. Ash stated she did not have any documents in response to the March grand jury subpoena.
Q. We previously looked at the subpoena which identified what types of records were requested, right?
A. Yes.
Q. And what, if anything, did the defendant say about why she had no e-mails in response to the subpoena?



A. She said she lost access to her MCU e-mail when she resigned.
Q. Where did she say any e-mails would have been?
A. On the MCU e-mail server.
Q. What, if anything, did the defendant say about why she had no text messages to produce?
A. She said she deleted her text messages.
Q. Did she say with whom?
A. Yes. With Kam Wong.
Q. Was the defendant asked what her communications with Mr. Wong were about?
A. Yes.
Q. What, if anything, did the defendant say about what her communications with Mr. Wong were about?
A. She stated that they were personal.
Q. Was she asked what those personal communications concerned?
A. Yes.
Q. What did she say?
A. She stated the communications concerned her asking Mr. Wong if she could host her birthday party at MCU Park.
Q. Was she asked whether they concerned MCU business?
A. Yes.
Q. What did she say?
A. She said it did not.
Q. What, if anything, did she say about why she deleted the



text messages?
A. She stated there was no need to keep any text messages.
Q. Did the defendant state when she deleted the messages with Kam Wong?
A. Yes.
Q. When did she say she had done that?
A. After she was served the first grand jury subpoena.
Q. Returning back to the grand jury subpoena itself, if we may publish it. If we look at the fourth category of documents requested.
What types of communications with Kam Wong did the subpoena request from the defendant?
A. Any and all communication.
Q. Did that include communications that were personal?
A. Yes.
Q. As an investigator, how can someone's personal communications matter to an investigation?
A. Explains a person's action.
Q. Could you give an example?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. How can a person's relationship with someone else matter to the investigation?
MS. COHEN: Objection, your Honor.
THE COURT: Overruled.

A. Can you repeat that?
Q. How can a person's relationship with another person matter to the investigation?
A. Explains their actions.
Q. How so?
A. It explains why, you know, they may or may not cooperate with the investigation.
Q. Can it explain anything else?
A. Their relationship.
Q. How can their relationship matter?
MS. COHEN: Objection, your Honor.
THE COURT: Overruled.
A. In terms of -- they may cover up for the person, they may, you know, not tell the truth when asked about the person that's being investigated.
Q. Why did the relationship between Sylvia Ash and Kam Wong matter to the investigation?
A. Because it explained Ms. Ash's actions.
Q. Did there come a time the defendant was served with a second grand jury subpoena?
A. Yes.
Q. When was that?
A. June 2018.
Q. Between when the first grand jury subpoena was served and the second grand jury subpoena that you mentioned, had there



been any developments in the investigation involving MCU?
A. Yes.
Q. Had you made any arrests?
A. Yes.
Q. Who had you arrested?
A. Kam Wong.
Q. When was he arrested?
A. May 8, 2018.
Q. What was he charged with?
A. Embezzlement.
Q. From whom or what?
A. Embezzlement from the credit union, MCU.
Q. Were the charges public?
A. Yes, they were.
Q. In addition, since the March grand jury subpoena to Ms. Ash, had you participated in any search warrants in connection with this investigation?
A. Yes, I have.
Q. How many search warrants had you participated in this investigation since then?
A. Two search warrants.
Q. What was the first search warrant for?
A. It was a search warrant conducted and executed on Kam Wong's residence.
Q. When did that search take place?



A. May 8, 2018.
Q. What was your role, if anything, in connection with that search?
A. I swore out the warrant as well as planned the search, and I reviewed the evidence that was seized from the search.
Q. What was the next search you participated in connection with this investigation?
A. It was in May 2018.
Q. What was that of?
A. Joseph Gagliardo's residence.
Q. Who at the time was Joseph Gagliardo?
A. He was a member of the supervisory committee for MCU.
Q. Where was Mr. Gagliardo's home located?
A. In Brooklyn.
Q. When was that search?
A. May of 2018.
Q. What was your role, if any, in connection with the search of Mr. Gagliardo's home?
A. The same it was with Kam Wong's search.
Q. Are you familiar with an agency called the New York State Department of Financial Services?
A. Yes.
Q. Does it sometimes go by an acronym?
A. Yes.
Q. What is that?



A. DFS.
Q. How are you familiar with DFS?
A. From the investigation.
Q. What is DFS?
A. An agency that regulates credit unions.
Q. In 2018, did DFS take any actions with respect to MCU?
A. Yes.
Q. What were they?
A. They disbanded the supervisory committee and the board of directors.
Q. What do you mean by disband?
A. The members lost their roles.
Q. When the MCU supervisory committee was disbanded, did that include Mr. Gagliardo losing his role?
A. Yes, it did.
Q. Approximately when did that occur?
A. May 2018.
Q. Before or after Mr. Gagliardo's home was searched?
A. After.
Q. You mentioned the DFS also took an action disbanding MCU's board of directors?
A. Yes.
Q. When did that occur?
A. June 2018.
Q. What reasons, if any, did DFS give when disbanding the

board?
A. Poor oversight.
Q. You mentioned that there was another grand jury subpoena issued in June 2018?
A. Yes.
Q. Let us show for the witness only what's been marked for identification as Government Exhibit 118.
Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. An e-mail to Ms. Ash with the grand jury subpoena attached to it.
MR. MARK: Government offers Government Exhibit 118 into evidence.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 118 received in evidence)
Q. Just what was the date of this e-mail?
A. June 18, 2018.
Q. Let's briefly turn to the second page. Is this a cover letter to the subpoena similar to the previous one we looked at?
A. Yes, it is.
Q. Turning to the third page. Is that the subpoena itself?
A. Yes.



Q. What's the date of this one?
A. June 18, 2018.
Q. Also addressed to Sylvia Ash?
A. Yes.
Q. Did this include the same criminal statutes or additional statutes as the one we looked at before?
A. Additional statutes.
Q. Which statutes were additional this time?
A. Title 18, United States Code, 1344, 1346, 1349 and 1512.
Q. Are you familiar with those statutes?
A. Yes, I am.
Q. What does Section 1344 concern?
A. Bank fraud.
Q. What does Section 1346 concern?
A. Honest services fraud.
Q. And what is honest services fraud?
A. Kickbacks or bribery.
Q. What about Section 1349?
A. Conspiracy to commit wire fraud.
Q. And what about Section 1512?
A. Obstruction of justice.
Q. What did this grand jury subpoena command Ms. Ash to do?
A. To turn over documents and testify.
Q. What was the appearance date for this subpoena?
A. June 28, 2018.



Q. If we could turn to the next page. Is that the rider for this subpoena?
A. Yes.
Q. Did the subpoena have any instructions?
A. Yes, it did.
Q. Were there the same number or more instructions than before?
A. It was more instructions.
Q. Directing your attention to the second instruction, what was it?
A. The subpoena calls for the production of specific documents, including e-mails and text messages, in the possession, custody or control of Sylvia Ash.
Q. In connection with the third instruction, is there a reference to what's called a cloud storage account?
A. Yes, it is.
Q. Are you familiar with the term "cloud storage account"?
A. Yes.
Q. Could you give an example of a cloud storage account?
A. An iCloud account.
Q. Was there any time period for the materials requested by the subpoena?
A. Yes. January 1st, 2015 to the present.
Q. How many categories of materials did the subpoena require production of?



A. Four.
Five, I'm sorry.
Q. What was the first category of documents requested?
A. Any and all correspondence, including e-mails, letters, and text messages, whether sent or unsent, with or regarding Kam Wong, Joseph Gagliardo, Giovanni Porcelli, Linda Lambert, Kim Thompson, Nana Osei-Bonsu, Mark Brantley, James Durrah, Angel Audiffred, and Ana Puello.
Q. Was that limited to any particular topics of communications?
A. No, it was not.
Q. I'll ask you about some you haven't mentioned.
Who was Linda Lambert?
A. She was the chief financial officer at the time.
Q. What about Mark Brantley?
A. He was a former board chair.
Q. Who is James Durrah?
A. He was also a former board chair.
Q. And what was the second category of documents generally requested?
A. Any and all correspondence, including e-mails, letters, and text messages, whether sent or unsent, with or regarding Eisner Amper, including any principal, officer, employee, contractor, agent, and representative relating to Kam Wong's compensation and any criminal or internal investigation of Kam Wong.

Q. What is Eisner Amper?
A. MCU's outside auditor.
Q. Let's go to category four. What did that request seek?
A. Any and all documents, including correspondence regarding any criminal investigation, internal investigation, or audit related to Kam Wong.
Q. What is an internal investigation?
A. An investigation done by MCU.
Q. Was MCU at the time conducting an internal investigation?
A. Yes, they were.
Q. What was the last category of materials requested?
A. Any and all documents regarding any gifts, presents, donations, and/or items of value received from or given to Kam Wong, Joseph Gagliardo, Giovanni Porcelli and/or the Municipal Credit Union.
Q. Returning to page three. Did this subpoena, like the last one we looked at, provide any warnings to Ms. Ash?
A. Yes, it did.
Q. What did it provide?
THE COURT: Same ones, right?
Q. Same warnings?
A. Yes.
Q. After this grand jury subpoena was served on Ms. Ash, did Ms. Ash produce any documents in response to the June subpoena?
A. Yes, she did.



Q. When did she produce --
THE COURT: This is a good place to stop.
MR. MARK: Very good place.
THE COURT: We'll resume at 2 o'clock. Enjoy your lunches from our indescribable cafeteria.
(Jury excused)
(Recess)
(Continued on next page)



AFTERNOON SESSION
2:10 PM
(Trial resumed; in open court; jury not present)
THE COURT: I have a note from Juror No. 6. I've marked it Court Exhibit C. He has a physical scheduled for 9:00 o'clock next Monday morning, I think it is, December 6th. He would like us not to start till noon so he can do that. He has Medicare. He explains that under Medicare, the government will pay for his physical only if it takes place this month, and he wants to do it.
I propose to ask him if he can reschedule for later in December, but failing that, what are we going to do, right?
MS. COHEN: We have no objection to starting at noon, your Honor.
MR. MARK: We have no objection. I think we're going to go through this trial much quicker than planned, given how everything is moving at this pace.
THE COURT: Okay. That's number one.
Number two, if I have the names in front of me, I could tell you who it is, but another juror reported that it took him three hours to get home last night.
Mr. Orfini; thank you, Andy.
He wonders if the government would spring for a hotel, and I have asked Ed Friedland, who is the oracle on such matters, to see what we can do about that. And I'm just going



to tell them that we're working on these things.
I received the government's letter dated today in relation to a laundry list of grievances.
Have you seen it yet, Ms. Cohen?
MS. COHEN: I have seen it. We have not had time to thoroughly review it, but I have it.
THE COURT: Okay.
I'll try to make this simple. Without definitively saying whether or not I think the defendant's opening crossed the vouching line or not, I'm just going to caution that we should not approach that line again, on either side, if you know what I'm saying. I hope you do.
Likewise, without now ruling on whether the door has been opened to the other charges involving Gagliardo and Wong, I think the defense needs to be careful on that going forward, to avoid making what might be problematic even more so. But I'm not saying it was.
This is a prelude to saying I would like the government's response to the first part of the letter by 8:30 tomorrow morning so that I can make a ruling.
My initial reaction is that I think there is quite possibly something to the government's view that the possibility of sanctions with respect to the disclosure matter goes to motive and intent. But I just alert you to that; that's not a ruling.

Let's get the jury.
MR. MARK: Your Honor, just to try to be efficient, I note that there is one related sort of exhibit that we intend to introduce through this witness. It's Government Exhibit 103. This is a document that was recovered from Ms. Ash's house. It relates only in the fact that it relates to the rules, and --
THE COURT: Which ruling?
MR. MARK: Sorry, it relates to the fact that the defendant was told by an advisory committee in 2015 that she couldn't serve as chair of MCU. We think this is covered by your Honor's prior rulings, but I understand the defendant plans to object to this, and I wanted to just highlight it before we do this before the jury. I think it's governed by your Honor's prior rulings but I understand the defense --
THE COURT: Anything new to add to this?
MS. COHEN: Yes, your Honor.
Government Exhibit, proposed Government Exhibit, 103 appears to be a draft opinion submitted by — I don't know who it's written by — Judge Mulvey and, as such, the document itself is hearsay. I don't think it is relevant. They can certainly elicit --
THE COURT: It's offered not for the truth of the matter but for the fact that it was in her possession. So let's move on from hearsay.



Their position is, it goes to motive.
MS. COHEN: I understand that, your Honor, but they are going to call someone, as I understand it, from the Judicial Commission who can testify about discussions they had with Judge Ash.
THE COURT: I'll worry about that if, as, and when. Counsel just raised the issue of this one document.
MS. COHEN: Correct. And I think the document itself is hearsay.
THE COURT: Well, I understand you think it's hearsay. I don't.
Okay.
MS. COHEN: Your Honor, I think it is being admitted for the truth of what's in it.
THE COURT: I'm sorry, what?
MS. COHEN: Did your Honor say you didn't think it was hearsay because it's not admitted for the truth? I think it is admitted for the truth.
THE COURT: I listen at 33 RPMs and you sometimes speak at 78.
MS. COHEN: Sorry, your Honor.
I think it is hearsay because I believe it is being offered for the truth of the matter asserted in the draft opinion.
THE COURT: Well, except that the government says



that's not why they're offering it; they're offering it as to motive and intent, and I'm going to receive it for that.
MR. MARK: Your Honor, I would just note, as we've said multiple times, we don't oppose a limiting instruction if the defense requests one --
THE COURT: Of course.
MR. MARK: -- to clarify that.
THE COURT: Of course.
MS. COHEN: Your Honor, if you would give a limiting instruction when it goes in, that would be helpful.
THE COURT: Of course.
MS. COHEN: Thank you.
THE COURT: Okay.
(Continued on next page)



(Jury present)
THE COURT: Okay. The jurors are present, as is the defendant, who has been throughout.
Just a word on the communications I received from, members of the jury:
Mr. Potter, if you can reschedule this thing and keep your benefits, reschedule later in the month, that would be ideal, but if you can't, we'll accommodate you. If you can let me know Monday, by Monday, if you can get through to the doctor.
JUROR: Okay. Thanks.
THE COURT: As to the lengthy trip — from Rockland County, I think it is — I'm very sympathetic about the terrible commute last night. I don't know what it was about the traffic last night but it was horrible. I have made an inquiry on behalf of the juror who inquired as to whether the government would pay for a hotel. That goes through our District Executive, who then probably has to call somebody in Washington. If there's anything we can do about that, we will try to do it. It's just not up to me; I don't have the authority and I don't think our District Executive does either. But we'll see what we can do. We want to make things as easy in possible.
In the meantime, I am hopeful that by breaking when we're scheduled to break, at 4:30, a quick getaway might help,

because I often find that if I can be on the FDR Drive by 20 to 5:00, it goes a lot better, and another 20 minutes is the difference sometimes between a horrible commute and something a little bit more tolerable.

Where is the witness?

He is reminded he's still under oath. And we will pick up where we left off.

Okay. Let's proceed.

LaVALE JACKSON, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. MARK:

Q. Before the lunch break, I believe we looked at two different subpoenas; is that right?
A. Yes.
Q. And the first subpoena, that was from March of 2018?
A. Yes, it was.
Q. I think you testified that you spoke with Ms. Ash on two occasions about that subpoena?
A. Yes.
Q. Did she produce any documents in response to those two subpoenas?
A. No, she -- she produced documents in response to the second subpoena.
Q. But as to the first subpoena, did she produce any documents?



A. No, she did not.
Q. How was the government's investigation impacted, if at all, by her statements that she didn't have any documents to produce?
A. Can you repeat that, please?
Q. Yes.

THE COURT: You're confusing this. Right? We just got an answer about the second subpoena, and that she produced documents, and now you're saying how was it impacted by the fact that she didn't produce documents.

MR. MARK: You're exactly right, your Honor.

Q. Going back to the first subpoena, I think you said that she didn't produce any documents in response to the first subpoena?
A. Correct.
Q. And you testified earlier, before the lunch break, that you spoke with her on two occasions about that first subpoena response?
A. Yes.
Q. And on both occasions she said she had no documents to produce; is that right?
A. Yes.
Q. My question to you at that point in time: How was the government's investigation impacted by the defendant's statements that she had no documents to produce?
A. We were -- we had incomplete information -- we had



incomplete information to conduct our investigation.
Q. Had you also -- I think you testified you had been collecting information from other sources?
A. Yes.
Q. What were some of those sources that you were collecting information from?
A. We collected information from MCU, from their subpoena returns.
Q. When did they start producing materials in response to the subpoenas?
A. Immediately.
Q. By the time that the defendant was served with the second subpoena, in June of 2018, you had received materials from MCU?
A. Yes.
Q. Had any of those documents related to Ms. Ash?
A. Yes, it did.
Q. Did that include emails?
A. Yes.
Q. And text messages that she had?
A. Yes.
Q. So what prompted the second grand jury subpoena to be issued?
A. We had additional information.
Q. What was that information?
A. The documents from the MCU subpoena response.



Q. And what sort of documents are you talking about?
A. Particularly emails.
Q. Did those include the defendant's emails?
A. Yes, it did.
Q. What about text messages?
A. Yes.
Q. Did those include the defendant's text messages?
A. Yes, it did.
Q. Now, we went through the second grand jury subpoena. Did the defendant end up producing any documents in response to this subpoena?
A. Yes, she did.
Q. When was that?
A. In July of 2018.
Q. How did she produce those materials?
A. By email.
Q. Did she produce them directly or through anyone?
A. Through her attorney at the time.
Q. Prior to the second subpoena, had the defendant engaged the services of an attorney before?
A. No, she didn't.
Q. Who was the attorney she engaged to respond to the second subpoena?
A. Roger Archibald.
Q. I'm showing you what's been marked for identification

purposes as Government Exhibit 122.
Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It's an email from Roger Archibald's legal assistant.
Q. Is this responding to the second grand jury subpoena?
A. Yes, it is.
MR. MARK: The government offers this email.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 122 received in evidence)
Q. Does it say here the subject is re: Honorable Sylvia Ash Grand Jury Subpoena?
A. Yes.
Q. "In the attachments please find the requested documents from -- requested document from Judge Ash"?
A. Yes.
Q. Were there any attachments to this email?
A. Yes, there were.
Q. How many?
A. Three.
Q. What format were they?
A. ZIP format.
Q. What is a ZIP format?
A. It condenses large files, to be sent securely.



Q. Have you reviewed all of the documents that were in the ZIP files?
A. Yes, I have.
Q. I'm showing you now, if you could look at what's been marked for identification purposes as Government Exhibit 123, 124, and 125.
Do you recognize these documents?
A. Yes, I do.
Q. What are they?
A. They're emails that were part of the production, subpoena production.
MR. MARK: The government, with this caveat, offers these documents as the documents that the defendant produced, but we're not offering them for the truth of what the documents say in them. There's a lot of documents or there are some documents --
THE COURT: So the exhibits in each case are the totality of the three respective attachments, whether just the first page or they're just the selection of each?
MR. MARK: I think the witness testified that they were the totality of the attachments that were there.
THE COURT: Is that right?
THE WITNESS: Yes.
THE COURT: Okay.
So Government Exhibit 123 is Attachment No. 1 to



Government Exhibit 122, 124 is Attachment No. 2; and 125 is Attachment No. 3. The documents are offered simply to show what was produced, not for the truth of anything contained within the exhibits.
And to illustrate what I'm talking about in saying that, I said to you folks earlier that there would be times when documents would be received for one purpose but not another. Here, these documents are introduced, the attachments, to show you what it is that was produced on behalf of Ms. Ash to the grand jury, irrespective of the truth or falsity of those materials.
Now, you may consider them but not for the truth of what the documents say. Imagine, for example, we were in another kind of case an Alice In Wonderland kind of case, in which it became somehow relevant that on a previous occasion somebody wrote or somebody said, "The moon is made of green cheese." And if it were relevant in the case, the judge would admit that statement for the purpose of proving that the person had said, or written, that the moon is made of green cheese but not as evidence of what the moon is really made of. That's what I've done here.
Okay.
(Government's Exhibits 123, 124, and 125 received in evidence)
MR. MARK: If we could publish just the cover page of



Government Exhibit 123 and 124.
Q. This is just the first page of several pages that the defendant produced in response to the subpoena?
A. Yes.
Q. Broadly speaking, what sort of documents did the defendant produce in response to the June subpoena?
A. She produced emails, copies of Kam Wong's credit card statements, various memos.
Q. Did Ms. Ash produce any text messages as part of this production?
A. No, she did not.
Q. Did Ms. Ash produce any of her bank statements as part of this production?
A. No, she did not.
Q. Did Ms. Ash produce any of her cable or phone billing statements as part of this production?
A. No, she did not.
Q. After this production, does Ms. Ash produce any other materials to the United States Attorney's Office that are responsive to the June 2018 subpoena?
A. No, she did not.
Q. After you received this production, did you participate in any other interviews with Ms. Ash?
A. Yes, I did.
Q. Approximately when did that interview take place?

A. July 9, 2018.
Q. Where was it?
A. At the U.S. Attorney's Office.
Q. Did you personally participate in that interview?
A. Yes, I did.
Q. Other than yourself, who participated in that interview?
A. Two Assistant United States Attorneys, and Ms. Ash's attorney.
Q. And who was her attorney? Was that Mr. Archibald again?
A. Yes.
THE COURT: And was Ms. Ash there?
THE WITNESS: Yes, she was.
THE COURT: Okay.
Q. Had her attorney, Mr. Archibald, been present for any previous time you spoke with the defendant?
A. No, he was not.
Q. Had you known of any attorney that represented her before?
A. No.
Q. How did the subject of this interview compare with either of your previous interviews with her?
A. They were similar.
Q. During this meeting, was Ms. Ash asked questions regarding Kam Wong's disability insurance policy?
A. Yes, she was.
Q. Did Ms. Ash say during this interview whether she had any



conversations with Tom Siciliano regarding Kam Wong's disability insurance?
A. Yes, she did.
Q. How many conversations did she say she had?
A. Two conversations.
Q. When did she say that they were?
A. May or June of 2015.
Q. During your previous interviews with Ms. Ash, had she ever mentioned any conversations with Tom Siciliano in May or June of 2015?
A. No, she did not.
Q. What, if anything, did she say this time about the first conversation she had with Mr. Siciliano?
A. That she was contacted by Mr. Siciliano in regards to Kam Wong's long-term disability policy.
Q. What, if anything, did she say about what Mr. Siciliano said during that call?
A. She stated that Mr. Siciliano wanted -- said that Mr. Wong wanted to -- he wanted cash in lieu of his long-term disability policy.
Q. Did she say Mr. Siciliano said anything else?
A. Yes; that it was legal for Wong to do it that way but not advisable.
Q. Prior to this conversation that she told you about, which she said happened in May or June of 2015, what, if anything,



did she say she knew about Kam Wong's disability insurance policy?
A. She said she didn't know anything about the policy.
Q. What, if any, other changes -- did she say whether she discussed any changes to the contract with Mr. Siciliano?
A. No, she did not.
Q. What was the next conversation that Ms. Ash told you about with Mr. Siciliano regarding long-term disability policy?
A. She said she had a meeting with Mr. Siciliano, Nana Osei Bonsu, Giovanni Porcelli and Mr. Wong.
Q. When did she say that meeting was?
A. May or June of 2015.
Q. Where did she say it was?
A. At MCU.
Q. What, if anything, did she say was discussed during that meeting?
A. Kam Wong went outside of his contract to purchase long-term disability insurance.
Q. What, if anything, did she say Wong said during that meeting?
A. That it would be a cost savings for him to go outside of his contract to purchase insurance.
Q. Had Ms. Ash previously discussed in substance this meeting before with you?
A. Not in substance, no.



Q. Had she told you about a different meeting previously?
A. Yes.
Q. When was that meeting?
A. October 2015.
Q. How did the attendees in this meeting compare with the meeting she told about you previously?
A. In the first meeting, she was unsure if Mr. Siciliano or Ken Thompson was present, but with this, the June or May meeting, she stated that Mr. Siciliano was present, and not Ken Thompson.
Q. During this July 2018 interview, was Ms. Ash questioned regarding her resignation from MCU's board?
A. Yes.
Q. What, if anything, did she say about why she was resigned?
A. She said she resigned because she was elevated to be the presiding judge in the State of New York and because MCU had foreclosure issues she stepped down.
Q. Had she previously told you when she was elevated to be presiding judge?
A. No, she did not.
Q. During this interview, did she mention anything about the New York State Commission on Judicial Conduct?
A. Yes, she did -- no, she did not. I'm sorry.
Q. Did she mention anything about a 2015 opinion from the Advisory Committee on Judicial Ethics?

A. No, she didn't.
Q. Now, you had generally described some of the documents that she did produce, and then the documents that she produced in response to the subpoena; is that right?
A. Correct.
Q. In the production the defendant had made, had she produced records related to a trip to Las Vegas?
A. Oh, yes, she did.
Q. When was that trip?
A. I don't recall.
Q. Do you recall the year of the trip?
A. It was in 2016.
Q. Do you recall the purpose of that trip?
A. It was a strategic planning event.
Q. Was that trip before or after the defendant resigned from MCU?
A. That was after she resigned.
Q. Was the defendant asked questions, during this interview, about that trip?
A. Yes, she was.
Q. What, if anything, did the defendant say with who paid for that trip?
A. She said MCU paid for the trip.
Q. Was she asked questions about why MCU paid for that trip?
A. Yes.



Q. What did she say about that?
A. MCU paid for the trip prior to her resigning from the board.
Q. And who, if anyone, did she say went with her on that trip?
A. Her aunt.
Q. During this interview, was Ms. Ash again asked questions about whether she had any text messages with Mr. Wong?
A. Yes.
Q. What did she say about that?
A. She said she did not have any text messages.
Q. Did she explain why she didn't have any text messages?
A. Yes. She said she deleted her text messages.
Q. During this interview, was Ms. Ash asked questions about an iPhone X?
A. Yes.
Q. Why was she asked questions about an iPhone X?
A. Sorry?
Q. I said -- during the course of your investigation before this interview, had you found out anything about an iPhone X?
A. Yes.
Q. What did you learn, and who did you learn it from?
A. I learned that she received an iPhone X from Kam Wong.
Q. Had you reviewed text messages from MCU about that topic?
A. Yes.
Q. Text messages that she hadn't produced to you --



A. Yes.
Q. -- but you had received from MCU?
A. Yes.
Q. So you questioned her about this iPhone X?
A. Yes, I did.
Q. Who, if anyone, did she say gave her that phone?
A. She said Mr. Wong gave her the iPhone X.
Q. What, if anything, did she say about how Mr. Wong came to give her the iPhone X?
A. She said he contacted her to come get the iPhone X.
Q. Did she say when that was?
A. I don't recall.

MR. MARK: Mr. Charalambous, if we could show for the witness only what's marked as 3535-282. The bottom of page 2.

THE COURT: Just let me see if I can understand your testimony, Mr. Jackson.

The interview we're now talking about was, I think you said, in July?

THE WITNESS: July.

THE COURT: July 9th.

And she had already, if I understand you correctly, sent you the email with the three attachments of documents from the second subpoena, yes?

THE WITNESS: Correct.

THE COURT: And the iPhone X you've been talking



about, did you learn from her when she had taken physical possession of the iPhone X?

THE WITNESS: From what I recall, she stated that she traveled to MCU to retrieve it from Kam Wong.

THE COURT: Before July 9th?

THE WITNESS: Before July 9th, correct.

THE COURT: Now, had she had another iPhone from MCU before that, according to what she told you?

THE WITNESS: No, she didn't. She had a personal iPhone.

THE COURT: Is that what she told you in this July 9th meeting?

THE WITNESS: I have to refresh my memory and look at the report.

THE COURT: All right. Let's pick up here.

BY MR. MARK:
Q. Maybe we can just sort of focus this, which is: Approximately when was it that -- do you recall approximately when was it that she said she got the iPhone X?
A. I believe in 2016.

MR. MARK: Your Honor, may I approach the witness? The one document to refresh his recollection isn't in the computer.

THE COURT: Okay.

Just state for the record the identification number of

what you're showing him.
MR. MARK: Yes, your Honor. It's what's been marked as 3535-282 --
THE COURT: Okay.
MR. MARK: -- for identification, and I directed him to page 2 of that.
THE COURT: Okay.
And what's the question?
Q. Does that refresh your recollection about when Ms. Ash told you Kam Wong gave her the iPhone X?
A. Yes, it does.
Q. What did she say about when Kam Wong gave her the iPhone X?
A. She received the iPhone X after Mr. Wong was arrested.
Q. After he was arrested or --
A. After --
Q. -- or after a different event?
A. I'm sorry, she stopped using --
MS. COHEN: Objection.
THE COURT: Go ahead.
A. She stopped using the iPhone X after he was arrested.
Q. So what did she say about when she stopped using the iPhone X?
A. After Mr. Wong was arrested.
Q. Okay.
What, if anything, did she say about why she stopped



using the iPhone X?
A. Because MCU requested the return of the iPhone X.
Q. What, if anything, did she say she did with that iPhone X after she received that request?
A. She took it to an Apple store to get reset, or wiped.
Q. Did Ms. Ash say whether she returned the iPhone X to MCU?
A. She said she did not return it to MCU.
Q. Did she explain why she didn't?
A. Yes. She said she received a memo from Monique Smith, on behalf of the acting CEO at the time, that she did not have to return the iPhone X.
Q. Was Ms. Ash asked when she went to the Apple store to delete the contents of her iPhone X?
A. Do you mind if I look -- refresh my memory or --
Q. I think --
THE COURT: Do you remember the first question: Do you remember what, if anything, she said about when she went to the Apple store? Do you remember?
THE WITNESS: No, I do not.
THE COURT: Okay.
BY MR. MARK:
Q. Please take a look at what was previously identified as 3535-282, and see if that refreshes your recollection.
A. Yes, it does. She stated she didn't recall when she traveled to the Apple store.



Q. Now, during this interview, was Ms. Ash asked again about the memo that she signed that Kam Wong provided her?
A. Yes, she was.
Q. During this interview, was Ms. Ash asked questions about signing a second copy of the memo that Kam Wong provided her?
A. Yes.
Q. Why was she asked questions about a second copy of the memo?
A. Because I received a second copy of the memo from MCU.
Q. And prior to this interview, had Ms. Ash ever told you anything about a second copy of the memo?
A. No, she did not.
Q. What, if anything, did she say about signing a second copy of the memo?
A. She said Mr. Wong contacted her and asked her if she could come sign the second copy of the memo.
Q. What did she say she did?
A. She said she signed the copy of the memo.
Q. You mentioned before the iPhone X that you said that she had taken to the Apple store; is that right?
A. Yes.
Q. Was that before or after Kam Wong was arrested?
A. That was after Kam Wong was arrested.
Q. In response to this subpoena, did she produce any text messages?



A. No, she did not.
Q. Now, you've talked about a number of interviews here that you conducted. When you talked about them, are those the exact words always that were used, or were you generally testifying to, at times, the substance of what was said?
A. Testifying to the substance that was said.
Q. Now, did you participate in any other interviews of the defendant after this?
A. No, I did not.
Q. You testified earlier that you participated in searches in connection with this investigation?
A. Yes.
Q. Did that include homes?
A. Yes.
Q. When a home is searched, is there a particular procedure for how that search is conducted?
A. Yes, it is.
Q. Could you explain that process?
A. Prior to executing a search, video and photos are taken of the residence, labels are placed on each room that's going to be searched, evidence forms are filled out that indicates what's being taken, and the evidence is bagged up and then, prior to a search concluding, exit videos and photos are taken, and evidence is taken back to my office and placed in the evidence vault.

Q. What happens with those items that are seized after they're in the evidence vault?
A. They get reviewed.
Q. Did you review some of the materials that were seized in connection with this investigation?
A. Yes, I did.
Q. Earlier you testified that you participated in two of the searches, in two searches of Mr. Wong and Mr. Gagliardo's residence; is that correct?
A. Yes.
Q. Was there evidence collected from those two searches?
A. Yes.
Q. What sort of evidence was collected?
A. Documents and electronics.
Q. Did that include phones?
A. Yes.
Q. Did you review any of that evidence?
A. Yes, I did.
Q. Where did you review it?
A. In my office, in the evidence vault.
Q. What evidence did you remove from the evidence vault?
A. Phones.
Q. And for what purpose did you remove phones from the evidence vault?
A. To turn over to my analyst to analyze.



Q. Starting first with the evidence collected from the search of Mr. Wong's residence, did you remove any phone from that vault that was obtained from the search?
A. Yes.
Q. What did you do with that phone?
A. Hand them over to my analysts to be analyzed.
Q. Turning next to the evidence collected from Mr. Gagliardo's residence, did you remove any evidence from the vault that was obtained from that search?
A. Yes.
Q. What did you remove?
A. Phones and electronics.
Q. What did you do with the phones that were recovered?
A. Turned them over to an analyst to be analyzed.
Q. Did the analyst search both Kam Wong's and Gagliardo's phones?
A. Yes.
Q. How do you know that?
A. I reviewed that evidence that was searched.
Q. Were there any text messages between the defendant and Kam Wong and Joseph Gagliardo on those phones?
A. Yes.
Q. Are you familiar with a company named Stroz Friedberg?
A. Yes, I am.
Q. How are you familiar with that?



A. They are a company MCU hired to analyze their electronics.
Q. Did there come a time that you picked up anything from Stroz Friedberg in connection with the federal investigation?
A. Yes.
Q. What did you pick up?
A. Phones and other electronics.
Q. What did you do with the phones and other electronics that you picked up?
A. I turned them over to a lab at the district attorney's office to be analyzed.
Q. Why did you bring them to the district attorney's office lab as opposed to the lab at your office?
A. They have -- their lab have -- they're more capable of analyzing large data.
Q. Did it have to do with the volume of devices?
A. Yes.
Q. That they can handle more devices than your office can?
A. Correct.
Q. Are there any practices that you usually follow when you pick up or deliver evidence?
A. Yes.
Q. What are they?
A. Fill out receipts, evidence receipts.
Q. Are those evidence receipts business records of the U.S. Attorney's Office?



A. Yes, it is.
Q. Is there a regular practice that you use in filling out those receipts?
A. Yes.
MR. MARK: If we could show for the witness only what's marked for identification as Government Exhibit 128, Government Exhibit 130, and Government Exhibit 134.
Q. Do you recognize these documents?
A. Yes, I do.
Q. What are they?
A. Evidence receipts.
MR. MARK: The government offers Government Exhibit 128, 130, and 134 into evidence.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibits 128, 130, and 134 received in evidence)
BY MR. MARK:
Q. Turning first to Government Exhibit 128, the first page, what is this document?
A. It's an evidence receipt.
Q. The date of this document, is it November 9, 2018?
A. Yes.
Q. On the list of documents, does it include an item for Sylvia Ash Apple iPhone X and another item for Sylvia Ash Apple

Watch?
A. Yes, it does.
Q. Who did you receive these items from?
A. From Stroz Friedberg.
Q. You said that was MCU's outside --
A. Outside vendor.
Q. -- vendor? What's the next document?
MR. MARK: We can take a look at the second page.
Q. If you can generally explain, what's this document?
A. It's an evidence receipt as well.
Q. Is that for a number of items including the iPhone X that were released to the DA's office?
A. Correct.
MR. MARK: And if we could turn to the last document in this exhibit, the last page.
Q. What is this document?
A. It's a chain-of-custody receipt.
Q. Was that your signature?
A. Yes, it is.
Q. Is this one that the DA's office prepares?
A. Yes.
MR. MARK: If we could just go to the first page. Sorry, the first page of that receipt. I guess that's page 3. Thank you.
Q. Does this list, from the DA's office, the iPhone X that you



delivered to their office to be analyzed?
A. Yes, it does.
Q. Is this identified as CP0001?
A. Yes.
Q. We won't go through each of the other exhibits, but just generally, if you could turn to Government Exhibit 134, and just tell us what those collection of documents relate to.
A. Two iPhones that was used by Kam Wong.
Q. Are those receipts for your picking up those devices from Stroz and delivering them to the DA's office to be analyzed?
A. Yes.
Q. Now, turning next to Government Exhibit 130, this one says it relates to one hard drive; is that right?
A. Yes.
Q. On the next page, does it explain what the hard drive contained?
A. Yes. It contained three forensic images of an iPhone X done by Stroz Friedberg.
Q. When did you deliver that hard drive to the DA's office lab to be analyzed?
A. February 23rd, 2021.
Q. Did you participate in any searches that related -- so, after all of these devices were given over to the DA's office, is it your understanding the DA's office analyzed those devices?



A. Yes.
Q. Changing topics off those devices, did you participate in any searches that related to any of Ms. Ash's property?
A. Yes, I did.
Q. What was searched?
A. Her residence as well as electronics.
Q. When you say electronics, what are you referring to?
A. Her phone and computers.
Q. Were there any other searches of her property that were executed?
A. Yes. Her iCloud account and emails.
Q. Are you familiar with the term "preservation request"?
A. Yes.
Q. What is a preservation request?
A. A request made to a provider to preserve evidence.
Q. Were any preservation requests made in this case?
A. Yes, it was.
Q. Did any of them relate to any of the defendant's accounts?
A. Yes.
Q. Which accounts?
A. Email accounts.
Q. Why was a preservation request made in this case?
A. We wanted to maintain the emails in its original state.
Q. Did you have any concerns about whether electronic evidence would be maintained in this case?



A. Yes, I did.
Q. Why?
A. Because of the deletion of text messages and emails.
Q. Now asking you some questions about the search of Ms. Ash's home that you said took place, what was your role, if any, in connection with that search?
A. I swore out the warrant, I prepared the search plan, and I reviewed the evidence that was seized from Ms. Ash's residence.
Q. Was evidence collected -- so there was evidence collected in connection with that search?
A. Yes.
Q. After the search, where was the evidence placed?
A. In my evidence vault.
Q. Did you review any of that evidence?
A. Yes, I did.
Q. Were there any electronic devices seized in connection that search?
A. Yes.
Q. What, if anything, did you do with the electronic devices seized in connection with the search of Ms. Ash's home?
A. I turned them over to the district attorney's office to be analyzed.
Q. Were there any documents seized from Ms. Ash's residence?
A. Yes.
MR. MARK: If we could show for the witness only

what's been marked as Government Exhibit 103, 107, 109, and 113.
Q. Were these documents obtained from the search of Mrs. Ash's home?
A. Yes, they were.
MR. MARK: The government offers Government Exhibit 103, 107, 109 and 113 into evidence.
MS. COHEN: Subject to your Honor's ruling, no objection to these exhibits.
THE COURT: Those four exhibits are received, not for the truth of their contents, but for the fact of what they contained and the fact that they came from Ms. Ash's house.
(Government's Exhibits 103, 107, 109 and 113 received in evidence)
BY MR. MARK:
Q. Turning first to Government Exhibit 103, does it say this is a draft opinion dated April 21st, 2015?
A. Yes.
Q. What does the digest say at the top?
A. "Full-time judge may not serve as chair or board member for a not-for-profit credit union."
Q. Does it have any handwriting on this document?
A. Yes.
Q. Is there also handwriting circling the word "and" down below?



A. Yes.
Q. In several different places; is that right?
A. Correct.
Q. Turning next to Government Exhibit 107, is this dated July 1, 2015?
A. Yes, it is.
Q. Could you read just the first paragraph, what it says on the top?
A. "Call from Judge George Marlow, at (845)454-2125, and Tara Smith, (212)428-2504, informing me that because MCU has cases in state court on a regular basis, notwithstanding the fact that it is a not-for-profit organization, I am not permit to serve as their board chair. See 212(2)(L) of the judiciary law."
Q. The date of these notes were July 1?
A. Yes.
Q. What was the date Ms. Ash told you she resigned from MCU?
A. It was in 2016.
Q. Turning next to Government Exhibit 113, if we could publish that, what is this letter?
A. It's a letter to Ms. Ash from MCU in regards to returning any MCU devices she have in her position.
Q. Was it from Norman Kohn, the acting president/CEO?
A. Yes.
Q. Dated June 19, 2018?



A. Yes.
Q. Could you just read the first two paragraphs of this letter?
A. "Dear Judge Ash: It has come to the attention of the Municipal Credit Union that you are in possession of electronic devices owned by MCU, including, but not limited to, any iPads, iPhones, Apple Watches (iWatches) or other electronic devices issued to you by MCU or any of its current or former employees or representatives, including former president/CEO Kam Wong. MCU requests that you return all such devices to MCU immediately.
"Please be advised that you do not have MCU's permission or authority to wipe, delete, reset factory restore image or copy any of MCU's electronic devices (cell phone/laptop/iPad, et cetera) or to print off any emails or documents located on MCU's electronic devices. See MCU policy manual 10.15; 14.69-11; 14.69-12; 19.01 and MCU electronics agreements previously signed by you."
Q. The date on this, again, was June 19, 2018?
A. Yes.
Q. Now turning to the next document that you just said you had found from the search of Ms. Ash's residence, which is Government Exhibit 109, do you recognize this document?
A. Yes.
Q. Other than the signature, was this the same document that



Mr. Wong gave you when you interviewed him on June 25th, 2018?
A. Yes, it was.
Q. Had Ms. Ash produced this in response to any subpoenas?
A. No, no, she did not.
Q. Now, did there come a time that you participated in the arrest of Ms. Ash?
A. Yes.
Q. In connection with arresting Ms. Ash, did you seize anything?
A. Yes, I did.
Q. What did you seize?
A. Her phone.
Q. After the seizing the phone, what did you do with it?
A. I allowed Ms. Ash to contact her attorney.
Q. After letting her contact her attorney, what did you do with it?
A. I took the phone back and placed it in evidence.
Q. Did you later obtain a search warrant for it?
A. Yes, I did.
Q. What did you do with the phone after you got the search warrant?
A. I turned it over to my analyst to analyze.
Q. And why did you give it to an analyst to analyze?
A. To see if -- just to see if she had any text messages and emails on the phone.

Q. Did there come a time that you brought that phone to someone else to analyze?
A. Yes. I took it over to a lab at the district attorney's office.
Q. I'm showing you what's been marked now for identification purposes as Government Exhibit 131.
Do you recognize these documents?
A. Yes, I do.
Q. What are they?
A. Evidence-received forms.
Q. For what?
A. For Ms. Ash's iPhone 6s Plus.
Q. Is that the phone you seized when you arrested her?
A. Yes, it is.
MR. MARK: The government offers Government Exhibit 131 into evidence.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 131 received in evidence)
Q. Why did you deliver this phone to the DA's office's laboratory?
A. They could -- because they can do a more thorough search.
THE COURT: Let's take our afternoon break here, 15 minutes.
(Recess)



(In open court; jury not present)
THE COURT: At the risk of jinxing us, how long do you think now will the trial go? I don't mean for today. I mean overall.
MR. MARK: Oh overall? I guess it depends on where we land on Monday. But I think we could rest Tuesday or Wednesday of next week.
THE COURT: Next week.
MR. MARK: Yes.
THE COURT: Okay. You looked shocked, Ms. Cohen.
MS. COHEN: No, just pleasantly surprised.
MR. MARK: When she concedes most of the facts in her opening.
THE COURT: Never fair.
MR. MARK: The one thing I do want to note is pursuant to the parties' agreements, last night, we notified defense of the witnesses we intended to call today. We are not going to get through all of them, and all the exhibits we intended to introduce through all of those witnesses.
The opposing party would also give notice of the exhibits they planned to do with those witnesses. We've received none. I understand the defense is going to make judgment calls and things like that but right now.
THE COURT: Whereas the U.S. attorney is just this machine that grinds on without judgment. I'm teasing. You



know that.
MR. MARK: I wasn't a machine this morning, so we'll try to grind more.
But what I'm noting is we haven't seen any of these exhibits, and we might need to take some time to take a look at them when we receive them and see what evidentiary objections we might have.
THE COURT: Yes.
(Continued on next page)



(Jury present)
THE COURT: Jurors all present and accounted for. The defendant is present.
As soon as the jurors are all seated, Mr. Mark, you can go ahead.
MR. MARK: Thank you, your Honor.
BY MR. MARK:
Q. Before the break, we had talked about a number of different electronic devices, is that right?
A. Yes.
Q. And was one of them an iPhone X?
A. Yes.
Q. That's the one I think you testified you picked up from the Stroz Friedberg and delivered to the DA's office?
A. Right.
Q. What was your understanding about whether there were any text messages that the DA's office could recover from that phone?
A. There were not text messages.
Q. There were not?
A. No, there were no text messages.
Q. During the interview, in July 2019, had you spoken with Ms. Ash about that iPhone X?
A. Yes.
Q. When did she say she had received that phone?

A. Do you mind if I refresh my recollection?
Q. First, do you recall when she said that she told you?
MS. COHEN: Objection, your Honor. Asked and answered.
THE COURT: Overruled.
A. She received the phone from Kam Wong.
Q. Did she tell you when she received it?
A. I believe so, but I don't recall right now.
Q. Could you take a look at what's marked for identification purposes as 3535-282. You can look at the bottom of that page. And tell me if that refreshes your recollection.
A. Yes, it does.
Q. So what did Ms. Ash say to you?
A. She received the iPhone X after she signed the memo.
Q. When did Mr. Wong give you the memo signed by Ms. Ash?
A. In January of 2018.
Q. You mentioned that she had previously --
THE COURT: Excuse me. So what memo are you talking about?
THE WITNESS: The memo that she signed, that she received from Kam Wong as it pertained to his longterm disability policy.
THE COURT: Thank you.
MR. MARK: Thank you.
Q. You previously testified that she also talked about a



second copy of that memo that she signed?
A. Yes.
Q. When did she say during that interview she signed that second memo?
A. A week or two after she signed the first one.
Q. Had she mentioned that second memo to you in any of the interviews before July 2018?
A. No, she did not.
Q. Now, you mentioned earlier that she had told you that she had deleted materials from that or deleted that iPhone X; is that right?
A. Yes.
Q. When did she say she did that?
A. After Mr. Wong got -- was arrested.
Q. When was he arrested?
A. In May of 2018.
Q. When was the first subpoena that was served on Ms. Ash?
A. March 2018.
Q. When did you speak with her first about that response to the subpoena?
A. April 2018.
Q. At that time, what did she tell you about whether she had any responsive documents to that subpoena?
A. That she did not have any responsive documents.
Q. When was the first time she told you that she wiped or



erased her iPhone X?
A. In June of 2018. The first time she wiped her iPhone X -- in July of 2018.
Q. In the July interview?
A. Correct.
Q. And that was after she received the second subpoena?
A. Correct.
Q. When she told you about the --
THE COURT: Excuse me. There are too many variables in this.
She told you in July that she deleted texts from her iPhone X, right?
THE WITNESS: Yes.
THE COURT: That was the first time, yes?
THE WITNESS: Yes.
THE COURT: And did she then tell you when she deleted the material?
THE WITNESS: Yes, she did.
THE COURT: What did she say?
THE WITNESS: It was after Mr. Wong was arrested.
THE COURT: Thank you.
BY MR. MARK:
Q. Did she say when after he was arrested she deleted the materials from the iPhone X?
A. No, she did not.



Q. Did she say anything to you about an iCloud transfer from that device?
A. No, she did not.
Q. Did she say anything to you about whether she had messages on any other devices?
A. No, she did not.
Q. Now, before the break we also talked about a phone that you seized from Ms. Ash when you arrested her?
A. Yes.
Q. That phone, was it analyzed?
A. Yes, it was.
Q. I think you said it was both analyzed by the U.S. attorney's office and the DA's office; is that right?
A. Correct.
Q. Have you reviewed anything from the analysis of that phone?
A. Yes, I did.
Q. What have you reviewed?
A. Text messages and e-mails between her and Mr. Wong.
Q. Were those from the phone that you arrested her with?
A. Yes.
MR. MARK: May I have one moment, your Honor?
THE COURT: Yes, you may.
MR. MARK: No further questions.
THE COURT: Thank you. Cross-examination.
MS. COHEN: Thank you, your Honor.

CROSS-EXAMINATION
BY MS. COHEN:
Q. Agent Jackson, you've participated in hundreds of witness interviews, right?
A. I would say that, yes.
Q. Typically, in a witness interview, the prosecutors or the agent asks the witness questions, right?
A. Correct.
Q. And typically, the agents at the interview take notes of what the witness says, right?
A. Correct.
Q. So in general, the interview of a witness is not like one might see in TV or the movies, where the witness comes in and starts talking about everything they know, right?
A. Correct.
Q. And your interview with Ms. Ash, both the interviews, the one on March 1st and the one on July 9, was no different. The prosecutors asked her questions and she answered questions, right?
A. Yes, she did.
Q. In the first interview of Ms. Ash on March 1, Ms. Ash was shown the memo that Kam Wong gave her to sign, I believe it's Government Exhibit 116, and she was asked if that was her signature on the memo, right?
A. Correct.



Q. And the second memo that you were just asked about on direct testimony that Mr. Wong asked Ms. Ash to sign, is identical to the memo you showed her on March 1, which is Government 116, right?
A. I believe so.
MS. COHEN: If I could have pulled up on the screen for identification Government Exhibit I believe it is 109. Can I please have Government 109 for identification pulled up.
THE COURT: 109 in evidence.
MR. MARK: It is, your Honor.
MS. COHEN: Thank you. Pursuant to the stipulation?
THE COURT: No.
MS. COHEN: You entered 109? My apologies.
MR. MARK: I thought --
THE COURT: No problem. Let's get on with it. It is in evidence.
BY MS. COHEN:
Q. Agent Jackson, if you look at what's been marked what is in evidence as Government Exhibit 109, and if we can publish it to the jury because it's in evidence.
Is Government Exhibit 109 what you referred to as the second memo that Kam Wong asked Ms. Ash to sign?
A. Yes.
Q. Thank you.
MS. COHEN: And if you put, Ms. Stephenson, if you can



please put Government Exhibit 109 side by side with Government Exhibit 116, thank you.
Q. And Agent Jackson, other than Ms. Ash's signature, which appears on Government Exhibit 116, are Government Exhibit 109 and Government Exhibit 116 identical?
A. Yes.
MS. COHEN: You can take that down.
Q. Agent Jackson, is it also common when you interview witnesses that you go over conversations that the witness recalls in greater detail the second time you talk to them?
A. It all depends.
Q. It often happens that you talk to a witness once, you get certain detail, and then you talk to the witness a second time and you get greater detail about a certain conversation. That happens, right?
A. It happens, yes.
MR. MARK: Objection.
THE COURT: What's the objection?
MR. MARK: Your Honor, defense objected many times to my examination about other -- about other --
Relevance.
THE COURT: Overruled.
Q. Agent Jackson, is it your general practice when you conduct investigations to take notes when you talk to witnesses?
A. If I'm interviewing them, yes.



Q. Is it the general practice that you take notes of the person you are interviewing so that you have a record of what is said?
A. Correct.
Q. That general practice is true whether you interview that witness on the phone, by Zoom, or in person, right?
A. Correct.
Q. It's important to have a record of what the person says, because that may be important to your investigation, right?
A. Yes, if it's substance.
Q. Isn't it also true that you take notes of what the witness says and you then memorialize those notes in what I believe you referred to as a formal report? Isn't that right?
A. Correct.
Q. Isn't it correct that you create a formal report of your notes so that there is a formal record of what a witness said to the government?
A. Correct.
Q. You would agree that it is an important part of your job to make those formal reports of what a witness said to you in an investigation?
A. Correct.
Q. You spoke with Ms. Ash on -- I believe you didn't remember the date, but you recalled it was in April of 2018, right?
A. Correct.

Q. At the time I think you said you were in the office of the U.S. attorney's building?
A. Yes.
Q. And you had one of the members of the prosecution team, an AUSA with you as well?
A. Yes.
Q. You have no notes of that conversation with Ms. Ash, right?
A. No, because it was a scheduling call.
Q. Well, in that call, isn't it true you asked her if she had any documents responsive to your first grand jury subpoena?
A. Yes, I did, but it was before her grand jury appearance.
Q. Understood. Isn't it true you didn't ask her what time she was going to drop off documents, right?
A. No, I did not.
Q. You didn't ask her what day she was going to appear, did you?
A. No, I did not.
Q. Instead, what you asked her on that call was she did she have any documents responsive to your grand jury subpoena, right?
A. Yes.
Q. You have no notes of what her response was?
A. No, I don't.
Q. And there's no notes by the prosecutor about what her response was, right?



A. No, I do not.
Q. Were you aware during that call with Ms. Ash in April of 2018 that she was driving in her car when she spoke to you?
A. I was not aware of that.
Q. You didn't contact Ms. Ash -- let's just back up a little bit.
You did not contact Ms. Ash until January 31 of 2018; is that right?
A. Correct.
Q. Prior to that, you had dropped off a business card at Kam Wong's residence, and that was on January 17, 2018, correct?
A. Correct.
Q. Ms. Ash told you when you spoke to her on March 1, 2018, that she had signed the memo, Government Exhibit 116, at Wong's request on January 22, 2018, right?
A. Yes.
Q. And as of January 1 -- as of January 22, 2018, you had not contacted Mrs. Ash, right?
A. No, I did not.
Q. And no one with the federal government or working with your office in connection with this investigation had contacted Ms. Ash as of January 22, 2018, right?
A. No, because I didn't know anything about -- I didn't know anything about the memo until the 19th or the 25th of January.
Q. Prior to learning about the memo from Mr. Wong, correct?



A. Correct.
Q. When you learned about the memo from Mr. Wong on or about January 25, 2018, you had not contacted nor had anyone else from the federal government contacted Ms. Ash?
A. No.
Q. No, you had not, and no one in the federal government had not?
A. I had not.
Q. Just want to be very clear about this point.
No one in the federal government had contacted, to your knowledge, anyone had contacted Ms. Ash related to this investigation as of January 25?
A. I don't believe -- I don't know, I don't believe so. I had not.
Q. Okay. Well, you knew who was working with you on the investigation, correct?
A. I was working with the prosecutors in my office.
Q. And so to your knowledge, had anyone who was working on the investigation of Kam Wong or Ms. Ash, or any investigations related to it, contacted Ms. Ash as of January 25, 2018?
A. Not that I know of.
Q. And the first contact with Ms. Ash by yourself or anyone else that you know of who was working on the federal investigation was January 31, 2018, right?
A. Yes.



Q. Isn't it correct that Ms. Ash met with you -- and you testified about it on direct -- voluntarily, right?
A. Yes, she did.
Q. She had no obligation to talk with the government, did she?
A. No, she didn't.
Q. In fact, Ms. Ash spoke to you voluntarily four times, right?
A. Yes.
Q. During the first interview of Ms. Ash on March 1, she voluntarily came down to the U.S. attorney's office, right?
A. Yes, she did.
Q. And she came down to the U.S. attorney's office to talk to you after work hours, right?
A. Yes.
Q. And you asked, the prosecution team asked her questions and she answered questions, right?
A. Yes, she did.
Q. Ms. Ash didn't ask to leave the interview early, did she?
A. No, she did not.
Q. And Ms. Ash came alone to that interview, right? Not with any lawyer?
A. Correct.
Q. At the end of that interview on March 1, the prosecution team told Ms. Ash to get an attorney, right?
A. Yes.

Q. And even after Ms. Ash was told to get an attorney, Ms. Ash continued to talk with you and with the prosecution team without an attorney; isn't that right?
A. Correct.
Q. In fact, isn't it true Ms. Ash, when you called her, would call you back or she would call back the prosecution team?
A. Yes.
Q. And Ms. Ash again talked to you on June 8, right? I believe that was on the phone, correct?
A. Yes, it was.
Q. And again she spoke to you without an attorney?
A. Correct.
Q. And she didn't ask to get off the phone call early, did she?
A. No, she did not.
Q. She had no obligation to talk to you, did she?
A. No, she did not.
Q. So let me just talk a little bit about what Ms. Ash told you during the first interview on March 1st.
I believe you testified on direct that she told you that she recalled that Wong had told her back in 2015 that there was a less expensive way to give him cash rather than have the bank buy longterm disability insurance, right?
A. Correct.
Q. And she told you that she signed the memo, Government



Exhibit 116, that Wong had given her, in mid January, because she recalled that conversation with him back in 2015, right?
A. Correct.
Q. She admitted to you that the first time she met with you and you showed her the memo, and she told you she recalled talking to Mr. Wong about longterm disability and it would be better to get cash instead of cause the bank to buy the insurance, that the memo, Government Exhibit 116, upon looking at it at the U.S. attorney's office, wasn't accurate, right?
A. Correct.
Q. Ms. Ash told you it was inaccurate and the reasons why was because she didn't recall ever approving cash in lieu of those benefits, right?
A. Correct.
Q. And Ms. Ash also volunteered to you during that voluntary interview on March 1 that she had never seen Mr. Wong's employment contract, right?
A. I don't recall. I believe so, but I don't recall.
Q. She told you also that she had reviewed that memo, Government 116, when Wong gave it to her to sign for all of two minutes when Mr. Wong gave it to her, right?
A. Correct.
Q. You recall that, right?
A. Yes.
Q. She also volunteered to you during that interview on



March 1 that Wong had told her, when he asked her to sign the memo, Government Exhibit 116, that he was in some sort of trouble, he was under investigation. Do you recall her telling you that?
A. Correct.
Q. Ms. Ash never said that Wong had told her that he was under a federal investigation?
A. No.
Q. And at the time, and still today, and I think you testified on direct, the MCU is a regulated bank, regulated, correct?
A. Yes.
Q. It's regulated by the New York State Department of Financial Services, right?
A. Yes.
Q. I believe that you received, in the course of your investigation, other copies that are identical except for the person to whom they're addressed as Government Exhibit 116 that Mr. Wong gave to two other people connected with the MCU to sign in mid January 2018, right?
A. Yes.
Q. Do you recall that Mr. Bonsu was a board member of the MCU, right?
A. Yes.
Q. And do you recall that he was a board member from 2009 until the board was disbanded in or about May of 2018?



A. I don't recall the approximate dates, but I know he was a board member in 2018.
Q. Do you recall he had been a board member for some period of time before then?
A. Yes.
Q. Do you recall that in fact Mr. Bonsu was the treasurer of the MCU board?
A. Yes.
Q. And do you recall Mr. Wong giving you a memo that is identical in substance to Government 116 that is signed by Mr. Bonsu?
A. Yes.
Q. Do you recall Mr. Wong giving you -- withdrawn.
Do you recall that Mr. Wong gave you the memo that's identical to Government Exhibit 116 signed by Mr. Bonsu on or about January 22 or 23 of 2018?
A. I believe he gave me the memo in January, but as far as the dates, I don't recall, no.
Q. Do you remember getting the memo signed by Mr. Bonsu before you received the memo signed by Ms. Ash from Mr. Wong?
A. It was before, yes.
Q. Do you recall that -- well, you first approached Wong when?
A. January 2018.
Q. Do you recall if it was January 18, 2018?
A. Yes.

Q. So after you dropped a business card off at Mr. Wong's residence on January 18, right, he called you?
A. I dropped the business card off January 17.
Q. Then you met with him on January 18?
A. Correct.
Q. On January 18, is that when he handed you two memos?
A. No, it was not.
Q. Did he hand you the memos on January 19?
A. No. It was a week or two later.
Q. Okay. So a week or two later brings you to January 22 through 27 or so, some time in that time frame, 2018?
A. I don't recall the exact dates.
Q. Before you contacted Ms. Ash, which was on January 31, did you have copies of two memos that Mr. Wong had given you that are identical to Government 116, one was signed by Mr. Bonsu and another was signed by an individual Giovanni Porcelli. Do you remember that?
A. Yes.
Q. Did you also, when you contacted Ms. Ash on 1/31, have a copy of Government Exhibit 116 that had you gotten from Mr. Wong?
A. Yes.
Q. So, Giovanni Porcelli, do you recall he was the chair of the supervisory board of the MCU, right?
A. Yes.



Q. Do you recall if Mr. Wong gave you a memo signed by Mr. Porcelli that is in substance identical to Government 116?
A. Yes, he did.
MS. COHEN: If I could please have what's been marked for identification as Government Exhibit C and D put up on the screen, split screen.
THE COURT: Defendant's Exhibits?
MS. COHEN: These are Defense Exhibits for identification C and D.
Q. Mr. Jackson, looking at first what's been marked as identification as Government Exhibit C, do you recognize that document?
A. Yes, I do.
Q. Do you recognize it as the document we've been talking about that Mr. Wong gave you that was signed by Mr. Bonsu?
A. Yes.
MS. COHEN: The defense moves in Defendant's Exhibit C into evidence.
MR. MARK: No objection.
THE COURT: C is received.
(Defendant's Exhibit C received in evidence)
BY MS. COHEN:
Q. Agent Jackson, if you can look at what's been marked for identification Defendant's Exhibit D for identification, do you recognize that document?



A. Yes, I do.
Q. Do you recognize it as a memo that Wong gave to you that was signed by Mr. Porcelli that we've been talking about?
A. Yes.
MS. COHEN: The defense moves in Defendant's Exhibit D into evidence.
MR. MARK: No objection.
THE COURT: Received.
(Defendant's Exhibit D received in evidence)
MS. COHEN: We can publish those for the jury. Thank you.
THE COURT: Yes.
Q. So Agent Jackson, looking at Defendant's Exhibit C and Defendant's Exhibit D, are those the two memos that Kam Wong gave to you some time before January 31? One, Defendant's Exhibit C, is signed by Mr. Bonsu as treasurer of the board, and Defendant's Exhibit B is signed by Giovanni Porcelli, supervisory committee chair?
A. Yes, they are.
Q. Right. And if we can, and I'm sorry to do this to you, Ms. Stephenson, but if we could do side by side Government Exhibit 116 and Defendant's Exhibit C side by side.
Agent Jackson, comparing Government Exhibit 116 which was the memo you were shown on direct that Kam Wong gave to you signed by Sylvia Ash, to Defendant's Exhibit C, which I showed



you on cross, which appears to be the same memo, except to Mr. Bonsu as treasurer of the board, and signed by Mr. Bonsu on the bottom 1/22/18, and compare them. Are they exactly the same except for who they are to and the signature of who signed them?
A. Yes.
MS. COHEN: Ms. Stephenson, if I can please have Government Exhibit 116 on the screen compared to Defendant's Exhibit D. Thank you.
MR. MARK: Objection.
THE COURT: Are you saying something or not?
MR. MARK: I said I am just objecting here. I am asking for a sidebar on this.
THE COURT: All right. Come on up.
(Continued on next page)

(At the sidebar)
MR. MARK: The memo that you were going to show him signed by Bonsu.
THE COURT: Signed by?
MR. MARK: Nana Osei-Bonsu was not the version that was initially provided to Mr. Jackson. It is a different version. Because I think you got them from the attachments to a letter, an e-mail that was sent to the MCUA.
MS. COHEN: He said it was the same.
THE COURT: Yes, he did. Maybe he made a mistake; maybe he didn't.
MR. MARK: Okay.
(Continued on next page)



(In open court)
THE COURT: Continue.
MS. COHEN: Thank you, your Honor.
We can put back on the screen the side by side comparison of Government Exhibit 116 with Defendant's Exhibit D.
Q. Agent Jackson, looking at the screen, Government Exhibit 116, the memo that Kam Wong gave you signed by Ms. Ash that's dated January 22, and comparing it to Defendant's Exhibit D, which is the memo that you testified Kam Wong gave you that was signed by Giovanni Porcelli as supervisory committee chair of the MCU, and signed on 1/23/2018, are they identical in substance?
A. Yes, they are.
THE COURT: Where did that come from?
Electronic gremlins again.
MS. COHEN: We can take that down.
Q. So, moving now in time to June 8, 2018. I think you testified Ms. Ash again voluntarily spoke to you and the prosecution team?
A. Yes.
Q. During that conversation, you asked her whether she had documents responsive to I believe the first subpoena, right?
A. Correct.
Q. During that discussion with Ms. Ash, she told you that she had lost her access to bank documents when she left the board, because she had lost access to her MCU e-mail account; isn't that right?



A. She said she lost access to her MCU e-mail.
Q. She also told you during that interview on June 8 that she had e-mailed with Wong, but not related to MCU business, except that she told you she had asked him to approve her birthday party at the MCU Park, correct?
A. Correct.
Q. And Ms. Ash told you that she had deleted those e-mails with Mr. Wong, right?
A. She deleted text messages she stated.
Q. And she told you she deleted those communications with Wong, because she did not believe they were relevant to Wong's theft from the MCU, right?
A. I don't believe that's what she said.
Q. Okay. Do you recall her telling you on June 8 during that interview that Ms. Ash had deleted text messages, which is what I believe you said, with Wong, because there was no need to keep the communications between herself and Wong?
A. Correct.
Q. And this interview of Ms. Ash June 8 was more than a month after Wong had been arrested, right?
A. About a month, yes.
Q. In general, in your experience, you know the difference



between a grand jury subpoena and a civil subpoena, right?
A. Yes.
Q. And --
THE COURT: Sustained. The answer is stricken.
Q. Ms. Ash -- let's just move to the next time she met with you voluntarily. I think it was July 9; is that right?
A. Yes.
Q. At that time, she told you that the MCU had asked her to return her phone, right?
A. Correct.
Q. And isn't it true that she told you she went to the Apple store and transferred the data from her MCU phone to a new phone, right?
A. She said she got -- she did not say -- I don't recall her saying she transferred the data. She said she went to the Apple store and got her phone reset or wiped.
Q. Do you recall her using the word "wipe"?
A. Reset or wipe. I don't recall the exact words.
Q. If you want to look at, to refresh your recollection about the words used, would it help you or you don't recall the exact words used either way?
A. I don't recall either way.
Q. She told you -- we are on the July 9 interview -- she told you on the July 9 voluntary interview about the content of the text messages that she no longer had, right?

A. I don't recall -- I don't recall her discussing the content of the text messages.
Q. You don't recall her telling you she had sent texts of support and to trust in God to Wong?
A. Yes.
Q. You do recall that?
A. I do recall that, yes.
Q. Do you recall her telling that you she had even given attorneys' names to Wong?
A. Yes.
Q. Do you recall her telling you that there are pictures of grandkids sent between her and Wong?
A. Yes.
Q. Do you recall her telling you those were the texts she had deleted?
A. I recall her saying she deleted text messages.
Q. Do you recall the three types of text messages I just gave you as examples that you recalled, supporting Wong, trusting God, giving him attorneys ' names, and pictures of grandkids were among the texts that Ms. Ash told you she had deleted?
A. I just recall her telling me she deleted all her text messages.
Q. You recall her telling you that the text messages with Wong were messages of support, telling him to trust in God, giving him attorneys' names, and also pictures of grandkids, right?



MR. MARK: Objection.
THE COURT: Sustained. Form.
Q. Just so the record is clear, I want to be clear about what you recall, Agent Jackson. You recall on July 9 Ms. Ash told you she had deleted texts, correct?
A. Correct.
Q. And you recall that she was asked what the content of the texts were, right?
A. I don't believe we asked her the content of the text messages. She deleted -- she just said she deleted text messages.
Q. Do you recall her volunteering to you that the text messages that had been deleted included texts where she had texted words of support to Wong?
A. If that was included in her text messages, yeah, she deleted all -- she said she deleted her text messages. She didn't make a separation from business text messages or personal text messages. She just said she deleted all text messages.
Q. But you recall that she told you about what some of her text messages with Wong were about?
A. Correct.
Q. And those were text messages that were deleted, right?
A. Correct.
Q. And the content that you recall her telling you about is



what I just asked you about: Trust in God, supporting him, giving him attorneys' numbers and pictures of grandkids. You recall those specific example, right?
A. Yes.
Q. She told you, actually on July 9, right, that she still had the iPhone X, right?
A. Yes.
Q. She told you it was in her house, right?
A. Correct.
Q. So you were shown, do you recall -- let's just back up to your direct testimony for a minute.

You were shown a lot of MCU checks that were written to Wong, right?
A. Yes.
Q. That's Government Exhibit 604 through 609 series. Do you recall those?
A. Yes.
Q. And the judge asked you if the signature that appears on the check of Ms. Ash appeared to be a stamp, meaning a stamp of her signature, not that she actually signed it, right? Do you recall that?
A. Yes.
Q. Okay. And you recall saying, yes, it appeared to be a stamp of her signature, right?
A. Correct.



Q. You never found any evidence that Ms. Ash knew or ever saw any of those checks, Government Exhibit 604 through 609, right?
MR. MARK: Objection.
THE COURT: Ground?
MR. MARK: Calls for hearsay.
THE COURT: Sustained as to form.
Q. For those exhibits, Government Exhibit 604 through 609, you didn't develop any evidence in your investigation that Ms. Ash knew or ever saw about those checks, right?
MR. MARK: Objection.
THE COURT: Same question. Same ruling.
Q. Again, for Government Exhibit -- I'll try another way, your Honor.

Government Exhibit 604 through 609, you never asked Ms. Ash if she knew about those checks, did you?
A. No, I did not.
Q. Ms. Ash was never charged with helping Wong take the money in the form of those checks, right?
MR. MARK: Objection.
THE COURT: There is no such charge on trial in this case. That's as far as we are going.
Q. I think -- sorry, your Honor. I'm trying to find a piece of paper.

I think you testified you were the case agent responsible for the investigation of Kam Wong, right?

A. Yes.
Q. And you were also the case agent responsible for the investigation of Joseph Gagliardo, right?
A. Yes.
Q. And during both of those investigations, you never found any evidence that Ms. Ash stole any money with Wong or Gagliardo?
MR. MARK: Objection.
THE COURT: Sustained.
MS. COHEN: Your Honor, a moment to approach, please?
THE COURT: No.
MS. COHEN: Okay.
Q. You never asked -- withdrawn.
I'll ask it a different way.
Let's go back to the interviews for one minute.
You said Ms. Ash spoke to you a total of four times voluntarily, right?
A. Correct.
Q. Ms. Ash never asked to leave any of those interviews, right?
A. No, she did not.
Q. Ms. Ash never refused to answer any question, did she?
A. No, she didn't.
MS. COHEN: A moment to confer, your Honor?
THE COURT: Of course.



MS. COHEN: Thank you.
No further questions, your Honor.
THE COURT: Thank you. Redirect?
MR. MARK: No, your Honor.
THE COURT: Okay. Thank you. You are excused, Agent.
(Witness excused)
THE COURT: Who will the government's next witness be?
MS. KATZ: The People call Robert Adams.
THE COURT: Okay. I think, how long do you anticipate him on direct?
MS. KATZ: I'm sorry. I didn't hear.
THE COURT: How long will you have him on direct do you think?
MS. KATZ: I would say about 40 to 45 minutes.
THE COURT: I think we're going to break here and give Mr. Orfuni a head start on the commute.
9:30 tomorrow morning.
(Jury excused)
(Continued on next page)



THE COURT: Anything further tonight?
MR. MARK: I think we gave you enough paper already today.
THE COURT: I would say.
MS. COHEN: Nothing from the defense, your Honor.
THE COURT: Good. Thank you.
MS. COHEN: Thank you, your Honor.
THE COURT: See you in the morning.
(Adjourned until December 2, 2021, at 9:30 a.m.)



INDEX OF EXAMINATION


| Examination of: | Page |
|---|---|
| LOUISE COGAN-RUPANI | |
| Direct By Mr. Rebold | 66 |
| Cross By Mr. Reilly | 109 |
| LAVALE JACKSON | |
| Direct By Mr. Mark | 120 |
| LaVALE JACKSON | |
| Direct By Mr. Mark | 184 |
| Cross By Ms. Cohen | 224 |


GOVERNMENT EXHIBITS


| Exhibit No. | Received |
|---|---|
| 851 | 77 |
| 1007 | 89 |
| 402, 403A, 404A, 420A, 426, 452A, 453, 457, 458A, 460A, 461, 463, 463A through 463N, 465, 467, 469A, 472A, 480, 481, 482A through 482L, 483A, 484, 954, 956, 960, 407, 413, 415 through 418, 425, 428, 429, 439, 441, 444, 486, 487, 491, 493, 498, 499, 950, 951, 954, 955, 956, 957, 959, 960, 962, 963, 964 | 100 |

901 . . . . . . . . . . . . . . . . . . . . 102
1004 . . . . . . . . . . . . . . . . . . . 127
604A, 605, 606, 607, 608A, 609A . . . . . . 129
115A, 115B . . . . . . . . . . . . . . . . 139
448 . . . . . . . . . . . . . . . . . . . . 144
116 . . . . . . . . . . . . . . . . . . . . 146
126 . . . . . . . . . . . . . . . . . . . . 149
117 . . . . . . . . . . . . . . . . . . . . 158
118 . . . . . . . . . . . . . . . . . . . . 172
122 . . . . . . . . . . . . . . . . . . . . 188
123, 124, and 125 . . . . . . . . . . . . . 190
128, 130, and 134 . . . . . . . . . . . . . 207
103, 107, 109 and 113 . . . . . . . . . . . 212
131 . . . . . . . . . . . . . . . . . . . . 216

DEFENDANT EXHIBITS

Exhibit No. Received

C . . . . . . . . . . . . . . . . . . . . . 237
D . . . . . . . . . . . . . . . . . . . . . 238

$

**$1,700 (1)**
109:2
**$130,000 (1)**
147:10
**$2,000 (1)**
108:22
**$20,000 (2)**
85:15,16
**$250 (1)**
81:5
**$29,000 (1)**
109:10
**$3.7 (3)**
140:12;147:13;154:1
**$4.2 (1)**
70:6
**$600,000 (1)**
82:20

@

**@nymcuorg (2)**
94:5,9

A

**abbreviation (1)**
112:1
**ability (2)**
83:9;98:10
**able (3)**
62:2;83:6;141:17
**above (5)**
90:15;107:24;148:5,
6;162:3
**absence (1)**
100:3
**accept (2)**
89:21,23
**access (5)**
84:10;166:1;242:1,2,
4
**accommodate (1)**
183:8
**accompanying (1)**
158:25
**according (1)**
199:8
**account (14)**
61:9;62:5;127:5,11,
13,13,18;128:5;174:15,
17,19,20;210:11;242:2
**accounted (1)**
219:2
**accounting (10)**
64:16;88:1,11;91:8;
92:5;96:13;103:25;
104:15,16;119:15
**accounts (6)**
70:4;103:13;125:4;
210:18,20,21
**accurate (12)**
72:8;90:11;94:15,24;
96:19,24;119:18;
148:6;156:3,4,7;233:9
**accurately (3)**
77:7;92:19;101:20
**acronym (1)**
170:23
**across (1)**
131:7
**acting (2)**
201:10;213:23
**action (2)**
167:18;171:20
**actions (3)**
168:4,18;171:6
**activities (1)**
128:9
**activity (3)**
61:16;126:20,21
**actual (3)**
88:10;100:25;102:17
**actually (6)**
88:11;95:13;96:9;
138:24;246:5,20
**Adams (1)**
249:8
**add (1)**
180:16
**added (3)**
85:10,10;91:24
**addition (6)**
80:9;83:12;86:2;
153:13;162:6;169:15
**additional (9)**
84:17;85:6;88:18;
142:4;150:1;173:5,7,8;
186:23
**address (5)**
144:6;156:22;
158:16,17,20
**addressed (5)**
156:18,21;159:9;
173:3;234:17
**addressees (1)**
99:20
**addresses (4)**
93:22;94:2,8;99:16
**adequate (1)**
160:16
**Adjourned (1)**
250:9
**administer (1)**
147:21
**Administration (3)**
69:5,13;121:21
**administrator (1)**
71:4
**admission (2)**
65:2;98:9
**admit (2)**
63:22;190:18
**admitted (4)**
181:13,17,18;233:4
**adopt (1)**
106:15
**advance (3)**
88:15;116:6,10
**advertised (1)**
83:19
**advertising (7)**
67:17,18;82:3;83:9,
10,13,21
**advisable (2)**
154:21;193:23
**advised (2)**
158:25;214:12
**advisory (2)**
180:10;195:25
**affairs (1)**
71:13
**affect (1)**
63:4
**affiliate (1)**
82:10
**affixed (1)**
130:21
**afternoon (3)**
133:3;178:1;216:23
**again (24)**
62:13;74:13;76:18;
100:1;108:24;114:18;
115:19;116:13,19;
135:23;141:24;142:3,
18;145:9;179:11;
192:9;197:6;202:1;
214:19;232:8,11;
241:16,19;247:12
**agency (4)**
120:17,18;170:20;
171:5
**Agent (36)**
61:4,5,9,24;62:2,5,5;
120:4,22,23;121:22;
124:1,2,5;130:20;
132:2,12;133:5,6;
145:18;150:20;175:24;
224:3,7;225:18;226:3,
8,23;237:23;238:13,
23;241:7;245:4;
247:24;248:2;249:5
**agents (3)**
138:13;160:9;224:9
**ago (2)**
83:22;98:5
**agree (4)**
64:11;156:5,8;
227:19
**agreed (7)**
88:25;89:22;90:13,
17;100:1;132:16;148:6
**agreement (15)**
64:14;82:5,6,6,8,12,
17,21;83:1,3,8;84:16;
85:4,12;89:6
**agreements (4)**
82:4;83:22;214:18;
217:16
**ahead (2)**
200:19;219:5
**airfare (1)**
79:13
**alcohol (6)**
103:14,14,17;109:6;
114:13,16
**alert (1)**
179:24
**Alice (1)**
190:14
**allow (3)**
101:9;117:8;159:21
**allowed (2)**
103:17;215:14
**allowing (1)**
61:10
**almost (2)**
108:22;136:3
**alone (1)**
231:20
**along (1)**
99:25
**always (6)**
86:8;87:21;95:2,12;
98:25;203:4
**amend (1)**
97:9
**amendments (2)**
145:1,6
**amicable (2)**
75:7,10
**AML (1)**
62:17
**among (3)**
119:13;122:10;
244:20
**amount (6)**
104:1;134:13;
147:11,16,16,18
**amounts (2)**
103:8;156:5
**Amper (2)**
175:23;176:1
**Ana (1)**
175:8
**analysis (1)**
223:15
**analyst (5)**
204:25;205:14,15;
215:22,23
**analysts (1)**
205:6
**analyze (5)**
204:25;206:1;
215:22,23;216:2
**analyzed (10)**
205:6,14;206:10;
209:1,10,20,24;211:22;
223:10,12
**analyzing (1)**
206:14
**and/or (3)**
93:10;176:13,14
**Andy (3)**
96:18;119:23;178:22
**Angel (1)**
175:7
**anniversary (1)**
113:2
**annoyed (1)**
156:16
**annual (3)**
71:23;82:16,19
**answered (4)**
117:11;220:4;
224:18;231:16
**anticipate (1)**
249:9
**Antoinette (1)**
133:5
**apart (1)**
164:17
**Apologies (4)**
96:22;103:3;117:19;
225:13
**apologize (2)**
84:21;99:8
**apparently (1)**
149:23
**appear (9)**
99:13;129:20,23;
156:11;160:23;163:23,
24;164:1;228:15
**appearance (5)**
163:1,4,19;173:24;
228:11
**appeared (8)**
130:17,21;138:7;
148:25;156:12;157:4;
246:19,23
**appears (7)**
77:8;126:8;130:25;
180:19;226:4;239:1;
246:18
**Apple (10)**
201:5,12,18,25;
202:20;207:25,25;
214:7;243:11,16
**applicable (1)**
147:15
**application (1)**
61:13
**appointed (3)**
75:18;152:22,25
**appreciate (1)**
65:6
**approach (4)**
148:6;179:11;
199:21;248:10
**approached (1)**
235:22
**appropriate (1)**

106:9
**approval (7)**
142:14,19,20;143:5,8,12;145:21
**approve (1)**
242:7
**approved (5)**
116:13,19;135:10,11;142:21
**approving (2)**
143:24;233:12
**approximate (2)**
100:22;235:1
**Approximately (28)**
69:16;70:6;73:19;76:10;79:6;81:5,11,13;82:20,23;83:11;88:14;102:20;109:6,10;112:8;121:25;123:5;126:14;127:5;133:2,13;140:12;151:19;171:16;191:25;199:18,18
**April (10)**
107:13;160:22;162:13,13,16;163:1;212:17;221:21;227:24;229:2
**Aramark (5)**
85:1,2;87:21;88:9;91:6
**Archibald (3)**
187:24;192:9,14
**Archibald's (1)**
188:5
**area (1)**
84:6
**argument (2)**
62:11;63:15
**arguments (1)**
63:9
**Around (7)**
70:13;74:15;75:19;92:14;95:12;96:7;110:23
**arrest (2)**
110:23;215:6
**arrested (18)**
75:23;110:19;169:5,7;200:13,14,20,23;202:22,23;216:13;221:14,15;222:20,23;223:8,19;242:23
**arresting (1)**
215:8
**arrests (1)**
169:3
**arrogant (1)**
156:12
**article (1)**
126:7
**Ash (184)**
73:8,10,11;74:1,2,4,11,13,16,17,23;75:4,5;77:6,25;81:6;102:21;104:9;105:6,16;108:16;110:10;112:4,20;113:12;115:16,25;116:17;125:10,16,17,18,23;129:24;130:21;138:7,11,19,20;142:21,23;143:3,6,9,12;146:1,21,25;148:10;150:2,13,19;151:6;152:9;153:16,21,25;154:4,10,17,22;155:14;156:11,21;157:9,22;158:12,16;159:10;160:1,19,23;161:4,25;162:8,20;163:14,16;165:6,12,19;168:16;169:16;172:11;173:3,22;174:13;176:17,23,24;181:5;184:17;186:15;188:12,16;190:10;191:9,12,15,18,23;192:11,22,25;193:8;194:7,23;195:11;197:6,13;200:9;201:6,12;202:1,4,10;207:25,25;213:17,21;214:4;215:3,6,8,14;219:23;220:13,15;221:17;223:8;224:16,21,21;225:2,22;227:23;228:7;229:2,5,7,13,18,22;230:4,11,19,20,22;231:1,6,9,18,20,24;232:1,1,5,8,18;233:11,15;234:6;235:20;236:13,19;238:25;241:8,19,25;242:10,18,22;243:5;244:20;245:4;246:19;247:1,8,15,17;248:6,16,19,22
**Ash's (22)**
115:19;116:14;130:17;143:19;152:6,10;156:9;157:1;165:16;168:18;180:5;192:7;210:3;211:4,8,20,23;212:3,12;214:22;216:12;226:3
**Ashton (1)**
81:19
**asserted (1)**
181:23
**assets (1)**
70:6
**assigned (3)**
67:2,4;71:4
**assist (1)**
150:11
**assistance (1)**
107:15
**assistant (8)**
149:9;151:18,22;163:7;164:23;165:14;188:5;192:7
**associated (1)**
114:13
**Associates (2)**
136:16,18
**assuming (1)**
85:18
**assumption (1)**
61:14
**attached (4)**
108:5;130:22;145:4;172:11
**attachment (4)**
158:2;189:25;190:1,2
**attachments (7)**
188:15,18;189:18,21;190:9;198:22;240:7
**attempt (2)**
131:14,17
**attend (7)**
78:21;80:22,24;83:10;113:9,13;162:4
**attended (6)**
78:19;80:23;81:16,17;102:12;113:12
**attendee (2)**
81:1,4
**attendees (2)**
79:13;195:5
**attending (1)**
87:24
**attends (1)**
78:14
**attention (5)**
111:16;113:24;146:17;174:9;214:4
**attorney (18)**
151:18,22;154:16;163:7;187:18,20,22;192:8,9,14,17;215:14,15;217:24;231:24;232:1,3,11
**attorneys (4)**
164:23;165:14;192:7;244:19
**attorneys' (3)**
244:9,25;246:2
**Attorney's (28)**
120:12,14,19,21;121:4;123:16;125:1,15;132:2,13;133:7;142:9;145:14;150:20;151:16;163:9;191:19;192:3;206:9,11,25;211:21;216:3;223:13;228:2;231:10,12;233:9
**Audiffred (1)**
175:8
**audit (3)**
72:5,6;176:5
**auditor (1)**
176:2
**auditors (1)**
124:19
**August (26)**
67:1,2,6;73:17,23;104:1,6;105:2,7,20;108:9,12,17,19,25;109:8,8,9,9;112:14;115:15,20,24;116:6,10,16
**aunt (1)**
197:5
**AUSA (1)**
228:5
**AUSAs (2)**
165:1,2
**authentic (1)**
99:14
**authenticate (3)**
64:12,22;98:11
**authenticity (4)**
64:13;98:20;106:23;128:13
**authority (2)**
183:21;214:13
**authorized (1)**
107:14
**authors (1)**
99:20
**available (3)**
68:20;108:9;128:7
**avoid (1)**
179:16
**aware (15)**
64:24;72:19,22;73:18;75:1;76:11;81:1;103:13;114:5;115:17;117:7,14,21;229:2,4

**B**

**back (24)**
88:9;91:5;108:15;126:12;130:12,13,16;132:5,7,9;150:13;151:9;167:8;185:12;203:24;215:17;229:5;232:6,6,21;233:2;241:4;246:10;248:15
**background (2)**
133:18;152:6
**bagged (1)**
203:22
**bank (11)**
61:9;68:5,9;127:9,18;173:13;191:12;232:23;233:7;234:10;242:1
**banking (3)**
68:4;126:20,21
**banks (1)**
124:19
**baseball (3)**
64:10;82:10;107:21
**based (11)**
63:8;76:1;81:25;83:3;86:10;96:8;98:18;108:16,24;109:5;138:10
**basic (1)**
64:15
**basis (3)**
61:10,21;213:11
**bear (2)**
97:14;99:16
**became (5)**
115:17;123:17;128:7;152:14;190:15
**Becker (1)**
150:8
**beer (1)**
87:11
**began (2)**
135:6,8
**begin (2)**
124:8;142:10
**beginning (4)**
126:12;151:24;156:11,12
**behalf (3)**
183:16;190:9;201:10
**behavior (2)**
136:24;137:1
**below (5)**
103:8;108:4;148:5,7;212:25
**benefits (2)**
183:7;233:13
**better (3)**
69:1;184:2;233:7
**beverage (2)**
88:12;109:7
**beverages (5)**
87:5,10;102:16;103:14;108:22
**Beyond (1)**
83:6
**bias (1)**
61:22
**bigger (2)**
141:2,2
**bill (1)**
104:6
**billing (1)**
191:15
**billion (1)**
70:6
**binder (1)**
91:18
**bio (1)**
75:3
**birthday (9)**
86:15,17;87:19;105:3,4;107:13;108:25;166:20;242:7

**bit (5)**
67:14;102:8;184:4;229:6;232:18
**blazer (1)**
126:8
**board (77)**
70:16,19,21,23;71:2,4,5,8,9,10,11,16,20,21;72:2,11,13,16;73:1,11,13,19,22;75:6,9;78:8,10,14,22;79:3;80:18,23;104:21;107:11;111:22;112:9,12,14;115:15;116:23;124:20;125:13;135:11,12;142:14,19,20;143:1,12,24,24;145:21;148:19,21;152:10,14,19,21;171:9,21;172:1;175:16,18;195:12;197:3;212:20;213:13;234:21,24,25;235:2,3,7;236:24;238:16;239:2;242:1
**boilerplate (1)**
90:1
**Bonsu (12)**
194:10;234:21;235:6,11,15,19;236:15;237:15;238:16;239:2,2;240:3
**book (1)**
98:25
**both (13)**
63:12;72:13;91:7;92:22;94:5;96:13;107:2;158:2;185:19;205:15;223:12;224:16;248:5
**bottom (7)**
104:8,13;105:19;107:19;198:14;220:10;239:3
**bottom-right-hand (1)**
129:21
**bound (1)**
89:8
**Brantley (2)**
175:7,15
**break (8)**
118:11;183:25;184:12;185:15;216:23;219:8;223:7;249:15
**breakdown (1)**
87:23
**breaking (1)**
183:24
**bribery (2)**
121:13;173:17
**briefly (6)**
109:11;111:17;117:4;133:18;158:22;172:20
**bring (3)**
65:8;81:9;206:11
**brings (1)**
236:10
**broad (2)**
82:5;91:1
**Broadly (1)**
191:5
**broken (1)**
139:22
**broker (1)**
136:19
**Brooklyn (6)**
64:9;82:8,9,13,13;170:14
**brought (1)**
216:1
**BSA (1)**
62:18
**building (1)**
228:2
**business (19)**
64:15;86:6;91:12,14;92:9,11,18;100:3,4;113:5;131:24;132:1;166:21;206:24;229:10;236:1,3;242:6;245:17
**buy (2)**
232:23;233:7

## C

**cable (1)**
191:15
**cafeteria (1)**
177:5
**cake (1)**
105:3
**call (37)**
66:3;83:6;99:2;131:25;132:4,7,9,11,15;142:8,10,23;151:4;162:21;163:6,8,10,13,20;164:6,9;165:6,9,15;181:3;183:18;193:17;213:9;217:17;228:8,9,18;229:2;232:6,6,13;249:8
**called (13)**
63:21;66:6;68:14,17;90:5;120:7;128:1;162:19,20;170:20;174:15;232:5;236:2
**calls (7)**
66:4;120:3;162:12;164:10;174:11;217:23;247:5
**came (11)**
61:3;74:7,8;85:4;89:18;102:18;198:8;212:12;231:10,12,20
**can (94)**
61:23;64:21;65:5;66:8;67:14;68:16;69:23;70:25;71:1,9;72:1;75:5,8;76:21,24;80:7;83:16,25;84:3;85:9;86:14;88:4;91:1,20;100:1,2;102:3,4,5,6,20;103:6,15;104:10,12,14;105:12,14;107:17;108:2,6,8,10;115:22;117:1;123:12;129:6,10;130:16;131:25;136:7;144:23;146:15;147:21;148:9;158:6;167:16,22;168:1,2,8,10;178:7,11,25;179:20;180:21;181:4;183:6,8,9,19,22;184:1;185:5;198:15;199:17;206:17,17;208:8,9;216:22;219:5;220:10;225:7,19,25;226:7;237:23;238:10,20;239:7;241:4,17
**capable (1)**
206:13
**car (1)**
229:3
**card (7)**
131:24;132:1,4;191:7;229:10;236:1,3
**career (1)**
123:6
**careful (1)**
179:15
**case (18)**
82:7;89:9;117:6;124:1,2,4;126:1,4;189:17;190:14,14,17;210:16,22,25;247:21,24;248:2
**cases (5)**
121:12,12,13,13;213:10
**cash (7)**
147:2,20;155:9;193:19;232:22;233:7,12
**categorical (1)**
98:17
**categories (10)**
70:1;88:4;90:23;91:1,6;94:22;102:6,9;161:13;174:24
**categorize (1)**
102:6
**category (8)**
161:16,19,20;167:9;175:3,19;176:3,11
**cause (2)**
149:24;233:7
**caution (1)**
179:10
**caveat (1)**
189:12
**celebrate (3)**
86:15,17;113:1
**celebration (5)**
74:9;80:3,8,15;107:13
**cell (4)**
132:10;145:3;161:9;214:14
**centennial (17)**
74:9;79:25;80:2,5,11,12,14;81:2,7;111:17;112:17,21,23;113:1,8;117:22,25
**CEO (12)**
70:22;75:14,16,18,20;76:11;124:12,13;133:21;146:23;147:25;201:10
**CEO's (1)**
147:19
**certain (8)**
64:14,16;68:20;89:7,18;139:4;226:13,14
**certainly (1)**
180:22
**certificate (1)**
107:5
**cetera (1)**
214:15
**chain (1)**
105:21
**chain-of-custody (1)**
208:17
**Chair (22)**
73:22,24;107:12;108:12;112:14;125:13;143:1;148:17,20;152:14,16,21;153:6;157:7;175:16,18;180:11;212:20;213:13;236:23;238:18;241:11
**chance (1)**
104:3
**change (5)**
70:23;71:2;114:18;157:1,3
**changed (1)**
103:18
**changes (2)**
194:4,5
**Changing (1)**
210:2
**channels (2)**
66:24,25
**Charalambous (17)**
76:20;77:15;101:13;102:3;103:19;104:12;105:12,18;107:17,23;108:6,14;129:6;144:20;146:15;158:6;198:13
**charge (3)**
85:22;124:3;247:20
**charged (5)**
61:16;138:23;160:1;169:9;247:17
**charges (2)**
169:13;179:14
**chart (8)**
100:18,22;101:7,9,18,20;136:23;139:8
**check (5)**
129:14;135:14;162:22,22;246:19
**checks (22)**
126:22,25;127:1,3,9,15;128:22;129:11;130:7,14;131:3,6;132:14;133:24;134:2;135:17;136:8;246:12;247:2,9,15,18
**cheese (2)**
190:17,19
**chief (1)**
175:14
**chosen (1)**
71:21
**circling (1)**
212:24
**circumstances (1)**
155:2
**Citibank (6)**
127:10,13;128:2,4,7,8
**city (2)**
68:18,20
**civil (2)**
162:6;243:1
**clarification (1)**
63:6
**clarify (2)**
115:23;182:7
**clarity (1)**
117:6
**clear (9)**
107:1;110:9;117:16;119:7;132:19;162:14;230:9;245:3,3
**CLERK (1)**
65:7
**close (1)**
61:11
**clothing (1)**
126:7
**cloud (3)**
174:15,17,19
**co-branding (2)**
83:9,13
**cocktail (1)**
87:8
**cocky (1)**
156:13
**Code (2)**
159:13;173:9
**C-o-g-a-n (1)**

66:9
**Cogan-Rupani (23)**
63:23;66:4,5,8,15;70:7;76:23;77:21;78:1;81:25;90:22;93:2;100:17;102:5;103:7;106:7;109:5,23;110:2;111:7;115:1;117:6,21
**Cogan-Rupani's (1)**
98:10
**Cohen (79)**
61:8,23;62:1,8,10,24;63:1;122:8,10,18;125:25;126:3;129:2;135:3;136:10;137:2;138:3,10,15,18;139:17;144:17;146:10,12;149:13;156:24;158:3;159:17,22,25;160:6,17;167:20,24;168:11;172:15;178:13;179:4,5;180:17;181:2,8,13,16,21;182:9,12;188:9;200:18;207:14;212:8;216:17;217:10,11;220:3;223:25;224:2;225:6,11,13,17,25;226:7;237:4,8,17,22;238:5,10;239:7;240:9;241:3,17;248:10,12,24;249:1;250:5,7
**colleague (2)**
133:5;145:18
**colleagues (2)**
109:12;110:10
**collected (7)**
186:7;204:11,13;205:1,7;211:9,9
**collecting (2)**
186:3,5
**collection (1)**
209:7
**College (1)**
121:17
**colleges (1)**
68:20
**colored (1)**
126:8
**combination (1)**
94:8
**coming (7)**
90:22;91:17;93:3;94:17;95:16;100:17;110:4
**command (2)**
160:19;173:22
**comment (2)**
89:16;106:11
**commenting (1)**
106:9
**commercial (1)**
152:22
**Commission (2)**
181:4;195:22
**commit (1)**
173:19
**committee (28)**
70:16,18,21,24;71:2,6,8,24;72:3,3,10,11,14,17;78:8,11,23;80:23;111:23;124:20;148:17;170:12;171:9,13;180:10;195:25;238:18;241:11
**common (1)**
226:8
**commonality (1)**
94:4
**commonly (1)**
66:19
**communicate (2)**
74:2,10
**communicating (1)**
106:2
**communication (6)**
76:1;91:4;98:19,20;115:16;167:13
**communications (14)**
67:17,18;138:6;166:10,14,16,19;167:11,14,17;175:10;183:4;242:13,20
**community (2)**
113:4,10
**commute (3)**
183:14;184:3;249:16
**company (4)**
126:25;154:16;205:23;206:1
**compare (4)**
147:16;192:19;195:5;239:3
**compared (1)**
239:8
**comparing (2)**
238:23;241:9
**comparison (1)**
241:5
**compensation (1)**
175:24
**competent (1)**
98:19
**components (3)**
83:10,14,21
**computer (1)**
199:23
**computers (2)**
161:10;210:8
**concedes (1)**
217:12
**concern (4)**
146:24;159:16;173:12,14
**concerned (4)**
157:4;166:16,19,21
**concerns (2)**
115:6;210:24
**concluding (1)**
203:23
**condenses (1)**
188:25
**conduct (4)**
138:8;186:1;195:22;226:23
**conducted (10)**
76:7;124:6;125:2,17,18;128:8;159:2;169:23;203:3,16
**conducting (1)**
176:9
**Coney (1)**
82:9
**confer (2)**
109:11;248:24
**conference (15)**
78:2,4,6,7,7,12,18;79:2,5,14,20,23;111:20;112:12;133:1
**conferred (2)**
64:10;119:5
**confirm (1)**
148:5
**confused (1)**
97:19
**confusing (1)**
185:7
**connected (1)**
234:18
**connection (19)**
88:1;121:22;124:15;125:12;159:1;169:17;170:2,6,17;174:14;203:11;204:5;206:3;211:6,10,16,20;215:8;229:21
**conservative (1)**
140:2
**consider (1)**
190:12
**consist (2)**
68:18;84:1
**consists (1)**
84:2
**conspiracy (2)**
138:23;173:19
**constitute (1)**
162:5
**consumed (1)**
114:13
**contact (11)**
136:13;142:6;143:16;145:3;151:1;163:3;215:14,15;229:5,7;230:22
**contacted (20)**
150:2,14,19;151:9;155:6,12;158:16;165:5;193:14;198:10;202:15;229:18,21;230:3,4,10,11,20;236:13,19
**contained (8)**
72:22;101:21;102:10;104:14;190:3;209:16,17;212:12
**contemplate (1)**
102:15
**contempt (1)**
162:5
**content (6)**
106:10;243:24;244:1;245:7,9,25
**contents (2)**
201:13;212:11
**continuation (1)**
107:14
**continue (2)**
107:8;241:2
**Continued (11)**
65:12;118:17;137:7;177:8;182:14;184:10;218:9;232:2;239:15;240:13;249:19
**contract (20)**
135:8;136:23,23;139:8;141:10,14;143:9,25;144:3,4,14;145:1,4,6;152:6;153:18;194:5,17,22;233:17
**contractor (1)**
175:23
**control (1)**
174:13
**conversation (16)**
117:24;134:23;143:3,15,20;146:25;153:10,12;155:8;193:13,24;194:7;226:14;228:7;233:2;241:22
**conversations (9)**
153:5,8;154:10,17;193:1,4,5,9;226:9
**convey (1)**
130:20
**cooperate (1)**
168:6
**cooperative (1)**
111:12
**coordinator (1)**
105:25
**copies (10)**
88:10,10;90:11;91:4;94:15,19;128:4;191:7;234:16;236:14
**copy (16)**
61:8;88:7;149:1,3,9,18;202:5,7,9,11,13,16,18;214:14;221:1;236:20
**corner (1)**
129:21
**correction (1)**
119:7
**correctly (2)**
61:14;198:21
**correspondence (4)**
161:21;175:4,21;176:4
**corruption (1)**
121:3
**cost (25)**
81:1,4;82:16,19,22;85:14;100:22,25,25;102:14,15,17;103:13;108:21;109:2;134:3,17,20;147:8,11,20;153:22;154:1,4;194:21
**costs (5)**
84:17,18,22;87:17;109:7
**counsel (10)**
64:11;65:2;66:11;90:1;100:6;119:6;148:23;154:14,15;181:7
**counselor (2)**
120:5;160:4
**County (1)**
183:13
**couple (1)**
62:15
**course (20)**
91:3,11,14;92:9,11;98:24;122:20,23;125:1,7,9;130:8;140:19;150:3;182:6,8,11;197:18;234:15;248:25
**court (236)**
61:1,2,7,20,25;62:7,10,19;63:2,12,16,18,20,25;64:18,25;65:4,6,8,11;66:2,10;74:21;77:13;89:3,5,15;90:22;91:17,20;94:18;95:16;96:18,23;97:9,19;98:1,4,14,23;99:6,9,13,16,19,23;100:8,17;102:1;103:4,6;106:11,15,20,23;107:4;109:13,17,20;110:4;111:4,6;114:25;115:9,12;117:3,10,12,16,18;118:2,5,9,11,13;119:1,2,10,20,22;120:1,5;122:9,11,19;123:10,13;125:21;126:2,5,6,11;127:21,25;128:10;129:3,19;130:12,16,20;131:2;135:4;136:11;137:3,6;138:2,14,22,24;139:1,18;144:18,23;146:11,13;147:4,6;

149:14;152:24;156:25;158:1,4,9;159:18,21,23;160:3,8,18;162:5;163:25;164:2;167:21,25;168:12;172:16;176:20;177:2,4;178:3,4,5,18;179:7;180:8,16,23;181:6,10,15,19,25;182:6,8,11,13;183:2,12;185:7;188:10;189:17,22,24;192:11,13;198:15,20,25;199:5,7,11,15,24;200:4,7,19;201:16,20;207:15;212:10;213:11;216:18,23;217:1,2,8,10,14,24;218:8;219:2;220:5,18,23;222:9,14,16,19,21;223:22,24;225:9,12,15;226:18,22;237:7,20;238:8,12;239:11,14;240:4,10;241:1,2,15;243:4;245:2;247:4,6,11,20;248:9,11,25;249:3,5,7,9,12,15;250:1,4,6,8
**courtroom (4)** 74:15;77:18;98:24;125:23
**Court's (4)** 76:20;77:16;88:24;89:12
**cover (5)** 158:2,23;168:13;172:20;190:25
**coverage (1)** 147:9
**covered (2)** 84:16;180:11
**covers (2)** 134:12;161:8
**CP0001 (1)** 209:3
**create (1)** 227:15
**created (3)** 83:18;128:6,7
**creation (1)** 100:18
**credibility (1)** 62:4
**Credit (56)** 66:18;67:13,19,24,25;68:1,2,5,15,17,18;69:5,12;70:3,17;71:5,12,14;72:5;73:12;75:2,15,17,20;79:15,18;80:3,15;81:21,24;82:7,8;83:2,19;84:19,23,24;85:17;87:4;90:6;104:24;106:1;107:6;115:4;123:18,21;124:12;126:13;128:5;160:10;169:12;171:5;176:15;191:7;212:21;214:5
**crime (2)** 122:4,25
**crimes (5)** 120:20,24;136:1,5;159:11
**Criminal (7)** 121:17;122:20;159:2;162:6;173:5;175:25;176:5
**cross (7)** 61:10,13,21,24;62:2,25;239:1
**crossed (1)** 179:9
**cross-examination (4)** 109:18,21;223:24;224:1
**cross-examine (1)** 61:5
**current (3)** 66:23;148:20;214:8
**currently (2)** 62:22;120:11
**custody (1)** 174:13
**customary (1)** 156:22
**Cyclones (3)** 64:9;82:9,13

## D

**DA's (11)** 208:12,20,25;209:10,19,23,24;216:20;219:14,17;223:13
**data (3)** 206:14;243:12,15
**date (24)** 100:23;116:14;127:7;129:14;132:19;135:15,18;142:1;149:16;158:10;159:7;160:21;162:3;163:1,4,19;172:18;173:1,24;207:22;213:15,17;214:19;227:24
**dated (9)** 90:20;105:20;127:1;131:3;179:2;212:17;213:4,25;241:9
**dates (7)** 95:10;100:19;102:11;108:9;235:1,18;236:12
**day (7)** 116:5;118:10;132:16,17;133:2;141:25;228:15
**days (1)** 79:6
**deal (5)** 62:10;76:16;83:17;85:18;97:11
**dealt (2)** 62:19,21
**Dear (1)** 214:4
**December (4)** 82:15;178:6,12;250:9
**decide (1)** 89:24
**decision (1)** 122:25
**decrease (1)** 136:8
**decreases (1)** 135:19
**dedicated (2)** 83:12,18
**defendant (53)** 74:20,23;79:2,19,22;81:6;86:10,16;87:18;89:6;93:8;95:13;96:10;100:19,23;104:18;105:22;106:2;107:25;108:11;126:5,10;149:1,24;164:11,14,18,20;165:17,24;166:5,10,13;167:3,12;168:19;180:10,12;183:3;186:12;187:10,19;189:13;191:3,5;192:15;196:6,15,18,21;203:8;205:20;219:3
**defendant's (34)** 61:4;64:8,20;80:18;81:20,22;87:2;90:23;93:5;95:9;96:6;101:10;105:1;109:7;179:9;185:23;187:3,7;210:18;237:7,17,21,24;238:5,9,13,14,15,17,22,25;239:8;241:5,9
**defense (14)** 61:10;62:2;64:11;119:6;179:15;180:15;182:5;217:16,22;226:19;237:8,17;238:5;250:5
**define (1)** 161:11
**definitively (1)** 179:8
**degree (2)** 121:18,19
**delayed (1)** 76:23
**delete (2)** 201:13;214:13
**deleted (25)** 166:7,25;167:3;197:12;221:10,10;222:11,16,23;242:10,12,13,18;244:15,16,20,21;245:5,10,10,13,16,16,18,23
**deletion (1)** 211:3
**deliver (3)** 206:20;209:19;216:20
**delivered (2)** 209:1;219:14
**delivering (1)** 209:10
**demanded (1)** 162:5
**demeanor (4)** 138:12;156:9;157:1,7
**deny (1)** 61:12
**department (25)** 64:6;67:2,5,8,11,12,16,20;69:9;78:17;82:1;85:25;86:11;87:14;88:7,11;96:8,14;103:25;105:25;115:2;120:14;121:6;170:21;234:12
**departments (4)** 80:9;88:1;91:8,10
**depending (1)** 70:2
**depends (2)** 217:5;226:11
**depict (1)** 77:7
**depicted (2)** 77:22,24
**deposit (2)** 68:4;69:1
**deposited (1)** 127:17
**DEPUTY (1)** 65:7
**describe (5)** 75:5,8;88:4;126:7;137:1
**described (1)** 196:2
**desire (1)** 111:11
**desserts (1)** 87:9
**detail (5)** 62:23;113:23;226:10,13,14
**detailed (1)** 73:7
**details (1)** 91:4
**determining (1)** 114:2
**develop (1)** 247:8
**development (1)** 86:7
**developments (1)** 169:1
**device (1)** 223:2
**devices (17)** 161:9;206:15,17;209:9,23,25;210:2;211:16,19;213:22;214:6,7,10,14,16;219:9;223:5
**devoted (1)** 62:10
**DFS (7)** 69:11;171:1,2,4,6,20,25
**differ (1)** 68:7
**differed (1)** 72:1
**difference (2)** 184:3;242:25
**different (15)** 74:7;83:11;87:12;88:21;113:11;130:14;131:6;184:13;195:1;200:16;213:2;219:8;224:17;240:6;248:14
**digest (1)** 212:19
**digital (3)** 66:24,25;68:4
**direct (15)** 62:23;66:13;110:18;115:19;120:9;160:23;184:10;225:2;231:2;232:20;234:10;238:24;246:11;249:10,12
**directed (1)** 200:5
**Directing (2)** 146:17;174:9
**directly (4)** 74:4;76:16;115:3;187:17
**Director (7)** 66:24,25;67:9,11;82:1;107:11;110:22
**directors (28)** 70:16,19,21;71:5,8,9,10,11,12,16;72:2,11,16;73:1,12,14,19,22;75:6,9;78:8,10,14,23;80:23;111:22;171:10,21
**directors' (1)** 72:13
**disability (25)** 133:19;134:6;

141:18;145:7;146:23;147:1;148:12;152:7;153:2,6,20,22;154:18;155:10;161:17;192:23;193:2,15,19;194:1,8,18;220:22;232:23;233:6
**disagree (1)**
64:11
**disband (1)**
171:11
**disbanded (3)**
171:9,13;234:25
**disbanding (2)**
171:20,25
**disclosure (1)**
179:23
**discount (1)**
140:2
**discuss (6)**
141:10;143:5;150:22;154:7,10;156:17
**discussed (19)**
107:12;133:17,18;147:9;152:5,6,11;153:3,23,24;154:5,8,9;163:11,20;165:15;194:5,15,23
**discussing (3)**
139:3;158:15;244:1
**discussion (1)**
241:25
**discussions (1)**
181:4
**displayed (1)**
76:24
**disregard (1)**
135:5
**distributed (1)**
117:23
**distribution (1)**
85:22
**District (10)**
120:13;122:12;123:17;160:24;183:17,21;206:9,11;211:21;216:3
**dividing (1)**
136:7
**doctor (1)**
183:10
**document (51)**
97:18;103:25;106:3,4,13;139:21;140:1,5,5,8,10;141:6;144:10;146:4,17,18;149:6,23;155:3,6,13,20,23,24,25;156:2,3,4,6;158:1;172:8;180:5,20;181:7,8;188:2,16;199:22;207:20,22;208:7,9,14,16;212:22;214:21,23,25;237:12,14,25
**documentation (2)**
91:5;143:2
**documents (88)**
92:14;95:8;97:12;98:9;106:8,16,25;123:1;128:18;139:5,7,11,14;141:12;143:13,21,21,23;144:1;145:23;147:5;150:1,3;154:23,25;155:14;160:20;161:8,11,17;162:23;164:5,17,19;165:18,19;167:9;173:23;174:12;175:3,19;176:4,12,24;184:20,22,25;185:3,9,10,13,19,24;186:15,25;187:1,10;188:15;189:1,7,13,13,14,15,16;190:2,7,8,13;191:5;196:2,3;198:22;204:14;207:8,24;209:7;211:23;212:3;214:16;216:7;221:23,24;228:10,13,19;241:23;242:1
**dollars (1)**
82:24
**domain (1)**
99:17
**donations (1)**
176:13
**done (6)**
88:15;114:3;167:6;176:8;190:21;209:18
**door (1)**
179:13
**down (14)**
73:24;74:3;75:9;76:12;79:2;108:12;139:22;161:19;195:17;212:24;226:7;231:10,12;241:17
**Downtown (2)**
123:24;132:23
**draft (3)**
180:19;181:23;212:17
**drinks (2)**
84:13,25
**Drive (4)**
184:1;209:13,15,19
**drives (1)**
161:10
**driving (1)**
229:3
**drop (1)**
228:13
**dropped (3)**
229:10;236:1,3
**due (1)**
74:3
**duly (2)**
66:7;120:8
**during (59)**
64:4,5;67:4,7;73:18;78:24;82:12;101:10;115:1;125:1;130:8;132:11,15;133:15,23;136:12,20,24;141:10;143:15,20;145:19,23;153:21;154:10,22;155:14;156:9,17;163:10,20;165:13,15;192:22,25;193:8,17;194:15,19;195:11,21;196:18;197:6,13,18;202:1,4;219:22;221:3;229:2;231:9;232:19;233:15,25;241:22,25;242:5,17;248:5
**Durrah (2)**
175:7,17
**duties (1)**
67:10
**duty (2)**
92:18;94:14

## E

**earlier (6)**
155:16;185:15;190:6;203:10;204:7;221:9
**early (2)**
231:18;232:13
**easier (1)**
147:21
**easy (1)**
183:22
**Ed (1)**
178:24
**education (1)**
68:4
**effect (2)**
89:17;119:24
**effective (2)**
107:12;147:20
**effectively (1)**
114:9
**efficient (4)**
63:14;65:4,6;180:2
**efficiently (1)**
101:9
**Eisner (2)**
175:22;176:1
**either (7)**
144:1;153:14;179:11;183:21;192:19;243:21,22
**election (1)**
71:22
**electronic (10)**
161:9;210:24;211:16,19;214:5,7,14,16;219:9;241:16
**electronics (11)**
125:4,19,22;204:14;205:12;206:1,6,7;210:6,7;214:17
**elevated (2)**
195:15,18
**elicit (1)**
180:22
**eligibility (1)**
70:3
**eligible (1)**
71:19
**else (15)**
69:10;85:19;117:3;119:24;130:24;133:8,8;150:22;151:17;167:22;168:8;193:21;216:2;230:3,23
**email (34)**
64:21;74:1,2,12;91:4;93:22;94:2,7,22;95:3;96:14;98:12;99:16;104:14,17;105:1,15,20,21,21;106:2,10,19;107:6,20;108:4,17;116:6;187:16;188:5,8,18;198:22;210:21
**e-mail (20)**
144:5,6,7,13,24;149:9,16;157:22;158:2,10,16,17,20;166:1,4;172:11,18;240:8;242:2,4
**e-mailed (1)**
242:6
**e-mailing (1)**
158:12
**emails (41)**
64:17,19,22;75:3;93:2,5,8,11,14,20;94:11,15,17,18,22;95:1,2,5,9,21;96:2,4,6;98:11,16;99:2,14,20,21;106:8;116:4;186:17;187:2,3;189:10;191:7;210:11,23;211:3;214:15;215:25
**e-mails (12)**
125:4;161:22;164:11,13,17;165:25;166:3;174:12;175:4,21;223:18;242:10
**embezzlement (3)**
121:12;169:10,12
**employee (9)**
63:24;64:3;68:18;69:22,25;93:13;111:11;116:23;175:23
**employees (11)**
64:23;72:17;80:24;93:10,19;94:7;95:2;96:1;99:21;160:9;214:8
**employer (1)**
134:25
**employment (4)**
144:14;145:1,6;233:17
**enabled (1)**
80:24
**enclosed (1)**
144:25
**end (7)**
62:12;82:21;86:22;139:4;152:18;187:10;231:23
**endeavor (1)**
89:10
**endeavoring (2)**
65:4,6
**ended (2)**
94:5;95:13
**ending (1)**
95:3
**enforcement (1)**
156:23
**engaged (4)**
61:16;131:9;187:19,22
**Enjoy (1)**
177:4
**enough (1)**
250:2
**entered (1)**
225:13
**entities (1)**
124:18
**entity (4)**
68:22;122:17,25;154:16
**entries (3)**
92:14,18;103:7
**Epstein (1)**
150:8
**erased (1)**
222:1
**essential (1)**
62:1
**establish (1)**
138:5
**established (1)**
89:8
**estimate (1)**
109:5
**et (1)**
214:15
**Ethics (1)**
195:25
**even (4)**
61:11;179:16;232:1;244:8
**evening (1)**
132:8
**Event (10)**

79:25;80:2,5;81:1;
88:18;102:14;104:6;
116:11;196:14;200:16
**events (7)**
64:23;80:9;87:5,18,
18,19;95:12
**event's (1)**
88:21
**everybody (2)**
66:2;81:17
**evidence (94)**
63:8,22;77:11,14;
88:24;89:2,4,12,14;
90:14,19;91:2;92:21,
24;100:15;101:24;
102:2;103:21;106:7;
107:18;119:12,19,22;
122:4,24;127:20,22;
129:1,5;138:6;139:16,
19;144:19;146:9,14;
149:12,15,22;157:25;
158:5;170:5;172:14,
17;188:11;190:20,24;
203:21,22,24,25;204:2,
11,13,17,20,21,21,24;
205:1,7,8,19;206:20,
23,24;207:11,13,17,21;
208:10;210:15,24;
211:8,9,9,12,13,14;
212:7,14;215:17;
216:16,19;225:9,16,19,
20;237:18,21;238:6,9;
247:1,8;248:6
**Evidence-received (1)**
216:10
**evidentiary (1)**
218:6
**evolved (1)**
70:12
**exact (4)**
203:3;236:12;
243:18,20
**exactly (3)**
98:25;185:11;239:3
**examination (6)**
62:23;66:13;110:18;
120:9;184:10;226:20
**examine (1)**
66:11
**example (6)**
129:7,14;167:19;
174:19;190:13;246:3
**examples (1)**
244:18
**except (6)**
98:6;181:25;234:16;
239:1,4;242:6
**excepted (1)**
119:12
**exception (1)**
96:15
**exceptions (3)**
97:11,11,15
**exchanged (1)**
162:12
**excluded (1)**
96:21
**excluding (1)**
96:20
**excuse (6)**
92:23;113:7;114:6;
115:7;220:18;222:9
**excused (6)**
118:6,7;177:6;249:5,
6,18
**executed (3)**
125:3;169:23;210:10
**executing (1)**
203:19
**executive (3)**
126:24;183:18,21
**Exhibit (115)**
76:22;77:3,11,14,16;
89:1,4;90:18;97:1,12,
21;98:4;101:15,23;
102:2,10;105:13;
107:18;108:15;127:22;
128:6;129:4,7;139:15,
19,20;141:3;144:9,15,
19;146:3,8,14,16;
149:5,11,15;155:18;
157:18,24;158:5;
159:4;172:7,13,17;
178:5;180:3,4,18,18;
188:1,11;189:5,25;
190:1;191:1;207:6,7,7,
12,19;208:15;209:6,
12;212:1,6,16;213:4,
19;214:23;216:6,15,
19;224:23;225:7,19,
21;226:1,2,4,4,5;
229:14;233:1,8;234:2,
17;235:15;236:20;
237:5,11,17,21,24;
238:5,9,13,14,16,17,22,
22,23,25;239:8,9;
241:5,5,7,9;246:15;
247:2,7,12,14
**exhibits (46)**
63:22;90:7,15;91:18,
19,23,25;92:3,9,12,23;
95:17;96:15,25;97:1,2,
21;98:12;100:10;
101:3,4,6;119:4,5,11,
12,14,17;128:3,18,25;
139:10;189:17;190:4,
23;207:16;209:5;
212:9,10,13;217:18,21;
218:5;237:7,8;247:7
**existed (1)**
73:3
**exit (1)**
203:23
**expand (1)**
67:14
**expect (1)**
64:21
**expenses (1)**
102:11
**expensive (1)**
232:22
**experience (6)**
96:8;126:24;134:24;
136:7;156:22;242:25
**explain (18)**
69:23;71:1,10;72:1;
80:7;83:16,25;85:9;
86:14;102:6;103:15;
140:5;168:8;197:11;
201:8;203:18;208:9;
209:15
**explained (2)**
158:18;168:18
**explaining (1)**
158:17
**Explains (4)**
167:18;168:4,6;
178:8
**extended (1)**
134:13
**extent (3)**
68:23;71:1;83:15

**F**

**facilitates (1)**
107:1
**facsimile (1)**
130:22
**fact (20)**
68:6,7;110:19,22;
114:13;130:9;131:10;
138:4,15,18;180:6,9,
24;185:10;212:11,12;
213:11;231:6;232:5;
235:6
**factory (1)**
214:13
**facts (2)**
89:7;217:12
**failing (1)**
178:12
**Failure (1)**
162:4
**fair (1)**
217:14
**fairly (2)**
77:7;101:20
**false (1)**
160:11
**falsity (1)**
190:11
**familiar (24)**
69:17;70:7;71:15;
72:19;73:5,8;75:11;
78:1;79:25;83:15;
113:22;123:3;134:9;
140:13;150:8,10;
159:14;170:20;171:2;
173:10;174:17;205:23,
25;210:12
**family (1)**
114:23
**far (3)**
121:14;235:17;
247:21
**FDNY (2)**
68:19;70:1
**FDR (1)**
184:1
**February (2)**
151:7;209:21
**February/March (1)**
76:10
**federal (22)**
75:23;76:4;90:14;
120:17,18,20;121:8,22;
122:5,7;135:23;
138:12;159:3,11;
160:12;206:3;229:20;
230:4,6,10,23;234:7
**federally (1)**
69:2
**feel (1)**
145:2
**fees (1)**
68:25
**felony (1)**
159:2
**felt (1)**
138:16
**few (4)**
91:23;97:17;103:7;
109:25
**field (1)**
165:2
**Fifteen (1)**
118:14
**figures (1)**
139:22
**files (2)**
188:25;189:2
**Fill (1)**
206:23
**filled (1)**
203:21
**filling (1)**
207:2
**final (1)**
88:20
**financial (9)**
68:2,4;69:9;72:7;
120:24;135:25;170:21;
175:14;234:13
**find (4)**
89:8;184:1;188:15;
247:22
**firm (2)**
150:8,11
**first (59)**
63:21,23;66:3;89:3,
12;96:18;103:7;
107:18;118:10;122:19;
129:9,10;131:14;
139:20;140:1;158:8,
24;161:7,16;165:8;
167:7;168:24;169:22;
175:3;179:19;184:15,
24;185:12,13,16;
189:19;191:2;193:12;
195:7;201:16;205:1;
207:19,19;208:22,23;
212:16;213:7;214:2;
220:2;221:5,17,19,25;
222:2,14;224:21;
228:10;230:22;231:9;
232:19;233:4;235:22;
237:10;241:23
**five (6)**
70:11;72:3;79:6;
86:18;145:1;175:2
**flag (2)**
63:20;65:3
**flash (1)**
161:10
**fluctuate (2)**
82:17;147:21
**fluctuated (1)**
82:18
**focus (4)**
64:4;104:12;124:23;
199:17
**focused (3)**
124:22,24;126:16
**focusing (3)**
71:7;86:10;107:18
**folks (4)**
72:10;79:9;98:25;
190:6
**follow (1)**
206:19
**followed (1)**
94:9
**following (3)**
91:17;96:15;97:21
**follows (2)**
66:7;120:8
**food (16)**
84:13,24;85:2;86:3;
87:5,7,22;88:6,8,12;
91:4;102:16;107:12;
108:5,22;109:6
**foreclosure (2)**
152:23;195:17
**forensic (1)**
209:17
**form (9)**
68:25;87:22;88:15,
21;99:14;134:2;245:2;
247:6,18
**formal (5)**
152:4;227:13,15,16,
20
**format (3)**
188:22,23,24

**former (8)**
73:11;75:14;104:24;125:13;175:16,18;214:8,9
**forms (4)**
91:3,3;203:21;216:10
**for-profit (1)**
68:10
**forth (1)**
71:19
**forward (1)**
179:15
**found (6)**
92:12;161:9;197:19;214:22;247:1;248:5
**foundation (2)**
64:15;100:3
**four (9)**
79:6;86:18;103:3;161:15;175:1;176:3;212:10;231:6;248:16
**fourth (4)**
84:3;161:19,20;167:9
**frame (1)**
236:11
**fraud (5)**
160:13;173:13,15,16,19
**frauds (1)**
121:12
**fraudulent (1)**
160:15
**free (1)**
145:2
**frequently (3)**
78:12;86:16;114:23
**Friedberg (5)**
205:23;206:3;208:4;209:18;219:14
**Friedland (1)**
178:24
**friends (1)**
114:23
**front (2)**
91:18;178:19
**full (6)**
89:13;91:25;118:11;142:20;143:25;145:21
**Full-time (1)**
212:20
**functions (2)**
67:12;72:5
**funds (1)**
71:13
**further (8)**
90:13,17;109:15;118:1;145:2;223:23;249:2;250:1
**furtherance (2)**
149:25;160:14
**future (2)**
140:3,4

## G

**Gagliardo (8)**
170:11;171:14;175:6;176:14;179:14;205:21;248:3,7
**Gagliardo's (7)**
170:10,13,18;171:18;204:8;205:7,15
**gala (18)**
74:9;80:11,12,14,15,17,20,22;81:2,7,16,20,23;112:21,23;113:9;117:22,25
**game (3)**
84:4;87:24;88:14
**games (3)**
83:11;88:13;102:12
**gave (23)**
114:23;147:17;149:23;198:6,7;200:10,12;215:1;224:22;233:20,21;234:18;235:14,17;237:1,15;238:2,15,24;241:8,10;244:17;250:2
**general (13)**
84:5;121:7;122:2;133:17;148:23;152:5;154:14,15;224:12;226:23;227:1,5;242:25
**generally (13)**
76:3;88:12;110:15;113:5;122:7;128:21;134:19;146:24;175:19;196:2;203:4;208:9;209:6
**gentlemen (1)**
96:23
**George (1)**
213:9
**getaway (1)**
183:25
**gets (1)**
119:23
**gifts (1)**
176:12
**Giovanni (10)**
148:15,16;153:15;175:6;176:14;194:10;236:16,23;238:17;241:11
**given (6)**
176:13;178:16;209:23;233:1;236:14;244:8
**giving (6)**
157:8;235:9,13;244:19,24;246:2
**glance (1)**
89:15
**goal (2)**
113:1,8
**God (4)**
244:4,19,24;246:1
**goes (8)**
107:2;138:15,20;179:24;181:1;182:10;183:17;184:2
**Good (11)**
61:2;63:19;66:2,15,16;109:23,24;120:11;177:2,3;250:6
**governed (2)**
114:6;180:14
**government (136)**
61:8,15;66:3,4,6;76:22;77:2,10,11,16;89:1,6;90:6,18;91:19,25;92:23;95:16;96:15;97:1,1,2,12,21;98:4;101:15,23;102:10;105:13;107:18;108:15;111:8,12;114:21;120:3,7;127:19;128:2,5,25;129:7;138:20;139:9,15,15,20;141:3;144:9,15,15;146:3,8,8,16;149:5,11,11;155:18;157:18,24,24;172:7,13,13;178:8,23;180:4,18,18;181:25;183:16;188:1,8;189:5,12,25;190:1;191:1;207:6,7,7,12,12,19;209:6,12;212:1,6,6,16;213:4,19;214:23;216:6,15,15;224:23;225:4,7,8,19,21;226:1,1,4,4,5;227:17;229:14,20;230:4,6,10;231:4;232:25;233:8,20;234:2,17;235:10,15;236:15,20;237:2,5,11;238:21,23;239:8;241:5,7;246:15;247:2,7,12,14
**government's (28)**
61:3,12;62:4;63:23;77:14;89:4;100:10;102:2;110:5;127:22;129:4;139:19;144:19;146:14;149:15;158:5;172:17;179:2,19,22;185:2,23;188:11;190:23;207:16;212:13;216:19;249:7
**Graduate (2)**
121:15,16
**grand (55)**
121:23;122:2,3,5,7,12,16,24;123:2,3,5;124:6,15;125:2,17;157:9,14,23;158:18,23,25;159:3,6,11,12,19;160:19;162:8,24;163:4,10,15,19,23;165:18,20;167:7,8;168:20,24,25;169:15;172:3,11;173:22;176:23;186:21;187:9;188:6,13;190:10;228:10,11,19;243:1
**grandkids (4)**
244:12,19,25;246:2
**gray (1)**
74:17
**grayish (1)**
126:8
**great (1)**
62:10
**greater (2)**
226:10,14
**Green (3)**
150:8;190:16,19
**gremlins (1)**
241:16
**grievances (1)**
179:3
**grind (1)**
218:3
**grinds (1)**
217:25
**Ground (3)**
111:4;115:9;247:4
**group (5)**
68:18;69:25;71:11;74:1;122:3
**groups (1)**
69:22
**guarantee (1)**
72:7
**guess (3)**
84:22;208:23;217:5
**guests (5)**
80:25;81:9,15,22;113:13
**Guzman (3)**
133:5,6;145:18

## H

**half (5)**
93:15;105:19;107:19;133:14;151:20
**hallway (1)**
65:7
**hamburgers (1)**
87:8
**hand (3)**
61:12;205:6;236:8
**handed (1)**
236:6
**handle (1)**
206:17
**handwriting (2)**
212:22,24
**handwritten (6)**
126:22,25;128:22;132:14;133:24;134:2
**happened (8)**
70:15;73:23;75:19;85:9,9;131:23;152:18;193:25
**happens (4)**
204:1;226:12,15,16
**happy (2)**
65:10;105:4
**hard (3)**
209:13,15,19
**head (6)**
64:5;126:24;133:10;154:16,16;249:16
**header (2)**
94:21;105:14
**health (1)**
70:2
**hear (4)**
93:15;126:2;146:11;249:11
**heard (3)**
134:24;151:9;159:22
**hearsay (7)**
180:21,25;181:9,10,17,22;247:5
**held (6)**
73:18;78:12,24;79:7;80:20;128:5
**Help (3)**
111:14;183:25;243:20
**helpful (2)**
160:7;182:10
**helping (1)**
247:17
**hereby (2)**
100:1;162:4
**herself (2)**
151:23;242:20
**Hi (2)**
108:4;144:25
**high (1)**
88:4
**higher (1)**
69:1
**highest (1)**
121:18
**high-level (1)**
102:5
**highlight (1)**
180:13
**Hilton (1)**
80:21
**himself (1)**
151:23
**hint (1)**
118:13
**hired (2)**
150:11;206:1
**hmm (1)**

129:19
**hold (1)**
73:21
**holder (1)**
127:13
**home (12)**
131:18,19,24;132:4;170:13,18;171:18;178:21;203:15;211:5,20;212:4
**homes (1)**
203:13
**Honest (2)**
173:15,16
**Honor (105)**
61:19,23;62:1;63:1,7,10,17,19;64:2;65:10;66:12;74:19;77:10,12;88:23;89:10;92:21;96:12,17,22;97:5,14;98:8,22;99:8,12,15,18,22;100:7;101:23,25;103:5;106:6,14,18,22;107:3;109:11,15,19;117:1,4,11,17,19;118:1,4,8,10,11;122:8,10,18,23;126:3;127:23;129:2;130:19;136:10;137:2,4;139:17;144:17;146:12;149:13;158:3;159:17,25;160:6,17;167:20,24;168:11;172:15;178:14;180:2,17;181:2,13,16,21;182:3,9;185:11;188:9;199:21;200:2;207:14;216:17;219:6;220:3;223:21,25;225:10;226:19;241:3;247:13,22;248:10,24;249:2,4;250:5,7
**Honorable (1)**
188:12
**Honor's (3)**
180:12,15;212:8
**hope (2)**
63:22;179:12
**hopeful (1)**
183:24
**horrible (2)**
183:15;184:3
**hospitals (2)**
68:20;70:2
**host (2)**
121:13;166:20
**hotdogs (1)**
87:8
**hotel (7)**
79:9,11,12,16,16;178:23;183:17
**hour (2)**
133:14;151:20
**hours (3)**
88:14;178:21;231:13
**house (3)**
180:6;212:12;246:8
**housekeeping (2)**
62:15;119:4
**human (1)**
133:10
**hundred (1)**
80:4
**Hundreds (3)**
122:1;123:7;224:3
**hundredth (1)**
113:2
**hyphen (1)**
66:9

**I**

**iCloud (4)**
125:4;174:20;210:11;223:1
**ideal (1)**
183:8
**identical (9)**
94:18;225:3;226:5;234:16;235:10,15;236:15;237:2;241:12
**identification (28)**
76:21;92:3;101:14,24;103:22;125:25;126:4;128:15;139:9;144:8;146:2;149:5;157:17;172:7;187:25;189:5;199:25;200:5;207:6;216:5;220:9;225:7,8;237:5,9,11,24,24
**identified (11)**
74:20;96:25;97:12;98:9,13;126:10;132:12;150:19;165:21;201:22;209:3
**identify (6)**
126:4;132:1;141:8;142:23,25;151:23
**illustrate (1)**
190:5
**image (1)**
214:14
**images (1)**
209:17
**Imagine (1)**
190:13
**immediately (4)**
107:12,24;186:11;214:11
**impacted (4)**
123:2;185:2,9,23
**implemented (1)**
103:16
**important (3)**
227:8,9,19
**inaccurate (1)**
233:11
**inadvertently (1)**
97:5
**incapable (1)**
106:20
**include (14)**
97:9,18,20;102:17;121:11;167:14;171:14;173:5;186:17;187:3,7;203:13;204:15;207:24
**included (10)**
75:2;83:22;84:11;85:12;98:1,5;119:17;121:11;245:13,15
**includes (1)**
102:16
**including (16)**
68:3;73:3;94:22;105:2;138:7;145:1;161:9,21;174:12;175:4,21,23;176:4;208:11;214:6,9
**incomplete (2)**
185:25;186:1
**incorporation (1)**
107:5
**increase (2)**
103:13;114:12
**increased (1)**
103:10
**incur (2)**
108:21;109:2
**incurred (3)**
101:1;102:12;109:7
**indeed (1)**
138:5
**indescribable (1)**
177:5
**indicate (4)**
104:14;114:22;147:8;159:11
**indicated (2)**
96:20;105:6
**indicates (1)**
203:21
**indict (1)**
122:25
**indicting (1)**
122:16
**indifferent (1)**
62:13
**individual (8)**
68:14;73:5,8;75:11;87:24;106:9;122:16;236:16
**individuals (3)**
71:11;72:4;113:11
**indulgence (1)**
89:13
**inferred (1)**
61:15
**inform (3)**
101:9;106:5;107:10
**information (14)**
94:21;101:21;102:6,9;128:7;136:13;143:16;185:25;186:1,3,6,7,23,24
**informed (1)**
122:21
**informing (1)**
213:10
**initial (1)**
179:21
**initially (4)**
126:16,19;129:8;240:6
**inquire (1)**
109:19
**inquired (1)**
183:16
**inquiry (1)**
183:15
**inscription (1)**
105:4
**inspection (1)**
97:20
**Inspector (1)**
121:7
**instances (1)**
103:11
**instead (6)**
134:25;141:18;147:24;153:19;228:18;233:7
**instituted (1)**
114:18
**institution (2)**
68:2;69:2
**instruct (2)**
159:24;160:4
**instruction (5)**
161:7;174:9,14;182:4,10
**instructions (5)**
122:22;161:5;174:4,6,8
**insurance (27)**
134:7,9,12,17,20,25;136:19;141:19,22;145:7;146:23;147:9,24;148:12;153:6,19,20,23;154:18;161:18;192:23;193:2;194:1,18,22;232:23;233:8
**insured (1)**
69:2
**intend (5)**
62:25;64:7;118:11;119:18;180:3
**intended (2)**
217:17,18
**intent (2)**
179:24;182:2
**interacting (2)**
74:7;75:3
**interest (1)**
140:2
**interface (1)**
67:20
**interim (2)**
71:4;76:11
**internal (6)**
72:6;76:7;175:25;176:5,7,9
**internet (1)**
160:14
**interview (75)**
130:1,5,9;131:10,14,17;133:2,4,13,15,17,23;136:24;138:5,7;139:3,4;141:10;142:16;145:13;151:13,17,19,21,24;152:3,5;154:22;155:14;156:9,11,17,23;157:9;164:20,22;165:12,13;191:25;192:4,6,19,25;195:11,21;196:18;197:6,13,19;198:17;202:1,4,10;219:22;221:3;222:4;224:6,9,12,16,21;226:8;227:5;231:9,18,20,23;232:19;233:16,25;242:5,18,22;243:23,24
**interviewed (3)**
138:12;145:9;215:1
**interviewing (2)**
226:25;227:2
**interviews (13)**
124:6;125:2,17;191:23;192:20;193:8;203:2,7;221:7;224:4,16;248:15,19
**into (27)**
62:23;63:22;77:10;88:24;89:2,11,13;90:19;91:17;92:21;101:24;102:14;111:8;119:12,19;127:20;129:1;136:7;139:16;146:9;157:25;172:14;207:13;212:7;216:16;237:18;238:6
**introduce (3)**
138:6;180:4;217:19
**introduced (1)**
190:8
**introducing (1)**
75:3
**Investigate (3)**
120:20,24;122:7
**investigated (3)**
76:4;155:7;168:15
**investigating (4)**
124:8;126:19;135:25;159:12

**investigation (59)**
62:18;76:7;111:8;123:18,25;124:3,16,22;125:1,7,9,15;126:13;129:25;130:8;131:10,15;140:19;149:25;150:3,12;159:2,20;167:17,23;168:3,7,17;169:1,17,20;170:7;171:3;175:25;176:5,5,7,8,9;185:2,23;186:1;197:18;203:11;204:5;206:3;227:9,21;229:21;230:12,16,19,24;234:3,7,16;247:8,25;248:3
**investigations (6)**
121:10,11,23;226:24;230:19;248:5
**investigative (1)**
124:25
**investigator (3)**
121:8;135:23;167:16
**investigators (3)**
75:23;76:4;160:12
**investigatory (3)**
125:6,10,14
**invited (1)**
80:25
**invoice (1)**
88:20
**invoices (2)**
88:8;91:5
**involve (1)**
125:10
**involved (3)**
121:23;123:17;135:25
**involves (2)**
160:11,13
**involving (2)**
169:1;179:14
**iPads (1)**
214:6
**iPhone (39)**
197:14,16,19,22;198:4,7,9,10,25;199:2,7,10,19;200:10,12,13,20,22;201:1,2,3,6,11,13;202:19;207:25;208:11,25;209:17;216:12;219:11,23;220:14;221:10;222:1,2,12,24;246:6
**iPhones (2)**
209:8;214:7
**irrespective (1)**
190:10
**Island (2)**
82:9;131:20
**issuance (1)**
157:14
**issue (4)**
63:20;119:4;138:9;181:7
**issued (8)**
93:22;94:7;124:15,18;159:1;172:4;186:22;214:8
**issues (1)**
195:17
**item (2)**
207:24,25
**itemized (1)**
104:5
**items (7)**
87:23;88:18;162:4;176:13;204:1;208:3,11
**iWatches (1)**
214:7

## J

**Jackson (19)**
120:4,6,11;144:25;147:7;184:9;198:16;224:3;225:18;226:3,8,23;237:10,23;238:13,23;240:6;241:7;245:4
**James (3)**
119:23;175:7,17
**January (38)**
130:4;131:16;132:20;142:2;144:13;145:12;149:17;150:17;153:1;161:22;174:23;220:16;229:7,11,15,17,17,22,24;230:3,12,20,24;233:1;234:19;235:16,17,23,24;236:2,3,4,6,8,10,13;238:15;241:9
**Jay (1)**
121:17
**jinxing (1)**
217:2
**job (1)**
227:19
**John (1)**
121:17
**join (1)**
70:3
**joined (1)**
75:2
**joining (1)**
121:4
**Joseph (6)**
170:10,11;175:6;176:14;205:21;248:3
**Judge (34)**
73:11;74:1,2,11,17,23,25;75:1,4,5;77:6,25;81:6;104:9;105:6,16;107:15;108:16;115:14,16;151:5;152:22,25;156:21;180:20;181:5;188:16;190:17;195:16,19;212:20;213:9;214:4;246:18
**judgment (2)**
217:23,25
**Judicial (3)**
181:4;195:22,25
**judiciary (1)**
213:13
**July (23)**
129:15;187:14;192:1;195:11;198:18,19,20;199:5,6,11;213:5,15;219:22;221:7;222:3,4,11;224:17;243:6,23,24;245:4;246:5
**jump (1)**
104:2
**jumping (1)**
90:4
**June (34)**
75:19;108:7,10;116:7,9;146:25;162:10,11;164:21;165:6;168:23;171:24;172:4,19;173:2,25;176:24;186:13;191:6,20;193:7,9,25;194:12;195:8;213:25;214:19;215:1;222:2;232:8;241:18;242:5,17,22
**juries (2)**
122:5,7
**Juror (4)**
178:4,20;183:11,16
**jurors (4)**
66:2;183:2;219:2,4
**jury (89)**
61:1;65:7,8;66:1;69:24;83:15;89:5;98:15;101:10;102:4;103:6,23;119:1,2,25;120:1;121:23;122:2,3,12,16,21,24;123:2,3,5,13;124:6,15;125:2,17;129:8;135:4;141:4;144:23;157:9,14,23;158:7,18,23,25;159:3,6,11,12,20,24;160:5,19;162:8,24;163:4,10,15,19,23;165:18,20;167:7,8;168:20,24,25;169:15;172:3,11;173:22;176:23;177:6;178:3;180:1,14;183:1,5;186:21;187:9;188:6,13;190:10;217:1;219:1;225:20;228:10,11,19;238:10;243:1;249:18
**jury's (1)**
65:5
**Justice (3)**
120:15;121:17;173:21

## K

**Kam (89)**
75:11,13,14,16,22;76:12,16;77:6,8,23;85:24;104:13,18,22;105:16;107:14,25;108:11;110:19;114:3,9,18,22;115:2;116:13,19;124:10,11,22;126:16,20;127:16,18;128:22;129:17,24;130:1;131:10,14,24;144:22;146:19;147:17;148:20;149:9;152:6;161:18,22;166:9;167:4,11;168:16;169:6,23;170:19;175:5,24,25;176:6,13;191:7;192:23;193:1,14;194:1,17;197:22;199:4;200:10,12;202:2,5,22,23;205:15,20;209:8;214:9;220:6,21;224:22;225:22;229:10;230:19;238:14,24;241:8,10;247:25
**KATZ (3)**
249:8,11,14
**keep (7)**
91:11,15;92:8,12;167:2;183:6;242:20
**Ken (2)**
195:8,9
**kept (1)**
88:7
**Kibitel (3)**
104:18,23;107:20
**kickback (1)**
121:13
**Kickbacks (1)**
173:17
**Kim (3)**
133:10;153:13;175:6
**kind (2)**
190:14,14
**kinds (2)**
121:10;160:9
**knew (5)**
194:1;230:15;247:1,9,15
**knowledge (17)**
61:15;82:21;86:4;94:7,11,14,21;95:5,21;96:4;99:21;104:20;108:21;113:13;116:22;230:11,18
**known (4)**
63:3;66:19;113:4;192:17
**Kohn (2)**
76:15;213:23

## L

**lab (6)**
206:9,12,12,13;209:19;216:3
**labels (1)**
203:20
**Labor (1)**
121:6
**laboratory (1)**
216:21
**ladies (1)**
96:23
**Lambert (2)**
175:6,13
**land (1)**
217:6
**language (1)**
90:2
**laptop (1)**
161:10
**large (2)**
188:25;206:14
**largely (1)**
91:23
**Las (4)**
79:8,17;112:5;196:7
**last (18)**
61:3,8;66:9;70:11;73:18;102:8;105:9;133:13;151:19;161:19;176:11,16;178:21;183:14,15;208:14,15;217:16
**Lastly (1)**
63:6
**later (10)**
108:25;132:8;164:11,14,18;178:11;183:7;215:18;236:9,10
**laundry (1)**
179:3
**LaVale (3)**
120:4,6;184:9
**law (4)**
122:20;150:11;162:7;213:14
**lawyer (1)**
231:21
**lay (1)**
64:15
**layer (1)**
84:3
**lays (1)**
161:4
**lcogan-rupani@nymcuorg (1)**
94:3
**leadership (2)**
70:7,19

**leading (2)**
71:7,16
**leads (1)**
157:6
**league (1)**
82:10
**learn (5)**
75:25;76:9;197:21,
21;199:1
**learned (7)**
75:22;76:3,6;110:19;
111:7;197:22;230:2
**learning (1)**
229:25
**least (1)**
113:15
**leave (2)**
231:18;248:19
**leaving (1)**
112:12
**led (3)**
151:21;157:14;
165:13
**left (8)**
74:17;77:24;112:8;
115:14;131:24;132:4;
184:7;242:1
**legal (5)**
122:21;154:19,21;
188:5;193:22
**lengthy (2)**
63:15;183:12
**Leo's (1)**
105:4
**less (3)**
100:25;138:19;
232:22
**letter (15)**
61:3,7,8;63:9,11;
94:8;158:23,24;
172:21;179:2,19;
213:20,21;214:3;240:8
**letters (4)**
61:15;63:13;175:4,
21
**letting (2)**
63:10;215:15
**level (1)**
88:4
**liability (1)**
140:10
**liaison (1)**
80:10
**Licette (4)**
105:22,24;106:4;
107:10
**lied (2)**
138:11,19
**lieu (4)**
147:2;155:9;193:19;
233:12
**likely (1)**
138:19
**Likewise (1)**
179:13
**limitation (1)**
116:22
**limited (5)**
117:8;147:4;161:21;
175:9;214:6
**limiting (2)**
182:4,9
**Linda (2)**
175:6,13
**line (2)**
179:10,11
**liquors (1)**
87:12
**list (13)**
70:1;80:24;81:17;
91:21,25;97:6,8;98:5;
119:12,14;179:3;
207:24;208:25
**listed (7)**
97:21;99:19;101:4;
125:7;128:19;140:8;
156:5
**listen (1)**
181:19
**listing (1)**
96:19
**little (8)**
65:3;67:14;88:20;
147:7;156:15;184:4;
229:5;232:18
**loan (4)**
61:5,9;62:9;69:1
**loans (1)**
68:4
**local (2)**
82:4;120:17
**located (3)**
122:14;170:13;
214:16
**locked (1)**
108:12
**logo (2)**
83:18,20
**long (13)**
64:14;66:21,25;79:5;
121:8;131:20;133:13;
135:23;151:19;152:16;
217:2;249:9,12
**longer (2)**
115:4;243:25
**longterm (18)**
133:18;134:6,25;
141:18;145:7;146:23;
147:1;148:12;152:7;
153:2,6,19;154:18;
155:9;161:17;220:21;
232:23;233:6
**long-term (4)**
193:15,19;194:8,17
**Look (17)**
62:7;74:15;104:3;
122:4;128:14;167:9;
189:4;199:13;201:14,
22;208:8;218:5;220:9,
10;225:18;237:23;
243:19
**looked (10)**
61:2;99:11;135:15;
155:16;165:21;172:21;
173:6;176:17;184:12;
217:10
**looking (7)**
77:2,5;103:23;233:8;
237:10;238:13;241:7
**losing (1)**
171:14
**lost (5)**
166:1;171:12;242:1,
2,4
**lot (5)**
68:20;123:10;184:2;
189:15;246:12
**loud (1)**
107:5
**Louise (4)**
63:23;66:4,5,8
**lower (4)**
68:25;103:8;140:3,4
**Lrupani@nymcuorg (1)**
94:3
**lunch (2)**
184:12;185:15
**lunches (1)**
177:5

## M

**ma'am (1)**
118:6
**machine (3)**
130:23;217:25;218:2
**MacKoul (2)**
136:16,17
**Madam (3)**
73:22,24;108:12
**maintain (2)**
94:14;210:23
**maintained (12)**
87:25;88:5;90:11;
91:7,10;94:11;95:21;
96:4;119:18;128:4,8;
210:25
**makes (1)**
68:23
**making (2)**
122:24;179:16
**managed (1)**
72:6
**management (10)**
67:21;70:20,22;71:2,
13;72:5;74:8;78:9,9;
124:21
**Manhattan (5)**
122:15;123:24;
132:23;145:15;151:16
**manual (7)**
72:20,23;73:3,6;
113:22;131:1;214:17
**manually (1)**
130:21
**many (21)**
69:15;81:11;93:25;
101:3;102:20,23;
119:4;121:25;123:5;
126:25;130:11;131:12;
135:25;153:8;161:13;
169:19;174:24;188:20;
193:4;222:9;226:19
**March (25)**
66:22;67:6;151:14;
157:13;158:11;159:8;
162:25;163:10;164:12,
15;165:16,18,20;
169:15;184:15;221:18;
224:17,21;225:3;
229:13;231:9,23;
232:19;233:16;234:1
**Mark (101)**
61:18,19;62:14,15,
21;63:3,14,17;118:15;
119:3;120:3,10;
122:23;123:15;126:9;
127:19,23;128:1,12,25;
129:6;130:19;137:4;
138:4,17,23,25;139:2,
15;144:15,20;146:8,
15;147:4;149:11;
157:24;158:2,6;
159:19;172:13;175:7,
15;177:3;178:15;
180:2,9;182:3,7;
184:11;185:11;188:8;
189:12,20;190:25;
198:13;199:16,21;
200:2,5;201:21;207:5,
12,18;208:8,14,22;
211:25;212:6,15;
216:15;217:5,9,12,15;
218:2;219:4,6,7;
220:24;222:22;223:21,
23;225:10,14;226:17,
19;237:19;238:7;
239:10,12;240:2,5,12;
245:1;247:3,5,10,19;
248:8;249:4;250:2
**marked (21)**
88:25;101:14;
128:15;144:8;149:4;
155:18;157:17;172:6;
178:5;187:25;189:5;
198:14;200:2;207:6;
212:1;216:5;220:9;
225:18;237:4,10,23
**market (1)**
113:4
**marketing (31)**
64:6,17;67:3,4,8,9,9,
11,12,16,20;78:17,22;
80:9;82:1;85:25;86:7,
11;87:14,25;88:6;91:7;
92:5;96:8,14;104:24;
105:25,25;110:22;
115:1;119:15
**Marlow (1)**
213:9
**Master's (1)**
121:19
**material (2)**
61:11;222:17
**materials (14)**
123:12;150:6;
161:13;174:21,24;
176:11;186:9,13;
187:15;190:11;191:19;
204:4;221:10;222:24
**matter (11)**
62:12;63:10;122:21;
167:17,22;168:2,10,17;
179:23;180:24;181:23
**matters (3)**
62:15;152:23;178:25
**may (42)**
65:2;66:11;73:17;
74:19;77:21;90:18;
97:14;109:11,19,20;
120:5;126:9;137:4;
138:15,18;147:5;
149:4;159:22;161:9;
167:8;168:6,6,13,13;
169:8;170:1,8,16;
171:17;190:12;193:7,
9,25;194:12;195:8;
199:21;212:20;221:16;
223:21,22;227:9;
234:25
**maybe (5)**
63:16;147:7;199:17;
240:10,11
**MCU (193)**
62:5,18,22;63:24;
64:3,9,20,23;66:19,21,
23;67:11,21,23;68:11,
16,22,23;69:2,6,15;
70:5,8,13,20;71:16;
72:17,20;75:6;76:3,7;
82:1,12;83:5,7,7,11,12,
17,20,23,23,25;84:2,3;
85:6,6,22;87:2,5,17;
90:3,6,12,24;91:11,14;
92:8,11;93:5,10,13,19,
23;94:2,7,14;95:9,14;
96:1,7;99:3,14;100:4,
19,22;101:1,10;102:14,
17;103:16;104:1,20,
21;105:2,9;107:12,13;
108:5,22;109:3,7,8;
110:13,23;111:8,11,17;
113:5,16,18,24,25;
114:6,16;115:7;
116:23;117:7,21;

119:16,18;123:21,25;
124:8,13,19,20,21;
125:12;127:14;129:12;
130:7;133:20,22,24;
135:13,22;136:19;
140:25;141:21;142:5;
148:19;150:1,4,6,11;
152:23;153:19;154:14;
166:1,4,20,21;169:1,
12;170:12;171:6,13;
176:8,9;180:11;186:7,
13,25;194:14;195:16;
196:16,23,24;197:2,23;
198:2;199:4,7;201:2,6,
7;202:9;206:1;213:10,
17,21,22;214:6,8,10,
10,16,17;234:10,18,21;
235:7;236:24;241:12;
242:2,4,6,8,15;243:8,
12;246:12
**MCUA (1)**
240:8
**mcuorg (1)**
99:17
**MCU's (24)**
64:8;82:25;87:2;
94:11;95:5,22;96:5;
113:2,22;116:2;
123:23;132:22;148:21,
23;152:10,20;153:6;
171:20;176:2;195:12;
208:5;214:12,14,16
**mean (9)**
67:14;68:13;123:8;
124:2;130:20;140:15;
171:11;217:3,3
**meaning (3)**
83:6;87:18;246:19
**meant (1)**
83:18
**meantime (1)**
183:24
**media (2)**
67:17;82:3
**Medicare (2)**
178:8,8
**meet (8)**
110:4;122:3;132:16,
17,21;150:21;151:10,
11
**meeting (25)**
71:23;132:25;
133:11;136:12,20;
138:8;145:17,19,23;
153:17,21;154:10;
192:22;194:9,11,16,20,
23;195:1,3,5,6,7,9;
199:12
**meetings (3)**
74:8;117:25,25
**member (15)**
68:14,16;70:4;71:15,
19,19;73:11;112:22;
116:23;170:12;212:20;
234:21,24;235:2,3
**member-owned (1)**
67:24
**members (17)**
68:3,12,13,18,25;
69:15,24;71:14,21;
72:16;89:5;110:4;
124:20,20;171:12;
183:5;228:4
**members' (1)**
104:21
**membership (2)**
68:19;72:9
**memo (60)**
146:1,7,24;147:8,9,
11,19,23;148:2,4,7,25;
149:10,18;152:8;
155:1,16;157:4;201:9;
202:2,5,8,9,11,14,16,
18;220:14,15,18,20;
221:1,4,6;224:22,24;
225:1,3,22;229:14,24,
25;230:2;232:25;
233:5,8,19;234:2;
235:9,14,17,19,20;
237:1;238:2,24;239:1;
240:2;241:8,10
**memorandum (2)**
148:11,20
**memorialize (1)**
227:12
**memory (2)**
199:13;201:14
**memos (5)**
191:8;236:6,8,14;
238:14
**mention (6)**
134:16;141:12;
145:7;147:14;195:21,
24
**mentioned (24)**
69:25;70:1;71:8,24;
78:14;83:13;85:4;
92:22;96:13;112:17,
24;113:12;114:11;
126:16;134:14;168:25;
171:20;172:3;175:12;
193:9;202:19;220:17;
221:6,9
**menu (1)**
108:5
**Mercado (2)**
105:22,24
**messages (49)**
161:22;164:14,16;
166:6,7;167:1,2,3;
174:12;175:5,22;
186:19;187:5,7;191:9;
197:7,10,11,12,23,25;
202:25;205:20;211:3;
215:24;219:17,19,21;
223:4,18;242:12,18;
243:25;244:2,16,17,22,
23,24;245:10,11,13,15,
16,17,18,19,21,23
**met (8)**
110:2,9,9;114:21;
231:1;233:4;236:4;
243:5
**method (1)**
147:20
**Mets (1)**
82:10
**Mid (3)**
151:7;233:1;234:19
**Midtown (1)**
80:21
**might (5)**
179:16;183:25;
218:5,7;224:13
**million (3)**
140:12;147:13;154:2
**millions (1)**
127:6
**mind (4)**
138:21,21;201:14;
220:1
**minor (1)**
82:10
**minute (4)**
77:18;98:5;246:11;
248:15
**minutes (6)**
118:14;143:24;
184:2;216:24;233:21;
249:14
**misconduct (4)**
123:18,25;126:13;
160:9
**Miss (1)**
133:10
**missed (1)**
98:1
**mistake (1)**
240:10
**misunderstand (2)**
99:4,6
**misuse (1)**
115:11
**model (5)**
140:2,6,20,22;
147:17
**moment (7)**
83:22;92:25;97:14;
117:1;223:21;248:10,
24
**Monday (4)**
178:6;183:9,9;217:6
**monetary (1)**
103:8
**money (16)**
68:23,24;70:4;82:25;
104:1;109:6;124:10;
134:1,24;135:7,8;
141:18;142:4,12;
247:17;248:6
**Monique (1)**
201:9
**month (5)**
108:12;178:9;183:7;
242:22,24
**months (1)**
112:8
**moon (3)**
190:16,19,20
**more (20)**
63:14;65:3;67:14;
93:22;97:19;101:9;
113:5;138:19;147:20;
158:1;165:7;174:6,8;
179:16;184:4;206:13,
17;216:22;218:3;
242:22
**morning (14)**
61:2;63:19;66:2,15,
16;109:23,24;118:12;
120:11;178:6;179:20;
218:2;249:17;250:8
**most (3)**
93:8;103:10;217:12
**motion (1)**
62:17
**motive (3)**
179:24;181:1;182:2
**move (4)**
108:6;158:9;180:25;
243:5
**moves (2)**
237:17;238:5
**movies (1)**
224:13
**moving (3)**
99:25;178:17;241:18
**Mrs (3)**
138:20;212:3;229:18
**much (9)**
64:16;70:4;82:21;
85:14;109:6;118:8;
127:3,5;178:16
**multiple (3)**
110:7;136:7;182:4
**Mulvey (1)**
180:20
**Municipal (33)**
66:18;67:13,24;
68:17;73:12;75:14,17,
20;79:15,18;80:3,15;
81:21,24;82:7,8;83:2,
19;84:19,23,24;85:17;
87:4;90:6;104:24;
106:1;123:18,21;
124:12;126:13;128:5;
176:14;214:5
**must (2)**
106:4;107:10
**Myself (5)**
133:5;145:18;
157:22;163:7;164:23

## N

**NA (1)**
128:2
**name (7)**
64:9;66:8,9;71:19;
81:18;99:17;109:25
**named (6)**
73:8;75:11;83:4;
105:22;154:11;205:23
**names (6)**
94:8;99:19;178:19;
244:9,19,25
**naming (12)**
82:4,5,6,12,16,25;
83:3,6;84:16;85:4,12;
86:2
**Nana (6)**
148:15,18;153:14;
175:7;194:9;240:5
**narcotics (1)**
61:14
**Nathan (1)**
109:25
**National (2)**
69:5,12
**nature (2)**
89:20;159:19
**NCUA (3)**
62:22;69:11,12
**near (1)**
128:6
**need (8)**
61:25;65:3;98:6;
111:14;159:23;167:2;
218:5;242:19
**needed (1)**
87:23
**needs (2)**
122:21;179:15
**net (4)**
140:11,13;147:15;
154:2
**nevertheless (1)**
64:22
**New (12)**
67:24;80:21;120:13;
123:17;152:23;160:24;
170:20;180:16;195:16,
22;234:12;243:12
**Newspapers (1)**
82:3
**next (36)**
65:12;118:9,17;
120:2,3;132:16,17;
137:7;141:3,25;151:6;
160:25;162:9,15;
164:20;170:6;174:1;
177:8;178:6;182:14;
194:7;205:7;208:7;
209:12,15;213:4,19;
214:21;217:7,8;218:9;

239:15;240:13;243:5;249:7,19
**nickname (1)** 78:4
**night (6)** 61:3,9;178:21;183:14,15;217:16
**none (4)** 61:11;73:4;143:4;217:22
**non-for-profit (3)** 67:24;68:2,8
**non-law (1)** 156:22
**nonparty (1)** 99:2
**noon (2)** 178:7,13
**nor (1)** 230:3
**normally (1)** 164:9
**Norman (2)** 76:15;213:23
**note (7)** 61:23;94:4;119:23;178:4;180:3;182:3;217:15
**noted (1)** 147:25
**notes (16)** 133:15;152:1,3;164:6,9;165:9;213:15;224:9;226:24;227:1,11,12,16;228:7,22,24
**not-for-profit (3)** 68:22;212:21;213:12
**notice (1)** 217:20
**notified (1)** 217:16
**noting (1)** 218:4
**notion (1)** 106:24
**notwithstanding (1)** 213:11
**November (1)** 207:22
**number (12)** 64:7;127:20;132:9;143:19;145:3;174:6;178:18,19;199:25;203:2;208:11;219:8
**numbers (4)** 128:10,12;141:2;246:2
**nymcuorg (1)** 95:3
**NYPD (2)** 68:19;70:1

## O

**oath (1)** 184:6
**object (2)** 98:9;180:13
**objected (1)** 226:19
**objecting (1)** 239:12
**objection (59)** 61:23;77:12;90:14;98:10,16,17;99:1,23;100:3,4;101:25;106:6,18,23;111:3;114:24;115:8;117:9,10;122:8,9,18;125:25;126:3;129:2;135:3;136:10;137:2;138:2;139:17;144:17;146:10,12;149:13;156:24;158:3;159:17;167:20,24;168:11;172:15;178:13,15;188:9;200:18;207:14;212:9;216:17;220:3;226:17,18;237:19;238:7;239:10;245:1;247:3,10,19;248:8
**objections (1)** 218:6
**obligation (2)** 231:4;232:16
**obliged (1)** 89:20
**observe (2)** 136:24;156:9
**obstruction (2)** 121:12;173:21
**obtain (3)** 85:6;140:24;215:18
**obtained (4)** 121:18;205:3,9;212:3
**obtaining (1)** 134:25
**obvious (1)** 129:19
**obviously (4)** 97:7;106:7,22;107:4
**occasion (1)** 190:15
**occasions (4)** 110:7;184:18;185:16,19
**occur (2)** 171:16,23
**occurred (2)** 63:9;79:2
**o'clock (2)** 177:4;178:6
**October (7)** 78:25;79:1;80:13;111:21;112:18;153:11;195:4
**off (9)** 98:5;184:7;210:2;214:15;228:13;229:10;232:13;236:1,3
**offenses (1)** 160:11
**offer (9)** 64:7;68:6;89:1;92:21;96:12,25;97:20;101:23;128:25
**offered (3)** 180:23;181:23;190:2
**offering (6)** 92:24;96:20;97:24;182:1,1;189:14
**offers (13)** 77:10;127:19;139:15;144:15;146:8;149:11;157:24;172:13;188:8;189:12;207:12;212:6;216:15
**Office (50)** 120:12,14,19,21;121:4,6;123:17;125:1,15;132:3,13;133:7;142:9,9;145:3,14;150:20;151:16;163:9;165:4,5;191:19;192:3;203:24;204:20;206:10,11,12,17,25;208:12,20,25;209:1,10,19,23,24;211:21;216:4;219:14,17;223:13,13;228:1;229:21;230:17;231:10,12;233:9
**officer (2)** 175:14,23
**officers (2)** 160:9,12
**offices (4)** 123:23;132:22,25;165:3
**office's (1)** 216:20
**official (1)** 159:1
**often (2)** 184:1;226:12
**old (1)** 80:4
**omitted (1)** 97:6
**Once (6)** 62:12;88:18;102:22;103:1;142:18;226:12
**One (59)** 62:17;63:20;73:19;85:5;86:18;89:12,16;93:11,22;94:4;97:14,14;98:18;112:22;117:1,24,25;118:13;119:3,7;121:2;129:6;130:12,16;133:1;141:14;147:5;152:17;153:9,14;155:18;172:21;173:1,6;176:17;178:18;180:3;181:7;182:5;190:7;199:22;208:20;209:12,13;217:15;219:11,13;221:5;223:21;224:12,17,17;228:4;229:20;230:6,10;236:15;238:15;248:15
**one-page (1)** 158:1
**ones (4)** 94:19;96:20;128:23;176:20
**online (1)** 82:3
**only (14)** 76:21;101:14;124:22;127:24;133:11;139:9;140:19;146:2;172:6;178:9;180:6;198:14;207:5;211:25
**open (7)** 61:1;68:19;119:1;139:1;178:3;217:1;241:1
**opened (1)** 179:14
**opening (3)** 63:8;179:9;217:13
**operations (1)** 124:7
**opinion (5)** 147:19;180:19;181:24;195:24;212:17
**oppose (2)** 65:2;182:4
**opposed (3)** 130:22;140:17;206:12
**opposing (1)** 217:20
**oracle (1)** 178:24
**orally (1)** 142:21
**order (9)** 84:13;87:22;88:15,17,21;91:3;103:14,17;107:13
**ordered (1)** 87:24
**orders (6)** 86:3;88:6,8,10,12;91:4
**Orfini (1)** 178:22
**Orfuni (1)** 249:16
**organization (5)** 68:8,10;72:7;99:14;213:12
**orient (1)** 105:14
**original (2)** 86:4;210:23
**Osei (1)** 194:9
**Osei-Bonsu (5)** 148:15,18;153:14;175:7;240:5
**others (7)** 93:19;97:7;122:10;124:23,24;125:14;160:14
**out (19)** 61:4;74:1;91:22;105:18;107:5,23;111:14;114:23;117:18;134:12;140:17;153:18;161:4;170:4;197:19;203:21;206:23;207:2;211:7
**outside (8)** 124:19,19;153:18;176:2;194:17,21;208:5,6
**over (25)** 62:13;70:11;74:12,17;85:7;86:25;103:10;109:2;114:12;121:9;122:4;126:22;135:24;136:2;141:2;173:23;204:25;205:6,14;206:9;209:23;211:21;215:22;216:3;226:9
**overall (2)** 217:4,5
**overruled (8)** 99:23;106:24,25;126:6;167:25;168:12;220:5;226:22
**oversight (3)** 71:13;72:4;172:2
**owned (1)** 214:6
**owns (1)** 68:11

## P

**pace (1)** 178:17
**page (43)** 65:12;90:16;104:2,5,10;118:17;119:6;127:24;129:9,10;136:23;137:7;139:8;141:14,15;158:8,22;159:4;160:25;161:24;172:20,24;174:1;

176:16;177:8;182:14;189:19;190:25;191:2;198:14;200:6;207:19;208:8,15,22,23,24;209:15;218:9;220:10;239:15;240:13;249:19
**pages (1)** 191:2
**paid (18)** 81:20,22;84:18,22;85:16;87:2;88:9,11;104:1;113:15,16;135:19,20,22;196:21,23,24;197:2
**paper (2)** 247:23;250:2
**paperwork (5)** 64:16,17;104:15,16;119:16
**paragraph (4)** 90:4;127:24,24;213:7
**paragraphs (1)** 214:2
**Park (28)** 64:9;83:5,7,9,11,12,17,20,23,25;84:2,3;85:6;90:24;93:6;95:10,14;104:1;107:13;108:5;114:14;115:20,25;116:2,14,17;166:20;242:8
**part (21)** 67:20;74:1;83:7,17;85:12;104:13;110:12;113:1,7,8;120:14;128:8;138:24;153:12;163:3;179:19;189:10;191:9,12,16;227:19
**participant (7)** 64:21;93:10,13;94:18;95:2,24;96:1
**participants (4)** 84:11;93:17,20;96:2
**participate (7)** 100:18;125:6;191:22;192:4;203:7;209:22;210:2
**participated (15)** 101:21;121:10;133:4;145:17;151:17;163:6;164:22;169:16,19;170:6;192:6;203:10;204:7;215:5;224:3
**particular (5)** 79:9;120:25;165:7;175:9;203:15
**Particularly (1)** 187:2
**parties (4)** 87:20;88:25;89:22;90:20
**parties' (1)** 217:16
**partners (1)** 82:7
**partnership (1)** 86:2
**party (8)** 90:13;98:11,17,19;108:25;166:20;217:20;242:8
**past (1)** 106:24
**Pause (4)** 61:6;97:16;109:14;117:2
**pay (7)** 82:25;84:24;87:5;113:16;114:16;178:9;183:17
**paying (1)** 141:21
**payments (17)** 135:10,11,21;136:7;139:22,24;142:15,22;143:25;145:21;147:20,24,25;148:2;150:24;152:7,8
**payout (1)** 148:6
**payouts (1)** 156:8
**pays (2)** 79:13,16
**penalties (2)** 162:6,7
**people (7)** 99:19;113:9,9;122:3;148:12;234:18;249:8
**per (6)** 81:1,4;85:14,15;144:25;147:10
**percent (2)** 140:3;156:3
**perhaps (2)** 64:18;91:20
**period (5)** 64:10;101:10;115:3;174:21;235:3
**permission (5)** 76:21;77:16;88:24;125:21;214:13
**permit (1)** 213:12
**permitted (1)** 80:22
**person (16)** 74:12;89:18,18;92:18;122:25;154:11;162:17;164:24;168:2,13,14;190:18;227:2,6,8;234:17
**personal (10)** 86:13;102:21;107:10;161:9;166:15,16;167:14,16;199:9;245:18
**personalized (1)** 105:3
**personally (3)** 73:2;87:13;192:4
**person's (3)** 167:18,22;168:2
**perspective (1)** 115:10
**pertain (1)** 160:5
**pertained (2)** 152:7;220:21
**pertaining (4)** 122:4;124:7;162:24;163:15
**pertains (1)** 159:19
**phone (37)** 74:12;132:10;142:7,16;162:12,17,18;164:24,25;165:15;191:15;198:6;205:2,5;210:8;215:12,13,17,20,25;216:1,13,20;219:18,25;220:6;223:7,10,15,19;227:6;232:9,13;243:9,12,13,16
**phone/laptop/iPad (1)** 214:15
**phones (10)** 161:10;204:15,22,23;205:12,13,16,21;206:6,7
**photo (2)** 77:6,21
**photograph (1)** 77:7
**photos (2)** 203:19,23
**phrase (4)** 69:17;71:24;83:13,15
**physical (4)** 84:10;178:5,9;199:1
**pick (4)** 184:7;199:15;206:5,20
**picked (3)** 206:2,8;219:13
**picking (1)** 209:9
**pictures (4)** 244:11,19,25;246:2
**piece (1)** 247:22
**place (14)** 71:22;74:9;83:11;117:24;132:25;145:13;151:13,15;169:25;177:2,3;178:9;191:25;211:5
**placed (8)** 86:3;88:12;130:23;142:8;203:20,24;211:12;215:17
**places (1)** 213:2
**plan (4)** 78:10,22;124:6;211:7
**planned (7)** 132:17;145:20;154:5;165:12;170:4;178:16;217:21
**planning (24)** 62:23;78:2,4,6,7,12,17,19;79:2,5,14,19,22;111:18,20,25;112:1,11,11,20;116:5,10;154:1;196:14
**plans (1)** 180:13
**play (1)** 82:14
**pleasantly (1)** 217:11
**please (39)** 70:25;71:9;72:1;74:15;75:5;76:21;77:16;80:7;85:9;86:14;101:13;102:3;103:15,22;105:12;106:3;107:9,17;108:2,4,14;120:2;123:9,11;127:25;145:2;148:5;158:9,25;160:25;185:5;188:15;201:22;214:12;225:8;226:1;237:4;239:7;248:10
**plus (2)** 97:1;216:12
**pm (3)** 105:20;108:7;178:2
**point (7)** 64:18,25;65:1;110:20;160:4;185:22;230:9
**policies (2)** 72:22,25
**policy (32)** 72:20,23;113:18,22;114:6,9,18;115:6;117:7,14,22,24;133:19;134:3,5,6;135:1;141:19;147:1,1,3,12;152:7;155:10;192:23;193:15,20;194:2,3,8;214:16;220:22
**Poor (1)** 172:2
**pops (1)** 77:19
**Porcelli (12)** 148:15,16;153:15;175:6;176:14;194:10;236:16,23;237:2;238:3,17;241:11
**portion (6)** 105:1,21;107:25;108:2;133:11,12
**position (7)** 71:20;73:18,21;120:21;133:20;181:1;213:22
**positions (3)** 72:13,14,14
**possession (4)** 174:13;180:24;199:2;214:5
**possibility (1)** 179:23
**possible (1)** 183:23
**possibly (1)** 179:22
**postdated (2)** 80:17;86:24
**potential (1)** 123:18
**potentially (1)** 86:18
**Potter (1)** 183:6
**PR (1)** 80:9
**practically (1)** 108:12
**practice (6)** 106:16;163:3;207:2;226:23;227:1,5
**practices (1)** 206:19
**precisely (1)** 98:18
**preclude (2)** 61:13;62:17
**prefatory (1)** 90:2
**prefer (1)** 160:4
**prejudicial (2)** 138:11,13
**prelude (1)** 179:18
**premises (2)** 84:10;125:21
**premium (7)** 134:3,14,16,17,19;147:8;153:22
**premiums (2)** 147:12,21
**preorder (1)** 91:3
**preparation (4)** 74:8;80:8,10;110:12
**prepared (5)**

138:4,16,18;152:4;
211:7
**preparedness (1)**
138:8
**prepares (1)**
208:20
**present (28)**
61:1;63:4,8;66:1,3;
78:22;81:6;97:20;
98:15;119:1,13,25;
120:1;133:8,9,11;
161:23;174:23;178:3;
183:1,2;192:14;195:8,
9;217:1;219:1,2,3
**presentation (2)**
107:1;111:22
**presently (3)**
63:24;64:3;70:4
**presents (2)**
78:10;176:12
**preservation (4)**
210:12,14,16,22
**preserve (1)**
210:15
**president (5)**
67:9,11;75:14,20;
104:24
**president/CEO (2)**
213:23;214:9
**presiding (2)**
195:16,19
**pretty (2)**
129:19;156:15
**previous (5)**
172:21;190:15;
192:15,20;193:8
**previously (11)**
106:24;114:21;
165:21;194:23;195:1,
6,18;201:22;214:18;
220:17,25
**price (1)**
114:12
**primary (2)**
68:14;81:25
**principal (1)**
175:23
**print (1)**
214:15
**Prior (25)**
67:2;70:18;88:14;
90:22;91:17;93:2;
94:17;95:16;100:17;
110:4;112:12;121:4;
134:23;138:6;163:3;
180:12,15;187:19;
193:24;197:2;202:10;
203:19,23;229:10,25
**private (14)**
64:8;83:23,25;84:6,
8;86:12,16;87:3,19;
100:20;104:21;105:2,
9;109:8
**prize (1)**
63:13
**probably (2)**
123:7;183:18
**problem (3)**
98:8;100:6;225:15
**problematic (1)**
179:16
**procedure (1)**
203:15
**proceed (3)**
120:5;122:23;184:8
**process (3)**
87:21;103:16;203:18
**processed (1)**
88:11
**prodigious (1)**
63:12
**produce (32)**
150:6;160:20;161:4;
162:4,23;163:18;
164:5,11,13,14,16,18,
19;166:6;176:24;
177:1;184:20,24;
185:4,10,13,20,24;
187:15,17;191:6,9,12,
15,18;196:3;202:24
**produced (11)**
184:22;185:8;
189:13;190:3,9;191:3,
7;196:3,6;197:25;
215:3
**producing (2)**
186:9;187:10
**production (11)**
161:14;174:11,25;
189:10,11;191:10,13,
16,18,22;196:6
**products (4)**
67:18;68:3,4,6
**professional (4)**
74:3;75:7,10;86:6
**proffer (4)**
62:4;137:4;138:10,
16
**prohibit (1)**
117:15
**prohibited (1)**
117:22
**prominent (1)**
113:10
**promoted (1)**
82:1
**prompted (1)**
186:21
**proper (3)**
61:10,21;115:11
**property (2)**
210:3,9
**proposal (1)**
61:4
**propose (1)**
178:11
**proposed (1)**
180:18
**proposition (1)**
98:18
**prosecute (1)**
120:20
**prosecution (6)**
228:4;231:15,23;
232:2,6;241:20
**prosecutor (1)**
228:24
**prosecutors (4)**
62:3;224:6,18;
230:17
**provide (18)**
136:12,20,22;
142:11;143:15,18;
144:1,4;145:23,25;
148:11,20;149:18;
158:20;159:24;161:25;
176:17,19
**provided (7)**
139:4,14;144:3;
146:7;202:2,5;240:6
**provider (1)**
210:15
**provides (3)**
68:3;70:3;128:1
**providing (2)**
114:2;141:13
**proving (1)**
190:18
**provisions (1)**
73:5
**public (6)**
83:19;110:23;111:1;
121:3,21;169:13
**publish (13)**
77:16;102:3;129:8;
139:20;141:4;144:20;
146:15;158:6;167:9;
190:25;213:19;225:19;
238:10
**published (1)**
76:1
**Puello (1)**
175:8
**pull (9)**
76:21;103:22;
105:12,18;107:17,23;
108:10,15;129:6
**pulled (2)**
225:6,8
**purchase (3)**
153:19;194:17,22
**purpose (8)**
86:5,8;162:21;165:6;
190:7,18;196:13;
204:23
**purposes (9)**
87:15;89:9;144:8;
146:2;149:5;188:1;
189:5;216:6;220:10
**pursuant (2)**
217:15;225:11
**put (7)**
71:19;119:19;
130:12;225:25;226:1;
237:5;241:4
**putting (1)**
63:9

## Q

**qualifications (1)**
72:9
**qualified (2)**
71:15,18
**quick (2)**
62:15;183:25
**quicker (1)**
178:16
**quickly (6)**
81:18;96:21;98:15;
108:2;129:9;137:6
**quite (1)**
179:21

## R

**radio (1)**
82:3
**raise (2)**
90:14;115:6
**raised (1)**
181:7
**ran (1)**
80:9
**range (1)**
140:8
**ranged (1)**
87:11
**rate (2)**
140:2,3
**rates (2)**
69:1,1
**rather (2)**
96:21;232:22
**re (2)**
115:22;188:12
**reaction (1)**
179:21
**read (22)**
61:7;88:24;89:11,13;
90:1;91:22;96:21;98:5;
100:2;103:6;106:3,12;
107:5;108:2,8;127:25;
140:1;141:15;147:5;
148:9;213:7;214:2
**reading (5)**
100:1;106:16,20,25;
147:4
**really (1)**
190:20
**reason (5)**
98:14;130:6;142:12;
152:20;158:17
**reasonable (1)**
92:15
**reasons (4)**
74:3;107:11;171:25;
233:11
**REBOLD (58)**
63:19;64:3,19;65:1;
66:4,12,14;74:19,22;
76:20;77:10,15,20;
88:23;89:10;90:3,21;
91:23;92:21;96:12,21,
22;97:5,13,17,24,25;
98:3,12;100:16;
101:13,23;102:3;
103:5,19;104:12;
105:12,18;107:17,23;
108:6,14;109:11,15;
111:3,5;114:12,24;
115:8,10,19;117:9,11;
118:4,10;119:9,11,21
**recall (59)**
62:8;158:15;196:10,
11,13;198:12;199:3,
18;201:24;220:2,8;
233:12,18,18,23;234:3,
21,24;235:1,3,6,9,13,
14,18,22,24;236:12,23;
237:1;242:17;243:14,
17,18,20,22;244:1,1,3,
6,7,8,11,14,16,17,21,
23;245:4,4,7,12,20,25;
246:3,10,16,21,23
**recalled (6)**
155:8;227:24;
232:21;233:2,5;244:18
**recalls (1)**
226:10
**receipt (4)**
207:21;208:10,17,23
**receipts (6)**
206:23,23,24;207:3,
11;209:9
**receive (7)**
83:7;134:18;141:17;
142:20;182:2;208:3;
218:6
**received (88)**
61:7;73:2;77:13,14;
83:10;88:9,9;89:3,4;
90:18;91:5;94:19,23;
99:24;100:15;102:1,2;
115:16;119:22;124:10;
126:22,25;127:21,22;
129:3,5;132:14;134:2,
4;139:18,19;142:5,12,
12,14,15;143:5,9,12,
25;144:18,19;145:22;
146:13,14;148:25;
149:14,15;150:24;
152:8;158:4,5;172:16,
17;176:13;179:2;
183:4;186:13;188:10,

11;190:7,23;191:22;197:22;198:2;200:13;201:4,9;202:9;207:15,16;212:10,13;216:18,19;217:22;219:25;220:6,7,14,21;222:6;234:15;235:20;237:20,21;238:8,9
**receiver (1)** 105:16
**receivership (1)** 62:22
**receiving (9)** 130:6;133:23;134:24;135:7,8;142:21;147:24,25;149:23
**Recess (3)** 118:16;177:7;216:25
**recipient (1)** 105:15
**recognize (22)** 74:13;76:18;92:3;101:16;104:8;125:23;128:18;139:11;144:10;146:4;149:6;157:19;172:8;188:2;189:7;207:8;214:23;216:7;237:11,14,25;238:2
**recollection (8)** 62:19;108:17;199:22;200:9;201:23;220:1,11;243:19
**record (13)** 74:19;77:22;87:17;90:3;119:7;126:9;132:19;162:14;199:25;227:2,8,16;245:3
**recorded (1)** 92:15
**records (37)** 64:7,14,15;65:2;71:13;87:25;88:5;90:4,11,23;91:7,10,11,15;92:5,5,8,12,22;95:8;96:9,13,14,14;100:3,5;103:21;108:24;109:6;115:24;119:18;128:4;163:14,17;165:22;196:7;206:24
**recover (1)** 219:17
**recovered (2)** 180:5;205:13
**redirect (2)** 118:3;249:3
**refer (1)** 74:24
**reference (2)** 151:5;174:15
**referenced (2)** 90:15;96:9
**references (1)** 148:2
**referred (6)** 74:23;92:6;111:24;123:21;225:21;227:13
**referring (1)** 210:7
**reflect (4)** 74:19;100:22;101:20;126:9
**reflected (10)** 92:8;97:17;100:18;101:6;102:7;115:24;116:4;143:9,10,12
**reflecting (1)** 143:24
**reflection (1)** 116:17
**refresh (6)** 199:13,22;200:9;201:14;220:1;243:19
**refreshes (2)** 201:23;220:11
**refused (1)** 248:22
**regard (1)** 162:23
**regarding (17)** 67:18;72:13;91:10;94:17;95:1;107:20;147:1;148:12;155:8;175:5,22;176:4,12;192:22;193:1;194:8;195:12
**regards (7)** 124:8;132:14;142:4;150:23;165:7;193:14;213:21
**regretfully (1)** 106:4
**regrettably (1)** 107:10
**regular (7)** 91:11,14;92:9,11;98:24;207:2;213:11
**regularly (1)** 128:8
**regulate (1)** 106:25
**regulated (5)** 69:6,10;234:10,10,12
**regulates (1)** 171:5
**REILLY (31)** 64:2;65:9,10;77:12;96:17;98:7,8,22;99:4,5,7;100:7;101:25;106:6,13,18,22;107:3;109:19,22,25;115:13;117:1,3,4,5,13,17,19,20;118:1
**reimbursed (1)** 140:11
**relate (15)** 64:8,20,22,23;93:5;95:9;96:6;103:21;104:5,17;105:1;119:15;136:5;209:7;210:18
**related (14)** 90:23;95:8;141:13,14;161:17;176:6;180:3;186:15;196:7;209:22;210:3;230:11,20;242:6
**relates (7)** 63:21;160:8,13;180:6,6,9;209:13
**relating (3)** 61:9;62:18;175:24
**relation (3)** 61:3;88:13;179:3
**relations (2)** 110:23;111:1
**relationship (9)** 75:5,8;86:1;157:15;167:22;168:2,9,10,16
**released (1)** 208:12
**Relevance (7)** 111:5;115:10;122:10;137:5;138:2;159:18;226:21
**relevant (9)** 64:5;127:24;138:8,11;160:3;180:21;190:15,17;242:14
**relied (1)** 101:6
**rely (1)** 101:3
**remember (7)** 81:17;201:16,17,18;227:23;235:19;236:17
**reminded (1)** 184:6
**removal (1)** 70:18
**remove (5)** 204:21,23;205:2,8,11
**removed (5)** 70:17,24;71:3,6;75:20
**renewed (1)** 135:9
**repeat (5)** 102:8;123:9;154:3;168:1;185:5
**repetitious (1)** 62:11
**rephrase (1)** 70:25
**report (4)** 152:4;199:14;227:13,15
**reported (2)** 115:2;178:20
**reporting (1)** 72:7
**reports (1)** 227:20
**representative (3)** 90:5;128:2;175:24
**representatives (1)** 214:9
**represented (1)** 192:17
**representing (1)** 110:10
**request (12)** 105:3;123:12;144:25;149:19;167:12;176:3;201:4;210:12,14,15,22;229:15
**requested (11)** 144:1;150:1;165:22;167:10;174:21;175:3,20;176:11;188:15,16;201:2
**requests (3)** 182:5;210:16;214:10
**require (2)** 161:13;174:24
**reschedule (3)** 178:11;183:6,7
**reservation (1)** 87:14
**reservations (2)** 79:16;87:3
**reserved (2)** 100:19,23
**reserving (1)** 95:13
**reset (4)** 201:5;214:13;243:16,18
**reside (1)** 99:3
**residence (13)** 125:19;169:24;170:10;203:20;204:9;205:2,8;210:6;211:8,23;214:22;229:11;236:2
**residences (1)** 125:3
**resignation (4)** 80:18;86:24;107:11;195:12
**resigned (10)** 105:6;108:16;152:19,24;166:2;195:14,15;196:15,17;213:17
**resigning (2)** 152:20;197:2
**resistance (1)** 64:16
**resources (1)** 133:10
**respect (11)** 61:5,13;74:6;89:20;90:15;98:16;111:20;116:11;125:15;171:6;179:23
**respective (1)** 189:18
**respond (2)** 150:25;187:22
**responding (1)** 188:6
**response (30)** 108:11;114:11;140:25;142:18;149:18;150:6;164:12,15;165:7,16,18,19,25;176:24;179:19;184:20,22;185:13,17;186:9,25;187:10;191:3,6;196:4;202:24;215:3;221:19;228:22,25
**responses (1)** 157:8
**responsibilities (4)** 67:10;71:12;72:4;124:4
**Responsible (6)** 67:12,16;72:6;104:20;247:25;248:2
**responsive (9)** 161:8;163:14,17;191:20;221:23,24;228:10,19;241:23
**rest (1)** 217:6
**restore (1)** 214:13
**resume (1)** 177:4
**resumed (3)** 61:1;178:3;184:9
**retrieve (1)** 199:4
**retroactive (1)** 148:2
**return (7)** 129:9,10;201:2,7,11;214:10;243:9
**returned (3)** 68:25;151:2;201:6
**Returning (5)** 135:6;161:24;167:8;176:16;213:21
**returns (1)** 186:8
**review (15)** 90:23;91:5,17;93:2;95:16;108:24;109:5;122:4;145:1,4;179:6;204:4,17,19;211:14
**reviewed (15)** 91:2,3;94:17;95:8;

140:20,22;170:5;189:1;197:23;204:3;205:19;211:8;223:15,17;233:19
**reviewing (3)** 119:15;140:5;157:4
**rider (3)** 161:2,3;174:1
**right (146)** 61:18;62:12;65:11;77:22;83:20,23;98:21;99:11;110:2,10,16,20,24;111:9,12,18,21,25;112:2,4,9,12,15,18,21,24;113:2,5,9,10,13,16,22;114:3,7,9,14,16,19;115:2,15,17,21,25;116:2,8,14,20,24;117:23;118:5;126:17;131:4;159:21;162:3;165:22;176:20;178:12;184:13;185:7,11,20;189:22;196:4;199:15;202:20;209:13;213:2;217:23;219:9,15;220:8;221:11;222:12;223:13;224:4,7,10,14,19,24;225:4;226:15;227:6,9,13,24;228:7,13,20,25;229:8,15,18,22;230:24;231:2,7,10,13,16,20,24;232:3,8,23;233:2,9,13,17,21,23;234:13,19,22;236:2,24;238:20;239:14;241:23;242:3,11,15,23;243:1,6,9,13,25;244:25;245:8,23;246:3,5,6,8,13,20,24;247:2,9,18,25;248:3,17,20
**rights (13)** 82:4,5,6,12,16,25;83:3,6,20;84:16;85:4,12;86:2
**risk (1)** 217:2
**Robert (1)** 249:8
**Rockland (1)** 183:12
**Roger (2)** 187:24;188:5
**role (18)** 78:16;80:5,8;82:1;85:25;87:13;110:22;111:11;112:11,20;122:16,19;123:25;151:23;170:2,17;171:14;211:5
**roles (1)** 171:12
**room (4)** 84:8;122:4;165:1;203:20
**rooms (1)** 133:1
**RPMs (1)** 181:19
**rubber (1)** 130:23
**Rule (1)** 90:14
**rules (1)** 180:7
**ruling (10)** 61:24;62:11,12;138:22;179:13,20,25;180:8;212:8;247:11
**rulings (2)** 180:12,15
**run (1)** 71:20
**Rupani (2)** 64:17;104:3
**R-u-p-a-n-i (1)** 66:9

## S

**sake (1)** 99:25
**salaried (1)** 72:14
**same (23)** 70:10;72:11;85:18;91:21;107:14;115:25;119:6;127:7;135:15,18;147:18;165:1;170:19;173:5;174:6;176:20,21;214:25;239:1,4;240:9;247:11,11
**sampling (1)** 103:20
**sanctions (2)** 162:6;179:23
**sanitation (1)** 70:2
**sat (1)** 157:7
**save (2)** 88:7;91:20
**savings (1)** 194:21
**saw (4)** 76:18;112:6;247:1,9
**saying (16)** 79:1;80:17;86:24;100:4;108:16;117:18;179:9,12,17,18;185:9;190:5;239:11;243:15;244:16;246:23
**scan (1)** 129:8
**scheduled (2)** 178:5;183:25
**scheduling (3)** 164:9,10;228:8
**scheme (1)** 160:15
**school (2)** 121:14,15
**screen (8)** 76:25;77:18;225:6;237:6,6;239:8;241:4,7
**SDNY (1)** 76:2
**search (37)** 124:7;125:3,18,20,21;169:16,19,21,22,23,25;170:3,4,5,6,15,17,19;203:16,19,23;205:1,3,9,15;211:4,6,7,10,12,17,20;212:3;214:22;215:18,20;216:22
**searched (7)** 125:4,5;171:18;203:15,21;205:19;210:5
**searches (7)** 203:10;204:8,8,11;209:22;210:3,9
**season (1)** 107:21
**seat (1)** 63:25
**seated (1)** 219:4
**seats (1)** 84:5
**secluded (2)** 84:6,8
**second (34)** 85:10;93:15;127:24;130:12;158:22;168:20,25;172:20;174:9;175:19;184:22;185:8;186:12,21;187:9,19,22;188:6;198:23;202:5,7,9,11,13,16;208:8;221:1,4,6;222:6;225:1,22;226:10,13
**second-to-the-last (1)** 148:4
**section (8)** 84:5;159:16;160:8,11;173:12,14,18,20
**securely (1)** 188:25
**seek (2)** 130:5;176:3
**seeking (1)** 63:7
**seemed (1)** 156:15
**SEGs (3)** 69:17,22,23
**seize (2)** 215:8,11
**seized (9)** 170:5;204:1,4;211:8,16,20,23;216:13;223:8
**seizing (1)** 215:13
**select (3)** 68:17;69:22,25
**selected (1)** 72:10
**selection (1)** 189:19
**self-evident (1)** 77:21
**send (1)** 158:18
**sender (2)** 105:15,16
**sending (1)** 94:22
**senior (1)** 124:21
**sent (14)** 61:8;74:1;94:19,23;95:12;104:17;144:13;175:5,22;188:25;198:22;240:8;244:3,12
**sentence (3)** 140:1;148:4;158:24
**separation (1)** 245:17
**series (1)** 246:15
**serve (5)** 75:16;123:8;180:11;212:20;213:13
**served (16)** 73:13;75:6;78:16;123:5;124:6;125:3,17;157:9;162:8,24;167:7;168:19,24;176:23;186:12;221:17
**server (1)** 166:4
**servers (4)** 94:12;95:6,22;99:3
**service (1)** 152:10
**services (9)** 67:18;68:3,7;69:9;170:21;173:15,16;187:20;234:13
**serving (1)** 157:22
**session (2)** 78:20;178:1
**set (5)** 114:9;138:20;150:21;151:10,11
**sets (2)** 72:22,25
**seven (1)** 70:11
**several (3)** 90:23;191:2;213:2
**Shall (1)** 107:8
**share (2)** 68:15,15
**shift (1)** 70:13
**shocked (1)** 217:10
**short (1)** 156:15
**shorter (1)** 147:7
**shorthand (4)** 69:12,19,21;100:2
**show (9)** 101:14;146:3;172:6;190:2,9;198:13;207:5;211:25;240:2
**showed (3)** 225:3;233:5;238:25
**showing (8)** 139:9;144:8;149:4;157:17;187:25;189:4;200:1;216:5
**shown (6)** 155:14,16;224:22;238:24;246:10,12
**shrimp (1)** 87:8
**Siciliano (18)** 153:13;154:11,13,18,19,20;193:1,9,13,14,16,18,21;194:5,8,9;195:7,9
**sick (1)** 134:12
**side (9)** 179:11;226:1,1;238:21,21,22,22;241:4,4
**sidebar (5)** 137:4;138:1;159:22;239:13;240:1
**sides (1)** 107:2
**sign (9)** 148:5;155:6;202:16;224:22;225:2,22;233:20;234:1,19
**signature (16)** 104:8,9;129:20;130:17,21,22;131:1;148:9;208:18;214:25;224:24;226:3;239:4;246:18,20,24
**signatures (2)** 130:14;131:6
**signed (42)** 75:4;90:20;146:1;148:7;149:1,24;152:9;155:1,13,22,24;202:2,

18;214:18;220:14,15,20;221:1,3,5;229:14;232:25;235:10,15,19,20;236:15,16;237:1,15;238:3,16,17,25;239:2,4;240:3,4;241:8,11,12;246:20
**significance (1)** 69:23
**signing (3)** 155:2;202:5,13
**similar (5)** 68:5,6,6;172:21;192:21
**Similarly (4)** 112:17;116:16;117:14,21
**simple (1)** 179:8
**simply (3)** 82:6;106:18;190:2
**single (2)** 89:11;102:14
**sitting (1)** 74:17
**slash (1)** 67:9
**Smith (2)** 201:9;213:10
**social (2)** 67:17;82:3
**sodas (1)** 87:11
**somebody (6)** 84:13;88:17;116:23;183:18;190:16,16
**somehow (1)** 190:15
**someone (5)** 134:12,24;167:22;181:3;216:2
**someone's (2)** 125:21;167:16
**sometimes (6)** 76:23;89:17;123:21;170:23;181:19;184:3
**somewhere (1)** 82:23
**son (1)** 81:16
**soon (1)** 219:4
**sorry (24)** 63:25;81:13;84:20;93:13;96:5,23;99:7;102:8;103:3;115:22;117:16,17;127:12;175:2;180:9;181:15,21;195:23;197:17;200:17;208:23;238:20;247:22;249:11
**sort (10)** 63:15;84:5;98:17;130:25;180:3;187:1;191:5;199:17;204:13;234:2
**sought (1)** 129:25
**sound (1)** 116:8
**sources (2)** 186:3,5
**Southern (3)** 120:12;123:17;160:24
**SP (4)** 78:5,6;111:24;112:1
**span (1)** 82:2
**spare (1)** 90:1
**speak (11)** 106:8;142:3;150:23;151:6;158:12;162:9,11,12,14;181:20;221:19
**speaking (3)** 64:1;110:15;191:5
**speaks (1)** 106:13
**Special (9)** 120:4,22,23;132:2,12;133:5,6;145:18;150:20
**specific (7)** 70:1;87:18,22;95:10;141:7;174:11;246:3
**specifically (2)** 86:10;104:5
**spell (1)** 66:9
**spend (1)** 65:3
**split (1)** 237:6
**spoke (12)** 141:24;162:10;184:17;185:16;192:15;227:23;229:3,13;231:6;232:11;241:19;248:16
**spoken (1)** 219:22
**sports (1)** 82:4
**spreadsheets (1)** 88:6
**spring (1)** 178:23
**squelched (2)** 65:9,10
**stable (1)** 70:10
**stadium (7)** 64:10;82:13;83:1,3,7,8;84:6
**staff (1)** 80:10
**stagnant (1)** 82:16
**stamp (5)** 130:23,25;246:19,19,24
**stands (2)** 69:22;138:22
**start (9)** 62:13;86:20;105:19;119:3;126:14;163:13;178:7;186:9;249:16
**started (4)** 116:5;142:16;147:23,25
**Starting (7)** 71:9;82:19;105:14;152:14;158:8;178:13;205:1
**starts (1)** 224:14
**State (13)** 67:25;120:17;138:20,21;152:23;167:3;170:20;195:16,22;199:25;210:23;213:11;234:12
**stated (25)** 135:19,22;136:19;139:22;142:11,20,21;152:22;153:16,18;154:19,20;155:7;156:5,8;163:17;165:19;166:15,19;167:2;193:18;195:9;199:3;201:24;242:12
**statement (3)** 97:9;148:5;190:18
**statements (6)** 160:12;185:3,24;191:8,12,16
**states (11)** 106:4;132:2;151:18,22;159:13;163:7;164:23;165:14;173:9;191:19;192:7
**stating (1)** 103:25
**status (2)** 162:22,22
**statutes (9)** 159:14,24,25;160:5;173:5,6,7,8,10
**stay (1)** 79:9
**Stephenson (3)** 225:25;238:21;239:7
**stepped (6)** 73:24;75:9;76:11,12;79:2;195:17
**stepping (1)** 74:3
**steps (5)** 124:25;125:6,10,14;149:24
**Steven (2)** 104:18,23
**still (4)** 124:13;184:6;234:9;246:5
**stipulate (1)** 64:13
**stipulated (5)** 89:7;90:2,13,17;100:1
**stipulation (18)** 64:13;88:25;89:1,5,11,13,17,20;90:4,18;91:21;92:23;98:10;100:2;119:13,17;127:20;225:11
**stole (1)** 248:6
**stop (2)** 100:1;177:2
**stopped (4)** 200:17,20,21,25
**storage (3)** 174:15,17,19
**store (7)** 201:5,12,18,25;202:20;243:12,16
**strategic (20)** 78:1,4,6,7,10,12,17,19,22;79:1,5,13,19,22;111:17,20,25;112:1,11;196:14
**strategy (1)** 111:1
**stricken (3)** 135:4;136:11;243:4
**strokes (2)** 82:5;91:1
**Stroz (6)** 205:23;206:3;208:4;209:10,18;219:14
**structure (6)** 70:8,10,13,19,23;71:1
**subcommittees (1)** 112:22
**sub-exhibits (2)** 90:10;128:3
**subject (9)** 91:21;94:23;146:22;152:10;153:2;162:5;188:12;192:19;212:8
**subjects (2)** 133:17;152:5
**submit (2)** 63:10;87:21
**submitted (3)** 87:23;88:8;180:19
**subpoena (90)** 123:8,12;140:25;157:10,14,23;158:12,19,23;159:1,6,7,11;160:19,25;161:3,5,8,11,13,24;162:2,8,24;163:4,10,15;164:12,15;165:8,16,18,20,21,25;167:7,8,12;168:20,24,25;169:15;172:3,11,21,24;173:22,24;174:2,4,11,22,24;176:16,23,24;184:15,18,23,24;185:8,12,13,16;186:7,13,21,25;187:9,11,19,23;188:6,13;189:10;191:3,6,20;196:4;198:23;202:24;221:17,20,23;222:6;228:10,19;241:23;243:1,1
**subpoenaed (1)** 150:4
**subpoenas (12)** 123:3,5;124:6,15,18;125:2,18;150:6;184:13,21;186:10;215:3
**subsequent (1)** 115:20
**subset (2)** 64:19;98:12
**substance (10)** 132:11,15;194:23,25;203:5,6;227:10;235:10;237:2;241:13
**substantial (2)** 98:12;100:4
**subtracting (1)** 97:7
**successful (1)** 131:21
**suit (1)** 74:18
**suite (38)** 64:9,20;83:12,23,25;84:2,3,7,9,11,11,12,13;85:5,10,11,19;87:2,3,19;88:17;96:9;100:19,23;102:17,21;103:21;104:21,21;105:2,10;108:19,25;114:1,2;116:2,24;119:16
**suites (25)** 85:6,16,23;86:1,3,5,8,12,16;87:3,14;88:2;90:24;93:6;95:13;96:7;101:10;103:17;109:8;113:25;114:2,7,23;115:7;117:8
**sum (6)** 134:1;153:16;154:17;155:5;163:16;165:15
**summarize (2)** 91:1;102:9

**summary (4)**
100:18;101:7,18;
102:11
**supervisory (25)**
70:16,18,21,24;71:2,
5,8,24;72:3,9,14,16;
78:8,11,23;80:23;
111:22;124:20;148:17;
170:12;171:9,13;
236:24;238:18;241:11
**support (3)**
244:4,24;245:14
**supporting (3)**
103:20;244:18;246:1
**supposed (1)**
162:23
**Sure (10)**
83:17;96:18;106:4,9;
112:13;113:20;115:23;
119:23;153:14;160:3
**surprised (1)**
217:11
**surrounding (1)**
160:11
**suspected (1)**
159:2
**suspicion (1)**
126:21
**suspicious (2)**
126:20,23
**Sustained (14)**
111:6;114:25;
115:12;117:12;122:11;
135:4;136:11;137:3;
156:25;167:21;243:4;
245:2;247:6;248:9
**swore (2)**
170:4;211:7
**sworn (2)**
66:7;120:8
**Sylvia (25)**
73:8,10,11;75:4;
77:6,25;104:9;105:4,
16;108:4,9;125:10,16,
17;130:17;146:21;
148:10;159:10;168:16;
173:3;174:13;188:12;
207:25,25;238:25
**sympathetic (1)**
183:13

**T**

**talk (10)**
132:13;226:10,12,
13,24;231:4,12;232:2,
16,18
**talked (8)**
114:21;141:18;
203:2,3;219:8;220:25;
223:7;232:8
**talking (12)**
62:24;87:7,10;187:1;
190:5;198:17,25;
220:18;224:14;233:6;
237:14;238:3
**Tara (1)**
213:9
**tax (1)**
136:5
**taxes (12)**
135:19,20,22;136:8;
140:11,13,16,17;
141:21;147:14,15;
154:2
**team (11)**
70:22;72:6;78:9,9;
110:5;228:4;231:15,
24;232:2,6;241:20
**teams (1)**
86:7
**teasing (1)**
217:25
**technology (1)**
76:23
**telephone (1)**
143:19
**telling (11)**
62:8;234:3;242:17;
244:3,8,11,14,21,23,
24;245:25
**Ten (3)**
81:12,14,22
**tendered (1)**
107:11
**tens (1)**
127:4
**term (5)**
140:13,15;161:11;
174:17;210:12
**terms (2)**
122:2;168:13
**terrible (1)**
183:13
**testified (28)**
66:7;83:22;89:18;
110:18;111:7,16;
112:20;113:21;114:1;
115:14;119:14;120:8;
128:23;130:17;184:17;
185:15;186:2;189:20;
203:10;204:7;219:13;
220:25;231:2;232:20;
234:9;241:10,19;
247:24
**testify (6)**
90:6;93:3;98:20;
128:2;173:23;181:4
**testifying (3)**
131:9;203:4,6
**testimony (9)**
63:5;99:1;113:25,25;
123:1;160:20;198:16;
225:2;246:11
**texted (1)**
245:14
**texts (8)**
164:17;222:11;
244:3,14,20;245:5,8,13
**Thanks (2)**
108:5;183:11
**theft (1)**
242:15
**theory (1)**
61:21
**thereafter (1)**
92:16
**therefore (1)**
106:20
**therein (1)**
101:21
**thereof (2)**
90:11;128:3
**third (5)**
84:3;85:11;159:4;
172:24;174:14
**Thomas (2)**
153:13;154:11
**Thompson (5)**
133:10;153:14;
175:7;195:8,10
**thorough (1)**
216:22
**thoroughly (1)**
179:6
**thought (2)**
63:14;225:14
**thousand (3)**
82:23;103:8,10
**thousands (2)**
123:7;127:4
**Three (11)**
103:3;131:13;
159:25;161:24;176:16;
178:21;188:21;189:18;
198:22;209:17;244:17
**throughout (1)**
183:3
**ticket (1)**
81:20
**tickets (11)**
81:22;83:10;84:2,12;
85:19,22;102:18;
113:15;114:1,2;117:22
**till (1)**
178:7
**times (17)**
86:18;88:17,20;96:7;
100:25;102:20,23;
130:11;131:12,13;
162:11;182:4;190:6;
203:5;226:19;231:6;
248:16
**title (6)**
66:23;67:7;151:23;
156:23;159:13;173:9
**titled (1)**
90:3
**today (10)**
74:16;90:22;100:17;
110:4,16;179:2;217:3,
17;234:9;250:3
**together (2)**
63:9;78:9
**told (52)**
62:2,3,5;110:15;
123:13;132:12;150:19,
23;163:22,24;180:10;
193:24;194:7;195:1,6,
18;199:8,11;200:9;
202:10;213:17;220:2;
221:9,25;222:8,11;
229:13;231:24;232:1,
18,20,21,25;233:5,11,
19;234:1,6;241:25;
242:5,7,10,13;243:8,
11,23,23;244:20;245:4,
20;246:5,8
**tolerable (1)**
184:4
**Tom (2)**
193:1,9
**tomorrow (2)**
179:20;249:17
**tonight (1)**
250:1
**took (11)**
71:22;74:9;83:11;
117:24;125:1;171:20;
178:21;201:5;211:5;
215:17;216:3
**top (4)**
85:19;146:17;
212:19;213:8
**topic (3)**
114:5,22;197:23
**topics (3)**
110:15;175:9;210:2
**total (7)**
81:17;121:8;127:5;
140:10;147:11,16;
248:16
**totality (2)**
189:18,21
**towards (1)**
139:3
**track (1)**
88:7
**traffic (1)**
183:14
**training (1)**
73:2
**transactions (1)**
92:15
**transfer (1)**
223:1
**transferred (2)**
243:12,15
**transparency (1)**
142:11
**traveled (4)**
112:2,4;199:4;
201:25
**traveling (1)**
151:1
**treasurer (4)**
148:19;235:6;
238:16;239:2
**Trial (8)**
61:1;64:5;90:19;
106:16;178:3,16;
217:3;247:20
**trip (12)**
183:12;196:7,9,11,
13,15,19,22,23,24;
197:2,4
**trouble (1)**
234:3
**true (11)**
89:24;90:11;94:14;
119:17;128:4;227:5,
11;228:9,12;232:5;
243:11
**trust (3)**
244:4,24;246:1
**trusting (1)**
244:18
**truth (12)**
111:15;168:14;
180:23;181:14,17,18,
23;189:14;190:3,10,
12;212:11
**try (7)**
138:5;147:7;179:8;
180:2;183:20;218:3;
247:12
**trying (1)**
247:22
**Tuesday (1)**
217:6
**turn (12)**
104:10;111:16;
113:24;158:22;159:4;
160:25;172:20;173:23;
174:1;204:25;208:14;
209:6
**Turned (4)**
205:14;206:9;
211:21;215:22
**turning (13)**
80:3,15;90:16;141:3;
150:13;172:24;205:7;
207:19;209:12;212:16;
213:4,19;214:21
**TV (2)**
82:3;224:13
**Twice (1)**
102:24
**two (32)**
82:7;94:1,4;97:6,14;
112:3,8;144:1;159:25;
164:23;165:14;169:21;
178:19;184:12,17,20;
185:16;192:7;193:5;
204:7,8,11;209:8;

214:2;221:5;233:20;
234:18;236:6,9,10,14;
238:14
**type (3)**
134:7,9;152:25
**types (8)**
87:7,10;122:24;
123:12;160:8;165:22;
167:11;244:17
**typically (3)**
78:24;224:6,9

## U

**ultimately (1)**
151:11
**unclear (1)**
117:6
**under (7)**
62:22;90:14;92:18;
178:8;184:6;234:3,6
**understood (4)**
63:6;114:22;116:13;
228:12
**unduly (2)**
138:10,13
**Union (53)**
66:18;67:13,19,24,
25;68:1,2,5,15,17,18;
69:5,12;70:3,17;71:5,
12,14;72:5;73:12;75:2,
15,17,21;79:15,18;
80:3,15;81:21,24;82:7,
8;83:2,19;84:19,23,24;
85:17;87:4;90:6;
104:25;106:1;107:6;
115:4;123:19,21;
124:12;126:13;128:5;
169:12;176:15;212:21;
214:5
**unions (2)**
160:10;171:5
**unit (2)**
120:25;121:3
**United (10)**
132:2;151:18,22;
159:13;163:7;164:23;
165:14;173:9;191:19;
192:7
**Unless (2)**
65:9;98:1
**unsent (2)**
175:5,22
**unsure (1)**
195:7
**up (43)**
62:16;71:7,16;73:3;
76:21;77:19;89:23,24;
95:13;103:22;105:12;
107:17;108:6,10,15;
112:14;119:23;129:6;
130:12;136:7;138:20;
150:21;151:10,11;
157:7;168:13;183:20;
184:7;187:10;199:15;
203:22;206:2,5,8,20;
209:9;219:13;225:6,8;
229:5;237:5;239:14;
246:10
**upcoming (1)**
107:21
**upon (2)**
101:6;233:8
**upper-left-hand-corner (1)**
129:12
**USDOJgov (1)**
144:7
**use (37)**
64:8,20;83:9,12,20,
23;84:12;86:11,13,16;
87:2;88:1;90:24;93:5;
95:9;96:6;100:20;
101:10;102:21,21;
103:4,21;104:21;
105:2,9;108:19,24;
109:8;115:7,19;
116:14,24;117:8;
119:16;122:24;160:13;
207:2
**used (12)**
82:25;86:8;87:18;
96:9;114:2,7;115:25;
124:20;203:4;209:8;
243:20,21
**useful (1)**
103:4
**users (2)**
84:6,8
**using (8)**
116:17;140:2,3;
200:17,20,21;201:1;
243:17
**usually (1)**
206:19

## V

**value (3)**
140:3,4;176:13
**variables (1)**
222:9
**varied (1)**
141:2
**variety (2)**
87:11;113:11
**various (10)**
74:7;102:12;121:11,
12;124:19;130:14;
131:6;160:8,9;191:8
**vary (2)**
87:8;141:1
**vault (8)**
203:25;204:2,20,21,
24;205:3,8;211:13
**Vegas (4)**
79:8,17;112:5;196:7
**vendor (3)**
85:2;208:6,7
**vendors (1)**
124:19
**version (3)**
140:20;240:5,7
**versions (1)**
140:22
**via (1)**
74:12
**Vice (3)**
67:9,10;104:24
**video (1)**
203:19
**videos (1)**
203:23
**view (1)**
179:22
**violation (1)**
113:18
**violations (1)**
62:18
**VIP (1)**
84:2
**visits (1)**
86:6
**volume (1)**
206:15
**voluntarily (6)**
231:2,6,10;241:19;
243:6;248:17
**voluntary (2)**
233:15;243:24
**volunteered (2)**
233:15,25
**volunteering (1)**
245:12
**vouching (1)**
179:10

## W

**wait (1)**
77:18
**wants (1)**
178:10
**warnings (3)**
161:25;176:17,21
**warrant (8)**
125:18,20;169:22,
23;170:4;211:7;
215:18,21
**warrants (5)**
124:7;125:3;169:16,
19,21
**Washington (1)**
183:19
**wasting (1)**
123:10
**watch (2)**
84:4;208:1
**Watches (1)**
214:7
**way (13)**
72:10;74:24;76:11;
77:7;107:1;119:2;
129:7;193:22;232:22;
243:21,22;247:12;
248:14
**ways (4)**
74:10;81:25;156:4,7
**wearing (2)**
126:7,8
**websites (1)**
67:17
**Wednesday (1)**
217:6
**week (5)**
217:7,8;221:5;236:9,
10
**weekend (1)**
107:15
**weight (1)**
89:24
**well-known (1)**
113:9
**weren't (1)**
117:21
**what's (33)**
101:14;107:18;
117:10;122:9;128:15;
129:14,18;149:4,16;
157:17;158:10;159:18;
172:6;173:1;174:15;
181:14;187:25;189:4;
198:14;200:2,8;
203:22;207:6;208:7,9;
212:1;216:5;220:9;
225:18;226:18;237:4,
10,23
**Whereas (1)**
217:24
**wherever (1)**
161:8
**whole (2)**
100:2;133:11
**who's (1)**
77:22
**whose (3)**
71:12;72:4;82:25
**wife (1)**
131:25
**wine (1)**
87:11
**wipe (3)**
214:13;243:17,18
**wiped (4)**
201:5;221:25;222:2;
243:16
**wire (2)**
160:13;173:19
**wires (1)**
160:14
**withdrawn (4)**
92:24;96:5;235:13;
248:13
**within (9)**
67:7;72:23;83:9;
92:15;99:14,16;
104:14,16;190:4
**without (7)**
90:2;102:14;179:8,
13;217:25;232:3,11
**Witness (82)**
61:13,16;63:21,22,
23;64:12,20,21;66:3,6,
8;74:20;76:22;89:21,
21,22;90:5;99:2,10,12,
15,18,22;101:14;
109:16;118:7,8,9;
119:14,19;120:2,3,7;
126:4,9;128:1,14;
130:17,25;146:3;
147:5;156:23;163:3;
164:1,3;172:6;180:4;
184:5;189:20,23;
192:12;198:14,19,24;
199:3,6,9,13,21;
201:19;207:5;211:25;
220:20;222:13,15,18,
20;224:3,6,7,10,12,13;
226:9,12,13;227:6,11,
16,20;249:6,7
**witness' (1)**
115:10
**witnesses (7)**
62:16;63:4;217:17,
19,21;226:9,24
**witness's (1)**
122:19
**woman (1)**
105:22
**wonderful (1)**
107:15
**Wonderland (1)**
190:14
**wonders (1)**
178:23
**Wong (192)**
75:11,13,14,16,22;
76:12,16;77:6,8,23;
85:24;104:13,18,22;
105:17;107:20,25;
108:11;110:19;114:3,
9,18,23;115:2;116:13,
19;117:8;124:10,11,
22;126:16,22;127:16;
128:22;129:17,24;
130:1,5,9;131:10,14,
24;132:4,11,17;133:8,
13;134:1,23;135:6;
136:12,17,20;138:6,15,
18,21;139:4,14,21;
141:5,17,24;142:3,10,
11;143:11,15;144:13,
22,24;145:9,19;146:7,
19,25;147:1,17,23;
148:11,20,25;149:3,23;
150:24;152:8,8;153:5,

13,16,18,25;154:5,8,9,20;155:1,6,7,9,12;157:16;161:18,22;166:9,11,14,19;167:4,11;168:16;169:6;175:6,25;176:6,14;179:14;193:18,22;194:10,17,19;197:7,22;198:7,8;199:4;200:10,12,13,23;202:2,5,15,22,23;204:8;205:21;209:8;214:9;215:1;220:6,15,21;221:14;222:20;223:18;224:22;225:2,22;229:25;230:2,19;232:21;233:1,6,20,21;234:1,6,18;235:9,13,14,20,22;236:14,21;237:1,15;238:2,14,24;241:8,10;242:6,11,14,19,20,23;244:4,9,12,18,23;245:14,21;246:13;247:17,25;248:6
**Wong's (26)** 126:20,21;127:18;136:24;138:4,12,20;145:6;149:9;152:6;153:2;169:24;170:19;175:24;191:7;192:23;193:1,15;194:1;205:2,15;229:11,14;233:16;236:1;242:14
**word (4)** 134:14;183:4;212:24;243:17
**words (5)** 203:4;243:18,20,21;245:14
**work (15)** 66:17,18;70:2;74:4;86:10;87:13;110:23;111:1;120:11,12,25;121:5,22;133:6;231:13
**worked (2)** 112:24;121:6
**workers (2)** 68:19,21
**working (10)** 64:23;132:2;133:22;150:20;179:1;229:20;230:15,17,18,23
**works (1)** 133:7
**worried (1)** 157:5
**worry (1)** 181:6
**write (1)** 144:24
**writers (1)** 63:12
**written (9)** 127:7,15,16;129:16;135:15,18;180:20;190:19;246:12
**wrong (1)** 62:13
**wrote (1)** 190:16
**Wynn (2)** 79:12,16

## Y

**year (24)** 71:22;73:19;78:13,24,25;79:9;85:14,15,16;86:19,20,22,25;87:19;108:25;115:25;122:20;139:23;147:10,21,22;152:17,18;196:11
**yearlong (1)** 80:8
**years (25)** 64:4,5,10;67:4,7;70:11;71:7,16;73:13,16;75:16;80:4;82:2,12;85:7;101:11;112:3;121:9;131:7;133:22;135:24,25;136:2,3;140:8
**York (10)** 67:25;80:21;120:13;123:17;152:23;160:24;170:20;195:16,22;234:12
**you! (1)** 108:13

## Z

**ZIP (3)** 188:23,24;189:1
**zoom (2)** 107:19;227:6

## 1

**1 (22)** 61:4,9,13,16,24;62:2,5,6;90:4;140:3;161:22;189:25;213:5,15;224:21;225:3;229:13,17;231:9,23;233:16;234:1
**1/22/18 (1)** 239:3
**1/23/2018 (1)** 241:12
**1/31 (1)** 236:19
**10 (2)** 160:22;163:1
**10.15 (1)** 214:17
**10:01 (1)** 105:20
**100 (3)** 80:16;126:22;156:3
**100,000 (2)** 147:10,10
**1001 (2)** 159:13;160:11
**1004 (2)** 127:20,22
**1007 (7)** 89:1,4;90:18;97:1,12,22;98:4
**103 (6)** 180:5,18;212:1,7,13,16
**107 (4)** 212:1,7,13;213:4
**109 (12)** 212:1,7,13;214:23;225:7,8,9,13,19,21;226:1,4
**10th (3)** 105:2;108:7;109:8
**11 (2)** 104:6;108:10
**113 (4)** 212:2,7,13;213:19
**115A (4)** 139:10,15,19,20
**115B (4)** 139:10,16,19;141:3
**116 (26)** 146:3,9,14,16;155:18;224:23;225:4;226:2,4,5;229:14;233:1,8,20;234:2,17;235:10,15;236:15,20;237:2;238:22,23;239:8;241:5,8
**117 (3)** 157:18,24;158:5
**118 (3)** 172:7,13,17
**11th (2)** 105:2,3
**12 (2)** 71:11,11
**12:02 (1)** 108:10
**122 (3)** 188:1,11;190:1
**123 (4)** 189:5,25;190:23;191:1
**124 (4)** 189:6;190:1,23;191:1
**125 (3)** 189:6;190:1,23
**126 (3)** 149:5,12,15
**128 (4)** 207:6,13,16,19
**13 (1)** 159:8
**130 (4)** 207:7,13,16;209:12
**131 (3)** 216:6,16,19
**134 (4)** 207:7,13,16;209:6
**1343 (2)** 159:13;160:13
**1344 (2)** 173:9,12
**1346 (2)** 173:9,14
**1349 (2)** 173:9,18
**14.69-11 (1)** 214:17
**14.69-12 (1)** 214:17
**14th (1)** 104:1
**15 (5)** 80:13;105:7;108:17;158:11;216:23
**1512 (2)** 173:9,20
**15th (5)** 73:23;105:20;115:15,24;116:6
**16 (3)** 121:9;135:24;136:2
**17 (3)** 131:16;229:11;236:3
**18 (13)** 84:2,11;85:19;130:4;132:20;159:13;172:19;173:2,9;235:24;236:2,4,6
**19 (5)** 142:2;144:13;213:25;214:19;236:8
**19.01 (1)** 214:17
**19th (1)** 229:24
**1st (5)** 129:15;151:14;174:23;224:17;232:19

## 2

**2 (6)** 90:16;177:4;190:1;198:14;200:6;250:9
**2:10 (1)** 178:2
**20 (2)** 184:1,2
**2007 (3)** 75:18;133:21;140:9
**2008 (3)** 66:22;67:6;73:17
**2009 (2)** 82:15;234:24
**2010 (11)** 82:2;83:4;86:21;95:10;100:20;102:12,21;103:16;109:9;127:2;131:3
**2011 (1)** 102:23
**2012 (2)** 102:25;103:16
**2013 (4)** 103:2,17;104:1,6
**2014 (1)** 85:10
**2015 (18)** 146:25;148:1;152:15;153:11;155:8;161:22;174:23;180:10;193:7,10,25;194:12;195:4,24;212:17;213:5;232:21;233:2
**2016 (30)** 67:7;73:17,23;74:9;78:19;79:1,24;80:13;85:10;105:7;107:21;108:17,19;111:18,21;112:4,14,17,18;115:3,15,20,25;116:7,9;129:15;153:1;196:12;199:20;213:18
**2017 (17)** 78:19;79:24;82:2;86:23,24;95:10;100:20;102:13;108:25;109:9;116:16,16;123:16;124:9;126:15;127:2;131:3
**2018 (75)** 70:14,15;71:3,7,16;73:3;75:18,19;76:10;130:4;131:16;132:20;142:2;144:13;145:12;149:17;150:17;151:7,14;157:13;158:11;159:8;160:22;162:10,13,16;164:21;168:23;169:8;170:1,8,16;171:6,17,24;172:4,19;173:2,25;184:15;186:13;187:14;191:20;192:1;195:11;207:22;213:25;214:19;215:1;220:16;221:7,16,18,21;222:2,3;227:24;229:3,7,11,13,15,17,22;230:3,20,24;234:19,25;235:2,16,23,24;236:11;241:18
**2019 (3)** 82:15;83:4;219:22

**2021 (5)**
67:1,2,6;209:21;
250:9
**2023 (1)**
140:9
**2122L (1)**
213:13
**212428-2504 (1)**
213:10
**21st (1)**
212:17
**22 (6)**
229:15,17,22;
235:16;236:10;241:9
**23 (1)**
235:16
**23rd (1)**
209:21
**24 (1)**
108:19
**24th (2)**
107:13;116:10
**25 (5)**
145:12;149:17;
230:3,12,20
**25th (2)**
215:1;229:24
**27 (1)**
236:11
**28 (1)**
173:25

## 3

**3 (3)**
127:24;190:2;208:24
**3:30 (1)**
133:3
**30 (1)**
133:22
**31 (5)**
150:17;229:7;
230:24;236:13;238:15
**33 (1)**
181:19
**3535-282 (4)**
198:14;200:3;
201:23;220:10

## 4

**4:30 (1)**
183:25
**40 (2)**
83:11;249:14
**400 (5)**
90:7;119:9,11,21,22
**401 (4)**
119:9,11,20,22
**402 (3)**
90:7;91:19;100:10
**403 (4)**
90:7;91:19;96:15;
97:22
**403A (3)**
90:7;91:19;100:10
**404 (4)**
90:7;91:19;96:15;
97:22
**404A (3)**
90:7;91:19;100:10
**407 (3)**
95:17;97:2;100:13
**413 (3)**
95:17;97:2;100:13
**415 (3)**
95:17;97:2;100:13
**416 (2)**
95:17;97:2
**417 (1)**
95:17
**418 (3)**
95:17;97:3;100:13
**420 (3)**
90:7;96:15;97:22
**420A (2)**
90:7;100:10
**425 (3)**
95:17;97:3;100:13
**426 (2)**
90:7;100:10
**428 (3)**
95:17;97:3;100:13
**429 (4)**
95:17;97:3,6;100:13
**431 (1)**
97:3
**439 (6)**
95:17;97:6,7,10;
100:13;107:18
**441 (4)**
95:17;97:3;100:13;
105:13
**444 (3)**
95:18;97:3;100:14
**445 (2)**
96:16;97:24
**448 (3)**
144:9,16,19
**45 (1)**
249:14
**452 (3)**
90:8;96:16;97:22
**452A (4)**
90:8;100:11;103:22,
24
**453 (2)**
90:8;100:11
**457 (2)**
90:8;100:11
**458 (3)**
90:8;96:16;97:22
**458A (2)**
90:8;100:11
**460 (3)**
90:8;96:16;97:22
**460A (2)**
90:8;100:11
**461 (2)**
90:8;100:11
**463 (2)**
90:8;100:11
**463A (2)**
90:8;100:11
**463N (2)**
90:9;100:11
**465 (2)**
90:9;100:11
**467 (2)**
90:9;100:12
**469 (3)**
90:9;96:16;97:22
**469A (2)**
90:9;100:12
**472 (3)**
90:9;96:16;97:22
**472A (2)**
90:9;100:12
**48 (1)**
88:14
**480 (2)**
90:9;100:12
**481 (2)**
90:9;100:12
**482A (2)**
90:9;100:12
**482L (2)**
90:10;100:12
**483 (3)**
90:10;96:16;97:22
**483A (2)**
90:10;100:12
**484 (2)**
90:10;100:12
**485 (3)**
90:10;96:16;97:23
**486 (4)**
95:18;97:7,10;
100:14
**487 (3)**
95:18;97:3;100:14
**491 (2)**
95:18;100:14
**493 (3)**
95:18;97:3;100:14
**498 (3)**
95:18;97:3;100:14
**499 (3)**
95:18;97:4;100:14

## 5

**5 (1)**
104:2
**5:00 (1)**
184:2
**50-word (1)**
107:6

## 6

**6 (2)**
104:5;178:4
**6:01 (1)**
108:7
**600,000 (1)**
69:16
**601 (1)**
128:10
**604 (8)**
128:3,6,10,12;
246:15;247:2,7,14
**604A (4)**
128:15;129:1,4;
130:13
**605 (3)**
128:15;129:1,4
**606 (3)**
128:15;129:1,4
**607 (3)**
128:15;129:1,4
**608A (5)**
128:16;129:1,4,7;
130:19
**609 (9)**
128:3,6,10,11,12;
246:15;247:2,7,14
**609A (3)**
128:16;129:1,4
**657 (3)**
159:13,16;160:8
**6s (1)**
216:12
**6th (1)**
178:6

## 7

**72 (1)**
88:14
**78 (1)**
181:20

## 8

**8 (9)**
104:10;165:6;169:8;
170:1;232:8;241:18;
242:5,17,22
**8:30 (1)**
179:19
**800 (1)**
82:23
**845454-2125 (1)**
213:9
**851 (5)**
76:22;77:3,11,14,17

## 9

**9 (8)**
192:1;207:22;
224:17;243:6,23,24;
245:4;246:5
**9:00 (1)**
178:6
**9:30 (2)**
249:17;250:9
**900 (1)**
82:23
**901 (8)**
90:14;101:15,16,24;
102:2,7,10;108:15
**950 (3)**
95:18;97:4;100:14
**951 (2)**
95:18;100:14
**952 (2)**
95:18;97:4
**954 (5)**
91:25;92:23;97:1;
100:12,14
**955 (3)**
95:18;97:4;100:14
**956 (4)**
92:1;97:1;100:13,14
**957 (3)**
95:18;97:4;100:15
**959 (3)**
95:19;97:4;100:15
**960 (4)**
92:1;97:2;100:13,15
**962 (3)**
95:19;97:4;100:15
**963 (3)**
92:1;97:2;100:15
**964 (3)**
92:1;97:2;100:15
**9th (4)**
198:20;199:5,6,11