# 22-1048-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SYLVIA ASH, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT**
**Volume 3 of 5 (Pages A-543 to A-840)**

JUSTINE A. HARRIS
NOAM BIALE
MAYA BRODZIAK
SHER TREMONTE, LLP
*Attorneys for Defendant-Appellant*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

## TABLE OF CONTENTS


| | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Ash's Memorandum of Law in Support of Motion to Suppress, dated March 20, 2020 | A-26 |
| Declaration of Carrie H. Cohen, for Ash, in Support of Motion to Suppress, dated March 20, 2020 | A-53 |
| Exhibit A to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated February 20, 2020 | A-59 |
| Exhibit C to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated March 11, 2020 | A-61 |
| Exhibit D to Cohen Declaration - E-mail from Carrie H. Cohen to Janie C. Buckley, dated March 16, 2020 | A-63 |
| Exhibit E to Cohen Declaration - Affidavit of Lavale Jackson, in Support of Application for Search Warrants for Stored Electronic Communications, filed March 18, 2019 [Redacted] | A-66 |
| Exhibit G to Cohen Declaration - Consent to Search – Devices | A-115 |
| Exhibit Q to Cohen Declaration - Document entitled "Reset Device Chain of Custody – DRAFT," dated February 4, 2019 [Redacted] | A-119 |

**Page**

Exhibit S to Cohen Declaration - Department of Financial Services Press Release: "Department of Financial Services Takes Possession of Municipal Credit Union and Names NUCA as Conservator" ............................. A-122

Memorandum Opinion of the Honorable Lewis A. Kaplan, dated June 2, 2020.................................... A-126

Superseding Indictment, filed July 21, 2021 ............. A-145

Ash's Memorandum of Law in Opposition to Government's Proposed 404(b) Evidence and in Support of Ash's Motion *in Limine*, dated October 29, 2021 ................................................... A-153

The Government's Motions *in Limine,* dated October 29, 2021 ................................................... A-181

Proposed Jury Instructions on behalf of Ash, dated November 9, 2021 ................................................ A-224

The Government's Request to Charge, dated November 9, 2021 ................................................ A-256

Ash's Memorandum of Law in Opposition to Government's Motions *in Limine*, dated November 12, 2021 .............................................. A-343

Exhibit A to Memorandum of Law - Copies of Judicial Documents ............................... A-363

Oral Argument Transcript, dated November 18, 2021 .............................................. A-381

Trial Transcript, dated November 30, 2021 ............... A-443

Trial Transcript, dated December 1, 2021 ................. A-471

Trial Transcript, dated December 2, 2021 ................. A-543

**Page**

Trial Transcript, dated December 6, 2021 ................. A-613

Trial Transcript, dated December 7, 2021 ................. A-667

Trial Transcript, dated December 8, 2021 ................. A-753

Trial Transcript, dated December 9, 2021 ................. A-803

Trial Transcript, dated December 13, 2021 ............... A-880

Government Exhibit 112 -
Letter from Eli J. Mark, dated June 18, 2018,
with Attachment..................................................... A-891

Government Exhibit 113 -
Letter from Norman Kohn to the Honorable
Sylvia Ash, dated June 19, 2018............................ A-896

Government Exhibit 114 -
Letter from Norman Kohn to the Honorable
Sylvia Ash, dated July 13, 2018............................. A-897

Government Exhibit 117 -
E-mail from LaVale Jackson to
sylviaash@aol.com, dated March 15, 2018, with
Attachments [Redacted]......................................... A-898

Government Exhibit 401 -
MCU's Policy Manual ........................................... A-902

Government Exhibit 751 -
E-mail Chain from the Honorable Sylvia Ash to
Monique Smith, dated May 15, 2018 .................... A-1190

Government Exhibit 769 -
E-mail Chain from the Honorable Sylvia Ash to
RFarley@nymcu.org, dated February 20, 2018..... A-1192

**Page**

Government Exhibit 801 -
Department of Justice Press Release "CEO and President of New York Credit Union Charged with Embezzlement and Fraud," dated May 8, 2018 .......... A-1193

Government Exhibit 901 -
Sylvia Ash's Use of MCU Park Suites, 2010 through 2017 .......... A-1196

Sentencing Transcript, dated April 20, 2022 .......... A-1197

Notice of Appeal, filed May 10, 2022 .......... A-1237

Letter from Carrie H. Cohen to the Honorable Lewis A. Kaplan, dated June 10, 2022 .......... A- 1239

**In The Matter Of:**
*UNITED STATES OF AMERICA, v.*
*SYLVIA ASH,*

---

*December 2, 2021*

---

*Southern District Court Reporters*

Original File LC2KASHF.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 2, 2021
9:30 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JAMIE C. BUCKLEY



(Trial resumed; jury not present)
THE COURT: Good morning.
MS. COHEN: Good morning, your Honor.
THE COURT: A couple of things before we bring the jury in. As to Mr. Orfuni, the juror who had the nasty commute. He lives about as far north in the Southern District as you can get. And to my amazement, our ever resourceful clerk and district executive have learned that if he wants to stay in the city, we can reimburse him, assuming I order it, for lodging at the federal government rate and per diem.
Anybody have any problems with that?
MS. COHEN: No, your Honor.
MR. MARK: No, your Honor.
THE COURT: So, Andy will take care of this.
Secondly, thank you for the letters. I still haven't seen the disclosure form, and whatever instructions there are. And it seems to me I can't come to an informed conclusion without seeing that. Are they here somewhere in this pile of binders?
MR. MARK: They are, your Honor. They are, your Honor. If you give me one second, I will identify them by exhibit number.
The disclosure forms are at GX 500 through 506.
THE COURT: Okay. Are they all the same, you know, in material respects the questions are the same?



MR. MARK: They are all substantially the same and the instructions are right on the form with the questions and the answers right there.
THE COURT: Okay. Give me a moment.
What questions should I be looking at?
MR. MARK: 4A, your Honor, deals with disclosure of a directorship, which is blank.
THE COURT: If I am reading 4A correctly, it requires a listing any office, directorship, or position of any nature, whether compensated or not, held by the judge with any firm, corporation, association or other organization. Do not list membership or uncompensated honorary positions.
What else?
MR. MARK: Question number 9 deals with gifts.
THE COURT: What else?
MR. MARK: Question number 13 deals with income.
THE COURT: Income from compensated employment, directorships, and other fiduciary positions.
Is there a signature or anything of that nature?
MR. MARK: So, these are the public versions, and as you see on the first page, this statement is prepared for public inspection.
THE COURT: How do we know this is even her statement?
MR. MARK: Because we received them from the ethics commission itself.



THE COURT: Say that again, please?
MR. MARK: Because these were the ones that were obtained from the ethics commission directly.
THE COURT: Who says they're hers?
MR. MARK: I think, your Honor, that would be sufficient to establish they are hers, given that they are in her name and they were supplied by the --
THE COURT: You know, maybe -- oh, I see, wait a minute. I missed question one.
MR. MARK: I didn't highlight that, your Honor.
THE COURT: No, you didn't.
MR. MARK: Question one has her name. These were from the ethics commission that were supplied directly.
The version of these are the public inspection ones which are relevant because these are the ones that the public can get access to.
THE COURT: Got it.
MR. MARK: Sorry. I missed the most obvious question at the beginning.
THE COURT: Yes. Okay.
MR. MARK: Obviously, on here lists her title, her work address, and the other identifying information.
THE COURT: Yes, okay. There are an awful lot of justices of the Supreme Court at 360 Adams Street, I figure.
MR. MARK: Yes, your Honor.

THE COURT: Yes. Okay. All right.
Look, I think this has gone as far as it needs to go. And what's your proffer as to what you would offer and how as to sanctions?
MR. MARK: So, as to sanctions, what we would intend to offer is the testimony of a witness Robert Tembeckjian who is --
THE COURT: I know who he is.
MR. MARK: Administrator and counsel of the state judicial conduct committee.
THE COURT: What he's going to say?
MR. MARK: He is going to say that judges have to file these financial disclosure forms, and that failure to file could subject -- false filings in those forms could subject a judge to sanctions. And I think --
THE COURT: What kind of sanctions?
MR. MARK: Administrative sanctions that could go up to including loss of a job.
THE COURT: What's the authority for that?
MR. MARK: What's the -- well --
THE COURT: Are you proposing to call him to testify as to what the law of New York is?
MR. MARK: We're proposing to call him to testify as to what his role and responsibilities are with the state judicial conduct commission, and that is what they are charged



with doing is investigating and --
THE COURT: So what?
MR. MARK: Determining those sanctions.
THE COURT: So what?
MR. MARK: So, and that the judge and Sylvia Ash knew that, because she was on the conduct committee herself for a period of time. And he in fact trained her when she was on that committee.
THE COURT: And what is the source of legal authority to impose sanctions and what sanctions are authorized by law?
MR. MARK: Those would be -- we'll make it very clear those are administrative sanctions, they're not criminal sanctions. And we weren't planning to, but we can go into the statutory basis for the -- for that, for those sanctions.
THE COURT: Put to one side that Mr. Tembeckjian -- I can't pronounce his name, never could -- trained Ms. Ash. We'll deal with that in a minute, and that she was on this committee.
MR. MARK: Yes.
THE COURT: I'm going to call I him Mr. T. Okay. Mr. T just can't go imposing sanctions because he likes the idea.
MR. MARK: No.
THE COURT: No. Something says that this committee has certain authority that the legislature has granted; yes?



MR. MARK: Yes, and that's what he is going to talk about in that background context, of course. That the commission itself is charged with investigating those sorts of -- I mean, all sorts of different judicial ethics, rules and conducts and potential misconducts. They are charged with investigating those, and that then they are charged with also prosecuting those investigations.
THE COURT: And all of that follows, I presume, from some statute enacted by the New York legislature; yes?
MR. MARK: Yes.
THE COURT: Okay. So I don't see why we should have a witness testifying to his understanding of what a New York statute provides.
MR. MARK: Well --
THE COURT: Is there a good reason to do that?
MR. MARK: Well, I think the good reason to do that is that he's testifying all from his personal experience, right, and he's not testifying as an expert. He's testifying as this is my job, these are my responsibilities, and this is --
THE COURT: Whether it's his job or not doesn't matter to anybody. Except to the extent that it may involve personal interactions with the defendant that may or may not be relevant.
MR. MARK: It's very relevant in particular in this context, your Honor, because the defendant was on that



commission, and for a very short period of time where she had personal interactions with him, so she knew intimately what that -- beyond the fact that she would have known as a judge about the judicial conduct commission, she was on that commission for a period of time. She received training from Mr. Tembeckjian. And she knew what they did and how they did it.
So, I think it's critically important to come from that witness the explanations as opposed to just reading a particular statute.
THE COURT: Well, I can understand the argument that his interactions with the defendant are relevant. I'll hear from counsel on the other side in a minute. I don't see why he gets to testify to what he understood the law of New York to be.
MR. MARK: Well, I think he's -- we're not going to proffer -- there is a particular sanction that's tied to this -- he is going to just talk generally the range of sanctions that are available and that's what his commission is charged with --
THE COURT: Where does it come from?
MR. MARK: It comes from law.
THE COURT: Okay. So I'm going to give legal instructions, and not Mr. T.
MR. MARK: Of course, your Honor.

THE COURT: Okay. Now, briefly, counsel, Ms. Cohen, why shouldn't he be an appropriate witness on the interactions with the defendant?

MS. COHEN: Your Honor, this sort of foray into the judicial commission, how it works, what she did when she was on it, is exactly what the defense was concerned about.

THE COURT: Except that if you heard what I said, if there's an instruction to be given on the law of New York here, it's coming from me, not the understanding of a person who I'm sure is in many ways an expert, but we don't allow that kind of testimony.

MS. COHEN: Correct, your Honor. If this witness is allowed to testify about his interactions with Ms. Ash, I don't know what they were. We don't have any 3500 on this witness about that at all sitting here, so I don't know what he will say. I don't know what their interactions were. It is totally irrelevant and very prejudicial to Ms. Ash to have that sort of testimony.

THE COURT: Suppose he were to testify that prior to the filing of these forms, they had a conversation in which there was a discussion of whether an uncompensated directorship had to be disclosed, whether perks that were received in connection with service in that uncompensated position had to be disclosed, and he told her in no uncertain terms absolutely. Just suppose those are the facts.



MS. COHEN: So I'm sure if those were the facts, we would have known about that because that 3500 --

THE COURT: You're fighting the hypothetical.

MS. COHEN: Those aren't the facts.

THE COURT: Really?

MS. COHEN: I'm sure the government would have put that in their very, very detailed complaint. They would have put it before the Court on the numerous motions on this case.

THE COURT: Ms. Cohen, you are a very fine lawyer. One of the things you're very fine at is avoiding the question.

MS. COHEN: Those are not the facts.

The facts here, as proffered by the assistant, are that this person may have trained Ms. Ash on what, I don't know, when she was on the commission. I don't think this person ever interacted with Ms. Ash on the filing of her forms. Using the examples --

THE COURT: If he interacted with her on the commission about what the obligations of judges are in responding to the form, and what can happen to a judge if the judge makes false statements, why isn't that relevant?

MS. COHEN: I don't believe he did, your Honor, though.

THE COURT: You know --

MS. COHEN: Well, the government --

THE COURT: As a defense lawyer I would move to



preclude every prosecution witness on the ground that I don't think that the witness has any relevant knowledge.

MS. COHEN: The government here has a disclosure obligation, your Honor, and by now they would have to disclose to the defense, because perhaps we would have opened differently if they had --

THE COURT: What disclosure obligation are you referring to?

MS. COHEN: If the government had knowledge that Ms. Ash had discussions with someone on the judicial commission when she was on it about how to disclose these forms, they would have had to disclose that to us as either Rule 16, Brady, Giglio, or all three. We don't have that disclosure.

THE COURT: It certainly is not necessarily Brady. It's certainly not Jencks, unless there is a statement by Mr. T. And I offhand don't see why it is under Rule 16 either.

MS. COHEN: A relevant statement to the commission that they are seeking to introduce.

THE COURT: The hypothesis is that there are statements by him.

MS. COHEN: I thought your hypothetical was also statements by him that she listened to and asked questions on and was trained on. That would have been something that the government would have been obligated to disclose to the defense prior to the beginning of trial.



THE COURT: Is that true in your view?

MR. MARK: I don't think that's what Rule 16 covers, your Honor.

THE COURT: I don't either. I'll look at it again.

MS. COHEN: I don't know that this witness knows this so perhaps -- perhaps the government can tell us what this witness knows and proffer to the Court what the actual facts might be. We sitting here have not one piece of 3500.

THE COURT: I'm actually not getting much help here. Rule 16 in relevant part goes to oral statements by the defendant before or after arrest in response to interrogation by a government agent. Yes?

MS. COHEN: Correct, your Honor.

THE COURT: Okay. So if they have a witness who is going to say that he had a conversation with her, and it is a relevant conversation, how is that disclosable under Rule 16? It's not. Right?

MS. COHEN: Correct, your Honor.

THE COURT: Okay. So, you know, I've been around a while.

MS. COHEN: Your Honor, and it would have been disclosed as 3500 material, certainly.

THE COURT: Why is that true?

MS. COHEN: Your Honor, if the government is seeking to -- has talked to a potential witness at trial, the

statements that witness makes to the government that they intend to call the witness are disclosable to the defense.

THE COURT: Everything, without exception, whatever the witness said?

MS. COHEN: This is on a subject matter that they have put, that they charged, when they arrest and the arresting document in the complaint, there is numerous paragraphs about the judicial commission. This is a topic we moved on, they moved on. This is not something not known to the government and the defense is entitled to know what their witness says. That's the whole purpose of the 3500 disclosure.

THE COURT: Doesn't 3500 apply to written statements only by the witness?

MS. COHEN: Your Honor, when the witness speaks with the government and they record it, it is turned over as a written statement of the witness.

I'm sorry if I'm not following, your Honor.

Anyway, here I don't know that this witness recalls any conversation with Ms. Ash specifically about training on this form. If he did --

THE COURT: I'll deal it when he's called. And I'm not going to deal with it now. And we're not going to have him testifying to the law.

MR. MARK: We understand, your Honor. And we intend to not call him until Monday, because's up in Albany, so I



think he will be a witness likely on Monday. And we'll go over with your Honor and we're happy to consider your Honor's thoughts on this right now, and in constructing how we are going to present his direct testimony.

THE COURT: Okay.

MS. COHEN: Just two things on that. If I could have 3500 of that witness over the weekend, if you have spoken to him already, which it's clear you have, I would request that. I also, to the extent he is going to testify about the range of sanctions, as I'm sure your Honor knows, it is a very complicated process and the range of sanctions varies based on the facts, and it is not appropriate here to get into it, because it is a whole mini trial.

THE COURT: That may well be true. But, the fact that there are sanctions that are potentially imposed is all that anybody could possibly need.

MS. COHEN: Your Honor, the government moved to preclude the defense --

THE COURT: I read your letter. And it's a whole other kettle of fish. It just is.

MR. MARK: Your Honor, I'll note for the record, we've turned over 3500 for Mr. Tembeckjian. I'm looking at our binder. We have 3500 for him for October 10 of 14 handwritten pages of notes, from November 23 of an additional two pages of handwritten notes, as well as there are other statements,



e-mails and other memos he made to file conversations with the defendant.

I've got to say, I'm very confused by Ms. Cohen's statements on this matter.

MS. COHEN: There is nothing in that 3500 that relates to training of her --

THE COURT: Look, you were leading me to believe that you had no 3500 at all on this person.

MS. COHEN: I'm sorry, your Honor. I did not mean to say that. I meant to say on this issue. This issue of when she was on the commission and what training he may have been in with her or records of her attending training with him. We have nothing on that specific issue.

He's been a witness on their list and we have 3500 on him, of course. But on this exact issue which they now bring up we have no --

THE COURT: I think I've heard enough on this for now. All right.

Let's get the jury.

I'm now advised that the clerk's office needs clearance from the administrative office before they can offer accommodation to the juror so we are going to wait on that.

(Jury present)

THE COURT: Good morning, everybody. Sorry that we kept you waiting, but the bright news is that I'm informed by



counsel that the trial is running significantly faster than they expected. And I would expect there is a good chance that the government will conclude its presentation certainly next week, and hopefully more toward the early part than the latter part. But that's a hope.

I understand through Andy the problem about the delay in the exhibits.

So, let me just say to counsel that there is, I'm told, a five second delay between the time Andy pushes a button to publish the exhibit to the jury and when it comes up on their screens. And that's been a problem in previous trials and we've tried to solve it, but it's apparently insolvable at least by the contractors the government has working on this. So if you move too fast with the exhibits, the jury never gets to see it or focus on it. So just bear that in mind.

Government's next witness.

MS. KATZ: The government calls Robert Adams.

THE COURT: Mr. Adams, put a couple of inches more between you and the microphone please before we blow all our eardrums out. Okay.

THE WITNESS: Sorry about that.

THE COURT: Not your fault.

ROBERT ADAMS,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION
BY MS. KATZ:
Q. Good morning, Mr. Adams.
A. Good morning.
Q. Can you tell the jury, are you currently employed?
A. Yes, I'm currently employed.
Q. Who do you work for?
A. I'm employed by Apple Incorporated.
Q. Can you tell the jury in brief what is Apple Incorporated?
A. Yeah, Apple Incorporated is a technology and hardware company that specializes in iPhone, iPads, Macs. Additionally they also own retail stores across the globe.
Q. I was going to ask you what kind of products Apple makes, but since you've already introduced them, can you tell the jury what is an iPhone and an iPad?
A. Sure. An iPhone is a personal cellular device that can be used to make phone calls, applications, watch movies, videos, take photos, just day-to-day use of a cell phone.
And an iPad is a tablet device that you can, similar to a phone, download software, you can watch movies, take pictures, make phone calls through Facetime, use it for anything you need in your day-to-day life.
Q. What is an Apple Watch?
A. An Apple Watch is a peripheral that attaches to your iPhone that tells time, you can receive messages. It is used for



health data, exercise, messaging and getting alerts.
Q. Does it have to be paired to a specific phone?
A. It has to be paired to an iPhone. An iPhone 7 or later.
Q. What are AirPods?
A. AirPods are wireless headphones that can connect to any Apple device. They're used by Bluetooth, and they come in a couple different models.
Q. What is your title at Apple?
A. I'm currently an operations manager.
Q. Can you tell the jury what some of your responsibilities are in that role.
A. Yeah. I am in charge of the facilities of the building, as well as the inventory levels, including, you know, iPhone, iPads, day-to-day business. I also have direct reports. Additionally, I work across departmentally, so I work on the sales side and also the Genius Bar.
Q. Are you assigned to work at a specific location?
A. I work at the Apple Fifth Avenue location, which is the big glass cube on Fifth Avenue.
Q. In your role, do you supervise anyone?
A. Yes, I have a team of direct reports that report directly to me, but I also support the rest of the department as well in operations.
Q. Have you received any training in Apple software and hardware?



A. Yes, I have.
Q. Can you describe that to the jury.
A. Sure. Every Apple employee goes through at least a week's worth of training in hardware and software, specifically designed for us to be able to help customers, but also understand just what Apple offers in terms of hardware and software.
Q. You mentioned the term Genius Bar before. Does that relate to customer care issues?
A. Yes, it does.
Q. Can you tell the jury if you've received any training in Apple customer care issues?
A. I sure have. That's one of the first things we get trained in as being able to support customers in both the sales side and the technical side.
Q. What is a Genius Bar?
A. Genius Bar is a portion of the store where customers can come to receive technical support for either hardware or software.
Q. Who staffers the Genius Bar?
A. The Genius Bar is staffed by Apple employees. We have a complete array of different roles that support different parts of the Genius Bar, from a technical specialist to a genius as well as technical experts.
Q. Have you yourself worked at a Genius Bar personally?



A. I have supported the Genius Bar as leadership.
Q. How does one make an appointment with a Genius Bar?
A. There is multiple ways to create an appointment with the Genius Bar. You can come to the store for an appointment. You can also do it over the phone. Or you can do it through the support app which you can download.
Q. Can devices other than phones be serviced at the Genius Bar?
A. Yes.
Q. Like what?
A. You can have an iPad serviced, you can have a Mac serviced, you can have your watch; pretty much anything that's made by Apple.
Q. Does Apple provide support services in another form besides the Genius Bar?
A. Yes. There's two other ways you can receive support outside the Genius Bar. You can do a chat on computer, but you can also call an at-home advisor over the phone, so you can chat with somebody over the phone.
Q. So we already talked about what an iPhone is. Now can you explain what is an iCloud?
A. Sure. ICloud is a service that Apple offers that allows you to back up your data and information remotely. You can use it to also download information to other devices if you wanted to with an Apple ID.

Q. If a customer wanted to create an iCloud account, what are the first steps?
A. The first step in creating an iCloud account is you have to use your e-mail address, you have a primary e-mail address, and you go through the process of filling out your name, address, contact information.
Q. Do you need something called an Apple ID?
A. Yes, you do need an Apple ID. You have to create an Apple ID with an e-mail address.
Q. Once information is uploaded to the iCloud, how long does it stay there?
A. It stays there until you delete it.
Q. How does someone sync their phone with their iCloud account?
A. So, whether you are having a new device or you are signing into a device that's completely wiped or cleared, you do have to sign in with your Apple ID. And then you select the back up that you want to download, and it will download it.
Q. Are you familiar with the regularly conducted business practices of Apple, including customer care and the Genius Bar?
A. Yes, I am.
Q. Does Apple maintain and keep records, including customer care and Genius Bar records, as part of its regularly conducted business?
A. Yes.



Q. Are they under a business duty to do so accurately?
A. Yes.
Q. Are those Apple records, including customer care records, created at or near the time of the customer experience or transaction?
A. Yes, they are.
Q. Are those the types of records that Apple employees rely upon to conduct their business accurately?
A. Yes.
MS. KATZ: I'm going to ask Mr. Hamill just to show the witness only what is marked for identification as trial exhibit number 552, 550, 554A, 554B, 554C, and 556.
Q. Mr. Adams, just take a look at those exhibits on the screen, and tell me do you recognize them?
A. Yes, I do.
Q. Have you had a chance to review them before coming to court to testify today?
A. Yes, I have.
Q. Are they all fair and accurate copies of Apple records and data associated with the names -- with the name Sylvia Ash or -- one second.
Apple ID Sylviaash@aol.com as well as the names Giovanni Porcelli and Nana Osei-Bonsu?
A. Yes.
MS. KATZ: Your Honor, the People offer Exhibit 552,



550, 554A, B and C, and 556.
THE COURT: Wrong courthouse.
MS. COHEN: No objection.
MS. KATZ: Excuse me. Government offers.
THE COURT: They're received.
(Government's Exhibit 552, 550, 554A, 554B, 554C, 556 received in evidence)
MS. KATZ: Mr. Hamill, can you please now publish Exhibit Number 552 to the jury. And I'm going to pause to make sure it all loads on your screen before I talk about it.
Q. So, Mr. Adams, can you see 552 on your screen?
A. Yes, I can.
Q. I'm going to direct your attention to a tab that is labeled GCRM at the bottom.
Do you see that?
A. I do, yes.
Q. What is GCRM?
A. GCRM is a program that we use and it is data we keep that is related to iCloud and Apple IDs specifically to individuals. You can also look up serial numbers and it will bring up GCRM data.
Q. Do you see a column on the left-hand side of the screen that says "description"?
A. I do, yes.
Q. So starting at the left-hand column, and then moving to the



right through serial number and purchase date, can you read those entries to the jury.
A. Sure. The description says iPhone 10, silver, 256 gigabyte, T-Mobile U.S.A.
Q. And is iPhone 10 sometimes referred to as an iPhone X?
A. Yes, it is.
Q. What does 256 gigabyte indicate?
A. That is the internal storage on that particular device.
Q. What does T-MO indicate?
A. That indicates the carrier of the model, so in this circumstance it would be T-Mobile.
Q. And can you tell the jury the serial number and the purchase date of this iPhone X.
A. Yes. The serial number is DNPVPAQSJCL9. And the purchase date is November 23, 2017.
MS. KATZ: Mr. Hamill, if you can just scroll to the right so we can see the column that says "customer name."
Q. Mr. Adams, can you read the customer name to the jury.
A. Sure. The name is Honorable Sylvia Ash.
MS. KATZ: Mr. Hamill, if you can keep scrolling to the right until you see a column that says Apple log on ID and e-mail address.
Q. Mr. Adams, can you tell us what the entries are for those two columns.
A. For the Apple log on ID and the e-mail address it says

Sylviaash@aol.com. E-mail address Sylviaash@aol.com.
Q. The phone number?
A. The phone number present is 917-669-7560.
MS. KATZ: And now, Mr. Hamill, moving even further to the right, can you scroll until you see a column that is labeled "site."
Q. Mr. Adams, under the column labeled "site," what is the entry?
A. Municipal Credit Union.
MS. KATZ: Now Mr. Hamill, if you could go to the tab at the bottom that says "registration."
Q. And Mr. Adams, what kind of information is contained in the registration tab?
A. In the registration tab you are going to see essentially how the device is registered, the serial number, who it is registered to, the date that it's registered, and the registration source.
Q. So, is the device on this page the same device we were just talking about on the GCRM page?
A. Yes, it is.
Q. So directing your attention to the column that says "date registration received" and "the registration source," can you read that to the jury.
A. Yes. The date registration received is January 20, 2018. And the registration source is going to be iCloud.



Q. What does that mean, that the registration source is iCloud?
A. That means the device was registered via iCloud which means that an individual signed in with their iCloud account, Apple ID. And it registered that device to them.
MS. KATZ: Mr. Hamill, moving further to the right, can you just take us to what the first and last name and e-mail address is for the user who registered this device.
Q. And Mr. Adams, you can read those columns.
A. The first name is going to be Honorable Sylvia, last name is Ash. The e-mail address is Sylviaash@aol.com.
Q. So now I'm going to direct your attention to a third tab that is labeled "support case notes."
Mr. Hamill, if you can pull that up.
Can you tell the jury what type of information is contained in support case notes.
A. So in support case notes, these are notes from a Genius Bar or at-home advisor session. That individual would have, you're going to find case ID numbers, which identifies the unique case or circumstance that individual has. You're also going to see the serial number for the device that they have called about or e-mailed about or chatted about. And then the case title, which is kind of the header or the statement about what's going on, and then you're also going to see a section of actual notes that Apple advisors have taken which are very specific to each



case and each moment in the session.
Q. Following up on what you said about notes. Are Apple employees trained on how to take notes during these sessions?
A. Yes, they are.
Q. Can you tell us a little bit about that training.
A. The training we get in terms of taking notes for sessions, it is very strict. It is done through training that we receive through our training team. In addition, we have our Genius Bar team members shadow, which means they actually get to watch someone take notes, as well as reverse shadow, so someone shadows them and provides them feedback.
The information that has to be contained in there is exactly things that are offered to the customer, the circumstance that the customer is in, what they have going on, as well as what they decide to do based on the support that is offered.
Q. Following up on what you said about the case ID column, which is the second column. When is an Apple case ID number created?
A. An Apple case ID number is created when there is an intake from I guess it would be either an at-home advisor or a Genius Bar team member, and that creates -- it is like a unique number that's specific to that issue for that customer.
Q. So is it correct that it tracks a specific event and not a date?



A. Correct.
Q. So is it common to see multiple case ID numbers across different dates?
A. Yes, it is.
Q. Or the same case ID numbers rather?
A. Yeah, it is.
Q. Then do you see the column named "serial number"?
A. I do, yes.
Q. When is that information collected from the customer?
A. That information can be collected in two different circumstances. One is the initial intake, if the device in question is currently being used or needs support and you do it through the support app, it will ask you which device. Otherwise, the advisor will ask you for the serial number of the device.
Q. Is the serial number here listed the serial number for the iPhone X?
A. Yes, it is.
MS. KATZ: And then Mr. Hamill, if you can move a little to the right to the case title.
Q. Who creates the case title?
A. The case title is created by the Apple advisor.
Q. When you had a chance to scroll through the column, did you notice that some case titles are repeated multiple times even on different dates?

A. Yes, I have.
Q. Why would that be?
A. That could be because the individual wanted to get some more support or their issue was unresolved or they had to come back for another session. Or they didn't get the support that they needed. But, it can be calls and even in-person sessions.
Q. Does a case title sync with a case ID number?
A. Yes, it does.
Q. Who decides when an assigned case title and case ID closes and a new one starts?
A. Pretty much when the customer and the advisor, whether it is the Genius Bar member or the at-home advisor, both agree that the session is concluded and there is no further support that's required.
Q. Lastly, the case notes description. Is that the column containing the notes that we talked about before?
A. Yes, that is correct.
Q. So I'm now going to direct your attention to specifically to case ID 100542261395. And can you direct the jury's attention, what is the first date for the entry of that case ID?
A. The first date for that is May 22, 2018.
Q. Is that the same iPhone X serial number next to it?
A. Yes, that is correct.
Q. And what is the case title associated with this case ID?



A. Transfer iPhone X to iPhone 7 and give iPhone 10 or X as a gift.
Q. When you reviewed this document, did you see that there were multiple entries -- I think over 10 -- for this case ID and this case title?
A. Yes, that is correct.
Q. Did you review those entries?
A. I did.
Q. In those entries, does the caller or customer associated with these case titles identify themselves?
A. Yes, they do.
Q. Can you point out to the jury where that is.
A. Under where it says caller, I guess it would be line 14, it says Sylvia Ash.
Q. Is there also a phone number noted?
A. Yes, the phone number we can see there is 917-669-7560.
Q. For the case entries that occur in May 2018, can you tell the jury what the subject matter was in the case notes description.
A. Sure. Can we just expand the case notes.
MS. KATZ: Yes, Mr. Hamill, if you can expand. Thank you.
A. So in this particular case note that's highlighted in yellow, it starts out talking about being unable to send e-mail. Even though the case note says it is about providing



an iPhone as a gift. But in this particular circumstance, it is all about their e-mail.
Q. Why would the case title be different than the substance in the notes description?
A. Very often customers will have an initial issue that they are calling about, but they'll change the subject and ask for support about something else before the issue at hand that they need support with.
MS. KATZ: Mr. Hamill, if you can scroll back to where we can see the dates.
Q. And now I am going to direct your attention to the row that is June 21, 2018 at 25:26. And is that the same case ID and same case title as before?
A. Yes, it is.
MS. KATZ: And Mr. Hamill, if you can go to the note section and expand that square.
Q. Mr. Adams, if you could read for the jury what the customer starting at the top, what the customer notes are for this entry.
A. Sure. So the caller is Sylvia Ash. Phone number is 718-693-7560. Their e-mail is Sylviaash@aol.com. And the issue that they have identified is either backup/migrate/update or restore. And they are looking, if you scroll down, we can look at the customer notes.
Customer wants to transfer iPhone 10 to iPhone 7 and



give iPhone 10 as a gift. And customer has requested appointment with the Genius Bar.
Q. Can you tell if this interaction was over the phone?
A. Yes, I can. The indicator is at the top where it says "caller." That's the first thing you can see there. And then if you scroll down a little bit further, under additional notes, it says Cassandra Books-Spears T1 or Tier 1 technical support. And you see the letters AHA. That stands for at-home advisor. So that's support that would be offered over the phone.
Q. In the context of Apple customer care and Genius Bar speak, what does the term "transfer iPhone X to iPhone 7" mean?
A. That means the customer wants to transfer the data from the iPhone 10 to the iPhone 7.
Q. Can you explain in Apple language what does a transfer mean?
A. So, in this circumstance, in order to transfer data, the iPhone 7 has to be cleared of any data that's on it because you can't overlap data if you already have data on there. So in this circumstance, this customer wanted to essentially erase the iPhone 7, and migrate their data, whether it would be through an iCloud backup or a backup that's on a computer, but it's not specified on here.
Q. What does requested appointment with Genius Bar mean?
A. That means customer wanted to go to a physical location to

get support within a store at the Genius Bar.
Q. So I am going to direct your attention to the next entry for this same case ID and title, which is June 23, 2018.
Mr. Hamill, if you would endeavor to pull that up. And could you scroll to the customer notes column.
What does this entry indicate?
A. If we can get it expanded.
Q. Are you able to read that sentence?
A. Yeah. It says: "Affected product iPhone 10 issue. Erase all content and settings backup/migrate/update/restore. Referred customer to an Apple authorized service provider."
Q. In this language is the "erase all content and settings" referring to the iPhone X?
A. Yes.
MS. KATZ: And then Mr. Hamill, moving to the customer care notes directly below this.
Q. Can you read to the jury what this next entry is.
A. Sure. It says: "Has watch appointment Tom. Wants to erase watch and repair to iPhone 7."
Q. In terms of the Apple customer care terms, what is watch referring to and what is erase watch and repair to iPhone 7?
A. This indicates that the customer is in possession of an Apple Watch that is currently paired to their iPhone. In this circumstance it sounds as if the Apple Watch is paired to the iPhone 10 and they want to pair it to the iPhone 7 so you have



to erase the watch itself to be able to pair it to the iPhone 7.
MS. KATZ: Mr. Hamill, if you can scroll back over to the left so we can see the dates. And there is the next entry for June 23, 2018, for this particular case ID issue. We would be down to the second-to-last row now.
Mr. Hamill, if you expand the customer case notes, the text will become visible.
Q. So we are looking at the customer care notes for the next entry on June 23, 2018. And Mr. Adams, starting from the top, can you read these notes to the jury.
A. Yeah. It says: "Issue. Customer came in with two iPhones. Would like to set up with iCloud restore and the second to clear completely. Also unpairing watch. Steps to reproduce. Actions checking all backups and Apple ID passwords. 6-Plus froze and am using the computer to set as new. Will be restoring once phone allows. Watch is now unpairing."
Q. Is there anything in this entry that indicates that a new phone was purchased on that day?
A. No.
Q. In terms of Apple customer care language, what does the term "set up with iCloud restore and second to clear completely" mean?
A. Sure. To set up a phone with iCloud restore, that involves



ensuring that the phone in question that they want to restore is completely wiped. You want to restore your iCloud backup onto your -- onto a device. To clear completely means to erase all content, the settings and data that's on there.
Q. Is there a difference between clearing a phone completely in an Apple store and how someone can just manually delete something off their phone at home per se?
A. The difference is very minimal. You know, if you do it within an Apple store, it is the same steps we would reproduce in doing at home. The reason people will come to the store is they need help in doing so.
Q. Are you familiar with the term "factory reset"?
A. I am, yes.
Q. What does that mean?
A. Factory reset means it is literally reset to the way it was produced at the factory, so it has no data or information on it. It has no Apple ID. No iCloud. Just fresh, new.
Q. I want to understand, is that the equivalent of the term "clear completely" as you understand it at the Genius Bar?
A. Yes.
Q. If a phone was factory reset, would anyone be able to recover any data from it?
A. Not from the phone itself, no.
Q. Would you be able to recover what iCloud account it was previously linked with, if it was?



A. Not -- no, because you can look up any kind of serial numbers but, no.
Q. What does unpairing watch mean?
A. Unpairing the watch means that it is being removed from that phone itself. So it means it is removed from being a peripheral for it, so you are unpairing it from that watch.
Q. Do you remember in the previous entries it said an iPhone 7. Is that correct?
A. That's correct, yes.
Q. Does it appear now based on this entry that it was an iPhone 6-Plus instead?
A. Yes, that sounds accurate.
Q. In June 2018, how new was iPhone 6-Plus?
A. It was not new by any means.
Q. How many models had come after it? You can approximate.
A. I'm trying to go through. About four or five models.
Q. In June 2018, how new was iPhone X or 10?
A. That was the newest model available.
Q. What does the term "6-Plus froze and am using computer to set as new" indicate?
A. It indicates that while they were trying to erase the data from the 6-Plus manually, which is in the settings, which you choose to erase all content in settings, the 6-Plus froze which means the screen wasn't usable. So they have to plug it into a computer. So at the Apple store, in circumstances like this,

we would plug one of our phones into an in-store use computer we have to make sure we can erase all contents and settings without having to use the phone.
Q. Does it indicate anywhere in these notes that the 6-Plus, the contents of the 6-Plus was backed up anywhere first?
A. It does not.
Q. If the 6-Plus had been brand new at the time, would the contents be deleted before it could be restored?
MS. COHEN: Objection, your Honor.
A. No, it wouldn't.
THE COURT: The witness already answered.
Q. "Watch is now unpairing." What does that indicate is happening?
A. That indicates that the watch is being removed from the phone that it's paired to.
MS. KATZ: Mr. Hamill, if you can just scroll down. I want to make sure I didn't miss anything at the bottom. I believe that was the last line.
So now I am going to ask you, Mr. Hamill, to publish what's already been admitted as Exhibit 550 to the jury. I'm going to wait until everyone can see.
Q. Mr. Adams, what is 550?
A. 550 is GCRM data for what looks like two iPads here.
Q. Can you tell the jury what the entries are for the description, serial number and purchase date for these two



iPads?
A. Sure. The first one is an iPad Air 2 wi-fi cell 64 gigabytes gold AS-U.S.A. The serial number associated with that is DMPNV9MAG5YN. And it has a purchase date of March 20, 2015.
The second one is an iPad Air 2 wi-fi cell 64 gigabyte gold AS-U.S.A. The associated serial number is DMPPQ3QBG5YN with a purchase date of June 10, 2015.
MS. KATZ: Mr. Hamill, if you can scroll all the way to the right again until you see a column named "site." And stop right there.
Q. What entry do you see under the column "site"?
A. It says Municipal Credit Union.
MS. KATZ: Mr. Hamill, could you take us to the registration tab, please.
Q. Mr. Adams, do the serial numbers on this registration tab match the two iPads we just talked about?
A. Yes, they do.
Q. Then looking to the right, can you tell the jury what the registration source is and what the date the registration was received.
A. Sure. For both that's a registration source through iCloud. And the date registered, the first one is October 14, 2015. And the second is September 7, 2017.
MS. KATZ: Mr. Hamill, taking us further to the right



again, can you scroll until we see -- exactly here.
Q. The first, last name and e-mail addresses, Mr. Adams. Can you read those to the jury.
A. Sure. For both devices it says Honorable Sylvia Ash, with the e-mail address Sylviaash@aol.com.
MS. KATZ: Now Mr. Hamill, I am going to ask you to publish 554A to the jury.
Q. Mr. Adams, what type of information is contained in 554A?
A. In 554A you are going to find very similar to before, serial numbers and devices purchase date and registration for these particular devices.
MS. KATZ: Mr. Hamill, if you can scroll to the right, so we can see more information.
Q. Mr. Adams, do you see the columns labeled "product description," "customer name" and "contact name"?
A. Yes, I do.
Q. Do you also see the purchase dates?
A. I do, yes.
Q. Can you just walk the jury through what are the product descriptions and the purchase dates. You don't have to read every single detail, just indicate what the product type is.
A. Sure. There is an iPad mini with a purchase date of November 6, 2012. An iPhone 5 with a purchase date of April 17, 2013. There is an iPad with wi-fi and cellular with a purchase date of December 19, 2013. There is an iPhone



6-Plus gold with a purchase date of October 3, 2014. Another iPhone 6-Plus gold with a purchase date of November 19, 2014. And an iPhone 10 with a purchase date of November 23, 2017.
Q. Were there any Apple products purchased in 2018, according to this chart?
A. No, there are none.
Q. What are the entries for customer and contact names for these items?
A. The customer contact name and customer names you can see are Honorable Sylvia Ash with one being Honorable Sylvia G. Ash.
MS. KATZ: Mr. Hamill, if you can just scroll further to the right where we see address information and Apple log in -- stop at Apple log in IDs.
Q. Can you tell the jury what the Apple log in IDs are?
A. The first one you can see is Sash@MCU.org, and the others are all Sylviaash@aol.com.
Q. Just scrolling a little further to the right, please. For the first -- the second and third entry under the column "street address," can you read what that says.
A. Yes. It says Municipal Credit Union, 22 Cortlandt Street, New York, New York.
MS. KATZ: Mr. Hamill, can you now publish 554B.
Q. What is 554B, Mr. Adams?
A. Can we scroll to the left?

This is more GCRM data for devices that have been registered. You'll find serial numbers, purchase dates, device types, as well as who they are registered to.
Q. If you can go to the registration 2 tab. And can you scroll to the right until you see a name.
Can you tell the jury what the Apple customer name is associated with these devices?
A. There are two that I see. One is S. Osei Bonsu and the other is Samuel Osei Bonsu.
Q. What do you in the e-mail addresses?
A. I see SoseiBonsu@NYMCU.org and SoseiBonsu@aol.com.
Q. In the GCRM tab, are identifiers listed for all these devices?
A. Yes.
Q. Do those include serial numbers and IMEI numbers?
A. Yes.
MS. KATZ: Next Mr. Hamill, can you show us 554C. Mr. Hamill, if you can just scroll through to the right so Mr. Adams can see the full content.
Q. Mr. Adams, can you tell us who the Apple customer is that this information is related to.
A. The name that I see is Giovanni Porcelli.
Q. What is the e-mail address?
A. The e-mail address is GPorcelli@NYMCU.org.
Q. Scrolling back to the left, do you see devices listed



associated with Mr. Porcelli?
A. I do, yes.
Q. Do you also see identifying numbers for these devices?
A. I do, yes.
MS. KATZ: We can close this out, and, Mr. Hamill, can you please publish Exhibit Number 556.
Q. Can you tell the jury what kind of record 556 is.
A. 556 is account details that are correlated to an Apple ID.
Q. Looking at the top-left-hand corner, do you see a number that is labeled DSID?
A. I do, yes.
Q. What is the DSID number of this record?
A. The DSID number is 433139195.
Q. What is a DSID number?
A. A DSID is a unique identifier for an Apple ID. So, like before we've had serial numbers for devices, this is essentially the serial number or directory number for an Apple ID.
Q. What is the Apple ID associated with this DSID number?
A. The Apple ID associated with this particular DSID number is Sylviaash@aol.com.
Q. What is the first and last name associated with this account?
A. First name Honorable Sylvia, last name Ash.
MS. KATZ: Mr. Hamill, I am going to ask you to show



what is marked for identification as Exhibit Number 200, just to the witness only at this point.
Q. Are you able to see that, Mr. Adams?
A. Yes, I am.
Q. Have you had a chance to review Exhibit Number 200 before?
A. Yes, I have.
Q. In the upper-left-hand corner, do you see DSID number?
A. I do, yes.
Q. Is it the same DSID number that matched with the records associated with Sylviaash@aol.com?
A. Yes, it is.
Q. Just in general, what type of record is number 200?
A. This record is a collection of text messages.
Q. To your knowledge, did there come a time when Apple received a search warrant for items, including text messages, from this Apple iCloud account?
A. Yes.
Q. Do these appear to be the text messages that were produced by Apple in response to that?
A. Yes, they are.
Q. Does Apple maintain and keep copies of text messages that are backed up to iCloud accounts as part of its regularly conducted business?
A. Yes.
Q. Are they under a business duty to do so accurately?



A. Yes.
Q. Are the text messages backups created at or near the time that the messages were actually created or received?
A. Yes.
Q. Can you tell the jury what is the date range of the text messages in this.
A. They start -- if you scroll all the way down -- they start around early 2015, and go to about -- go back to the top. We're looking at probably around March 2019.
Q. Were you asked to perform any searches of the contents of Exhibit Number 200?
A. Yes.
Q. Specifically, were you asked to look for any messages to and from the phone number 917-670-3336?
A. Yes.
Q. When you looked at those results, did you see any text messages prior to the date of July 25, 2018?
A. Yes. Sorry. No.
Q. Did you want to refresh your recollection at all or do you remember?
A. If you can refresh my recollection, please.
MS. COHEN: Objection.
THE COURT: Sustained.
Q. Mr. Adams, do you remember if you saw any messages prior to July 25, 2018 in that search?

A. Yes.
Q. What do you remember?
A. I remember just a few text messages, but not too many.
Q. Were there any text messages that preceded the date July 25, 2018?
A. From that number, no.
Q. Then, specifically, did you also search for the phone number 646-388-8833?
A. Yes.
MS. KATZ: Mr. Hamill, I'm asking you to show the witness only exhibit 200A.
Q. Can you see 200A on your screen?
A. Yes.
Q. Does 200A reflect the results of your search of 200?
A. Yes.
Q. Is 200A fair and accurate copies of the text messages contained in number 200?
A. Yes, they are.
Q. Do they contain text messages both to and from that phone number that I just read?
A. Yes.
MS. KATZ: The People offer 200A.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 200A received in evidence)



MS. KATZ: Mr. Hamill, can you please publish 200A to the jury.
Q. Mr. Adams, looking at 200A, can you tell the jury where the senders and recipients are indicated?
A. Yes. We have the sender is the third column. Then the recipient -- if you scroll to the right.
Q. I'll rephrase my question to break it up.
Do you see the column message DCID?
A. Yes.
Q. Does the phone number in that column, is that the owner of this iCloud account?
A. Yes.
Q. And is the phone number 646-338-8833 who the person was corresponding with?
A. Yes.
Q. And in the column that is titled "message body," is that the contents of the actual text messages that were sent?
A. Yes.
Q. In the "message time" column, does that indicate the date and time the messages were sent?
A. Yes, it is.
MS. KATZ: And Mr. Hamill, I'm going to direct your attention, if you could just highlight the first row where it says "message body."
Q. And Mr. Adams, if you could read that first line.



A. It says: "Good morning, Kam," OBJ, which is where an object would be. "Sylvia."
Q. If you could just read the next four lines after that.
MS. COHEN: Objection, your Honor. The document speaks for itself. The witness has no knowledge.
THE COURT: Overruled.
Q. The next four lines, Mr. Adams?
A. It says: "Thanks."
The next message is: "??... if I can be of any assistance, do not hesitate to call."
The next one says: "Now I know who are my real supporters mentally and spiritually."
And the final message in that says: "Know that I got your back 100 percent."
Q. What is the date range of those messages?
A. We have February 2018, February 1st, 2018, to February 2, 2018.
Q. Did you also conduct a search of Exhibit Number 200 for the term MCU in the message body column?
A. Yes.
Q. And are the results of that search contained in Exhibit 200C?
A. Yes.
Q. Are the contents of 200C fair and accurate copies of what was contained in 200?



A. Yes.
MS. KATZ: I have no further questions. Thank you.
THE COURT: Thank you. Let's take our morning break. 15 minutes.
(Jury excused)
(Continued on next page)

(Recess)
(In open court; jury not present)
MR. MARK: I have one issue I want to bring up to the Court right now.
THE COURT: Okay.
MR. MARK: Which is that because my colleague Ms. Katz was going to the restroom, during the break she was able to check her phone and found out that there is an exhibit that the defendant plans to use with Mr. Adams, which we had absolutely no notice of. We took a look, because Mr. Reilly --
THE COURT: You turned around so I couldn't hear you.
MR. MARK: I said which we had no notice of. And we asked Mr. Reilly to take a look at that exhibit. And we did. It looks like a PDF excerpt of a larger report. He wasn't able to show us the whole report. We have no sort of context for what that exhibit is, where it came from.
And I've got to say, this is completely inconsistent with the spirit of the parties' agreement to turn over exhibits so we would have a sense of what these are and we could raise evidentiary issues beforehand.
THE COURT: The whole atmosphere here has become regrettable. I haven't commented on it before, but accusations of disingenuous behavior, that word was used in a letter today that I read this morning. And you know, I don't think it is very helpful. I'd like to see an end to it.



And we'll deal with this exhibit when --
MS. COHEN: If I could correct something Mr. Mark said. Which is the exhibit we sent them by e-mail is simply an excerpt of Government Exhibit 554A that they used, and it is too hard to scroll through it, so we literally screenshot it and marked it while the witness was on the stand. Nothing more.
THE COURT: We'll deal with it if there is anything to deal with.
MR. MARK: We just might need to have some time to look at that and raise that, so I'm raising that with your Honor.
THE COURT: The jury is on its way.
(Continued on next page)



(Jury present)
THE COURT: Jurors and the defendant all are present. Let's continue.
MS. COHEN: Thank you, your Honor.
THE COURT: Cross-examination.
CROSS-EXAMINATION
BY MS. COHEN:
Q. Mr. Adams, am I correct that many times a day people come into an Apple store to transfer data from one phone to another phone?
A. Yes, yes, they do.
Q. And people come to the Apple store to get the help from the Genius Bar in transferring the data from one phone to another phone, right?
A. Yes, that's correct.
Q. Nothing unusual about a person coming to do that, right?
A. No.
Q. Am I correct you were not the person who assisted Ms. Ash at the Apple store on June 23, 2018?
A. That is correct.
Q. Are you aware that the Apple store Ms. Ash went to was in Brooklyn, New York?
A. I was not aware of that.
Q. And am I correct if -- actually, you spent some time on direct on the support case notes from Ms. Ash's visit to the



Apple store on June 23, 2018?
A. Can you repeat the first part? I couldn't hear you.
Q. Sure.
Do you recall on direct you spent some time looking at the support case notes from Ms. Ash's visit to the Apple store on June 23, 2018? Do you recall that testimony?
A. Yes.
Q. And you recall that in the case notes, it said transfer iPhone X and give iPhone X as a gift. Do you recall that?
A. I do, yes.
Q. Do you know if what Ms. Ash actually said to the Genius Bar person she was working with on June 23 was "give" or "given"?
Do you know the exact words she used?
A. You say give as a gift, that portion?
Q. Correct. I think the portion you spent some time on the support case notes talked about transfer iPhone X and give iPhone X as a gift. That is what is reported?
A. Yes, that's correct.
Q. You don't know sitting here today if what Ms. Ash actually said was "given," with an N, rather than "give" without the N, right?
A. Yes.
Q. And there are sometimes typos or errors in the case notes, right?
A. Sure, yeah.

Q. So are you aware that Ms. Ash went to that same Apple store in Brooklyn previously on January 20, 2018?
A. No, I'm not familiar with that.
Q. And that exhibit that you looked at for a while, and were asked questions about on direct, Government Exhibit 552, begins on May 19, 2018; is that right?
A. That is correct, yeah.
Q. So I'm going to show you what's been marked for identification as Defense Exhibit F, and, Ms. Stephenson, if you can pull that up for the witness and the attorneys on the screen.
I will represent to you that Defense Exhibit F is an excerpt from what is in evidence as Government Exhibit 554A. But just please look at it and tell me if you recognize what's been marked for identification as Defense Exhibit F.
A. Yeah, it looks familiar.
Q. Does it look familiar because it's an excerpt from what you produced to the testimony and testified about here today Government Exhibit 554A?
A. Hmm-hmm.
Q. Is that a yes?
A. That's a yes, sorry.
Q. Thank you.
MS. COHEN: The defense moves Defense Exhibit F into evidence.



MS. KATZ: No objection.
THE COURT: Received.
(Defendant's Exhibit F received in evidence)
MS. COHEN: If we can publish Defense Exhibit F to the jury, please.
Q. So, in Defense Exhibit F, reflects on January 20, 2018, Ms. Ash went in person to an Apple store for assistance; is that right?
A. That's what that shows, yes.
Q. On the first entry line, where it says 1/20/2018, the additional notes three boxes over say "CX wants help with her iPhone X and would like Genius Bar appointment." Right?
A. Yeah.
Q. I didn't read the typos that are in there, obviously, right?
A. Yeah, that's fine.
Q. Are you aware that Ms. Ash went to the Apple store on January 20, 2018, to transfer data on an iPhone 7 to an iPhone X?
MS. KATZ: Objection.
THE COURT: What's the objection?
MS. KATZ: Counsel is testifying for something that's not in evidence in these records. Hearsay, your Honor.
THE COURT: Of course.
Members of the jury, I'm going to allow the question



because it's cross-examination. But I remind you that the evidence is the witness's answer, not the question. And you may not assume that the factual part of the question is true unless a witness testifies that it's true from the stand.
Somebody could say, for example, just to pick a crazy example, Are you aware of the fact that Abraham Lincoln was the first president of the United States? Well, we all know he wasn't. The fact that it is in the question is not evidence that it's true. If the witness says, Oh yes, I know that. Well, tells you something about the witness's knowledge of history. Let's go on.
A. Can you repeat the question, please.
Q. Sure. Are you aware that Ms. Ash went to the Apple store on January 20, 2018, to transfer data from her iPhone 7 to an iPhone X?
A. Nothing in this indicates that they wanted to do that.
Q. So, but is that possible that that's what Ms. Ash went to the Apple store to do?
THE COURT: Sustained.
MS. KATZ: Objection.
THE COURT: Anything is possible.
MS. COHEN: I'm just trying -- withdrawn, your Honor.
THE COURT: It is possible George Washington did it. Let's go on.
Q. Mr. Adams, just going to the visit Ms. Ash went, she went



to the Apple store on June 23, 2018. You testified about at length on direct.
A. Hmm-hmm.
Q. It's not unusual for people to come to the Apple store with a phone they already have purchased or had at home to transfer data. Right?
A. Yes, that is common.
Q. And some people buy a phone in the Apple store to transfer data, so that also happens, right?
A. Yes.
Q. And some people bring the phone with them to transfer the data, right?
A. Yes.
Q. Can you tell just looking back for a moment, please, on Defense Exhibit F, can you tell here if Ms. Ash's visit to the Apple store on January 20, 2018, was to the Brooklyn store, the same store she visited on June 23, 2018?
A. Nothing here indicates that.
MS. KATZ: Objection.
THE COURT: Did somebody say something?
MS. KATZ: Objection. That she visited a Brooklyn store is not in evidence. And the witness has not confirmed that.
THE COURT: The question is: Can you tell here if Ms. Ash's visit to the Apple store was to the Brooklyn store,

the same store she visited on June 23.
I'm going to sustain the objection as to form and let's try to boil it down and take it one piece at a time.
MS. COHEN: Sure, your Honor.
Q. So are you aware of what store Ms. Ash went to, to transfer the data from her -- let's do the June visit, 2018, the iPhone X to the 7?
A. I am not.
Q. Are you aware of what store Ms. Ash went to on January 20, 2018, with regard to help with her iPhone X?
A. No, I'm not.
Q. I think you used the word on direct "wiping" of a phone; is that right?
A. That's correct, that's from the notes.
Q. Is wiping of a phone simply as you used it the transfer of the data from one iPhone to another iPhone?
A. No.
Q. What did you use the term "wiping" to mean?
A. Wipe means to remove all content and settings from the device.
Q. Is it common then when someone wants to transfer data, wants to have a new phone, that they wipe the old phone, and put the data on the new phone so their new phone has their data?
A. That is possible, but it doesn't always occur.



Q. So if I go into an Apple store and I have a new phone and I want the old phone's data transferred to my new phone, the new phone has everything that I need, it is sometimes true that I ask you to make the old phone have nothing on it. Essentially wipe it. Right?
A. Yeah, that is common practice.
MS. KATZ: Objection.
MS. COHEN: No further questions.
THE COURT: Any redirect?
MS. KATZ: Just one question briefly, your Honor.
REDIRECT EXAMINATION
BY MS. KATZ:
Q. Mr. Adams, on Defense Exhibit F, is there anything in the notes that indicates what the location of the store was where the events occurred?
A. No, there is nothing there.
Q. In the Apple records that I showed you, was there anything that indicated where the location of the store is?
A. Nope.
MS. KATZ: No further questions.
THE COURT: Thank you, you are excused, Mr. Adams. Thank you.
(Witness excused)
THE COURT: Next witness.
MS. KATZ: The government calls Boris Vestfrid.



BORIS VESTFRID,
called as a witness by the Government,
having been duly sworn, testified as follows:
THE WITNESS: Boris Vestfrid, V-e-s-t-f-r-i-d.
DIRECT EXAMINATION
BY MS. KATZ:
Q. Good morning, Mr. Vestfrid.
A. Good morning.
Q. Are you currently employed?
A. Yes.
Q. Where do you work?
A. I work for the District Attorney of New York.
Q. Are you assigned to a specific unit there?
A. Yes.
Q. What is that unit?
A. The High-Tech Analysis Unit.
Q. Do people commonly call it "HTAU"?
A. Yes.
Q. How long have you worked at HTAU?
A. For seven years.
Q. What is your title there?
A. I'm a senior computer forensics analyst.
Q. When were you promoted to the senior level?
A. About two years ago.
Q. Can you tell the jury what your responsibilities are in



that role?
A. To extract, preserve and analyze data collected from electronic devices.
Q. When you say electronic devices, what kind of devices can that mean?
A. Cell phones, computers, thumb drives.
Q. Can you give an estimate, in your time in HTAU, approximately how many cell phones you have analyzed?
A. Roughly, 5,000.
Q. Before HTAU where did you work?
A. For the special narcotics prosecutor.
Q. What was your position there?
A. I was a computer forensics analyst.
Q. What were some of your responsibilities in that role?
A. They were the same.
Q. Did you also analyze cell phones and other devices?
A. Yes.
Q. Can you tell the jury what kind of training and certifications you've received in your capacity as an analyst?
A. My background is in computers, and I have received numerous on-the-job training on from how to handle electronic evidence, how to extract data from electronic evidence, and how to analyze that data. I'm also certified in some of the software that we use on day-to-day basis to perform my job.
Q. Do you use a program called Cellebrite?

A. Yes.
Q. Can you explain to the jury what Cellebrite is and what it is used for?
A. Cellebrite is one of the softwares that we use, that we use to extract data from cell phones, and then analyze that data and create reports.
Q. Do you use Cellebrite regularly in your job?
A. Yes.
Q. Now, you mentioned that a Cellebrite report is created.
Can you explain to the jury, does that Cellebrite report look like what it would look like if you were open your phone and look inside?
A. No. Cellebrite report categorizes all the data that was recovered from the cell phone and presents it to the user in a readable format.
Q. Is the Cellebrite report divided into different categories?
A. Yes.
Q. What are some of those categories?
A. Depending on the cell phone that you're analyzing, if it's a smartphone, you will have contacts, photos, videos, text messages, emails, different applications that might be on that phone.
MS. KATZ: Mr. Hamill, I'm going to ask you to show the witness only what is marked for identification as Government's Exhibits 269, 270, 260, 268, 271, 272, 248, and



249.
Q. Mr. Vestfrid, have you had a chance to review those exhibits before testifying today?
A. Yes.
Q. In general, what are they?
A. Those are some of the devices that I was asked to analyze.
Q. Are those photographs of the devices?
A. Yes.
Q. And are those devices you were asked to analyze in connection with this investigation?
A. Yes.
Q. Do those photographs fairly and accurately depict the devices that you analyzed?
A. Yes.
MS. KATZ: Your Honor, the government offers Trial Exhibits 269, 270, 260, 268, 271, 272, 248, and 249.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibits 269, 270, 260, 268, 271, 272, 248, and 249 received in evidence)
Q. Can you describe to the jury how these devices were received by your lab at HTAU?
A. The intake process is what we use to grant access for evidence to come into our unit, date for receiving the evidence is established, and once that date is established, we require a



search warrant or a consent form. Once those evidence comes to our unit, we go over the paperwork, we photograph every evidence, and every evidence gets a case label with the case name and associated number for that device. Once everything is labeled and documented in our tracking system, an analyst gets assigned, and they proceed to extract data for those devices.
Q. What, if any, kind of analysis did you perform on those devices that you just saw on those exhibits?
A. I performed a data extraction on all of those devices, and I generated the reports for all those devices.
Q. Would those be Cellebrite reports?
A. Yes.
MS. KATZ: Mr. Hamill, I'm now going to ask you to show the witness only what is marked for identification as Government Exhibit 262, 263, 264, 267, 252, 253, 255, 256, 259, 258, 204, 206, 208, 207, and 250.
THE COURT: What was the final number, please?
MS. KATZ: 250.
THE COURT: Thank you.
BY MS. KATZ:
Q. Mr. Vestfrid, have you had a chance to review those exhibits before testifying here today?
A. Yes.
Q. In general, what are they?
A. These are the screenshots of the software, the data that we



would see presented to us on the software. These are also screenshots of PDFs for some of the categories that were generated, and the screenshots of specific tabs that were asked to be generated.
Q. Does one of those tabs include something called a powering event log?
A. Yes.
Q. Did you create these screenshots yourself during your analysis?
A. Yes.
Q. Are these screenshots fair and accurate copies of the reports and devices that you created screenshots from?
A. Yes.
MS. KATZ: The government offers 262, 263, 264, 267, 252, 253, 255, 256, 259, 258, 204, 206, 208, 207, and 250.
MR. REILLY: No objection, your Honor.
THE COURT: They're received.
(Government's Exhibits 262, 263, 264, 267, 252, 253, 255, 256, 259, 258, 204, 206, 208, 207, and 250 received in evidence)
BY MS. KATZ:
Q. Mr. Vestfrid, specifically, in regards to the screenshot of what we call the extraction summary page, what kind of information is included on an extraction summary page?
A. The extraction summary page will contain the data about the

device, such as device info, it will provide us all the categories, such as text messages, emails, photos, videos, and so on, that will give the user general information on what was contained on that device.
Q. What is a preliminary device report that you also mentioned?
A. That's just a PDF version of the device data and the information about the software, what version of the software was used, which plug-ins were used to decode the data, and so on.
Q. What is a powering event log?
A. A powering event log is a portion where the software would let us know every time the device as powered down.
THE COURT: Could you please tell the jury, if you haven't done so already, what a PDF is?
THE WITNESS: A PDF is a way to export the data, such as Word document or -- PDF is just taking a subset of the report and generating it into PDF.
BY MS. KATZ:
Q. Is a PDF a type of file?
A. It's a type of file, yes.
Q. The powering events log, is that saved in a place called system data in the phone or device?
A. Yes.
Q. What is system data?



A. System data is the software that is running on the phone, that contains all the system information. It does not contain any user data that a user would generate.
Q. What is user data?
A. A user data is something that a user using the phone would -- every time a user would take a photo, that would be user data; every text message that was sent, that's a user data. It's something that is created by the user on that device.
Q. In your training and experience, if a phone has been factory reset or wiped, can you obtain user-created data from it?
A. No.
Q. Are you still able to obtain system data from it?
A. Yes.
MS. KATZ: So, Mr. Hamill, can you please publish Exhibit No. 271 to the jury, which has already been moved in.
Q. I'll just wait for it to appear.
Mr. Vestfrid, looking at 271, can you tell the jury what this is?
A. This is a photo that was taken of the device as it went through the intake process. This is the label that was created by our unit with the case name, case number, the borough that's associated with it, and the device number.
Q. Do you assign device numbers, just as an internal tracking



method?
A. Yes.
Q. So is this device assigned the number CP1?
A. Yes.
Q. What does CP stand for?
A. Cell phone 1. It was the first device that was taken out of the box and assigned that number.
MS. KATZ: Mr. Hamill, if could you show Mr. Vestfrid what is already in evidence as an Apple record that is 552. And go to the GCRM tab.
Q. Mr. Vestfrid, did you have a chance to look at the device identifiers that appear on Exhibit No. 552?
A. Yes.
Q. In terms of those device identifiers, did they match CP1, the phone you analyzed?
A. Yes.
Q. Okay. Thank you.
MS. KATZ: Mr. Hamill, can you now please publish 272 to the jury.
Q. Mr. Vestfrid, what is this a photograph of?
A. Once we turned on the phone, this is what we saw as the first screen for that device.
Q. In your experience, have you seen a screen that simply says "Hello" on it before, on Apple phones?
A. Yes.



Q. What does that indicate?
A. That indicates that it's either a brand new device or the device was recently wiped or reset to factory, and this is the factory welcome screen that you would see.
Q. Did you attempt to recover any user-created data from this phone?
A. Yes.
Q. What was the result?
A. There was no user data collected from this device, only the system data.
Q. And were you able to indeed recover system data from this phone?
A. Yes.
MS. KATZ: Mr. Hamill, can you publish what's already admitted as Exhibit No. 207 to the jury.
Q. Can you tell the jury what is this a picture of?
A. This is the extraction summary report for this device. On the left-hand side, you can see the device info, such as the information about the device, and on the right-hand side you can see the phone data and file system.
Q. Now, looking at the right-hand side of the screen, do you see that there are numbers next to where it says "Images" and "Text" and "Documents"?
A. Yes.
Q. What kind of data is that?

A. Those are the system images, such as preloaded photos for screen savers and backgrounds, different emojis.
MS. KATZ: Mr. Hamill, can you please publish 208 to the jury.
Q. What is No. 208?
A. This is the powering-on event, where we could see the last time the device was turned on.
Q. Do you see a date on the powering event log that indicates when you performed your own analysis?
A. Yes.
Q. What date is that?
A. It's around, I believe, 11/9 or 11/13.
Q. So is it fair to say that every time you perform an analysis, or attempt to perform an analysis, of the phone, that will get logged in the powering event?
A. Yes.
Q. What is the earliest date that you see on this powering event log?
A. 6/23/2018.
Q. Directing your attention back to Apple Exhibit 552, which is already in evidence --
MS. KATZ: Mr. Hamill, if you could pull that up.
Q. -- on the support case notes, do you see an entry that matches that date, June 23rd, 2018?
A. Yes, that date appears to be there.



Q. Thank you.
MS. KATZ: Now Mr. Hamill, will you please publish Exhibit No. 269 to the jury.
Q. What is this a photograph of?
A. This is a photograph of a tablet, which is has the MCU sticker on the back, it has our tracking system sticker on the back as well, and the date on the bottom one, when it was taken in.
Q. Did you label this for tracking purposes as TB12?
A. Yes.
Q. What does TB stand for?
A. Tablet.
MS. KATZ: Mr. Hamill, could you publish No. 270 to the jury.
Q. Can you tell the jury what this is?
A. This is another tablet that was taken in for this case and a label provided, numbering label provided was TB13.
Q. Did you have a chance to review what is already in evidence as the Apple records number 550 that deal with two iPad tablets?
A. Yes.
Q. Do the identifying informations on that record match the device identifiers for these tablets?
A. Yes.
Q. Did you attempt to extract user-created data from both



tablet 12 and tablet 13?
A. Yes.
Q. What was the result?
A. There was no user data present on this device -- these devices.
Q. What was the status of the devices?
A. They were both wiped, or brand new.
Q. Were you able to recover any system data?
A. Yes.
MS. KATZ: Mr. Hamill, can you publish 262 to the jury, please.
Q. What is 262?
A. 262 is a device events.
Q. What is the earliest date you see on the device event log?
A. 7/27/2018.
MS. KATZ: Mr. Hamill, will you now publish 267 to the jury.
Q. What is 267?
A. These are the device events for tablet TB-0013.
Q. What is the earliest date recorded?
A. 8/20/2018.
Q. Did any system data exist on these tablets prior to those two dates we just mentioned?
A. The system data is always on the device.
Q. I'm sorry, events, excuse me, system events.



A. I'm sorry, I'm not following your question.
Q. Were there any events in these logs prior to those two dates that we just mentioned?
A. I cannot say.
Q. Well, are there any dates prior to 8/20/2018 on this log?
A. No.
MS. KATZ: Mr. Hamill, will you please publish No. 206 to the jury.
Q. Mr. Vestfrid, as part of your investigation, did you receive the results of an iCloud search warrant from Apple?
A. Yes.
Q. And what is No. 206?
A. This is the results, this is the screenshot of a summary extraction summary, for the iCloud that we received. This contains everything that Apple provided to us, and we took that data and inserted it into Cellebrite for analysis, and this is the results that were found that Apple provided to us.
Q. Just to be clear, is this just a screenshot and not the full results?
A. Yes.
Q. Based on the screenshot, what was the Apple ID for that account?
A. Sylviaash@aol.com.
MS. KATZ: Mr. Hamill, will you now please publish 268 to the jury.

Q. Can you tell the jury what is 268?
A. This is another device that came into our unit for analysis in regards to this case. It was assigned CP13, and it was taken in on 11/26/2019.
Q. Is this an iPhone 6 Plus?
A. Yes.
Q. Can you tell the jury what, if any, type of forensic analysis did you perform on this phone?
A. I attempted to -- I performed a complete data extraction for this device.
Q. Were you able to retrieve user-created data for this device?
A. Yes.
Q. Was there a Cellebrite report generated as part of your analysis?
A. Yes.
Q. Did you create any screenshots of this device while you were analyzing it?
A. Yes.
MS. KATZ: Mr. Hamill, can you please show the witness only what is marked for identification as Exhibit Nos. 218, 224, 226, 215, and 214.
Q. Do you recognize those exhibits, Mr. Vestfrid?
A. Yes.
Q. What are they?



A. After we extract data from the device, we go manually into the device and scroll through different screens of the device and take photographs of those screens to memorialize what the device looked like, what applications were running on it, and what kind of data, and to see if all the data -- if we're missing any data by the software so we can perform additional extractions.
Q. Do those screenshots also help to aid in identifying the user of the phone?
A. Yes.
Q. Are these exhibits fair and accurate copies of the screenshots that you took while examining the phone?
A. Yes.
MS. KATZ: The government offers 218, 224, 226, 215, and 214.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibits 218, 224, 226, 215, and 214 received in evidence).
MS. KATZ: Mr. Hamill, can you please publish 218.
Q. Mr. Vestfrid, looking at 218, what is this a screenshot of?
A. This is a screenshot of the settings portion of the device. This is what a user would see while holding their phone when they click on settings.
Q. At the top, what is the assigned user name for this device?



A. Honorable Sylvia Ash.
Q. What, if any, services underneath that does it indicate are being used with this phone?
A. When we received the phones, all the phones are put in airplane mode so that no new data could be added to the device, and so that the device could not be remotely wiped.
Q. Underneath where it says Honorable Sylvia Ash, do you see a list of Apple services?
A. Yes.
Q. Can you read those to the jury?
A. Apple ID, Apple iCloud, iTunes and App Store.
MS. KATZ: Can you please publish, Mr. Hamill, No. 226 to the jury.
Q. What is this screen, Mr. Vestfrid?
A. This is the contacts portion of the cell phone when you click -- when you go into contacts and you click on My Contact, this is what the user would see for their own contact.
Q. What is the name of this contact card?
A. Honorable Sylvia G. Ash.
MS. KATZ: Mr. Hamill, can you please display No. 215 to the jury.
Q. What is this a screenshot of?
A. This is an application called Gmail. It's an email application, and this is what you would see if you're browsing your email.



Q. Do you see any names repeated on the screenshot?
A. Yes.
Q. What name is that?
A. Sylvia G. Ash.
MS. KATZ: Mr. Hamill, can you please publish Exhibit No. 214 to the jury.
Q. What is this a screenshot of?
A. This is a screenshot of the photo album. When you go into your photos, this is what you would see, different albums that the user would create.
MS. KATZ: Mr. Hamill, can you publish 224 to the jury.
Q. What is this screen?
A. This is the iCloud portion of the device. In here, you could see everything that was being backed up to iCloud.
MS. KATZ: Mr. Hamill, now can you please show the witness only what is marked for identification as Exhibit No. 234.
Q. Mr. Vestfrid, do you recognize this exhibit?
A. Yes.
Q. What is it?
A. This is the portion of the complete report labeled "Calendar Events."
Q. Is this a fair and accurate copy of the calendar section of the Cellebrite report you created for this device?

A. Yes.
MS. KATZ: The government offers 234.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 234 received in evidence)
MS. KATZ: Mr. Hamill, please publish 234 to the jury.
Q. Mr. Vestfrid, I'm just going to walk you through several events?
MS. KATZ: Mr. Hamill, if you could go to item number 79 on page 13.
Q. And, Mr. Vestfrid, could you just read the date and then the subject for us?
A. Start time is May 12, 2015 at 12:00:00 p.m. UTC, 2 and -- end time is May 12, 2015 at 1:00 p.m. UTC zero -- UTC plus 2.
Q. What is the subject?
A. The subject is MCU chair press release.
Q. What is the category on the right-hand side?
A. The category is which account was used to create this calendar event.
Q. And what is the listed category?
A. Hon.sylviagash85@gmail.com.
Q. Mr. Vestfrid, in the future, you can just read the first date, you don't have to read the full time and end time, you can just read the start date.
So, next, I'm going to direct your attention to No. 71



on page 12. Can you just read the start date and the event for the jury?
A. Start date is August 2nd, 2015; subject is MCU Suite Park Party; and the category is hon.sylviagash85@gmail.com.
Q. Thank you. Unless the category changes, you don't need to read that over again.
Please proceed to item number 65 on page 11.
A. Start time September 12, 2015; subject is U.S. Open tickets.
Q. Okay.
And directing your attention now to item numbers 58 and 59 on page 10, can you read that, please?
THE COURT: Item 65 was on page 13, was it not?
MS. KATZ: I'm sorry if I misstated the page number, your Honor. Item No. 65, yes, you're correct it was on page 13.
Q. So, next move to item numbers 59 and 58.
THE COURT: On page 12?
MS. KATZ: On page 12.
Q. Can you read those to the jury, please?
A. Start time is 10/19/2015; subject is MCU SP opening ceremony; and the category was work.
Number 59: The start time, 10/17/2015; subject, MCU SP in Puerto Rico; category, hon.sylviagash85@gmail.com.
Q. What is the location in number 58?



A. Hyatt -- 58? The Ritz-Carlton at San Juan.
Q. Now, moving to item number 53?
A. Location is Hyatt Regency.
Q. Now moving to item number 53?
A. 59, Hyatt Regency.
Q. Yes. Moving on to item 53 now.
A. Okay.
Q. This is page 11.
A. Start time is 11/13/2015; subject is Kam's evaluation.
Q. What is the location?
A. MCU.
Q. And now directing your attention to page 71 -- excuse me, item number 71.
I'm sorry, my mistake. Can you go to item number 25 instead. Can you read that for the jury, please?
A. August 2nd, 2016; subject, MCU Park; location, Korin et al.
Q. Now move to item number 22.
A. Start time is August 14th, 2016; subject: MCU; location: Family birthday.
Q. Now moving to item number 20?
A. Start time is 10/16/2016; subject: MCU Centennial Celebration; location: New York Hilton Hotel.
Q. And item number 18?
A. Start time: 10/29/2016; subject: MCU SP-LV; location: Wynn Las Vegas.



Q. Item number 17?
A. Start time is 5/8/2017; subject: MCU annual meeting; location: Hilton New York and Towers.
Q. And now item number 15?
A. Start time is 5/19/2017; subject: MCU; location: Gift bags.
Q. And item number 12?
A. Start time is 1/19/2018; subject: IPhone X; location: MCU.
Q. And item number 11?
A. Start time is 2/23/2018; subject: Kam's suspension.
Q. And item number 10?
A. Start time is 2/27/18; subject: MCU New York Nets tickets; location: Barclays Center.
Q. And item number 9?
A. Start time: 3/2/2018; subject: LaVale Jackson; location: U.S. Attorney's Office, 1st Street Andrews Place, New York, NYC.
Q. And item number 8?
A. Start time is 6/8/2018; subject: TDOJ; location: Received call.
Q. And item number 7?
A. Start time: 6/19/2018; subject: Received email from MCU.
Q. And item number 5?
A. Start time is 6/20/2018; subject: Received FedEx from MCU;

location: Equipment letter.
Q. Lastly, item number 4?
A. 6/22/2018; subject: MCU board; location: Suspended.
Q. Okay.
MS. KATZ: Now, Mr. Hamill, can you please show the witness only what is marked for identification as Exhibit No. 235.
Q. Mr. Vestfrid, do you recognize this document?
A. Yes.
Q. What is it?
A. These are some of the contacts that were stored on this device.
Q. Is this exhibit a fair and accurate copy of the contacts card section from the Cellebrite report that you created?
A. Yes.
MS. KATZ: The government offers 235.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 235 received in evidence)
MS. KATZ: Mr. Hamill, please publish 235 to the jury.
Q. I'm going to direct your attention to entry number 54.
Can you read for the jury the name, the date, and then what, if anything, is written in the notes section?
A. The name is LaVale Jackson; it was created on 4/24/2019.
Q. And to the far right, the notes section?



A. Kam suspended equals 02/22/2018, DOJ interview equals 3/1/18; DOJ 2nd interview canceled; 4/10/18; Kam arrested equals 5/12/18; Joe G's home raided equals 5/23/18; supervisory Comt. removed equals 5/24/18; board removed equals "empty"; GJH equals 6/27/18.
Q. Next, I'm going to direct your attention to item number 72.
Can you please read the name of this entry, the date it was created, the email, and then, on the right, what, if anything, is indicated in the notes column?
A. MCU name is MCU facts board info; created on 11/13/2017; email is -- it's a home email, board_of_directors@nymcu.org member equals 2004; board director equals 05/2008; Mark Brantley resigned as chair equals 2015. Board chair equals 05/05/2015; elected chair equals 5/11/16 through 8/15/16; resigned 8/15/16; 10/16/16 equals resigned as MCU trustee.
PW equals chair 2015.
Signed memo for Kam 1/25/18.
Received iPhone X as belated birthday/Christmas gift from Kam.
Received call from DOJ - 1/18.
Call from MCU attorney: 2/14/18.
Met with DOJ — 3/16/18.
Kam suspended equals 02/22/18.
DOJ interview equals 3/1/18.
DOJ 2nd interview canceled 4/10/18.



Kam arrested equals 5/12/18.
Joe G's home raided equals 5/23/18.
Supervisory Comt. removed equals 5/24/18.
Bd fired Kam equals 5/31/18 --
Q. And you can skip the last two lines.
Then I'm going to direct your attention to item number 36. What is the name of that entry?
A. Joseph A. Guagliardo.
Q. And then, moving to the next column, I'm just going to ask you to point out to the jury the phone number at the bottom. Can you read the phone number that starts with 917?
A. (917)670-3336.
Q. And then, lastly, go to item number 38. What is the user name for 38?
A. Kam H. Wong.
Q. And directing your attention to the phone number section, can you please just read to the jury and indicate what the title is, the phone number that begins with (646)33.
A. Work number, (646)338-8833.
MS. KATZ: Okay. We're done with this exhibit now, Mr. Hamill.
Q. Now, in addition to these sections, Mr. Vestfrid, did you also perform a search of this iPhone 6 Plus for text messages associated with the name Kam Wong and the phone numbers that we just saw in that contacts section?



A. Yes.
MS. KATZ: Mr. Hamill, please show the witness only what is marked for identification as Exhibit Nos. 230, 231, 244, 240, 236, 237, 238, 239, 240, 242, 243, 224, 245, and 276.
Q. What are those exhibits?
A. These are some of the text messages that were exported out into separate reports that contained the numbers, phone numbers, that were requested to be searched.
Q. Are these fair and accurate copies of the text messages that you extracted from this iPhone 6?
A. Yes.
MS. KATZ: The government offers 230, 231, 244, 240, 236, 237, 238, 239, 240, 242, 243, 244, and 245.
THE COURT: Just give me a second here.
They're received.
MR. REILLY: Your Honor, no objection, but just to clarify the record, Ms. Katz referenced 240 twice. I just didn't know whether there was a different exhibit she's referencing --
THE COURT: I'm sorry, I can't hear you.
MR. REILLY: I'm sorry, your Honor.
Ms. Katz referenced Exhibit 240 twice. I don't know if there's something to be in its place and that was an error or if it was just in the list twice. The government has no objection. I just wanted the record --

THE COURT: Well, we appreciate that, but neither the court reporter nor I heard that mentioned twice.
MS. KATZ: My colleague also alerted me. I also did accidentally say that number twice. That was just a slip.
THE COURT: Well, all right, well we can ignore it because of what I just said.
(Government's Exhibits 230, 231, 244, 240, 236, 237, 238, 239, 242, 243, 244, and 245 received in evidence)
MS. KATZ: Mr. Hamill, please publish Exhibit No. 230 to the jury.
Q. And, Mr. Vestfrid, looking at this screen, can you tell the jury what are the start and last activity times, and who are the participants in this text message?
A. Start time is 3/18/2018, last activity is 4/29/2018. The two participants are Honorable Sylvia Ash, and Kam H. Wong.
MS. KATZ: Mr. Hamill, can you now move to No. 231.
Q. Can you tell the jury what the date range is of this message thread and who the participants are?
A. Start time is 11/21/2015; last activity is 2/14/2018; and the same participants, Honorable Sylvia Ash and Kam H. Wong.
MS. KATZ: Mr. Hamill, if you could just go to page 3 of this document. I'm sorry, stop there.
Q. And, Mr. Vestfrid, just directing your attention, do you see a message at the very bottom of this page that says, "Delivered 2/2/2018"?



A. Yes.
Q. And can you read who the sender was and what the body of the text is?
A. The message is from Sylvia Ash: "If I can be of any assistance, do not hesitate to call."
MS. KATZ: Mr. Hamill, if could you just go to the next page where the conversation continues.
Q. Mr. Vestfrid, will you just read the first two messages here?
A. Reply from Kam H. Wong: "Now I know who are my real supporters, mentally and spiritually."
Q. And the next message, please?
A. The message is from Honorable Sylvia Ash to Kam Wong: "I know I got your back 100 percent."
Q. What is that date?
A. 2/22/2018.
MS. KATZ: Mr. Hamill, can you move on to No. 244.
MR. REILLY: Your Honor, can I object?
THE COURT: Yes.
MR. REILLY: Only that I believe the testimony misstates the evidence. I believe the date is 2/2/2018, not 2/22/2018.
THE COURT: Well, it says what it says. Let's go on.
Q. And number 244, please.
Can you tell the jury, looking at the top of the page,



who the participants are and what is the date?
A. The participants are Kam H. Wong, 4/29/2018 --
MS. KATZ: I'm sorry, Mr. Hamill, just at the top of the page.
Q. Continue, Mr. Vestfrid.
A. Participants is Kam H. Wong. Do you want me to read the text message?
Q. Who is the recipient?
A. Honorable Sylvia Ash.
Q. What is the date?
A. 4/29/2018.
Q. Now, moving on to number 240, what is number 240?
A. This is a portion of the text messages that were exported out into a PDF format.
Q. Looking at item number 36, what is the date?
A. The message timestamp is 7/20/2018.
Q. Looking at item number 42, what is the date?
A. 5/11/2018.
Q. Can you just read item number 40 to the jury, the -- you can just indicate the sender and the date and the body.
A. This is an iMessage from 1(917)669-7560 to 1(917)669-7560, Honorable Sylvia Ash is the owner, timestamp is 5/15/2018.
Q. What is the body in the right-hand side?
A. It's an outgoing message. Body is: MCU Park manager Gary Perone phone number (646)335-8292.



Q. Thank you.
MS. KATZ: Now can you publish No. 237 to the jury.
Q. What is 237?
A. This is a first page of another PDF-created report for SMS messages.
Q. What are SMS messages?
A. It's a different type of application that you could use to send text messages.
Q. What is the date for item number 1?
A. 2/11/2018.
Q. What is the date for item number 10?
A. 2/7/2018.
Q. And what is the name listed in the party column?
A. From Kam Wong (646)338-8833.
MS. KATZ: Can you go to Exhibit No. 238 now.
Q. Directing your attention to item number 57, can you read what the date is and the body of that message?
A. The date is 9/5/2018. "Hi Marty. I just left an MCU branch where I reactivated and updated an account which had been dormant for over three years...I completely forgot that I had that account. Thankfully, my millions are still intact (LOL). I truly appreciate you contacting me with the information...thank you."
MS. KATZ: Next, go to item number 60.
A. 7/7/2018.

Q. Who are the participants in this chat under the "To" section?
A. From -- to Honorable Sylvia Ash, Beryl Major and Nana Osei Bonsu.
Q. Can you read the body?
A. "Did James ever join the WhatsApp group? What is the 925 telephone number you wrote. We have a problem. Call me when get a chance. Do not write me on the app at this time. Thanks."
Q. Now, can you read item number 62?
A. Time is 5/17/2018.
Q. Just read the body.
A. "Long-time head of MCU charged with stealing millions from coffers (free article)."
MS. KATZ: Now, Mr. Hamill could you please publish number 239 to the jury.
Q. Can you read item number 72?
A. The time is 2/19/2018.
Q. Who are the participants noted on the left-hand side?
A. Beryl Major, Nana Osei Bonsu, and Monique Smith.
Q. What does it say in the body?
A. "Nana, you don't have to call me back but I hope you have read the minutes. The way in which they are written leaves the board unprotected but protects the institution. We are not MCU. That is major!"



Q. Next, can you read item number 74?
A. Time is 2/11/2018.
Q. Who is the message to?
A. To Kam Wong. "Will check it out and let them know that I know the famous Mr. KW. Maybe that will get me a free desert or extra cherry on my cocktail. LOL."
MS. KATZ: Mr. Hamill, you can close out this exhibit, and next I'm going to ask you to publish No. 260.
Q. What is this exhibit, No. 260?
A. This is a device that came into our unit that contained three extractions.
Q. What kind of extractions?
A. Cell phone extractions.
Q. What, if anything, did you do with those extractions?
A. Those -- a copy of this hard drive was made to our system, and then I processed the data with Cellebrite.
Q. Did you create three Cellebrite reports for the three extractions?
A. Yes.
Q. What, if anything, did you name those extractions to help keep track of each of them?
A. The three extractions were given consecutive cell phone numbers, CP16, CP17, and CP18.
MS. KATZ: Mr. Hamill, please publish No. 253 to the jury.



Q. Now, what is this an extraction summary for?
A. This is the data that was provided on that hard drive for the report of -- for CP16.
Q. Looking at the file system and device information that is over on the left-hand side of the screen, can you tell the jury, what does it say under --
MS. KATZ: I'm sorry, Mr. Hamill, further down.
Q. What does it say under "Owner Name" at the bottom?
A. Kam's iPhone X Silver 3338.
Q. Just a couple of lines underneath that, what is the provided phone number?
A. (646)338-8833.
Q. Is that the same phone number that you saw saved in the IPhone 6 Plus we were just talking about?
A. Yes.
Q. Up towards the top, do you see where it says Apple ID?
A. Kwong@mcu.org -- nymcu.org.
Q. A little below that, can you read the serial number?
A. G6TVK189JCL9.
Q. Looking at the top of the screen, what was the date that this extraction was made?
A. The extraction start date is 1/13/2018.
MS. KATZ: And now, Mr. Hamill, can you please put No. 256 on the screen.
Q. Mr. Vestfrid, did you examine the identifiers listed for 256 as well?



A. Yes.
Q. Does 256 pertain to CP17?
A. Yes.
Q. Were all the identifiers the same as CP16?
A. Yes.
Q. But what was the extraction date on this one, as noted at the top?
A. The extraction date for this time period is 6 -- 2/6/2018.
MS. KATZ: Now, Mr. Hamill, if you could put up Exhibit No. 259.
Q. Is this an extraction summary for CP18?
A. Yes.
Q. What, if anything, did you notice about the identifiers for this?
A. They are the same.
Q. The same as CP17 and 16?
A. Correct.
Q. What was the extraction date for this?
A. 10/6/2020.
MS. KATZ: Mr. Hamill, please publish No. 248 to the jury.
Q. What is number 248?
A. This is another device that came into our lab. The number was given to it CP15.

MS. KATZ: Publishing No. 250 to the jury, please.
Q. Does 250 show the device identifiers for CP15?
A. Yes. This is a summary extraction for CP15.
Q. Did those device identifiers match CP16, 17 and 18?
A. Yes.
Q. What can you conclude about all four of these reports having matching identifiers?
A. That all the data came from the same device.
Q. But on different dates; is that correct?
A. Yes.
Q. What is the date that you performed the extraction of CP15? Is it indicated on here?
A. It would be within a few days of receiving the device.
MS. KATZ: Go back to No. 248, please.
Q. What is the date you received the device?
A. 10/08/2020.
Q. Now, did you search all three of these reports — CP16, 17 and 18 — as well as this device for the name Sylvia Ash and phone numbers associated with her from the contact cards in her device?
A. Yes.
MS. KATZ: Mr. Hamill, can you please show the witness only what is marked for identification as Exhibit No. 251, 254, and 257.
Q. What are these exhibits?



A. These are some of the chats I recovered from the device.
Q. From CP16, 17 and 18?
A. Yes.
Q. Are they fair and accurate copies of the contents of the text message section of those three reports?
A. Yes.
MS. KATZ: Mr. Hamill, will you now please show know the witness Exhibit No. 251A, B, C --
THE COURT: I'm going to propose that we interrupt this and break for lunch.
MS. KATZ: Okay.
THE COURT: Let's say ten minutes to 2:00 we'll resume.
(Luncheon recess)



AFTERNOON SESSION
2:00
THE COURT: Andy, is the jury ready?
THE DEPUTY CLERK: They are in the hallway.
THE COURT: Bring them in.
(Jury present)
THE COURT: The jurors and defendant all are present as they've been throughout.
You may continue, counselor.
BY MS. KATZ:
Q. I believe before the break, Mr. Vestfrid, I had just showed you Exhibits 251, 254, and 257.
Do you recall I asked you if those were the results of your searches of CP 16, 17 and 18 for the name Sylvia Ash and associated phone numbers?
A. Yes.
Q. Are they fair and accurate copies of the contents of your Cellebrite report that you prepared for those three extractions?
A. Yes.
MS. KATZ: Mr. Hamill, can you now show the witness only for identification Exhibit Number 251A, B, C, H, K, L, N, O, R, S, T, V, and W.
Q. Have you had a chance to review those exhibits?
A. Yes.



Q. Are those exhibits all certain text messages from Exhibit Number 251?
A. Yes.
Q. Are they fair and accurate copies of portions of the text message sections in Exhibit Number 251?
A. Yes.
MS. KATZ: The government offers Exhibits 251A, B, C, H, K, L, N, O, R, S, T, V and W.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 251A, B, C, H, K, L, N, O, R, S, T, V, W received in evidence)
MS. KATZ: Mr. Hamill, let's please start with Exhibit Number 251B.
Q. And Mr. Vestfrid, can you tell the jury looking at these message what is the date and the participants in this text message thread.
Mr. Hamill, you may need to just enlarge it so Mr. Vestfrid can read the screen.
A. This is from Honorable Sylvia Ash to Kwong@NYMCU.org.
"Good morning, Kam. The laptop I would like is a Mac Air. Thanks. P.S. lovely picture of you and Ruby on Facebook."
Q. Mr. Vestfrid, if you could just continue and read the following two messages below.

A. From Kam Wong: "Yes, I wouldn't give you any cheap stuff."
From Kam Wong: "I'll order the bigger one which still compact and light. I don't think you'll want the smaller 11-inch display one."
Q. I believe the message continues on the second page, Mr. Hamill. And the first two messages.
A. From Ash: "I will rely on your recommendations as an Apple expert. Lastly, I did not know the word cheap was in your vocabulary."
Replied from Kam Wong: "Haha you got me."
Q. Lastly, could you read the message at the bottom of this page and note the date as well.
A. This message from Honorable Sylvia G. Ash to Kam Wong. It says: "Knicks game. Kam, went to the game last night and got the opportunity to meet some of the players and celebrities at a private reception to celebrate their win afterwards. My guests and I had a wonderful time. Thanks again for the tickets. Sylvia." Dated 1/24/2015.
Q. Did you search for a copy of this message thread in CP 17, 18 and 15?
A. Yes.
Q. What was the results?
A. These messages were deleted.
MS. KATZ: Mr. Hamill, next publish Exhibit Number 251C to the jury. Starting at the second message, Mr. Hamill,



if could you just enlarge that for the witness.
Q. And Mr. Vestfrid, could you read it to the jury.
A. "Sylvia, I just found out that the watch style and model that I gave you they only come in 38-millimeter same surface."
Reply from Sylvia, Honorable Sylvia Ash: "No problem."
Q. What is the date of those messages?
A. 6/6/2015.
Q. I believe the conversation continues on the next page. Or --
A. "Besides the new watch I ordered one more band for you. I think you'll like it. See the picture in the next message."
Q. And then there is a final message at the bottom of the screen.
A. The reply was: "Love it. It looks very rich and elegant. Just like me. LOL."
MS. KATZ: Mr. Hamill, will you go to the next page where there is an entry dated July 8, 2015. The last message.
Q. And could you read the date and the participants and the body of that message, Mr. Vestfrid.
A. Yes. From Honorable Sylvia G. Ash to Kam Wong: "Picked up the Mets tickets. Thanks." 7/7/2015.
Q. Did you search for a copy of these messages from the reports for CP 17, 18 and the iPhone?
A. Yes.
Q. Can you just remind the jury what CP 17, 18 and 15 are.



A. CP 15 is the actual iPhone. CP 16 was the first extraction, the first time that the phone was extracted. CP 17 was the second time the phone was extracted. And CP 18 was the last time the phone was extracted.
Q. Are all these messages that I am showing you now from CP 16, the first extraction?
A. Yes, they only contained in the first extraction of CP 16.
MS. KATZ: So Mr. Hamill, next go to Exhibit Number 251H.
Q. And starting at the top of this screen, Mr. Vestfrid, could you read the date and the participants in the body.
A. From Sylviaash@aol.com to Kam Wong: "Kam, do you have any access to U.S. Open tickets? Sylvia."
Replied from Kam: "what's going on? You have a six sense or something. Our chemistry is kicking in. I placed an order yesterday. Hopefully I can get at least one game and the tickets will be yours."
Q. And please continue with the rest of the text message chain.
A. "Great minds think alike. Thanks."
MS. KATZ: Mr. Hamill, if you could then just skip to page number three or the third page. The last message at the bottom of the page could you enlarge, please.
Q. Mr. Vestfrid, could you read that to the jury.
A. "Sylvia, great news. I'm able to get two tickets for the



women's final for the U.S. Open tennis but hush hush."
MS. KATZ: Mr. Hamill, could you move ahead in this exhibit to messages that started 8/28/2015. Could you just enlarge those two messages. Exactly.
Q. Mr. Vestfrid, could you read these messages to the jury and note the participants and the date.
A. Message to Sylviaash@aol.com from Kam Wong: "Sylvia, I forgot to give you my last set of Mets tickets last night. The tickets are for September 21. Monday game starting at 7:10 p.m. How do you want me to send the tickets to you? We have time. Just let me know when you have a chance."
Q. Continue.
A. Reply from Kam. Rely from Sylvia: "Kam, I am having dinner in the city this evening, so please leave them in my mailbox and I will pick them up. Thanks again, especially for the U.S. open tickets. Have a fabulous weekend. S."
MS. KATZ: Mr. Hamill, will you go to Exhibit Number 251K.
Q. And Mr. Vestfrid, will you read the contents of this page, noting participants and the date.
A. From Honorable Sylvia G. Ash to Kam Wong: "Hey Kam, finally got my new phone operating and love it. Thanks, Sylvia."
Reply from Kam: "Great. Any time, Sylvia."
From Kam to Sylvia: "Hi, Sylvia. I got the black

watchband. Do you want me to bring it to Puerto Rico?"
Q. When you searched CP 17 and 18, and CP 15, the iPhone device, were these messages in there?
A. No, they were only on CP 16.
MS. KATZ: So Mr. Hamill, please publish 251L to the jury.
Q. And starting with the message on the bottom of the page, the last message.
A. From Kam Wong to Sylvia G. Ash: "Hi Sylvia, I got up early to order the new iPad Pro and Apple Pencil. I was able to secure an iPad Pro order for this week's shipment. The pencil will be shipped on the 19th. By the way I picked up the gold color for you. Is that okay?"
Q. I believe it continues on the next page.
A. Message from Kam Wong to Honorable Sylvia G. Ash: "Haha I beat it. I went back to the website to check to see if people order at this very moment what would be the shipment date. They have to wait two weeks now."
Reply from Honorable Sylvia G. Ash to Kam Wong: "Kam, you are unbelievable. You should take out stock in Apple if you don't have already. Gold is my favorite color. Thank you."
Q. Did you conduct a search of these messages in CP 17, 18 and the actual device CP 15?
A. Yes.



Q. What was the result?
A. These messages only contained on cell phone CP 16.
MS. KATZ: Mr. Hamill, please go to 251J. Could you please enlarge it.
Q. And Mr. Vestfrid, read the contents of this page.
A. From Kam Wong to Sylviaash@aol.com: "Sylvia, good morning. I was able to secure one iPhone 6-S rose gold. You can have it. I'm hoping they will send it to me before our SP retreat."
Q. Continue.
A. Reply from Sylviaash@aol.com to Kam Wong: "Good morning, Kam. Thank you."
MS. KATZ: Next go to Exhibit Number 251O. Can you enlarge this so the witness can read.
Q. And Mr. Vestfrid, can you please read the first two messages here and note the date and participants.
A. From Honorable Sylvia G. Ash to Kam Wong: "Hey Kam, I will be coming in tomorrow for the elections committee meeting at 5 p.m. Did you receive tickets for our suite at MCU Park? If so I would like to select some dates for my annual birthday party. Additionally, if you have any Knicks or any game or event tickets available, I would appreciate a few. Thanks. Sylvia Ash."
Reply from Kam Wong to Honorable Sylvia G. Ash: "Hi, Sylvia. No, I have not received the MCU Park tickets yet. I think have one Knicks game left. I'll leave that with



Monique."
Q. Did you search for these messages in CP 17 and 18 and the actual phone itself?
A. Yes.
Q. What was the result?
A. The first message to Kam Wong was deleted. And only was -- it was only present on CP 16.
MS. KATZ: Mr. Hamill, please publish number 251R to the jury. Starting with the second message, just blow up the second and third message on the screen.
Q. Mr. Vestfrid, can you note the date and the participants and read the body to the jury.
A. From Honorable Sylvia G. Ash to Kam Wong: "Good morning, Kam. Hope all is well with you as it is with me. I am having some guests from Dubai visiting me with me October 16-20 who are great U.S. baseball fans. If available, I would appreciate four premium Mets or New York Yankees baseball tickets for any of those dates or any tickets that you may have available for those dates."
Reply from Kam Wong to Honorable Sylvia G. Ash: "I have to check because I think the season will be over by then."
Q. I believe the message thread continues on the next page.
A. From Honorable Sylvia G. Ash to Kam Wong: "Okay, how are you?"
Reply from Kam Wong to Honorable Sylvia G. Ash: "I'm



fine but busy as usual. Let me see if basketball season is starting around that time frame. I may be able to get some hockey tickets. I'll do my best to find something for you. For you, Sylvia, I'll do my best."
Q. Did you search for a copy of these messages in CP 17 and 18 and the actual device itself?
A. Yes.
Q. What was the result?
A. There were all deleted except for cell phone, CP 16.
MS. KATZ: Mr. Hamill, please publish 251S to the jury. And could you just enlarge the second message at the bottom of the page.
Q. And Mr. Vestfrid, can you note the date and the participants and read the body to the jury.
A. From Honorable Sylvia G. Ash to Kam Wong: "Hi Kam. It was great to see you this evening. As usual you looked well. I am writing to inquire if you have any available dates at MCU Park during the month of August that I can have for my birthday party. Thank you, Sylvia. P.S. I miss you guys."
Q. What is the date?
A. 5/11/2017.
Q. Did you do a search for this message in CP 17 and 18 and the actual device itself?
A. Yes.
Q. What was the result?

A. These messages were missing from the other reports except for CP 16.

MS. KATZ: Mr. Hamill, please publish 251T to the jury. Starting at the message on the middle of the page. Could you just blow that up.

Q. Mr. Vestfrid, could you just note the date and participants and read the body to the jury.

A. From Honorable Sylvia G. Ash to Kam Wong: "Good morning, Kam. I will be in the city this evening and can stop by if you have any game tickets or an extra iPhone available. Always thank you for your generosity and for remembering me. Sylvia." On 6/12/2017.

Reply from Kam Wong to Honorable Sylvia G. Ash: "I don't have the iPhone yet. I need to find a temp one for you first."

Q. Did you search for a copy of these messages in CP 17, 18 and the actual device?

A. Yes.

Q. I didn't hear you.

A. Yes.

Q. What was the result?

A. The message "I don't have the iPhone yet" was only present on CP 16.

Q. I just want to make sure I understand you correctly. Do you mean the first message from Sylvia was deleted or did I



misunderstand you? Sorry.

A. I believe that only the message from Kam Wong was deleted.

Q. Thank you.

MS. KATZ: And Mr. Hamill, next will you publish 251V to the jury. Can you enlarge the messages so Mr. Vestfrid can see.

Q. And Mr. Vestfrid, can you please note the date of this message before you read it.

A. 1/18/2018 to Honorable Sylvia G. Ash from Kam Wong: "Hi Sylvia. I have the silver X that you may like. Do you want to come to pick it up tomorrow?"

Reply from Honorable Sylvia G. Ash to Kam Wong: "Definitely yes. Can I pick it up in the morning?"

Q. And I believe the message continues.

A. "Okay. Just let me know what time."

Q. And the message continues on the second page, please.

A. "Between 8:30 and 9?"

"Sounds good. I'll see you then."

Q. And is that still 1/18/2018?

A. Yes.

MS. KATZ: Mr. Hamill, can you go down to where the messages start at 1/19/2018. I believe it is the next page.

A. Message from Kam Wong to Sylvia -- Honorable Sylvia G. Ash: "Hi, Sylvia. Are you coming?" And continues: "When you come, if I'm not here, just wait for me."



Q. Can you read the final message on this page.

A. "Just walking into the building."

Q. I believe there is a second page. A third page, sorry. Could you expand these two messages.

A. Reply from Kam Wong: "Oh, okay. Okay, Sylvia, I forgot to tell you the AirPod which is Apple's Bluetooth wireless earphones are very good. I'll get you one because they go really nice and work great with the X."

Q. What is the date of that message?

A. 1/19/2018.

Q. Did you search for a copy of these messages in CP 17 and 18 and the device itself?

A. Yes.

Q. What was the result?

A. These messages were only present on CP 16.

MS. KATZ: Lastly, Mr. Hamill, will you publish Exhibit 251A to the jury.

Q. And can you read for the jury the date of this message thread.

A. The date is 1/19/2018 from Joe Gagliardo to owner Kam Wong to Kevin, to Edward, to Kam Wong Kwong@NYMCU.org Kam Wong. "Are you in tomorrow?"

Q. And the message continues on the following pages.

A. Reply from Kam Wong: "Yes, I'll be in, but Sylvia will be in the office to see me. I can call you later if you're still



up." Follows up with "She'll be in between 8:30 and 9 a.m."

Q. And continue on the next page.

A. A reply from Gagliardo: "Is everything okay?" Kam Wong responds: "Yes, I'll call you later."

Q. And continue to the next page.

A. Reply to the group chat from Gagliardo: "Tonight?" Reply from Kam Wong: "Yes."

Q. Is the date still January 19, 2018?

A. Yes.

Q. Go to the next page, please. You can just read the first message here.

A. Gagliardo responds "Okay."

MS. KATZ: And go to the next page now, please, Mr. Hamill. Actually Mr. Hamill, you can skip along to the next page. Continuing with the first message at the top.

A. Kam Wong responds to the chat: "I had a good conversation with Sylvia."

Joe Gagliardo responds: "Good. If you want me, I'm in Staten Island for a few more hours. I'm working and waiting for my friend."

Q. Go on to the next page.

A. Kam Wong responds to the group chat: "Okay, after you done. I have a 3 p.m. meeting."

Joe Gagliardo responds: "okay. Hopefully I'll hear from her today. I'd like to give you some peace of mind."

Q. Go on to the next page, please.
A. Joe Gagliardo responds to the group message: "ASAP."
Kam Wong responds: "Hear from Sylvia?"
Q. Go to the next page, please.
A. Joe Gagliardo responds: "Yes. Of course. She's looking for PBA cards."
Continue: "Hahahaha."
Q. Go on to the next page, please.
A. Kam Wong responds: "Sylvia remembers our conversation. She said if anyone asks for an affidavit for our conversation, she'll sign it."
Joe Gagliardo responds: "It's all good Kam."
Q. Go to the next page.
A. Joe Gagliardo responds: "She understands."
Kam Wong responds: "I just said to her that someone is giving me trouble for the LTD insurance offset."
Q. Go to the next page.
A. Joe Gagliardo responds: "She and I have a good enough relationship that if you can't talk to her or anyone else, I'll be able to intervene without a problem."
Continue with: "Eisner is also a good place with this."
Q. Go to the next page please.
A. Kam Wong responds: "Okay, that's great."
Joe Gagliardo responds: "Thank you for the trust."



Q. And the next page.
A. Joe Gagliardo continues: "We want this to go away before it goes any further."
Kam Wong responds: "I spoke to Gio. He's on board. He will sign the memo that captured our conversation."
Q. What is the date of those two messages?
A. 1/22/2018.
Q. And I believe this is the last page. Excuse me one more page. Could you go ahead and read this as well.
A. Kam Wong replies: "I really really appreciate all your guys trust and help."
Joe Gagliardo replies: "That's the way I taught him."
MS. KATZ: Mr. Hamill, will you now please go to 251W.
Q. Directing your attention to the top of the page, can you read that first message and note the date.
A. 1/19/20 from Honorable Sylvia G. Ash to Kam Wong: "You're the best."
Q. I'm sorry, just want to direct your attention again to the date. Where you said 1/19/20, do you see the date continues on the second line?
A. 1/19/2018.
Q. And then the message below that, please. The last message.
A. From Kam Wong to Honorable Sylvia G. Ash: "Sylvia, I have the AirPods. Do you want me to send someone to bring that to you?"



Q. What is the date of that message?
A. 1/24/2018.
MS. KATZ: Mr. Hamill, will you now please show the witness only what is marked for identification as Exhibit number 254N.
Q. Oh, I'm sorry, Mr. Vestfrid, I forgot to ask you. Those messages that we just went through, did you search for them in CP 17 and 18 and the device itself?
A. Yes.
Q. What was the result?
A. Those messages were only present on CP 16.
Q. Does that indicate to you that they were deleted from the following reports?
A. Yes.
MS. KATZ: Mr. Hamill, please show, you have it up already, number 254N.
Q. Mr. Vestfrid, is this text message excerpt from your full report for CP 17?
A. Yes.
Q. Is this text message excerpt a fair and accurate copy from your full report?
A. Yes.
MS. KATZ: The People offer 254N.
THE COURT: Received.
(Government's Exhibit 254N received in evidence)



Q. Can you please display 254N to the jury.
Mr. Vestfrid, directing your attention to the message at the top of the page. Can you note the participants and the date and read the body.
A. From Honorable Sylvia G. Ash to Kam Wong: "Know that I got your back." On 2/2/2018.
Q. After the word "back," do you see the numbers 100 percent as well?
A. 100 percent.
Sorry.
Q. Okay. So Mr. Vestfrid, just directing your attention back to the iPhone that we called CP 15.
MS. KATZ: Mr. Hamill, can you please show the witness only what is marked for identification as Exhibit Number 246.
Q. Is 246 a copy of your extraction report for text messages from CP 15?
A. Yes.
Q. Are they fair and accurate copies of the text messages that you extracted from that device?
A. Yes.
MS. KATZ: Mr. Hamill, can you please show the witness number 246D.
Q. Is 246D also an excerpt from your search of CP 15?
A. Yes.
Q. What message of the Cellebrite report is 246D from?

A. These are some of the e-mails that were recovered from the iPhone.
Q. Is 246D a fair and accurate copy of the e-mail section of your search of CP 15?
A. Yes.
MS. KATZ: The People offer 246D.
MR. REILLY: No objection.
THE COURT: Received.
(Government's Exhibit 246D received in evidence)
MS. KATZ: Can you please display 246D to the jury.
THE COURT: Can you folks read this?
MS. KATZ: I am going to ask Mr. Hamill just to zoom in on item number one which we'll be talking about so everybody can read.
Q. Mr. Vestfrid, starting on the left-hand side, can you note the date and the parties for the jury and then continue to read the content.
A. From on 2/6/2018 from Kamwong@NYMCU.org to Kamwong@NYMCU.org. Subject is Sylvia G. Ash CEO LTD insurance premium memo.
Q. Do you see a red and white icon at the bottom of that box?
A. Yes.
Q. What is that?
A. It is an attachment of a PDF.
Q. In your report, is it possible to view the actual



attachment that was with this e-mail?
A. Yes.
MS. KATZ: Mr. Hamill, can you please show the witness 246G.
THE COURT: 246 what?
MS. KATZ: G.
THE COURT: G as in George?
MS. KATZ: Yes.
Just scroll to the second page so he can see the whole document.
Q. Is 246G the actual attachment that we just saw on 246D?
A. Yes.
Q. Is it a fair and accurate copy of the attachment as it existed in your Cellebrite report?
A. Yes.
MS. KATZ: The People offer 246G.
MS. COHEN: No objection.
THE COURT: Received.
(Government's Exhibit 246G received in evidence)
MS. KATZ: Can you display 246G for the jury, please.
Q. I'm now going to ask Mr. Vestfrid to read the whole memo, but if you can just note the to, from, subject and date at the top.
A. To: Sylvia G. Ash, former chair of board. From: Kam Wong, president/CEO. Subject: Longterm disability insurance



for the CEO. Date: January 22, 2018.
Q. Returning to the document. Just directing your attention to the very bottom of the page. Do you see a printed name?
A. Yes.
Q. What is that printed name?
A. Sylvia G. Ash and the signature.
Q. Moving on, in your search of CP 15, were you also able to recover any types of audio files from the device?
A. Yes.
Q. Specifically were you able to recover voice mails that were saved?
A. Yes.
MS. KATZ: Mr. Hamill, can you show the witness 246B.
Q. Directing your attention to the top of 246B. What is that?
A. This is one page out of many pages of the complete report. This is the voice mail section inside the PDF. It has two entries for two voice mails that were recovered.
Q. Can you note what the dates of those voice mails were and who it indicates they were from.
A. Time stamp is 1/18/2018 from Honorable Sylvia G. Ash, duration 22 seconds. Name of the file is 21, file name is 21.AMR.
Q. Contained in the Cellebrite report, are there actual copies of those audio files?
A. Yes.



MS. KATZ: Mr. Hamill, will you show the witness only what is marked for identification as Exhibit Number 277.
Q. Mr. Vestfrid, did you have a chance to review the contents of 277, the audio file, before?
A. Yes.
Q. Does this correspond to the voice mail left on 118/2018?
A. I believe so.
MS. KATZ: Thank you, Mr. Hamill.
Q. And lastly, Mr. Vestfrid, I'm going to ask you, did you have a chance previously to look at what has already been moved into evidence as Apple records 54B and C that pertain to Mr. Bonsu and Mr. Porcelli?
A. Yes.
Q. And when you looked at those records, were there device identifiers listed with the actual descriptions of the device?
A. Yes.
Q. Specifically, for four of those devices, which consisted of an iPad Air, an iPhone X, an iPhone 6-S, and an iPad Air 2, did you attempt to perform extractions of those four devices?
A. Yes.
Q. What was the result?
A. Data were extracted from all those devices and analyzed. Those devices did not contain any user data.
Q. What did that indicate to you?
A. Those devices were either new or they were previously reset

to factory.
MS. KATZ: Give me one second to confer with my colleagues.
THE COURT: Yes.
MS. KATZ: Going back to number 277, the People offer 277.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 277 received in evidence)
MS. KATZ: No further questions, your Honor.
THE COURT: Thank you.
Cross-examination.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good afternoon, Mr. Vestfrid.
A. Good afternoon.
Q. Just a few questions. You testified near the end of your direct about an exhibit which was marked as Government's Exhibit 251A. It was a text chain involving Kam Wong, Joe Guagliardo, and two individuals identified as Kevin and Edward. Do you recall that?
A. Yes.
Q. Was there any indication on that text chain that Ms. Ash or a phone or device associated with Ms. Ash had ever joined that text exchange?



A. No, it was not part of the text chain.
Q. Now, you also testified about quite a few messages involving Kam Wong and Sylvia Ash on direct, right?
A. Yes.
Q. Is it fair to say you didn't identify any text messages during your testimony that showed Kam Wong text messaging Ms. Ash he was under federal investigation?
A. I did not go through all the messages in all the phones. I was only asked to export specific messages.
Q. I understand. My question is a little more specific. Which is to say, the testimony that you offered here today and the text messages that you testified about, is it fair to say you didn't identify any in which Mr. Wong informed Ms. Ash that he was under federal investigation?
A. From the few selected messages that I was asked to analyze, I did not see anything like that. But I did not read all the messages that were recovered from the device.
Q. Understood. Now, you also testified about some text messages with respect to an individual named Joe or Joseph Guagliardo; is that correct?
A. Yes.
Q. Again, is it fair to say that with respect to the messages that you testified about here today, you didn't identify any instance in which Mr. Guagliardo identified or indicated to Ms. Ash that there was a federal investigation going on; is



that correct?
A. I believe so, but, these messages came out of Kam Wong's phone. So, I cannot say if Gagliardo and Honorable Sylvia Ash did not have their own chats on their own devices.
MR. REILLY: Move to strike the last part as unresponsive, your Honor.
THE COURT: The last sentence is stricken.
Q. Now, I'm going to ask the witness to take a look quickly at Government Exhibit in evidence 234. And in particular, I'm going to ask to direct his attention to item 44 in that document.
Mr. Vestfrid, can I ask you to identify the start time of the date associated with item 44 in Government's Exhibit 234.
A. 3/23/2016.
Q. What's the subject of that?
A. Kam's contract.
Q. And the location?
A. MCU.
Q. And is that the category again reflects that's associated with the Hon.sylviagash85@gmail.com; is that correct?
A. Yes.
Q. I am going to ask you to turn your attention, and I'm going to show you entry 61 in Government's Exhibit 234. I'll ask you to identify the date, start time associated with that.



A. 10/15/2015. Subject: MCU supervisory committee meeting.
Q. And then I am going to ask you to look at Government's Exhibit 81 -- excuse me. Same exhibit, Government Exhibit 234, entry 81 and 82 in that matter.
Can you identify the start time associated with entry 81.
A. 4/30/2015. Subject: MCU HR meeting.
Q. Are there two names associated --
A. Location: Kam and Ed.
Q. The category is the Ash e-mail account; is that correct?
A. Yes.
Q. And then with respect to entry 82, can you identify the start time?
A. Yes. 4/29/2015. Subject: Mark B. and Tom S. Location: MCU phone conference.
Q. The same category; is that correct?
A. Yes.
MR. REILLY: May I have a brief moment to confer.
THE COURT: Yes.
MR. REILLY: No further questions, your Honor.
THE COURT: Thank you, any redirect?
MS. KATZ: No, your Honor.
THE COURT: You are excused, sir. Thank you.
THE WITNESS: Thank you.
(Witness excused)

LC23ASH3 Page 373

THE COURT: Let's take our break here. 15 minutes.
(Jury excused)
THE COURT: I do not remember the government putting on the record the usual statement about what, if any, plea offers have been made.
MR. MARK: That's correct, your Honor. There were informal discussions with Ms. Ash. There were no formal plea offers that were extended to Ms. Ash in this matter.
THE COURT: Is there any disagreement about that, Ms. Cohen?
MS. COHEN: That's correct, your Honor.
THE COURT: Is that your understanding, too, Ms. Ash?
THE DEFENDANT: Yes, your Honor.
THE COURT: I'm sorry?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. Thank you. I just wanted it on the record.
(Recess)
(Continued on next page)

LC2KASH4 Page 374

(In open court; jury not present)
MR. REILLY: Your Honor, can I raise one quick question?
THE COURT: Yes.
MR. REILLY: I just want to front an issue, not with respect --
THE COURT: I'm sorry, you better go over in the booth because I can't hear you with the mask.
MR. REILLY: Sorry, your Honor.
Not with the upcoming witness but with the witness after --
THE COURT: We have defeated the purpose of going into the booth.
MR. REILLY: Not with the upcoming witness but with the witness we believe the government has advised they will call after, there is one question or, I should say, one objection with respect to relevance because --
THE COURT: Who is the witness?
MR. REILLY: It's Monique Smith, your Honor.
THE COURT: Okay.
MR. REILLY: There is an exhibit — I believe it's 461 and 461A — it is the board minutes for a February 2018 board meeting. I understand that the government intends to offer just A, which are the steps that a special committee intended to put in place removing Kam Wong from the board and otherwise restricting his work at MCU. Obviously, his suspension has been well trodden ground — we don't object to that — but we don't believe specific steps that the MCU put in place against him with respect to access to his bank account or access to his office or those things are particularly relevant to the -- or, I should say, are relevant to the charged conduct here.

LC2KASH4 Page 375

MR. REBOLD: Yes, your Honor. We think it's highly relevant, and as Mr. Reilly just indicated, it's well trodden ground. Without objection throughout the trial, there's been testimony about Kam Wong being forced to resign. We just heard testimony from a witness who pointed out timelines that the defendant created on her own iPhone that may or may not be accurate. These minutes — and, again, we just want the final page, which memorializes that Mr. Wong has been advised to step down — confirms that it happened on or about the date in the defendant's phone, which is February 22nd, 2018.
The witness who will be testifying is the person who's responsible for circulating and generating those minutes, and I don't see how it's prejudicial in any way to the defendant to put into evidence the memorialization of the date and fact that the board recommended that Kam Wong resign on that date.
THE COURT: Yes, I was going to say.
Ms. Ash was on the board at that date or not? Just remind me, please.
MR. REBOLD: She was not.

LC2KASH4 Page 376

THE COURT: She was not?
And the date that it happened corresponds to the timeline in her phone?
MR. REBOLD: Can I just confirm that with my colleagues?
(Pause)
MR. REBOLD: Yes, your Honor.
THE COURT: I think it's surely not the most important document in the case, but it doesn't sound to me like it's prejudicial in any way. Not unfairly prejudicial is what I should have said.
MR. REILLY: Your Honor, our objection is simply that it relates to MCU's remedial step as to Mr. Wong, not the fact of his suspension, which, as we said, is understood and it's in the record.
THE COURT: Are you prepared to stipulate to the date and the removal?
MR. REILLY: Yes, your Honor.
THE COURT: So what do you need the rest for, Mr. Rebold?
MR. REBOLD: Just one moment?
(Pause)
MR. REBOLD: Your Honor, the minutes also, if you'll just direct your attention to the bottom of 461A, also adopt that Mr. Wong needs to turn over his MCU-issued phones and

other computer devices, which we believe is similarly relevant, based on the evidence --
THE COURT: You're speaking at 78 and I'm still 33.
MR. REBOLD: Sorry, your Honor.
If your Honor will direct his attention to Government Exhibit 461A, near the bottom --
THE COURT: Of course I don't have 461A.
MR. REBOLD: If you have 461 and just go to the final page of that document, you'll find what is effectively 461A. I'll just give your Honor a moment to review the document.
(Pause)
THE COURT: Okay. And this accomplishes what?
MR. REBOLD: This relates to the board recommending and codifying -- memorializing that Wong is also required to turn over his MCU-issued computer equipment, phones and other devices in his possession.
THE COURT: Yes, I got that, but --
MR. MARK: Your Honor, may I?
THE COURT: Yes, I made one exception earlier for Ms. Cohen, so I'll make one for you.
MR. MARK: This will be my one exception, your Honor.
It gives important context for the fact that the defendant then communicates with Kam Wong on a new phone that he gets after -- so by way of a timeline: Kam Wong --
THE COURT: So the inference is that this somehow or



another -- first of all, it's known to Wong?
MR. MARK: Oh, this is, yes --
THE COURT: Yes, obviously it's known to Wong, right? Because they kick him out, and they say, give us the phones, give us all that. We know that Wong and the defendant are in close touch, and then the defendants, whatever happened with their phones happens afterwards, and there's an inference that there's a relationship between these events; yes?
MR. MARK: She then communicates with Kam Wong --
THE COURT: On a new phone, which means she knows there's a new phone.
MR. MARK: Exactly.
THE COURT: The inference is she knows why there's a new phone?
MR. MARK: Exactly, your Honor.
THE COURT: Okay.
Overruled. It will come in. Let's go, Andy.
THE DEPUTY CLERK: Okay.
(Continued on next page)



(Jury present)
THE COURT: The jurors and the defendant all are present, as they have been throughout.
Ladies and gentlemen, lest I forget at the end of the day, there's a member of the jury who has a medical checkup on Monday morning, so we're going to begin testimony at 12:30, and your lunch will be where you get it every day, at noon, in case you're interested in the cuisine from downstairs, and so you can come and have lunch. Then we'll start around 12:30.
As I say, we're still moving ahead. It may not seem like it every minute but we're moving ahead quickly.
Okay. Where is the witness?
MR. REBOLD: The government calls Robert MacKoul.
ROBERT E. MacKOUL,
called as a witness by the Government,
having been duly sworn, testified as follows:
THE WITNESS: My name is Robert E. MacKoul M-a-c-K-o-u-l.
THE COURT: Okay. Let's proceed, Mr. Rebold.
DIRECT EXAMINATION
BY MR. REBOLD:
Q. Good afternoon, Mr. MacKoul.
Do you presently work?
A. Yes, I do.
Q. What do you do for a living?



A. I am in the insurance industry.
Q. How long have you been in the insurance industry?
THE COURT: Mr. MacKoul --
A. It will be 52 years --
THE COURT: Mr. MacKoul, could we move the microphone a little closer to you so you're speaking into it.
THE WITNESS: Okay.
THE COURT: It's flexible.
A. Fifty two years, this September.
Q. In the years leading up to and including 2018, did you work for a particular company?
A. Yes. I created two insurance firms — one, MacKoul & Associates was a retail insurance brokers; the other, New Empire Group was a wholesale insurance broker.
Q. At a very high level, can you explain for the members of the jury what an insurance broker is?
A. An insurance broker represents the insured to insurance carriers to provide insurance for their needs.
Q. Is the "insured" another way of saying a person or a group of people that need insurance?
A. It could be a person, it could be a company, it could be personal or commercial insurance.
Q. What were your duties and responsibilities with MacKoul & Associates?
A. I was the chief executive officer and -- president and

chief executive officer.
Q. And during what range of years did you work for MacKoul & Associates?
A. MacKoul & Associates was created in 1987.
Q. And did you continue to work at MacKoul & Associates up to and including 2018?
A. Yes.
Q. What were your duties and responsibilities as CEO for MacKoul & Associates?
A. Well, I maintained my own clients. And my responsibilities as the chief executive officer was to grow the business, at the time that I turned the business over to my son, in 2018, and really devoted my duties to the other company, was to grow the business — the business was up to 36 employees, it had some heft — and I was a businessman.
Q. What categories of clients did you have with MacKoul & Associates?
A. Well, there were different facets of it. There was personal insurance, there was commercial insurance, there was employee benefits. And we had people, and qualified people, who handled different aspects of all the business.
Q. Now, were some of your clients companies?
A. Yes.
Q. Were some of your clients CEOs of companies?
A. Yes.



Q. Did you work with employees of companies as well?
A. Yes.
Q. Mr. MacKoul, before we go any further, do you presently have any medical or other issues that affect your short-term memory?
A. Possibly. I have had three brain surgeries. I had two in 2016, the second -- for a tumor called a meningioma. The second surgery in 2016 was because my -- I developed an infection after the first surgery. The third surgery was earlier this year, in May, and I had radiation just a bit over a month ago, that ended just before Thanksgiving.
Q. Have you found that some of that treatment has affected your short-term memory?
A. I would say that it's possible, but I'm also 74 years old, and some of the short-term memory is just like everybody else my age.
Q. To your knowledge, has --
THE COURT: Hopefully not people older than you are.
Q. To your knowledge, has your long-term member by been adversely impacted?
A. No.
Q. Was one of your clients at MacKoul & Associates the Municipal Credit Union, also known as MCU?
A. Yes.
Q. During what years was MCU a client of yours?



A. MCU was a client from 1982 until 2019.
Q. So that actually predated your establishment of MacKoul & Associates?
A. Yes.
Q. What were your duties and responsibilities with respect to the client services you provided to MCU?
A. I provided most of the employee benefits for MCU, and I had some individual executive benefit programs for executives in the Municipal Credit Union.
Q. Did you work with and for the chief executive officers, or CEOs, who served at MCU over those years?
A. Yes.
Q. Did you provide insurance services to those individuals?
A. Yes.
Q. Mr. MacKoul, are you familiar with the phrase "long-term disability insurance"?
A. Yes.
Q. Can you please summarize, in broad strokes, what is long-term disability insurance?
A. Long-term disability insurance is exactly as it sounds; it is disability that is written for a longer period of time, anywhere from a year to a lifetime.
Q. Meaning, that if you needed insurance, you would get paid for a year or up to your full lifetime?
A. That's correct. They're a choice of the length of the



benefits, the waiting period before the benefit begins and the amount of the benefit based upon your income.
Q. Are you familiar with the phrase "supplemental long-term disability insurance"?
A. I am.
Q. What is supplemental long-term disability insurance?
A. Supplemental long-term disability insurance would be -- would supplement a group long-term disability program which provided a benefit that was not enough to replace the income of the person who was insured.
Q. Is it fair to say that's insurance provided in addition to the preexisting insurance that was contemplated by one's insurance policy?
A. Correct. But it would be supplemental to a group disability policy, which MCU had.
Q. Can you just briefly describe what a group policy is versus an individual policy?
A. Well, it's written for the group. It is based upon occupation, and a premium is paid by a corporation that insures everybody in the corporation for disability, should it occur.
Q. Does everyone in a group insurance policy gets the same thing as other folks in the group?
A. Well, it can be distinguished by different classes within a corporation.
Q. Got it.

Mr. MacKoul, are you familiar with the phrase "insurance premium" and how that differs from an insurance policy?
A. An insurance premium is what is paid to buy the insurance policy.
Q. Are you familiar with an individual named Kam Wong?
A. I am.
Q. Who is Kam Wong?
A. Kam Wong was the chief executive officer of the Municipal Credit Union from about 2007.
Q. Was that up until around 2018?
A. Yes.
Q. Can you describe your relationship with Mr. Wong?
A. Cordial, businesslike.
Q. Did you work with him on his insurance policies?
A. I did.
Q. Did Kam Wong have insurance through MCU?
A. He had -- he was part of the group insurance program, the benefits that were provided, and I wrote individual policies of life insurance, long-term care, which is not disability, and attempted to write disability, but it was never approved.
Q. Do you recall meeting with, and communicating with, Kam Wong about his insurance policy back in 2006?
A. Yes.
Q. At that time, did you discuss with Mr. Wong his long-term



disability insurance?
A. Yes.
Q. Can you just summarize what you discussed about his long-term disability insurance at that time?
A. Well, we applied in 2006 for long-term disability insurance to the Guardian Life Insurance Company, but the policy was never approved.
Q. Did you look into the cost and obtain a rough --
THE COURT: Can we pause for a minute and get some clarity on a few things.
MCU had a group long-term disability policy; is that correct?
THE WITNESS: Yes.
THE COURT: And Mr. Wong was covered by that, independent of any efforts on your part to procure other insurance for him, to supplement the group policy; is that right?
THE WITNESS: That is correct.
THE COURT: Was he covered under the group long-term disability policy for some fraction of whatever his income was in the event he became disabled?
THE WITNESS: Yes.
THE COURT: Okay.
Now, can you describe the kind of insurance you said you explored in 2006 in the disability area with respect to



Mr. Wong, and how it was different from the group policy?
THE WITNESS: A group policy -- a group policy provides benefits in the same way that an individual policy provides benefits, up to a certain limit of a person's income, such as it will replace 60 percent of an executive's income. But it does — this is group we're talking about — but it does have deductions, and deductions would be if that disabled executive received Social Security, that Social Security benefit that he received would reduce the benefit the insurance company would pay. If he received workers compensation because of the benefit, that benefit from workers compensation would reduce the benefit that the insurance company would pay.
An individual disability policy is written on an individual, and it is a fixed premium. At that executive or that employee's age, the premium does not rise, the benefits do not change, until that executive is 65. And there are no deductions, no offsets. As a matter of fact, the executive could be laid off and then become disabled, either due to an accident or sickness, and because he cannot do the duties of his occupation, he'd still be paid the benefit with no offsets.
So they're completely different. Group insurance is not portable, meaning if the executive left the firm, the disability would remain with MCU, and he would have to go someplace else that had a group disability policy. His individual disability policy is completely portable, takes it



with him.
THE COURT: If I understand you correctly, and please correct me if I am wrong, what you were exploring in 2006 with respect to Mr. Wong was an individual policy to supplement the 60 percent of his income in the event of disability less the offsets, should he become disabled; is that right?
THE WITNESS: I was.
The one thing about the group disability that I did not mention in my statement just a moment ago was that there is a maximum benefit. So it could be that an individual such as Mr. Wong, who's the CEO, makes more money than the maximum benefit would pay him under the group plan. In that case, he could apply for an individual disability policy, and because the group insurance didn't provide enough of a benefit, it could be issued and underwritten that way.
I don't remember what Mr. Wong's salary was in 2006. I know MCU's group plan had a maximum benefit, I believe, of something like $10,000 a month, but I'm not sure, and I have no recollection of exactly why the policy was not issued. It could have been that, it could have been a health reason of some sort, or it could have been just that there was disability in place and The Guardian wasn't willing to write the policy.
THE COURT: Okay. Thank you.
Go ahead, Mr. Rebold.
MR. REBOLD: Thank you, your Honor.

BY MR. REBOLD:
Q. Mr. MacKoul, do you remember communicating to Mr. Wong the insurance policy you were pursuing with The Guardian back in 2006?
A. Yes.
Q. Did you do so in writing?
A. Yes.
Q. Prior to coming into court, did you have an opportunity to review that package that you communicated to Mr. Wong?
A. I did.
MR. REBOLD: Mr. Charalambous, if we can just pull up for identification only Government Exhibit 714A.
Q. And, Mr. MacKoul, since it's a multipage document, if you wouldn't mind looking at the exhibit binder in front of you. I think you were just grabbing for it a moment ago.
A. Let me get my glasses out, if you don't mind.
Q. If you can please turn to 714A, and without reading anything out loud, if you could just review that document quickly and let me know when you have had a chance to review it.
(Pause)
A. Yes.
Q. Is 714A the Guardian group insurance plan that you conveyed to Mr. Wong back in 2006?
A. Yes.



Q. Is that an accurate copy of the package that you sent to him?
A. Yes.
MR. REBOLD: Your Honor, the government offers Government Exhibit 714A for identification into evidence.
MR. REILLY: No objection, your Honor.
THE COURT: I don't have a copy of that. Presumably, it's part of something else?
MR. REBOLD: Yes, your Honor. It's the first 19 pages of Government Exhibit 714.
(Government's Exhibit 714A received in evidence)
MR. REBOLD: Mr. Charalambous, if you can now please publish 714A to the jury.
Q. Mr. MacKoul, I'd just like to look at about two pages from this document, but does this indicate the date that you communicated this policy to Kam Wong?
A. Yes.
Q. When did you communicate that to him?
A. Well, it's dated August 22nd, 2006. So I'm going to assume I wrote the letter, either emailed it to him -- I don't believe I emailed it to him, probably took it in.
Q. Does the actual cover letter reference a meeting that you had with Mr. Wong about the --
A. Confirming the meeting.
Q. When did the meeting take place?



A. At the MCU.
Q. And was that on August 17, 2006, as per the first page of the memo?
A. Well, I have the letter. I wrote it on -- let's see.
Right, meeting of August 17th. I wrote the letter on the 22nd, and it basically said that I will -- here's a recap, this is when I'm going to reach out and obtain a proposal and an illustration for coverage from the Guardian.
Q. Turning to page 3 of this package, is there also a letter to Kam Wong that summarizes the details of the policy that you pursued?
A. Yes.
MR. REBOLD: If we can just zoom in on the middle portion in bold.
Q. Where it says, monthly benefit, $10,000, what does that mean?
A. That means if he was disabled, the monthly benefit he would be paid would be $10,000 a month.
Q. That would be for the supplemental policy in addition to whatever the group policy offered him?
A. That's correct.
Q. Where it says length of benefit, to age 65, what does that mean?
A. That means he would be paid until he was 65 years old.
Q. Do you recall around how old Kam Wong was back in 2006?



A. I'm going to say he was 50 or close to 50. Let me see what it says on the -- it was based upon him being 50 years old.
Q. Where it says, annual premium, does that effectively reflect that to pursue this policy, it would cost just under $7,000 per year?
A. That's correct.
Q. Your testimony is that that policy was either not -- was it not pursued or not approved?
A. It was applied to -- we applied to Guardian, but the policy was never issued.
Q. Do you know why it wasn't issued?
A. I do not -- I cannot state that I know the answer, no.
Q. Mr. MacKoul, fast-forwarding about nine years to 2015, did the subject of Kam Wong's long-term insurance policy come up again?
A. Yes.
Q. And, by the way, did you understand that Kam Wong's contract allowed for supplemental long-term disability insurance?
A. Yes.
Q. Can you please summarize what was communicated -- what you discussed with --
THE COURT: Slow down. Just ask one question.
Q. Can you please summarize what you discussed with Mr. Wong in 2015?

A. Well, he called and we discussed obtaining more coverage or coverage up to -- it was a significant amount of coverage, and I told him that we could apply to regular disability carrier, like Guardian or other carriers that are competitors, Unum, and then we would have to go to what they call the excess market, and it would be the type of contract that would be written on athletes by --
THE COURT: Sorry, written by what?
THE WITNESS: Professional athletes and stuff, because these would be custom-type of contracts, and that it was going to be expensive.
Q. Did you communicate to him a rough range of how expensive it would be per year to pursue that policy in 2015?
A. I did, and it was based upon really just talking to other associates in the business, wholesalers, that dealt with insurance brokers that -- it wasn't a formal -- but it was going to be expensive, it was going to be 20 to 50 thousand dollars, or something like that, a year to obtain that type of coverage that he was looking to provide.
Q. Did you communicate that to him by email?
A. I did.
Q. Prior to coming to court, did you have an opportunity to review that email?
A. I did.
Q. Is that a fair and accurate copy of the email that you sent



to Mr. Wong back in 2015?
A. Yes.
THE COURT: Is what a fair and accurate copy?
MR. REBOLD: The email that he reviewed prior to coming to court.
THE COURT: Does it have an exhibit number?
MR. REBOLD: I'm about to show it to him, your Honor.
Mr. Charalambous, can you please show Mr. MacKoul Government Exhibit 710 for identification.
Q. Do you recognize Government Exhibit 710?
A. Do I?
Q. Do you recognize this document?
A. Yes.
Q. Is this the email you sent to Mr. Wong in 2015 regarding your estimate for the cost of long-term disability insurance?
A. Yes.
Q. Is this a fair and accurate copy of that email?
A. It is.
MR. REBOLD: Your Honor, I now offer Government Exhibit 710 for identification into evidence.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 710 received in evidence)
MR. REBOLD: If we can please publish that, Mr. Charalambous. And, Mr. Charalambous, if we can just zoom



in on the top third or half of that email, up through and including the bullet points.
A. You want me to summarize this?
Q. In a moment.
Am I correct, Mr. MacKoul, that you were the sender of this email?
A. Yes.
Q. And that it was sent on July 29, 2015?
A. Yes.
Q. And that Kam Wong was one of the recipients of that email?
A. He's the only -- well, the other were my staff members.
Q. Can you please read the subject of the email?
A. "Long-Term Disability insurance."
Q. Can you please read the first few sentences that follow before the bullet points?
A. "Kam, this email confirms my research into the purchase of long-term disability insurance to provide $55,000 a month of coverage on you. The coverage amount is based approximately 50 percent of your annual income. The total annual premium would range from 20 or 30 thousand a year, depending upon many underwriting factors."
A base policy would be purchased for 25,000, and an excess policy of disability would be purchased for another 35; waiting period would be 90 to 180 days, and the benefit period would be five years.



Q. So when you said to him that the insurance would provide $55,000 a month of coverage on you, can you just explain what that means?
A. Well, it looks to me like I couldn't add because the 25 and 35 add up to 60. But what it was is the combination of two different types of policies would add up to 55 or 60 thousand dollars of coverage, that if he became disabled after the waiting period, whatever that was, a benefit would be payable to him for five years.
Q. Just to be clear, that means he would get either 55,000 or 60,000 dollars a month paid out to him?
A. That's correct.
Q. That would be in addition to what was already covered give the group insurance policy?
A. That is correct.
Q. When you say the total annual premium would range from 20 to -- 20,000 to 30,000 dollars per year, is that an explanation of what it would cost him per year to obtain that policy, had he pursued it in 2015?
A. That is correct. And that probably is -- there is not a firm proposal. And, again, what I was doing was doing research for Mr. Wong as to if he wanted to purchase $55,000 a month, which represented about 50 percent of his annual income, how would it be structured, and about how much would it cost. This is not a formal proposal; this is more or less somebody getting

back to him saying, look, it's going to be expensive, if you want to do it, we can move forward. But he didn't want to move forward.
Q. How do you know he didn't want to move forward?
A. He said, I'll get back to you.
Q. Did he ever get back to you?
A. No.
Q. Did Mr. Wong at that time mention anything to you about getting paid a cash payout from MCU in place of getting the premiums he would have paid for long-term disability insurance?
A. No.
MR. REILLY: Objection, your Honor; leading.
THE COURT: Sustained. Answer stricken.
Q. What, if anything, did Kam Wong discuss with you regarding a cash payout in lieu of pursuing long-term disability insurance?
MR. REILLY: Objection, your Honor.
THE COURT: Overruled.
A. He did not.
Q. Back when you ran the numbers, back in 2006, what, if anything, did Kam Wong say about a cash payout in place for his premiums in place of pursuing long-term disability insurance?
A. There was no discussion of that.
Q. After 2015, was there a time where the topic of long-term disability insurance came up between you and Mr. Wong again?



A. Yes.
Q. Around when was that?
A. I believe it was 2018.
Q. Can you please describe the circumstances of how that came up?
A. It was on my birthday that -- it was a Friday. That I remember. I had my five kids and grandkids all coming the following day, Saturday, to celebrate Grandpa's birthday. So we were out together, just getting ready to have the whole family over.
Q. "We" meaning you and?
A. And my wife.
Q. What date was that?
A. January 19th.
Q. What happened while you were out with your wife on January 19th?
A. He called me on the cell phone.
Q. "He" being Kam Wong?
A. "He" being Kam Wong, yes.
Q. Can you please summarize the conversation you had then?
A. Well, it was -- I had a great deal of difficulty understanding, but it basically sounded like he was saying to me that MCU -- he was going to be reimbursed, or wanted to be reimbursed, for premiums that MCU never paid for the disability insurance he never obtained. And he had documentation and



such.
And I told him, well, okay, I'm out running around, send it to me and let me take a look at what you have.
Q. Prior to that conversation in 2018, on January 19th, had Mr. Wong ever raised the topic of getting cash payouts in place of insurance premiums for long-term disability insurance?
A. No.
Q. Now, Mr. MacKoul, you said that you have been in the insurance business since 1982?
A. 1969.
Q. Sorry, you were with MCU since 1982?
A. Since 1982, yes.
Q. And you have been in the business since 1969?
A. Yes.
Q. And approximately how many clients have you had?
A. Well, the retail insurance agency — which provides, life, health and all personal insurances for the public — probably has four to six thousand clients. And the wholesale brokerage, which only deals with insurance agents, probably has about the same.
Q. In your decades of work in the insurance industry, and with the thousands of clients you served, how many times, over the course of that span, had one of your clients indicated that they were authorized to receive a cash payout in lieu of a long-term disability insurance premium?



MR. REILLY: Objection, your Honor.
THE COURT: Sustained.
Q. What was your reaction when Mr. Wong reached out to you on January 19th, 2018?
A. Well, until I was able to see the attachments he emailed me, I still wasn't sure what he was talking about, to be frank with you. I was more or less guessing that that's what he was after.
Q. Did there come a time, after that phone call, where he sent you an email?
A. Yes.
Q. Was that on the very same day or around that day?
A. Yes.
Q. Have you reviewed that email prior to coming into court?
A. Yes.
MR. REBOLD: Mr. Charalambous, if you can please pull up for the witness only Government Exhibit 707.
Q. Mr. MacKoul, if you can tell me when you see that on your screen.
Is that on your screen now?
A. Yes.
MR. REBOLD: You can zoom out of that, Mr. Charalambous. If you can just thumb through the pages of this exhibit for Mr. MacKoul, and now if we can turn back to the first page, Mr. Charalambous.

BY MR. REBOLD:
Q. Mr. MacKoul, do you recognize Government Exhibit 707 for identification?
A. I to.
Q. What is 707 for identification?
A. It is the email that Kam sent me, and it had a copy of pages that relate to disability insurance in his contract. And going beyond that, I'd have to -- the last page is the page that I fixated on because it was the numbers that he came out with to arrive at a number that seemed to be that MCU owed him over $3 million.
Q. So, before we get any further into the substance of the exhibit, Mr. MacKoul, is Government Exhibit 707 for identification a true and accurate copy of the email and the relevant attachments that Kam Wong sent to you on January 19, 2018?
A. Yes.
MR. REBOLD: Your Honor, I now offer Government Exhibit 707 for identification into evidence.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 707 received in evidence)
MR. REBOLD: And, Mr. Charalambous, if you can please publish that for the jury.
Q. At the first page, is this just the cover page of the



email?
A. Yes.
Q. Does this indicate that it's from Mr. Wong to you?
A. Yes.
Q. Sent on January 19, 2018?
A. Yes.
Q. Does the attachments line indicate that there are approximately three documents attached?
A. Yes.
MR. REBOLD: Mr. Charalambous, if you can please go to page 2, the first attachment. Page 2 of the document.
Q. Do you recognize this attachment?
A. I do.
Q. What do you recognize this document to be, page 2 of Government Exhibit 707?
A. It is stating, in the insurance section, 5, exactly what MCU will pay for.
Q. Do you recognize this to be a page from Kam Wong's original insurance policy?
A. It's not his insurance policy; it's his employment contract.
Q. My apologies. Is this a copy of that?
A. Yes.
Q. Can you just hone in for a moment on Section 5.4, if you can just 5.4, if you can just read that and tell us what that



means?
A. "Supplemental long-term disability insurance — the credit union shall provide and pay the premium for supplemental disability insurance which will pay a benefit to cover the dollar difference between the monthly salary and maximum payment under the standard long-term disability program."
Basically, that's the gap I explained before, that if the group plan had a maximum benefit of $10,000 a month, that's the maximum Kam would be able to collect from the insurance carrier, and that the supplemental disability was to be purchased to fill that gap based upon his income, which was substantially higher than the $10,000 a month would provide.
MR. REBOLD: Mr. Charalambous, if you can just zoom in on the very bottom area of this page. There's an arrow on the document pointing to something that says "Long-Term Care."
Q. Just briefly, without getting into a full explanation, is long-term care the same or different from long-term disability insurance?
A. Long-term care insurance is in the same family but it's completely different than long-term disability. Long-term care is meant to provide the benefit for someone who needs long-term care because they can't do four of life's necessary functions, such as dressing, such as bathing, such as transporting oneself from one place to another.
So it would pay for nursing homes and, depending upon



the type of what the provisions are of the contract, it would pay for a nurse or a person, depending upon the contract, which it will pay for someone to give home care for someone who can no longer really take care of themselves. That's long-term care. As opposed to disability insurance, which basically provides that you can't do the duties of your occupation or you can't work, but that doesn't mean you can't dress, transport yourself, bathe and things like that.
Q. Mr. MacKoul, did the substance of your conversation with Kam Wong on that date, and the email that he sent thereafter, focus on long-term disability, supplemental loss of disability or long-term care?
A. It did not -- his long-term care policy was approved and was issued in 2007. So he had long-term care already.
Q. Thank you.
MR. REBOLD: Mr. Charalambous, if we could turn to the next attachment, starting with page 3.
Q. Do you recognize what we're looking at here on page 3?
A. I'm looking at a memo to Kam Wong from Tom Siciliano, who was the corporate attorney.
Q. Is that a memo that was dated several years earlier, on May 4, 2015?
A. Yes.
Q. Did it relate to the fifth amendment to Kam Wong's agreement or contract?

A. It relates to the fifth amendment, but what that amendment is escapes me until I can read it.
Q. In the following pages --
MR. REBOLD: If we can just zoom out now, Mr. Charalambous, to pages 4 and 5, if we can just turn to the next page quickly.
Q. -- did you review this document prior to coming to court?
A. I did.
Q. Is this what you understood to be the fifth amendment to Kam Wong's contract?
A. That's correct.
Q. And where, if at all, in that document is long-term disability insurance or supplemental long-term disability insurance referenced?
A. It is not.
Q. Do you know why Mr. Wong sent you this email as part of the attachments?
A. I think what -- I can only suppose what he was trying to do.
MR. REILLY: Objection, your Honor.
THE COURT: Mr. MacKoul?
THE WITNESS: Yes.
THE COURT: You're not here to suppose. You're here to tell us what you know.
I take it the answer is you don't know?



THE WITNESS: I don't know.
THE COURT: Okay. Let's go on.
MR. REBOLD: Mr. Charalambous, if you can now turn to page 6, the third attachment of the email.
BY MR. REBOLD:
Q. Do you recognize this document?
A. I do.
Q. What do you understand this document to be?
A. Lord help me.
This document is what Kam was presenting as part of -- to arrive at the amount that he felt that MCU owed him, or he was entitled to, in premiums, interests, salary, increases, from 2007 through 2023.
Q. When you said, "Lord help me," why did you say that?
MR. REILLY: Objection, your Honor.
THE COURT: Overruled.
A. Because the frustration that I had that weekend, which ultimately led me to actually go in and see him the following Thursday, was to get my head around these numbers.
Q. Based on your work in the insurance industry, what was it about these numbers you needed to get your head around?
MR. REILLY: Objection, your Honor.
A. I don't see how he arrived at --
THE COURT: Overruled.
A. I don't see how he arrived at a number of 3 million --



whether it was 3,700,000 -- as a payment to him for premiums that MCU didn't pay since he became the CEO of the firm in 2007.
Q. Do you have any idea where Kam Wong got these figures from?
A. No.
Q. In your experience with the insurance industry, the work you did with MCU, and the work you did for Kam Wong, are these figures consistent with what would actually be the cost of premiums for long-term disability insurance for Kam Wong?
A. Well, it's -- no.
Q. Okay.
A. I didn't -- there's factors built into that, salary increases of 7.25 percent, it's very creative. And I just -- I did not understand it, and after he told me that, I didn't believe him, so...
Q. How did you react to Mr. Wong when he told you that?
MR. REILLY: Objection, your Honor.
THE COURT: Sustained.
A. Am I supposed to answer that?
Q. No, sir.
THE COURT: No, no, when I say sustained, you don't answer. Sorry.
BY MR. REBOLD:
Q. Did Mr. Wong email you again several days later?
A. I remember sending him a text saying, I'm going to be in



the city tomorrow, I'd like to drop by. That was on the following Wednesday.
Q. Prior to that, do you recall receiving an email with a memorandum attached to it?
A. Yes, I do, yes, I do.
MR. REBOLD: If you could please, Mr. Charalambous, pull up for identification only, and for Mr. MacKoul only, Government Exhibit 709. And if you can just scroll through the relevant attachment or attachments.
Q. Mr. MacKoul, do you recognize Government Exhibit 709?
A. I do.
Q. Is that the email that Kam Wong subsequently sent to you?
A. Yes.
Q. When did he send that to you?
A. He sent it to me on the following Monday.
Q. Is that --
A. Which was January the 22nd.
Q. Is that a fair and accurate copy of the email that he sent to you --
A. Yes.
Q. -- and the relevant attachment?
A. Yes.
MR. REBOLD: Your Honor, I offer Government Exhibit 709 for identification into evidence.
MR. REILLY: No objection, your Honor.

THE COURT: Received.
(Government's Exhibit 709 received in evidence)
MR. REBOLD: Mr. Charalambous, if you can please publish that.
Q. Is this the cover page of the email?
A. Yes, it is.
Q. Did Mr. Wong indicate that he wanted to share with you an attached memo?
A. Yes.
Q. Did he say that that was going to be signed by their supervisory chair?
A. Yes.
Q. Was there a document attached?
A. Yes, there was.
MR. REBOLD: If you can, please, Mr. Charalambous, pull up that document.
Q. Is this a memorandum addressed to Giovanni Porcelli from Kam Wong?
A. Yes.
Q. Does it relate to long-term disability insurance?
A. Yes.
Q. Have you seen this document prior to coming to court?
A. Yes, I have.
Q. In broad strokes, what does this document communicate?
A. It's confirming the conversation that he had in 2015, that



in order to get long-term disability coverage, the annual premium is very costly, can range from 100 to 130 thousand a year, based upon our research.
In addition, most insurance carriers will not offer 100 percent compensation. And the credit union might have to seek a dual insurance plan, and the cost will be even higher.
The premium amount is also increased by time value of money, changes in compensation levels, and age factors. And basically the bottom line on the last two sentences is he feels it is more cost effective and easier to administrate if they go to a cash payment method, which I assume would be paid to him.
Once the CEO starts receiving payments, including retroactive payments from 2007, Section 5.4 will be canceled and voided out.
Q. Is that reference to Section 5.4 the section of Mr. Wong's contract that you testified about earlier?
A. Yes.
Q. This document purports to convey a conversation from three years earlier, in June 2015, correct?
A. Yes.
Q. As Mr. Wong's insurance broker, did he ever communicate that conversation to you at any time in 2015?
A. No.
Q. Did he ever communicate that conversation to you at any time after 2015 until he referenced it in January of 2018?



A. No.
Q. You said that thereafter you exchanged a text communication with Kam Wong to set up a meeting?
A. Yes.
Q. And do you remember when that meeting was?
A. The meeting was on that Thursday. It was a Wednesday that I sent the text. It was the Thursday that I met with him in the morning.
Q. Meaning that same week?
A. That same week.
Q. And do you recall that conversation?
A. Yes. When I got there to go over the attachments that he had before sent me, he said, don't worry about it, it's a done deal.
Q. Based on your years of knowing and communicating with Mr. Wong, what did you understand him to mean when he said, don't worry about it, it's a done deal?
A. He said, it's done, there's nothing for you to do.
MR. REBOLD: Your Honor, may I briefly confer with my colleagues?
THE COURT: Yes.
(Pause)
MR. REBOLD: I have no further questions for this witness.
THE COURT: All right. Thank you.



Cross-examination, Mr. Reilly?
MR. REILLY: May I inquire, your Honor?
THE COURT: Yes.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good afternoon, Mr. MacKoul. How are you?
A. Good afternoon, counselor.
Q. My name is Nathan Reilly.
We haven't met before, right?
A. No.
Q. You have met with members of the prosecution team to prepare for coming in to testify today, correct?
A. That is correct.
Q. But you haven't met with anybody who is representing Ms. Ash; is that right?
A. No.
Q. Now, you testified on direct that you had known Mr. Wong since he became -- or as part of his employment with the MCU; is that right?
A. I had known Kam from before he was the CEO. He was the chief financial officer before that.
Q. At MCU, right?
A. At MCU.
Q. And I think you described your relationship with him as one that was cordial and businesslike; is that right?

A. Yes.
Q. In fact, at some point in your relationship, Mr. Wong asked you for loans; is that right?
A. Yes.
Q. And these were personal loans to him; is that right?
A. Yes.
Q. From you?
A. The answer is yes. But it was not that he asked me; he requested to take a loan on a life insurance policy that was collaterally assigned to the credit union. And in order to take the loan, he would need a second -- he would need a second corporate officer to sign the form to grant him the loan. And he did not want anybody in the credit union beside himself to know that he was taking the loan on his insurance.
So he used the explanation that his oldest son was getting engaged and he needed $35,000 for the down payment on whatever. And I said, do you want my firm to just give you the money and when you get a bonus, when you get your bonus at the end of the year or in the following year, you'll pay it back?
And he said yes.
Q. Is it fair to say that was unusual, in the context of your relationship with clients?
A. Yes.
Q. Is it also true that you honored his wishes and didn't communicate with anybody at the MCU about his loan?



MR. REBOLD: Objection.
A. Correct.
THE COURT: Sorry?
MR. REBOLD: I objected before the witness answered.
Q. And, in fact, he took a second loan; is that right?
A. He did the following year, stating that his second son was getting married, only this time he requested a loan of $40,000. He had, indeed, paid back the $35,000 at the end of the year or shortly thereafter.
Q. Again, that was unusual, is that right, for your business?
A. Yes.
Q. Now, I'm going to show you what's in evidence, a piece of evidence you testified about right at the end of your direct examination, Government's Exhibit 709. I'm going to ask Ms. Stephenson to put it on your screen, specifically page 2 of that document.
Now --
THE COURT: I don't believe that's page 2, counselor. Maybe it is. Let me just see.
I stand corrected. It is.
Q. Mr. MacKoul, you testified about the contents of this memorandum when Mr. Rebold was asking you questions; is that right?
A. Yes.
Q. Is it fair to say that there are portions of the memo that



are accurate?
A. I don't see that --
MR. REBOLD: Objection.
A. I don't see that the numbers he put in there are accurate.
THE COURT: Mr. MacKoul, hold up. There's an objection.
MR. REBOLD: As to hearsay, your Honor.
THE COURT: Yes, agreed. Sustained.
BY MR. REILLY:
Q. Well, Mr. MacKoul, on direct examination, you testified about Section 5.4 of Mr. Wong's employment contract; is that right?
A. Yes.
Q. And that refers to long-term disability insurance; is that correct?
A. Yes.
Q. Is it correct that Government's Exhibit 709 refers to Section 5.4 of the CEO contract?
THE COURT: Yes, it does. Let's move on.
Q. Mr. MacKoul, is it also true that the statement -- excuse me, in Government's Exhibit 709, that most insurance carriers will not offer a hundred percent compensation coverage plan? Is that an accurate statement?
A. That is true. They're not looking for someone to benefit by being disabled, benefit beyond what their income was after



taxes and so on and so forth.
Q. Now, I'm going to change focus now, Mr. MacKoul.
Do you recall that, as part of Government's Exhibit 707, which was a January 19, 2018, email to you from Mr. Wong, that there was a memo attached, which was from Kam Wong from Thomas Siciliano?
A. Right.
Q. And I think you said that you understood Mr. Siciliano to be the lawyer, a corporate counsel, for the MCU; is that right?
A. Yes.
Q. I think you also testified that when you got this email from Mr. Wong on January 19, 2018, you found the request -- you couldn't quite understand the request, you found it very unusual?
A. Yes.
Q. Did you reach out to Mr. Siciliano with respect to this request?
MR. REBOLD: Objection.
THE COURT: Sustained.
A. With respect to --
THE COURT: Sustained. I know it's hard to hear me, but when there's an objection, I have to rule, and if I say sustained, you shouldn't answer.
Okay, next question.
MR. REILLY: Yes, your Honor.

BY MR. REILLY:
Q. Now, Mr. MacKoul, you testified about a conversation that you had with Mr. Wong initially in 2006; is that right?
A. Yes.
Q. And it was a conversation between you and Mr. Wong; is that right?
A. Yes.
Q. And Ms. Sylvia Ash was not a part of that conversation, was she?
A. Who?
Q. Ms. Sylvia Ash.
A. No.
Q. Is it fair to say that you don't know Ms. Sylvia Ash?
A. I do not know Ms. Sylvia Ash.
Q. You've never spoken to her?
A. To my knowledge, I have not.
Q. You've never communicated with her via email or text?
A. No.
Q. And, in fact, she's not on any of the communications --
THE COURT: Counsel, could we move it along. You made your point.
MR. REILLY: One moment, your Honor?
(Pause)
MR. REILLY: Thank you, your Honor.
Sorry. Very briefly:



BY MR. REILLY:
Q. Mr. MacKoul, can you tell me, without giving discussing any of the content, what, if any, conversations you've had with Thomas Siciliano?
MR. REBOLD: Objection sustained.
A. I have had --
THE COURT: Sustained, sustained.
THE WITNESS: Okay.
Q. I wanted to clarify one other point, Mr. MacKoul.
You discussed a loan that you had given to -- or, excuse me, a second loan with respect to Mr. Wong of $40,000 loan. Did you in fact make that loan?
MR. REBOLD: Objection.
A. MacKoul & Associates -- okay.
THE COURT: Overruled.
A. MacKoul & Associates made both loans to Kam.
Q. Can you describe generally when those loans were made?
A. I believe one was made in 2013, and the other was made the year after.
Q. Very briefly, I'm going to ask you to look at Government's Exhibit 709 one more time. Page 2.
Mr. MacKoul, there's a statement in the second paragraph that states, "The annual premium for long-term disability insurance coverage can be very costly."
Is that, in your experience, an accurate statement?



MR. REBOLD: Objection.
THE COURT: Sustained as to form, at least.
A. The answer --
THE COURT: No. Mr. MacKoul, I sustained the objection.
Next question.
BY MR. REILLY:
Q. In your experience, Mr. MacKoul, are long-term disability coverage -- excuse me, long-term disability coverage program -- excuse me, your Honor, policies, can they be very costly?
THE COURT: Sustained. It's the same question to which I just sustained an objection. Obviously, one of the problems is that what's very expensive to me or you is not very expensive to Bill Gates, and there are all kinds of variations in between. Let's get on with it.
BY MR. REILLY:
Q. Now, directing your attention to the last sentence of that second paragraph, it says, "The premium amount is also increased by the time value of money, changes in compensation levels, and age factors."
Is that an accurate statement, Mr. MacKoul?
MR. REBOLD: Objection.
THE COURT: Sustained.
MR. REILLY: No further questions, your Honor.
THE COURT: Thank you.



Any redirect?
MR. REBOLD: Briefly, your Honor.
REDIRECT EXAMINATION
BY MR. REBOLD:
Q. Mr. MacKoul, on cross-examination, you were asked, and you answered, certain questions about what was usual and unusual based on your experience in the insurance business, regarding requests and information communicated by your clients.
Do you recall that?
A. You want to repeat that for me, please?
Q. During cross-examination, Mr. Reilly asked you about what was usual and unusual about a request made by Mr. Wong to you, based on your experience in the insurance industry.
Do you recall that?
A. Yes.
Q. Based on your experience in the insurance industry, was it usual or unusual for Kam Wong to ask you your views on an insurance policy that would allow him to receive $3.7 million in cash payouts for premiums not paid?
THE COURT: Sustained.
A. That is --
THE COURT: Sustained.
MR. REBOLD: I have no further questions, your Honor.
THE COURT: Thank you.
MS. COHEN: No further questions, your Honor.

MR. REILLY: Sorry.
THE COURT: Mr. MacKoul, thank you very much. You're excused.
THE WITNESS: Thank you.
THE COURT: And enjoy the weekend.
(Witness temporarily excused)
THE COURT: Ladies and gentlemen, that concludes the work for this week.
We will resume at 12:30 on Monday, and you're welcome to your sandwiches at noon. And enjoy the weekend.
JURY MEMBERS: Thank you.
THE COURT: I hope we're moving along well. I'll get an idea of that in a minute.
As soon as the jury is out, I just want to find out where we are.
(Continued on next page)



(Jury not present)
THE COURT: What's left to be done in this case?
MR. MARK: I think, roughly, because we're going to start on Monday at 12:30, I would anticipate resting on Wednesday.
THE COURT: Who are the witnesses left?
MR. MARK: The witnesses -- give me one second?
(Pause)
MR. MARK: Your Honor, I anticipate eight more witnesses.
THE COURT: Eight?
MR. MARK: Eight more witnesses and a possible custodian of records, depending on --
THE COURT: Eight? What for?
MR. MARK: What for?
THE COURT: Yes.
MR. MARK: Do you want a proffer on the particular witnesses?
THE COURT: No.
MR. MARK: I understand your point, your Honor.
THE COURT: I mean, look, to say that today was tedious is an understatement. So, look, I'm delighted that you're getting it in as quickly as you are, compared to what we thought going in, and I don't mean to take away from that, but I think it could be done more efficiently. That's all I'm



communicating.
How long, if any, Ms. Cohen, do you expect to be on the defense case?
MS. COHEN: It will depend somewhat on the eight witnesses and what they say, but I expect, if there is a defense case, it will done within a day.
THE COURT: Within a day?
MS. COHEN: Right, meaning if we start in the afternoon and go to the next, a full trial day.
THE COURT: So we're probably looking at it going to the jury a week from Monday, yes?
MS. COHEN: Yes, although perhaps earlier, depending on the pace.
THE COURT: I understand.
I normally do this at the beginning of a trial but I'll do it now: I'm going to address Ms. Ash on her awareness that she's the decider on whether she testifies or not.
Ms. Ash, you have the right to your attorney's best advice on the subject of whether you testify in your own defense, but they can't make that decision for you. I'm sure you know that, but I think it's only prudent that I make sure you understand that.
Do you understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: And I take it also that you understand



that the final decision on whether or not you testify is yours alone, and not the attorneys'; yes?
THE DEFENDANT: Yes, your Honor.
THE COURT: In the event your attorneys either present no defense or present a defense and rest without calling you and you want to testify, the way I handle it in my courtroom is to ask any defendant at that point to simply stand up, don't say anything, I will see you, I'll take the jury out, and then I'll see why you're standing, and if you want to testify, you will be given the right to testify.
Do you understand?
THE DEFENDANT: I understand, your Honor.
THE COURT: Great. Okay.
Anything else?
MS. COHEN: Your Honor, just a housekeeping matter: I know we're not sitting trial tomorrow. Would it be okay if we left everything? We'll clean up, obviously. I don't know if your Honor has other things in the courtroom.
THE COURT: I think you better address that question to Andy.
MS. COHEN: Will do, your Honor.
THE COURT: I'm not in charge of that.
Okay. Thank you, all.
MR. MARK: Thank you.
THE COURT: Have a good weekend, everybody.

MS. COHEN: Have a good weekend, your Honor.
THE COURT: Thank you.
(Adjourned to December 6, 2021 at 12:30 p.m.)
* * *



INDEX OF EXAMINATION


| Examination of: | Page |
|---|---|
| ROBERT ADAMS | |
| Direct By Ms. Katz | 269 |
| Cross By Ms. Cohen | 303 |
| Redirect By Ms. Katz | 310 |
| BORIS VESTFRID | |
| Direct By Ms. Katz | 311 |
| Cross By Mr. Reilly | 369 |
| ROBERT E. MacKOUL | |
| Direct By Mr. Rebold | 379 |
| Cross By Mr. Reilly | 412 |
| Redirect By Mr. Rebold | 420 |


GOVERNMENT EXHIBITS


| Exhibit No. | Received |
|---|---|
| 552, 550, 554A, 554B, 554C, 556 | 275 |
| 200A | 297 |
| 269, 270, 260, 268, 271, 272, 248, and 249 | 314 |
| 262, 263, 264, 267, 252, 253, 255, 256, 259, 258, 204, 206, 208, 207, and 250 | 316 |
| 218, 224, 226, 215, and 214 | 326 |
| 234 | 329 |
| 235 | 333 |





| | |
|---|---|
| 230, 231, 244, 240, 236, 237, 238, 239, 242, 243, 244, and 245 | 337 |
| 251A, B, C, H, K, L, N, O, R, S, T, V, W | 348 |
| 254N | 363 |
| 246D | 365 |
| 246G | 366 |
| 277 | 369 |
| 714A | 390 |
| 710 | 394 |
| 707 | 401 |
| 709 | 409 |


DEFENDANT EXHIBITS


| Exhibit No. | Received |
|---|---|
| F | 306 |

## $

**$10,000 (5)** 388:18;391:15,18;403:8,12
**$3 (1)** 401:11
**$3.7 (1)** 420:18
**$35,000 (2)** 413:16;414:8
**$40,000 (2)** 414:7;418:11
**$55,000 (3)** 395:17;396:2,22
**$7,000 (1)** 392:5

## A

**able (22)** 271:5,14;285:8;286:1;287:21,24;295:3;301:7,14;318:14;320:11;323:8;325:11;351:25;353:10;354:7;356:2;361:20;367:7,10;400:5;403:9
**Abraham (1)** 307:6
**absolutely (2)** 261:24;301:9
**access (5)** 256:16;314:23;351:13;375:4,4
**accident (1)** 387:19
**accidentally (1)** 337:4
**accommodation (1)** 267:22
**accomplishes (1)** 377:12
**according (1)** 292:4
**account (15)** 273:1,3,14;278:4;287:24;294:8,23;295:16;298:11;324:22;329:18;340:19,21;372:10;375:4
**accounts (1)** 295:22
**accurate (28)** 274:19;288:12;297:16;299:24;316:11;326:11;328:24;333:13;336:9;346:4;347:17;348:4;363:20;364:18;365:3;366:13;375:13;390:1;393:25;394:3,17;401:14;408:18;415:1,4,23;418:25;419:21
**accurately (4)** 274:1,8;295:25;314:12
**accusations (1)** 301:22
**across (3)** 269:12;270:15;280:2
**Actions (1)** 286:15
**activity (3)** 337:12,14,19
**actual (14)** 264:7;278:24;298:17;351:1;353:24;355:3;356:6,23;357:17;365:25;366:11;367:23;368:15;390:22
**actually (10)** 264:9;279:9;296:3;303:24;304:11,19;360:14;383:2;406:18;407:8
**Adams (32)** 256:24;268:17,18,23;269:3;274:13;275:11;276:18,23;277:7,12;278:9;283:17;286:10;289:22;290:16;291:2,8,14;292:24;293:19,20;295:3;296:24;298:3,25;299:7;301:9;303:8;307:25;310:13,21
**add (3)** 396:4,5,6
**added (1)** 327:5
**addition (6)** 279:8;335:22;384:11;391:19;396:13;410:4
**additional (4)** 266:24;284:6;306:11;326:6
**Additionally (3)** 269:11;270:15;354:20
**address (17)** 256:22;273:4,4,5,9;276:22,25;277:1;278:8,11;291:5;292:13,20;293:23,24;423:16;424:19
**addressed (1)** 409:17
**addresses (2)** 291:2;293:10
**Adjourned (1)** 425:3
**administrate (1)** 410:10
**Administrative (3)** 257:17;258:12;267:21
**Administrator (1)** 257:9
**admitted (2)** 289:20;320:15
**adopt (1)** 376:24
**adversely (1)** 382:20
**advice (1)** 423:19
**advised (3)** 267:20;374:15;375:14
**advisor (8)** 272:18;278:18;279:21;280:14,22;281:11,12;284:9
**advisors (1)** 278:25
**affect (1)** 382:4
**Affected (2)** 285:9;382:12
**affidavit (1)** 361:10
**AFTERNOON (7)** 347:1;369:15,16;379:22;412:6,7;423:9
**afterwards (2)** 349:16;378:7
**again (16)** 256:1;264:4;290:10;291:1;330:6;349:17;352:15;362:18;370:22;371:20;375:13;392:15;396:21;397:25;407:24;414:10
**against (1)** 375:3
**age (5)** 382:16;387:15;391:22;410:8;419:20
**agency (1)** 399:16
**agent (1)** 264:12
**agents (1)** 399:19
**ago (4)** 311:24;382:11;388:9;389:15
**agree (1)** 281:12
**agreed (1)** 415:8
**agreement (2)** 301:18;404:25
**AHA (1)** 284:8
**ahead (5)** 352:2;362:9;379:10,11;388:24
**aid (1)** 326:8
**Air (5)** 290:2,6;348:22;368:18,18
**airplane (1)** 327:5
**AirPod (1)** 359:6
**AirPods (3)** 270:4,5;362:24
**al (1)** 331:16
**Albany (1)** 265:25
**album (1)** 328:8
**albums (1)** 328:9
**alerted (1)** 337:3
**alerts (1)** 270:1
**alike (1)** 351:20
**allow (3)** 261:10;306:25;420:18
**allowed (2)** 261:13;392:18
**allows (2)** 272:22;286:17
**alone (1)** 424:2
**along (3)** 360:14;417:20;421:12
**although (1)** 423:12
**always (3)** 309:25;323:24;357:10
**amazement (1)** 254:7
**amendment (4)** 404:24;405:1,1,9
**amount (6)** 384:2;393:2;395:18;406:11;410:7;419:18
**Analysis (10)** 311:16;315:7;316:9;321:9,14,14;324:16;325:2,8,15
**analyst (4)** 311:22;312:13,19;315:5
**analyze (7)** 312:2,16,23;313:5;314:6,9;370:15
**analyzed (4)** 312:8;314:13;319:15;368:22
**analyzing (2)** 313:19;325:18
**Andrews (1)** 332:17
**Andy (6)** 254:14;268:6,9;347:3;378:17;424:20
**annual (9)** 332:2;354:19;392:3;395:19,19;396:16,23;410:1;418:23
**answered (3)** 289:11;414:4;420:6
**anticipate (2)** 422:4,9
**apologies (1)** 402:22
**app (4)** 272:6;280:13;327:11;341:8
**apparently (1)** 268:12
**appear (4)** 288:10;295:18;318:18;319:12
**appears (1)** 321:25
**Apple (98)** 269:8,9,10,13,23,24;270:6,8,18,24;271:3,6,12,21;272:13,14,22,25;273:7,8,8,17,20,22;274:3,7,19,22;275:19;276:21,25;278:4,25;279:2,18,20;280:22;284:11,15;285:11,20,23,24;286:15,22;287:6,9,17;288:25;292:4,13,14,15;293:6,20;294:8,15,17,19,20;295:14,16,19,21;303:9,12,19,21;304:1,5;305:1;306:7,17;307:13,18;308:1,4,8,16,25;310:1,17;319:9,24;321:20;322:19;324:10,15,17,21;327:8,11,11;343:16;349:7;353:10,20;368:11
**Apple's (1)** 359:6
**application (3)** 327:23,24;340:7
**applications (3)** 269:17;313:21;326:4
**applied (3)** 386:5;392:9,9
**apply (3)** 265:12;388:13;393:3
**appointment (7)** 272:2,3,4;284:2,24;285:18;306:12

**appreciate (5)**
337:1;340:22;
354:21;355:16;362:10
**appropriate (2)**
261:2;266:12
**approved (4)**
385:21;386:7;392:8;
404:13
**approximate (1)**
288:15
**approximately (4)**
312:8;395:18;
399:15;402:8
**April (1)**
291:24
**area (2)**
386:25;403:14
**argument (1)**
260:11
**around (14)**
264:19;296:8,9;
301:11;321:12;356:2;
379:9;385:11;391:25;
398:2;399:2;400:12;
406:19,21
**array (1)**
271:22
**arrest (2)**
264:11;265:6
**arrested (2)**
334:2;335:1
**arresting (1)**
265:6
**arrive (2)**
401:10;406:11
**arrived (2)**
406:23,25
**arrow (1)**
403:14
**article (1)**
341:14
**ASAP (1)**
361:2
**Ash (90)**
258:5,16;261:13,17;
262:13,15;263:10;
265:19;274:20;276:19;
278:11;282:14;283:20;
291:4;292:10,11;
294:24;303:18,21;
304:11,19;305:1;
306:7,17;307:13,17,25;
309:5,9;327:1,7,19;
328:4;337:15,20;
338:4,13;339:9,22;
341:3;345:18;347:14;
348:20;349:7,13;
350:5,20;352:21;
353:9,15,19;354:16,22,
23;355:13,20,23,25;
356:15;357:8,13;
358:9,12,23;362:16,23;
364:5;365:19;366:24;
367:6,20;369:23,24;
370:3,7,13,25;371:3;
372:10;373:7,8,12;
375:23;412:15;417:8,
11,13,14;423:16,18
**Ash's (4)**
303:25;304:5;
308:15,25
**aspects (1)**
381:21
**assign (1)**
318:25
**assigned (9)**
270:17;281:9;
311:13;315:6;319:3,7;
325:3;326:25;413:10
**assistance (3)**
299:10;306:7;338:5
**assistant (1)**
262:12
**assisted (1)**
303:18
**associated (22)**
274:20;281:25;
282:9;290:3,7;293:7;
294:1,19,20,22;295:10;
315:4;318:24;335:24;
345:19;347:15;369:24;
371:13,20,25;372:5,8
**Associates (12)**
380:13,24;381:3,4,5,
9,17;382:22;383:3;
393:15;418:14,16
**association (1)**
255:11
**assume (3)**
307:3;390:19;410:11
**assuming (1)**
254:9
**AS-USA (2)**
290:3,7
**athletes (2)**
393:7,9
**at-home (5)**
272:18;278:18;
279:21;281:12;284:8
**atmosphere (1)**
301:21
**attached (5)**
402:8;408:4;409:8,
13;416:5
**attaches (1)**
269:24
**attachment (10)**
365:24;366:1,11,13;
402:11,12;404:17;
406:4;408:9,21
**attachments (6)**
400:5;401:15;402:7;
405:17;408:9;411:12
**attempt (4)**
320:5;321:14;
322:25;368:19
**attempted (2)**
325:9;385:21
**attending (1)**
267:12
**attention (29)**
275:13;277:21;
278:12;281:18,20;
283:11;285:2;298:23;
321:20;329:25;330:11;
331:12;333:21;334:6;
335:6,16;337:23;
340:16;362:14,18;
364:2,11;367:2,14;
371:10,23;376:24;
377:5;419:17
**Attorney (3)**
311:12;334:21;
404:20
**attorneys (2)**
305:10;424:4
**attorneys' (1)**
424:2
**Attorney's (2)**
332:17;423:18
**audio (3)**
367:8,24;368:4
**August (7)**
330:3;331:16,18;
356:18;390:19;391:2,5
**authority (3)**
257:19;258:9,25
**authorized (3)**
258:10;285:11;
399:24
**available (7)**
260:19;288:18;
354:21;355:16,18;
356:17;357:10
**Avenue (2)**
270:18,19
**avoiding (1)**
262:10
**aware (8)**
303:21,23;305:1;
306:17;307:6,13;
309:5,9
**awareness (1)**
423:16
**away (2)**
362:2;422:24
**awful (1)**
256:23

**B**

**back (33)**
272:23;273:17;
281:5;283:9;286:3;
293:25;296:8;299:14;
308:14;321:20;322:6,
7;338:14;341:22;
345:14;353:16;364:6,
7,11;369:5;385:23;
389:3,24;391:25;
394:1;397:1,5,6,20,20;
400:24;413:19;414:8
**backed (3)**
289:5;295:22;328:15
**background (2)**
259:2;312:20
**backgrounds (1)**
321:2
**backup (3)**
284:22,22;287:2
**backup/migrate/update (1)**
283:22
**backup/migrate/update/restore (1)**
285:10
**backups (2)**
286:15;296:2
**bags (1)**
332:6
**band (1)**
350:10
**bank (1)**
375:4
**Bar (28)**
270:16;271:8,16,17,
20,21,23,25;272:1,2,4,
8,15,17;273:20,23;
278:17;279:8,22;
281:12;284:2,11,24;
285:1;287:19;303:13;
304:11;306:12
**Barclays (1)**
332:14
**base (1)**
395:22
**baseball (2)**
355:16,17
**based (17)**
266:11;279:15;
288:10;324:21;377:2;
384:2,18;392:2;
393:14;395:18;403:11;
406:20;410:3;411:15;
420:7,13,16
**basically (5)**
391:6;398:22;403:7;
404:5;410:9
**basis (2)**
258:14;312:24
**basketball (1)**
356:1
**bathe (1)**
404:8
**bathing (1)**
403:23
**Bd (1)**
335:4
**bear (1)**
268:15
**beat (1)**
353:16
**became (4)**
386:21;396:7;407:2;
412:18
**because's (1)**
265:25
**become (4)**
286:8;301:21;
387:18;388:6
**beforehand (1)**
301:20
**begin (1)**
379:6
**beginning (3)**
256:19;263:25;
423:15
**begins (3)**
305:5;335:18;384:1
**behavior (1)**
301:23
**belated (1)**
334:18
**below (4)**
285:16;343:18;
348:25;362:22
**benefit (24)**
383:8;384:1,2,9;
387:9,9,11,11,12,20;
388:10,12,14,17;
391:15,17,22;395:24;
396:8;403:4,8,21;
415:24,25
**benefits (7)**
381:20;383:7;384:1;
385:19;387:3,4,15
**Beryl (2)**
341:3,20
**beside (1)**
413:13
**besides (2)**
272:14;350:10
**best (4)**
356:3,4;362:17;
423:18
**better (2)**
374:7;424:19
**beyond (3)**
260:3;401:8;415:25
**big (1)**
270:18
**bigger (1)**
349:2
**Bill (1)**
419:14
**binder (2)**
266:23;389:14
**binders (1)**
254:19
**birthday (5)**
331:19;354:19;
356:18;398:6,8
**birthday/Christmas (1)**
334:18
**bit (3)**
279:5;284:6;382:10
**black (1)**

352:25
**blank (1)**
255:7
**blow (3)**
268:19;355:9;357:5
**Bluetooth (2)**
270:6;359:6
**board (14)**
333:3;334:4,10,12,13;341:24;362:4;366:24;374:22,22,25;375:21,23;377:13
**board_of_directors@nymcuorg (1)**
334:11
**body (17)**
298:16,24;299:19;338:2;339:20,23,24;340:17;341:5,12,21;350:19;351:11;355:12;356:14;357:7;364:4
**boil (1)**
309:3
**bold (1)**
391:14
**Bonsu (5)**
293:8,9;341:4,20;368:12
**bonus (2)**
413:18,18
**Books-Spears (1)**
284:7
**booth (2)**
374:7,13
**Boris (3)**
310:25;311:1,4
**borough (1)**
318:23
**both (8)**
271:14;281:12;290:22;291:4;297:19;322:25;323:7;418:16
**bottom (18)**
275:14;277:11;289:17;322:7;335:10;337:24;343:8;349:11;350:12;351:23;353:7;356:12;365:21;367:3;376:24;377:6;403:14;410:9
**box (2)**
319:7;365:21
**boxes (1)**
306:11
**Brady (2)**
263:12,14
**brain (1)**
382:6
**branch (1)**
340:19
**brand (3)**
289:7;320:2;323:7
**Brantley (1)**
334:13
**break (6)**
298:7;300:3;301:7;346:10;347:11;373:1
**brief (2)**
269:9;372:18
**briefly (8)**
261:1;310:10;384:16;403:16;411:19;417:25;418:20;420:2
**bright (1)**
267:25
**bring (8)**
254:4;267:15;275:20;301:3;308:11;347:5;353:1;362:24
**broad (2)**
383:18;409:24
**broker (4)**
380:14,16,17;410:21
**brokerage (1)**
399:18
**brokers (2)**
380:13;393:16
**Brooklyn (5)**
303:22;305:2;308:16,21,25
**browsing (1)**
327:24
**building (2)**
270:12;359:2
**built (1)**
407:12
**bullet (2)**
395:2,15
**business (17)**
270:14;273:19,24;274:1,8;295:23,25;381:11,12,14,14,21;393:15;399:9,13;414:10;420:7
**businesslike (2)**
385:14;412:25
**businessman (1)**
381:15
**busy (1)**
356:1
**button (1)**
268:9
**buy (2)**
308:8;385:4

## C

**Calendar (3)**
328:23,24;329:19
**call (20)**
257:21,23;258:20;265:2,25;272:18;299:10;311:17;316:23;332:21;334:20,21;338:5;341:7,22;359:25;360:4;374:16;393:5;400:9
**called (14)**
265:21;268:24;273:7;278:21;311:2;312:25;316:5;317:22;327:23;364:12;379:15;382:7;393:1;398:17
**caller (4)**
282:9,13;283:20;284:5
**calling (2)**
283:6;424:5
**calls (6)**
268:17;269:17,21;281:6;310:25;379:13
**came (10)**
286:12;301:16;325:2;342:10;344:24;345:8;371:2;397:25;398:4;401:9
**can (276)**
254:7,9;256:16;258:13;260:11;262:19;264:6;267:21;269:5,9,14,16,19,20,25;270:5,10;271:2,11,17;272:4,5,5,6,7,11,11,12,16,17,18,18,20,23;275:8,11,12,20;276:1,12,16,17,18,20,23;277:5,22;278:7,9,14,15;279:5;280:10,19;281:6,19;282:12,16,17,20,21;283:9,10,15,23;284:3,4,5,15;285:7,17;286:3,4,11;287:6;288:1,15;289:2,16,21,24;290:9,19;291:1,2,12,13,19;292:9,12,15,16,20,23,25;293:4,4,6,17,18,19,20;294:5,5,7;296:5,21;297:12;298:1,3;299:9;304:2;305:10;306:4;307:12;308:14,15,24;311:25;312:4,7,18;313:2,10;314:21;318:11,16,19;319:18;320:14,16,18,20;321:3;322:15;323:10;325:1,7,20;326:6,20;327:10,12,20;328:5,11,16;329:22,24;330:1,12,20;331:14,15;333:5,22;334:7;335:5,11,17;337:5,11,16,17;338:2,4,17,18,25;339:19,20;340:2,15,16;341:5,10,17;342:1,7;343:5,18,23;345:6,22;347:21;348:15,19;350:25;351:16;354:7,12,13,14;355:11;356:13,18;357:9;358:5,5,7,13,21;359:1,18,25;360:10,14;362:14;364:1,3,13,21;365:10,11,14,15;366:3,9,20,22;367:13,18;371:12;372:5,12;374:2;376:4;379:9;380:15;383:18;384:16,23;385:13;386:3,9,24;389:11,17;390:12;391:13;392:21,24;394:8,24,25;395:12,14;396:2;397:2;398:4,20;400:16,18,22,23,24;401:23;402:10,24,25,25;403:13;404:3;405:2,4,5,18;406:3;408:8;409:3,15;410:2;418:2,17,24;419:10
**canceled (3)**
334:2,25;410:13
**capacity (1)**
312:19
**captured (1)**
362:5
**card (2)**
327:18;333:14
**cards (2)**
345:19;361:6
**care (23)**
254:14;271:9,12;273:20,23;274:3;284:11;285:16,20;286:9,22;385:20;403:15,17,19,20,22;404:3,4,5,12,13,14
**carrier (3)**
276:10;393:3;403:10
**carriers (4)**
380:18;393:4;410:4;415:21
**case (58)**
262:8;278:13,16,17,19,19,22;279:1,17,18,20;280:2,5,20,21,22,24;281:7,7,9,9,15,19,20,25,25;282:4,5,10,17,18,20,23,25;283:3,12,13;285:3;286:5,7;303:25;304:5,8,16,23;315:3,3;318:23,23;321:23;322:16;325:3;376:9;379:7;388:12;422:2;423:3,6
**cash (7)**
397:9,15,21;399:5,24;410:11;420:19
**Cassandra (1)**
284:7
**categories (5)**
313:16,18;316:2;317:2;381:16
**categorizes (1)**
313:13
**category (10)**
329:17,18,20;330:4,5,22,24;371:20;372:10,16
**celebrate (2)**
349:16;398:8
**Celebration (1)**
331:22
**celebrities (1)**
349:15
**cell (16)**
269:18;290:2,6;312:6,8,16;313:5,14,19;319:6;327:15;342:13,22;354:2;356:9;398:17
**Cellebrite (19)**
312:25;313:2,4,7,9,10,13,16;315:11;324:16;325:14;328:25;333:14;342:16,17;347:18;364:25;366:14;367:23
**cellular (2)**
269:16;291:24
**Centennial (1)**
331:21
**Center (1)**
332:14
**CEO (8)**
365:19;367:1;381:8;388:11;407:2;410:12;412:20;415:18
**CEOs (2)**
381:24;383:11
**ceremony (1)**
330:22
**certain (4)**
258:25;348:1;387:4;420:6
**certainly (4)**
263:14,15;264:22;268:3
**certifications (1)**
312:19
**certified (1)**
312:23
**chain (4)**
351:19;369:19,23;370:1
**chair (7)**
329:16;334:13,13,14,16;366:24;409:11
**chance (14)**
268:2;274:16;280:23;295:5;314:2;315:21;319:11;322:18;341:8;347:24;352:11;368:3,10;389:19
**change (3)**
283:6;387:16;416:2
**changes (3)**
330:5;410:8;419:19
**Charalambous (17)**

389:11;390:12;
394:8,25,25;400:16,23,
25;401:23;402:10;
403:13;404:16;405:5;
406:3;408:6;409:3,15
**charge (2)**
270:12;424:22
**charged (8)**
257:25;259:3,5,6;
260:20;265:6;341:13;
375:6
**chart (1)**
292:5
**chat (6)**
272:17,19;341:1;
360:6,16,22
**chats (2)**
346:1;371:4
**chatted (1)**
278:22
**cheap (2)**
349:1,8
**check (4)**
301:8;342:4;353:16;
355:21
**checking (1)**
286:15
**checkup (1)**
379:5
**chemistry (1)**
351:15
**cherry (1)**
342:6
**chief (6)**
380:25;381:1,11;
383:10;385:9;412:21
**choice (1)**
383:25
**choose (1)**
288:23
**circulating (1)**
375:18
**circumstance (7)**
276:11;278:20;
279:14;283:1;284:17,
20;285:24
**circumstances (3)**
280:11;288:25;398:4
**city (4)**
254:9;352:14;357:9;
408:1
**clarify (2)**
336:17;418:9
**clarity (1)**
386:10
**classes (1)**
384:23
**clean (1)**
424:17
**clear (8)**
258:11;266:8;
286:14,23;287:3,19;
324:18;396:10
**clearance (1)**
267:21
**cleared (2)**
273:16;284:18
**clearing (1)**
287:5
**clerk (3)**
254:8;347:4;378:18
**clerk's (1)**
267:20
**click (3)**
326:24;327:16,16
**client (3)**
382:25;383:1,6
**clients (11)**
381:10,16,22,24;
382:22;399:15,18,22,
23;413:22;420:8
**close (4)**
294:5;342:7;378:6;
392:1
**closer (1)**
380:6
**closes (1)**
281:9
**cocktail (1)**
342:6
**codifying (1)**
377:14
**coffers (1)**
341:14
**COHEN (52)**
254:3,12;261:1,4,12;
262:1,4,6,9,11,21,24;
263:3,9,17,21;264:5,
13,18,21,24;265:5,14;
266:6,17;267:5,9;
275:3;289:9;296:22;
297:23;299:4;302:2;
303:4,7;305:24;306:4;
307:22;309:4;310:8;
366:17;373:10,11;
377:20;420:25;423:2,
4,8,12;424:15,21;425:1
**Cohen's (1)**
267:3
**collaterally (1)**
413:10
**colleague (2)**
301:6;337:3
**colleagues (3)**
369:3;376:5;411:20
**collect (1)**
403:9
**collected (4)**
280:9,10;312:2;
320:9
**collection (1)**
295:13
**color (2)**
353:13,21
**column (25)**
275:22,25;276:17,
21;277:5,7,21;279:17,
18;280:7,23;281:15;
285:5;290:10,12;
292:19;298:5,8,10,16,
19;299:19;334:9;
335:9;340:13
**columns (3)**
276:24;278:9;291:14
**combination (1)**
396:5
**coming (13)**
261:9;274:16;
303:16;354:17;358:24;
389:8;393:22;394:5;
398:7;400:14;405:7;
409:22;412:12
**commented (1)**
301:22
**commercial (2)**
380:22;381:19
**commission (16)**
255:25;256:3,13;
257:25;259:3;260:1,4,
5,19;261:5;262:14,18;
263:10,17;265:8;
267:11
**committee (8)**
257:10;258:6,8,18,
24;354:17;372:1;
374:24
**common (4)**
280:2;308:7;309:21;
310:6
**commonly (1)**
311:17
**communicate (7)**
390:18;393:12,20;
409:24;410:21,24;
413:25
**communicated (5)**
389:9;390:16;
392:21;417:17;420:8
**communicates (2)**
377:23;378:9
**communicating (4)**
385:22;389:2;
411:15;423:1
**communication (1)**
411:2
**communications (1)**
417:19
**commute (1)**
254:6
**compact (1)**
349:3
**companies (3)**
381:22,24;382:1
**company (7)**
269:11;380:11,21;
381:13;386:6;387:10,
12
**compared (1)**
422:23
**compensated (2)**
255:10,17
**compensation (6)**
387:10,11;410:5,8;
415:22;419:19
**competitors (1)**
393:4
**complaint (2)**
262:7;265:7
**complete (4)**
271:22;325:9;
328:22;367:15
**completely (12)**
273:16;286:14,24;
287:2,3,5,19;301:17;
340:20;387:21,25;
403:20
**complicated (1)**
266:11
**computer (10)**
272:17;284:22;
286:16;288:19,25;
289:1;311:22;312:13;
377:1,15
**computers (2)**
312:6,20
**Comt (2)**
334:4;335:3
**concerned (1)**
261:6
**conclude (2)**
268:3;345:6
**concluded (1)**
281:13
**concludes (1)**
421:7
**conclusion (1)**
254:17
**conduct (8)**
257:10,25;258:6;
260:4;274:8;299:18;
353:23;375:6
**conducted (3)**
273:19,23;295:23
**conducts (1)**
259:5
**confer (3)**
369:2;372:18;411:19
**conference (1)**
372:15
**confirm (1)**
376:4
**confirmed (1)**
308:22
**Confirming (2)**
390:24;409:25
**confirms (2)**
375:15;395:16
**confused (1)**
267:3
**connect (1)**
270:5
**connection (2)**
261:23;314:10
**consecutive (1)**
342:22
**consent (1)**
315:1
**consider (1)**
266:2
**consisted (1)**
368:17
**consistent (1)**
407:8
**constructing (1)**
266:3
**contact (8)**
273:6;291:15;292:7,
9;327:16,17,18;345:19
**contacting (1)**
340:22
**contacts (6)**
313:20;327:15,16;
333:11,13;335:25
**contain (4)**
297:19;316:25;
318:2;368:23
**contained (13)**
277:12;278:16;
279:12;291:8;297:17;
299:21,25;317:4;
336:7;342:10;351:7;
354:2;367:23
**containing (1)**
281:16
**contains (2)**
318:2;324:15
**contemplated (1)**
384:12
**content (8)**
285:10,12;287:4;
288:23;293:19;309:19;
365:17;418:3
**contents (12)**
289:2,5,8;296:10;
298:17;299:24;346:4;
347:17;352:19;354:5;
368:3;414:21
**context (6)**
259:2,25;284:11;
301:15;377:22;413:21
**continue (13)**
303:3;339:5;347:9;
348:24;351:18;352:12;
354:9;360:2,5;361:7,
21;365:16;381:5
**Continued (5)**
300:6;302:14;
373:19;378:19;421:16
**continues (11)**
338:7;349:5;350:8;
353:14;355:22;358:14,
16,24;359:23;362:2,19
**Continuing (1)**
360:15
**contract (12)**

371:17;392:18;
393:6;401:7;402:21;
404:1,2,25;405:10;
410:16;415:11,18
**contractors (1)**
268:13
**contracts (1)**
393:10
**conversation (21)**
261:20;264:15,16;
265:19;338:7;350:8;
360:16;361:9,10;
362:5;398:20;399:4;
404:9;409:25;410:18,
22,24;411:11;417:2,5,8
**conversations (2)**
267:1;418:3
**convey (1)**
410:18
**conveyed (1)**
389:23
**copies (12)**
274:19;295:21;
297:16;299:24;316:11;
326:11;336:9;346:4;
347:17;348:4;364:18;
367:23
**copy (21)**
328:24;333:13;
342:15;349:19;350:22;
356:5;357:16;359:11;
363:20;364:15;365:3;
366:13;390:1,7;
393:25;394:3,17;
401:6,14;402:22;
408:18
**Cordial (2)**
385:14;412:25
**corner (2)**
294:9;295:7
**corporate (3)**
404:20;413:12;416:9
**corporation (4)**
255:11;384:19,20,24
**corrected (1)**
414:20
**correctly (3)**
255:8;357:24;388:2
**correlated (1)**
294:8
**correspond (1)**
368:6
**corresponding (1)**
298:14
**corresponds (1)**
376:2
**Cortlandt (1)**
292:21
**cost (8)**
386:8;392:4;394:15;
396:18,24;407:8;
410:6,10
**costly (3)**
410:2;418:24;419:10
**counsel (8)**
257:9;260:13;261:1;
268:1,8;306:22;416:9;
417:20
**counselor (3)**
347:9;412:7;414:18
**couple (4)**
254:4;268:18;270:7;
343:10
**course (7)**
259:2;260:25;
267:15;306:24;361:5;
377:7;399:23
**COURT (236)**
254:2,4,14,24;255:4,
8,15,17,23;256:1,4,8,
11,17,20,23,24;257:1,
8,11,16,19,21;258:2,4,
9,15,20,24;259:8,11,
15,20;260:11,21,23;
261:1,7,19;262:3,5,8,9,
17,23,25;263:7,14,19;
264:1,4,7,9,14,19,23;
265:3,12,21;266:5,14,
19;267:7,17,24;268:18,
22;274:16;275:2,5;
289:11;296:23;297:24;
299:6;300:3;301:2,4,5,
11,21;302:8,13;303:2,
5;306:2,21,24;307:19,
21,23;308:20,24;310:9,
21,24;314:18;315:17,
19;316:17;317:14;
326:17;329:4;330:13,
18;333:18;336:14,20;
337:1,2,5;338:19,23;
346:9,12;347:3,5,7;
348:10;363:24;365:8,
11;366:5,7,18;369:4,8,
11;371:7;372:19,21,
23;373:1,3,9,12,14,16;
374:1,4,7,12,18,20;
375:22;376:1,8,16,19;
377:3,7,12,17,19,25;
378:3,10,13,16;379:2,
19;380:3,5,8;382:18;
386:9,14,19,23;388:2,
23;389:8;390:7;
392:23;393:8,22;
394:3,5,6,22;397:13,
18;400:2,14;401:21;
405:7,21,23;406:2,16,
24;407:18,21;409:1,
22;411:21,25;412:3;
414:3,18;415:5,8,19;
416:19,21;417:20;
418:7,15;419:2,4,11,
23,25;420:20,22,24;
421:2,5,7,12;422:2,6,
11,14,16,19,21;423:7,
10,14,25;424:4,13,19,
22,25;425:2
**courthouse (1)**
275:2
**courtroom (2)**
424:6,18
**cover (4)**
390:22;401:25;
403:4;409:5
**coverage (14)**
391:8;393:1,2,2,19;
395:18,18;396:2,7;
410:1;415:22;418:24;
419:9,9
**covered (3)**
386:14,19;396:13
**covers (1)**
264:2
**CP (35)**
319:5;347:14;
349:19;350:23,25;
351:1,1,2,3,5,7;353:2,
2,4,23,24;354:2;355:2,
7;356:5,9,22;357:2,16,
23;359:11,15;363:8,11,
18;364:12,16,23;
365:4;367:7
**CP1 (2)**
319:3,14
**CP13 (1)**
325:3
**CP15 (4)**
344:25;345:2,3,11
**CP16 (6)**
342:23;343:3;344:5;
345:4,17;346:2
**CP17 (3)**
342:23;344:3,17
**CP18 (2)**
342:23;344:12
**crazy (1)**
307:5
**create (9)**
272:3;273:1,8;313:6;
316:8;325:17;328:10;
329:18;342:17
**created (18)**
274:4;279:19,20;
280:22;296:2,3;313:9;
316:12;318:8,22;
328:25;333:14,24;
334:8,10;375:12;
380:12;381:4
**creates (2)**
279:22;280:21
**creating (1)**
273:3
**creative (1)**
407:13
**Credit (10)**
277:9;290:13;
292:21;382:23;383:9;
385:10;403:2;410:5;
413:10,13
**criminal (1)**
258:12
**critically (1)**
260:8
**Cross-examination (9)**
303:5,6;307:1;
369:12,13;412:1,4;
420:5,11
**cube (1)**
270:19
**cuisine (1)**
379:8
**currently (6)**
269:5,6;270:9;
280:12;285:23;311:9
**custodian (1)**
422:13
**customer (39)**
271:9,12;273:1,20,
22;274:3,4;276:17,18;
279:13,14,23;280:9;
281:11;282:9;283:17,
18,24,25;284:1,11,13,
20,25;285:5,11,15,20,
22;286:7,9,12,22;
291:15;292:7,9,9;
293:6,20
**customers (4)**
271:5,14,17;283:5
**custom-type (1)**
393:10
**CX (1)**
306:11

## D

**data (77)**
270:1;272:23;
274:20;275:18,21;
284:13,17,18,19,19,21;
287:4,16,22;288:21;
289:23;293:1;303:9,
13;306:18;307:14;
308:6,9,12;309:6,16,
21,23,24;310:2;312:2,
22,23;313:5,5,13;
315:6,9,25;316:25;
317:7,9,16,23,25;
318:1,3,4,5,7,8,11,14;
320:5,9,10,11,20,25;
322:25;323:4,8,22,24;
324:16;325:9,11;
326:1,5,5,6;327:5;
342:16;343:2;345:8;
368:22,23
**date (100)**
276:1,13,15;277:16,
21,24;279:25;281:20,
22;289:25;290:4,8,20,
23;291:10,22,23,25;
292:1,2,3;296:5,17;
297:4;298:19;299:15;
314:24,25;321:8,11,17,
24,25;322:7;323:14,
20;329:11,23,24;330:1,
3;333:22;334:7;
337:17;338:15,21;
339:1,10,15,17,20;
340:9,11,17,18;343:20,
22;344:7,9,19;345:11,
15;348:16;349:12;
350:6,18;351:11;
352:6,20;353:17;
354:15;355:11;356:13,
20;357:6;358:7;359:9,
18,20;360:8;362:6,15,
19,19;363:1;364:4;
365:16;366:22;367:1;
371:13,25;375:15,20,
21,23;376:2,16;
390:15;398:13;404:10
**Dated (4)**
349:18;350:17;
390:19;404:21
**dates (16)**
280:3,25;283:10;
286:4;291:17,20;
293:2;323:23;324:3,5;
345:9;354:19;355:18,
19;356:17;367:18
**day (10)**
286:20;303:8;379:5,
7;398:8;400:12,12;
423:6,7,9
**days (3)**
345:13;395:24;
407:24
**day-to-day (4)**
269:18,22;270:14;
312:24
**DCID (1)**
298:8
**deal (10)**
258:17;265:21,22;
302:1,8,9;322:19;
398:21;411:14,17
**deals (4)**
255:6,14,16;399:19
**dealt (1)**
393:15
**decades (1)**
399:21
**December (2)**
291:25;425:3
**decide (1)**
279:15
**decider (1)**
423:17
**decides (1)**
281:9
**decision (2)**
423:20;424:1
**decode (1)**
317:9
**deductions (3)**
387:7,7,17
**defeated (1)**

374:12
**defendant (20)**
259:22,25;260:12;
261:3;264:11;267:2;
301:9;303:2;347:7;
373:13,15;375:12,19;
377:23;378:5;379:2;
423:24;424:3,7,12
**defendants (1)**
378:6
**Defendant's (2)**
306:3;375:16
**defense (21)**
261:6;262:25;263:5,
24;265:2,10;266:18;
305:9,12,15,24,24;
306:4,6;308:15;
310:13;423:3,6,20;
424:5,5
**Definitely (1)**
358:13
**delay (2)**
268:6,9
**delete (2)**
273:12;287:6
**deleted (7)**
289:8;349:23;355:6;
356:9;357:25;358:2;
363:12
**delighted (1)**
422:22
**Delivered (1)**
337:25
**department (1)**
270:22
**departmentally (1)**
270:15
**depend (1)**
423:4
**Depending (6)**
313:19;395:20;
403:25;404:2;422:13;
423:12
**depict (1)**
314:12
**DEPUTY (2)**
347:4;378:18
**describe (7)**
271:2;314:21;
384:16;385:13;386:24;
398:4;418:17
**described (1)**
412:24
**description (7)**
275:23;276:3;
281:15;282:19;283:4;
289:25;291:15
**descriptions (2)**
291:20;368:15
**desert (1)**
342:5
**designed (1)**
271:5
**detail (1)**
291:21
**detailed (1)**
262:7
**details (2)**
294:8;391:10
**Determining (1)**
258:3
**developed (1)**
382:8
**device (88)**
269:16,19;270:6;
273:15,16;276:8;
277:15,18,18;278:3,5,
8,21;280:11,13,15;
287:3;293:2;309:20;
315:4;317:1,1,4,5,7,13,
23;318:9,21,24,25;
319:3,6,11,14,22;
320:2,3,9,17,18,19;
321:7;322:23;323:4,
13,14,19,24;325:2,10,
12,17;326:1,2,2,4,22,
25;327:5,6;328:14,25;
333:12;342:10;343:4;
344:24;345:2,4,8,13,
15,18,20;346:1;353:3,
24;356:6,23;357:17;
359:12;363:8;364:19;
367:8;368:14,15;
369:24;370:17
**devices (35)**
272:7,24;291:4,10,
11;293:1,7,13,25;
294:3,16;312:3,4,4,16;
314:6,7,9,13,21;315:6,
8,9,10;316:12;323:5,6;
368:17,19,22,23,25;
371:4;377:1,16
**devoted (1)**
381:13
**diem (1)**
254:10
**difference (3)**
287:5,8;403:5
**different (24)**
259:4;270:7;271:22,
22;280:3,10,25;283:3;
313:16,21;321:2;
326:2;328:9;336:18;
340:7;345:9;381:18,
21;384:23;387:1,21;
396:6;403:17,20
**differently (1)**
263:6
**differs (1)**
385:2
**difficulty (1)**
398:21
**dinner (1)**
352:14
**direct (31)**
266:4;269:1;270:14,
21;275:13;278:12;
281:18,19;283:11;
285:2;298:22;303:25;
304:4;305:5;308:2;
309:12;311:5;329:25;
333:21;334:6;335:6;
362:18;369:18;370:3;
371:10;376:24;377:5;
379:20;412:17;414:13;
415:10
**directing (13)**
277:21;321:20;
330:11;331:12;335:16;
337:23;340:16;362:14;
364:2,11;367:2,14;
419:17
**directly (4)**
256:3,13;270:21;
285:16
**director (1)**
334:12
**directorship (3)**
255:7,9;261:21
**directorships (1)**
255:18
**directory (1)**
294:17
**disability (59)**
366:25;383:16,19,
20,21;384:4,6,7,8,15,
20;385:20,21;386:1,4,
5,11,20,25;387:13,23,
24,25;388:5,8,13,21;
392:18;393:3;394:15;
395:13,17,23;397:10,
15,22,25;398:24;399:6,
25;401:7;403:2,4,6,10,
17,20;404:5,11,11;
405:13,13;407:9;
409:20;410:1;415:14;
418:24;419:8,9
**disabled (7)**
386:21;387:7,18;
388:6;391:17;396:7;
415:25
**disagreement (1)**
373:9
**disclosable (2)**
264:16;265:2
**disclose (4)**
263:4,11,12,24
**disclosed (3)**
261:22,24;264:22
**disclosure (8)**
254:16,23;255:6;
257:13;263:3,7,13;
265:11
**discuss (2)**
385:25;397:14
**discussed (5)**
386:3;392:22,24;
393:1;418:10
**discussing (1)**
418:2
**discussion (2)**
261:21;397:23
**discussions (2)**
263:10;373:7
**disingenuous (1)**
301:23
**display (5)**
327:20;349:4;364:1;
365:10;366:20
**distinguished (1)**
384:23
**District (3)**
254:6,8;311:12
**divided (1)**
313:16
**DMPNV9MAG5YN (1)**
290:4
**DMPPQ3QBG5YN (1)**
290:7
**DNPVPAQSJCL9 (1)**
276:14
**document (30)**
265:7;282:3;299:4;
317:17;333:8;337:22;
366:10;367:2;371:11;
376:9;377:9,10;
389:13,18;390:15;
394:12;402:11,14;
403:15;405:7,12;
406:6,8,10;409:13,16,
22,24;410:18;414:16
**documentation (1)**
398:25
**documented (1)**
315:5
**Documents (2)**
320:23;402:8
**DOJ (6)**
334:1,2,20,22,24,25
**dollar (1)**
403:5
**dollars (4)**
393:18;396:7,11,17
**done (10)**
279:7;317:15;
335:20;360:23;411:13,
17,18;422:2,25;423:6
**dormant (1)**
340:20
**down (12)**
283:23;284:6;286:6;
289:16;296:7;309:3;
317:13;343:7;358:21;
375:15;392:23;413:16
**download (5)**
269:20;272:6,24;
273:18,18
**downstairs (1)**
379:8
**dress (1)**
404:7
**dressing (1)**
403:23
**drive (2)**
342:15;343:2
**drives (1)**
312:6
**drop (1)**
408:1
**DSID (9)**
294:10,12,13,14,15,
19,20;295:7,9
**dual (1)**
410:6
**Dubai (1)**
355:15
**due (1)**
387:18
**duly (3)**
268:25;311:3;379:16
**duration (1)**
367:21
**during (8)**
279:3;301:7;316:8;
356:18;370:6;381:2;
382:25;420:11
**duties (6)**
380:23;381:8,13;
383:5;387:19;404:6
**duty (2)**
274:1;295:25

## E

**eardrums (1)**
268:20
**earlier (6)**
377:19;382:10;
404:21;410:16,19;
423:12
**earliest (3)**
321:17;323:14,20
**early (3)**
268:4;296:8;353:9
**earphones (1)**
359:7
**easier (1)**
410:10
**Ed (1)**
372:9
**Edward (2)**
359:21;369:20
**effective (1)**
410:10
**effectively (2)**
377:9;392:3
**efficiently (1)**
422:25
**efforts (1)**
386:15
**eight (5)**
422:9,11,12,14;
423:4
**Eisner (1)**
361:21

**either (13)**
263:12,16;264:4;
271:18;279:21;283:22;
320:2;368:25;387:18;
390:20;392:7;396:10;
424:4
**elected (1)**
334:14
**elections (1)**
354:17
**electronic (4)**
312:3,4,21,22
**elegant (1)**
350:14
**else (8)**
255:13,15;283:7;
361:19;382:15;387:24;
390:8;424:14
**email (33)**
327:23,25;332:23;
334:8,11,11;393:20,23,
25;394:4,14,17;395:1,
6,10,12,16;400:10,14;
401:6,14;402:1;
404:10;405:16;406:4;
407:24;408:3,12,18;
409:5;416:4,11;417:17
**e-mail (20)**
273:4,4,9;276:22,25;
277:1;278:7,11;
282:25;283:2,21;
291:2,5;293:10,23,24;
302:3;365:3;366:1;
372:10
**emailed (3)**
390:20,21;400:5
**e-mailed (1)**
278:22
**emails (2)**
313:21;317:2
**e-mails (2)**
267:1;365:1
**emojis (1)**
321:2
**Empire (1)**
380:14
**employed (4)**
269:5,6,8;311:9
**employee (3)**
271:3;381:20;383:7
**employees (5)**
271:21;274:7;279:3;
381:14;382:1
**employee's (1)**
387:15
**employment (4)**
255:17;402:20;
412:18;415:11
**empty (1)**
334:4
**enacted (1)**
259:9
**end (8)**
301:25;329:14,23;
369:17;379:4;413:19;
414:8,13
**endeavor (1)**
285:4
**ended (1)**
382:11
**engaged (1)**
413:16
**enjoy (2)**
421:5,10
**enlarge (8)**
348:18;350:1;
351:23;352:4;354:4,
13;356:11;358:5
**enough (4)**
267:17;361:18;
384:9;388:14
**ensuring (1)**
287:1
**entitled (2)**
265:10;406:12
**entries (10)**
276:2,23;282:4,7,9,
17;288:7;289:24;
292:7;367:17
**entry (22)**
277:8;281:20;
283:19;285:2,6,17;
286:4,10,19;288:10;
290:12;292:19;306:10;
321:23;333:21;334:7;
335:7;350:17;371:24;
372:4,5,12
**equals (20)**
334:1,1,3,3,4,4,5,12,
12,13,13,14,15,16,23,
24;335:1,2,3,4
**Equipment (2)**
333:1;377:15
**equivalent (1)**
287:18
**erase (10)**
284:20;285:9,12,19,
21;286:1;287:3;
288:21,23;289:2
**error (1)**
336:23
**errors (1)**
304:23
**escapes (1)**
405:2
**especially (1)**
352:15
**essentially (4)**
277:14;284:20;
294:17;310:4
**establish (1)**
256:6
**established (2)**
314:25,25
**establishment (1)**
383:2
**estimate (2)**
312:7;394:15
**et (1)**
331:16
**ethics (4)**
255:24;256:3,13;
259:4
**evaluation (1)**
331:9
**even (6)**
255:23;277:4;
280:24;281:6;282:25;
410:6
**evening (3)**
352:14;356:16;357:9
**event (15)**
279:24;316:6;
317:11,12;321:6,8,15,
18;323:14;329:19;
330:1;354:21;386:21;
388:5;424:4
**events (10)**
310:15;317:22;
323:13,19,25,25;324:2;
328:23;329:8;378:8
**everybody (5)**
267:24;365:13;
382:15;384:20;424:25
**everyone (2)**
289:21;384:21
**evidence (45)**
275:7;297:25;
305:13,25;306:3,23;
307:2,8;308:22;
312:21,22;314:20,24,
24;315:1,3,3;316:20;
319:9;321:21;322:18;
326:19;329:5;333:19;
337:8;338:21;348:12;
363:25;365:9;366:19;
368:11;369:9;371:9;
375:20;377:2;390:5,
11;394:20,23;401:19,
22;408:24;409:2;
414:12,13
**evidentiary (1)**
301:20
**exact (2)**
267:15;304:13
**exactly (9)**
261:6;279:13;291:1;
352:4;378:12,15;
383:20;388:19;402:16
**EXAMINATION (7)**
269:1;310:11;311:5;
379:20;414:14;415:10;
420:3
**examine (1)**
343:25
**examining (1)**
326:12
**example (2)**
307:5,6
**examples (1)**
262:16
**Except (4)**
259:21;261:7;356:9;
357:1
**exception (3)**
265:3;377:19,21
**excerpt (7)**
301:14;302:4;
305:13,17;363:17,20;
364:23
**excess (2)**
393:5;395:23
**exchange (1)**
369:25
**exchanged (1)**
411:2
**Excuse (9)**
275:4;323:25;
331:12;362:8;372:3;
415:20;418:11;419:9,
10
**excused (8)**
300:5;310:21,23;
372:23,25;373:2;
421:3,6
**executive (12)**
254:8;380:25;381:1,
11;383:8,10;385:9;
387:8,14,16,17,22
**executives (1)**
383:8
**executive's (1)**
387:5
**exercise (1)**
270:1
**exhibit (114)**
254:22;268:10;
274:12,25;275:6,9;
289:20;294:6;295:1,5;
296:11;297:11,25;
299:18,21;301:8,13,16;
302:1,3,4;305:4,5,9,12,
13,15,19,24;306:3,4,6;
308:15;310:13;315:15;
318:17;319:12;320:15;
321:20;322:3;325:21;
328:6,18,19;329:5;
333:7,13,19;335:20;
336:3,18,22;337:9;
340:15;342:7,9;
344:11;345:23;346:8;
347:22;348:1,5,11,13;
349:24;351:8;352:3,
17;354:12;359:17;
363:4,25;364:14;
365:9;366:19;368:2;
369:9,18,19;371:9,13,
24;372:3,3,3;374:21;
377:6;389:12,14;
390:5,10,11;394:6,9,
10,20,23;400:17,24;
401:2,13,13,19,22;
402:15;408:8,10,23;
409:2;414:14;415:17,
21;416:3;418:21
**exhibits (21)**
268:7,14;274:13;
301:18;313:25;314:3,
16,19;315:8,22;
316:18;325:23;326:11,
18;336:5;337:7;
345:25;347:12,24;
348:1,7
**exist (1)**
323:22
**existed (1)**
366:14
**expand (5)**
282:20,21;283:16;
286:7;359:4
**expanded (1)**
285:7
**expect (3)**
268:2;423:2,5
**expected (1)**
268:2
**expensive (6)**
393:11,12,17;397:1;
419:13,14
**experience (10)**
259:17;274:4;
318:10;319:23;407:6;
418:25;419:8;420:7,
13,16
**expert (3)**
259:18;261:10;349:8
**experts (1)**
271:24
**explain (6)**
272:21;284:15;
313:2,10;380:15;396:2
**explained (1)**
403:7
**explanation (3)**
396:17;403:16;
413:15
**explanations (1)**
260:9
**explored (1)**
386:25
**exploring (1)**
388:3
**export (2)**
317:16;370:9
**exported (2)**
336:6;339:13
**extended (1)**
373:8
**extent (2)**
259:21;266:9
**extra (2)**
342:6;357:10
**extract (6)**
312:2,22;313:5;
315:6;322:25;326:1

**extracted (6)**
336:10;351:2,3,4;
364:19;368:22
**extraction (20)**
315:9;316:23,24,25;
320:17;324:14;325:9;
343:1,21,22;344:7,9,
12,19;345:3,11;351:2,
6,7;364:15
**extractions (10)**
326:7;342:11,12,13,
14,18,20,22;347:19;
368:19

## F

**fabulous (1)**
352:16
**Facebook (1)**
348:23
**Facetime (1)**
269:21
**facets (1)**
381:18
**facilities (1)**
270:12
**fact (13)**
258:7;260:3;266:14;
307:6,8;375:20;
376:13;377:22;387:17;
413:2;414:5;417:19;
418:12
**factors (4)**
395:21;407:12;
410:8;419:20
**factory (8)**
287:12,15,16,21;
318:11;320:3,4;369:1
**facts (8)**
261:25;262:1,4,11,
12;264:7;266:12;
334:10
**factual (1)**
307:3
**failure (1)**
257:13
**fair (27)**
274:19;297:16;
299:24;316:11;321:13;
326:11;328:24;333:13;
336:9;346:4;347:17;
348:4;363:20;364:18;
365:3;366:13;370:5,
12,22;384:11;393:25;
394:3,17;408:18;
413:21;414:25;417:13
**fairly (1)**
314:12
**false (2)**
257:14;262:20
**familiar (9)**
273:19;287:12;
305:3,16,17;383:15;
384:3;385:1,6
**Family (3)**
331:19;398:10;
403:19
**famous (1)**
342:5
**fans (1)**
355:16
**far (3)**
254:6;257:2;333:25
**fast (1)**
268:14
**faster (1)**
268:1
**fast-forwarding (1)**
392:13
**fault (1)**
268:22
**favorite (1)**
353:21
**February (5)**
299:16,16,16;
374:22;375:16
**federal (4)**
254:10;370:7,14,25
**FedEx (1)**
332:25
**feedback (1)**
279:11
**feels (1)**
410:9
**felt (1)**
406:11
**few (9)**
297:3;345:13;
354:21;360:19;369:17;
370:2,15;386:10;
395:14
**fiduciary (1)**
255:18
**Fifth (5)**
270:18,19;404:24;
405:1,9
**Fifty (1)**
380:9
**fighting (1)**
262:3
**figure (1)**
256:24
**figures (2)**
407:4,8
**file (10)**
257:12,13;267:1;
317:20,21;320:20;
343:4;367:21,21;368:4
**files (2)**
367:8,24
**filing (2)**
261:20;262:15
**filings (1)**
257:14
**fill (1)**
403:11
**filling (1)**
273:5
**final (8)**
299:13;315:17;
350:12;352:1;359:1;
375:13;377:8;424:1
**finally (1)**
352:22
**financial (2)**
257:13;412:21
**find (7)**
278:19;291:9;293:2;
356:3;357:14;377:9;
421:14
**fine (4)**
262:9,10;306:16;
356:1
**fired (1)**
335:4
**firm (5)**
255:10;387:22;
396:21;407:2;413:17
**firms (1)**
380:12
**first (47)**
255:21;271:13;
273:2,3;278:7,10;
281:20,22;284:5;
289:5;290:2,23;291:2;
292:16,19;294:22,24;
298:23,25;304:2;
306:10;307:7;319:6,
22;329:22;338:8;
340:4;349:6;351:1,2,6,
7;354:14;355:6;
357:15,25;360:10,15;
362:15;378:1;382:9;
390:9;391:2;395:14;
400:25;401:25;402:11
**fish (1)**
266:20
**five (5)**
268:9;288:16;
395:25;396:9;398:7
**fixated (1)**
401:9
**fixed (1)**
387:14
**flexible (1)**
380:8
**focus (3)**
268:15;404:11;416:2
**folks (2)**
365:11;384:22
**follow (1)**
395:14
**following (14)**
265:17;279:2,17;
324:1;348:25;359:23;
363:13;398:8;405:3;
406:18;408:2,15;
413:19;414:6
**follows (5)**
259:8;268:25;311:3;
360:1;379:16
**foray (1)**
261:4
**forced (1)**
375:10
**forensic (1)**
325:7
**forensics (2)**
311:22;312:13
**forget (1)**
379:4
**forgot (4)**
340:20;352:8;359:5;
363:6
**form (9)**
254:16;255:2;
262:19;265:20;272:14;
309:2;315:1;413:12;
419:2
**formal (3)**
373:7;393:16;396:25
**format (2)**
313:15;339:14
**former (1)**
366:24
**forms (6)**
254:23;257:13,14;
261:20;262:15;263:11
**forth (1)**
416:1
**forward (3)**
397:2,3,4
**found (6)**
301:8;324:17;350:3;
382:12;416:12,13
**four (9)**
288:16;299:3,7;
345:6;355:17;368:17,
19;399:18;403:22
**fraction (1)**
386:20
**frame (1)**
356:2
**frank (1)**
400:6
**free (2)**
341:14;342:5
**fresh (1)**
287:17
**Friday (1)**
398:6
**friend (1)**
360:20
**front (2)**
374:5;389:14
**froze (3)**
286:16;288:19,23
**frustration (1)**
406:17
**full (8)**
293:19;324:19;
329:23;363:17,21;
383:24;403:16;423:9
**functions (1)**
403:22
**further (20)**
277:4;278:6;281:13;
284:6;290:25;292:12,
18;300:2;310:8,20;
343:7;362:3;369:10;
372:20;382:3;401:12;
411:23;419:24;420:23,
25
**future (1)**
329:22

## G

**G6TVK189JCL9 (1)**
343:19
**Gagliardo (15)**
359:20;360:3,6,12,
18,24;361:2,5,12,14,
18,25;362:2,12;371:3
**game (7)**
349:14,14;351:16;
352:9;354:20,25;
357:10
**gap (2)**
403:7,11
**Gary (1)**
339:24
**Gates (1)**
419:14
**gave (1)**
350:4
**GCRM (9)**
275:14,17,18,20;
277:19;289:23;293:1,
12;319:10
**general (4)**
295:12;314:5;
315:24;317:3
**generally (2)**
260:18;418:17
**generate (1)**
318:3
**generated (4)**
315:10;316:3,4;
325:14
**generating (2)**
317:18;375:18
**generosity (1)**
357:11
**Genius (29)**
270:16;271:8,16,17,
20,21,23,23,25;272:1,
2,4,7,15,17;273:20,23;
278:17;279:8,21;
281:12;284:2,11,24;
285:1;287:19;303:13;
304:11;306:12
**gentlemen (2)**
379:4;421:7
**George (2)**

307:23;366:7
**gets (6)**
260:14;268:14;
315:3,5;377:24;384:21
**gift (8)**
282:2;283:1;284:1;
304:9,14,17;332:5;
334:18
**gifts (1)**
255:14
**gigabyte (3)**
276:4,7;290:6
**gigabytes (1)**
290:3
**Giglio (1)**
263:13
**Gio (1)**
362:4
**Giovanni (3)**
274:23;293:22;
409:17
**given (8)**
256:6;261:8;304:12,
20;342:22;344:25;
418:10;424:10
**gives (1)**
377:22
**giving (2)**
361:16;418:2
**GJH (1)**
334:4
**glass (1)**
270:19
**glasses (1)**
389:16
**globe (1)**
269:12
**Gmail (1)**
327:23
**goes (3)**
264:10;271:3;362:3
**gold (7)**
290:3,7;292:1,2;
353:12,21;354:7
**Good (30)**
254:2,3;259:15,16;
267:24;268:2;269:3,4;
299:1;311:7,8;348:21;
354:6,10;355:13;
357:8;358:18;359:7;
360:16,18;361:12,18,
21;369:15,16;379:22;
412:6,7;424:25;425:1
**government (56)**
254:10;262:6,24;
263:3,9,24;264:6,12,
24;265:1,9,15;266:17;
268:3,13,17,24;275:4;
302:4;305:5,13,19;
310:25;311:2;314:15;
315:15;316:14;326:14;
329:2;333:16;336:12,
24;348:7;371:9;372:3;
373:3;374:15,23;
377:5;379:13,15;
389:12;390:4,5,10;
394:9,10,19;400:17;
401:2,13,18;402:15;
408:8,10,23
**Government's (28)**
268:16;275:6;
297:25;313:25;314:19;
316:18;326:18;329:5;
333:19;337:7;348:11;
363:25;365:9;366:19;
369:9,18;371:13,24;
372:2;390:11;394:23;
401:22;409:2;414:14;
415:17,21;416:3;
418:20
**GPorcelli@NYMCUorg (1)**
293:24
**grabbing (1)**
389:15
**grandkids (1)**
398:7
**Grandpa's (1)**
398:8
**grant (2)**
314:23;413:12
**granted (1)**
258:25
**Great (9)**
351:20,25;352:24;
355:16;356:16;359:8;
361:24;398:21;424:13
**ground (3)**
263:1;375:2,9
**group (30)**
341:6;360:6,22;
361:2;380:14,19;
384:8,14,16,18,21,22;
385:18;386:11,16,19;
387:1,2,2,6,21,24;
388:8,12,14,17;389:23;
391:20;396:14;403:8
**grow (2)**
381:11,13
**G's (2)**
334:3;335:2
**Guagliardo (4)**
335:8;369:20;
370:20,24
**Guardian (7)**
386:6;388:22;389:3,
23;391:8;392:9;393:4
**guess (2)**
279:21;282:13
**guessing (1)**
400:7
**guests (2)**
349:17;355:15
**guys (2)**
356:19;362:11
**GX (1)**
254:23

## H

**Haha (2)**
349:10;353:15
**Hahahaha (1)**
361:7
**half (1)**
395:1
**hallway (1)**
347:4
**Hamill (105)**
274:10;275:8;
276:16,20;277:4,10;
278:6,14;280:19;
282:21;283:9,15;
285:4,15;286:3,7;
289:16,19;290:9,14,25;
291:6,12;292:12,23;
293:17,18;294:5,25;
297:10;298:1,22;
313:23;315:13;318:16;
319:8,18;320:14;
321:3,22;322:2,13;
323:10,16;324:7,24;
325:20;326:20;327:12,
20;328:5,11,16;329:6,
9;333:5,20;335:21;
336:2;337:9,16,21;
338:6,17;339:3;
341:15;342:7,24;
343:7,23;344:10,21;
345:22;346:7;347:21;
348:13,18;349:6,24,25;
350:16;351:8,21;
352:2,17;353:5;354:3;
355:8;356:10;357:3;
358:4,21;359:16;
360:14,14;362:13;
363:3,15;364:13,21;
365:12;366:3;367:13;
368:1,8
**hand (1)**
283:7
**handle (2)**
312:21;424:6
**handled (1)**
381:21
**handwritten (2)**
266:23,25
**happen (1)**
262:19
**happened (4)**
375:15;376:2;378:6;
398:15
**happening (1)**
289:13
**happens (2)**
308:9;378:7
**happy (1)**
266:2
**hard (4)**
302:5;342:15;343:2;
416:21
**hardware (5)**
269:10;270:25;
271:4,6,18
**head (3)**
341:13;406:19,21
**header (1)**
278:23
**headphones (1)**
270:5
**health (3)**
270:1;388:20;399:17
**hear (9)**
260:12;301:11;
304:2;336:20;357:19;
360:24;361:3;374:8;
416:21
**heard (4)**
261:7;267:17;337:2;
375:10
**Hearsay (2)**
306:23;415:7
**heft (1)**
381:15
**held (1)**
255:10
**Hello (1)**
319:24
**help (11)**
264:9;271:5;287:11;
303:12;306:11;309:10;
326:8;342:20;362:11;
406:9,14
**helpful (1)**
301:25
**here's (1)**
391:6
**herself (1)**
258:6
**hesitate (2)**
299:10;338:5
**Hey (2)**
352:21;354:16
**Hi (7)**
340:18;352:25;
353:9;354:23;356:15;
358:9,24
**high (1)**
380:15
**higher (2)**
403:12;410:6
**highlight (2)**
256:10;298:23
**highlighted (1)**
282:23
**highly (1)**
375:7
**High-Tech (1)**
311:16
**Hilton (2)**
331:22;332:3
**himself (1)**
413:13
**history (1)**
307:11
**Hmm-hmm (2)**
305:20;308:3
**hockey (1)**
356:3
**hold (1)**
415:5
**holding (1)**
326:23
**home (7)**
287:7,10;308:5;
334:3,11;335:2;404:3
**homes (1)**
403:25
**hone (1)**
402:24
**Honor (110)**
254:3,12,13,20,21;
255:6;256:5,10,25;
259:25;260:25;261:4,
12;262:21;263:4;
264:3,13,18,21,24;
265:14,17,24;266:2,10,
17,21;267:9;274:25;
289:9;297:23;299:4;
302:12;303:4;306:23;
307:22;309:4;310:10;
314:15,17;316:16;
326:16;329:3;330:15;
333:17;336:16,21;
338:18;348:9;369:7,
10;371:6;372:20,22;
373:6,11,13,15;374:2,
9,19;375:7;376:7,12,
18,23;377:4,5,10,18,
21;378:15;388:25;
390:4,6,9;394:7,19,21;
397:12,17;400:1;
401:18,20;405:20;
406:15,22;407:17;
408:23,25;411:19;
412:2;415:7;416:25;
417:22,24;419:10,24;
420:2,23,25;422:9,20;
423:24;424:3,12,15,18,
21;425:1
**Honorable (39)**
276:19;278:10;
291:4;292:10,10;
294:24;327:1,7,19;
337:15,20;338:13;
339:9,22;341:3;
348:20;349:13;350:5,
20;352:21;353:15,19;
354:16,23;355:13,20,
23,25;356:15;357:8,
13;358:9,12,23;362:16,
23;364:5;367:20;371:3
**honorary (1)**
255:12
**honored (1)**
413:24

**Honor's (1)**
266:2
**Honsylviagash85@gmailcom (4)**
329:21;330:4,24;
371:21
**hope (4)**
268:5;341:22;
355:14;421:12
**hopefully (4)**
268:4;351:16;
360:24;382:18
**hoping (1)**
354:8
**Hotel (1)**
331:22
**hours (1)**
360:19
**housekeeping (1)**
424:15
**HR (1)**
372:7
**HTAU (5)**
311:17,19;312:7,10;
314:22
**hundred (1)**
415:22
**hush (2)**
352:1,1
**Hyatt (3)**
331:1,3,5
**hypothesis (1)**
263:19
**hypothetical (2)**
262:3;263:21

**I**

**iCloud (27)**
272:21,22;273:1,3,
10,13;275:19;277:25;
278:2,3,4;284:22;
286:13,23,25;287:2,17,
24;290:23;295:16,22;
298:11;324:10,14;
327:11;328:14,15
**icon (1)**
365:21
**ID (34)**
272:25;273:7,8,9,17;
274:22;276:21,25;
278:5,19;279:17,18,20;
280:2,5;281:7,9,19,21,
25;282:4;283:12;
285:3;286:5,15;
287:17;294:8,15,18,19,
20;324:21;327:11;
343:16
**idea (3)**
258:22;407:4;421:13
**identification (25)**
274:11;295:1;305:9,
15;313:24;315:14;
325:21;328:17;333:6;
336:3;345:23;347:22;
363:4;364:14;368:2;
389:12;390:5;394:9,
20;401:3,5,14,19;
408:7,24
**identified (3)**
283:22;369:20;
370:24
**identifier (1)**
294:15
**identifiers (11)**
293:12;319:12,14;
322:23;343:25;344:5,
14;345:2,4,7;368:15
**identifies (1)**
278:19
**identify (9)**
254:21;282:10;
370:5,13,23;371:12,25;
372:5,12
**identifying (4)**
256:22;294:3;
322:22;326:8
**IDs (3)**
275:19;292:14,15
**ignore (1)**
337:5
**illustration (1)**
391:8
**Images (2)**
320:22;321:1
**IMEI (1)**
293:15
**iMessage (1)**
339:21
**impacted (1)**
382:20
**important (3)**
260:8;376:8;377:22
**impose (1)**
258:10
**imposed (1)**
266:15
**imposing (1)**
258:21
**inches (1)**
268:18
**include (2)**
293:15;316:5
**included (1)**
316:24
**including (10)**
257:18;270:13;
273:20,22;274:3;
295:15;380:10;381:6;
395:2;410:12
**income (12)**
255:16,17;384:2,9;
386:20;387:4,5;388:5;
395:19;396:23;403:11;
415:25
**inconsistent (1)**
301:17
**Incorporated (3)**
269:8,9,10
**increased (2)**
410:7;419:19
**increases (2)**
406:12;407:13
**indeed (2)**
320:11;414:8
**independent (1)**
386:15
**indicate (18)**
276:7,9;285:6;
288:20;289:4,12;
291:21;298:19;320:1;
327:2;335:17;339:20;
363:12;368:24;390:15;
402:3,7;409:7
**indicated (7)**
298:4;310:18;334:9;
345:12;370:24;375:8;
399:23
**indicates (11)**
276:10;285:22;
286:19;288:21;289:14;
307:16;308:18;310:14;
320:2;321:8;367:19
**indication (1)**
369:23
**indicator (1)**
284:4
**individual (16)**
278:4,18,20;281:3;
370:19;383:8;384:17;
385:6,19;387:3,13,14,
25;388:4,10,13
**individuals (3)**
275:19;369:20;
383:13
**industry (7)**
380:1,2;399:21;
406:20;407:6;420:13,
16
**infection (1)**
382:9
**inference (3)**
377:25;378:7,13
**info (3)**
317:1;320:18;334:10
**informal (1)**
373:7
**information (22)**
256:22;272:23,24;
273:6,10;277:12;
278:15;279:12;280:9,
10;287:16;291:8,13;
292:13;293:21;316:24;
317:3,8;318:2;320:19;
343:4;420:8
**informations (1)**
322:22
**informationthank (1)**
340:23
**informed (3)**
254:17;267:25;
370:13
**initial (2)**
280:11;283:5
**initially (1)**
417:3
**in-person (1)**
281:6
**inquire (2)**
356:17;412:2
**inserted (1)**
324:16
**inside (2)**
313:12;367:16
**insolvable (1)**
268:12
**inspection (2)**
255:22;256:14
**instance (1)**
370:24
**instead (2)**
288:11;331:15
**institution (1)**
341:24
**in-store (1)**
289:1
**instruction (1)**
261:8
**instructions (3)**
254:16;255:2;260:24
**insurance (97)**
361:16;365:19;
366:25;380:1,2,12,13,
14,16,17,17,18,20,22;
381:19,19;383:13,16,
19,20,23;384:4,6,7,11,
12,13,21;385:2,2,4,4,
15,17,18,20,23;386:1,
4,5,6,16,24;387:9,12,
21;388:14;389:3,23;
392:14,19;393:16;
394:15;395:13,17;
396:1,14;397:10,16,22,
25;398:25;399:6,6,9,
16,19,21,25;401:7;
402:16,19,20;403:2,4,
9,18,19;404:5;405:13,
14;406:20;407:6,9;
409:20;410:4,6,21;
413:9,14;415:14,21;
418:24;420:7,13,16,18
**insurances (1)**
399:17
**insured (3)**
380:17,19;384:10
**insures (1)**
384:19
**intact (1)**
340:21
**intake (4)**
279:20;280:11;
314:23;318:22
**intend (3)**
257:5;265:2,24
**intended (1)**
374:24
**intends (1)**
374:23
**interacted (2)**
262:15,17
**interaction (1)**
284:3
**interactions (6)**
259:22;260:2,12;
261:2,13,16
**interested (1)**
379:8
**interests (1)**
406:12
**internal (2)**
276:8;318:25
**interrogation (1)**
264:11
**interrupt (1)**
346:9
**intervene (1)**
361:20
**interview (4)**
334:1,2,24,25
**intimately (1)**
260:2
**into (37)**
258:13;261:4;
266:12;273:16;288:24;
289:1;303:9;305:24;
310:1;313:16;314:24;
317:18;324:16;325:2;
326:1;327:16;328:8;
336:7;339:14;342:10;
344:24;359:2;368:11;
374:12;375:20;380:6;
386:8;389:8;390:5;
394:20;395:16;400:14;
401:12,19;403:16;
407:12;408:24
**introduce (1)**
263:18
**introduced (1)**
269:14
**inventory (1)**
270:13
**investigating (3)**
258:1;259:3,6
**investigation (5)**
314:10;324:9;370:7,
14,25
**investigations (1)**
259:7
**involve (1)**
259:21
**involves (1)**
286:25
**involving (2)**
369:19;370:3
**iPad (12)**
269:15,19;272:11;

290:2,6;291:22,24;322:19;353:10,11;368:18,18
**iPads (5)** 269:11;270:14;289:23;290:1,17
**iPhone (75)** 269:11,15,16,24;270:3,3,13;272:20;276:3,5,5,13;280:17;281:23;282:1,1,1;283:1,25,25;284:1,12,12,14,14,18,21;285:9,13,19,21,23,25,25;286:1;288:7,11,13,17;291:23,25;292:2,3;304:9,9,16,17;306:12,18,18;307:14,15;309:6,10,16,16;325:5;332:8;334:18;335:23;336:10;343:9,14;350:23;351:1;353:2;354:7;357:10,14,22;364:12;365:2;368:18,18;375:12
**iPhones (1)** 286:13
**irrelevant (1)** 261:17
**Island (1)** 360:19
**issue (14)** 267:10,10,13,15;279:23;281:4;283:5,7,22;285:9;286:5,12;301:3;374:5
**issued (5)** 388:15,19;392:10,11;404:14
**issues (4)** 271:9,12;301:20;382:4
**item (40)** 329:9;330:7,11,13,15,17;331:2,4,6,13,14,17,20,23;332:1,4,7,10,12,15,19,22,24;333:2;334:6;335:6,13;339:15,17,19;340:9,11,16,24;341:10,17;342:1;365:13;371:10,13
**items (2)** 292:8;295:15
**iTunes (1)** 327:11

J

**Jackson (2)** 332:16;333:24
**James (1)** 341:6
**January (19)** 277:24;305:2;306:6,18;307:14;308:16;309:9;360:8;367:1;398:14,16;399:4;400:4;401:15;402:5;408:17;410:25;416:4,12
**Jencks (1)** 263:15
**job (5)** 257:18;259:19,20;312:24;313:7
**Joe (15)** 334:3;335:2;359:20;360:18,24;361:2,5,12,14,18,25;362:2,12;369:19;370:19
**join (1)** 341:6
**joined (1)** 369:24
**Joseph (2)** 335:8;370:19
**Juan (1)** 331:1
**judge (6)** 255:10;257:15;258:5;260:3;262:19,20
**judges (2)** 257:12;262:18
**judicial (7)** 257:10,25;259:4;260:4;261:5;263:10;265:8
**July (5)** 296:17,25;297:5;350:17;395:8
**June (17)** 283:12;285:3;286:5,10;288:13,17;290:8;303:19;304:1,6,12;308:1,17;309:1,6;321:24;410:19
**juror (2)** 254:5;267:22
**Jurors (3)** 303:2;347:7;379:2
**jury (120)** 254:1,5;267:19,23;268:10,14;269:5,9,14;270:10;271:2,11;275:9;276:2,12,18;277:23;278:15;282:12,18;283:17;285:17;286:11;289:20,24;290:19;291:3,7,19;292:15;293:6;294:7;296:5;298:2,3;300:5;301:2;302:13;303:1;306:5,25;311:25;312:18;313:2,10;314:21;317:14;318:17,19;319:19;320:15,16;321:4;322:3,14,15;323:11,17;324:8,25;325:1,7;327:10,13,21;328:6,12;329:6;330:2,20;331:15;333:20,22;335:10,17;337:10,12,17;338:25;339:19;340:2;341:16;342:25;343:6;344:22;345:1;347:3,6;348:15;349:25;350:2,25;351:24;352:5;353:6;355:9,12;356:11,14;357:4,7;358:5;359:17,18;364:1;365:10,16;366:20;373:2;374:1;379:1,5;380:16;390:13;401:24;421:11,14;422:1;423:11;424:8
**jury's (1)** 281:19
**justices (1)** 256:24

K

**Kam (126)** 299:1;334:1,2,17,19,23;335:1,4,15,24;337:15,20;338:10,13;339:2,6;340:14;342:4;348:21;349:1,2,10,13,14;350:20;351:12,12,14;352:7,13,13,21,21,24,25;353:9,15,19,19;354:6,10,11,16,16,23;355:6,13,14,20,23,25;356:15,15;357:8,9,13;358:2,9,12,23;359:5,20,21,21,24;360:3,7,16,22;361:3,9,12,15,24;362:4,10,16,23;364:5;366:24;369:19;370:3,6;371:2;372:9;374:25;375:10,21;377:23,24;378:9;385:6,8,9,17,22;390:16;391:10,25;392:14,17;395:10,16;397:14,21;398:18,19;401:6,15;402:18;403:9;404:10,19,24;405:10;406:10;407:4,7,9;408:12;409:18;411:3;412:20;416:5;418:16;420:17
**Kam's (4)** 331:9;332:11;343:9;371:17
**Kamwong@NYMCUorg (2)** 365:18,19
**KATZ (150)** 268:17;269:2;274:10,25;275:4,8;276:16,20;277:4,10;278:6;280:19;282:21;283:9,15;285:15;286:3;289:16;290:9,14,25;291:6,12;292:12,23;293:17;294:5,25;297:10,22;298:1,22;300:2;301:6;306:1,20,22;307:20;308:19,21;310:7,10,12,20,25;311:6;313:23;314:15;315:13,18,20;316:14,21;317:19;318:16;319:8,18;320:14;321:3,22;322:2,13;323:10,16;324:7,24;325:20;326:14,20;327:12,20;328:5,11,16;329:2,6,9;330:14,19;333:5,16,20;335:20;336:2,12,17,22;337:3,9,16,21;338:6,17;339:3;340:2,15,24;341:15;342:7,24;343:7,23;344:10,21;345:1,14,22;346:7,11;347:10,21;348:7,13;349:24;350:16;351:8,21;352:2,17;353:5;354:3,12;355:8;356:10;357:3;358:4,21;359:16;360:13;362:13;363:3,15,23;364:13,21;365:6,10,12;366:3,6,8,16,20;367:13;368:1,8;369:2,5,10;372:22
**keep (5)** 273:22;275:18;276:20;295:21;342:21
**kept (1)** 267:25
**kettle (1)** 266:20
**Kevin (2)** 359:21;369:20
**kick (1)** 378:4
**kicking (1)** 351:15
**kids (1)** 398:7
**kind (15)** 257:16;261:10;269:13;277:12;278:23;288:1;294:7;312:4,18;315:7;316:23;320:25;326:5;342:12;386:24
**kinds (1)** 419:14
**knew (3)** 258:5;260:2,6
**Knicks (3)** 349:14;354:20,25
**knowing (1)** 411:15
**knowledge (8)** 263:2,9;295:14;299:5;307:10;382:17,19;417:16
**known (8)** 260:3;262:2;265:9;378:1,3;382:23;412:17,20
**knows (5)** 264:5,7;266:10;378:10,13
**Korin (1)** 331:16
**KW (1)** 342:5
**Kwong@mcuorg (1)** 343:17
**Kwong@NYMCUorg (2)** 348:20;359:21

L

**lab (2)** 314:22;344:24
**label (5)** 315:3;318:22;322:9,17,17
**labeled (8)** 275:13;277:6,7;278:13;291:14;294:10;315:5;328:22
**Ladies (2)** 379:4;421:7
**laid (1)** 387:18
**language (3)** 284:15;285:12;286:22
**laptop (1)** 348:21
**larger (1)** 301:14
**Las (1)** 331:25
**last (25)** 278:7,10;289:18;291:2;294:22,24;321:6;335:5;337:12,14,19;349:14;350:17;351:4,22;352:8,8;353:8;362:8,22;371:5,7;401:8;410:9;419:17
**Lastly (7)** 281:15;333:2;335:13;349:8,11;359:16;368:9
**later (4)** 270:3;359:25;360:4;

407:24
**latter (1)**
268:4
**LaVale (2)**
332:16;333:24
**law (6)**
257:22;258:10;
260:14,22;261:8;
265:23
**lawyer (3)**
262:9,25;416:9
**leadership (1)**
272:1
**leading (3)**
267:7;380:10;397:12
**learned (1)**
254:8
**least (4)**
268:13;271:3;
351:16;419:2
**leave (2)**
352:14;354:25
**leaves (1)**
341:23
**led (1)**
406:18
**left (10)**
286:4;292:25;
293:25;340:18;354:25;
368:6;387:22;422:2,6;
424:17
**left-hand (6)**
275:22,25;320:18;
341:19;343:5;365:15
**legal (2)**
258:9;260:23
**legislature (2)**
258:25;259:9
**length (3)**
308:2;383:25;391:22
**less (3)**
388:5;396:25;400:7
**lest (1)**
379:4
**letter (8)**
266:19;301:23;
333:1;390:20,22;
391:4,5,9
**letters (2)**
254:15;284:8
**level (2)**
311:23;380:15
**levels (3)**
270:13;410:8;419:20
**lieu (2)**
397:15;399:24
**life (5)**
269:22;385:20;
386:6;399:16;413:9
**life's (1)**
403:22
**lifetime (2)**
383:22,24
**light (1)**
349:3
**likely (1)**
266:1
**likes (1)**
258:21
**limit (1)**
387:4
**Lincoln (1)**
307:6
**line (7)**
282:13;289:18;
298:25;306:10;362:20;
402:7;410:9
**lines (4)**
299:3,7;335:5;
343:10
**linked (1)**
287:25
**list (4)**
255:11;267:14;
327:8;336:24
**listed (7)**
280:16;293:12,25;
329:20;340:13;343:25;
368:15
**listened (1)**
263:22
**listing (1)**
255:9
**lists (1)**
256:21
**literally (2)**
287:15;302:5
**little (7)**
279:5;280:20;284:6;
292:18;343:18;370:10;
380:6
**lives (1)**
254:6
**living (1)**
379:25
**loads (1)**
275:10
**loan (11)**
413:9,11,12,14,25;
414:5,7;418:10,11,12,
12
**loans (4)**
413:3,5;418:16,17
**location (23)**
270:17,18;284:25;
310:14,18;330:25;
331:3,10,16,18,22,24;
332:3,5,8,14,16,20;
333:1,3;371:18;372:9,
15
**lodging (1)**
254:10
**log (13)**
276:21,25;292:13,
14,15;316:6;317:11,12,
22;321:8,18;323:14;
324:5
**logged (1)**
321:15
**logs (1)**
324:2
**LOL (3)**
340:22;342:6;350:15
**long (4)**
273:10;311:19;
380:2;423:2
**longer (2)**
383:21;404:4
**Longterm (1)**
366:25
**long-term (48)**
382:19;383:15,19,
20;384:3,6,7,8;385:20,
25;386:4,5,11,19;
392:14,18;394:15;
395:13,17;397:10,15,
22,24;399:6,25;403:2,
6,15,17,17,19,20,20,21;
404:4,11,12,13,14;
405:12,13;407:9;
409:20;410:1;415:14;
418:23;419:8,9
**Long-time (1)**
341:13
**Look (27)**
257:2;264:4;267:7;
274:13;275:20;283:24;
288:1;296:13;301:10,
13;302:11;305:14,17;
313:11,11,12;319:11;
368:10;371:8;372:2;
386:8;390:14;397:1;
399:3;418:20;422:21,
22
**looked (5)**
296:16;305:4;326:4;
356:16;368:14
**looking (27)**
255:5;266:22;
283:23;286:9;290:19;
294:9;296:9;298:3;
304:4;308:14;318:19;
320:21;326:21;337:11;
338:25;339:15,17;
343:4,20;348:15;
361:5;389:14;393:19;
404:18,19;415:24;
423:10
**looks (5)**
289:23;301:14;
305:16;350:14;396:4
**Lord (2)**
406:9,14
**loss (2)**
257:18;404:11
**lot (1)**
256:23
**loud (1)**
389:18
**Love (2)**
350:14;352:22
**lovely (1)**
348:22
**LTD (2)**
361:16;365:19
**lunch (3)**
346:10;379:7,9
**Luncheon (1)**
346:14

**M**

**Mac (2)**
272:11;348:21
**MacKoul (50)**
379:13,14,17,22;
380:3,5,12,23;381:2,4,
5,9,16;382:3,22;383:2,
15;385:1;389:2,13;
390:14;392:13;394:8;
395:5;399:8;400:18,
24;401:2,13;404:9;
405:21;408:7,10;
412:6;414:21;415:5,
10,20;416:2;417:2;
418:2,9,14,16,22;
419:4,8,21;420:5;
421:2
**M-a-c-K-o-u-l (1)**
379:18
**Macs (1)**
269:11
**mail (2)**
367:16;368:6
**mailbox (1)**
352:15
**mails (3)**
367:10,17,18
**maintain (2)**
273:22;295:21
**maintained (1)**
381:10
**Major (2)**
341:3,20
**major! (1)**
341:25
**makes (4)**
262:20;265:1;
269:13;388:11
**manager (2)**
270:9;339:24
**manually (3)**
287:6;288:22;326:1
**many (9)**
261:10;288:15;
297:3;303:8;312:8;
367:15;395:20;399:15,
22
**March (2)**
290:4;296:9
**MARK (59)**
254:13,20;255:1,6,
14,16,20,24;256:2,5,
10,12,18,21,25;257:5,
9,12,17,20,23;258:3,5,
11,19,23;259:1,10,14,
16,24;260:16,22,25;
264:2;265:24;266:21;
301:3,6,12;302:2,10;
334:12;372:14;373:6;
377:18,21;378:2,9,12,
15;422:3,7,9,12,15,17,
20;424:24
**marked (16)**
274:11;295:1;302:6;
305:8,15;313:24;
315:14;325:21;328:17;
333:6;336:3;345:23;
363:4;364:14;368:2;
369:18
**market (1)**
393:5
**married (1)**
414:7
**Marty (1)**
340:18
**mask (1)**
374:8
**match (4)**
290:17;319:14;
322:22;345:4
**matched (1)**
295:9
**matches (1)**
321:24
**matching (1)**
345:7
**material (2)**
254:25;264:22
**matter (8)**
259:20;265:5;267:4;
282:18;372:4;373:8;
387:17;424:15
**maximum (6)**
388:10,11,17;403:5,
8,9
**may (26)**
259:21,22,22;
262:13;266:14;267:11;
281:22;282:17;305:6;
307:3;329:13,14;
347:9;348:18;355:18;
356:2;358:10;372:18;
375:12,12;377:18;
379:10;382:10;404:22;
411:19;412:2
**maybe (3)**
256:8;342:5;414:19
**MCU (60)**
299:19;322:5;
329:16;330:3,21,23;
331:11,16,18,21,24;
332:2,5,9,13,23,25;
333:3;334:10,10,15,21;
339:24;340:18;341:13,

25;354:18,24;356:17;
371:19;372:1,7,15;
375:1,3;382:23,25;
383:1,6,7,11;384:15;
385:17;386:11;387:23;
391:1;397:9;398:23,
24;399:11;401:10;
402:17;406:11;407:2,
7;412:18,22,23;
413:25;416:9
**MCU-issued (2)**
376:25;377:15
**MCU's (2)**
376:13;388:17
**mean (18)**
259:4;267:9;278:1;
284:12,16,24;286:24;
287:14;288:3;309:18;
312:5;357:25;391:16,
23;404:7;411:16;
422:21,24
**Meaning (5)**
383:23;387:22;
398:11;411:9;423:8
**means (18)**
278:3,3;279:9;
284:13,25;287:3,15;
288:4,5,14,24;309:19;
378:10;391:17,24;
396:3,10;403:1
**meant (2)**
267:10;403:21
**medical (2)**
379:5;382:4
**meet (1)**
349:15
**meeting (14)**
332:2;354:17;
360:23;372:1,7;
374:23;385:22;390:22,
24,25;391:5;411:3,5,6
**member (5)**
279:22;281:12;
334:12;379:5;382:19
**members (6)**
279:9;306:25;
380:15;395:11;412:11;
421:11
**membership (1)**
255:12
**memo (10)**
334:17;362:5;
365:20;366:21;391:3;
404:19,21;409:8;
414:25;416:5
**memorandum (3)**
408:4;409:17;414:22
**memorialization (1)**
375:20
**memorialize (1)**
326:3
**memorializes (1)**
375:14
**memorializing (1)**
377:14
**memory (3)**
382:5,13,15
**memos (1)**
267:1
**meningioma (1)**
382:7
**mentally (2)**
299:12;338:11
**mention (2)**
388:9;397:8
**mentioned (6)**
271:8;313:9;317:6;
323:23;324:3;337:2
**message (67)**
298:8,16,19,24;
299:9,13,19;318:7;
337:13,18,24;338:4,12,
13;339:7,16,24;
340:17;342:3;346:5;
348:5,16,17;349:5,11,
13,19,25;350:11,12,17,
19;351:18,22;352:7;
353:7,8,15;355:6,9,10,
22;356:11,22;357:4,22,
25;358:2,8,14,16,23;
359:1,9,18,23;360:11,
15;361:2;362:15,22,
22;363:1,17,20;364:2,
25
**messages (66)**
269:25;295:13,15,
18,21;296:2,3,6,13,17,
24;297:3,4,16,19;
298:17,20;299:15;
313:21;317:2;335:23;
336:6,9;338:8;339:13;
340:5,6,8;348:1,25;
349:6,23;350:6,22;
351:5;352:3,4,5;353:3,
23;354:2,15;355:2;
356:5;357:1,16;358:5,
22;359:4,11,15;362:6;
363:7,11;364:15,18;
370:2,5,8,9,12,15,17,
19,22;371:2
**messaging (2)**
270:1;370:6
**Met (5)**
334:22;411:7;412:9,
11,14
**method (2)**
319:1;410:11
**Mets (3)**
350:21;352:8;355:17
**microphone (2)**
268:19;380:5
**middle (2)**
357:4;391:13
**might (4)**
264:8;302:10;
313:21;410:5
**migrate (1)**
284:21
**million (3)**
401:11;406:25;
420:18
**millions (2)**
340:21;341:13
**mind (4)**
268:15;360:25;
389:14,16
**minds (1)**
351:20
**mini (2)**
266:13;291:22
**minimal (1)**
287:8
**minute (6)**
256:9;258:17;
260:13;379:11;386:9;
421:13
**minutes (8)**
300:4;341:23;
346:12;373:1;374:22;
375:13,18;376:23
**misconducts (1)**
259:5
**miss (2)**
289:17;356:19
**missed (2)**
256:9,18
**missing (2)**
326:6;357:1
**misstated (1)**
330:14
**misstates (1)**
338:21
**mistake (1)**
331:14
**misunderstand (1)**
358:1
**mode (1)**
327:5
**model (3)**
276:10;288:18;350:3
**models (3)**
270:7;288:15,16
**moment (12)**
255:4;279:1;308:14;
353:17;372:18;376:21;
377:10;388:9;389:15;
395:4;402:24;417:22
**Monday (8)**
265:25;266:1;352:9;
379:6;408:15;421:9;
422:4;423:11
**money (4)**
388:11;410:8;
413:18;419:19
**Monique (3)**
341:20;355:1;374:19
**month (10)**
356:18;382:11;
388:18;391:18;395:17;
396:2,11,22;403:8,12
**monthly (3)**
391:15,17;403:5
**more (19)**
268:4,18;281:4;
291:13;293:1;302:7;
350:10;360:19;362:8;
370:10;388:11;393:1;
396:25;400:7;410:10;
418:21;422:9,12,25
**morning (18)**
254:2,3;267:24;
269:3,4;299:1;300:3;
301:24;311:7,8;
348:21;354:6,10;
355:13;357:8;358:13;
379:6;411:8
**most (5)**
256:18;376:8;383:7;
410:4;415:21
**motions (1)**
262:8
**move (15)**
262:25;268:14;
280:19;330:17;331:17;
337:16;338:17;352:2;
371:5;380:5;397:2,2,4;
415:19;417:20
**moved (5)**
265:8,9;266:17;
318:17;368:10
**moves (1)**
305:24
**movies (2)**
269:17,20
**moving (14)**
275:25;277:4;278:6;
285:15;331:2,4,6,20;
335:9;339:12;367:7;
379:10,11;421:12
**much (5)**
264:9;272:12;
281:11;396:24;421:2
**multipage (1)**
389:13
**multiple (4)**
272:3;280:2,24;
282:4
**Municipal (6)**
277:9;290:13;
292:21;382:23;383:9;
385:9

## N

**name (44)**
256:7,12;258:16;
273:5;274:20;276:17,
18,19;278:7,10,10;
291:2,15,15;292:9;
293:5,6,22;294:22,24,
24;315:4;318:23;
326:25;327:18;328:3;
333:22,24;334:7,10;
335:7,14,24;340:13;
342:20;343:8;345:18;
347:14;367:3,5,21,21;
379:17;412:8
**named (4)**
280:7;290:10;
370:19;385:6
**names (6)**
274:20,22;292:7,9;
328:1;372:8
**Nana (4)**
274:23;341:3,20,22
**narcotics (1)**
312:11
**nasty (1)**
254:5
**Nathan (1)**
412:8
**nature (2)**
255:9,19
**near (4)**
274:4;296:2;369:17;
377:6
**necessarily (1)**
263:14
**necessary (1)**
403:22
**need (15)**
266:16;269:22;
273:7,8;283:8;287:11;
302:10;310:3;330:5;
348:18;357:14;376:19;
380:20;413:11,11
**needed (4)**
281:6;383:23;
406:21;413:16
**needs (6)**
257:2;267:20;
280:12;376:25;380:18;
403:21
**neither (1)**
337:1
**Nets (1)**
332:13
**New (42)**
257:22;259:9,12;
260:14;261:8;273:15;
281:10;286:17,19;
287:17;288:13,14,17,
20;289:7;292:22,22;
303:22;309:22,23,23;
310:1,2,2;311:12;
320:2;323:7;327:5;
331:22;332:3,13,17;
350:10;352:22;353:10;
355:17;368:25;377:23;
378:10,11,14;380:13
**newest (1)**
288:18
**news (2)**
267:25;351:25
**next (56)**

268:3,16;281:23;
285:2,17;286:4,9;
293:17;299:3,7,9,11;
300:6;302:14;310:24;
320:22;329:25;330:17;
334:6;335:9;338:7,12;
340:24;342:1,8;
349:24;350:8,11,16;
351:8;353:14;354:12;
355:22;358:4,22;
360:2,5,10,13,15,21;
361:1,4,8,13,17,23;
362:1;373:19;378:19;
404:17;405:6;416:24;
419:6;421:16;423:9
**nice (1)**
359:8
**night (2)**
349:14;352:8
**nine (1)**
392:13
**none (1)**
292:6
**noon (2)**
379:7;421:10
**Nope (1)**
310:19
**nor (1)**
337:2
**normally (1)**
423:15
**north (1)**
254:6
**Nos (2)**
325:21;336:3
**note (16)**
266:21;282:23,25;
283:15;349:12;352:6;
354:15;355:11;356:13;
357:6;358:7;362:15;
364:3;365:15;366:22;
367:18
**noted (3)**
282:15;341:19;344:7
**notes (37)**
266:24,25;278:13,
16,17,17,24;279:2,3,6,
10;281:15,16;282:18,
20;283:4,18,24;284:7;
285:5,16;286:7,9,11;
289:4;303:25;304:5,8,
16,23;306:11;309:14;
310:14;321:23;333:23,
25;334:9
**notice (4)**
280:24;301:10,12;
344:14
**noting (1)**
352:20
**November (5)**
266:24;276:15;
291:23;292:2,3
**number (130)**
254:22;255:14,16;
274:12;275:9;276:1,
12,14;277:2,3,15;
278:21;279:18,20,22;
280:7,14,16,16;281:7,
23;282:15,16;283:20;
289:25;290:3,7;294:6,
9,12,13,14,17,17,19,20;
295:1,5,7,9,12;296:11,
14;297:6,8,17,20;
298:10,13;299:18;
315:4,17;318:23,24;
319:3,7;322:19;329:9;
330:7,14,23,25;331:2,
4,13,14,17,20,23;
332:1,4,7,10,12,15,19,
22,24;333:2,21;334:6;
335:6,10,11,13,16,18,
19;337:4;338:24;
339:12,12,15,17,19,25;
340:9,11,16,24;341:7,
10,16,17;342:1;343:11,
13,18;344:23,24;
347:22;348:2,5,14;
349:24;351:8,22;
352:17;354:12;355:8;
363:5,16;364:14,22;
365:13;368:2;369:5;
394:6;401:10;406:25
**numbering (1)**
322:17
**numbers (28)**
275:20;278:19;
280:2,5;288:2;290:16;
291:10;293:2,15,15;
294:3,16;318:25;
320:22;330:11,17;
335:24;336:7,8;
342:23;345:19;347:15;
364:7;397:20;401:9;
406:19,21;415:4
**numerous (3)**
262:8;265:7;312:20
**nurse (1)**
404:2
**nursing (1)**
403:25
**NYC (1)**
332:18
**nymcuorg (1)**
343:17

## O

**OBJ (1)**
299:1
**object (3)**
299:2;338:18;375:2
**objected (1)**
414:4
**objection (49)**
275:3;289:9;296:22;
297:23;299:4;306:1,
20,21;307:20;308:19,
21;309:2;310:7;
314:17;316:16;326:16;
329:3;333:17;336:16,
25;348:9;365:7;
366:17;369:7;374:17;
375:9;376:12;390:6;
394:21;397:12,17;
400:1;401:20;405:20;
406:15,22;407:17;
408:25;414:1;415:3,6;
416:18,22;418:5,13;
419:1,5,12,22
**obligated (1)**
263:24
**obligation (2)**
263:4,7
**obligations (1)**
262:18
**obtain (6)**
318:11,14;386:8;
391:7;393:18;396:18
**obtained (2)**
256:3;398:25
**obtaining (1)**
393:1
**obvious (1)**
256:18
**Obviously (6)**
256:21;306:14;
375:1;378:3;419:12;
424:17
**occupation (3)**
384:19;387:20;404:6
**occur (3)**
282:17;309:25;
384:20
**occurred (1)**
310:15
**October (4)**
266:23;290:23;
292:1;355:15
**off (2)**
287:7;387:18
**offer (15)**
257:3,6;267:21;
274:25;297:22;363:23;
365:6;366:16;369:5;
374:23;394:19;401:18;
408:23;410:4;415:22
**offered (5)**
279:13,16;284:9;
370:11;391:20
**offers (13)**
271:6;272:22;275:4;
314:15;316:14;326:14;
329:2;333:16;336:12;
348:7;373:5,8;390:4
**offhand (1)**
263:16
**office (6)**
255:9;267:20,21;
332:17;359:25;375:5
**officer (6)**
380:25;381:1,11;
385:9;412:21;413:12
**officers (1)**
383:10
**offset (1)**
361:16
**offsets (3)**
387:17,20;388:6
**often (1)**
283:5
**old (7)**
309:22;310:2,4;
382:14;391:24,25;
392:2
**older (1)**
382:18
**oldest (1)**
413:15
**Once (7)**
273:10;286:17;
314:25;315:1,4;
319:21;410:12
**one (62)**
254:21;256:9,12;
258:15;262:10;264:8;
271:13;272:2;274:21;
280:11;281:10;289:1;
290:2,6,23;292:10,16;
293:8;299:11;301:3;
303:9,13;309:3,16;
310:10;313:4;316:5;
322:7;344:7;349:2,4;
350:10;351:16;354:7,
25;357:14;359:7;
362:8;365:13;367:15;
369:2;374:2,16,16;
376:21;377:19,20,21;
380:12;382:22;388:8;
392:23;395:10;399:23;
403:24;412:24;417:22;
418:9,18,21;419:12;
422:7
**ones (3)**
256:2,14,15
**one's (1)**
384:12
**oneself (1)**
403:23
**only (37)**
265:13;274:11;
295:2;297:11;313:24;
315:14;320:9;325:21;
328:17;333:6;336:2;
338:20;345:23;347:22;
350:4;351:7;353:4;
354:2;355:6,7;357:22;
358:2;359:15;363:4,
11;364:14;368:1;
370:9;389:12;395:11;
399:19;400:17;405:18;
408:7,7;414:7;423:21
**on-the-job (1)**
312:21
**onto (2)**
287:3,3
**open (7)**
301:2;313:11;330:8;
351:13;352:1,16;374:1
**opened (1)**
263:5
**opening (1)**
330:21
**operating (1)**
352:22
**operations (2)**
270:9,23
**opportunity (3)**
349:15;389:8;393:22
**opposed (2)**
260:9;404:5
**oral (1)**
264:10
**order (9)**
254:9;284:17;349:2;
351:16;353:10,11,17;
410:1;413:10
**ordered (1)**
350:10
**Orfuni (1)**
254:5
**organization (1)**
255:11
**original (1)**
402:18
**Osei (4)**
293:8,9;341:3,20
**Osei-Bonsu (1)**
274:23
**others (1)**
292:16
**Otherwise (2)**
280:14;374:25
**out (34)**
268:20;273:5;
282:12,24;294:5;
301:8;319:6;335:10;
336:6;339:14;342:4,7;
350:3;353:20;367:15;
371:2;375:11;378:4;
389:16,18;391:7;
396:11;398:9,15;
399:2;400:3,22;401:9;
405:4;410:14;416:16;
421:14,14;424:8
**outgoing (1)**
339:24
**outside (1)**
272:17
**over (28)**
265:15;266:1,7,22;
272:5,18,19;282:4;
284:3,9;286:3;301:18;
306:11;315:2;330:6;
340:20;343:5;355:21;
374:7;376:25;377:15;

381:12;382:10;383:11;398:10;399:22;401:11;411:12
**overlap (1)** 284:19
**Overruled (6)** 299:6;378:17;397:18;406:16,24;418:15
**owed (2)** 401:10;406:11
**own (8)** 269:12;321:9;327:17;371:4,4;375:12;381:10;423:19
**owner (4)** 298:10;339:22;343:8;359:20

## P

**pace (1)** 423:13
**package (3)** 389:9;390:1;391:9
**page (89)** 255:21;277:18,19;300:6;302:14;316:23,24,25;329:10;330:1,7,12,13,14,15,18,19;331:8,12;337:21,24;338:7,25;339:4;340:4;349:5,12;350:8,16;351:22,22,23;352:19;353:7,14;354:5;355:22;356:12;357:4;358:16,22;359:1,3,3;360:2,5,10,13,15,21;361:1,4,8,13,17,23;362:1,8,9,14;364:3;366:9;367:3,15;373:19;375:14;377:9;378:19;391:2,9;400:25;401:8,8,25,25;402:11,11,14,18;403:14;404:17,18;405:6;406:4;409:5;414:15,18;418:21;421:16
**pages (10)** 266:24,24;359:23;367:15;390:9,14;400:23;401:7;405:3,5
**paid (13)** 383:23;384:19;385:4;387:20;391:18,24;396:11;397:9,10;398:24;410:11;414:8;420:19
**pair (2)** 285:25;286:1
**paired (5)** 270:2,3;285:23,24;289:15
**paperwork (1)** 315:2
**paragraph (2)** 418:23;419:18
**paragraphs (1)** 265:7
**Park (6)** 330:3;331:16;339:24;354:18,24;356:17
**part (19)** 264:10;268:4,5;273:23;295:22;304:2;307:3;324:9;325:14;370:1;371:5;385:18;386:15;390:8;405:16;406:10;412:18;416:3;417:8
**participants (19)** 337:13,15,18,20;339:1,2,6;341:1,19;348:16;350:18;351:11;352:6,20;354:15;355:11;356:14;357:6;364:3
**particular (12)** 259:24;260:10,17;276:8;282:23;283:1;286:5;291:11;294:20;371:9;380:11;422:17
**particularly (1)** 375:5
**parties (1)** 365:16
**parties' (1)** 301:18
**parts (1)** 271:22
**Party (4)** 330:4;340:13;354:20;356:19
**passwords (1)** 286:16
**pause (9)** 275:9;376:6,22;377:11;386:9;389:21;411:22;417:23;422:8
**pay (11)** 387:10,12;388:12;402:17;403:3,4,25;404:2,3;407:2;413:19
**payable (1)** 396:8
**payment (4)** 403:6;407:1;410:11;413:16
**payments (2)** 410:12,13
**payout (4)** 397:9,15,21;399:24
**payouts (2)** 399:5;420:19
**PBA (1)** 361:6
**PDF (10)** 301:14;317:7,15,16,17,18,20;339:14;365:24;367:16
**PDF-created (1)** 340:4
**PDFs (1)** 316:2
**peace (1)** 360:25
**Pencil (2)** 353:10,11
**People (18)** 274:25;287:10;297:22;303:8,12;308:4,8,11;311:17;353:16;363:23;365:6;366:16;369:5;380:20;381:20,20;382:18
**per (7)** 254:10;287:7;391:2;392:5;393:13;396:17,18
**percent (11)** 299:14;338:14;364:7,9;387:5;388:5;395:19;396:23;407:13;410:5;415:22
**perform (9)** 296:10;312:24;315:7;321:13,14;325:8;326:6;335:23;368:19
**performed (4)** 315:9;321:9;325:9;345:11
**perhaps (4)** 263:5;264:6,6;423:12
**period (9)** 258:7;260:1,5;344:9;383:21;384:1;395:24,24;396:8
**peripheral (2)** 269:24;288:6
**perks (1)** 261:22
**Perone (1)** 339:25
**person (14)** 261:9;262:13,15;267:8;298:13;303:16,18;304:12;306:7;375:17;380:19,21;384:10;404:2
**personal (8)** 259:17,21;260:2;269:16;380:22;381:19;399:17;413:5
**personally (1)** 271:25
**person's (1)** 387:4
**pertain (2)** 344:3;368:11
**phone (102)** 269:17,18,20,21;270:2;272:5,18,19;273:13;277:2,3;282:15,16;283:20;284:3,10;286:17,20,25;287:1,5,7,21,23;288:5;289:3,15;296:14;297:7,19;298:10,13;301:8;303:9,10,13,14;308:5,8,11;309:12,15,22,22,23,23;310:1,2,3,4;313:12,14,19,22;317:23;318:1,5,10;319:6,15,21;320:6,12,20;321:14;325:8;326:9,12,23;327:3,15;335:10,11,16,18,24;336:7;339:25;342:13,22;343:11,13;345:19;347:15;351:2,3,4;352:22;354:2;355:3;356:9;369:24;371:3;372:15;375:16;376:3;377:23;378:10,11,14;398:17;400:9
**phones (14)** 272:7;289:1;312:6,8,16;313:5;319:24;327:4,4;370:8;376:25;377:15;378:4,7
**phone's (1)** 310:2
**photo (3)** 318:6,21;328:8
**photograph (4)** 315:2;319:20;322:4,5
**photographs (3)** 314:7,12;326:3
**photos (5)** 269:18;313:20;317:2;321:1;328:9
**phrase (3)** 383:15;384:3;385:1
**physical (1)** 284:25
**pick (4)** 307:5;352:15;358:11,13
**Picked (2)** 350:20;353:12
**picture (3)** 320:16;348:22;350:11
**pictures (1)** 269:21
**piece (3)** 264:8;309:3;414:12
**pile (1)** 254:18
**place (13)** 317:22;332:17;336:23;361:21;374:25;375:3;388:22;390:25;397:9,21,22;399:5;403:24
**placed (1)** 351:15
**plan (6)** 388:12,17;389:23;403:8;410:6;415:22
**planning (1)** 258:13
**plans (1)** 301:9
**players (1)** 349:15
**plea (2)** 373:4,7
**please (97)** 256:1;268:19;275:8;290:15;292:18;294:6;296:21;298:1;305:14;306:5;307:12;308:14;315:17;317:14;318:16;319:18;321:3;322:2;323:11;324:7,24;325:20;326:20;327:12,20;328:5,16;329:6;330:7,12,20;331:15;333:5,20;334:7;335:17;336:2;337:9;338:12,24;341:15;342:24;343:23;344:21;345:1,14,22;346:7;348:13;351:18,23;352:14;353:5;354:3,4,14;355:8;356:10;357:3;358:7,16;360:10,13;361:1,4,8,23;362:13,22;363:3,15;364:1,13,21;365:10;366:3,20;375:24;383:18;388:2;389:17;390:12;392:21,24;394:8,24;395:12,14;398:4,20;400:16;401:23;402:10;408:6;409:3,15;420:10
**plug (2)** 288:24;289:1
**plug-ins (1)** 317:9
**Plus (4)** 325:5;329:14;335:23;343:14
**pm (6)** 329:13,14;352:10;354:18;360:23;425:3
**point (8)** 282:12;295:2;

335:10;413:2;417:21;
418:9;422:20;424:7
**pointed (1)**
375:11
**pointing (1)**
403:15
**points (2)**
395:2,15
**policies (4)**
385:15,19;396:6;
419:10
**policy (42)**
384:13,15,16,17,21;
385:3,5,23;386:6,11,
16,20;387:1,2,2,3,13,
24,25;388:4,13,19,22;
389:3;390:16;391:10,
19,20;392:4,7,9,14;
393:13;395:22,23;
396:14,18;402:19,20;
404:13;413:9;420:18
**Porcelli (5)**
274:23;293:22;
294:1;368:12;409:17
**portable (2)**
387:22,25
**portion (10)**
271:17;304:14,15;
317:12;326:22;327:15;
328:14,22;339:13;
391:14
**portions (2)**
348:4;414:25
**position (3)**
255:9;261:23;312:12
**positions (2)**
255:12,18
**possession (2)**
285:22;377:16
**possible (7)**
307:17,21,23;
309:25;365:25;382:14;
422:12
**possibly (2)**
266:16;382:6
**potential (2)**
259:5;264:25
**potentially (1)**
266:15
**powered (1)**
317:13
**powering (7)**
316:5;317:11,12,22;
321:8,15,17
**powering-on (1)**
321:6
**practice (1)**
310:6
**practices (1)**
273:20
**preceded (1)**
297:4
**preclude (2)**
263:1;266:18
**predated (1)**
383:2
**preexisting (1)**
384:12
**prejudicial (4)**
261:17;375:19;
376:10,10
**preliminary (1)**
317:5
**preloaded (1)**
321:1
**premium (16)**
355:17;365:20;
384:19;385:2,4;
387:14,15;392:3;
395:19;396:16;399:25;
403:3;410:2,7;418:23;
419:18
**premiums (8)**
397:10,22;398:24;
399:6;406:12;407:1,9;
420:19
**prepare (1)**
412:12
**prepared (3)**
255:21;347:18;
376:16
**present (20)**
254:1;266:4;267:23;
277:3;301:2;303:1,2;
323:4;347:6,7;355:7;
357:22;359:15;363:11;
374:1;379:1,3;422:1;
424:4,5
**presentation (1)**
268:3
**presented (1)**
316:1
**presenting (1)**
406:10
**presently (2)**
379:23;382:3
**presents (1)**
313:14
**preserve (1)**
312:2
**president (2)**
307:7;380:25
**president/CEO (1)**
366:25
**press (1)**
329:16
**Presumably (1)**
390:7
**presume (1)**
259:8
**pretty (2)**
272:12;281:11
**previous (2)**
268:11;288:7
**previously (4)**
287:25;305:2;
368:10,25
**primary (1)**
273:4
**printed (2)**
367:3,5
**prior (15)**
261:19;263:25;
296:17,24;323:22;
324:2,5;389:8;393:22;
394:4;399:4;400:14;
405:7;408:3;409:22
**private (1)**
349:16
**Pro (2)**
353:10,11
**probably (6)**
296:9;390:21;
396:20;399:17,19;
423:10
**problem (5)**
268:6,11;341:7;
350:5;361:20
**problems (2)**
254:11;419:13
**proceed (3)**
315:6;330:7;379:19
**process (4)**
266:11;273:5;
314:23;318:22
**processed (1)**
342:16
**procure (1)**
386:15
**produced (3)**
287:16;295:18;
305:18
**product (4)**
285:9;291:14,19,21
**products (2)**
269:13;292:4
**Professional (1)**
393:9
**proffer (4)**
257:3;260:17;264:7;
422:17
**proffered (1)**
262:12
**program (6)**
275:18;312:25;
384:8;385:18;403:6;
419:9
**programs (1)**
383:8
**promoted (1)**
311:23
**pronounce (1)**
258:16
**proposal (3)**
391:7;396:21,25
**propose (1)**
346:9
**proposing (2)**
257:21,23
**prosecuting (1)**
259:7
**prosecution (2)**
263:1;412:11
**prosecutor (1)**
312:11
**protects (1)**
341:24
**provide (11)**
272:14;317:1;
380:18;383:13;388:14;
393:19;395:17;396:1;
403:3,12,21
**provided (11)**
322:17,17;324:15,
17;343:2,11;383:6,7;
384:9,11;385:19
**provider (1)**
285:11
**provides (6)**
259:13;279:11;
387:3,4;399:16;404:6
**providing (1)**
282:25
**provisions (1)**
404:1
**prudent (1)**
423:21
**PS (2)**
348:22;356:19
**public (5)**
255:20,22;256:14,
15;399:17
**publish (41)**
268:10;275:8;
289:19;291:7;292:23;
294:6;298:1;306:4;
318:16;319:18;320:14;
321:3;322:2,13;
323:10,16;324:7,24;
326:20;327:12;328:5,
11;329:6;333:20;
337:9;340:2;341:15;
342:8,24;344:21;
349:24;353:5;355:8;
356:10;357:3;358:4;
359:16;390:13;394:24;
401:24;409:4
**Publishing (1)**
345:1
**Puerto (2)**
330:24;353:1
**pull (8)**
278:14;285:4;
305:10;321:22;389:11;
400:16;408:7;409:16
**purchase (18)**
276:1,13,14;289:25;
290:4,8;291:10,17,20,
22,23,25;292:1,2,3;
293:2;395:16;396:22
**purchased (6)**
286:20;292:4;308:5;
395:22,23;403:11
**purports (1)**
410:18
**purpose (2)**
265:11;374:12
**purposes (1)**
322:9
**pursue (2)**
392:4;393:13
**pursued (3)**
391:11;392:8;396:19
**pursuing (3)**
389:3;397:15,22
**pushes (1)**
268:9
**Put (14)**
258:15;262:6,8;
265:6;268:18;309:23;
327:4;343:23;344:10;
374:25;375:3,20;
414:15;415:4
**putting (1)**
373:3
**PW (1)**
334:16

## Q

**qualified (1)**
381:20
**quick (1)**
374:2
**quickly (5)**
371:8;379:11;
389:19;405:6;422:23
**quite (2)**
370:2;416:13

## R

**radiation (1)**
382:10
**raided (2)**
334:3;335:2
**raise (3)**
301:19;302:11;374:2
**raised (1)**
399:5
**raising (1)**
302:11
**ran (1)**
397:20
**range (11)**
260:18;266:9,11;
296:5;299:15;337:17;
381:2;393:12;395:20;
396:16;410:2
**rate (1)**
254:10
**rather (2)**
280:5;304:20
**reach (2)**
391:7;416:16

**reached (1)**
400:3
**react (1)**
407:16
**reaction (1)**
400:3
**reactivated (1)**
340:19
**read (74)**
266:19;276:1,18;277:23;278:9;283:17;285:8,17;286:11;291:3,20;292:20;297:20;298:25;299:3;301:24;306:14;327:10;329:11,22,23,24;330:1,6,12,20;331:15;333:22;334:7;335:11,17;338:2,8;339:6,19;340:16;341:5,10,12,17,23;342:1;343:18;348:19,24;349:11;350:2,18;351:11,24;352:5,19;354:5,13,14;355:12;356:14;357:7;358:8;359:1,18;360:10;362:9,15;364:4;365:11,14,16;366:21;370:16;395:12,14;402:25;405:2
**readable (1)**
313:15
**reading (3)**
255:8;260:9;389:17
**ready (2)**
347:3;398:9
**real (2)**
299:11;338:10
**Really (7)**
262:5;359:8;362:10,10;381:13;393:14;404:4
**reason (4)**
259:15,16;287:10;388:20
**REBOLD (56)**
375:7,25;376:4,7,20,21,23;377:4,8,13;379:13,19,21;388:24,25;389:1,11;390:4,9,12;391:13;394:4,7,19,24;400:16,22;401:1,18,23;402:10;403:13;404:16;405:4;406:3,5;407:23;408:6,23;409:3,15;411:19,23;414:1,4,22;415:3,7;416:18;418:5,13;419:1,22;420:2,4,23
**recall (13)**
304:4,6,8,9;347:13;369:21;385:22;391:25;408:3;411:11;416:3;420:9,14
**recalls (1)**
265:18
**recap (1)**
391:6
**receive (8)**
269:25;271:18;272:16;279:7;324:10;354:18;399:24;420:18
**received (60)**
255:24;260:5;261:22;270:24;271:11;275:5,7;277:22,24;290:21;295:15;296:3;297:24,25;306:2,3;312:19,20;314:18,20,22;316:17,19;324:14;326:17,19;327:4;329:4,5;332:20,23,25;333:18,19;334:18,20;336:15;337:8;345:15;348:10,12;354:24;363:24,25;365:8,9;366:18,19;369:8,9;387:8,9,10;390:11;394:22,23;401:21,22;409:1,2
**receiving (4)**
314:24;345:13;408:3;410:12
**recently (1)**
320:3
**reception (1)**
349:16
**Recess (3)**
301:1;346:14;373:18
**recipient (2)**
298:6;339:8
**recipients (2)**
298:4;395:10
**recognize (14)**
274:14;305:14;325:23;328:19;333:8;394:10,12;401:2;402:12,14,18;404:18;406:6;408:10
**recollection (3)**
296:19,21;388:19
**recommendations (1)**
349:7
**recommended (1)**
375:21
**recommending (1)**
377:13
**record (13)**
265:15;266:21;294:7,12;295:12,13;319:9;322:22;336:17,25;373:4,17;376:15
**recorded (1)**
323:20
**records (14)**
267:12;273:22,23;274:3,3,7,19;295:9;306:23;310:17;322:19;368:11,14;422:13
**recover (7)**
287:22,24;320:5,11;323:8;367:8,10
**recovered (5)**
313:14;346:1;365:1;367:17;370:17
**red (1)**
365:21
**redirect (5)**
310:9,11;372:21;420:1,3
**reduce (2)**
387:9,12
**reference (2)**
390:22;410:15
**referenced (4)**
336:17,22;405:14;410:25
**referencing (1)**
336:19
**referred (2)**
276:5;285:11
**referring (3)**
263:8;285:13,21
**refers (2)**
415:14,17
**reflect (2)**
297:14;392:4
**reflects (2)**
306:6;371:20
**refresh (2)**
296:19,21
**regard (1)**
309:10
**regarding (3)**
394:14;397:14;420:7
**regards (2)**
316:22;325:3
**Regency (2)**
331:3,5
**registered (9)**
277:15,16,16;278:3,5,8;290:23;293:2,3
**registration (16)**
277:11,13,14,17,22,22,24,25;278:1;290:15,16,20,20,22;291:10;293:4
**regrettable (1)**
301:22
**regular (1)**
393:3
**regularly (4)**
273:19,23;295:22;313:7
**Reilly (53)**
301:10,13;314:17;316:16;326:16;329:3;333:17;336:16,21;338:18,20;348:9;365:7;369:7,14;371:5;372:18,20;374:2,5,9,14,19,21;375:8;376:12,18;390:6;394:21;397:12,17;400:1;401:20;405:20;406:15,22;407:17;408:25;412:1,2,5,8;415:9;416:25;417:1,22,24;418:1;419:7,16,24;420:11;421:1
**reimburse (1)**
254:9
**reimbursed (2)**
398:23,24
**relate (4)**
271:8;401:7;404:24;409:20
**related (2)**
275:19;293:21
**relates (4)**
267:5;376:13;377:13;405:1
**relationship (6)**
361:19;378:8;385:13;412:24;413:2,22
**release (1)**
329:16
**relevance (1)**
374:17
**relevant (16)**
256:15;259:23,24;260:12;262:20;263:2,17;264:10,16;375:5,6,8;377:1;401:15;408:9,21
**rely (3)**
274:7;349:7;352:13
**remain (1)**
387:23
**remedial (1)**
376:13
**remember (11)**
288:7;296:20,24;297:2,3;373:3;388:16;389:2;398:7;407:25;411:5
**remembering (1)**
357:11
**remembers (1)**
361:9
**remind (3)**
307:1;350:25;375:24
**remotely (2)**
272:23;327:6
**removal (1)**
376:17
**remove (1)**
309:19
**removed (6)**
288:4,5;289:14;334:4,4;335:3
**removing (1)**
374:25
**repair (2)**
285:19,21
**repeat (3)**
304:2;307:12;420:10
**repeated (2)**
280:24;328:1
**rephrase (1)**
298:7
**replace (2)**
384:9;387:5
**Replied (2)**
349:10;351:14
**replies (2)**
362:10,12
**Reply (17)**
338:10;350:5,14;352:13,24;353:19;354:10,23;355:20,25;357:13;358:12;359:5,24;360:3,6,6
**report (25)**
270:21;301:14,15;313:9,11,13,16;317:5,18;320:17;325:14;328:22,25;333:14;340:4;343:3;347:18;363:18,21;364:15,25;365:25;366:14;367:15,23
**reported (1)**
304:17
**reporter (1)**
337:2
**reports (14)**
270:14,21;313:6;315:10,11;316:12;336:7;342:17;345:6,17;346:5;350:23;357:1;363:13
**represent (1)**
305:12
**represented (1)**
396:23
**representing (1)**
412:14
**represents (1)**
380:17
**reproduce (2)**
286:15;287:9
**request (5)**
266:8;416:12,13,17;420:12
**requested (5)**
284:1,24;336:8;413:9;414:7
**requests (1)**
420:8
**require (1)**
314:25
**required (2)**
281:14;377:14

**requires (1)** 255:8
**research (3)** 395:16;396:21;410:3
**reset (7)** 287:12,15,15,21; 318:11;320:3;368:25
**resign (2)** 375:10,21
**resigned (3)** 334:13,15,15
**resourceful (1)** 254:7
**respect (12)** 370:19,22;372:12; 374:6,17;375:4;383:5; 386:25;388:4;416:16, 20;418:11
**respects (1)** 254:25
**responding (1)** 262:19
**responds (17)** 360:4,12,16,18,22, 24;361:2,3,5,9,12,14, 15,18,24,25;362:4
**response (2)** 264:11;295:19
**responsibilities (9)** 257:24;259:19; 270:10;311:25;312:14; 380:23;381:8,10;383:5
**responsible (1)** 375:18
**rest (4)** 270:22;351:18; 376:19;424:5
**resting (1)** 422:4
**restore (6)** 283:23;286:13,23, 25;287:1,2
**restored (1)** 289:8
**restoring (1)** 286:17
**restricting (1)** 375:1
**restroom (1)** 301:7
**result (10)** 320:8;323:3;354:1; 355:5;356:8,25; 357:21;359:14;363:10; 368:21
**results (9)** 296:16;297:14; 299:21;324:10,13,17, 19;347:13;349:22
**resume (2)** 346:13;421:9
**resumed (1)** 254:1
**retail (3)** 269:12;380:13; 399:16
**retreat (1)** 354:8
**retrieve (1)** 325:11
**retroactive (1)** 410:13
**Returning (1)** 367:2
**reverse (1)** 279:10
**review (14)** 274:16;282:7;295:5; 314:2;315:21;322:18; 347:24;368:3;377:10; 389:9,18,19;393:23; 405:7
**reviewed (3)** 282:3;394:4;400:14
**rich (1)** 350:14
**Rico (2)** 330:24;353:1
**right (65)** 255:2,3;257:1; 259:17;264:17;266:3; 267:18;276:1,17,21; 277:5;278:6;280:20; 290:10,11,19,25; 291:12;292:13,18; 293:5,18;298:6;301:4; 303:14,16;304:21,24; 305:6;306:8,12,15; 308:6,9,12;309:13; 310:5;333:25;334:8; 337:5;370:3;378:3; 386:17;388:6;391:5; 411:25;412:9,15,19,22, 25;413:3,5;414:5,10, 13,23;415:12;416:7,9; 417:3,6;423:8,18; 424:10
**right-hand (4)** 320:19,21;329:17; 339:23
**rise (1)** 387:15
**Ritz-Carlton (1)** 331:1
**Robert (6)** 257:6;268:17,23; 379:13,14,17
**role (5)** 257:24;270:11,20; 312:1,14
**roles (1)** 271:22
**rose (1)** 354:7
**rough (2)** 386:8;393:12
**Roughly (2)** 312:9;422:3
**row (3)** 283:11;286:6;298:23
**Ruby (1)** 348:22
**Rule (6)** 263:12,16;264:2,10, 16;416:22
**rules (1)** 259:4
**running (4)** 268:1;318:1;326:4; 399:2

## S

**salary (4)** 388:16;403:5; 406:12;407:12
**sales (2)** 270:16;271:14
**same (33)** 254:24,25;255:1; 277:18;280:5;281:23; 283:12,13;285:3; 287:9;295:9;305:1; 308:17;309:1;312:15; 337:20;343:13;344:5, 16,17;345:8;350:4; 372:3,16;384:21; 387:3;399:20;400:12; 403:17,19;411:9,10; 419:11
**Samuel (1)** 293:9
**San (1)** 331:1
**sanction (1)** 260:17
**sanctions (16)** 257:4,5,15,16,17; 258:3,10,10,12,13,14, 21;260:19;266:10,11, 15
**sandwiches (1)** 421:10
**Sash@MCUorg (1)** 292:16
**Saturday (1)** 398:8
**saved (3)** 317:22;343:13; 367:11
**savers (1)** 321:2
**saw (6)** 296:24;315:8; 319:21;335:25;343:13; 366:11
**saying (4)** 380:19;397:1; 398:22;407:25
**screen (25)** 274:14;275:10,11, 22;288:24;297:12; 305:11;319:22,23; 320:4,21;321:2; 327:14;328:13;337:11; 343:5,20,24;348:19; 350:13;351:10;355:10; 400:19,20;414:15
**screens (3)** 268:11;326:2,3
**screenshot (11)** 302:5;316:22; 324:13,18,21;326:21, 22;327:22;328:1,7,8
**screenshots (9)** 315:25;316:2,3,8,11, 12;325:17;326:8,12
**scroll (22)** 276:16;277:5; 280:23;283:9,23; 284:6;285:5;286:3; 289:16;290:9;291:1, 12;292:12,25;293:5, 18;296:7;298:6;302:5; 326:2;366:9;408:8
**scrolling (3)** 276:20;292:18; 293:25
**se (1)** 287:7
**search (22)** 295:15;296:25; 297:7,14;299:18,21; 315:1;324:10;335:23; 345:17;349:19;350:22; 353:23;355:2;356:5, 22;357:16;359:11; 363:7;364:23;365:4; 367:7
**searched (2)** 336:8;353:2
**searches (2)** 296:10;347:14
**season (2)** 355:21;356:1
**second (31)** 254:21;268:9; 274:21;279:18;286:14, 23;290:6,24;292:19; 336:14;349:5,25; 351:3;355:9,10; 356:11;358:16;359:3; 362:20;366:9;369:2; 382:7,8;413:11,11; 414:5,6;418:11,22; 419:18;422:7
**Secondly (1)** 254:15
**seconds (1)** 367:21
**second-to-last (1)** 286:6
**section (19)** 278:24;283:16; 328:24;333:14,23,25; 335:16,25;341:2; 346:5;365:3;367:16; 402:16,24;410:13,15, 15;415:11,18
**sections (2)** 335:22;348:5
**secure (2)** 353:11;354:7
**Security (2)** 387:8,8
**seeing (1)** 254:18
**seek (1)** 410:6
**seeking (2)** 263:18;264:24
**seem (1)** 379:10
**seemed (1)** 401:10
**seems (1)** 254:17
**select (2)** 273:17;354:19
**selected (1)** 370:15
**send (7)** 282:24;340:8; 352:10;354:8;362:24; 399:3;408:14
**sender (4)** 298:5;338:2;339:20; 395:5
**senders (1)** 298:4
**sending (1)** 407:25
**senior (2)** 311:22,23
**sense (2)** 301:19;351:15
**sent (19)** 298:17,20;302:3; 318:7;390:1;393:25; 394:14;395:8;400:9; 401:6,15;402:5; 404:10;405:16;408:12, 15,18;411:7,13
**sentence (3)** 285:8;371:7;419:17
**sentences (2)** 395:14;410:9
**separate (1)** 336:7
**September (4)** 290:24;330:8;352:9; 380:9
**serial (22)** 275:20;276:1,12,14; 277:15;278:21;280:7,

14,16,16;281:23;
288:1;289:25;290:3,7,
16;291:10;293:2,15;
294:16,17;343:18
**served (2)**
383:11;399:22
**service (3)**
261:23;272:22;
285:11
**serviced (3)**
272:7,11,11
**services (5)**
272:14;327:2,8;
383:6,13
**session (5)**
278:18;279:1;281:5,
13;347:1
**sessions (3)**
279:3,6;281:6
**set (7)**
286:13,16,23,25;
288:20;352:8;411:3
**settings (9)**
285:10,12;287:4;
288:22,23;289:2;
309:19;326:22,24
**seven (1)**
311:20
**several (3)**
329:7;404:21;407:24
**shadow (2)**
279:9,10
**shadows (1)**
279:11
**shall (1)**
403:3
**share (1)**
409:7
**shipment (2)**
353:11,17
**shipped (1)**
353:12
**short (1)**
260:1
**shortly (1)**
414:9
**short-term (3)**
382:4,13,15
**show (28)**
274:10;293:17;
294:25;297:10;301:15;
305:8;313:23;315:14;
319:8;325:20;328:16;
333:5;336:2;345:2,22;
346:7;347:21;363:3,
15;364:13,21;366:3;
367:13;368:1;371:24;
394:7,8;414:12
**showed (3)**
310:17;347:11;370:6
**showing (1)**
351:5
**shows (1)**
306:9
**Siciliano (5)**
404:19;416:6,8,16;
418:4
**sickness (1)**
387:19
**side (14)**
258:15;260:13;
270:16;271:14,15;
275:22;320:18,19,21;
329:17;339:23;341:19;
343:5;365:15
**sign (4)**
273:17;361:11;
362:5;413:12
**signature (2)**
255:19;367:6
**signed (3)**
278:4;334:17;409:10
**significant (1)**
393:2
**significantly (1)**
268:1
**signing (1)**
273:15
**silver (3)**
276:3;343:9;358:10
**similar (2)**
269:19;291:9
**similarly (1)**
377:1
**simply (5)**
302:3;309:15;
319:23;376:12;424:7
**single (1)**
291:21
**site (4)**
277:6,7;290:10,12
**sitting (4)**
261:15;264:8;
304:19;424:16
**six (2)**
351:14;399:18
**skip (3)**
335:5;351:21;360:14
**slip (1)**
337:4
**Slow (1)**
392:23
**smaller (1)**
349:3
**smartphone (1)**
313:20
**Smith (2)**
341:20;374:19
**SMS (2)**
340:4,6
**Social (2)**
387:8,8
**software (13)**
269:20;270:24;
271:4,7,19;312:23;
315:25;316:1;317:8,8,
12;318:1;326:6
**softwares (1)**
313:4
**solve (1)**
268:12
**somebody (4)**
272:19;307:5;
308:20;396:25
**somehow (1)**
377:25
**someone (12)**
263:10;273:13;
279:10,10;287:6;
309:21;361:15;362:24;
403:21;404:3,3;415:24
**someplace (1)**
387:24
**sometimes (3)**
276:5;304:23;310:3
**somewhat (1)**
423:4
**somewhere (1)**
254:18
**son (3)**
381:12;413:15;414:6
**soon (1)**
421:14
**Sorry (31)**
256:18;265:17;
267:9,24;268:21;
296:18;305:22;323:25;
324:1;330:14;331:14;
336:20,21;337:22;
339:3;343:7;358:1;
359:3;362:18;363:6;
364:10;373:14;374:7,
9;377:4;393:8;399:11;
407:22;414:3;417:25;
421:1
**sort (4)**
261:4,17;301:15;
388:21
**sorts (2)**
259:3,4
**SoseiBonsu@aolcom (1)**
293:11
**SoseiBonsu@NYMCUorg (1)**
293:11
**sound (1)**
376:9
**sounded (1)**
398:22
**sounds (4)**
285:24;288:12;
358:18;383:20
**source (7)**
258:9;277:17,22,25;
278:1;290:20,22
**Southern (1)**
254:6
**SP (3)**
330:21,24;354:8
**span (1)**
399:23
**speak (1)**
284:11
**speaking (2)**
377:3;380:6
**speaks (2)**
265:14;299:5
**special (2)**
312:11;374:24
**specialist (1)**
271:23
**specializes (1)**
269:11
**specific (11)**
267:13;270:2,17;
278:25;279:23,24;
311:13;316:3;370:9,
10;375:3
**specifically (10)**
265:19;271:4;
275:19;281:18;296:13;
297:7;316:22;367:10;
368:17;414:15
**specified (1)**
284:23
**spent (3)**
303:24;304:4,15
**spirit (1)**
301:18
**spiritually (2)**
299:12;338:11
**SP-LV (1)**
331:24
**spoke (1)**
362:4
**spoken (2)**
266:7;417:15
**square (1)**
283:16
**staff (1)**
395:11
**staffed (1)**
271:21
**staffers (1)**
271:20
**stamp (1)**
367:20
**stand (6)**
302:6;307:4;319:5;
322:11;414:20;424:7
**standard (1)**
403:6
**standing (1)**
424:9
**stands (1)**
284:8
**start (35)**
296:7,7;329:13,24;
330:1,3,8,21,23;331:9,
18,21,24;332:2,5,8,11,
13,16,20,23,25;337:12,
14,19;343:22;348:13;
358:22;371:12,25;
372:5,13;379:9;422:4;
423:8
**started (1)**
352:3
**starting (12)**
275:25;283:18;
286:10;349:25;351:10;
352:9;353:7;355:9;
356:2;357:4;365:15;
404:17
**starts (4)**
281:10;282:24;
335:11;410:12
**state (3)**
257:9,24;392:12
**statement (13)**
255:21,23;263:15,
17;265:16;278:23;
373:4;388:9;415:20,
23;418:22,25;419:21
**statements (8)**
262:20;263:20,22;
264:10;265:1,12;
266:25;267:4
**Staten (1)**
360:19
**States (2)**
307:7;418:23
**stating (2)**
402:16;414:6
**status (1)**
323:6
**statute (3)**
259:9,13;260:10
**statutory (1)**
258:14
**stay (2)**
254:9;273:11
**stays (1)**
273:12
**stealing (1)**
341:13
**step (3)**
273:3;375:14;376:13
**Stephenson (2)**
305:9;414:15
**steps (5)**
273:2;286:14;287:9;
374:24;375:3
**sticker (2)**
322:6,6
**still (11)**
254:15;318:14;
340:21;349:2;358:19;
359:25;360:8;377:3;
379:10;387:20;400:6
**stipulate (1)**
376:16
**stock (1)**
353:20
**stop (4)**
290:11;292:14;
337:22;357:9

**storage (1)**
276:8
**store (34)**
271:17;272:4;285:1;287:6,9,10;288:25;303:9,12,19,21;304:1,5;305:1;306:7,17;307:13,18;308:1,4,8,16,16,17,22,25,25;309:1,5,9;310:1,14,18;327:11
**stored (1)**
333:11
**stores (1)**
269:12
**Street (4)**
256:24;292:20,21;332:17
**stricken (2)**
371:7;397:13
**strict (1)**
279:7
**strike (1)**
371:5
**strokes (2)**
383:18;409:24
**structured (1)**
396:24
**stuff (2)**
349:1;393:9
**style (1)**
350:3
**subject (37)**
257:14,14;265:5;282:18;283:6;329:12,15,16;330:3,8,21,23;331:9,16,18,21,24;332:2,5,8,11,13,16,20,23,25;333:3;365:19;366:22,25;371:16;372:1,7,14;392:14;395:12;423:19
**subsequently (1)**
408:12
**subset (1)**
317:17
**substance (3)**
283:3;401:12;404:9
**substantially (2)**
255:1;403:12
**sufficient (1)**
256:6
**Suite (2)**
330:3;354:18
**summarize (6)**
383:18;386:3;392:21,24;395:3;398:20
**summarizes (1)**
391:10
**summary (9)**
316:23,24,25;320:17;324:13,14;343:1;344:12;345:3
**supervise (1)**
270:20
**supervisory (4)**
334:3;335:3;372:1;409:11
**supplement (3)**
384:8;386:16;388:4
**supplemental (11)**
384:3,6,7,14;391:19;392:18;403:2,3,10;404:11;405:13
**supplied (2)**
256:7,13
**support (25)**
270:22;271:14,18,22;272:6,14,16;278:13,16,17;279:15;280:12,13;281:4,5,13;283:7,8;284:8,9;285:1;303:25;304:5,16;321:23
**supported (1)**
272:1
**supporters (2)**
299:12;338:11
**Suppose (4)**
261:19,25;405:18,23
**supposed (1)**
407:19
**Supreme (1)**
256:24
**sure (30)**
261:10;262:1,6;266:10;269:16;271:3,13;272:22;275:10;276:3,19;282:20;283:20;285:18;286:25;289:2,17;290:2,22;291:4,22;304:3,25;307:13;309:4;357:24;388:18;400:6;423:20,21
**surely (1)**
376:8
**surface (1)**
350:4
**surgeries (1)**
382:6
**surgery (3)**
382:8,9,9
**Suspended (3)**
333:3;334:1,23
**suspension (3)**
332:11;375:1;376:14
**sustain (1)**
309:2
**Sustained (20)**
296:23;307:19;397:13;400:2;407:18,21;415:8;416:19,21,23;418:5,7,7;419:2,4,11,12,23;420:20,22
**sworn (3)**
268:25;311:3;379:16
**Sylvia (85)**
258:5;274:20;276:19;278:10;282:14;283:20;291:4;292:10,10;294:24;299:2;327:1,7,19;328:4;337:15,20;338:4,13;339:9,22;341:3;345:18;347:14;348:20;349:13,18;350:3,5,5,20;351:13,25;352:7,13,21,23,24,25,25;353:9,9,15,19;354:6,16,22,23,24;355:13,20,23,25;356:4,15,19;357:8,11,13,25;358:9,10,12,23,23,24;359:5,24;360:17;361:3,9;362:16,23,23;364:5;365:19;366:24;367:6,20;370:3;371:3;417:8,11,13,14
**Sylviaash@aolcom (14)**
274:22;277:1,1;278:11;283:21;291:5;292:17;294:21;295:10;324:23;351:12;352:7;354:6,10
**sync (2)**
273:13;281:7
**system (17)**
315:5;317:23,25;318:1,2,14;320:10,11,20;321:1;322:6;323:8,22,24,25;342:15;343:4

**T**

**T1 (1)**
284:7
**tab (10)**
275:13;277:10,13,14;278:12;290:15,16;293:4,12;319:10
**tablet (7)**
269:19;322:5,12,16;323:1,1,19
**tablets (3)**
322:20,23;323:22
**tabs (2)**
316:3,5
**talk (4)**
259:1;260:18;275:10;361:19
**talked (5)**
264:25;272:20;281:16;290:17;304:16
**talking (7)**
277:19;282:24;343:14;365:13;387:6;393:14;400:6
**taught (1)**
362:12
**taxes (1)**
416:1
**TB (1)**
322:11
**TB-0013 (1)**
323:19
**TB12 (1)**
322:9
**TB13 (1)**
322:17
**TDOJ (1)**
332:20
**team (5)**
270:21;279:8,9,22;412:11
**technical (5)**
271:15,18,23,24;284:7
**technology (1)**
269:10
**tedious (1)**
422:22
**telephone (1)**
341:7
**tells (2)**
269:25;307:10
**Tembeckjian (4)**
257:6;258:15;260:6;266:22
**temp (1)**
357:14
**temporarily (1)**
421:6
**ten (1)**
346:12
**tennis (1)**
352:1
**term (8)**
271:8;284:12;286:23;287:12,18;288:19;299:19;309:18
**terms (7)**
261:24;271:6;279:6;285:20,20;286:22;319:14
**testified (17)**
268:25;305:18;308:1;311:3;369:17;370:2,12,18,23;379:16;410:16;412:17;414:13,21;415:10;416:11;417:2
**testifies (2)**
307:4;423:17
**testify (13)**
257:21,23;260:14;261:13,19;266:9;274:17;412:12;423:19;424:1,6,9,10
**testifying (9)**
259:12,17,18,18;265:23;306:22;314:3;315:22;375:17
**testimony (13)**
257:6;261:11,18;266:4;304:6;305:18;338:20;370:6,11;375:10,11;379:6;392:7
**Thankfully (1)**
340:21
**Thanks (9)**
299:8;341:9;348:22;349:17;350:21;351:20;352:15,22;354:21
**Thanksgiving (1)**
382:11
**thereafter (3)**
404:10;411:2;414:9
**third (9)**
278:12;292:19;298:5;351:22;355:10;359:3;382:9;395:1;406:4
**Thomas (2)**
416:6;418:4
**though (2)**
262:22;282:25
**thought (2)**
263:21;422:24
**thoughts (1)**
266:3
**thousand (5)**
393:17;395:20;396:6;399:18;410:2
**thousands (1)**
399:22
**thread (5)**
337:18;348:17;349:19;355:22;359:19
**three (14)**
263:13;306:11;340:20;342:11,17,17,22;345:17;346:5;347:18;351:22;382:6;402:8;410:18
**throughout (3)**
347:8;375:9;379:3
**thumb (2)**
312:6;400:23
**Thursday (3)**
406:19;411:6,7
**tickets (18)**
330:9;332:13;349:18;350:21;351:13,17,25;352:8,9,10,16;354:18,21,24;355:17,18;356:3;357:10
**tied (1)**
260:17
**Tier (1)**
284:7
**timeline (2)**
376:3;377:24
**timelines (1)**
375:11

**times (4)**
280:24;303:8;
337:12;399:22
**timestamp (2)**
339:16,22
**title (15)**
256:21;270:8;
278:22;280:20,21,22;
281:7,9,25;282:5;
283:3,13;285:3;
311:21;335:18
**titled (1)**
298:16
**titles (2)**
280:24;282:10
**T-MO (1)**
276:9
**T-Mobile (2)**
276:4,11
**today (11)**
274:17;301:23;
304:19;305:18;314:3;
315:22;360:25;370:11,
23;412:12;422:21
**together (1)**
398:9
**told (6)**
261:24;268:9;393:3;
399:2;407:14,16
**Tom (3)**
285:18;372:14;
404:19
**tomorrow (5)**
354:17;358:11;
359:22;408:1;424:16
**Tonight (1)**
360:6
**took (5)**
301:10;324:15;
326:12;390:21;414:5
**top (17)**
283:18;284:4;
286:10;296:8;326:25;
338:25;339:3;343:16,
20;344:8;351:10;
360:15;362:14;364:3;
366:23;367:14;395:1
**topic (3)**
265:8;397:24;399:5
**top-left-hand (1)**
294:9
**total (2)**
395:19;396:16
**totally (1)**
261:16
**touch (1)**
378:6
**toward (1)**
268:4
**towards (1)**
343:16
**Towers (1)**
332:3
**track (1)**
342:21
**tracking (4)**
315:5;318:25;322:6,
9
**tracks (1)**
279:24
**trained (6)**
258:7,16;262:13;
263:23;271:13;279:3
**training (15)**
260:5;265:19;267:6,
11,12;270:24;271:4,
11;279:5,6,7,8;312:18,
21;318:10
**transaction (1)**
274:5
**Transfer (17)**
282:1;283:25;
284:12,13,15,17;303:9;
304:8,16;306:18;
307:14;308:5,8,11;
309:5,15,21
**transferred (1)**
310:2
**transferring (1)**
303:13
**transport (1)**
404:7
**transporting (1)**
403:23
**treatment (1)**
382:12
**Trial (11)**
254:1;263:25;
264:25;266:13;268:1;
274:11;314:15;375:9;
423:9,15;424:16
**trials (1)**
268:11
**tried (1)**
268:12
**trodden (2)**
375:2,8
**trouble (1)**
361:16
**true (11)**
264:1,23;266:14;
307:3,4,9;310:3;
401:14;413:24;415:20,
24
**truly (1)**
340:22
**trust (2)**
361:25;362:11
**trustee (1)**
334:15
**try (1)**
309:3
**trying (4)**
288:16,21;307:22;
405:18
**tumor (1)**
382:7
**turn (9)**
301:18;371:23;
376:25;377:15;389:17;
400:24;404:16;405:5;
406:3
**turned (6)**
265:15;266:22;
301:11;319:21;321:7;
381:12
**Turning (1)**
391:9
**twice (5)**
336:17,22,24;337:2,
4
**two (35)**
266:6,24;272:16;
276:24;280:10;286:12;
289:23,25;290:17;
293:8;311:24;322:19;
323:23;324:2;335:5;
337:15;338:8;348:25;
349:6;351:25;352:4;
353:18;354:14;359:4;
362:6;367:16,17;
369:20;372:8;380:9,
12;382:6;390:14;
396:5;410:9
**type (11)**
278:15;291:8,21;
295:12;317:20,21;
325:7;340:7;393:6,18;
404:1
**types (4)**
274:7;293:3;367:8;
396:6
**typos (2)**
304:23;306:14

## U

**ultimately (1)**
406:18
**unable (1)**
282:24
**unbelievable (1)**
353:20
**uncertain (1)**
261:24
**uncompensated (3)**
255:12;261:21,23
**under (18)**
263:16;264:16;
274:1;277:7;282:13;
284:6;290:12;292:19;
295:25;341:1;343:6,8;
370:7,14;386:19;
388:12;392:4;403:6
**underneath (3)**
327:2,7;343:10
**understands (1)**
361:14
**understatement (1)**
422:22
**understood (5)**
260:14;370:18;
376:14;405:9;416:8
**underwriting (1)**
395:21
**underwritten (1)**
388:15
**unfairly (1)**
376:10
**Union (10)**
277:9;290:13;
292:21;382:23;383:9;
385:10;403:3;410:5;
413:10,13
**unique (3)**
278:19;279:22;
294:15
**unit (8)**
311:13,15,16;
314:24;315:2;318:23;
325:2;342:10
**United (1)**
307:7
**unless (3)**
263:15;307:4;330:5
**unpairing (6)**
286:14,18;288:3,4,6;
289:12
**unprotected (1)**
341:24
**unresolved (1)**
281:4
**unresponsive (1)**
371:6
**Unum (1)**
393:4
**unusual (8)**
303:16;308:4;
413:21;414:10;416:14;
420:6,12,17
**up (57)**
257:17;265:25;
267:16;268:10;272:23;
273:17;275:20,20;
278:14;279:2,17;
285:4;286:13,23,25;
288:1;289:5;295:22;
298:7;301:3;305:10;
321:22;328:15;343:16;
344:10;350:20;352:15;
353:9,12;355:9;357:5;
358:11,13;360:1,1;
363:15;380:10;381:5,
14;383:24;385:11;
387:4;389:11;392:14;
393:2;395:1;396:5,6;
397:25;398:5;400:17;
408:7;409:16;411:3;
415:5;424:7,17
**upcoming (2)**
374:10,14
**updated (1)**
340:19
**uploaded (1)**
273:10
**upon (10)**
274:8;384:2,18;
392:2;393:14;395:20;
403:11,25;404:2;410:3
**upper-left-hand (1)**
295:7
**USA (1)**
276:4
**usable (1)**
288:24
**use (16)**
269:18,21;272:23;
273:4;275:18;289:1,3;
301:9;309:18;312:24,
25;313:4,4,7;314:23;
340:7
**used (15)**
269:17,25;270:6;
280:12;301:23;302:4;
304:13;309:12,15;
313:3;317:9,9;327:3;
329:18;413:15
**user (21)**
278:8;313:14;317:3;
318:3,3,4,5,5,6,7,7,8;
320:9;323:4;326:9,23,
25;327:17;328:10;
335:13;368:23
**user-created (4)**
318:11;320:5;
322:25;325:11
**Using (4)**
262:16;286:16;
288:19;318:5
**usual (6)**
356:1,16;373:4;
420:6,12,17
**UTC (3)**
329:13,14,14

## V

**value (2)**
410:7;419:19
**variations (1)**
419:14
**varies (1)**
266:11
**Vegas (1)**
331:25
**version (3)**
256:14;317:7,8
**versions (1)**
255:20
**versus (1)**
384:16
**Vestfrid (53)**
310:25;311:1,4,7;
314:2;315:21;316:22;
318:19;319:8,11,20;

324:9;325:23;326:21;
327:14;328:19;329:7,
11,22;333:8;335:22;
337:11,23;338:8;
339:5;343:25;347:11;
348:15,19,24;350:2,19;
351:10,24;352:5,19;
354:5,14;355:11;
356:13;357:6;358:5,7;
363:6,17;364:2,11;
365:15;366:21;368:3,
9;369:15;371:12
**V-e-s-t-f-r-i-d (1)**
311:4
**via (2)**
278:3;417:17
**videos (3)**
269:17;313:20;317:2
**view (2)**
264:1;365:25
**views (1)**
420:17
**visible (1)**
286:8
**visit (6)**
303:25;304:5;
307:25;308:15,25;
309:6
**visited (3)**
308:17,21;309:1
**visiting (1)**
355:15
**vocabulary (1)**
349:9
**voice (5)**
367:10,16,17,18;
368:6
**voided (1)**
410:14

## W

**wait (6)**
256:8;267:22;
289:21;318:18;353:18;
358:25
**waiting (5)**
267:25;360:19;
384:1;395:24;396:8
**walk (2)**
291:19;329:7
**walking (1)**
359:2
**wants (7)**
254:8;283:25;
284:13;285:18;306:11;
309:21,22
**warrant (3)**
295:15;315:1;324:10
**Washington (1)**
307:23
**watch (22)**
269:17,20,23,24;
272:12;279:9;285:18,
19,20,21,23,24;286:1,
14,17;288:3,4,6;
289:12,14;350:3,10
**watchband (1)**
353:1
**way (16)**
287:15;290:9;296:7;
302:13;317:16;341:23;
353:12;362:12;375:19;
376:10;377:24;380:19;
387:3;388:15;392:17;
424:6
**ways (3)**
261:10;272:3,16
**website (1)**
353:16
**Wednesday (3)**
408:2;411:6;422:5
**week (5)**
268:4;411:9,10;
421:8;423:11
**weekend (7)**
266:7;352:16;
406:17;421:5,10;
424:25;425:1
**weeks (1)**
353:18
**week's (2)**
271:3;353:11
**welcome (2)**
320:4;421:9
**weren't (1)**
258:13
**what's (14)**
257:3,19,20;278:23;
289:20;305:8,14;
306:21;320:14;351:14;
371:16;414:12;419:13;
422:2
**WhatsApp (1)**
341:6
**white (1)**
365:21
**whole (8)**
265:11;266:13,19;
301:15,21;366:9,21;
398:9
**wholesale (2)**
380:14;399:18
**wholesalers (1)**
393:15
**who's (2)**
375:17;388:11
**wife (2)**
398:12,15
**wi-fi (3)**
290:2,6;291:24
**willing (1)**
388:22
**win (1)**
349:16
**Wipe (3)**
309:19,22;310:5
**wiped (6)**
273:16;287:2;
318:11;320:3;323:7;
327:6
**wiping (3)**
309:12,15,18
**wireless (2)**
270:5;359:6
**wishes (1)**
413:24
**withdrawn (1)**
307:22
**within (6)**
285:1;287:9;345:13;
384:23;423:6,7
**without (10)**
254:18;265:3;289:3;
304:20;361:20;375:9;
389:17;403:16;418:2;
424:5
**witness (86)**
257:6;259:12;260:9;
261:2,12,14;263:1,2;
264:5,7,14,25;265:1,2,
4,10,13,14,16,18;
266:1,7;267:14;
268:16,21,24;274:11;
289:11;295:2;297:11;
299:5;302:6;305:10;
307:4,9;308:22;
310:23,24;311:2,4;
313:24;315:14;317:16;
325:20;328:17;333:6;
336:2;345:22;346:8;
347:21;350:1;354:13;
363:4;364:13,21;
366:3;367:13;368:1;
371:8;372:24,25;
374:10,10,14,15,18;
375:11,17;379:12,15,
17;380:7;386:13,18,
22;387:2;388:7;393:9;
400:17;405:22;406:1;
411:24;414:4;418:8;
421:4,6
**witnesses (6)**
422:6,7,10,12,18;
423:5
**witness's (2)**
307:2,10
**women's (1)**
352:1
**wonderful (1)**
349:17
**Wong (129)**
335:15,24;337:15,
20;338:10,13;339:2,6;
340:14;342:4;349:1,2,
10,13;350:20;351:12;
352:7,21;353:9,15,19;
354:6,10,16,23;355:6,
13,20,23,25;356:15;
357:8,13;358:2,9,12,
23;359:5,20,21,21,24;
360:3,7,16,22;361:3,9,
15,24;362:4,10,16,23;
364:5;366:25;369:19;
370:3,6,13;374:25;
375:10,14,21;376:13,
25;377:14,23,24;378:1,
3,5,9;385:6,8,9,13,17,
23,25;386:14;387:1;
388:4,11;389:2,9,24;
390:16,23;391:10,25;
392:24;394:1,14;
395:10;396:22;397:8,
14,21,25;398:18,19;
399:5;400:3;401:15;
402:3;404:10,19;
405:16;407:4,7,9,16,
24;408:12;409:7,18;
411:3,16;412:17;
413:2;416:4,5,12;
417:3,5;418:11;
420:12,17
**Wong's (10)**
371:2;388:16;
392:14,17;402:18;
404:24;405:10;410:15,
21;415:11
**word (5)**
301:23;309:12;
317:17;349:8;364:7
**words (1)**
304:13
**work (26)**
256:22;269:7;
270:15,15,17,18;
311:11,12;312:10;
330:22;335:19;359:8;
375:1;379:23;380:10;
381:2,5;382:1;383:10;
385:15;399:21;404:7;
406:20;407:6,7;421:8
**worked (2)**
271:25;311:19
**workers (2)**
387:10,11
**working (3)**
268:13;304:12;
360:19
**works (1)**
261:5
**worry (2)**
411:13,17
**worth (1)**
271:4
**write (3)**
341:8;385:21;388:22
**writing (2)**
356:17;389:6
**written (9)**
265:12,16;333:23;
341:23;383:21;384:18;
387:13;393:6,8
**Wrong (2)**
275:2;388:3
**wrote (5)**
341:7;385:19;
390:20;391:4,5
**Wynn (1)**
331:25

## Y

**Yankees (1)**
355:17
**year (15)**
382:10;383:22,24;
392:5;393:13,18;
395:20;396:17,18;
410:3;413:19,19;
414:6,8;418:19
**years (17)**
311:20,24;380:4,9,
10;381:2;382:14,25;
383:11;391:24;392:2,
13;395:25;396:9;
404:21;410:19;411:15
**yearsI (1)**
340:20
**yellow (1)**
282:24
**yesterday (1)**
351:16
**York (14)**
257:22;259:9,12;
260:14;261:8;292:22,
22;303:22;311:12;
331:22;332:3,13,17;
355:17

## Z

**zero (1)**
329:14
**zoom (6)**
365:12;391:13;
394:25;400:22;403:13;
405:4

## 0

**02/22/18 (1)**
334:23
**02/22/2018 (1)**
334:1
**05/05/2015 (1)**
334:14
**05/2008 (1)**
334:12

## 1

**1 (3)**
284:7;319:6;340:9
**1/13/2018 (1)**
343:22

**1/18 (1)**
334:20
**1/18/2018 (3)**
358:9,19;367:20
**1/19/20 (2)**
362:16,19
**1/19/2018 (5)**
332:8;358:22;
359:10,20;362:21
**1/20/2018 (1)**
306:10
**1/22/2018 (1)**
362:7
**1/24/2015 (1)**
349:18
**1/24/2018 (1)**
363:2
**1/25/18 (1)**
334:17
**1:00 (1)**
329:14
**10 (16)**
266:23;276:3,5;
282:1,4;283:25;284:1,
14;285:9,25;288:17;
290:8;292:3;330:12;
332:12;340:11
**10/08/2020 (1)**
345:16
**10/15/2015 (1)**
372:1
**10/16/16 (1)**
334:15
**10/16/2016 (1)**
331:21
**10/17/2015 (1)**
330:23
**10/19/2015 (1)**
330:21
**10/29/2016 (1)**
331:24
**10/6/2020 (1)**
344:20
**100 (6)**
299:14;338:14;
364:7,9;410:2,5
**100542261395 (1)**
281:19
**11 (3)**
330:7;331:8;332:10
**11/13 (1)**
321:12
**11/13/2015 (1)**
331:9
**11/13/2017 (1)**
334:10
**11/21/2015 (1)**
337:19
**11/26/2019 (1)**
325:4
**11/9 (1)**
321:12
**118/2018 (1)**
368:6
**11-inch (1)**
349:4
**12 (8)**
323:1;329:13,14;
330:1,8,18,19;332:7
**12:00:00 (1)**
329:13
**12:30 (5)**
379:6,9;421:9;422:4;
425:3
**13 (5)**
255:16;323:1;
329:10;330:13,16
**130 (1)**
410:2
**14 (3)**
266:23;282:13;
290:23
**14th (1)**
331:18
**15 (13)**
300:4;332:4;349:20;
350:25;351:1;353:2,
24;364:12,16,23;
365:4;367:7;373:1
**16 (18)**
263:12,16;264:2,10,
16;344:17;347:14;
351:1,6,7;353:4;354:2;
355:7;356:9;357:2,23;
359:15;363:11
**16-20 (1)**
355:15
**17 (20)**
291:24;332:1;345:4,
17;346:2;347:14;
349:19;350:23,25;
351:2;353:2,23;355:2;
356:5,22;357:16;
359:11;363:8,18;391:2
**17th (1)**
391:5
**18 (17)**
331:23;345:4,18;
346:2;347:14;349:20;
350:23,25;351:3;
353:2,23;355:2;356:5,
22;357:16;359:11;
363:8
**180 (1)**
395:24
**19 (9)**
291:25;292:2;305:6;
360:8;390:9;401:15;
402:5;416:4,12
**1917669-7560 (2)**
339:21,21
**1969 (2)**
399:10,13
**1982 (4)**
383:1;399:9,11,12
**1987 (1)**
381:4
**19th (5)**
353:12;398:14,16;
399:4;400:4
**1st (2)**
299:16;332:17

## 2

**2 (13)**
290:2,6;293:4;
299:16;329:13,14;
368:18;402:11,11,14;
414:15,18;418:21
**2/11/2018 (2)**
340:10;342:2
**2/14/18 (1)**
334:21
**2/14/2018 (1)**
337:19
**2/19/2018 (1)**
341:18
**2/2/2018 (3)**
337:25;338:21;364:6
**2/22/2018 (2)**
338:16,22
**2/23/2018 (1)**
332:11
**2/27/18 (1)**
332:13
**2/6/2018 (2)**
344:9;365:18
**2/7/2018 (1)**
340:12
**2:00 (2)**
346:12;347:2
**20 (12)**
277:24;290:4;305:2;
306:6,18;307:14;
308:16;309:9;331:20;
393:17;395:20;396:16
**20,000 (1)**
396:17
**200 (8)**
295:1,5,12;296:11;
297:14,17;299:18,25
**2004 (1)**
334:12
**2006 (12)**
385:23;386:5,25;
388:3,16;389:4,24;
390:19;391:2,25;
397:20;417:3
**2007 (5)**
385:10;404:14;
406:13;407:3;410:13
**200A (8)**
297:11,12,14,16,22,
25;298:1,3
**200C (2)**
299:22,24
**2012 (1)**
291:23
**2013 (3)**
291:24,25;418:18
**2014 (2)**
292:1,2
**2015 (24)**
290:5,8,24;296:8;
329:13,14;330:3,8;
334:13,16;350:17;
392:13,25;393:13;
394:1,14;395:8;
396:19;397:24;404:22;
409:25;410:19,22,25
**2016 (4)**
331:16,18;382:7,8
**2017 (3)**
276:15;290:24;292:3
**2018 (46)**
277:24;281:22;
282:17;283:12;285:3;
286:5,10;288:13,17;
292:4;296:17,25;
297:5;299:16,16,17;
303:19;304:1,6;305:2,
6;306:6,18;307:14;
308:1,16,17;309:6,10;
321:24;360:8;367:1;
374:22;375:16;380:10;
381:6,12;385:11;
398:3;399:4;400:4;
401:16;402:5;410:25;
416:4,12
**2019 (2)**
296:9;383:1
**2021 (1)**
425:3
**2023 (1)**
406:13
**204 (3)**
315:16;316:15,19
**206 (5)**
315:16;316:15,19;
324:7,12
**207 (4)**
315:16;316:15,19;
320:15
**208 (5)**
315:16;316:15,19;
321:3,5
**21 (3)**
283:12;352:9;367:21
**214 (4)**
325:22;326:15,18;
328:6
**215 (4)**
325:22;326:14,18;
327:20
**218 (5)**
325:21;326:14,18,
20,21
**21AMR (1)**
367:22
**22 (5)**
281:22;292:21;
331:17;367:1,21
**224 (5)**
325:22;326:14,18;
328:11;336:4
**226 (4)**
325:22;326:14,18;
327:12
**22nd (4)**
375:16;390:19;
391:6;408:17
**23 (13)**
266:24;276:15;
285:3;286:5,10;292:3;
303:19;304:1,6,12;
308:1,17;309:1
**230 (4)**
336:3,12;337:7,9
**231 (4)**
336:3,12;337:7,16
**234 (8)**
328:18;329:2,5,6;
371:9,14,24;372:3
**235 (4)**
333:7,16,19,20
**236 (3)**
336:4,13;337:7
**237 (5)**
336:4,13;337:7;
340:2,3
**238 (4)**
336:4,13;337:8;
340:15
**239 (4)**
336:4,13;337:8;
341:16
**23rd (1)**
321:24
**240 (9)**
336:4,4,12,13,17,22;
337:7;339:12,12
**242 (3)**
336:4,13;337:8
**243 (3)**
336:4,13;337:8
**244 (7)**
336:4,12,13;337:7,8;
338:17,24
**245 (3)**
336:4,13;337:8
**246 (3)**
364:14,15;366:5
**246B (2)**
367:13,14
**246D (8)**
364:22,23,25;365:3,
6,9,10;366:11
**246G (5)**
366:4,11,16,19,20
**248 (6)**
313:25;314:16,20;
344:21,23;345:14
**249 (3)**
314:1,16,20

**25 (5)**
296:17,25;297:5;
331:14;396:4
**25,000 (1)**
395:22
**25:26 (1)**
283:12
**250 (6)**
315:16,18;316:15,
19;345:1,2
**251 (4)**
345:23;347:12;
348:2,5
**251A (6)**
346:8;347:22;348:7,
11;359:17;369:19
**251B (1)**
348:14
**251C (1)**
349:25
**251H (1)**
351:9
**251J (1)**
354:3
**251K (1)**
352:18
**251L (1)**
353:5
**251O (1)**
354:12
**251R (1)**
355:8
**251S (1)**
356:10
**251T (1)**
357:3
**251V (1)**
358:4
**251W (1)**
362:13
**252 (3)**
315:15;316:15,18
**253 (4)**
315:15;316:15,18;
342:24
**254 (2)**
345:23;347:12
**254N (5)**
363:5,16,23,25;
364:1
**255 (3)**
315:15;316:15,19
**256 (8)**
276:3,7;315:15;
316:15,19;343:24;
344:1,3
**257 (2)**
345:24;347:12
**258 (3)**
315:16;316:15,19
**259 (4)**
315:15;316:15,19;
344:11
**260 (5)**
313:25;314:16,19;
342:8,9
**262 (6)**
315:15;316:14,18;
323:10,12,13
**263 (3)**
315:15;316:14,18
**264 (3)**
315:15;316:14,18
**267 (5)**
315:15;316:14,18;
323:16,18
**268 (5)**
313:25;314:16,19;
324:24;325:1
**269 (4)**
313:25;314:16,19;
322:3
**270 (4)**
313:25;314:16,19;
322:13
**271 (5)**
313:25;314:16,19;
318:17,19
**272 (4)**
313:25;314:16,19;
319:18
**276 (1)**
336:4
**277 (5)**
368:2,4;369:5,6,9
**29 (1)**
395:8
**2nd (4)**
330:3;331:16;334:2,
25

**3**

**3 (7)**
292:1;337:21;
360:23;391:9;404:17,
18;406:25
**3,700,000 (1)**
407:1
**3/1/18 (2)**
334:2,24
**3/16/18 (1)**
334:22
**3/18/2018 (1)**
337:14
**3/2/2018 (1)**
332:16
**3/23/2016 (1)**
371:15
**30 (1)**
395:20
**30,000 (1)**
396:17
**33 (1)**
377:3
**3338 (1)**
343:9
**35 (2)**
395:23;396:5
**3500 (12)**
261:14;262:2;264:8,
22;265:11,12;266:7,22,
23;267:5,8,14
**36 (3)**
335:7;339:15;381:14
**360 (1)**
256:24
**38 (2)**
335:13,14
**38-millimeter (1)**
350:4

**4**

**4 (3)**
333:2;404:22;405:5
**4/10/18 (2)**
334:2,25
**4/24/2019 (1)**
333:24
**4/29/2015 (1)**
372:14
**4/29/2018 (3)**
337:14;339:2,11
**4/30/2015 (1)**
372:7
**40 (1)**
339:19
**42 (1)**
339:17
**433139195 (1)**
294:13
**44 (2)**
371:10,13
**461 (2)**
374:21;377:8
**461A (5)**
374:22;376:24;
377:6,7,9
**4A (2)**
255:6,8

**5**

**5 (5)**
291:23;332:24;
354:18;402:16;405:5
**5,000 (1)**
312:9
**5.4 (6)**
402:24,25;410:13,
15;415:11,18
**5/11/16 (1)**
334:14
**5/11/2017 (1)**
356:21
**5/11/2018 (1)**
339:18
**5/12/18 (2)**
334:3;335:1
**5/15/2018 (1)**
339:22
**5/17/2018 (1)**
341:11
**5/19/2017 (1)**
332:5
**5/23/18 (2)**
334:3;335:2
**5/24/18 (2)**
334:4;335:3
**5/31/18 (1)**
335:4
**5/8/2017 (1)**
332:2
**50 (6)**
392:1,1,2;393:17;
395:19;396:23
**500 (1)**
254:23
**506 (1)**
254:23
**52 (1)**
380:4
**53 (3)**
331:2,4,6
**54 (1)**
333:21
**54B (1)**
368:11
**55 (1)**
396:6
**55,000 (1)**
396:10
**550 (7)**
274:12;275:1,6;
289:20,22,23;322:19
**552 (9)**
274:12,25;275:6,9,
11;305:5;319:9,12;
321:20
**554A (9)**
274:12;275:1,6;
291:7,8,9;302:4;
305:13,19
**554B (4)**
274:12;275:6;
292:23,24
**554C (3)**
274:12;275:6;293:17
**556 (6)**
274:12;275:1,6;
294:6,7,8
**57 (1)**
340:16
**58 (4)**
330:11,17,25;331:1
**59 (4)**
330:12,17,23;331:5

**6**

**6 (8)**
291:23;325:5;
335:23;336:10;343:14;
344:9;406:4;425:3
**6/12/2017 (1)**
357:12
**6/19/2018 (1)**
332:23
**6/20/2018 (1)**
332:25
**6/22/2018 (1)**
333:3
**6/23/2018 (1)**
321:19
**6/27/18 (1)**
334:5
**6/6/2015 (1)**
350:7
**6/8/2018 (1)**
332:20
**60 (5)**
340:24;387:5;388:5;
396:5,6
**60,000 (1)**
396:11
**61 (1)**
371:24
**62 (1)**
341:10
**64 (2)**
290:2,6
**64633 (1)**
335:18
**646335-8292 (1)**
339:25
**646338-8833 (3)**
335:19;340:14;
343:12
**646-338-8833 (1)**
298:13
**646-388-8833 (1)**
297:8
**65 (6)**
330:7,13,15;387:16;
391:22,24
**6-Plus (11)**
286:16;288:11,13,
19,22,23;289:4,5,7;
292:1,2
**6-S (2)**
354:7;368:18

**7**

**7 (17)**
270:3;282:1;283:25;
284:12,14,18,21;
285:19,21,25;286:2;
288:8;290:24;306:18;
307:14;309:7;332:22
**7.25 (1)**
407:13
**7/20/2018 (1)**
339:16

**7/27/2018 (1)**
323:15
**7/7/2015 (1)**
350:21
**7/7/2018 (1)**
340:25
**7:10 (1)**
352:10
**707 (8)**
400:17;401:2,5,13,
19,22;402:15;416:4
**709 (8)**
408:8,10,24;409:2;
414:14;415:17,21;
418:21
**71 (3)**
329:25;331:12,13
**710 (4)**
394:9,10,20,23
**714 (1)**
390:10
**714A (6)**
389:12,17,23;390:5,
11,13
**718-693-7560 (1)**
283:21
**72 (2)**
334:6;341:17
**74 (2)**
342:1;382:14
**78 (1)**
377:3
**79 (1)**
329:10

## 8

**8 (2)**
332:19;350:17
**8/15/16 (2)**
334:14,15
**8/20/2018 (2)**
323:21;324:5
**8/28/2015 (1)**
352:3
**8:30 (2)**
358:17;360:1
**81 (3)**
372:3,4,6
**82 (2)**
372:4,12

## 9

**9 (4)**
255:14;332:15;
358:17;360:1
**9/5/2018 (1)**
340:18
**90 (1)**
395:24
**917 (1)**
335:11
**917-669-7560 (2)**
277:3;282:16
**917670-3336 (1)**
335:12
**917-670-3336 (1)**
296:14
**925 (1)**
341:6

**In The Matter Of:**
*UNITED STATES OF AMERICA, v.*
*SYLVIA ASH,*

---

*December 6, 2021*

---

*Southern District Court Reporters*

Original File LC6KASHF.txt
Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 6, 2021
12:30 p.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JAMIE C. BUCKLEY



(Trial resumed; jury not present)
THE COURT: Good afternoon, folks.
MS. COHEN: Good afternoon, your Honor.
MR. MARK: Good afternoon, your Honor.
THE COURT: I hope everyone had a good weekend.
MS. COHEN: I believe Andy went to go down to the jury.
THE COURT: That figures.
I got the lengthy papers from Ms. Cohen. We're going to distribute to you, I believe it will be marked exhibit next in order, I think it is C or D, two for each side, a draft of a limiting instruction which sets out more or less the substance of what I propose to say at an appropriate time. And I'll give you an opportunity later in the day to make any suggestions, but I'm not going to keep the jury waiting to discuss this now.
MS. COHEN: Your Honor, I believe the government intends to call two witnesses that relate to the topic of your Honor's proposed limiting instruction. I assume we'll take a break after the government's first two witnesses, but before the second two, so we're able to digest this.
THE COURT: Probably. Probably.
MS. COHEN: I would request before any witness went on that we would have the opportunity --
THE COURT: Probably.
MS. COHEN: I'll take it. Thank you, your Honor.



MR. MARK: So your Honor knows, we told Ms. Cohen the first three witnesses are witnesses who are current or former employees of MCU, and the last two witnesses that we gave Ms. Cohen notice of, Laura Smith and Robert Tembeckjian, are the two witnesses she raised an issue. We of course think that's completely fine to take a break before then.
THE COURT: Okay.
(Continued on next page)



(Jury present)
THE COURT: I hope everybody had a nice weekend. Jurors all are present as is the defendant.
Next witness for the government?
MR. REBOLD: The government calls Monique Smith.
MONIQUE SMITH,
called as a witness by the Government,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. REBOLD:
Q. Good afternoon.
A. Good afternoon.
Q. Ms. Smith, where do you currently work?
A. I currently work at the Metropolitan Museum.
Q. Where did you work before that?
A. Previously, I worked at MCU.
Q. Can you please tell the jury when you first started at MCU and what year you left.
A. Yes, I first started in 1996, and I worked as an intern up until about 2006 and then worked as the admin, executive admin until about 2018.
Q. When you say you were an executive admin, can you say what that means?
A. Yes, executive administrative assistant/office manager.
Q. To whom were you an administrative assistant?

A. To the board of directors.
Q. Can you just summarize your duties and responsibilities as an executive administrative assistant to the board of directors.
A. Yes. I was the liaison between the board of directors and the managers, management team. I also scheduled and coordinated executive, you know, committee meetings. I also planned strategic planning annual conferences and board conferences. And I also prepared board reports and minutes for the board.
Q. When you say that you planned board trips, including the strategic planning meetings, what specifically was your role in helping plan those meetings?
A. Yes. I was the coordinator and I also helped facilitate these annual conferences.
Q. Did your role include booking travel reservations for the attendees?
A. Yes.
Q. Did it include selecting the locations such as the hotels?
A. Correct.
Q. When you said that you were a liaison between the board and the management team, did the management team include the chief executive officer or CEO at MCU?
A. Yes.
Q. Are you familiar with an individual named Mr. Kam Wong?



A. I am.
Q. Who was Mr. Wong?
A. Mr. Wong was the former CEO, president and CEO of MCU.
Q. What was your relationship with Mr. Wong?
A. I worked directly also with Mr. Wong. And we, I worked closely with him as well, as his support.
Q. Ms. Smith, did there come a time where Mr. Wong asked you to do something for him that you understood was inappropriate?
A. Yes.
Q. Can you explain.
A. Well, several years back, my mother had back surgery, and intense back surgery, and she stayed with me and I took care of her at my house. And Kam knew that and he asked if when I returned back to work, he asked if we can spare, like, a couple of pills from her pain medication, from my mother's pain medication, because he was in a lot of pain. And you know, he didn't go to the doctors, he was waiting for his next appointment to go to the doctors, and he needed just, like, a few pills to help him get through until he saw the doctor.
Q. Around what year was it that Kam Wong asked you to do that?
A. Around 2014 I believe it started.
Q. Did you agree to do that?
A. I did.
Q. When you mentioned your mother had pain medication, what type of pain medication or pills was she prescribed?



A. Yeah, she, it was like Tylenol with codeine, you know, pain, it was pain medication, Tylenol with codeine.
Q. Around how many of these pills did you give to Mr. Wong over the course of time that you did it?
A. Very few and far in between. You know, he would -- probably maybe like two or three at a time that he would call and say that he needed, you know, something to get by until he saw his next doctor, he went to his next doctors appointment.
Q. Around how many pills would you say you gave Mr. Wong over the course of this conduct?
A. 10.
Q. You said -- sorry you said that started in about 2014?
A. Yes.
Q. Around when did it end?
A. I believe it ended somewhere around the -- couple years later. Around 2017.
Q. Can you please explain why you agreed to do this for Mr. Wong?
A. You know, he was my boss. And you know, I was very concerned for him. I felt bad for him. He walked around the office saying he had, like, all this dental work done, and he was in pain, and he needed just something to get by until he saw his doctors.
Q. Ms. Smith, did you receive any payment or anything else in value from Mr. Wong in exchange for providing him those pills?



A. No.
Q. Did you ever tell Mr. Wong that you were trying to get a doctor to prescribe more pills so you could provide them to Mr. Wong?
A. I did. There was a time where, you know, he started asking, you know, a little bit more frequently and I was just getting uncomfortable with it. So, I was making up excuses, because I didn't want to say no. He was my boss and he was also the CEO, and so I just started making excuses.
Q. Did you actually tell a doctor to prescribe more pills?
A. No.
Q. Ms. Smith, have you met with the government in preparation for your testimony prior to today?
A. Yes.
Q. Did you disclose this conduct to the government during those meetings?
A. Yes.
Q. To your knowledge, is there any connection between your testimony today and whether you might or might not face any charges for giving pills to Mr. Wong?
A. No.
MR. REILLY: Objection.
THE COURT: Overruled.
Q. Has the government ever indicated to you one way or another that whether you faced charges is tied to your testimony today?

A. No.
Q. Ms. Smith, do you know an individual named Sylvia Ash?
A. Yes, I do.
Q. Did you work with her in your capacity as executive administrator to the board?
A. I did, yes.
Q. Would you recognize her if you saw her again?
A. Yes.
Q. I'd like you to take a look around the courtroom to tell us if you see Ms. Ash here today.
A. Yes.
Q. Can you please identify her by an article of clothing.
A. She has a teal shirt on. Teal green.
MR. REBOLD: May the record please reflect that the witness identified the defendant.
THE COURT: Yes.
Q. Ms. Smith, can you please describe your relationship with the defendant during her time serving on the board.
A. Yes. We worked -- we were very friendly and we worked very closely as Ms. Ash served on the board of directors.
Q. Did you communicate with her in person?
A. Yes.
Q. Did you do so by phone?
A. Yes.
Q. What about by text message?



A. Yes.
Q. Were there times where you met with the defendant outside of the office for social reasons?
A. Yes.
Q. Can you describe your relationship with the defendant after she left MCU?
A. Yes, we remained close and spoke from time to time.
Q. Directing your attention to on or about August 15, 2016. Did you come to learn that Ms. Ash stepped down from her position on the board?
A. Yes.
Q. How did you learn that?
A. There was a letter, a resignation letter that she submitted to the board of directors to -- that she resigned from the board.
Q. Was that letter sent around on or about August 15, 2016?
A. Yes.
Q. Were you included on the list of recipients of that letter?
A. Yes.
Q. Did you ever come to discuss Ms. Ash's resignation directly with her?
A. Yeah, we had a conversation about that.
Q. Can you summarize what, if anything, she said?
A. She, you know, informed me that she was resigning from the board at that time, and, you know, at that time she wasn't



really happy about that. And you know, there was like this feuding between the board of directors, you know, like a separation between them. And she just felt at that time that they just didn't want her on the board any longer.
Q. After the defendant stepped down from the board, did you continue to see her at MCU?
A. Yes.
Q. How frequently?
A. Fairly frequently. She would visit.
Q. Do you know, would you meet with her when she visited MCU?
A. Yes, she would stop by the office.
Q. Did you know who else she was meeting with during those visits?
A. Yeah, she would definitely come and see Kam as well.
Q. Can you describe the defendant's relationship with Kam Wong as you observed it?
A. They were very friendly and pretty close.
Q. Did you ever travel with the defendant after she resigned from MCU?
A. Yes.
Q. When was that?
A. We traveled to the -- we had an annual strategic planning conference every year, and Ms. Ash attended one of those conferences.
Q. Specifically, did she travel to the 2016 special planning



conference after her resignation?
A. Yes.
Q. Where was that conference held?
A. The conference was held at the Wynn Hotel in Las Vegas.
Q. Around how long, to your knowledge, was Ms. Ash out in Vegas for that conference?
A. About a week. That's how long the conference lasted. So about a week.
Q. Ms. Smith, based on your experience planning these conferences, to your knowledge, are gifts traditionally given out during the strategic planning conference?
A. Yes.
Q. Was there a gift given out at the 2016 conference?
A. Yes.
Q. Typically, who is it that is supposed to receive the gift at the strategic planning conference?
A. The participants of the conferences who attends the conference. So, it's the staff and also the board of directors.
Q. What was the gift being distributed for the 2016 special planning conference?
A. I believe -- it was the Apple Watch.
Q. Was Ms. Ash given an Apple Watch at the 2016 planning special planning conference?
A. No.

Q. Did you come to learn that she expressed her opinion on that?
A. There was -- when we returned back, we were in the office and I was with -- Kam had passed by my office and he expressed that Sylvia Ash had called him and that he wanted to -- that she was looking to receive an Apple Watch. And I told him that we didn't have any more left at the time. And I also let him know that there was one more left, that was actually mine, and I had -- I didn't open it yet. So I told him that this was the only one left, and I offered it up to give to her and then he actually took it.
Q. Did you come to see Ms. Ash again after that conference, after that conversation with Mr. Wong?
A. Yes.
Q. Did you see her wearing the watch?
A. Yes.
Q. Ms. Smith, to your knowledge, who was it that pays for the Apple Watches that are distributed at the strategic planning conference?
A. Municipal Credit Union.
Q. Ms. Smith, directing your attention to in or around January of 2018. Did you come to learn that there was a criminal investigation into Kam Wong?
A. Yes, I did.
Q. How did you initially learn about that?



A. I first learned about it because another former director called me and he -- called me up on the phone and he said that two agents visited his home to talk about Kam Wong.
Q. Did you come to speak with others about the investigation?
A. Yes, I also spoke to Kam Wong about the investigation. You know, I saw him walking around the office and he was moping around and didn't understand, you know, what was going on with him, you know. He just seemed like he wasn't himself.
And he finally called me into his office and he sat me down and he said, listen, you know, there is an investigation happening. But, please, you know, don't worry about it, everything is going to be okay, it was all a misunderstanding. You know, misunderstanding about my contract. And so, you know, which I felt very horrible about. And then he also said that he was so upset about it that he felt like he was going to commit suicide.
Q. Ms. Smith, keeping your attention in or around January 2018. Did you also discuss the federal criminal investigation with the defendant?
A. Yes.
Q. How did the two of you communicate about it?
A. We spoke over the phone about it.
Q. What, if anything, did Ms. Ash say in reference to the criminal investigation when you spoke with her by phone in or around January of 2018?



A. She called one time and she mentioned that Kam had called her. And she -- that he called her and he wanted her to come in and sign a document. And she was uncomfortable with what he was asking.
Q. Sometime thereafter, did you review a document that had been dated from around the same time and signed by the defendant?
A. Yes, I did.
MR. REBOLD: Mr. Charalambous, if you can please pull up what is in evidence as Government Exhibit 116.
Q. Ms. Smith, is your screen lit up yet?
A. Yes, it is.
Q. Do you recognize Government 116?
A. Yes.
Q. What is Government 116?
A. It is a longterm disability insurance for the CEO dated January 22, 2018.
Q. Is this the document that you reviewed some time around the time or after the time of your conversation with Ms. Ash by phone?
A. Yes.
Q. Do you recognize Ms. Ash's signature through your work with her?
A. Yes, I do.
Q. Is that signature at the bottom of 116 consistent with the



defendant's signature?
A. Yes.
Q. At some time -- you can pull that down, Mr. Charalambous. Thank you.
At some time did you speak with Ms. Ash about whether she, too, was meeting with federal investigators?
A. Yes, yeah, there was a time that we talked about it, and she mentioned that she was meeting with the federal investigators as well.
Q. Ms. Smith, directing your attention to February 22, 2018. Was there a board meeting held on that date?
A. Yes.
Q. Can you summarize what occurred during that board meeting?
A. That was the board meeting that Kam was actually asked to step down.
Q. Were the minutes of that board meeting memorialized?
A. Yes.
Q. You said earlier in your testimony that one of your jobs was to create and circulate board meeting minutes. Is that correct?
A. That's correct.
Q. Did you generate the meeting minutes for the February 22, 2018 meeting?
A. I did.
Q. Did those meetings include a series of recommendations made

by the board regarding Kam Wong?
A. Yes, it did.
MR. REBOLD: Mr. Charalambous, if you can please just display for the witness only what's been marked for identification as Government Exhibit 461.
Q. Ms. Smith, if you can please let us know when that document is in front of you.
A. Yes, it's in front of me.
MR. REBOLD: Mr. Charalambous, if you can please scroll through the document to make sure the witness is familiar with it.
THE WITNESS: Oh, okay.
Q. Have you had a chance to review Government Exhibit 461 for identification?
A. Yes.
Q. Are those the board meeting minutes that you generated in relation to the February 22, 2018 annual -- or board meeting?
A. Yes.
Q. Is that a fair and accurate copy of those board meeting minutes?
A. It is.
MR. REBOLD: Mr. Charalambous, if you can please pull up Government Exhibit 461A for identification.
Q. Did you recognize 461A?
A. Yes.



Q. What is 461A?
A. 461A is the recommendations that was submitted.
Q. Is it fair to say that's the very last page of the larger set of minutes?
A. Yes.
Q. Is this a fair and accurate copy of the recommendations?
A. Yes.
MR. REBOLD: At this time the government offers 461 for identification into evidence.
MR. REILLY: No objection.
THE COURT: Received.
(Government's Exhibit 461 received in evidence)
MR. REBOLD: Mr. Charalambous, I'd just like you to highlight just a couple of items on 461A. But if you could first please publish it for the members of the jury. If you can please just highlight the section where it says "first," please, Mr. Charalambous. If you can zoom in on that.
If you can now highlight or zoom in where it says "finally" at the bottom of the document. If you can please zoom in on that.
Q. Ms. Smith, if you can read the portion where it says "finally."
A. The first tab? The first tab, right?
Q. Sure.
A. I'm sorry. You said "finally."



"Finally, the special committee recommends that Kam Wong immediately be directed to turn over and return to MCU all MCU-issued and owned computer equipment, phones and other devices in his possession."
MR. REBOLD: Thank you, Mr. Charalambous. If you can please pull that one down.
Q. Ms. Smith, directing your attention to May of 2018. Did you come to learn that Kam Wong had been placed under arrest?
A. Yes.
Q. How did you learn about that?
A. It was on the news and media.
Q. Did you ever discuss Mr. Wong's arrest with Ms. Ash?
A. Yes, we did.
Q. Was that discussion at or around the time of the arrest?
A. Yes.
Q. Can you please summarize -- how did the two of you communicate about that?
A. We communicated over phone.
Q. Can you please summarize what Ms. Ash said about Mr. Wong's arrest.
A. We, when we talked about it, we, you know, talked about the turmoil and his arrest and everything that was happening with MCU, and she said to me that she was scared, and, you know, that's...
Q. Also in May of 2018, were you instructed by the -- did you



receive any instructions from the interim CEO regarding electronic devices held by Ms. Ash?
A. Yes.
Q. Who was the interim CEO?
A. Norman Kohn.
Q. What, if anything, did Mr. Kohn direct you to do?
A. He directed me to reach out to Sylvia Ash and ask her to submit or turn in all of her MCU devices.
Q. What did you do after you received that instruction?
A. I sent her an e-mail and put it in the same terms, to please, as per Mr. Kohn, to please submit all of her MCU devices that she had in her possession.
Q. Did Ms. Ash respond to your e-mail?
A. Yes.
Q. What did she say in response?
A. She said nicely written letter, jokingly. And she asked for me to call her.
Q. Did you call her?
A. Yes.
Q. What did the two of you discuss by phone?
A. We, you know, talked about the request and that they were asking her to submit it, and how ridiculous it was, and she wasn't too happy about, you know, having to submit those devices.
Q. Who said that it was ridiculous?

A. We talked about, you know, how ridiculous it was. Probably Ms. Ash and myself.
Q. After that conversation, what did you do next in relation to the phones?
A. After that, I went to the acting CEO at the time and told -- and informed him that, you know, I sent Sylvia the information, you know, the e-mail, and this is what she said.
Q. What did Mr. Kohn say in response?
A. He -- he said that it was --
MR. REILLY: Objection. Calls for hearsay from Mr. Kohn.
MR. REBOLD: It explains what she did next, your Honor.
THE COURT: It's not received for the truth of the matter, ladies and gentlemen, but to explain why she did what she did thereafter, if anything.
A. So, he -- after, after that, she -- he said that it was okay for her to keep the devices because it was longer than three years old. So that it was okay for her to keep the devices.
Q. What, if anything, did you do after he had told you that?
A. I went, I sent her Sylvia Ash an e-mail back letting her know that it was okay to keep the devices.
Q. This was in May of 2018?
A. Yes.



Q. You previously testified that Ms. Ash had received an Apple Watch in 2016, correct?
A. Yes.
Q. Were you aware that -- withdrawn.
If you were to see that e-mail that you sent to -- withdrawn again.
Did Ms. Ash respond to the e-mail that you sent to her?
A. After the last comment? I don't believe so.
Q. If you were to see the e-mail exchange, would that refresh your memory?
A. Yes.
MR. REBOLD: Mr. Charalambous, if you can please show the witness only what's been marked for identification as Government Exhibit 751.
Q. Now that you've had an opportunity to view Government Exhibit 751, does that refresh your memory as to whether Ms. Ash responded to your followup e-mail?
A. Yes.
Q. While 751 is in front of you, is this an e-mail exchange between the two of you in relation to the returning of devices that had been given to her from MCU?
A. Yes.
Q. Is it a fair and accurate copy of the e-mails as you had exchanged them back in 2018?



A. Yes.
MR. REBOLD: The government offers Government Exhibit 751 for identification into evidence.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 751 received in evidence)
MR. REBOLD: Mr. Charalambous, starting at the bottom where it says on May 14 at 4:13 p.m., if you can zoom in on that section.
Q. Is this the e-mail that you sent to Ms. Ash instructing her to return the devices?
A. Yes.
Q. You can read that into evidence.
A. Okay.
"Hi, Sylvia. Hope all is well. As per MCU protocol, we are required to retrieve all MCU devices/equipment that are given to board members once they have departed MCU. Unfortunately, at the time of your departure, we did not collect your devices. Therefore, for your convenience, we will make the necessary arrangements to pick up the equipment via MCU carrier. Please let me know at your earliest convenience when and where is best for you. Sorry for any inconvenience this may have caused. Warm regards, Monique."
MR. REBOLD: Mr. Charalambous, if you can go to the response from May 14.



Q. Is this from Ms. Ash to you indicating "nicely written letter, call me"?
A. Yes.
MR. REBOLD: And then Mr. Charalambous, if you can please pull up to where it says on May 15 at 12:55 p.m.
Q. If you can please read into the record the e-mail you sent back to Ms. Ash on that date and time.
A. "Hi, Sylvia. As per the acting CEO, since you've had the devices for three years or more, there is no need to return them. Therefore, please disregard my original e-mail."
MR. REBOLD: Mr. Charalambous, if you can pull out to the top of the document, including the header, if you have the e-mail header. If you can include the header and the response.
Q. Is this an e-mail from Tuesday, May 15, at 13:11 hours by Ms. Ash?
A. Yes.
Q. Does that say "no comment"?
A. It says "no comment," yes.
MR. REBOLD: Mr. Charalambous, if you can just please put this document side by side with what's in evidence as Government Exhibit 113.
Mr. Charalambous, if you can just highlight the dates on the top of the document on the left, 751, and the date on the document on the right, 113.
Mr. Charalambous, if you can just zoom in on the

substance of the letter from June 19, please.
While he's doing that, may I confer with my colleagues?
THE COURT: You may.
MR. REBOLD: Your Honor, I don't have any further questions for this witness.
THE COURT: Thank you. Cross-examination.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good afternoon, Ms. Smith.
A. Good afternoon.
Q. Ms. Smith, my name is Nathan Reilly and I represent Ms. Ash.
I believe you testified on direct you've met with the government prior to coming here today; is that correct?
A. Yes.
Q. To prepare for your testimony?
A. Yes.
Q. On multiple occasions, right?
A. Yes.
Q. And you and I haven't met before; is that right?
A. That's correct.
Q. And in fact, at some point you were contacted by one of my colleagues, Ms. Cohen; is that right?
A. Yes.



Q. But you didn't speak with Ms. Cohen, myself, or anyone on Ms. Ash's defense team; is that right?
A. That's correct.
Q. In fact, you mentioned to the government that Ms. Cohen had called, right?
A. Yes.
Q. Now, I'd like to turn your attention to your testimony about your work for Kam Wong.
You testified on direct about the fact that on multiple occasions you provided pills to Mr. Wong?
A. Yes.
Q. I think you said you felt terrible for him because he was expressing he was in pain, right?
A. Yes.
Q. And you liked Mr. Wong, is that right, personally?
A. Yes.
Q. And you believed him when he said he was in pain?
A. I absolutely believed him, yes.
Q. You hadn't seen a doctor's note or anything. You just took his word for it, right?
A. That's correct. He was going back and forth to the doctors appointments, and seeing him walk past my office several times.
Q. I believe you said you hadn't been made any promises by government with respect to that conduct; is that right?
A. Yes.



Q. Mr. Wong also gave you a down payment for your home; is that correct?
A. He did.
Q. He also approved an advance on a bonus for you; is that right?
A. Yes.
Q. That was a sizable advance, right? More than $100,000?
A. It was somewhere -- around 100,000.
Q. And you communicated with him, I think you testified you communicated with him in person and by phone and by text; is that right?
A. Yes.
Q. Is it fair to say you were, when you initially learned of the investigation, you were pretty supportive of him, right?
A. Yes.
Q. You couldn't believe he had engaged in that conduct, right?
A. Yes.
Q. Ms. Smith, you were aware there were other people at MCU who had given pills to Mr. Wong; is that right?
A. I later learned, yes.
THE COURT: Sustained. Answer stricken.
Q. I wanted to -- before I move on. You also mentioned I think that you had a pretty warm relationship with Ms. Ash, right?
A. Yes.



Q. And you socialized with her outside of the office from time to time, outside of the MCU; is that right?
A. Yes.
Q. And I think you characterized her relationship with -- you thought her relationship with Mr. Wong was close as well, right?
A. Yes.
Q. Is it fair to say there were times when you socialized with Ms. Ash outside the office, when you did so without Mr. Wong?
A. Yes.
Q. Ms. Smith, I want to talk to you briefly about, you talked about the strategic planning conference in Las Vegas; is that right?
A. Yes, hmm-hmm.
Q. You said it was held at the Wynn in 2016, right?
A. Hmm-hmm.
Q. Is it fair to say that before she left the board, Ms. Ash was involved in planning that conference?
A. Yes.
Q. I think you said that your recollection was Ms. Ash was in Las Vegas for about a week; is that right?
A. Yes.
Q. And is it right that the planning conference itself was three or four days? Is that right?
A. Yes, the actual meeting itself was about three or four

days, correct.
Q. And is it correct that during those days, those were full meeting days; is that right?
A. Yes.
Q. With meetings about MCU business and the goings on of the entity?
A. Correct.
Q. I think you also testified about a Apple Watch that had been given out as a gift at that particular conference, right?
A. Yes.
Q. And am I correct Ms. Ash didn't ask you for a watch? Is that right?
A. That's right.
Q. In fact, you heard about that she asked for one; is that right?
A. Directly from the CEO at the time, Kam.
Q. And I think you said you gave a watch that was supposed to be yours; is that right?
A. Yes.
Q. Did Mr. Wong replace that watch for you?
A. He did.
Q. Ms. Smith, I want to talk -- on your direct examination, you referenced you discussed a couple different conversations that you had with Ms. Ash in 2018. I'd like to talk about those.



Is it right that you first spoke with the government in connection with this investigation back in 2018?
A. Yes.
Q. And then after that, the next time you spoke with them was a few months ago in 2021; is that right?
A. Yes.
Q. So, I'd like --
A. You said a few months?
Q. The next time you spoke to them was in 2021; is that right?
A. Yes.
Q. Okay. So, I'd like to direct your attention to I believe you testified on direct about a January -- a conversation that you thought occurred in January 2018 with Ms. Ash; is that right? And I think you didn't recall a specific date; is that right?
A. Right.
Q. But you recall that it was around the time of a meeting; is that right?
A. Yes.
Q. And I think you said that Ms. Ash told you she was coming in to sign something; is that right?
A. Yes.
Q. But at the time you didn't know what that was, right?
A. Right. Yeah.
Q. And you didn't see a copy when she came in; is that right?



A. No.
THE COURT: It's not right or you didn't see a copy?
THE WITNESS: I didn't see the copy.
THE COURT: Thank you.
Q. You said on direct examination that you thought she or she expressed she was uncomfortable; is that right?
A. Yes.
Q. But you don't recall the specific words she used, do you?
A. I believe -- that's what I got from the conversation, that she was uncomfortable with what Kam was asking her for.
Q. I wanted to clarify. Was that your impression of her words? Is that right?
A. That's -- that's what I took and that's what she -- yes, and that's what she said, you know, she was uncomfortable with what he was asking her to do.
Q. I want to try nail this down. Do you recall the specific words she said?
A. I feel like it was she said she was uncomfortable with it.
Q. Again, just to be --
A. Okay.
Q. Do you recall the specific words?
THE COURT: Counsel, you've asked that several times. You had your answer.
Q. Is it fair to say there aren't any notes of this call?
A. That's fair, yes.



Q. There is not a text message about it?
A. No.
Q. There is not a recording of it, right?
A. No.
Q. When you talked with the government in July 2018, you didn't tell them about this conversation, did you?
MR. REBOLD: Objection.
THE COURT: Sustained.
Q. Ms. Smith, I want to turn your attention to the second conversation that you discussed. I think you said at some point, you had a conversation with Ms. Ash about where she told you she had been speaking to federal investigators; is that right?
A. Yes.
Q. But you don't recall precisely when that conversation happened, do you?
A. It was early -- January, February of 2018.
Q. I think -- excuse me.
You testified -- you testified on direct that conversation happened, correct?
A. I'm sorry?
Q. You testified, excuse me, you testified on direct that that conversation occurred, right?
A. Yes, yeah.
Q. And you previously told the government about it; is that

right?
A. Yes.
Q. And did you previously tell the government when it occurred?
A. That conversation?
Q. Yes.
A. Yes, I believe so.
MR. REBOLD: Objection.
THE COURT: Overruled.
Q. But again, you don't have any notes of that conversation; is that right?
A. No.
Q. Or anything that shows when that --
THE COURT: That's right or you don't have any notes?
THE WITNESS: I'm sorry?
THE COURT: He said you don't have any notes of that conversation, is that right? And you said no.
Now, one way to take that is it's not right that you don't have any notes, and the other way to take it is that it is right that you don't have any notes.
THE WITNESS: No, let me clarify that.
I don't have any notes of that conversation.
Q. I'll try to be clearer in my questions.
Is it also fair to say you don't have any text messages memorialized in that conversation?



A. No.
Q. And no e-mails memorialized in that conversation?
A. No.
Q. Now, I'm going to turn your attention to the third conversation that you discussed, which was that at some point around the time -- after Mr. Wong's arrest, you and Ms. Ash spoke and I believe your testimony on direct is she conveyed she was scared; is that right?
A. Yes.
Q. Again, do you recall the precise words she used?
A. Yes, that she was scared.
Q. Again, that's -- you don't have -- there is no contemporaneous notes of that call?
A. No, I don't. It was a conversation.
Q. Similarly, no text messages or other written documents about that?
A. No.
Q. I'd like to turn now your attention to what's in evidence -- you testified about Government's Exhibit 461A. If you remember, that was the recommendations to the special committee from the February 22, 2018 board meeting. Do you remember that?
A. Yes.
Q. Is it correct that you were at that board meeting; is that right?



A. Yes.
Q. MCU's outside counsel was there; is that right?
A. Yes.
Q. Melissa Jampol?
A. Yes.
Q. And at that point, you knew that MCU had received a subpoena from the federal government; is that right?
A. Correct.
Q. From the U.S. attorney's office?
A. Yes.
Q. And the outside lawyers made a presentation; is that right?
A. Yes.
MR. REBOLD: Objection, your Honor.
THE COURT: Well, I'll allow it to stand, but I would have sustained it if you got it out fast enough.
Q. At that time there was a special committee of the board; is that right?
A. Yes.
Q. At that meeting, a special committee made some recommendations; is that right?
A. Correct.
Q. Or I guess, maybe to be more precise, it reviewed and adopted some recommendations; is that right?
A. Yes.
Q. I think you testified on direct that one of those was to



suspend Kam Wong?
A. Yes.
Q. And to name Norman Kohn as the acting CEO; is that right?
A. Yes.
Q. And then also that the Kam Wong should turn over his devices, right?
A. Yes.
THE COURT: Is this going anywhere but repetition?
MR. REILLY: Last question on this, your Honor.
Q. And did you understand those devices were to be turned over to investigators?
MR. REBOLD: Objection.
THE COURT: Sustained.
Q. I want to turn your attention to Government Exhibit 751, which was your e-mail with Ms. Ash about returning the devices.
A. Hmm-hmm.
Q. Do you recall that?
And I think you testified and the document shows it was dated May 14, 2018, right?
A. Yes.
Q. And by that point, Ms. Ash had been gone from the board about two years, right? A little less?
A. Correct.
Q. You mentioned that -- excuse me.
The e-mail indicated that it was being sent -- that

you were requesting the return of the devices per MCU protocol, right?
A. Yes.
Q. And you had written the e-mail at Norman Kohn's request; is that right?
A. Correct.
Q. To ask Ms. Ash for the return of the devices?
THE COURT: Can we get to a point here instead of just repeating?
MR. REILLY: I'll get there quickly, your Honor.
Q. Is it fair to say -- excuse me.
When you said that the devices were being requested as part of MCU protocol, it was in fact a specific request from Norman Kohn, right?
A. Yes.
Q. When you talked to -- you said you talked to Ms. Ash after that e-mail; is that right?
A. Yes.
Q. You told her that the request had come from Norman Kohn, right?
A. Yes.
Q. I think you said both of you thought it was -- I believe it was an unusual or even a ridiculous request; is that right?
A. You know, we just, felt that, yeah, that's correct.
Q. Is it fair to say during that conversation you didn't



reference that these -- excuse me -- that this was in connection with a federal investigation?
A. Can you repeat that?
Q. Sure. Is it fair to say that during that conversation you didn't say the request was relating to a federal investigation?
MR. REBOLD: Objection.
THE COURT: Sustained.
MR. REILLY: May I have one moment, your Honor?
THE COURT: Yes.
MR. REILLY: Thank you, your Honor. Just a few more questions.
Q. Ms. Smith, during the conversation, just directing your attention back to the conversation with Ms. Ash at or near the time of Mr. Wong's arrest in 2018.
I think you testified that Ms. Ash indicated that she was scared. Did you also say you were scared at that time?
MR. REBOLD: Objection.
THE COURT: Sustained.
Q. Ms. Smith, you indicated, I think, you talked to the government in 2018; is that right?
MR. REBOLD: Objection.
THE COURT: Sustained.
MR. REILLY: No further questions, your Honor.
THE COURT: Thank you. Any redirect?
MR. REBOLD: No, your Honor.



THE COURT: Thank you. You are excused.
(Witness excused)
THE COURT: Next witness.
MR. MARK: Government calls as its next witness Thomas Siciliano.
THOMAS SICILIANO,
called as a witness by the Government,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. MARK:
Q. Good afternoon, Mr. Siciliano.
A. Good afternoon.
Q. Mr. Siciliano, are you currently employed?
A. No, I'm not.
Q. Where were you previously employed?
A. I was previously employed at the Municipal Credit Union.
Q. What was your title at Municipal Credit Union?
A. General counsel.
Q. What in sum is a general counsel?
A. The general counsel was the chief legal officer for Municipal Credit Union.
Q. For approximately how long did you work at MCU as its general counsel?
A. I started as general counsel in August of 1981. And I -- it ended in January of 2019.



Q. What happened in January 2019?
A. My position was terminated.
Q. How far did you go in school?
A. I received a juris doctorate degree from St. John's University.
Q. When you worked at MCU, who did you report to?
A. I reported mainly to the -- the president chief executive officer, and on some occasions with certain items, I would report to the board of directors.
Q. Who until February 2018 was the chief executive officer at of MCU?
A. His name was Kam Wong.
Q. You mentioned you were the general counsel or chief legal officer for MCU. What in sum did that job entail?
A. Well, as general counsel, I managed the legal department. Naturally, I performed work for the legal department. Legal department had five attorneys, including myself. We would handle various legal matters that would come into the institution.
Q. Would that include any sorts of litigation?
A. Yes, it would.
Q. What sorts of litigation was MCU involved with during your time there?
A. There would be various types of litigation. Being a financial institution, of course there was mortgage foreclosure

actions that would take place. There would be certain types of collection litigation for the institution, although we did not handle that in house. We also did not handle the mortgage foreclosures in house. But there was other general litigation that we handled. Oftentimes there would be litigation involving an individual who would claim they were injured at a branch office. So sometimes litigation would take place with regard to that. So it would have been a wide range of litigation.
Q. You mentioned some of that litigation wasn't handled in house. What do you mean by that?
A. Some of the litigation would have been handled by the attorneys in the legal department. But, for example, collection litigation would be handled by collection attorneys, not employed by the credit union. As would the same thing with the foreclosure litigation would be handled by an outside firm not employed by the Municipal Credit Union. And of course, I mentioned that sometimes there would be litigation involving someone who claims they were injured. Typically that would be covered by insurance, and the insurance company would appoint an attorney to handle that kind of matter.
Q. So those would be outside attorneys at outside firms that would handle those sorts of matters?
A. Yes.
Q. Are you familiar with an individual named Sylvia Ash?



A. Yes, I am.
Q. Did she serve on MCU's board?
A. Yes, she did.
Q. From when until when approximately?
A. Approximately 2009 to 2016.
Q. Do you recognize Ms. Ash in the courtroom?
A. Yes, I do.
Q. Could you describe an article of clothing she's wearing.
A. She is wearing a dark jacket in the first row.
MR. MARK: May the record reflect that the witness identified the defendant.
THE COURT: Yes.
Q. While Ms. Ash was on MCU's board, did she hold any positions on the board?
A. Of course she was a member of the board. I know she was also a member of the Municipal Credit Union coordinating committee. She was also the chair for many years of the coordinating committee. She was also the first vice chair of the board of directors for some time. And for a little over a year, she was the chair of the board of directors.
She may have had other titles too.
Q. At the time Ms. Ash served on the board, did she have another job?
A. Yes, she did.
Q. What was her job?



A. She was a justice of the supreme court of New York.
Q. Where was she a justice of the supreme court of New York?
A. Kings County.
Q. You mentioned of her various positions at MCU's board that she was chair of MCU's board for a period of time?
A. Yes.
Q. When approximately did she become chair of MCU's board?
A. I believe she became chair approximately May of 2015.
Q. For approximately how long did you know Ms. Ash during your time at MCU?
A. I knew her from approximately 2008, 2009, until she resigned with the board.
Q. While she was on the board, did you speak with her?
A. Oh, yes.
Q. How frequently?
A. Well, we, I would have seen her at the annual -- the board meeting was a monthly meeting, so I would have seen her at the annual board meeting. I would have seen her at the coordinating committee which didn't meet every month, but met several times a year. And she could have been at the institution attending a different kind of committee meeting, one of the ones I don't attend, but I would have seen her and talked to her.
Q. Did you ever see her socially or at outside events?
A. Except something regarding a credit union affair, no, not



socially.
Q. What was your relationship with Ms. Ash like overall?
A. I think we had a very good relationship.
Q. Prior to becoming chair of MCU's board, did Ms. Ash ask for your assistance with anything not related to MCU?
A. Yes.
Q. What did she ask for your assistance with?
A. I received an e-mail from her asking if the legal department could do some research on certain aspects of credit unions in that she was, she was developing an argument in case -- in case her service on the board was ever questioned.
Q. When was that approximately?
A. That would have been approximately April of 2015.
Q. You mentioned that she sent you an e-mail. Is that right?
A. Yes.
Q. Did she reference anything in that e-mail?
A. In the e-mail, there was a section that was set forth in the e-mail of a judicial rule.
Q. Did you respond to Ms. Ash's e-mail?
A. Yes, I did.
Q. How did you respond?
A. I responded by sending her an e-mail indicating that we would limit our comments to our facts about the structure and organizations of credit unions in general and Municipal Credit Union particularly. I went on to indicate we had no experience

with regard to judiciary laws or the judicial code of conduct, so we wouldn't provide any information or advice on those items. And I also indicated that as counsel for the credit union, I didn't feel it was appropriate for us to address those issues.
Q. Did Ms. Ash follow up with you after you sent your reply?
A. Not that I recall.
Q. You mentioned the various types of litigation that MCU is involved in before. Did you ever discuss those various types of litigation with Ms. Ash?
A. I believe we discussed it on one occasion.
Q. What did you discuss with her?
A. She had contacted me at some point and asked me if I could -- if we had pending litigation, if I could give her a brief description of the types of litigation we had, and I did.
Q. Broadly, was that brief description similar to the one you gave to the jury earlier?
A. To the best of my recollection, yes.
Q. Did you ever discuss with Ms. Ash why she resigned from MCU's board?
A. Yes, I did.
Q. What did she say about that?
A. She indicated that she had received some kind of determination that indicated she could not sit on the board and be a judge, and she was going to resign.



Q. When did she tell you that?
A. This would have been in August of 2016.
Q. Where was that meeting?
A. That was at Municipal Credit Union at 22 Cortlandt Street in Manhattan.
Q. Did she explain what she meant when she said there was an adverse determination?
A. No. I don't remember her explaining that.
Q. How was Ms. Ash's demeanor when she told you this?
A. I really don't recall.
Q. You mentioned earlier that Ms. Ash was at one time the chair of the coordinating committee; is that right?
A. Yes.
Q. What is the coordinating committee in short?
A. The Municipal Credit Union had structured its board responsibilities through a committee system, where there would be committees of the board who would do certain amount of the work and then report up to the board of directors.
The coordinating committee had several responsibilities. They dealt with the board strategic planning meeting, they dealt with training of board members and supervisory committee members, it handled bylaw amendments. Various, various things of that nature.
Q. What is the role of the chair of that committee?
A. It was a chair as would you see in how most committees



would work. She would preside over the meeting, she would work with others in setting up an agenda for the meeting and made sure the meeting progressed and took care of its responsibilities.
Q. When was Ms. Ash on the coordinating committee?
A. Well, it was for a number of years. I don't recall when it started. But, her tenure on the coordinating committee would have ended when she became the chair of the board.
Q. So a number of years before she became the chair of the board in 2015?
A. Yes.
Q. Are you familiar with the term "employment contract"?
A. Yes, I am.
Q. What is an employment contract, in sum?
A. Employment contract is typically a written contract, but it is a contract that sets forth the duties and responsibilities of an employee, together with the payment, fringe benefits, and other items the employee would receive in exchange for such services.
Q. Did Kam Wong have an employment contract?
A. Yes, he did.
Q. When did he have one?
A. From what I recall, he had one the entire time he was the chief executive officer.
Q. Generally speaking, what did Mr. Wong's employment contract



concern generally? What did it cover?
A. It covered his -- broadly, very broadly would cover his job responsibilities, it would have covered his term of office, would have covered what his salary and fringe benefits would have been. Pretty much encompassing what he was required to do, and what he was going to receive in exchange.
Q. Can responsibility, if any, did the coordinating committee have for Kam Wong's contract?
A. The coordinating committee had some responsibility with regard to the employment contract. One of its main responsibilities, as I recall it, was involved with handling amendments to the contract.
Q. What responsibilities, if any, did you have concerning Mr. Wong's employment contract?
A. My main responsibilities with regard to his contract were rather limited. I would answer questions that the board may have had concerning the contract. And I also, I prepared amendments to the contract that were negotiated by the board and the former CEO.
Q. Now, you just mentioned an amendment to a contract. What is an amendment to a contract in this context?
A. The best way to put it is an amendment is a supplementary agreement that somehow adds something, changes something, or deletes something from a prior agreement.
Q. Is it an agreement?

A. Yes, it is an agreement.
Q. By whom in this context?
A. It would be an agreement between Municipal Credit Union as the employer, and in that situation Kam Wong as the employee.
Q. Are you familiar with the process for how amendments to Kam Wong's contract were made?
A. Yes, I am.
Q. Are you familiar because you participated in that process?
A. Yes, I did.
Q. So just broadly, what was the process for amendments to Kam Wong's contract being made?
A. Well, typically what would happen is that he would discuss on an informal basis the items he wanted changed in his contract. And the procedure typically used was then that once that was agreed upon, it would go to the coordinating committee for review, discussion. And if they agreed, they would pass a motion to recommend it to the board of directors.
Q. If it went to the board of directors, what would happen next?
A. The board of directors would discuss the amendments and they would recognize that it was recommended, of course, by the coordinating committee, and then the board would vote on it whether to adopt the amendment or not.
Q. If the amendment was adopted, what would happen after that?
A. At that point, I was typically asked to draft an amendment



to the contract that would reflect whatever the agreement, the new agreement was between the parties.
Q. What would be the next step after that?
A. It would be signed by the -- be signed on behalf of the institution, and Kam Wong would sign it.
Q. Who would sign it on behalf of the institution?
A. Typically it would be the chair, but not always, but typically the chair.
Q. When you referred to chair, is that the chair of the board of directors?
A. I'm sorry. Chair of the board of directors.
Q. How many amendments were there to Mr. Wong's contract?
A. There were five amendments.
Q. How many of those were in writing?
A. All five.
Q. Were any of those amendments oral?
A. No.
MR. MARK: Mr. Hamill, may we publish what's already in evidence as Government Exhibit 448 and turn to page 11. Just give a moment for it to come up.
Q. Mr. Siciliano, do you see the document in front of you now?
A. I do see the first page of it.
Q. Do you recognize what's shown on page 11?
A. Yes, this appears to be the original representation of the original contract entered into between Municipal Credit Union



and Kam Wong.
Q. What was the initial term of this contract?
A. The initial term was for five years.
Q. Was that from 2008 to 2013 as indicated in this agreement?
A. Yes, from January 1st, 2008 to December 31, 2013.
Q. You mentioned earlier this contract also mentioned terms relating to salary; is that right?
A. Yes.
Q. Through your job, were you familiar with the term "employee benefits"?
A. Yes, I am.
Q. What are employee benefits?
A. Employee benefits are certain additional items that a -- that an employee would receive in addition to his or her salary. It could be anything from vacation time to holidays off to certain types of insurances.
Q. Did Kam Wong's contract provide for any employee benefits?
A. Yes, it did.
Q. Generally, what were they?
A. He was entitled to several different types of insurances, he was entitled to participate in the credit union's bonus plan. I believe it referenced certain time off benefits that he would also have such as vacation. I believe it did.
MR. MARK: Mr. Hamill, can we just flip through this contract slowly and then stop where we get to section 5.



Q. Is section 5, Mr. Siciliano, titled "insurance"?
A. Yes, it is.
Q. Does it list various different types of insurance that are provided for under the contract?
A. It does.
Q. What is the type of insurance that's listed in section 5.2?
A. 5.2 of indicates disability insurance.
Q. In sum, what is disability insurance?
A. My understanding is disability insurance helps replace a portion of your income for the most extent if you're injured, off work, or you become ill.
Q. Was Mr. Wong ever disabled, to your knowledge?
A. Not to my knowledge.
MR. MARK: Now, returning to the contract, Mr. Hamill. Could we just blow up section 5.4.
Q. What does this section of the contract relate to?
A. This referred to a supplemental longterm disability insurance.
Q. What is supplemental longterm disability insurance?
A. My understanding of supplemental disability longterm insurance is that it would pay some additional amount over the standard disability insurance covering all or a portion of the gap between what basic disability insurance provides and what the person was earning.
Q. What role, if any, did you have in drafting this version of

Kam Wong's employment contract?
A. I was not involved in drafting of this agreement.
Q. Do you know who drafted it?
A. I was told that it was drafted by the former Municipal Credit Union CEO, but I don't know that to be a fact.
Q. When did you first see a copy of this contract?
A. I believe the first time I saw it was when Kam Wong assumed the responsibilities of CEO.
Q. Who provided it to you?
A. Kam Wong.
Q. You discussed earlier that you dealt with drafting certain amendments to Kam Wong's contract. Is that right?
A. Yes, I did.
Q. In summary, what did those amendments concern?
A. Well, they concerned a number of items. The basic one that were repeated a few times was an extension of the term of the agreement. But it did cover things like life insurance, there was a change in the life insurance clause at one point. And certain other changes, but, I think three -- I believe three of the amendments dealt at least in part with extending the term of the agreement.
Q. Approximately when was the last amendment to the contract?
A. It was approximately May 2015.
Q. Who signed that amendment?
A. That amendment would have been signed by Kam Wong and the



then-chair of the board Mark Brantley.
Q. Generally, what did that last amendment to the contract concern?
A. My recollection is that it addressed two issues. One was extending the term of the contract to I believe December 31, 2023, and it also addressed spousal -- spousal post-retirement medical benefits. Mr. Wong wanted clarification or to make sure it was in place that if he died, that the retirement that his wife would receive the same post-retirement medical insurance that was received by other MCU spouses.
Q. Did any of the five amendments to the Kam Wong's contract that you referenced relate to longterm disability insurance for Mr. Wong?
A. No, I don't believe they did.
Q. Did you ever discuss with anyone a proposed amendment to Mr. Wong's contract relating to longterm disability insurance?
A. Never, no.
Q. Did Mr. Wong ever tell you that he was going to seek cash instead of a longterm disability policy?
A. No, he didn't.
Q. Did Mr. Wong ever tell you he wanted to be paid instead of getting a longterm disability policy?
A. No, he didn't.
Q. Did you ever tell Ms. Ash that it was legal but not advisable for Kam Wong to get cash instead of MCU providing a



longterm disability policy?
A. No, I didn't.
Q. Did you ever tell Ms. Ash it was legal but not advisable for Kam Wong to get paid instead of the entity providing a longterm disability policy?
A. No, I didn't.
Q. Prior to the last amendment to Kam Wong's contract that you were just talking about, did you request any review of Mr. Wong's benefits under the contract?
A. Yes, I did.
Q. What did you request?
A. I had requested -- after meeting with Ms. Ash, we discussed and it was decided that we would ask the head of the marketing department -- I'm sorry -- the head of human resources department to review Mr. Wong's contract, review the benefits in his contract, and to ensure that the benefits that were provided for his contract were actually in place.
Q. Approximately when was that?
A. That was I believe March of 2015.
Q. Once again, who conducted that review?
A. The individual's name was Kim Thompson. She was the head of the human resources department.
Q. What were the findings of that review?
A. Ms. Thompson forwarded us a report that indicated that neither disability insurance nor a supplementary pension plan



were in place.
Q. What was Mrs. Ash's role, if any, in that review at the time?
A. Well, at that time, we were discussing her contract. Ms. Ash agreed that it would be a good idea to have the review. And a copy of the report was sent to Ms. Ash so she would have it when she proceeded with how we would take care of the issue of the open items.
Q. You said a copy of that report. Was that an e-mail?
A. That was an e-mail.
Q. An e-mail laying out what benefits Mr. Wong had and which ones he didn't have?
A. Yes. It was a chart, actually, that indicated what was in place and what wasn't in place.

MR. MARK: Mr. Hamill, if you could show for the witness only what has been marked for identification as Government Exhibit 968.

Q. Do you recognize this e-mail, Mr. Siciliano?
A. Yes, this is the final e-mail in a string of e-mails addressing this issue.

MR. MARK: The government offers Government Exhibit 968 into evidence.

MS. COHEN: No objection.

THE COURT: Received.

(Government's Exhibit 968 received in evidence)

MR. MARK: May we publish, Mr. Hamill.
Q. What is the date of the final e-mail in this chain?
A. It is dated March 16, 2015.
MR. MARK: Mr. Hamill, can we start at the back of the chain and just slowly flip through. It is an e-mail chain from back to front. We could -- you can continue. And continue. If -- sorry, Mr. Hamill. If you can stop right there on this chart.
Q. Mr. Siciliano, is this chart part of an e-mail that Ms. Thompson sent?
A. Yes, it is.
Q. Who is Kim Thompson?
A. I believe her title at the time was vice president of the human resources department.
Q. What was depicted in this chart?
A. As I indicated, on the left-hand side were a number of benefits that Kam Wong was entitled to under his contract. And then there is an indication, the chart was made, there was an indication whether that benefit was in place or not in place.
Q. It indicates certain benefits are in place and certain ones are not in place?
A. Yes.
Q. And just briefly, what were the ones that it indicated were not in place?
A. The chart indicates that longterm disability, longterm



disability, supplementary disability, and supplementary pension plan were not in place.
Q. I think the way this is printed out, it cuts off the last part of the chart. Do you know what it said at the end of that chart?
A. I don't remember the exact wording, but it was which party needed to address the issue or which party was responsible for the issue. And I believe all three items that I mentioned, it was referred throughout was the board of directors, but I don't recall exactly what the title was at the top there, but from seeing it here.
Q. We talked about longterm disability and supplementary disability already, right?
A. Yes.
Q. Just for the jury, what is a supplementary pension plan, very briefly?
A. Supplementary pension plan in this situation was also referred to as a deferred compensation plan. It was to -- all pension plans have limits on them, or certain pension plans have limits on them, depending how much money you make and a lot of circumstances. This was to supplement the normal pension plan.
MR. MARK: Mr. Hamill, if we can go forward with the string now to the first page of the e-mail chain.
Q. The bottom e-mail, is that one from you, Mr. Siciliano,



March 12, 2015?
A. Yes, that is an e-mail from me.
Q. Who is that directed to?
A. It is directed to, it says Mark and Sylvia. That would be Mark Brantley who was the chair of the board, and Sylvia Ash who at that time was the chair of the coordinating committee and the first vice chair.
Q. Generally, what did that e-mail concern?
A. What we did here is we sent to Mr. Brantley and Ms. Ash the string of e-mails that had been produced showing what benefits were in place for Mr. Wong and which ones weren't.
Q. Why did you provide this review to Mr. Brantley and Ms. Ash?
A. As I mentioned earlier, it was -- it was done after a meeting that Ms. Ash and I had because we thought it would be wise, there were a number of benefits in Mr. Wong's contract, we thought it would be wise to have a review of it to make sure that what he was entitled to, he had. And this was sent to them because they would have been the two board members that at this point were dealing with the issue.
Q. After you sent this e-mail, did you in fact get together with the defendant?
A. I don't remember if -- well, we saw each other often. But, I don't remember if we actually discussed this in person or by telephone.



Q. At that time, did you discuss with Ms. Ash that Mr. Wong didn't have longterm disability insurance?
A. Yes.
Q. Did you discuss that Mr. Wong didn't have longterm disability insurance with the board of directors as a whole?
A. I don't recall doing so.
Q. At this point in time, you said that Mr. Wong's longterm disability policy was not in place; is that right?
A. Yes, yes, that's what I was informed of.
THE COURT: In speaking in the last few questions and answers about his longterm disability policy, were you talking about the group longterm disability under which he and everybody else at MCU was covered, or were you speaking about the supplemental longterm disability referred to in clause 5.4 of the employment contract? Or something else?
THE WITNESS: Oh. The report we had said disability and supplementary disability. At this point I don't recall whether the credit union had -- but I assumed it had -- basic disability. So, I would have been working under the pretense that, yes, probably we're dealing more supplementary disability. But at this point I can't say for sure we had disability insurance. I believe it did.
THE COURT: Okay.
Q. Was the focus of your attention on supplementary disability insurance?

A. No, the focus of my attention was on the supplementary pension plan.
Q. Now, as far as you were aware in 2015, did Mr. Wong ever obtain a supplementary longterm disability insurance policy?
A. Not to my knowledge, no.
Q. After Kam Wong's last amendment to the contract was signed, did you ever meet with Kam Wong to discuss his contract in 2016?
A. Yes, I did.
Q. When was that?
A. That would have been in or about March of 2016.
Q. Who else was present for that?
A. At the meeting was Kam Wong, Sylvia Ash, and me.
Q. During this meeting in March 2016, what in sum was discussed?
A. It was discussed that, that there were three issues with regard to his contract that yet needed to be addressed that hadn't been addressed yet. One was the disability insurance issue, one was the supplementary pension issue, and we also had discussed that there were a number of clarifications or corrections that needed to be made to his agreement that had not been implemented.
Q. Did Mr. Wong respond to each of those three items that you just listed?
A. He did.



Q. How did Mr. Wong respond to each of those items, if you could go through them in order.
A. With regard to the corrections and clarifications to the contract, he said he didn't care about wording changes.
With regard to the disability insurance, he said that he didn't want disability insurance, it was too expensive.
And with regard to the supplementary pension plan, I believe he said either he needed to think about it or he wasn't ready to fund it, I believe.
Q. How did Mr. Wong appear during this meeting?
A. I thought he appeared annoyed, agitated.
Q. What about his demeanor appeared to be annoyed or agitated?
A. Just his facial expression, the tone of his voice.
Q. Had you ever experienced him being annoyed or agitated before?
A. Not with me. I always found him to be extremely professional.
Q. What did Mr. Wong say about the disability insurance policy when you discussed it?
A. If I recollect correctly, he said he did not want it, it was too expensive.
Q. Did you respond to Mr. Wong's comment that the disability insurance was too expensive?
A. I was about to respond, but Ms. Ash responded.
Q. What did Ms. Ash say?



A. She told him something to the effect of -- I think she noticed his attitude also. She said that we're not here to hurt you, we're here to resolve issues. Something along those lines.
Q. Did Mr. Wong respond to Ms. Ash's comment?
A. Not at that point as I recall.
Q. Did you make any notes of that meeting?
A. Yes, I did.
Q. Why did you do that?
A. I often make notes of meetings. This matter had been -- was dealing with the CEO contract and had been hanging around for quite a long time. And situations like that, I would often make, when I took certain things into consideration, best to keep a record of what happened along the way.
Q. While you were working at MCU, as far as you know, did Kam Wong's supplementary longterm disability policy ever get put in place?
A. Not that I know of.
Q. While you were working at MCU, as far as you knew, before the federal investigation, did Kam Wong ever get cash instead of insurance?
A. Not that I knew of.
Q. While you were working at MCU, as far as you know, did Wong ever get longterm disability insurance?
A. Not that I know of, no.



Q. Did you ever discuss with Kam Wong whether he would get cash instead of that insurance policy?
A. No, I didn't.
Q. Were you ever part of a meeting where that was discussed?
A. No, I wasn't.
MR. MARK: Nothing further, your Honor.
THE COURT: Thank you. We'll break here. 15 minutes, folks.
(Jury excused)
(Recess)
(Continued on next page)

(In open court; jury not present)

THE COURT: I was just handed a copy of Defendant's Exhibit E for identification.

Why?

MR. MARK: Because the government just received a copy of Defense Exhibit E, obviously not necessarily in the spirit of the parties' earlier agreement.

THE COURT: Let's stop throwing mud, okay?

MR. MARK: But the key point is that we understand the defense is planning to try to admit that with Mr. Siciliano. This is a Part 300 notice that relates to Mr. Siciliano. It's not a document that he is on, it's not a document that he was sent, it's not a document that he received, and I do not see that there's any admissible basis or reason that they should be attempting to introduce this document through Mr. Siciliano.

THE COURT: Okay.

What's the counterargument?

MS. COHEN: Your Honor, two things:

One is, first, the items set forth on page 2 of proposed Defense Exhibit E relate to Mr. Siciliano's job performance, which is, of course, directly at issue based on his direct testimony about what he did or didn't do with respect to Mr. Wong's contract.

THE COURT: I don't know how that follows, but let's go on.



MS. COHEN: So it is relevant and admissible to -- first, I was -- withdrawn, your Honor. I was going to say I wanted to ask Mr. Siciliano questions about the reasons why he was terminated, the circumstances of that termination, which was brought out on direct that he was fired, but not the reasons why, but that's fertile ground. I wasn't necessarily going to introduce this exhibit unless --

THE COURT: You're speaking so fast, I'm not getting much of it.

MS. COHEN: I wasn't necessarily going to introduce Defense Exhibit E unless Mr. Siciliano does not recall the reasons why he was fired.

In addition, the reasons why he was fired --

THE COURT: Let's start with basics, right?

MS. COHEN: Sure.

THE COURT: He hasn't said he was fired. That's the first problem. He said his position was eliminated.

MS. COHEN: I don't believe that was the testimony. I believe he said he was terminated.

THE COURT: I don't like to have to do this, but --

MS. COHEN: Our realtime wasn't working, so I can't scroll back.

THE COURT: He may have said his position was terminated, which is, in either case, a different matter.

MS. COHEN: Either way, your Honor, he said -- if he



said his position was eliminated, we would be entitled to ask him questions because that's not, in fact, what happened. So, either way.

MR. MARK: And, your Honor --

THE COURT: Just a minute, please.

MR. MARK: Oh, sure.

MS. COHEN: Your Honor, I found the cite. He did say "My position was terminated" at line 13:40:43. Our realtime is not working.

THE COURT: Line 13: what?

MS. COHEN: 40:43, at the beginning.

THE COURT: Well, none of those numbers seem to mean much.

MS. COHEN: Yes, I can't tell -- because our realtime isn't working right, so I can't tell.

What I'm reading is:

"Q. What happened in January 2019?

"A. My position was terminated."

And there's no follow-up question regarding that question.

THE COURT: Well, you're certainly entitled to ask him about the circumstances in which his employment ended. I think that's fair. I don't know that it goes any farther than that, but I'm not ruling on that now.

What else?



MS. COHEN: Your Honor, depending on his answers to those questions, I would first try to refresh his recollection by showing him what's been marked --

THE COURT: Which you can do if, and only if, he says he doesn't remember.

MS. COHEN: Correct, your Honor.

And that may or may not refresh his recollection. If, for some reason, it does not refresh his recollection, we would seek to move it. It is relevant to his credibility, it is relevant to his bias, and --

THE COURT: It's total hearsay, every word of it, right?

MS. COHEN: Your Honor, it's a business record of the MCU produced to us in discovery, so it's not hearsay.

THE COURT: I haven't heard that foundation.

MS. COHEN: Your Honor, we had an agreement with the government that any document from the MCU, they would not contest authenticity or that it was a true and accurate business record. This is a document produced by the government to us in discovery. And you can tell that it's also marked as Mr. Siciliano's 3500.

THE COURT: Mr. Mark?

MR. MARK: That is not an accurate description of the agreement that we had with the defendant. More importantly, regardless of the fact that this is a document, obviously, that

MCU created, it's absolute hearsay, which is readily apparent from reading the document.

Moreover, I think what Ms. Cohen attempts to do through this document, and in general, raises significant issues because it seems to be that she is not seeking merely to impeach Mr. Siciliano, but to impeach him not with legitimate grounds, but just whether he was a good or bad employee and what his job performance is, which I think is beyond the scope and not sort of fertile grounds of impeachment. So we'll be objecting, your Honor, to the extent --

THE COURT: Well, I imagine you will, and I will deal with it when as and if it comes.

Okay. Let's bring in the jury.

Just out of curiosity, did the government stipulate anything that came out of MCU's files meets the business records requirement?

MR. MARK: We did not. That's not in the stipulation either that's entered into evidence. And, in fact, the defense would not stipulate to many categories of MCU documents that we received, in particular, all of the emails that we received from MCU.

THE COURT: Okay, Andy.

(Continued on next page)



(Jury present)

THE COURT: Okay. The jurors and the defendant all are present, as they have been throughout.

Bring in the witness.

Okay. Cross-examination.

MS. COHEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MS. COHEN:

Q. Mr. Siciliano, you met with the government about six times to prepare your testimony today, right?
A. About, yes, I'd say approximately.
Q. And you met with the government on September 15, 2019; is that right?
A. I don't recall the date. I met with them once in 2019.
Q. And then you met with them about five times in preparation for your testimony today in about the month leading up to this trial, right?
A. Yes, approximately five times.
Q. The government told you the questions they would ask you, and you told them the answers you would give to those questions, right?
A. We went over the questions that I would be asked on direct.
Q. And you went over the answers you would give on direct, correct?
A. Well, I gave the answers that I felt were appropriate to



the questions I was asked.
Q. So the government told you the questions they would ask you, and then you answered those questions in those meetings with the government, right?
A. Yes.
Q. You never met with me or anyone on Ms. Ash's defense team in preparation for your testimony, right?
A. No, I didn't.
Q. You never spoke to, in fact, me or anyone on Ms. Ash's defense team at all, right?
A. No.
Q. And you recall --

THE COURT: No, it's not right because you did meet with them, or, no, you didn't meet with them?

THE WITNESS: No, I did not meet with anyone on the defense team.

BY MS. COHEN:
Q. And isn't it correct that the defense team called you and you refused to talk to us?
A. The defense did call me, and I did not speak to the defense team.
Q. And isn't it correct you told the government that the defense team tried to talk to you?
A. Yes, I did.
Q. And, Mr. Siciliano, you were fired from the MCU in



January 2019, right?
A. Yes.
Q. And isn't it true you were fired from the MCU in January 2019 due to your poor job performance and misconduct?
A. No, I don't believe that's true.
Q. Are you aware that one of the reasons you were fired from your job at the MCU was related to a Mercedes that the MCU purchased for you?
A. No, that's not true, and I was not fired for that reason.

MS. COHEN: Your Honor, if I could perhaps refresh the defendant's -- Mr. Siciliano's — my apologies — memory with what's been marked for identification --

THE COURT: Sustained. No reference to any documents not in evidence. You can't refresh his recollection with anything. He has no failure of recollection.

BY MS. COHEN:
Q. Mr. Siciliano, you recall that when you worked at the MCU, Mr. Wong gave you an E400 Mercedes, right?
A. The trade union provided me with an E400 Mercedes-Benz.
Q. And the E400 series of Mercedes is a large luxury sedan, right?

MR. MARK: Objection.

A. Mid --

THE COURT: What's the objection?

MR. MARK: Relevance.

THE COURT: Sustained.
BY MS. COHEN:
Q. You said that the MCU bought you the Mercedes, meaning the MCU paid for it, right?
A. Yes.
Q. And Mr. Wong was responsible for buying that Mercedes for you, right?
A. Mr. Wong authorized it.
Q. And you didn't pay any tax on the value of that Mercedes, right?
MR. MARK: Objection.
THE COURT: Sustained.
Q. Isn't it true Mr. Wong told you -- no, withdrawn.
That Mercedes that the MCU bought for you was an early retirement gift, right?
MR. MARK: Objection.
THE COURT: Sustained.
Q. Are you aware that the MCU reported that Mercedes to the MCU's regulators at the Department of Financial Services?
A. No, I'm not.
MR. MARK: Objection.
THE COURT: Sustained.
I want to caution the jury to remember that the lawyers' questions are not evidence.



BY MS. COHEN:
Q. When you were fired from the MCU, are you aware that there was outside counsel working for the MCU investigating various conduct of MCU past and present employees?
A. Yes.
Q. Are you aware that the MCU outside counsel found that you had failed to provide legal advice, in dereliction of your duties, related to Mr. Wong's contract?
MR. MARK: Objection.
THE COURT: Sustained.
If you continue doing this, Ms. Cohen, I'm going to terminate your cross.
MS. COHEN: Understood, your Honor.
Now, if I could just have a sidebar on that, so I fully understand --
THE COURT: No, you understand. You certainly understand.
MS. COHEN: Okay, your Honor.
BY MS. COHEN:
Q. While you were general counsel --
MS. COHEN: Actually, can I have a sidebar about another line of questioning, so I don't go outside a different -- a different line of questioning?
THE COURT: Let's move along.
Q. While you were general counsel at the MCU, you engaged in



outside legal activities, right?
A. Yes, I did.
Q. And those outside legal activities included providing legal services to employees at the MCU, right?
MR. MARK: Objection.
THE COURT: Sustained.
THE WITNESS: No --
THE COURT: When I sustain an objection, you don't answer.
BY MS. COHEN:
Q. You never did any work for Ms. Ash, paid or unpaid, right?
A. No, I did not.
Q. And you were aware, when you were fired from the MCU, that your provision of legal services to employees of the MCU was one of the reasons you were fired?
MR. MARK: Objection.
THE COURT: Sustained.
You're right at the line, Ms. Cohen. You're about to be terminated from the cross.
MS. COHEN: I'll move to a different subject, your Honor.
BY MS. COHEN:
Q. Mr. Siciliano, you testified on direct about discussions related to Mr. Wong's contract and benefits that he was entitled to under the contract, but didn't have.



Do you recall that?
A. Yes.
Q. And two of the benefits that Mr. Wong was entitled to under his contract, but that he didn't have, were long-term disability and supplemental long-term disability.
You recall that testimony?
A. Yes.
Q. By saying that Mr. Wong was entitled to receive those benefits, but he didn't have it, it means that Mr. Wong's contract provided he could get those benefits, but, as of 2015, he did not have them in place; is that right?
A. That's what the report that we received said.
MS. COHEN: If we could pull up that report, Government Exhibit 968, please — thank you, Ms. Stephenson — and this is in evidence.
Q. You recall looking at Government Exhibit 968 on direct, correct, Mr. Siciliano?
A. I do.
Q. And this is the email exchange between yourself, Ms. Ash, the former chair of the board, Mark Brantley, and Kim Thompson, who you said was in human resources, right?
A. Yes.
Q. It's with respect to Mr. Wong's contract and different benefits that he was entitled to, but didn't have in place, right?

A. That's right.
MS. COHEN: You can turn to page 5, please, Ms. Stephenson.
If you can scroll down a little bit.
BY MS. COHEN:
Q. The message on the bottom of page 5 of Government Exhibit 968 is a message from Kam Wong to Kim Thompson on March 10, 2015.
Do you see that?
A. Yes.
MS. COHEN: If we can just highlight that, if that's possible, and box it. Thank you.
Q. In this email, Mr. Wong is informing Kim Thompson that he does not have long-term disability, right?
A. That's right.
THE COURT: Can we scroll to the next page, please.
A little lower.
Q. The next page of Government Exhibit 968 is that chart you testified about on direct, right?
A. Yes.
Q. And that's a chart that shows that Mr. Wong was entitled to long-term disability and supplemental long-term disability, but they were not yet in place, right?
A. Yes.
Q. And you testified on direct about a conversation about



Mr. Wong's benefits that were not yet in place with Ms. Ash and Mr. Wong, right?
A. I'm sorry, could you repeat that?
Q. Sure.
You testified on direct about a conversation you had with Ms. Ash and Mr. Wong about benefits that were not -- that he was entitled to under the contract, but that were not yet in place.
Do you recall that?
A. Yes.
MS. COHEN: If I can pull up, please, what is marked for identification as Government Exhibit 970 for the witness and government only, please.
Q. Mr. Siciliano, do you recognize what's been marked as Government Exhibit 970 for identification?
A. Yes, I do.
Q. Is it an email that you sent to Mark Brantley and Sylvia Ash on or about March 6, 2015?
A. Yes, it is.
Q. Looking at it, does it appear to be a true and accurate copy of the email as you sent it when you were at the MCU?
A. Well, I can only see the first page. If it can be rolled down?
Q. Sure.
A. I believe that is true and accurate, yes.



MS. COHEN: Your Honor, the defense moves Government Exhibit 970 into evidence.
MR. MARK: Objection.
THE COURT: Grounds?
MR. MARK: Relevance, hearsay.
THE COURT: Let's look at it more closely.
All right, sidebar. I want to know about the relevance for this.
(Continued on next page)



(At the sidebar)
THE COURT: So why is this relevant?
MS. COHEN: Your Honor, he testified about this -- Mr. Wong's employment contract, about the discussions he had with Sylvia Ash, discussions with Mark Brantley about the extensions of the employment contract. This is part and parcel of the same conversation; it's an email he sent. I don't think it's hearsay; it's a business record of the MCU. I don't think -- it was produced to us in discovery by the government from the MCU, and it's completely relevant. He spent most of his direct testimony talking about discussions regarding Mr. Wong's contract.
THE COURT: Now, apart from your position that it's completely relevant, is there anything else you want to say as to what about it is relevant?
MS. COHEN: Sure.
It is relevant that Kim Thompson, who he talked about on direct, is in the process of finalizing her review of the benefits in the employment contract --
THE COURT: And that's relevant why?
MS. COHEN: -- against that which has been put in place for the CEO. Because it is relevant that --
THE COURT: The question isn't that it's sort of generally on subjects we've already discussed, the question is, what fact in issue does the existence of this document make

more or less likely?

MS. COHEN: They put testimony in on direct that Mr. Siciliano, and I don't know the exact words he used, but did not recall talking about the benefits that were not put in place with Ms. Ash, that he didn't say certain things, and it is relevant to show, your Honor, that, in fact, there were discussions with Mr. Siciliano and Ms. Ash and others about the CEO's contract in 2015 related to the long-term disability, which is, of course, the issue that appears in the memo.

THE COURT: Am I mistaken, or did we hear about 20 minutes of testimony from him on direct about those precise subjects? Which is entirely consistent with this.

MS. COHEN: So this is --

THE COURT: So you're impeaching him with a prior consistent statement.

MS. COHEN: I'm not impeaching him at all.

THE COURT: What are you doing?

MS. COHEN: I'm giving additional information related to the direct testimony that they did not introduce on the exact subject matter.

MR. MARK: The additional testimony she seems to want is hearsay. Just because it's an email doesn't mean it's a business record, your Honor.

THE COURT: I don't see it, Ms. Cohen. I just don't.

MS. COHEN: I will save time because I don't think my



further argument will prevail, but I don't see how it is -- (a) it is a business record, it's an email produced from the MCU from their servers that they kept in the ordinary course of business. We heard all about that on direct, about the MCU emails, and I don't think you need me to call an MCU person back to authenticate this as a business record.

So leaving that aside, there were a lot of questions on direct about conversations about Mr. Wong's contract and benefits that weren't in place, and this is further discussion of it.

THE COURT: And, therefore, what?

MS. COHEN: Therefore, it is relevant because I expect the government to argue, which they already have, that the memo Ms. Ash signed --

THE COURT: I can't hear you.

MS. COHEN: The memo Ms. Ash signed in 2018 is false, and the fact that there were discussions, which she told the government about in 2015, related to this exact topic of his long-term disability makes it less likely that when she signed that --

THE COURT: Didn't he testify on direct that he had a conversation with her about precisely that?

MS. COHEN: He did. And I am entitled to also show that he had emails with her about precisely that.

MR. MARK: I don't see how this goes to a relevant



fact in evidence. There has already been emails that came in that were admissible, and what she seeks to do is put this email into evidence for the hearsay statements in it.

THE COURT: What hearsay statements are you talking about?

MR. MARK: Well, I think almost all of it. I don't have a copy of the document, your Honor.

MS. COHEN: I'll share mine.

MR. MARK: So I assume that most of this email is simply recounting prior conversations and prior actions, all of which are not inconsistent with what he had testified about before.

Thank you, Ms. Cohen.

THE COURT: I'm going to allow it, not because I think I'm persuaded, but because we've already spent more time arguing about it than it's worth, but we're not going too far with it.

MS. COHEN: I wasn't intending to, your Honor. Thank you.

(Continued on next page)



(In open court)

MR. MARK: Your Honor.

THE COURT: Government Exhibit 970 is received.

(Government's Exhibit 970 received in evidence)

MS. COHEN: Ms. Stephenson, if you could please publish Government Exhibit 970.

BY MS. COHEN:

Q. Mr. Siciliano, looking at Government Exhibit 970, what is it?

A. It's an email from me to Mark Brantley and Sylvia Ash.

Q. Who was Mr. Brantley again?

A. He was the former chair of the board. He was the chair of the board at that point.

Q. What's being discussed in Government Exhibit 970?

A. I am sending to Ms. Ash and Mr. Brantley a first draft of the fifth amendment to Kam Wong's employment contract.

Q. And that's -- the fifth amendment to Mr. Wong's employment contract is an amendment that you drafted, right?

A. Yes, it is.

Q. And that's the amendment that would be an amendment to the contract that ultimately got voted on to be in effect through December 2023, I believe, you testified?

A. Yeah. One of the items it would have done is make an extension of the contract till that date.

Q. If you look at the fourth paragraph — it's three lines —

can you tell us what is being discussed there?
A. Is that the paragraph that starts furthermore?
Q. Correct.
A. This is the -- one second, I'm sorry.
MS. COHEN: Can you highlight that or box it, Ms. Stephenson.
Thank you.
THE WITNESS: This is the paragraph that's referring to what we discussed earlier on direct, that Kim Thompson was doing a review of the benefits of Kam Wong that are in place as compared to what was in the contract.
Q. Thank you.
You don't know, sitting here today --
MS. COHEN: Withdrawn, your Honor.
Q. After March of 2015, I believe you testified on direct, but please correct me if I am wrong, that the issue of Mr. Wong's long-term disability and supplemental long-term disability, you don't recall it coming up again; is that right?
A. I don't recall it was.
MS. COHEN: A moment to confer, your Honor?
THE COURT: Yes.
MS. COHEN: Thank you.
(Pause)
MS. COHEN: No further questions, your Honor.
THE COURT: Thank you.



Any redirect?
MR. MARK: Briefly, your Honor.
Mr. Hamill, could we start where we left off, with Government Exhibit 970. And can we publish that to the jury, too.
Thank you.
REDIRECT EXAMINATION
BY MR. MARK:
Q. Mr. Siciliano, Ms. Cohen drew your attention to certain portions of this email; is that right, on cross-examination?
A. Yes, she did.
Q. I just want to be clear. This amendment, did this relate to the proposed fifth amendment to the contract?
A. This document refers to the fifth amendment of the contract, yes.
Q. And was there any discussion in the proposed fifth amendment of the contract regarding long-term disability insurance?
A. No. With regard to the fifth amendment? No, there was no discussion in the fifth amendment with regard to disability insurance. The disability insurance issue came up as a result of a review of the existing contract.
Q. And that review indicated that Mr. Wong did not have disability insurance in place; is that right?
A. That's correct.



Q. Was there any discussion that -- was there ever any discussion with Mr. Wong, Ms. Ash, or anyone else about Kam Wong taking cash instead of a long-term disability insurance?
A. I'm not aware of any.
Q. And there's nothing in this email about that, is there?
A. Oh, no.
MR. MARK: One second, your Honor?
(Pause)
MR. MARK: Nothing further, your Honor.
THE COURT: All right. Thank you.
Anything else?
MS. COHEN: No, your Honor.
THE COURT: All right. You are excused, Mr. Siciliano. Thank you.
(Witness excused)
THE COURT: Next witness.
MS. KATZ: The government calls Seeta Seepersaud.
SEETA SEEPERSAUD,
called as a witness by the Government,
having been duly sworn, testified as follows:
THE WITNESS: My name is Seeta Seepersaud. First name S-e-e-t-a, last name S-e-e-p-e-r-s-a-u-d.
THE COURT: You may proceed, Ms. Katz.
MS. KATZ: Thank you.



DIRECT EXAMINATION
BY MS. KATZ:
Q. Good afternoon.
Can you please tell the jury, are you currently employed?
A. Yes.
Q. Where do you work?
A. Municipal Credit Union, known as MCU.
Q. How long have you worked for MCU?
A. Over 20 years.
Q. What department are you assigned to?
A. Accounting.
Q. Have you always been assigned to the accounting department?
A. Yes.
Q. What was your first position in the accounting department?
A. I started off as an accounts payable clerk.
Q. Can you tell the jury what some of your responsibilities were as an accounts payable clerk?
A. My responsibilities and duties were making sure all the company bills and expenses were paid and they were paid on time.
Q. And did your responsibilities also include handling employee expense reports for reimbursements?
A. Yes.
Q. Can you tell the jury what the expense reimbursement

process was for MCU employees?
A. When employees paid out-of-pocket money for company expenditure, they usually complete an expense report, signed and approved by the manager, provide supporting documents, meaning receipts, to support the expense they are claiming.
Q. As accounts payable clerk, were those records submitted to you for processing?
A. Yes.
Q. Did there come a time when you were promoted?
A. Yes, I was.
Q. When was that?
A. The end of 2012.
Q. What were you promoted to?
A. Accounts payable supervisor.
Q. As a supervisor, did you also start handling expense reimbursements for members of the MCU board?
A. Yes.
Q. Was there any difference between how those expense reimbursements were handled versus MCU employees?
A. With the board members, it was a little different because, in most cases, I would receive the reimbursement expense report without receipts attached or anyone's approval at the time the payment was being processed.
Q. What happened when you received the paperwork like that?
A. I usually gave it to my direct report for her approval



before I processed the payments.
Q. Is there any significance to a $50 cap in terms of expense reimbursements?
A. There was expense that I process for some expenses for $50. I should say what they were?
Q. I'll help you out with another question.
If a board member submitted an expense for $50, were they required to submit backup documentation or receipts for that?
A. It was told to me they were -- they were no receipts, it's okay to process without those receipts.
Q. As long as it's $50?
A. Yes.
Q. Who told you that?
A. My direct report, which is -- was Linda Lambert.
Q. Now I'm going to ask you about Exhibit No. 463 and 463A through N.
Can you tell the jury, does the MCU accounting department maintain what is called a general ledger?
A. Yes, we do.
Q. Can you tell the jury what kind of records are saved in the general ledger?
A. It's the expense information, including all the backups and receipts.
Q. By "expense information," do you mean the expense



reimbursement requests?
A. Correct.
Q. And by backup documentation, do you mean receipts that were submitted with it?
A. Correct.
Q. I'm showing you -- this has already been admitted into evidence as No. 463.
MS. KATZ: Mr. Hamill, could you show the jury what has also been admitted into evidence as 463A.
Q. Ms. Seepersaud, you had the chance to review 463A earlier?
A. Yes.
Q. Can you tell the jury what 463A is?
A. It's the expense -- the payment history for Sylvia Ash.
Q. When you say "payment history," what do you mean?
A. All payments processed for a period of time.
Q. By "payments," do you mean expenses she was reimbursed for?
A. Yes.
Q. Directing your attention to the top right-hand corner of the page, can you tell the jury what the starting date is for this document?
A. January 31st, 2015.
MS. KATZ: Mr. Hamill, if you could go to the last page of this document. I think it's page 4.
Q. Looking at the bottom right-hand corner of the page, what is the last date on this document?



A. October 29, 2016.
Q. Do you see, on the column to the left of that, it says "Report Total"?
A. Yes.
Q. What is the dollar amount next to "Report Total"?
A. $56,648.63.
Q. What does that number represent?
A. The amount paid to Sylvia Ash from January 2015 through October 2016.
Q. Was that paid to Ms. Ash by MCU?
A. Yes.
Q. Do you know who Sylvia Ash is?
A. Personally, no.
Q. How do you know of her?
A. She was on MCU board, board member.
Q. How did you communicate or interact with her?
A. Through email or phone calls, and sometimes she usually sent her expenses via fax.
Q. Did she submit her expense reports directly to you?
A. Not all of them. Sometimes they go to Linda Lambert or it would go to Monique Smith. It depends.
Q. Eventually were you the one who processed them?
A. Yes.
MS. KATZ: Mr. Hamill, I'm just going to ask you to go now to Exhibit No. 463N. N as in Nancy.

Q. Can you see 463N on your screen?
A. Yes.
Q. Is this an invoice voucher report for Sylvia Ash for August 31st, 2016?
A. Correct.
Q. Looking at that report, can you tell the jury how much Ms. Ash was reimbursed for?
A. $2,736.40.
Q. To your knowledge, was Ms. Ash still chair of the board on August 31st, 2016?
A. I would believe so because I don't know when she stepped down as being board, but the expense was reimbursed to her.
MS. KATZ: Mr. Hamill, going to the second page. If you could just make it a little bigger so the witness can see.
Q. Looking at the left-hand side under "Description," can you read what the description is?
A. It's airfare for self and guest for 2016 strategic planning in Las Vegas.
Q. Looking at the middle of this document, do you see a handwritten notation going across it?
A. Yes.
Q. What does that handwritten notation say?
A. "Approved by the board - 8/25th board meeting."
Q. Do you recognize anyone's signatures on this page?
A. Yes.



Q. Can you point out to the jury where and whose signatures you recognize?
A. On the right-hand top signature is Kam Wong, below that is Linda Lambert, and to the left, James Durrah approved.
Q. What is the date next to that?
A. James Durrah approved this payment October 11, 2016.
Q. Do you see a stamp that says "Researched" on this?
A. Yes.
Q. Who put that stamp there?
A. That's my accounts payable stamp. Once I research and confirm this payment was not paid before, I stamped it researched, okay to pay, dated, who the payee is. We call it vendor ID. In this case, it's Sylvia Ash.
Q. What is the significance of the research stamp? What does it mean you've done?
A. My duties were including of making sure we're not duplicating payments.
MS. KATZ: Mr. Hamill, if you could turn to page 5 of this exhibit. And, Mr. Hamill, if you could just blow up so the witness can read the passenger name section on the right-hand side.
Q. Was this document part of the backup documentation you received for this expense report?
A. Yes.
Q. And what is the passenger name on this plane ticket?



A. Julia Lystra Collis.
Q. Is that person, to your knowledge, a member of MCU -- I'm sorry, an MCU employee?
A. No.
Q. Is that person, to your knowledge, on the MCU board?
A. No.
MS. KATZ: Mr. Hamill, could you turn to page 8. If you don't mind just making it a little bit bigger.
Q. Was this document also submitted to you as part of the backup documentation for this expense report?
A. Yes.
Q. Can you read to the jury, where it says "Vendor," what is the vendor?
A. Britney Spears, Piece of Me, at Planet Hollywood.
Q. What is the total charge at the bottom?
A. $522.78.
Q. Was Ms. Ash reimbursed by MCU for this ticket?
A. Yes.
MS. KATZ: Mr. Hamill, can you please go to Exhibit No. 463E.
Q. Looking at 463E, is this an invoice voucher report for February 28, 2015?
A. Yes.
Q. And looking at the total amount on this report, how much was Ms. Ash reimbursed for?



A. $4,756.28.
MS. KATZ: Mr. Hamill, can you turn to page 5.
Q. Was this part of the backup documentation you received with this expense report?
A. Yes.
Q. Just directing your attention to where it says "Event and Location" at the bottom of the page, can you read that to the jury?
A. "CCCU and CUES International Convention - 2015."
And below that, it says, "Moon Palace & Spa Resort, Cancun, Mexico."
MS. KATZ: Mr. Hamill, could you turn to page 8.
Q. Directing your attention to the bottom left-hand corner of the page, was this also a document you received as part of Ms. Ash's expense report?
A. Yes.
Q. Looking at the traveler name on this ticket at the bottom left-hand corner, what name is that?
A. Quaseem Ashton Jafar.
Q. To your knowledge, is that person an MCU employee?
A. No.
Q. Is that person on the board of MCU?
A. No.
MS. KATZ: Mr. Hamill, please turn to 463H.
Q. Is 463H an invoice voucher report for Ms. Ash for April 30,

2015?
A. Yes.
Q. Based on this report, how much was she reimbursed?
A. $12,527.52.
MS. KATZ: Mr. Hamill, if you could turn to page 2 and enlarge what is the description of what this invoice is for.
Q. Ms. Seepersaud, can you please read what the description is?
A. "CU conference - Greek Isle cruise conference - July 31st, 2015."
MS. KATZ: Mr. Hamill, now go to 463M. M as in Mary, not N.
Q. Is this an invoice voucher report for July 21st, 2016?
A. Yes.
Q. Based on this report, how much was Ms. Ash reimbursed for?
A. $1,793.50.
MS. KATZ: Mr. Hamill, will you turn to page 2. And if you could just make that screen a little bigger so we could see it.
Q. Is this the expense report with itemized expenses?
A. Yes.
Q. And directing your attention about five lines down, do you see an entry that says "Titanic Tour"?
A. Yes.
Q. Underneath that, what is the entry?



A. "Game of Thrones Tour."
Q. Two more down, what is the entry?
A. "Belfast Bicycle Tour."
Q. Was Ms. Ash reimbursed by MCU for all of those expenses?
A. Yes.
MS. KATZ: Mr. Hamill, now go to Exhibit No. 463F. If you don't mind making that a little bit bigger.
Q. Is this an expense report for Sylvia Ash for April 1st, 2015?
A. Yes.
Q. How many $50 items are itemized on this list?
A. Seven.
Q. Just remind the jury, did you get any backup documentation for 50-dollar items?
A. Yes.
Q. Excluding the one that says internet at the top, what are the descriptions given for the six 50-dollar items?
A. The meeting that Sylvia Ash attended, and it was known to me they're expenses for transportation.
Q. Did you get any transportation invoices for that?
A. No.
MS. KATZ: Mr. Hamill, could you go to 463G.
Q. Is this also an expense report for Sylvia Ash for April 30, 2016?
A. Yes.



Q. How many 50-dollar items do you see on this?
A. Seven.
Q. Was Ms. Ash reimbursed for all those 50-dollar expenses?
A. Yes.
Q. Were these all categorized as travel for meetings as well?
A. Yes.
Q. Did you get any backup documentation for those 50-dollar travel expenses?
A. No.
MS. KATZ: Mr. Hamill, can you now go to Exhibit No. 463J.
Q. Now, is this an expense report for Sylvia Ash? And directing your attention to the upper right-hand corner, to the dates, it says from January 1st, 2015, through July 30, 2015.
A. Yes.
Q. Can you tell the jury, what are the descriptions for all seven entries on this expense report?
A. Cable Internet reimbursement.
Q. What was the total that she was reimbursed for that expense report?
A. It was $205.16 monthly, which totaled, for seven months, $1,436.12.
Q. Were there backup records attached to this?
A. The cable bill was attached.
MS. KATZ: So, Mr. Hamill, if could you just flip



through — I believe there's about four more pages after this — to show to the jury.
Q. What was the provider on this bill?
A. I didn't get you.
Q. I'm sorry.
What was the provider on this bill?
A. Optimum.
MS. KATZ: Mr. Hamill, if you could just scroll down a little.
Q. What was the name on this bill?
A. Ms. Sylvia Ash.
Q. Is that address on the bill the MCU address?
A. No.
Q. Did you review, prior to coming here today, expense reports contained in Exhibit No. 463 for February 15, March 15, April 15, May 15, June 15, and July 15?
A. Yes.
Q. Was internet an expense listed in all of those expense reports?
A. Yes.
Q. Was Ms. Ash reimbursed back on those dates for internet expenses?
A. Yes.
Q. What were the reimbursement amounts for all of those internet expenses?

A. Before this payment, they were $50 monthly.
Q. And did Ms. Ash continue to submit reimbursements monthly for Cablevision internet service during her tenure at MCU?
A. Yes.
MS. KATZ: Mr. Hamill, please go to Exhibit No. 463B.
Q. Is this an expense report for Ms. Ash for January 31st, 2015?
A. Yes.
Q. Looking at this report, how much was she reimbursed?
A. $153.05.
MS. KATZ: Mr. Hamill, can you turn to page 3, please.
Q. Just making page 3 a little bit bigger, do you see an entry for cell phone?
A. Yes.
Q. What was the amount reimbursed for cell phone?
A. $153.05.
Q. Did you get backup documentation for this cell phone expense?
A. Cell phone bill.
MS. KATZ: Mr. Hamill, if you could turn to page 4, I believe, or the next page, yes.
Q. Was this the cell phone bill that you received?
A. Yes.
MS. KATZ: Mr. Hamill, if you could just make it a little bit bigger so we can see who it says the service is for



at the top of the page. Okay.
Q. Do you see Sylvia Ash's name there?
A. Yes.
Q. Is that address an MCU address underneath it?
A. No.
Q. Does this bill show you if there were multiple phone lines associated with this T-Mobile account?
A. No.
Q. Was this the only page you got?
A. Yes.
Q. Did you also, in your role, handle billing for MCU wireless-issued cell phones?
A. Yes.
Q. What was that?
A. All MCU telecom bills, including employees' cell phones.
Q. And based on your review of the billing, did Ms. Ash, in fact, receive an MCU-issued cell phone?
A. From my recollection, Ms. Ash has two phones assigned to her.
Q. Were those paid for by MCU?
A. Yes.
Q. In addition to this T-Mobile bill?
A. Yes.
MS. KATZ: Mr. Hamill, can you show the witness Exhibit No. 434 only, not to the jury yet.



Q. Do you have an MCU-issued email address?
A. Yes.
Q. What is that email address?
A. Sseepersaud@NYMCU.gov.
Q. Take a look at what you can see is Exhibit No. 434.
Do you see your email address on there?
A. Yes.
Q. Is No. 434 a fair and accurate copy of an email you received from sylviaash@aol.com on Dec. 1st, 2015?
A. Yes.
MS. KATZ: The government offers 434, your Honor.
MR. REILLY: Objection, your Honor.
THE COURT: Yes?
MR. REILLY: Not with respect to the authenticity, your Honor --
THE COURT: I'm sorry, I can't --
MR. REILLY: I apologize, your Honor.
The objection is with respect to the relevance of this document.
MS. KATZ: Your Honor, if you're reviewing it, it is a three-page document.
THE COURT: Okay. Let me get the whole thing. Well, is the position that this was reimbursed?
MS. KATZ: Yes, your Honor.
MR. REILLY: Withdrawn, your Honor.



THE COURT: Okay.
434 is received.
(Government's Exhibit 434 received in evidence)
MS. KATZ: Can we display 434 to the jury?
THE COURT: You may.
BY MS. KATZ:
Q. Looking at the top of 434, what is the subject line?
A. "Kam's Expenses."
Q. Was there an attachment to this email?
A. Based on this email, yes.
MS. KATZ: Mr. Hamill, could you go to the next page, please.
Q. Do you recognize this document?
A. It's a fax from Sylvia Ash.
Q. Directing your attention to the middle of the page, where it says "Re: Reason," what was the reason?
A. "Approved monthly expenses."
MS. KATZ: Mr. Hamill, if could you turn to the next page.
Q. Was this the second page of the attachment?
A. Yes.
Q. Directing your attention to the top of the page, who does it say prepared for?
A. This says "Kam Wong corporate credit card, American Express."

Q. Did Mr. Wong have any other corporate credit cards besides American Express?
A. He had an MCU Visa card.
Q. Why was Ms. Ash sending you Mr. Wong's American Express statement?
A. They were sent to her for her approval, review and approve.
Q. When Ms. Ash was chair of the board, did she regularly send you Mr. Wong's credit card statements for approval?
A. Yes.
Q. To your knowledge, was that one of her responsibilities?
A. Yes.
MS. KATZ: Mr. Hamill, if you could zoom out to show the whole statement again.
Q. Just directing your attention to the line where it says "Apple," do you see that, about four up from the bottom?
A. Yes.
Q. Can you just tell the jury, across from where it says "Apple," what was the amount?
A. $2,175.27.
MS. KATZ: Mr. Hamill, if you don't mind zooming out again.
Q. Looking at the total amount payment received in the right-hand corner, the first line under "Activity"?
A. The total of this bill?
Q. Yes.



A. 16,000 --
THE WITNESS: Can you make it a little bigger? No, the top where it says "Balance Due." Yes.
$16,557.65.
BY MS. KATZ:
Q. Based on your experience in handling these monthly bills, was this an average amount of Mr. Wong's American Express credit card statements?
A. Sometimes it could be higher.
Q. Sometimes it would be higher?
A. Yes.
Q. As chair of the board, was there anyone who had to approve Ms. Ash's MCU credit card reports -- credit card payments, expenses? Excuse me.
A. Board chair expenses was approved by Kam Wong and board treasurer.
Q. To your knowledge, when Ms. Ash was board, did Kam Wong ever deny any of her expenses?
A. No.
Q. And, to your knowledge, when Ms. Ash was chair of the board, did she ever deny any of Mr. Wong's expenses?
A. No.
MS. KATZ: Just a moment to confer, your Honor?
(Pause)
MS. KATZ: Mr. Hamill, will you please display what is



already admitted into evidence as Government Exhibit 441.
Q. Directing your attention to the middle of the page, where there is an email that is sent from the Honorable Sylvia Ash, it begins, "Regrettably," Ms. Seepersaud, what is the date on that email?
A. August 15, 2016.
Q. Can you read what the paragraph says, the body of the email?
A. "Regrettably, I must inform you that, for personal reasons, I have tendered my resignation as director and board chair of MCU effective immediately. I have discussed the food order for my birthday celebration at MCU Park on April 24th with Kam, and he has authorized the continuation of same. Thank you for your assistance and have a wonderful weekend. Judge Ash -- Judge A."
MS. KATZ: Mr. Hamill, can you go back to 463N, as in Nancy.
Q. Ms. Seepersaud, earlier I asked you about that August 31st, 2016, date, and I asked if that was before or after Ms. Ash had resigned. At the time, you didn't remember.
Is your memory refreshed now?
A. Yes.
Q. And what is the answer?
A. She has resigned as board chair.
Q. So was this expense submitted after she resigned?



A. Yes.
MS. KATZ: No further questions.
THE COURT: Thank you.
Cross-examination?
You may proceed.
MR. REILLY: Thank you, your Honor.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good afternoon, Ms. Seepersaud. How are you?
A. I'm good.
Q. My name is Nathan Reilly. We haven't met before, have we?
A. No.
Q. In fact, you haven't met with any member of Ms. Ash's defense team, have you, in advance of trial?
A. No.
Q. Ms. Seepersaud, you testified on direct about some expenses associated with conferences; is that right?
A. Yes.
Q. Is it correct that MCU's policy permitted boards to bring guests with them to strategic planning conferences, for instance?
A. I am not aware of that. I have never seen the policy.
Q. Fair enough.
So you were not aware of the policy while you were the accounting supervisor; is that right?

A. Correct.
Q. But you saw these expenses be submitted from time to time; is that right?
A. Yes.
Q. And you didn't approve them on your own, right? I think you said you reported to Linda Lambert; is that right?
A. Correct.
Q. And they were approved, to your knowledge, by Linda Lambert; is that correct?
A. Yes.
Q. Ms. Lambert reported to Kam Wong; is that right?
A. Yes.
Q. Similarly, with respect to expenses relating to conferences, is it also true that you saw expenses submitted for things like entertainment items? Is that right?
A. Yes.
Q. And, again, those were ultimately approved; is that right?
A. Correct.
Q. And approved by Linda Lambert in your department; is that right?
A. Yes. Once I received, Linda Lambert would approve the statement.
Q. Now, you also testified about the fact that there were 50-dollar expenses that were -- excuse me, requests for expenses in the amount, of a number of them, in the amount of



$50, right?
A. Yes.
Q. Including some that were submitted by Ms. Ash that you looked at and testified about on direct, right?
A. Yes.
Q. And I think you testified that, for members of the board, backup receipts were not required; is that right?
A. That's what was told to me.

MS. KATZ: Objection, your Honor.

THE COURT: What's the objection?

MS. KATZ: A mischaracterization of what the witness testified to.

THE COURT: Overruled.

BY MR. REILLY:

Q. And those expenses, were those 50-dollar reimbursements without receipts, were regularly approved; is that right?
A. Yes.
Q. Lastly, you talked a little bit -- you testified about Government's Exhibit 434 right at the end of your direct examination, which was the corporate AmEx statement for Mr. Wong, right?
A. Yes.
Q. And you noted that it was signed "Approved by Ms. Ash"; is that right?
A. Yes.



Q. Is it also true that it was reviewed, prior to going to Ms. Ash, by someone in the accounting department?
A. It was approved -- reviewed by Linda Lambert.
Q. Is it also true that it was part of the chair of the board's job to review the expenses and approve them before they were paid?
A. Yes.

MR. REILLY: May I have one moment to confer, your Honor?

THE COURT: Yes.

(Pause)

MR. REILLY: Nothing further.

THE COURT: Thank you.

Anything else, Ms. Katz?

MS. KATZ: No, your Honor.

THE COURT: Thank you. You're excused.

(Witness excused)

THE COURT: Next witness.

MR. MARK: The government calls as its next witness Laura Smith.

I note, your Honor, that Ms. Cohen, I thought, wanted to take a break before Ms. Smith is called, but I'll see if that's still the case.

MS. COHEN: Your Honor, it relates to the issue that we discussed this morning.



THE COURT: I understand that.

MS. COHEN: Yes, your Honor.

I would like to have one.

THE COURT: Ladies and gentlemen, we're going to take ten minutes, please. Counsel remain.

(Continued on next page)

LC6KASH2 Page 540

(Jury not present)

THE COURT: Let's deal with Ms. Smith first. What exactly is the proffer on Ms. Smith?

MR. MARK: The proffer on Ms. Smith is that she is going to testify that she is the chief counsel of the Advisory Committee on Judicial Ethics, and she's going to testify about two different requests that Ms. Ash submitted to the Advisory Committee on Judicial Ethics. There was one from 2008 and there was an opinion that related to -- sorry, let me step back one second -- which is a request that related to Ms. Ash serving on the board of MCU, and that there was an opinion provided by the committee, and then there was a second request --

THE COURT: When was that opinion provided?

MR. MARK: 2008.

And that one said and she will testify what that one said.

And then there was a second request that was submitted in 2015, relating to Ms. Ash serving as the chair of MCU's board, and she will testify about the response to that request.

She will also testify generally about the advisory committee itself. That is a committee that obviously Ms. Ash is familiar with since she submitted those requests to it. And there's information about that committee that's publicly available.

LC6KASH2 Page 541

She will also testify and we intend to submit the rules of judicial conduct, which pertain to what Ms. Ash was making a request about with the previous witness. We do not intend to ask her to opine on those rules; merely that the rules say what they are and they inform, obviously, Ms. Ash's actions here.

So all of this evidence is key evidence that goes to the matters that your Honor has already ruled on and that pertain to the defendant's affirmative knowledge in these matters and inform the actions that she took.

Moreover, this is critical evidence, given the way that Ms. Ash has opened in this case, arguing there were certain mistakes that were made and this informs the fact that these were not simple mistakes that were made.

THE COURT: The 2008 response to Ms. Ash's request, remind me, said what?

MR. MARK: It said two things. It said that, in general, one could serve on a nonprofit board and included cautionary language for exceptions about when you could not serve. And that's quoted from the rules itself, which dealt with if a nonprofit organization is regularly involved in adversary proceedings.

THE COURT: And the second one?

MR. MARK: The second one, there was no written opinion that was issued, but it was communicated to her that

LC6KASH2 Page 542

she could not serve, there was an advisory draft opinion that already came into evidence that Ms. Ash obtained on that matter. And she ultimately requested the advisory committee withdraw her request so there would not be a published opinion saying that she could not serve. This is in 2015.

THE COURT: And this is about a year short of when she resigned?

MR. MARK: Correct, your Honor.

THE COURT: All right.

Now, the rules of judicial conduct are part of the New York Codes, Rules and Regulations, right?

MR. MARK: Correct, your Honor.

THE COURT: It seems to me that that piece of this is the subject to be charged by the judge. Why isn't that so?

MR. MARK: Well, your Honor, these are public rules, they're available on the website, and they have been. So your Honor obviously could charge her on that, but we're not asking to make an ultimate determination. The jury is not going to be asked to make an ultimate determination of whether she violated or didn't violate those.

THE COURT: I understand that, I understand that.

Your position is it goes to motive, knowledge and intent?

Okay.

MR. MARK: Thank you.

LC6KASH2 Page 543

THE COURT: Very briefly, Ms. Cohen, very briefly.

MS. COHEN: Your Honor, as to the rules of judicial conduct, as we set forth in our letter, that is statute, we do not believe it is properly put before the jury because it is confusing and unduly prejudicial and for a number of reasons that should not be put before the jury.

Information about the advisory committee in a limited fashion, I don't know that we object to. I'll see how far it goes. We may object to some of it. A lot of what the advisory committee does has absolutely no relevance here, and I am very worried that the jury will infer that Ms. Ash was engaged in all sorts of misconduct on the bench if this witness talks about all the different rules and roles of the advisory committee.

THE COURT: Look, it comes down to two things, I think.

The first is whether simply, as a matter of convenience, I allow either the rules of conduct in textual form or parts of it in textual form, or whether I charge it in whole or in part. It seems clear to me that the jury needs to understand them to a point, in order to evaluate the argument that among the motives that led to conduct here — that is, charged conduct — was to avoid problems with the Ethics Commission and things that could flow with that. So that's the first issue.

In what form am I going to take that? I am taking it for a limited purpose.

And the second: I offered a draft of a limiting instruction this morning. It's Court Exhibit E. And I don't pretend I've drafted perfection here — if anybody has a suggestion I'll be happy to hear it — but I think that covers, as well as it should be covered, Ms. Cohen's understandable concern that the jury, in its absence, might regard this case as being a case about judicial conduct, or misconduct.

I'll ask the government first, and then Ms. Cohen: Anything on the proposed limiting instruction?

MR. MARK: Not from the government, your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: Your Honor, the third paragraph, last sentence, which starts, "The third count," I would just ask that at the end you add the words "to obstruct a federal investigation."

THE COURT: Any problem with that, Mr. Mark?

MR. MARK: No, your Honor.

THE COURT: Okay.

Anything else, Ms. Cohen? I will give that.

MS. COHEN: Two things, your Honor:

If your Honor were to include some portion that your Honor believed was relevant as to judicial conduct regarding the forms at issue, there is a very wide variety of what



happens — from nothing, to censure, to private censure public censure — when a judge does not fill out the forms correctly. I think it is extremely misleading to suggest to the jury what the law is, about judicial conduct, at all; rather, they will have the form, they will have her answer, they will have Ms. Smith's testimony, and they can make whatever inferences they believe are fair based on that evidence.

THE COURT: Look, you've now shifted subjects, I think, because this is not directed at the form. I think the form is in — I'm not sure, maybe it isn't yet — but, in any case, I certainly anticipate charging the jury that they have the form and that in the event there were a complaint, there would be proceedings, the details of which are not relevant, and the possible outcome could be a determination of anywhere from no violation to violation, and in the event of the latter, the consequences could range from a private admonition or censure, whatever they call it, all the way up to removal.

MR. MARK: We have no objection to that, nor do we intend what Ms. Cohen suggested, which is to suggest any particular outcome on these particular facts.

THE COURT: Right.

MS. COHEN: Okay. So what the government is proffering that this witness will be talking about, the advisory draft opinion, which I believe is Government Exhibit 525, that they said was in evidence, and my understanding is



it's in evidence only because it was recovered during the search warrant at Ms. Ash's house.

And as to that advisory draft opinion, your Honor, we would say, with this witness, it was a draft opinion, it is hearsay and it should not be admitted because now, with this witness, it is being admitted for the truth of the matter asserted.

THE COURT: No, I think not. It is being offered for the proposition that this view was expressed to her. It is the expression of the view, from an official source, that potentially creates the motive to do what she is alleged to have done, whether it's right or wrong.

MS. COHEN: Your Honor, I remain extremely concerned that this trial has become, with these witnesses and what is being allowed into evidence, a trial about the conduct on the bench as opposed to whether she lied to the government.

THE COURT: Well, I hear you say that over and over again, but you and I don't agree on that. The context of the obstruction related, in some ways, if there was obstruction, to the fact that she was a judge sitting on this board and doing what she was doing.

MS. COHEN: Correct. And as to that, we haven't objected to that evidence coming in. Once it goes farther astray, the objection --

THE COURT: Yes, but I don't think we are going any



farther afield.

Okay. Let's --

MR. MARK: When does your Honor intend to give this proposed limiting instruction?

THE COURT: At an appropriate point in the testimony of Ms. Smith.

Oh, yes, I have a note from Juror 17, which will be marked as Court Exhibit F. Juror 17 says that he or she is in public accounting, has an important meeting with a client, apparently, at 2:00 o'clock on December 9th, and has to be there, and wants to know if the juror can kind of skip half the day and come in and catch up on somebody else's notes, and has a flight to New Orleans on December 16th and won't be back until the night of December 19th.

Any thoughts or suggestions, folks? This is actually Alternate No. 5.

MR. MARK: Well, I guess the first thing is, he's talking about Friday --

MS. COHEN: Thursday, I believe.

MR. MARK: Oh. Thank you.

My guess is it just makes sense to just wait and see on this, given it's Alternate No. 5 and given where we are in the proceeding of the case, your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: Obviously, I don't think the December 16th

flight will come into play, your Honor.

As to the December 9th meeting, it's unclear to me whether or not we will be in court.

And, of course, the juror could not miss any part of testimony or deliberations.

THE COURT: Of course.

Okay. Let's get the jury. I think Andy may be doing it.

I'm not sure we resolved the issue about the form in which the rules of conduct is going to be handled, whether it will go into evidence or be handled in my instruction, and whether the government can boil it down to what's relevant as opposed to a whole big pile of stuff.

MR. MARK: So, your Honor, it's only 14 pages. We don't plan to dwell on it with this witness. We would like to just enter it into evidence with her in a very streamlined fashion. And, candidly, the defense hasn't argued that they're not relevant and hasn't suggested any proposed redactions or simplifications on them. So we would propose to do it just quickly with this witness.

MS. COHEN: Can you just give me an exhibit number, Mr. Mark?

MR. MARK: It's Exhibit 546.

MS. COHEN: Your Honor, that's the court rules, and we would object to them going into evidence with this witness.



THE COURT: Well, the alternative is, I'm going to charge it as part of my charge or take judicial notice of it. So those are your options.

MS. COHEN: A moment to confer, your Honor?

(Pause)

MS. COHEN: Your Honor, we would rather that, although obviously we will, I assume, have the ability to review what your Honor proposes and --

THE COURT: If I charge it, correct; if I take judicial notice you already have notice.

Okay, let's go.

MR. MARK: Your Honor, just so I'm aware, did you rule on this or no?

THE COURT: You can offer it in. We'll see where we go.

(Continued on next page)



(Jury present)

THE COURT: The jurors and the defendant all are present.

I have the note from Alternate No. 5 Ms. Riefenhauser.

Ms. Riefenhauser, I'm afraid we cannot accommodate you about December 9th at all. You're on the jury; you have to be here.

As to December 16th and 17th, I remember your raising that previously. Let's just hang loose about that. This may be over by then, and there are other options, possibly.

Okay, next witness.

MR. MARK: The government calls Laura Smith.

LAURA SMITH,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE WITNESS: Laura Smith, S-m-i-t-h.

THE COURT: You may proceed, counselor.

DIRECT EXAMINATION

BY MR. MARK:

Q. Good afternoon, Ms. Smith.

Ms. Smith, did you volunteer to testify today, or did the government ask you to testify?

A. I was ordered to testify with a subpoena, a federal subpoena.

Q. Where do you currently work?



A. I work for the New York State court system.

Q. Do you work for any particular committee?

A. Yes. I work for the Advisory Committee on Judicial Ethics. I'm their chief counsel.

Q. How long have you worked for the advisory committee for judicial ethics?

A. I've been the chief counsel since July 1st, 2015, and I have been associated with the committee as a staff counsel since August 2006.

Q. Does that mean you're a lawyer?

A. I am a lawyer, yes.

Q. What does the role of being chief counsel relate to?

A. I help -- I guess I help administer the committee. We receive inquiries from judges around the state, ethics inquiries, and so I review those and coordinate with the advisory committee, which will give advice to the judges around the state.

Q. I'll ask you about a bit more about the advisory committee's work.

But, briefly, could you tell us what is the Advisory Committee on Judicial Ethics?

A. Sure. It's a body of 27 judges, either sitting judges or retired judges, from a wide variety of courts around the State of New York, and they receive inquiries from other judges within the State of New York asking about how to make sure

their conduct is in compliance with the rules governing judicial conduct, which is the ethics rules that govern New York State judges.
Q. Is the advisory committee a nonpartisan organization?
A. Correct. It's part of the New York State Unified Court System, and they cannot be partisan.
Q. Are there any rules pertaining to secrecy that govern the advisory committee's work?
A. Yes. The judiciary law provides that notwithstanding any other provisions of law, inquiries to the committee are completely confidential except that we are required to publish ethics opinions that are done in a way that's anonymous so you don't know who the inquirer is.
Q. You mentioned that the committee is composed of 27 judges; is that right?
A. Correct.
Q. As chief counsel, do you have a staff?
A. Yes.
Q. How many?
A. I have one attorney full time that works with me and two administrative staff that work with us. And there's also a sort of volunteer staff attorney who does other jobs as well within the court system, who works with us part time.
Q. You mentioned that your work relates to the rules governing judicial conduct; is that right?



A. Correct.
Q. Just very, very broadly, what are they?
A. They are the ethical guidelines that govern the judges of the State of New York at every level. So it goes through a wide variety of activities, on and off the bench, and what they should do to basically promote public confidence in the judiciary.
Q. Where can someone find those rules?
A. We have a link to them on our website. They're also available in other locations as well.
Q. For approximately how long have they been linked to on your website?
A. The website went live in February 2008, I believe, and I believe those were linked from the beginning.
Q. That's a public website?
A. It is a public website, yes.
MR. MARK: Mr. Hamill, may we show the witness what's been marked for identification only as Government Exhibit 546.
Q. Ms. Smith, do you recognize what's been marked as Government Exhibit 546?
MR. MARK: And, Mr. Hamill, you can just flip through this.
A. Yes.
Q. What is it?
A. That is a copy of the rules governing the judicial conduct



as they are appearing on our website.
MR. MARK: The government offers Government Exhibit 546 into evidence.
MR. REILLY: Objection, your Honor, as per our prior discussion, counsel objects to the relevance of portions of this --
THE COURT: Sorry, you object to?
MR. REILLY: We believe they're irrelevant portions of the exhibit, your Honor.
THE COURT: Well, you certainly haven't specified any up to now.
MR. REILLY: Your Honor, we figured that the entirety of the exhibit is not relevant to what's --
THE COURT: So it's not portions, it's the whole thing?
MR. REILLY: Well, as offered, your Honor.
THE COURT: Look, come to the sidebar.
(Continued on next page)



(At the sidebar)
THE COURT: We just went through a discussion, part of which was whether this needed to be excerpted or not excerpted, and you people were like a bunch of mummies on that issue.
MR. REILLY: Your Honor, I apologize. Our understanding was that the Court was intending to take judicial notice of the existence of the rules --
THE COURT: Or portions of them.
MR. REILLY: Or portions thereof.
-- but not to enter --
THE COURT: And I didn't say that. I said there were several options: One is, they could come in in toto now; one is that they could have come in in excerpted form now; one is, I could charge on it in an appropriately determined fashion; and one is that I could have taken judicial notice of all or part.
And now, for the first time, you have the nerve to tell me you object to parts of it and you can't tell me what parts, right?
MR. REILLY: Your Honor, our objections were: We received this exhibit last evening, we offered our objection in our papers this morning, and are objecting to it being offered in its entirety, your Honor.
THE COURT: Yes, that's right.
MS. COHEN: Your Honor, we object to the entirety --

THE COURT: And you lost that battle, in one way or the another. And I specifically foresaw this possibility and asked you, in no uncertain terms, about excerpting. And you didn't say a thing. That ship has sailed for now.

MS. COHEN: Your Honor, since I was the one who argued this, we objected to excerpting and preferred that your Honor take judicial notice, of which I asked could we have a preview of what your Honor would say.

THE COURT: Yes, right, you asked me to take judicial notice of the rules.

MS. COHEN: The rules or the relevant part of the rules, your Honor?

THE COURT: The record speaks for itself.

(Continued on next page)



(In open court)

THE COURT: Government Exhibit 546 is received.

(Government's Exhibit 546 received in evidence)

THE COURT: But, ladies and gentlemen, it's received only for a very limited purpose, and I need to make clear to you exactly what it's received for and what it is not received for.

I told you at the beginning of this trial that Ms. Ash is on trial here only for the four alleged crimes that are laid out in the indictment.

As I told you before, and I'm sure you know, the first count charges that Ms. Ash conspired to obstruct justice, in essence, by agreeing to sign a false and misleading document in an attempt to impede a federal investigation of Kam Wong, and to take other actions in an attempt to impede that investigation.

The second and third counts each charge Ms. Ash with a separate substantive crime of obstruction of justice.

The second count, you may remember, focuses particularly on the memorandum that she allegedly signed regarding a purported 2015 conversation in relation to Mr. Kam Wong taking money from MCU in lieu of MCU paying insurance premiums to buy supplemental disability insurance for him.

The third count focuses particularly on Ms. Ash's compliance, or lack of compliance, with two grand jury



subpoenas to obstruct the federal investigation.

The fourth count charges her with allegedly making a false statement during an interview with the U.S. Attorney's Office concerning whether she had documents responsive to one of the subpoenas.

As you know, she is presumed innocent of all those charges unless and until you all are convinced that the government has proved her guilty beyond a reasonable doubt of one or more charges; and, of course, I'm referring to the four charges in the indictment.

You must remember always that Ms. Ash is not charged in this case with any crime in relation to the discharge of her duties as a judge of the State of New York. And you may not convict her of anything at all in this case on the basis that you think she violated her duties as a judge, nor may you consider any evidence that you may think proves or suggests that she violated, or may have violated, her duties as a judge, as evidence that she's a person who has a propensity to engage in misconduct or criminal behavior.

But that is not to say that the fact that Ms. Ash was a state court judge during the period that concerns you in this case is entirely irrelevant. You're entitled to consider any evidence concerning Ms. Ash's knowledge, obligations, actions, and inactions as a judge insofar as you find that the evidence sheds light on her motive, her knowledge, and her intent in



doing what she's been charged with in the indictment, to whatever extent she did what's charged in the indictment, and you may consider this evidence for no other purpose.

Okay. I think we're at a point where it probably makes sense to break this evening. So we'll resume at 9:30 tomorrow morning and we'll take it from there.

(Continued on next page)

(Jury not present)
THE COURT: You're free for the evening.
THE WITNESS: Thank you.
(Witness temporarily excused)
THE COURT: Counsel may be seated.
Okay, Mr. Mark. What is it?
MR. MARK: I'll just note, we have this witness and three other witnesses to testify -- sorry, can you hear me, your Honor?
THE COURT: A little louder.
MR. MARK: We have three more witnesses that we intend to testify at this trial.
THE COURT: Tembeckjian, and who else?
MR. MARK: Tembeckjian; Enrique Sanchez, who's an investigative analyst in our office relating to certain cell phones; and a summary witness at the end; and then we plan to rest after that. So I anticipate that's probably going to happen sometime tomorrow.
Under the parties' agreement, the defense had committed to give us a witness list, notice of who those witnesses would be, 26.2 material, and exhibits, by this time. I just note for the record that we have not received any of that as of now.
THE COURT: What about it, Ms. Cohen?
MS. COHEN: The defense has not decided if we will



call any witnesses and, if it intends to call witnesses, who they will be. When that is decided, we will turn over the names and whatever statements they have made to us pursuant to our agreement and whatever exhibits we intend to use, all of which are documents that the government has produced to us, if we use any at all.
MR. MARK: I'd say, your Honor the agreement was filed with the Court. That's not consistent with the agreement that they were going to delay in the fashion they have done so, your Honor. This was a negotiated agreement, with many different terms, it was multiple pages, and I will note that that's not consistent with what the defense agreed to do.
MS. COHEN: I disagree, your Honor.
The agreement was, when we decided if we were going to call any witnesses, we would notify the prosecution --
THE COURT: This is a filed document?
MR. MARK: It is a filed document, on October 15th.
MS. COHEN: Your Honor, I believe what Mr. Mark quibbles with is that we haven't made a decision yet, and we haven't.
THE COURT: Look, this is only about the umpteenth time during this case that there's a disagreement as to what passed between the lawyers. And I have to tell you that, whoever is responsible for it — and it may well be both of you but I'm in no position to judge right now — it really has never



happened like this in my experience in a criminal case in 27 years. And I'm really disappointed, to say the least.
So the language of the agreement is that at least three days prior to the anticipated start of the defense case, defense counsel are to provide the government with a list of witnesses whom the defendant reasonably expects to call in her case "regardless of whether, at that point, the defense has firmly decided whether to present a case. Likewise, defense counsel is to provide a list of exhibits that it reasonably expects to seek to introduce during the case, regardless of whether at that point the defense has firmly decided whether to present a case. The exhibit list will be subject to good-faith revision as the defense continues to prepare for its case."
Now, it's not a hundred percent either way, obviously. I imagine Ms. Cohen will tell me that at this moment the defense does not reasonably expect to call anybody in their case, and, therefore, they're under no obligation to identify witnesses, and won't be until they firmly decided whether they're presenting a case; and a comparable argument with respect to exhibits.
I imagine that's what you will say, right, Ms. Cohen?
MS. COHEN: Correct, your Honor.
THE COURT: And that this was a negotiated agreement in which both sides got things they wanted and, at least apparently, gave up things they didn't want to give up. It is



perfectly evident from the letter. And all I can say is, maybe next time it will be drafted more clearly.
If you actually are going to say that there's a violation here, I suggest that you're going to have to make an application for specific relief and support it with some law.
MR. MARK: Thank you, your Honor.
THE COURT: Okay. Thank you.
(Adjourned to December 7, 2021 at 9:30 a.m.)
* * *

INDEX OF EXAMINATION

Examination of: Page
MONIQUE SMITH
Direct By Mr. Rebold . . . . . . . . . . . . . . 431
Cross By Mr. Reilly . . . . . . . . . . . . . 452
THOMAS SICILIANO
Direct By Mr. Mark . . . . . . . . . . . . . . 466
Cross By Ms. Cohen . . . . . . . . . . . . . . 497
Redirect By Mr. Mark . . . . . . . . . . . . . 513
SEETA SEEPERSAUD
Direct By Ms. Katz . . . . . . . . . . . . . . 515
Cross By Mr. Reilly . . . . . . . . . . . . . 535
LAURA SMITH
Direct By Mr. Mark . . . . . . . . . . . . . . 550

GOVERNMENT EXHIBITS

Exhibit No. Received
461 . . . . . . . . . . . . . . . . . . . . 445
751 . . . . . . . . . . . . . . . . . . . . 450
968 . . . . . . . . . . . . . . . . . . . . 483
970 . . . . . . . . . . . . . . . . . . . . 511
434 . . . . . . . . . . . . . . . . . . . . 531
546 . . . . . . . . . . . . . . . . . . . . 557

## $

**$1,436.12 (1)** 526:22
**$1,793.50 (1)** 524:16
**$100,000 (1)** 454:7
**$12,527.52 (1)** 524:4
**$153.05 (2)** 528:10,16
**$16,557.65 (1)** 533:4
**$2,175.27 (1)** 532:19
**$2,736.40 (1)** 520:8
**$205.16 (1)** 526:21
**$4,756.28 (1)** 523:1
**$50 (7)** 517:2,4,7,12;525:11;528:1;537:1
**$522.78 (1)** 522:16
**$56,648.63 (1)** 519:6

## A

**ability (1)** 549:7
**able (1)** 429:20
**absence (1)** 544:8
**absolute (1)** 496:1
**absolutely (2)** 453:18;543:10
**accommodate (1)** 550:5
**account (1)** 529:7
**Accounting (7)** 515:12,13,15;517:18;535:25;538:2;547:9
**accounts (5)** 515:16,18;516:6,14;521:10
**accurate (8)** 444:19;445:6;449:24;495:18,23;505:20,25;530:8
**across (2)** 520:20;532:17
**acting (3)** 448:5;451:8;463:3
**actions (6)** 468:1;510:10;541:6,10;557:15;558:23
**activities (3)** 502:1,3;553:5
**Activity (1)** 532:23
**actual (1)** 455:25
**actually (10)** 435:10;440:8,11;443:14;482:17;483:13;486:24;501:21;547:15;563:3
**add (1)** 544:16
**addition (3)** 478:14;493:13;529:22
**additional (4)** 478:13;479:21;508:18,21
**address (9)** 472:4;485:7;527:12,12;529:4,4;530:1,3,6
**addressed (4)** 481:4,6;488:17,18
**addressing (1)** 483:20
**adds (1)** 475:23
**Adjourned (1)** 563:8
**admin (3)** 431:20,20,22
**administer (1)** 551:13
**administrative (4)** 431:24,25;432:3;552:21
**administrator (1)** 436:5
**admissible (3)** 492:14;493:1;510:2
**admit (1)** 492:10
**admitted (5)** 518:6,9;534:1;546:5,6
**admonition (1)** 545:16
**adopt (1)** 476:23
**adopted (2)** 462:23;476:24
**advance (3)** 454:4,7;535:14
**adversary (1)** 541:22
**adverse (1)** 473:7
**advice (3)** 472:2;501:7;551:16
**advisable (2)** 481:25;482:3
**Advisory (17)** 540:5,7,21;542:1,3;543:7,9,13;545:24;546:3;551:3,5,16,18,20;552:4,8
**affair (1)** 470:25
**affirmative (1)** 541:9
**afield (1)** 547:1
**afraid (1)** 550:5
**afternoon (12)** 429:2,3,4;431:11,12;452:10,11;466:11,12;515:3;535:9;550:20
**again (14)** 436:7;440:12;449:6;458:19;460:10;461:10,12;482:20;511:11;512:18;532:13,21;536:17;546:18
**against (1)** 507:21
**agenda (1)** 474:2
**agents (1)** 441:3
**agitated (3)** 489:11,12,14
**ago (1)** 457:5
**agree (2)** 433:22;546:18
**agreed (5)** 434:17;476:15,16;483:5;561:12
**agreeing (1)** 557:13
**agreement (23)** 475:23,24,25;476:1,3;477:1,2;478:4;480:2,17,21;488:21;492:7;495:16,24;560:19;561:4,7,8,10,14;562:3,23
**airfare (1)** 520:17
**alleged (2)** 546:11;557:9
**allegedly (2)** 557:20;558:2
**allow (3)** 462:14;510:14;543:18
**allowed (1)** 546:15
**almost (1)** 510:6
**along (3)** 490:3,14;501:24
**Alternate (3)** 547:16,22;550:4
**alternative (1)** 549:1
**although (2)** 468:2;549:6
**always (4)** 477:7;489:16;515:13;558:11
**amendment (24)** 475:20,21,22;476:23,24,25;480:22,24,25;481:2,15;482:7;488:6;511:16,17,18,20,20;513:12,13,14,17,19,20
**amendments (13)** 473:22;475:12,18;476:5,10,20;477:12,13,16;480:12,14,20;481:11
**American (4)** 531:24;532:2,4;533:7
**AmEx (1)** 537:20
**among (1)** 543:22
**amount (11)** 473:17;479:21;519:5,8;522:24;528:15;532:18,22;533:7;536:25,25
**amounts (1)** 527:24
**analyst (1)** 560:15
**Andy (3)** 429:6;496:22;548:7
**annoyed (3)** 489:11,12,14
**annual (6)** 432:8,15;438:22;444:17;470:16,18
**anonymous (1)** 552:12
**answered (1)** 498:3
**anticipate (2)** 545:11;560:17
**anticipated (1)** 562:4
**apart (1)** 507:13
**apologies (1)** 499:11
**apologize (2)** 530:17;555:5
**apparent (1)** 496:1
**apparently (2)** 547:10;562:25
**appear (2)** 489:10;505:20
**appeared (2)** 489:11,12
**appearing (1)** 554:1
**appears (2)** 477:24;508:9
**Apple (8)** 439:22,23;440:6,18;449:1;456:8;532:15,18
**application (1)** 563:5
**appoint (1)** 468:20
**appointment (2)** 433:18;434:8
**appointments (1)** 453:22
**appropriate (4)** 429:13;472:4;497:25;547:5
**appropriately (1)** 555:14
**approval (4)** 516:22,25;532:6,8
**approve (5)** 532:6;533:12;536:5,21;538:5
**approved (13)** 454:4;516:4;520:23;521:4,6;531:17;533:15;536:8,17,19;537:16,23;538:3
**approximately (15)** 466:22;469:4,5;470:7,8,9,11;471:12,13;480:22,23;482:18;497:11,18;553:11
**April (6)** 471:13;523:25;525:8,23;527:16;534:12
**argue (1)** 509:13
**argued (2)** 548:17;556:5
**arguing (2)** 510:16;541:12
**argument (4)** 471:10;509:1;543:21;562:19
**Around (26)** 433:20,21;434:3,9,14,15,16,20;436:9;437:16;439:5;440:21;441:6,7,17,25;442:6,18;446:14;454:8;457:17;461:6;490:11;551:14,16,23
**arrangements (1)** 450:20
**arrest (7)** 446:8,12,14,20,22;

461:6;465:14
**article (2)**
436:12;469:8
**Ash (129)**
436:2,10,20;437:9;
438:23;439:5,23;
440:5,12;441:23;
442:19;443:5;446:12,
19;447:2,7,13;448:2,
22;449:1,7,18;450:10;
451:1,7,15;452:13;
454:23;455:9,17,20;
456:11,24;457:13,20;
459:11;461:6;463:15,
21;464:7,16;465:13,
15;468:25;469:6,13,
22;470:9;471:2,4;
472:6,10,19;473:11;
474:5;481:24;482:3,
12;483:5,6;486:5,9,13,
15;487:1;488:13;
489:24,25;502:11;
503:19;505:1,6,18;
507:5;508:5,7;509:14,
16;511:10,15;514:2;
518:13;519:8,10,12;
520:3,7,9;521:13;
522:17,25;523:25;
524:15;525:4,8,18,23;
526:3,12;527:11,21;
528:2,6;529:16,18;
531:14;532:4,7;
533:17,20;534:3,14,19;
537:3,23;538:2;540:7,
10,19,22;541:2,12;
542:2;543:11;557:8,
12,17;558:11,20
**Ash's (18)**
437:20;442:22;
453:2;471:19;473:9;
483:2;490:5;498:6,9;
523:15;529:2;533:13;
535:13;541:5,15;
546:2;557:24;558:23
**Ashton (1)**
523:19
**aside (1)**
509:7
**aspects (1)**
471:9
**asserted (1)**
546:7
**assigned (3)**
515:11,13;529:18
**assistance (3)**
471:5,7;534:14
**assistant (2)**
431:25;432:3
**assistant/office (1)**
431:24
**associated (3)**
529:7;535:17;551:8
**assume (3)**
429:18;510:9;549:7
**assumed (2)**
480:7;487:18
**astray (1)**
546:24
**attached (3)**
516:22;526:23,24
**attachment (2)**
531:9,20
**attempt (2)**
557:14,15
**attempting (1)**
492:15
**attempts (1)**
496:3
**attend (1)**
470:22
**attended (2)**
438:23;525:18
**attendees (1)**
432:17
**attending (1)**
470:21
**attends (1)**
439:17
**attention (24)**
437:8;440:21;
441:17;443:10;446:7;
453:7;457:11;459:9;
461:4,18;463:14;
465:13;487:24;488:1;
513:9;518:18;523:6,
13;524:22;526:13;
531:15,22;532:14;
534:2
**attitude (1)**
490:2
**attorney (3)**
468:21;552:20,22
**attorneys (4)**
467:17;468:13,14,22
**attorney's (2)**
462:9;558:3
**August (9)**
437:8,16;466:24;
473:2;520:4,10;534:6,
18;551:9
**authenticate (1)**
509:6
**authenticity (2)**
495:18;530:14
**authorized (2)**
500:8;534:13
**available (3)**
540:25;542:16;
553:10
**average (1)**
533:7
**avoid (1)**
543:23
**aware (12)**
449:4;454:18;488:3;
499:6;500:18;501:2,6;
502:13;514:4;535:22,
24;549:12

## B

**back (19)**
433:11,11,12,14;
440:3;448:22;449:25;
451:7;453:21;457:2;
465:13;484:4,6;
493:22;509:6;527:21;
534:16;540:9;547:13
**backup (10)**
517:8;518:3;521:22;
522:10;523:3;525:13;
526:7,23;528:17;537:7
**backups (1)**
517:23
**bad (2)**
434:20;496:7
**Balance (1)**
533:3
**based (8)**
439:9;492:21;524:3,
15;529:16;531:10;
533:6;545:7
**basic (3)**
479:23;480:15;
487:18
**basically (1)**
553:6
**basics (1)**
493:14
**basis (3)**
476:13;492:14;
558:14
**battle (1)**
556:1
**became (3)**
470:8;474:8,9
**become (3)**
470:7;479:11;546:14
**becoming (1)**
471:4
**beginning (3)**
494:11;553:14;557:8
**begins (1)**
534:4
**behalf (2)**
477:4,6
**behavior (1)**
558:19
**Belfast (1)**
525:3
**below (2)**
521:3;523:10
**bench (3)**
543:12;546:16;553:5
**benefit (1)**
484:19
**benefits (27)**
474:17;475:4;
478:10,12,13,17,22;
481:7;482:9,15,16;
483:11;484:17,20;
486:10,16;502:24;
503:3,9,10,24;505:1,6;
507:19;508:4;509:9;
512:10
**besides (1)**
532:1
**best (4)**
450:22;472:18;
475:22;490:13
**beyond (2)**
496:8;558:8
**bias (1)**
495:10
**Bicycle (1)**
525:3
**big (1)**
548:13
**bigger (7)**
520:14;522:8;
524:18;525:7;528:12,
25;533:2
**bill (10)**
526:24;527:3,6,10,
12;528:19,22;529:6,
22;532:24
**billing (2)**
529:11,16
**bills (3)**
515:20;529:15;533:6
**birthday (1)**
534:12
**bit (8)**
435:6;504:4;522:8;
525:7;528:12,25;
537:18;551:18
**blow (2)**
479:15;521:19
**board (100)**
432:1,3,5,8,9,10,11,
21;436:5,18,20;437:10,
14,15,25;438:2,4,5;
439:18;443:11,13,14,
16,19;444:1,16,17,19;
450:17;455:17;461:21,
24;462:16;463:21;
467:9;469:2,13,14,15,
19,20,22;470:4,5,7,12,
13,16,18;471:4,11;
472:20,24;473:15,17,
18,20,21;474:8,10;
475:16,18;476:17,18,
20,22;477:9,11;481:1;
485:9;486:5,19;487:5;
503:20;511:12,13;
516:16,20;517:7;
519:15,15;520:9,12,23,
23;522:5;523:22;
532:7;533:12,15,15,17,
21;534:10,24;537:6;
540:11,20;541:18;
546:20
**boards (1)**
535:19
**board's (1)**
538:5
**body (2)**
534:7;551:22
**boil (1)**
548:12
**bonus (2)**
454:4;478:21
**booking (1)**
432:16
**boss (2)**
434:19;435:8
**both (3)**
464:22;561:24;
562:24
**bottom (11)**
442:25;445:19;
450:7;485:25;504:6;
518:24;522:15;523:7,
13,17;532:15
**bought (2)**
500:3,14
**box (2)**
504:12;512:5
**branch (1)**
468:7
**Brantley (10)**
481:1;486:5,9,12;
503:20;505:17;507:5;
511:10,11,15
**break (5)**
429:19;430:6;491:7;
538:22;559:5
**brief (2)**
472:15,16
**briefly (7)**
455:11;484:23;
485:16;513:2;543:1,1;
551:20
**bring (3)**
496:13;497:4;535:19
**Britney (1)**
522:14
**Broadly (5)**
472:16;475:2,2;
476:10;553:2
**brought (1)**
493:5
**bunch (1)**
555:4
**business (9)**
456:5;495:13,19;
496:15;507:8;508:23;
509:2,4,6
**buy (1)**
557:23
**buying (1)**
500:6
**bylaw (1)**
473:22

## C


**Cable (2)**
526:18,24
**Cablevision (1)**
528:3
**call (16)**
429:17;434:6;447:17,18;451:2;458:24;461:13;498:20;509:5;521:12;545:17;561:1,1,15;562:6,16
**called (15)**
431:7;440:5;441:2,2,9;442:1,1,2;453:5;466:7;498:18;514:19;517:19;538:22;550:14
**calls (7)**
431:5;448:10;466:4;514:17;519:17;538:19;550:12
**came (5)**
457:25;496:15;510:1;513:21;542:2
**Can (96)**
431:17,22;432:2;433:10,14;434:17;436:12,17;437:5,23;438:15;442:9;443:3,13;444:3,6,9,22;445:16,17,18,19,21;446:5,16,19;449:13;450:8,13,24;451:4,6,11,13,19,22,25;464:8;465:3;475:7;478:24;484:4,6,7;485:23;495:4,20;501:21;504:2,4,11,16;505:11,22,22;512:1,5;513:4;515:4,17,25;517:18,21;518:12,19;520:1,6,14,15;521:1,20;522:12,19;523:2,7;524:7;526:10,16;528:11,25;529:24;530:5;531:4;532:17;533:2;534:7,16;545:6;547:11;548:12,21;549:14;553:8,21;560:8;563:1
**Cancun (1)**
523:11
**candidly (1)**
548:17
**cap (1)**
517:2
**capacity (1)**
436:4
**card (6)**
531:24;532:3,8;533:8,13,13
**cards (1)**
532:1
**care (4)**
433:12;474:3;483:7;489:4
**carrier (1)**
450:21
**case (23)**
471:11,11;493:24;521:13;538:23;541:12;544:8,9;545:11;547:23;558:12,14,22;561:22;562:1,4,7,8,10,12,13,17,19
**cases (1)**
516:21
**cash (5)**
481:18,25;490:20;491:2;514:3
**catch (1)**
547:12
**categories (1)**
496:19
**categorized (1)**
526:5
**caused (1)**
450:23
**caution (1)**
500:23
**cautionary (1)**
541:19
**CCCU (1)**
523:9
**celebration (1)**
534:12
**cell (9)**
528:13,15,17,19,22;529:12,15,17;560:15
**censure (4)**
545:1,1,2,17
**CEO (16)**
432:23;433:3,3;435:9;442:16;447:1,4;448:5;451:8;456:16;463:3;475:19;480:5,8;490:11;507:22
**CEO's (1)**
508:8
**certain (17)**
467:8;468:1;471:9;473:17;478:13,16,22;480:11,19;484:20,20;485:19;490:13;508:5;513:9;541:13;560:15
**certainly (4)**
494:21;501:16;545:11;554:10
**chain (4)**
484:2,5,5;485:24
**chair (32)**
469:17,18,20;470:5,7,8;471:4;473:12,24,25;474:8,9;477:7,8,9,9,11;486:5,6,7;503:20;511:12,12;520:9;532:7;533:12,15,20;534:10,24;538:4;540:19
**chance (2)**
444:13;518:10
**change (1)**
480:18
**changed (1)**
476:13
**changes (3)**
475:23;480:19;489:4
**characterized (1)**
455:4
**Charalambous (16)**
442:9;443:3;444:3,9,22;445:13,17;446:5;449:13;450:7,24;451:4,11,19,22,25
**charge (8)**
522:15;542:17;543:19;549:2,2,9;555:14;557:17
**charged (5)**
542:14;543:23;558:11;559:1,2
**charges (7)**
435:20,25;557:12;558:2,7,9,10
**charging (1)**
545:11
**chart (10)**
483:13;484:8,9,15,18,25;485:4,5;504:18,21
**chief (11)**
432:22;466:20;467:7,10,13;474:24;540:5;551:4,7,12;552:17
**circulate (1)**
443:19
**circumstances (3)**
485:21;493:4;494:22
**cite (1)**
494:7
**claim (1)**
468:6
**claiming (1)**
516:5
**claims (1)**
468:19
**clarification (1)**
481:7
**clarifications (2)**
488:20;489:3
**clarify (2)**
458:11;460:21
**clause (2)**
480:18;487:14
**clear (3)**
513:12;543:20;557:5
**clearer (1)**
460:23
**clearly (1)**
563:2
**clerk (3)**
515:16,18;516:6
**client (1)**
547:9
**close (3)**
437:7;438:17;455:5
**closely (3)**
433:6;436:20;506:6
**clothing (2)**
436:12;469:8
**code (1)**
472:1
**codeine (2)**
434:1,2
**Codes (1)**
542:11
**COHEN (104)**
429:3,6,9,16,22,25;430:1,4;452:24;453:1,4;483:23;492:18;493:1,10,15,18,21,25;494:7,11,14;495:1,6,13,16;496:3;497:6,8;498:17;499:10,16;500:2;501:1,11,13,18,19,21;502:10,18,20,22;503:13;504:2,5,11;505:11;506:1;507:3,16,21;508:2,13,16,18,24,25;509:12,16,23;510:8,13,18;511:5,7;512:5,14,20,22,24;513:9;514:12;538:21,24;539:2;543:1,2;544:10,13,14,21,22;545:19,22;546:13,22;547:19,24,25;548:21,24;549:4,6;555:25;556:5,11;560:24,25;561:13,18;562:15,21,22
**Cohen's (1)**
544:7
**colleagues (2)**
452:3,24
**collect (1)**
450:19
**collection (3)**
468:2,14,14
**Collis (1)**
522:1
**column (1)**
519:2
**coming (5)**
452:15;457:20;512:18;527:14;546:23
**comment (5)**
449:9;451:17,18;489:22;490:5
**comments (1)**
471:23
**Commission (1)**
543:24
**commit (1)**
441:16
**committed (1)**
560:20
**committee (42)**
432:7;446:1;461:21;462:16,19;469:17,18;470:19,21;473:12,14,16,19,22,24;474:5,7;475:7,9;476:15,22;486:6;540:6,8,12,22,22,24;542:3;543:7,10,14;551:2,3,5,8,13,16,21;552:4,10,14
**committees (2)**
473:17,25
**committee's (2)**
551:19;552:8
**communicate (4)**
436:21;441:21;446:17;519:16
**communicated (4)**
446:18;454:9,10;541:25
**company (3)**
468:20;515:20;516:2
**comparable (1)**
562:19
**compared (1)**
512:11
**compensation (1)**
485:18
**complaint (1)**
545:12
**complete (1)**
516:3
**completely (4)**
430:6;507:10,14;552:11
**compliance (3)**
552:1;557:25,25
**composed (1)**
552:14
**computer (1)**
446:3
**concern (5)**
475:1;480:14;481:3;486:8;544:8
**concerned (3)**
434:20;480:15;546:13
**concerning (4)**
475:13,17;558:4,23
**concerns (1)**
558:21
**conduct (21)**
434:10;435:15;453:24;454:16;472:1;501:4;541:2;542:10;543:3,18,22,23;544:9,24;545:4;546:15;

548:10;552:1,2,25;
553:25
**conducted (1)**
482:20
**confer (5)**
452:2;512:20;
533:23;538:8;549:4
**conference (20)**
438:23;439:1,3,4,6,7,
11,13,16,18,21,24;
440:12,19;455:12,18,
23;456:9;524:9,9
**conferences (9)**
432:8,9,15;438:24;
439:10,17;535:17,20;
536:14
**confidence (1)**
553:6
**confidential (1)**
552:11
**confirm (1)**
521:11
**confusing (1)**
543:5
**connection (3)**
435:18;457:2;465:2
**consequences (1)**
545:16
**consider (3)**
558:16,22;559:3
**consideration (1)**
490:13
**consistent (5)**
442:25;508:12,15;
561:8,12
**conspired (1)**
557:12
**contacted (2)**
452:23;472:13
**contained (1)**
527:15
**contemporaneous (1)**
461:13
**contest (1)**
495:18
**context (3)**
475:21;476:2;546:18
**continuation (1)**
534:13
**continue (5)**
438:6;484:6,6;
501:11;528:2
**Continued (10)**
430:8;491:11;
496:23;506:9;510:20;
539:6;549:16;554:18;
556:14;559:7
**continues (1)**
562:13
**contract (75)**
441:13;474:12,14,
15,15,16,20,25;475:8,
10,12,14,15,17,18,20,
21;476:6,11,14;477:1,
12,25;478:2,6,17,25;
479:4,14,16;480:1,6,
12,22;481:2,5,11,16;
482:7,9,15,16,17;
483:4;484:17;486:16;
487:15;488:6,7,17;
489:4;490:11;492:23;
501:8;502:24,25;
503:4,10,23;505:7;
507:4,6,12,19;508:8;
509:8;511:16,18,21,24;
512:11;513:13,15,17,
22
**convenience (3)**
450:19,21;543:18
**Convention (1)**
523:9
**conversation (29)**
437:22;440:13;
442:19;448:3;457:12;
458:9;459:6,10,11,15,
20,23;460:5,10,17,22,
25;461:2,5,14;464:25;
465:4,12,13;504:25;
505:5;507:7;509:22;
557:21
**conversations (3)**
456:23;509:8;510:10
**conveyed (1)**
461:7
**convict (1)**
558:14
**convinced (1)**
558:7
**coordinate (1)**
551:15
**coordinated (1)**
432:7
**coordinating (13)**
469:16,18;470:19;
473:12,14,19;474:5,7;
475:7,9;476:15,22;
486:6
**coordinator (1)**
432:14
**copy (15)**
444:19;445:6;
449:24;457:25;458:2,
3;480:6;483:6,9;492:2,
5;505:21;510:7;530:8;
553:25
**corner (6)**
518:18,24;523:13,
18;526:13;532:23
**corporate (3)**
531:24;532:1;537:20
**corrections (2)**
488:21;489:3
**correctly (2)**
489:20;545:2
**Cortlandt (1)**
473:4
**Counsel (25)**
458:22;462:2;
466:18,19,20,23,24;
467:13,15;472:3;
501:3,6,20,25;539:5;
540:5;551:4,7,8,12;
552:17;554:5;560:5;
562:5,9
**counselor (1)**
550:17
**count (5)**
544:15;557:12,19,
24;558:2
**counterargument (1)**
492:17
**counts (1)**
557:17
**County (1)**
470:3
**couple (4)**
433:14;434:15;
445:14;456:23
**course (13)**
430:5;434:4,10;
467:25;468:17;469:15;
476:21;492:21;508:9;
509:3;548:4,6;558:9
**COURT (171)**
429:2,5,8,21,24;
430:7;431:2;435:23;
436:16;445:11;448:14;
450:5;452:4,7;454:21;
458:2,4,22;459:8;
460:9,14,16;462:14;
463:8,13;464:8;465:7,
9,18,22,24;466:1,3;
469:12;470:1,2;
483:24;487:10,23;
491:7;492:1,2,8,16,24;
493:8,14,16,20,23;
494:5,10,12,21;495:4,
11,15,22;496:11,22;
497:2;498:13;499:13,
24;500:1,12,17,22;
501:10,16,24;502:6,8,
17;504:16;506:4,6;
507:2,13,20,23;508:10,
14,17,24;509:11,15,21;
510:4,14;511:1,3;
512:21,25;514:10,13,
16,23;530:13,16,22;
531:1,5;535:3;537:10,
13;538:10,13,16,18;
539:1,4;540:2,14;
541:15,23;542:6,9,13,
21;543:1,15;544:4,13,
18,20;545:8,21;546:8,
17,25;547:5,8,24;
548:3,6,24;549:1,9,14;
550:2,17;551:1;552:5,
23;554:7,10,14,17;
555:2,6,8,11,24;556:1,
9,13;557:1,2,4;558:21;
560:2,5,10,13,24;
561:8,16,21;562:23;
563:7
**courtroom (2)**
436:9;469:6
**courts (1)**
551:23
**cover (3)**
475:1,2;480:17
**covered (6)**
468:20;475:2,3,4;
487:13;544:7
**covering (1)**
479:22
**covers (1)**
544:6
**create (1)**
443:19
**created (1)**
496:1
**creates (1)**
546:11
**credibility (1)**
495:9
**Credit (26)**
440:20;466:16,17,
21;468:15,17;469:16;
470:25;471:9,24,24;
472:3;473:4,15;476:3;
477:25;478:21;480:5;
487:18;515:8;531:24;
532:1,8;533:8,13,13
**crime (2)**
557:18;558:12
**crimes (1)**
557:9
**criminal (5)**
440:22;441:18,24;
558:19;562:1
**critical (1)**
541:11
**cross (2)**
501:12;502:19
**Cross-examination (7)**
452:7,8;497:5,7;
513:10;535:4,7
**cruise (1)**
524:9
**CU (1)**
524:9
**CUES (1)**
523:9
**curiosity (1)**
496:14
**current (1)**
430:2
**currently (5)**
431:13,14;466:13;
515:4;550:25
**cuts (1)**
485:3

## D

**dark (1)**
469:9
**date (12)**
443:11;451:7,23;
457:14;484:2;497:14;
511:24;518:19,25;
521:5;534:4,19
**dated (5)**
442:6,16;463:19;
484:3;521:12
**dates (3)**
451:22;526:14;
527:21
**day (2)**
429:14;547:12
**days (5)**
455:24;456:1,2,3;
562:4
**deal (2)**
496:11;540:2
**dealing (3)**
486:20;487:20;
490:11
**dealt (5)**
473:20,21;480:11,
20;541:20
**Dec (1)**
530:9
**December (11)**
478:5;481:5;511:22;
547:10,13,14,25;548:2;
550:6,8;563:8
**decided (7)**
482:13;560:25;
561:2,14;562:8,11,18
**decision (1)**
561:19
**defendant (15)**
431:3;436:15,18;
437:2,5;438:5,18;
441:19;442:7;469:11;
486:22;495:24;497:2;
550:2;562:6
**defendant's (5)**
438:15;443:1;492:2;
499:11;541:9
**defense (26)**
453:2;492:6,10,20;
493:11;496:18;498:6,
10,16,18,20,20,23;
506:1;535:14;548:17;
560:19,25;561:12;
562:4,5,7,8,11,13,16
**deferred (1)**
485:18
**definitely (1)**
438:14
**degree (1)**
467:4
**delay (1)**

561:9
**deletes (1)**
475:24
**deliberations (1)**
548:5
**demeanor (2)**
473:9;489:12
**dental (1)**
434:21
**deny (2)**
533:18,21
**departed (1)**
450:17
**department (16)**
467:15,16,17;
468:13;471:9;482:14,
15,22;484:14;500:19;
515:11,13,15;517:19;
536:19;538:2
**departure (1)**
450:18
**depending (2)**
485:20;495:1
**depends (1)**
519:21
**depicted (1)**
484:15
**dereliction (1)**
501:7
**describe (4)**
436:17;437:5;
438:15;469:8
**description (7)**
472:15,16;495:23;
520:15,16;524:6,7
**descriptions (2)**
525:17;526:16
**details (1)**
545:13
**determination (5)**
472:24;473:7;
542:18,19;545:14
**determined (1)**
555:14
**developing (1)**
471:10
**devices (18)**
446:4;447:2,8,12,24;
448:18,20,23;449:21;
450:11,19;451:9;
463:6,10,15;464:1,7,12
**devices/equipment (1)**
450:16
**died (1)**
481:8
**difference (1)**
516:18
**different (13)**
456:23;470:21;
478:20;479:3;493:24;
501:23,23;502:20;
503:23;516:20;540:7;
543:13;561:10
**digest (1)**
429:20
**DIRECT (39)**
431:9;447:6;452:14;
453:9;456:22;457:11,
12;458:5;459:19,22;
461:7;462:25;466:9;
492:22;493:5;497:22,
23;502:23;503:16;
504:19,25;505:5;
507:11,18;508:2,11,19;
509:4,8,21;512:9,15;
515:1;516:25;517:15;
535:16;537:4,19;
550:18
**directed (5)**
446:2;447:7;486:3,4;
545:9
**Directing (14)**
437:8;440:21;
443:10;446:7;465:12;
518:18;523:6,13;
524:22;526:13;531:15,
22;532:14;534:2
**directly (5)**
433:5;437:20;
456:16;492:21;519:19
**director (2)**
441:1;534:10
**directors (18)**
432:1,4,5;436:20;
437:14;438:2;439:19;
467:9;469:19,20;
473:18;476:17,18,20;
477:10,11;485:9;487:5
**disability (56)**
442:16;479:7,8,9,17,
19,20,22,23;481:12,16,
19,22;482:1,5,25;
484:25;485:1,1,12,13;
487:2,5,8,11,12,14,16,
17,19,21,22,24;488:4,
18;489:5,6,18,22;
490:16,24;503:5,5;
504:14,22,22;508:8;
509:19;512:17,17;
513:17,20,21,24;514:3;
557:23
**disabled (1)**
479:12
**disagree (1)**
561:13
**disagreement (1)**
561:22
**disappointed (1)**
562:2
**discharge (1)**
558:12
**disclose (1)**
435:15
**discovery (3)**
495:14,20;507:9
**discuss (15)**
429:15;437:20;
441:18;446:12;447:20;
472:9,12,19;476:12,20;
481:15;487:1,4;488:7;
491:1
**discussed (18)**
456:23;459:10;
461:5;472:11;480:11;
482:12;486:24;488:15,
16,20;489:19;491:4;
507:24;511:14;512:1,
9;534:11;538:25
**discussing (1)**
483:4
**discussion (9)**
446:14;476:16;
509:9;513:16,20;
514:1,2;554:5;555:2
**discussions (6)**
502:23;507:4,5,11;
508:7;509:17
**display (3)**
444:4;531:4;533:25
**disregard (1)**
451:10
**distribute (1)**
429:10
**distributed (2)**
439:20;440:18
**doctor (4)**
433:19;434:8;435:3,
10
**doctorate (1)**
467:4
**doctors (5)**
433:17,18;434:8,23;
453:21
**doctor's (1)**
453:19
**document (37)**
442:3,5,18;444:6,10;
445:19;451:12,20,23,
24;463:18;477:21;
492:12,12,13,15;
495:17,19,25;496:2,4;
507:25;510:7;513:14;
518:20,23,25;520:19;
521:22;522:9;523:14;
530:19,21;531:13;
557:13;561:16,17
**documentation (8)**
517:8;518:3;521:22;
522:10;523:3;525:13;
526:7;528:17
**documents (6)**
461:15;496:19;
499:13;516:4;558:4;
561:5
**dollar (1)**
519:5
**done (7)**
434:21;486:14;
511:23;521:15;546:12;
552:12;561:9
**doubt (1)**
558:8
**down (17)**
429:6;437:9;438:5;
441:10;443:3,15;
446:6;454:1;458:16;
504:4;505:23;520:12;
524:22;525:2;527:8;
543:15;548:12
**draft (8)**
429:11;476:25;
511:15;542:1;544:3;
545:24;546:3,4
**drafted (5)**
480:3,4;511:18;
544:5;563:2
**drafting (3)**
479:25;480:2,11
**drew (1)**
513:9
**due (2)**
499:4;533:3
**duly (4)**
431:8;466:8;514:20;
550:15
**duplicating (1)**
521:17
**during (19)**
435:15;436:18;
438:12;439:11;443:13;
456:2;464:25;465:4,
12;467:22;470:9;
488:14;489:10;528:3;
546:1;558:3,21;
561:22;562:10
**Durrah (2)**
521:4,6
**duties (8)**
432:2;474:16;501:8;
515:19;521:16;558:13,
15,17
**dwell (1)**
548:15

**E**

**E400 (3)**
499:18,19,20
**earlier (10)**
443:18;472:17;
473:11;478:6;480:11;
486:14;492:7;512:9;
518:10;534:18
**earliest (1)**
450:21
**early (2)**
459:17;500:14
**earning (1)**
479:24
**effect (2)**
490:1;511:21
**effective (1)**
534:11
**either (8)**
489:8;493:24,25;
494:3;496:18;543:18;
551:22;562:14
**electronic (1)**
447:2
**eliminated (2)**
493:17;494:1
**else (12)**
434:24;438:12;
487:13,15;488:12;
494:25;507:14;514:2,
11;538:14;544:21;
560:13
**else's (1)**
547:12
**email (22)**
503:19;504:13;
505:17,21;507:7;
508:22;509:2;510:3,9;
511:10;513:10;514:5;
519:17;530:1,3,6,8;
531:9,10;534:3,5,8
**e-mail (38)**
447:10,13;448:7,22;
449:5,7,10,18,20;
450:10;451:6,10,13,14;
463:15,25;464:4,17;
471:8,14,16,17,18,19,
22;483:9,10,11,18,19;
484:2,5,9;485:24,25;
486:2,8,21
**emails (4)**
496:20;509:5,24;
510:1
**e-mails (4)**
449:24;461:2;
483:19;486:10
**employed (6)**
466:13,15,16;
468:15,17;515:5
**employee (12)**
474:17,18;476:4;
478:9,12,13,14,17;
496:7;515:23;522:3;
523:20
**employees (7)**
430:3;501:4;502:4,
14;516:1,2,19
**employees' (1)**
529:15
**employer (1)**
476:4
**employment (15)**
474:12,14,15,20,25;
475:10,14;480:1;
487:15;494:22;507:4,
6,19;511:16,17
**encompassing (1)**
475:5
**end (6)**
434:14;485:4;

516:12;537:19;544:16;
560:16
**ended (4)**
434:15;466:25;
474:8;494:22
**engage (1)**
558:18
**engaged (3)**
454:16;501:25;
543:11
**enlarge (1)**
524:6
**enough (2)**
462:15;535:23
**Enrique (1)**
560:14
**ensure (1)**
482:16
**entail (1)**
467:14
**enter (2)**
548:16;555:10
**entered (2)**
477:25;496:18
**entertainment (1)**
536:15
**entire (1)**
474:23
**entirely (2)**
508:12;558:22
**entirety (3)**
554:12;555:23,25
**entitled (14)**
478:20,21;484:17;
486:18;494:1,21;
502:25;503:3,8,24;
504:21;505:7;509:23;
558:22
**entity (2)**
456:6;482:4
**entries (1)**
526:17
**entry (4)**
524:23,25;525:2;
528:12
**equipment (2)**
446:3;450:20
**essence (1)**
557:13
**ethical (1)**
553:3
**Ethics (9)**
540:6,8;543:23;
551:3,6,14,21;552:2,12
**evaluate (1)**
543:21
**even (1)**
464:23
**evening (3)**
555:21;559:5;560:2
**Event (3)**
523:6;545:12,15
**events (1)**
470:24
**Eventually (1)**
519:22
**everybody (2)**
431:2;487:13
**everyone (1)**
429:5
**evidence (42)**
442:10;445:9,12;
450:3,6,13;451:20;
461:19;477:19;483:22,
25;496:18;499:14;
500:24;503:15;506:2;
510:1,3;511:4;518:7,9;
531:3;534:1;541:7,7,
11;542:2;545:7,25;
546:1,15,23;548:11,16,
25;554:3;557:3;
558:16,18,23,24;559:3
**evident (1)**
563:1
**exact (4)**
485:6;508:3,20;
509:18
**exactly (3)**
485:10;540:3;557:6
**EXAMINATION (8)**
431:9;456:22;458:5;
466:9;513:7;515:1;
537:20;550:18
**example (1)**
468:13
**Except (2)**
470:25;552:11
**exceptions (1)**
541:19
**excerpted (3)**
555:3,3,13
**excerpting (2)**
556:3,6
**exchange (6)**
434:25;449:10,20;
474:18;475:6;503:19
**exchanged (1)**
449:25
**Excluding (1)**
525:16
**excuse (7)**
459:18,22;463:24;
464:11;465:1;533:14;
536:24
**excused (8)**
466:1,2;491:9;
514:13,15;538:16,17;
560:4
**excuses (2)**
435:7,9
**executive (10)**
431:20,22,24;432:3,
7,23;436:4;467:7,10;
474:24
**exhibit (62)**
429:10;442:10;
444:5,13,23;445:12;
449:15,17;450:2,6;
451:21;461:19;463:14;
477:19;483:17,21,25;
492:3,6,20;493:7,11;
503:14,16;504:7,18;
505:12,15;506:2;
511:3,4,6,8,14;513:4;
517:16;519:25;521:19;
522:19;525:6;526:11;
527:15;528:5;529:25;
530:5;531:3;534:1;
537:19;544:4;545:24;
547:8;548:21,23;
553:18,20;554:2,9,13;
555:21;557:2,3;562:12
**exhibits (4)**
560:21;561:4;562:9,
20
**existence (2)**
507:25;555:7
**existing (1)**
513:22
**expect (2)**
509:12;562:16
**expects (2)**
562:6,10
**expenditure (1)**
516:3
**expense (32)**
515:23,25;516:3,5,
15,18,21;517:2,4,7,23,
25,25;518:13;519:19;
520:12;521:23;522:10;
523:4,15;524:20;
525:8,23;526:12,17,19;
527:14,18,18;528:6,18;
534:25
**expenses (25)**
515:20;517:4;
518:16;519:18;524:20;
525:4,19;526:3,8;
527:22,25;531:8,17;
533:14,15,18,21;
535:16;536:2,13,14,24,
25;537:15;538:5
**expensive (3)**
489:6,21,23
**experience (4)**
439:9;471:25;533:6;
562:1
**experienced (1)**
489:14
**explain (4)**
433:10;434:17;
448:15;473:6
**explaining (1)**
473:8
**explains (1)**
448:12
**Express (4)**
531:25;532:2,4;
533:7
**expressed (4)**
440:1,4;458:6;546:9
**expressing (1)**
453:13
**expression (2)**
489:13;546:10
**extending (2)**
480:20;481:5
**extension (2)**
480:16;511:24
**extensions (1)**
507:6
**extent (3)**
479:10;496:10;559:2
**extremely (3)**
489:16;545:3;546:13

**F**

**face (1)**
435:19
**faced (1)**
435:25
**facial (1)**
489:13
**facilitate (1)**
432:14
**fact (21)**
452:23;453:4,9;
456:14;464:13;480:5;
486:21;494:2;495:25;
496:18;498:9;507:25;
508:6;509:17;510:1;
529:17;535:13;536:23;
541:13;546:20;558:20
**facts (2)**
471:23;545:20
**failed (1)**
501:7
**failure (1)**
499:15
**fair (17)**
444:19;445:3,6;
449:24;454:13;455:8,
17;458:24,25;460:24;
464:11,25;465:4;
494:23;530:8;535:23;
545:7
**Fairly (1)**
438:9
**false (3)**
509:16;557:13;558:3
**familiar (8)**
432:25;444:11;
468:25;474:12;476:5,
8;478:9;540:23
**far (8)**
434:5;467:3;488:3;
490:15,19,23;510:16;
543:8
**farther (3)**
494:23;546:23;547:1
**fashion (4)**
543:8;548:17;
555:14;561:9
**fast (2)**
462:15;493:8
**fax (2)**
519:18;531:14
**February (9)**
443:10,22;444:17;
459:17;461:21;467:10;
522:22;527:15;553:13
**federal (12)**
441:18;443:6,8;
459:12;462:7;465:2,5;
490:20;544:16;550:23;
557:14;558:1
**feel (2)**
458:18;472:4
**felt (7)**
434:20;438:3;
441:14,15;453:12;
464:24;497:25
**fertile (2)**
493:6;496:9
**feuding (1)**
438:2
**few (7)**
433:19;434:5;457:5,
8;465:10;480:16;
487:10
**fifth (7)**
511:16,17;513:13,
14,16,19,20
**figured (1)**
554:12
**figures (1)**
429:8
**filed (3)**
561:7,16,17
**files (1)**
496:15
**fill (1)**
545:2
**final (2)**
483:19;484:2
**finalizing (1)**
507:18
**finally (5)**
441:9;445:19,22,25;
446:1
**financial (2)**
467:25;500:19
**find (2)**
553:8;558:24
**findings (1)**
482:23
**fine (1)**
430:6
**fired (11)**
493:5,12,13,16;
498:25;499:3,6,9;
501:2;502:13,15
**firm (1)**
468:16

**firmly (3)**
562:8,11,18
**firms (1)**
468:22
**first (33)**
429:19;430:2;
431:17,19;441:1;
445:15,16,23,23;457:1;
469:9,18;477:22;
480:6,7;485:24;486:7;
492:19;493:2,17;
495:2;505:22;511:15;
514:21;515:15;532:23;
540:2;543:17,25;
544:10;547:17;555:17;
557:11
**five (8)**
467:17;477:13,15;
478:3;481:11;497:15,
18;524:22
**flight (2)**
547:13;548:1
**flip (4)**
478:24;484:5;
526:25;553:21
**flow (1)**
543:24
**focus (2)**
487:24;488:1
**focuses (2)**
557:19,24
**folks (3)**
429:2;491:8;547:15
**follow (1)**
472:6
**follows (5)**
431:8;466:8;492:24;
514:20;550:15
**followup (1)**
449:18
**follow-up (1)**
494:19
**food (1)**
534:11
**foreclosure (2)**
467:25;468:16
**foreclosures (1)**
468:4
**foresaw (1)**
556:2
**form (9)**
543:19,19;544:1;
545:5,9,10,12;548:9;
555:13
**former (7)**
430:2;433:3;441:1;
475:19;480:4;503:20;
511:12
**forms (2)**
544:25;545:2
**forth (5)**
453:21;471:17;
474:16;492:19;543:3
**forward (1)**
485:23
**forwarded (1)**
482:24
**found (3)**
489:16;494:7;501:6
**foundation (1)**
495:15
**four (6)**
455:24,25;527:1;
532:15;557:9;558:9
**fourth (2)**
511:25;558:2
**free (1)**
560:2
**frequently (4)**
435:6;438:8,9;
470:15
**Friday (1)**
547:18
**friendly (2)**
436:19;438:17
**fringe (2)**
474:17;475:4
**front (5)**
444:7,8;449:20;
477:21;484:6
**full (2)**
456:2;552:20
**fully (1)**
501:15
**fund (1)**
489:9
**further (9)**
452:5;465:23;491:6;
509:1,9;512:24;514:9;
535:2;538:12
**furthermore (1)**
512:2

## G

**Game (1)**
525:1
**gap (1)**
479:23
**gave (9)**
430:3;434:9;454:1;
456:17;472:17;497:25;
499:18;516:25;562:25
**General (15)**
466:18,19,20,23,24;
467:13,15;468:4;
471:24;496:4;501:20,
25;517:19,22;541:18
**Generally (7)**
474:25;475:1;
478:19;481:2;486:8;
507:24;540:21
**generate (1)**
443:22
**generated (1)**
444:16
**gentlemen (3)**
448:15;539:4;557:4
**gift (5)**
439:13,15,20;456:9;
500:15
**gifts (1)**
439:10
**given (11)**
439:10,13,23;
449:22;450:17;454:19;
456:9;525:17;541:11;
547:22,22
**giving (2)**
435:20;508:18
**goes (7)**
494:23;509:25;
541:7;542:22;543:9;
546:23;553:4
**goings (1)**
456:5
**Good (17)**
429:2,3,4,5;431:11,
12;452:10,11;466:11,
12;471:3;483:5;496:7;
515:3;535:9,10;550:20
**good-faith (1)**
562:12
**govern (3)**
552:2,7;553:3
**governing (3)**
552:1,24;553:25
**government (83)**
429:16;431:4,5,7;
435:12,15,24;442:10,
13,15;444:5,13,23;
445:8;449:15,16;
450:2,2;451:21;
452:15;453:4,24;
457:1;459:5,25;460:3;
462:7;463:14;465:20;
466:4,7;477:19;
483:17,21,21;492:5;
495:17,19;496:14;
497:9,12,19;498:2,4,
22;503:14,16;504:6,
18;505:12,13,15;
506:1;507:9;509:13,
18;511:3,6,8,14;513:4;
514:17,19;530:11;
534:1;538:19;544:10,
12;545:22,24;546:16;
548:12;550:12,14,22;
553:18,20;554:2,2;
557:2;558:8;561:5;
562:5
**government's (9)**
429:19;445:12;
450:6;461:19;483:25;
511:4;531:3;537:19;
557:3
**grand (1)**
557:25
**Greek (1)**
524:9
**green (1)**
436:13
**ground (1)**
493:6
**grounds (3)**
496:7,9;506:4
**group (1)**
487:12
**guess (4)**
462:22;547:17,21;
551:13
**guest (1)**
520:17
**guests (1)**
535:20
**guidelines (1)**
553:3
**guilty (1)**
558:8

## H

**half (1)**
547:11
**Hamill (41)**
477:18;478:24;
479:14;483:15;484:1,
4,7;485:23;513:3;
518:8,22;519:24;
520:13;521:18,19;
522:7,19;523:2,12,24;
524:5,11,17;525:6,22;
526:10,25;527:8;
528:5,11,20,24;529:24;
531:11,18;532:12,20;
533:25;534:16;553:17,
21
**handed (1)**
492:2
**handle (6)**
467:18;468:3,3,21,
23;529:11
**handled (9)**
468:5,10,12,14,16;
473:22;516:19;548:10,
11
**handling (4)**
475:11;515:22;
516:15;533:6
**handwritten (2)**
520:20,22
**hang (1)**
550:9
**hanging (1)**
490:11
**happen (4)**
476:12,18,24;560:18
**happened (8)**
459:16,20;467:1;
490:14;494:2,17;
516:24;562:1
**happening (2)**
441:11;446:22
**happens (1)**
545:1
**happy (3)**
438:1;447:23;544:6
**head (3)**
482:13,14,21
**header (3)**
451:12,13,13
**hear (5)**
508:10;509:15;
544:6;546:17;560:8
**heard (3)**
456:14;495:15;509:4
**hearsay (10)**
448:10;495:11,14;
496:1;506:5;507:8;
508:22;510:3,4;546:5
**held (5)**
439:3,4;443:11;
447:2;455:15
**help (4)**
433:19;517:6;
551:13,13
**helped (1)**
432:14
**helping (1)**
432:13
**helps (1)**
479:9
**Hi (2)**
450:15;451:8
**higher (2)**
533:9,10
**highlight (6)**
445:14,16,18;
451:22;504:11;512:5
**himself (1)**
441:8
**history (2)**
518:13,14
**hmm-hmm (3)**
455:14,16;463:16
**hold (1)**
469:13
**holidays (1)**
478:15
**Hollywood (1)**
522:14
**home (2)**
441:3;454:1
**Honor (102)**
429:3,4,16,25;430:1;
448:13;450:4;452:5;
462:13;463:9;464:10;
465:8,10,23,25;491:6;
492:18;493:2,25;
494:4,7;495:1,6,13,16;
496:10;497:6;499:10;
501:13,18;502:21;
506:1;507:3;508:6,23;
510:7,18;511:2;
512:14,20,24;513:2;

514:7,9,12;530:11,12,15,17,20,24,25;533:23;535:6;537:9;538:9,15,21,24;539:2;541:8;542:8,12,15,17;543:2;544:12,14,19,22,23,24;546:3,13;547:3,23;548:1,14,24;549:4,6,8,12;554:4,9,12,16;555:5,20,23,25;556:5,6,8,12;560:9;561:7,10,13,18;562:22;563:6
**Honorable (1)** 534:3
**Honor's (1)** 429:18
**hope (3)** 429:5;431:2;450:15
**horrible (1)** 441:14
**Hotel (1)** 439:4
**hotels (1)** 432:19
**hours (1)** 451:14
**house (5)** 433:13;468:3,4,11;546:2
**human (4)** 482:14,22;484:14;503:21
**hundred (1)** 562:14
**hurt (1)** 490:3

## I

**ID (1)** 521:13
**idea (1)** 483:5
**identification (12)** 444:5,14,23;445:9;449:14;450:3;483:16;492:3;499:12;505:12,15;553:18
**identified (2)** 436:15;469:11
**identify (2)** 436:12;562:17
**ill (1)** 479:11
**imagine (3)** 496:11;562:15,21
**immediately (2)** 446:2;534:11
**impeach (2)** 496:6,6
**impeaching (2)** 508:14,16
**impeachment (1)** 496:9
**impede (2)** 557:14,15
**implemented (1)** 488:22
**important (1)** 547:9
**importantly (1)** 495:24
**impression (1)** 458:11
**inactions (1)** 558:24
**inappropriate (1)** 433:8
**include (8)** 432:16,19,22;443:25;451:13;467:20;515:22;544:23
**included (3)** 437:18;502:3;541:18
**including (7)** 432:11;451:12;467:17;517:23;521:16;529:15;537:3
**income (1)** 479:10
**inconsistent (1)** 510:11
**inconvenience (1)** 450:22
**indicate (1)** 471:25
**indicated (13)** 435:24;463:25;465:15,19;472:3,23,24;478:4;482:24;483:13;484:16,23;513:23
**indicates (3)** 479:7;484:20,25
**indicating (2)** 451:1;471:22
**indication (2)** 484:18,19
**indictment (4)** 557:10;558:10;559:1,2
**individual (4)** 432:25;436:2;468:6,25
**individual's (1)** 482:21
**infer (1)** 543:11
**inferences (1)** 545:6
**inform (3)** 534:9;541:5,10
**informal (1)** 476:13
**information (7)** 448:7;472:2;508:18;517:23,25;540:24;543:7
**informed (3)** 437:24;448:6;487:9
**informing (1)** 504:13
**informs (1)** 541:13
**initial (2)** 478:2,3
**initially (2)** 440:25;454:13
**injured (3)** 468:6,19;479:10
**innocent (1)** 558:6
**inquirer (1)** 552:13
**inquiries (4)** 551:14,15,24;552:10
**insofar (1)** 558:24
**instance (1)** 535:21
**instead (8)** 464:8;481:19,21,25;482:4;490:20;491:2;514:3
**institution (6)** 467:19,25;468:2;470:21;477:5,6
**instructed (1)** 446:25
**instructing (1)** 450:10
**instruction (7)** 429:12,18;447:9;544:4,11;547:4;548:11
**instructions (1)** 447:1
**insurance (40)** 442:16;468:20,20;479:1,3,6,7,8,9,18,19,21,22,23;480:17,18;481:10,12,16;482:25;487:2,5,22,25;488:4,18;489:5,6,18,23;490:21,24;491:2;513:18,21,21,24;514:3;557:22,23
**insurances (2)** 478:16,20
**intend (6)** 541:1,4;545:19;547:3;560:11;561:4
**intending (2)** 510:18;555:6
**intends (2)** 429:17;561:1
**intense (1)** 433:12
**intent (2)** 542:23;558:25
**interact (1)** 519:16
**interim (2)** 447:1,4
**intern (1)** 431:19
**International (1)** 523:9
**internet (6)** 525:16;526:18;527:18,21,25;528:3
**interview (1)** 558:3
**into (23)** 440:23;441:9;445:9;450:3,13;451:6;467:18;477:25;483:22;490:13;496:18;506:2;510:3;518:6,9;534:1;542:2;546:15;548:1,11,16,25;554:3
**introduce (5)** 492:15;493:7,10;508:19;562:10
**investigating (1)** 501:3
**investigation (15)** 440:23;441:4,5,10,19,24;454:14;457:2;465:2,5;490:20;544:17;557:14,16;558:1
**investigative (1)** 560:15
**investigators (4)** 443:6,9;459:12;463:11
**invoice (5)** 520:3;522:21;523:25;524:6,13
**invoices (1)** 525:20
**involved (6)** 455:18;467:22;472:9;475:11;480:2;541:21
**involving (2)** 468:6,18
**irrelevant (2)** 554:8;558:22
**Isle (1)** 524:9
**issue (18)** 430:5;483:7,20;485:7,8;486:20;488:19,19;492:21;507:25;508:9;512:16;513:21;538:24;543:25;544:25;548:9;555:4
**issued (1)** 541:25
**issues (5)** 472:5;481:4;488:16;490:3;496:5
**itemized (2)** 524:20;525:11
**items (18)** 445:14;467:8;472:3;474:18;476:13;478:13;480:15;483:8;485:8;488:23;489:1;492:19;511:23;525:11,14,17;526:1;536:15

## J

**jacket (1)** 469:9
**Jafar (1)** 523:19
**James (2)** 521:4,6
**Jampol (1)** 462:4
**January (17)** 440:21;441:18,25;442:17;457:12,13;459:17;466:25;467:1;478:5;494:17;499:1,4;518:21;519:8;526:14;528:6
**job (10)** 467:14;469:23,25;475:2;478:9;492:20;496:8;499:4,7;538:5
**jobs (2)** 443:18;552:22
**John's (1)** 467:4
**jokingly (1)** 447:16
**judge (12)** 472:25;534:14,14;542:14;545:2;546:20;558:13,15,17,21,24;561:25
**judges (9)** 551:14,16,22,22,23,24;552:3,14;553:3
**judicial (22)** 471:18;472:1;540:6,8;541:2;542:10;543:2;544:9,24;545:4;549:2,10;551:3,6,21;552:2,25;553:25;555:6,15;556:7,9
**judiciary (3)** 472:1;552:9;553:7
**Julia (1)** 522:1
**July (6)** 459:5;524:9,13;526:14;527:16;551:7
**June (2)** 452:1;527:16
**juris (1)** 467:4

**Juror (4)**
547:7,8,11;548:4
**Jurors (3)**
431:3;497:2;550:2
**jury (46)**
429:1,7,15;431:1,17;445:15;472:17;485:15;491:9;492:1;496:13;497:1;500:23;513:4;515:4,17,25;517:18,21;518:8,12,19;520:6;521:1;522:12;523:8;525:13;526:16;527:2;529:25;531:4;532:17;540:1;542:18;543:4,6,11,20;544:8;545:3,11;548:7;550:1,6;557:25;560:1
**justice (4)**
470:1,2;557:12,18

## K

**Kam (56)**
432:25;433:13,20;438:14,15;440:4,23;441:3,5;442:1;443:14;444:1;446:1,8;453:8;456:16;458:10;463:1,5;467:12;474:20;475:8;476:4,5,10;477:5;478:1,17;480:1,7,10,12,25;481:11,25;482:4,7;484:17;488:6,7,13;490:15,20;491:1;504:7;511:16;512:10;514:2;521:3;531:24;533:15,17;534:12;536:11;557:14,21
**Kam's (1)**
531:8
**KATZ (45)**
514:17,23,24;515:2;518:8,22;519:24;520:13;521:18;522:7,19;523:2,12,24;524:5,11,17;525:6,22;526:10,25;527:8;528:5,11,20,24;529:24;530:11,20,24;531:4,6,11,18;532:12,20;533:5,23,25;534:16;535:2;537:9,11;538:14,15
**keep (5)**
429:15;448:18,19,23;490:14
**keeping (1)**
441:17
**kept (1)**
509:3
**key (2)**
492:9;541:7
**Kim (7)**
482:21;484:12;503:20;504:7,13;507:17;512:9
**kind (5)**
468:21;470:21;472:23;517:21;547:11
**Kings (1)**
470:3
**knew (5)**
433:13;462:6;470:11;490:19,22
**knowledge (19)**
435:18;439:5,10;440:17;479:12,13;488:5;520:9;522:2,5;523:20;532:10;533:17,20;536:8;541:9;542:22;558:23,25
**known (2)**
515:8;525:18
**knows (1)**
430:1
**Kohn (8)**
447:5,6,11;448:8,11;463:3;464:14,19
**Kohn's (1)**
464:4

## L

**lack (1)**
557:25
**ladies (3)**
448:15;539:4;557:4
**laid (1)**
557:9
**Lambert (9)**
517:15;519:20;521:4;536:6,9,11,19,21;538:3
**language (2)**
541:19;562:3
**large (1)**
499:20
**larger (1)**
445:3
**Las (4)**
439:4;455:12,21;520:18
**last (15)**
430:3;445:3;449:9;463:9;480:22;481:2;482:7;485:3;487:10;488:6;514:22;518:22,25;544:14;555:21
**lasted (1)**
439:7
**Lastly (1)**
537:18
**later (3)**
429:14;434:16;454:20
**latter (1)**
545:15
**Laura (5)**
430:4;538:20;550:12,13,16
**law (4)**
545:4;552:9,10;563:5
**laws (1)**
472:1
**lawyer (2)**
551:10,11
**lawyers (2)**
462:11;561:23
**lawyers' (1)**
500:24
**laying (1)**
483:11
**leading (1)**
497:16
**learn (7)**
437:9,12;440:1,22,25;446:8,10
**learned (3)**
441:1;454:13,20
**least (4)**
480:20;562:2,3,24
**leaving (1)**
509:7
**led (1)**
543:22
**ledger (2)**
517:19,22
**left (10)**
431:18;437:6;440:7,8,10;451:23;455:17;513:3;519:2;521:4
**left-hand (4)**
484:16;520:15;523:13,18
**legal (15)**
466:20;467:13,15,16,16,18;468:13;471:8;481:24;482:3;501:7;502:1,3,3,14
**legitimate (1)**
496:6
**lengthy (1)**
429:9
**less (4)**
429:12;463:22;508:1;509:19
**letter (9)**
437:13,13,16,18;447:16;451:2;452:1;543:3;563:1
**letting (1)**
448:22
**level (1)**
553:4
**liaison (2)**
432:5,21
**lied (1)**
546:16
**lieu (1)**
557:22
**life (2)**
480:17,18
**light (1)**
558:25
**liked (1)**
453:15
**likely (2)**
508:1;509:19
**Likewise (1)**
562:8
**limit (1)**
471:23
**limited (4)**
475:16;543:7;544:2;557:5
**limiting (5)**
429:12,18;544:3,11;547:4
**limits (2)**
485:19,20
**Linda (8)**
517:15;519:20;521:4;536:6,8,19,21;538:3
**line (8)**
494:8,10;501:22,23;502:18;531:7;532:14,23
**lines (4)**
490:4;511:25;524:22;529:6
**link (1)**
553:9
**linked (2)**
553:11,14
**list (7)**
437:18;479:3;525:11;560:20;562:5,9,12
**listed (3)**
479:6;488:24;527:18
**listen (1)**
441:10
**lit (1)**
442:11
**litigation (17)**
467:20,22,24;468:2,4,5,7,9,10,12,14,16,18;472:8,10,14,15
**little (16)**
435:6;463:22;469:19;504:4,17;516:20;520:14;522:8;524:18;525:7;527:9;528:12,25;533:2;537:18;560:10
**live (1)**
553:13
**Location (1)**
523:7
**locations (2)**
432:19;553:10
**long (9)**
439:5,7;466:22;470:9;490:12;515:9;517:12;551:5;553:11
**longer (2)**
438:4;448:18
**longterm (22)**
442:16;479:17,19,20;481:12,16,19,22;482:1,5;484:25,25;485:12;487:2,4,7,11,12,14;488:4;490:16,24
**long-term (11)**
503:4,5;504:14,22,22;508:8;509:19;512:17,17;513:17;514:3
**look (8)**
436:9;506:6;511:25;530:5;543:15;545:8;554:17;561:21
**looked (1)**
537:4
**looking (14)**
440:6;503:16;505:20;511:8;518:24;520:6,15,19;522:21,24;523:17;528:9;531:7;532:22
**loose (1)**
550:9
**lost (1)**
556:1
**lot (4)**
433:16;485:21;509:7;543:9
**louder (1)**
560:10
**lower (1)**
504:17
**luxury (1)**
499:20
**Lystra (1)**
522:1

## M

**main (2)**
475:10,15
**mainly (1)**
467:7
**maintain (1)**
517:19
**makes (3)**
509:19;547:21;559:5
**making (9)**
435:7,9;515:19;521:16;522:8;525:7;528:12;541:3;558:2
**managed (1)**
467:15
**management (3)**

432:6,22,22
**manager (2)**
431:24;516:4
**managers (1)**
432:6
**Manhattan (1)**
473:5
**many (10)**
434:3,9;469:17;
477:12,14;496:19;
525:11;526:1;552:19;
561:10
**March (9)**
482:19;484:3;486:1;
488:11,14;504:8;
505:18;512:15;527:15
**MARK (80)**
429:4;430:1;466:4,
10;469:10;477:18;
478:24;479:14;481:1;
483:15,21;484:1,4;
485:23;486:4,5;491:6;
492:5,9;494:4,6;
495:22,23;496:17;
499:22,25;500:11,16,
21;501:9;502:5,16;
503:20;505:17;506:3,
5;507:5;508:21;
509:25;510:6,9;511:2,
10;513:2,8;514:7,9;
538:19;540:4,15;
541:17,24;542:8,12,15,
25;544:12,18,19;
545:18;547:3,17,20;
548:14,22,23;549:12;
550:12,19;553:17,21;
554:2;560:6,7,11,14;
561:7,17,18;563:6
**marked (12)**
429:10;444:4;
449:14;483:16;495:3,
20;499:12;505:11,14;
547:8;553:18,19
**marketing (1)**
482:13
**Mary (1)**
524:11
**material (1)**
560:21
**matter (8)**
448:15;468:21;
490:10;493:24;508:20;
542:3;543:17;546:6
**matters (4)**
467:18;468:23;
541:8,10
**May (41)**
436:14;446:7,25;
448:24;450:8,23,25;
451:5,14;452:2,4;
463:19;465:8;469:10,
21;470:8;475:16;
477:18;480:23;484:1;
493:23;495:7,7;
514:23;527:16;531:5;
535:5;538:8;543:9;
548:7;550:9,17;
553:17;557:19;558:13,
15,16,17;559:3;560:5;
561:24
**maybe (4)**
434:6;462:22;
545:10;563:1
**MCU (94)**
430:3;431:16,17;
432:23;433:3;437:6;
438:6,10,19;446:2,23;
447:8,11;449:22;
450:15,16,17,21;
454:18;455:2;456:5;
462:6;464:1,13;
466:22;467:6,11,14,22;
470:10;471:5;472:8;
481:10,25;487:13;
490:15,19,23;495:14,
17;496:1,19,21;
498:25;499:3,7,7,17;
500:3,4,14,18;501:2,3,
4,6,25;502:4,13,14;
505:21;507:8,10;
509:2,4,5;515:8,9;
516:1,16,19;517:18;
519:10,15;522:2,3,5,
17;523:20,22;525:4;
527:12;528:3;529:4,
11,15,20;532:3;
533:13;534:11,12;
540:11;557:22,22
**MCU-issued (3)**
446:3;529:17;530:1
**MCU's (12)**
462:2;469:2,13;
470:4,5,7;471:4;
472:20;496:15;500:19;
535:19;540:19
**mean (9)**
468:11;494:12;
508:22;517:25;518:3,
14,16;521:15;551:10
**meaning (2)**
500:3;516:5
**means (2)**
431:23;503:9
**meant (1)**
473:6
**media (1)**
446:11
**medical (2)**
481:7,9
**medication (5)**
433:15,16,24,25;
434:2
**meet (6)**
438:10;470:19;
488:7;498:13,14,15
**meeting (39)**
438:12;443:6,8,11,
13,14,16,19,22,23;
444:16,17,19;455:25;
456:3;457:17;461:21,
24;462:19;470:17,17,
18,21;473:3,21;474:1,
2,3;482:12;486:15;
488:13,14;489:10;
490:7;491:4;520:23;
525:18;547:9;548:2
**meetings (9)**
432:7,12,13;435:16;
443:25;456:5;490:10;
498:3;526:5
**meets (1)**
496:15
**Melissa (1)**
462:4
**member (6)**
469:15,16;517:7;
519:15;522:2;535:13
**members (8)**
445:15;450:17;
473:21,22;486:19;
516:16,20;537:6
**memo (3)**
508:9;509:13,16
**memorandum (1)**
557:20
**memorialized (3)**
443:16;460:25;461:2
**memory (4)**
449:11,17;499:11;
534:21
**mentioned (20)**
433:24;442:1;443:8;
453:4;454:22;463:24;
467:13;468:10,18;
470:4;471:14;472:8;
473:11;475:20;478:6,
6;485:8;486:14;
552:14,24
**Mercedes (8)**
499:7,18,20;500:3,6,
9,14,18
**Mercedes-Benz (1)**
499:19
**merely (2)**
496:5;541:4
**message (4)**
436:25;459:1;504:6,
7
**messages (2)**
460:25;461:15
**met (12)**
435:12;437:2;
452:14,21;470:19;
497:9,12,14,15;498:6;
535:11,13
**Metropolitan (1)**
431:14
**Mexico (1)**
523:11
**Mid (1)**
499:23
**middle (3)**
520:19;531:15;534:2
**might (3)**
435:19,19;544:8
**mind (3)**
522:8;525:7;532:20
**mine (2)**
440:8;510:8
**minute (1)**
494:5
**minutes (10)**
432:9;443:16,19,22;
444:16,20;445:4;
491:7;508:11;539:5
**mischaracterization (1)**
537:11
**misconduct (4)**
499:4;543:12;544:9;
558:19
**misleading (2)**
545:3;557:13
**miss (1)**
548:4
**mistaken (1)**
508:10
**mistakes (2)**
541:13,14
**misunderstanding (2)**
441:12,13
**moment (7)**
465:8;477:20;
512:20;533:23;538:8;
549:4;562:15
**money (3)**
485:20;516:2;557:22
**Monique (4)**
431:5,6;450:23;
519:21
**month (2)**
470:19;497:16
**monthly (6)**
470:17;526:21;
528:1,2;531:17;533:6
**months (3)**
457:5,8;526:21
**Moon (1)**
523:10
**moping (1)**
441:6
**more (21)**
429:12;435:3,6,10;
440:7,8;451:9;454:7;
462:22;465:10;487:20;
495:24;506:6;508:1;
510:15;525:2;527:1;
551:18;558:9;560:11;
563:2
**Moreover (2)**
496:3;541:11
**morning (4)**
538:25;544:4;
555:22;559:6
**mortgage (2)**
467:25;468:3
**most (5)**
473:25;479:10;
507:10;510:9;516:21
**mother (2)**
433:11,24
**mother's (1)**
433:15
**motion (1)**
476:17
**motive (3)**
542:22;546:11;
558:25
**motives (1)**
543:22
**move (4)**
454:22;495:9;
501:24;502:20
**moves (1)**
506:1
**Mrs (1)**
483:2
**much (9)**
475:5;485:20;493:9;
494:13;520:6;522:24;
524:3,15;528:9
**mud (1)**
492:8
**multiple (4)**
452:19;453:10;
529:6;561:11
**mummies (1)**
555:4
**Municipal (13)**
440:20;466:16,17,
21;468:17;469:16;
471:24;473:4,15;
476:3;477:25;480:4;
515:8
**Museum (1)**
431:14
**must (2)**
534:9;558:11
**myself (3)**
448:2;453:1;467:17

## N

**nail (1)**
458:16
**name (14)**
452:12;463:3;
467:12;482:21;514:21,
21,22;521:20,25;
523:17,18;527:10;
529:2;535:11
**named (3)**
432:25;436:2;468:25
**names (1)**
561:3
**Nancy (2)**

519:25;534:17
**Nathan (2)**
452:12;535:11
**Naturally (1)**
467:16
**nature (1)**
473:23
**near (1)**
465:13
**necessarily (3)**
492:6;493:6,10
**necessary (1)**
450:20
**need (3)**
451:9;509:5;557:5
**needed (8)**
433:18;434:7,22;
485:7;488:17,21;
489:8;555:3
**needs (1)**
543:20
**negotiated (3)**
475:18;561:10;
562:23
**neither (1)**
482:25
**nerve (1)**
555:17
**New (12)**
470:1,2;477:2;
542:11;547:13;551:1,
24,25;552:2,5;553:4;
558:13
**news (1)**
446:11
**next (35)**
429:10;430:8;431:4;
433:17;434:8,8;448:3,
12;457:4,9;466:3,4;
476:19;477:3;491:11;
496:23;504:16,18;
506:9;510:20;514:16;
519:5;521:5;528:21;
531:11,18;538:18,19;
539:6;549:16;550:11;
554:18;556:14;559:7;
563:2
**nice (1)**
431:2
**nicely (2)**
447:16;451:1
**night (1)**
547:14
**none (1)**
494:12
**nonpartisan (1)**
552:4
**nonprofit (2)**
541:18,21
**nor (3)**
482:25;545:18;
558:15
**normal (1)**
485:21
**Norman (5)**
447:5;463:3;464:4,
14,19
**notation (2)**
520:20,22
**note (7)**
453:19;538:21;
547:7;550:4;560:7,22;
561:11
**noted (1)**
537:23
**notes (11)**
458:24;460:10,14,
16,19,20,22;461:13;
490:7,10;547:12
**notice (10)**
430:4;492:11;549:2,
10,10;555:7,15;556:7,
10;560:20
**noticed (1)**
490:2
**notify (1)**
561:15
**notwithstanding (1)**
552:9
**number (10)**
474:6,9;480:15;
484:16;486:16;488:20;
519:7;536:25;543:5;
548:21
**numbers (1)**
494:12

## O

**object (6)**
543:8,9;548:25;
554:7;555:18,25
**objected (2)**
546:23;556:6
**objecting (2)**
496:10;555:22
**Objection (30)**
435:22;445:10;
448:10;450:4;459:7;
460:8;462:13;463:12;
465:6,17,21;483:23;
499:22,24;500:11,16,
21;501:9;502:5,8,16;
506:3;530:12,18;
537:9,10;545:18;
546:24;554:4;555:21
**objections (1)**
555:20
**objects (1)**
554:5
**obligation (1)**
562:17
**obligations (1)**
558:23
**observed (1)**
438:16
**obstruct (3)**
544:16;557:12;558:1
**obstruction (3)**
546:19,19;557:18
**obtain (1)**
488:4
**obtained (1)**
542:2
**obviously (8)**
492:6;495:25;
540:22;541:5;542:17;
547:25;549:7;562:14
**occasion (1)**
472:11
**occasions (3)**
452:19;453:10;467:8
**occurred (4)**
443:13;457:13;
459:23;460:4
**o'clock (1)**
547:10
**October (4)**
519:1,9;521:6;
561:17
**off (7)**
478:16,22;479:11;
485:3;513:3;515:16;
553:5
**offer (1)**
549:14
**offered (6)**
440:10;544:3;546:8;
554:16;555:21,22
**offers (5)**
445:8;450:2;483:21;
530:11;554:2
**office (15)**
434:21;437:3;
438:11;440:3,4;441:6,
9;453:22;455:1,9;
462:9;468:7;475:3;
558:4;560:15
**officer (6)**
432:23;466:20;
467:8,10,14;474:24
**official (1)**
546:10
**often (3)**
486:23;490:10,12
**Oftentimes (1)**
468:5
**old (1)**
448:19
**once (7)**
450:17;476:14;
482:20;497:14;521:10;
536:21;546:23
**one (52)**
435:24;438:23;
440:8,10;442:1;
443:18;446:6;452:23;
456:14;460:18;462:25;
465:8;470:22;472:11,
16;473:11;474:22,23;
475:10;480:15,18;
481:4;485:25;488:18,
19;492:19;499:6;
502:15;511:23;512:4;
514:7;519:22;525:16;
532:10;538:8;539:3;
540:8,10,16,16;541:18,
23,24;552:20;555:12,
12,13,15;556:1,5;
558:4,9
**ones (5)**
470:22;483:12;
484:20,23;486:11
**only (15)**
440:10;444:4;
449:14;483:16;495:4;
505:13,22;529:9,25;
546:1;548:14;553:18;
557:5,9;561:21
**open (5)**
440:9;483:8;492:1;
511:1;557:1
**opened (1)**
541:12
**opine (1)**
541:4
**opinion (10)**
440:1;540:9,11,14;
541:25;542:1,4;
545:24;546:3,4
**opinions (1)**
552:12
**opportunity (3)**
429:14,23;449:16
**opposed (2)**
546:16;548:13
**Optimum (1)**
527:7
**options (3)**
549:3;550:10;555:12
**oral (1)**
477:16
**order (4)**
429:11;489:2;
534:11;543:21
**ordered (1)**
550:23
**ordinary (1)**
509:3
**organization (2)**
541:21;552:4
**organizations (1)**
471:24
**original (3)**
451:10;477:24,25
**Orleans (1)**
547:13
**others (3)**
441:4;474:2;508:7
**out (19)**
429:12;439:5,11,13;
447:7;451:11;456:9;
462:15;483:11;485:3;
493:5;496:14,15;
517:6;521:1;532:12,
20;545:2;557:10
**outcome (2)**
545:14,20
**out-of-pocket (1)**
516:2
**outside (15)**
437:2;455:1,2,9;
462:2,11;468:16,22,22;
470:24;501:3,6,22;
502:1,3
**over (17)**
434:4,9;441:22;
446:2,18;463:5,10;
469:19;474:1;479:21;
497:22,23;515:10;
546:17,17;550:10;
561:2
**overall (1)**
471:2
**Overruled (3)**
435:23;460:9;537:13
**own (1)**
536:5
**owned (1)**
446:3

## P

**page (47)**
430:8;445:3;477:19,
22,23;485:24;491:11;
492:19;496:23;504:2,
6,16,18;505:22;506:9;
510:20;518:19,23,23,
24;520:13,24;521:18;
522:7;523:2,7,12,14;
524:5,17;528:11,12,20,
21;529:1,9;531:11,15,
19,20,22;534:2;539:6;
549:16;554:18;556:14;
559:7
**pages (3)**
527:1;548:14;561:11
**paid (12)**
481:21;482:4;500:4;
502:11;515:20,20;
516:2;519:8,10;
521:11;529:20;538:6
**pain (10)**
433:15,15,16,24,25;
434:2,2,22;453:13,17
**Palace (1)**
523:10
**papers (2)**
429:9;555:22
**paperwork (1)**
516:24
**paragraph (5)**
511:25;512:2,8;
534:7;544:14

**parcel (1)**
507:6
**Park (1)**
534:12
**part (21)**
464:13;480:20;484:9;485:4;491:4;492:11;507:6;521:22;522:9;523:3,14;538:4;542:10;543:20;548:4;549:2;552:5,23;555:2,16;556:11
**participants (1)**
439:17
**participate (1)**
478:21
**participated (1)**
476:8
**particular (5)**
456:9;496:20;545:20,20;551:2
**particularly (3)**
471:25;557:20,24
**parties (1)**
477:2
**parties' (2)**
492:7;560:19
**partisan (1)**
552:6
**parts (3)**
543:19;555:18,19
**party (2)**
485:6,7
**pass (1)**
476:16
**passed (2)**
440:4;561:23
**passenger (2)**
521:20,25
**past (2)**
453:22;501:4
**Pause (5)**
512:23;514:8;533:24;538:11;549:5
**pay (3)**
479:21;500:9;521:12
**payable (5)**
515:16,18;516:6,14;521:10
**payee (1)**
521:12
**paying (1)**
557:22
**payment (10)**
434:24;454:1;474:17;516:23;518:13,14;521:6,11;528:1;532:22
**payments (5)**
517:1;518:15,16;521:17;533:13
**pays (1)**
440:17
**pending (1)**
472:14
**pension (10)**
482:25;485:1,15,17,19,19,22;488:2,19;489:7
**people (2)**
454:18;555:4
**per (5)**
447:11;450:15;451:8;464:1;554:4
**percent (1)**
562:14
**perfection (1)**
544:5
**perfectly (1)**
563:1
**performance (3)**
492:21;496:8;499:4
**performed (1)**
467:16
**perhaps (1)**
499:10
**period (3)**
470:5;518:15;558:21
**permitted (1)**
535:19
**person (10)**
436:21;454:10;479:24;486:24;509:5;522:2,5;523:20,22;558:18
**personal (1)**
534:9
**personally (2)**
453:15;519:13
**persuaded (1)**
510:15
**pertain (2)**
541:2,9
**pertaining (1)**
552:7
**phone (16)**
436:23;441:2,22,24;442:20;446:18;447:20;454:10;519:17;528:13,15,17,19,22;529:6,17
**phones (6)**
446:3;448:4;529:12,15,18;560:16
**pick (1)**
450:20
**Piece (2)**
522:14;542:13
**pile (1)**
548:13
**pills (11)**
433:15,19,25;434:3,9,25;435:3,10,20;453:10;454:19
**place (26)**
468:1,7;481:8;482:17;483:1,14,14;484:19,19,20,21,24;485:2;486:11;487:8;490:17;503:11,24;504:23;505:1,8;507:22;508:5;509:9;512:10;513:24
**placed (1)**
446:8
**plan (12)**
432:13;478:22;482:25;485:2,15,17,18,22;488:2;489:7;548:15;560:16
**plane (1)**
521:25
**Planet (1)**
522:14
**planned (2)**
432:8,11
**planning (18)**
432:8,12;438:22,25;439:9,11,16,21,23,24;440:18;455:12,18,23;473:20;492:10;520:17;535:20
**plans (2)**
485:19,19
**play (1)**
548:1
**please (44)**
431:17;434:17;436:12,14,17;441:11;442:9;444:3,6,9,22;445:15,16,17,19;446:6,16,19;447:11,11;449:13;450:21;451:5,6,10,19;452:1;494:5;503:14;504:2,16;505:11,13;511:5;512:16;515:4;522:19;523:24;524:7;528:5,11;531:12;533:25;539:5
**pm (2)**
450:8;451:5
**point (22)**
452:23;459:11;461:5;462:6;463:21;464:8;472:13;476:25;480:18;486:20;487:7,17,21;490:6;492:9;511:13;521:1;543:21;547:5;559:4;562:7,11
**policy (13)**
481:19,22;482:1,5;487:8,11;488:4;489:18;490:16;491:2;535:19,22,24
**poor (1)**
499:4
**portion (4)**
445:21;479:10,22;544:23
**portions (6)**
513:10;554:5,8,14;555:8,9
**position (12)**
437:10;467:2;493:17,23;494:1,8,18;507:13;515:15;530:23;542:22;561:25
**positions (2)**
469:14;470:4
**possession (2)**
446:4;447:12
**possibility (1)**
556:2
**possible (2)**
504:12;545:14
**possibly (1)**
550:10
**post-retirement (2)**
481:6,9
**potentially (1)**
546:11
**precise (3)**
461:10;462:22;508:11
**precisely (3)**
459:15;509:22,24
**preferred (1)**
556:6
**prejudicial (1)**
543:5
**premiums (1)**
557:23
**preparation (3)**
435:12;497:15;498:7
**prepare (3)**
452:17;497:10;562:13
**prepared (3)**
432:9;475:17;531:23
**prescribe (2)**
435:3,10
**prescribed (1)**
433:25
**present (14)**
429:1;431:1,3;488:12;492:1;497:1,3;501:4;540:1;550:1,3;560:1;562:8,12
**presentation (1)**
462:11
**presenting (1)**
562:19
**preside (1)**
474:1
**president (3)**
433:3;467:7;484:13
**presumed (1)**
558:6
**pretend (1)**
544:5
**pretense (1)**
487:19
**pretty (4)**
438:17;454:14,23;475:5
**prevail (1)**
509:1
**preview (1)**
556:7
**previous (1)**
541:3
**Previously (7)**
431:16;449:1;459:25;460:3;466:15,16;550:9
**printed (1)**
485:3
**prior (12)**
435:13;452:15;471:4;475:24;482:7;508:14;510:10,10;527:14;538:1;554:4;562:4
**private (2)**
545:1,16
**Probably (8)**
429:21,21,24;434:6;448:1;487:20;559:4;560:17
**problem (2)**
493:17;544:18
**problems (1)**
543:23
**procedure (1)**
476:14
**proceed (3)**
514:23;535:5;550:17
**proceeded (1)**
483:7
**proceeding (1)**
547:23
**proceedings (2)**
541:22;545:13
**process (7)**
476:5,8,10;507:18;516:1;517:4,11
**processed (4)**
516:23;517:1;518:15;519:22
**processing (1)**
516:7
**produced (6)**
486:10;495:14,19;507:9;509:2;561:5
**professional (1)**
489:17
**proffer (2)**
540:3,4
**proffering (1)**
545:23
**progressed (1)**
474:3
**promises (1)**
453:23
**promote (1)**

553:6
**promoted (2)**
516:9,13
**propensity (1)**
558:18
**properly (1)**
543:4
**propose (2)**
429:13;548:19
**proposed (8)**
429:18;481:15;
492:20;513:13,16;
544:11;547:4;548:18
**proposes (1)**
549:8
**proposition (1)**
546:9
**prosecution (1)**
561:15
**protocol (3)**
450:15;464:1,13
**proved (1)**
558:8
**proves (1)**
558:16
**provide (8)**
435:3;472:2;478:17;
486:12;501:7;516:4;
562:5,9
**provided (8)**
453:10;479:4;480:9;
482:17;499:19;503:10;
540:12,14
**provider (2)**
527:3,6
**provides (2)**
479:23;552:9
**providing (4)**
434:25;481:25;
482:4;502:3
**provision (1)**
502:14
**provisions (1)**
552:10
**public (6)**
542:15;545:1;547:9;
553:6,15,16
**publicly (1)**
540:24
**publish (6)**
445:15;477:18;
484:1;511:6;513:4;
552:11
**published (1)**
542:4
**pull (8)**
442:9;443:3;444:22;
446:6;451:5,11;
503:13;505:11
**purchased (1)**
499:8
**purported (1)**
557:21
**purpose (3)**
544:2;557:5;559:3
**pursuant (1)**
561:3
**put (11)**
447:10;451:20;
475:22;490:16;507:21;
508:2,4;510:2;521:9;
543:4,6

**Q**

**Quaseem (1)**
523:19
**quibbles (1)**
561:19
**quickly (2)**
464:10;548:20
**quite (1)**
490:12
**quoted (1)**
541:20

**R**

**raised (1)**
430:5
**raises (1)**
496:4
**raising (1)**
550:8
**range (2)**
468:8;545:16
**rather (3)**
475:16;545:4;549:6
**Re (1)**
531:16
**reach (1)**
447:7
**read (9)**
445:21;450:13;
451:6;520:16;521:20;
522:12;523:7;524:7;
534:7
**readily (1)**
496:1
**reading (2)**
494:16;496:2
**ready (1)**
489:9
**really (4)**
438:1;473:10;
561:25;562:2
**realtime (3)**
493:21;494:8,14
**reason (5)**
492:14;495:8;499:9;
531:16,16
**reasonable (1)**
558:8
**reasonably (3)**
562:6,9,16
**reasons (9)**
437:3;493:3,6,12,13;
499:6;502:15;534:9;
543:5
**REBOLD (27)**
431:5,10;436:14;
442:9;444:3,9,22;
445:8,13;446:5;
448:12;449:13;450:2,
7,24;451:4,11,19;
452:5;459:7;460:8;
462:13;463:12;465:6,
17,21,25
**recall (28)**
457:14,17;458:8,16,
21;459:15;461:10;
463:17;472:7;473:10;
474:6,23;475:11;
485:10;487:6,17;
490:6;493:11;497:14;
498:12;499:17;503:1,
6,16;505:9;508:4;
512:18,19
**receipts (9)**
516:5,22;517:8,10,
11,24;518:3;537:7,16
**receive (13)**
434:24;439:15;
440:6;447:1;474:18;
475:6;478:14;481:9;
503:8;516:21;529:17;
551:14,24
**Received (38)**
445:11,12;447:9;
448:14;449:1;450:5,6;
462:6;467:4;471:8;
472:23;481:10;483:24,
25;492:5,13;496:20,
20;503:12;511:3,4;
516:24;521:23;523:3,
14;528:22;530:9;
531:2,3;532:22;
536:21;555:21;557:2,
3,4,6,6;560:22
**Recess (1)**
491:10
**recipients (1)**
437:18
**recognize (13)**
436:7;442:13,22;
444:24;469:6;476:21;
477:23;483:18;505:14;
520:24;521:2;531:13;
553:19
**recollect (1)**
489:20
**recollection (9)**
455:20;472:18;
481:4;495:2,7,8;
499:14,15;529:18
**recommend (1)**
476:17
**recommendations (6)**
443:25;445:2,6;
461:20;462:20,23
**recommended (1)**
476:21
**recommends (1)**
446:1
**record (12)**
436:14;451:6;
469:10;490:14;495:13,
19;507:8;508:23;
509:2,6;556:13;560:22
**recording (1)**
459:3
**records (4)**
496:16;516:6;
517:21;526:23
**recounting (1)**
510:10
**recovered (1)**
546:1
**redactions (1)**
548:18
**redirect (3)**
465:24;513:1,7
**reference (4)**
441:23;465:1;
471:16;499:13
**referenced (3)**
456:23;478:22;
481:12
**referred (5)**
477:9;479:17;485:9,
18;487:14
**referring (2)**
512:8;558:9
**refers (1)**
513:14
**reflect (3)**
436:14;469:10;477:1
**refresh (7)**
449:10,17;495:2,7,8;
499:10,14
**refreshed (1)**
534:21
**refused (1)**
498:19
**regard (11)**
468:8;472:1;475:10,
15;488:17;489:3,5,7;
513:19,20;544:8
**regarding (8)**
444:1;447:1;470:25;
494:19;507:11;513:17;
544:24;557:21
**regardless (3)**
495:25;562:7,10
**regards (1)**
450:23
**Regrettably (2)**
534:4,9
**regularly (3)**
532:7;537:16;541:21
**Regulations (1)**
542:11
**regulators (1)**
500:19
**REILLY (28)**
435:22;445:10;
448:10;450:4;452:9,
12;463:9;464:10;
465:8,10,23;530:12,14,
17,25;535:6,8,11;
537:14;538:8,12;
554:4,8,12,16;555:5,9,
20
**reimbursed (14)**
518:16;520:7,12;
522:17,25;524:3,15;
525:4;526:3,19;
527:21;528:9,15;
530:23
**reimbursement (5)**
515:25;516:21;
518:1;526:18;527:24
**reimbursements (6)**
515:23;516:16,19;
517:3;528:2;537:15
**relate (6)**
429:17;479:16;
481:12;492:20;513:12;
551:12
**related (10)**
471:5;499:7;501:8;
502:24;508:8,18;
509:18;540:9,10;
546:19
**relates (3)**
492:11;538:24;
552:24
**relating (6)**
465:5;478:7;481:16;
536:13;540:19;560:15
**relation (5)**
444:17;448:3;
449:21;557:21;558:12
**relationship (9)**
433:4;436:17;437:5;
438:15;454:23;455:4,
5;471:2,3
**Relevance (6)**
499:25;506:5,8;
530:18;543:10;554:5
**relevant (19)**
493:1;495:9,10;
507:2,10,14,15,17,20,
22;508:6;509:12,25;
544:24;545:13;548:12,
18;554:13;556:11
**relief (1)**
563:5
**remain (2)**
539:5;546:13
**remained (1)**
437:7
**remember (12)**
461:20,22;473:8;
485:6;486:23,24;

495:5;500:23;534:20;
550:8;557:19;558:11
**remind (2)**
525:13;541:16
**removal (1)**
545:17
**repeat (2)**
465:3;505:3
**repeated (1)**
480:16
**repeating (1)**
464:9
**repetition (1)**
463:8
**replace (2)**
456:20;479:9
**reply (1)**
472:6
**report (35)**
467:6,9;473:18;
482:24;483:6,9;
487:16;503:12,13;
516:3,21,25;517:15;
519:3,5;520:3,6;
521:23;522:10,21,24;
523:4,15,25;524:3,13,
15,20;525:8,23;526:12,
17,20;528:6,9
**reported (4)**
467:7;500:18;536:6,
11
**reports (6)**
432:9;515:23;
519:19;527:14,19;
533:13
**represent (2)**
452:12;519:7
**representation (1)**
477:24
**request (16)**
429:22;447:21;
464:4,13,19,23;465:5;
482:8,11;540:10,13,18,
20;541:3,15;542:4
**requested (3)**
464:12;482:12;542:3
**requesting (1)**
464:1
**requests (4)**
518:1;536:24;540:7,
23
**required (5)**
450:16;475:5;517:8;
537:7;552:11
**requirement (1)**
496:16
**research (3)**
471:9;521:10,14
**Researched (2)**
521:7,12
**reservations (1)**
432:16
**resign (1)**
472:25
**resignation (4)**
437:13,20;439:1;
534:10
**resigned (8)**
437:14;438:18;
470:12;472:19;534:20,
24,25;542:7
**resigning (1)**
437:24
**resolve (1)**
490:3
**resolved (1)**
548:9
**Resort (1)**
523:10
**resources (4)**
482:14,22;484:14;
503:21
**respect (7)**
453:24;492:23;
503:23;530:14,18;
536:13;562:20
**respond (9)**
447:13;449:7;
471:19,21;488:23;
489:1,22,24;490:5
**responded (3)**
449:18;471:22;
489:24
**response (6)**
447:15;448:8;
450:25;451:13;540:20;
541:15
**responsibilities (14)**
432:2;473:16,20;
474:4,16;475:3,11,13,
15;480:8;515:17,19,
22;532:10
**responsibility (2)**
475:7,9
**responsible (3)**
485:7;500:6;561:24
**responsive (1)**
558:4
**rest (1)**
560:17
**result (1)**
513:21
**resume (1)**
559:5
**resumed (1)**
429:1
**retired (1)**
551:23
**retirement (2)**
481:8;500:15
**retrieve (1)**
450:16
**return (5)**
446:2;450:11;451:9;
464:1,7
**returned (2)**
433:14;440:3
**returning (3)**
449:21;463:15;
479:14
**review (23)**
442:5;444:13;
476:16;482:8,15,15,20,
23;483:2,5;486:12,17;
507:18;512:10;513:22,
23;518:10;527:14;
529:16;532:6;538:5;
549:7;551:15
**reviewed (4)**
442:18;462:22;
538:1,3
**reviewing (1)**
530:20
**revision (1)**
562:13
**ridiculous (4)**
447:22,25;448:1;
464:23
**Riefenhauser (2)**
550:4,5
**right (145)**
445:23;451:24;
452:19,21,24;453:2,5,
13,15,20,24;454:5,7,
11,14,16,19,24;455:2,
6,13,15,21,23,24;
456:3,9,12,13,15,18;
457:1,5,9,14,15,16,18,
21,23,24,25;458:2,6,
12;459:3,13,23;460:1,
11,14,17,18,20;461:8,
25;462:2,7,11,17,20,
23;463:3,6,19,22;
464:2,5,14,17,20,23;
465:20;471:14;473:12;
478:7;480:12;484:7;
485:13;487:8;493:14;
494:15;495:12;497:10,
13,17,21;498:4,7,10,
13;499:1,18,21;500:4,
7,10,15;502:1,4,11,18;
503:11,21,25;504:1,14,
15,19,23;505:2;506:7;
511:18;512:18;513:10,
24;514:10,13;535:17,
25;536:3,5,6,11,15,17,
20;537:1,4,7,16,19,21,
24;542:9,11;545:21;
546:12;552:15,25;
555:19,24;556:9;
561:25;562:21
**right-hand (6)**
518:18,24;521:3,21;
526:13;532:23
**Robert (1)**
430:4
**role (7)**
432:12,16;473:24;
479:25;483:2;529:11;
551:12
**roles (1)**
543:13
**rolled (1)**
505:22
**row (1)**
469:9
**rule (2)**
471:18;549:12
**ruled (1)**
541:8
**rules (22)**
541:2,4,5,20;542:10,
11,15;543:2,13,18;
548:10,24;552:1,2,7,
24;553:8,25;555:7;
556:10,11,12
**ruling (1)**
494:24

## S

**sailed (1)**
556:4
**salary (3)**
475:4;478:7,15
**same (6)**
442:6;447:10;
468:15;481:9;507:7;
534:13
**Sanchez (1)**
560:14
**sat (1)**
441:9
**save (1)**
508:25
**saved (1)**
517:21
**saw (9)**
433:19;434:8,23;
436:7;441:6;480:7;
486:23;536:2,14
**saying (3)**
434:21;503:8;542:5
**scared (5)**
446:23;461:8,11;
465:16,16
**scheduled (1)**
432:6
**school (1)**
467:3
**scope (1)**
496:8
**screen (3)**
442:11;520:1;524:18
**scroll (5)**
444:10;493:22;
504:4,16;527:8
**search (1)**
546:2
**seated (1)**
560:5
**second (14)**
429:20;459:9;512:4;
514:7;520:13;531:20;
540:10,12,18;541:23,
24;544:3;557:17,19
**secrecy (1)**
552:7
**section (9)**
445:16;450:9;
471:17;478:25;479:1,
6,15,16;521:20
**sedan (1)**
499:20
**seeing (2)**
453:22;485:11
**seek (3)**
481:18;495:9;562:10
**seeking (1)**
496:5
**seeks (1)**
510:2
**seem (1)**
494:12
**seemed (1)**
441:8
**seems (4)**
496:5;508:21;
542:13;543:20
**Seepersaud (9)**
514:17,18,21;
518:10;524:7;534:4,
18;535:9,16
**S-e-e-p-e-r-s-a-u-d (1)**
514:22
**Seeta (3)**
514:17,18,21
**S-e-e-t-a (1)**
514:22
**selecting (1)**
432:19
**self (1)**
520:17
**send (1)**
532:7
**sending (3)**
471:22;511:15;532:4
**sense (2)**
547:21;559:5
**sent (23)**
437:16;447:10;
448:6,22;449:5,7;
450:10;451:6;463:25;
471:14;472:6;483:6;
484:10;486:9,18,21;
492:13;505:17,21;
507:7;519:18;532:6;
534:3
**sentence (1)**
544:15
**separate (1)**
557:18
**separation (1)**
438:3
**September (1)**

497:12
**series (2)**
443:25;499:20
**serve (5)**
469:2;541:18,20;
542:1,5
**served (2)**
436:20;469:22
**servers (1)**
509:3
**service (3)**
471:11;528:3,25
**services (4)**
474:19;500:19;
502:4,14
**serving (3)**
436:18;540:11,19
**set (4)**
445:4;471:17;
492:19;543:3
**sets (2)**
429:12;474:16
**setting (1)**
474:2
**Seven (4)**
525:12;526:2,17,21
**several (7)**
433:11;453:22;
458:22;470:20;473:19;
478:20;555:12
**share (1)**
510:8
**sheds (1)**
558:25
**shifted (1)**
545:8
**ship (1)**
556:4
**shirt (1)**
436:13
**short (2)**
473:14;542:6
**show (10)**
449:13;483:15;
508:6;509:23;518:8;
527:2;529:6,24;
532:12;553:17
**showing (3)**
486:10;495:3;518:6
**shown (1)**
477:23
**shows (3)**
460:13;463:18;
504:21
**Siciliano (26)**
466:5,6,11,13;
477:21;479:1;483:18;
484:9;485:25;492:10,
11,15;493:3,11;496:6;
497:9;498:25;499:17;
502:23;503:17;505:14;
508:3,7;511:8;513:9;
514:14
**Siciliano's (3)**
492:20;495:21;
499:11
**side (6)**
429:11;451:20,20;
484:16;520:15;521:21
**sidebar (6)**
501:14,21;506:7;
507:1;554:17;555:1
**sides (1)**
562:24
**sign (5)**
442:3;457:21;477:5,
6;557:13
**signature (4)**
442:22,25;443:1;
521:3
**signatures (2)**
520:24;521:1
**signed (12)**
442:6;477:4,4;
480:24,25;488:6;
509:14,16,19;516:3;
537:23;557:20
**significance (2)**
517:2;521:14
**significant (1)**
496:4
**similar (1)**
472:16
**Similarly (2)**
461:15;536:13
**simple (1)**
541:14
**simplifications (1)**
548:19
**simply (2)**
510:10;543:17
**sit (1)**
472:24
**sitting (3)**
512:13;546:20;
551:22
**situation (2)**
476:4;485:17
**situations (1)**
490:12
**six (2)**
497:9;525:17
**sizable (1)**
454:7
**skip (1)**
547:11
**slowly (2)**
478:25;484:5
**Smith (39)**
430:4;431:5,6,13;
433:7;434:24;435:12;
436:2,17;439:9;
440:17,21;441:17;
442:11;443:10;444:6;
445:21;446:7;452:10,
12;454:18;455:11;
456:22;459:9;465:12,
19;519:21;538:20,22;
540:2,3,4;547:6;
550:12,13,16,20,21;
553:19
**S-m-i-t-h (1)**
550:16
**Smith's (1)**
545:6
**social (1)**
437:3
**socialized (2)**
455:1,8
**socially (2)**
470:24;471:1
**somebody (1)**
547:12
**somehow (1)**
475:23
**someone (3)**
468:19;538:2;553:8
**Sometime (2)**
442:5;560:18
**sometimes (6)**
468:7,18;519:17,20;
533:9,10
**somewhere (2)**
434:15;454:8
**sorry (16)**
434:12;445:25;
450:22;459:21;460:15;
477:11;482:14;484:7;
505:3;512:4;522:3;
527:5;530:16;540:9;
554:7;560:8
**sort (3)**
496:9;507:23;552:22
**sorts (4)**
467:20,22;468:23;
543:12
**source (1)**
546:10
**Spa (1)**
523:10
**spare (1)**
433:14
**speak (5)**
441:4;443:5;453:1;
470:13;498:20
**speaking (5)**
459:12;474:25;
487:10,13;493:8
**speaks (1)**
556:13
**Spears (1)**
522:14
**special (7)**
438:25;439:20,24;
446:1;461:20;462:16,
19
**specific (6)**
457:14;458:8,16,21;
464:13;563:5
**specifically (3)**
432:12;438:25;556:2
**specified (1)**
554:10
**spent (2)**
507:10;510:15
**spirit (1)**
492:6
**spoke (9)**
437:7;441:5,22,24;
457:1,4,9;461:7;498:9
**spousal (2)**
481:6,6
**spouses (1)**
481:10
**Sseepersaud@NYMCUgov (1)**
530:4
**St (1)**
467:4
**staff (5)**
439:18;551:8;
552:17,21,22
**stamp (4)**
521:7,9,10,14
**stamped (1)**
521:11
**stand (1)**
462:14
**standard (1)**
479:22
**start (5)**
484:4;493:14;513:3;
516:15;562:4
**started (9)**
431:17,19;433:21;
434:12;435:5,9;
466:24;474:7;515:16
**starting (2)**
450:7;518:19
**starts (2)**
512:2;544:15
**State (10)**
551:1,14,17,23,25;
552:3,5;553:4;558:13,
21
**statement (6)**
508:15;532:5,13;
536:22;537:20;558:3
**statements (5)**
510:3,4;532:8;533:8;
561:3
**statute (1)**
543:3
**stayed (1)**
433:12
**step (3)**
443:15;477:3;540:9
**Stephenson (4)**
503:14;504:3;511:5;
512:6
**stepped (3)**
437:9;438:5;520:11
**still (2)**
520:9;538:23
**stipulate (2)**
496:14,19
**stipulation (1)**
496:17
**stop (4)**
438:11;478:25;
484:7;492:8
**strategic (10)**
432:8,12;438:22;
439:11,16;440:18;
455:12;473:20;520:17;
535:20
**streamlined (1)**
548:16
**Street (1)**
473:4
**stricken (1)**
454:21
**string (3)**
483:19;485:24;
486:10
**structure (1)**
471:23
**structured (1)**
473:15
**stuff (1)**
548:13
**subject (5)**
502:20;508:20;
531:7;542:14;562:12
**subjects (3)**
507:24;508:12;545:8
**submit (8)**
447:8,11,22,23;
517:8;519:19;528:2;
541:1
**submitted (13)**
437:13;445:2;516:6;
517:7;518:4;522:9;
534:25;536:2,14;
537:3;540:7,18,23
**subpoena (3)**
462:7;550:23,24
**subpoenas (2)**
558:1,5
**substance (2)**
429:12;452:1
**substantive (1)**
557:18
**suggest (3)**
545:3,19;563:4
**suggested (2)**
545:19;548:18
**suggestion (1)**
544:6
**suggestions (2)**
429:14;547:15
**suggests (1)**
558:16
**suicide (1)**
441:16
**sum (5)**

466:19;467:14;
474:14;479:8;488:14
**summarize (5)**
432:2;437:23;
443:13;446:16,19
**summary (2)**
480:14;560:16
**supervisor (3)**
516:14,15;535:25
**supervisory (1)**
473:22
**supplement (1)**
485:21
**supplemental (8)**
479:17,19,20;
487:14;503:5;504:22;
512:17;557:23
**supplementary (15)**
475:22;482:25;
485:1,1,12,15,17;
487:17,20,24;488:1,4,
19;489:7;490:16
**support (3)**
433:6;516:5;563:5
**supporting (1)**
516:4
**supportive (1)**
454:14
**supposed (2)**
439:15;456:17
**supreme (2)**
470:1,2
**sure (19)**
444:10;445:24;
465:4;474:3;481:8;
486:17;487:21;493:15;
494:6;505:4,24;
507:16;515:19;521:16;
545:10;548:9;551:22,
25;557:11
**surgery (2)**
433:11,12
**suspend (1)**
463:1
**sustain (1)**
502:8
**Sustained (15)**
454:21;459:8;
462:15;463:13;465:7,
18,22;499:13;500:1,12,
17,22;501:10;502:6,17
**sworn (4)**
431:8;466:8;514:20;
550:15
**Sylvia (27)**
436:2;440:5;447:7;
448:6,22;450:15;
451:8;468:25;486:4,5;
488:13;505:17;507:5;
511:10;518:13;519:8,
12;520:3;521:13;
525:8,18,23;526:12;
527:11;529:2;531:14;
534:3
**sylviaash@aolcom (1)**
530:9
**system (4)**
473:16;551:1;552:6,
23

**T**

**tab (2)**
445:23,23
**talk (6)**
441:3;455:11;
456:22,24;498:19,23
**talked (14)**
443:7;446:21,21;
447:21;448:1;455:11;
459:5;464:16,16;
465:19;470:23;485:12;
507:17;537:18
**talking (7)**
482:8;487:11;
507:11;508:4;510:4;
545:23;547:18
**talks (1)**
543:12
**tax (1)**
500:9
**teal (2)**
436:13,13
**team (11)**
432:6,22,22;453:2;
498:6,10,16,18,21,23;
535:14
**telecom (1)**
529:15
**telephone (1)**
486:25
**Tembeckjian (3)**
430:4;560:13,14
**temporarily (1)**
560:4
**ten (1)**
539:5
**tendered (1)**
534:10
**tenure (2)**
474:7;528:3
**term (8)**
474:12;475:3;478:2,
3,9;480:16,20;481:5
**terminate (1)**
501:12
**terminated (7)**
467:2;493:4,19,24;
494:8,18;502:19
**termination (1)**
493:4
**terms (5)**
447:10;478:6;517:2;
556:3;561:11
**terrible (1)**
453:12
**testified (32)**
431:8;449:1;452:14;
453:9;454:9;456:8;
457:12;459:19,19,22,
22;461:19;462:25;
463:18;465:15;466:8;
502:23;504:19,25;
505:5;507:3;510:11;
511:22;512:15;514:20;
535:16;536:23;537:4,
6,12,18;550:15
**testify (12)**
509:21;540:5,6,16,
20,21;541:1;550:21,22,
23;560:8,12
**testimony (21)**
435:13,19,25;
443:18;452:17;453:7;
461:7;492:22;493:18;
497:10,16;498:7;
503:6;507:11;508:2,
11,19,21;545:6;547:5;
548:5
**textual (2)**
543:18,19
**then-chair (1)**
481:1
**thereafter (2)**
442:5;448:16
**Therefore (5)**
450:19;451:10;
509:11,12;562:17
**thereof (1)**
555:9
**third (5)**
461:4;544:14,15;
557:17,24
**Thomas (2)**
466:4,6
**Thompson (9)**
482:21,24;484:10,
12;503:20;504:7,13;
507:17;512:9
**thought (8)**
455:5;457:13;458:5;
464:22;486:15,17;
489:11;538:21
**thoughts (1)**
547:15
**three (15)**
430:2;434:6;448:19;
451:9;455:24,25;
480:19,19;485:8;
488:16,23;511:25;
560:8,11;562:4
**three-page (1)**
530:21
**Thrones (1)**
525:1
**throughout (2)**
485:9;497:3
**throwing (1)**
492:8
**Thursday (1)**
547:19
**ticket (3)**
521:25;522:17;
523:17
**tied (1)**
435:25
**till (1)**
511:24
**times (9)**
437:2;453:22;455:8;
458:22;470:20;480:16;
497:9,15,18
**Titanic (1)**
524:23
**title (3)**
466:17;484:13;
485:10
**titled (1)**
479:1
**titles (1)**
469:21
**T-Mobile (2)**
529:7,22
**today (10)**
435:13,19,25;
436:10;452:15;497:10,
16;512:13;527:14;
550:21
**together (2)**
474:17;486:21
**told (23)**
430:1;440:6,9;448:6,
21;457:20;459:11,25;
464:19;473:9;480:4;
490:1;497:19,20;
498:2,22;500:13;
509:17;517:10,14;
537:8;557:8,11
**tomorrow (2)**
559:6;560:18
**tone (1)**
489:13
**took (7)**
433:12;440:11;
453:19;458:13;474:3;
490:13;541:10
**top (10)**
451:12,23;485:10;
518:18;521:3;525:16;
529:1;531:7,22;533:3
**topic (2)**
429:17;509:18
**total (8)**
495:11;519:3,5;
522:15,24;526:19;
532:22,24
**totaled (1)**
526:21
**toto (1)**
555:12
**Tour (3)**
524:23;525:1,3
**trade (1)**
499:19
**traditionally (1)**
439:10
**training (1)**
473:21
**transportation (2)**
525:19,20
**travel (5)**
432:16;438:18,25;
526:5,8
**traveled (1)**
438:22
**traveler (1)**
523:17
**treasurer (1)**
533:16
**Trial (8)**
429:1;497:17;
535:14;546:14,15;
557:8,9;560:12
**tried (1)**
498:23
**trips (1)**
432:11
**true (10)**
495:18;499:3,5,9;
500:13;505:20,25;
536:14;538:1,4
**truth (2)**
448:14;546:6
**try (4)**
458:16;460:23;
492:10;495:2
**trying (1)**
435:2
**Tuesday (1)**
451:14
**turmoil (1)**
446:22
**turn (21)**
446:2;447:8;453:7;
459:9;461:4,18;463:5,
14;477:19;504:2;
521:18;522:7;523:2,
12,24;524:5,17;528:11,
20;531:18;561:2
**turned (1)**
463:10
**two (25)**
429:11,17,19,20;
430:3,5;434:6;441:3,
21;446:16;447:20;
449:21;463:22;481:4;
486:19;492:18;503:3;
525:2;529:18;540:7;
541:17;543:15;544:22;
552:20;557:25
**Tylenol (2)**
434:1,2
**type (2)**
433:25;479:6
**types (8)**

467:24;468:1;472:8,
9,15;478:16,20;479:3
**Typically (8)**
439:15;468:19;
474:15;476:12,14,25;
477:7,8

## U

**ultimate (2)**
542:18,19
**ultimately (3)**
511:21;536:17;542:3
**umpteenth (1)**
561:21
**uncertain (1)**
556:3
**unclear (1)**
548:2
**uncomfortable (6)**
435:7;442:3;458:6,
10,14,18
**under (13)**
446:8;479:4;482:9;
484:17;487:12,19;
502:25;503:3;505:7;
520:15;532:23;560:19;
562:17
**Underneath (2)**
524:25;529:4
**understandable (1)**
544:7
**understood (2)**
433:8;501:13
**unduly (1)**
543:5
**Unfortunately (1)**
450:18
**Unified (1)**
552:5
**Union (18)**
440:20;466:16,17,
21;468:15,17;469:16;
470:25;471:25;472:4;
473:4,15;476:3;
477:25;480:5;487:18;
499:19;515:8
**unions (2)**
471:10,24
**union's (1)**
478:21
**University (1)**
467:5
**unless (3)**
493:7,11;558:7
**unpaid (1)**
502:11
**unusual (1)**
464:23
**up (26)**
431:19;435:7;
440:10;441:2;442:10,
11;444:23;450:20;
451:5;472:6;473:18;
474:2;477:20;479:15;
497:16;503:13;505:11;
512:18;513:21;521:19;
532:15;545:17;547:12;
554:11;562:25,25
**upon (1)**
476:15
**upper (1)**
526:13
**upset (1)**
441:15
**use (2)**
561:4,6
**used (4)**
458:8;461:10;
476:14;508:3
**usually (3)**
516:3,25;519:17

## V

**vacation (2)**
478:15,23
**value (2)**
434:25;500:9
**variety (3)**
544:25;551:23;553:5
**various (9)**
467:18,24;470:4;
472:8,9;473:23,23;
479:3;501:3
**Vegas (5)**
439:4,6;455:12,21;
520:18
**vendor (3)**
521:13;522:12,13
**version (1)**
479:25
**versus (1)**
516:19
**via (2)**
450:20;519:18
**vice (3)**
469:18;484:13;486:7
**view (3)**
449:16;546:9,10
**violate (1)**
542:20
**violated (4)**
542:19;558:15,17,17
**violation (3)**
545:15,15;563:4
**Visa (1)**
532:3
**visit (1)**
438:9
**visited (2)**
438:10;441:3
**visits (1)**
438:13
**voice (1)**
489:13
**volunteer (2)**
550:21;552:22
**vote (1)**
476:22
**voted (1)**
511:21
**voucher (4)**
520:3;522:21;
523:25;524:13

## W

**wait (1)**
547:21
**waiting (2)**
429:15;433:17
**walk (1)**
453:22
**walked (1)**
434:20
**walking (1)**
441:6
**wants (1)**
547:11
**Warm (2)**
450:23;454:23
**warrant (1)**
546:2
**Watch (9)**
439:22,23;440:6,15;
449:2;456:8,11,17,20
**Watches (1)**
440:18
**way (13)**
435:24;460:18,19;
475:22;485:3;490:14;
493:25;494:3;541:11;
545:17;552:12;556:1;
562:14
**ways (1)**
546:19
**wearing (3)**
440:15;469:8,9
**website (7)**
542:16;553:9,12,13,
15,16;554:1
**week (3)**
439:7,8;455:21
**weekend (3)**
429:5;431:2;534:14
**weren't (2)**
486:11;509:9
**what's (18)**
444:4;449:14;
451:20;461:18;477:18,
23;492:17;495:3;
499:12,24;505:14;
511:14;537:10;548:12;
553:17,19;554:13;
559:2
**whole (6)**
487:5;530:22;
532:13;543:20;548:13;
554:14
**who's (1)**
560:14
**whose (1)**
521:1
**wide (4)**
468:8;544:25;
551:23;553:5
**wife (1)**
481:9
**wireless-issued (1)**
529:12
**wise (2)**
486:16,17
**withdraw (1)**
542:4
**withdrawn (6)**
449:4,6;493:2;
500:13;512:14;530:25
**within (2)**
551:25;552:23
**without (4)**
455:9;516:22;
517:11;537:16
**witness (53)**
429:22;431:4,7;
436:15;444:4,10,12;
449:14;452:6;458:3;
460:15,21;466:2,3,4,7;
469:10;483:16;487:16;
497:4;498:15;502:7;
505:12;512:8;514:15,
16,19,21;520:14;
521:20;529:24;533:2;
537:11;538:17,18,19;
541:3;543:12;545:23;
546:4,6;548:15,20,25;
550:11,14,16;553:17;
560:3,4,7,16,20
**witnesses (15)**
429:17,19;430:2,2,3,
5;546:14;560:8,11,21;
561:1,1,15;562:6,18
**wonderful (1)**
534:14
**Wong (87)**
432:25;433:2,3,4,5,7,
20;434:3,9,18,25;
435:2,4,20;438:15;
440:13,23;441:3,5;
444:1;446:2,8;453:8,
10,15;454:1,19;455:5,
9;456:20;463:1,5;
467:12;474:20;476:4;
477:5;478:1;479:12;
480:7,10,25;481:7,13,
18,21,25;482:4;
483:11;484:17;486:11;
487:1,4;488:3,7,13,23;
489:1,10,18;490:5,20,
23;491:1;499:18;
500:6,8,13;503:3,8;
504:7,13,21;505:2,6;
512:10;513:23;514:2,
3;521:3;531:24;532:1;
533:15,17;536:11;
537:21;557:14,22
**Wong's (39)**
446:12,19;461:6;
465:14;474:25;475:8,
14;476:6,11;477:12;
478:17;480:1,12;
481:11,16;482:7,9,15;
486:16;487:7;488:6;
489:22;490:16;492:23;
501:8;502:24;503:9,
23;505:1;507:4,12;
509:8;511:16,17;
512:16;532:4,8;533:7,
21
**word (2)**
453:20;495:11
**wording (2)**
485:6;489:4
**words (7)**
458:8,12,17,21;
461:10;508:3;544:16
**work (24)**
431:13,14,15;
433:14;434:21;436:4;
442:22;453:8;466:22;
467:16;473:18;474:1,
1;479:11;502:11;
515:7;550:25;551:1,2,
3,19;552:8,21,24
**worked (11)**
431:16,19,20;433:5,
5;436:19,19;467:6;
499:17;515:9;551:5
**working (8)**
487:19;490:15,19,
23;493:21;494:9,15;
501:3
**works (2)**
552:20,23
**worried (1)**
543:11
**worry (1)**
441:11
**worth (1)**
510:16
**writing (1)**
477:14
**written (6)**
447:16;451:1;
461:15;464:4;474:15;
541:24
**wrong (2)**
512:16;546:12
**Wynn (2)**
439:4;455:15

## Y

**year (6)**
431:18;433:20;

438:23;469:20;470:20;
542:6
**years (11)**
433:11;434:15;
448:19;451:9;463:22;
469:17;474:6,9;478:3;
515:10;562:2
**York (10)**
470:1,2;542:11;
551:1,24,25;552:3,5;
553:4;558:13

**Z**

**zoom (6)**
445:17,18,20;450:8;
451:25;532:12
**zooming (1)**
532:20

**1**

**10 (2)**
434:11;504:8
**100,000 (1)**
454:8
**11 (3)**
477:19,23;521:6
**113 (2)**
451:21,24
**116 (4)**
442:10,13,15,25
**12 (1)**
486:1
**12:55 (1)**
451:5
**13 (1)**
494:10
**13:11 (1)**
451:14
**13:40:43 (1)**
494:8
**14 (4)**
450:8,25;463:19;
548:14
**15 (13)**
437:8,16;451:5,14;
491:7;497:12;527:15,
15,16,16,16,16;534:6
**15th (1)**
561:17
**16 (1)**
484:3
**16,000 (1)**
533:1
**16th (3)**
547:13,25;550:8
**17 (2)**
547:7,8
**17th (1)**
550:8
**19 (1)**
452:1
**1981 (1)**
466:24
**1996 (1)**
431:19
**19th (1)**
547:14
**1st (5)**
478:5;525:8;526:14;
530:9;551:7

**2**

**2 (3)**
492:19;524:5,17
**2:00 (1)**
547:10
**20 (2)**
508:11;515:10
**2006 (2)**
431:20;551:9
**2008 (7)**
470:11;478:4,5;
540:8,15;541:15;
553:13
**2009 (2)**
469:5;470:11
**2012 (1)**
516:12
**2013 (2)**
478:4,5
**2014 (2)**
433:21;434:12
**2015 (29)**
470:8;471:13;
474:10;480:23;482:19;
484:3;486:1;488:3;
503:10;504:8;505:18;
508:8;509:18;512:15;
518:21;519:8;522:22;
523:9;524:1,10;525:9;
526:14,14;528:7;
530:9;540:19;542:5;
551:7;557:21
**2016 (23)**
437:8,16;438:25;
439:13,20,23;449:2;
455:15;469:5;473:2;
488:8,11,14;519:1,9;
520:4,10,17;521:6;
524:13;525:24;534:6,
19
**2017 (1)**
434:16
**2018 (23)**
431:21;440:22;
441:18,25;442:17;
443:10,23;444:17;
446:7,25;448:24;
449:25;456:24;457:2,
13;459:5,17;461:21;
463:19;465:14,20;
467:10;509:16
**2019 (7)**
466:25;467:1;
494:17;497:12,14;
499:1,4
**2021 (3)**
457:5,9;563:8
**2023 (2)**
481:6;511:22
**21st (1)**
524:13
**22 (6)**
442:17;443:10,22;
444:17;461:21;473:4
**24th (1)**
534:12
**26.2 (1)**
560:21
**27 (3)**
551:22;552:14;562:1
**28 (1)**
522:22
**29 (1)**
519:1

**3**

**3 (2)**
528:11,12
**30 (3)**
523:25;525:23;
526:14
**300 (1)**
492:11
**31 (2)**
478:5;481:5
**31st (6)**
518:21;520:4,10;
524:9;528:6;534:18
**3500 (1)**
495:21

**4**

**4 (2)**
518:23;528:20
**4:13 (1)**
450:8
**40:43 (1)**
494:11
**434 (9)**
529:25;530:5,8,11;
531:2,3,4,7;537:19
**441 (1)**
534:1
**448 (1)**
477:19
**461 (4)**
444:5,13;445:8,12
**461A (6)**
444:23,24;445:1,2,
14;461:19
**463 (3)**
517:16;518:7;527:15
**463A (4)**
517:16;518:9,10,12
**463B (1)**
528:5
**463E (2)**
522:20,21
**463F (1)**
525:6
**463G (1)**
525:22
**463H (2)**
523:24,25
**463J (1)**
526:11
**463M (1)**
524:11
**463N (3)**
519:25;520:1;534:16

**5**

**5 (9)**
478:25;479:1;504:2,
6;521:18;523:2;
547:16,22;550:4
**5.2 (2)**
479:6,7
**5.4 (2)**
479:15;487:14
**50-dollar (7)**
525:14,17;526:1,3,7;
536:24;537:15
**525 (1)**
545:25
**546 (6)**
548:23;553:18,20;
554:3;557:2,3

**6**

**6 (1)**
505:18

**7**

**7 (1)**
563:8
**751 (7)**
449:15,17,20;450:3,
6;451:23;463:14

**8**

**8 (2)**
522:7;523:12
**8/25th (1)**
520:23

**9**

**9:30 (2)**
559:5;563:8
**968 (7)**
483:17,22,25;
503:14,16;504:7,18
**970 (9)**
505:12,15;506:2;
511:3,4,6,8,14;513:4
**9th (3)**
547:10;548:2;550:6

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*SYLVIA ASH,*

---

*December 7, 2021*

---

*Southern District Court Reporters*

Original File LC73ASHF.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 7, 2021
9:45 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JANIE C. BUCKLEY



(Trial resumed; jury not present)
THE COURT: Where are your colleagues?
MR. REBOLD: I believe they are in the hallway. May I have one minute to go grab them? Thank you.
THE COURT: Tell them to bring the witness in.
Good morning, everybody.
MS. COHEN: Good morning, your Honor.
(Jury present)
THE COURT: Good morning, all. Here is the missing juror.
Jurors all present and accounted for; defendant is also present as throughout. The witness is on the stand.
Ms. Smith, you are reminded you are still under oath.
Mr. Mark, you may proceed.
LAURA SMITH,
called as a witness by the Government,
having been previously sworn, testified as follows:
DIRECT EXAMINATION (Continued)
BY MR. MARK:
Q. Good morning, Ms. Smith.
A. Good morning.
Q. Yesterday, we only sort of briefly started talking about the advisory committee on judicial ethics. And I think you said you were the chief counsel of that committee. Is that right?



A. Yes.
Q. Could you just remind the jury what the advisory committee on judicial ethics is.
A. The advisory committee on judicial ethics is a body of 12 sitting or retired judges of the State of New York, that gives ethics advice to other judges within the state.
Q. What does it give advice about to those judges?
A. It gives advice about interpretation of the rules governing judicial conduct, which are the rules that New York State judges at every level must follow.
Q. I think you were saying those rules are available online; is that right?
A. Correct.
MR. MARK: Mr. Hamill, Mr. Charalambous, may we publish what's already been offered and admitted into evidence as Government Exhibit 546.
Q. Do you recognize this, Ms. Smith?
A. There is nothing on my screen at the moment. Should I press something?
MR. MARK: Oh no.
A. Yes. I recognize this.
Q. What is this?
A. This is -- it appears to be a printout of the rules of part 100, the rules governing judicial conduct from the NYcourts.gov website.



Q. Ms. Smith, could you take a look at page four of this document. Do you see where it says section 100.3?
A. Yes.
Q. Could you just read the title of that section?
THE COURT: Counsel, we are not going to do this.
MR. MARK: Mr. Charalambous, we can put this down.
Q. If a judge wants advice from the committee regarding the rules governing judicial conduct, how do they make a request to the committee?
A. They have two ways of doing this. They can call, and we can give them some informal advice over the phone, or they can write and they can seek a written opinion from the advisory committee.
Q. What's the difference between an informal request and a written request?
A. The difference is that a -- if we talk -- well. Okay. Let me put it this way. Sorry.
If there is a written request that is considered by the full advisory committee, and they decide it at one of their seven scheduled meetings, they will authorize the publication of a written opinion for that judge addressing the ethics issue of that judge. And if the judge gets that opinion and acts in accordance with the opinion, the judge's conduct is presumed proper for the purpose of any disciplinary proceeding that may be brought by the commission on judicial conduct. And that's

by statute.
If a judge, if the judge talks to somebody over the phone and is given ethics advice over the phone, that doesn't create that same statutory presumption.
Q. So, just broadly speaking, because I think you said a lot right there. If an informal request comes in, how does that get responded to?
A. The -- somebody from the -- when a call comes into our main line, people are notified by it, the co-chairs of the committee, the chief counsel, me, and one or two committee members and staff counsel are all notified, and one of us will call the judge and speak to them about their question. We'll provide advice over the phone. If there are written opinions we can give them, we'll give them copies of those opinions. And if they want to subsequently write in, it can write in and get advice tailored to their circumstances.
Q. So with a written request, can you just sort of walk through the steps of that procedure.
A. Okay. It comes into our office, it's stamped received. It is then sent to me as chief counsel for an initial review, and then it is circulated to a small group, currently the co-chairs and what we designate as the panel chair, the five different groups for purpose of researching and proposing an answer for the full committee to consider. So there will be one judge who will take the lead on that for discussion at the meeting.



Q. So, after the committee meets, do they render a decision on the request?
A. Yes. They vote on what the outcome should be. And that decision, if the majority of the committee agrees on a decision, they will have a decision on the inquiry.
Q. Will that decision on the inquiry become public?
A. Ordinarily, yes. There was a time when I first joined the committee in 2006 through about 2013 or so, the committee sometimes thought it could issue unpublished opinions. They did change the practice after that.
Q. When was that practice changed?
A. Approximately 2013 or 2014.
Q. After an opinion is decided, are they publicly available for the public or other judges to see?
A. Yes.
Q. Where are they available?
A. We publish them on our website, the website of the advisory committee on judicial ethics. They often get sent to the New York Law Journal and to some other locations for publication.
Q. When an opinion is published, does it identify who the judge is who requested the opinion?
A. No. We make every effort to comply with the statute which requires us to hide identifying details and make it anonymous in that way.
Q. You were talking earlier about the impact a written opinion



from the committee can have for the judge who requests it, right?
A. Yes.
Q. And I think were you saying that it could assist that judge if there is a later investigation by --
THE COURT: Let's not repeat.
Q. So, are you familiar with someone named Sylvia Ash?
A. Yes.
Q. How are you familiar with her?
A. We had some interaction in my professional capacity as chief counsel.
Q. Did Ms. Ash ever submit any request to the advisory committee on judicial ethics?
A. Yes.
Q. Did any of them pertain to Municipal Credit Union or MCU?
A. Yes.
Q. How many?
A. Two inquiries that the committee addressed in March 2008. And again in April and June 2015. So two separate inquiries.
Q. Two separate inquiries, one in 2008 and one in 2015; is that right?
A. Yes.
Q. Broadly speaking, what was the nature of the 2008 inquiry?
A. It was a question whether it was permissible, ethically permissible for the Judge Ash to serve on the board of the



Municipal Credit Union.
Q. Broadly speaking, was that inquiry responded to by the committee at that time?
A. Yes, it was.
Q. Broadly speaking, how was it responded to?
A. The committee issued a three-page -- sorry. Three-paragraph opinion called 08-34 was the number assigned. And the first paragraph contained an apology for the delay in responding to the inquiry.
The second paragraph said it was permissible to serve on the board of the Municipal Credit Union because it is a not-for-profit.
And the third paragraph contained a reminder that as a full-time judge, she could not serve if the MCU turned out to be -- if it was likely to be engaged regularly in adversarial proceedings in any court.
So it was a three-paragraph opinion.
Q. You just said there was a reminder. Was that a reminder in reference to anything in particular?
A. It was a -- I'm calling it reminder, because we expect -- we -- it wasn't the focus of the opinion. It was a, you know, a caveat or a caution. It is a limitation on the general principle that judges generally may serve on the boards of not-for-profit entities.
Q. That limitation, that general principle, does that come

from the judicial rules itself?
A. Yes, it does.
Q. Now, turning to the 2015 inquiry that you were talking about. Broadly speaking, what did that inquiry concern?
A. In that inquiry, Judge Ash asked if it was permissible to serve as chair of the board of the Municipal Credit Union.
Q. Was that inquiry responded to by the committee?
A. The committee voted on the response, on the outcome in April 2015.
Q. We'll go through this one in more detail, but broadly, what was the response to that inquiry?
A. The answer was no, she could not serve as the chair, and she should resign from the board.
Q. The time on that was 2015; is that right?
A. Correct. April 2015.
MR. MARK: Mr. Charalambous, may we show for the witness only what has been marked for identification as Government Exhibit 522.
Q. Mr. Smith, do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It is an inquiry from Judge Ash to the committee which was stamped "received" on April 6, 2015.
MR. MARK: Government offers Government Exhibit 522 into evidence.



MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 522 received in evidence)
MR. MARK: May we publish this?
THE COURT: Yes.
MR. MARK: I think there is a little delay on the monitors.
THE COURT: Is this showing up on your screen, folks? Okay.
MR. MARK: Now it's with the jurors in the back, too. All right.
Q. Ms. Smith, I see a name on the top Maryrita Dobiel. Who is she? Who was she at the time?
A. Maryrita Dobiel was my predecessor. She was chief counsel for the advisory committee on judicial ethics at that time.
Q. Was this inquiry assigned a particular number, 15-78?
A. Yes.
Q. That continues to be the reference?
A. Yes.
Q. Could you just read the last paragraph of the letter.
A. "I'm hereby inquiring as a New York State Justice of Kings County Supreme Court whether I am permitted to serve as the chair of MCU's board of directors."
Q. Did the advisory committee, when did the advisory committee first consider or meet on this inquiry?



A. April 23, 2015.
Q. Did you attend that meeting?
A. I did.
Q. What was the committee's decision at that time?
A. They said it was not permissible to serve on the board of the Municipal Credit Union for a full-time judge.
Q. Was that conveyed to Ms. Ash?
A. Yes.
MR. MARK: Mr. Charalambous, would you show for the witness only what has been marked and actually offered into evidence as Government Exhibit 103.
Q. Ms. Smith, do you recognize, apart from the handwriting, do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It is an internal working document of the committee. It was a draft opinion that was included in the agenda materials for the April 23 meeting in 2015 for the committee's consideration and deliberations.
MR. MARK: Mr. Charalambous, can you publish this to the jury now.
MR. REILLY: Objection, your Honor.
MR. MARK: This is already in evidence.
MR. REILLY: It was in evidence for the limited purpose of showing where it was recovered.



THE COURT: The purpose of?
MR. REILLY: Showing it was in Ms. Ash's possession.
THE COURT: Okay. Overruled.
MR. MARK: I'm waiting for a second until it shows up on the monitors.
Q. You said this is a draft opinion?
A. Correct.
Q. What was the date that -- was it before the committee had their meeting you just talked about?
A. Yes, it would have been prepared before the meeting, so it could be distributed to the committee for consideration at the meeting.
THE COURT: Mr. Mark, I think we would move faster if you listened more closely to the answers.
MR. MARK: Thank you, your Honor.
THE COURT: She already testified to all of that.
Q. Now, this document, did the committee ever issue this opinion?
A. No.
Q. Why not?
A. Because before it went through the review and editing and cite checking process, Judge Ash asked for reconsideration.
Q. What is reconsideration?
A. Reconsideration is when a judge thinks that the committee perhaps made a mistake or didn't consider all the relevant

information. And they ask the committee to reconsider their advice.
Q. Can you read the handwriting just on the top left of this document.
A. It appears to say "I have to write a letter to the committee asking for reconsideration."
Q. Now, this is an internal document of the advisory committee?
THE COURT: You already said that.
MR. MARK: Sorry.
Q. Who is supposed to have this sort of document?
MR. REILLY: Objection, your Honor.
THE COURT: Sustained.
Q. Was this ever made publicly available?
MR. REILLY: Objection, your Honor. Asked and answered.
THE COURT: Overruled.
A. Not by the committee, no.
Q. Would it have been consistent with the committee's policies and practices to provide Ms. Ash with a copy of this document?
A. No.
Q. Why not?
A. Because it hasn't gone through the review and editing and cite checking process.
Q. As far as you were aware, was Ms. Ash ever provided a copy



of this document?
A. I do not -- I do not know of anyone who is authorized to do so, and I did not know that she was given a copy of this.
Q. I think previously you said that after this decision, Ms. Ash sought reconsideration?
A. Yes.
Q. What did she do in seeking reconsideration?
A. She submitted additional information to the committee. And that information was a copy of opinion 08-34 she had previously received in 2008, and also a copy of a decision I think by Justice Silberman in which the Municipal Credit Union tried to get transferred into the commercial division on a case and was denied because they are a not-for-profit organization.
MR. MARK: Mr. Charalambous, may we show the witness what has been marked for identification only as Government Exhibit 519. If you could just flip through the pages slowly.
Q. Ms. Smith, do you recognize this three-page document?
A. Yes.
Q. What is it?
A. It is a fax from Judge Ash to Maryrita Dobiel in 2015 asking for reconsideration or part of it.
Q. In the second page, did it include anything?
A. Yes, the second page is a copy of opinion 08-34.
MR. MARK: Government offers Government Exhibit 519 into evidence.



MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 519 received in evidence)
MR. MARK: Mr. Charalambous, can you just go to the second page of this document and publish it for the jury.
Q. This is advisory opinion 08-34 that you referenced before by the reference to the number at the top; is that right, Ms. Smith?
A. Yes.
Q. And it's got the three paragraphs and the cautionary language --
THE COURT: Let's move along, please.
MR. MARK: Yes.
THE COURT: First she told you what was in it. Now it's on the screen and we don't have to have you go through it again.
MR. MARK: We'll go a little faster, your Honor.
We take this down, Mr. Charalambous, and may we show for the witness what's already been marked for identification as Government Exhibit 521.
Q. Ms. Smith, do you recognize this chain of e-mails?
A. Yes.
Q. What are they?
A. They are -- the first one. Sorry. The first one is the one from Judge Ash to Maryrita Dobiel, asking for -- it's part



of the request for reconsideration. It attaches the Supreme Court order that I had mentioned.
MR. MARK: The government offers Government Exhibit 521 in evidence.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 521 received in evidence)
Q. Did the committee consider Mrs. Ash's inquiry further after receiving these two documents that we've just talked about?
A. Yes, they did.
Q. When was that?
A. At the June 11, 2015 meeting.
Q. Did you attend that meeting?
A. I did.
Q. What was the committee's decision at the June 11 meeting?
A. They said she should not -- that Judge Ash should not serve on the board of the Municipal Credit Union, she should resign, and they instructed that she would be permitted to withdraw or invited to withdraw the inquiry.
Q. What is the impact, if any, of withdrawing an inquiry?
A. The impact is that no written opinion will be issued on that question.
Q. Does the withdrawing of an inquiry provide any of the sort of protections for a judge in a later ethical investigation that you talked about before?

A. No.
Q. Why did the committee suggest withdrawing the inquiry in this scenario?
MR. REILLY: Objection, your Honor.
THE COURT: Sustained.
Q. Focusing your attention on July 1st, 2015. Did you have a conversation with Sylvia Ash?
A. Yes, I did.
Q. Who participated in that conversation?
A. It was the then-chair of the committee, Judge Marlow, and Judge Ash, and me.
Q. What was the purpose of that -- was that a phone call?
A. It was a phone call.
Q. What was the purpose of that phone call?
A. It was to communicate the committee's decision on her request for reconsideration.
Q. What, in summary, did Judge Marlow say to Judge Ash on the call?
A. He told her to resign from the board of the Municipal Credit Union, to -- that she may withdraw her inquiry, that she should keep a memorandum of our discussion, and she should keep a copy of 08-34 in her files.
Q. Did Judge Marlow explain on that call why Ms. Ash should resign?
MR. REILLY: Objection, your Honor.



THE COURT: Sustained. It's leading.
Q. What, if anything, did Judge Marlow say about why Ms. Ash should resign?
MR. REILLY: Objection, your Honor.
THE COURT: Overruled.
A. He said that the issue was that the Municipal Credit Union is regularly involved in litigation. Adversarial litigation.
Q. What is adversarial litigation?
A. Adversarial litigation is when you have both side -- basically -- sorry. Contested litigation. So it's not very -- you know, so there's actual disagreement.
Q. In the courts; is that right?
A. In the courts, yes.
Q. And did you say anything on that call?
A. Yes.
Q. What did you say?
MR. REILLY: Objection, your Honor.
THE COURT: Overruled.
A. I know at one point I asked Judge Marlow whether it would be possible for Judge Ash to resign without saying that it was specifically due to judicial ethics she was resigning. Whether maybe she could give a more vague but still truthful statement.
Q. Why did you say that?
A. I hoped that would make it less embarrassing for Judge Ash to resign.



Q. During the call, did Ms. Ash say anything?
A. I think so. She said toward the beginning of the call when Judge Marlow told her that this was a difficult conversation and it was going to be news she didn't want to hear, I believe she asked if there was any further appeal possible. If there was any way to sort of advocate, maybe, if that's the right word, for being permitted to stay on the board.
Q. Was that responded to?
A. Judge Marlow told her to wait and hear him out so he could explain what was going on.
Q. What did Judge Marlow ultimately tell Ms. Ash to do?
A. He told her to resign from the board of the Municipal Credit Union.
Q. During the call, did Ms. Ash say anything about whether she had become Municipal Credit Union's chair since she submitted her initial inquiry to the committee?
A. I don't recall her mentioning that.
Q. During the call, did you receive anything from Ms. Ash?
A. Yes, I did.
Q. What did you receive?
A. I received an e-mail withdrawing her inquiry.
MR. MARK: Mr. Charalambous, may we show for the witness only what's been marked for identification purposes as Government Exhibit 524.
Q. Do you recognize this?



A. I do.
Q. What is it?
A. It is an e-mail from Judge Ash to me withdrawing her inquiry 15-78.
MR. MARK: Government offers Government Exhibit 524 into evidence.
MR. REILLY: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 524 received in evidence)
Q. This is dated July 1, 2015; is that right?
A. Correct.
Q. Did you receive --
THE COURT: Mr. Mark, you know, we can all read it. Let's move on.
MR. MARK: Thank you.
Q. During this call, did Ms. Ash ever say she was not going to resign from MCU's board?
A. No, I do not remember her saying that.
Q. Did she ask for any time to resign?
A. I don't think so. But I know that Judge Marlow suggested within a week.
Q. Based on the call, did you expect Ms. Ash to resign within a week?
A. I expected her to resign.
MR. REILLY: Objection, your Honor.

THE COURT: The objection is sustained. The answer is stricken.
Q. What was the effect of Ms. Ash's letter withdrawing her inquiry?
A. No inquiry would be published -- no opinion would be published on her inquiry 15-78.
MR. MARK: If I may have one moment, your Honor.
No further questions.
THE COURT: Thank you. Cross-examination, Mr. Reilly.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good morning, Ms. Smith. How are you?
A. Good. Good morning.
Q. My name is Nathan Reilly and I'm part of Ms. Ash's representation.
Ms. Smith, you testified yesterday that you were appearing here pursuant to subpoena; is that correct?
A. Yes.
Q. Is it correct that you have met prior with the government to prepare for today; is that right?
A. Yes.
Q. And they told you the questions they would ask and the answers that you would expect to give; is that right?
A. They didn't tell me what answers I should give.
Q. I apologize. They told you the questions they would ask,



correct?
A. Yes.
Q. You told them the answers you would expect to give?
A. Yes.
Q. You haven't met with anyone from Ms. Ash's counsel; is that correct?
A. No.
Q. I want to direct your attention -- Ms. Stephenson, can you put Government Exhibit 519 in evidence up. And the third page of that document.
Ms. Smith, was Mr. Hack associated with the advisory committee?
A. Yes, he was chief counsel before Maryrita Dobiel.
Q. This was submitted to the committee in February 2017, right?
A. That's the date the document bears, yes.
Q. And then turning to page two. So the response is in March 18, 2018; is that right?
A. Correct.
Q. A little more than a year later?
A. Yes.
Q. There is an apology at the top for falling through the cracks; is that right?
A. Yes.
Q. I think you testified on direct that this was -- well. At



that time, the advisory committee had a policy in which certain opinions were not published; is that right?
A. Yes.
Q. This was one of the opinions that was not published?
A. That's correct.
Q. Is it fair to say that from the committee's -- excuse me. From the committee's practices, a judge who received an opinion, an unpublished opinion, could still rely on it?
A. Correct.
THE COURT: Did you say something?
MR. MARK: I said "objection."
THE COURT: Overruled.
Q. You testified on direct about the conversation that you and Ms. Ash and Judge Marlow had, right?
A. Yes.
Q. Where she was advised that she shouldn't -- that she wouldn't be permitted to serve as the MCU board chair; is that right?
A. Yes, that she could not serve on the board at all.
Q. I want to make sure I recall your testimony correctly. Is it right that you suggested to Ms. Ash that she submit a written withdrawal of her request for an opinion?
A. Judge Marlow would have communicated that, but yes.
Q. That was communicated --
A. She was invited to withdraw her inquiry, yes.



Q. That's the e-mail you received during the course of the call?
A. Yes.
MR. REILLY: May I have one moment, your Honor?
THE COURT: Yes.
MR. REILLY: Nothing further, your Honor.
THE COURT: Thank you. Mr. Mark, anything else?
MR. MARK: No, your Honor.
THE COURT: Thank you. You are excused.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: Next witness.
MR. MARK: The government calls Robert Tembeckjian.
ROBERT TEMBECKJIAN,
called as a witness by the Government,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. MARK:
Q. Good morning, Mr. Tembeckjian.
A. Good morning.
Q. Where do you currently work?
A. I work at the New York State commission on judicial conduct.
Q. How long have you worked on that New York State commission on judicial conduct?

A. I've been there for more than 40 years.
Q. What is your title?
A. I am the administrator and counsel to the commission.
Q. Are you a lawyer?
A. I am a lawyer.
Q. Could you tell the jury what the commission on judicial conduct is.
A. Yes. The commission is the New York State government agency that is responsible for enforcing ethics on the judges of the New York State court system. There are approximately 3400 judges throughout New York State. And the commission is the body that receives complaints, investigates complaints, and where there is cause, to discipline judges publicly for ethical violations.
Q. Are ethical violations for judges governed by any rules?
A. Yes. In New York, they are called the rules governing judicial conduct. They are promulgated by the chief administrator of the courts for New York State on approval of the New York State court of appeals, which is the highest court in New York. And those rules are based on the American Bar Association model code of judicial conduct.
Q. Focusing on the commission itself. How many people serve on the commission?
A. There are 11 members of the commission.
Q. What are their backgrounds?



A. There are four judges, five lawyers, and two non-lawyers. Each commission member serves a four-year term.
Q. Who appoints them?
A. The governor appoints four of the members, the chief judge of New York State appoints three of the members, and the four leaders of the New York State Legislature each appoints one.
Q. I note you said that there are various appointed authorities. Is the commission itself a partisan organization?
A. No, it is not. In fact, it is designed in a way to ensure that it is not partisan by spreading out the appointing authorities to these six individuals.
Q. As counsel to the commission, do you have a staff?
A. Yes, I do.
Q. How many?
A. Currently we have 43.
Q. Are they all attorneys like you?
A. No. Approximately 20 are attorneys, and the rest are investigators and administrative staff.
Q. Does the commission on judicial conduct maintain a public website?
A. Yes, it does.
Q. Broadly speaking, what's on that website?
A. Oh, there's quite a lot. There are all of our governing authorities, which is to say the rules and the statutes and the provisions of the state Constitution under which we operate.



It has our Constitutional authority, statutory authority. We have our operating procedures and rules on there. We have our policy manual on there. We've got our code of ethics on the website. We have the commission's decisions in all of the cases that have resulted in public discipline over the last 40 years, actually since April 1st of 1978, which is when the commission went into existence in its current form. Our press releases.

There is a substantial amount of information on our website.
Q. What are the sorts of discipline that the commission can impose?
A. It can range, depending on the severity of the misconduct, from a private cautionary letter, to a public admonition or a public censure, both of which are reprimands. A censure is a stronger reprimand than a public admonition.

The commission has the authority to retire a judge for physical or mental disability. And we also have the authority to determine -- to remove a judge from office for misconduct that is considered especially serious or egregious.

All of those public decisions are reviewable directly by the New York State court of appeals, which as I said, is the state's highest court.
Q. What are, just broadly speaking, the sorts of violations or sorts of matters that the commission investigates?



MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. What, if any, training do the judges have on rules governing judicial conduct?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained. Too broad.
Q. From your experience on the commission, do you have an understanding of whether judges get training on the judicial rules of conduct?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained in that form.
Q. From your experience working on the commission for more than or approximately 40 years, do you have an understanding of the types of training that the judges receive?
A. Yes, I do.
Q. Do new judges get any sort of training?
MS. COHEN: Objection, your Honor.
THE COURT: Overruled.
A. Yes, they do.
Q. What type of new training do judges -- what type of training do new judges get?
MS. COHEN: Objection, your Honor.
THE COURT: Overruled.
A. There is a New York State Judicial Institute which is a program of the court system. And that judicial institute,

which is based at the Pace University Law School in White Plains, offers every January training programs that run two weeks for all newly elected and newly appointed judges. And as part of that program, there are ethics components which acquaint judges with the ethics rules that they are obliged to follow.
Q. Does the training also apply when a judge is promoted to a new position?
A. Yes, newly elected and newly appointed judges.
THE COURT: Mr. Tembeckjian, you used the word "offers" in relation to the Judicial Institute. What did you mean by that?
THE WITNESS: What did I mean by that?
THE COURT: Yes.
THE WITNESS: I'm sorry, your Honor.
THE COURT: The acoustics are a problem.
THE WITNESS: Yes, that's all right. I appreciate that.
There is a program with a curriculum that is run by the Judicial Institute. And when I say "offers," it is under their auspices, but they have speakers who come in to train the judges on the law, the rules, their ethical obligations. I myself am a teacher at the program and give a program annually on the rules governing judicial conduct.
So, forgive me if I was inexact, but when I say



"offers," it is under the authority of the Judicial Institute, it is physically at the Judicial Institute, although in the last the two years we've been doing it virtually because of COVID restrictions.
THE COURT: I asked the question because it's not clear to me from what you said that a newly appointed or elected or promoted judge necessarily must attend.
THE WITNESS: Oh, I see what you mean. I'm sorry.
Newly elected and newly appointed judges must attend. They are required to attend training programs run by the Judicial Institute, depending on the type of promotion. If the judge is not moving to a new position, let's say from criminal or civil court to Supreme Court, they don't have to attend. But if they have been elected to one court and then they are elected to another court, a higher court, then they must attend the training program.
THE COURT: Thank you. Go ahead, counselor.
MR. MARK: Thank you for clarifying.
Q. What about if a judge is on the civil court and goes to the Supreme Court. Would they need to attend the training at that point in time?
A. Yes.
Q. Returning to the work of the commission. How does the commission begin an investigation?
A. The commission is authorized to investigate complaints, so



typically, a complaint will be sent in to us from an individual or an organization that has a grievance against a judge. The commission also has the authority on its own to initiate a complaint and investigation, and that would be based on information that comes to its attention from something other than a written complaint.
Q. You mentioned before the commission has a policy manual; is that right?
A. Yes.
MR. MARK: Mr. Charalambous, would you show what is marked for identification only as Government Exhibit 543 to the witness.
Q. Do you recognize this document?
A. I do. That is our policy manual that's available on our website.
Q. Just take a look down at the bottom at the date, if you could.
A. Yes, that is June 2015.
Q. Is this the one that was in effect in June 2015?
A. Yes, it was.
Q. For how long was that policy manual in effect?
A. It is still in effect. There was one amendment in June of 2016 I believe. One addition.
MR. MARK: The government offers Government Exhibit 543 into evidence.



MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. Are you familiar with someone named Sylvia Ash?
A. I am.
Q. How are you familiar with her?
A. I became acquainted with her when she was appointed to the commission in April of 2016.
Q. How was she appointed to the commission?
A. She was an appointee of the chief judge of the State of New York.
Q. What was Ms. Ash's employment at the time?
A. She was a justice of the Supreme Court sitting in Brooklyn.
Q. How long had she been a judge at the time?
A. She became a civil court judge I believe in -- in 2006. And then became, as I recall, a Supreme Court justice in 2011.
Q. Is the Supreme Court divided into any sort of divisions or different areas?
A. Yes, it is.
Q. Was Ms. Ash assigned to any particular one at the time?
A. In 2016, when she became a member of the commission, she was a member of the commercial division of Supreme Court in Brooklyn, and she was actually the presiding justice of the commercial division in Brooklyn.
Q. What is the commercial division?
A. The commercial division is a segment of the courts in which

highly complex commercial litigation takes place involving companies, large amounts of documents, large amounts of money usually.
Q. You mentioned she was the presiding judge. What is the presiding judge?
A. She is essentially responsible for the management of that division, and there are approximately five or six Supreme Court justices who serve in the commercial division in Brooklyn. There are others in Manhattan and elsewhere.
Q. Do you recognize what Ms. Ash looks like?
A. I do.
Q. Do you see her in the courtroom?
A. I believe she is to your right. She's behind a mask and I'm not accustomed to seeing her masked. But I believe she's the lady in the dark jacket with a white collar underneath.
MR. MARK: May the record reflect the witness identified the defendant.
THE COURT: Yes.
Q. How long did Ms. Ash serve on the judicial conduct commission?
A. From April 1st of 2016 to August 11, 2016.
Q. What was Mrs. Ash's role on the commission when she served?
A. She was a member, one of 11.
Q. Is there any code of ethics that applies to commission members?



A. There is.
Q. What in sum is that?
A. In the public officers law, there is an ethics code that applies to all public officers, and the commission adopted an additional code of ethics for its members.
MR. MARK: Mr. Charalambous, may we show Mr. Tembeckjian what is marked for identification only as Government Exhibit 545.
Q. Do you recognize this document?
A. I do.
Q. What is it?
A. It is the code of ethics for members of the commission, judicial conduct commission.
MR. MARK: The government offers Government Exhibit 545 into evidence.
MS. COHEN: Objection. Relevance.
THE COURT: Sidebar.
(Continued on next page)



(At the sidebar)
MR. MARK: I didn't want to ask it on the record. 2 and 3.1 both deal with conflict of interests or financial disclosures.
MS. COHEN: She's not being accused here of violating anything she did in her role as a commissioner on the commission on judicial conduct. This is highly prejudicial. It has little if no relevance to the matters, to the charged conduct, or even to the other bad act evidence that your Honor allowed.
THE COURT: I just think it's too far afield. Sustained.
(Continued on next page)



(In open court)
MR. MARK: May I proceed?
THE COURT: Yes, I'm sorry.
BY MR. MARK:
Q. After Ms. Ash became a member of the commission on judicial conduct, did she receive any training pertaining to the commission?
A. Yes.
Q. From whom did she receive that?
A. Initially from me.
Q. What was the purpose of that training?
A. All commission member terms begin on April 1st. And shortly after a new member comes on the commission, I meet with them to acquaint them with how the commission operates, what rules we enforce, what our relationship is with other entities in the court system, the types of complaints that we typically see, and to answer questions that they might have about literally how the commission operates. How we send materials to them, how they prepare for a meeting, what's on the agenda. So forth.
Q. What are the types of complaints that the judicial commission receives?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. After Ms. Ash joined the commission, did she receive any

additional training apart from the one you just mentioned?
A. Yes. In June of 2016, on June 2nd, coordinating with the actual commission meeting date, we gave an ethics refresher to all the members of the commission. That is to say, one of my deputies and I made a presentation to them on ethics obligations.
Q. Could you give a little more detail on what that presentation was.
MS. COHEN: Objection, your Honor.
THE COURT: Sustained. You have no foundation at least at this point.
Q. Ms. Ash was part of this training; is that right?
A. She was present for the meeting, yes, as part of the training.
Q. Did any of that training relate to financial disclosures?
A. Yes, it did.
Q. Could you explain how so?
A. Yes. Part of the presentation was acquainting the commission members with their obligation to file annual financial disclosure statements for the judge members with the ethics commission of the court system. For the non-judge members, it is with the joint commission on public ethics which is a New York State government entity that disseminates and collects those ethics disclosure forms.
Q. In connection with this training, were there any documents



that were shown or distributed?
A. Yes. As a matter of fact, we, we -- we showed the provision of our code of ethics which relates to financial disclosure. And there was a slide show program that the joint commission on public ethics makes available to state agencies to give in what they require as periodic ethics updates.
MR. MARK: Your Honor, in light of Mr. Tembeckjian's testimony, the government renews its offer of Government Exhibit 545 dealing with the code of ethics.
THE COURT: Same ruling.
Q. You mentioned --
THE COURT: Give me a moment. Tell me the number again?
MR. MARK: Government Exhibit 545.
THE COURT: Same ruling.
MR. MARK: Your Honor, may I have a very brief sidebar on that?
THE COURT: I thought we did that already.
(Continued on next page)



(At the sidebar)
MR. MARK: Your Honor, there is also for the record Government Exhibit 545, in 3(i) it also talks about obligations for financial disclosure. I don't think there is any dispute this is relevant evidence. Ms. Cohen's argument is it is 403. Given the way she opened that it was mistake, it would be highly prejudicial and would give a misleading impression to the jury that she didn't know the seriousness of the consequences that Ms. Ash understood from this. And so this would give a misleading impression to the jury if we kept this evidence out. This is a two-page document that this witness said he reviewed with Ms. Ash.
THE COURT: Same ruling.
(Continued on next page)



(In open court)
MR. MARK: Thank you, your Honor.
BY MR. MARK:
Q. You had mentioned, Mr. Tembeckjian, I think the ethics commission; is that right?
A. Yes, for the courts. Unified Court System, yes.
Q. What is the ethics commission?
A. It is the body that is responsible within the court system for disseminating and collecting annual financial disclosure statements from all of the judges in the New York State court system at the level of city court and above.
Q. Are those disclosure statements publicly available?
A. Yes, they are.
Q. For how long has that been true?
A. I think since about 1990 when the ethics commission actually first began operations.
Q. How could someone obtain a judge's disclosure statement?
A. You make a simple request to the ethics commission, it has an executive director, their offices are in lower Manhattan at the headquarters of the Office of Court Administration. You make a request in writing and they are required to oblige.
MR. MARK: Mr. Charalambous, may we show for the witness only what's been marked as Government Exhibits 535 through 541. If we could just show each one slowly to the witness. After we've gone through one completely, we can just

show the first page.
Q. Mr. Tembeckjian, do you recognize these documents, Government Exhibit 535 through 541?
A. Yes, I do.
Q. With what are they?
A. They are the instructions for filing financial disclosure statements, they're quite detailed instructions as to who must file, what must be on those forms, how to answer various questions and so forth.
MR. MARK: Mr. Charalambous, can we show for the witness only what has been marked for identification as Government Exhibit 530 through 534. We can just do the first page of the next ones.
Q. Mr. Tembeckjian, do you recognize these documents?
A. Yes, I do.
Q. Can what are they?
A. They are the financial disclosure statements filed by Sylvia Ash, Judge Ash. I don't recall which -- what the year on the very first one you showed me, but there were three. 2018. I think they were 2015 or 2016 but you'd have to show me again.
Q. Just take a look right now.
A. 2014 through 2018.
MR. MARK: Mr. Charalambous, if you can show what's been marked for identification only as Government Exhibit



500 and 501 to the witness. You can just go to the first page of this one. You can go to Government Exhibit 501.
Q. Mr. Tembeckjian, do you recognize these documents?
A. Yes, I do. They are the financial disclosure statements filed by Judge Ash in 2012 and 2013.
MR. MARK: The government offers Government Exhibits 535 through 541, 530, through 534, and 500 to 501.
MS. COHEN: Your Honor, the defense objects to Government Exhibit 541.
Mr. Mark, if you can just repeat the numbers.
MR. MARK: Sure. 535 to 541. 530 through 534. And 500 to 501.
MS. COHEN: To 501.
MR. MARK: Yes. 500 and 501.
MS. COHEN: The defense objects to the exhibits that are marked that are instructions for each year, which I believe -- Mr. Mark, please correct me if I'm wrong -- government Exhibit 538, 539 --
THE COURT: Instructions are 535 to 541 as I understood it.
MR. MARK: That's correct, your Honor.
MS. COHEN: Thank you, your Honor. Thank you Mr. Mark. Defense objects to 535 through 541.
THE COURT: Mr. Mark, with respect to 500, 501 and 530 to 534, I take it those are offered not for the truth of the



matters asserted but for the fact that those are the forms that the defendant signed and filed.
MR. MARK: Correct, your Honor.
THE COURT: All right. 500 to 501 and 530 to 534 are received for the limited purpose of showing that these are the forms the defendant allegedly signed and filed. But not for the truth of the answers that they contain.
Now, with respect to 535 to 541, the objection is sustained for the moment at least, because I hear no foundation.
(Government's Exhibit 500 through 501, 530 through 534 received in evidence)
MR. MARK: Your Honor, I'll proceed on that.
Q. Speaking on the instructions, do the financial disclosure statements have instructions for completing them?
A. Yes, they do.
Q. Where are those instructions available?
A. To the public they are available in the same way that the financial disclosure form is, from the ethics commission of the court system. You make a request to the executive director and she will provide them.
Q. For how long has that been so?
A. Since 1990 when the ethics commission went into effect.
Q. Are the instructions otherwise provided to judges?
A. Yes, annually when the financial disclosure form is sent,



the instructions are also sent.
Q. How long has that been so?
A. That has been so since 1990.
MR. MARK: The government renews its offer of 535 through 541 now.
MS. COHEN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 535 through 541 received in evidence)
MR. MARK: Mr. Charalambous, could you publish Government Exhibit 538.
Q. Mr. Tembeckjian, what is this document?
A. These are the -- oops.
Thank you, that's all right.
Q. Would it be easier if we don't highlight, Mr. Tembeckjian?
A. No, it's fine.
These are the instructions for filing the financial disclosure statements for the calendar year of 2015.
Q. When would somebody file a financial disclosure for the calendar year of 2015?
A. The statements are due by May 15 of the next year. So May 15, 2016, is when the financial disclosure for the year 2015 would have been due.
Q. Could you just read -- we can put this down -- the first sentence and bullet under where it says who must file.

A. Yes. It says "You must file a financial disclosure statement for calendar year 2015 if you are employed by the Unified Court System in 2016 and you are a state paid judge or justice, regardless of your annual rate of compensation."
Q. Can what are state paid judges or justices?
A. State paid judges are throughout New York State, all judges of city courts and above.
The New York State court system basically has two tiers of judges. There are the local town and village court justices who are paid by their local municipality or their local town and village. And then there are higher court judges who are referred to in the vernacular of the court system as state paid, because their salaries are paid by the state, as opposed to the local town or village that employs the local town or village justice.
Q. Does the category of state paid judges include judges who are on the Supreme Court?
A. Oh, yes, it does, yes.
MR. MARK: Now, if we may go, Mr. Charalambous to page two.
Q. Does it say provide instructions on how to file on this page?
A. Yes, it does.
MR. MARK: Now going a little lower, Mr. Charalambous, if you could just highlight under general information and the



first two bullet points.
Q. Here, there is general information with general instructions; is that right?
A. Yes, correct.
Q. There is a big bolded statement. Could you read what that one says.
A. Yes. It says "Do not attach tax returns or 1099 forms to your financial disclosure statement. The information contained in these such documents must be reported in the relevant response areas in your statement. If you attach them to your statement, they will be returned to you, and, if appropriate, the relevant statement pages will be returned to you, or you will have to revise your online statement."
MR. MARK: And now, Mr. Charalambous, can we go to the middle of page four. Could you just highlight above and below where it says public inspection and below.
MS. COHEN: Your Honor, objection.
THE COURT: I haven't heard a question yet.
Q. Do you see where it says "public inspection," Mr. Tembeckjian?
A. Yes.
MR. MARK: Could we continue and read the next -- continue on to page five. Actually on page four, could you just highlight the bottom of page four. There we go. Where it says "review of statements and penalties." Right there.



Q. Mr. Tembeckjian, could you just read this paragraph right here.
A. Yes.
MS. COHEN: Your Honor, I object.
THE COURT: Overruled.
A. The title is "review of statement and penalties." It reads as follows: "The commission reviews each statement for compliance with disclosure requirements. If your statement is deficient, you must revise it. If you fail to timely file a financial disclosure statement, or if you file a deficient statement, you will be given a 15-day period to cure your deficiency. If you fail to cure the deficiency within the specified time period, the commission is required to send a notice of delinquency: (a) to you; and (b) in the case of a judge or justice, to the state commission on judicial conduct, or in the case of a non-judicial officer or employee, to the chief administrator of the courts. An individual who knowingly and willfully fails to file an annual statement of financial disclosure or who knowingly and willfully, with intent to deceive, makes a false statement or gives information which such individual knows to be false on such statement of financial disclosure, shall be subject to disciplinary action as otherwise permitted by law, rule or collective bargaining agreement."
THE COURT: Before we go on, I remind you, ladies and



gentlemen, of the instruction I gave you yesterday afternoon.
Ms. Ash is not on trial here for any alleged crime or any alleged violation of standards of judicial ethics, financial disclosure, that may have been required and so forth. She's on trial for the four crimes I instructed you about and for that alone. And this evidence that you have been hearing and will be hearing is to be considered by you only insofar as you think it bears on Ms. Ash's knowledge, obligations, actions and inactions, that is to say, with respect to her motive, knowledge and intent in respect of doing what she's charged with in this indictment. This is not a hearing on disclosure violations per se. This is a trial of the four charges in the indictment. Period.
Let's go on.
MR. MARK: Thank you.
Q. The reference that you read to the state commission on judicial conduct. Is that the commission that you sit on?
A. Yes, it is.
Q. Is one of the roles to investigate financial disclosure statements that are brought to your attention?
MS. COHEN: Objection.
THE COURT: Sustained. Answer stricken.
I guess we didn't have an answer.
This has been covered to whatever extent it needs to be covered. Let's move along.

MR. MARK: All right.
Q. Now, did instructions next provide question by question directions on the financial disclosure statement?
Mr. Tembeckjian, is that right?
A. I see that, yes.
Q. On question two where it says UCS position, what does that refer to?
A. UCS is the initialed shorthand for Unified Court System, the New York State court system which is referred to in the Constitution of New York as the Unified Court System. So your UCS position would be the position that you hold in the court system.
THE COURT: Let's move along a little faster, Mr. Mark, please.
Q. Just on the title, directing your attention to question four. What does that question ask to be reported, if you can highlight the first bullet.
A. Yes. Question four relates to positions you've held in the year 2015.
Q. Does that --
A. That particular statement.
Q. Does that include a reference to not-for-profits?
A. Yes, it refers to any paid or unpaid position, including trustee, partner, director, president, vice president, secretary, treasury, member of a board, executive committee or



other committee in a firm, corporation, whether a for-profit or not-for-profit, association general or limited partnership, family charitable and so forth.
Q. That's good, Mr. Tembeckjian. We'll just direct your attention just two other questions.
Question nine on page six. Could you just read the first paragraph of that question.
A. Yes. On the instructions, this is the question pertaining to gifts to you and your family.
Q. All right. And now if we could go to page seven, question 13. And you can read the first paragraph of that instruction.
A. Yes. Question 13: Income received by you or your spouse. "Report all income received by you or your spouse in 2015, in excess of $1,000, from any source other than your UCS position reported in question 2(a)."
MR. MARK: Now, Mr. Charalambous, could we now publish Government Exhibit 531.
Q. Mr. Tembeckjian, what is this document?
A. This is Judge Ash's financial disclosure statement for the calendar year of 2015.
Q. It lists her name and job title on this first page?
A. Yes.
Q. And now I'll just direct your attention to three different questions that we had instructions on before. On question 4(a) on page two.



A. Yes.
Q. What was Ms. Ash's -- what was the information that was entered for this question?
A. The answer was "none."
Q. All right. This is the one that pertained to direct positions or directorships, correct?
MS. COHEN: Objection.
THE COURT: Sustained.
Don't do that, Mr. Mark.
MR. MARK: Okay.
Q. Directing your attention, page four, question 3 where it says list sort of gift.
What's the answer on this one?
A. I'm sorry. The question 9 is showing up and I think you said question 4.
Q. I apologize. On question 9 it was asking to list each source of gifts. What's the answer on this one?
A. The answer is "none."
Q. Now directing your attention to question 13 where it says list below the nature and amount of income in excess of $1,000 from each source for the reporting individual.
What's the answer there?
A. The answer is "none."
MR. MARK: Could we scroll down, Mr. Charalambous, to the end of the document.



Q. From reviewing this document, did the defendant -- this document, and we didn't show all the other -- have you reviewed this financial disclosure for Ms. Ash as well as the financial disclosures for the other years that you looked at previously?
A. Yes, I have.
Q. In any of those years, did Ms. Ash report anything pertaining to Municipal Credit Union?
A. No.
MS. COHEN: Objection, your Honor.
A. Sorry.
MR. MARK: I'm trying to be quick.
THE COURT: I understand that. I couldn't hear what Ms. Cohen said.
MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. We looked at a number of specific questions. Question 4 related to directorships, question 9 related to gifts, and question 13 related to income. Just as we went through for this particular year, 2015. Is that right?
THE COURT: Is there a question?
MS. COHEN: Objection, your Honor.
MR. MARK: Sorry.
THE COURT: We were all here. You did that.
Q. Did any of the other years that for these financial disclosure statements, did Ms. Ash indicate that she had

anything to report for questions 4(a), 9 or 13?
A. No, she did not.
MR. MARK: We can put this down, Mr. Charalambous.
Q. Did there come a time that you learned that Ms. Ash had a connection to Municipal Credit Union?
A. Yes, there did.
Q. When was that?
A. That was in June of 2016.
Q. How did you learn that?
A. It was shortly after the ethics refresher training we had given for the members of the commission which was on June 2nd, 2016. Another member of the commission called me and indicated that he believed Judge Ash was serving on the board and as the chairwoman of the Municipal Credit Union. And that's when it came to my attention.
Q. After you spoke with that commission member, what did you do?
A. I went on the internet and I called up the web page for the Municipal Credit Union, and, indeed, I saw that Judge Ash was on their website as their chairwoman.
Q. After you saw that website, what did you do upon learning that?
A. I instructed an investigator on my staff by the name of Ethan Beckett to access the electronic database of the court system to determine whether or not the Municipal Credit Union



was engaged in litigation in the Courts in New York.
Q. Is it a regular part of Mr. Beckett's job to use that electronic database?
A. Yes, it is.
Q. For what purpose or purposes?
A. In the course of an investigation, we will look at that electronic database to determine what judges are presiding over what cases, what lawyers are representing parties, actions in the cases that have taken place. It helps us to build a profile and a chronology of a case in the court system that a complaint, for example, has been made about, and we're investigating.
Q. Did Mr. Beckett report back to you after he checked the electronic database?
A. Yes, he did.
MR. MARK: I'm showing the witness what has been marked for identification purposes as Government Exhibit 508.
A. I recognize the document, yes.
Q. What is this?
A. This is a memorandum that Mr. Beckett prepared in response to my direction to him that he create a statistical profile basically of the litigation that the Municipal Credit Union was involved in.
Q. Did you receive this?
A. I did.



Q. Was it also made at or near the event -- was it made at or around the time that Mr. Beckett searched the electronic database of the courts?
A. Yes, yes, it was June 10, 2016, and he probably searched the internet that day or the day before.
Q. Was it made and kept in the course of the commission's regularly conducted activity?
A. Oh, yes.
Q. Is it one that's routinely made in the commission's usual practice?
A. Yes, it is.
MR. MARK: The government offers Government Exhibit 508 into evidence.
THE COURT: Received.
(Government's Exhibit 508 received in evidence)
MR. MARK: May we publish this.
Q. So at the top of the memo, it says from Ethan Beckett and it says to Mark Levine.
Who is that?
A. Mark Levine is the deputy administrator of the commission who oversees the investigations run out of our New York City office. Mr. Levine reports to me, Mr. Beckett reports to Mr. Levine and to me. Mr. Levine was his immediate supervisor at the time. But I had asked Mr. Beckett to do this memo and he gave it to us both.



Q. And what did the inquiry that Mr. Beckett did at your request reveal?
A. It revealed that between 2012 and the first five months of 2016, so about four and a half years, that the Municipal Credit Union was involved in over 2,000 cases in the courts in the New York City region.
Q. This is not all the counties of New York State; is that right?
A. Correct. Correct. It covers New York City, so the five boroughs of New York City, Nassau and Suffolk Counties and Westchester County.
Q. What, if anything, did you do after you received this memo?
A. I got in touch by e-mail with Judge Ash to arrange a meeting with her so I could discuss what I had learned about the Municipal Credit Union's litigation activity.
Q. Why did you want to meet with her?
A. Because there is a rule governing judicial conduct that prohibits a judge from serving on the board of a non-profit organization that is regularly engaged in adversary proceedings in the courts. And based on this memorandum, which showed over 2,000 cases in a period of just a little over four years, it certainly seemed to me that the Municipal Credit Union was regularly engaged in adversary proceedings, and Judge Ash's membership would have been prohibited.
Q. Did you meet with her?

A. I did, on June 24, 2016.
Q. Where did that meeting take place?
A. It took place in her chambers in Brooklyn.
Q. How did that meeting begin?
A. It began by my telling her that I was there to discuss with her her membership on the Municipal Credit Union, and that my concern was that because the MCU -- I was using shorthand -- the MCU was seemed to be regularly engaged in litigation, that her membership on the board would be prohibited by the ethics rules.
Q. Did you share anything with her?
A. Oh, yes. The memorandum from Mr. Beckett that I just identified, I gave to her.
Q. Did you ask her to do anything?
A. When I gave her the memorandum, she said she had not been aware that the MCU was engaged in so much litigation. I indicated to her that I thought clearly she had to resign from the MCU.
Q. How did she respond when you said that she needed to resign from the MCU?
A. She told me that she had an advisory opinion that permitted her to serve on the MCU, and she took it out and she showed it to me.
Q. What did you do after she showed you that opinion?
A. Well, I read the opinion, and I pointed out to her that



although the opinion did say that she could serve on the MCU, it included a caveat that specifically said if the MCU was regularly engaged in adversary proceedings in any court, as a judge, she was prohibited from serving.
Q. When was that opinion from?
A. The opinion she showed me was from 2008. I think it was March 2008.
Q. Did she show you any opinions from any other years?
A. No, that's the only one she showed me.
Q. After she showed you that opinion, how did you respond?
A. When she showed me the opinion, I pointed out the language that qualified her permission to serve. And I said that it seemed to me, by any stretch, that an organization that's involved in 3 or 400 new cases every year, is regularly engaged in adversary proceedings, and it would have disqualified her from being a participant.
Q. What was discussed next during this meeting?
A. I'm sorry? And she agreed. And she said to me that she would confirm these numbers with the executive director of the MCU, and assuming that they were verified, she would resign from the MCU and she gave me a date. She said she would resign by July 11 of 2016.
Q. Now, did there come a time that you spoke again with Ms. Ash about her service on MCU's board?
A. Yes, there did.



Q. When was that?
A. I next spoke to her on August 9 of 2016.
Q. Did you speak with her in person or by phone?
A. I spoke with her by phone.
Q. What was the purpose of that phone call?
A. I had looked up the MCU website on the internet, and saw that she was still listed as the chairwoman of the board. So, I called her to express my concern that she was still on the board and I wanted it verified. Because sometimes, you know, entities are not always up to date on their websites, and I wanted to confirm with her that she had resigned from the MCU board as she told me she would in mid-July.
Q. How did Ms. Ash respond to you?
A. She told me she had not resigned from the MCU, and she told me that she was looking for another way to resolve the matter. And that for the moment, she was intending not to resign.
Q. Did she explain what she meant by another way to resolve the matter?
A. No, she did not.
Q. In your experience, was there another way to resolve the matter?
A. No. Not at all.
Q. After she said that, did you respond to her?
A. I did. I told her that, with regret, that I would be recommending that the commission commence an investigation of



her over her continued membership on the MCU board.
Q. After your August 9 conversation with her, did she -- with Ms. Ash, did she inform you of anything regarding her service on the commission?
A. Yes. She had indicated -- she said to me that she was sorry the situation had come to this, she understood my position, we talked about how untenable it would be for a member of the commission to also be the subject of an investigation by the commission. And she told me that she would resign from the judicial conduct commission.
Q. At that time, did she say anything about resigning from MCU?
A. No. She did not.
MR. MARK: Mr. Charalambous, could you show what has been marked for identification purposes as Government 516 to the witness only.
Q. Mr. Tembeckjian, do you recognize this document?
A. Yes, I'm seeing the first page, there is probably more. There we go.
It is a series of e-mails that Judge Ash and I exchanged on August 10, the day after I told her that I would be recommending that we investigate her.
MR. MARK: The government offers Government Exhibit 516 into evidence.
MS. COHEN: No objection.

THE COURT: Received.
(Government's Exhibit 516 received in evidence)
MR. MARK: May we publish.
THE COURT: Yes.
Q. Could you just read the first sentence. It is a one-sentence e-mail.
A. Yes.
THE COURT: I think we can spare him.
MR. MARK: Okay.
Q. Could you just identify who the people are on the cc?
A. Yes. The cc's are -- the first one is Janet DiFiore, she is the chief judge of the State of New York. The second cc is to Lawrence Marks, he is the chief administrative judge for the State of New York. And the third is Joseph Belluck. He is then and now the chair of the judicial conduct commission.
Q. If we just continue on to the first page. This deals with a leave of absence.
Is the top e-mail then an e-mail withdrawing her request for a leave of absence and tendering her resignation?
A. Yes. That's correct. That was the next day. The 11th of August, 2016.
Q. Did the commission file a complaint against Ms. Ash related to MCU?
MS. COHEN: Objection, your Honor.
A. Yes, it did.



THE COURT: Sustained. Answer stricken.
Q. Did the commission meet on August 11, 2016?
A. Yes, it did.
Q. What happened, did anything happen relating to Ms. Ash at that meeting?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. You said that Ms. Ash didn't indicate to you whether she was resigning when you spoke with her last; is that right?
A. Correct.
MS. COHEN: Objection.
Q. What did you do next?
A. What did I do next?
Q. What did -- what did you inform Ms. Ash?
Just before you said you had informed Ms. Ash what you might need to do as a result; is that right?
MS. COHEN: Objection.
THE COURT: Sustained. I think you're probably about done. Move on to something else if you have anything.
MR. MARK: Your Honor, may I have --
THE COURT: No, just move it along.
MR. MARK: All right.
Q. Did the commission -- I'm trying to --
THE COURT: Just get on with it.
Q. Did there come a time that you learned whether Ms. Ash had



resigned from MCU?
A. There did.
Q. How did you learn that?
A. Her attorney at the time informed me that she had resigned from the MCU, and that was some time in August 2016, mid-August I think.
Q. Had anything happened in between August 9 and then?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained.
Q. As a result of --
THE COURT: How much more do you have here, counselor?
MR. MARK: This is about, this is about where we're finishing, your Honor, but it's quite important, your Honor.
THE COURT: If you have a question, ask it.
MR. MARK: Okay.
THE COURT: If you don't have a question, you're finished.
MR. MARK: Thank you, your Honor.
Mr. Charalambous, can we show for the witness only what is marked as Government Exhibit 517.
Q. Do you recognize this document?
A. I do.
Q. What is it?
MS. COHEN: Objection, your Honor.
THE COURT: Sustained. Come to the sidebar.



(At the sidebar)
THE COURT: What are you doing and why?
MR. MARK: Your Honor, this was already the subject of a motion in limine. There was a complaint that was filed against her and your Honor already ruled this was admissible. I'm not intending to ask anything more than the complaint was filed. That's why I've been dancing around it.
THE COURT: What is the relevance?
MR. MARK: That's what prompted her to finally resign. And it is not public that this happens.
MS. COHEN: Your Honor, he testified about the reasons why he made the inquiry of Ms. Ash that he made. The complaint itself is hearsay. The complaint is highly prejudicial. It has minimal, if any, relevance here.
MR. MARK: Your Honor, it would be incredibly misleading to give the impression why she stepped down was merely she had a conversation with Mr. Tembeckjian. That would leave a misleading impression. We were trying to avoid the actual document, which is why we asked many questions, and Ms. Cohen objected to every single one of them.
THE COURT: This is the end of your direct?
MR. MARK: This was, yes, the last point.
THE COURT: We are going to take a break and I'll rule when I come back.
(In open court)

THE COURT: We are going to take a 15-minute break and resume thereafter.

(Recess)

(Continued on next page)



(In open court; jury not present)

THE COURT: I'm sustaining the objection.

MR. MARK: Even in light of your Honor's prior motion in limine which granted this, which your Honor --

THE COURT: You know, sometimes one gets smarter or better informed. I think you have more than amply covered what you need.

MR. MARK: Your Honor, but I'm very concerned about misleading impressions given to the jury that Ms. Cohen might make in closing arguments that we're not able to rebut based on the fact that she is --

THE COURT: What's that?

MR. MARK: That it was simply the fact that Mr. Tembeckjian told her that she needed to resign, so she resigned. And so simply on the fact of being informed, that then she, without the nature of any -- your Honor --

THE COURT: Go ahead.

MR. MARK: I see I'm losing, and I don't think I'm going --

THE COURT: I'll hear you out.

MR. MARK: I know you always do, as you do from all parties, but we'll move on, your Honor.

THE COURT: All right. That's your call.

MR. MARK: I understand.

THE COURT: Okay. Bring in the jury, please.



(Jury present)

THE COURT: Okay. The jurors and the defendant all are present. The objection to Government Exhibit 517 is sustained.

MR. MARK: Thank you, your Honor.

Just a couple of questions.

BY MR. MARK:

Q. Before the break, Mr. Tembeckjian, you had testified that after your August 9th call with the defendant, you had learned that she resigned from MCU.

Is that what you testified about before?

A. Yes.

Q. And you had learned that from an attorney, that she had?

A. Yes. Her attorney at the time was Lawrence Laufer, L-a-u-f-e-r, and he advised me.

Q. About how long after August 9th did he advise you that Ms. Ash resigned?

A. I believe it was the end of August. About August 31st, August 30th, it was toward the end of the month.

Q. At the time Mr. Laufer advised you that Ms. Ash had resigned from MCU, what, if anything, did you know about whether the Advisory Committee on Judicial Ethics had previously told Ms. Ash to resign from MCU's board?

MS. COHEN: Objection.

THE COURT: Sustained.



MR. MARK: No further questions.

THE COURT: Thank you.

Cross-examination?

MS. COHEN: Thank you, your Honor.

THE COURT: Ms. Cohen, you may proceed.

MS. COHEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MS. COHEN:

Q. You testified on direct that you met with Ms. Ash on June 24th, 2016, to go over how the commission worked.

Do you recall that testimony?

A. Actually, on June 24th, I met with her to tell her about my concerns about her being on the MCU. On April the 5th of 2016, I met with her for her orientation.

Q. Correct. Thank you for correcting me on the dates.

So on April 5, 2016, you met with Ms. Ash to talk about how the commission operated, right?

A. Correct, yes.

Q. During that meeting, you didn't have a discussion with her about how to fill out judicial disclosure forms, correct?

A. Correct, we did not discuss how to fill out judicial disclosure forms.

Q. Indeed, when Ms. Ash joined the commission, the commission issued a press release about her joining the commission; isn't that right?

A. I don't believe we did. I don't recall that we did.
Q. Is it customary and usual for the commission to issue press releases when new commissioners come onto the commission?
MR. MARK: Objection.
THE WITNESS: Sometimes. It depends on the appointing authority's preference.
BY MS. COHEN:
Q. But you don't recall, one way or the other, if a press release was issued about Ms. Ash?
A. No, I don't believe that we did, actually.
Q. Just pivoting now to that meeting on June24th, where you were meeting with her to discuss the investigation that your colleague had performed related to the number of cases the MCU had in the state courts in the five boroughs plus Nassau, Suffolk, and Westchester, do you recall that?
A. Yes.
Q. There was no case that your investigator found over which Ms. Ash presided that the MCU was a party to, right?
A. We didn't look for that. We looked for the number of cases that the MCU was engaged in.
Q. You're not aware, though, when you met with her, or anytime thereafter, that there was an actual case before Ms. Ash in which the MCU was a party?
A. Right, I was not aware of that.
Q. When you met with Ms. Ash, she was cooperative and answered



all your questions?
A. Oh, yes.
Q. I believe you testified you called Ms. Ash again on, I think you said, August 9th, 2016, because you saw, from looking on the MCU's website, that she was still listed on the website, the MCU's website, as the board chair, right?
A. Correct, yes.
Q. And she told you she was still, I believe you said, looking at the issue and wanted another way to deal with it.
Do you recall that?
A. Yes.
Q. If I could turn your attention now to, please, you talked a lot on direct about those instructions for filling out disclosure forms.
Do you recall that testimony?
A. Yes, I do.
Q. In particular, you went through Government Exhibit 538, which are the instructions for filling out disclosure forms for the year 2015?
A. Yes.
Q. And you have no knowledge whether Ms. Ash actually read those instructions, do you?
A. I would have no knowledge of that, correct.
Q. And you would agree that the MCU is sort of a hybrid institution — it is both a bank, but it is a not-for-profit; is



that right?
MR. MARK: Objection.
THE COURT: Sustained.
BY MS. COHEN:
Q. You're aware that the MCU is an institution that is organized under a particular New York statute, correct?
MR. MARK: Objection.
THE COURT: Sustained.
Q. Nowhere on -- let's talk about the form itself. On the disclosure form, there is no direct question about service on the Municipal Credit Union; is that right?
MR. MARK: Objection.
THE COURT: Sustained.
Q. Let's actually look at the form.
MS. COHEN: Can we pull up, Ms. Stephenson, Government Exhibit 531.
Q. You were asked questions about question 13.
MS. COHEN: If we could just scroll to question 13, please. Thank you.
If this can be published to the jury because it's in evidence. Thank you.
BY MS. COHEN:
Q. Looking at question 13, it asks the person filling it out to list the nature and amount of any income in excess of 1,000 from each source. The sources are from employment listed under



item 2 above; is that correct?
A. Item 2 above? I don't see item 2 above, but I see where it says item 2 above. Yes, correct.
Q. So the nature of the income includes, you see that?
A. Yes.
MS. COHEN: You can take that down.
Q. Let's look, actually, now at the instructions for filling out the form. Particularly we'll look at the one the government showed you for 2015, Government Exhibit 538.
MS. COHEN: Ms. Stephenson, if you can pull that up, please.
Q. Particularly page 5, which you testified about on your direct, you see the highlighted portion on the very top of page 5 of Government Exhibit 538 — you testified about this on direct — you recall that if there is a deficiency in the filing, the person filling it out would be given a 15-day period to cure the deficiency?
A. I see that, yes.
Q. And a deficiency can mean an error on the statement; is that correct?
MR. MARK: Objection.
THE COURT: Sustained.
BY MS. COHEN:
Q. What does "deficiency" mean?
MR. MARK: Objection.

THE COURT: Sustained.
BY MS. COHEN:
Q. Well, you are not aware if Ms. Ash was ever told that there was any deficiency in her financial disclosure statements, are you?
A. I am not aware of that, correct.
Q. And you are not aware if Ms. Ash was ever given a 15-day period to cure any deficiency in her disclosure statements?
MR. MARK: Objection.
THE WITNESS: I am not aware, correct.
Q. You answered a bunch of questions on direct about training that's provided to new judges by the institute -- provided to new judges or when a judge changes courts, right?
A. Right. Yes, if you're elected to a higher court, you go back to training, right.
Q. And when you're a new judge or you are elected to a higher court, the training at the institute is mandatory, correct?
A. Correct.
Q. And I believe you testified on direct Ms. Ash became a Civil Court judge in 2006, correct?
A. Yes.
Q. And she was elevated to be a Supreme Court justice in 2011, correct?
A. Yes.
Q. You don't have any records about whether Ms. Ash attended



training in 2006 or 2011, right?
A. I do not.
Q. In 2016, I believe you testified, she was approved to be the presiding judge of the same court in which she sat in Brooklyn, correct?
A. Of the commercial division of Supreme Court, yes.
Q. And so Ms. Ash at that time was not -- it was not mandatory for her to attain any training at the institute; is that correct?
A. Not -- correct, yes. Not for elevation within the same position, yes, you are correct.
Q. And you have no knowledge about whether Ms. Ash went to any training at the institute about anything in 2016, right?
A. Correct, I don't know.
Q. And you have no knowledge if Ms. Ash went to training in any year at the institute, right?
A. Yes, correct.
Q. I believe you testified on direct about the commission and how it works, and that there are four judges appointed by the chief judge of the highest court in New York, the Court of Appeals, right?
A. Three judges, yes, not four, but, yes, three judges by the chief judge of New York.
Q. In total, I believe you testified there are 14 members of the commission?



A. Eleven.
Q. Eleven members, my apologies.
The 11 members are appointed, three by the chief judge, some amount by the governor, and other amounts by the New York State Legislature, the leaders --
A. Four and four. Four by the governor, four by the legislature, and three by the chief judge.
Q. Thank you so much.
A. That's all right.
Q. So for those 11 members, there's a qualification, for serving on the commission, a reputation for honesty and ethical conduct?
MR. MARK: Objection.
THE COURT: Sustained.
MS. COHEN: Moment to confer, your Honor?
THE COURT: Yes.
MS. COHEN: Thank you.
(Pause)
MS. COHEN: No further questions, your Honor.
THE COURT: Thank you.
Anything else, Mr. Mark?
MR. MARK: Very briefly, your Honor.
REDIRECT EXAMINATION
BY MR. MARK:
Q. Now, Mr. Tembeckjian, Ms. Cohen asked you a number of



questions where you said you had no knowledge about whether Ms. Ash attended the required training for the judicial institute; is that right?
A. Correct.
Q. But you do have knowledge that she met with you on at least -- or you were present for at least two occasions where she had training while she was on the commission, right?
A. Yes.
MS. COHEN: Objection.
THE COURT: Overruled.
BY MR. MARK:
Q. And you had personal interactions with Ms. Ash while she was on the commission, right?
A. Yes, I did.
Q. Did she ever display to you -- did she ever appear to be confused about what the rules of judicial conduct were?
MS. COHEN: Objection.
THE COURT: Overruled.
THE WITNESS: No.
MR. MARK: No further questions.
THE COURT: Thank you.
MS. COHEN: One question, your Honor?
THE COURT: Yes.

RECROSS EXAMINATION
BY MS. COHEN:
Q. You never discussed with Ms. Ash the financial disclosure forms or how she should fill them out, correct?
A. Correct.
MS. COHEN: Thank you. No further questions, your Honor.
THE COURT: Thank you.
Thank you, Mr. Tembeckjian. You're excused.
THE WITNESS: Thank you, Judge.
(Witness excused)
THE COURT: Government's next witness?
MR. MARK: The government calls Enrique Santos.
ENRIQUE SANTOS,
called as a witness by the Government,
having been duly sworn, testified as follows:
THE WITNESS: Enrique Santos, E-n-r-i-q-u-e S-a-n-t-o-s.
THE COURT: Thank you.
You may proceed.
DIRECT EXAMINATION
BY MR. MARK:
Q. Mr. Santos, it's two minutes before noon, so I'll still say good morning to you.
A. Good morning.



Q. Where do you work?
A. The U.S. Attorney's Office for the Southern District of New York.
Q. How long have you worked at the U.S. Attorney's Office?
A. Thirteen years.
Q. What's your title there?
A. Investigative analyst.
Q. What are your job responsibilities as an investigative analyst?
A. My primary functions are to perform forensic examinations of mobile devices, such as cell phones, computer tablets, and GPS devices, and I also operate and maintain an evidence vault.
Q. What is your educational background, Mr. Santos?
A. I have a Master's degree in criminal justice from the John Jay College of Criminal Justice, and I have a Bachelor's degree in political science from State University of New York at Purchase.
Q. You mentioned part of your job responsibilities deal with forensic analysis of mobile devices; is that right?
A. Yes.
Q. Have you received training in the analysis of mobile devices?
A. Yes.
Q. Could you briefly describe that training for us?
A. I currently have approximately 160 hours' worth of formal



classroom training. I have attended numerous forensics-related webinars, conferences, workshops. I've received certifications for each of the forensic tools that I use, and I'm also part of professional organizations for forensics.
Q. Is one of those forensic tools that you use Cellebrite?
A. Yes.
Q. Have you received training in Cellebrite?
A. Yes.
Q. During your time at the U.S. Attorney's Office, have you performed cell phone extractions?
A. Yes.
Q. Approximately how many?
A. Two thousand.
Q. Have you analyzed cell phone extractions that were completed by others?
A. Yes.
Q. Approximately how many?
A. Fifty.
Q. In advance of trial in this matter, were you asked to review any cell phone extractions?
A. Yes.
Q. Who initially performed those extractions?
A. My supervisor, Investigative Analyst Reginald Donaldson.
Q. What were you asked to do in this case with those extractions?



A. I was asked to look at the original forensic image that was created for those devices and search for a couple of different items.
MR. MARK: Mr. Charalambous, may we show, for the witness only, what has been marked as Government Exhibits 279, 362, and 363.
BY MR. MARK:
Q. Do you recognize what's depicted in these documents?
A. Yes.
Q. What is it?
A. These are screenshots taken of the Cellebrite application. They are of reports created for different cell phones that were examined as part of this case.
MR. MARK: The government offers Government Exhibits 279, 362, and 363 into evidence.
MS. BUCKLEY: No objection, your Honor.
THE COURT: They are received.
(Government's Exhibits 279, 362, and 363 received in evidence)
BY MR. MARK:
Q. Directing your attention first to Government Exhibit 362.
MR. MARK: And, Mr. Charalambous, if we could publish that to the jury as well.
Q. What sort of information is contained on this report?
A. This is an extraction summary, so it contains some unique

identifying numbers for the phone that was examined. So, specifically, you have, for example, the IMIE number of the phone, and you also have the phone number that belonged to that phone.
Q. What's the IMEI number that you referenced?
A. IMEI is an acronym that stands for International Mobile Equipment Identifier, and it's the number that goes 352001095569028. It's kind of like a serial number for the device.
Q. I see two levels below that, it says MSISDN. What is that?
A. That's an acronym that stands for mobile station international subscriber directory number. It's essentially the phone number for the device, and the phone number listed here is an area code (516)401-0150.
Q. This is a Samsung model phone with, I guess, the model that's listed right there; is that right?
A. Correct. The model of the phone is a Samsung Model SM-J327T1.
MR. MARK: Mr. Charalambous, could we show, for the witness only, what's marked as Government Exhibit 350. And flip to the next page as well.
Q. Do you recognize this document?
A. I do.
Q. What is it?
A. This is a Cellebrite report containing excerpts of the



entire phone, specifically the contacts section.
Q. Is this a fair and accurate copy of the contacts from the Cellebrite report for the device with phone number (516)401-0150?
A. Yes.
MR. MARK: The government offers Government Exhibit 350 into evidence.
THE COURT: Received.
(Government's Exhibit 350 received in evidence)
MR. MARK: Mr. Charalambous, could you direct the witness' attention to Government Exhibit 363. It's marked for identification only.
Actually, sorry, this is in evidence. You can display this for the jury.
BY MR. MARK:
Q. What type of phone is this extraction summary for?
A. Apple iPhone X.
Q. Where it says MSISDN number, what's the phone number listed there?
A. Area code (646)341-1478.
Q. Up above that, I see it says "Devicable Info Apple ID." What does that refer to?
A. That is the Apple ID associated with this device.
Q. Which one is that here?
A. JGuagliardo@NYMCU.org.



Q. Below that, it says "iCloud account present," and then it says "True" after that. What does that refer to?
A. It means the phone was paired with an Apple iCloud account.
Q. Mr. Santos, were you asked to review the extraction of this iPhone X for messages associated with the phone number (917)669-7560?
A. Yes.
MR. MARK: Mr. Charalambous, could we show, for the witness only, what's been marked, for identification purposes, as Government Exhibits 360L through the letter R, 360RR, and 360S through the letter X, and 366 and 366A.
BY MR. MARK:
Q. Do you recognize those exhibits?
A. I do.
Q. What are they?
A. These are all messages that were found on that iPhone X.
Q. Are those all of the messages or just certain ones?
A. Just certain ones.
Q. Are those fair and accurate copies of those specific messages that you extracted from the iPhone X?
A. Yes.
MR. MARK: The government now offers Government Exhibits 360L through R, 360RR, 360S through X, and 366 and 366A.
MS. BUCKLEY: No objection, your Honor.



THE COURT: Give me the letters again, please.
MR. MARK: Sorry, I couldn't hear you, your Honor.
THE COURT: Sorry. Give me the letters again, please.
MR. MARK: Of course, your Honor.
It's 360L through R, RR, then S through X.
THE COURT: Thank you.
Did I hear objection or no objection?
MS. BUCKLEY: No objection, your Honor.
MR. MARK: I figured your Honor had it, but then it's also 366 and 366A.
THE COURT: Just a moment.
And those were included in the offer?
MR. MARK: Yes, your Honor.
THE COURT: They're included in your "no objection," right, counsel?
MS. BUCKLEY: That is correct, your Honor.
THE COURT: Those are all received.
(Government's Exhibits 360L through R, 360RR, 360S through X, 366, and 366A received in evidence)
BY MR. MARK:
Q. Directing your attention first to what's been marked as Government Exhibit 360L.
MR. MARK: Mr. Charalambous, we could publish that to the jury as well.
THE COURT: Excuse me, just so we're clear, I may have

just missed this, but these are extractions from messages found in searching Government Exhibit 363; is that right?
MR. MARK: Searching, I think --
BY MR. MARK:
Q. Mr. Santos, was that -- we were looking at Government Exhibit 363. Was that the screenshot of this particular iPhone X?
A. I'm sorry, can you repeat the question?
Q. Let me go back.
Could you take a look at Government Exhibit 363.
On this extraction summary, does it reflect an extraction of the phone with number (646)343-1478?
A. Yes.
Q. And this, you said, was an iPhone X with an Apple ID of JGuagliardo@NYMCU.org?
A. Correct.
Q. Is this the extraction report that you were asked to extract certain messages with a certain cell phone number, specifically (917)669-7560?
A. Correct.
Q. Now --
THE COURT: And Government's Exhibits 360L through R, 360RR, 360S through X, as in Xavier, 366 and 366A, those are selected messages that were found on Government Exhibit 363; is that right?



MR. MARK: Yes, your Honor.
THE COURT: Thank you.
MR. MARK: Thank you for clarifying.
If we could take a look, Mr. Charalambous, first at 360L. And if we could just blow up the participants. Thank you.
BY MR. MARK:
Q. On the list of participants, does it indicate whose phone this was?
A. Yes.
Q. How does it indicate that?
A. The phone number associated with the device is listed here — it's the phone number ending in 1478 — and the owner here is listed as JAG.
Q. Where do the names under each of the phone numbers come from?
A. From the contacts section of the phone.
Q. Mr. Santos, I'm just going to ask you if you could read the dates of these messages and the sender in the body of these messages?
A. Okay. So the first message was sent on January 3rd, 2018, at 9:59 p.m. It's sent from a contact saved as Ash, Hon. Sylvia G, and the body reads: "Hi Joe. Hope you and your family had a wonderful Christmas and wishing you all the best for 2018. I am writing to request some 2018 PBA cards, as many



as you can spare. Thanks, Sylvia."
And the response from the phone number ending 1478, JAG, was sent on the same date, January 3rd, 2018, at 11:29 p.m., and the message reads: "I ordered cards for you from the list you gave me last year."
MR. MARK: Mr. Charalambous, could you publish what has been marked and admitted into evidence as Government Exhibits 366 and, side by side, 366A.
BY MR. MARK:
Q. Mr. Santos, what's depicted here, and why does this look a little bit different than the last message that we looked at?
A. So this is what's referred to as a multimedia message. It's a message that's sent from one phone to another that contains -- in this case, it's an image, but it could be a video or an audio. So here, you have the date and time that that message was sent, and 366A is a blown-up version of that photo.
Q. Who is that photo sent from?
A. Contact saved as Ash, Hon. Sylvia G.
MR. MARK: We can take this down, Mr. Charalambous.
Could you put up, and publish for the jury, what has been marked as Government Exhibit 360O, as in Oscar.
Q. Mr. Santos, could you just read who is the sender on these messages and the content along with the date?
A. Sure.



This is an outgoing message from the Apple iPhone X, with the user JAG, to -- it's a message sent on February 22nd, 2018, at 11:23 p.m. The message says: "The board just suspended Kam. The lawyers told him the Justice Department was pressuring them."
The next message, also outgoing, says, "Don't call Kam's number. They took that phone, also."
And the response is from contact Ash, Hon. Sylvia G, on February 22nd, 2018, at 11:45 p.m., and the response is: "OMG! That is so wrong. Please call me anytime when you can talk."
MR. MARK: Mr. Charalambous, could you now publish, for the jury, what's been marked as 360R and, next to it, 360RR.
Q. Mr. Santos, could you just indicate who this is from, the date, and what are we looking at here?
A. This is an outgoing -- what appears to be a screenshot of a document from the iPhone X with the user name JAG, outgoing to contact Ash, Hon. Sylvia G, and it was sent on February 23rd, 2018, at 8:22 p.m. And then on the right, 360RR, is a blown-up version of that screenshot that was sent.
Q. That's the full-sized image of what was sent?
A. Correct.
MR. MARK: Now, Mr. Charalambous, could I direct your attention to 360. Could you display, for the jury, what's been

marked as 360P.
BY MR. MARK:
Q. For these, could you just read the sender once again and the body of the text message and the date?
A. So the first message is an outgoing message, again from JAG, that was sent on February 23rd, 2018, at 12:01 a.m. The message reads: "I'm so sick. I know they hit the board in the room in exec session. No recording of the meeting. And just stroked them."
The response is from Ash, Hon. Sylvia G, also on February 23rd, 2018, at 12:05 a.m. The message reads: "With the exception of Beryl, the board is very weak and has no balls. They are very complacent and afraid to rock the boat because they don't want to lose their position. They are more concerned about their status than what is best for MCU. They have no loyalty."
MR. MARK: Mr. Charalambous, could we skip now to Government Exhibit 360T, and could we publish that to the jury.
Q. If we could just -- if you could just read the bottom message in this chain and then continuing on to the next page?
A. The bottom message is an outgoing message from the iPhone X user JAG, sent on March 16, 2018, at 8:15 a.m. The message reads: "They are really digging for anything. Billable hours."
Then followed by another outgoing message, also from



the same person or phone, sent on March 16, 2018, at 8:16 a.m. the message reads: "We are a long way from initial issue."
The response is from Ash, Hon. Sylvia G, same date, at 8:23 a.m. The response is: "They are casting a wide net hoping to dig up as much dirt as possible to expand and justify their initial issue. Kam needs to start working on plan B. That is one of the main reasons why you must join the board."
MR. MARK: And now, Mr. Charalambous, if you could publish, for the jury, what's been marked as Government Exhibit 360U.
BY MR. MARK:
Q. And, Mr. Santos, once again, could you just read the body of these messages and indicate the dates where they change?
A. These are all outgoing messages from contact JAG from the iPhone X, sent on March 30, 2018, at 8:50 a.m. It starts: "Kam isn't even the issue anymore."
The next message is sent on April 4, 2018, at 12:15 p.m. It says: "Let there be no mistake that we are not the problem! Has anyone told the board that Epstein and Becker are up to a million dollars and all the subpoenas have been answered?"
And there appears to be a document attached to this message titled, "Memo to the Examiners of the NYSDFS04.2018."
And then the next message, sent a minute later, says: "They are now doing an audit of the Cuba and Vienna trips.



Million dollar lawyers doing $10,000 audits."
MR. MARK: Now, Mr. Charalambous, if we could go to 360V, as in Victor, and publish that to the jury.
BY MR. MARK:
Q. Once again, Mr. Santos, if you could just read the senders and the bodies of these messages and note the date?
A. The first message is an incoming message from Ash, Hon. Sylvia G, sent on May 4, 2018, 7:31 a.m. It says: "Good luck with the annual membership today. May the force be with you all."
The response from the iPhone X, JAG, says: "Regulators coming." And that was sent about 30 seconds after the initial message.
And the next message, sent about a minute later, says: "First time I've ever seen that."
And the response from Ash, Hon. Sylvia G is: "Ouch. Don't be surprised if someone from DOJ isn't there also!"
MR. MARK: Mr. Charalambous, could you publish now what's been marked in evidence as 360X, as in Xavier.
Q. This is a longer string, Mr. Santos, but if you could read this, indicating, once again, the sender and the body of the message, and when dates change, just note that date change.
A. So the first message is an outgoing message from the iPhone X, user JAG, sent on May 8, 2018, at 12:16 p.m., and there appears to be a link to an article -- excuse me, a press



release from the Department of Justice with the title "CEO and President of New York Credit Union Charged with Embezzlement and Fraud." And there's a hyperlink.
Then there's another message, also outgoing from the iPhone X, that says: "The hammer drops."
And then the following message says: "CH4."
Q. If you could continue on the next page, Mr. Santos?
A. Another outgoing message from the iPhone X, user JAG, still May 8, 2018, says: "Post."
And then there is a response from Ash --
THE COURT: Just give us a second here. We're having technical difficulties.
MR. MARK: Are you still having that, your Honor?
THE COURT: Yes.
Can the jurors see? You can see.
MR. MARK: I note it's 12:23. Would you like to take a lunch break to fix that?
THE COURT: Yes, I think that makes sense.
Folks, 2:00 o'clock.
(Luncheon recess)
(Continued on next page)

AFTERNOON SESSION

2:00 p.m.

(Jury not present)

THE COURT: We're waiting for the jury.

MS. COHEN: Your Honor, while we're waiting for the jury, at the end of the day, there is an issue relating to failure to disclose 3500 material that I would like to bring to the Court's attention that we learned about this morning. And I wanted to alert the Court to that for timing purposes of the day.

(Continued on next page)



(Jury present)

THE COURT: Jurors and defendant are present as they've been throughout.

You may continue, Mr. Mark.

MR. MARK: Thank you, your Honor.

BY MR. MARK:

Q. Mr. Santos, before we took a break for the lunch, I believe you were testifying about certain cell phone extractions that you did from a particular iPhone X; is that right?

A. Yes.

Q. That was the one that had the Apple ID with JGagliardo@NYMCU.org?

A. Correct.

MR. MARK: Now, Mr. Charalambous, would you show for the witness only what's been marked for identification purposes as Government Exhibit 364.

Q. And Mr. Santos, do you recognize this document?

A. I do.

Q. What do you recognize it as?

A. This is a text message exchange recovered from that Apple iPhone 10.

Q. Who is it between?

A. The Apple iPhone 10 with the user name JAG with the phone number ending with 8833 with the contact name saved as Kam.

Q. Is that a true and accurate copy of an excerpt of messages



from the phone with the phone number ending 1478?

A. Correct.

MR. MARK: The government offers --

Q. And let me also ask you to be efficient.

MR. MARK: Could you show, Mr. Charalambous, what has been marked for identification purposes as Government Exhibit 364A.

Q. Do you recognize this document?

A. I do.

Q. What do you recognize it as?

A. This was part of a message that was sent from that Apple iPhone 10 to the user Kam. It is a blown-up version of that photo.

MR. MARK: The government offers Government Exhibits 364 and 364A into evidence.

MS. BUCKLEY: No objection, your Honor.

THE COURT: Received, both of them.

(Government's Exhibit 364, 364A received in evidence)

MR. MARK: Mr. Charalambous, can we publish to the jury just the top portion.

Q. Is that from the user Kam to the phone with JAG and that's on January 18, 2018?

A. Correct. This is an incoming message with a photo attached that was received on January 18, 2018, at 4:26 p.m.

MR. MARK: Mr. Charalambous, can we just flip to 364A.



Q. Is that the photograph that was sent?

A. Yes.

MR. MARK: You can put that down, Mr. Charalambous.

Q. Before the break, we were going through a text message that was marked as Government Exhibit 360.

MR. MARK: And Mr. Charalambous, if you can display that. It's already in evidence. 360-X.

Q. We had started going through this message string I think before there were some technical difficulties on the computers. The computer monitors. And this was a string between -- if we can just look above between which participants.

A. Yes. This is a message exchanged between the Apple iPhone 10 user name JAG and the contact saved as Ash Hon Sylvia G.

Q. And I think we started going through this, and I don't want to cover the previous ground. But there was a press release, there was some mentions here of Channel 4. If we can continue on to the next page. And the date here is May 8.

If you can read through the sender, the body of these messages.

A. So the message continues, the sent message says "post." That's from the Apple iPhone 10 to user Ash Hon Sylvia G. And Ash Hon Sylvia G responds "Damn, damn, damn."

That's on May 8, 2018, 5:13 p.m.

MR. MARK: Could we continue along, Mr. Charalambous. We can skip over these too. And continue here on the green

bubbles.
A. Another outgoing message from the Apple iPhone 10. Looks to be a linked article from the New York Daily News with the title "MCU chief allegedly embezzled millions money fund article." And the date is May 8, 2018 at 7:24 p.m.
Q. Keep going.
A. And the rest of the messages are also outgoing messages to the same person. It says "Just gets worse." And then there is a linked screenshot of what appears to be a newspaper. And then the bottom reads "Norman referenced Sylvia, Nana and Gio as people who were part of contract signings that are being looked at." And that's from May 9, 2018, 7:41 p.m.
Q. This message, 360S, along with the other messages that you testified about in a series of 360L through 360X as well as 366 -- that's a mouthful. Those were all from iPhone 6. So those were all on the phone with the owner identified as JAG?
A. Yes. It is an iPhone 10.
Q. Okay. And now I want to just direct your attention to a different phone.
MR. MARK: Mr. Charalambous, can we publish for the jury what is marked and already in evidence as Government Exhibit 279.
Q. And what's depicted here?
A. This is a screen shot of the Cellebrite application, specifically of the examination of an Apple iPhone 6-S. And



displayed here are the identifying numbers such as the IMEI number and the phone numbers associated with the device.
Q. What's the phone number associated with this device?
A. Area code 917-669-7560.
MR. MARK: Mr. Charalambous, can you put side by side the phone number for the messages we were looking at before.
Q. Is that the same phone number as saved for Ash Hon Sylvia G in the JAG phone?
A. Yes.
Q. And what type of phone is the phone with the ending number 7560?
A. It is an Apple iPhone 6-S Plus.
Q. What was the date of the extraction from this phone?
A. October 21, 2019.
Q. Did you search for messages that were previously marked for identification in that phone?
A. Yes.
Q. Did that include the messages that were previously marked for identification as 360L through X and 366?
A. Yes.
Q. And what was the result of your search for those messages in the phone with the last four digits of 7560?
A. Negative. I couldn't find the messages on the phone.
Q. In your review of extractions of cell phones, have you encountered situations involving deleted data?



A. Yes.
MS. BUCKLEY: Objection, your Honor.
THE COURT: Overruled.
A. Yes.
Q. What are some of the reasons why data could not be recovered from a phone?
MS. BUCKLEY: Objection, your Honor.
THE COURT: You need a foundation.
Q. Have you received training on recovery of data from devices?
A. Yes.
Q. Could you explain your training.
A. Like I mentioned, 160 hours of formal classroom training, I've attended numerous webinars, I've tended seminars, workshops related to forensics, and I've received my certifications for the tools that I use.
Q. What are some of the reasons from that training and your experience doing thousands of extractions of phones, what are some of the reasons why data could not be recovered from a phone?
MS. BUCKLEY: Objection your Honor.
THE COURT: Overruled.
A. There is a couple different variables. Couple different reasons why you wouldn't be able to recover deleted messages. So, it depends on, not every cell phone model is supported for



deleted data recovery. So that's one reason. Maybe you don't have the right cell phone model. Depends on the operating system version. So different, there are changes made from version to version that would maybe prevent us from being able to recover deleted data. Different security patches could prevent us from recovering data.
Sir, can you refresh my memory? What's the question again?
Q. So, and in your experience, what are some of the reasons that data might be deleted from a phone?
MS. BUCKLEY: Objection, your Honor.
THE COURT: Sustained.
Q. Have you encountered situations where messages are deleted on phones from your review of extractions?
A. Yes.
Q. What are some of the reasons that data can be deleted from a phone?
MS. BUCKLEY: Objection, your Honor.
THE COURT: Sustained.
Q. Based on your review of this iPhone 6-S Plus, were there messages in the time frame of these -- based on your review of the iPhone 6-S Plus, were there messages that were on the phone with the phone number ending 5760 that were in the same time frame as the messages that you did not find that were marked as Government Exhibit 360L through X and 366?

MS. BUCKLEY: Objection, your Honor.
THE COURT: Let's state that question a little more succinctly.
MR. MARK: I will.
Q. You previously said that you attempted to search for the messages identified as 360L through X and 366 on the iPhone 6-S Plus with the last four digits 7560. Is that right?
A. Yes.
Q. And in attempting to search for those messages, did you generally observe the date range for some of the messages that were -- that were on the phone?
A. Yes.
Q. Were there messages on that phone within date ranges that the messages for 360L through X were?
MS. BUCKLEY: Objection, your Honor.
MR. MARK: I can rephrase that.
THE COURT: Let's try.
Q. 360L through X, were those messages that from January 2018 to May or so of 2018?
A. Correct.
Q. And on the iPhone 6-S Plus that you reviewed the extraction of, did you find messages between January 2018 and May 2018?
A. Yes.
Q. But did you find the messages that we were just -- that you had found on the JAG phone which were previously marked



identified and offered into evidence?
A. Yes.
Excuse me. Sorry. No.
Q. Just so the record is clear. Could you explain your answer?
MS. BUCKLEY: Objection, your Honor.
THE COURT: How do you explain "no"?
Mr. Santos, if I understand correctly, the messages that were marked Government Exhibit 360L through X were between what you identified as the JAG phone, and the phone ending in the digits 7560. Is that correct?
THE WITNESS: Correct, your Honor.
THE COURT: And those were all extracted from the JAG phone; is that correct?
THE WITNESS: Yes, your Honor.
THE COURT: And then you looked on the phone, you looked on the extraction from the phone, the number for which was 7560; yes?
THE WITNESS: Correct.
THE COURT: And if the messages you found on the JAG phone had either been sent to the 7560 phone, or sent by the 7560 phone to the JAG phone, in the normal course, you would have expected the same text messages to be in the memory of the 7560 phone also referred to as the iPhone 6-S as in Sam. Is that right?



THE WITNESS: Correct, your Honor.
THE COURT: You looked for that, right?
THE WITNESS: Correct.
THE COURT: And they weren't there, right?
THE WITNESS: Correct.
THE COURT: Okay. Please proceed.
MR. MARK: Okay.
Q. You're familiar with how an iPhone 6-S Plus works, right?
A. Yes.
Q. Can a user of an iPhone 6-S Plus manually delete certain messages?
A. Yes.
MS. BUCKLEY: Objection, your Honor.
THE COURT: Overruled.
A. Yes.
MR. MARK: May I have one moment?
THE COURT: Yes.
MR. MARK: No further questions, your Honor.
THE COURT: Thank you. Cross-examination.
CROSS-EXAMINATION
BY MS. BUCKLEY:
Q. Good afternoon, Mr. Santos.
A. Good afternoon.
Q. I'm Janie Buckley, I'm one of Ms. Ash's attorneys. I'm going to ask you a few questions.



A. Okay.
Q. So, you recall testifying on direct about text messages between Mr. Joseph Gagliardo and Ms. Ash, correct?
A. Correct.
Q. And in fact, you just read aloud for the jury some of the text messages between Ms. Ash and Mr. Gagliardo, right?
A. Yes.
Q. And the messages you read aloud for us were only a subset of the messages between Ms. Ash and Mr. Gagliardo that were found on Mr. Gagliardo's cell phone, correct?
A. Yes.
Q. And you pulled the subset or you -- withdrawn, your Honor.
The messages that you selected to excerpt, you did that at the direction of the prosecutors here, correct?
A. Yes.
Q. But you did prepare a report of all of the text messages between Ms. Ash and Mr. Gagliardo, correct?
A. The original report was created by my supervisor. I just pulled some of the messages that I was directed to pull.
Q. But you reviewed that entire report, correct?
A. Yes.
Q. So, turning to your testimony on some of the text messages from this morning and on direct, you looked at what has been identified as Government's Exhibit 360S and you said you reviewed that, correct?

THE COURT: Was that an S or an X, counsel?
MS. BUCKLEY: An S as in Sam, your Honor.
THE COURT: Thank you.
A. Can I see 360S to refresh my recollection?
MS. BUCKLEY: Certainly. Ms. Stephenson, can you pull up 360S for the witness only.
A. Yes.
Q. And are you aware that these text messages were about attending a funeral of an MCU board member who had just died?
A. No.
THE COURT: Members of the jury, I just remind you that the lawyers' questions are not evidence. It is only the answers. Go ahead.
MS. BUCKLEY: Thank you, your Honor.
Ms. Stephenson, can you please put up what was put up for identification as Government Exhibit 360E just for the witness. If you can scroll down to page 19 of the document. Please scroll a little bit more, Ms. Stephenson. Keep going, Ms. Stephenson. Thank you. You can stop there.
Q. Mr. Santos, if you can go back up to page 19.
Mr. Santos, I direct your attention to the last two messages on this page. Now that we've reviewed, do you now recall that these text messages were about attending a funeral of a recently deceased former board member?
MR. MARK: Objection.



THE COURT: Sustained.
MS. BUCKLEY: You can take that down, Ms. Stephenson.
Q. Mr. Santos, you also testified regarding some text messages exchanged between Ms. Ash and Mr. Gagliardo on February 23, 2018, right?
A. Yes.
MS. BUCKLEY: Ms. Stephenson, can you please show the witness what has been marked for identification only as Defense Exhibit P?
THE COURT: Is that T as in Tom. P as in pneumonia?
MS. BUCKLEY: P as in Peter.
THE COURT: Pneumonia. Which is it?
MS. BUCKLEY: P as in pneumonia.
THE COURT: Thank you.
Comes out of a Lily Tomlin routine many years ago. She played a telephone information operator, and somebody asked for the name of Kaplan. And she said is that K as in knife, A as in aardvark, P as in pneumonia, L as in llama, A as in aardvark again.
You can go on. It was very funny.
MS. BUCKLEY: Thank you, your Honor.
THE COURT: Especially if you have my surname.
Q. Do you recognize these text messages as an excerpt of what was previously marked for identification only as Government's Exhibit 360E, the larger report that we just looked at?



A. Yes.
MS. BUCKLEY: I offer Defense Exhibit P into evidence.
MR. MARK: Objection, your Honor. Most of the string is in evidence already as 360P and 360Q, and the one portion that's not is hearsay.
THE COURT: Draw my attention to the portion that isn't, please.
MR. MARK: The first two messages are. And the particular portion is February 23, 2018, 12:15:39.
THE COURT: Scroll down, please. Stop. You said 12:15:39. Scroll a little bit further.
MR. MARK: Right there.
THE COURT: Right there. Stop. 12:15:39? I see it. All right. Objection sustained.
MS. BUCKLEY: Your Honor, if I may, we're offering this exhibit for completeness.
THE COURT: The objection is sustained.
MS. BUCKLEY: May I be heard at sidebar?
THE COURT: No.
MS. BUCKLEY: Okay.
Q. Mr. Santos, as you testified, you reviewed the extractions of the cell phone of Mr. Joseph Gagliardo, correct?
A. Correct.
Q. And it's from these extractions that the text messages we've been looking at today between Ms. Ash and Mr. Gagliardo



were obtained, right?
A. In part, yes.
Q. Okay. You are aware that Mr. Gagliardo's cell phone also had text messages with Kam Wong on it, correct?
A. Yes.
Q. And Mr. Santos, do you recall that there were about 1,000 text messages on Mr. Gagliardo's cell phone exchanged between Mr. Gagliardo and Mr. Wong from late December 2017 until on or about Mr. Wong's arrest on May 8, 2018?
A. I don't remember the number of messages or the exact dates, but just that there were messages exchanged between Gagliardo and Wong.
Q. That's fair. So, I'm now going to show you two documents that have been marked for identification only as Defense Exhibits Q and R. We'll start with Defense Exhibit Q, Ms. Stephenson.
Mr. Santos, you recognize this document as part of the extractions that were used to pull out certain text messages we've discussed today, correct?
A. Yes, this is the Excel version of the chat section of the report.
MS. BUCKLEY: And Ms. Stephenson, if we can please scroll down to the bottom.
Q. And Mr. Santos, if I could direct your attention to the numbers on the far left of this spreadsheet. And this

spreadsheet has about 190 text messages between Mr. Wong and Mr. Gagliardo on it, right?
A. Yes.
MR. MARK: Objection. Relevance.
THE COURT: Sustained. The document is not in evidence either.
MS. BUCKLEY: Ms. Stephenson, can you please show the witness what has been identified as Defense Exhibit R.
Q. Similarly, Mr. Santos, like Exhibit Q, you recognize this document as part of the extractions, the spreadsheet version that has been used to pull out certain text messages we've discussed, correct?
A. Yes. This is from the SMS section of the report.
MR. MARK: Same objection.
Q. And it has about 80 text messages between Mr. Wong and Mr. Gagliardo on it, right?
MR. MARK: Objection.
THE COURT: Sustained.
MS. BUCKLEY: You can take that down.
Q. These spreadsheets we've been looking at, the text messages between Mr. Wong and Mr. Gagliardo, they don't include any other participants, correct?
A. I didn't get to see that last one.
MS. BUCKLEY: We'll put it back up for you.
MR. MARK: Objection. The document is not in



evidence.
THE COURT: Sustained.
MS. BUCKLEY: Ms. Stephenson, can you please show the witness what is marked as Defense Exhibit Q-1 for identification only.
Q. Mr. Santos, this is an excerpt of what I just showed you as Defense Exhibit Q, correct?
A. I haven't had a chances to compare the two spreadsheets, but I suppose it's possible.
Q. Would you -- like an opportunity to compare the two spreadsheets?
THE COURT: Do you have any questions? Please could we move this along.
MS. BUCKLEY: Yes, your Honor.
THE COURT: Defendant's Exhibit Q isn't in evidence. Defendant's Exhibit Q-1 isn't in evidence. You can't ask questions that go into the content of either one without them being in evidence. So let's move along.
MS. BUCKLEY: Well then I'd like to offer Defense Exhibit Q-1 into evidence.
MR. MARK: Objection. Relevance and 403.
THE COURT: Sustained.
Q. Can we please show for the witness Defense Exhibit Q-2.
MS. BUCKLEY: I'd like to offer Defense Exhibit Q-2 into evidence.



MR. MARK: Objection, relevance.
THE COURT: Sustained.
MS. BUCKLEY: All right. Ms. Stephenson, can you please put back up what have been previously marked and offered into evidence as Government's Exhibits 364 and 364A.
Q. Mr. Santos, you previously testified regarding this exhibit, correct?
A. Which exhibit is this?
Q. What has been identified as Government's Exhibit 364 and we are going to show you 364A.
A. Okay.
MS. BUCKLEY: And Ms. Stephenson, you can publish this to the jury.
Q. This is a text message dated January 18, 2018, between Mr. Wong and Mr. Gagliardo, correct?
A. I'm sorry, I actually don't have it up on my screen.
THE DEPUTY CLERK: The witness's screen went blank.
MR. MARK: I can give the witness the exhibit that, Ms. Buckley, this is 364?
MS. BUCKLEY: And 364A.
THE WITNESS: Okay.
Q. So, you agree it shows some text messages dated January 18, 2018, between Mr. Wong and Mr. Gagliardo, just the first page for now.
A. Yes.



Q. And in the first text on this page, Mr. Wong is sending Mr. Gagliardo a photograph of Agent LaVale Jackson's business card, right?
A. Yes.
Q. And Government Exhibit 364A is the larger version of the photograph of Agent LaVale Jackson's business card that Mr. Wong sent to Mr. Gagliardo, correct?
A. Yes.
Q. And then, back to 364, after he receives this text message from Mr. Wong, Mr. Gagliardo responds "thank you." Right?
A. Correct.
MS. BUCKLEY: Your Honor, may I have a moment to confer?
THE COURT: Sure.
MS. BUCKLEY: Thank you. Your Honor, may I be heard at sidebar regarding the relevance of the number of text messages between Mr. Gagliardo and Mr. Wong?
THE COURT: I think the witness said he has no idea or words to that effect.
MS. BUCKLEY: Your Honor, he did testify that regarding the spreadsheets he recognized them. And was going to identify --
THE COURT: That's not my memory. Come up here, please.
(Continued on next page)

(At the sidebar)
MS. BUCKLEY: Your Honor, the witness did testify that he recognized the spreadsheets that had the text messages on them between Mr. Wong and Mr. Gagliardo, and the objection was sustained regarding relevance. We were going to get him -- he was going to be able to identify the number of text messages based on the spreadsheet. They are relevant because they occur between two alleged co-conspirators of Ms. Ash.
THE COURT: Two alleged?
MS. BUCKLEY: Co-conspirators of Ms. Ash during the time of the charged conspiracy. And the volume of text messages between two alleged co-conspirators tends to show, as compared to the volume of text messages between Ms. Ash and the two alleged co-conspirators, tends to show -- makes it less likely to be true that she was a member of that conspiracy.
MR. MARK: That she's not on those messages, there is no indication that -- the content of those messages is completely irrelevant. And it is incredibly confusing to the jury to infer anything from the content or the volume of text messages that they are attempting to -- attempting to draw out.
THE COURT: Look, I stand by the ruling. First of all, as you know, the jury will be instructed that if a conspiracy is formed, the defendant does not have to have joined at the beginning, need not be in it throughout, and need not be in it at the end, as I remember the charge. But in any



case, the basic point is, all it takes is adherence for a moment, that's it. She need not know the other members of the conspiracy. And what you're really inviting is putting in whatever number of hundreds of text messages there may be for the purpose of showing that it was an entirely different kind of relationship -- I'm hypothesizing, of course -- between whatever his name is.
MS. COHEN: Mr. G.
THE COURT: Thank you.
MS. BUCKLEY: I'm the only one on our team who can reliably say his name.
THE COURT: You deserve a merit badge for that, and I'm not being sarcastic. I'm being good humored.
It's just a frolic and a detour. It doesn't get us anywhere so I stand by the ruling.
MS. BUCKLEY: Thank you, your Honor.
(Continued on next page)



(In open court)
MS. BUCKLEY: No further questions.
THE COURT: Any redirect?
REDIRECT EXAMINATION
BY MR. MARK:
Q. Mr. Santos, on cross-examination you were asked a few questions about 360S. Is that right?
A. Can I just see 36 -- the exhibit.
MR. MARK: Mr. Charalambous, this is actually in evidence. And I don't think it was shown to the jury before.
THE COURT: What are we waiting for?
MR. MARK: The back screen is a little slow.
THE COURT: Thank you.
Q. You were asked a question or two about whether this exhibit, 360S, refreshed your recollection about an event, right?
A. Yes.
MS. BUCKLEY: Objection, your Honor.
THE COURT: What's the objection?
MS. BUCKLEY: It misstates the testimony.
THE COURT: Overruled. The jury will remember the testimony.
Q. I don't think this was published before. It looks like it's published now. Can we go to the second page.
Could you just read who the sender is and what the



body and content of that message is at the bottom one.
A. This was an incoming message received on the Apple iPhone 10 with the user name JAG that was received on March 2nd, 2018, at 10:38 p.m. from contact saved as Ash Hon Sylvia G. And the contents reads "I will be there st 3 tomorrow. Thanks for the heads up. Pursuant to Mission Impossible, these e-mail correspondence will be deleted in five minutes." And then there's is two emojis, "see you tomorrow."
MR. MARK: No further questions.
THE COURT: Thank you. Any recross?
MS. BUCKLEY: No, your Honor.
THE COURT: Mr. Santos, thank you. You are excused.
(Witness excused)
THE COURT: Next witness.
MS. COHEN: I believe the government's next witness relates to an issue I raised after the lunch break.
THE COURT: Come to the sidebar.
(Continued on next page)

(At the sidebar)

MS. COHEN: Your Honor, we were informed this morning by Mr. Mark that, apparently, there was 3500 material -- that there was material sent to the next witness who is going to be called Jeremy Rosenberg.

MR. MARK: Rosenman.

MS. COHEN: Apologies. That Mr. Mark represented he was unaware of prior to this morning at about 9 a.m. He then sent me a copy of the document he was referring to that he was not aware of, which appears to be a script for this witness of every question that the government intends to ask the witness, every exhibit the government intends to admit. It appears to be a handwritten script of everything.

It appears to me that that is 3500 material because you don't have written the questions without knowing the answers. There is no or very limited 3500 material of interviews or prep of Mr. Rosenman. And the reason is because there is this script which essentially was the prep of Mr. Rosenman that was provided.

THE COURT: I'm sorry. It was what?

MS. COHEN: The reason there is no, basically, very limited 3500 for Mr. Rosenman is because the script essentially is the -- what was written based on prepping Mr. Rosenman. We received it at 9 a.m. We received at 1:48 p.m. another copy of this script. I will tell you the two scripts are three pages



single spaced with lots of detail in them. We were not provided with any e-mails, I was told by Mr. Mark --

THE COURT: Keep your voice down.

MS. COHEN: Sorry. I was trying to be helpful to the court reporter.

THE COURT: I appreciate that.

MS. COHEN: I was told by Mr. Mark that the first script that was provided to me around 9 a.m. this morning after Mr. Mark told me about it was e-mailed or was provided to Mr. Rosenberg in advance of his testimony -- Rosenman in advance of his testimony. I do not have any e-mail or note of when it was provided to Mr. Rosenman. The second script which was provided to me today at approximately 1:45 p.m., for Mr. Rosenman, I was not provided with any e-mail or correspondence --

THE COURT: You didn't get it from Mr. Rosenman, did you?

MS. COHEN: No. I got every document from Mr. Mark. One document this morning at 8:45, the script, and a second script at 1:45.

THE COURT: I assume you misspoke.

MS. COHEN: Sorry if I did, your Honor.

THE COURT: You said you got it from Mr. Rosenman at 1:45.

MS. COHEN: Sorry. I did not. I got nothing from



Mr. Rosenman.

THE COURT: Can we get on with it.

MS. COHEN: Sure.

So, the witness that they are calling now apparently was provided, according to Mr. Mark's representation to me this morning, was provided with a script. I don't know any information about that. When it happened, the communication, if there is an e-mail, a text, which would be 3500 that should have been provided to the defense as to both scripts.

THE COURT: Mr. Mark.

MR. MARK: Putting aside whether it is 3500.

THE COURT: I'm sorry?

MR. MARK: I said putting aside whether it is 3500, this morning I did notify Ms. Cohen that I learned that Ms. Katz had provided a script of questions she was planning to ask Mr. Rosenman. He is a summary witness just to testify about particular documents. Although it is no different than sharing questions, going over questions with a witness, that was not the practice in the Southern District of New York. I notified Ms. Cohen and told her that's what happened. She asked for a copy of that and we provided that.

I also talked with Ms. Katz and learned that's a general practice of the DA's office with law enforcement witnesses to share the questions directly with them. And so we notified that to Ms. Cohen.



So regardless of whether it is 3500, which I don't think it's the witness's 3500, promptly upon learning that and learning about that practice, we let Ms. Cohen know about that. I'm not sure what more there is, other than that.

THE COURT: What do you propose I do?

MS. COHEN: I would like a copy of any e-mail where either the script was shared with Mr. Rosenman, or text --

THE COURT: Any e-mails?

MS. COHEN: From Ms. Katz I presume or whoever on the prosecution team shared the script with Mr. Rosenman.

MR. MARK: It was Ms. Katz.

MS. COHEN: Thank you. Any communications between Ms. Katz and Mr. Rosenman which would be 3500.

MR. MARK: I don't believe he replied to any of those so I don't think there is 3500, but we gave you the scripts.

THE COURT: Well, all right. There is the representation. So there isn't anything else?

MS. COHEN: How am I supposed to cross Mr. Rosenman without knowing what day it was provided and what format it was provided.

THE COURT: One way that occurs to me is you possibly might ask him.

MS. COHEN: I think the government's obligated to tell me in advance before I ask.

THE COURT: I gather that's your view of the Jencks

Act, but it sure isn't mine. It is a statement by the witness to which the Jencks Act applies, and I haven't heard anything that says this is a statement by the witness. And following on -- well, I'll save my other comment for another time.

MS. COHEN: Your Honor, I don't want to hold up the jury. But, I learned also that this exact same practice was followed with a witness who is off, who has been put on direct cross and fully, which is Mr. Boris Vestfrid.

THE COURT: Mr. who?

MS. COHEN: Mr. Vestfrid. He was the witness for the government who testified about all of the iPhones, etc. at length during this trial, and introduced many of the e-mails and texts into evidence. I learned today for the first time that there were similar scripts sent to Mr. Vestfrid by Ms. Katz that were never provided in 3500. I don't think we need to deal with that now, but I would like to be heard on that. I don't want to hold up the jury.

THE COURT: We are not going to hold up the jury. We're going to go ahead.

MR. MARK: Can I just --

MS. COHEN: I would like to be heard on that issue because that, your Honor, is a violation of the Jencks Act.

THE COURT: That's your view.

MR. MARK: And just to be clear, that was because I inquired of Ms. Katz this morning when I learned about the



e-mail that was sent to Mr. Rosenman. Even though I don't think it was 3500. We asked Ms. Katz if there were any others. She obviously promptly informed us of it, she had also done that with Mr. Vestfrid.

THE COURT: We've been all over that.

MR. MARK: It is a different practice and we let Ms. Cohen know as soon as we --

THE COURT: I got it. You said that before. Let's go ahead.

(Continued on next page)



(In open court)

MS. KATZ: The government calls Jeremy Rosenman.

JEREMY ROSENMAN,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. KATZ:

Q. Good afternoon.
A. Good afternoon.
Q. Can you please tell the jury, are you currently employed?
A. Yes.
Q. Where is it that you work?
A. I work for the United States Attorney's Office for the Southern District of New York.
Q. What is your job title?
A. I'm a special agent.
Q. How long have you worked in that position?
A. Since August of 2016.
Q. Can you tell the jury what kind of cases you investigate?
A. I investigate primarily white collar cases involving public corruption.
Q. What are some of your duties and responsibilities as a special agent?
A. I review financial records, e-mails, phone records, and interview witnesses.



Q. Where did you work prior to this position?
A. I was an investigator at the Department of Labor for eight years.
Q. What kind of investigative work did you do there?
A. Primarily civil and some criminal investigations related to labor unions and other labor violations.
Q. Can you tell the jury what was the highest level of education you've received?
A. I have a master's degree in government and politics, and a certificate in forensic accounting.
Q. Mr. Rosenman, can you tell the jury, did you prepare for your testimony here this afternoon?
A. Yes, I did.
Q. How did you prepare?
A. I met with the prosecution team to review the questions that I would be asked and the charts that would be presented today.

MS. KATZ: Your Honor, I am going to read stipulation 1004 into the record and I'll ask Mr. Hamill to pull up that stipulation. And I'm going to skip the first paragraph and just read in pertinent part.

If called as a witness, a representative from American Express would testify that Government Exhibit 600 is a true and correct copy of a credit card statement maintained by American Express. Government Exhibit 600 was created at or near the

time the information became available to American Express and was created and maintained by American Express as part of its regularly conducted business activity.

2. If called as a witness, a representative from JPMorgan Chase Bank, JPMorgan, would testify that Government Exhibit 601 is a true and correct copy of a signature card maintained by JPMorgan, and Government Exhibit 602, and any and all sub-exhibits thereof contain true and correct copies of bank account statements maintained by JPMorgan. Government Exhibits 601 and 602 are records for an account held by Sylvia G. Ash at JPMorgan, were created at or near the time the information became available to JPMorgan, and were created and maintained by JPMorgan as part of its regularly conducted business activity.

3. If called as a witness, a representative from Citibank would testify that Government Exhibits 604 through 609 and any and all sub-exhibits thereof are true and correct copies of records maintained by Citibank for an account held by Municipal Credit Union. Government Exhibits 604 through 609 were created at or near the time the information became available to Citibank and were created and maintained by Citibank as part of its regularly conducted business activity.

I believe there is one more page.

It is further stipulated and agreed that no party will raise any objection under Federal Rules of Evidence 802 or 901



with respect to any of the exhibits referenced above. It is further stipulated and agreed that this stipulation, which is Government Exhibit 1004, may be received into evidence at trial.

MS. KATZ: The People offer 1004, 600, 601, 602 and 604 through 609.

THE COURT: They are all received.

(Government's Exhibit 1004, 600, 601, 602, 604 through 609 received in evidence)

MS. KATZ: Mr. Hamill, can you please show the witness what is now been admitted into evidence as Exhibit 601. If you don't mind making the screen a little bit bigger.

Q. Can you please just tell the jury what the bank account is and who the account holder is here.
A. Yes. This is a JPMorgan Chase signature card in the account of Hon. Sylvia G. Ash.
Q. Have you also reviewed the contents of Exhibit 602?
A. I have.
Q. What are they?
A. They are bank statements.
Q. Are they bank statements that relate to this Chase account?
A. Yes, they are.
Q. Is it fair to say that those records are voluminous in nature?
A. Yes, they are several hundred pages.



Q. Were you directed to search Exhibit 2 for a certain kind of transaction?
A. Yes, I was.
Q. Can you tell the jury what kind of transaction that was?
A. I did searches looking for direct deposits from Municipal Credit Union into this account.

MS. KATZ: Mr. Hamill, can you please show the witness only what is marked for identification as 900.

Q. Does 900 fairly summarize the results of your search of Exhibits 602 and 601?
A. Yes, it does.

MS. KATZ: The government offers 900.

MR. REILLY: No objection, your Honor.

THE COURT: Received.

(Government's Exhibit 900 received in evidence)

MS. KATZ: Mr. Hamill, can you please display Exhibit 900 to the jury.

Q. Can you please tell the jury what is summarized in Exhibit 900.
A. Yes, on the left-hand side you see the deposit date, and on the right is the amount of the direct deposit from Municipal Credit Union into the JPMorgan Chase account belonging to Ms. Ash.
Q. What is the first date of the deposit that you identified for this type of transaction?



A. February 12, 2015.

MS. KATZ: Mr. Hamill, can you go to the second page.

Q. And what is the last date you identified?
A. November 16, 2016.
Q. Can you tell the jury what the total dollar amount was?
A. $56,648.63.

MS. KATZ: I'm now going to move on to affirmation 1003. And reading in pertinent part, starting at paragraph labeled numbered 1: If called as a witness, a representative from Yaana Technologies, LLC, would testify that Yaana Technologies, LLC, is an authorized agent of CSC Holdings, LLC, Altice U.S.A. designated to respond to, among other things, court orders for the production of customer records, and that Government Exhibit 603 contains true and correct copies of billing statements for cable, internet, and phone services provided by Optimum for the subscriber Sylvia Ash for the service period between January 8, 2015, up to and including September 7, 2016, which are maintained by Altice U.S.A.

The records reflected in Government Exhibit 603 were created at or near the time the information became available to Altice U.S.A. and were created and maintained by Altice U.S.A. as part of its regularly conducted business activity.

It is further stipulated and agreed that no party will raise any objection under Federal Rules of Evidence 802 or 901 with respect to the exhibit referenced above. It is further

stipulated and agreed that this stipulation, which is Government Exhibit 1003, may be received into evidence at trial.

And your Honor, the People offer 1003 and 603.

MR. REILLY: No objection, your Honor.

THE COURT: They are received.

MS. KATZ: Mr. Hamill, before we --

THE COURT: This is the government offering it.

MS. KATZ: The government, yes, your Honor.

Mr. Hamill, before we show 603, can you please show the jury what is already admitted into evidence as 463J.

Q. Mr. Rosenman, looking at what already is in evidence as 463J, can you read the first line in the column description.

A. Yes. It is Cablevision.

MS. KATZ: Mr. Hamill, can you turn to page three, please.

Q. And what is the account number and the individual's name listed on this page?

A. The account number is 07836-313603-01. Service for Ms. Sylvia Ash.

MS. KATZ: Mr. Hamill, can you please show the witness 603 now. If you don't mind making it a little bit bigger so we can see the top of the page.

Q. Did you examine 603 in preparation for your testimony today?



A. Yes, I did.

Q. Looking at the top-right-hand corner of the page. Did you find a matching name and account number as compared to 463J?

A. Yes.

Q. Looking at the bottom-left-hand corner of the page, what is the total amount due on this bill?

A. $205.15.

Q. Scrolling down toward the bottom of the page, can you tell the jury what services were covered under this bill?

A. Yes. It includes TV, some premium channels, cable boxes, phone, internet, taxes and other fees.

MS. KATZ: I'm now going to turn to affirmation 1002.

THE COURT: It's called a stipulation.

MS. KATZ: Sorry. Yes, your Honor. Affirmation. Stipulation. Late in the day.

Reading in pertinent part from paragraph number 1.

If called as a witness, a representative from T-Mobile would testify that Government Exhibits 650 through 656 consist of true and correct copies of telephone records for the cell phone numbers 917-669-7560 and 917-470-7172 subscribed to in the name of Sylvia G. Ash.

Government Exhibits 650 through 656 contain records that were maintained by T-Mobile were created at or near the time the information became available to T-Mobile, were created and maintained by T-Mobile as part of its regularly conducted



business activity.

Government Exhibits 653, 654, and 655 are spreadsheets which include call and text detailed data for phone number 917-669-7560 during particular date ranges. Each spreadsheet contains identical categories of information divided into several columns.

Your Honor, I'm not going to read each column, but I will go to the last page of the stipulation.

It is further stipulated and agreed that no parties will raise any objections under Federal Rules of Evidence 802 or 901 with respect to the exhibits referenced above.

The People offer stipulation 1006 and Exhibits 657 through 658.

MR. REILLY: No objection.

MS. KATZ: 650 through 656.

THE COURT: I thought it was 1002.

MS. KATZ: You're correct, your Honor. 1002.

THE COURT: They are received.

(Government's Exhibit 1002, 650 through 656 received in evidence)

MS. KATZ: Mr. Hamill, can you please show the jury what is already in evidence as 463 and turn to page 17.

Q. Can you please tell the jury what the account number and listed individual is on page 17 of 463.

A. Yes. The account number is 221191235, and it is listed to



Sylvia G. Ash.

MS. KATZ: Mr. Hamill, will you please show the jury now what is in evidence as 650.

Q. Did you have a chance to review 650?

A. I did.

Q. Did you find a matching account number and name that appeared in 463?

A. Yes, I did.

(Continued on next page)

MS. KATZ: Mr. Hamill, can you please scroll through to page 3 of 665.
BY MS. KATZ:
Q. Looking at the top of the screen, can you tell the jury what services are included under this account?
A. Yes. It looks like a plan for a family unlimited plan, including two lines.
Q. Thank you.
MS. KATZ: I'm now going to turn to Stipulation 1006. Reading starting at paragraph 1: "If called as a witness, a representative from Cellco Partnership, doing business as Verizon Wireless, would testify that Government Exhibits 657 through 658 consist of true and accurate copies of telephone records for the cell phone numbers (917)301-5175 and (646)338-8833 respectively.
"Government Exhibits 657 through 658 containing records from Verizon were created at or near the time the information became available to Verizon and were created and maintained by Verizon as part of its regularly conducted business activity.
"As to both activities, which contain spreadsheets with several columns of information, the columns are itemized below."
I won't read them all into the record at this time, but, Mr. Hamill, if you could just go to the last page of the



stipulation.
"It is further stipulated and agreed that no party will raise any objection under Federal Rules of Evidence 802 or 901 with respect to the exhibits referenced above."
The government offers Stipulation 1006 and Exhibits 657 through 658.
MR. REILLY: No objection, your Honor.
THE COURT: They're received.
(Government's Exhibits 1006, 657, and 658 received in evidence)
MS. KATZ: Mr. Hamill, will you please show the jury what is in evidence already as 235 and turn to page 5. Could you enlarge the section of the screen at the bottom that shows a contact card for Joe Gagliardo.
I'm sorry, there's several boxes, Mr. Hamill. If you could enlarge all of them for that name, starting at 31.
BY MS. KATZ:
Q. Looking at these boxes, Mr. Rosenman, do you recognize any phone numbers that you analyzed as part of your preparation for today?
A. Yes.
Q. Which phone numbers do you recognize?
A. All of the numbers I searched for in the records.
MS. KATZ: Mr. Hamill, can you now turn to page 8, where there's a contact entry for the name Kam Wong. Can you



just expand the top square.
BY MS. KATZ:
Q. Does contact entry number 38 also contain the phone numbers that you analyzed as part of your preparation for today's testimony?
A. Yes.
Q. Mr. Rosenman, did you review the contents of 657, 658, which are Verizon records, as well as 650 and 656, which are T-Mobile call history records?
A. Yes, I did.
Q. Is it fair to say that those records were voluminous in nature?
A. Yes, they were.
Q. What, if anything, were you asked to do with those records?
A. Search for particular phone calls within the records.
Q. Do the phone numbers you searched for, were they included in the ones that I just showed you in Exhibit 235?
A. Yes, they were.
MS. KATZ: Mr. Hamill, can you please show the witness what is marked, for identification only, as Exhibits 902, 904, and 905.
Q. Do these three exhibits fairly and accurately summarize your analysis of the Verizon and T-Mobile records that are now in evidence?
A. Yes, they do.



MS. KATZ: The government offers 902, 904, and 905.
MR. REILLY: No objection, your Honor.
MS. KATZ: Mr. Hamill --
THE COURT: They're received.
(Government's Exhibits 902, 904, and 905 received in evidence)
MS. KATZ: Mr. Hamill, please show the jury what is now in evidence as No. 902.
BY MS. KATZ:
Q. Can you tell the jury what this chart summarizes?
A. Yes. This chart summarizes calls among Sylvia Ash, Kam Wong, and Special Agent LaVale Jackson.
Q. You mentioned the name Special Agent Jackson.
Do you work with Mr. Jackson?
A. Yes, I do.
Q. For how long have you worked with him?
A. For the entire time that I've worked at the U.S. Attorney's Office.
Q. During that time, did you become familiar with his phone number?
A. I have.
Q. When you reviewed Exhibit 658, did you see an entry for his phone number?
A. Yes, I did.
Q. Can you indicate to the jury where on your chart that entry

appears?
A. That is the second line on January 17, 2018, at 6:42 p.m.
Q. Following that date, on the day after, does your summary contain an analysis of what calls, if any, were made the following morning?
A. Yes.
Q. Can you indicate to the jury where those are?
A. Yes. Right below that line, there are four calls on January 18, 2018, amongst Sylvia Ash and Kam Wong.
MS. KATZ: Mr. Hamill, can you please show the witness now No. 904.
Q. Can you tell the jury what chart this summarizes?
A. Yes. This chart summarizes calls between Joseph Gagliardo and Sylvia Ash.
Q. What is the time period of the chart?
A. It's between February 5, 2018, and May 9, 2018.
MS. KATZ: Mr. Hamill, can you please show the witness Exhibit No. 905 now.
Q. What does this chart summarize?
A. This summarizes text messages between Sylvia Ash and Kam Wong for the period February 3rd -- 23rd, 2018, through March 12, 2018.
Q. Directing your attention to the date February 23rd, 2018, what, if anything, does this chart summarize about your observations?



A. That there were several text messages between the two of them.
Q. During what time period?
A. Again, from February 23rd, 2018, on that day, there were several text messages during the evening or early morning of the 23rd.
MS. KATZ: I'm now going to turn to Stipulation 1001. Reading paragraph 1: "If called as a witness, a representative from Oath Inc., formerly known as AOL, would testify that Government Exhibit 562 contains subscriber information for the email address sylviaash@aol.com and that the records contained in Government Exhibit 562 were maintained by Oath, were created at or near the time the information became available to Oath, and were created and maintained by Oath as part of its regularly conducted business activity.
"The same witness would further testify that Government Exhibits 750 through 772 contained fair and accurate copies of emails and their attachments maintained by and stored by Oath in its ordinary course of its business and associated with the Ash AOL account."
Could you just go to the second page. Thank you.
"It is further stipulated and agreed that this stipulation, which is Government Exhibit 1001, as well as Government Exhibit 562, described in this stipulation, may be received into evidence at trial, and it is further stipulated



and agreed that no party will raise any objection under Federal Rules of Evidence 802 or 901 with respect to Government Exhibit 562 and that no party will raise any objection under Federal Rule of Evidence 901 with respect to Government Exhibits 750 through 772."
At this time, the government offers 562, 750, 751, 752, 753 --
THE COURT: You're not going to read them all off, are you?
MS. KATZ: No, not all of them.
-- 754, 755, 761, 762, 763, 764, 765, 766, and 769.
THE COURT: They're received.
(Government's Exhibits 562, 750, 751, 752, 753, 754, 755, 761, 762, 763, 764, 765, 766, and 769 received in evidence)
MS. KATZ: Mr. Hamill, can you please show the jury what is now in evidence as Exhibit 562.
BY MS. KATZ:
Q. Mr. Rosenman, can you tell the jury, looking at Exhibit 562, what is the email address and full name on this record?
A. Yes. The email address is S-y-l-v-l-a Ash@aim.com, and it's the subscriber to Sylvia Ash.
Q. Looking at the mail name row, do you see what that says?
A. Yes. It's S-y-l-v-l-a Ash@aol.com.



Q. Mr. Rosenman, have you also examined Exhibits 750 through 772?
A. Yes, I have.
Q. In general, what are they?
A. They are email records.
Q. Do they relate to this AOL account?
A. Yes, they do.
MS. KATZ: Mr. Hamill, can you show the jury what is now in evidence as Exhibit 761.
Q. Can you just tell the jury the date of this email, and read the body there?
A. Yes. The date it was sent is Monday, August 22nd, 2016, and it says, "A friendly reminder for an upcoming event: The Honorable Sylvia G. Ash birthday celebration, Wednesday August 24, 2016, 6:00 p.m., MCU Park, Suite 301."
MS. KATZ: Mr. Hamill, can you now show the jury what is in evidence as 763.
Q. Can you tell the jury what the date is and if there is an attachment indicated with this email?
A. So the date it was sent was Friday, September 2nd, 2016.
Q. In the subject -- can you read the subject line as well?
A. Yes. It says, "Forward: MCU 1099 Form."
MS. KATZ: Mr. Hamill, can you turn to the second page of this email.
Q. Do you know what a 1099 form is?

A. Yes.
Q. What is it?
A. It's an IRS form issued to individuals. In this case, it's a miscellaneous 1099 to report a nonwage income.
Q. Based on this --
MR. REILLY: Objection, your Honor.
THE COURT: What's the objection?
MR. REILLY: The foundation with respect to his knowledge about the 1099, your Honor.
THE COURT: The usual practice is that you object before the witness answers, not after the lawyer is into the next question. So it's overruled.
BY MS. KATZ:
Q. Looking at this exhibit, can you tell the jury what name is listed in the payer's position and what name is listed in the recipient's name?
A. Yes. The payer is Municipal Credit Union, and the recipient's name is Sylvia G. Ash.
Q. In the upper right-hand corner of the document, what does it say, to the right of the 2015?
A. It says "Miscellaneous Income."
MS. KATZ: Mr. Hamill, can you please show the witness what is in evidence as Exhibit 480.
Q. What is the name of the form on 480, at the bottom left-hand corner?



A. Form 1099 Miscellaneous.
Q. What year is indicated on 480?
A. 2016.
MS. KATZ: Mr. Hamill, can you please show the jury what is in evidence as 766.
Q. Can you tell the jury what the date is, and read the body of the email?
A. Yes. The date is Wednesday, November 9, 2016. The body says: "Hi Kam. Attached is a true copy of my expense report seeking reimbursement for expenses incurred at the 2016 SP retreat. Thank you, Sylvia."
MS. KATZ: Mr. Hamill, can you just scroll through the next pages of this exhibit.
Mr. Hamill, can you now show the jury what is in evidence as Exhibit 769.
Q. Can you read for the jury indicating the date, and then read the body of the email, starting from the bottom going up, in chronological order?
A. Yes. The first date is Tuesday, February 20, 2018. The body says, "Judge Ash: Please see attached Nets tickets from Kam for the February 26th game against Chicago."
The next email is sent on Tuesday, February 20, 2018, and the body says, "Thank you very much. Judge Ash."
MS. KATZ: Mr. Hamill, can you now show the jury what is in evidence as Exhibit No. 754.



Q. Can you tell the jury what the date is, and just read the bottom half of this message?
A. On August 4, 2015, was when the email was sent on the bottom. It says, "Your birdie told you incorrectly. I was in Rome on Saturday on a Mediterranean cruise as part of my birthday celebration. I am now in Greece. Back on 8/12."
MS. KATZ: Mr. Hamill, can you now turn to Exhibit 463H. And go to the second page, please. And if you could just make that bigger so the witness can read it.
Q. Can you note the description and the date that is in the square in the middle of that exhibit?
A. Yes. It says, "CU conferences — Greek Isle cruise conference - 7/31/2015. Celebrity Cruises - Reflection/cruise/conference/port tax/insurance/transfers/and airfare."
Q. Is that just within one day of the date that we saw for Exhibit No. 754?
A. Yes.
MS. BUCKLEY: I'm now going to turn to Stipulation 1005.
Reading in pertinent part: "If called as a witness, a representative from Google LLC would testify that: (a) Government Exhibit 561 contains subscriber information for email address hon.sylviagash85@gmail.com, the Ash Gmail account, and that the records contained in Government



Exhibit 561 were maintained by Google, were created at or near the time the information became available to Google, and were created and maintained by Google as part of its regularly conducted business activity;
"(b) The file hon.sylviagash85@gmail.com.content.preserved1.mbox ('Gmail Preservation 1'), marked for identification as Government Exhibit 337, contains fair and accurate copies of emails and their attachments for the period of January 1, 2015, through June 13, 2018, associated with the Ash Google account as they existed on Google's systems on June 13, 2018, and were stored by Google in its ordinary course of its business;
"(c) The file hon.sylviagash85@gmail.com.content.preserved2.mbox (Gmail reservation 2), marked for identification as Government Exhibit 338, contains fair and accurate copies of emails and their attachments for the period of January 1, 2015, through July 31, 2018, associated with the Ash Google account, as they existed on Google's systems on March 8, 2019, and were stored by Google in its ordinary course of its business.
"(d) Government Exhibits 300 through 336 contain fair and accurate copies of emails and their attachments that were associated with the Ash Google account as they existed on Google's systems on June 13, 2018, and were stored by Google in its ordinary course of its business.

"It is further stipulated and agreed that no party will raise any objection under Federal Rules of Evidence 802 or 901 with respect to the Government Exhibit 561, and that no party will raise any objection under Federal Rule of Evidence 901 with respect to Government Exhibits 300 through 338."

The government offers 561, Exhibits 300, 304, and 328.

MR. REILLY: No objection, your Honor.

THE COURT: 561, 300, 304, and 328 are received.

(Government's Exhibits 561, 300, 304, and 328 received in evidence)

MS. KATZ: Mr. Hamill, can you please show the jury what is now admitted into evidence as Exhibit 561.

BY MS. KATZ:

Q. Looking at the top of the screen, can you tell the jury what the name and email address is?

A. Yes. The name is Sylvia Ash, and the email is hon.sylviagash85@gmail.com.

Q. What is listed as the alternate email account?

A. It is sash@nycourts.gov.

Q. Did you review Exhibits No. 337 and 338, which are marked for identification only?

A. Yes.

Q. What, in general, is contained in those type of records?

A. Those are mbox files that contain emails.



Q. Is it fair to say that those records were voluminous in nature?

A. Yes. They contained several hundred emails.

Q. Were you asked to search those exhibits for particular senders, recipients, or keywords?

A. Yes, I was.

Q. Can you tell the jury what those -- who those recipients were and what the keywords were?

A. Yes. I looked for emails amongst Ms. Ash, Kam Wong, Joseph Gagliardo, and the keyword of MCU.

Q. Approximately how many email accounts have you reviewed as an investigator at S.D.N.Y.?

A. Dozens.

Q. Have you become familiar with the term "preservation"?

A. Yes.

Q. What does it mean, in terms of email accounts?

A. It's a request to the email provider to preserve the email account as sort of a snapshot in time of all the emails that are in that account when the preservation request is received.

MS. KATZ: Mr. Hamill, can you show the witness only what is marked for identification as 903A, 903B, 904C, and 904D.

Q. Once you've had a chance to look at those exhibits, can you tell the jury if they fairly and accurately summarize the results of your searches of Exhibits 337 and 338?



A. Yes, they do.

MS. KATZ: The government offers 904A, B, C, and D.

THE COURT: I thought you said 903.

MS. KATZ: I'm sorry, your Honor, 903.

THE COURT: So you're now offering?

MS. KATZ: 903A, 903B, C, and D.

MR. REILLY: No objection, your Honor.

THE COURT: 903A through D are received.

(Government's Exhibits 903a through D received in evidence)

MS. KATZ: I'm sorry, I didn't hear you.

THE COURT: 903A, B, C, D received.

MS. KATZ: Thank you, your Honor.

THE COURT: How much longer do you expect to be?

MS. KATZ: Final set of questions, your Honor.

Mr. Hamill, can you please display Exhibit 903A.

BY MS. KATZ:

Q. Can you tell the jury what 903A summarizes?

A. Yes. It summarizes the total email account in the mbox file as of June 13, 2018, on the left, and then on the right, the same total email account as of July 21st, 2018.

Q. Just directing your attention to the final line, how many total emails were in preservation 1?

A. 964.

Q. How many total emails were in preservation 2?



A. 465.

MS. KATZ: Mr. Hamill, can you now show the jury 903B.

Q. Can you tell the jury what this chart summarizes?

A. Yes. On the -- for each individual, there's an individual listed, Kam Wong. On the left-hand column, it lists the number of emails from Kam Wong in 2015 and 2018, and then on the right, it is the number of emails that existed in the later preservation in the same years.

And then the bottom section has the same analysis for Joseph Gagliardo.

Q. Looking at preservation 1 for Kam Wong, how many total emails did you find associated with his name?

A. Twenty in 2015 and one in 2018.

Q. What was the result for preservation 2 with the same search?

A. There were thirteen in 2015 and zero in 2018.

Q. Looking at your summary of the results of the search for Joseph Gagliardo, how many emails associated with his name did you find in preservation 1?

A. One in 2015 and one in 2016 and 34 in 2018.

Q. Looking at the results in preservation 2, how many total emails did you find for Joseph Gagliardo in preservation 2?

A. Zero for 2015, zero for 2016, and zero for 2018.

MS. KATZ: All right. You can close out of this, Mr. Hamill, and please show Exhibit 903C.

Q. Can you describe to the jury what is summarized in this chart?
A. Similarly, this was a keyword search looking for the keyword MCU. The column on the left lists, by year, the number of emails that hit on that keyword, and the column on the right shows the number of hits on that keyword for the second preservation.
Q. Can you tell the jury what the results in the total column were for your keyword search of MCU in preservation 1?
A. The first one was 179 emails.
Q. What was the result for the same search in preservation No. 2?
A. Ninety-five emails.
Q. Can you tell the jury, what was the time period between the two preservation accounts?
A. The first preservation was on June 13, 2018, and the second was on July 31st, 2018, so approximately a month and a half.
MS. KATZ: Mr. Hamill, can you lastly open Exhibit 903D.
Q. Can you tell the jury what is summarized in 903D?
A. This summarizes emails containing an ACH notification in the first preservation on the left, and then the same ACH notification emails in preservation 2 on the right.
Q. Based on your training and your certification in forensic accounting, are you familiar with what the term "ACH" means?



A. Yes.
Q. What does that mean?
A. It means automated clearinghouse.
Q. What is it?
A. Similar to a direct deposit, it's an automated transfer of money from one bank to another.
MS. KATZ: Mr. Hamill, can you show the witness what is marked, for identification only, as Exhibit No. 341.
Q. What is Exhibit 341?
A. This is an example of the -- an accounts payable notification notifying Sylvia Ash of an ACH deposit.
Q. Does Exhibit 341 contain copies of all the emails you found with that ACH keyword in preservation 1?
A. Yes.
Q. Are they fair and accurate copies of the emails that you found in Exhibit No. 337?
A. Yes.
MS. KATZ: The government offers 341.
THE COURT: Received.
(Government's Exhibit 341 received in evidence)
BY MS. KATZ:
Q. Mr. Rosenman, of the ACH emails that were present in preservation 1, did you compare them to the Chase transactions that you summarized in Exhibit 900?
A. Yes, I did.



Q. What was the result?
A. The emails were -- reflected accurately the amounts that were deposited into the Sylvia Ash Chase account.
MS. KATZ: Mr. Hamill, can you show the witness what is now in evidence as Exhibit 300.
Q. What is Exhibit 300?
A. It is an email.
Q. Was this email from preservation 1?
A. Yes.
Q. Can you tell the jury who it was sent to and the date, and then read the body of the email?
A. Yes. This was an email sent from Joseph Gagliardo to Sylvia Ash on Thursday, May 7, 2015. The body says, "Congratulations, Madam Chair. Long may you wave."
MS. KATZ: Mr. Hamill, can you now turn to Exhibit 304.
Q. Can you tell the jury who the recipient is and what is the date?
A. Of the top email?
Q. Yes.
A. The recipient of the top email is Sylvia Ash. The date is April 2nd, 2018.
Q. I'm not going to ask you to read out loud the contents of the whole email, but can you summarize what this email contains?



A. It is information from Joseph Gagliardo about the supervisory committee that he emailed to himself from one email address to another.
MS. KATZ: Mr. Hamill, can you now show Exhibit No. 328.
THE COURT: Counsel, I thought you were on your last series of questions a while ago.
MS. KATZ: I'm almost done, your Honor.
BY MS. KATZ:
Q. Can you please read note to the recipients of this email and what are the dates?
A. Yes. This email is from Joseph Gagliardo, and it's sent on April 24, 2018, to szymom.woronowich@dfs.ny.gov gporcelli@nymcu.org and michael.adinolfi@dfs.ny.gov.
Q. Did you find this email in preservation 1?
A. Yes, I did.
Q. Do you see Sylvia Ash's name email address in the cc or to column?
A. No, I don't.
Q. What is a bcc?
A. It stands for blind carbon copy.
Q. What does that mean?
A. Usually someone would bcc someone if they don't want the other recipients to see an email was sent to them as well.
Q. Do you see the email address that ends with DFS.NY.gov?

A. Yes.
Q. Are you familiar with what DFS stands for?
A. That's the Department of Financial Services.
MS. KATZ: Mr. Hamill, you can close this.
And there was one final stipulation, your Honor. This is Stipulation 1008.
It reads: "Government Exhibit 277 is a true and accurate audio recording of a voicemail left by the telephone assigned the telephone number (917)669-7560, on the telephone assigned the telephone number (646)338-8833 on January 16, 2018, at approximately 2:59 p.m.
"Government Exhibit 277A is a true and accurate audio recording of a voicemail left by the telephone assigned the telephone number (917)699-7560 on the telephone assigned the telephone number (646)338-8833 on January 18, 2018, at approximately 9:25 a.m.
"It is further stipulated and agreed that no party will raise any objection under Federal Rule of Evidence 901 with respect to any of the exhibits referenced above.
"It is further stipulated and agreed that this stipulation, which is Government Exhibit 1008, and the exhibits referenced above may be received into evidence at trial."
Just a moment to confer, your Honor?
THE COURT: Are you offering those?
MS. KATZ: Yes, your Honor.



THE COURT: They're received.
(Government's Exhibits 1008, 277, and 277A received in evidence)
MS. KATZ: Your Honor, I was just alerted that due to a technical problem, Exhibit No. 904 didn't display for the jury, so I'm just going to ask Mr. Hamill to reshow 904.
THE COURT: I'm not sure that you offered it. Let me just check my notes.
No, I'm sorry, you did, and it's in evidence, so you may.
BY MS. KATZ:
Q. Mr. Rosenman, if you don't mind repeating, what is summarized in Exhibit 904?
A. Yes. These are phone calls between Joseph Gagliardo and Sylvia Ash.
Q. What is the time period that is summarized in this chart?
A. February 5, 2018 -- between February 5, 2018, and May 9, 2018.
MS. KATZ: Thank you.
No further questions, your Honor.
THE COURT: All right. Thank you.
We'll take our break till 4:00 o'clock now, folks.
(Continued on next page)



THE COURT: The jurors and the defendant all are present, as they have been throughout.
Mr. Reilly, you may proceed.
MR. REILLY: Thank you, your Honor.
CROSS-EXAMINATION
BY MR. REILLY:
Q. Good afternoon, Agent Rosenman.
A. Good afternoon.
Q. Now, you testified on direct examination about a number of charts that you prepared, right?
A. Correct.
Q. And you prepared those in consultation with the prosecution team; is that right?
A. Yes.
Q. And you also prepared with the prosecution team for your testimony today, right?
A. Yes, I did.
Q. And you received a script of questions from them last night?
A. I received a list of questions, yes.
Q. You received a second one this morning, right?
A. That's correct.
Q. Now, I'm going --
MR. REILLY: Ms. Stephenson, I'd like to see Government Exhibit 902 in evidence and ask you if we could show



it to the witness.
You can publish it, Ms. Stephenson.
BY MR. REILLY:
Q. Agent Rosenman, this is the summary you prepared from toll records in this case; is that right?
A. Yes, that's correct.
Q. It doesn't reflect the content of any connected calls, does it?
A. That's correct.
Q. In fact, it's possible that some of these were voicemails; is that right?
A. It's possible.
Q. Agent Rosenman, you testified on direct about preservation with respect to, I think, what we were referring to as mboxes, right?
A. That's correct.
Q. And, in particular, with respect to the Gmail box that had been marked for identification as 337 and 338 in this matter; is that right?
A. Yes.
Q. I just want to make sure I have the testimony right. Is it correct that M1, what's in evidence -- excuse me, in evidence as -- or, excuse me, not in evidence, marked for identification as Government 336 is emails between January 1st and June 13th, 2018, right?

A. Yes.
Q. And those appear as they were preserved on Google's system on that date of June 13, 2018; is that right?
A. That's my understanding, yes.
Q. Now, with respect to --
THE COURT: I'm sorry, I thought I understood you to say that they were emails between January 1st and June 13th, 2018. Is that right?
THE WITNESS: Yes. I believe that was the preservation -- the preservation period ended on that date.
THE COURT: Okay. Let's go ahead.
BY MR. REILLY:
Q. With respect to the second -- what we referred to as the mbox 2, which is marked for identification as Government Exhibit 338, that reflects emails between January 1st, 2015, and July 31st, 2018; is that right?
A. Yes.
Q. And that's as they existed on Google's system on March 8, 2019; is that right?
A. I don't know if that was the date when the order was returned. I wasn't given that information.
MR. REILLY: Ms. Stephenson, can I ask you to publish what's in evidence as Government's Exhibit 1005. In particular, I'll ask you to scroll to paragraph 1(c).
THE COURT: Look, this is a stipulation, right?



MR. REILLY: Yes, your Honor.
THE COURT: The whole point of that is that you've agreed on whatever it says there.
MR. REILLY: Yes, your Honor.
THE COURT: They're not to be used for impeachment or anything else.
You want to read something, read it. That's the whole point of stipulations.
MR. REILLY: Yes.
BY MR. REILLY:
Q. Do you agree the parties have stipulated that this is -- the mbox 2 is the emails as they appeared -- as they existed on Google's system on March 8, 2009?
THE COURT: Sustained. Whether he agrees with that or not, it doesn't matter.
MR. REILLY: Yes, your Honor.
THE COURT: That's what it is for the purpose of this case.
BY MR. REILLY:
Q. Agent Rosenman, you testified about some searches you ran in which you compared the content of mbox 2, the second set of Gmail materials, and mbox 1, right?
A. That's correct.
Q. You indicated that there were documents that existed in mbox 1, the earlier preservation set, that didn't exist in



mbox 2, correct?
A. Yes.
Q. Is it fair to say that you can't tell when those documents were deleted?
A. No.
THE COURT: It's not fair to say?
THE WITNESS: The exact date that they were deleted?
THE COURT: The question is this: "Is it fair to say that you can't tell when those documents were deleted?"
You said: "No."
One way to read that answer is, no, it's not fair to say that. Another way to read it is, no, you really can't tell when the documents were deleted.
Which is it?
THE WITNESS: Understood, your Honor.
To clarify, there's no way to know specifically which day they were deleted, but they were deleted at some point between the first preservation and the second preservation.
BY MR. REILLY:
Q. I want to direct your attention to, and I will ask Ms. Stephenson to pull up 903A in evidence.
Mr. Rosenman, this reflects your comparison of the total content of mbox 1 and mbox 2; is that correct?
A. Yes.
Q. And there are approximately -- strike that.



There were 964 emails in mbox 1 and 456 in mbox 2, correct?
A. Yes.
Q. But not all of those were MCU-related emails; is that right?
A. No.
Q. I want to now direct your attention to Government's Exhibits 903B and then 903C.
THE COURT: Do you have any questions?
MR. REILLY: Sorry, your Honor. I just wanted to make sure it was visible.
BY MR. REILLY:
Q. With respect to 903B, those are keyword searches you ran as to Kam Wong and Joe Guagliardo, right?
A. Yes.
Q. And 903C were keyword searches as to Kam Wong, right -- excuse me, I'm sorry, excuse me, as to the MCU, right?
A. Yes.
Q. And an email could be responsive to both searches; is that correct?
A. Yes.
MR. REILLY: May I have one moment to consult, your Honor?
(Pause)
MR. REILLY: Nothing further, your Honor.

THE COURT: Thank you.
Anything else, Ms. Katz?
MS. KATZ: Briefly, your Honor.
Mr. Hamill, could you show the jury 903B, please.
REDIRECT EXAMINATION
BY MS. KATZ:
Q. Mr. Rosenman, you were just asked on cross about your comparison between the two mbox files for this account.
Is it fair to say that you did not find emails in the second preservation that you found in the first?
A. That's correct.
Q. What does that indicate to you?
A. That the emails were likely deleted.
MS. KATZ: Just for the record, your Honor, I just want to be clear that Stipulations 1001 through 1006 and 108 have been offered into evidence.
THE COURT: Okay.
MS. COHEN: Your Honor, so the record is clear, subject to your Honor's ruling, we have no objection -- pretrial rulings, we have no objection to the stipulations in those exhibits.
MS. KATZ: Nothing further, your Honor.
THE COURT: Would you tell us again the numbers you were just checking on, so Andy can check his notes?
MS. KATZ: 1001 through 1006 and 1008. 1007 was



previously moved in by cocounsel.
THE COURT: 1008 is in. 1001 is in. 1006 is in. 1002 is in. 1003 is in. 1004 is in.
Are there any others on your list?
MS. KATZ: 1005.
THE COURT: There was a reference to it earlier today as being in evidence. I don't immediately find where it was received, but I take it there's no objection, and so it will be received now if it wasn't otherwise.
MS. KATZ: Thank you.
(Government's Exhibits 1001 through 1006 and 1008 received in evidence)
THE COURT: Mr. Mark?
MR. MARK: At this time, the government rests, your Honor.
THE COURT: Okay.
Ladies and gentlemen of the jury, this concludes the presentation of the government's evidence.
Is there going to be a defense case?
MS. COHEN: Yes, your Honor.
THE COURT: Okay.
Ladies and gentlemen, we'll see you at 9:30 tomorrow morning. And as I think you can tell, the likelihood is my best guess is the case will finish up no later than sometime early next week.



Okay. Thank you.
Counsel, remain. The witness is excused.
(Witness excused)
THE COURT: Let's make it 10:00 o'clock tomorrow morning for the jury.
JURY MEMBERS: Thank you.
THE COURT: Counsel at 9:30.
(Continued on next page)



(Jury not present)
THE COURT: Counsel may be seated.
I assume there are motions. Am I right or not?
MS. COHEN: Your Honor, the government filed a letter with respect to the two witnesses that we identified.
THE COURT: Are there any motions?
MS. COHEN: Oh, yes, your Honor, of course. The defense has a motion under Rule 29.
THE COURT: You want to be heard on it?
MS. COHEN: I do, your Honor.
THE COURT: Go ahead. Preferably from in the box without a mask. I hate --
MS. COHEN: Of course, your Honor.
THE COURT: I hate the boxes, too, but I hear better.
MS. COHEN: I'm fine in the box, your Honor.
THE COURT: It's not a penalty box.
MS. COHEN: Your Honor, the defense moves to dismiss all the counts of the indictment pursuant to Rule 29.
I believe the government has not met its burden of proof on any of the four counts. I will specifically address the failure of proof on Count One and Count Two.
Your Honor, Count One charges the defendant with a conspiracy to obstruct a federal investigation. There is insufficient proof that Ms. Ash ever joined any conspiracy with either Mr. Wong or with Mr. Guagliardo.

There is no evidence she entered into any agreement with them to violate the federal law. There's been no testimony from either of her alleged coconspirators. There's been no tape recording introduced into evidence of any conversation Ms. Ash had with either of her alleged coconspirators.

The texts and the emails that were admitted on the government's case between Ms. Ash and her alleged coconspirator, Kam Wong, and then texts with Ms. Ash between herself and her alleged coconspirator, Mr. Guagliardo — whose name I will refer to as Mr. G., since I mispronounce it often — none of the texts between Ms. Ash and her alleged coconspirators, Mr. Wong or Mr. Joe G., demonstrate that she had an agreement with either of them to violate the federal law.

Relatedly, any emails that were introduced into evidence by the government between Ms. Ash and Mr. Wong, one of her alleged coconspirators, or Mr. G., one of her other alleged coconspirators, show that she agreed with them to violate any federal law.

I believe the only relevant texts that the government introduced into evidence is Government Exhibit 251A, which your Honor may recall is a text chain that Ms. Ash is not on. There are four people on this text chain. One is Mr. Wong, the other is Mr. G., and then there are two other individuals, but not



Ms. Ash.

In this text chain, the relevant part, your Honor, is where Wong texts to the group about what he told Ms. Ash about the memo he had her sign on or about January 19, 2018, quote from Government Exhibit 251A: "I just said to her that someone is giving me trouble for the LTD insurance offsets."

Your Honor, that is the only statement by a coconspirator, alleged coconspirator, in this case that the government introduced about Ms. Ash's -- it shows Ms. Ash's lack of involvement in any conspiracy, it shows her lack of agreeing to join any conspiracy, and it is proof --

THE COURT: What is the date and time of that text?

MS. COHEN: Your Honor, we can pull it up on the screen, if you want. It's 351A --

THE COURT: You said 251 earlier.

MS. COHEN: Sorry, yes, that's what I meant, your Honor — I misspoke — Government Exhibit 251A. I'm just going to grab it and leave the box for a minute, your Honor.

(Pause)

THE COURT: I found it.

MS. COHEN: Okay.

THE COURT: Okay.

MS. COHEN: So, accordingly, the government has not met its burden to demonstrate that Ms. Ash entered into a conspiracy with either of the two alleged coconspirators to



violate the federal criminal laws.

THE COURT: Had there been any contact by the date of this text with her by law enforcement?

MS. COHEN: No, there was not, your Honor.

THE COURT: Had there been any contact between law enforcement and anybody else on this text chain before this date?

MS. COHEN: Yes, your Honor. I believe that the testimony at trial was that Agent Jackson had left a business card at Mr. Wong's address on January 17, 2018.

THE COURT: And there's nothing before that?

MS. COHEN: Correct, your Honor.

And I also believe in the record that Mr. Wong texted or emailed a copy of that business card to the alleged coconspirator, Mr. G., but not that he sent it to Ms. Ash.

THE COURT: What, if anything, is there about calls or texts, independent of whether there is content?

So what we have, on Government Exhibit 902, is an avalanche of calls starting at 6:11 p.m. on January 17th and going basically all night or close to all night.

MS. COHEN: I'm sorry. Your Honor is looking at Government Exhibit 902 on January 18, where I see four calls in the morning -- or three calls in the morning and one --

THE COURT: There are two the night before.

MS. COHEN: Correct, your Honor.



Well, one is between Agent Jackson and Wong on the 17th.

THE COURT: You're correct.

Okay, go ahead.

MS. COHEN: Your Honor, I believe the testimony at trial from Agent Jackson, and there were emails to this effect introduced by the government, that what Ms. Ash and Wong were talking about on January 18 was that Wong told Ms. Ash he had an iPhone X available to give her and to arrange to come to the office that day to get it.

THE COURT: How would Jackson have known that?

MS. COHEN: Because Ms. Ash told him that during her interviews, and it was brought up by the government on direct.

And there are also emails to that effect between Ms. Ash and Mr. Wong on January 18th, saying I'm on my way to the office.

But there's nothing about the content of any of these calls in evidence to meet the government's burden that they entered into a conspiracy beyond a reasonable doubt, and that's what they are discussing on the one call the night of January 17th --

THE COURT: It's certainly a permissible inference that she knows, certainly by the wee hours of January 18th, that a government investigator is trying to get a hold of Wong.

MS. COHEN: Your Honor, I'm not sure what you're --

"the wee hours"? There's one call — a call of a duration of 20 seconds — which would lend the inference that it was a voicemail left and not that they actually spoke on January 17th.

THE COURT: It's hard to tell, but then the calls start again at 7:50 in the morning on the 18th.

MS. COHEN: For 18 seconds, your Honor, there's a call -- and I believe there's all calls from Wong to Ash. On January 18th, there's a second call at 9:30, four seconds, then there's another call at 9:31 for 21 seconds. I don't think that's indicative that they actually -- Ms. Ash and Wong spoke on those days. The government's produced no evidence that they spoke --

THE COURT: What about the one at 1:15 in the afternoon?

MS. COHEN: The conversation on January 18th at 1:15 for three minutes and seven seconds, we do not know the content, but there was testimony that Mr. Wong and Ms. Ash did communicate on January 18th when Mr. Wong told Ms. Ash to come to the office because he had a brand new iPhone X to give her.

THE COURT: Who said that that's what happened?

MS. COHEN: Ms. Ash told that to Agent Jackson during her first interview on March 1st, and Agent Jackson testified about that on direct. And I believe there are also contemporaneous either emails or texts about coming to pick up



the iPhone X on that day.

THE COURT: The jury is not obliged to buy that. But go ahead.

MS. COHEN: Also, relatedly, on Count Two, which is that Ms. Ash, when she signed the memo that Ms. Wong presented to her on January 18th -- that Mr. Wong presented to her --

THE COURT: It was January 18th.

MS. COHEN: Thank you, your Honor. I thought it was.

There's no evidence in the record that when Ms. Ash signed that memo, she had any knowledge of the federal investigation, and in order to obstruct justice, as charged in Count Two of the indictment, she needs to intend to obstruct a federal investigation — it is not sufficient to intend to obstruct a state regulatory inquiry or anything else — and there is nothing that the government put in in the record that demonstrates beyond a reasonable doubt that Ms. Ash knew, when she signed the memo on January 18th, that there was a federal investigation.

THE COURT: Is there any evidence as to the time she signed the memo, or where she was when she signed it?

MS. COHEN: Yes, your Honor.

I believe the testimony — again, this would be from Agent Jackson, and I do believe there are contemporaneous emails — that she was on her way up, that she signed the memo at the MCU in the afternoon of January 18th.



You also have Government Exhibit 251A, where the alleged Coconspirator Wong tells alleged Coconspirator Mr. G., that all he told Ash about signing the memo is that someone is giving me trouble.

THE COURT: Well, that's all that Wong wrote in the text.

MS. COHEN: Correct, your Honor, but he did not write that he told her that the FBI had visited, he did not write that there was a federal investigation, and the government put no evidence in the record that at the time, January 18th, when she signed the memo, she had any knowledge of a federal investigation.

And just to add to that, Agent Jackson testified that when Ms. Ash met with the government on March 1, she told them that what Wong told her when she signed the memo was that he was being looked at, but not that he was being looked at by the federal government, not that there was a federal investigation. And, in fact — there's no dispute about this — the federal government did not contact or make any appearance to Ms. Ash until January 31st, and there's no evidence in the record that anyone told Ms. Ash about the federal investigation as of January 18th, 2018, the date she signed the memo.

So, therefore, Count Two of the indictment, the government has not proven beyond a reasonable doubt, and it should be dismissed.



THE COURT: Did you want to address the other counts, or no?

MS. COHEN: Your Honor, I think the other counts, I think the evidence -- based on the evidence presented, the government simply has not met its burden that she deleted emails or texts in an effort to obstruct the federal government investigation, Count Three, or Count Four, that she made a false statement with the intent to obstruct a government investigation.

THE COURT: Okay. Thank you.

MS. COHEN: Thank you, your Honor.

THE COURT: Who's going to do this? Mr. Mark?

MR. MARK: Sure, your Honor.

Well, first, the government has overwhelmingly met its burden of proof as to each count — Count One, Count Two, Count Three, and Count Four.

As the evidence at trial demonstrated and the phone calls that your Honor was, I think, just looking at from the summary chart, immediately after Special Agent Jackson contacted Kam Wong, looking into the money that Mr. Wong had received, Mr. Wong started communicating with Ms. Ash. The fact that there is no wiretaps, no recordings of those conversations, doesn't mean that you can't draw a fair inference as to what those calls, whether any of those particular calls touched on the investigation.

And I'd note that, obviously, it's not merely there has to be an investigation at the time. It needs merely to be that there's an investigation that was -- proved that the defendant acted in contemplation of a potential investigation.

But, that being said, there is significant evidence that the defendant knew, not just that she understood or reasonably believed, that there would be investigation, and a federal investigation, based on the fact that MCU was a regulated institution, because the defendant herself admitted to federal investigators that she knew there was an investigation when she signed the first memo.

And I don't think that Ms. Cohen's characterization of when the memo was signed, on January 18th -- that's one inference that she is permitted to draw, but there's another inference that the jury is permitted to draw, which is that she signed it at or after January 22nd, which is the date of that memo, and the fact that it was given to Mr. Jackson on January 25th — those are both in the record — and that during that period of time, Mr. Wong came up with the fact that he needed Ms. Ash's assistance, and they were in contact about that, and then she, in fact, knew about what the investigation was and signed the memo anyways. And she didn't just sign it once, she signed it a second time, which you saw from the February 5th text messages with Kam Wong that indicated the second signing of the memo.



So not just her signing of the memo, but the text messages and the emails and the phone calls overwhelmingly demonstrate that the defendant participated in the conspiracy with Mr. Wong. They demonstrate that the defendant knowingly signed be a false document prepared by Kam Wong not once, but twice, and that she did so with the intent to impede and obstruct or influence an investigation of a matter within the jurisdiction of an agency of the United States or in relation to or in contemplation of such matter or case.

THE COURT: Now, the evidence that she admitted that she knew when she signed the document there was a federal investigation comes from where?

MR. MARK: I didn't say she admitted that she knew it was a federal investigation. She denied understanding of what the investigation --

(Pause)

THE COURT: So what is it she said? And what's the evidence that she said it?

MR. MARK: From Mr. Jackson's testimony regarding their interview on March 1st, that she admitted that there was an investigation. And there's also testimony from Monique Smith, who was a witness and had been the assistant to the board of directors, that she testified about a phone call that she had with Ms. Ash prior to Ms. Ash signing that memo.

THE COURT: And said?



MR. MARK: That there was a conversation about the federal investigation, and that Ms. Ash told Ms. Smith that she was uncomfortable signing the memorandum.

THE COURT: Just give me a second, please.

(Pause)

MR. MARK: Your Honor, with the assistance of cocounsel, I have a transcript cite for that testimony, though it seems like your Honor is probably already ahead of me.

THE COURT: Page 155 of maybe the second day. Is that right?

MR. MARK: For Mr. Jackson? I believe so. And I have a transcript cite for Ms. Smith.

THE COURT: Just give me a second.

MR. MARK: Of course.

(Pause)

THE COURT: So, Mr. Jackson said that she admitted that Wong said that he was being investigated, no specific reference to by whom, but, by this time, Mr. Wong certainly knew by whom, and it's quite likely he told her by whom.

So give me the other reference, please.

MR. MARK: The transcript would be page 441.

THE COURT: Well, my material isn't paginated so neatly. Which date, if you have it handy?

MR. MARK: It was Monday's testimony, so that would be the 6th.



THE COURT: Yes. And I don't think the 6th is loaded into our system yet.

MR. MARK: I can read that transcript.

THE COURT: Yes, that would be a help.

MR. MARK: Sure.

Just the portion which is --

THE COURT: Wait a minute. Here it is.

What's the page?

MR. MARK: Page 441, line 17. It's from 441, line 17, to 442, line 4.

THE COURT: Got it.

Okay, go ahead.

MR. MARK: So I don't want to repeat --

THE COURT: You don't have to repeat what you said.

MR. MARK: Okay.

So there's ample evidence, both from the emails and text messages and just looking at the testimony of both Special Agent Jackson and Ms. Smith, to demonstrate that the defendant knew that the document was false, and that the defendant knew that there was a federal investigation at the time, and that she went ahead and she signed the memo anyways.

So that is sufficient proof as to Count Two and as to Count One, the conspiracy count.

Turning to Count Three, which -- there is significant evidence in the record about the defendant's obstruction and

concealment of records in response to the grand jury subpoenas. Particularly she received two different grand jury subpoenas. She failed to produce any documents in response to the first subpoena. There was significant evidence, and overwhelming evidence, that she had responsive documents and didn't produce them, that she told Special Agent Jackson, not once, but twice, that she didn't have that, and that those are false statements designed to obstruct the investigation.

(Continued on next page)



THE COURT: Remind me, the documents she had were what?

MR. MARK: That she had had text messages and e-mails at a minimum in response to the grand jury subpoena, including communications with Kam Wong, communications regarding the federal investigation, and communications regarding an internal investigation. So those were communications with Mr. Wong and Mr. Gagliardo.

THE COURT: The Apple store date is what date?

MR. MARK: The Apple store date, continuing along the line is August -- is June 24. 23. I'm corrected. Which is after the second subpoena that the defendant received where there is the wiping of the Apple iPhone. So, all of that evidence --

THE COURT: So of course, there is the Apple store incident is after the demand to return the phone to MCU; yes?

MR. MARK: Yes, your Honor.

THE COURT: And it's perhaps arguable, and I imagine I'll hear it from Ms. Cohen at an appropriate time, that she was going to give the phone back, the phone had all kinds of personal stuff, she wanted to give it back clean. She wanted to transfer it all to her new personal phone which I guess is the iPhone 6, right, 6-S? And you know, not a further thought to it. Entirely possible, right?

MR. MARK: I would expect that Ms. Cohen would make



that argument in closing, in her closing summation if she chooses to give one. But, the evidence here is --

THE COURT: I wouldn't bet against it.

MR. MARK: Of course --

THE COURT: Always a bad thing to do anyway.

MR. MARK: Of course. Ms. Cohen can make lots of arguments as to what she believes the inferences are, but the evidence that the government has presented overwhelmingly demonstrates the inferences, and is clearly sufficient to meet the burden of proof as to a Rule 29 motion that the defendant has -- that the government has presented sufficient evidence for the jury to find beyond a reasonable doubt that the defendant intended to obstruct the investigation by deleting, concealing, and hiding evidence in response to those two grand jury subpoenas.

Turning last to the fourth count, which deals with false statements to a federal official. That deals with particularly the defendant's statements to Special Agent Jackson on June 8 denying that she had any documents responsive to the second subpoena. And clearly, the evidence has demonstrated she made that statement, it was false at the time, that that statement was material, since it related to the production of materials to the grand jury, and that it was made knowingly and it was made with a matter within the jurisdiction of the government of the United States.



THE COURT: Thank you. Anything else, Ms. Cohen, on this?

MS. COHEN: Your Honor, I think I've addressed --

THE COURT: I'm sorry?

MS. COHEN: No, your Honor. I think that my argument anticipated Mr. Mark's argument.

THE COURT: The motion is denied.

Okay. What else?

MR. MARK: Your Honor, as you know, we like to flood you with letters.

THE COURT: Don't remind me.

MR. MARK: Well, unfortunately, I think that's what I am doing right now.

THE COURT: I'm trying to consider it as climate change.

MR. MARK: So, we authored -- last night we received 26.2 material and exhibits for the defense case. And we've been furiously reviewing that. And it raises a number of different issues, your Honor, evidentiary issues about the admissibility of the documents and the proposed testimony. I'll try to be concise and efficient.

THE COURT: I noticed your letter is dated on the 80th anniversary of Pearl Harbor.

MR. MARK: Hopefully we won't meet such a fate. So we have laid this out. I know your Honor just

received it. So, obviously we can argue, but we largely will reiterate the points in the letter. I do think that as we asked for, there needs to be also a significant and sufficient proffer as to the relevance and admissibility.

THE COURT: The first thing I need to have is the exhibits that are in controversy.

MR. MARK: I think Ms. Cohen e-mailed them last night to the Court at the same time we received them. We don't have a copy but maybe Ms. Cohen has a copy.

MR. REILLY: Your Honor, I also provided Mr. Mohan a hard copy although I have another set here if you need them.

THE COURT: That would be a good idea. I have a folder that has a number of things with defendant exhibit markings. Maybe this is what you're referring to.

MR. REILLY: I believe so, your Honor.

THE COURT: If that's so, I don't need to bother you for more. Let's see. H, I J, K, I do have. I am assuming L must be there. Okay. Since the defense hasn't responded in writing, I guess now is the time.

MR. REILLY: Your Honor, I am going to move to the box.

THE COURT: Good.

MR. REILLY: Your Honor, first, to maybe narrow down some of the issues, and because there were some anticipated argument or there was some issues raised in the letter about



precluding certain type of testimony that, to be clear, we did not intend to offer. So, with respect to -- and I'm going to address specifically Mr. Osei-Bonsu who is the first individual addressed.

We don't intend, if he is permitted to testify, we don't intend to elicit any information about the fact that he proffered with the government. We would not seek to suggest that the fact he signed a similarly misleading memo and was not charged is relevant here.

Additionally, we are not seeking to elicit from him any information about benefits that he received from the MCU consistent with the Court's prior order. And similarly, we are not asking him to opine on policy issues. So I want to take those off the table so to speak because those are issues that the government raised that we do not intend to proceed on.

I think there are essentially, your Honor, if I can proffer as to what we would expect his testimony to be, sort of four areas. One would be that he participated in a meeting in 2015 with Mr. Wong, Ms. Ash, and an individual named Giovanni Porcelli where they discussed the -- where they discussed what I expect his testimony will be that Mr. Wong raised the idea of the longterm disability insurance policy, that it was expensive, that he might have a cheaper alternative that would save money and presented some numbers. And that further the upshot of the meeting was, okay, well, bring that before the



board. And that Mr. Osei Bonsu didn't hear about that subsequently until 2017, your Honor.

The reason that we believe that's relevant is it goes to Ms. Ash's state of mind, your Honor. The memo, which is obviously subject to a charged count, excuse me, a charged count, that is the fact that there is -- that it references a prior conversation that in fact happened is relevant as to Ms. Ash's state of mind as to whether or not she was, in seeking to deceive and join a conspiracy, or alternatively, that she was being duped by Mr. Wong who was referencing an old conversation that in fact happened, and using that to craft a memo that would serve his purposes.

So, we believe that the testimony about the circumstances of that are highly relevant to her state of mind. We wouldn't be seeking to offer Mr. Wong's statements about the reality of his plan or the viability of his plan for the truth, because in fact we don't believe they were true. But we think the fact that that meeting happened, and that those individuals were present together, is relevant evidence, your Honor.

THE COURT: What about that, Mr. Mark?

MR. MARK: We have no objection to that line of testimony.

THE COURT: Okay.

MR. REILLY: So then the second line of testimony -- excuse me. The second set of exhibits are Defendant's Exhibit



H, I, J, and K., which are substantially similar to Government Exhibit 115A in evidence. And also, your Honor, to an Exhibit 707 that Mr. MacKoul testified about.

What I would expect that Mr. Osei Bonsu would testify, your Honor, is that at various times in 2017, he was approached at the beginning or frequently at the end of board meetings or fiscal committee meetings by Mr. Wong, and told and asked to sign documents relating to his longterm disability. These schedules. And he recognized, Mr. Osei Bonsu would, I would expect would testify that he recognizes these documents as bearing his signatures, that he remembers signing them. To be clear, your Honor, Ms. Ash was not --

THE COURT: He recognizes his signature?

MR. REILLY: Yes, sir. He recognizes his signature and recognizes these documents as the ones represented to him by Mr. Wong.

And to be clear, your Honor, Ms. Ash was not present at these meetings. We believe -- there was an issue or I am not sure if it is still being advanced by the government that there would be a 403 argument.

We believe there is a substantially similar version of this evidence, so I don't think it would be unfairly prejudicial.

Respect to relevance, your Honor, we believe that this tends to show that Mr. Wong had commenced his course of

Lc73ash5 Page 749

fraudulent conduct in advance of 2018, throughout 2017, and would seek to offer in evidence to reflect that Ms. Ash was not part of the conspiracy and that wasn't part of the criminal conduct. As such -- so that when, and I believe the inference that can be drawn is, in 2018, when Ms. Ash signs a memo and Mr. Osei Bonsu signs a similar memo that is in evidence as Defense Exhibit C, that this wasn't reflective of Ms. Ash joining the conspiracy. This was existing conduct being engaged in by Mr. Wong. Again, that's not being offered for their truth, your Honor, but rather to show that Mr. Wong had an existing course of conduct that was outside of the alleged obstructive conspiracy that Mr. Wong was -- and that Mr. Wong was engaged in this conduct.

THE COURT: Mr. Mark?

MR. MARK: I think Mr. Reilly's proffer highlights the relevancy and 403 issues of this testimony.

First, as he says, it is not related to the charged conduct here. The defendant is charged with conspiracy to obstruct the federal investigation. She is not charged with the underlying fraud. So the fact that Kam Wong, these documents are reflective of Kam Wong's underlying fraud and they were provided to another individual who was not Ms. Ash is irrelevant to what her state of mind when she took the actions that are subject here.

And as to the 403 issues, the fact that there was one

Lc73ash5 Page 750

document in evidence doesn't mean a host of other documents coming in won't confuse the jury. Because I don't actually understand the point of what the documents are. Considering the defendant didn't receive the documents, hasn't seen the documents. And so it leads to -- it doesn't seem to have any probative value, and it leads to a confusing nature as to what is being demonstrated here.

Your Honor has seen the documents. They're very confusing as to what they are, and I am not sure what inference the defendant is trying to offer through them. So, I think whatever probative value, which we argue is not existent or minimal, would be is overwhelmed by the confusing nature of the documents, your Honor.

THE COURT: The objection to these, both to the line of questioning and the exhibits, is sustained. I think it is virtually -- I don't thinking it is relevant evidence. And if it were, I think the likelihood of confusion and unfair prejudice by inviting the jury to take their eye off the ball, namely that the issue is whether the defendant participated in a conspiracy to obstruct and obstructed and made false statements, later, with the question of whether she's culpable in Wong's fraud. Those are two different things. And I don't think it is appropriate to accept the invitation to confuse them. So that one's out.

MR. REILLY: Yes, your Honor. So, the bucket three so

Lc73ash5 Page 751

to speak is the circumstances surrounding Mr. Osei Bonsu's signing of the exhibit which is in evidence as Government's Exhibit C, which is essentially the version of the memo that --

THE COURT: Government's Exhibit C?

MR. REILLY: Defendant's Exhibit C in evidence, which is the memo -- which is effectively identical to the one signed by Ms. Ash that was signed by Mr. Osei Bonsu.

THE COURT: He signed that when?

MR. REILLY: He signed it, his recollection is, your Honor, that he signed it at or around the time of the fiscal committee meeting which happened on January 22, 2015.

THE COURT: That's relevant because?

MR. REILLY: Again, your Honor, I think it shows the -- now this is within the time frame that is -- the obstructive conspiracy that's alleged to occur. We believe it reflects Mr. Wong's pattern and practice with respect to this particular memorandum. How he was seeking to get signatures to bolster his position. And that the fact he duped Mr. Osei Bonsu into signing it would allow the jury to infer that Ms. Ash similarly was -- excuse me, was similarly duped or drawn into signing the memo.

THE COURT: Mr. Mark?

MR. MARK: I think once again that sort of highlights the problematic nature of this testimony. To infer one person's state of mind here, Mr. Bonsu, who is not alleged to

Lc73ash5 Page 752

be a co-conspirator here, and with another -- defendant's state of mind here, because they would be completely informed by all sorts of different circumstances and different events, and that would lead, to the extent there is any probative value here and it seems to be largely irrelevant, it would be overwhelmed by the confusion they're asked to draw. Which is that whatever Mr. Bonsu thought based on his own experience and the events he had with Mr. Wong, which are different from Ms. Ash's, are the same as what Ms. Ash did. So whether he was duped doesn't really lend any insight into whether Ms. Ash was duped.

THE COURT: The objection to that one is sustained too for the same reasons.

Next? Bucket four.

MR. REILLY: Your Honor, would you permit Mr. Osei Bonsu to testify to the limited fact of when and where he signed it?

THE COURT: How does that help?

MR. REILLY: Again, just to place it in time with respect to the other -- the other with respect to other memos and the excuse me -- Mr. Wong's actions in furtherance of the conspiracy. Or the alleged conspiracy. And to -- excuse me. Let me take a step back.

To establish his course of conduct and how this, his actions, how his actions to cover up his own conduct are placed in time with other events, including Ms. Ash's signature.

MR. MARK: Your Honor, that would seem to be cumulative based on the fact there is already evidence in the record from Special Agent Jackson which would potentially open the door to the host of other issues that are presented by this.

THE COURT: No. No.

Last bucket.

MR. REILLY: I think the last bucket I think is probably covered by -- I'll raise it for the Court but I think it's covered by the Court's guidance on the last matter. Which is the board minutes of the -- excuse me, the fiscal committee minutes from the January 22 meeting which were, again, signed by Mr. Osei Bonsu and reflect essentially the fiscal committee's adoption of a recommendation to the board effectively adopting what's in the meeting -- excuse me. What is in the meeting minutes -- the memos, I should say, Ms. Ash's memo, Mr. Porcelli's memo, and Mr. Osei Bonsu's memo.

Again, for the sake of clarity, your Honor, that exhibit which is Defense marked for identification I want to confirm -- I believe it is L, your Honor, reflects the meeting on January 22, 2018, of the fiscal policy committee meeting.

THE COURT: Mr. Mark?

MR. MARK: Your Honor, this present the whole host of issues under the last bucket which is the meeting minutes that the defendant or Mr. Reilly is referring to relate to a meeting



that Ms. Ash was not present for, and the fact is, these are not even admissible. These are not like standard board meeting minutes. These were documents, a document that was prepared hastily by Mr. Wong in order to provide a cover story to the government and obstruct the investigation.

THE COURT: We know that how?

MR. MARK: Basically, we know that from Mr. Bonsu's -- we know that from Mr. Bonsu himself.

MR. REILLY: To be clear, I believe Mr. Bonsu's testimony would be that these were, these were consistent with the minutes that were prepared -- minutes were always prepared at fiscal policy meetings, and these were consistent with the preparation of minutes, and that he signed this and this reflects what happened at that meeting.

And that's not -- I am not putting aside Mr. Mark's objections on relevance. That's how he would testify about his knowledge of this document, that it was consistent with the practices while he was on the fiscal policy committee.

THE COURT: He would testify that there were usually minutes; yes?

MR. REILLY: Yes, your Honor.

THE COURT: Who usually took them?

MR. REILLY: They were usually taken by -- excuse me. I believe it was Monique Smith, your Honor.

THE COURT: And she wrote this document?



MR. REILLY: I don't want to mis -- I just don't know the answer.

THE COURT: That would be a good idea not to do that.

MR. REILLY: Yes.

THE COURT: So there is not going to be any testimony she wrote this document.

MR. REILLY: No. His recollection is this is consistent with memos he regularly saw, and he signed it because it accurately reflected what happened at that meeting.

THE COURT: Who typed it up?

MR. REILLY: I don't know that he knows that, your Honor.

THE COURT: Who gave it to him to sign?

MR. REILLY: Again, I believe it was -- I should say I'll find out, your Honor.

THE COURT: Somebody other than he?

MR. REILLY: He did not type it up. He will certainly say that.

THE COURT: I don't think so. I mean, you're effectively asking me to put a quasi forged document in front of the jury. It's not forged in the sense I'm saying it is not this guy's signature. But it sure as heck, from what has been said here, highly unlikely that these were kept in anything like the ordinary course of business, not even by the people who were charged with doing that.



MR. REILLY: Your Honor, I think that it was prepared in the course of this meeting happening and prepared for presentation to the board on the 25th as minutes of the meeting. It was then withdrawn or not presented as a result of the fact that the federal investigation became known.

THE COURT: The answer is no.

I can just imagine being launched into another day of testimony about the minutes to no good end. In addition to the highly dubious relevance at best.

MR. MARK: And I'll just put on the record just for additional -- which is that the minutes themselves, what they recount, Mr. Bonsu would say that that doesn't actually accurately reflect the conversation he would -- that he would testify about in 2015. Adding to the 403 issues.

THE COURT: Mr. Reilly, do you acknowledge that's so?

MR. REILLY: Yes, your Honor. It is not accurate. It is -- again it is being offered, your Honor, for the --

THE COURT: The fake minutes of the fake information for an alternative purpose. No. Absolutely not. All right.

Anything else?

MR. REILLY: With respect to Mr. Kohn, Ms. Cohen will address that, your Honor.

MR. MARK: Your Honor, I would just note for the record that while the government does not allege Mr. Bonsu is a co-conspirator in this case, he did come in and proffer with

the government. I take Mr. Reilly's representation he won't question Mr. Bonsu about that.

MR. REILLY: Yes, I thought I addressed that.

THE COURT: I thought so, too.

MR. MARK: I was -- I thought he addressed that, but I would note that I think it might be wise before he testifies that your Honor outside the presence of the jury just advise him of his rights because he is not represented by an attorney.

THE COURT: Okay. Remind me if I don't.

MR. REILLY: Yes, your Honor.

THE COURT: Next.

MS. COHEN: Your Honor, as to Mr. Kohn, just a couple things. The government lists a number of things that it believes the defense should not try to elicit from Mr. Kohn, many of which the defense was not intending to elicit from Mr. Kohn, so I will only address the things in dispute, your Honor.

THE COURT: Why don't you tell me the things you are not going to do.

MS. COHEN: Sure. Your Honor, we are not intending to elicit from Mr. Kohn any benefits that he or other MCU executives, board members or employees received from Wong and/or the MCU, or his opinion about any benefits, or his opinion about the MCU policies or manual.

We will, though, seek to elicit from Mr. Kohn the



number of subscriptions to professional sports teams that the MCU had, which is different from what I just said.

We will not seek to elicit from Mr. Kohn his views about the internal investigation or his views about the federal investigation, or his views about what Ms. Ash thought about either the internal investigation or the federal investigation.

We will not seek to elicit details from Mr. Kohn of the internal investigation, other than as is relevant to the two exhibits we seek to enter through Mr. Kohn, which are his two letters to Ms. Ash seeking the return of the MCU devices which we've marked Defense Exhibits N, we've marked them Defense Exhibits N and then the other letter's already in evidence as Government Exhibit 113.

THE COURT: What do you propose to have him say about that?

MS. COHEN: We expect the witness would testify that he sent both of those letters, Defense Exhibit N for identification and what's in evidence as Government Exhibit 113, to Ms. Ash. That he was instructed that the language in that letter is not his language, that the language was drafted by outside counsel at Epstein Becker & Green. That he did not know what purpose outside counsel sought the devices back from Ms. Ash, and he had no discussions with Ms. Ash about the letters or the return of the phones at any time.

That information, your Honor, that testimony, your



Honor, of course is relevant to whether Ms. Ash when she went to the Apple store to wipe her phone was doing so as part of obstructive conduct to obstruct the federal investigation, versus returning the phones to MCU as instructed by the letters Mr. Kohn sent to her.

THE COURT: I'll hear from Mr. Mark now.

MR. MARK: Okay. Well, first, there is one exhibit that's in evidence that's 113. That predates the Apple iPhone that's already in evidence. The second letter is letter N. That postdates the Apple iPhone. So I don't understand how that's relevant at all to what Ms. Ash did when she wiped her phone.

THE COURT: Back up. Exhibit 113 predates the visit to Apple?

MR. MARK: Predates the visit to Apple.

THE COURT: Okay.

MR. MARK: And Exhibit N postdates the visit to Apple. So that can't inform what she did when she went to the Apple store. So I'll take that off the table.

As to the rest --

THE COURT: Is there any answer to that, Ms. Cohen?

MS. COHEN: Yes, it doesn't actually postdate when the phone was returned to the government, which they put into evidence.

MR. MARK: There is no evidence when the defendant



returned the phone, and indeed, as your Honor knows, we didn't put in the particulars of that because of a potential opening the door to a defense argument. So, I'm not sure.

MS. COHEN: I believe there is evidence about when the phone was received.

MR. MARK: There is evidence as to when the --

MS. COHEN: The phone was received in evidence by the government.

THE COURT: I just don't understand how either exhibit is relevant to what her intent was in wiping the phone.

MR. MARK: Your Honor, the testimony is absolutely irrelevant given what the proffer is. The fact that the language is not Mr. Kohn's doesn't inform --

THE COURT: That obviously doesn't matter.

MR. MARK: Exactly. And she just said Mr. Kohn didn't have any discussions with Ms. Ash, so his testimony is completely irrelevant to what Ms. Ash did or didn't do when she received those letters. And the letters speak, the letter speaks for itself.

THE COURT: I don't get it, Ms. Cohen. Maybe I'm missing something.

MS. COHEN: We would be unable to argue because there would be nothing in the record to show Mr. Kohn never spoke to Ms. Ash about the return of the phone, absent Mr. Kohn telling the jury so. So we --

THE COURT: You are going to call him for the purpose of saying I never spoke to her about it?

MS. COHEN: That is one purpose. We have other things we are going to talk about with Mr. Kohn about, your Honor.

THE COURT: Whether he did it on the instructions of counsel and whatever he thought the purpose of those instructions were, I don't see the relevance of.

MS. COHEN: Your Honor, he did not know what the purpose of the instructions were and I think --

THE COURT: So what?

MS. COHEN: Excuse me?

THE COURT: So what?

MS. COHEN: Your Honor, I think that demonstrates that the MCU was trying to trick Ms. Ash to turn in her phone because they were cooperating with the government at that time, which is in evidence.

THE COURT: You lost that motion long before trial.

MS. COHEN: Yes, your Honor, but they introduced into evidence that the MCU was cooperating and turning over documents as early as February of 2018.

THE COURT: Look --

MS. COHEN: The government chose to introduce that into evidence. We are entitled --

THE COURT: If you want to call Kohn to say I sent this letter and I never spoke to her about it, I don't hear any



objection to that.

MR. MARK: That's correct, your Honor.

THE COURT: And knock yourself out. But that's it. The rest of this stuff about the instructions and outside counsel is not coming in. Do we have anything else? Subscription to sports teams.

MR. MARK: I don't understand the relevance of that.

MS. COHEN: There has been extensive testimony put forward by the government about various tickets Mr. Wong gave to Ms. Ash, both in testimony and in e-mails and in texts. It is relevant how those tickets came to the possession of Mr. Wong. It is relevant that they were season tickets held by the bank what Mr. Wong controlled.

I'm not seeking to introduce who got them or who they were provided to. But simply that the MCU had season tickets to these various sports teams and they were held by Mr. Wong.

THE COURT: And the argument on the other side, which seems to me appropriate, is that Ms. Ash, for whatever reason, liked getting these tickets, he was the source of the tickets, and along with all the other considerations, that afforded her a motive to try to help him out of the jam he was in with the grand jury investigation. And the fact that there may have been lots more tickets and lots more people getting tickets, doesn't matter.

MS. COHEN: Your Honor, the e-mails and the texts give



the misleading impression that Mr. Wong bought the tickets specifically to Ms. Ash to give them to her. That is a fair reading of the e-mails and the texts that the government put in. That is not true. What is true and what the government did not introduce and what we seek to introduce in extremely limited fashion is that the bank had subscriptions, season tickets to these various sporting events. It is not Mr. Wong went and bought tickets.

THE COURT: We already know they had a season box to the Cyclones, it had 18 seats. There is also some e-mail or text traffic about Knicks tickets and I think other tickets, but those are the ones I remember offhand. And so what?

MS. COHEN: I think the fact there are subscription tickets to the Knicks and other sporting events is a very different thing than what, if you just look on the face of the e-mails and texts and why the government put them into evidence was to show that she was asking Wong to go get her tickets and he went and got her tickets. That is not in fact what happened. The bank had subscriptions to various sports team tickets and he distributed them. It is a difference, but it is a difference that matters, your Honor.

If the government wants to stipulate that's true, I won't have to ask Mr. Kohn. But right now the jury is being mis --

THE COURT: No, they're not.



MR. MARK: Candidly, I'm very confused. That was not the impression I got from the testimony. Most of it dealt with MCU Park, as your Honor noted, and it was clear from that witness about those tickets, how they were provided, and there were these subscriptions. So this seems to be cumulative and it seems to be irrelevant as well. It seems to have limited relevance to what the defendant seeks to do here. So, we would object.

THE COURT: What other subscription tickets were there?

MS. COHEN: Your Honor, there are subscription tickets to all the major New York sports teams. Ranging from two to four tickets. There were season tickets to the Knicks, to the Rangers, to the Jets, to the Yankees. And there were season tickets for every game, home game, that Mr. Wong controlled. And there were two tickets to the Jets, there were two or four tickets to the Rangers, there were three sets of two tickets each to the Knicks, and there were one am I missing. There were I think two or more tickets, season tickets to the Yankees. It was a season subscription.

THE COURT: Well, look, I'm going to allow it, but this is all you get on it.

MS. COHEN: That's all I was intending to do, your Honor.

THE COURT: And I have to tell you that if I were

defending this case, I would be mighty worried that this was more harmful than helpful. But that's your call.
MS. COHEN: Understood, your Honor.
THE COURT: Okay. Anything else?
MR. MARK: Only just to clarify, are those the only two lines of testimony that Mr. Kohn is going to testify about?
MS. COHEN: No, I mentioned also that Mr. Kohn would testify about the MCU policy manual.
THE COURT: What's he going to say about it?
MS. COHEN: He's going to say that is the policy that was in effect. He is familiar with it. And we are going to introduce the policy manual in evidence through Mr. Kohn to which there is no objection, and point out several sections of it that relate to board reimbursement and what was permitted per MCU policy.
MR. MARK: I guess, my question is, is what Ms. Cohen is planning to do introduce the whole policy manual or just excerpts of that policy?
MS. COHEN: As Mr. Mark knows, since we talked about this last night, we intend to --
THE COURT: Play nicely, people.
MS. COHEN: I am, your Honor.
We intend to introduce what has been marked and shared with the government, an excerpt of the policy manual, including the overview of that policy manual that the government asked us



to include in that exhibit.
MR. MARK: So it sounds like two things. One is we don't have any objection to the policy manual itself coming in.
THE COURT: By which I take you to mean Exhibit B1.
MR. MARK: Yes. B1.
What Ms. Cohen seems to do is having Mr. Kohn opine on the policy or testify as to his understanding of that which is irrelevant, and which is the same issue that Ms. Cohen raised as to other documents like financial disclosure statements. The document speaks for itself and there is no need for Mr. Kohn's testimony about that.
THE COURT: I'll receive B1 and that's it.
MS. COHEN: May I be heard on that, your Honor?
THE COURT: You can be heard, yes.
MS. COHEN: Mr. Kohn worked for the MCU for 42 years. He was senior management, he was the acting CEO, he was the chief financial officer. He is very familiar with the policy manual that we seek to mark the excerpts of B1. We are not seeking him to opine on the meaning of any of it. But we are seeking to introduce it for him and pull up various sections of it, have him read it into evidence. The same way the government on numerous occasions had people, agents and others, pull up documents and read from them. We are entitled to the same latitude.
THE COURT: If you want to put in B1 and demonstrate,



as the government did with some of their witnesses, that they're capable of reading aloud from a document, I'll allow it within reason as I did within reason with them. That's it. One hint of an opinion, gone.
MS. COHEN: Understood, your Honor. We were never intending on having him talk about his opinion about anything.
MR. MARK: And it sounds like they are trying to get more than just even if they don't get his opinion. It sounds like they are looking to try to get more.
THE COURT: It sounded like that to me, too. But I am going to hold Ms. Cohen to her word. You don't call somebody to establish they've been there for 40 years and they understand this manual and da-da-da to prove that they're literate in the English language. That's what she says she is going to do and that's all she's going to do.
MS. COHEN: Your Honor, I would just add, I don't see it referenced here, but just so the government doesn't claim we didn't inform them. Just so the Court is aware. Just so everyone is aware. I think with Mr. Kohn we also intend to show him a memo regarding the amount of reimbursement each board member could seek for attendance at credit union conferences.
THE COURT: This is Defendant's Exhibit O.
MS. COHEN: It is, your Honor. And again, we are not going to ask him to opine on it. He's aware of it, he knows



it, and we'll just show it to him and have him read relevant portions of it.
THE COURT: Mr. Mark?
MR. MARK: Well, I guess, the first question I have, what is the relevance of this testimony? I understand that's what they plan to do with him. But I don't understand what the relevance of it is.
MS. COHEN: There has been extensive testimony about Ms. Ash's Greek island cruise and other expenses incurred at credit union conferences, different from the strategic planning conference. We are entitled to introduce MCU policy which permitted board members to put in for expense reimbursement for municipal credit conferences in general, up to $20,000 by MCU policy.
THE COURT: That's not what it says, actually. It says that the bank has budgeted based on an assumption it will not exceed $20,000 per committee member.
MS. COHEN: Correct. It corresponds to a specific section of the MCU policy manual. You have to read them in tandem, your Honor.
MR. MARK: I think we have no objection to the MCU policy manual. That gives Ms. Cohen what she wants. She wants to make all sorts of other inferences which I think are misleading.
THE COURT: What does it dovetail to in the manual?

MS. COHEN: If I could just step out and get the exact section. It is 2.09. I just can't remember the sub.

2.09-1. It is on page 2.4 of what is marked for identification B1, and there is no page numbers at the bottom, your Honor. It is about a little more than halfway through document.

THE COURT: I'm not going to allow Defendant's O. I think it's confusing. It invites the jury to conclude that there was a $20,000 fund for each director to use as they saw fit, and that's not what the policy memorandum says. And it is inconsistent with the English language insofar as Defendant's Exhibit O is concerned. There is a list in Defendant's Exhibit B1 of the particular expenses that are reimbursable. Transportation, necessary transportation, standard tipping, business meeting expenses, telephone expenses, business supplies and out-of-pocket expenses, including beauty supply, clothes, souvenirs, sporting equipment, and gifts. Personal entertainment expenses are limited to $500 for the entire conference. Networking is not to be charged against it.

Now, that doesn't say anything about tickets to Britney Spears concerts or anything like that. And I think that the probative value, if any, of Defendant's Exhibit O is substantially outweighed by the risk that the jury will draw inappropriate conclusions.

MS. COHEN: Your Honor, may I elicit testimony from



Mr. Kohn that he is aware that each board member could spend up to $20,000 on attendance at credit union conferences? Because right now, the jury has the misleading impression that it was somehow wrong of Ms. Ash to submit reimbursements for attendance at those conferences. Which is contrary to MCU policy as in the policy manual 2.09-1, and the dollar amount does matter, since the government put in a lot of evidence about the cost of everything Ms. Ash spent attending conferences.

THE COURT: If it said what you say it said, maybe. But it doesn't.

MS. COHEN: That was my -- may I elicit from Mr. Kohn his knowledge about the policy, which he knows and his position at the MCU?

THE COURT: No, no, no. Okay.

Anything else?

MS. COHEN: Your Honor, there is the matter that I raised at sidebar as it relates to a witness that, while the government has rested, but as relates to Mr. Vestfrid and his testimony and the failure of the government to disclose to the defense that in advance of his testimony, they had sent him the script for his testimony on several occasions.

THE COURT: I understand what you mean. But, lest anybody draw the wrong conclusion, where I come from, a script is every word to be spoken by any participation in the play.



And what I was informed at the sidebar, and I understand you to agree with this, there was no script in that sense. There was a list of questions with no answers. Now, if that's wrong, I need to know it.

MS. COHEN: Your Honor, I call it a script because that is the title of the document.

THE COURT: I don't care what it's called. Call it a zebra.

MS. COHEN: I believe that the questions are formulated by prep sessions that the government had with Mr. Vestfrid, and his answers got turned into questions, and the answers were never recorded on any 3500 provided for Mr. Vestfrid. In fact, there was very limited 3500 material of anything he said to the government. There were three lines of written 3500 only. I believe that is because everything that Mr. Vestfrid told the government was turned into a script that was provided to Mr. Vestfrid, but should have been provided to the defense, because it effectively was his 3500.

THE COURT: So are you asking for any relief or not?

MS. COHEN: I am, your Honor. I would ask for two things, your Honor. We were not able to cross-examine Mr. Vestfrid with this information. Which we would have, I assure you, your Honor. It prejudiced the defense immensely in our ability to cross-examine Mr. Vestfrid who was a key witness for the government.



THE COURT: I'm sorry, Ms. Cohen. The hour draws late, and I ask you whether you are asking for any relief. And if so, what. Could I get an answer to that question?

MS. COHEN: Sure, your Honor. The defense would ask for a mistrial based on that.

THE COURT: Denied.

MS. COHEN: The defense would ask for a dismissal of the indictment.

THE WITNESS: Denied.

MS. COHEN: The defense would ask for some relief, your Honor, because we were not able to cross-examine Mr. Vestfrid about the fact that he had all the questions ahead of time, and we did not have his -- effectively no 3500 material for him, since the way the government chose to prep him was by turning his answers into questions that were never provided to the defense.

THE COURT: There was another witness of whom that was effectively true, right? Today.

MS. COHEN: Correct, your Honor. We were advised of that before the witness took the stand, so we were able to ask him questions about it.

THE COURT: And you didn't.

MS. COHEN: We did, your Honor. In fact we asked him if he was provided with the questions that he would be asked in advance of his testimony.

THE COURT: Right. And that was the sum total of your cross about it.

MS. COHEN: Your Honor, that witness was a very different witness than Mr. Vestfrid.

THE COURT: Look, I don't buy it. I don't buy it at all. In my view, this was not Jencks material in the first place.

As to the second witness, while I understand that the practice in this district is to produce Jencks material earlier, the statute requires it be produced only at the completion of the direct, and you had it before the direct started as to this afternoon or this morning's witness. Even if the statement was a Jencks statement, the government technically complied with the statute.

Now, with respect to the other witness, whose name I can never keep in mind, in my view, there was no Jencks violation for the simple reason that a list of questions is not a statement of the witness. Section 3500(e) provides that the term statement as used in the relevant parts of the Jencks Act in relations to any witness called by the United States means:

(1) A written statement made by said witness and signed or otherwise adopted or approved by him;

(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and



recorded contemporaneously with the making of such oral statement; or

(3) A statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

No way, no how, is what has been described to me without objection fall within that definition. And to the extent that I'm familiar with the case law, anything short of a substantially verbatim memorandum by an agent or an investigative agent or law enforcement person of what the witness is saying doesn't cut it under anybody's law.

Now, I make that statement on a limited amount of research today because I've had very little time, and it's not essential to my conclusion. The statutory definition is more than enough.

Furthermore, the relief that's sought is out of all proportion to any violation that occurred, if there was one, and I hold that there was not. In no way is there any persuasive claim of any prejudice whatsoever. I don't buy any of it. And certainly, nothing that would warrant dismissal or anything else that Ms. Cohen suggested.

Moreover, nobody has challenged that the way in which this came about, though unfortunate, is because the assistant responsible for these two witnesses is in fact a special assistant U.S. attorney, who, as I understand it, is an



assistant district attorney in New York County, and as evidenced by fact that she hasn't gotten used to referring to the government in this court as "the government," and still refers to it as "the People," hasn't tried very many criminal cases in the federal court. And conformed to an existing state practice. Now I don't know it is an existing state practice, except I've been told that, and nobody disputes it.

But certainly there was no intention to deprive the defense of anything to which it was entitled, and I just don't buy this whole argument.

If there is a conviction, I'm sure you know where the court of appeals is, and we have a possibility I suppose of a 2255, but I don't want to get there personally. And that's the end of that.

Anything else this evening? I may have one more thing myself.

(Continued on next page)



MR. MARK: Your Honor, I think there are a couple of things on our agenda.

One of them might be on yours, which is, first, a housekeeping issue, which is: We received exhibits for Mr. Bonsu and Mr. Cohen; we haven't received any exhibits for if the defendant decides to testify. So we would request that, obviously, if Ms. Ash testifies, that we get provided notice for those exhibits that she plans to before it because, as we see here, those could present significant issues.

Second is just sort of on a scheduling matters, which I assume was the one your Honor wanted to talk about, which is if you had a sense of when you anticipated a charge conference would be here. I'm not sure how long the defense case will be but then I guess the question of when closing arguments would be.

THE COURT: What is the defense's present intention about Ms. Ash testifying?

MS. COHEN: Your Honor, we need to confer with our client, and we will do so this evening.

And if there are any exhibits, we, of course, if the defendant chooses to testify, which is her constitutional right to do so, we will provide any exhibits to the government.

THE COURT: I'll leave it at that for the moment.

In terms of schedule — you know, you heard what I had to say before — I don't know how long a defense case there's

going to be any more than you do, Mr. Mark. And there we are.

Now, I have a note from Alternate No. 5, another one. She doesn't quit easily. She hopes all is well, again, but she's back on the subject of her audit meeting, that she says started at 2:00 p.m. on Thursday, December 9th, which is two days hence. She said she spoke to her client last night, and they propose moving the meeting till 4:00 o'clock, in which case, she'd have to leave at 3:30 because one of the board members can meet only on Thursday. And the alternate says she will be, as we know, in New Orleans on December 16th. What we know is she has plans to be in New Orleans on December 16th. Her main priority is jury duty but the client wanted to know if there's any way that the trial would be able to start earlier on December 9th so she can attend this meeting and she wants to know tomorrow.

This will be marked Court Exhibit next in order, which I think will be F.

Views?

MR. MARK: I think that's a significant request to ask of all the other jurors, to work their schedule around Alternate No. 5, your Honor.

THE COURT: Well, yes, sure it is.

Ms. Cohen, anything?

MS. COHEN: Your Honor, I don't think there's an appreciable difference between ending at 3:30 and ending at



4:30 on 12/9. I would suggest that we accommodate that juror and say that if we are sitting, if that juror is still sitting, on December 9th, we will end either testimony or deliberations at 3:30.

THE COURT: Well, she's an alternate, and she's the fifth alternate, and there's another option, which I'm reluctant to make a decision about now, but probably will be in a position to make a decision about tomorrow, depending on what I hear from the defense about how long your case is going to be, and from the government about whether there's likely to be a rebuttal case.

MS. COHEN: Your Honor, we would not object, given that we haven't used any alternates and we appear at least to be through the government's case, that if you wanted to excuse Alternate No. 5, I think there are enough other alternates.

THE COURT: Yes, maybe, unless one of them has been exposed to COVID in the last couple of days.

MS. COHEN: Then we've all been exposed.

THE COURT: Well, I hope not.

MS. COHEN: I hope not too, your Honor.

THE COURT: Sure, I understand that. In ordinary times, it would be easy. I would just excuse her, but we could wind up excusing four or five of them, six of them.

MS. COHEN: My preference, your Honor, would be to tell her that -- if she feels she needs to tell her client, I



don't want her sitting here worried and upset she's not able to tell her client and not listening to the testimony. So I'd prefer she had some comfort --

THE COURT: How long will your two witnesses, given the rulings I've made, take? An hour?

MS. COHEN: Tops, your Honor.

THE COURT: So we're going to know whether Ms. Ash is taking the stand probably by about 10:30 tomorrow morning.

MS. COHEN: I would say 11:00, your Honor, to be safe, because I don't know the cross.

THE COURT: And you will know whether that's happening then. And so let's wait till midday tomorrow and I'll make a decision then.

MS. COHEN: Your Honor, to Mr. Mark's point, do you know when the parties will get a copy of your Honor's expected charge to the jury? Trying to plan ahead a little bit.

THE COURT: Well, that's fair.

It all depends. You're not going to get it till the evidence closes, not in this case. And I don't think there's going to be anything unexpected in it; for example, this is not a case in which you have to thread the needle of on what issues in a conspiracy case conscious avoidance is appropriate and on what issues it isn't. This is a case where the issue is whether she joined in a conspiracy. My understanding is conscious avoidance doesn't apply to that issue and there's no



question about what the objects of the conspiracy were. So that's my preliminary take on that. So I don't see that, which is often a hangup in these cases, taking a lot of time.

And I thought, on the whole, the defense's reaction to the government's requests to charge was simply to cross out big patches of it, some of which I'm willing to do, and some of which I think were overly aggressive, but on the substance, I think everybody's in the same place.

MS. COHEN: Your Honor, given the testimony — and we also submitted the requests to charge before your Honor's ruling on the motions in limine — I just want to review. We may have additional supplemental requests to charge.

THE COURT: Well, I hope they're not ones that should have been raised before.

MS. COHEN: They won't be, your Honor.

THE COURT: So I don't think you're going to have a big problem with it, but I've been wrong before on all sorts of things. Okay. Anything else tonight?

MS. COHEN: No, your Honor.

THE COURT: Okay. Thank you. Have a good evening. And don't write a lot of letters, okay?

MR. MARK: I think the letter-writing is over.

THE COURT: Oh, I hope so.

MR. MARK: Thank you, your Honor.

(Adjourned to December 8, 2021 at 9:30 a.m.)

INDEX OF EXAMINATION


Examination of: Page

LAURA SMITH

Direct By Mr. Mark . . . . . . . . . . . . . . 566

Cross By Mr. Reilly . . . . . . . . . . . . . 585

ROBERT TEMBECKJIAN

Direct By Mr. Mark . . . . . . . . . . . . . . 588

Cross By Ms. Cohen . . . . . . . . . . . . . . 632

Redirect By Mr. Mark . . . . . . . . . . . . . 639

Recross By Ms. Cohen . . . . . . . . . . . . . 641

ENRIQUE SANTOS

Direct By Mr. Mark . . . . . . . . . . . . . . 641

Cross By Ms. Buckley . . . . . . . . . . . . . 667

Redirect By Mr. Mark . . . . . . . . .679 redirect

JEREMY ROSENMAN

Direct By Ms. Katz . . . . . . . . . . . . . . 687

Cross By Mr. Reilly . . . . . . . . . . . . . 719

Redirect By Ms. Katz . . . . . . . . . . . . . 725


GOVERNMENT EXHIBITS


Exhibit No. Received

522 . . . . . . . . . . . . . . . . . . . . . 574

519 . . . . . . . . . . . . . . . . . . . . . 579

521 . . . . . . . . . . . . . . . . . . . . . 580

524 . . . . . . . . . . . . . . . . . . . . . 584

500 through 501, 530 through 534 . . . . . 607





535 through 541 . . . . . . . . . . . . . . 608

508 . . . . . . . . . . . . . . . . . . . . . 619

516 . . . . . . . . . . . . . . . . . . . . . 625

279, 362, and 363 . . . . . . . . . . . . . 644

350 . . . . . . . . . . . . . . . . . . . . . 646

360L through R, 360RR, 360S through X, . . . 648
366, and 366A

364, 364A . . . . . . . . . . . . . . . . . 659

1004, 600, 601, 602, 604 through 609 . . . 690

900 . . . . . . . . . . . . . . . . . . . . . 691

1002, 650 through 656 . . . . . . . . . . . 695

1006, 657, and 658 . . . . . . . . . . . . . 698

902, 904, and 905 . . . . . . . . . . . . . 700

562, 750, 751, 752, 753, 754, 755, 761, . . . 703
762, 763, 764, 765, 766, and
769

561, 300, 304, and 328 . . . . . . . . . . . 709

903a through D . . . . . . . . . . . . . . . 711

341 . . . . . . . . . . . . . . . . . . . . . 714

1008, 277, and 277A . . . . . . . . . . . . 718

1001 through 1006 and 1008 . . . . . . . . . 726

## $

**$1,000 (2)** 614:14;615:20
**$10,000 (1)** 655:1
**$20,000 (4)** 768:13,17;769:9;770:2
**$205.15 (1)** 694:7
**$500 (1)** 769:18
**$56,648.63 (1)** 692:6

## A

**aardvark (2)** 670:18,19
**ability (1)** 771:24
**able (9)** 630:10;663:24;664:4;677:6;771:21;772:11,20;777:13;779:1
**above (15)** 604:11;609:7;610:15;636:1,2,2,3;646:21;660:11;690:1;692:25;695:11;698:4;717:19,22
**absence (2)** 625:17,19
**absent (1)** 760:24
**Absolutely (2)** 756:19;760:11
**accept (1)** 750:23
**access (1)** 617:24
**accommodate (1)** 778:1
**accordance (1)** 568:23
**according (1)** 683:5
**accordingly (1)** 730:23
**account (31)** 647:1,3;689:9,10,18;690:13,14,16,21;691:6,22;693:17,19;694:3;695:23,25;696:6;697:5;702:20;704:6;707:25;708:10,18,23;709:19;710:18,19;711:19,21;715:3;725:8
**accounted (1)** 566:11
**accounting (2)** 688:10;713:25
**accounts (4)** 710:11,16;713:15;714:10
**accurate (12)** 646:2;647:19;658:25;697:13;702:17;708:8,16,22;714:15;717:8,12;756:16
**accurately (5)** 699:22;710:24;715:2;755:9;756:13
**accused (1)** 599:5
**accustomed (1)** 597:14
**ACH (6)** 713:21,22,25;714:11,13,22
**acknowledge (1)** 756:15
**acoustics (1)** 593:16
**acquaint (2)** 593:5;600:14
**acquainted (1)** 596:6
**acquainting (1)** 601:18
**acronym (2)** 645:6,11
**act (5)** 599:9;685:1,2,22;773:19
**acted (1)** 737:4
**acting (1)** 766:16
**action (1)** 611:22
**actions (6)** 612:8;618:8;749:23;752:20,24,24
**activities (1)** 697:21
**activity (10)** 619:7;620:15;689:3,14,22;692:22;695:1;697:20;702:15;708:4
**acts (1)** 568:22
**actual (4)** 582:11;601:3;628:19;633:22
**actually (19)** 575:10;591:6;596:22;604:16;610:23;632:12;633:10;634:21;635:14;636:7;646:13;675:16;679:9;733:3,11;750:2;756:12;759:22;768:15
**add (2)** 735:13;767:16
**Adding (1)** 756:14
**addition (2)** 595:23;756:8
**additional (5)** 578:8;598:5;601:1;756:11;780:12
**Additionally (1)** 746:10
**address (14)** 702:11;703:20,22;707:24;709:16;716:3,17,25;728:20;731:10;736:1;746:3;756:22;757:16
**addressed (5)** 571:18;744:3;746:4;757:3,5
**addressing (1)** 568:21
**adherence (1)** 678:1
**Adjourned (1)** 780:25
**Administration (1)** 604:20
**administrative (2)** 590:18;625:13
**administrator (4)** 589:3,18;611:17;619:20
**admissibility (2)** 744:20;745:4
**admissible (2)** 628:5;754:2
**admit (1)** 681:12
**admitted (11)** 567:15;651:7;690:11;693:11;709:13;729:7;737:9;738:10,13,20;739:16
**admonition (2)** 591:14,16
**adopted (2)** 598:4;773:22
**adopting (1)** 753:15
**adoption (1)** 753:14
**advance (7)** 643:19;682:10,11;684:24;749:1;770:21;772:25
**advanced (1)** 748:19
**adversarial (4)** 572:15;582:7,8,9
**adversary (4)** 620:19,23;622:3,15
**advice (9)** 567:6,7,8;568:7,11;569:3,13,16;577:2
**advise (2)** 631:16;757:7
**advised (4)** 587:16;631:15,20;772:19
**advisory (16)** 566:23;567:2,4;568:12,19;570:17;571:12;574:15,24,24;577:7;579:6;586:11;587:1;621:21;631:22
**advocate (1)** 583:6
**affirmation (3)** 692:7;694:12,14
**afforded (1)** 762:20
**afield (1)** 599:11
**afraid (1)** 653:13
**afternoon (12)** 612:1;657:1;667:22,23;687:8,9;688:12;719:7,8;733:15;734:25;773:12
**again (29)** 571:19;579:16;602:13;605:21;622:23;634:3;648:1,3;653:3,5;654:12;655:5,21;664:8;670:19;702:4;725:23;733:6;734:22;749:9;751:13,23;752:18;753:12,18;755:14;756:17;767:24;777:3
**against (6)** 595:2;625:22;628:5;706:21;743:3;769:19
**agencies (1)** 602:5
**agency (2)** 589:9;738:8
**agenda (3)** 575:17;600:19;776:2
**Agent (25)** 676:2,6;687:16,23;692:11;700:12,13;719:7;720:4,13;722:20;731:9;732:1,6;733:22,23;734:23;735:13;736:19;740:18;741:6;743:18;753:3;774:9,10
**agents (1)** 766:22
**aggressive (1)** 780:7
**ago (2)** 670:15;716:7
**agree (4)** 634:24;675:22;722:11;771:2
**agreed (14)** 622:18;689:24;690:2;692:23;693:1;695:9;698:2;702:22;703:1;709:1;717:17,20;722:3;729:19
**agreeing (1)** 730:11
**agreement (3)** 611:24;729:1,14
**agrees (2)** 570:4;722:14
**ahead (14)** 594:17;630:17;669:13;685:19;686:9;721:11;728:11;732:4;734:3;739:8;740:12,21;772:12;779:16
**airfare (1)** 707:15
**alert (1)** 657:9
**alerted (1)** 718:4
**allege (1)** 756:24
**alleged (22)** 612:2,3;677:8,9,12,14;729:3,5,8,10,12,18,18;730:8,25;731:14;735:2,2;749:11;751:15,25;752:21
**allegedly (2)** 607:6;661:4
**allow (4)** 751:19;764:21;767:2;769:7
**allowed (1)** 599:10
**almost (1)** 716:8
**alone (1)** 612:6
**along (11)** 579:12;612:25;613:13;626:21;651:24;660:24;661:13;674:13,18;742:10;762:20
**aloud (3)** 668:5,8;767:2
**also! (1)** 655:17
**alternate (7)** 709:19;777:2,9,21;778:5,6,15
**alternates (2)** 778:13,15
**alternative (2)** 746:23;756:19
**alternatively (1)**

747:9
**although (4)**
594:2;622:1;683:17;
745:11
**Altice (4)**
692:12,18,21,21
**always (4)**
623:10;630:21;
743:5;754:11
**amendment (1)**
595:22
**American (5)**
589:20;688:22,24;
689:1,2
**among (2)**
692:12;700:11
**amongst (2)**
701:9;710:9
**amount (10)**
591:9;615:20;
635:24;639:4;691:21;
692:5;694:6;767:20;
770:6;774:12
**amounts (4)**
597:2,2;639:4;715:2
**ample (1)**
740:16
**amply (1)**
630:6
**analysis (5)**
642:19,21;699:23;
701:4;712:9
**analyst (3)**
642:7,9;643:23
**analyzed (3)**
643:14;698:19;699:4
**and/or (1)**
757:23
**Andy (1)**
725:24
**anniversary (1)**
744:23
**annual (5)**
601:19;604:9;609:4;
611:18;655:9
**annually (2)**
593:23;607:25
**anonymous (1)**
570:23
**answered (4)**
577:16;633:25;
637:11;654:21
**anticipated (3)**
744:6;745:24;776:12
**anymore (1)**
654:16
**anyways (2)**
737:22;740:21
**AOL (3)**
702:9,20;704:6
**apart (2)**
575:12;601:1
**apologies (2)**
639:2;681:7
**apologize (2)**
585:25;615:16
**apology (2)**
572:8;586:22
**apparently (2)**
681:3;683:4
**appeal (1)**
583:5
**appeals (4)**
589:19;591:22;
638:21;775:12
**appear (3)**
640:15;721:2;778:13
**appearance (1)**
735:19
**appeared (2)**
696:7;722:12
**appearing (1)**
585:17
**appears (10)**
567:23;577:5;
652:17;654:22;655:25;
661:9;681:10,12,14;
701:1
**Apple (27)**
646:17,21,23;647:3;
649:14;652:1;658:11,
20,23;659:11;660:12,
21;661:2,25;662:12;
680:2;742:9,10,13,15;
759:2,8,10,14,15,17,18
**application (2)**
644:11;661:24
**applies (3)**
597:24;598:4;685:2
**apply (2)**
593:7;779:25
**appointed (9)**
590:7;593:3,9;594:6,
9;596:6,8;638:19;
639:3
**appointee (1)**
596:9
**appointing (2)**
590:10;633:5
**appoints (4)**
590:3,4,5,6
**appreciable (1)**
777:25
**appreciate (2)**
593:17;682:6
**approached (1)**
748:5
**appropriate (5)**
610:11;742:19;
750:23;762:18;779:22
**approval (1)**
589:18
**approved (2)**
638:3;773:22
**Approximately (14)**
570:12;589:10;
590:17;592:13;597:7;
642:25;643:12,17;
682:13;710:11;713:17;
717:11,16;723:25
**April (15)**
571:19;573:9,15,23;
575:1,18;591:6;596:7;
597:21;600:12;632:13,
16;654:17;715:22;
716:13
**area (3)**
645:14;646:20;662:4
**areas (3)**
596:17;610:10;
746:18
**arguable (1)**
742:18
**argue (3)**
745:1;750:11;760:22
**argument (9)**
603:5;743:1;744:5,6;
745:25;748:20;760:3;
762:17;775:10
**arguments (3)**
630:10;743:7;776:14
**around (5)**
619:2;628:7;682:8;
751:10;777:20
**arrange (2)**
620:13;732:9
**arrest (1)**
672:9
**article (3)**
655:25;661:3,5
**Ash (195)**
571:7,12,25;573:5,
22;575:7;576:22;
577:20,25;578:5,20;
579:25;580:16;581:7,
11,17,23;582:2,20,24;
583:1,11,14,18;584:3,
16,22;587:14,21;596:3,
19;597:10,19;600:5,
25;601:12;603:9,12;
605:18,18;606:5;
612:2;616:3,6,25;
617:4,13,19;620:13;
622:24;623:13;624:3,
20;625:22;626:4,8,14,
15,25;628:12;631:17,
20,23;632:9,16,23;
633:9,18,22,25;634:3,
21;637:3,7,19,25;
638:7,12,15;640:2,12;
641:3;650:22;651:19;
652:8,19;653:10;
654:3;655:7,16;
656:10;660:13,21,22;
662:7;668:3,6,9,17;
670:4;671:25;677:8,
10,13;680:4;689:11;
690:16;691:23;692:16;
693:20;694:21;696:1;
700:11;701:9,14,20;
702:20;703:23;704:14;
705:18;706:20,23;
707:24;708:10,18,23;
709:17;710:9;714:11;
715:3,13,21;718:15;
728:24;729:5,8,9,12,
17,23;730:1,3,24;
731:15;732:7,8,12,15;
733:8,11,18,19,22;
734:5,9,16;735:3,14,
19,21;736:21;738:24,
24;739:2;746:19;
748:12,17;749:2,5,7,
22;751:7,20;752:9,10;
754:1;758:5,10,19,23,
23;759:1,11;760:16,17,
24;761:14;762:10,18;
763:2;770:4,8;776:7,
17;779:7
**Ash@aimcom (1)**
703:22
**Ash@aolcom (1)**
703:25
**Ash's (22)**
576:2;580:8;585:3,
14;586:5;596:11;
597:22;612:8;614:19;
615:2;620:23;667:24;
716:17;730:9,9;
737:20;747:4,8;752:8,
25;753:16;768:9
**aside (3)**
683:11,13;754:15
**asserted (1)**
607:1
**assigned (7)**
572:7;574:16;
596:19;717:9,10,13,14
**assist (1)**
571:4
**assistance (2)**
737:20;739:6
**assistant (4)**
738:22;774:23,25;
775:1
**associated (12)**
586:11;646:23;
647:5;650:12;662:2,3;
702:19;708:10,18,23;
712:12,18
**Association (2)**
589:21;614:2
**assume (3)**
682:21;728:3;776:11
**assuming (2)**
622:20;745:17
**assumption (1)**
768:16
**assure (1)**
771:23
**attach (2)**
610:7,10
**attached (4)**
654:22;659:23;
706:9,20
**attaches (1)**
580:1
**attachment (1)**
704:19
**attachments (4)**
702:18;708:9,17,22
**attain (1)**
638:8
**attempted (1)**
665:5
**attempting (3)**
665:9;677:20,20
**attend (9)**
575:2;580:13;594:7,
9,10,13,15,20;777:14
**attendance (3)**
767:21;770:2,5
**attended (4)**
637:25;640:2;643:1;
663:14
**attending (3)**
669:9,23;770:8
**attention (24)**
581:6;586:8;595:5;
612:20;613:15;614:5,
23;615:11,19;617:15;
634:12;644:21;646:11;
648:21;652:25;657:8;
661:18;669:21;671:6;
672:24;701:23;711:22;
723:20;724:7
**attorney (6)**
627:4;631:13,14;
757:8;774:25;775:1
**attorneys (3)**
590:16,17;667:24
**Attorney's (5)**
642:2,4;643:9;
687:13;700:17
**audio (3)**
651:15;717:8,12
**audit (2)**
654:25;777:4
**audits (1)**
655:1
**August (19)**
597:21;623:2;624:2,
21;625:21;626:2;
627:5,7;631:9,16,18,
18,19;634:4;687:18;
704:12,15;707:3;
742:11
**auspices (1)**
593:21
**authored (1)**
744:16
**authorities (3)**
590:8,11,24
**authority (6)**
591:1,1,17,18;594:1;

595:3
**authority's (1)**
633:6
**authorize (1)**
568:20
**authorized (3)**
578:2;594:25;692:11
**automated (2)**
714:3,5
**available (18)**
567:11;570:13,16;577:14;595:14;602:5;604:12;607:17,18;689:1,12,21;692:20;694:24;697:18;702:13;708:2;732:9
**avalanche (1)**
731:19
**avoid (1)**
628:18
**avoidance (2)**
779:22,25
**aware (16)**
577:25;621:16;633:21,24;635:5;637:3,6,7,10;669:8;672:3;681:10;767:18,19,25;770:1

## B

**B1 (7)**
766:4,5,12,18,25;769:4,13
**Bachelor's (1)**
642:15
**back (17)**
574:10;618:13;628:24;637:15;649:9;669:20;673:24;675:4;676:9;679:12;707:6;742:20,21;752:22;758:22;759:13;777:4
**background (1)**
642:13
**backgrounds (1)**
589:25
**bad (2)**
599:9;743:5
**badge (1)**
678:12
**ball (1)**
750:18
**balls (1)**
653:13
**bank (11)**
634:25;689:5,9;690:13,20,21;714:6;762:13;763:6,19;768:16
**Bar (1)**
589:20
**bargaining (1)**
611:23
**Based (18)**
584:22;589:20;593:1;595:4;620:20;630:10;664:20,21;677:7;681:23;705:5;713:24;736:4;737:8;752:7;753:2;768:16;772:5
**basic (1)**
678:1
**basically (6)**
582:10;609:8;618:22;681:21;731:20;754:7
**bcc (2)**
716:20,23
**bearing (1)**
748:11
**bears (2)**
586:16;612:8
**beauty (1)**
769:16
**became (15)**
596:6,14,15,20;600:5;637:19;689:1,12,20;692:20;694:24;697:18;702:13;708:2;756:5
**Becker (2)**
654:19;758:21
**Beckett (9)**
617:24;618:13,20;619:2,17,22,24;620:1;621:12
**Beckett's (1)**
618:2
**become (4)**
570:6;583:15;700:19;710:14
**began (2)**
604:16;621:5
**begin (3)**
594:24;600:12;621:4
**beginning (3)**
583:2;677:24;748:6
**behind (1)**
597:13
**believes (2)**
743:7;757:14
**Belluck (1)**
625:14
**belonged (1)**
645:3
**belonging (1)**
691:22
**below (7)**
610:15,16;615:20;645:10;647:1;697:23;701:8
**benefits (3)**
746:11;757:21,23
**Beryl (1)**
653:12
**best (4)**
650:24;653:15;726:24;756:9
**bet (1)**
743:3
**better (2)**
630:6;728:14
**beyond (4)**
732:19;734:16;735:24;743:12
**big (3)**
610:5;780:5,17
**bigger (3)**
690:12;693:22;707:9
**bill (2)**
694:6,9
**Billable (1)**
653:23
**billing (1)**
692:15
**birdie (1)**
707:4
**birthday (2)**
704:14;707:6
**bit (6)**
651:11;669:18;671:11;690:12;693:22;779:16
**blank (1)**
675:17
**blind (1)**
716:21
**blow (1)**
650:5
**blown-up (3)**
651:16;652:20;659:12
**board (44)**
571:25;572:11;573:6,13;574:23;575:5;580:17;581:19;583:7,12;584:17;587:17,19;613:25;617:13;620:18;621:9;622:24;623:7,9,12;624:1;631:23;634:6;652:3;653:7,12;654:7,19;669:9,24;738:23;747:1;748:6;753:11,14;754:2;756:3;757:22;765:14;767:21;768:12;770:1;777:8
**boards (1)**
572:23
**boat (1)**
653:13
**bodies (1)**
655:6
**body (18)**
567:4;589:12;604:8;650:19,23;653:4;654:12;655:21;660:18;680:1;704:11;706:6,8,17,20,23;715:11,13
**bolded (1)**
610:5
**bolster (1)**
751:18
**Bonsu (15)**
747:1;748:4,9;749:6;751:7,19,25;752:7,15;753:13;754:8;756:12,24;757:2;776:5
**Bonsu's (4)**
751:1;753:17;754:7,9
**Boris (1)**
685:8
**boroughs (2)**
620:10;633:14
**both (15)**
582:9;591:15;599:3;619:25;634:25;659:17;683:9;697:21;724:19;737:18;740:16,17;750:14;758:17;762:10
**bother (1)**
745:16
**bottom (15)**
595:16;610:24;653:19,21;661:10;672:23;680:1;694:8;698:13;705:24;706:17;707:2,4;712:9;769:4
**bottom-left-hand (1)**
694:5
**bought (2)**
763:1,8
**box (7)**
720:17;728:11,15,16;730:18;745:21;763:9
**boxes (4)**
694:10;698:15,18;728:14
**brand (1)**
733:20
**break (8)**
628:23;629:1;631:8;656:17;658:7;660:4;680:16;718:22
**brief (1)**
602:16
**briefly (4)**
566:22;639:22;642:24;725:3
**bring (4)**
566:5;630:25;657:7;746:25
**Britney (1)**
769:21
**broad (1)**
592:6
**broadly (8)**
569:5;571:23;572:2,5;573:4,10;590:22;591:24
**Brooklyn (6)**
596:12,22,23;597:8;621:3;638:5
**brought (3)**
568:25;612:20;732:13
**bubbles (1)**
661:1
**bucket (5)**
750:25;752:13;753:7,8,24
**BUCKLEY (52)**
644:16;647:25;648:8,16;659:16;663:2,7,21;664:11,18;665:1,15;666:6;667:13,21,24;669:2,5,14;670:2,7,11,13,21;671:2,15,18,20;672:22;673:7,19,24;674:3,14,19,24;675:3,12,19,20;676:12,15,20;677:2,10;678:10,16;679:2,18,20;680:11;707:19
**budgeted (1)**
768:16
**build (1)**
618:9
**bullet (3)**
608:25;610:1;613:17
**bunch (1)**
637:11
**burden (6)**
728:19;730:24;732:18;736:5,15;743:10
**business (20)**
676:2,6;689:3,14,22;692:22;695:1;697:11,20;702:15,19;708:4,12,20,25;731:9,14;755:24;769:15,15
**buy (5)**
734:2;773:5,5;774:19;775:10

## C

**cable (2)**
692:15;694:10
**Cablevision (1)**
693:14
**calendar (4)**
608:18,20;609:2;614:20
**call (36)**
568:10;569:8,12;581:12,13,14,18,23;582:14;583:1,2,14,18;584:16,22;588:2;623:5;630:23;631:9;

652:6,10;695:3;699:9;732:20;733:1,1,8,9,10;738:23;761:1,24;765:2;767:11;771:5,7
**called (22)**
566:16;572:7;588:15;589:16;617:12,18;623:8;634:3;641:15;681:5;687:4;688:22;689:4,15;692:9;694:13,17;697:10;702:8;707:21;771:7;773:20
**calling (2)**
572:20;683:4
**calls (21)**
588:13;641:13;687:2;699:15;700:11;701:4,8,13;718:14;720:7;731:16,19,22,23;732:18;733:5,8;736:18,24,25;738:2
**came (4)**
617:15;737:19;762:11;774:23
**can (170)**
568:6,10,11,11,12;569:14,15,17;571:1;575:20;577:3;579:4;584:13;586:8;591:11,13;604:25;605:10,12,16,24;606:1,2,10;608:24;609:5;610:14;613:16;614:11;617:3;625:8;627:19;635:15,20;636:6,10,19;646:13;649:8;651:1,20;652:10;656:15,15;659:19,25;660:3,6,11,16,18,25;661:20;662:5;664:7,16;665:16;667:10;669:4,5,15,17,19,20;670:2,7,20;672:22;673:7,19;674:3,23;675:3,12,18;678:10;679:8,24;683:2;685:20;687:10,19;688:7,11;690:10,13;691:4,7,16,18;692:2,5;693:10,13,15,21,23;694:8;695:21,23;697:1,4;698:24,25;699:19;700:10,25;701:7,10,12,17;703:16,19;704:8,10,16,18,21,23;705:14,22;706:4,6,12,14,16,24;707:1,7,9,10;709:12,15;710:7,20,23;711:16,18;712:2,3,24;713:1,8,14,18,20;714:7;715:4,10,15,17,24;716:4,10;717:4;720:2;721:22;725:24;726:23;730:13;740:3;743:6;745:1;746:16;749:5;756:7;766:14;773:16;777:9,14
**Candidly (1)**
764:1
**capable (1)**
767:2
**capacity (1)**
571:10
**carbon (1)**
716:21
**card (8)**
676:3,6;688:24;689:6;690:15;698:14;731:10,14
**cards (2)**
650:25;651:4
**care (1)**
771:7
**case (32)**
578:12;611:14,16;618:10;633:17,22;643:24;644:13;651:14;678:1;705:3;720:5;722:18;726:19,24;729:8;730:8;738:9;744:17;756:25;765:1;774:8;776:13,25;777:8;778:9,11,14;779:19,21,22,23
**cases (12)**
591:5;618:8,9;620:5,21;622:14;633:13,19;687:19,20;775:5;780:3
**casting (1)**
654:4
**categories (1)**
695:5
**category (1)**
609:16
**cause (1)**
589:13
**caution (1)**
572:22
**cautionary (2)**
579:10;591:14
**caveat (2)**
572:22;622:2
**cc (3)**
625:10,12;716:17
**cc's (1)**
625:11
**celebration (2)**
704:14;707:6
**Celebrity (1)**
707:13
**cell (16)**
642:11;643:10,14,20;644:12;649:18;658:8;662:24;663:25;664:2;668:10;671:22;672:3,7;694:19;697:14
**Cellco (1)**
697:11
**Cellebrite (6)**
643:5,7;644:11;645:25;646:3;661:24
**censure (2)**
591:15,15
**CEO (2)**
656:1;766:16
**certain (11)**
587:1;647:17,18;649:18,18;658:8;667:10;672:18;673:11;691:1;746:1
**certainly (8)**
620:22;669:5;732:22,23;739:18;755:17;774:20;775:8
**certificate (1)**
688:10
**certification (1)**
713:24
**certifications (2)**
643:2;663:16
**CH4 (1)**
656:6
**chain (6)**
579:21;653:20;729:23,24;730:2;731:6
**chair (9)**
569:22;573:6,12;574:23;583:15;587:17;625:15;634:6;715:14
**chairwoman (3)**
617:14,20;623:7
**challenged (1)**
774:22
**chambers (1)**
621:3
**chance (2)**
696:4;710:23
**chances (1)**
674:8
**change (5)**
570:10;654:13;655:22,22;744:15
**changed (1)**
570:11
**changes (2)**
637:13;664:3
**Channel (1)**
660:16
**channels (1)**
694:10
**characterization (1)**
737:12
**Charalambous (48)**
567:14;568:6;573:16;575:9,20;578:14;579:4,18;583:22;595:10;598:6;604:22;605:10,24;608:10;609:19,24;610:14;614:16;615:24;617:3;624:14;627:19;644:4,22;645:19;646:10;647:8;648:23;650:4;651:6,20;652:12,24;653:17;654:8;655:2,18;658:14;659:5,19,25;660:3,6,24;661:20;662:5;679:9
**charge (6)**
677:25;776:12;779:16;780:5,10,12
**charged (13)**
599:8;612:10;656:2;677:11;734:11;746:9;747:5,5;749:17,18,19;755:25;769:19
**charges (2)**
612:12;728:22
**charitable (1)**
614:3
**chart (12)**
700:10,11,25;701:12,13,15,19,24;712:3;713:2;718:16;736:19
**charts (2)**
688:16;719:10
**Chase (6)**
689:5;690:15,21;691:22;714:23;715:3
**chat (1)**
672:20
**cheaper (1)**
746:23
**check (2)**
718:8;725:24
**checked (1)**
618:13
**checking (3)**
576:22;577:24;725:24
**Chicago (1)**
706:21
**chief (18)**
566:24;569:10,20;571:11;574:14;586:13;589:17;590:4;596:9;611:17;625:12,13;638:20,23;639:3,7;661:4;766:17
**chooses (2)**
743:2;776:21
**chose (2)**
761:22;772:14
**Christmas (1)**
650:24
**chronological (1)**
706:18
**chronology (1)**
618:10
**circulated (1)**
569:21
**circumstances (4)**
569:16;747:14;751:1;752:3
**cite (4)**
576:22;577:24;739:7,12
**Citibank (4)**
689:16,18,21,22
**city (6)**
604:11;609:7;619:21;620:6,9,10
**civil (5)**
594:13,19;596:14;637:20;688:5
**claim (2)**
767:17;774:19
**clarify (2)**
723:16;765:5
**clarifying (2)**
594:18;650:3
**clarity (1)**
753:18
**classroom (2)**
643:1;663:13
**clean (1)**
742:21
**clear (11)**
594:6;648:25;666:4;685:24;725:15,18;746:1;748:12,17;754:9;764:3
**clearinghouse (1)**
714:3
**clearly (3)**
621:17;743:9,20
**CLERK (1)**
675:17
**client (5)**
776:19;777:6,12;778:25;779:2
**climate (1)**
744:14
**close (3)**
712:24;717:4;731:20
**closely (1)**
576:14
**closes (1)**
779:19
**closing (4)**
630:10;743:1,1;776:14
**clothes (1)**
769:17
**co-chairs (2)**
569:9,21
**coconspirator (7)**
729:9,10;730:8,8;731:15;735:2,2
**co-conspirator (2)**
752:1;756:25
**coconspirators (6)**
729:3,6,13,18,19;

730:25
**co-conspirators (4)**
677:8,10,12,14
**cocounsel (2)**
726:1;739:7
**code (11)**
589:21;591:3;
597:24;598:3,5,12;
602:3,9;645:14;
646:20;662:4
**COHEN (186)**
566:7;592:1,5,10,17,
22;596:1;598:16;
599:5;600:23;601:9;
606:8,13,15,22;608:6;
610:17;611:4;612:21;
615:7;616:9,13,14,21;
624:25;625:24;626:6,
11,17;627:8,24;628:11,
20;630:9;631:24;
632:4,5,6,8;633:7;
635:4,15,18,22;636:6,
10,23;637:2;639:15,17,
19,25;640:9,17,22;
641:2,6;657:5;678:8;
680:15;681:2,7,21;
682:4,7,18,22,25;
683:3,14,20,25;684:3,
6,9,12,18,23;685:5,10,
21;686:7;725:18;
726:20;728:4,7,10,13,
15,17;730:13,16,21,23;
731:4,8,12,21,25;
732:5,12,25;733:7,16,
22;734:4,8,21;735:7;
736:3,11;742:19,25;
743:6;744:1,3,5;745:7,
9;756:21;757:12,20;
758:16;759:21,22;
760:4,7,20,22;761:3,8,
11,13,18,22;762:8,25;
763:13;764:11,23;
765:3,7,10,16,19,22;
766:6,8,13,15;767:5,
11,16,24;768:8,18,22;
769:1,25;770:12,17;
771:5,9,20;772:1,4,7,
10,19,23;773:3;
774:21;776:5,18;
777:23,24;778:12,18,
20,24;779:6,9,14;
780:9,15,19
**Cohen's (2)**
603:5;737:12
**collar (2)**
597:15;687:20
**colleague (1)**
633:13
**colleagues (1)**
566:2
**collecting (1)**
604:9
**collective (1)**
611:23
**collects (1)**
601:24
**College (1)**
642:15
**column (7)**
693:13;695:7;712:5;
713:4,5,8;716:18
**columns (3)**
695:6;697:22,22
**comfort (1)**
779:3
**coming (5)**
655:12;733:25;
750:2;762:5;766:3
**commence (1)**
623:25
**commenced (1)**
748:25
**comment (1)**
685:4
**commercial (8)**
578:12;596:21,23,
24,25;597:1,8;638:6
**commission (85)**
568:25;588:22,24;
589:3,6,8,11,22,23,24;
590:2,8,12,19;591:7,
11,17,25;592:7,12;
594:23,24,25;595:3,7;
596:7,8,20;597:20,22,
24;598:4,12,13;599:7;
600:5,7,12,13,14,18,22,
25;601:3,4,19,21,22;
602:5;604:5,7,15,18;
607:19,23;611:7,13,15;
612:16,17;617:11,12,
16;619:20;623:25;
624:4,8,9,10;625:15,
22;626:2,23;632:10,17,
23,23,24;633:2,3;
638:18,25;639:11;
640:7,13
**commissioner (1)**
599:6
**commissioners (1)**
633:3
**commission's (3)**
591:4;619:6,9
**committee (54)**
566:23,24;567:2,4;
568:7,9,13,19;569:10,
10,24;570:1,4,8,8,18;
571:1,13,18;572:3,6;
573:7,8,22;574:15,24,
24;575:16;576:8,11,17,
24;577:1,6,8,18;578:8;
580:8;581:2,10;
583:16;586:12,14;
587:1;613:25;614:1;
631:22;716:2;748:7;
751:11;753:11,21;
754:18;768:17
**committee's (8)**
575:4,18;577:19;
580:15;581:15;587:6,
7;753:14
**communicate (2)**
581:15;733:19
**communicated (2)**
587:23,24
**communicating (1)**
736:21
**communication (1)**
683:7
**communications (5)**
684:12;742:5,5,6,7
**companies (1)**
597:2
**compare (3)**
674:8,10;714:23
**compared (3)**
677:13;694:3;722:21
**comparison (2)**
723:22;725:8
**compensation (1)**
609:4
**complacent (1)**
653:13
**complaint (9)**
595:1,4,6;618:11;
625:22;628:4,6,12,13
**complaints (5)**
589:12,12;594:25;
600:16,21
**completed (1)**
643:15
**completely (4)**
604:25;677:18;
752:2;760:17
**completeness (1)**
671:16
**completing (1)**
607:15
**completion (1)**
773:11
**complex (1)**
597:1
**compliance (1)**
611:8
**complied (1)**
773:14
**comply (1)**
570:22
**components (1)**
593:4
**computer (2)**
642:11;660:10
**computers (1)**
660:9
**concealing (1)**
743:14
**concealment (1)**
741:1
**concern (3)**
573:4;621:7;623:8
**concerned (3)**
630:8;653:15;769:12
**concerns (1)**
632:13
**concerts (1)**
769:21
**concise (1)**
744:21
**conclude (1)**
769:8
**concludes (1)**
726:17
**conclusion (2)**
770:24;774:14
**conclusions (1)**
769:24
**conduct (35)**
567:9,24;568:8,23,
25;588:23,25;589:7,17,
21;590:19;592:4,9;
593:24;597:19;598:13;
599:7,9;600:6;611:15;
612:17;620:17;624:10;
625:15;639:12;640:16;
749:1,4,8,11,13,18;
752:23,24;759:3
**conducted (9)**
619:7;689:3,13,22;
692:22;694:25;697:19;
702:15;708:4
**confer (4)**
639:15;676:13;
717:23;776:18
**conference (4)**
707:13;768:11;
769:19;776:12
**conferences (8)**
643:2;707:12;
767:22;768:10,13;
770:2,5,9
**confirm (3)**
622:19;623:11;
753:20
**conflict (1)**
599:3
**conformed (1)**
775:5
**confuse (2)**
750:2,23
**confused (2)**
640:16;764:1
**confusing (5)**
677:18;750:6,9,12;
769:8
**confusion (2)**
750:17;752:6
**Congratulations (1)**
715:14
**connected (1)**
720:7
**connection (2)**
601:25;617:5
**conscious (2)**
779:22,25
**consequences (1)**
603:9
**consider (5)**
569:24;574:25;
576:25;580:8;744:14
**consideration (2)**
575:19;576:11
**considerations (1)**
762:20
**considered (3)**
568:18;591:20;612:7
**Considering (1)**
750:3
**consist (2)**
694:18;697:13
**consistent (6)**
577:19;746:12;
754:10,12,17;755:8
**conspiracy (24)**
677:11,15,23;678:3;
728:23,24;730:10,11,
25;732:19;738:3;
740:23;747:9;749:3,8,
12,18;750:20;751:15;
752:21,21;779:22,24;
780:1
**Constitution (2)**
590:25;613:10
**Constitutional (2)**
591:1;776:21
**consult (1)**
724:22
**consultation (1)**
719:12
**contact (15)**
650:22;651:19;
652:8,19;654:14;
658:24;660:13;680:4;
698:14,25;699:3;
731:2,5;735:19;737:20
**contacted (1)**
736:20
**contacts (3)**
646:1,2;650:17
**contain (9)**
607:7;689:8;694:22;
697:21;699:3;701:4;
708:21;709:25;714:12
**contained (9)**
572:8,13;610:8;
644:24;702:11,17;
707:25;709:24;710:3
**containing (3)**
645:25;697:16;
713:21
**contains (9)**
644:25;651:14;
692:14;695:5;702:10;
707:23;708:8,16;
715:25
**contemplation (2)**
737:4;738:9

**contemporaneous (2)**
733:25;734:23
**contemporaneously (1)**
774:1
**content (11)**
651:24;674:17;677:17,19;680:1;720:7;722:21;723:23;731:17;732:17;733:18
**contents (4)**
680:5;690:17;699:7;715:23
**Contested (1)**
582:10
**continue (8)**
610:22,23;625:16;656:7;658:4;660:16,24,25
**Continued (18)**
566:18;598:18;599:13;602:19;603:14;624:1;629:4;656:21;657:11;676:25;678:17;680:18;686:10;696:9;718:23;727:8;741:9;775:17
**continues (2)**
574:18;660:20
**continuing (2)**
653:20;742:10
**contract (1)**
661:11
**contrary (1)**
770:5
**controlled (2)**
762:13;764:15
**controversy (1)**
745:6
**conversation (12)**
581:7,9;583:3;587:13;624:2;628:17;729:5;733:16;739:1;747:7,11;756:13
**conversations (1)**
736:23
**conveyed (1)**
575:7
**conviction (1)**
775:11
**cooperating (2)**
761:15,19
**cooperative (1)**
633:25
**coordinating (1)**
601:2
**copies (13)**
569:14;647:19;689:8,18;692:14;694:19;697:13;702:18;708:8,16,22;714:12,15
**copy (22)**
577:20,25;578:3,9,10,23;581:22;646:2;658:25;681:9,24;683:21;684:6;688:24;689:6;706:9;716:21;731:14;745:9,9,11;779:15
**corner (4)**
694:2,5;705:19,25
**corporation (1)**
614:1
**corrected (1)**
742:11
**correcting (1)**
632:15
**correctly (2)**
587:20;666:8
**correspondence (2)**
680:7;682:15
**corresponds (1)**
768:18
**corruption (1)**
687:21
**cost (1)**
770:8
**counsel (21)**
566:24;568:5;569:10,11,20;571:11;574:14;586:5,13;589:3;590:12;648:15;669:1;716:6;727:2,7;728:2;758:21,22;761:6;762:5
**counselor (2)**
594:17;627:11
**Count (20)**
728:21,21,22;734:4,12;735:23;736:7,7,15,15,15,15,16;740:22,23,23,24;743:16;747:5,6
**counties (2)**
620:7,10
**counts (4)**
728:18,20;736:1,3
**County (3)**
574:22;620:11;775:1
**couple (7)**
631:6;644:2;663:23,23;757:12;776:1;778:17
**course (23)**
588:1;618:6;619:6;648:4;666:22;678:6;702:19;708:12,20,25;728:7,13;739:14;742:15;743:4,6;748:25;749:11;752:23;755:24;756:2;759:1;776:20
**COURT (464)**
566:2,5,9;568:5;571:6;572:16;574:2,5,8,22;576:1,3,13,16;577:9,13,17;579:2,12,14;580:2,6;581:5;582:1,5,18;584:8,13;585:1,9;587:10,12;588:5,7,9,12;589:10,19,19;591:22,23;592:2,6,11,18,23,25;593:10,14,16;594:5,13,13,14,15,15,17,19,20;596:2,12,14,15,16,21;597:7,18;598:17;599:11;600:1,3,16,24;601:10,21;602:10,12,15,18;603:13;604:1,6,8,10,11,20;606:19,24;607:4,20;608:7;609:3,8,9,11,12,17;610:18;611:5,25;612:22;613:8,9,10,11,13;615:8;616:12,15,20,23;617:24;618:10;619:14;622:3;625:1,4,8;626:1,7,18,21,24;627:9,11,14,16,25;628:2,8,21,23,25;629:1;630:1,2,5,12,17,20,23,25;631:2,25;632:2,5;635:3,8,13;636:22;637:1,14,17,20,22;638:4,6,20,20;639:14,16,20;640:10,18,21,23;641:8,12,19;644:17;646:8;648:1,3,6,11,14,17,25;649:22;650:2;656:11,14,18;657:4,9;658:2;659:17;663:3,8,22;664:12,19;665:2,17;666:7,13,16,20;667:2,4,6,14,17,19;669:1,3,11;670:1,10,12,14,22;671:6,10,13,17,19;673:5,18;674:2,12,15,22;675:2;676:14,18,23;677:9,21;678:9,12;679:1,3,11,13,19,21;680:10,12,14,17;681:20;682:3,5,6,16,21,23;683:2,10,12;684:5,8,16,21,25;685:9,18,23;686:5,8;687:1;690:7;691:14;692:13;693:6,8;694:13;695:16,18;698:8;700:4;703:8,12;705:7,10;709:9;711:3,5,8,12,14;714:19;716:6;717:24;718:1,7,21;719:1;721:6,11,25;722:2,5,14,17;723:6,8;724:9;725:1,17,23;726:2,6,13,16,21;727:4,7;728:2,6,9,11,14,16;730:12,15,20,22;731:2,5,11,16,24;732:3,11,22;733:5,14,21;734:2,7,19;735:5;736:1,10,12;738:10,17,25;739:4,9,13,16,22;740:1,4,7,11,14;742:1,9,15,18;743:3,5;744:1,4,7,11,14,22;745:5,8,12,16,22;747:20,23;748:13;749:14;750:14;751:4,8,12,22;752:11,17;753:6,9,22;754:6,19,22,25;755:3,5,10,13,16,19;756:6,15,18;757:4,9,11,18;758:14;759:6,13,16,21;760:9,14,20;761:1,5,10,12,17,21,24;762:3,17;763:9,25;764:9,21,25;765:4,9,21;766:4,12,14,25;767:10,18,23;768:3,15,25;769:7;770:10,15,23;771:7,19;772:1,6,17,22;773:1,5;775:3,5,12;776:16,23;777:16,22;778:5,16,19,21;779:4,7,11,17;780:13,16,20,23
**courtroom (1)**
597:12
**courts (13)**
582:12,13;589:18;596:25;604:6;609:7;611:17;618:1;619:3;620:5,20;633:14;637:13
**Court's (3)**
657:8;746:12;753:10
**cover (3)**
660:15;752:24;754:4
**covered (6)**
612:24,25;630:6;694:9;753:9,10
**covers (1)**
620:9
**COVID (2)**
594:4;778:17
**cracks (1)**
586:23
**craft (1)**
747:11
**create (2)**
569:4;618:21
**created (19)**
644:2,12;668:18;688:25;689:2,11,12,20,21;692:20,21;694:23,24;697:17,18;702:12,14;708:1,3
**Credit (32)**
571:15;572:1,11;573:6;575:6;578:11;580:17;581:20;582:6;583:13,15;616:7;617:5,14,19,25;618:22;620:4,15,22;621:6;635:11;656:2;688:24;689:19;691:6,22;705:17;767:21;768:10,13;770:2
**crime (1)**
612:2
**crimes (1)**
612:5
**criminal (7)**
594:12;642:14,15;688:5;731:1;749:3;775:4
**cross (6)**
684:18;685:8;725:7;773:2;779:10;780:5
**Cross-examination (8)**
585:9,10;632:3,7;667:19,20;679:6;719:5
**cross-examine (3)**
771:21,24;772:11
**cruise (3)**
707:5,12;768:9
**Cruises (1)**
707:13
**CSC (1)**
692:11
**CU (1)**
707:12
**Cuba (1)**
654:25
**culpable (1)**
750:21
**cumulative (2)**
753:2;764:5
**cure (4)**
611:11,12;636:17;637:8
**current (1)**
591:7
**currently (5)**
569:21;588:21;590:15;642:25;687:10
**curriculum (1)**
593:19
**customary (1)**
633:2
**customer (1)**
692:13
**cut (1)**
774:11
**Cyclones (1)**
763:10

## D

**da-da-da (1)**
767:13
**Daily (1)**
661:3
**damn (3)**
660:22,22,22
**dancing (1)**
628:7

**dark (1)**
597:15
**DA's (1)**
683:23
**data (10)**
662:25;663:5,9,19;
664:1,5,6,10,16;695:3
**database (5)**
617:24;618:3,7,14;
619:3
**date (52)**
576:8;586:16;
595:16;601:3;622:21;
623:10;651:3,15,24;
652:16;653:4;654:3;
655:6,22;660:17;
661:5;662:13;665:10,
13;691:20,24;692:3;
695:4;701:3,23;
704:10,12,18,20;706:6,
8,16,19;707:1,10,16;
715:10,18,21;721:3,10,
20;723:7;730:12;
731:2,7;735:22;
737:16;739:23;742:9,
9,10
**dated (4)**
584:10;675:14,22;
744:22
**dates (6)**
632:15;650:19;
654:13;655:22;672:10;
716:11
**day (16)**
619:5,5;624:21;
625:20;657:6,10;
684:19;694:15;701:3;
702:4;707:16;723:17;
732:10;734:1;739:9;
756:7
**days (3)**
733:12;777:6;778:17
**deal (4)**
599:3;634:9;642:18;
685:16
**dealing (1)**
602:9
**deals (3)**
625:16;743:16,17
**dealt (1)**
764:2
**deceased (1)**
669:24
**deceive (2)**
611:20;747:9
**December (7)**
672:8;777:5,10,11,
14;778:3;780:25
**decide (1)**
568:19
**decided (1)**
570:13
**decides (1)**
776:6
**decision (13)**
570:1,4,5,5,6;575:4;
578:4,10;580:15;
581:15;778:7,8;779:13
**decisions (2)**
591:4,21
**defendant (31)**
566:11;597:17;
607:2,6;616:1;631:2,9;
658:2;677:23;719:1;
728:22;737:4,6,9;
738:3,4;740:18,19;
742:12;743:10,13;
745:13;749:18;750:4,
10,19;753:25;759:25;
764:7;776:6,21
**Defendant's (12)**
674:15,16;740:25;
743:18;747:25;751:5;
752:1;767:23;769:7,
11,12,22
**defending (1)**
765:1
**defense (38)**
606:8,15,23;670:8;
671:2;672:14,15;
673:8;674:4,7,19,23,
24;683:9;726:19;
728:8,17;744:17;
745:18;749:7;753:19;
757:14,15;758:11,12,
17;760:3;770:21;
771:18,23;772:4,7,10,
16;775:9;776:13,25;
778:9
**defense's (2)**
776:16;780:4
**deficiency (8)**
611:12,12;636:15,
17,19,24;637:4,8
**deficient (2)**
611:9,10
**definition (2)**
774:7,14
**degree (3)**
642:14,15;688:9
**delay (2)**
572:8;574:6
**delete (1)**
667:10
**deleted (16)**
662:25;663:24;
664:1,5,10,13,16;
680:7;723:4,7,9,13,17,
17;725:13;736:5
**deleting (1)**
743:13
**deliberations (2)**
575:19;778:3
**delinquency (1)**
611:14
**demand (1)**
742:16
**demonstrate (6)**
729:13;730:24;
738:3,4;740:18;766:25
**demonstrated (3)**
736:17;743:21;750:7
**demonstrates (3)**
734:16;743:9;761:13
**denied (5)**
578:13;738:14;
744:7;772:6,9
**denying (1)**
743:19
**Department (4)**
652:4;656:1;688:2;
717:3
**depending (3)**
591:13;594:11;778:8
**depends (4)**
633:5;663:25;664:2;
779:18
**depicted (3)**
644:8;651:10;661:23
**deposit (5)**
691:20,21,24;714:5,
11
**deposited (1)**
715:3
**deposits (1)**
691:5
**deprive (1)**
775:8
**deputies (1)**
601:5
**deputy (2)**
619:20;675:17
**describe (2)**
642:24;713:1
**described (2)**
702:24;774:6
**description (2)**
693:13;707:10
**deserve (1)**
678:12
**designate (1)**
569:22
**designated (1)**
692:12
**designed (2)**
590:9;741:8
**detail (3)**
573:10;601:7;682:1
**detailed (2)**
605:7;695:3
**details (2)**
570:23;758:7
**determine (3)**
591:19;617:25;618:7
**detour (1)**
678:14
**Devicable (1)**
646:21
**device (7)**
645:9,13;646:3,23;
650:12;662:2,3
**devices (8)**
642:11,12,19,22;
644:2;663:10;758:10,
22
**DFS (1)**
717:2
**DFSNYgov (1)**
716:25
**died (1)**
669:9
**difference (5)**
568:14,16;763:20,
21;777:25
**different (24)**
569:22;596:17;
614:23;644:2,12;
651:11;661:19;663:23,
23;664:3,5;678:5;
683:17;686:6;741:2;
744:19;750:22;752:3,
3,8;758:2;763:15;
768:10;773:4
**difficult (1)**
583:3
**difficulties (2)**
656:12;660:9
**DiFiore (1)**
625:11
**dig (1)**
654:5
**digging (1)**
653:23
**digits (3)**
662:22;665:7;666:11
**DIRECT (38)**
566:18;586:8,25;
587:13;588:17;614:4,
23;615:5;628:21;
632:9;634:13;635:10;
636:13,15;637:11,19;
638:18;641:21;646:10;
652:24;661:18;668:2,
23;669:21;672:24;
685:7;687:6;691:5,21;
714:5;719:9;720:13;
723:20;724:7;732:13;
733:24;773:11,11
**directed (2)**
668:19;691:1
**directing (7)**
613:15;615:11,19;
644:21;648:21;701:23;
711:22
**direction (2)**
618:21;668:14
**directions (1)**
613:3
**directly (2)**
591:21;683:24
**director (5)**
604:19;607:20;
613:24;622:19;769:9
**directors (2)**
574:23;738:23
**directorships (2)**
615:6;616:17
**directory (1)**
645:12
**dirt (1)**
654:5
**disability (3)**
591:18;746:22;748:8
**disagreement (1)**
582:11
**disciplinary (2)**
568:24;611:22
**discipline (3)**
589:13;591:5,11
**disclose (2)**
657:7;770:20
**disclosure (38)**
601:20,24;602:4;
603:4;604:9,12,17;
605:6,17;606:4;
607:14,19,25;608:18,
19,22;609:1;610:8;
611:8,10,19,22;612:4,
11,19;613:3;614:19;
616:3,25;632:20,22;
634:14,18;635:10;
637:4,8;641:3;766:9
**disclosures (3)**
599:4;601:15;616:4
**discuss (4)**
620:14;621:5;
632:21;633:12
**discussed (6)**
622:17;641:3;
672:19;673:12;746:20,
20
**discussing (1)**
732:20
**discussion (3)**
569:25;581:21;
632:19
**discussions (2)**
758:23;760:16
**dismiss (1)**
728:17
**dismissal (2)**
772:7;774:20
**dismissed (1)**
735:25
**display (7)**
640:15;646:13;
652:25;660:6;691:16;
711:16;718:5
**displayed (1)**
662:1
**dispute (3)**
603:4;735:18;757:16
**disputes (1)**
775:7
**disqualified (1)**

622:15
**disseminates (1)**
601:23
**disseminating (1)**
604:9
**distributed (3)**
576:11;602:1;763:20
**District (5)**
642:2;683:19;
687:14;773:9;775:1
**divided (2)**
596:16;695:5
**division (8)**
578:12;596:21,23,
24,25;597:7,8;638:6
**divisions (1)**
596:16
**Dobiel (5)**
574:12,14;578:20;
579:25;586:13
**document (53)**
568:2;573:19;
575:13,16;576:17;
577:4,7,11,20;578:1,
17;579:5;586:10,16;
595:13;598:9;603:11;
608:12;614:18;615:25;
616:1,2;618:18;
624:17;627:21;628:19;
645:22;652:18;654:22;
658:17;659:8;669:17;
672:17;673:5,10,25;
681:9;682:18,19;
705:19;738:5,11;
740:19;750:1;754:3,
17,25;755:6,20;
766:10;767:2;769:6;
771:6
**documents (33)**
580:9;597:2;601:25;
605:2,14;606:3;610:9;
644:8;672:13;683:17;
722:24;723:3,9,13;
741:3,5;742:1;743:19;
744:20;748:8,10,15;
749:21;750:1,3,4,5,8,
13;754:3;761:20;
766:9,23
**DOJ (1)**
655:17
**dollar (3)**
655:1;692:5;770:6
**dollars (1)**
654:20
**Donaldson (1)**
643:23
**done (3)**
626:19;686:3;716:8
**door (2)**
753:4;760:3
**doubt (4)**
732:19;734:16;
735:24;743:12
**dovetail (1)**
768:25
**down (18)**
568:6;579:18;
595:16;608:24;615:24;
617:3;628:16;636:6;
651:20;660:3;669:17;
670:2;671:10;672:23;
673:19;682:3;694:8;
745:23
**Dozens (1)**
710:13
**draft (2)**
575:17;576:6
**drafted (1)**
758:20
**Draw (8)**
671:6;677:20;
736:23;737:14,15;
752:6;769:23;770:24
**drawn (2)**
749:5;751:21
**draws (1)**
772:1
**drops (1)**
656:5
**dubious (1)**
756:9
**due (5)**
582:21;608:21,23;
694:6;718:4
**duly (3)**
588:16;641:16;687:5
**duped (5)**
747:10;751:18,20;
752:9,10
**duration (1)**
733:1
**During (17)**
583:1,14,18;584:16;
588:1;622:17;632:19;
643:9;677:10;685:12;
695:4;700:19;702:3,5;
732:12;733:22;737:18
**duties (1)**
687:22
**duty (1)**
777:12

## E

**earlier (6)**
570:25;722:25;
726:6;730:15;773:10;
777:13
**early (3)**
702:5;726:25;761:20
**easier (1)**
608:15
**easily (1)**
777:3
**easy (1)**
778:22
**editing (2)**
576:21;577:23
**education (1)**
688:8
**educational (1)**
642:13
**effect (9)**
585:3;595:19,21,22;
607:23;676:19;732:6,
14;765:11
**effectively (6)**
751:6;753:15;
755:20;771:18;772:13,
18
**efficient (2)**
659:4;744:21
**effort (2)**
570:22;736:6
**egregious (1)**
591:20
**eight (1)**
688:2
**either (13)**
666:21;673:6;
674:17;684:7;728:25;
729:3,5,14;730:25;
733:25;758:6;760:9;
778:3
**elected (8)**
593:3,9;594:7,9,14,
15;637:14,16
**electrical (1)**
773:23
**electronic (5)**
617:24;618:3,7,14;
619:2
**elevated (1)**
637:22
**elevation (1)**
638:10
**Eleven (2)**
639:1,2
**elicit (10)**
746:6,10;757:14,15,
21,25;758:3,7;769:25;
770:12
**else (17)**
588:7;626:19;
639:21;684:17;722:6;
725:2;731:6;734:14;
744:1,8;756:20;762:5;
765:4;770:16;774:21;
775:15;780:18
**elsewhere (1)**
597:9
**email (37)**
702:11;703:20,22;
704:5,10,19,24;706:7,
17,22;707:3,24;709:16,
17,19;710:11,16,17,17;
711:19,21;715:7,8,11,
12,19,21,24,24;716:2,
10,12,15,17,24,25;
724:19
**e-mail (14)**
583:21;584:3;588:1;
620:13;625:6,18,18;
680:6;682:11,14;
683:8;684:6;686:1;
763:10
**emailed (2)**
716:2;731:14
**e-mailed (2)**
682:9;745:7
**emails (41)**
702:18;708:8,16,22;
709:25;710:3,9,18;
711:23,25;712:6,7,12,
18,22;713:5,10,13,21,
23;714:12,15,22;
715:2;720:24;721:7,
15;722:12;724:1,4;
725:9,13;729:7,16;
732:6,14;733:25;
734:24;736:6;738:2;
740:16
**e-mails (11)**
579:21;624:20;
682:2;684:8;685:12;
687:24;742:3;762:10,
25;763:3,16
**embarrassing (1)**
582:24
**embezzled (1)**
661:4
**Embezzlement (1)**
656:2
**emojis (1)**
680:8
**employed (2)**
609:2;687:10
**employee (1)**
611:16
**employees (1)**
757:22
**employment (2)**
596:11;635:25
**employs (1)**
609:14
**encountered (2)**
662:25;664:13
**end (10)**
615:25;628:21;
631:18,19;657:6;
677:25;748:6;756:8;
775:14;778:3
**ended (1)**
721:10
**ending (9)**
650:13;651:2;
658:24;659:1;662:10;
664:23;666:10;777:25,
25
**ends (1)**
716:25
**enforce (1)**
600:15
**enforcement (4)**
683:23;731:3,6;
774:10
**enforcing (1)**
589:9
**engaged (11)**
572:15;618:1;
620:19,23;621:8,16;
622:3,14;633:20;
749:9,13
**English (2)**
767:14;769:11
**enlarge (2)**
698:13,16
**enough (2)**
774:15;778:15
**Enrique (3)**
641:13,14,17
**E-n-r-i-q-u-e (1)**
641:17
**ensure (1)**
590:9
**enter (1)**
758:9
**entered (4)**
615:3;729:1;730:24;
732:19
**entertainment (1)**
769:18
**entire (4)**
646:1;668:20;
700:17;769:18
**entirely (2)**
678:5;742:24
**entities (3)**
572:24;600:15;
623:10
**entitled (4)**
761:23;766:23;
768:11;775:9
**entity (1)**
601:23
**entry (4)**
698:25;699:3;
700:22,25
**Epstein (2)**
654:19;758:21
**Equipment (2)**
645:7;769:17
**error (1)**
636:19
**especially (2)**
591:20;670:22
**essential (1)**
774:14
**essentially (7)**
597:6;645:12;
681:18,22;746:16;
751:3;753:13
**establish (2)**
752:23;767:12
**etc (1)**

685:11
**Ethan (2)**
617:24;619:17
**ethical (5)**
580:24;589:13,15;
593:22;639:11
**ethically (1)**
571:24
**ethics (37)**
566:23;567:3,4,6;
568:21;569:3;570:18;
571:13;574:15;582:21;
589:9;591:3;593:4,5;
597:24;598:3,5,12;
601:3,5,21,22,24;
602:3,5,6,9;604:4,7,15,
18;607:19,23;612:3;
617:10;621:9;631:22
**even (8)**
599:9;630:3;654:16;
686:1;754:2;755:24;
767:8;773:12
**evening (4)**
702:5;775:15;
776:19;780:20
**event (3)**
619:1;679:15;704:13
**events (5)**
752:3,7,25;763:7,14
**everybody (1)**
566:6
**everybody's (1)**
780:8
**everyone (1)**
767:19
**evidence (157)**
567:15;573:25;
574:3;575:11,23,24;
578:25;579:3;580:4,7;
584:6,9;586:9;595:25;
598:15;599:9;603:5,
11;607:12;608:9;
612:6;619:13,15;
624:24;625:2;635:21;
642:12;644:15,19;
646:7,9,13;648:19;
651:7;655:19;659:15,
18;660:7;661:21;
666:1;669:12;671:2,4;
673:6;674:1,15,16,18,
20,25;675:5;679:10;
685:13;689:25;690:3,
9,11;691:15;692:24;
693:2,11,12;695:10,20,
22;696:3;698:3,10,12;
699:24;700:6,8;
702:25;703:2,4,15,17;
704:9,17;705:23;
706:5,15,25;709:2,5,
11,13;711:10;714:20;
715:5;717:18,22;
718:3,9;719:25;
720:22,22,23;721:23;
723:21;725:16;726:7,
12,18;729:1,4,17,22;
732:18;733:12;734:9,
19;735:10,20;736:4,4,
17;737:5;738:10,18;
740:16,25;741:4,5;
742:14;743:2,8,11,14,
20;747:19;748:2,22;
749:2,6;750:1,16;
751:2,5;753:2;758:13,
18;759:8,9,24,25;
760:4,6,7;761:16,19,
23;763:16;765:12;
766:21;770:7;779:19
**evidenced (1)**
775:2
**evidentiary (1)**
744:19
**exact (4)**
672:10;685:6;723:7;
769:1
**Exactly (1)**
760:15
**EXAMINATION (10)**
566:18;588:17;
639:23;641:1,21;
661:25;679:4;687:6;
719:9;725:5
**examinations (1)**
642:10
**examine (1)**
693:24
**examined (3)**
644:13;645:1;704:1
**Examiners (1)**
654:23
**example (4)**
618:11;645:2;
714:10;779:20
**exceed (1)**
768:17
**Excel (1)**
672:20
**except (1)**
775:7
**exception (1)**
653:12
**excerpt (5)**
658:25;668:13;
670:23;674:6;765:24
**excerpts (3)**
645:25;765:18;
766:18
**excess (3)**
614:14;615:20;
635:24
**exchange (1)**
658:20
**exchanged (5)**
624:21;660:12;
670:4;672:7,11
**excuse (19)**
587:6;648:25;
655:25;666:3;720:22,
23;724:17,17;747:5,
25;751:20;752:20,21;
753:11,15;754:23;
761:11;778:14,22
**excused (8)**
588:9,11;641:9,11;
680:12,13;727:2,3
**excusing (1)**
778:23
**exec (1)**
653:8
**executive (4)**
604:19;607:20;
613:25;622:19
**executives (1)**
757:22
**Exhibit (180)**
567:16;573:18,24;
574:3;575:11;578:16,
24;579:3,20;580:3,7;
583:24;584:5,9;586:9;
595:11,24;598:8,14;
602:9,14;603:3;605:3,
12,25;606:2,9,18;
607:11;608:8,11;
614:17;618:17;619:12,
15;624:23;625:2;
627:20;631:3;634:17;
635:16;636:9,14;
644:21;645:20;646:7,
9,11;648:22;649:2,6,
10,24;651:22;653:18;
654:10;658:16;659:6,
18;660:5;661:22;
664:25;666:9;668:24;
669:16;670:9,25;
671:2,16;672:15;
673:8,9;674:4,7,15,16,
20,23,24;675:7,8,9,18;
676:5;679:8,15;
681:12;688:23,25;
689:6,7;690:3,8,11,17;
691:1,15,16,18;692:14,
19,25;693:2;695:19;
699:17;700:22;701:18;
702:10,12,23,24;703:3,
17,20;704:9;705:14,
23;706:13,15,25;707:8,
11,17,23;708:1,8,16;
709:3,13;711:16;
712:25;713:19;714:8,
9,12,16,20,24;715:5,6,
16;716:5;717:7,12,21;
718:5,13;719:25;
721:15,23;729:22;
730:5,17;731:18,22;
735:1;745:13;747:25;
748:2,2;749:7;751:2,3,
4,5;753:19;758:13,17,
18;759:7,13,17;760:9;
766:1,4;767:23;
769:12,12,22;777:16
**Exhibits (64)**
604:23;606:6,15;
644:5,15,18;647:10,13,
23;648:18;649:22;
651:8;659:14;672:15;
675:5;689:10,16,19;
690:1;691:10;694:18,
22;695:2,11,12;697:12,
16;698:4,6,9;699:20,
22;700:5;702:17;
703:5,13;704:1;
708:21;709:5,7,10,21;
710:4,23,25;711:9;
717:19,21;718:2;
724:8;725:21;726:11;
744:17;745:6;747:25;
750:15;758:9,11,12;
776:4,5,8,20,22
**exist (1)**
722:25
**existed (7)**
708:11,19,23;712:7;
721:18;722:12,24
**existence (1)**
591:7
**existent (1)**
750:11
**existing (4)**
749:8,11;775:5,6
**expand (2)**
654:5;699:1
**expect (11)**
572:20;584:22;
585:23;586:3;711:14;
742:25;746:17,21;
748:4,10;758:16
**expected (3)**
584:24;666:23;
779:15
**expense (2)**
706:9;768:12
**expenses (7)**
706:10;768:9;
769:13,15,15,16,18
**expensive (1)**
746:23
**experience (6)**
592:7,12;623:20;
663:18;664:9;752:7
**explain (7)**
581:23;583:10;
601:17;623:17;663:12;
666:4,7
**exposed (2)**
778:17,18
**express (5)**
623:8;688:23,25;
689:1,2
**extensive (2)**
762:8;768:8
**extent (3)**
612:24;752:4;774:8
**extract (1)**
649:18
**extracted (2)**
647:20;666:13
**extraction (9)**
644:25;646:16;
647:4;649:11,12,17;
662:13;665:21;666:17
**extractions (14)**
643:10,14,20,22,25;
649:1;658:8;662:24;
663:18;664:14;671:21,
24;672:18;673:10
**extremely (1)**
763:5
**eye (1)**
750:18

## F

**face (1)**
763:15
**fact (37)**
590:9;602:2;607:1;
630:11,13,15;668:5;
720:10;735:18;736:22;
737:8,17,19,21;746:6,
8;747:6,7,11,17,18;
749:20,25;751:18;
752:15;753:2;754:1;
756:5;760:12;762:22;
763:13,18;771:13;
772:12,23;774:24;
775:2
**fail (2)**
611:9,12
**failed (1)**
741:3
**fails (1)**
611:18
**failure (3)**
657:7;728:21;770:20
**fair (20)**
587:6;646:2;647:19;
672:13;690:23;699:11;
702:17;708:8,16,21;
710:1;714:15;723:3,6,
8,11;725:9;736:23;
763:2;779:17
**fairly (3)**
691:9;699:22;710:24
**fake (2)**
756:18,18
**fall (1)**
774:7
**falling (1)**
586:22
**false (9)**
611:20,21;736:8;
738:5;740:19;741:7;
743:17,21;750:20
**familiar (12)**
571:7,9;596:3,5;
667:8;700:19;710:14;

713:25;717:2;765:11;
766:17;774:8
**family (4)**
614:3,9;650:24;
697:6
**far (3)**
577:25;599:11;
672:25
**fashion (1)**
763:6
**faster (3)**
576:13;579:17;
613:13
**fate (1)**
744:24
**fax (1)**
578:20
**FBI (1)**
735:8
**February (20)**
586:14;652:2,9,19;
653:6,11;670:4;671:9;
692:1;701:16,21,23;
702:4;706:19,21,22;
718:17,17;737:24;
761:20
**Federal (38)**
689:25;692:24;
695:10;698:3;703:1,4;
709:2,4;717:18;
728:23;729:2,14,20;
731:1;734:10,13,17;
735:9,11,17,17,18,21;
736:6;737:8,10;
738:11,14;739:2;
740:20;742:6;743:17;
749:19;756:5;758:4,6;
759:3;775:5
**feels (1)**
778:25
**fees (1)**
694:11
**few (2)**
667:25;679:6
**fifth (1)**
778:6
**Fifty (1)**
643:18
**figured (1)**
648:9
**file (13)**
601:19;605:8;
608:19,25;609:1,21;
611:9,10,18;625:22;
708:5,13;711:20
**filed (7)**
605:17;606:5;607:2,
6;628:4,7;728:4
**files (3)**
581:22;709:25;725:8
**filing (3)**
605:6;608:17;636:16
**fill (3)**
632:20,21;641:4
**filling (5)**
634:13,18;635:23;
636:7,16
**Final (3)**
711:15,22;717:5
**finally (1)**
628:9
**financial (33)**
599:3;601:15,20;
602:3;603:4;604:9;
605:6,17;606:4;
607:14,19,25;608:17,
19,22;609:1;610:8;
611:10,18,22;612:4,19;
613:3;614:19;616:3,3,
24;637:4;641:3;
687:24;717:3;766:9,17
**find (14)**
662:23;664:24;
665:22,24;694:3;
696:6;712:12,19,22;
716:15;725:9;726:7;
743:12;755:15
**fine (2)**
608:16;728:15
**finish (1)**
726:24
**finished (1)**
627:17
**finishing (1)**
627:13
**firm (1)**
614:1
**first (57)**
570:7;572:8;574:25;
579:14,24,24;604:16;
605:1,12,19;606:1;
608:24;610:1;613:17;
614:7,11,21;620:3;
624:18;625:5,11,16;
644:21;648:21;650:4,
21;653:5;655:7,15,23;
671:8;675:23;676:1;
677:21;682:7;685:13;
688:20;691:24;693:13;
706:19;713:10,16,22;
723:18;725:10;733:23;
736:14;737:11;741:3;
745:5,23;746:3;
749:17;759:7;768:4;
773:6;776:3
**fiscal (7)**
748:7;751:10;
753:11,13,21;754:12,
18
**fit (1)**
769:10
**five (9)**
569:22;590:1;597:7;
610:23;620:3,9;
633:14;680:7;778:23
**fix (1)**
656:17
**flip (3)**
578:16;645:21;
659:25
**flood (1)**
744:9
**focus (1)**
572:21
**Focusing (2)**
581:6;589:22
**folder (1)**
745:13
**folks (3)**
574:8;656:19;718:22
**follow (2)**
567:10;593:6
**followed (2)**
653:25;685:7
**following (4)**
656:6;685:3;701:3,5
**follows (5)**
566:17;588:16;
611:7;641:16;687:5
**force (1)**
655:9
**forensic (7)**
642:10,19;643:3,5;
644:1;688:10;713:24
**forensics (2)**
643:4;663:15
**forensics-related (1)**
643:1
**forged (2)**
755:20,21
**forgive (1)**
593:25
**form (13)**
591:7;592:11;
607:19,25;635:9,10,14;
636:8;704:22,25;
705:3,24;706:1
**formal (2)**
642:25;663:13
**format (1)**
684:19
**formed (1)**
677:23
**former (1)**
669:24
**formerly (1)**
702:9
**forms (10)**
601:24;605:8;607:1,
6;610:7;632:20,22;
634:14,18;641:4
**formulated (1)**
771:10
**for-profit (1)**
614:1
**forth (4)**
600:20;605:9;612:4;
614:3
**Forward (2)**
704:22;762:9
**found (11)**
633:17;647:16;
649:1,24;665:25;
666:20;668:10;714:12,
16;725:10;730:20
**foundation (4)**
601:10;607:10;
663:8;705:8
**four (34)**
568:1;590:1,4,5;
610:15,23,24;612:5,12;
613:16,18;615:11;
620:4,21;638:19,22;
639:6,6,6,6;662:22;
665:7;701:8;728:20;
729:24;731:22;733:9;
736:7,16;746:18;
752:13;764:13,16;
778:23
**fourth (1)**
743:16
**four-year (1)**
590:2
**frame (3)**
664:21,24;751:14
**Fraud (4)**
656:3;749:20,21;
750:22
**fraudulent (1)**
749:1
**frequently (1)**
748:6
**Friday (1)**
704:20
**friendly (1)**
704:13
**frolic (1)**
678:14
**front (1)**
755:20
**full (3)**
568:19;569:24;
703:20
**full-sized (1)**
652:22
**full-time (2)**
572:14;575:6
**fully (1)**
685:8
**functions (1)**
642:10
**fund (2)**
661:4;769:9
**funeral (2)**
669:9,23
**funny (1)**
670:20
**furiously (1)**
744:18
**further (29)**
580:8;583:5;585:8;
588:6;632:1;639:19;
640:20;641:6;667:18;
671:11;679:2;680:9;
689:24;690:2;692:23,
25;695:9;698:2;
702:16,22,25;709:1;
717:17,20;718:20;
724:25;725:22;742:23;
746:24
**furtherance (1)**
752:20
**Furthermore (1)**
774:16

## G

**Gagliardo (30)**
668:3,6,9,17;670:4;
671:22,25;672:8,11;
673:2,16,21;675:15,23;
676:2,7,10,17;677:4;
698:14;701:13;710:10;
712:10,18,22;715:12;
716:1,12;718:14;742:8
**Gagliardo's (3)**
668:10;672:3,7
**game (3)**
706:21;764:15,15
**gather (1)**
684:25
**gave (10)**
601:3;612:1;619:25;
621:13,15;622:21;
651:5;684:15;755:13;
762:9
**general (10)**
572:22,25;609:25;
610:2,2;614:2;683:23;
704:4;709:24;768:13
**generally (2)**
572:23;665:10
**gentlemen (3)**
612:1;726:17,22
**gets (3)**
568:22;630:5;661:8
**gift (1)**
615:12
**gifts (4)**
614:9;615:17;
616:17;769:17
**Gio (1)**
661:10
**Giovanni (1)**
746:19
**given (14)**
569:3;578:3;603:6;
611:11;617:11;630:9;
636:16;637:7;721:21;
737:17;760:12;778:12;
779:4;780:9
**gives (4)**
567:5,8;611:20;
768:22
**giving (2)**

730:6;735:4
**Gmail (4)**
707:24;708:14;
720:17;722:22

'

**'Gmail (1)**
708:6

## G

**goes (3)**
594:19;645:7;747:3
**Good (26)**
566:6,7,9,20,21;
585:12,13,13;588:19,
20;614:4;641:24,25;
655:8;667:22,23;
678:13;687:8,9;719:7,
8;745:12,22;755:3;
756:8;780:20
**Google (10)**
707:22;708:1,2,3,10,
12,18,20,23,24
**Google's (6)**
708:11,19,24;721:2,
18;722:13
**governed (1)**
589:15
**governing (8)**
567:8,24;568:8;
589:16;590:23;592:4;
593:24;620:17
**Government (206)**
566:16;567:16;
573:18,24,24;575:11;
578:15,24,24;579:20;
580:3,3;583:24;584:5,
5;585:19;586:9;
588:13,15;589:8;
595:11,24,24;598:8,14,
14;601:23;602:8,8,14;
603:3;604:23;605:3,
12,25;606:2,6,6,9,18;
608:4,11;614:17;
618:17;619:12,12;
624:15,23,23;627:20;
631:3;634:17;635:15;
636:9,9,14;641:13,15;
644:5,14,14,21;645:20;
646:6,6,11;647:10,22,
22;648:22;649:2,5,10,
24;651:7,22;653:18;
654:9;658:16;659:3,6,
14,14;660:5;661:21;
664:25;666:9;669:16;
676:5;681:11,12;
685:11;687:2,4;688:9,
23,25;689:5,7,9,16,19;
690:3;691:12;692:14,
19;693:2,8,9;694:18,
22;695:2;697:12,16;
698:5;700:1;702:10,
12,17,23,24;703:2,4,6;
707:23,25;708:7,15,21;
709:3,5,7;711:2;
714:18;717:7,12,21;
719:25;720:24;721:14;
726:14;728:4,19;
729:17,21,22;730:5,9,
17,23;731:18,22;732:7,
13,24;734:15;735:1,9,
14,17,19,24;736:5,6,8,
14;743:8,11,25;746:7,
15;748:1,19;754:5;
756:24;757:1,13;
758:13,18;759:23;
760:8;761:15,22;
762:9;763:3,4,16,22;
765:24,25;766:22;
767:1,17;770:7,19,20;
771:10,14,16,25;
772:14;773:13;775:3,
3;776:22;778:10
**Government's (41)**
574:3;579:3;580:7;
584:9;607:11;608:8;
619:15;625:2;641:12;
644:18;646:9;648:18;
649:22;659:18;668:24;
670:24;675:5,9;
680:15;684:23;690:8;
691:15;695:19;698:9;
700:5;703:13;709:10;
711:9;714:20;718:2;
721:23;724:7;726:11,
18;729:8;732:18;
733:12;751:2,4;
778:14;780:5
**governor (3)**
590:4;639:4,6
**gporcelli@nymcuorg (1)**
716:14
**GPS (1)**
642:12
**grab (2)**
566:4;730:18
**grand (7)**
741:1,2;742:4;
743:14,23;762:22;
774:4
**granted (1)**
630:4
**Greece (1)**
707:6
**Greek (2)**
707:12;768:9
**green (2)**
660:25;758:21
**grievance (1)**
595:2
**ground (1)**
660:15
**group (2)**
569:21;730:3
**groups (1)**
569:23
**Guagliardo (3)**
724:14;728:25;
729:10
**guess (8)**
612:23;645:15;
726:24;742:22;745:19;
765:16;768:4;776:14
**guidance (1)**
753:10
**guy's (1)**
755:22

## H

**Hack (1)**
586:11
**half (3)**
620:4;707:2;713:17
**halfway (1)**
769:5
**hallway (1)**
566:3
**Hamill (45)**
567:14;688:19;
690:10;691:7,16;
692:2;693:7,10,15,21;
695:21;696:2;697:1,
25;698:11,15,24;
699:19;700:3,7;
701:10,17;703:16;
704:8,16,23;705:22;
706:4,12,14,24;707:7;
709:12;710:20;711:16;
712:2,25;713:18;
714:7;715:4,15;716:4;
717:4;718:6;725:4
**hammer (1)**
656:5
**handwriting (2)**
575:12;577:3
**handwritten (1)**
681:13
**handy (1)**
739:23
**hangup (1)**
780:3
**happen (1)**
626:4
**happened (12)**
626:4;627:7;683:7,
20;733:21;747:7,11,
18;751:11;754:14;
755:9;763:19
**happening (2)**
756:2;779:11
**happens (1)**
628:10
**Harbor (1)**
744:23
**hard (2)**
733:5;745:11
**harmful (1)**
765:2
**hastily (1)**
754:4
**hate (2)**
728:12,14
**headquarters (1)**
604:20
**heads (1)**
680:6
**hear (14)**
583:4,9;607:9;
616:12;630:20;648:2,
7;711:11;728:14;
742:19;747:1;759:6;
761:25;778:9
**heard (10)**
610:18;671:18;
676:15;685:2,16,21;
728:9;766:13,14;
776:24
**hearing (3)**
612:6,7,11
**hearsay (2)**
628:13;671:5
**heck (1)**
755:22
**held (5)**
613:18;689:10,18;
762:12,16
**help (3)**
740:4;752:17;762:21
**helpful (2)**
682:4;765:2
**helps (1)**
618:9
**hence (1)**
777:6
**hereby (1)**
574:21
**herself (2)**
729:10;737:9
**Hi (2)**
650:23;706:9
**hide (1)**
570:23
**hiding (1)**
743:14
**higher (4)**
594:15;609:11;
637:14,16
**highest (4)**
589:19;591:23;
638:20;688:7
**highlight (5)**
608:15;609:25;
610:15,24;613:17
**highlighted (1)**
636:13
**highlights (2)**
749:15;751:23
**highly (7)**
597:1;599:7;603:7;
628:13;747:14;755:23;
756:9
**himself (2)**
716:2;754:8
**hint (1)**
767:4
**history (1)**
699:9
**hit (2)**
653:7;713:5
**hits (1)**
713:6
**hold (7)**
613:11;685:5,17,18;
732:24;767:11;774:18
**holder (1)**
690:14
**Holdings (1)**
692:11
**home (1)**
764:15
**Hon (14)**
650:22;651:19;
652:8,19;653:10;
654:3;655:7,16;
660:13,21,22;662:7;
680:4;690:16
**honesty (1)**
639:11
**Honor (271)**
566:7;574:1;575:22;
576:15;577:12,15;
579:1,17;580:5;581:4,
25;582:4,17;584:7,25;
585:7;588:4,6,8;592:1,
5,10,17,22;593:15;
596:1;599:9;600:23;
601:9;602:7,16;603:2;
604:2;606:8,21,22;
607:3,13;608:6;
610:17;611:4;616:9,
14,21;625:24;626:6,
20;627:8,13,13,18,24;
628:3,5,11,15;630:4,8,
16,22;631:5;632:4,6;
639:15,19,22;640:22;
641:7;644:16;647:25;
648:2,4,8,9,13,16;
650:1;656:13;657:5;
658:5;659:16;663:2,7,
21;664:11,18;665:1,
15;666:6,12,15;667:1,
13,18;668:12;669:2,
14;670:21;671:3,15;
674:14;676:12,15,20;
677:2;678:16;679:18;
680:11;681:2;682:22;
685:5,22;688:18;
691:13;693:4,5,9;
694:14;695:7,17;
698:7;700:2;705:6,9;
709:8;711:4,7,13,15;
716:8;717:5,23,25;

718:4,20;719:4;722:1,4,16;723:15;724:10,23,25;725:3,14,18,22;726:15,20;728:4,7,10,13,15,17,22;729:23;730:2,7,13,17,18;731:4,8,12,21,25;732:5,25;733:7;734:8,21;735:7;736:3,11,13,18;739:6,8;742:17;744:3,5,9,19,25;745:10,15,20,23;746:16;747:2,4,19;748:2,5,12,17,24;749:10;750:8,13,25;751:10,13;752:14;753:1,18,20,23;754:21,24;755:12,15;756:1,16,17,22,23;757:7,10,12,17,20;758:25;759:1;760:1,11;761:4,8,13,18;762:2,25;763:21;764:3,11,24;765:3,22;766:13;767:5,16,24;768:20;769:5,25;770:17;771:5,20,21,23;772:4,11,19,23;773:3;776:1,11,18;777:21,24;778:12,20,24;779:6,9,14;780:9,15,19,24
**Honorable (1)**
704:14
**Honor's (4)**
630:3;725:19;779:15;780:10
**honsylviagash85@gmailcom (2)**
707:24;709:18
**honsylviagash85@gmailcomcontentpreserved1mbox (1)**
708:6
**honsylviagash85@gmailcomcontentpreserved2mbox (1)**
708:14
**Hope (5)**
650:23;778:19,20;780:13,23
**hoped (1)**
582:24
**Hopefully (1)**
744:24
**hopes (1)**
777:3
**hoping (1)**
654:5
**host (3)**
750:1;753:4,23
**hour (2)**
772:1;779:5
**hours (4)**
653:24;663:13;732:23;733:1
**hours' (1)**
642:25
**housekeeping (1)**
776:4
**humored (1)**
678:13
**hundred (2)**
690:25;710:3
**hundreds (1)**
678:4
**hybrid (1)**
634:24
**hyperlink (1)**
656:3
**hypothesizing (1)**
678:6

**I**

**iCloud (2)**
647:1,3
**ID (4)**
646:21,23;649:14;658:11
**idea (4)**
676:18;745:12;746:21;755:3
**identical (2)**
695:5;751:6
**identification (34)**
573:17;578:15;579:19;583:23;595:11;598:7;605:11,25;618:17;624:15;646:12;647:9;658:15;659:6;662:16,19;669:16;670:8,24;672:14;674:5;691:8;699:20;708:7,15;709:22;710:21;714:8;720:18,23;721:14;753:19;758:18;769:4
**identified (12)**
597:17;621:13;661:16;665:6;666:1,10;668:24;673:8;675:9;691:24;692:3;728:5
**Identifier (1)**
645:7
**identify (4)**
570:20;625:10;676:22;677:6
**identifying (3)**
570:23;645:1;662:1
**image (3)**
644:1;651:14;652:22
**imagine (2)**
742:18;756:7
**IMEI (3)**
645:5,6;662:1
**IMIE (1)**
645:2
**immediate (1)**
619:23
**immediately (2)**
726:7;736:19
**immensely (1)**
771:23
**impact (3)**
570:25;580:20,21
**impeachment (1)**
722:5
**impede (1)**
738:6
**important (1)**
627:13
**impose (1)**
591:12
**Impossible (1)**
680:6
**impression (7)**
603:7,10;628:16,18;763:1;764:2;770:3
**impressions (1)**
630:9
**inactions (1)**
612:9
**inappropriate (1)**
769:24
**Inc (1)**
702:9
**incident (1)**
742:16
**include (7)**
578:22;609:16;613:22;662:18;673:21;695:3;766:1
**included (6)**
575:17;622:2;648:12,14;697:5;699:16
**includes (2)**
636:4;694:10
**including (7)**
613:23;692:17;697:7;742:4;752:25;765:24;769:16
**Income (8)**
614:12,13;615:20;616:18;635:24;636:4;705:4,21
**incoming (3)**
655:7;659:23;680:2
**inconsistent (1)**
769:11
**incorrectly (1)**
707:4
**incredibly (2)**
628:15;677:18
**incurred (2)**
706:10;768:9
**indeed (3)**
617:19;632:23;760:1
**independent (1)**
731:17
**indicate (9)**
616:25;626:8;650:8,11;652:15;654:13;700:25;701:7;725:12
**indicated (7)**
617:12;621:17;624:5;704:19;706:2;722:24;737:24
**indicating (2)**
655:21;706:16
**indication (1)**
677:17
**indicative (1)**
733:11
**indictment (6)**
612:11,13;728:18;734:12;735:23;772:8
**individual (10)**
595:1;611:17,21;615:21;695:24;712:4,4;746:3,19;749:22
**individuals (4)**
590:11;705:3;729:25;747:18
**individual's (1)**
693:17
**inexact (1)**
593:25
**infer (3)**
677:19;751:19,24
**inference (7)**
732:22;733:2;736:24;737:14,15;749:4;750:9
**inferences (3)**
743:7,9;768:23
**influence (1)**
738:7
**Info (1)**
646:21
**inform (5)**
624:3;626:14;759:18;760:13;767:18
**informal (3)**
568:11,14;569:6
**information (32)**
577:1;578:8,9;591:9;595:5;609:25;610:2,8;611:20;615:2;644:24;670:16;683:7;689:1,12,20;692:20;694:24;695:5;697:18,22;702:10,13;707:23;708:2;716:1;721:21;746:6,11;756:18;758:25;771:22
**informed (8)**
626:15;627:4;630:6,15;681:2;686:3;752:2;771:1
**initial (5)**
569:20;583:16;654:2,6;655:13
**initialed (1)**
613:8
**Initially (2)**
600:10;643:22
**initiate (1)**
595:3
**inquired (1)**
685:25
**inquiries (3)**
571:18,19,20
**inquiring (1)**
574:21
**inquiry (29)**
570:5,6;571:23;572:2,9;573:3,4,5,7,11,22;574:16,25;580:8,19,20,23;581:2,20;583:16,21;584:4;585:4,5,6;587:25;620:1;628:12;734:14
**insight (1)**
752:10
**insofar (2)**
612:7;769:11
**inspection (2)**
610:16,19
**Institute (13)**
592:24,25;593:11,20;594:1,2,11;637:12,17;638:8,13,16;640:3
**institution (3)**
634:25;635:5;737:9
**instructed (6)**
580:18;612:5;617:23;677:22;758:19;759:4
**instruction (2)**
612:1;614:11
**instructions (23)**
605:6,7;606:16,19;607:14,15,17,24;608:1,17;609:21;610:3;613:2;614:8,24;634:13,18,22;636:7;761:5,7,9;762:4
**insufficient (1)**
728:24
**insurance (2)**
730:6;746:22
**intend (9)**
734:12,13;746:2,5,6,15;765:20,23;767:19
**intended (1)**
743:13
**intending (6)**
623:16;628:6;757:15,20;764:23;767:6
**intends (2)**
681:11,12
**intent (5)**
611:19;612:10;736:8;738:6;760:10
**intention (2)**
775:8;776:16
**interaction (1)**
571:10

**interactions (1)**
640:12
**interests (1)**
599:3
**internal (6)**
575:16;577:7;742:6;758:4,6,8
**International (2)**
645:6,12
**internet (5)**
617:18;619:5;623:6;692:15;694:11
**interpretation (1)**
567:8
**interview (3)**
687:25;733:23;738:20
**interviews (2)**
681:17;732:13
**into (61)**
567:15;569:8,19;573:25;575:10;578:12,25;584:6;591:7;595:25;596:16;598:15;607:23;619:13;624:24;644:15;646:7;651:7;659:15;666:1;671:2;674:17,20,25;675:5;685:13;688:19;690:3,11;691:6,22;693:2,11;695:5;697:24;702:25;705:11;709:13;715:3;717:22;725:16;729:1,4,16,22;730:24;732:19;736:20;740:2;751:19,21;752:10;756:7;759:23;761:18,23;763:16;766:21;771:11,16;772:15
**introduce (9)**
761:22;762:14;763:5,5;765:12,17,23;766:20;768:11
**introduced (7)**
685:12;729:4,16,22;730:9;732:7;761:18
**investigate (5)**
594:25;612:19;624:22;687:19,20
**investigated (1)**
739:17
**investigates (2)**
589:12;591:25
**investigating (1)**
618:12
**investigation (47)**
571:5;580:24;594:24;595:4;618:6;623:25;624:9;633:12;728:23;734:11,13,18;735:9,12,17,21;736:7,9,25;737:2,3,4,7,8,11,21;738:7,12,14,15,21;739:2;740:20;741:8;742:6,7;743:13;749:19;754:5;756:5;758:4,5,6,6,8;759:3;762:22
**investigations (2)**
619:21;688:5
**Investigative (5)**
642:7,8;643:23;688:4;774:10
**investigator (5)**
617:23;633:17;688:2;710:12;732:24
**investigators (2)**
590:18;737:10
**invitation (1)**
750:23
**invited (2)**
580:19;587:25
**invites (1)**
769:8
**inviting (2)**
678:3;750:18
**involved (4)**
582:7;618:23;620:5;622:14
**involvement (1)**
730:10
**involving (3)**
597:1;662:25;687:20
**iPhone (40)**
646:17;647:5,16,20;649:7,14;652:1,18;653:21;654:15;655:11,24;656:5,8;658:9,21,23;659:12;660:12,21;661:2,15,17,25;662:12;664:20,22;665:6,21;666:24;667:8,10;680:2;732:9;733:20;734:1;742:13,23;759:8,10
**iPhones (1)**
685:11
**irrelevant (7)**
677:18;749:23;752:5;760:12,17;764:6;766:8
**IRS (1)**
705:3
**island (1)**
768:9
**Isle (1)**
707:12
**issue (18)**
568:21;570:9;576:17;582:6;633:2;634:9;654:2,6,16;657:6;680:16;685:21;748:18;750:19;766:8;776:4;779:23,25
**issued (5)**
572:6;580:21;632:24;633:9;705:3
**issues (14)**
744:19,19;745:24,25;746:13,14;749:16,25;753:4,24;756:14;776:9;779:21,23
**item (4)**
636:1,2,2,3
**itemized (1)**
697:22
**items (1)**
644:3

## J

**jacket (1)**
597:15
**Jackson (19)**
700:12,13,14;731:9;732:1,6,11;733:22,23;734:23;735:13;736:19;737:17;739:11,16;740:18;741:6;743:19;753:3
**Jackson's (3)**
676:2,6;738:19
**JAG (21)**
650:14;651:3;652:2,18;653:6,22;654:14;655:11,24;656:8;658:23;659:21;660:13;661:16;662:8;665:25;666:10,13,20,22;680:3
**jam (1)**
762:21
**Janet (1)**
625:11
**Janie (1)**
667:24
**January (44)**
593:2;650:21;651:3;659:22,24;665:18,22;675:14,22;692:17;701:2,9;708:9,17;717:10,15;720:24;721:7,15;730:4;731:10,19,22;732:8,15,21,23;733:4,9,16,19;734:6,7,17,25;735:10,20,22;737:13,16,18;751:11;753:12,21
**Jay (1)**
642:15
**Jencks (8)**
684:25;685:2,22;773:6,9,13,16,19
**Jeremy (3)**
681:5;687:2,3
**Jets (2)**
764:14,16
**JGagliardo@NYMCUorg (1)**
658:12
**JGuagliardo@NYMCUorg (2)**
646:25;649:15
**job (5)**
614:21;618:2;642:8,18;687:15
**Joe (4)**
650:23;698:14;724:14;729:13
**John (1)**
642:14
**join (3)**
654:7;730:11;747:9
**joined (6)**
570:7;600:25;632:23;677:24;728:24;779:24
**joining (2)**
632:24;749:8
**joint (2)**
601:22;602:4
**Joseph (12)**
625:14;668:3;671:22;701:13;710:9;712:10,18,22;715:12;716:1,12;718:14
**Journal (1)**
570:19
**JPMorgan (9)**
689:5,5,7,9,11,12,13;690:15;691:22
**judge (78)**
568:7,21,22,22;569:2,2,12,24;570:21;571:1,4,25;572:14;573:5,22;575:6;576:22,24;578:20;579:25;580:16,24;581:10,11,17,17,23;582:2,19,20,24;583:3,9,11;584:3,20;587:7,14,23;590:4;591:17,19;593:7;594:7,12,19;595:2;596:9,13,14;597:4,5;601:20;605:18;606:5;609:3;611:15;614:19;617:13,19;620:13,18,23;622:4;624:20;625:12,13;637:13,16,20;638:4,20,23;639:4,7;641:10;706:20,23
**judges (37)**
567:5,6,7,10;570:14;572:23;589:9,11,13,15;590:1;592:3,8,14,16,20,21;593:3,5,9,22;594:9;604:10;607:24;609:5,6,6,9,11,16,16;618:7;637:12,13;638:19,22,22
**judge's (2)**
568:23;604:17
**judicial (44)**
566:23;567:3,4,9,24;568:8,25;570:18;571:13;573:1;574:15;582:21;588:22,25;589:6,17,21;590:19;592:4,8,24,25;593:11,20,24;594:1,2,11;597:19;598:13;599:7;600:5,21;611:15;612:3,17;620:17;624:10;625:15;631:22;632:20,21;640:2,16
**July (7)**
581:6;584:10;622:22;708:18;711:21;713:17;721:16
**June (24)**
571:19;580:12,15;595:18,19,22;601:2,2;617:8,11;619:4;621:1;632:10,12;708:10,11,24;711:20;713:16;720:24;721:3,7;742:11;743:19
**June24th (1)**
633:11
**jurisdiction (2)**
738:8;743:24
**juror (3)**
566:10;778:1,2
**Jurors (7)**
566:11;574:10;631:2;656:15;658:2;719:1;777:20
**jury (113)**
566:1,8;567:2;575:21;579:5;589:6;603:8,10;630:1,9,25;631:1;635:20;644:23;646:14;648:24;651:21;652:13,25;653:18;654:9;655:3;657:3,4,6;658:1;659:20;661:21;668:5;669:11;675:13;677:19,22;679:10,21;685:6,17,18;687:10,19;688:7,11;690:13;691:4,17,18;692:5;693:11;694:9;695:21,23;696:2;697:4;698:11;700:7,10,25;701:7,12;703:16,19;704:8,10,16,18;705:14;706:4,6,14,16,24;707:1;709:12,15;710:7,24;711:18;712:2,3;713:1,8,14,20;715:10,17;718:6;725:4;726:17;727:5,6;728:1;734:2;737:15;741:1,2;742:4;743:12,15,23;750:2,18;751:19;755:21;757:7;760:25;762:22;763:23;

769:8,23;770:3;774:5;777:12;779:16
**Justice (14)** 574:21;578:11;596:12,15,22;609:4,15;611:15;637:22;642:14,15;652:4;656:1;734:11
**justices (3)** 597:8;609:5,10
**justify (1)** 654:5

## K

**Kam (26)** 652:4;654:6,16;658:24;659:12,21;672:4;698:25;700:11;701:9,20;706:9,21;710:9;712:5,6,11;724:14,16;729:9;736:20;737:24;738:5;742:5;749:20,21
**Kam's (1)** 652:7
**Kaplan (1)** 670:17
**Katz (89)** 683:15,22;684:9,11,13;685:15,25;686:2;687:2,7;688:18;690:5,10;691:7,12,16;692:2,7;693:7,9,15,21;694:12,14;695:15,17,21;696:2;697:1,3,9;698:11,17,24;699:2,19;700:1,3,7,9;701:10,17;702:7;703:10,16,18;704:8,16,23;705:13,22;706:4,12,24;707:7;709:12,14;710:20;711:2,4,6,11,13,15,17;712:2,24;713:18;714:7,18,21;715:4,15;716:4,8,9;717:4,25;718:4,11,19;725:2,3,6,14,22,25;726:5,10
**keep (6)** 581:21,21;661:6;669:18;682:3;773:16
**kept (3)** 603:10;619:6;755:23
**key (1)** 771:24
**keyword (9)** 710:10;713:3,4,5,6,9;714:13;724:13,16
**keywords (2)** 710:5,8
**kind (6)** 645:8;678:5;687:19;688:4;691:1,4
**kinds (1)** 742:20
**Kings (1)** 574:21
**knew (9)** 734:16;737:6,10,21;738:11,13;739:19;740:19,19
**Knicks (4)** 763:11,14;764:13,18
**knife (1)** 670:17
**knock (1)** 762:3
**knowing (2)** 681:15;684:19
**knowingly (4)** 611:17,19;738:4;743:24
**knowledge (13)** 612:8,10;634:21,23;638:12,15;640:1,5;705:9;734:10;735:11;754:17;770:13
**known (3)** 702:9;732:11;756:5
**knows (7)** 611:21;732:23;755:11;760:1;765:19;767:25;770:13
**Kohn (24)** 756:21;757:12,14,16,21,25;758:3,7,9;759:5;760:15,23,24;761:4,24;763:23;765:6,7,12;766:6,15;767:19;770:1,12
**Kohn's (2)** 760:13;766:11

## L

**labeled (1)** 692:9
**Labor (3)** 688:2,6,6
**lack (2)** 730:10,10
**ladies (3)** 611:25;726:17,22
**lady (1)** 597:15
**laid (1)** 744:25
**language (8)** 579:11;622:11;758:19,20,20;760:13;767:14;769:11
**large (2)** 597:2,2
**largely (2)** 745:1;752:5
**larger (2)** 670:25;676:5
**last (26)** 574:20;591:5;594:3;626:9;628:22;651:5,11;662:22;665:7;669:21;673:23;692:3;695:8;697:25;716:6;719:18;743:16;744:16;745:7;753:7,8,10,24;765:20;777:6;778:17
**lastly (1)** 713:18
**late (3)** 672:8;694:15;772:2
**later (8)** 571:5;580:24;586:20;654:24;655:14;712:7;726:24;750:21
**latitude (1)** 766:24
**Laufer (2)** 631:14,20
**L-a-u-f-e-r (1)** 631:15
**launched (1)** 756:7
**LAURA (1)** 566:15
**LaVale (3)** 676:2,6;700:12
**Law (14)** 570:19;593:1,22;598:3;611:23;683:23;729:2,15,20;731:3,5;774:8,10,11
**Lawrence (2)** 625:13;631:14
**laws (1)** 731:1
**lawyer (3)** 589:4,5;705:11
**lawyers (4)** 590:1;618:8;652:4;655:1
**lawyers' (1)** 669:12
**lead (2)** 569:25;752:4
**leaders (2)** 590:6;639:5
**leading (1)** 582:1
**leads (2)** 750:5,6
**learn (2)** 617:9;627:3
**learned (11)** 617:4;620:14;626:25;631:9,13;657:8;683:14,22;685:6,13,25
**learning (3)** 617:21;684:2,3
**least (5)** 601:11;607:9;640:6,6;778:13
**leave (6)** 625:17,19;628:18;730:18;776:23;777:8
**left (9)** 577:3;672:25;711:20;713:4,22;717:8,13;731:9;733:3
**left-hand (3)** 691:20;705:25;712:5
**Legislature (3)** 590:6;639:5,7
**lend (2)** 733:2;752:10
**length (1)** 685:12
**less (2)** 582:24;677:14
**lest (1)** 770:23
**letter (15)** 574:20;577:5;585:3;591:14;647:10,11;728:4;744:22;745:2,25;758:20;759:9,9;760:18;761:25
**letters (10)** 648:1,3;744:10;758:10,17,24;759:4;760:18,18;780:21
**letter's (1)** 758:12
**letter-writing (1)** 780:22
**level (3)** 567:10;604:11;688:7
**levels (1)** 645:10
**Levine (5)** 619:18,20,22,23,23
**light (2)** 602:7;630:3
**liked (1)** 762:19
**likelihood (2)** 726:23;750:17
**likely (5)** 572:15;677:15;725:13;739:19;778:10
**Lily (1)** 670:15
**limine (3)** 628:4;630:4;780:11
**limitation (2)** 572:22,25
**limited (11)** 575:24;607:5;614:2;681:16,22;752:15;763:6;764:6;769:18;771:13;774:12
**line (13)** 569:9;693:13;701:2,8;704:21;711:22;740:9,9,10;742:11;747:21,24;750:14
**lines (3)** 697:7;765:6;771:14
**link (1)** 655:25
**linked (2)** 661:3,9
**list (11)** 615:12,16,20;635:24;650:8;651:5;719:20;726:4;769:12;771:3;773:17
**listed (15)** 623:7;634:5;635:25;645:13,16;646:18;650:12,14;693:18;695:24,25;705:15,15;709:19;712:5
**listened (1)** 576:14
**listening (1)** 779:2
**lists (4)** 614:21;712:5;713:4;757:13
**literally (1)** 600:18
**literate (1)** 767:14
**litigation (11)** 582:7,7,8,9,10;597:1;618:1,22;620:15;621:8,16
**little (18)** 574:6;579:17;586:20;599:8;601:7;609:24;613:13;620:21;651:11;665:2;669:18;671:11;679:12;690:12;693:22;769:5;774:13;779:16
**llama (1)** 670:18
**LLC (4)** 692:10,11,11;707:22
**loaded (1)** 740:1
**local (5)** 609:9,10,11,14,14
**locations (1)** 570:19
**long (18)** 588:24;595:21;596:13;597:19;604:14;607:22;608:2;631:16;642:4;654:2;687:17;700:16;715:14;761:17;776:13,25;778:9;779:4
**longer (2)** 655:20;711:14
**longterm (2)**

746:22;748:8
**look (20)**
568:1;595:16;605:22;618:6;633:19;635:14;636:7,8;644:1;649:10;650:4;651:10;660:11;677:21;710:23;721:25;761:21;763:15;764:21;773:5
**looked (14)**
616:4,16;623:6;633:19;651:11;661:12;666:16,17;667:2;668:23;670:25;710:9;735:16,16
**looking (28)**
623:15;634:4,8;635:23;649:5;652:16;662:6;671:25;673:20;691:5;693:12;694:2,5;697:4;698:18;703:19,24;705:14;709:15;712:11,17,21;713:3;731:21;736:18,20;740:17;767:9
**looks (4)**
597:10;661:2;679:23;697:6
**lose (1)**
653:14
**losing (1)**
630:18
**lost (1)**
761:17
**lot (6)**
569:5;590:23;634:13;770:7;780:3,21
**lots (4)**
682:1;743:6;762:23,23
**loud (1)**
715:23
**lower (2)**
604:19;609:24
**loyalty (1)**
653:16
**LTD (1)**
730:6
**luck (1)**
655:8
**lunch (3)**
656:17;658:7;680:16
**Luncheon (1)**
656:20

## M

**M1 (1)**
720:22
**MacKoul (1)**
748:3
**Madam (1)**
715:14
**mail (1)**
703:24
**main (3)**
569:8;654:7;777:12
**maintain (2)**
590:19;642:12
**maintained (17)**
688:24;689:2,7,9,13,18,21;692:18,21;694:23,25;697:19;702:12,14,18;708:1,3
**major (1)**
764:12
**majority (1)**
570:4
**makes (4)**
602:5;611:20;656:18;677:14
**making (3)**
690:12;693:22;774:1
**management (2)**
597:6;766:16
**mandatory (2)**
637:17;638:7
**Manhattan (2)**
597:9;604:19
**manual (17)**
591:3;595:7,14,21;757:24;765:8,12,17,24,25;766:3,18;767:13;768:19,22,25;770:6
**manually (1)**
667:10
**many (17)**
571:17;589:22;590:14;628:19;643:12,17;650:25;670:15;685:12;710:11;711:22,25;712:11,18,21;757:15;775:4
**March (14)**
571:18;586:18;622:7;653:22;654:1,15;680:3;701:22;708:19;721:18;722:13;733:23;735:14;738:20
**Mark (273)**
566:14,19;567:14,20;568:6;573:16,24;574:4,6,10;575:9,20,23;576:4,13,15;577:10;578:14,24;579:4,13,17;580:3;583:22;584:5,13,15;585:7;587:11;588:7,8,13,18;594:18;595:10,24;597:16;598:6,14;599:2;600:2,4;602:7,14,16;603:2;604:2,3,22;605:10,24;606:6,10,11,14,17,21,23,24;607:3,13;608:4,10;609:19,24;610:14,22;612:15;613:1,14;614:16;615:9,10,24;616:11,22;617:3;618:16;619:12,16,18,20;624:14,23;625:3,9;626:20,22;627:12,15,18;628:3,9,15,22;630:3,8,13,18,21,24;631:5,7;632:1;633:4;635:2,7,12;636:21,25;637:9;639:13,21,22,24;640:11,20;641:13,22;644:4,7,14,20,22;645:19;646:6,10,15;647:8,12,22;648:2,4,9,13,20,23;649:3,4;650:1,3,7;651:6,9,20;652:12,24;653:2,17;654:8,11;655:2,4,18;656:13,16;658:4,5,6,14;659:3,5,14,19,25;660:3,6,24;661:20;662:5;665:4,16;667:7,16,18;669:25;671:3,8,12;673:4,14,17,25;674:21;675:1,18;677:16;679:5,9,12;680:9;681:3,6,7;682:2,7,9,18;683:10,11,13;684:11,14;685:20,24;686:6;726:13,14;736:12,13;738:13,19;739:1,6,11,14,21,24;740:3,5,9,13,15;742:3,10,17,25;743:4,6;744:9,12,16,24;745:7;747:20,21;749:14,15;751:22,23;753:1,22,23;754:7;756:10,23;757:5;759:6,7,15,17,25;760:6,11,15;762:2,7;764:1;765:5,16,19;766:2,5,18;767:7;768:3,4,21;776:1;777:1,19;780:22,24
**marked (55)**
573:17;575:10;578:15;579:19;583:23;595:11;598:7;604:23;605:11,25;606:16;618:17;624:15;627:20;644:5;645:20;646:11;647:9;648:21;651:7,22;652:13;653:1;654:9;655:19;658:15;659:6;660:5;661:21;662:15,18;664:24;665:25;666:9;670:8,24;672:14;674:4;675:4;691:8;699:20;708:7,15;709:21;710:21;714:8;720:18,23;721:14;753:19;758:11,11;765:23;769:3;777:16
**markings (1)**
745:14
**Marks (1)**
625:13
**Mark's (4)**
683:5;744:6;754:15;779:14
**Marlow (11)**
581:10,17,23;582:2,19;583:3,9,11;584:20;587:14,23
**Maryrita (5)**
574:12,14;578:20;579:25;586:13
**mask (2)**
597:13;728:12
**masked (1)**
597:14
**Master's (2)**
642:14;688:9
**matching (2)**
694:3;696:6
**material (12)**
657:7;681:3,4,14,16;739:22;743:22;744:17;771:13;772:14;773:6,9
**materials (4)**
575:17;600:18;722:22;743:23
**matter (15)**
602:2;623:15,18,21;643:19;720:18;722:15;738:7,9;743:24;753:10;760:14;762:24;770:7,17
**matters (5)**
591:25;599:8;607:1;763:21;776:10
**May (66)**
566:3,14;567:14;568:24;572:23;573:16;574:4;578:14;579:18;581:20;583:22;585:7;588:4;597:16;598:6;600:2;602:16;604:22;608:21,22;609:19;612:4;619:16;625:3;626:20;632:5;641:20;644:4;648:25;655:8,9,24;656:9;658:4;660:17,23;661:5,12;665:19,22;667:16;671:15,18;672:9;676:12,15;678:4;690:3;693:2;701:16;702:24;715:13,14;717:22;718:10,17;719:3;724:22;728:2;729:23;762:22;766:13;769:25;770:12;775:15;780:12
**maybe (11)**
582:22;583:6;664:1,4;739:9;745:9,14,23;760:20;770:10;778:16
**mbox (13)**
709:25;711:19;721:14;722:12,21,22,25;723:1,23,23;724:1,1;725:8
**mboxes (1)**
720:14
**MCU (62)**
571:15;572:14;587:17;621:7,8,16,18,20,22;622:1,2,20,21;623:6,11,14;624:1,12;625:23;627:1,5;631:10,21;632:13;633:13,18,20,23;634:24;635:5;653:15;661:4;669:9;704:15,22;710:10;713:4,9;724:17;734:25;737:8;742:16;746:11;757:21,23,24;758:2,10;759:4;761:14,19;762:15;764:3;765:8,15;766:15;768:11,13,19,21;770:5,14
**MCU-related (1)**
724:4
**MCU's (6)**
574:23;584:17;622:24;631:23;634:5,6
**mean (13)**
593:12,13;594:8;636:19,24;710:16;714:2;716:22;736:23;750:1;755:19;766:4;770:23
**meaning (1)**
766:19
**means (4)**
647:3;713:25;714:3;773:20
**meant (2)**
623:17;730:16
**mechanical (1)**
773:23
**Mediterranean (1)**
707:5
**meet (9)**
574:25;600:13;620:16,25;626:2;732:18;743:9;744:24;777:9
**meeting (41)**
569:25;575:2,18;576:9,10,12;580:12,13,15;600:19;601:3,13;620:14;621:2,4;622:17;626:5;632:19;633:11,12;653:8;

746:18,25;747:18;
751:11;753:12,15,16,
20,21,24,25;754:2,14;
755:9;756:2,4;769:15;
777:4,7,14
**meetings (5)**
568:20;748:6,7,18;
754:12
**meets (1)**
570:1
**member (17)**
590:2;596:20,21;
597:23;600:5,12,13;
613:25;617:12,16;
624:8;669:9,24;
677:15;767:21;768:17;
770:1
**members (22)**
569:11;589:24;
590:4,5;597:25;598:5,
12;601:4,19,20,22;
617:11;638:24;639:2,
3,10;669:11;678:2;
727:6;757:22;768:12;
777:9
**membership (5)**
620:24;621:6,9;
624:1;655:9
**memo (34)**
619:17,24;620:12;
654:23;730:4;734:5,
10,17,20,24;735:3,11,
15,22;737:11,13,17,22,
25;738:1,24;740:21;
746:8;747:4,12;749:5,
6;751:3,6,21;753:17,
17,17;767:20
**memorandum (9)**
581:21;618:20;
620:20;621:12,15;
739:3;751:17;769:10;
774:9
**memory (3)**
664:7;666:23;676:23
**memos (3)**
752:19;753:16;755:8
**mental (1)**
591:18
**mentioned (10)**
580:2;595:7;597:4;
601:1;602:11;604:4;
642:18;663:13;700:13;
765:7
**mentioning (1)**
583:17
**mentions (1)**
660:16
**merely (3)**
628:17;737:1,2
**merit (1)**
678:12
**message (49)**
650:21;651:4,11,12,
13,16;652:1,2,3,6;
653:4,5,5,7,11,20,21,
21,22,25;654:2,17,23,
24;655:7,7,13,14,22,
23,23;656:4,6,8;
658:20;659:11,23;
660:4,8,12,20,20;
661:2,13;675:14;
676:9;680:1,2;707:2
**messages (81)**
647:5,16,17,20;
649:1,18,24;650:19,20;
651:24;654:13,14;
655:6;658:25;660:19;
661:7,7,13;662:6,15,
18,21,23;663:24;
664:13,21,22,24;665:6,
9,10,13,14,18,22,24;
666:8,20,23;667:11;
668:2,6,8,9,13,16,19,
22;669:8,22,23;670:3,
23;671:8,24;672:4,7,
10,11,18;673:1,11,15,
20;675:22;676:17;
677:3,6,12,13,16,17,
20;678:4;701:20;
702:1,5;737:24;738:2;
740:17;742:3
**met (15)**
585:19;586:5;632:9,
12,14,16;633:21,25;
640:5;688:15;728:19;
730:24;735:14;736:5,
14
**michaeladinolfi@dfsnygov (1)**
716:14
**mid-August (1)**
627:5
**midday (1)**
779:12
**middle (2)**
610:15;707:11
**mid-July (1)**
623:12
**might (8)**
600:17;626:16;
630:9;664:10;684:22;
746:23;757:6;776:3
**mighty (1)**
765:1
**million (2)**
654:20;655:1
**millions (1)**
661:4
**mind (10)**
690:12;693:22;
718:12;747:4,8,14;
749:23;751:25;752:2;
773:16
**mine (1)**
685:1
**minimal (2)**
628:14;750:12
**minimum (1)**
742:4
**minute (5)**
566:4;654:24;
655:14;730:18;740:7
**minutes (16)**
641:23;680:7;
733:17;753:11,12,16,
24;754:3,11,11,13,20;
756:3,8,11,18
**mis (2)**
755:1;763:24
**miscellaneous (3)**
705:4,21;706:1
**misconduct (2)**
591:13,19
**misleading (9)**
603:7,10;628:16,18;
630:9;746:8;763:1;
768:24;770:3
**mispronounce (1)**
729:11
**missed (1)**
649:1
**missing (3)**
566:9;760:21;764:18
**Mission (1)**
680:6
**misspoke (2)**
682:21;730:17
**misstates (1)**
679:20
**mistake (3)**
576:25;603:6;654:18
**mistrial (1)**
772:5
**mobile (5)**
642:11,19,21;645:6,
11
**model (7)**
589:21;645:15,15,
17,17;663:25;664:2
**Mohan (1)**
745:10
**moment (14)**
567:18;585:7;588:4;
602:12;607:9;623:16;
639:15;648:11;667:16;
676:12;678:2;717:23;
724:22;776:23
**Monday (1)**
704:12
**Monday's (1)**
739:24
**money (5)**
597:2;661:4;714:6;
736:20;746:24
**Monique (2)**
738:21;754:24
**monitors (3)**
574:7;576:5;660:10
**month (2)**
631:19;713:17
**months (1)**
620:3
**more (27)**
573:10;576:14;
582:22;586:20;589:1;
592:12;601:7;624:18;
627:11;628:6;630:6;
653:14;665:2;669:18;
684:4;689:23;745:17;
762:23,23;764:19;
765:2;767:8,9;769:5;
774:14;775:15;777:1
**Moreover (1)**
774:22
**morning (29)**
566:6,7,9,20,21;
585:12,13;588:19,20;
641:24,25;657:8;
668:23;681:2,8;682:8,
19;683:6,14;685:25;
701:5;702:5;719:21;
726:23;727:5;731:23,
23;733:6;779:8
**morning's (1)**
773:12
**Most (2)**
671:3;764:2
**motion (6)**
628:4;630:3;728:8;
743:10;744:7;761:17
**motions (3)**
728:3,6;780:11
**motive (2)**
612:9;762:21
**mouthful (1)**
661:15
**move (12)**
576:13;579:12;
584:14;612:25;613:13;
626:19,21;630:22;
674:13,18;692:7;
745:20
**moved (1)**
726:1
**moves (1)**
728:17
**moving (2)**
594:12;777:7
**Mrs (2)**
580:8;597:22
**MSISDN (2)**
645:10;646:18
**much (6)**
621:16;627:11;
639:8;654:5;706:23;
711:14
**multimedia (1)**
651:12
**Municipal (27)**
571:15;572:1,11;
573:6;575:6;578:11;
580:17;581:19;582:6;
583:12,15;616:7;
617:5,14,19,25;618:22;
620:4,15,22;621:6;
635:11;689:19;691:5,
21;705:17;768:13
**municipality (1)**
609:10
**must (12)**
567:10;594:7,9,15;
605:7,8;608:25;609:1;
610:9;611:9;654:7;
745:18
**myself (2)**
593:23;775:16

## N

**name (33)**
574:12;585:14;
614:21;617:23;652:18;
658:23,24;660:13;
670:17;678:7,11;
680:3;693:17;694:3,
21;696:6;698:16,25;
700:13;703:20,24;
705:14,15,16,18,24;
709:16,17;712:12,18;
716:17;729:11;773:15
**named (3)**
571:7;596:3;746:19
**namely (1)**
750:19
**names (1)**
650:15
**Nana (1)**
661:10
**narrow (1)**
745:23
**Nassau (2)**
620:10;633:14
**Nathan (1)**
585:14
**nature (11)**
571:23;615:20;
630:16;635:24;636:4;
690:24;699:12;710:2;
750:6,12;751:24
**near (9)**
619:1;688:25;
689:11,20;692:20;
694:23;697:17;702:13;
708:1
**neatly (1)**
739:23
**necessarily (1)**
594:7
**necessary (1)**
769:14
**need (14)**
594:20;626:16;
630:7;663:8;677:24,
24;678:2;685:16;
745:5,11,16;766:10;
771:4;776:18

**needed (3)**
621:19;630:14;
737:20
**needle (1)**
779:21
**needs (6)**
612:24;654:6;
734:12;737:2;745:3;
778:25
**Negative (1)**
662:23
**net (1)**
654:4
**Nets (1)**
706:20
**Networking (1)**
769:19
**New (59)**
567:5,9;570:18;
574:21;588:22,24;
589:8,10,11,16,18,19,
20;590:5,6;591:22;
592:16,20,21,24;593:8;
594:12;596:9;600:13;
601:23;604:10;609:6,
8;613:9,10;618:1;
619:21;620:5,7,9,10;
622:14;625:12,14;
633:3;635:6;637:12,
13,16;638:20,23;
639:5;642:2,16;656:2;
661:3;683:19;687:14;
733:20;742:22;764:12;
775:1;777:10,11
**newly (7)**
593:3,3,9,9;594:6,9,9
**news (2)**
583:4;661:3
**newspaper (1)**
661:9
**Next (46)**
588:12;598:18;
599:13;602:19;603:14;
605:13;608:21;610:22;
613:2;622:17;623:2;
625:20;626:12,13;
629:4;641:12;645:21;
652:6,13;653:20;
654:17,24;655:14;
656:7,21;657:11;
660:17;676:25;678:17;
680:14,15,18;681:4;
686:10;696:9;705:12;
706:13,22;718:23;
726:25;727:8;741:9;
752:13;757:11;775:17;
777:16
**nicely (1)**
765:21
**night (9)**
719:19;731:20,20,
24;732:20;744:16;
745:7;765:20;777:6
**nine (1)**
614:6
**Ninety-five (1)**
713:13
**nobody (2)**
774:22;775:7
**none (4)**
615:4,18,23;729:12
**non-judge (1)**
601:21
**non-judicial (1)**
611:16
**non-lawyers (1)**
590:1
**non-profit (1)**
620:18
**nonwage (1)**
705:4
**noon (1)**
641:23
**normal (1)**
666:22
**Norman (1)**
661:10
**note (11)**
590:7;655:6,22;
656:16;682:11;707:10;
716:10;737:1;756:23;
757:6;777:2
**noted (1)**
764:3
**notes (2)**
718:8;725:24
**not-for-profit (5)**
572:12,24;578:13;
614:2;634:25
**not-for-profits (1)**
613:22
**notice (2)**
611:14;776:7
**noticed (1)**
744:22
**notification (3)**
713:21,23;714:11
**notified (4)**
569:9,11;683:20,25
**notify (1)**
683:14
**notifying (1)**
714:11
**November (2)**
692:4;706:8
**Nowhere (1)**
635:9
**number (63)**
572:7;574:16;579:7;
602:12;616:16;633:13,
19;639:25;645:2,3,5,7,
8,12,13,13;646:4,18,
18;647:6;649:12,18;
650:12,13;651:2;
652:7;658:24;659:1;
662:2,3,6,7,10;664:23;
666:17;672:10;676:16;
677:6;678:4;693:17,
19;694:3,16;695:3,23,
25;696:6;699:3;
700:20,23;712:5,7;
713:4,6;717:9,10,14,
15;719:9;744:18;
745:13;757:13;758:1
**numbered (1)**
692:9
**numbers (17)**
606:10;622:19;
645:1;650:15;662:1,2;
672:25;694:20;697:14;
698:19,22,23;699:3,16;
725:23;746:24;769:4
**numerous (3)**
643:1;663:14;766:22
**NYcourtsgov (1)**
567:24
**NYSDFS04.2018 (1)**
654:23

## O

**oath (6)**
566:13;702:9,12,13,
14,19
**object (4)**
611:4;705:10;764:8;
778:12
**objected (1)**
628:20
**objection (108)**
574:1;575:22;
577:12,15;579:1;
580:5;581:4,25;582:4,
17;584:7,25;585:1;
587:11;592:1,5,10,17,
22;596:1;598:16;
600:23;601:9;607:8;
608:6;610:17;612:21;
615:7;616:9,14,21;
624:25;625:24;626:6,
11,17;627:8,24;630:2;
631:3,24;633:4;635:2,
7,12;636:21,25;637:9;
639:13;640:9,17;
644:16;647:25;648:7,
7,8,14;659:16;663:2,7,
21;664:11,18;665:1,
15;666:6;667:13;
669:25;671:3,14,17;
673:4,14,17,25;674:21;
675:1;677:4;679:18,
19;689:25;691:13;
692:24;693:5;695:14;
698:3,7;700:2;703:1,3;
705:6,7;709:2,4,8;
711:7;717:18;725:19,
20;726:8;747:21;
750:14;752:11;762:1;
765:13;766:3;768:21;
774:7
**objections (2)**
695:10;754:16
**objects (4)**
606:8,15,23;780:1
**obligated (1)**
684:23
**obligation (1)**
601:19
**obligations (4)**
593:22;601:6;603:3;
612:8
**oblige (1)**
604:21
**obliged (2)**
593:5;734:2
**observations (1)**
701:25
**observe (1)**
665:10
**obstruct (13)**
728:23;734:11,12,
14;736:6,8;738:7;
741:8;743:13;749:19;
750:20;754:5;759:3
**obstructed (1)**
750:20
**obstruction (1)**
740:25
**obstructive (3)**
749:12;751:15;759:3
**obtain (1)**
604:17
**obtained (1)**
672:1
**obviously (6)**
686:3;737:1;745:1;
747:5;760:14;776:7
**occasions (3)**
640:6;766:22;770:22
**occur (2)**
677:7;751:15
**occurred (1)**
774:17
**occurs (1)**
684:21
**o'clock (4)**
656:19;718:22;
727:4;777:7
**October (1)**
662:14
**off (5)**
685:7;703:8;746:14;
750:18;759:19
**offer (13)**
602:8;608:4;648:12;
671:2;674:19,24;
690:5;693:4;695:12;
746:2;747:15;749:2;
750:10
**offered (9)**
567:15;575:10;
606:25;666:1;675:4;
718:7;725:16;749:9;
756:17
**offering (4)**
671:15;693:8;711:5;
717:24
**offers (25)**
573:24;578:24;
580:3;584:5;593:2,11,
20;594:1;595:24;
598:14;606:6;619:12;
624:23;644:14;646:6;
647:22;659:3,14;
691:12;698:5;700:1;
703:6;709:7;711:2;
714:18
**offhand (1)**
763:12
**office (13)**
569:19;591:19;
604:20;619:22;642:2,
4;643:9;683:23;
687:13;700:18;732:10,
16;733:20
**officer (2)**
611:16;766:17
**officers (2)**
598:3,4
**offices (1)**
604:19
**official (1)**
743:17
**offsets (1)**
730:6
**often (3)**
570:18;729:11;780:3
**old (1)**
747:10
**OMG! (1)**
652:10
**once (9)**
653:3;654:12;655:5,
21;710:23;737:23;
738:5;741:6;751:23
**one (99)**
566:4;568:19;
569:10,11,24;571:20,
20;573:10;579:24,24,
25;582:19;585:7;
587:4;588:4;590:6;
594:14;595:19,22,23;
596:19;597:23;601:1,
4;604:24,25;605:19;
606:2;610:6;612:19;
615:5,13,17;619:9;
622:9;625:11;628:20;
630:5;633:8;636:8;
640:22;643:5;646:24;
651:13;654:7;658:11;
664:1;667:16,24;
671:4;673:23;674:17;
678:10;680:1;682:19;
684:21;689:23;707:16;
712:13,20,20;713:10;

714:6;716:2;717:5;719:21;723:11;724:22;728:21,22;729:17,18,24;731:23;732:1,20;733:1,14;736:15;737:13;740:23;743:2;746:18;749:25;751:6,24;752:11;759:7;761:3;764:18;766:2;767:4;774:17;775:15;776:3,11;777:2,8;778:16
**ones (7)**
605:13;647:17,18;699:17;748:15;763:12;780:13
**one's (1)**
750:24
**one-sentence (1)**
625:6
**online (2)**
567:11;610:13
**only (40)**
566:22;573:17;575:10;578:15;583:23;595:11;598:7;604:23;605:11,25;612:7;622:9;624:16;627:19;644:5;645:20;646:12;647:9;658:15;668:8;669:6,12;670:8,24;672:14;674:5;678:10;691:8;699:20;709:22;710:20;714:8;729:21;730:7;757:16;765:5,5;771:15;773:10;777:9
**onto (1)**
633:3
**oops (1)**
608:13
**open (8)**
600:1;604:1;628:25;630:1;679:1;687:1;713:18;753:3
**opened (1)**
603:6
**opening (1)**
760:2
**operate (2)**
590:25;642:12
**operated (1)**
632:17
**operates (2)**
600:14,18
**operating (2)**
591:2;664:2
**operations (1)**
604:16
**operator (1)**
670:16
**opine (4)**
746:13;766:6,19;767:25
**opinion (35)**
568:12,21,22,23;570:13,20,21,25;572:7,17,21;575:17;576:6,18;578:9,23;579:6;580:21;585:5;587:8,8,22;621:21,24,25;622:1,5,6,10,11;757:23,24;767:4,6,8
**opinions (6)**
569:13,14;570:9;587:2,4;622:8
**opportunity (1)**
674:10
**opposed (1)**
609:14
**Optimum (1)**
692:16
**option (1)**
778:6
**oral (2)**
773:25;774:1
**order (7)**
580:2;706:18;721:20;734:11;746:12;754:4;777:16
**ordered (1)**
651:4
**orders (1)**
692:13
**Ordinarily (1)**
570:7
**ordinary (6)**
702:19;708:12,20,25;755:24;778:21
**organization (5)**
578:13;590:8;595:2;620:19;622:13
**organizations (1)**
643:4
**organized (1)**
635:6
**orientation (1)**
632:14
**original (2)**
644:1;668:18
**Orleans (2)**
777:10,11
**Oscar (1)**
651:22
**Osei (10)**
747:1;748:4,9;749:6;751:1,7,18;752:14;753:13,17
**Osei-Bonsu (1)**
746:3
**others (5)**
597:9;643:15;686:2;726:4;766:22
**otherwise (4)**
607:24;611:23;726:9;773:22
**Ouch (1)**
655:16
**out (32)**
572:14;583:9;590:10;603:11;619:21;621:22,25;622:11;630:20;632:20,21;634:13,18;635:23;636:8,16;641:4;670:15;672:18;673:11;677:20;712:24;715:23;744:25;750:24;755:15;762:3,21;765:13;769:1;774:16;780:5
**outcome (2)**
570:3;573:8
**outgoing (13)**
652:1,6,17,18;653:5,21,25;654:14;655:23;656:4,8;661:2,7
**out-of-pocket (1)**
769:16
**outside (5)**
749:11;757:7;758:21,22;762:4
**outweighed (1)**
769:23
**over (17)**
568:11;569:2,3,13;591:5;618:7;620:5,20,21;624:1;632:10;633:17;660:25;683:18;686:5;761:19;780:22
**overly (1)**
780:7
**Overruled (15)**
576:3;577:17;582:5,18;587:12;592:18,23;611:5;640:10,18;663:3,22;667:14;679:21;705:12
**oversees (1)**
619:21
**overview (1)**
765:25
**overwhelmed (2)**
750:12;752:5
**overwhelming (1)**
741:4
**overwhelmingly (3)**
736:14;738:2;743:8
**own (3)**
595:3;752:7,24
**owner (2)**
650:13;661:16

**P**

**Pace (1)**
593:1
**page (75)**
568:1;578:22,23;579:5;586:9,17;598:18;599:13;602:19;603:14;605:1,13;606:1;609:19,22;610:15,23,23,24;614:6,10,21,25;615:11;617:18;624:18;625:16;629:4;636:12,14;645:21;653:20;656:7,21;657:11;660:17;669:17,20,22;675:23;676:1,25;678:17;679:24;680:18;686:10;689:23;692:2;693:15,18,23;694:2,5,8;695:8,22,24;696:9;697:2,25;698:12,24;702:21;704:23;707:8;718:23;727:8;739:9,21;740:8,9;741:9;769:3,4;775:17
**pages (5)**
578:16;610:12;681:25;690:25;706:13
**paginated (1)**
739:22
**paid (8)**
609:3,5,6,10,13,13,16;613:23
**paired (1)**
647:3
**panel (1)**
569:22
**paragraph (13)**
572:8,10,13;574:20;611:1;614:7,11;688:20;692:8;694:16;697:10;702:8;721:24
**paragraphs (1)**
579:10
**Park (2)**
704:15;764:3
**part (36)**
567:23;578:21;579:25;585:14;593:4;601:12,13,18;618:2;642:18;643:3;644:13;659:11;661:11;672:2,17;673:10;688:21;689:2,13,22;692:8,22;694:16,25;697:19;698:19;699:4;702:14;707:5,21;708:3;730:2;749:3,3;759:2
**participant (1)**
622:16
**participants (4)**
650:5,8;660:11;673:22
**participated (4)**
581:9;738:3;746:18;750:19
**participation (1)**
770:25
**particular (19)**
572:19;574:16;596:19;613:21;616:19;634:17;635:6;649:6;658:9;671:9;683:17;695:4;699:15;710:4;720:17;721:24;736:25;751:17;769:13
**Particularly (4)**
636:8,12;741:2;743:18
**particulars (1)**
760:2
**parties (5)**
618:8;630:22;695:9;722:11;779:15
**partisan (2)**
590:8,10
**partner (1)**
613:24
**partnership (2)**
614:2;697:11
**parts (1)**
773:19
**party (10)**
633:18,23;689:24;692:23;698:2;703:1,3;709:1,4;717:17
**patches (2)**
664:5;780:6
**pattern (1)**
751:16
**Pause (6)**
639:18;724:24;730:19;738:16;739:5,15
**payable (1)**
714:10
**payer (1)**
705:17
**payer's (1)**
705:15
**PBA (1)**
650:25
**Pearl (1)**
744:23
**penalties (2)**
610:25;611:6
**penalty (1)**
728:16
**people (13)**
569:9;589:22;625:10;661:11;690:5;693:4;695:12;729:24;755:24;762:23;765:21;766:22;775:4
**per (3)**
612:12;765:15;768:17
**perform (1)**
642:10
**performed (3)**
633:13;643:10,22
**perhaps (2)**

576:25;742:18
**period (16)**
611:11,13;612:13;620:21;636:17;637:8;692:17;701:15,21;702:3;708:9,17;713:14;718:16;721:10;737:19
**periodic (1)**
602:6
**permissible (6)**
571:24,25;572:10;573:5;575:5;732:22
**permission (1)**
622:12
**permit (1)**
752:14
**permitted (11)**
574:22;580:18;583:7;587:17;611:23;621:21;737:14,15;746:5;765:14;768:12
**person (6)**
623:3;635:23;636:16;654:1;661:8;774:10
**personal (4)**
640:12;742:21,22;769:17
**personally (1)**
775:13
**person's (1)**
751:25
**persuasive (1)**
774:19
**pertain (1)**
571:15
**pertained (1)**
615:5
**pertaining (3)**
600:6;614:8;616:7
**pertinent (4)**
688:21;692:8;694:16;707:21
**Peter (1)**
670:11
**phone (111)**
568:11;569:3,3,13;581:12,13,14;623:3,4,5;643:10,14,20;645:1,3,3,4,13,13,15,17;646:1,3,16,18;647:3,5;649:12,18;650:8,12,13,15,17;651:2,13;652:7;654:1;658:8,23;659:1,1,21;661:16,19;662:2,3,6,7,8,10,10,13,16,22,23;663:6,20,25;664:2,10,17,22,23;665:11,13,25;666:10,10,14,16,17,21,21,22,22,24;668:10;671:22;672:3,7;687:24;692:15;694:11,20;695:3;697:14;698:19,22;699:3,15,16;700:19,23;718:14;736:17;738:2,23;742:16,20,20,22;759:2,12,23;760:1,5,7,10,24;761:14
**phones (7)**
642:11;644:12;662:24;663:18;664:14;758:24;759:4
**photo (4)**
651:17,18;659:13,23
**photograph (3)**
660:1;676:2,6
**physical (1)**
591:18
**physically (1)**
594:2
**pick (1)**
733:25
**pivoting (1)**
633:11
**place (7)**
597:1;618:9;621:2,3;752:18;773:7;780:8
**placed (1)**
752:24
**Plains (1)**
593:2
**plan (7)**
654:6;697:6,6;747:16,16;768:6;779:16
**planning (3)**
683:15;765:17;768:10
**plans (2)**
776:8;777:11
**Play (2)**
765:21;770:25
**played (1)**
670:16
**please (53)**
579:12;606:17;613:14;630:25;634:12;635:19;636:11;648:1,3;652:10;667:6;669:15,18;670:7;671:7,10;672:22;673:7;674:3,12,23;675:4;676:24;687:10;690:10,13;691:7,16,18;693:10,16,21;695:21,23;696:2;697:1;698:11;699:19;700:7;701:10,17;703:16;705:22;706:4,20;707:8;709:12;711:16;712:25;716:10;725:4;739:4,20
**plus (8)**
633:14;662:12;664:20,22;665:7,21;667:8,10
**pm (20)**
650:22;651:4;652:3,9,20;654:18;655:24;657:2;659:24;660:23;661:5,12;680:4;681:24;682:13;701:2;704:15;717:11;731:19;777:5
**pneumonia (4)**
670:10,12,13,18
**point (11)**
582:19;594:21;601:11;628:22;678:1;722:2,8;723:17;750:3;765:13;779:14
**pointed (2)**
621:25;622:11
**points (2)**
610:1;745:2
**policies (2)**
577:19;757:24
**policy (29)**
587:1;591:3;595:7,14,21;746:13,22;753:21;754:12,18;765:8,10,12,15,17,18,24,25;766:3,7,17;768:11,14,19,22;769:10;770:6,6,13
**political (1)**
642:16
**politics (1)**
688:9
**Porcelli (1)**
746:20
**Porcelli's (1)**
753:17
**portion (6)**
636:13;659:20;671:4,6,9;740:6
**portions (1)**
768:2
**position (16)**
593:8;594:12;613:6,11,11,23;614:14;624:7;638:11;653:14;687:17;688:1;705:15;751:18;770:13;778:8
**positions (2)**
613:18;615:6
**possession (2)**
576:2;762:11
**possibility (1)**
775:12
**possible (7)**
582:20;583:5;654:5;674:9;720:10,12;742:24
**possibly (1)**
684:21
**Post (2)**
656:9;660:20
**postdate (1)**
759:22
**postdates (2)**
759:10,17
**potential (2)**
737:4;760:2
**potentially (1)**
753:3
**practice (13)**
570:10,11;619:10;683:19,23;684:3;685:6;686:6;705:10;751:16;773:9;775:6,6
**practices (3)**
577:20;587:7;754:18
**precluding (1)**
746:1
**predates (3)**
759:8,13,15
**predecessor (1)**
574:14
**prefer (1)**
779:3
**Preferably (1)**
728:11
**preference (2)**
633:6;778:24
**prejudice (2)**
750:18;774:19
**prejudiced (1)**
771:23
**prejudicial (4)**
599:7;603:7;628:13;748:23
**preliminary (1)**
780:2
**premium (1)**
694:10
**prep (4)**
681:17,18;771:10;772:14
**preparation (4)**
693:24;698:19;699:4;754:13
**prepare (5)**
585:20;600:19;668:16;688:11,14
**prepared (12)**
576:10;618:20;719:10,12,15;720:4;738:5;754:3,11,11;756:1,2
**prepping (1)**
681:23
**presence (1)**
757:7
**present (22)**
566:1,8,11,12;601:13;630:1;631:1,3;640:6;647:1;657:3;658:1,2;714:22;719:2;728:1;747:19;748:17;753:23;754:1;776:9,16
**presentation (5)**
601:5,8,18;726:18;756:3
**presented (9)**
688:16;734:5,6;736:4;743:8,11;746:24;753:4;756:4
**Preservation (29)**
708:7;710:14,19;711:23,25;712:8,11,14,19,21,22;713:7,9,11,15,16,22,23;714:13,23;715:8;716:15;720:13;721:10,10;722:25;723:18,18;725:10
**preserve (1)**
710:17
**preserved (1)**
721:2
**presided (1)**
633:18
**president (3)**
613:24,24;656:2
**presiding (5)**
596:22;597:4,5;618:7;638:4
**press (7)**
567:19;591:7;632:24;633:2,8;655:25;660:15
**pressuring (1)**
652:5
**presume (1)**
684:9
**presumed (1)**
568:23
**presumption (1)**
569:4
**pretrial (1)**
725:20
**prevent (2)**
664:4,6
**previous (1)**
660:15
**previously (13)**
566:17;578:4,9;616:4;631:23;662:15,18;665:5,25;670:24;675:4,6;726:1
**primarily (2)**
687:20;688:5
**primary (1)**
642:10
**principle (2)**
572:23,25
**printout (1)**
567:23
**prior (7)**
585:19;630:3;681:8;688:1;738:24;746:12;747:7
**priority (1)**

777:12
**private (1)**
591:14
**probably (7)**
619:4;624:18;
626:18;739:8;753:9;
778:7;779:8
**probative (4)**
750:6,11;752:4;
769:22
**problem (3)**
593:16;718:5;780:17
**problem! (1)**
654:19
**problematic (1)**
751:24
**procedure (1)**
569:18
**procedures (1)**
591:2
**proceed (8)**
566:14;600:2;
607:13;632:5;641:20;
667:6;719:3;746:15
**proceeding (1)**
568:24
**proceedings (5)**
572:16;620:19,23;
622:3,15
**process (2)**
576:22;577:24
**produce (3)**
741:3,5;773:9
**produced (2)**
733:12;773:10
**production (2)**
692:13;743:23
**professional (3)**
571:10;643:4;758:1
**proffer (5)**
745:4;746:17;
749:15;756:25;760:12
**proffered (1)**
746:7
**profile (2)**
618:10,21
**program (7)**
592:25;593:4,19,23,
23;594:16;602:4
**programs (2)**
593:2;594:10
**prohibited (3)**
620:24;621:9;622:4
**prohibits (1)**
620:18
**promoted (2)**
593:7;594:7
**promotion (1)**
594:11
**prompted (1)**
628:9
**promptly (2)**
684:2;686:3
**promulgated (1)**
589:17
**proof (7)**
728:20,21,24;
730:11;736:15;740:22;
743:10
**proper (1)**
568:24
**proportion (1)**
774:17
**propose (3)**
684:5;758:14;777:7
**proposed (1)**
744:20
**proposing (1)**
569:23
**prosecution (4)**
684:10;688:15;
719:12,15
**prosecutors (1)**
668:14
**protections (1)**
580:24
**prove (1)**
767:13
**proved (1)**
737:3
**proven (1)**
735:24
**provide (8)**
569:13;577:20;
580:23;607:21;609:21;
613:2;754:4;776:22
**provided (30)**
577:25;607:24;
637:12,12;681:19;
682:2,8,9,12,13,14;
683:5,6,9,15,21;
684:19,20;685:15;
692:16;745:10;749:22;
762:15;764:4;771:12,
17,17;772:16,24;776:7
**provider (1)**
710:17
**provides (1)**
773:18
**provision (1)**
602:3
**provisions (1)**
590:25
**public (17)**
570:6,14;590:19;
591:5,14,15,16,21;
598:3,4;601:22;602:5;
607:18;610:16,19;
628:10;687:20
**publication (2)**
568:20;570:19
**publicly (4)**
570:13;577:14;
589:13;604:12
**publish (23)**
567:15;570:17;
574:4;575:20;579:5;
608:10;614:16;619:16;
625:3;644:22;648:23;
651:6,21;652:12;
653:18;654:9;655:3,
18;659:19;661:20;
675:12;720:2;721:22
**published (8)**
570:20;585:5,6;
587:2,4;635:20;
679:23,24
**pull (11)**
635:15;636:10;
668:19;669:5;672:18;
673:11;688:19;723:21;
730:13;766:20,23
**pulled (2)**
668:12,19
**Purchase (1)**
642:17
**purpose (18)**
568:24;569:23;
575:25;576:1;581:12,
14;600:11;607:5;
618:5;623:5;678:5;
722:17;756:19;758:22;
761:1,3,6,9
**purposes (9)**
583:23;618:5,17;
624:15;647:9;657:9;
658:15;659:6;747:12
**pursuant (3)**
585:17;680:6;728:18
**put (25)**
568:6,17;586:9;
608:24;617:3;651:21;
660:3;662:5;669:15,
15;673:24;675:4;
685:7;734:15;735:9;
755:20;756:10;759:23;
760:2;762:8;763:3,16;
766:25;768:12;770:7
**putting (4)**
678:3;683:11,13;
754:15

## Q

**Q-1 (3)**
674:4,16,20
**Q-2 (2)**
674:23,24
**qualification (1)**
639:10
**qualified (1)**
622:12
**quasi (1)**
755:20
**quick (1)**
616:11
**quit (1)**
777:3
**quite (4)**
590:23;605:7;
627:13;739:19
**quote (1)**
730:4

## R

**raise (10)**
689:25;692:24;
695:10;698:3;703:1,3;
709:2,4;717:18;753:9
**raised (7)**
680:16;745:25;
746:15,21;766:8;
770:18;780:14
**raises (1)**
744:18
**ran (2)**
722:20;724:13
**range (2)**
591:13;665:10
**Rangers (2)**
764:14,17
**ranges (2)**
665:13;695:4
**Ranging (1)**
764:12
**rate (1)**
609:4
**rather (1)**
749:10
**reaction (1)**
780:4
**read (50)**
568:4;574:20;577:3;
584:13;608:24;610:5,
22;611:1;612:16;
614:6,11;621:25;
625:5;634:21;650:18;
651:23;653:3,19;
654:12;655:5,20;
660:18;668:5,8;
679:25;688:18,21;
693:13;695:7;697:24;
703:8;704:10,21;
706:6,16,17;707:1,9;
715:11,23;716:10;
722:7,7;723:11,12;
740:3;766:21,23;
768:1,19
**reading (7)**
692:8;694:16;
697:10;702:8;707:21;
763:3;767:2
**reads (10)**
611:6;650:23;651:4;
653:7,11,23;654:2;
661:10;680:5;717:7
**reality (1)**
747:16
**really (4)**
653:23;678:3;
723:12;752:10
**reason (8)**
664:1;681:17,21;
747:3;762:18;767:3,3;
773:17
**reasonable (4)**
732:19;734:16;
735:24;743:12
**reasonably (1)**
737:7
**reasons (9)**
628:11;654:7;663:5,
17,19,24;664:9,16;
752:12
**REBOLD (1)**
566:3
**rebut (1)**
630:10
**rebuttal (1)**
778:11
**recall (15)**
583:17;587:20;
596:15;605:18;632:11;
633:1,8,15;634:10,15;
636:15;668:2;669:23;
672:6;729:23
**receive (10)**
583:18,20;584:12;
592:14;600:6,9,25;
618:24;750:4;766:12
**received (90)**
569:19;573:23;
574:2,3;578:10;579:2,
3;580:6,7;583:21;
584:8,9;587:7;588:1;
607:5,12;608:7,8;
614:12,13;619:14,15;
620:12;625:1,2;
642:21;643:2,7;
644:17,18;646:8,9;
648:17,19;659:17,18,
24;663:9,15;680:2,3;
681:24,24;688:8;
690:3,7,9;691:14,15;
693:2,6;695:18,19;
698:8,9;700:4,5;
702:25;703:12,14;
709:9,10;710:19;
711:8,9,12;714:19,20;
717:22;718:1,2;
719:18,20,21;726:8,9,
12;736:21;741:2;
742:12;744:16;745:1,
8;746:11;757:22;
760:5,7,18;776:4,5
**receives (3)**
589:12;600:22;676:9
**receiving (1)**
580:9
**recently (1)**
669:24
**Recess (2)**
629:3;656:20
**recipient (2)**

715:17,21
**recipients (4)**
710:5,7;716:10,24
**recipient's (2)**
705:16,18
**recital (1)**
773:25
**recognize (29)**
567:17,21;573:19;575:12,13;578:17;579:21;583:25;595:13;597:10;598:9;605:2,14;606:3;618:18;624:17;627:21;644:8;645:22;647:13;658:17,19;659:8,10;670:23;672:17;673:9;698:18,22
**recognized (3)**
676:21;677:3;748:9
**recognizes (4)**
748:10,13,14,15
**recollection (4)**
669:4;679:15;751:9;755:7
**recommendation (1)**
753:14
**recommending (2)**
623:25;624:22
**reconsider (1)**
577:1
**reconsideration (9)**
576:22,23,24;577:6;578:5,7,21;580:1;581:16
**record (20)**
597:16;599:2;603:2;666:4;688:19;697:24;703:21;725:14,18;731:13;734:9,15;735:10,20;737:18;740:25;753:3;756:10,24;760:23
**recorded (3)**
771:12;774:1,3
**recording (5)**
653:8;717:8,13;729:4;773:24
**recordings (1)**
736:22
**records (26)**
637:25;687:24,24;689:10,18;690:23;692:13,19;694:19,22;697:14,17;698:23;699:8,9,11,14,15,23;702:11;704:5;707:25;709:24;710:1;720:5;741:1
**recount (1)**
756:12
**recover (2)**
663:24;664:5
**recovered (4)**
575:25;658:20;663:6,19
**recovering (1)**
664:6
**recovery (2)**
663:9;664:1
**RECROSS (2)**
641:1;680:10
**REDIRECT (4)**
639:23;679:3,4;725:5
**refer (4)**
613:7;646:22;647:2;729:11
**reference (8)**
572:19;574:18;579:7;612:16;613:22;726:6;739:18,20
**referenced (10)**
579:6;645:5;661:10;690:1;692:25;695:11;698:4;717:19,22;767:17
**references (1)**
747:6
**referencing (1)**
747:10
**referred (5)**
609:12;613:9;651:12;666:24;721:13
**referring (5)**
681:9;720:14;745:14;753:25;775:2
**refers (2)**
613:23;775:4
**reflect (6)**
597:16;649:11;720:7;749:2;753:13;756:13
**reflected (3)**
692:19;715:2;755:9
**Reflection/cruise/conference/port (1)**
707:14
**reflective (2)**
749:7,21
**reflects (5)**
721:15;723:22;751:16;753:20;754:14
**refresh (2)**
664:7;669:4
**refreshed (1)**
679:15
**refresher (2)**
601:3;617:10
**regarding (11)**
568:7;624:3;670:3;675:6;676:16,21;677:5;738:19;742:5,6;767:20
**regardless (2)**
609:4;684:1
**Reginald (1)**
643:23
**region (1)**
620:6
**regret (1)**
623:24
**regular (1)**
618:2
**regularly (17)**
572:15;582:7;619:7;620:19,23;621:8;622:3,14;689:3,13,22;692:22;694:25;697:19;702:15;708:3;755:8
**regulated (1)**
737:9
**Regulators (1)**
655:12
**regulatory (1)**
734:14
**REILLY (75)**
574:1;575:22,24;576:2;577:12,15;579:1;580:5;581:4,25;582:4,17;584:7,25;585:9,11,14;588:4,6;691:13;693:5;695:14;698:7;700:2;705:6,8;709:8;711:7;719:3,4,6,24;720:3;721:12,22;722:1,4,9,10,16,19;723:19;724:10,12,22,25;745:10,15,20,23;747:24;748:14;750:25;751:5,9,13;752:14,18;753:8,25;754:9,21,23;755:1,4,7,11,14,17;756:1,15,16,21;757:3,10
**Reilly's (2)**
749:15;757:1
**reimbursable (1)**
769:13
**reimbursement (4)**
706:10;765:14;767:20;768:12
**reimbursements (1)**
770:4
**reiterate (1)**
745:2
**relate (5)**
601:15;690:21;704:6;753:25;765:14
**related (9)**
616:17,17,18;625:22;633:13;663:15;688:5;743:22;749:17
**Relatedly (2)**
729:16;734:4
**relates (5)**
602:3;613:18;680:16;770:18,19
**relating (3)**
626:4;657:6;748:8
**relation (2)**
593:11;738:8
**relations (1)**
773:20
**relationship (2)**
600:15;678:6
**release (4)**
632:24;633:9;656:1;660:15
**releases (2)**
591:8;633:3
**Relevance (18)**
598:16;599:8;628:8,14;673:4;674:21;675:1;676:16;677:5;745:4;748:24;754:16;756:9;761:7;762:7;764:7;768:5,7
**relevancy (1)**
749:16
**relevant (22)**
576:25;603:5;610:9,12;677:7;729:21;730:2;746:9;747:3,7,14,19;750:16;751:12;758:8;759:1,11;760:10;762:11,12;768:1;773:19
**reliably (1)**
678:11
**relief (4)**
771:19;772:2,10;774:16
**reluctant (1)**
778:7
**rely (1)**
587:8
**remain (1)**
727:2
**remember (6)**
584:18;672:10;677:25;679:21;763:12;769:2
**remembers (1)**
748:11
**remind (6)**
567:2;611:25;669:11;742:1;744:11;757:9
**reminded (1)**
566:13
**reminder (5)**
572:13,18,18,20;704:13
**remove (1)**
591:19
**render (1)**
570:1
**renews (2)**
602:8;608:4
**repeat (5)**
571:6;606:10;649:8;740:13,14
**repeating (1)**
718:12
**rephrase (1)**
665:16
**replied (1)**
684:14
**Report (16)**
614:13;616:6;617:1;618:13;644:24;645:25;646:3;649:17;668:16,18,20;670:25;672:21;673:13;705:4;706:9
**reported (3)**
610:9;613:16;614:15
**reporter (1)**
682:5
**reporting (1)**
615:21
**reports (3)**
619:22,22;644:12
**representation (4)**
585:15;683:5;684:17;757:1
**representative (8)**
688:22;689:4,15;692:9;694:17;697:11;702:8;707:22
**represented (3)**
681:7;748:15;757:8
**representing (1)**
618:8
**reprimand (1)**
591:16
**reprimands (1)**
591:15
**reputation (1)**
639:11
**request (21)**
568:8,14,15,18;569:6,17;570:2;571:12;580:1;581:16;587:22;604:18,21;607:20;620:2;625:19;650:25;710:17,19;776:6;777:19
**requested (1)**
570:21
**requests (4)**
571:1;780:5,10,12
**require (1)**
602:6
**required (5)**
594:10;604:21;611:13;612:4;640:2
**requirements (1)**
611:8
**requires (2)**
570:23;773:10
**research (1)**
774:13
**researching (1)**
569:23
**reservation (1)**

708:15
**reshow (1)**
718:6
**resign (21)**
573:13;580:17;581:19,24;582:3,20,25;583:12;584:17,19,22,24;621:17,19;622:20,21;623:16;624:10;628:9;630:14;631:23
**resignation (1)**
625:19
**resigned (8)**
623:11,14;627:1,4;630:15;631:10,17,21
**resigning (3)**
582:21;624:11;626:9
**resolve (3)**
623:15,17,20
**respect (27)**
606:24;607:8;612:9,10;690:1;692:25;695:11;698:4;703:2,4;705:8;709:3,5;717:19;720:14,17;721:5,13;724:13;728:5;746:2;748:24;751:16;752:19,19;756:21;773:15
**respectively (1)**
697:15
**respond (5)**
621:19;622:10;623:13,23;692:12
**responded (6)**
569:7;572:2,5;573:7;583:8;745:18
**responding (1)**
572:9
**responds (2)**
660:22;676:10
**response (18)**
573:8,11;586:17;610:10;618:20;651:2;652:8,9;653:10;654:3,4;655:11,16;656:10;741:1,3;742:4;743:14
**responsibilities (3)**
642:8,18;687:22
**responsible (4)**
589:9;597:6;604:8;774:24
**responsive (3)**
724:19;741:5;743:19
**rest (4)**
590:17;661:7;759:20;762:4
**rested (1)**
770:19
**restrictions (1)**
594:4
**rests (1)**
726:14
**result (7)**
626:16;627:10;662:21;712:14;713:11;715:1;756:4
**resulted (1)**
591:5
**results (5)**
691:9;710:25;712:17,21;713:8
**resume (1)**
629:2
**resumed (1)**
566:1
**retire (1)**
591:17
**retired (1)**
567:5
**retreat (1)**
706:11
**return (4)**
742:16;758:10,24;760:24
**returned (5)**
610:11,12;721:21;759:23;760:1
**Returning (2)**
594:23;759:4
**returns (1)**
610:7
**reveal (1)**
620:2
**revealed (1)**
620:3
**review (17)**
569:20;576:21;577:23;610:25;611:6;643:20;647:4;662:24;664:14,20,21;687:24;688:15;696:4;699:7;709:21;780:11
**reviewable (1)**
591:21
**reviewed (10)**
603:12;616:2;665:21;668:20,25;669:22;671:21;690:17;700:22;710:11
**reviewing (2)**
616:1;744:18
**reviews (1)**
611:7
**revise (2)**
610:13;611:9
**right (127)**
566:25;567:12;569:6;571:2,21;573:14;574:11;579:7;582:12;583:6;584:10;585:20,23;586:15,18,23;587:2,14,18,21;593:17;595:8;597:13;601:12;604:5;605:22;607:4;608:14;610:3,25;611:1;613:1,4;614:10;615:5;616:19;620:8;626:9,16,22;630:23;632:17,25;633:18,24;634:6;635:1,11;637:13,14,15;638:1,13,16,21;639:9;640:3,7,13;642:19;645:16,16;648:15;649:2,25;652:20;658:9;664:2;665:7;666:25;667:2,4,8;668:6;670:5;671:12,13,14;672:1;673:2,16;675:3;676:3,10;679:7,16;684:16;691:21;701:8;705:20;711:20;712:7,24;713:5,23;718:21;719:10,13,16,21;720:5,11,15,19,21,25;721:3,8,16,19,25;722:22;724:5,14,16,17;728:3;739:10;742:23,24;744:13;756:19;763:23;770:3;772:18;773:1;776:21
**right-hand (1)**
705:19
**rights (1)**
757:8
**risk (1)**
769:23
**Robert (2)**
588:13,14
**rock (1)**
653:13
**role (2)**
597:22;599:6
**roles (1)**
612:19
**Rome (1)**
707:5
**room (1)**
653:8
**Rosenberg (2)**
681:5;682:10
**Rosenman (33)**
681:6,17,19,22,23;682:10,12,14,16,23;683:1,16;684:7,10,13,18;686:1;687:2,3;688:11;693:12;698:18;699:7;703:19;704:1;714:22;718:12;719:7;720:4,13;722:20;723:22;725:7
**routine (1)**
670:15
**routinely (1)**
619:9
**row (1)**
703:24
**RR (1)**
648:5
**rule (9)**
611:23;620:17;628:23;703:4;709:4;717:18;728:8,18;743:10
**ruled (1)**
628:5
**rules (26)**
567:8,9,11,23,24;568:8;573:1;589:15,16,20;590:24;591:2;592:3,9;593:5,22,24;600:15;621:10;640:16;689:25;692:24;695:10;698:3;703:2;709:2
**ruling (7)**
602:10,15;603:13;677:21;678:15;725:19;780:11
**rulings (2)**
725:20;779:5
**run (4)**
593:2,19;594:10;619:21

## S

**safe (1)**
779:9
**sake (1)**
753:18
**salaries (1)**
609:13
**Sam (2)**
666:24;669:2
**same (30)**
569:4;602:10,15;603:13;607:18;638:4,10;651:3;654:1,3;661:8;662:7;664:23;666:23;673:14;685:6;702:16;711:21;712:8,9,14;713:11,22;745:8;752:9,12;766:8,21,24;780:8
**Samsung (2)**
645:15,17
**Santos (31)**
641:13,14,17,23;642:13;647:4;649:5;650:18;651:10,23;652:15;654:12;655:5,20;656:7;658:7,17;666:8;667:22;669:20,21;670:3;671:21;672:6,17,24;673:9;674:6;675:6;679:6;680:12
**S-a-n-t-o-s (1)**
641:18
**sarcastic (1)**
678:13
**sash@nycourtsgov (1)**
709:20
**sat (1)**
638:4
**Saturday (1)**
707:5
**save (2)**
685:4;746:24
**saved (6)**
650:22;651:19;658:24;660:13;662:7;680:4
**saw (8)**
617:19,21;623:6;634:4;707:16;737:23;755:8;769:9
**saying (8)**
567:11;571:4;582:20;584:18;732:15;755:21;761:2;774:11
**scenario (1)**
581:3
**schedule (2)**
776:24;777:20
**scheduled (1)**
568:20
**schedules (1)**
748:9
**scheduling (1)**
776:10
**School (1)**
593:1
**science (1)**
642:16
**screen (12)**
567:18;574:8;579:15;661:24;675:16,17;679:12;690:12;697:4;698:13;709:15;730:14
**screenshot (4)**
649:6;652:17,21;661:9
**screenshots (1)**
644:11
**script (19)**
681:10,13,18,22,25;682:8,12,19,20;683:6,15;684:7,10;719:18;770:22,24;771:2,5,16
**scripts (4)**
681:25;683:9;684:15;685:14
**scroll (10)**
615:24;635:18;669:17,18;671:10,11;672:23;697:1;706:12;721:24
**Scrolling (1)**
694:8
**SDNY (1)**
710:12
**se (1)**
612:12

**search (14)**
644:2;662:15,21;665:5,9;691:1,9;699:15;710:4;712:15,17;713:3,9,11
**searched (4)**
619:2,4;698:23;699:16
**searches (6)**
691:5;710:25;722:20;724:13,16,19
**searching (2)**
649:2,3
**season (8)**
762:12,15;763:6,9;764:13,14,19,20
**seated (1)**
728:2
**seats (1)**
763:10
**second (35)**
572:10;576:4;578:22,23;579:5;625:12;656:11;679:24;682:12,19;692:2;701:2;702:21;704:23;707:8;713:6,16;719:21;721:13;722:21;723:18;725:10;733:9;737:23,25;739:4,9,13;742:12;743:20;747:24,25;759:9;773:8;776:10
**seconds (6)**
655:12;733:2,7,9,10,17
**secretary (1)**
613:25
**section (11)**
568:2,4;646:1;650:17;672:20;673:13;698:13;712:9;768:19;769:2;773:18
**sections (2)**
765:13;766:20
**security (1)**
664:5
**seeing (2)**
597:14;624:18
**seek (10)**
568:12;746:7;749:2;757:25;758:3,7,9;763:5;766:18;767:21
**seeking (10)**
578:7;706:10;746:10;747:9,15;751:17;758:10;762:14;766:19,20
**seeks (1)**
764:7
**seem (2)**
750:5;753:1
**seemed (3)**
620:22;621:8;622:13
**seems (7)**
739:8;752:5;762:18;764:5,6,6;766:6
**segment (1)**
596:25
**selected (2)**
649:24;668:13
**seminars (1)**
663:14
**send (2)**
600:18;611:13
**sender (6)**
650:19;651:23;653:3;655:21;660:18;679:25
**senders (2)**
655:5;710:5
**sending (1)**
676:1
**senior (1)**
766:16
**sense (4)**
656:18;755:21;771:2;776:12
**sent (48)**
569:20;570:18;595:1;607:25;608:1;650:21,22;651:3,13,16,18;652:2,19,21,22;653:6,22;654:1,15,17,24;655:8,12,14,24;659:11;660:1,20;666:21,21;676:7;681:4,9;685:14;686:1;704:12,20;706:22;707:3;715:10,12;716:12,24;731:15;758:17;759:5;761:24;770:21
**sentence (2)**
608:25;625:5
**separate (2)**
571:19,20
**September (2)**
692:18;704:20
**serial (1)**
645:8
**series (3)**
624:20;661:14;716:7
**serious (1)**
591:20
**seriousness (1)**
603:8
**serve (18)**
571:25;572:10,14,23;573:6,12;574:22;575:5;580:16;587:17,19;589:22;597:8,19;621:22;622:1,12;747:12
**served (1)**
597:22
**serves (1)**
590:2
**service (5)**
622:24;624:3;635:10;692:17;693:19
**services (4)**
692:15;694:9;697:5;717:3
**serving (4)**
617:13;620:18;622:4;639:11
**session (2)**
653:8;657:1
**sessions (1)**
771:10
**set (5)**
711:15;722:21,25;745:11;747:25
**sets (1)**
764:17
**seven (3)**
568:20;614:10;733:17
**several (9)**
690:25;695:6;697:22;698:15;702:1,5;710:3;765:13;770:22
**severity (1)**
591:13
**shall (1)**
611:22
**share (2)**
621:11;683:24
**shared (3)**
684:7,10;765:23
**sharing (1)**
683:18
**short (1)**
774:8
**shorthand (2)**
613:8;621:7
**shortly (2)**
600:13;617:10
**shot (1)**
661:24
**show (66)**
573:16;575:9;578:14;579:18;583:22;595:10;598:6;602:4;604:22,24;605:1,10,20,24;616:2;622:8;624:14;627:19;644:4;645:19;647:8;658:14;659:5;670:7;672:13;673:7;674:3,23;675:10;677:12,14;690:10;691:7;693:10,10,21;695:21;696:2;698:11;699:19;700:7;701:10,17;703:16;704:8,16;705:22;706:4,14,24;709:12;710:20;712:2,25;714:7;715:4;716:4;719:25;725:4;729:19;748:25;749:10;760:23;763:17;767:20;768:1
**showed (12)**
602:2;605:19;620:20;621:22,24;622:6,9,10,11;636:9;674:6;699:17
**showing (7)**
574:8;575:25;576:2;607:5;615:14;618:16;678:5
**shown (2)**
602:1;679:10
**shows (7)**
576:4;675:22;698:13;713:6;730:9,10;751:13
**sick (1)**
653:7
**side (7)**
582:9;651:8,8;662:5,5;691:20;762:17
**Sidebar (13)**
598:17;599:1;602:16;603:1;627:25;628:1;671:18;676:16;677:1;680:17;681:1;770:18;771:1
**sign (4)**
730:4;737:22;748:8;755:13
**signature (6)**
689:6;690:15;748:13,14;752:25;755:22
**signatures (2)**
748:11;751:17
**signed (30)**
607:2,6;734:5,10,17,20,20,24;735:11,15,22;737:11,13,16,22,23;738:5,11;740:21;746:8;751:6,7,8,9,10;752:16;753:12;754:13;755:8;773:22
**significant (6)**
737:5;740:24;741:4;745:3;776:9;777:19
**signing (9)**
735:3;737:25;738:1,24;739:3;748:11;751:2,19,21
**signings (1)**
661:11
**signs (2)**
749:5,6
**Silberman (1)**
578:11
**similar (5)**
685:14;714:5;748:1,21;749:6
**Similarly (6)**
673:9;713:3;746:8,12;751:20,20
**simple (2)**
604:18;773:17
**simply (5)**
630:13,15;736:5;762:15;780:5
**single (2)**
628:20;682:1
**sit (1)**
612:17
**sitting (5)**
567:5;596:12;778:2,2;779:1
**situation (1)**
624:6
**situations (2)**
662:25;664:13
**six (4)**
590:11;597:7;614:6;778:23
**skip (3)**
653:17;660:25;688:20
**slide (1)**
602:4
**slow (1)**
679:12
**slowly (2)**
578:16;604:24
**small (1)**
569:21
**smarter (1)**
630:5
**Smith (19)**
566:13,15,20;567:17;568:1;573:19;574:12;575:12;578:17;579:8,21;585:12,16;586:11;738:22;739:2,12;740:18;754:24
**SM-J327T1 (1)**
645:18
**SMS (1)**
673:13
**snapshot (1)**
710:18
**somebody (6)**
569:2,8;608:19;670:16;755:16;767:11
**somehow (1)**
770:4
**someone (8)**
571:7;596:3;604:17;655:17;716:23,23;730:5;735:3
**sometime (1)**
726:24
**sometimes (4)**
570:9;623:9;630:5;633:5
**soon (1)**
686:7

**Sorry (36)**
568:17;572:6;
577:10;579:24;582:10;
593:15;594:8;600:3;
615:14;616:10,22;
622:18;624:6;646:13;
648:2,3;649:8;666:3;
675:16;681:20;682:4,
22,25;683:12;694:14;
698:15;711:4,11;
718:9;721:6;724:10,
17;730:16;731:21;
744:4;772:1
**sort (14)**
566:22;569:17;
577:11;580:23;583:6;
592:16;596:16;615:12;
634:24;644:24;710:18;
746:17;751:23;776:10
**sorts (6)**
591:11,24,25;752:3;
768:23;780:17
**sought (3)**
578:5;758:22;774:16
**sounded (1)**
767:10
**sounds (3)**
766:2;767:7,8
**source (5)**
614:14;615:17,21;
635:25;762:19
**sources (1)**
635:25
**Southern (3)**
642:2;683:19;687:14
**souvenirs (1)**
769:17
**SP (1)**
706:10
**spaced (1)**
682:1
**spare (2)**
625:8;651:1
**speak (5)**
569:12;623:3;
746:14;751:1;760:18
**speakers (1)**
593:21
**speaking (8)**
569:5;571:23;572:2,
5;573:4;590:22;
591:24;607:14
**speaks (2)**
760:19;766:10
**Spears (1)**
769:21
**special (10)**
687:16,23;700:12,
13;736:19;740:17;
741:6;743:18;753:3;
774:24
**specific (4)**
616:16;647:19;
739:17;768:18
**specifically (10)**
582:21;622:2;645:2;
646:1;649:19;661:25;
723:16;728:20;746:3;
763:2
**specified (1)**
611:13
**spend (1)**
770:1
**spent (1)**
770:8
**spoke (12)**
617:16;622:23;
623:2,4;626:9;733:3,
11,13;760:23;761:2,
25;777:6
**spoken (1)**
770:25
**sporting (3)**
763:7,14;769:17
**sports (5)**
758:1;762:6,16;
763:19;764:12
**spouse (2)**
614:12,13
**spreading (1)**
590:10
**spreadsheet (5)**
672:25;673:1,10;
677:7;695:4
**spreadsheets (7)**
673:20;674:8,11;
676:21;677:3;695:2;
697:21
**square (2)**
699:1;707:11
**st (1)**
680:5
**staff (4)**
569:11;590:12,18;
617:23
**stamped (2)**
569:19;573:23
**stand (5)**
566:12;677:21;
678:15;772:20;779:8
**standard (2)**
754:2;769:14
**standards (1)**
612:3
**stands (4)**
645:6,11;716:21;
717:2
**start (4)**
654:6;672:15;733:6;
777:13
**started (6)**
566:22;660:8,14;
736:21;773:12;777:5
**starting (5)**
692:8;697:10;
698:16;706:17;731:19
**starts (1)**
654:15
**State (47)**
567:5,6,9;574:21;
588:22,24;589:8,10,11,
18,19;590:5,6,25;
591:22;592:24;596:9;
601:23;602:5;604:10;
609:3,5,6,6,8,13,13,16;
611:15;612:16;613:9;
620:7;625:12,14;
633:14;639:5;642:16;
665:2;734:14;747:4,8,
14;749:23;751:25;
752:1;775:5,6
**statement (37)**
582:22;604:17;
609:2;610:5,8,10,11,
12,13;611:6,7,8,10,11,
18,20,21;613:3,21;
614:19;636:19;685:1,
3;688:24;730:7;736:8;
743:21,22;773:13,13,
18,19,21,25;774:2,3,12
**statements (24)**
601:20;604:10,12;
605:7,17;606:4;
607:15;608:18,21;
610:25;612:20;616:25;
637:4,8;689:9;690:20,
21;692:15;741:7;
743:17,18;747:15;
750:21;766:9
**States (4)**
687:13;738:8;
743:25;773:20
**state's (1)**
591:23
**station (1)**
645:11
**statistical (1)**
618:21
**status (1)**
653:15
**statute (5)**
569:1;570:22;635:6;
773:10,14
**statutes (1)**
590:24
**statutory (3)**
569:4;591:1;774:14
**stay (1)**
583:7
**stenographic (1)**
773:23
**step (2)**
752:22;769:1
**Stephenson (19)**
586:8;635:15;
636:10;669:5,15,18,19;
670:2,7;672:16,22;
673:7;674:3;675:3,12;
719:24;720:2;721:22;
723:21
**stepped (1)**
628:16
**steps (1)**
569:18
**still (14)**
566:13;582:22;
587:8;595:22;623:7,8;
634:5,8;641:23;656:8,
13;748:19;775:3;778:2
**stipulate (1)**
763:22
**stipulated (12)**
689:24;690:2;
692:23;693:1;695:9;
698:2;702:22,25;
709:1;717:17,20;
722:11
**stipulation (19)**
688:18,20;690:2;
693:1;694:13,15;
695:8,12;697:9;698:1,
5;702:7,23,24;707:20;
717:5,6,21;721:25
**stipulations (3)**
722:8;725:15,20
**stop (3)**
669:19;671:10,13
**store (5)**
742:9,10,15;759:2,
19
**stored (4)**
702:18;708:11,19,24
**story (1)**
754:4
**strategic (1)**
768:10
**stretch (1)**
622:13
**stricken (3)**
585:2;612:22;626:1
**strike (1)**
723:25
**string (4)**
655:20;660:8,10;
671:3
**stroked (1)**
653:9
**stronger (1)**
591:16
**stuff (2)**
742:21;762:4
**sub (1)**
769:2
**sub-exhibits (2)**
689:8,17
**subject (9)**
611:22;624:8;628:3;
704:21,21;725:19;
747:5;749:24;777:4
**submit (3)**
571:12;587:21;770:4
**submitted (4)**
578:8;583:15;
586:14;780:10
**subpoena (5)**
585:17;741:4;742:4,
12;743:20
**subpoenas (4)**
654:20;741:1,2;
743:15
**subscribed (1)**
694:20
**subscriber (5)**
645:12;692:16;
702:10;703:23;707:23
**Subscription (5)**
762:6;763:13;764:9,
11,20
**subscriptions (4)**
758:1;763:6,19;
764:5
**subsequently (2)**
569:15;747:2
**subset (2)**
668:8,12
**substance (1)**
780:7
**substantial (1)**
591:9
**substantially (5)**
748:1,21;769:23;
773:24;774:9
**succinctly (1)**
665:3
**sufficient (5)**
734:13;740:22;
743:9,11;745:3
**Suffolk (2)**
620:10;633:15
**suggest (3)**
581:2;746:7;778:1
**suggested (3)**
584:20;587:21;
774:21
**Suite (1)**
704:15
**sum (2)**
598:2;773:1
**summarize (6)**
691:9;699:22;
701:19,24;710:24;
715:24
**summarized (6)**
691:18;713:1,20;
714:24;718:13,16
**summarizes (9)**
700:10,11;701:12,
13,20;711:18,19;
712:3;713:21
**summary (9)**
581:17;644:25;
646:16;649:11;683:16;
701:3;712:17;720:4;
736:19
**summation (1)**

743:1
**supervisor (3)**
619:23;643:23;668:18
**supervisory (1)**
716:2
**supplemental (1)**
780:12
**supplies (1)**
769:16
**supply (1)**
769:16
**supported (1)**
663:25
**suppose (2)**
674:9;775:12
**supposed (2)**
577:11;684:18
**Supreme (12)**
574:22;580:1;594:13,20;596:12,15,16,21;597:7;609:17;637:22;638:6
**sure (23)**
587:20;606:11;651:25;676:14;683:3;684:4;685:1;718:7;720:21;724:11;732:25;736:13;740:5;748:19;750:9;755:22;757:20;760:3;772:4;775:11;776:13;777:22;778:21
**surname (1)**
670:22
**surprised (1)**
655:17
**surrounding (1)**
751:1
**suspended (1)**
652:4
**Sustained (42)**
577:13;581:5;582:1;585:1;592:2,6,11;596:2;599:12;600:24;601:10;607:9;612:22;615:8;616:15;626:1,7,18;627:9,25;631:4,25;635:3,8,13;636:22;637:1;639:14;664:12,19;670:1;671:14,17;673:5,18;674:2,22;675:2;677:5;722:14;750:15;752:11
**sustaining (1)**
630:2
**sworn (4)**
566:17;588:16;641:16;687:5
**Sylvia (40)**
571:7;581:7;596:3;605:18;650:23;651:1,19;652:8,19;653:10;654:3;655:8,16;660:13,21,22;661:10;662:7;680:4;689:10;690:16;692:16;693:20;694:21;696:1;700:11;701:9,14,20;703:23;704:14;705:18;706:11;709:17;714:11;715:3,13,21;716:17;718:15
**sylviaash@aolcom (1)**
702:11
**S-y-l-v-l-a (2)**
703:22,25
**system (22)**
589:10;592:25;600:16;601:21;604:6,8,11;607:20;609:3,8,12;613:8,9,10,12;617:25;618:10;664:3;721:2,18;722:13;740:2
**systems (3)**
708:11,19,24
**szymomworonowich@dfsnygov (1)**
716:13

## T

**table (2)**
746:14;759:19
**tablets (1)**
642:11
**tailored (1)**
569:16
**talk (7)**
568:16;632:16;635:9;652:11;761:4;767:6;776:11
**talked (7)**
576:9;580:9,25;624:7;634:12;683:22;765:19
**talking (4)**
566:22;570:25;573:3;732:8
**talks (2)**
569:2;603:3
**tandem (1)**
768:20
**tape (1)**
729:4
**tax (1)**
610:7
**tax/insurance/transfers/and (1)**
707:14
**taxes (1)**
694:11
**teacher (1)**
593:23
**team (6)**
678:10;684:10;688:15;719:13,15;763:19
**teams (4)**
758:1;762:6,16;764:12
**technical (3)**
656:12;660:9;718:5
**technically (1)**
773:14
**Technologies (2)**
692:10,11
**telephone (12)**
670:16;694:19;697:13;717:8,9,9,10,13,14,14,15;769:15
**telling (2)**
621:5;760:24
**tells (1)**
735:2
**Tembeckjian (22)**
588:13,14,19;593:10;598:7;604:4;605:2,14;606:3;608:12,15;610:20;611:1;613:4;614:4,18;624:17;628:17;630:14;631:8;639:25;641:9
**Tembeckjian's (1)**
602:7
**tended (1)**
663:14
**tendering (1)**
625:19
**tends (3)**
677:12,14;748:25
**term (4)**
590:2;710:14;713:25;773:19
**terms (3)**
600:12;710:16;776:24
**testified (31)**
566:17;576:16;585:16;586:25;587:13;588:16;628:11;631:8,11;632:9;634:3;636:12,14;637:19;638:3,18,24;641:16;661:14;670:3;671:21;675:6;685:11;687:5;719:9;720:13;722:20;733:23;735:13;738:23;748:3
**testifies (2)**
757:6;776:7
**testify (25)**
676:20;677:2;683:16;688:23;689:5,16;692:10;694:18;697:12;702:9,16;707:22;746:5;748:4,10;752:15;754:16,19;756:14;758:16;765:6,8;766:7;776:6,21
**testifying (3)**
658:8;668:2;776:17
**testimony (54)**
587:20;602:8;632:11;634:15;668:22;679:20,22;682:10,11;688:12;693:24;699:5;719:16;720:21;729:3;731:9;732:5;733:18;734:22;738:19,21;739:7,24;740:17;744:20;746:1,17,21;747:13,22,24;749:16;751:24;754:10;755:5;756:8;758:25;760:11,16;762:8,10;764:2;765:6;766:11;768:5,8;769:25;770:20,21,22;772:25;778:3;779:2;780:9
**texted (1)**
731:13
**texts (13)**
685:13;729:7,9,12,21;730:3;731:17;733:25;736:6;762:10,25;763:3,16
**Thanks (2)**
651:1;680:5
**then-chair (1)**
581:10
**thereafter (2)**
629:2;633:22
**therefore (1)**
735:23
**thereof (4)**
689:8,17;773:24;774:4
**thinking (1)**
750:16
**third (3)**
572:13;586:9;625:14
**Thirteen (2)**
642:5;712:16
**though (5)**
633:21;686:1;739:7;757:25;774:23
**thought (16)**
570:9;602:18;621:17;695:16;711:3;716:6;721:6;734:8;742:23;752:7;757:3,4,5;758:5;761:6;780:4
**thousand (1)**
643:13
**thousands (1)**
663:18
**thread (1)**
779:21
**three (19)**
579:10;590:5;605:19;614:23;638:22,22;639:3,7;681:25;693:15;699:22;731:23;733:17;736:7,16;740:24;750:25;764:17;771:14
**three-page (2)**
572:6;578:17
**Three-paragraph (2)**
572:7,17
**throughout (7)**
566:12;589:11;609:6;658:3;677:24;719:2;749:1
**Thursday (3)**
715:13;777:5,9
**tickets (30)**
706:20;762:9,11,12,15,19,19,23,23;763:1,7,8,11,11,14,17,18,20;764:4,9,11,13,13,15,16,17,17,19,19;769:20
**tiers (1)**
609:9
**till (4)**
718:22;777:7;779:12,18
**timely (1)**
611:9
**times (2)**
748:5;778:22
**timing (1)**
657:9
**tipping (1)**
769:14
**title (10)**
568:4;589:2;611:6;613:15;614:21;642:6;656:1;661:4;687:15;771:6
**titled (1)**
654:23
**T-Mobile (6)**
694:17,23,24,25;699:9,23
**today (13)**
585:20;655:9;671:25;672:19;682:13;685:13;688:17;693:25;698:20;719:16;726:6;772:18;774:13
**today's (1)**
699:4
**together (1)**
747:19
**told (42)**
579:14;581:19;583:3,9,12;585:22,25;586:3;621:21;623:12,14,14,24;624:9,21;630:14;631:23;634:8;637:3;652:4;654:19;682:2,7,9;683:20;707:4;730:3;732:8,12;733:19,22;735:3,8,14,15,21;739:2,19;741:6;748:7;771:16;775:7
**toll (1)**

720:4
**Tom (1)**
670:10
**Tomlin (1)**
670:15
**tomorrow (8)**
680:5,8;726:22;
727:4;777:15;778:8;
779:8,12
**tonight (1)**
780:18
**took (7)**
621:3,22;652:7;
658:7;749:23;754:22;
772:20
**tools (3)**
643:3,5;663:16
**top (14)**
574:12;577:3;579:7;
586:22;619:17;625:18;
636:13;659:20;693:23;
697:4;699:1;709:15;
715:19,21
**top-right-hand (1)**
694:2
**Tops (1)**
779:6
**total (12)**
638:24;692:5;694:6;
711:19,21,23,25;
712:11,21;713:8;
723:23;773:1
**touch (1)**
620:13
**touched (1)**
736:25
**toward (3)**
583:2;631:19;694:8
**town (4)**
609:9,11,14,15
**traffic (1)**
763:11
**train (1)**
593:21
**training (37)**
592:3,8,14,16,20,21;
593:2,7;594:10,16,20;
600:6,11;601:1,12,14,
15,25;617:10;637:11,
15,17;638:1,8,13,15;
640:2,7;642:21,24;
643:1,7;663:9,12,13,
17;713:24
**transaction (3)**
691:2,4,25
**transactions (1)**
714:23
**transcript (4)**
739:7,12,21;740:3
**transcription (2)**
773:24;774:4
**transfer (2)**
714:5;742:22
**transferred (1)**
578:12
**Transportation (2)**
769:14,14
**treasury (1)**
613:25
**Trial (15)**
566:1;612:2,5,12;
643:19;685:12;690:4;
693:3;702:25;717:22;
731:9;732:6;736:17;
761:17;777:13
**trick (1)**
761:14
**tried (2)**
578:11;775:4
**trips (1)**
654:25
**trouble (2)**
730:6;735:4
**true (19)**
604:14;647:2;
658:25;677:15;688:23;
689:6,8,17;692:14;
694:19;697:13;706:9;
717:7,12;747:17;
763:4,4,22;772:18
**trustee (1)**
613:24
**truth (4)**
606:25;607:7;
747:16;749:10
**truthful (1)**
582:22
**try (5)**
665:17;744:21;
757:14;762:21;767:9
**trying (10)**
616:11;626:23;
628:18;682:4;732:24;
744:14;750:10;761:14;
767:7;779:16
**Tuesday (2)**
706:19,22
**turn (13)**
634:12;693:15;
694:12;695:22;697:9;
698:12,24;702:7;
704:23;707:7,19;
715:15;761:14
**turned (3)**
572:14;771:11,16
**turning (7)**
573:3;586:17;
668:22;740:24;743:16;
761:19;772:15
**TV (1)**
694:10
**Twenty (1)**
712:13
**twice (2)**
738:6;741:6
**two (62)**
568:10;569:10;
571:18,19,20;580:9;
586:17;590:1;593:2;
594:3;609:8,20;610:1;
613:6;614:5,25;640:6;
641:23;643:13;645:10;
669:21;671:8;672:13;
674:8,10;677:8,9,12,
14;679:14;680:8;
681:25;697:7;702:1;
713:15;725:8;728:5,
21;729:25;730:25;
731:24;734:4,12;
735:23;736:15;740:22;
741:2;743:14;750:22;
758:9,10;764:12,16,16,
17,19;765:6;766:2;
771:20;774:24;777:5;
779:4
**two-page (1)**
603:11
**type (9)**
592:20,20;594:11;
646:16;662:10;691:25;
709:24;746:1;755:17
**typed (1)**
755:10
**types (3)**
592:14;600:16,21
**typically (2)**
595:1;600:16

## U

**UCS (4)**
613:6,8,11;614:14
**ultimately (1)**
583:11
**unable (1)**
760:22
**unaware (1)**
681:8
**uncomfortable (1)**
739:3
**under (23)**
566:13;590:25;
593:20;594:1;608:25;
609:25;635:6,25;
650:15;689:25;692:24;
694:9;695:10;697:5;
698:3;703:1,3;709:2,4;
717:18;728:8;753:24;
774:11
**underlying (2)**
749:20,21
**underneath (1)**
597:15
**understood (8)**
603:9;606:20;624:6;
721:6;723:15;737:6;
765:3;767:5
**unexpected (1)**
779:20
**unfair (1)**
750:17
**unfairly (1)**
748:22
**unfortunate (1)**
774:23
**unfortunately (1)**
744:12
**Unified (4)**
604:6;609:3;613:8,
10
**Union (28)**
571:15;572:1,11;
573:6;575:6;578:11;
580:17;581:20;582:6;
583:13;616:7;617:5,
14,19,25;618:22;620:5,
22;621:6;635:11;
656:2;689:19;691:6,
22;705:17;767:21;
768:10;770:2
**unions (1)**
688:6
**Union's (2)**
583:15;620:15
**unique (1)**
644:25
**United (4)**
687:13;738:8;
743:25;773:20
**University (2)**
593:1;642:16
**unless (1)**
778:16
**unlikely (1)**
755:23
**unlimited (1)**
697:6
**unpaid (1)**
613:23
**unpublished (2)**
570:9;587:8
**untenable (1)**
624:7
**up (45)**
574:8;576:4;586:9;
615:14;617:18;623:6,
10;635:15;636:10;
646:21;650:5;651:21;
654:5,20;669:6,15,15,
20;673:24;675:4,16;
676:23;680:6;685:5,
17,18;688:19;692:17;
706:17;723:21;726:24;
730:13;732:13;733:25;
734:24;737:19;752:24;
755:10,17;759:13;
766:20,23;768:13;
770:1;778:23
**upcoming (1)**
704:13
**updates (1)**
602:6
**upon (2)**
617:21;684:2
**upper (1)**
705:19
**upset (1)**
779:1
**upshot (1)**
746:25
**USA (4)**
692:12,18,21,21
**use (5)**
618:2;643:3,5;
663:16;769:9
**used (7)**
593:10;672:18;
673:11;722:5;773:19;
775:2;778:13
**user (12)**
652:2,18;653:22;
655:24;656:8;658:23;
659:12,21;660:13,21;
667:10;680:3
**using (2)**
621:7;747:11
**usual (3)**
619:9;633:2;705:10
**usually (5)**
597:3;716:23;
754:19,22,23

## V

**vague (1)**
582:22
**value (4)**
750:6,11;752:4;
769:22
**variables (1)**
663:23
**various (8)**
590:7;605:8;748:5;
762:9,16;763:7,19;
766:20
**vault (1)**
642:12
**verbatim (2)**
773:25;774:9
**verified (2)**
622:20;623:9
**Verizon (6)**
697:12,17,18,19;
699:8,23
**vernacular (1)**
609:12
**version (11)**
651:16;652:21;
659:12;664:3,4,4;
672:20;673:10;676:5;
748:21;751:3
**versus (1)**
759:4
**Vestfrid (13)**
685:8,10,14;686:4;

770:19;771:11,13,16,17,22,24;772:12;773:4
**viability (1)**
747:16
**vice (1)**
613:24
**Victor (1)**
655:3
**video (1)**
651:15
**Vienna (1)**
654:25
**view (4)**
684:25;685:23;773:6,16
**views (4)**
758:3,4,5;777:18
**village (4)**
609:9,11,14,15
**violate (4)**
729:2,14,19;731:1
**violating (1)**
599:5
**violation (4)**
612:3;685:22;773:17;774:17
**violations (5)**
589:14,15;591:24;612:12;688:6
**virtually (2)**
594:3;750:16
**visible (1)**
724:11
**visit (3)**
759:13,15,17
**visited (1)**
735:8
**voice (1)**
682:3
**voicemail (3)**
717:8,13;733:3
**voicemails (1)**
720:10
**volume (3)**
677:11,13,19
**voluminous (3)**
690:23;699:11;710:1
**vote (1)**
570:3
**voted (1)**
573:8

## W

**wait (3)**
583:9;740:7;779:12
**waiting (4)**
576:4;657:4,5;679:11
**walk (1)**
569:17
**wants (5)**
568:7;763:22;768:22,22;777:14
**warrant (1)**
774:20
**wave (1)**
715:14
**way (24)**
568:17;570:24;583:6;590:9;603:6;607:18;623:15,17,20;633:8;634:9;654:2;684:21;723:11,12,16;732:15;734:24;766:21;772:14;774:6,18,22;777:13
**ways (1)**
568:10
**weak (1)**
653:12
**web (1)**
617:18
**webinars (2)**
643:2;663:14
**website (14)**
567:25;570:17,17;590:20,22;591:4,10;595:15;617:20,21;623:6;634:5,5,6
**websites (1)**
623:10
**Wednesday (2)**
704:14;706:8
**wee (2)**
732:23;733:1
**week (3)**
584:21,23;726:25
**weeks (1)**
593:3
**weren't (1)**
667:4
**Westchester (2)**
620:11;633:15
**what's (38)**
567:15;568:14;579:19;583:23;590:22;600:19;604:23;605:24;615:13,17,22;630:12;642:6;644:8;645:5,20;646:18;647:9;648:21;651:10,12;652:13,25;654:9;655:19;658:15;661:23;662:3;664:7;679:19;705:7;720:22;721:23;738:17;740:8;753:15;758:18;765:9
**whatsoever (1)**
774:19
**White (3)**
593:1;597:15;687:20
**whole (7)**
715:24;722:2,7;753:23;765:17;775:10;780:4
**Who's (1)**
736:12
**whose (3)**
650:8;729:10;773:15
**wide (1)**
654:4
**willfully (2)**
611:18,19
**willing (1)**
780:6
**wind (1)**
778:23
**wipe (1)**
759:2
**wiped (1)**
759:11
**wiping (2)**
742:13;760:10
**Wireless (1)**
697:12
**wiretaps (1)**
736:22
**wise (1)**
757:6
**wishing (1)**
650:24
**withdraw (4)**
580:18,19;581:20;587:25
**withdrawal (1)**
587:22
**withdrawing (7)**
580:20,23;581:2;583:21;584:3;585:3;625:18
**withdrawn (2)**
668:12;756:4
**within (15)**
567:6;584:21,22;604:8;611:12;638:10;665:13;699:15;707:16;738:7;743:24;751:14;767:3,3;774:7
**without (7)**
582:20;630:16;674:17;681:15;684:19;728:12;774:7
**witness (114)**
566:5,12,16;573:17;575:10;578:14;579:19;583:23;588:10,11,12,15;593:13,15,17;594:8;595:12;597:16;603:11;604:23,25;605:11;606:1;618:16;624:16;627:19;633:5;637:10;640:19;641:10,11,12,15,17;644:5;645:20;647:9;658:15;666:12,15,19;667:1,3,5;669:6,17;670:8;673:8;674:4,23;675:18,21;676:18;677:2;680:13,14,15;681:4,10,11;683:4,16,18;685:1,3,7,10;687:4;688:22;689:4,15;690:10;691:7;692:9;693:21;694:17;697:10;699:19;701:10,17;702:8,16;705:11,22;707:9,21;710:20;714:7;715:4;720:1;721:9;723:7,15;727:2,3;738:22;758:16;764:4;770:18;771:24;772:9,17,20;773:3,4,8,12,15,18,20,21,25;774:4,11
**witness' (1)**
646:11
**witnesses (6)**
683:24;687:25;728:5;767:1;774:24;779:4
**witness's (2)**
675:17;684:2
**wonderful (1)**
650:24
**Wong (77)**
672:4,8,12;673:1,15,21;675:15,23;676:1,7,10,17;677:4;698:25;700:12;701:9,21;710:9;712:5,6,11;724:14,16;728:25;729:9,13,17,24;730:3;731:13;732:1,7,8,15,24;733:8,11,18,19;734:5,6;735:2,5,15;736:20,20,21;737:19,24;738:4,5;739:17,18;742:5,7;746:19,21;747:10;748:7,16,25;749:9,10,12,12,20;752:8;754:4;757:22;762:9,12,13,16;763:1,7,17;764:15
**Wong's (7)**
672:9;731:10;747:15;749:21;750:22;751:16;752:20
**word (4)**
583:7;593:10;767:11;770:25
**words (1)**
676:19
**work (10)**
588:21,22;594:23;642:1;687:12,13;688:1,4;700:14;777:20
**worked (7)**
588:24;632:10;642:4;687:17;700:16,17;766:15
**working (3)**
575:16;592:12;654:6
**works (2)**
638:19;667:8
**workshops (2)**
643:2;663:15
**worried (2)**
765:1;779:1
**worse (1)**
661:8
**worth (1)**
642:25
**write (7)**
568:12;569:15,15;577:5;735:7,8;780:21
**writing (3)**
604:21;650:25;745:19
**written (14)**
568:12,15,18,21;569:13,17;570:25;580:21;587:22;595:6;681:15,23;771:15;773:21
**wrong (6)**
606:17;652:10;770:4,24;771:3;780:17
**wrote (3)**
735:5;754:25;755:6

## X

**Xavier (2)**
649:23;655:19

## Y

**Yaana (2)**
692:10,10
**Yankees (2)**
764:14,20
**year (17)**
586:20;605:18;606:16;608:18,20,21,22;609:2;613:19;614:20;616:19;622:14;634:19;638:16;651:5;706:2;713:4
**years (16)**
589:1;591:6;592:13;594:3;616:4,6,24;620:4,21;622:8;642:5;670:15;688:3;712:8;766:15;767:12
**Yesterday (3)**
566:22;585:16;612:1
**York (44)**
567:5,9;570:19;574:21;588:22,24;589:8,10,11,16,18,19,20;590:5,6;591:22;592:24;596:10;601:23;604:10;609:6,8;613:9,10;618:1;619:21;620:6,7,9,10;625:12,

14;635:6;638:20,23;
639:5;642:3,16;656:2;
661:3;683:19;687:14;
764:12;775:1

## Z

**zebra (1)**
771:8
**zero (4)**
712:16,23,23,23

## 0

**07836-313603-01 (1)**
693:19
**08-34 (5)**
572:7;578:9,23;
579:6;581:22

## 1

**1 (21)**
584:10;692:9;
694:16;697:10;702:8;
708:9,17;711:23;
712:11,19;713:9;
714:13,23;715:8;
716:15;722:22,25;
723:23;724:1;735:14;
773:21
**1' (1)**
708:7
**1,000 (2)**
635:24;672:6
**1:15 (2)**
733:14,16
**1:45 (3)**
682:13,20,24
**1:48 (1)**
681:24
**10 (10)**
619:4;624:21;
658:21,23;659:12;
660:13,21;661:2,17;
680:3
**10:00 (1)**
727:4
**10:30 (1)**
779:8
**10:38 (1)**
680:4
**100 (1)**
567:24
**100.3 (1)**
568:2
**1001 (6)**
702:7,23;725:15,25;
726:2,11
**1002 (5)**
694:12;695:16,17,
19;726:3
**1003 (4)**
692:8;693:2,4;726:3
**1004 (5)**
688:19;690:3,5,8;
726:3
**1005 (3)**
707:20;721:23;726:5
**1006 (8)**
695:12;697:9;698:5,
9;725:15,25;726:2,11
**1007 (1)**
725:25
**1008 (6)**
717:6,21;718:2;
725:25;726:2,11
**103 (1)**
575:11
**108 (1)**
725:15
**1099 (6)**
610:7;704:22,25;
705:4,9;706:1
**11 (9)**
580:12,15;589:24;
597:21,23;622:22;
626:2;639:3,10
**11:00 (1)**
779:9
**11:23 (1)**
652:3
**11:29 (1)**
651:4
**11:45 (1)**
652:9
**113 (4)**
758:13,19;759:8,13
**115A (1)**
748:2
**11th (1)**
625:20
**12 (3)**
567:4;692:1;701:22
**12/9 (1)**
778:1
**12:01 (1)**
653:6
**12:05 (1)**
653:11
**12:15 (1)**
654:18
**12:15:39 (3)**
671:9,11,13
**12:16 (1)**
655:24
**12:23 (1)**
656:16
**13 (14)**
614:11,12;615:19;
616:18;617:1;635:17,
18,23;708:10,11,24;
711:20;713:16;721:3
**13th (2)**
720:24;721:7
**14 (1)**
638:24
**1478 (3)**
650:13;651:2;659:1
**15 (2)**
608:21,22
**155 (1)**
739:9
**15-78 (3)**
574:16;584:4;585:6
**15-day (3)**
611:11;636:16;637:7
**15-minute (1)**
629:1
**16 (4)**
653:22;654:1;692:4;
717:10
**160 (2)**
642:25;663:13
**16th (2)**
777:10,11
**17 (6)**
695:22,24;701:2;
731:10;740:9,9
**179 (1)**
713:10
**17th (4)**
731:19;732:2,21;
733:4
**18 (11)**
586:18;659:22,24;
675:14,22;701:9;
717:15;731:22;732:8;
733:7;763:10
**18th (13)**
732:15,23;733:6,9,
16,19;734:6,7,17,25;
735:10,22;737:13
**19 (3)**
669:17,20;730:4
**190 (1)**
673:1
**1978 (1)**
591:6
**1990 (3)**
604:15;607:23;608:3
**1c (1)**
721:24
**1st (9)**
581:6;591:6;597:21;
600:12;720:24;721:7,
15;733:23;738:20

## 2

**2 (21)**
599:2;636:1,2,2,3;
689:4;691:1;708:15;
711:25;712:14,21,22;
713:12,23;721:14;
722:12,21;723:1,23;
724:1;773:23
**2,000 (2)**
620:5,21
**2.09 (1)**
769:2
**2.09-1 (2)**
769:3;770:6
**2.4 (1)**
769:3
**2:00 (3)**
656:19;657:2;777:5
**2:59 (1)**
717:11
**20 (4)**
590:17;706:19,22;
733:1
**2006 (4)**
570:8;596:14;
637:20;638:1
**2008 (6)**
571:18,20,23;
578:10;622:6,7
**2009 (1)**
722:13
**2011 (3)**
596:15;637:22;638:1
**2012 (2)**
606:5;620:3
**2013 (3)**
570:8,12;606:5
**2014 (2)**
570:12;605:23
**2015 (42)**
571:19,20;573:3,9,
14,15,23;575:1,18;
578:20;580:12;581:6;
584:10;595:18,19;
605:20;608:18,20,23;
609:2;613:19;614:13,
20;616:19;634:19;
636:9;692:1,17;
705:20;707:3;708:9,
17;712:6,13,16,20,23;
715:13;721:15;746:19;
751:11;756:14
**2016 (36)**
595:23;596:7,20;
597:21,21;601:2;
605:20;608:22;609:3;
617:8,12;619:4;620:4;
621:1;622:22;623:2;
625:21;626:2;627:5;
632:10,13,16;634:4;
638:3,13;687:18;
692:4,18;704:12,15,20;
706:3,8,10;712:20,23
**2017 (5)**
586:14;672:8;747:2;
748:5;749:1
**2018 (75)**
586:18;605:20,23;
650:21,25,25;651:3;
652:3,9,20;653:6,11,
22;654:1,15,17;655:8,
24;656:9;659:22,24;
660:23;661:5,12;
665:18,19,22,22;670:5;
671:9;672:9;675:14,
23;680:3;701:2,9,16,
16,21,22,23;702:4;
706:19,22;708:10,11,
18,24;711:20,21;712:6,
13,16,20,23;713:16,17;
715:22;716:13;717:11,
15;718:17,17,18;
720:25;721:3,8,16;
730:4;731:10;735:22;
749:1,5;753:21;761:20
**2019 (3)**
662:14;708:19;
721:19
**2021 (1)**
780:25
**21 (2)**
662:14;733:10
**21st (1)**
711:21
**22 (3)**
751:11;753:12,21
**221191235 (1)**
695:25
**2255 (1)**
775:13
**22nd (4)**
652:2,9;704:12;
737:16
**23 (5)**
575:1,18;670:4;
671:9;742:11
**235 (2)**
698:12;699:17
**23rd (7)**
652:19;653:6,11;
701:21,23;702:4,6
**24 (4)**
621:1;704:15;
716:13;742:11
**24th (2)**
632:10,12
**251 (1)**
730:15
**251A (4)**
729:22;730:5,17;
735:1
**25th (2)**
737:18;756:3
**26.2 (1)**
744:17
**26th (1)**
706:21
**277 (2)**
717:7;718:2
**277A (2)**
717:12;718:2
**279 (4)**
644:5,15,18;661:22
**29 (3)**
728:8,18;743:10
**2a (1)**

614:15
**2nd (5)**
601:2;617:11;680:3;704:20;715:22

## 3

**3 (6)**
615:11;622:14;680:5;689:15;697:2;774:3
**3.1 (1)**
599:3
**3:30 (3)**
777:8,25;778:4
**30 (2)**
654:15;655:12
**300 (7)**
708:21;709:5,7,9,10;715:5,6
**301 (1)**
704:15
**304 (4)**
709:7,9,10;715:16
**30th (1)**
631:19
**31 (2)**
698:16;708:18
**31st (4)**
631:18;713:17;721:16;735:20
**328 (4)**
709:7,9,10;716:5
**336 (2)**
708:21;720:24
**337 (5)**
708:8;709:21;710:25;714:16;720:18
**338 (6)**
708:16;709:6,21;710:25;720:18;721:15
**34 (1)**
712:20
**3400 (1)**
589:11
**341 (5)**
714:8,9,12,18,20
**350 (3)**
645:20;646:7,9
**3500 (19)**
657:7;681:3,14,16,22;683:8,11,13;684:1,2,13,15;685:15;686:2;771:12,13,15,18;772:13
**3500e (1)**
773:18
**351A (1)**
730:14
**352001095569028 (1)**
645:8
**36 (1)**
679:8
**360 (2)**
652:25;660:5
**360E (2)**
669:16;670:25
**360L (14)**
647:10,23;648:5,18,22;649:22;650:5;661:14;662:19;664:25;665:6,14,18;666:9
**360O (1)**
651:22
**360P (2)**
653:1;671:4
**360Q (1)**
671:4
**360R (1)**
652:13
**360RR (6)**
647:10,23;648:18;649:23;652:14,20
**360S (10)**
647:11,23;648:18;649:23;661:13;668:24;669:4,6;679:7,15
**360T (1)**
653:18
**360U (1)**
654:10
**360V (1)**
655:3
**360X (2)**
655:19;661:14
**360-X (1)**
660:7
**362 (4)**
644:6,15,18,21
**363 (8)**
644:6,15,18;646:11;649:2,6,10,24
**364 (7)**
658:16;659:15,18;675:5,9,19;676:9
**364A (8)**
659:7,15,18,25;675:5,10,20;676:5
**366 (10)**
647:11,23;648:10,19;649:23;651:8;661:15;662:19;664:25;665:6
**366A (7)**
647:11,24;648:10,19;649:23;651:8,16
**38 (1)**
699:3
**3i (1)**
603:3
**3rd (3)**
650:21;651:3;701:21

## 4

**4 (7)**
615:15;616:16;654:17;655:8;660:16;707:3;740:10
**4:00 (2)**
718:22;777:7
**4:26 (1)**
659:24
**4:30 (1)**
778:1
**40 (4)**
589:1;591:5;592:13;767:12
**400 (1)**
622:14
**403 (6)**
603:5;674:21;748:20;749:16,25;756:14
**42 (1)**
766:15
**43 (1)**
590:15
**441 (3)**
739:21;740:9,9
**442 (1)**
740:10
**456 (1)**
724:1
**463 (3)**
695:22,24;696:7
**463H (1)**
707:8
**463J (3)**
693:11,13;694:3
**465 (1)**
712:1
**480 (3)**
705:23,24;706:2
**4a (2)**
614:24;617:1

## 5

**5 (10)**
632:16;636:12,14;698:12;701:16;718:17,17;777:2,21;778:15
**5:13 (1)**
660:23
**500 (7)**
606:1,7,12,14,24;607:4,11
**501 (9)**
606:1,2,7,12,13,14,24;607:4,11
**508 (3)**
618:17;619:13,15
**516 (3)**
624:15,24;625:2
**516401-0150 (2)**
645:14;646:4
**517 (2)**
627:20;631:3
**519 (4)**
578:16,24;579:3;586:9
**521 (3)**
579:20;580:4,7
**522 (3)**
573:18,24;574:3
**524 (3)**
583:24;584:5,9
**530 (6)**
605:12;606:7,11,24;607:4,11
**531 (2)**
614:17;635:16
**534 (6)**
605:12;606:7,11,25;607:4,11
**535 (9)**
604:23;605:3;606:7,11,19,23;607:8;608:4,8
**538 (5)**
606:18;608:11;634:17;636:9,14
**539 (1)**
606:18
**541 (10)**
604:24;605:3;606:7,9,11,19,23;607:8;608:5,8
**543 (2)**
595:11,25
**545 (5)**
598:8,15;602:9,14;603:3
**546 (1)**
567:16
**561 (7)**
707:23;708:1;709:3,7,9,10,13
**562 (8)**
702:10,12,24;703:3,6,13,17,20
**5760 (1)**
664:23
**5th (2)**
632:13;737:24

## 6

**6 (3)**
573:23;661:15;742:23
**6:00 (1)**
704:15
**6:11 (1)**
731:19
**6:42 (1)**
701:2
**600 (4)**
688:23,25;690:5,8
**601 (6)**
689:6,10;690:5,8,11;691:10
**602 (6)**
689:7,10;690:5,8,17;691:10
**603 (6)**
692:14,19;693:4,10,22,24
**604 (4)**
689:16,19;690:6,8
**609 (4)**
689:16,19;690:6,9
**646338-8833 (3)**
697:15;717:10,15
**646341-1478 (1)**
646:20
**646343-1478 (1)**
649:12
**650 (7)**
694:18,22;695:15,19;696:3,4;699:8
**653 (1)**
695:2
**654 (1)**
695:2
**655 (1)**
695:2
**656 (5)**
694:18,22;695:15,19;699:8
**657 (6)**
695:12;697:12,16;698:6,9;699:7
**658 (7)**
695:13;697:13,16;698:6,9;699:7;700:22
**665 (1)**
697:2
**6-S (10)**
661:25;662:12;664:20,22;665:6,21;666:24;667:8,10;742:23
**6th (2)**
739:25;740:1

## 7

**7 (2)**
692:18;715:13
**7/31/2015 (1)**
707:13
**7:24 (1)**
661:5
**7:31 (1)**
655:8
**7:41 (1)**
661:12
**7:50 (1)**
733:6
**707 (1)**
748:3
**750 (5)**
702:17;703:5,6,13;704:1

**751 (2)**
703:6,13
**752 (2)**
703:7,13
**753 (2)**
703:7,13
**754 (4)**
703:11,13;706:25;
707:17
**755 (2)**
703:11,14
**7560 (8)**
662:11,22;665:7;
666:11,18,21,22,24
**761 (3)**
703:11,14;704:9
**762 (2)**
703:11,14
**763 (3)**
703:11,14;704:17
**764 (2)**
703:11,14
**765 (2)**
703:11,14
**766 (3)**
703:11,14;706:5
**769 (3)**
703:11,14;706:15
**772 (3)**
702:17;703:5;704:2

## 8

**8 (13)**
655:24;656:9;
660:17,23;661:5;
672:9;692:17;698:24;
708:19;721:18;722:13;
743:19;780:25
**8/12 (1)**
707:6
**8:15 (1)**
653:22
**8:16 (1)**
654:1
**8:22 (1)**
652:20
**8:23 (1)**
654:4
**8:45 (1)**
682:19
**8:50 (1)**
654:15
**80 (1)**
673:15
**802 (6)**
689:25;692:24;
695:10;698:3;703:2;
709:2
**80th (1)**
744:22
**8833 (1)**
658:24

## 9

**9 (14)**
615:14,16;616:17;
617:1;623:2;624:2;
627:7;661:12;681:8,
24;682:8;701:16;
706:8;718:17
**9:25 (1)**
717:16
**9:30 (4)**
726:22;727:7;733:9;
780:25
**9:31 (1)**
733:10
**9:59 (1)**
650:22
**900 (7)**
691:8,9,12,15,17,19;
714:24
**901 (9)**
689:25;692:24;
695:11;698:4;703:2,4;
709:3,5;717:18
**902 (7)**
699:20;700:1,5,8;
719:25;731:18,22
**903 (2)**
711:3,4
**903A (8)**
710:21;711:6,8,9,12,
16,18;723:21
**903B (6)**
710:21;711:6;712:2;
724:8,13;725:4
**903C (3)**
712:25;724:8,16
**903D (2)**
713:19,20
**904 (7)**
699:20;700:1,5;
701:11;718:5,6,13
**904A (1)**
711:2
**904C (1)**
710:21
**904D (1)**
710:22
**905 (4)**
699:21;700:1,5;
701:18
**917301-5175 (1)**
697:14
**917-470-7172 (1)**
694:20
**917669-7560 (3)**
647:6;649:19;717:9
**917-669-7560 (3)**
662:4;694:20;695:4
**917699-7560 (1)**
717:14
**964 (2)**
711:24;724:1
**9th (6)**
631:9,16;634:4;
777:5,14;778:3

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*SYLVIA ASH,*

---

*December 8, 2021*

---

*Southern District Court Reporters*

Original File LC8KASHF.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 8, 2021
9:45 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JAMIE C. BUCKLEY



(In open court; jury not present)

THE COURT: Good morning, everyone.

COUNSEL: Good morning, your Honor.

THE COURT: I received Ms. Cohen's letter when I came in a short time ago. I read it. I reviewed the attachments.

It seeks no relief. I'm not sure whether each and every factual assertion made in the letter concerning the proceedings that took place in open court and at sidebar is accurate. I'm not saying I noticed any particular inaccuracies. I'm just not sure; I haven't compared it to the transcript.

To whatever extent, if any, it is not consistent with the transcript, the transcript is what happened, not what's in the letter. I say that only to be careful; as I say, I don't think I've detected any errors.

I've reviewed the materials, which I was not asked to do yesterday in ruling on the application. That's because they weren't submitted by the defendant, who had them. I proceeded on counsel's description of them, which was undisputed and, based on reading them, accurate, from both sides.

Apart from the use by defense counsel of the word "script," which, for reasons I expressed yesterday, I think was inaccurate and, in some respects, probably unintentionally, misleading.

Having reviewed these lists of questions, it is



perfectly apparent to me as follows:

They are not Jencks statements. The government was under no obligation to produce them. There most assuredly was no prejudice, even assuming that they had an obligation to produce. That's obviously true in the case of the witness who testified yesterday, I believe Rosenman, because the defense had the questions for him, could have crossed him on it, and didn't in any meaningful respect.

It is also true as to the earlier witness because there's nothing of substance in the list of questions, absolutely nothing. There is certainly no statement by the witness.

Moreover, this stuff is so obvious to anyone. The defense knew that the government had interviewed both witnesses, I believe multiple times, but in any case had done so, and gone over the questions that the government proposed to ask, and the witness — witnesses — told the government what they would answer. Everybody knew that happened, everybody with an operating brain and any experience. There is absolutely nothing in this stuff that could have been used to any advantage whatsoever in cross-examination.

I regard this application as frivolous — to be more specific, the application I turned down yesterday — frivolous. It's a Hail Mary pass.

Okay. That takes care of that.



Is there anything else we need to do before we bring the jury in, when we have the jury?

MR. MARK: Not from the government, your Honor.

Just to remind you that before the witness, Nana Osei-Bonsu, testifies, to just give him an advice of rights outside the presence of the jury.

THE COURT: Yes, okay.

So we'll put the witness on the stand before we bring the jury into the room, Andy.

And the jury is all present?

THE DEPUTY CLERK: We have 18.

THE COURT: I'm sorry, we're short one.

MS. COHEN: Your Honor, I'll just say, the defendant is not going to testify at trial. I didn't know if you wanted to do the colloquy with the defendant now since we have the time.

THE COURT: Yes, I appreciate the suggestion.

Ms. Ash, of course we had this discussion before: You can remain seated, I know it's hard for to you stand up. The decision on whether or not to testify is yours, yours alone, and not the lawyers'. You have the right to your lawyers' best advice as to whether it's in your interests to testify.

Without telling me what they said, have they advised you?

THE DEFENDANT: Yes, they have, your Honor.

LC8KASH1 Page 787

THE COURT: And are you satisfied with, not necessarily the substance of the advice, but are you satisfied that they advised you fully and carefully and on the basis of a discussion with you in which you had a full opportunity to ask questions and voice any concerns and opinions of your own, and a real interchange with counsel? Did that occur?
THE DEFENDANT: Yes, your Honor.
THE COURT: All right.
And is it in fact your decision and your decision alone not to testify?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay.
Now, we haven't yet come to the point where the defense will rest. When we get to that point, if you have changed your mind, please, as we discussed before, stand up and I will accommodate a desire to testify, even though you have said no now, if that's what you elect to do at the final opportunity.
Okay?
THE DEFENDANT: I understand. Thank you, your Honor.
THE COURT: Okay. Thank you.
MS. COHEN: Your Honor, we have Mr. Bonsu on his way up here. If your Honor wanted, we could put him in the witness stand --
THE COURT: I do, I do. When he gets here, we'll do

LC8KASH1 Page 788

that.
MS. COHEN: Thank you, your Honor.
MR. MARK: Your Honor, may I ask Ms. Cohen just one question?
THE COURT: Go ahead.
(Pause)
MS. COHEN: We're good, your Honor.
THE COURT: How long will the defense case take?
MS. COHEN: Your Honor, we have two witnesses. I expect the directs of both would be ten, fifteen — I'll overestimate that — twenty minutes each, the cross perhaps is ten minutes, so all of an hour. We may introduce a document or two into evidence. And then I will confer with my client, and if she still does not want to testify, we will rest. So perhaps --
THE COURT: An hour, hour and a half?
MS. COHEN: Correct.
THE COURT: Okay.
So we will make the charge -- assuming that all goes as predicted, will there be a rebuttal case?
MR. MARK: Assuming Ms. Ash doesn't testify --
THE COURT: You're not bound.
MR. MARK: -- there will not be a rebuttal case.
THE COURT: Okay.
So, on those assumptions, I'll have a draft charge for

LC8KASH1 Page 789

you today — I'm not sure exactly when because it's moved faster than I anticipated an — we'll get to the charge conference today, and close tomorrow.
MS. COHEN: Thank you, your Honor.
MR. MARK: Thank you, your Honor.
(Pause)
MR. REILLY: Your Honor, would you like Mr. Osei-Bonsu in the witness box?
THE COURT: Yes.
The record will reflect that the defendant is present but the jury is not. The witness, Mr. Bonsu, who will be called next, is on the witness stand.
Mr. Bonsu, I have to advise you, before you are even sworn, of the following:
You have the right, under the Fifth Amendment to the United States Constitution, not to give any testimony if you have a well-founded fear that the testimony may tend to incriminate you of a crime, whether a federal crime or a state crime. And if you want to consult with counsel about whether you should testify, I'll give you an opportunity to do that, and if you don't have a lawyer here, I will do my best to get one of the court-appointed lawyers, who may be in the building, to be available to you.
Do you understand?
MR. BONSU: Yes, sir.

LC8KASH1 Page 790

THE COURT: Are you prepared to testify?
MR. BONSU: Yes, sir.
THE COURT: All right.
If at any point during your testimony you feel that the answer to a question could tend to incriminate you, you can decline to answer on that basis. So your decision up to now is not irrevocable; you can invoke the privilege against self-incrimination on a question-by-question basis, and then, if there's an issue about it, I'll rule on it.
Do you understand?
MR. BONSU: Yes, sir.
THE COURT: Okay.
Now, we were, the last I heard, waiting for one juror but I expect the jury will be here very shortly.
Counsel, with respect to Alternate No. 5, I think my plan will be to have her show up tomorrow but to excuse her once we see that we have a jury and plenty of alternates, maybe after the closings.
How is that?
MS. COHEN: That's fine, your Honor. I recall she wanted an answer today.
THE COURT: Well --
MS. COHEN: So --
THE COURT: I understand she does, yes.
At the close of all the proof today, I may give her

advance notice of what's likely to happen tomorrow.
MS. COHEN: That's what I would suggest, your Honor.
THE COURT: Yes. Ready?
THE DEPUTY CLERK: We're still missing one juror, who I was told was in a long line downstairs I suspect when I get back down that juror will be there. So I'm going to go --
THE COURT: Okay.
MR. MARK: Your Honor, I'm only asking, if you'd excuse her after closings, is there any reason not to just keep her for the jury instructions, just in case?
THE COURT: Well, the jury instructions will come after the closings.
MR. MARK: I know. Were you saying you were going to excuse her before the jury instructions?
THE COURT: Yes, yes.
MR. MARK: Okay.
THE COURT: You have a problem with that?
MR. MARK: I was just thinking that, just in case we have some sort of significant issues with COVID, it might be worth --
THE COURT: But if we do, I don't think that's likely to happen in the middle of the day.
MR. MARK: Yes, your Honor.
THE COURT: It's likely to happen overnight.
MR. MARK: Okay.



THE COURT: Although, in my last two COVID criminal trials, in one case, a juror collapsed, and in the other case, one of the lawyers collapsed, neither from COVID, as it turned out, but we had ambulances in both cases.
MR. MARK: Well, we escaped the 80th anniversary of Pearl Harbor; hopefully, we'll escape the same --
THE COURT: Hopefully, we will.
MS. COHEN: Hopefully, we will not give you any drama.
THE COURT: Right.
MS. COHEN: Knock on wood.
THE COURT: There's been enough drama in 2020 and '21.
MS. COHEN: Agreed, your Honor.
THE COURT: And here we all thought 2021 would be a calm year.
I'm told that the missing juror is next to be screened downstairs.
MS. COHEN: I will take the opportunity to run to the restroom, your Honor.
THE COURT: I think you're safe.
(Pause)
THE COURT: Good morning, everybody.
JURY MEMBERS: Good morning.
THE COURT: The defense's first witness?
MR. REILLY: Yes, your Honor. The defense calls S. Nana Osei-Bonsu. I note that Mr. Osei-Bonsu is present in the witness box, your Honor.



THE COURT: I didn't hear any of that.
S. NANA OSEI-BONSU,
called as a witness by the Defendant,
having been duly sworn, testified as follows:
THE WITNESS: My full name is Samuel Nana Osei-Bonsu. Samuel, S-a-m-u-e-l, middle name Nana, N-a-n-a, and my last name Osei-Bonsu, O-s-e-i hyphen B-o-n-s-u.
MR. REILLY: May I inquire, your Honor?
THE COURT: You may.
DIRECT EXAMINATION
BY MR. REILLY:
Q. Good morning, Mr. Osei Bonsu.
A. Good morning, sir.
Q. Sir, are you employed?
A. Yes, sir.
Q. Where are you employed?
A. I work with Educational Alliance.
Q. What do you do there?
A. Well, I'm the RN supervisor.
THE COURT: I don't think anybody got. Would you repeat that slowly, Mr. Bonsu?
THE WITNESS: I am the supervising registered nurse.
BY MR. REILLY:
Q. Mr. Osei Bonsu, what's the highest level of education you've achieved?



A. Well, I have two Master's degrees.
Q. Mr. Osei Bonsu, did you receive a subpoena to appear here today?
A. Yes, sir.
Q. And you and I have met before; is that right?
A. Yes.
Q. To discuss your testimony here today?
A. Yes, sir.
Q. Mr. Osei Bonsu, are you familiar with something called the Municipal Credit Union?
A. Yes, sir. I served on the board before.
Q. You served on the board, is that what you said?
A. Yeah.
Q. Is that also known as the MCU?
A. Yes, sir.
Q. Briefly, can you tell us how you came to be on the board?
A. Well, I was working one day at the shelter in Brooklyn, and I came across this Daily News, and I was just reading it, and I saw an ad for board vacancies at the MCU. So, given my background in economics and having worked in a bank before, I thought I had enough of them to serve on the board. So I applied, I was interviewed, I was admitted, and the rest is history.
Q. And, Mr. Osei Bonsu, when did you join the board?

A. Well, actually, we joined the board in 2008, but there was a legal action going on, so it was not until 2009 that we became active members.
Q. So you became an active member of the board of the MCU in 2009?
A. Yeah.
Q. What, if any, committees were you a part of on the board?
A. Several. The coordinating committee and the fiscal committee.
Q. Now, Mr. Osei Bonsu, are you familiar with an individual named Kam Wong?
A. Yes. He was the CEO.
Q. When you say "CEO," is that the chief executive officer?
A. Yeah.
Q. At the MCU?
A. At the MCU.
Q. Did you know someone named Ms. Sylvia Ash?
A. Yes, sir.
Q. How did you know her?
A. We served on the board together. We came on the board the same day, and so we have been on the board together.
Q. Now, Mr. Osei Bonsu, I'm going to direct your attention to 2015. Do you recall having a meeting with Kam Wong in 2015?
A. Yes, I do. We have so many meetings in 2015, yeah.
Q. I'm going to ask you if you have a recollection of a



meeting with Ms. Ash and Mr. Wong?
A. Yes.
Q. What do you recall about that meeting?
A. Well, it was just an informal meeting, you know, and I think Kam wanted us to talk -- that he wanted to talk about his long-term disability insurance that he was entitled to.
Q. I just want to make sure it's clear. He talked about long-term disability insurance; is that right?
A. Yeah.
Q. And it was you and Ms. Ash, Mr. Wong. Who, if anyone else, was present?
A. There was the supervisor of the -- Porcelli — normally we call him Gio — of the supervisory -- committee chair of the supervisory committee at that time.
Q. So an individual you knew as Gio; is that right?
A. Yeah.
Q. What, if anything, did Mr. Wong say about the long-term disability insurance?
A. Basically he said he was in touch with the long-term disability insurance, which the bank had to pay for the premium, and that there was a cheaper way of saving the MCU, the credit union, more money if he got it on his own. So basically that's what we talked about. And it was an informal meeting, not a board meeting, not a staff meeting, or committee meeting.



Q. I just want to make sure I had it correct. He said that it --
THE COURT: No, let's have it from the witness.
MR. REILLY: Yes, your Honor.
BY MR. REILLY:
Q. Can you just describe what, if any, benefit he said it would give to the MCU?
A. He said he could save the MCU money by paying on his own instead of the credit union paying the insurance for him.
Q. Mr. Osei Bonsu, if you recall, how long was this meeting?
A. It was just an informal meeting. I'm going to say maybe about 20 minutes, 25, because we didn't have questions, he just laid out what the benefit would be to the MCU.
MR. REILLY: May I have one moment, your Honor?
THE COURT: Yes.
(Pause)
BY MR. REILLY:
Q. Mr. Osei Bonsu, the individual that you identified as Gio, do you know his full name?
A. I know the last name is Giovanni, but we just call him Gio, Gio. I can't recollect the full name.
MR. REILLY: No further questions, your Honor.
THE COURT: Thank you.
Cross-examination?



CROSS-EXAMINATION
BY MR. MARK:
Q. Good morning, Mr. Osei Bonsu.
A. Good morning, sir.
Q. You just testified on direct examination about this informal meeting in June 2015; is that right?
A. Yes, sir.
Q. And the participants in that meeting were Kam Wong, Sylvia Ash, Giovanni Porcelli, and yourself?
A. Yes.
Q. And there was nobody else in that meeting --
A. No.
Q. -- is that right?
A. Yeah.
MR. MARK: No further questions.
THE COURT: Thank you.
Anything else, Mr. Reilly?
MR. REILLY: No, your Honor.
THE COURT: You're excused. Thank you, Mr. Osei Bonsu.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: Next witness?
MS. COHEN: Your Honor, the defense calls Norman Kohn.
THE COURT: Do we have the witness?

MS. COHEN: We do, your Honor. We were just waiting for the other witness to leave. He's up here. Ms. Buckley went to assist him to come to the courtroom.
THE COURT: Thank you.
NORMAN KOHN,
called as a witness by the Defendant,
having been duly sworn, testified as follows:
THE WITNESS: Norman Kohn. K-o-h-n.
THE COURT: You may proceed.
MS. COHEN: Thank you, your Honor.
DIRECT EXAMINATION
BY MS. COHEN:
Q. Mr. Kohn, are you here in the courtroom voluntarily or pursuant to a subpoena to be here?
A. To a subpoena.
Q. And in preparation for coming to court today, did you speak with me, and I told you questions I would ask you, and you told me the answers you would give me?
A. Yes.
Q. Can you just briefly describe your background when you worked at the Municipal Credit Union?
A. Okay. I started at Municipal Credit Union in 1977 as the assistant controller, was promoted to the controller in 1978, was promoted to Chief Financial Officer in 1980. I was promoted to executive -- to the chief operating -- Chief



Operating Officer in 1984, and I was also still the Chief Financial Officer.
In 1988, I became just the Chief Operating Officer; we hired a new Chief Financial Officer. In 1994, I was promoted to Executive Vice President/Chief Operating Officer. In 2005, I became vice president of collections and strategic planning. In 2007, I became Senior Vice President/Chief Credit Officer.
In 2017, I became Executive Vice President/Chief Credit Officer. In 2018, I became the acting President/CEO. And then in October of 2018, I became, again, back to the Chief Credit Officer.
Many positions. I was there for 42 years.
Q. When did you leave the MCU?
A. In the end of February 2019.
Q. When you became the acting CEO, who did you replace?
A. I'm sorry?
Q. When you became acting CEO, who did you replace?
A. I replaced Kam Wong.
Q. While you were the acting CEO of the Municipal Credit Union, what, if any, letters did you send to Sylvia Ash?
A. I sent, I believe, a couple of letters — two, three letters — to Sylvia Ash asking her to return these electronic devices. These letters were drafted by Epstein Becker & Green.
MR. REBOLD: Objection.
THE COURT: Strike.



The jury will disregard that.
THE WITNESS: Oh, okay.
BY MS. COHEN:
Q. Mr. Kohn, if I could show you — and it will be put up on the screen in front of you — what is in evidence as Government Exhibit 113.
MS. COHEN: And, Ms. Stephenson, if you can put that up and publish it for the jury.
THE DEPUTY CLERK: Yes, this is the letter.
BY MS. COHEN:
Q. Mr. Kohn, do you recognize Government Exhibit 113?
A. Yes.
Q. What is it?
A. This is a letter to Judge Ash --
THE COURT: I think you've answered the question, Mr. Kohn.
Q. Mr. Kohn, after you sent the letter to Judge Ash, Government Exhibit 113, what conversations, if any, did you have with Ms. Ash about returning her devices to the MCU?
A. I did not have any conversations with Ms. Ash.
Q. When you say you didn't have any conversations with Ms. Ash, do you mean that you did not have any conversations with Ms. Ash at any time about the return of her devices to the MCU?
A. Correct.



MS. COHEN: We can take that down, Ms. Stephenson. Thank you.
BY MS. COHEN:
Q. Mr. Kohn, are you aware if the MCU had any season tickets to professional sports teams?
A. Yes.
Q. What tickets did the MCU have -- season tickets. What sports teams did the MCU have season tickets to?
A. Okay. They had season tickets to the Yankees, to the Mets, to the Jets, to the Knicks, to the Rangers, and I believe even to the New Jersey Nets, and, also, they had tickets to MCU Park.
Q. Who controlled -- who got to use the tickets that MCU had season?
A. They were controlled by the CEO, Kam Wong.
Q. Mr. Kohn, are you familiar with the MCU policy manual?
A. Yes, I am.
MS. COHEN: If I can put on the screen what has been marked for identification as Defense Exhibit B1. Ms. Stephenson, if you can put that up just for the witness and the government.
Q. Mr. Kohn, looking at what's been marked for identification as Defense Exhibit B1, which is a stipulation with the government, we represent, is dated 2015, are you familiar with this document?

A. Yes, I am.
Q. And what is it?
A. This is the policy manual for Municipal Credit Union that is -- that incorporates all of the policies that the company is supposed to follow.
MS. COHEN: The defense moves Defendant's Exhibit B1 into evidence.
MR. REBOLD: Your Honor, we don't object, but just with the clarifying point that B1 is an excerpt of the larger policy.
THE COURT: I assume you would agree with that, Ms. Cohen?
MS. COHEN: Yes. I was going to say that next. So, thank you.
THE COURT: B1 is received.
(Defendant's Exhibit B1 received in evidence)
MS. COHEN: If we can scroll, Ms. Stephenson, to the section that is excerpted in Defense Exhibit B1, which is 2.09.
If you can scroll back up.
Great.
BY MS. COHEN:
Q. Mr. Kohn, drawing your attention to the highlighted heading, "2.09 Board Expense Reimbursement Policy" — do you see that?
A. Yes, I see it.



Q. -- and looking at 2.09-1(A), if you can read for us 2.09-1(A)?
A. "For attendance at conferences and training sessions, the credit union shall pay or reimburse members of the board of directors and supervisory committee members for registration fees, hotel room or lodging, meals, necessary expenses for transportation, standard tipping, business meeting expenses, telephone expenses, business supplies, and out-of-pocket expenses, excluding the purchase of beauty supply, clothes, souvenirs, sporting equipment, gifts, et cetera."
MS. COHEN: If we can scroll down a little bit, Ms. Stephenson, please.
Q. Can you please direct your attention to capital C, and read what is provided for in the MCU policy?
A. "Personal entertainment expenses are limited to $500 for the entire conference."
Q. Drawing your attention to 2.09-2, can you just read the --
MS. COHEN: Thank you.
Q. -- first sentence of capital A under 2.09-2?
A. "An immediate family member accompanying the director and supervisory committee member is covered for all of the reimbursements listed in Section 2.09-1, which will be charged against the individual director's or supervisory committee member's budget allocation. All expenses (or estimated expenses) incurred by a family member shall be reported on a



separate section of the expense report by the directors" --
THE COURT: I'm sorry, I thought the question was to read the first sentence.
MS. COHEN: I was just about to interrupt, your Honor.
BY MS. COHEN:
Q. The first sentence is fine. Thank you, Mr. Kohn.
A. Oh, okay.
Q. If I can direct your attention next, please, to 2.09-4 --
MS. COHEN: If you can scroll down, Ms. Stephenson. Thank you.
Q. -- and if you could please read capital C under 2.09-4 of the MCU policy?
A. "Expenditures over $50 will not reimbursed without documentary evidence."
Q. Thank you, Mr. Kohn.
MS. COHEN: And we can take that down, Ms. Stephenson.
Q. Just one last question, Mr. Kohn: Do you know the names of Kam Wong's sons?
MR. REBOLD: Objection.
THE WITNESS: Kevin and Edward.
THE COURT: Just a minute, just a minute.
First of all, when a lawyer stands, there's an objection. You don't say anything. And you were asked whether you knew the names, the answer to which is yes, no, or I don't recall. That was the question.



Now, what is the objection?
MR. REBOLD: Your Honor, we're actually -- with apologies, we withdraw the objection.
THE COURT: All right.
Go ahead.
I take it the answer is yes?
THE WITNESS: I can answer?
Kevin and Edward.
MS. COHEN: Thank you.
No further questions, your Honor.
THE COURT: Okay.
Any cross-examination?
MR. REBOLD: Briefly, your Honor.
CROSS-EXAMINATION
BY MR. REBOLD:
Q. Good morning, Mr. Kohn.
Mr. Kohn, you just testified briefly about Section 2.09 of the policy manual, correct? Do you recall that?
A. Yes.
Q. Am I correct in saying that that applies to, among other things, reimbursement for conference expenses for board members? Is that correct?
A. Yes.
Q. Am I correct in saying this does not apply to reimbursement for expenses incurred by former board members?

A. That is correct.
Q. Now, Mr. Kohn, on direct, you testified about a letter in evidence as Government Exhibit 113 that was sent to Sylvia Ash regarding electronic devices that she held.
Do you recall that?
A. Can you repeat that, please?
Q. Do you recall testifying about the letter that you sent on or about June 19, 2018, to Ms. Ash?
A. Yes.
Q. Am I correct in saying that about a month earlier, in May of 2018, you instructed Monique Smith to contact the defendant to request that she return her electronic devices?
A. I really don't remember.
Q. In June of 2019 -- excuse me, June 19 of 2018, you sent a single-page letter to Ms. Ash, correct?
A. Yes.
Q. You sent it in two ways, correct?
A. I believe so, yes.
Q. You sent it by FedEx, right?
A. Yes.
Q. And you sent it by email, correct?
A. Yes.
Q. And you understood that it was important that Ms. Ash receive that letter, correct?
MS. COHEN: Objection, your Honor.



THE COURT: Sustained.
BY MR. REBOLD:
Q. Now, that letter requested that she return any and all electronic devices, correct?
A. Yes.
Q. And it further instructed her that she did not have permission to wipe or delete or factory-reset the device, correct?
A. Yes.
Q. And it also instructed her that she did not have permission to copy or transfer data from the device, correct?
A. Yes.
Q. And that if she did copy or transfer data from the device, she was to return that copy or transfer to MCU, correct?
A. Yes.
MR. REBOLD: I have no further questions, your Honor.
THE COURT: Thank you.
Any redirect?
MS. COHEN: Briefly, your Honor.
Ms. Stephenson, if we can just pull back up Defendant's Exhibit B1 in evidence and direct the witness' attention to 2.08.
THE WITNESS: I'm sorry, can you --
MS. COHEN: Sure.



REDIRECT EXAMINATION
BY MS. COHEN:
Q. Ms. Stephenson is going to pull up Defense Exhibit B1 and direct your attention to 2.08 on your screen.
A. Okay. They're going to bring that up on the screen?
Q. Yes.
If I can direct your attention to the second paragraph under 2.08, and if you can just read the one sentence there?
MR. REBOLD: Objection, your Honor. It's in evidence, it speaks for itself, and it's beyond the scope of cross-examination.
THE COURT: Sustained on the last ground.
MS. COHEN: Well, it's in evidence, your Honor.
Can I have a sidebar, though, about an opening the door issue based on the cross?
THE COURT: Yes.
MS. COHEN: Thank you, your Honor.
(Continued on next page)



(At the sidebar)
MS. COHEN: Your Honor, I specifically did not ask him, although it's in evidence, to testify about wiping the phone, and I know you sustained the objection as to was it important, but I believe that that opened the door for me to ask the witness who drafted the letter.
MR. REBOLD: Your Honor, it's absolutely irrelevant who drafted the letter. What's relevant is that the letter was received by Sylvia Ash.
THE COURT: It's absolutely irrelevant. He didn't open the door.
MS. COHEN: Thank you, your Honor.
(Continued on next page)

(In open court)
MS. COHEN: No further questions.
MR. REBOLD: Nothing further from the government.
THE COURT: Thank you, Mr. Kohn. You may step down. You're done.
(Witness excused)
THE COURT: Anything else on the defense case, Ms. Cohen?
MS. COHEN: Yes, your Honor. There's an exhibit that is in evidence that we would like to play for the jury.
THE COURT: You can do that in your closing argument.
MS. COHEN: Your Honor --
THE COURT: You say it's in evidence, right?
MS. COHEN: It is in evidence, your Honor. It is a very short, perhaps 21-second, voicemail.
THE COURT: It's also part of your summation.
MS. COHEN: It is, your Honor.
THE COURT: All right. Any further evidence you want to present?
MS. COHEN: Can I have a moment to confer with my client?
THE COURT: Please.
(Pause)
MS. COHEN: Your Honor, the defense rests.
If I could just put on the record, though, that the



exhibit that I wanted to play, which is Government Exhibit 277-A, which was admitted through the stipulation, Government Exhibit 1008.
THE COURT: Okay.
The defense rests. You'll preserve your motions in the event there's a rebuttal.
Does the government have any rebuttal evidence to present?
MR. MARK: No, your Honor.
THE COURT: Ladies and gentlemen, that concludes the presentation of evidence in this case. The next thing that happens is that I have to advise both sides as to what my instructions on the law will be because they need to know that before they make their closing arguments, and that's going to take us most of the rest of the day because they have a right to be heard on that. So I'm going to send you off now, and ask you to be back at 9:30 tomorrow morning.
You will get the case tomorrow, barring unforeseen circumstances. So everybody is worried about Christmas and travel plans on December 16th. That will be in your hands sometime tomorrow.
Now, Ms. Riefenhauser, I'm afraid I have to ask you to come back in the morning. However, it is not unlikely that I will be able to excuse you at sometime in the morning. I can't promise, but there's a good chance. Okay?



Anything else before I send the jury home, folks?
MS. COHEN: No, your Honor.
MR. MARK: No, your Honor.
THE COURT: Okay. Ladies and gentlemen, enjoy the day off.
(Continued on next page)



(Jury not present)
THE COURT: Counsel may be seated.
We should have copies of the draft charge ready for you in 20 minutes or a half hour. James will bring them down to the courtroom.
I think maybe what we'll do is start the charge conference at 2:00 o'clock. Is that all right?
MS. COHEN: That's fine, your Honor.
MR. MARK: Yes, your Honor.
THE COURT: Yes, we have motions first, though.
So James can go off and get his copying machine fired up, and I will deal with the motions now.
Ms. Cohen? Or Mr. Reilly? Who's doing this?
MS. COHEN: Your Honor, I will do it again.
Your Honor, the defense moves, pursuant to Rule 33, to dismiss the indictment on all four counts.
THE COURT: Rule 33?
MS. COHEN: Did I misstate the rule? Sorry, your Honor.
THE COURT: That's a motion for a new trial.
MS. COHEN: Correct, your Honor. Apologies. I didn't have my notes in front of me. I do know that rule, though.
THE COURT: I'd rather imagine you did.
MS. COHEN: Your Honor, the defense makes a motion for a new trial on various grounds, the first being that the

government has not met its burden of proof.

THE COURT: I think you misspoke again.

MS. COHEN: Let me just --

THE COURT: I think you're moving for a judgment of acquittal.

MS. COHEN: Correct.

THE COURT: Is that right?

MS. COHEN: Judgment for acquittal, your Honor.

THE COURT: Yes, but you said "new trial."

MS. COHEN: Sorry, your Honor.

THE COURT: It's one of those mornings.

MS. COHEN: Yes. Sorry. I was ready to proceed to closing, so I have to reorient.

Your Honor, the defense moves, under Rule 29, for a judgment of acquittal. The defense believes that the evidence presented by the government is insufficient to sustain a conviction on any of the four charged counts in the superseding indictment.

Your Honor, if I can address specifically Counts One and Two of the indictment first, and then I'll address Three and Four briefly.

Your Honor, as to Count One: There's no evidence or there's insufficient evidence to sustain a conviction that Ms. Ash entered into a conspiracy to violate the federal laws. There's been no testimony by any of her alleged two



coconspirators, Mr. Wong or Mr. Guagliardo. There is no evidence presented regarding conversations between Ms. Ash and her alleged two coconspirators from which a reasonable jury could infer that Ms. Ash was part of a conspiracy to violate the federal laws.

In fact, what the evidence shows is a communication between Mr. Wong and Mr. Guagliardo where they discuss what they are telling Ms. Ash about the memo Mr. Wong got Ms. Ash to sign to cover up his crimes, for which there's insufficient evidence she knew anything about Mr. Wong's motive to get her to sign it, which was to cover up his crimes. And in that discussion between Mr. Wong and Mr. Gagliardo — and there are two other people on that text chain — names of Kevin and Edward — which the defense put in, the government did not — are Mr. Wong's sons. In that text chain --

THE COURT: Well, maybe they're his sons.

MS. COHEN: -- the evidence -- there's no evidence from the government as to who they are; there's evidence from the defense that the names of Mr. Wong's sons are Kevin and Edward, so there's a reasonable inference that those are his sons. Certainly, Ms. Ash is not on that text chain, your Honor.

And in that text chain, Mr. Wong says to Mr. Gagliardo that he spoke with Ms. Ash, but he didn't tell her the reason why she was signing the memo.



Your Honor, if Ms. Ash was part of the conspiracy with Mr. Wong and Mr. Gagliardo, there would be no reason to lie to Ms. Ash because she would have known the reason why she was being asked to sign the memo. And there was no other text communication or email communication put in evidence by the government between Mr. Wong and Ms. Ash or Mr. Gagliardo and Ms. Ash or Ms. Ash and Mr. Gagliardo and Mr. Wong that evidenced that Ms. Ash was part of any conspiracy by Mr. Wong or Mr. Gagliardo to violate the Federal Rules, the Federal Criminal Code.

In addition, your Honor, I would say, relatedly, the evidence -- much of the trial, the government spent on putting on evidence that Ms. Ash requested iPhones and gifts from Mr. Wong, that she requested sports tickets, that the MCU had subscription tickets, that she went on certain conferences for which she was reimbursed. All of that conduct, the defense submits, and put into evidence the MCU policy manual in effect at the time, Defendant's Exhibit B1, that permitted Ms. Ash to go on conferences, to seek reimbursement for the conferences, to seek reimbursement for transportation to meetings, but all of that other evidence about benefits and gifts that Ms. Ash got while she was on the board did not help to demonstrate at all that there was any conspiracy between Mr. Wong and Ms. Ash or between Ms. Ash and Mr. Guagliardo. Instead — and I recognize your Honor is going to give a limiting instruction to



the jury on this topic — there is a concern, which the defense has expressed throughout this trial, that the admission of such evidence will unfairly prejudice the jury in that they will blame Ms. Ash for taking things of value and acting a certain way while she was on the board, that they think is unbecoming of a board member, that they think is unbecoming of a judge, and that they will use that evidence to convict her rather than the evidence that was put forward by the government on the conspiracy count, Count One, which is insufficient to sustain a conviction as to Count One.

As to Count Two, on Ms. Ash signing a memo that she -- and telling the government signing a memo with the intent to obstruct a federal investigation: The evidence is insufficient to sustain a conviction on Count Two because there was no evidence that when Ms. Ash signed the memo on January 18, 2018, that she had any knowledge that there was a federal investigation. The only evidence the government put in was that Mr. Wong was approached by Agent Jackson of the U.S. Attorney's Office on January 17th and left a business card, and that they talked — "they" meaning Mr. Wong and Agent Jackson — later that evening.

THE COURT: Just refresh my recollection as to how you reconcile your assertion about the memo being signed on January 18th with the date on it, which is January 22nd.

MS. COHEN: Correct, your Honor. So the government

did not call Mr. Wong, obviously, who was the person who created those memos and who presented them to Ms. Ash to sign, and so I think the record is unclear, and the government did not put in any evidence as to why the memo is dated January 22, but was signed by Ms. Ash, according to Agent Jackson's testimony of what Ms. Ash told them, on January 19th, when she went to the MCU at Mr. Wong's request to pick up the phone, that she signed it then, and then, as she voluntarily told the government, she signed another copy, at Mr. Wong's request, a few days later because he said he needed another copy.

THE COURT: So your whole argument about ignorance of the federal investigation hinges on your client's self-serving and hearsay statement to the agent?

MS. COHEN: No, your Honor. There are contemporaneous text messages between Ms. Ash and Mr. Wong --

THE COURT: That establish the date of signing?

MS. COHEN: No. Mr. Wong was clever enough not to tell Ms. Ash why he wanted her to come to the MCU. He lured her to the MCU with the promise of the new iPhone X that he knew she wanted, based on the emails and based on the evidence in this case. And there is an email chain about when she's going to come to the office to pick up the iPhone X. And the government, who has the burden here, not the defense, did not put on any evidence to refute that Ms. Ash signed the memo when she went into the office to pick up the iPhone X on the 19th.



It is the government's burden --

THE COURT: Except there is absolutely no such evidence except your client's self-serving and hearsay statement. There's just no evidence at all.

I mean, there's maybe evidence that she went there that day, okay, but you have the dated memorandum, which is some evidence that the memorandum didn't even exist on that day.

MS. COHEN: So, your Honor, I don't think that -- first of all, it is the government's burden to put in the evidence to prove that Ms. Ash knew that there was a federal investigation and to prove that Ms. Ash's statements, as your Honor --

THE COURT: Is there evidence that she knew by January 22nd?

MS. COHEN: No. I was going to turn to that next, your Honor.

There is no evidence that the government put forward that Ms. Ash knew that there was a federal investigation on January 22nd. The first time --

THE COURT: Wong certainly knew by then.

MS. COHEN: Correct. And Wong certainly shared that information with the actual coconspirator, Mr. Guagliardo. He sent a copy of Agent Jackson's business card via text to Mr. Guagliardo, did not send that to Ms. Ash, nor did



Mr. Guagliardo send it to Ms. Ash. And there's no email, text, voicemail, where Mr. Wong or Mr. Guagliardo shares with Ms. Ash that Agent Jackson, of the U.S. Attorney's Office, had visited Mr. Wong on January 17th. The first time the federal government appears to Judge Ash is on January 31st, when Agent Jackson called her on the phone and she spoke with him, on January 31st.

And the government did not put on any evidence of any communication to demonstrate that Ms. Ash knew on January 19th, when the defense submits the evidence shows she signed the memo, or even on January 22nd, when she may have signed a second copy of the memo at Mr. Wong's request, absolutely no evidence in the record showing that Ms. Ash knew there was a federal investigation.

On those grounds, we believe that a judgment of acquittal on Count Two is appropriate.

As to Count Three, which relates to Ms. Ash obstructing a federal investigation because she deleted texts that were responsive to a subpoena served on her and failed to provide emails that were in her personal email account, we believe the evidence does not show any intent to either delete the texts or not produce emails because Ms. Ash was trying to obstruct the federal investigation. In fact, the evidence shows that Ms. Ash told the government she deleted texts with Kam Wong because they weren't about bank business, they were



personal, and that she had an attorney who produced emails to the government, and that there were some emails that weren't included in that production.

The government did not show that there was anything in the emails or the texts that was relevant to what Ms. Ash believed was being investigated, which was Mr. Wong's embezzlement from the MCU, and, in fact, the government has the texts and the emails because they were either on someone else's phone or they were preserved in email boxes pursuant to a preservation letter, and, in fact, those emails and texts that they entered into evidence, the ones they entered into evidence do not relate to bank business.

And so the government has not proven that Ms. Ash's intent, when she deleted text messages, or when her attorney, when he produced documents that were in her possession, that there was a failure to produce certain emails, that Ms. Ash did so with the requisite intent to obstruct a federal investigation.

As to Count Four, making a false statement to the government, which relates to Ms. Ash telling the government in June of 2018 she didn't have any documents responsive to this subpoena: Very similar as the argument related to Count Three, which is that the government failed to introduce evidence that was sufficient to sustain a conviction on Count Four because they failed to show that when Ms. Ash told the government she

didn't have any documents, that she did so with the intent to obstruct their investigation. In fact, she told the government the reason she told them she had no documents, because she did not think -- she did not have any documents that related to bank business, and whether she read the subpoena right or read the subpoena wrong, the government failed to introduce any evidence sufficient to sustain a conviction that her intent in doing that was to obstruct a federal investigation versus believing that the federal investigation was about Wong and his embezzlement, and that whatever documents she had did not have anything to do with that. And she told the federal government that whatever documents she had related to bank business would have been on her MCU email account, which she no longer had access to.

So, for all those reasons, the defense submits that there is insufficient evidence to sustain a conviction for all the four counts in the superseding indictment and moves pursuant to Rule 29.

THE COURT: Thank you.

Mr. Mark?

MR. MARK: The grounds advanced by Ms. Cohen are largely --

THE COURT: Please.

MR. MARK: Your Honor, the grounds advanced by Ms. Cohen are largely the same grounds that were well trodden



yesterday afternoon. The evidence here is not just sufficient, but overwhelming, that the defendant did what she is charged with doing in each of the four counts, and the government has met its burden as to each of the elements in each of those counts.

Unless your Honor wants to hear further --

THE COURT: I'll leave to your judgment what you want to do, but I have this question.

MR. MARK: Yes, your Honor.

THE COURT: In looking at this email chain, which is Government Exhibit 251A, which starts from Wong, Gagliardo, and as we get along, we have the text or email -- I guess it's a text — from Wong to Gagliardo at 1715 hours on January 22nd, in which Wong expresses his real, real appreciation for all your guys' trust and help, and then Wong gets back to him at some point — the time said 17:49 — and says he spoke to Gio — which I gather is Porcelli — he's onboard, he will sign a memo that captured our conversation.

So that means that certainly permits an inference that Gagliardo and Wong, by the time of that text, had some kind of plan or arrangement with which Gio was onboard, and Gio's signing the memo that captured our conversation, at least permissibly, is a reference to the memo that Ms. Ash ultimately signed as well.

And then Gagliardo draws a heavy black line under the



conclusion, he said: We want this to go away before it goes any further. That's at 5:49, 1749. And there's more thanking for the trust.

And then we have the text from Gagliardo to Wong saying, apparently with reference to Ms. Ash: She and I have a good enough relationship -- I'm sorry, it's from Gagliardo: She and I have good enough relationship, that if you can't talk to her or anyone else, I'll be able to intervene without a problem.

So Gagliardo is offering to try to get Ms. Ash onboard if Wong is having a problem.

And then Wong says: I just said to her that someone is giving me trouble for the LTD insurance offsets.

Now, I understand why, and Ms. Cohen, certainly permissibly, would like to construe that last text has meaning. I said to her only -- or I said to her just that someone is giving me trouble, isn't there an alternative reading? The alternative reading is: I short time ago told her that someone's giving me trouble for the LTD insurance offsets, not that that's the only thing that was said in the conversation, that someone was giving him trouble.

Do you disagree with that?

MR. MARK: I don't, your Honor. I think that is a much better reading of the text, which is corroborated by other evidence in the case, such as phone calls --



THE COURT: Well, not least of them being the very next text --

MR. MARK: Exactly.

THE COURT: -- in which Guagliardo says: She understands.

And then there's a text from Wong later — not much later, maybe a minute or two — but -- oh, unless these are in reverse order. I'm not sure of the order.

MR. MARK: Unlike emails, they do go chronologically.

THE COURT: They do go chronologically, so my order is reversed, but I think the point is the same.

Okay. It is the same.

Okay. I just wanted to test my assessment of that.

MR. MARK: Your Honor, I'm happy -- we went through this a lot — I'm happy to go through it in more detail — but the emails, particularly these text messages, lay out the chronology of the testimony, not just of the admissions that Ms. Ash made to Agent Jackson, but also the testimony we highlighted when we read yesterday of Monique Smith, all overwhelmingly show that the defendant knew that there was a federal investigation at the time that she signed the memo.

THE COURT: Okay.

The motion, Ms. Cohen, is denied, but I do assure you that if there's a conviction, I'm confident you'll renew it, and I will look at it all again very closely.

Okay. So I'll see you at 2:00 o'clock.
Do you have copies now, James?
James has copies of the draft charge for you already. He's way ahead of me in all things. And so I'll see you at 2:00 o'clock.
MR. MARK: Your Honor, maybe I'm asking inappropriately, but is there a PDF version that could be sent to the parties?
THE COURT: I'm sorry, is there what?
MR. MARK: Is there a PDF version of the document that can be sent to the parties, or is that not your Honor's practice?
THE COURT: Why do you need a PDF?
MR. MARK: No problem. We can --
THE COURT: We can give it to you, but we don't have one.
MR. MARK: Oh, you don't have one?
THE COURT: Right. But we could make one. I see you want to put it in your system.
MR. MARK: We can take it back to our office and scan it.
THE COURT: You can scan it, too.
MS. COHEN: That's what I just said.
THE COURT: The clerk's office has been on a campaign for the last five years to shift all the clerical work in the



court into chambers.
MR. MARK: Oh, okay.
THE COURT: God forbid, they should -- they do a great job with difficult circumstances.
MR. MARK: Thank you, your Honor.
MS. COHEN: Thank you, your Honor.
(Recess)



AFTERNOON SESSION
3:00 p.m.
THE COURT: Good afternoon, folks.
MR. MARK: Good afternoon.
MS. COHEN: Good afternoon, your Honor.
THE COURT: We have figured out what the glitch was that resulted in the distributions of the new version of the charge, which is essentially the same as the old one, but it's redlined. So we'll mark it as Court Exhibit H, yes?
THE DEPUTY CLERK: Yes, Judge.
THE COURT: A copy of the 12.08.2021 [2] draft of the proposed charge. And we'll go to it.
Any objections from the beginning through page seven?
Government?
MR. MARK: No, your Honor.
THE COURT: Who is going to handle this for the defense?
MS. COHEN: I will handle it, your Honor.
Your Honor page four, first full paragraph, the end of that sentence, "except as I will otherwise indicate." I think it is confusing, I think it is not necessary.
THE COURT: I agree with you. Anybody disagree? I'm striking the latter.
I do want to also note that I have been informed that Ms. Ash, to whatever extent she may have had a right to be



present this afternoon, has waived any such right and is not here. And am I correct in that?
MS. COHEN: You are correct, your Honor.
THE COURT: Thank you.
Anything else through the bottom of page seven.
MS. COHEN: Yes. B. The first paragraph, last sentence where you say, "Now I will explain to you in more detail what the indictment charges with respect to the counts for your determination."
THE COURT: Yes.
MS. COHEN: The defense would ask that you reremind the jury that the indictment is just the accusatory instrument, it is not evidence, and defendant is presumed innocent.
THE COURT: Please look at page three, lines 13 through 15. The point's covered I believe.
MS. COHEN: That's fine, your Honor. Withdrawn.
THE COURT: Okay. Anything else through the bottom of page seven?
MS. COHEN: Page six, line eight. The sentence begins on line seven, "The first way is that you may find that the defendant either committed."
THE COURT: Yes.
MS. COHEN: We would like "or caused someone else to commit" stricken there, and I guess the "either" before "committed" would also need to be stricken.

I think it's confusing and you later on charge on aiding and abetting.

THE COURT: Government have a view?

MR. MARK: We object because I think there is aiding and abetting charged, so I think it is relevant to explain what a substantive count is and that there two ways they can be found.

THE COURT: No, I think --

MR. MARK: Actually, sorry. The point is somewhat different.

THE COURT: I think counsel is right.

MR. MARK: I looked at that and I don't disagree.

THE COURT: So, line seven and eight should read, "The first way is that you may find that the defendant committed the substantive crimes charged." And what I omitted is deleted.

MS. COHEN: Thank you, your Honor.

Page seven, the first full paragraph.

THE COURT: Old charges may be completed but they never disappear.

MR. MARK: May I make one note. If you delete that "or caused someone else to commit a crime." Should you add then under the second way "defendant aided and abetted or willfully caused someone else."

THE COURT: No.

MR. MARK: Actually no.



THE COURT: Actually not.

MR. MARK: Actually --

THE COURT: Okay. Anything else through page seven?

MS. COHEN: Yes, your Honor. On the top of page seven, line four, "I therefore instruct you that the defendant is to be presumed innocent," we would ask that you add "on each count."

THE COURT: Okay.

MS. COHEN: Then at the last sentence of that paragraph which begins on line six, "If the government fails to sustain its burden," we would ask to add "on any count," "you must find the defendant not guilty," we would suggest you add "of that count."

THE COURT: That seems helpful. I will do that. Anything else on that section?

MS. COHEN: No, your Honor.

I would say all of this is subject to we had submitted redline of the government's proposal. And that's in the record and we understand this to be your decision, your resolution.

THE COURT: My view is that your redline contained no proposed additions, and only struck language from what the government proposed that you didn't want in there. If there is any objection to this charge, you need to voice it now.

MS. COHEN: Okay. So, your Honor, there is nothing from page seven, but I'll try to know where we've objected



before.

THE COURT: That is fine. Let's see. Page eight through page 10, line 19.

MS. COHEN: So, your Honor -- sorry. The government goes first.

THE COURT: Yes.

MR. MARK: Nothing from the government.

THE COURT: All right. Ms. Cohen.

MS. COHEN: On page nine, line eight, which is the heading element 2. We would request it just says "knowingly," I don't think participation --

THE COURT: I'll do that.

Anything else on this section?

MS. COHEN: On page 10, line four, "obstruct or influence an investigation." We would ask that you insert the word "federal" before investigation so it would be a federal investigation.

THE COURT: Mr. Mark?

MR. MARK: May I have one moment, your Honor.

I think the language of the statute is an investigation, and talks about that the investigation is within the jurisdiction that's of a federal nature. So I would suggest we stick with the language of Sand that's typically provided.

THE COURT: And therefore?



MR. MARK: We object to the proposal.

THE COURT: Let's go to line eight. Is anybody objecting to anything on line eight?

MS. COHEN: Yes, your Honor. We would object to "or otherwise" at the end of that sentence. So we would say it should be an --

THE COURT: This is the 1519 count, right?

MS. COHEN: Correct, your Honor.

MR. MARK: Your Honor --

THE COURT: Let me read the statute again, please.

I'll make this change.

MR. MARK: Your Honor, may I raise one thing?

THE COURT: Yes.

MR. MARK: Before you do, I cite to our request to charge. This is United States v. Hassler, 992 F.3d 243, 247 (4th Cir. 2021). "Every circuit to address the issue presented in this appeal has concluded that knowledge of a federal investigation under Section 1519 is a jurisdictional element. And the government was not required to prove that the defendant knew or contemplated --"

THE COURT: I suspect it may say is not.

MR. MARK: Was not required.

THE COURT: Is not a jurisdictional element.

MR. MARK: No, is a jurisdictional element.

THE COURT: All right.

MR. MARK: "And the government was not required to prove that the defendant knew or contemplated that the investigation he intended to impede was within the jurisdiction of a federal agency."

This is a key distinction between 1519 and --

THE COURT: Read the part that came after the word "impede."

MR. MARK: The government was -- was within the -- he did not need to know that it was --

THE COURT: Look, you just read off a quotation. And after the word "impede," I couldn't make out what you were saying.

MR. MARK: Oh, I apologize.

THE COURT: Would you continue reading from the word "impede."

MR. MARK: Oh, sorry. I misunderstood you, your Honor.

"he intended to impede was within the jurisdiction of a federal agency."

So the government is not required to prove the defendant knew that the investigation was federal. It's merely a jurisdictional element, which distinguishes Section 1519 from the other statute, 1512. I can also point your Honor to a Second Circuit case as well.

THE COURT: Please don't point me to anything while



I'm looking this up, okay.

MR. MARK: No problem.

THE COURT: I'm familiar with the points.

So how would you restructure this?

MR. MARK: Your Honor, I think it's accurate as drafted, and the proposal the defendant makes would be inaccurate and inconsistent with Second Circuit case law.

THE COURT: First of all, there is a typo on line five that I'm sure you all picked up and that the word should be "she was," not "she as."

Now, so what I'm looking at now is revising this to leave the first sentence alone, that is the first sentence of the first full paragraph on page 10, and to strike out on line eight the words "whether federal or otherwise." And insert in place thereof, and following the word "investigation," the following: "Of any matter that happened to be within the jurisdiction of any department or agency of the United States."

Is there any objection to that?

MS. COHEN: No, your Honor.

THE COURT: Just making a further note to myself.

MR. MARK: I guess the one concern I have is that this might confuse the defendant's intent from the jurisdictional issue. And the federal investigation is purely a jurisdictional element. It doesn't have to go to the defendant's intent.



THE COURT: I understand that. Of course. I just was proposing to insert the precise language you just read to me. That comes right out of Hassler.

MR. MARK: Yes.

THE COURT: So do you still have a problem with it?

MR. MARK: But I -- I'm sorry if I'm just --

THE COURT: I think, well, maybe I'm seeing your point.

MR. MARK: I'm tired so maybe I'm not being as articulate. But I have the impression from where it's inserted it leads to something that is a little bit confusing.

THE COURT: Let me just read on.

What you're really saying is that to describe this as a crime with three elements is really what's misleading. In the sense that, there is a jurisdictional hook that has to be proved also. That hook is that, whether she knew it or not, it was a federal investigation. And by tossing the jurisdictional element into the knowledge element, it may be a little bit confusing.

I understand the analytical point.

MR. MARK: I also think --

THE COURT: There is no issue of fact in this case as to whether there was an investigation that was a matter within the jurisdiction of the United States government. Right?

MR. MARK: That is not -- there is no question that



that has been demonstrated, but the defendant has made arguments through cross-examination that suggest that her intent was merely to interfere with a state investigation, not a federal investigation.

THE COURT: I never heard that.

MR. MARK: Or an internal investigation. So I think without having precise clarity on this instruction, it can lead to confusion for the jurors.

THE COURT: How would you propose to handle it, Ms. Cohen?

MS. COHEN: Your Honor, I was fine with the way your Honor amended it. I'm also fine with leaving it as it was.

THE COURT: Well, then isn't the logical thing to do here to deal with this is to leave it as it was.

MR. MARK: Yes. That would be consistent with case law. Thank you, your Honor.

THE COURT: Okay. This will remain as it was typed except for the correction of the typographical on line five.

Anything else through page 10, line 19, from either side?

MS. COHEN: No, your Honor.

THE COURT: Page 10, line 21 through page 15, line nine.

Government?

MR. MARK: Yes. Would you like typographical --

THE COURT: Yes, sure. May as well.
MR. MARK: On page 10, line 24, it should be a romanette instead of a Roman numeral.
THE COURT: What did you call it?
MR. MARK: A romanette. Little Roman numerals.
THE COURT: What we have to do is disable the automatic capital in the Word Perfect which is almost impossible to do, I tell you. Okay. Let's go on.
MR. MARK: Just a spacing issue on the next line.
On page 12, line 25, it should just be changed to "her conduct."
THE COURT: Agreed.
MR. MARK: Going --
THE COURT: I suppose in the sentence, the end of the sentence, we should change "obstructs or influences" to "obstructed or influenced."
MR. MARK: Yes, your Honor.
THE COURT: Let's not take a lot of time on that one, okay.
MR. MARK: No.
THE COURT: Anything else?
MR. MARK: Then page 13.
THE COURT: Yes.
MR. MARK: Line 14. To act corruptly. Voluntarily and intentionally usually comes from the knowledge requirement.



Though usually to act corruptly is defined to mean act with a bad purpose. So voluntarily intentionally seem to just, while they're not wrong, don't seem to add anything there and might be a little bit confusing.
THE COURT: Let me just look back.
What do you think, Ms. Cohen?
MS. COHEN: I would prefer it as is, your Honor.
THE COURT: What do you think the law is?
MS. COHEN: I think the way you phrase it is consistent with the law.
THE COURT: You are a very hard person to get a straight answer from.
MS. COHEN: I think the government said it wasn't inconsistent.
THE COURT: No, they said it was confusing.
I'm going to strike voluntarily and intentionally. I think the government is right on this.
Anything else?
MR. MARK: The next sentence, your Honor, on line 16, this then talks about motive and what's ordinarily shown. Given that motive is not an element, and what might be ordinary isn't really required, the government would propose that your Honor strike this sentence.
THE COURT: Any problem with that, Ms. Cohen?
MS. COHEN: I don't mind striking the word "motive."



I think it is helpful to explain how one can act corruptly.
THE COURT: I'm going to strike that sentence. I think it's unnecessary. And maybe in the next sentence I'll change the word "motivation" to "purpose."
MR. MARK: That's a good suggestion, your Honor.
THE COURT: Thank you.
MS. COHEN: Your Honor, while we're on that, the defense would request that you actually strike 18 and 19.
THE COURT: Strike what?
MS. COHEN: That sentence that you just modified.
THE COURT: Because?
MS. COHEN: Because it is I think confusing. Elsewhere throughout the charge you talk about in whole or in part. And I don't think it needs to be said. It's not how you define how someone acts corruptly.
THE COURT: Well, there is another way to do this. I could charge "To act corruptly means to act, in whole or in part, with a bad purpose."
MS. COHEN: That would be preferrable, your Honor.
THE COURT: Any problem, Mr. Mark?
MR. MARK: No, your Honor.
THE COURT: Then I'll strike the sentence that Ms. Cohen doesn't like.
Anything else from the government on this section?



MR. MARK: The last comment I have is also just a little typo. It's on page 15, line three, looks like the quotation marks had solo marks as opposed to the double marks.
THE COURT: You are a stickler. When you're right, you're right. Okay.
Ms. Cohen, same section.
MS. COHEN: Sure. So, your Honor, this is as to Count Three on page 12, line 19. "An official proceeding means a proceeding before" we would ask that it say "a federal court, a federal judge, or federal agency."
THE COURT: Mr. Mark?
This is the 1512 count, right?
MS. COHEN: Correct, your Honor.
MR. MARK: Before -- oh, just adding the word a federal court and federal judge?
THE COURT: Yes.
MR. MARK: I have --
THE COURT: You have what?
MR. MARK: I have no problem with that given your Honor has the later instruction that a federal grand jury is an official proceeding.
THE COURT: Okay. Moving right along.
MS. COHEN: I would ask that the word "federal" get inserted on line 23 before the word "proceeding."
THE COURT: Mr. Mark?

MR. MARK: It's not wrong. It also seems unnecessary and I don't know if we go along this route, we are going to be adding "federal" every time before the word "proceeding."

THE COURT: What's the bottom line?

MR. MARK: I think it's unnecessary given the sentence it's clear as it's written and it will lead to a lot of changes.

THE COURT: I agree. Overruled. The point's made. Anything else through --

MS. COHEN: Yes, your Honor. Page 13, lines two and three we would ask they be omitted. I think --

THE COURT: No. The law is clear on that. Anything else?

MS. COHEN: Yes. On page 14, just because you are explaining what elements are, line five, if we can insert "a federal official proceeding" there.

MR. MARK: That's not the language -- sorry. That's not the language of the statute. The language --

THE COURT: I've already defined an official proceeding on page 12, lines 19 to 21. It is unnecessary.

MS. COHEN: Okay. My next thing is on page 15.

THE COURT: Sorry?

MS. COHEN: My next thing is page 15, line 16. I don't know if we're up to that.

THE COURT: Okay. Page 15, line 10 through page 18.



Government?

MR. MARK: On page 17, line 14, we would propose that "government making body" be changed to "government agency," which is consistent with the language of the earlier portions of the statute.

THE COURT: Give me the reference again.

MR. MARK: Sorry. It's page 17, line 14.

THE COURT: The proposal is what?

MR. MARK: Where it says "decision making body." It would be changed to "government agency" for consistency. And where it says "to which was addressed," I think that's more limited than the statute is, and we would propose "to which was provided." It doesn't matter under the law whether it needs to be addressed. It just needs to be provided to the government agency.

THE COURT: Any problem with that, Ms. Cohen?

MS. COHEN: No, your Honor.

THE COURT: Anything else on this section, Mr. Mark?

MR. MARK: Then where it says on the next sentence, "However, the government's not required to prove," we would propose that "the decision maker" would be changed to "anyone," which is the language of Sand. So "anyone actually relied on the alleged false statement."

THE COURT: Ms. Cohen?

MS. COHEN: Your Honor, I would object to that.



Anyone is anyone. And here, it has to be the decision maker, the government agency.

MR. MARK: This is saying what's not required.

THE COURT: The sentence is that they are not required to prove that. They are not required to prove that it was a decision maker. And they're also not required to prove that it is whoever played Clarabell the Clown on Howdy Doody. They just don't have to do it. So "anyone" seems to me to be the right word.

Anything else on that section from the government?

MR. MARK: On page 17, line 26, this seems to be a typo. It should be an act is done knowingly, not willfully. Because willfully is defined in the next sentence.

THE COURT: Sounds right.

MR. MARK: Page 18, line 14, just another typo. At the end of the sentence on line 14, it should be the statement must concern "an" authorized function, not "and."

THE COURT: Correct. Anything else?

MR. MARK: Now on page 19.

THE COURT: We are not up to that yet.

MR. MARK: Sorry, your Honor.

THE COURT: Okay. Anything -- sorry?

MR. MARK: So. Just through 18, yes.

THE COURT: To anything else on Count Four from the defense?



MS. COHEN: Your Honor, the defense would ask that your Honor insert a sentence, page 15, the end of the first paragraph under H, so it would be line 16. Words to the effect of "This is the only false statement with which the defendant is charged."

MR. MARK: The phrasing there would be I think sort of misleading because there are lots of false statements she's charged with just in Count Three, and this is very focused on Count Four. I don't think any clarifying language she proposes would be helpful, necessary --

THE COURT: It could say that -- let me have your language again, Ms. Cohen?

MS. COHEN: This is the only false statement or allegedly false statement with which the defendant is charged.

THE COURT: That formulation is a little troublesome. But the point is substantively right.

MS. COHEN: I'm not wedded to my language at all, your Honor.

THE COURT: Okay.

MR. MARK: If your Honor is thinking about that, it should be focused on Count Four.

THE COURT: Yes. Sure.

What about this: "That statement is the only false statement offense charged in Count Four."

MS. COHEN: We just say "the only alleged false

statement."
THE COURT: I said "charged."
MS. COHEN: I understand, your Honor. But I think just given the formulation of the sentence, it would be preferrable to put "alleged" before "false statement."
THE COURT: I don't think so. Do you object to my formulation?
MS. COHEN: Only in that respect that I just said.
THE COURT: What is that respect exactly? You are saying it is an incorrect statement as a matter of law? Or are you saying you'd rather have it in a way you'd rather spin it.
MS. COHEN: The latter, your Honor.
THE COURT: Yes. I thought. Okay.
MR. MARK: Can I just clarify. Should it be that statement is the only false statement charged in Count Four, I am not sure what offense it seems to carry there.
THE COURT: You are not sure what?
MR. MARK: The word offense, what weight that's carrying. So I was just saying should it say "That statement is the only false statement charged in Count Four"?
THE COURT: Ms. Cohen?
MS. COHEN: That's fine, your Honor.
THE COURT: I thought it would be. I'll do that. Page 19.
MS. COHEN: Your Honor, I wasn't -- I have a couple



other --
THE COURT: I'm sorry.
MS. COHEN: That's okay.
Page 15, the last sentence that begins on line 24, it ends on line 26. We think that is unnecessary. I think it is also unnecessarily prejudicial. It talks about excusing or justifying making a false statement. I don't think it's needed. And I think it's potentially confusing.
THE COURT: Mr. Mark?
MR. MARK: I think it's legally accurate. And given I think the nature of the defense, it's particularly appropriate here.
THE COURT: Objection is overruled.
Anything else?
MS. COHEN: Yes, your Honor. Page 16, under number one, element one, statement. The last sentence which begins on line 17, finishes on line 18.
Under the statute there is no distinction between written and oral statements. As for Count Four, there is no allegation of any written statement, so I think it could confuse the jury because there are a lot of other written statements that were allegedly --
THE COURT: That seems a fair point, doesn't it, Mr. Mark? You are relying on an oral statement, so what's the difference?



MR. MARK: No objection, your Honor.
THE COURT: That's deleted.
Anything else?
MS. COHEN: No, your Honor.
THE COURT: Page 19 through page 27.
MR. MARK: All right, your Honor. On page 19, line 17 to 18, after the comma on credit union, and I guess for consistency I know you changed what we proposed credit union to MCU.
THE COURT: So you are on what lines on page 19?
MR. MARK: On page 19, line I guess line six to eight. I'm noticing that this is more in line of our request to charge. Your Honor changed the language in Count Two to references to Government Exhibit 116, so I didn't know if your Honor wants to be consistent here. Obviously this is accurate.
THE COURT: Well, we can reference it again here.
MR. MARK: I'm noticing that as a consistency. You changed that before.
THE COURT: I'm just going to add in after the word "memorandum" on line seven, "i.e., Government Exhibit 116," and leave it at that.
MR. MARK: No objection to that.
And my substantive point would be at the end of the line of line seven, after the comma, it should be in "an attempt to obstruct," not "with the intent." That conforms



with the indictment. And --
THE COURT: I'm sorry. In the --
MR. MARK: "In an attempt to obstruct," and also it avoids the concern that that would have to be the only intent, because obviously the defendant can have dual intents.
THE COURT: Sounds right. What do you think, Ms. Cohen?
MS. COHEN: That's fine with the defendant, your Honor.
THE COURT: Okay. Next?
MR. MARK: On page 25, I'm a stickler. Line 14, I think there is meant to be a paragraph.
THE COURT: You're correct.
MR. MARK: And that's it for me.
THE COURT: Back to you, Ms. Cohen.
MS. COHEN: Your Honor, page 19, the paragraph which is lines 23 to 26, I don't think it is necessary to call out that Congress deemed to make this particular crime --
THE COURT: I agree. I'll delete that.
MS. COHEN: Page 21, line 14, which starts "more persons sat around a table and entered into a solemn compact." I think that language is a little too prejudicial. I would just say "entered into an agreement," which is what the law says.
THE COURT: This charge has been given thousands of

times and I'm not going to vary from it.

MS. COHEN: I also think, I would also request that line 17, the first full sentence there, and then the second sentence, continuing onto line 18, through line 19, so there are two sentences. First starts "indeed" on line 17, the second sentence starts with "when" on line 18. I think they're unnecessary. I don't necessarily think it is so extraordinary. I understand this may have been given 1,000 times, but sitting here reading it from the defense point of view, I think it is unnecessary and prejudicial.

THE COURT: Mr. Mark?

MR. MARK: I assume, and I know from personal experience, that is the argument made many times in this courthouse, and I have never seen it be successful.

THE COURT: You've never seen it what?

MR. MARK: Be successful. I think this is the standard language. It's particularly appropriate here. And it gives legal guidance which I don't think Ms. Cohen is disputing.

THE COURT: Look, the one change I'll make in it is on page 18, at the near right margin, I'll say "much is left." I'll say "much may be left." Which I think is fair. I also think with respect to the earlier sentence that indeed, it would be extraordinary if there were a formal document or a specific agreement.



Anything else on this section, Ms. Cohen?

MS. COHEN: Your Honor, just to complete my thought about this paragraph. Line 19, "since conspiracy, by its very nature is characterized by secrecy, it is rare," I don't think that's accurate. I think "it sometimes is proven without direct evidence" would be more accurate and less prejudicial.

THE COURT: I'll make two minor concessions.

I'll change the sentence to read "since conspiracy by its very nature often is characterized by secrecy, it is not often that a conspiracy can be proved by direct evidence." Etc.

Anything else on this section, Ms. Cohen?

MS. COHEN: Your Honor, line 22 to 23, we would ask that through any -- I'm going to mispronounce that word. Contrivance.

THE COURT: Contrivances.

MS. COHEN: Thank you. I am going to mispronounce that too, your Honor, or tacitly.

THE COURT: I couldn't get what you said.

MS. COHEN: I would ask that -- I just can't pronounce the word for some reason. Through any contrivance, impliedly or tacitly -- I apologize for my mispronunciation -- be stricken. I think it is confusing. I think you talk about indirect, direct.

THE COURT: Overruled.



Anything else?

MS. COHEN: Nothing else through page 27, your Honor.

THE COURT: Thank you. I question whether we need page 28 down to and including page 30, line 17.

Anybody have a different view?

MS. COHEN: No, your Honor. We do not have a different view.

MR. MARK: Well --

THE COURT: Let's start with conscious avoidance. Do you think that should be in?

MR. MARK: Sorry. Conscious avoidance. No, we're not going to ask for a conscious avoidance.

THE COURT: So that's out. Now, let's come back to declarations of co-conspirators.

MR. MARK: I think there are declarations of co-conspirators.

THE COURT: I have no doubt about that. But, there were no limiting instructions, there was nothing to suggest they shouldn't pay attention to that. Right?

MR. MARK: Yes.

THE COURT: We agreed that's going out?

MR. MARK: Yes, your Honor.

THE COURT: And I don't hear any objection from Ms. Cohen.

MS. COHEN: No. The defense agrees, your Honor.



THE COURT: Page 30, line 19 through page 31.

MR. MARK: Through which page, your Honor?

THE COURT: 31.

MR. MARK: Nothing from the government.

MS. COHEN: Nothing from the defense.

THE COURT: Thank you. Page 32, line 13.

MS. COHEN: Oh.

THE COURT: Through page 34, line nine. Mr. Mark?

MR. MARK: Only a typo. In page 32, line 23, it should be "commits an offense."

THE COURT: Thank you.

Ms. Cohen.

MS. COHEN: Your Honor, I didn't realize, I didn't realize that I was -- that page 32 lines what is K, dual intent, line two through seven, was supposed to be included before.

THE COURT: No, I'm mistaken.

MS. COHEN: It happens sometimes.

THE COURT: I would be the first to admit it, actually.

MS. COHEN: I meant that I'm right. Not that you're mistaken.

THE COURT: Both.

Let's deal with that at the top of page 32. And I just want the record to reflect that Mr. Mark makes a typo in

line three.
MS. COHEN: Because he goes first, I can't share that I found the same typo.
THE COURT: Yes. All right. I'm taking that as no objection there.
So Mr. Mark, anything on the aiding and abetting instruction?
MS. COHEN: Your Honor, on dual intent, I do have an objection to that. I don't think it's needed. I think it is also woven into other instructions that it doesn't have to be a sole motive, it can be different motives. And I don't think it is needed. I think it is confusing.
THE COURT: What do you think about that?
MR. MARK: It doesn't sound like she's objecting that it is legally accurate, which is it. I think it is appropriate here given the nature of the defense to give a specific instruction here.
THE COURT: It's going to stay.
Anything else from either side through page 34, line nine?
MR. MARK: Not from the government.
MS. COHEN: Your Honor, page 32, I don't think that willfully causing a crime.
THE COURT: Not an issue in this case, is it?
MR. MARK: Well, the only point is the subpoena



production was done through an attorney. So I think it's --
THE COURT: Where's the evidence?
MR. MARK: The documents because --
THE COURT: Where is the evidence that she caused him?
MR. MARK: That, it's obviously the inference, the fact that she received the subpoena and the documents came back.
If this is not going to be a point of litigation or argument, let me just confer with -- obviously I think if we take it out here, we'll have to take it out some other places. But, if this is not going to be a point of contention from the defense, the government is not going to --
THE COURT: Is that right, Ms. Cohen?
MS. COHEN: Correct. There is the fact in evidence that her attorney produced the document, but I guess I want to make sure we were not intending to argue anything from that nor was the government, I don't think.
THE COURT: I think what the government is looking for is an assurance that you are not going to say it was Archibald who did this.
MS. COHEN: I don't think there would be any evidence in the record to support that.
THE COURT: Directly or indirectly.
MS. COHEN: I don't think there is any evidence in the record that would allow me to argue that this was Archibald's



fault.
MR. MARK: I would prefer a better commitment from Ms. Cohen.
THE COURT: Well, I understand why.
MS. COHEN: It is in the record that her attorney produced them. We are not going to be arguing that --
THE COURT: You know what he's asking for, Ms. Cohen.
MS. COHEN: I actually don't. I actually don't. I am not trying to be --
THE COURT: For you to say here there is nothing in the record to support the argument is not the same as saying "I'm not going to make the argument."
MS. COHEN: I thought I said there is nothing in the record to support me making that argument, so of course I wouldn't make that argument.
THE COURT: He's quibbling whether the "of course" necessarily follows.
Does it follow?
MS. COHEN: We are not going to be making the argument in closing that it was Archibald's fault that certain e-mails weren't provided to the government.
Is that what they are looking for?
THE COURT: I think so.
MR. MARK: Yes, your Honor. Given that, we have no objection to striking here -- and then I know your Honor would,



in the earlier portion of the introduction on the substantive offenses, I think there is a reference to willful causation so we'll probably need to catch that.
THE COURT: You'll call my attention to it before we break. So, then I believe that this whole section on willfully causing that starts at page 34 is history. Agreed?
MS. COHEN: Yes, your Honor. Agreed.
THE COURT: Okay. Finally an opportunity to shorten something. Is there anything else on the aiding and abetting instruction? Government?
MR. MARK: No, your Honor.
THE COURT: Ms. Cohen?
MS. COHEN: So, I would ask, your Honor, that line 22 through 26 be omitted. I don't think it is necessary.
THE COURT: From which page?
MS. COHEN: Sorry. Page 33, your Honor. There are a list of questions to ask themselves, I don't think it is necessary. It is very different from the rest of the charge.
THE COURT: Overruled.
Page 35, line 17 through page 36, line eight. Mr. Mark?
MR. MARK: Just two typos, since I'm on a roll. Page 35.
THE COURT: Your roll was interrupted.
MR. MARK: I know. It's true.

Page 35, line 20, it should be "if the guilt of the defendant."
THE COURT: Good one.
MR. MARK: And page 36, line four, it should just be --
THE COURT: Lowercased T.
How about you, Ms. Cohen, can you top that?
MS. COHEN: Your Honor, the defense would ask page 35, line 20, the middle of the sentence "if the guilt of the defendant is shown," we would ask that you add the words "for any count." And then at the end of the sentence, we would ask that you add the words "with respect to that count."
THE COURT: Fine. Okay.
Section Roman numeral II which starts on page 36, and ends on 37. Anybody have any problems, Mr. Mark?
MR. MARK: No, your Honor.
MS. COHEN: No, your Honor.
THE COURT: Roman numeral III, page 37, through the rest of that part. And let me just flip through, there are a few things I think we can deal with right off the top.
Anybody think we need this instruction on publicity?
MR. MARK: No, your Honor.
MS. COHEN: We do. There have been numerous news articles.
THE COURT: I'll give it.



The accomplice testimony is out, yes?
MR. MARK: Yes.
MS. COHEN: Correct, your Honor.
THE COURT: The falsus in uno, in or out, Mr. Mark?
MR. MARK: In.
THE COURT: Ms. Cohen?
MS. COHEN: Sorry, your Honor. I am just thinking a moment.
I don't think there has been any suggestion through any cross that any witness lied. May have been mistaken, but I don't think you need this.
MR. MARK: I mean, what Ms. Cohen might think somebody -- someone's mistaken, somebody else could consider they lied.
THE COURT: I'm going to take it out.
False exculpatory statements, in or out, government?
MR. MARK: In, your Honor.
THE COURT: Ms. Cohen?
MS. COHEN: We would prefer it be out.
THE COURT: Sure you would. Overruled.
Similar acts?
MR. MARK: That doesn't seem applicable.
THE COURT: No, I don't think so either.
(Continued on next page)



THE COURT: No, I don't think so either.
MS. COHEN: The defense agrees, your Honor.
THE COURT: Investigative techniques? Out?
MR. MARK: I think somewhat it depends on what Ms. Cohen argues in her closing.
THE COURT: Fair point.
MS. COHEN: I was going to say, I don't think -- the defense is not going to argue that any search warrant or any particular technique used was not appropriate.
THE COURT: I'm going to leave it on the page. It will say, "if applicable," and I'll either read it or not, depending on the closing.
Searches? I guess that stays in?
MR. MARK: I think it should stay in, your Honor.
THE COURT: Charts and summaries? In.
MR. MARK: In. Only the charts and summaries for M, the ones that are admitted into evidence. There's no charts and summaries that were not admitted into evidence, there were no demonstrative charts. They were all 1006 charts.
THE COURT: Okay, that's correct.
Now, do I need to read these things about stipulations again? I instructed them during the trial. I'll read them if you want, but --
MS. COHEN: The defense doesn't think it's necessary, your Honor.



MR. MARK: I don't think it's necessary.
THE COURT: Okay. Out.
No character witnesses, we don't need that charge.
MS. COHEN: Correct, your Honor.
MR. MARK: Just your Honor skipped over Q, the redactions. You're going to include that one?
THE COURT: I don't remember anything with redactions.
MS. COHEN: The defense doesn't think there were any. I don't think we need to include that, your Honor.
MR. MARK: No, there are redactions. Obviously, we didn't draw the jury's attention to it, but on the subpoenas, there are redactions of my name on the subpoena, there are some redactions of my name from other emails. These are documents they might pull up --
THE COURT: So you want it?
MR. MARK: Yes.
THE COURT: Okay.
Obviously, the defendant's testimony is out.
With that once-over, is there anything else to talk about in section 3? Any objections?
MR. MARK: Unfortunately, a few little --
THE COURT: Typos.
MR. MARK: -- typos. That's it.
Page 38, line 27 — I think this is a relic of your Honor's prior limiting instruction — there's references to

"Ms. Ash" instead of "the defendant."
THE COURT: I'm sorry, where are you?
MR. MARK: Page 38, line 27.
THE COURT: I think you want "the defendant."
MR. MARK: It should be "the defendant." And the same on line -- sorry, page 39, line 3. It should be the defendant there as well.
THE COURT: Yes.
MR. MARK: Page 40, line 20, it should be "the fact that a witness." There's a missing "a."
And my last one for this section is page 51, line 4, it should be a "her," not a "him." "No adverse inference against her may be drawn."
THE COURT: Okay.
Ms. Cohen?
MS. COHEN: Your Honor, page 38, B1, disclosure forms, conduct as a state judge.
THE COURT: Yes.
MS. COHEN: Line 18, we would ask that you strike "training she may have received about those forms." There's no suggestion she did anything wrong with respect to not attending training she should have.
THE COURT: Mr. Mark?
MR. MARK: I think there is evidence about trainings, but if Ms. Cohen wants less in this limiting instruction,



that's fine.
THE COURT: If what?
MR. MARK: If Ms. Cohen wants less in this instruction, then the government doesn't have an objection to that.
THE COURT: I can't hear what you're saying. If she wants what?
MR. MARK: I think she just wants to strike language --
THE COURT: Yes.
MR. MARK: -- I said if she wants less in this instruction, less reference, the government doesn't have an objection, though the government just noted that I believe there was some evidence that came in about --
THE COURT: Yes, about training, but not about the forms.
MR. MARK: I think it generally covered financial disclosures but I'm not trying to quibble with that.
THE COURT: Okay. I'm taking it out.
Anything else, Ms. Cohen?
MS. COHEN: Yes, your Honor. Under number 2, "Benefits Or Items of Value," on page 39 --
THE COURT: Yes.
MS. COHEN: -- the sentence begins with the word "It" on line 15.



THE COURT: Yes.
MS. COHEN: "It was offered as evidence." We would suggest the rest of the sentence read: "It was offered as a potential explanation of the charged conspiracy."
THE COURT: I'll exchange it to read: "It was received as evidence of the background," et cetera.
MS. COHEN: I think it would be "the potential background" because that seems it make as if it actually did give the background, which is what the government alleges. We don't think it did.
THE COURT: That hair is too fine to split.
MR. MARK: I think, your Honor, it's so fine that I don't think it's legally accurate. But we have no objection to your Honor's proposal as you read it.
THE COURT: Okay.
Anything else on this section?
MS. COHEN: Yes. We would ask that you strike "and to complete the narrative of the crimes charged." I don't think that's why you admitted it. I think it was all to explain the background.
THE COURT: I'm going to leave it alone. I disagree with you.
Anything else on this section?
MS. COHEN: No, your Honor.
THE COURT: Okay.



Anything from either side on the balance of the charge?
MS. COHEN: No, your Honor.
MR. MARK: Sorry, just one second. Where did we get up to last?
THE COURT: We got all the way through everything, page 51.
MR. MARK: Okay.
The last one I have, actually, is a somewhat substantive one. On page 55, I think there's a little lack of clarity in this sentence. It's line 5, the sentence that says, "If you communicate with the Court before reaching a verdict, you must never indicate in a note to the Court how you are divided." I think it would be better --
THE COURT: I don't know what line you're referring to.
MR. MARK: Oh, sorry. Line 6. And I think, for clarity, it should read --
THE COURT: On which page?
MR. MARK: Oh. Page 55, your Honor.
THE COURT: Okay.
MR. MARK: So page 55, the sentence begins on line 5 and continues to line 6.
THE COURT: Okay.
MR. MARK: And for clarity, I would suggest that it

read: "You must never indicate in a note to the Court whether you are divided and, if so, how you are divided."
THE COURT: And I am going to add, "unless I specifically request that information."
Poor James is going to have to read my handwritten notes tonight.
Anything else? We're done with the charge?
Mr. Mark?
MR. MARK: The willful causation language up at the beginning, do you want us to point that out?
THE COURT: Yes. If you don't point it out, it's not going to happen.
MR. MARK: It looks like there's a reference to a page 6, line 13, I guess starting at line 13 through 19. So it should just be deleted on line 13 and then on line 18.
THE COURT: Yes.
Anywhere else?
MR. MARK: Not that I recall off the top of my head. If we notice anything else, we'll let Mr. Campbell know.
THE COURT: Okay. That takes care of the charge. Thank you for your help.
Now, let's just talk a minute about the verdict form.
On Count Three, there are two theories of liability. I haven't heard any suggestion of submitting special questions to the jury. Anybody want that? And, if so, why should I do



it?
MR. MARK: Your Honor, I don't think that's necessary because there are just two different ways of committing that offense.
THE COURT: Ms. Cohen?
MS. COHEN: We're not requesting a special verdict on that.
THE COURT: Okay.
Then we are done. The verdict form is blissfully simple, guilty or not guilty, on each of four counts.
MS. COHEN: We would just request a chance to look at it, your Honor.
Thank you, your Honor.
MR. MARK: Thank you, Mr. Mohan.
Your Honor, we have two little housekeeping matters before --
THE COURT: Do these have to be done now? Because I have a sentencing waiting.
MR. MARK: Oh. We could address these before our arguments tomorrow morning.
THE COURT: Oh, the assistants aren't here yet, so we have time.
MS. COHEN: Your Honor, on the verdict form, I'm a little worried that the jury is not going to be as familiar, copasetic, with what Count One, what Count Two, what Count



Three, what Count Four is. I understand, from the jury charge, you're intending to send the indictment back with them.
Am I correct on that?
THE COURT: I'm going to send in the charge and the indictment.
MS. COHEN: You're going to send the charge itself and indictment?
THE COURT: And the indictment.
MS. COHEN: I think I would rather there be a little more on the verdict form than just Count One, Count Two, Count Three, Four.
THE COURT: I have faith in them. With all that reference material, I don't see a need to do it. There's nothing wrong with the request — I don't fault you for making it — I just don't see any particular benefit.
MS. COHEN: I think it could be -- given that there's some overlap in the counts, it can be a little confusing. I just think they can get -- it would be better if it was a little more spelled out.
THE COURT: Look, what I'm concerned about is Count One. I can say, okay, Count One dash conspiracy; Count Two — obstruction; Count Three — obstruction. That doesn't differentiate between them. Then I have to -- I'm going to put some explanation on the verdict form. Now I have to summarize the indictment in some degree. I just would prefer not to do



that. It's just an invitation to a problem. And they will have the charge, and they will have the indictment, and they'll figure it out. If they can figure out guilty or not guilty, they can figure out of what.
MS. COHEN: Your Honor, we'll take a look at it. If we want to submit anything --
THE COURT: Sure.
MS. COHEN: -- we'll submit it tonight so you have a chance to look at it.
THE COURT: Okay.
How long do you expect to be on closings?
MR. MARK: I haven't gone through it yet, your Honor. My guess is probably -- I'm going to estimate, and I hope you don't cut me off, but an hour and a half.
THE COURT: Ms. Cohen?
MS. COHEN: I would estimate I would probably be about the same, although I may be much shorter. It's a little hard for me to tell because I don't know what the government's going to say.
THE COURT: Assuming everybody gets here on time, and we'll take an abbreviated lunch break, the jury probably gets the case around 3:30 or later, and then we break for the weekend. So that's where we are.
I thank you.
Are we ready on any of our next cases, Andy?

Let me hear from Ms. Cohen first.

MS. COHEN: We're starting at 9:30 tomorrow morning, your Honor?

THE COURT: Yes.

MS. COHEN: Thank you.

MR. MARK: So we'll deal with our housekeeping matters tomorrow morning, your Honor.

THE COURT: Yes.

MS. COHEN: Mr. Mohan, we'll put our binders on the back table. Is that okay?

THE DEPUTY CLERK: That would be fine. Thank you very much.

MS. COHEN: Thank you.

(Adjourned to December 8, 2021 at 9:30 a.m.)

* * *



INDEX OF EXAMINATION


| Examination of: | Page |
| --- | --- |
| S. NANA OSEI-BONSU | |
| Direct By Mr. Reilly | 793 |
| Cross By Mr. Mark | 798 |
| NORMAN KOHN | |
| Direct By Ms. Cohen | 799 |
| Cross By Mr. Rebold | 806 |
| Redirect By Ms. Cohen | 809 |


DEFENDANT EXHIBITS


| Exhibit No. | Received |
| --- | --- |
| B1 | 803 |

## $

**$50 (1)**
805:13
**$500 (1)**
804:15

## [

**[2] (1)**
829:11

## A

**abbreviated (1)**
870:21
**abetted (1)**
831:22
**abetting (4)**
831:2,5;855:6;858:9
**able (2)**
812:24;825:8
**absolutely (6)**
785:11,20;810:7,10;820:2;821:12
**access (1)**
823:14
**accommodate (1)**
787:16
**accompanying (1)**
804:20
**accomplice (1)**
860:1
**according (1)**
819:5
**account (2)**
821:20;823:13
**accurate (9)**
784:9,20;836:5;848:10;849:15;852:5,6;855:15;865:13
**accusatory (1)**
830:12
**achieved (1)**
794:1
**acquittal (4)**
815:5,8,15;821:16
**across (1)**
794:19
**act (7)**
839:24;840:1,1;841:1,18,18;845:12
**acting (5)**
800:9,15,17,19;818:4
**action (1)**
795:2
**active (2)**
795:3,4
**acts (2)**
841:16;860:21
**actual (1)**
820:23
**actually (13)**
795:1;806:2;831:9,25;832:1,2;841:9;844:22;854:20;857:8,8;865:8;866:9
**ad (1)**
794:20
**add (9)**
831:21;832:6,11,12;840:3;849:19;859:10,12;867:3
**adding (2)**
842:14;843:3
**addition (1)**
817:11
**additions (1)**
832:21
**address (4)**
815:19,20;834:16;868:19
**addressed (2)**
844:11,14
**Adjourned (1)**
871:14
**admission (1)**
818:2
**admissions (1)**
826:17
**admit (1)**
854:19
**admitted (5)**
794:23;812:2;861:17,18;865:19
**advance (1)**
791:1
**advanced (2)**
823:21,24
**advantage (1)**
785:21
**adverse (1)**
863:12
**advice (3)**
786:5,22;787:2
**advise (2)**
789:13;812:12
**advised (2)**
786:23;787:3
**afraid (1)**
812:22
**afternoon (6)**
824:1;829:1,3,4,5;830:1
**again (9)**
800:10;814:14;815:2;826:25;834:10;844:6;846:12;849:16;861:22
**against (3)**
790:7;804:23;863:13
**agency (8)**
835:4,19;836:17;842:10;844:3,10,15;845:2
**Agent (8)**
818:18,20;819:5,13;820:24;821:3,5;826:18
**ago (2)**
784:5;825:18
**agree (4)**
803:11;829:22;843:8;850:19
**Agreed (5)**
792:12;839:12;853:21;858:6,7
**agreement (2)**
850:23;851:25
**agrees (2)**
853:25;861:2
**ahead (3)**
788:5;806:5;827:4
**aided (1)**
831:22
**aiding (4)**
831:2,4;855:6;858:9
**allegation (1)**
848:20
**alleged (5)**
815:25;816:3;844:23;846:25;847:5
**allegedly (2)**
846:14;848:22
**alleges (1)**
865:9
**Alliance (1)**
793:18
**allocation (1)**
804:24
**allow (1)**
856:25
**almost (1)**
839:7
**alone (4)**
786:20;787:10;836:12;865:21
**along (3)**
824:12;842:22;843:2
**Alternate (1)**
790:15
**alternates (1)**
790:17
**alternative (2)**
825:17,18
**Although (3)**
792:1;810:3;870:17
**ambulances (1)**
792:4
**amended (1)**
838:12
**Amendment (1)**
789:15
**among (1)**
806:20
**analytical (1)**
837:20
**Andy (2)**
786:9;870:25
**anniversary (1)**
792:5
**answered (1)**
801:15
**anticipated (1)**
789:2
**Apart (1)**
784:21
**apologies (2)**
806:3;814:21
**apologize (2)**
835:13;852:22
**apparent (1)**
785:1
**apparently (1)**
825:5
**appeal (1)**
834:17
**appear (1)**
794:3
**appears (1)**
821:5
**applicable (2)**
860:22;861:11
**application (3)**
784:17;785:22,23
**applied (1)**
794:23
**applies (1)**
806:20
**apply (1)**
806:24
**appreciate (1)**
786:17
**appreciation (1)**
824:14
**approached (1)**
818:18
**appropriate (5)**
821:16;848:11;851:17;855:15;861:9
**Archibald (1)**
856:19
**Archibald's (2)**
856:25;857:20
**argue (3)**
856:16,25;861:8
**argues (1)**
861:5
**arguing (1)**
857:6
**argument (10)**
811:11;819:11;822:22;851:13;856:9;857:11,12,14,15,19
**arguments (3)**
812:14;838:2;868:20
**around (2)**
850:21;870:22
**arrangement (1)**
824:21
**articles (1)**
859:24
**articulate (1)**
837:10
**Ash (67)**
786:18;788:21;795:17;796:1,10;798:9;800:20,22;801:14,17,19,20,22,23;807:3,8,15,23;810:9;815:24;816:2,4,8,8,21,24;817:1,3,6,7,7,8,13,18,21,23,24;818:4,11,15;819:2,5,6,15,18,24;820:11,19,25;821:1,2,5,9,13,17,22,24;822:5,16,20,25;824:23;825:5,10;826:18;829:25;863:1
**Ash's (2)**
820:12;822:13
**assertion (2)**
784:7;818:23
**assessment (1)**
826:13
**assist (1)**
799:3
**assistant (1)**
799:23
**assistants (1)**
868:21
**assume (2)**
803:11;851:12
**assuming (4)**
785:4;788:19,21;870:20
**assumptions (1)**
788:25
**assurance (1)**
856:19
**assure (1)**
826:23
**assuredly (1)**
785:3
**attachments (1)**
784:5
**attempt (2)**
849:25;850:3
**attendance (1)**
804:3
**attending (1)**
863:21
**attention (11)**
795:22;803:22;804:13,17;805:8;808:22;809:4,7;853:19;858:4;862:11
**attorney (5)**
822:1,14;856:1,15;857:5
**Attorney's (2)**
818:19;821:3
**authorized (1)**
845:17

**automatic (1)**
839:7
**available (1)**
789:23
**avoidance (3)**
853:9,11,12
**avoids (1)**
850:4
**aware (1)**
802:4
**away (1)**
825:1

## B

**B1 (11)**
802:19,23;803:6,9,15,16,18;808:21;809:3;817:18;863:16
**back (14)**
791:6;800:10;803:19;808:20;812:17,23;824:15;827:20;840:5;850:15;853:13;856:7;869:2;871:10
**background (6)**
794:21;799:20;865:6,8,9,20
**bad (2)**
840:2;841:19
**balance (1)**
866:1
**bank (6)**
794:21;796:20;821:25;822:12;823:5,12
**barring (1)**
812:18
**based (4)**
784:20;809:15;819:20,20
**Basically (2)**
796:19,23
**basis (3)**
787:3;790:6,8
**beauty (1)**
804:9
**became (10)**
795:3,4;800:3,6,7,8,9,10,15,17
**Becker (1)**
800:23
**beginning (2)**
829:13;867:10
**begins (6)**
830:19;832:10;848:4,16;864:24;866:22
**believes (1)**
815:15
**believing (1)**
823:9
**benefit (3)**
797:6,13;869:15
**benefits (2)**
817:21;864:22
**best (2)**
786:21;789:21
**better (4)**
825:24;857:2;866:14;869:18
**beyond (1)**
809:10
**binders (1)**
871:9
**bit (4)**
804:11;837:11,18;840:4
**black (1)**
824:25
**blame (1)**
818:4
**blissfully (1)**
868:9
**board (20)**
794:12,13,17,20,22,25;795:1,4,7,20,20,21;796:24;803:23;804:4;806:21,25;817:22;818:5,6
**body (2)**
844:3,9
**Bonsu (18)**
787:22;789:11,13,25;790:2,11;793:13,22,25;794:3,10,25;795:10,22;797:10,18;798:3,20
**B-o-n-s-u (1)**
793:8
**both (6)**
784:20;785:14;788:10;792:4;812:12;854:23
**bottom (3)**
830:5,17;843:4
**bound (1)**
788:22
**box (2)**
789:8;793:1
**boxes (1)**
822:9
**brain (1)**
785:19
**break (3)**
858:5;870:21,22
**Briefly (6)**
794:17;799:20;806:13,17;808:19;815:21
**bring (4)**
786:1,8;809:5;814:4
**Brooklyn (1)**
794:18
**Buckley (1)**
799:2
**budget (1)**
804:24
**building (1)**
789:22
**burden (6)**
815:1;819:23;820:1,10;824:4;832:11
**business (8)**
804:7,8;818:19;820:24;821:25;822:12;823:5,12

## C

**call (6)**
796:13;797:20;819:1;839:4;850:17;858:4
**called (5)**
789:12;793:4;794:10;799:6;821:6
**calls (3)**
792:24;798:24;825:25
**calm (1)**
792:14
**came (7)**
784:4;794:17,19;795:20;835:6;856:6;864:14
**campaign (1)**
827:24
**Campbell (1)**
867:19
**can (52)**
786:19;790:5,7;794:17;797:6;799:20;801:7;802:1,18,20;803:17,19;804:1,11,13,17;805:8,9,16;806:7;807:6;808:20,23;809:7,8,14;811:11,20;814:11;815:19;827:11,14,15,20,22;831:6;835:23;838:7;841:1;843:15;847:14;849:16;850:5;852:10;855:11;859:7,20;869:17,18,21;870:3,4
**capital (4)**
804:13,19;805:11;839:7
**captured (2)**
824:18,22
**card (2)**
818:19;820:24
**care (2)**
785:25;867:20
**careful (1)**
784:14
**carefully (1)**
787:3
**carry (1)**
847:16
**carrying (1)**
847:19
**case (20)**
785:5,15;788:8,20,23;791:10,18;792:2,2;811:7;812:11,18;819:21;825:25;835:24;836:7;837:22;838:15;855:24;870:22
**cases (2)**
792:4;870:25
**catch (1)**
858:3
**causation (2)**
858:2;867:9
**caused (4)**
830:23;831:21,23;856:4
**causing (2)**
855:23;858:6
**CEO (6)**
795:12,13;800:15,17,19;802:15
**certain (4)**
817:15;818:4;822:16;857:20
**certainly (6)**
785:11;816:21;820:21,22;824:19;825:14
**cetera (2)**
804:10;865:6
**chain (6)**
816:13,15,21,23;819:21;824:10
**chair (1)**
796:13
**chambers (1)**
828:1
**chance (3)**
812:25;868:11;870:9
**change (5)**
834:11;839:15;841:5;851:20;852:8
**changed (8)**
787:15;839:10;844:3,10,21;849:8,13,18
**changes (1)**
843:7
**character (1)**
862:3
**characterized (2)**
852:4,9
**charge (24)**
788:19,25;789:2;814:3,6;827:3;829:8,12;831:1;832:23;834:15;841:14,18;849:13;850:25;858:18;862:3;866:2;867:7,20;869:1,4,6;870:2
**charged (14)**
804:22;815:17;824:2;831:5,15;846:5,8,14,24;847:2,15,20;865:4,18
**charges (2)**
830:8;831:18
**Charts (5)**
861:15,16,17,19,19
**cheaper (1)**
796:21
**chief (8)**
795:13;799:24,25,25;800:1,3,4,10
**Christmas (1)**
812:19
**chronologically (2)**
826:9,10
**chronology (1)**
826:17
**Cir (1)**
834:16
**circuit (3)**
834:16;835:24;836:7
**circumstances (2)**
812:19;828:4
**cite (1)**
834:14
**Clarabell (1)**
845:7
**clarify (1)**
847:14
**clarifying (2)**
803:9;846:9
**clarity (4)**
838:7;866:11,18,25
**clear (3)**
796:7;843:6,12
**clerical (1)**
827:25
**CLERK (5)**
786:11;791:4;801:9;829:10;871:11
**clerk's (1)**
827:24
**clever (1)**
819:17
**client (2)**
788:13;811:21
**client's (2)**
819:12;820:3
**close (2)**
789:3;790:25
**closely (1)**
826:25
**closing (6)**
811:11;812:14;815:13;857:20;861:5,12
**closings (4)**
790:18;791:9,12;870:11
**clothes (1)**
804:9

**Clown (1)**
845:7
**coconspirator (1)**
820:23
**coconspirators (2)**
816:1,3
**co-conspirators (2)**
853:14,16
**Code (1)**
817:10
**COHEN (223)**
786:13;787:22;
788:2,3,7,9,17;789:4;
790:20,23;791:2;
792:8,10,12,17;798:24;
799:1,10,12;801:3,7,
10;802:1,3,18;803:6,
12,13,17,21;804:11,18;
805:4,5,9,16;806:9;
807:25;808:19,24;
809:2,13,17;810:2,12;
811:2,8,9,12,14,17,20,
24;813:2;814:8,13,14,
18,21,24;815:3,6,8,10,
12;816:17;818:25;
819:14,17;820:9,16,22;
823:21,25;825:14;
826:23;827:23;828:6;
829:5,18;830:3,6,11,
16,19,23;831:16;832:4,
9,16,24;833:4,8,9,14;
834:4,8;836:19;
838:10,11,21;840:6,7,
9,13,24,25;841:8,11,
13,20,24;842:6,7,13,
23;843:10,14,21,23;
844:16,17,24,25;846:1,
12,13,17,25;847:3,8,
12,21,22,25;848:3,15;
849:4;850:7,8,15,16,
20;851:2,18;852:1,2,
12,13,17,20;853:2,6,
24,25;854:5,7,12,13,
18,21;855:2,8,22;
856:13,14,21,24;857:3,
5,7,8,13,19;858:7,12,
13,16;859:7,8,17,23;
860:3,6,7,12,18,19;
861:2,5,7,24;862:4,8;
863:15,16,19,25;864:3,
20,21,24;865:2,7,17,
24;866:3;868:5,6,11,
23;869:6,9,16;870:5,8,
15,16;871:1,2,5,9,13
**Cohen's (1)**
784:4
**collapsed (2)**
792:2,3
**collections (1)**
800:6
**colloquy (1)**
786:15
**coming (1)**
799:16
**comma (2)**
849:7,24
**comment (1)**
842:1
**commit (2)**
830:24;831:21
**commitment (1)**
857:2
**commits (1)**
854:10
**committed (3)**
830:21,25;831:14
**committee (8)**
795:8,9;796:13,14,
24;804:5,21,23
**committees (1)**
795:7
**committing (1)**
868:3
**communicate (1)**
866:12
**communication (4)**
816:6;817:5,5;821:9
**compact (1)**
850:21
**company (1)**
803:4
**compared (1)**
784:10
**complete (2)**
852:2;865:18
**completed (1)**
831:18
**concern (4)**
818:1;836:21;
845:17;850:4
**concerned (1)**
869:20
**concerning (1)**
784:7
**concerns (1)**
787:5
**concessions (1)**
852:7
**concluded (1)**
834:17
**concludes (1)**
812:10
**conclusion (1)**
825:1
**conduct (3)**
817:16;839:11;
863:17
**confer (3)**
788:13;811:20;856:9
**conference (4)**
789:2;804:16;
806:21;814:7
**conferences (4)**
804:3;817:15,19,19
**confident (1)**
826:24
**conforms (1)**
849:25
**confuse (2)**
836:22;848:21
**confusing (11)**
829:21;831:1;
837:11,19;840:4,15;
841:13;848:8;852:23;
855:12;869:17
**confusion (1)**
838:8
**Congress (1)**
850:18
**conscious (3)**
853:9,11,12
**consider (1)**
860:13
**consistency (3)**
844:10;849:8,17
**consistent (5)**
784:12;838:15;
840:10;844:4;849:15
**conspiracy (11)**
815:24;816:4;817:1,
8,23;818:9;852:3,8,10;
865:4;869:21
**Constitution (1)**
789:16
**construe (1)**
825:15
**consult (1)**
789:19
**contact (1)**
807:11
**contained (1)**
832:20
**contemplated (2)**
834:20;835:2
**contemporaneous (1)**
819:14
**contention (1)**
856:11
**continue (1)**
835:14
**Continued (4)**
809:18;810:13;
813:6;860:24
**continues (1)**
866:23
**continuing (1)**
851:4
**Contrivance (2)**
852:15,21
**Contrivances (1)**
852:16
**controlled (2)**
802:13,15
**controller (2)**
799:23,23
**conversation (3)**
824:18,22;825:20
**conversations (5)**
801:18,20,21,22;
816:2
**convict (1)**
818:7
**conviction (8)**
815:17,23;818:10,
14;822:24;823:7,16;
826:24
**coordinating (1)**
795:8
**copasetic (1)**
868:25
**copies (3)**
814:3;827:2,3
**copy (8)**
808:11,13,14;819:9,
10;820:24;821:12;
829:11
**copying (1)**
814:11
**correction (1)**
838:18
**corroborated (1)**
825:24
**corruptly (5)**
839:24;840:1;841:2,
16,18
**COUNSEL (7)**
784:3,21;787:6;
789:19;790:15;814:2;
831:11
**counsel's (1)**
784:19
**Count (41)**
815:22;818:9,9,10,
11,14;821:16,17;
822:19,22,24;831:6;
832:7,11,13;834:7;
842:7,12;845:24;
846:8,9,21,24;847:15,
20;848:19;849:13;
859:11,12;867:23;
868:25,25,25;869:1,10,
10,10,20,21,21,22
**counts (9)**
814:16;815:17,19;
823:17;824:3,5;830:8;
868:10;869:17
**couple (2)**
800:21;847:25
**course (4)**
786:18;837:1;
857:14,16
**court (340)**
784:1,2,4,8;786:7,12,
17;787:1,8,12,21,25;
788:5,8,16,18,22,24;
789:9;790:1,3,12,22,
24;791:3,7,11,15,17,
21,24;792:1,7,9,11,13,
19,21,23;793:2,10,21;
797:3,15,23;798:16,19,
23,25;799:4,9,16;
800:25;801:15;803:11,
15;805:2,21;806:4,11;
808:1,17;809:12,16;
810:10;811:1,4,7,11,
13,16,18,22;812:4,10;
813:4;814:2,10,17,20,
23;815:2,4,7,9,11;
816:16;818:22;819:11,
16;820:2,14,21;823:19,
23;824:7,10;826:1,4,
10,22;827:9,13,15,18,
22,24;828:1,3;829:3,6,
9,11,16,22;830:4,10,
14,17,22;831:3,8,11,
13,18,24;832:1,3,8,14,
20;833:2,6,8,12,18,25;
834:2,7,10,13,21,23,
25;835:6,10,14,25;
836:3,8,20;837:1,5,7,
12,22;838:5,9,13,17,
22;839:1,4,6,12,14,18,
21,23;840:5,8,11,15,
24;841:3,7,10,12,17,
21,23;842:4,9,11,15,
16,18,22,25;843:4,8,
12,19,22,25;844:6,8,
16,18,24;845:4,14,18,
20,22,24;846:11,15,19,
22;847:2,6,9,13,17,21,
23;848:2,9,13,23;
849:2,5,10,16,19;
850:2,6,10,13,15,19,
25;851:11,15,20;852:7,
16,19,25;853:3,9,13,
17,21,23;854:1,3,6,8,
11,17,19,23;855:4,13,
18,24;856:2,4,13,18,
23;857:4,7,10,16,23;
858:4,8,12,15,19,24;
859:3,6,13,18,25;
860:4,6,15,18,20,23;
861:1,3,6,10,15,20;
862:2,7,15,17,22;
863:2,4,8,14,18,23;
864:2,6,10,15,19,23;
865:1,5,11,15,21,25;
866:6,12,13,15,19,21,
24;867:1,3,11,16,20;
868:5,8,17,21;869:4,8,
12,20;870:7,10,15,20;
871:4,8
**court-appointed (1)**
789:22
**courthouse (1)**
851:14
**courtroom (3)**
799:3,13;814:5
**cover (2)**
816:9,11
**covered (3)**
804:21;830:15;
864:17
**COVID (3)**
791:19;792:1,3

**created (1)**
819:2
**Credit (13)**
794:11;796:22;
797:9;799:21,22;
800:7,9,11,19;803:3;
804:4;849:7,8
**crime (7)**
789:18,18,19;
831:21;837:14;850:18;
855:23
**crimes (4)**
816:9,11;831:15;
865:18
**criminal (2)**
792:1;817:10
**cross (3)**
788:11;809:15;
860:10
**crossed (1)**
785:7
**cross-examination (7)**
785:21;797:24;
798:1;806:12,14;
809:11;838:2
**cut (1)**
870:14

## D

**Daily (1)**
794:19
**dash (1)**
869:21
**data (2)**
808:11,13
**date (2)**
818:24;819:16
**dated (3)**
802:24;819:4;820:6
**day (7)**
791:22;794:18;
795:21;812:15;813:4;
820:6,8
**days (1)**
819:10
**deal (5)**
814:12;838:14;
854:24;859:20;871:6
**December (2)**
812:20;871:14
**decision (9)**
786:20;787:9,9;
790:6;832:19;844:9,
21;845:1,6
**declarations (2)**
853:14,15
**decline (1)**
790:6
**deemed (1)**
850:18
**defendant (34)**
784:18;786:13,15,
25;787:7,11,20;
789:10;793:4;799:6;
807:11;824:2;826:20;
830:13,21;831:14,22;
832:5,12;834:19;
835:2,21;836:6;838:1;
846:4,14;850:5,8;
859:2,10;863:1,4,5,6
**Defendant's (7)**
803:6,16;808:21;
817:18;836:22,25;
862:18
**defense (42)**
784:21;785:6,14;
787:14;788:8;792:24;
798:24;802:19,23;
803:6,18;809:3;811:7,
24;812:5;814:15,24;
815:14,15;816:14,19;
817:16;818:1;819:23;
821:10;823:15;829:17;
830:11;841:9;845:25;
846:1;848:11;851:9;
853:25;854:5;855:16;
856:12;859:8;861:2,8,
24;862:8
**defense's (1)**
792:23
**define (1)**
841:16
**defined (3)**
840:1;843:19;845:13
**degree (1)**
869:25
**degrees (1)**
794:2
**delete (4)**
808:7;821:21;
831:20;850:19
**deleted (6)**
821:18,24;822:14;
831:15;849:2;867:15
**demonstrate (2)**
817:22;821:9
**demonstrated (1)**
838:1
**demonstrative (1)**
861:19
**denied (1)**
826:23
**department (1)**
836:17
**depending (1)**
861:12
**depends (1)**
861:4
**DEPUTY (5)**
786:11;791:4;801:9;
829:10;871:11
**describe (3)**
797:6;799:20;837:13
**description (1)**
784:19
**desire (1)**
787:16
**detail (2)**
826:15;830:8
**detected (1)**
784:15
**determination (1)**
830:9
**device (3)**
808:7,11,13
**devices (6)**
800:23;801:19,23;
807:4,12;808:4
**difference (1)**
848:25
**different (6)**
831:10;853:5,7;
855:11;858:18;868:3
**differentiate (1)**
869:23
**difficult (1)**
828:4
**DIRECT (13)**
793:11;795:22;
798:5;799:11;804:13;
805:8;807:2;808:21;
809:4,7;852:6,10,24
**Directly (1)**
856:23
**director (1)**
804:20
**directors (2)**
804:5;805:1
**director's (1)**
804:23
**directs (1)**
788:10
**disability (4)**
796:6,8,18,20
**disable (1)**
839:6
**disagree (4)**
825:22;829:22;
831:12;865:21
**disappear (1)**
831:19
**disclosure (1)**
863:16
**disclosures (1)**
864:18
**discuss (2)**
794:8;816:7
**discussed (1)**
787:15
**discussion (3)**
786:18;787:4;816:12
**dismiss (1)**
814:16
**disputing (1)**
851:19
**disregard (1)**
801:1
**distinction (2)**
835:5;848:18
**distinguishes (1)**
835:22
**distributions (1)**
829:7
**divided (3)**
866:14;867:2,2
**document (5)**
788:12;802:25;
827:10;851:24;856:15
**documentary (1)**
805:14
**documents (10)**
822:15,21;823:1,3,4,
10,12;856:3,6;862:13
**done (7)**
785:15;811:5;
845:12;856:1;867:7;
868:9,17
**Doody (1)**
845:7
**door (3)**
809:15;810:5,11
**double (1)**
842:3
**doubt (1)**
853:17
**down (9)**
785:23;791:6;802:1;
804:11;805:9,16;
811:4;814:4;853:4
**downstairs (2)**
791:5;792:16
**draft (4)**
788:25;814:3;827:3;
829:11
**drafted (4)**
800:23;810:6,8;
836:6
**drama (2)**
792:8,11
**draw (1)**
862:11
**drawing (2)**
803:22;804:17
**drawn (1)**
863:13
**draws (1)**
824:25
**dual (3)**
850:5;854:14;855:8
**duly (2)**
793:5;799:7
**during (2)**
790:4;861:22

## E

**earlier (5)**
785:9;807:10;844:4;
851:23;858:1
**economics (1)**
794:21
**education (1)**
793:25
**Educational (1)**
793:18
**Edward (4)**
805:20;806:8;
816:14,20
**effect (2)**
817:17;846:3
**eight (9)**
830:19;831:13;
833:2,9;834:2,3;
836:14;849:11;858:20
**either (10)**
821:21;822:8;
830:21,24;838:19;
855:19;860:23;861:1,
11;866:1
**elect (1)**
787:17
**electronic (4)**
800:22;807:4,12;
808:4
**element (10)**
833:10;834:18,23,
24;835:22;836:24;
837:18,18;840:21;
848:16
**elements (3)**
824:4;837:14;843:15
**else (41)**
786:1;796:10;
798:11,17;811:7;
813:1;825:8;830:5,17,
23;831:21,23;832:3,
15;833:13;838:19;
839:21;840:18;841:25;
843:9,13;844:18;
845:10,18,24;848:14;
849:3;852:1,12;853:1,
2;855:19;858:9;
860:13;862:19;864:20;
865:16,23;867:7,17,19
**else's (1)**
822:8
**Elsewhere (1)**
841:14
**email (9)**
807:21;817:5;
819:21;821:1,20;
822:9;823:13;824:10,
12
**emails (12)**
819:20;821:20,22;
822:1,2,5,8,10,16;
826:9,16;862:13
**e-mails (1)**
857:20
**embezzlement (2)**
822:7;823:10
**employed (2)**
793:15,17
**end (8)**

800:14;829:19;
834:5;839:14;845:16;
846:2;849:23;859:11
**ends (2)**
848:5;859:15
**enjoy (1)**
813:4
**enough (5)**
792:11;794:22;
819:17;825:6,7
**entered (5)**
815:24;822:11,11;
850:21,23
**entertainment (1)**
804:15
**entire (1)**
804:16
**entitled (1)**
796:6
**Epstein (1)**
800:23
**equipment (1)**
804:10
**errors (1)**
784:15
**escape (1)**
792:6
**escaped (1)**
792:5
**essentially (1)**
829:8
**establish (1)**
819:16
**estimate (2)**
870:13,16
**estimated (1)**
804:24
**et (2)**
804:10;865:6
**Etc (1)**
852:11
**even (6)**
785:4;787:16;
789:13;802:10;820:7;
821:11
**evening (1)**
818:21
**event (1)**
812:6
**Everybody (5)**
785:18,18;792:21;
812:19;870:20
**everyone (1)**
784:2
**evidence (72)**
788:13;801:5;803:7,
16;805:14;807:3;
808:21;809:9,13;
810:3;811:10,13,14,18;
812:7,11;815:15,22,23;
816:2,6,10,17,17,18;
817:5,12,13,17,21;
818:3,7,8,13,15,17;
819:4,20,24;820:3,4,5,
7,11,14,18;821:8,10,
13,21,23;822:11,11,23;
823:7,16;824:1;
825:25;830:13;852:6,
10;856:2,4,14,21,24;
861:17,18;863:24;
864:14;865:2,6
**evidenced (1)**
817:8
**exactly (3)**
789:1;826:3;847:9
**EXAMINATION (4)**
793:11;798:5;
799:11;809:1
**Except (4)**
820:2,3;829:20;
838:18
**excerpt (1)**
803:9
**excerpted (1)**
803:18
**exchange (1)**
865:5
**excluding (1)**
804:9
**exculpatory (1)**
860:16
**excuse (5)**
790:16;791:9,14;
807:14;812:24
**excused (3)**
798:19,22;811:6
**excusing (1)**
848:6
**executive (4)**
795:13;799:25;
800:5,8
**Exhibit (20)**
801:6,11,18;802:19,
23;803:6,16,18;807:3;
808:21;809:3;811:9;
812:1,2,3;817:18;
824:11;829:9;849:14,
20
**exist (1)**
820:7
**expect (3)**
788:10;790:14;
870:11
**Expenditures (1)**
805:13
**Expense (2)**
803:23;805:1
**expenses (9)**
804:6,7,8,9,15,24,25;
806:21,25
**experience (2)**
785:19;851:13
**explain (4)**
830:7;831:5;841:1;
865:19
**explaining (1)**
843:15
**explanation (2)**
865:4;869:24
**expressed (2)**
784:22;818:2
**expresses (1)**
824:14
**extent (2)**
784:12;829:25
**extraordinary (2)**
851:7,24

**F**

**F3d (1)**
834:15
**fact (10)**
787:9;816:6;821:23;
822:7,10;823:2;
837:22;856:6,14;863:9
**factory-reset (1)**
808:7
**factual (1)**
784:7
**failed (4)**
821:19;822:23,25;
823:6
**fails (1)**
832:10
**failure (1)**
822:16
**fair (3)**
848:23;851:22;861:6
**faith (1)**
869:12
**false (13)**
822:19;844:23;
846:4,7,13,14,23,25;
847:5,15,20;848:7;
860:16
**falsus (1)**
860:4
**familiar (6)**
794:10;795:10;
802:16,24;836:3;
868:24
**family (2)**
804:20,25
**faster (1)**
789:1
**fault (3)**
857:1,20;869:14
**fear (1)**
789:17
**February (1)**
800:14
**federal (39)**
789:18;815:24;
816:5;817:9,9;818:13,
16;819:12;820:11,19;
821:4,14,18,23;822:17;
823:8,9,11;826:21;
833:16,16,22;834:17;
835:4,19,21;836:14,23;
837:17;838:4;842:9,
10,10,15,15,20,23;
843:3,16
**FedEx (1)**
807:19
**feel (1)**
790:4
**fees (1)**
804:6
**few (3)**
819:10;859:20;
862:21
**fifteen (1)**
788:10
**Fifth (1)**
789:15
**figure (3)**
870:3,3,4
**figured (1)**
829:6
**final (1)**
787:17
**Finally (1)**
858:8
**Financial (4)**
799:24;800:2,4;
864:17
**find (3)**
830:20;831:14;
832:12
**fine (14)**
790:20;805:6;814:8;
830:16;833:2;838:11,
12;847:22;850:8;
859:13;864:1;865:11,
12;871:11
**finishes (1)**
848:17
**fired (1)**
814:11
**first (27)**
792:23;804:19;
805:3,6,22;814:10,25;
815:20;820:10,20;
821:4;829:19;830:6,
20;831:14,17;833:5;
836:8,12,12,13;846:2;
851:3,5;854:19;855:2;
871:1
**fiscal (1)**
795:8
**five (4)**
827:25;836:8;
838:18;843:15
**flip (1)**
859:19
**focused (2)**
846:8,21
**folks (2)**
813:1;829:3
**follow (2)**
803:5;857:18
**following (3)**
789:14;836:15,16
**follows (4)**
785:1;793:5;799:7;
857:17
**forbid (1)**
828:3
**form (5)**
867:22;868:9,23;
869:10,24
**formal (1)**
851:24
**former (1)**
806:25
**forms (3)**
863:16,20;864:16
**formulation (3)**
846:15;847:4,7
**forward (2)**
818:8;820:18
**found (2)**
831:7;855:3
**four (21)**
814:16;815:17,21;
822:19,24;823:17;
824:3;829:19;832:5;
833:14;845:24;846:9,
21,24;847:15,20;
848:19;859:4;868:10;
869:1,11
**frivolous (2)**
785:22,23
**front (2)**
801:5;814:22
**full (8)**
787:4;793:6;797:19,
21;829:19;831:17;
836:13;851:3
**fully (1)**
787:3
**function (1)**
845:17
**further (11)**
797:22;798:15;
806:10;808:6,16;
811:2,3,18;824:6;
825:2;836:20

**G**

**Gagliardo (13)**
816:12,23;817:2,6,7,
9;824:11,13,20,25;
825:4,6,10
**gather (1)**
824:17
**generally (1)**
864:17
**gentlemen (2)**
812:10;813:4
**gets (4)**
787:25;824:15;
870:20,21

gifts (3)
804:10;817:13,21
Gio (7)
796:13,15;797:18,
20,21;824:16,21
Gio's (1)
824:21
Giovanni (2)
797:20;798:9
given (11)
794:20;840:21;
842:19;843:5;847:4;
848:10;850:25;851:8;
855:16;857:24;869:16
gives (1)
851:18
giving (4)
825:13,17,19,21
glitch (1)
829:6
God (1)
828:3
goes (4)
788:19;825:1;833:5;
855:2
Good (18)
784:2,3;788:7;
792:21,22;793:13,14;
798:3,4;806:16;
812:25;825:6,7;829:3,
4,5;841:6;859:3
government (82)
785:2,14,16,17;
786:3;801:5,11,18;
802:21,24;807:3;
811:3;812:1,3,7;815:1,
16;816:14,18;817:6,
12;818:8,12,17,25;
819:3,9,23;820:18;
821:5,8,24;822:2,4,7,
13,20,20,23,25;823:2,
6,11;824:3,11;829:14;
831:3;832:10,22;
833:4,7;834:19;835:1,
8,20;837:24;838:24;
840:13,17,22;841:25;
844:1,3,3,10,14;845:2,
10;849:14,20;854:4;
855:21;856:12,17,18;
857:21;858:10;860:16;
864:4,12,13;865:9
government's (5)
820:1,10;832:18;
844:20;870:18
grand (1)
842:20
Great (2)
803:20;828:3
Green (1)
800:23
ground (1)
809:12
grounds (5)
814:25;821:15;
823:21,24,25
Guagliardo (8)
816:1,7;817:24;
820:23,25;821:1,2;
826:4
guess (9)
824:12;830:24;
836:21;849:7,11;
856:15;861:13;867:14;
870:13
guidance (1)
851:18
guilt (2)
859:1,9
guilty (5)
832:12;868:10,10;
870:3,3
guys' (1)
824:15

H

Hail (1)
785:24
hair (1)
865:11
half (3)
788:16;814:4;870:14
handle (3)
829:16,18;838:9
hands (1)
812:20
handwritten (1)
867:5
happen (4)
791:1,22,24;867:12
happened (3)
784:13;785:18;
836:16
happens (2)
812:12;854:18
happy (2)
826:14,15
Harbor (1)
792:6
hard (3)
786:19;840:11;
870:17
Hassler (2)
834:15;837:3
head (1)
867:18
heading (2)
803:23;833:10
hear (5)
793:2;824:6;853:23;
864:6;871:1
heard (4)
790:13;812:16;
838:5;867:24
hearsay (2)
819:13;820:3
heavy (1)
824:25
held (1)
807:4
help (3)
817:22;824:15;
867:21
helpful (3)
832:14;841:1;846:10
highest (1)
793:25
highlighted (2)
803:22;826:19
hinges (1)
819:12
hired (1)
800:4
history (2)
794:24;858:6
home (1)
813:1
Honor (183)
784:3;786:3,13,25;
787:7,11,20,22,23;
788:2,3,7,9;789:4,5,7;
790:20;791:2,8,23;
792:12,18,24;793:1,9;
797:4,14,22;798:18,24;
799:1,10;803:8;805:4;
806:2,10,13;807:25;
808:16,19;809:9,13,17;
810:2,7,12;811:9,12,
14,17,24;812:9;813:2,
3;814:8,9,14,15,19,21,
24;815:8,10,14,19,22;
816:22;817:1,11,25;
818:25;819:14;820:9,
13,17;823:24;824:6,9;
825:23;826:14;827:6;
828:5,6;829:5,15,18,
19;830:3,16;831:16;
832:4,16,24;833:4,19;
834:4,8,9,12;835:17,
23;836:5,19;838:11,12,
16,21;839:17;840:7,19,
23;841:6,8,20,22;
842:7,13,20;843:10;
844:17,25;845:21;
846:1,2,18,20;847:3,
12,22,25;848:15;849:1,
4,6,13,15;850:9,16;
852:2,13,18;853:2,6,
22,25;854:2,13;855:8,
22;857:24,25;858:7,11,
13,16;859:8,16,17,22;
860:3,7,17;861:2,14,
25;862:4,5,9;863:16;
864:21;865:12,24;
866:3,20;868:2,12,13,
15,23;870:5,12;871:3,7
Honor's (3)
827:11;862:25;
865:14
hook (2)
837:15,16
hope (1)
870:13
hopefully (3)
792:6,7,8
hotel (1)
804:6
hour (5)
788:12,16,16;814:4;
870:14
hours (1)
824:13
housekeeping (2)
868:15;871:6
Howdy (1)
845:7
hyphen (1)
793:8

I

identification (2)
802:19,22
identified (1)
797:18
ie (1)
849:20
ignorance (1)
819:11
II (1)
859:14
III (1)
859:18
imagine (1)
814:23
immediate (1)
804:20
impede (5)
835:3,7,11,15,18
impliedly (1)
852:21
important (2)
807:23;810:5
impossible (1)
839:8
impression (1)
837:10
inaccuracies (1)
784:10
inaccurate (2)
784:23;836:7
inappropriately (1)
827:7
include (2)
862:6,9
included (2)
822:3;854:15
including (1)
853:4
inconsistent (2)
836:7;840:14
incorporates (1)
803:4
incorrect (1)
847:10
incriminate (2)
789:18;790:5
incurred (2)
804:25;806:25
indeed (2)
851:5,23
indicate (3)
829:20;866:13;867:1
indictment (13)
814:16;815:18,20;
823:17;830:8,12;
850:1;869:2,5,7,8,25;
870:2
indirect (1)
852:24
indirectly (1)
856:23
individual (4)
795:10;796:15;
797:18;804:23
infer (1)
816:4
inference (4)
816:20;824:19;
856:5;863:12
influence (1)
833:15
influenced (1)
839:16
influences (1)
839:15
informal (4)
796:4,23;797:11;
798:6
information (2)
820:23;867:4
informed (1)
829:24
innocent (2)
830:13;832:6
inquire (1)
793:9
insert (5)
833:15;836:14;
837:2;843:15;846:2
inserted (2)
837:10;842:24
instead (4)
797:9;817:24;839:3;
863:1
instruct (1)
832:5
instructed (4)
807:11;808:6,10;
861:22
instruction (11)
817:25;838:7;
842:20;855:7,17;
858:10;859:21;862:25;
863:25;864:4,12

**instructions (6)**
791:10,11,14;
812:13;853:18;855:10
**instrument (1)**
830:12
**insufficient (6)**
815:16,23;816:9;
818:9,13;823:16
**insurance (7)**
796:6,8,18,20;797:9;
825:13,19
**intended (2)**
835:3,18
**intending (2)**
856:16;869:2
**intent (13)**
818:12;821:21;
822:14,17;823:1,7;
836:22,25;838:3;
849:25;850:4;854:15;
855:8
**intentionally (3)**
839:25;840:2,16
**intents (1)**
850:5
**interchange (1)**
787:6
**interests (1)**
786:22
**interfere (1)**
838:3
**internal (1)**
838:6
**interrupt (1)**
805:4
**interrupted (1)**
858:24
**intervene (1)**
825:8
**interviewed (2)**
785:14;794:23
**into (15)**
786:9;788:13;803:7;
815:24;817:17;819:25;
822:11,11;828:1;
837:18;850:21,23;
855:10;861:17,18
**introduce (3)**
788:12;822:23;823:6
**introduction (1)**
858:1
**investigated (1)**
822:6
**investigation (28)**
818:13,17;819:12;
820:12,19;821:14,18,
23;822:18;823:2,8,9;
826:21;833:15,16,17,
21,21;834:18;835:3,
21;836:15,23;837:17,
23;838:3,4,6
**Investigative (1)**
861:3
**invitation (1)**
870:1
**invoke (1)**
790:7
**iPhone (3)**
819:19,22,25
**iPhones (1)**
817:13
**irrelevant (2)**
810:7,10
**irrevocable (1)**
790:7
**issue (7)**
790:9;809:15;
834:16;836:23;837:22;
839:9;855:24
**issues (1)**
791:19
**Items (1)**
864:22

**J**

**Jackson (5)**
818:18,20;821:3,6;
826:18
**Jackson's (2)**
819:5;820:24
**James (5)**
814:4,11;827:2,3;
867:5
**January (14)**
818:15,19,24,24;
819:4,6;820:15,20;
821:4,5,7,9,11;824:13
**Jencks (1)**
785:2
**Jersey (1)**
802:11
**Jets (1)**
802:10
**job (1)**
828:4
**join (1)**
794:25
**joined (1)**
795:1
**Judge (8)**
801:14,17;818:6;
821:5;829:10;842:10,
15;863:17
**judgment (5)**
815:4,8,15;821:15;
824:7
**June (5)**
798:6;807:8,14,14;
822:21
**jurisdiction (5)**
833:22;835:3,18;
836:17;837:24
**jurisdictional (8)**
834:18,23,24;
835:22;836:22,24;
837:15,17
**juror (5)**
790:13;791:4,6;
792:2,15
**jurors (1)**
838:8
**jury (28)**
784:1;786:2,2,6,9,
10;789:11;790:14,17;
791:10,11,14;792:22;
801:1,8;811:10;813:1;
814:1;816:3;818:1,3;
830:12;842:20;848:21;
867:25;868:24;869:1;
870:21
**jury's (1)**
862:11
**justifying (1)**
848:7

**K**

**Kam (8)**
795:11,23;796:5;
798:8;800:18;802:15;
805:18;821:25
**keep (1)**
791:9
**Kevin (4)**
805:20;806:8;
816:13,19
**key (1)**
835:5
**kind (1)**
824:20
**knew (17)**
785:14,18;796:15;
805:24;816:10;819:20;
820:11,14,19,21;821:9,
13;826:20;834:20;
835:2,21;837:16
**Knicks (1)**
802:10
**Knock (1)**
792:10
**knowingly (2)**
833:10;845:12
**knowledge (4)**
818:16;834:17;
837:18;839:25
**known (2)**
794:15;817:3
**Kohn (19)**
798:24;799:5,8,13;
801:4,11,16,17;802:4,
16,22;803:22;805:6,15,
17;806:16,17;807:2;
811:4
**K-o-h-n (1)**
799:8

**L**

**lack (1)**
866:10
**Ladies (2)**
812:10;813:4
**laid (1)**
797:13
**language (17)**
832:21;833:20,23;
837:2;843:17,18,18;
844:4,22;846:9,12,17;
849:13;850:22;851:17;
864:9;867:9
**largely (2)**
823:22,25
**larger (1)**
803:9
**last (16)**
790:13;792:1;793:7;
797:20;805:17;809:12;
825:15;827:25;830:6;
832:9;842:1;848:4,16;
863:11;866:5,9
**later (7)**
818:21;819:10;
826:6,7;831:1;842:20;
870:22
**latter (2)**
829:23;847:12
**law (9)**
812:13;836:7;
838:16;840:8,10;
843:12;844:13;847:10;
850:23
**laws (2)**
815:24;816:5
**lawyer (2)**
789:21;805:22
**lawyers (2)**
789:22;792:3
**lawyers' (2)**
786:21,21
**lay (1)**
826:16
**lead (2)**
838:7;843:6
**leads (1)**
837:11
**least (2)**
824:22;826:1
**leave (8)**
799:2;800:13;824:7;
836:12;838:14;849:21;
861:10;865:21
**leaving (1)**
838:12
**left (3)**
818:19;851:21,22
**legal (2)**
795:2;851:18
**legally (3)**
848:10;855:15;
865:13
**less (5)**
852:6;863:25;864:3,
11,12
**letter (15)**
784:4,7,14;801:9,14,
17;807:2,7,15,24;
808:3;810:6,8,8;
822:10
**letters (4)**
800:20,21,22,23
**level (1)**
793:25
**liability (1)**
867:23
**lie (1)**
817:2
**lied (2)**
860:10,14
**likely (3)**
791:1,21,24
**limited (2)**
804:15;844:12
**limiting (4)**
817:25;853:18;
862:25;863:25
**line (87)**
791:5;824:25;
830:19,20;831:13;
832:5,10;833:3,9,14;
834:2,3;836:8,13;
838:18,19,22,22;839:2,
9,10,24;840:19;842:2,
8,24;843:4,15,23,25;
844:2,7;845:11,15,16;
846:3;848:4,5,17,17;
849:6,11,11,12,20,24,
24;850:11,20;851:3,4,
4,5,6;852:3,13;853:4;
854:1,6,8,9,15;855:1,
19;858:13,20,20;859:1,
4,9;862:24;863:3,6,6,9,
11,19;864:25;866:11,
15,17,22,23;867:14,14,
15,15
**lines (6)**
830:14;843:10,20;
849:10;850:17;854:14
**list (2)**
785:10;858:17
**listed (1)**
804:22
**lists (1)**
784:25
**litigation (1)**
856:8
**little (16)**
804:11;837:11,18;
839:5;840:4;842:2;
846:15;850:22;862:21;
866:10;868:15,24;
869:9,17,19;870:17
**lodging (1)**
804:6
**logical (1)**

838:13
**long (4)**
788:8;791:5;797:10;870:11
**longer (1)**
823:13
**long-term (4)**
796:6,8,17,19
**look (9)**
826:25;830:14;835:10;840:5;851:20;868:11;869:20;870:5,9
**looked (1)**
831:12
**looking (7)**
802:22;804:1;824:10;836:1,11;856:18;857:22
**looks (2)**
842:2;867:13
**lot (4)**
826:15;839:18;843:6;848:21
**lots (1)**
846:7
**Lowercased (1)**
859:6
**LTD (2)**
825:13,19
**lunch (1)**
870:21
**lured (1)**
819:18

## M

**machine (1)**
814:11
**maker (3)**
844:21;845:1,6
**makes (3)**
814:24;836:6;854:25
**making (8)**
822:19;836:20;844:3,9;848:7;857:14,19;869:14
**manual (4)**
802:16;803:3;806:18;817:17
**many (3)**
795:24;800:12;851:13
**margin (1)**
851:21
**MARK (181)**
786:3;788:3,21,23;789:5;791:8,13,16,18,23,25;792:5;798:2,15;812:9;813:3;814:9;823:20,21,24;824:9;825:23;826:3,9,14;827:6,10,14,17,20;828:2,5;829:4,9,15;831:4,9,12,20,25;832:2;833:7,18,19;834:1,9,12,14,22,24;835:1,8,13,16;836:2,5,21;837:4,6,9,21,25;838:6,15,25;839:2,5,9,13,17,20,22,24;840:19;841:6,21,22;842:1,11,14,17,19,25;843:1,5,17;844:2,7,9,18,19;845:3,11,15,19,21,23;846:6,20;847:14,18;848:9,10,24;849:1,6,11,17,22;850:3,11,14;851:11,12,16;853:8,11,15,20,22;854:2,4,8,9,25;855:6,14,21,25;856:3,5;857:2,24;858:11,21,22,25;859:4,15,16,22;860:2,4,5,12,17,22;861:4,14,16;862:1,5,10,16,21,23;863:3,5,9,23,24;864:3,8,11,17;865:12;866:4,8,17,20,22,25;867:8,9,13,18;868:2,14,19;870:12;871:6
**marked (2)**
802:19,22
**marks (3)**
842:3,3,3
**Mary (1)**
785:24
**Master's (1)**
794:2
**material (1)**
869:13
**materials (1)**
784:16
**matter (4)**
836:16;837:23;844:13;847:10
**matters (2)**
868:15;871:6
**may (29)**
788:3,12;789:17,22;790:25;793:9,10;797:14;799:9;807:10;811:4;814:2;821:11;829:25;830:20;831:14,18,20;833:19;834:12,21;837:18;839:1;851:8,22;860:10;863:13,20;870:17
**maybe (10)**
790:17;797:11;814:6;816:16;820:5;826:7;827:6;837:7,9;841:4
**MCU (29)**
794:15,20;795:4,15,16;796:21;797:7,8,13;800:13;801:19,24;802:4,7,8,11,13,16;804:14;805:12;808:14;817:14,17;819:7,18,19;822:7;823:13;849:9
**meals (1)**
804:6
**mean (4)**
801:22;820:5;840:1;860:12
**meaning (2)**
818:20;825:15
**meaningful (1)**
785:8
**means (3)**
824:19;841:18;842:8
**meant (2)**
850:12;854:21
**meeting (14)**
795:23;796:1,3,4,24,24,24,25;797:10,11;798:6,8,11;804:7
**meetings (2)**
795:24;817:20
**member (5)**
795:4;804:20,21,25;818:6
**MEMBERS (6)**
792:22;795:3;804:4,5;806:22,25
**member's (1)**
804:24
**memo (15)**
816:8,25;817:4;818:11,12,15,23;819:4,24;821:11,12;824:17,22,23;826:21
**memorandum (3)**
820:6,7;849:20
**memos (1)**
819:2
**merely (2)**
835:21;838:3
**messages (3)**
819:15;822:14;826:16
**met (3)**
794:6;815:1;824:4
**Mets (1)**
802:9
**middle (3)**
791:22;793:7;859:9
**might (6)**
791:19;836:22;840:3,21;860:12;862:14
**mind (2)**
787:15;840:25
**minor (1)**
852:7
**minute (4)**
805:21,21;826:7;867:22
**minutes (4)**
788:11,12;797:12;814:4
**misleading (3)**
784:24;837:14;846:7
**mispronounce (2)**
852:14,17
**mispronunciation (1)**
852:22
**missing (3)**
791:4;792:15;863:10
**misspoke (1)**
815:2
**misstate (1)**
814:18
**mistaken (4)**
854:17,22;860:10,13
**misunderstood (1)**
835:16
**modified (1)**
841:11
**Mohan (2)**
868:14;871:9
**moment (4)**
797:14;811:20;833:19;860:8
**money (2)**
796:22;797:8
**Monique (2)**
807:11;826:19
**month (1)**
807:10
**more (11)**
785:22;796:22;825:2;826:15;830:7;844:11;849:12;850:20;852:6;869:10,19
**Moreover (1)**
785:13
**morning (15)**
784:2,3;792:21,22;793:13,14;798:3,4;806:16;812:17,23,24;868:20;871:2,7
**mornings (1)**
815:11
**most (2)**
785:3;812:15
**motion (3)**
814:20,24;826:23
**motions (3)**
812:5;814:10,12
**motivation (1)**
841:5
**motive (5)**
816:10;840:20,21,25;855:11
**motives (1)**
855:11
**moved (1)**
789:1
**moves (4)**
803:6;814:15;815:14;823:17
**moving (2)**
815:4;842:22
**much (7)**
817:12;825:24;826:6;851:21,22;870:17;871:12
**multiple (1)**
785:15
**Municipal (5)**
794:11;799:21,22;800:19;803:3
**must (4)**
832:12;845:17;866:13;867:1
**myself (1)**
836:20

## N

**name (8)**
793:6,7,8;797:19,20,21;862:12,13
**named (2)**
795:11,17
**names (4)**
805:17,24;816:13,19
**Nana (5)**
786:4;792:25;793:3,6,7
**N-a-n-a (1)**
793:7
**narrative (1)**
865:18
**nature (5)**
833:22;848:11;852:4,9;855:16
**near (1)**
851:21
**necessarily (3)**
787:2;851:7;857:17
**necessary (9)**
804:6;829:21;846:10;850:17;858:14,18;861:24;862:1;868:2
**need (14)**
786:1;812:13;827:13;830:25;832:23;835:9;853:3;858:3;859:21;860:11;861:21;862:3,9;869:13
**needed (4)**
819:10;848:8;855:9,12
**needs (3)**
841:15;844:13,14
**neither (1)**
792:3
**Nets (1)**
802:11
**new (7)**
800:4;802:11;814:20,25;815:9;819:19;829:7

**News (2)**
794:19;859:23
**next (21)**
789:12;792:15;798:23;803:13;805:8;809:18;810:13;812:11;813:6;820:16;826:2;839:9;840:19;841:4;843:21,23;844:19;845:13;850:10;860:24;870:25
**nine (4)**
833:9;838:23;854:8;855:20
**nobody (1)**
798:11
**nor (2)**
820:25;856:16
**normally (1)**
796:12
**Norman (3)**
798:24;799:5,8
**note (6)**
792:25;829:24;831:20;836:20;866:13;867:1
**noted (1)**
864:13
**notes (2)**
814:22;867:6
**notice (2)**
791:1;867:19
**noticed (1)**
784:9
**noticing (2)**
849:12,17
**number (2)**
848:15;864:21
**numeral (3)**
839:3;859:14,18
**numerals (1)**
839:5
**numerous (1)**
859:23
**nurse (1)**
793:23

## O

**object (6)**
803:8;831:4;834:1,4;844:25;847:6
**objected (1)**
832:25
**objecting (2)**
834:3;855:14
**Objection (20)**
800:24;805:19,23;806:1,3;807:25;809:9;810:4;832:23;836:18;848:13;849:1,22;853:23;855:5,9;857:25;864:4,13;865:13
**objections (2)**
829:13;862:20
**obligation (2)**
785:3,4
**obstruct (8)**
818:13;821:23;822:17;823:2,8;833:14;849:25;850:3
**obstructed (1)**
839:16
**obstructing (1)**
821:18
**obstruction (2)**
869:22,22
**obstructs (1)**
839:15
**obvious (1)**
785:13
**obviously (8)**
785:5;819:1;849:15;850:5;856:5,9;862:10,18
**occur (1)**
787:6
**o'clock (3)**
814:7;827:1,5
**October (1)**
800:10
**off (7)**
812:16;813:5;814:11;835:10;859:20;867:18;870:14
**offense (5)**
846:24;847:16,18;854:10;868:4
**offenses (1)**
858:2
**offered (2)**
865:2,3
**offering (1)**
825:10
**Office (6)**
818:19;819:22,25;821:3;827:20,24
**officer (10)**
795:13;799:24;800:1,2,3,4,5,7,9,11
**official (4)**
842:8,21;843:16,19
**offsets (2)**
825:13,19
**often (2)**
852:9,10
**old (2)**
829:8;831:18
**omitted (3)**
831:15;843:11;858:14
**onboard (3)**
824:17,21;825:10
**once (1)**
790:17
**once-over (1)**
862:19
**one (39)**
786:12;788:3;789:22;790:13;791:4;792:2,3;794:18;797:14;805:17;809:8;815:11,19,22;818:9,10;827:16,17,18;829:8;831:20;833:19;834:12;836:21;839:18;841:1;848:16,16;851:20;859:3;862:6;863:11;866:4,9,10;868:25;869:10,21,21
**ones (2)**
822:11;861:17
**only (17)**
784:14;791:8;818:17;825:16,20;832:21;846:4,13,23,25;847:8,15,20;850:4;854:9;855:25;861:16
**onto (1)**
851:4
**open (4)**
784:1,8;810:11;811:1
**opened (1)**
810:5
**opening (1)**
809:14
**operating (5)**
785:19;799:25;800:1,3,5
**opinions (1)**
787:5
**opportunity (5)**
787:4,18;789:20;792:17;858:8
**opposed (1)**
842:3
**oral (2)**
848:19,24
**order (3)**
826:8,8,10
**ordinarily (1)**
840:20
**ordinary (1)**
840:21
**Osei (11)**
793:13,25;794:3,10,25;795:10,22;797:10,18;798:3,20
**O-s-e-i (1)**
793:8
**Osei-Bonsu (7)**
786:5;789:7;792:25,25;793:3,6,8
**otherwise (3)**
829:20;834:5;836:14
**out (27)**
792:4;797:13;826:16;829:6;835:11;836:13;837:3;850:17;853:13,21;856:10,10;860:1,4,15,16,19;861:3;862:2,18;864:19;867:10,11;869:19;870:3,3,4
**out-of-pocket (1)**
804:8
**outside (1)**
786:6
**over (3)**
785:16;805:13;862:5
**overestimate (1)**
788:11
**overlap (1)**
869:17
**overnight (1)**
791:24
**Overruled (5)**
843:8;848:13;852:25;858:19;860:20
**overwhelming (1)**
824:2
**overwhelmingly (1)**
826:20
**own (3)**
787:5;796:22;797:8

## P

**page (90)**
809:18;810:13;813:6;829:13,19;830:5,14,18,19;831:17;832:3,4,25;833:2,3,9,14;836:13;838:19,22,22;839:2,10,22;842:2,8;843:10,14,20,21,23,25,25;844:2,7;845:11,15,19;846:2;847:24;848:4,15;849:5,5,6,10,11;850:11,16,20;851:21;853:2,4,4;854:1,1,2,6,8,9,14,24;855:19,22;858:6,15,16,20,20,22;859:1,4,8,14,18;860:24;861:10;862:24;863:3,6,9,11,16;864:22;866:7,10,19,20,22;867:13
**paragraph (10)**
809:7;829:19;830:6;831:17;832:10;836:13;846:3;850:12,16;852:3
**Park (1)**
802:12
**part (9)**
795:7;811:16;816:4;817:1,8;835:6;841:15,19;859:19
**participants (1)**
798:8
**participation (1)**
833:11
**particular (4)**
784:9;850:18;861:9;869:15
**particularly (3)**
826:16;848:11;851:17
**parties (2)**
827:8,11
**pass (1)**
785:24
**Pause (5)**
788:6;789:6;792:20;797:16;811:23
**pay (3)**
796:20;804:4;853:19
**paying (2)**
797:8,9
**PDF (3)**
827:7,10,13
**Pearl (1)**
792:6
**people (1)**
816:13
**Perfect (1)**
839:7
**perfectly (1)**
785:1
**perhaps (3)**
788:11,15;811:15
**permissibly (2)**
824:23;825:15
**permission (2)**
808:7,10
**permits (1)**
824:19
**permitted (1)**
817:18
**person (2)**
819:1;840:11
**Personal (4)**
804:15;821:20;822:1;851:12
**persons (1)**
850:21
**phone (5)**
810:4;819:7;821:6;822:9;825:25
**phrase (1)**
840:9
**phrasing (1)**
846:6
**pick (3)**
819:7,22,25
**picked (1)**
836:9
**place (2)**
784:8;836:15
**places (1)**
856:10
**plan (2)**
790:16;824:21

planning (1)
800:6
plans (1)
812:20
play (2)
811:10;812:1
played (1)
845:7
please (11)
787:15;804:12,13;
805:8,11;807:6;
811:22;823:23;830:14;
834:10;835:25
plenty (1)
790:17
pm (1)
829:2
point (21)
787:13,14;790:4;
803:9;824:16;826:11;
831:9;835:23,25;
837:8,20;846:16;
848:23;849:23;851:9;
855:25;856:8,11;
861:6;867:10,11
points (1)
836:3
point's (2)
830:15;843:8
policies (1)
803:4
policy (8)
802:16;803:3,10,23;
804:14;805:12;806:18;
817:17
Poor (1)
867:5
Porcelli (3)
796:12;798:9;824:17
portion (1)
858:1
portions (1)
844:4
positions (1)
800:12
possession (1)
822:15
potential (2)
865:4,7
potentially (1)
848:8
practice (1)
827:12
precise (2)
837:2;838:7
predicted (1)
788:20
prefer (4)
840:7;857:2;860:19;
869:25
preferrable (2)
841:20;847:5
prejudice (2)
785:4;818:3
prejudicial (4)
848:6;850:22;
851:10;852:6
premium (1)
796:21
preparation (1)
799:16
prepared (1)
790:1
presence (1)
786:6
present (9)
784:1;786:10;
789:10;792:25;796:11;
811:19;812:8;814:1;
830:1
presentation (1)
812:11
presented (4)
815:16;816:2;819:2;
834:16
preservation (1)
822:10
preserve (1)
812:5
preserved (1)
822:9
president (1)
800:6
President/CEO (1)
800:9
President/Chief (3)
800:5,7,8
presumed (2)
830:13;832:6
prior (1)
862:25
privilege (1)
790:7
probably (5)
784:23;858:3;
870:13,16,21
problem (11)
791:17;825:9,11;
827:14;836:2;837:5;
840:24;841:21;842:19;
844:16;870:1
problems (1)
859:15
proceed (2)
799:9;815:12
proceeded (1)
784:18
proceeding (7)
842:8,9,21,24;843:3,
16,20
proceedings (1)
784:8
produce (4)
785:3,5;821:22;
822:16
produced (4)
822:1,15;856:15;
857:6
production (2)
822:3;856:1
professional (1)
802:5
promise (2)
812:25;819:19
promoted (4)
799:23,24,25;800:4
pronounce (1)
852:20
proof (2)
790:25;815:1
proposal (5)
832:18;834:1;836:6;
844:8;865:14
propose (5)
838:9;840:22;844:2,
12,21
proposed (5)
785:16;829:12;
832:21,22;849:8
proposes (1)
846:9
proposing (1)
837:2
prove (9)
820:11,12;834:19;
835:2,20;844:20;
845:5,5,6
proved (2)
837:16;852:10
proven (2)
822:13;852:5
provide (1)
821:20
provided (5)
804:14;833:24;
844:13,14;857:21
publicity (1)
859:21
publish (1)
801:8
pull (3)
808:20;809:3;862:14
purchase (1)
804:9
purely (1)
836:23
purpose (3)
840:2;841:5,19
pursuant (4)
799:14;814:15;
822:9;823:18
put (21)
786:8;787:23;801:4,
7;802:18,20;811:25;
816:14;817:5,17;
818:8,17;819:4,24;
820:10,18;821:8;
827:19;847:5;869:23;
871:9
putting (1)
817:12

Q

question-by-question (1)
790:8
quibble (1)
864:18
quibbling (1)
857:16
quotation (2)
835:10;842:3

R

raise (1)
834:12
Rangers (1)
802:10
rare (1)
852:4
rather (5)
814:23;818:7;
847:11,11;869:9
reaching (1)
866:12
read (26)
784:5;804:1,13,17;
805:3,11;809:8;823:5,
5;826:19;831:13;
834:10;835:6,10;
837:2,12;852:8;
861:11,21,22;865:3,5,
14;866:18;867:1,5
reading (7)
784:20;794:19;
825:17,18,24;835:14;
851:9
Ready (4)
791:3;814:3;815:12;
870:25
real (3)
787:6;824:14,14
realize (2)
854:13,14
really (4)
807:13;837:13,14;
840:22
reason (6)
791:9;816:24;817:2,
3;823:3;852:21
reasonable (2)
816:3,20
reasons (2)
784:22;823:15
REBOLD (11)
800:24;803:8;
805:19;806:2,13,15;
808:2,16;809:9;810:7;
811:3
rebuttal (4)
788:20,23;812:6,7
recall (9)
790:20;795:23;
796:3;797:10;805:25;
806:18;807:5,7;867:18
receive (2)
794:3;807:24
received (7)
784:4;803:15,16;
810:9;856:6;863:20;
865:6
Recess (1)
828:7
recognize (2)
801:11;817:25
recollect (1)
797:21
recollection (2)
795:25;818:22
reconcile (1)
818:23
record (11)
789:10;811:25;
819:3;821:13;832:18;
854:25;856:22,25;
857:5,11,14
redactions (5)
862:6,7,10,12,13
redirect (2)
808:18;809:1
redline (2)
832:18,20
redlined (1)
829:9
reference (8)
824:23;825:5;844:6;
849:16;858:2;864:12;
867:13;869:13
references (2)
849:14;862:25
referring (1)
866:15
reflect (2)
789:10;854:25
refresh (1)
818:22
refute (1)
819:24
regard (1)
785:22
regarding (2)
807:4;816:2
registered (1)
793:23
registration (1)
804:5
REILLY (13)
789:7;792:24;793:9,
12,24;797:4,5,14,17,
22;798:17,18;814:13
reimburse (1)
804:4
reimbursed (2)
805:13;817:16

**Reimbursement (5)**
803:23;806:21,24;
817:19,20
**reimbursements (1)**
804:22
**relate (1)**
822:12
**related (3)**
822:22;823:4,12
**relatedly (1)**
817:11
**relates (2)**
821:17;822:20
**relationship (2)**
825:6,7
**relevant (3)**
810:8;822:5;831:5
**relic (1)**
862:24
**relied (1)**
844:22
**relief (1)**
784:6
**relying (1)**
848:24
**remain (2)**
786:19;838:17
**remember (2)**
807:13;862:7
**remind (1)**
786:4
**renew (1)**
826:24
**reorient (1)**
815:13
**repeat (2)**
793:22;807:6
**replace (2)**
800:15,17
**replaced (1)**
800:18
**report (1)**
805:1
**reported (1)**
804:25
**represent (1)**
802:24
**request (12)**
807:12;819:7,9;
821:12;833:10;834:14;
841:9;849:12;851:2;
867:4;868:11;869:14
**requested (3)**
808:3;817:13,14
**requesting (1)**
868:6
**required (10)**
834:19,22;835:1,20;
840:22;844:20;845:3,
4,5,6
**requirement (1)**
839:25
**requisite (1)**
822:17
**reremind (1)**
830:11
**resolution (1)**
832:19
**respect (8)**
785:8;790:15;830:8;
847:8,9;851:23;
859:12;863:21
**respects (1)**
784:23
**responsive (2)**
821:19;822:21
**rest (7)**
787:14;788:14;
794:23;812:15;858:18;
859:19;865:3
**restroom (1)**
792:18
**restructure (1)**
836:4
**rests (2)**
811:24;812:5
**resulted (1)**
829:7
**return (5)**
800:22;801:23;
807:12;808:3,14
**returning (1)**
801:19
**reverse (1)**
826:8
**reversed (1)**
826:11
**reviewed (3)**
784:5,16,25
**revising (1)**
836:11
**Riefenhauser (1)**
812:22
**right (43)**
786:21;787:8;
789:15;790:3;792:9;
794:6;796:8,15;798:6,
13;806:4;807:19;
811:13,18;812:15;
814:7;815:7;823:5;
827:18;829:25;830:1;
831:11;833:8;834:7,
25;837:3,24;840:17;
842:4,5,12,22;845:9,
14;846:16;849:6;
850:6;851:21;853:19;
854:21;855:4;856:13;
859:20
**rights (1)**
786:5
**RN (1)**
793:20
**roll (2)**
858:22,24
**Roman (4)**
839:3,5;859:14,18
**romanette (2)**
839:3,5
**room (2)**
786:9;804:6
**Rosenman (1)**
785:6
**route (1)**
843:2
**rule (7)**
790:9;814:15,17,18,
22;815:14;823:18
**Rules (1)**
817:9
**ruling (1)**
784:17
**run (1)**
792:17

**S**

**safe (1)**
792:19
**same (11)**
792:6;795:21;
823:25;826:11,12;
829:8;842:6;855:3;
857:11;863:5;870:17
**Samuel (2)**
793:6,7
**S-a-m-u-e-l (1)**
793:7
**Sand (2)**
833:23;844:22
**sat (1)**
850:21
**satisfied (2)**
787:1,2
**save (1)**
797:8
**saving (1)**
796:21
**saw (1)**
794:20
**saying (14)**
784:9;791:13;
806:20,24;807:10;
825:5;835:12;837:13;
845:3;847:10,11,19;
857:11;864:6
**scan (2)**
827:20,22
**scope (1)**
809:10
**screen (4)**
801:5;802:18;809:4,
5
**screened (1)**
792:15
**script (1)**
784:22
**scroll (4)**
803:17,19;804:11;
805:9
**search (1)**
861:8
**Searches (1)**
861:13
**season (5)**
802:4,7,8,9,14
**seated (2)**
786:19;814:2
**second (8)**
809:7;821:12;
831:22;835:24;836:7;
851:3,6;866:4
**secrecy (2)**
852:4,9
**section (20)**
803:18;804:22;
805:1;806:17;832:15;
833:13;834:18;835:22;
841:25;842:6;844:18;
845:10;852:1,12;
858:5;859:14;862:20;
863:11;865:16,23
**seeing (1)**
837:7
**seek (2)**
817:19,20
**seeks (1)**
784:6
**seem (3)**
840:2,3;860:22
**seems (7)**
832:14;843:1;845:8,
11;847:16;848:23;
865:8
**self-incrimination (1)**
790:8
**self-serving (2)**
819:12;820:3
**send (8)**
800:20;812:16;
813:1;820:25;821:1;
869:2,4,6
**Senior (1)**
800:7
**sense (1)**
837:15
**sent (11)**
800:21;801:17;
807:3,7,14,17,19,21;
820:24;827:7,11
**sentence (40)**
804:19;805:3,6;
809:8;829:20;830:7,
19;832:9;834:5;
836:12,12;839:14,15;
840:19,23;841:3,4,11,
23;843:5;844:19;
845:4,13,16;846:2;
847:4;848:4,16;851:3,
4,6,23;852:8;859:9,11;
864:24;865:3;866:11,
11,22
**sentences (1)**
851:5
**sentencing (1)**
868:18
**separate (1)**
805:1
**serve (1)**
794:22
**served (4)**
794:12,13;795:20;
821:19
**SESSION (1)**
829:1
**sessions (1)**
804:3
**seven (12)**
829:13;830:5,18,20;
831:13,17;832:3,5,25;
849:20,24;854:15
**Several (1)**
795:8
**shall (2)**
804:4,25
**share (1)**
855:2
**shared (1)**
820:22
**shares (1)**
821:2
**shelter (1)**
794:18
**shift (1)**
827:25
**short (4)**
784:5;786:12;
811:15;825:18
**shorten (1)**
858:8
**shorter (1)**
870:17
**shortly (1)**
790:14
**show (6)**
790:16;801:4;
821:21;822:4,25;
826:20
**showing (1)**
821:13
**shown (2)**
840:20;859:10
**shows (3)**
816:6;821:10,24
**side (3)**
838:20;855:19;866:1
**sidebar (3)**
784:8;809:14;810:1
**sides (2)**
784:20;812:12
**sign (5)**
816:9,11;817:4;
819:2;824:17
**signed (10)**
818:15,23;819:5,8,9,
24;821:10,11;824:24;

826:21
**significant (1)**
791:19
**signing (5)**
816:25;818:11,12;
819:16;824:22
**similar (2)**
822:22;860:21
**simple (1)**
868:10
**single-page (1)**
807:15
**sitting (1)**
851:8
**six (3)**
830:19;832:10;
849:11
**skipped (1)**
862:5
**slowly (1)**
793:22
**Smith (2)**
807:11;826:19
**sole (1)**
855:11
**solemn (1)**
850:21
**solo (1)**
842:3
**somebody (2)**
860:13,13
**someone (9)**
795:17;822:8;
825:12,16,21;830:23;
831:21,23;841:16
**someone's (2)**
825:19;860:13
**sometime (2)**
812:21,24
**sometimes (2)**
852:5;854:18
**somewhat (3)**
831:9;861:4;866:9
**sons (5)**
805:18;816:15,16,
19,21
**sorry (27)**
786:12;800:16;
805:2;808:23;814:18;
815:10,12;825:6;
827:9;831:9;833:4;
835:16;837:6;843:17,
22;844:7;845:21,22;
848:2;850:2;853:11;
858:16;860:7;863:2,6;
866:4,17
**sort (2)**
791:19;846:6
**sound (1)**
855:14
**Sounds (2)**
845:14;850:6
**souvenirs (1)**
804:10
**spacing (1)**
839:9
**speak (1)**
799:16
**speaks (1)**
809:10
**special (2)**
867:24;868:6
**specific (3)**
785:23;851:25;
855:16
**specifically (3)**
810:2;815:19;867:4
**spelled (1)**
869:19
**spent (1)**
817:12
**spin (1)**
847:11
**split (1)**
865:11
**spoke (3)**
816:24;821:6;824:16
**sporting (1)**
804:10
**sports (3)**
802:5,8;817:14
**staff (1)**
796:24
**stand (5)**
786:8,19;787:15,24;
789:12
**standard (2)**
804:7;851:17
**stands (1)**
805:22
**start (2)**
814:6;853:9
**started (1)**
799:22
**starting (2)**
867:14;871:2
**starts (6)**
824:11;850:20;
851:5,6;858:6;859:14
**state (3)**
789:18;838:3;863:17
**statement (22)**
785:11;819:13;
820:4;822:19;844:23;
845:16;846:4,13,14,23,
24;847:1,5,10,15,15,
19,20;848:7,16,20,24
**statements (6)**
785:2;820:12;846:7;
848:19,22;860:16
**States (4)**
789:16;834:15;
836:17;837:24
**statute (7)**
833:20;834:10;
835:23;843:18;844:5,
12;848:18
**stay (2)**
855:18;861:14
**stays (1)**
861:13
**step (1)**
811:4
**Stephenson (9)**
801:7;802:1,20;
803:17;804:12;805:9,
16;808:20;809:3
**stick (1)**
833:23
**stickler (2)**
842:4;850:11
**still (4)**
788:14;791:4;800:1;
837:5
**stipulation (2)**
802:23;812:2
**stipulations (1)**
861:21
**straight (1)**
840:12
**strategic (1)**
800:6
**stricken (3)**
830:24,25;852:23
**Strike (11)**
800:25;836:13;
840:16,23;841:3,9,10,
23;863:19;864:8;
865:17
**striking (3)**
829:23;840:25;
857:25
**struck (1)**
832:21
**stuff (2)**
785:13,20
**subject (1)**
832:17
**submit (2)**
870:6,8
**submits (3)**
817:17;821:10;
823:15
**submitted (2)**
784:18;832:17
**submitting (1)**
867:24
**subpoena (10)**
794:3;799:14,15;
821:19;822:22;823:5,
6;855:25;856:6;862:12
**subpoenas (1)**
862:11
**subscription (1)**
817:15
**substance (2)**
785:10;787:2
**substantive (5)**
831:6,15;849:23;
858:1;866:10
**substantively (1)**
846:16
**successful (2)**
851:14,16
**sufficient (3)**
822:24;823:7;824:1
**suggest (7)**
791:2;832:12;
833:23;838:2;853:18;
865:3;866:25
**suggestion (5)**
786:17;841:6;860:9;
863:21;867:24
**summaries (3)**
861:15,16,18
**summarize (1)**
869:24
**summation (1)**
811:16
**superseding (2)**
815:17;823:17
**supervising (1)**
793:23
**supervisor (2)**
793:20;796:12
**supervisory (5)**
796:13,14;804:5,21,
23
**supplies (1)**
804:8
**supply (1)**
804:9
**support (3)**
856:22;857:11,14
**suppose (1)**
839:14
**supposed (2)**
803:5;854:15
**sure (16)**
784:6,10;789:1;
796:7;797:1;808:24;
826:8;836:9;839:1;
842:7;846:22;847:16,
17;856:16;860:20;
870:7
**suspect (2)**
791:5;834:21
**sustain (8)**
815:16,23;818:9,14;
822:24;823:7,16;
832:11
**Sustained (3)**
808:1;809:12;810:4
**sworn (3)**
789:14;793:5;799:7
**Sylvia (6)**
795:17;798:8;
800:20,22;807:3;810:9
**system (1)**
827:19

## T

**table (2)**
850:21;871:10
**tacitly (2)**
852:18,22
**talk (7)**
796:5,5;825:7;
841:14;852:23;862:19;
867:22
**talked (3)**
796:7,23;818:20
**talks (3)**
833:21;840:20;848:6
**teams (2)**
802:5,8
**technique (1)**
861:9
**techniques (1)**
861:3
**telephone (1)**
804:8
**telling (4)**
786:23;816:8;
818:12;822:20
**ten (2)**
788:10,12
**tend (2)**
789:17;790:5
**test (1)**
826:13
**testified (6)**
785:6;793:5;798:5;
799:7;806:17;807:2
**testifies (1)**
786:5
**testify (10)**
786:14,20,22;
787:10,16;788:14,21;
789:20;790:1;810:3
**testifying (1)**
807:7
**testimony (10)**
789:16,17;790:4;
794:8;815:25;819:6;
826:17,18;860:1;
862:18
**texts (6)**
821:18,22,24;822:5,
8,10
**thanking (1)**
825:2
**theories (1)**
867:23
**therefore (2)**
832:5;833:25
**thereof (1)**
836:15
**thinking (3)**
791:18;846:20;860:7
**though (7)**
787:16;809:14;

811:25;814:10,22;
840:1;864:13
**thought (7)**
792:13;794:22;
805:2;847:13,23;
852:2;857:13
**thousands (1)**
850:25
**three (15)**
800:21;815:20;
821:17;822:22;830:14;
837:14;842:2,8;
843:11;846:8;855:1;
867:23;869:1,11,22
**throughout (2)**
818:2;841:14
**tickets (9)**
802:4,7,7,8,9,11,13;
817:14,15
**times (4)**
785:15;851:1,8,13
**tipping (1)**
804:7
**tired (1)**
837:9
**today (7)**
789:1,3;790:21,25;
794:4,8;799:16
**together (2)**
795:20,21
**told (13)**
785:17;791:5;
792:15;799:17,17;
819:6,8;821:24;
822:25;823:2,3,11;
825:18
**tomorrow (9)**
789:3;790:16;791:1;
812:17,18,21;868:20;
871:2,7
**tonight (2)**
867:6;870:8
**took (1)**
784:8
**top (5)**
832:4;854:24;859:7,
20;867:18
**topic (1)**
818:1
**tossing (1)**
837:17
**touch (1)**
796:19
**training (4)**
804:3;863:20,22;
864:15
**trainings (1)**
863:24
**transcript (3)**
784:11,13,13
**transfer (3)**
808:11,13,14
**transportation (2)**
804:7;817:20
**travel (1)**
812:20
**trial (7)**
786:14;814:20,25;
815:9;817:12;818:2;
861:22
**trials (1)**
792:2
**trodden (1)**
823:25
**trouble (4)**
825:13,17,19,21
**troublesome (1)**
846:15
**true (3)**
785:5,9;858:25
**trust (2)**
824:15;825:3
**try (2)**
825:10;832:25
**trying (3)**
821:22;857:9;864:18
**turn (1)**
820:16
**turned (2)**
785:23;792:3
**twenty (1)**
788:11
**two (27)**
788:9,13;792:1;
794:2;800:21;807:17;
815:20,25;816:3,13;
818:11,14;821:16;
826:7;831:6;843:10;
849:13;851:5;852:7;
854:15;858:22;867:23;
868:3,15,25;869:10,21
**typed (1)**
838:17
**typically (1)**
833:23
**typo (7)**
836:8;842:2;845:12,
15;854:9,25;855:3
**typographical (2)**
838:18,25
**typos (3)**
858:22;862:22,23

## U

**ultimately (1)**
824:23
**unbecoming (2)**
818:5,6
**unclear (1)**
819:3
**under (14)**
785:3;789:15;
804:19;805:11;809:8;
815:14;824:25;831:22;
834:18;844:13;846:3;
848:15,18;864:21
**understands (1)**
826:5
**understood (1)**
807:23
**undisputed (1)**
784:19
**unfairly (1)**
818:3
**unforeseen (1)**
812:18
**Unfortunately (1)**
862:21
**unintentionally (1)**
784:23
**Union (10)**
794:11;796:22;
797:9;799:21,22;
800:20;803:3;804:4;
849:7,8
**United (4)**
789:16;834:15;
836:17;837:24
**Unless (3)**
824:6;826:7;867:3
**Unlike (1)**
826:9
**unlikely (1)**
812:23
**unnecessarily (1)**
848:6
**unnecessary (7)**
841:4;843:1,5,20;
848:5;851:7,10
**uno (1)**
860:4
**up (26)**
786:19;787:15,23;
790:6,16;799:2;801:4,
8;802:20;803:19;
808:20;809:3,5;
814:12;816:9,11;
819:7,22,25;836:1,9;
843:24;845:20;862:14;
866:5;867:9
**use (3)**
784:21;802:13;818:7
**used (2)**
785:20;861:9
**usually (2)**
839:25;840:1

## V

**vacancies (1)**
794:20
**value (2)**
818:4;864:22
**various (1)**
814:25
**vary (1)**
851:1
**verdict (7)**
866:12;867:22;
868:6,9,23;869:10,24
**version (3)**
827:7,10;829:7
**versus (1)**
823:8
**via (1)**
820:24
**Vice (4)**
800:5,6,7,8
**view (5)**
831:3;832:20;851:9;
853:5,7
**violate (3)**
815:24;816:4;817:9
**visited (1)**
821:3
**voice (2)**
787:5;832:23
**voicemail (2)**
811:15;821:2
**voluntarily (5)**
799:13;819:8;
839:24;840:2,16

## W

**waiting (3)**
790:13;799:1;868:18
**waived (1)**
830:1
**wants (7)**
824:6;849:15;
863:25;864:3,7,8,11
**warrant (1)**
861:8
**way (12)**
787:22;796:21;
818:5;827:4;830:20;
831:14,22;838:11;
840:9;841:17;847:11;
866:6
**ways (3)**
807:17;831:6;868:3
**wedded (1)**
846:17
**weekend (1)**
870:23
**weight (1)**
847:18
**well-founded (1)**
789:17
**weren't (4)**
784:18;821:25;
822:2;857:21
**what's (10)**
784:13;791:1;
793:25;802:22;810:8;
837:14;840:20;843:4;
845:3;848:24
**whatsoever (1)**
785:21
**Where's (1)**
856:2
**whole (4)**
819:11;841:14,18;
858:5
**Who's (1)**
814:13
**willful (2)**
858:2;867:9
**willfully (5)**
831:23;845:12,13;
855:23;858:5
**wipe (1)**
808:7
**wiping (1)**
810:3
**withdraw (1)**
806:3
**Withdrawn (1)**
830:16
**within (6)**
833:21;835:3,8,18;
836:16;837:23
**Without (5)**
786:23;805:13;
825:8;838:7;852:5
**witness (32)**
785:5,9,12,17;786:4,
8;787:23;789:8,11,12;
792:23;793:1,4,6,23;
797:3;798:21,22,23,25;
799:2,6,8;801:2;
802:20;805:20;806:7;
808:23;810:6;811:6;
860:10;863:10
**witness' (1)**
808:21
**witnesses (4)**
785:15,17;788:9;
862:3
**Wong (39)**
795:11,23;796:1,10,
17;798:8;800:18;
802:15;816:1,7,8,12,
23;817:2,6,7,8,14,23;
818:18,20;819:1,15,17;
820:21,22;821:2,4,25;
823:9;824:11,13,14,15,
20;825:4,11,12;826:6
**Wong's (8)**
805:18;816:10,15,
19;819:7,9;821:12;
822:6
**wood (1)**
792:10
**word (20)**
784:21;833:16;
835:6,11,14;836:9,15;
839:7;840:25;841:5;
842:14,23,24;843:3;
845:9;847:18;849:19;
852:14,21;864:24
**words (4)**
836:14;846:3;

859:10,12
**work (2)** 793:18;827:25
**worked (2)** 794:21;799:21
**working (1)** 794:18
**worried (2)** 812:19;868:24
**worth (1)** 791:20
**woven (1)** 855:10
**written (4)** 843:6;848:19,20,21
**wrong (5)** 823:6;840:3;843:1; 863:21;869:14

Y

**Yankees (1)** 802:9
**year (1)** 792:14
**years (2)** 800:12;827:25
**yesterday (6)** 784:17,22;785:6,23; 824:1;826:19

1

**1,000 (1)** 851:8
**10 (7)** 833:3,14;836:13; 838:19,22;839:2; 843:25
**1006 (1)** 861:19
**1008 (1)** 812:3
**113 (4)** 801:6,11,18;807:3
**116 (2)** 849:14,20
**12 (3)** 839:10;842:8;843:20
**12.08.2021 (1)** 829:11
**13 (7)** 830:14;839:22; 843:10;854:6;867:14, 14,15
**14 (8)** 839:24;843:14; 844:2,7;845:15,16; 850:11,20
**15 (9)** 830:15;838:22; 842:2;843:21,23,25; 846:2;848:4;864:25
**1512 (2)** 835:23;842:12
**1519 (4)** 834:7,18;835:5,22
**16 (4)** 840:19;843:23; 846:3;848:15
**16th (1)** 812:20
**17 (9)** 844:2,7;845:11; 848:17;849:6;851:3,5; 853:4;858:20
**17:49 (1)** 824:16
**1715 (1)** 824:13
**1749 (1)** 825:2
**17th (2)** 818:19;821:4
**18 (13)** 786:11;818:15; 841:9;843:25;845:15, 23;848:17;849:7; 851:4,6,21;863:19; 867:15
**18th (1)** 818:24
**19 (18)** 807:8,14;833:3; 838:19;841:9;842:8; 843:20;845:19;847:24; 849:5,6,10,11;850:16; 851:4;852:3;854:1; 867:14
**1977 (1)** 799:22
**1978 (1)** 799:23
**1980 (1)** 799:24
**1984 (1)** 800:1
**1988 (1)** 800:3
**1994 (1)** 800:4
**19th (3)** 819:6,25;821:9

2

**2 (2)** 833:10;864:21
**2.08 (3)** 808:22;809:4,8
**2.09 (3)** 803:18,23;806:18
**2.09-1 (1)** 804:22
**2.09-1A (2)** 804:1,2
**2.09-2 (2)** 804:17,19
**2.09-4 (2)** 805:8,11
**2:00 (3)** 814:7;827:1,5
**20 (5)** 797:12;814:4;859:1, 9;863:9
**2005 (1)** 800:5
**2007 (1)** 800:7
**2008 (1)** 795:1
**2009 (2)** 795:2,5
**2015 (5)** 795:23,23,24;798:6; 802:24
**2017 (1)** 800:8
**2018 (7)** 800:9,10;807:8,11, 14;818:15;822:21
**2019 (2)** 800:14;807:14
**2020 (1)** 792:11
**2021 (3)** 792:13;834:16; 871:14
**21 (4)** 792:11;838:22; 843:20;850:20
**21-second (1)** 811:15
**22 (3)** 819:4;852:13;858:13
**22nd (5)** 818:24;820:15,20; 821:11;824:13
**23 (4)** 842:24;850:17; 852:13;854:9
**24 (2)** 839:2;848:4
**243 (1)** 834:15
**247 (1)** 834:15
**25 (3)** 797:12;839:10; 850:11
**251A (1)** 824:11
**26 (4)** 845:11;848:5; 850:17;858:14
**27 (4)** 849:5;853:2;862:24; 863:3
**277-A (1)** 812:2
**28 (1)** 853:4
**29 (2)** 815:14;823:18

3

**3 (2)** 862:20;863:6
**3:00 (1)** 829:2
**3:30 (1)** 870:22
**30 (2)** 853:4;854:1
**31 (2)** 854:1,3
**31st (2)** 821:5,7
**32 (5)** 854:6,9,14,24; 855:22
**33 (3)** 814:15,17;858:16
**34 (3)** 854:8;855:19;858:6
**35 (4)** 858:20,23;859:1,8
**36 (3)** 858:20;859:4,14
**37 (2)** 859:15,18
**38 (3)** 862:24;863:3,16
**39 (2)** 863:6;864:22

4

**4 (1)** 863:11
**40 (1)** 863:9
**42 (1)** 800:12
**4th (1)** 834:16

5

**5 (3)** 790:15;866:11,22
**5:49 (1)** 825:2
**51 (2)** 863:11;866:7
**55 (3)** 866:10,20,22

6

**6 (3)** 866:17,23;867:14

8

**8 (1)** 871:14
**80th (1)** 792:5

9

**9:30 (3)** 812:17;871:2,14
**992 (1)** 834:15

Okay. So I'll see you at 2:00 o'clock.
Do you have copies now, James?
James has copies of the draft charge for you already. He's way ahead of me in all things. And so I'll see you at 2:00 o'clock.
MR. MARK: Your Honor, maybe I'm asking inappropriately, but is there a PDF version that could be sent to the parties?
THE COURT: I'm sorry, is there what?
MR. MARK: Is there a PDF version of the document that can be sent to the parties, or is that not your Honor's practice?
THE COURT: Why do you need a PDF?
MR. MARK: No problem. We can --
THE COURT: We can give it to you, but we don't have one.
MR. MARK: Oh, you don't have one?
THE COURT: Right. But we could make one. I see you want to put it in your system.
MR. MARK: We can take it back to our office and scan it.
THE COURT: You can scan it, too.
MS. COHEN: That's what I just said.
THE COURT: The clerk's office has been on a campaign for the last five years to shift all the clerical work in the



court into chambers.
MR. MARK: Oh, okay.
THE COURT: God forbid, they should -- they do a great job with difficult circumstances.
MR. MARK: Thank you, your Honor.
MS. COHEN: Thank you, your Honor.
(Recess)



AFTERNOON SESSION
3:00 p.m.
THE COURT: Good afternoon, folks.
MR. MARK: Good afternoon.
MS. COHEN: Good afternoon, your Honor.
THE COURT: We have figured out what the glitch was that resulted in the distributions of the new version of the charge, which is essentially the same as the old one, but it's redlined. So we'll mark it as Court Exhibit H, yes?
THE DEPUTY CLERK: Yes, Judge.
THE COURT: A copy of the 12.08.2021 [2] draft of the proposed charge. And we'll go to it.
Any objections from the beginning through page seven?
Government?
MR. MARK: No, your Honor.
THE COURT: Who is going to handle this for the defense?
MS. COHEN: I will handle it, your Honor.
Your Honor page four, first full paragraph, the end of that sentence, "except as I will otherwise indicate." I think it is confusing, I think it is not necessary.
THE COURT: I agree with you. Anybody disagree? I'm striking the latter.
I do want to also note that I have been informed that Ms. Ash, to whatever extent she may have had a right to be



present this afternoon, has waived any such right and is not here. And am I correct in that?
MS. COHEN: You are correct, your Honor.
THE COURT: Thank you.
Anything else through the bottom of page seven.
MS. COHEN: Yes. B. The first paragraph, last sentence where you say, "Now I will explain to you in more detail what the indictment charges with respect to the counts for your determination."
THE COURT: Yes.
MS. COHEN: The defense would ask that you reremind the jury that the indictment is just the accusatory instrument, it is not evidence, and defendant is presumed innocent.
THE COURT: Please look at page three, lines 13 through 15. The point's covered I believe.
MS. COHEN: That's fine, your Honor. Withdrawn.
THE COURT: Okay. Anything else through the bottom of page seven?
MS. COHEN: Page six, line eight. The sentence begins on line seven, "The first way is that you may find that the defendant either committed."
THE COURT: Yes.
MS. COHEN: We would like "or caused someone else to commit" stricken there, and I guess the "either" before "committed" would also need to be stricken.

I think it's confusing and you later on charge on aiding and abetting.

THE COURT: Government have a view?

MR. MARK: We object because I think there is aiding and abetting charged, so I think it is relevant to explain what a substantive count is and that there two ways they can be found.

THE COURT: No, I think --

MR. MARK: Actually, sorry. The point is somewhat different.

THE COURT: I think counsel is right.

MR. MARK: I looked at that and I don't disagree.

THE COURT: So, line seven and eight should read, "The first way is that you may find that the defendant committed the substantive crimes charged." And what I omitted is deleted.

MS. COHEN: Thank you, your Honor.

Page seven, the first full paragraph.

THE COURT: Old charges may be completed but they never disappear.

MR. MARK: May I make one note. If you delete that "or caused someone else to commit a crime." Should you add then under the second way "defendant aided and abetted or willfully caused someone else."

THE COURT: No.

MR. MARK: Actually no.



THE COURT: Actually not.

MR. MARK: Actually --

THE COURT: Okay. Anything else through page seven?

MS. COHEN: Yes, your Honor. On the top of page seven, line four, "I therefore instruct you that the defendant is to be presumed innocent," we would ask that you add "on each count."

THE COURT: Okay.

MS. COHEN: Then at the last sentence of that paragraph which begins on line six, "If the government fails to sustain its burden," we would ask to add "on any count," "you must find the defendant not guilty," we would suggest you add "of that count."

THE COURT: That seems helpful. I will do that. Anything else on that section?

MS. COHEN: No, your Honor.

I would say all of this is subject to we had submitted redline of the government's proposal. And that's in the record and we understand this to be your decision, your resolution.

THE COURT: My view is that your redline contained no proposed additions, and only struck language from what the government proposed that you didn't want in there. If there is any objection to this charge, you need to voice it now.

MS. COHEN: Okay. So, your Honor, there is nothing from page seven, but I'll try to know where we've objected



before.

THE COURT: That is fine. Let's see. Page eight through page 10, line 19.

MS. COHEN: So, your Honor -- sorry. The government goes first.

THE COURT: Yes.

MR. MARK: Nothing from the government.

THE COURT: All right. Ms. Cohen.

MS. COHEN: On page nine, line eight, which is the heading element 2. We would request it just says "knowingly," I don't think participation --

THE COURT: I'll do that.

Anything else on this section?

MS. COHEN: On page 10, line four, "obstruct or influence an investigation." We would ask that you insert the word "federal" before investigation so it would be a federal investigation.

THE COURT: Mr. Mark?

MR. MARK: May I have one moment, your Honor.

I think the language of the statute is an investigation, and talks about that the investigation is within the jurisdiction that's of a federal nature. So I would suggest we stick with the language of Sand that's typically provided.

THE COURT: And therefore?



MR. MARK: We object to the proposal.

THE COURT: Let's go to line eight. Is anybody objecting to anything on line eight?

MS. COHEN: Yes, your Honor. We would object to "or otherwise" at the end of that sentence. So we would say it should be an --

THE COURT: This is the 1519 count, right?

MS. COHEN: Correct, your Honor.

MR. MARK: Your Honor --

THE COURT: Let me read the statute again, please.

I'll make this change.

MR. MARK: Your Honor, may I raise one thing?

THE COURT: Yes.

MR. MARK: Before you do, I cite to our request to charge. This is United States v. Hassler, 992 F.3d 243, 247 (4th Cir. 2021). "Every circuit to address the issue presented in this appeal has concluded that knowledge of a federal investigation under Section 1519 is a jurisdictional element. And the government was not required to prove that the defendant knew or contemplated --"

THE COURT: I suspect it may say is not.

MR. MARK: Was not required.

THE COURT: Is not a jurisdictional element.

MR. MARK: No, is a jurisdictional element.

THE COURT: All right.

MR. MARK: "And the government was not required to prove that the defendant knew or contemplated that the investigation he intended to impede was within the jurisdiction of a federal agency."

This is a key distinction between 1519 and --

THE COURT: Read the part that came after the word "impede."

MR. MARK: The government was -- was within the -- he did not need to know that it was --

THE COURT: Look, you just read off a quotation. And after the word "impede," I couldn't make out what you were saying.

MR. MARK: Oh, I apologize.

THE COURT: Would you continue reading from the word "impede."

MR. MARK: Oh, sorry. I misunderstood you, your Honor.

"he intended to impede was within the jurisdiction of a federal agency."

So the government is not required to prove the defendant knew that the investigation was federal. It's merely a jurisdictional element, which distinguishes Section 1519 from the other statute, 1512. I can also point your Honor to a Second Circuit case as well.

THE COURT: Please don't point me to anything while



I'm looking this up, okay.

MR. MARK: No problem.

THE COURT: I'm familiar with the points.

So how would you restructure this?

MR. MARK: Your Honor, I think it's accurate as drafted, and the proposal the defendant makes would be inaccurate and inconsistent with Second Circuit case law.

THE COURT: First of all, there is a typo on line five that I'm sure you all picked up and that the word should be "she was," not "she as."

Now, so what I'm looking at now is revising this to leave the first sentence alone, that is the first sentence of the first full paragraph on page 10, and to strike out on line eight the words "whether federal or otherwise." And insert in place thereof, and following the word "investigation," the following: "Of any matter that happened to be within the jurisdiction of any department or agency of the United States."

Is there any objection to that?

MS. COHEN: No, your Honor.

THE COURT: Just making a further note to myself.

MR. MARK: I guess the one concern I have is that this might confuse the defendant's intent from the jurisdictional issue. And the federal investigation is purely a jurisdictional element. It doesn't have to go to the defendant's intent.



THE COURT: I understand that. Of course. I just was proposing to insert the precise language you just read to me. That comes right out of Hassler.

MR. MARK: Yes.

THE COURT: So do you still have a problem with it?

MR. MARK: But I -- I'm sorry if I'm just --

THE COURT: I think, well, maybe I'm seeing your point.

MR. MARK: I'm tired so maybe I'm not being as articulate. But I have the impression from where it's inserted it leads to something that is a little bit confusing.

THE COURT: Let me just read on.

What you're really saying is that to describe this as a crime with three elements is really what's misleading. In the sense that, there is a jurisdictional hook that has to be proved also. That hook is that, whether she knew it or not, it was a federal investigation. And by tossing the jurisdictional element into the knowledge element, it may be a little bit confusing.

I understand the analytical point.

MR. MARK: I also think --

THE COURT: There is no issue of fact in this case as to whether there was an investigation that was a matter within the jurisdiction of the United States government. Right?

MR. MARK: That is not -- there is no question that



that has been demonstrated, but the defendant has made arguments through cross-examination that suggest that her intent was merely to interfere with a state investigation, not a federal investigation.

THE COURT: I never heard that.

MR. MARK: Or an internal investigation. So I think without having precise clarity on this instruction, it can lead to confusion for the jurors.

THE COURT: How would you propose to handle it, Ms. Cohen?

MS. COHEN: Your Honor, I was fine with the way your Honor amended it. I'm also fine with leaving it as it was.

THE COURT: Well, then isn't the logical thing to do here to deal with this is to leave it as it was.

MR. MARK: Yes. That would be consistent with case law. Thank you, your Honor.

THE COURT: Okay. This will remain as it was typed except for the correction of the typographical on line five.

Anything else through page 10, line 19, from either side?

MS. COHEN: No, your Honor.

THE COURT: Page 10, line 21 through page 15, line nine.

Government?

MR. MARK: Yes. Would you like typographical --

THE COURT: Yes, sure. May as well.
MR. MARK: On page 10, line 24, it should be a romanette instead of a Roman numeral.
THE COURT: What did you call it?
MR. MARK: A romanette. Little Roman numerals.
THE COURT: What we have to do is disable the automatic capital in the Word Perfect which is almost impossible to do, I tell you. Okay. Let's go on.
MR. MARK: Just a spacing issue on the next line.
On page 12, line 25, it should just be changed to "her conduct."
THE COURT: Agreed.
MR. MARK: Going --
THE COURT: I suppose in the sentence, the end of the sentence, we should change "obstructs or influences" to "obstructed or influenced."
MR. MARK: Yes, your Honor.
THE COURT: Let's not take a lot of time on that one, okay.
MR. MARK: No.
THE COURT: Anything else?
MR. MARK: Then page 13.
THE COURT: Yes.
MR. MARK: Line 14. To act corruptly. Voluntarily and intentionally usually comes from the knowledge requirement.



Though usually to act corruptly is defined to mean act with a bad purpose. So voluntarily intentionally seem to just, while they're not wrong, don't seem to add anything there and might be a little bit confusing.
THE COURT: Let me just look back.
What do you think, Ms. Cohen?
MS. COHEN: I would prefer it as is, your Honor.
THE COURT: What do you think the law is?
MS. COHEN: I think the way you phrase it is consistent with the law.
THE COURT: You are a very hard person to get a straight answer from.
MS. COHEN: I think the government said it wasn't inconsistent.
THE COURT: No, they said it was confusing.
I'm going to strike voluntarily and intentionally. I think the government is right on this.
Anything else?
MR. MARK: The next sentence, your Honor, on line 16, this then talks about motive and what's ordinarily shown. Given that motive is not an element, and what might be ordinary isn't really required, the government would propose that your Honor strike this sentence.
THE COURT: Any problem with that, Ms. Cohen?
MS. COHEN: I don't mind striking the word "motive."



I think it is helpful to explain how one can act corruptly.
THE COURT: I'm going to strike that sentence. I think it's unnecessary. And maybe in the next sentence I'll change the word "motivation" to "purpose."
MR. MARK: That's a good suggestion, your Honor.
THE COURT: Thank you.
MS. COHEN: Your Honor, while we're on that, the defense would request that you actually strike 18 and 19.
THE COURT: Strike what?
MS. COHEN: That sentence that you just modified.
THE COURT: Because?
MS. COHEN: Because it is I think confusing. Elsewhere throughout the charge you talk about in whole or in part. And I don't think it needs to be said. It's not how you define how someone acts corruptly.
THE COURT: Well, there is another way to do this. I could charge "To act corruptly means to act, in whole or in part, with a bad purpose."
MS. COHEN: That would be preferrable, your Honor.
THE COURT: Any problem, Mr. Mark?
MR. MARK: No, your Honor.
THE COURT: Then I'll strike the sentence that Ms. Cohen doesn't like.
Anything else from the government on this section?



MR. MARK: The last comment I have is also just a little typo. It's on page 15, line three, looks like the quotation marks had solo marks as opposed to the double marks.
THE COURT: You are a stickler. When you're right, you're right. Okay.
Ms. Cohen, same section.
MS. COHEN: Sure. So, your Honor, this is as to Count Three on page 12, line 19. "An official proceeding means a proceeding before" we would ask that it say "a federal court, a federal judge, or federal agency."
THE COURT: Mr. Mark?
This is the 1512 count, right?
MS. COHEN: Correct, your Honor.
MR. MARK: Before -- oh, just adding the word a federal court and federal judge?
THE COURT: Yes.
MR. MARK: I have --
THE COURT: You have what?
MR. MARK: I have no problem with that given your Honor has the later instruction that a federal grand jury is an official proceeding.
THE COURT: Okay. Moving right along.
MS. COHEN: I would ask that the word "federal" get inserted on line 23 before the word "proceeding."
THE COURT: Mr. Mark?

MR. MARK: It's not wrong. It also seems unnecessary and I don't know if we go along this route, we are going to be adding "federal" every time before the word "proceeding."
THE COURT: What's the bottom line?
MR. MARK: I think it's unnecessary given the sentence it's clear as it's written and it will lead to a lot of changes.
THE COURT: I agree. Overruled. The point's made. Anything else through --
MS. COHEN: Yes, your Honor. Page 13, lines two and three we would ask they be omitted. I think --
THE COURT: No. The law is clear on that. Anything else?
MS. COHEN: Yes. On page 14, just because you are explaining what elements are, line five, if we can insert "a federal official proceeding" there.
MR. MARK: That's not the language -- sorry. That's not the language of the statute. The language --
THE COURT: I've already defined an official proceeding on page 12, lines 19 to 21. It is unnecessary.
MS. COHEN: Okay. My next thing is on page 15.
THE COURT: Sorry?
MS. COHEN: My next thing is page 15, line 16. I don't know if we're up to that.
THE COURT: Okay. Page 15, line 10 through page 18.



Government?
MR. MARK: On page 17, line 14, we would propose that "government making body" be changed to "government agency," which is consistent with the language of the earlier portions of the statute.
THE COURT: Give me the reference again.
MR. MARK: Sorry. It's page 17, line 14.
THE COURT: The proposal is what?
MR. MARK: Where it says "decision making body." It would be changed to "government agency" for consistency. And where it says "to which was addressed," I think that's more limited than the statute is, and we would propose "to which was provided." It doesn't matter under the law whether it needs to be addressed. It just needs to be provided to the government agency.
THE COURT: Any problem with that, Ms. Cohen?
MS. COHEN: No, your Honor.
THE COURT: Anything else on this section, Mr. Mark?
MR. MARK: Then where it says on the next sentence, "However, the government's not required to prove," we would propose that "the decision maker" would be changed to "anyone," which is the language of Sand. So "anyone actually relied on the alleged false statement."
THE COURT: Ms. Cohen?
MS. COHEN: Your Honor, I would object to that.



Anyone is anyone. And here, it has to be the decision maker, the government agency.
MR. MARK: This is saying what's not required.
THE COURT: The sentence is that they are not required to prove that. They are not required to prove that it was a decision maker. And they're also not required to prove that it is whoever played Clarabell the Clown on Howdy Doody. They just don't have to do it. So "anyone" seems to me to be the right word.
Anything else on that section from the government?
MR. MARK: On page 17, line 26, this seems to be a typo. It should be an act is done knowingly, not willfully. Because willfully is defined in the next sentence.
THE COURT: Sounds right.
MR. MARK: Page 18, line 14, just another typo. At the end of the sentence on line 14, it should be the statement must concern "an" authorized function, not "and."
THE COURT: Correct. Anything else?
MR. MARK: Now on page 19.
THE COURT: We are not up to that yet.
MR. MARK: Sorry, your Honor.
THE COURT: Okay. Anything -- sorry?
MR. MARK: So. Just through 18, yes.
THE COURT: To anything else on Count Four from the defense?



MS. COHEN: Your Honor, the defense would ask that your Honor insert a sentence, page 15, the end of the first paragraph under H, so it would be line 16. Words to the effect of "This is the only false statement with which the defendant is charged."
MR. MARK: The phrasing there would be I think sort of misleading because there are lots of false statements she's charged with just in Count Three, and this is very focused on Count Four. I don't think any clarifying language she proposes would be helpful, necessary --
THE COURT: It could say that -- let me have your language again, Ms. Cohen?
MS. COHEN: This is the only false statement or allegedly false statement with which the defendant is charged.
THE COURT: That formulation is a little troublesome. But the point is substantively right.
MS. COHEN: I'm not wedded to my language at all, your Honor.
THE COURT: Okay.
MR. MARK: If your Honor is thinking about that, it should be focused on Count Four.
THE COURT: Yes. Sure.
What about this: "That statement is the only false statement offense charged in Count Four."
MS. COHEN: We just say "the only alleged false

statement."
THE COURT: I said "charged."
MS. COHEN: I understand, your Honor. But I think just given the formulation of the sentence, it would be preferrable to put "alleged" before "false statement."
THE COURT: I don't think so. Do you object to my formulation?
MS. COHEN: Only in that respect that I just said.
THE COURT: What is that respect exactly? You are saying it is an incorrect statement as a matter of law? Or are you saying you'd rather have it in a way you'd rather spin it.
MS. COHEN: The latter, your Honor.
THE COURT: Yes. I thought. Okay.
MR. MARK: Can I just clarify. Should it be that statement is the only false statement charged in Count Four, I am not sure what offense it seems to carry there.
THE COURT: You are not sure what?
MR. MARK: The word offense, what weight that's carrying. So I was just saying should it say "That statement is the only false statement charged in Count Four"?
THE COURT: Ms. Cohen?
MS. COHEN: That's fine, your Honor.
THE COURT: I thought it would be. I'll do that. Page 19.
MS. COHEN: Your Honor, I wasn't -- I have a couple



other --
THE COURT: I'm sorry.
MS. COHEN: That's okay.
Page 15, the last sentence that begins on line 24, it ends on line 26. We think that is unnecessary. I think it is also unnecessarily prejudicial. It talks about excusing or justifying making a false statement. I don't think it's needed. And I think it's potentially confusing.
THE COURT: Mr. Mark?
MR. MARK: I think it's legally accurate. And given I think the nature of the defense, it's particularly appropriate here.
THE COURT: Objection is overruled.
Anything else?
MS. COHEN: Yes, your Honor. Page 16, under number one, element one, statement. The last sentence which begins on line 17, finishes on line 18.
Under the statute there is no distinction between written and oral statements. As for Count Four, there is no allegation of any written statement, so I think it could confuse the jury because there are a lot of other written statements that were allegedly --
THE COURT: That seems a fair point, doesn't it, Mr. Mark? You are relying on an oral statement, so what's the difference?



MR. MARK: No objection, your Honor.
THE COURT: That's deleted.
Anything else?
MS. COHEN: No, your Honor.
THE COURT: Page 19 through page 27.
MR. MARK: All right, your Honor. On page 19, line 17 to 18, after the comma on credit union, and I guess for consistency I know you changed what we proposed credit union to MCU.
THE COURT: So you are on what lines on page 19?
MR. MARK: On page 19, line I guess line six to eight. I'm noticing that this is more in line of our request to charge. Your Honor changed the language in Count Two to references to Government Exhibit 116, so I didn't know if your Honor wants to be consistent here. Obviously this is accurate.
THE COURT: Well, we can reference it again here.
MR. MARK: I'm noticing that as a consistency. You changed that before.
THE COURT: I'm just going to add in after the word "memorandum" on line seven, "i.e., Government Exhibit 116," and leave it at that.
MR. MARK: No objection to that.
And my substantive point would be at the end of the line of line seven, after the comma, it should be in "an attempt to obstruct," not "with the intent." That conforms



with the indictment. And --
THE COURT: I'm sorry. In the --
MR. MARK: "In an attempt to obstruct," and also it avoids the concern that that would have to be the only intent, because obviously the defendant can have dual intents.
THE COURT: Sounds right. What do you think, Ms. Cohen?
MS. COHEN: That's fine with the defendant, your Honor.
THE COURT: Okay. Next?
MR. MARK: On page 25, I'm a stickler. Line 14, I think there is meant to be a paragraph.
THE COURT: You're correct.
MR. MARK: And that's it for me.
THE COURT: Back to you, Ms. Cohen.
MS. COHEN: Your Honor, page 19, the paragraph which is lines 23 to 26, I don't think it is necessary to call out that Congress deemed to make this particular crime --
THE COURT: I agree. I'll delete that.
MS. COHEN: Page 21, line 14, which starts "more persons sat around a table and entered into a solemn compact." I think that language is a little too prejudicial. I would just say "entered into an agreement," which is what the law says.
THE COURT: This charge has been given thousands of

times and I'm not going to vary from it.

MS. COHEN: I also think, I would also request that line 17, the first full sentence there, and then the second sentence, continuing onto line 18, through line 19, so there are two sentences. First starts "indeed" on line 17, the second sentence starts with "when" on line 18. I think they're unnecessary. I don't necessarily think it is so extraordinary. I understand this may have been given 1,000 times, but sitting here reading it from the defense point of view, I think it is unnecessary and prejudicial.

THE COURT: Mr. Mark?

MR. MARK: I assume, and I know from personal experience, that is the argument made many times in this courthouse, and I have never seen it be successful.

THE COURT: You've never seen it what?

MR. MARK: Be successful. I think this is the standard language. It's particularly appropriate here. And it gives legal guidance which I don't think Ms. Cohen is disputing.

THE COURT: Look, the one change I'll make in it is on page 18, at the near right margin, I'll say "much is left." I'll say "much may be left." Which I think is fair. I also think with respect to the earlier sentence that indeed, it would be extraordinary if there were a formal document or a specific agreement.



Anything else on this section, Ms. Cohen?

MS. COHEN: Your Honor, just to complete my thought about this paragraph. Line 19, "since conspiracy, by its very nature is characterized by secrecy, it is rare," I don't think that's accurate. I think "it sometimes is proven without direct evidence" would be more accurate and less prejudicial.

THE COURT: I'll make two minor concessions.

I'll change the sentence to read "since conspiracy by its very nature often is characterized by secrecy, it is not often that a conspiracy can be proved by direct evidence." Etc.

Anything else on this section, Ms. Cohen?

MS. COHEN: Your Honor, line 22 to 23, we would ask that through any -- I'm going to mispronounce that word. Contrivance.

THE COURT: Contrivances.

MS. COHEN: Thank you. I am going to mispronounce that too, your Honor, or tacitly.

THE COURT: I couldn't get what you said.

MS. COHEN: I would ask that -- I just can't pronounce the word for some reason. Through any contrivance, impliedly or tacitly -- I apologize for my mispronunciation -- be stricken. I think it is confusing. I think you talk about indirect, direct.

THE COURT: Overruled.



Anything else?

MS. COHEN: Nothing else through page 27, your Honor.

THE COURT: Thank you. I question whether we need page 28 down to and including page 30, line 17.

Anybody have a different view?

MS. COHEN: No, your Honor. We do not have a different view.

MR. MARK: Well --

THE COURT: Let's start with conscious avoidance. Do you think that should be in?

MR. MARK: Sorry. Conscious avoidance. No, we're not going to ask for a conscious avoidance.

THE COURT: So that's out. Now, let's come back to declarations of co-conspirators.

MR. MARK: I think there are declarations of co-conspirators.

THE COURT: I have no doubt about that. But, there were no limiting instructions, there was nothing to suggest they shouldn't pay attention to that. Right?

MR. MARK: Yes.

THE COURT: We agreed that's going out?

MR. MARK: Yes, your Honor.

THE COURT: And I don't hear any objection from Ms. Cohen.

MS. COHEN: No. The defense agrees, your Honor.



THE COURT: Page 30, line 19 through page 31.

MR. MARK: Through which page, your Honor?

THE COURT: 31.

MR. MARK: Nothing from the government.

MS. COHEN: Nothing from the defense.

THE COURT: Thank you. Page 32, line 13.

MS. COHEN: Oh.

THE COURT: Through page 34, line nine. Mr. Mark?

MR. MARK: Only a typo. In page 32, line 23, it should be "commits an offense."

THE COURT: Thank you.

Ms. Cohen.

MS. COHEN: Your Honor, I didn't realize, I didn't realize that I was -- that page 32 lines what is K, dual intent, line two through seven, was supposed to be included before.

THE COURT: No, I'm mistaken.

MS. COHEN: It happens sometimes.

THE COURT: I would be the first to admit it, actually.

MS. COHEN: I meant that I'm right. Not that you're mistaken.

THE COURT: Both.

Let's deal with that at the top of page 32. And I just want the record to reflect that Mr. Mark makes a typo in

line three.
MS. COHEN: Because he goes first, I can't share that I found the same typo.
THE COURT: Yes. All right. I'm taking that as no objection there.
So Mr. Mark, anything on the aiding and abetting instruction?
MS. COHEN: Your Honor, on dual intent, I do have an objection to that. I don't think it's needed. I think it is also woven into other instructions that it doesn't have to be a sole motive, it can be different motives. And I don't think it is needed. I think it is confusing.
THE COURT: What do you think about that?
MR. MARK: It doesn't sound like she's objecting that it is legally accurate, which is it. I think it is appropriate here given the nature of the defense to give a specific instruction here.
THE COURT: It's going to stay.
Anything else from either side through page 34, line nine?
MR. MARK: Not from the government.
MS. COHEN: Your Honor, page 32, I don't think that willfully causing a crime.
THE COURT: Not an issue in this case, is it?
MR. MARK: Well, the only point is the subpoena



production was done through an attorney. So I think it's --
THE COURT: Where's the evidence?
MR. MARK: The documents because --
THE COURT: Where is the evidence that she caused him?
MR. MARK: That, it's obviously the inference, the fact that she received the subpoena and the documents came back.
If this is not going to be a point of litigation or argument, let me just confer with -- obviously I think if we take it out here, we'll have to take it out some other places. But, if this is not going to be a point of contention from the defense, the government is not going to --
THE COURT: Is that right, Ms. Cohen?
MS. COHEN: Correct. There is the fact in evidence that her attorney produced the document, but I guess I want to make sure we were not intending to argue anything from that nor was the government, I don't think.
THE COURT: I think what the government is looking for is an assurance that you are not going to say it was Archibald who did this.
MS. COHEN: I don't think there would be any evidence in the record to support that.
THE COURT: Directly or indirectly.
MS. COHEN: I don't think there is any evidence in the record that would allow me to argue that this was Archibald's



fault.
MR. MARK: I would prefer a better commitment from Ms. Cohen.
THE COURT: Well, I understand why.
MS. COHEN: It is in the record that her attorney produced them. We are not going to be arguing that --
THE COURT: You know what he's asking for, Ms. Cohen.
MS. COHEN: I actually don't. I actually don't. I am not trying to be --
THE COURT: For you to say here there is nothing in the record to support the argument is not the same as saying "I'm not going to make the argument."
MS. COHEN: I thought I said there is nothing in the record to support me making that argument, so of course I wouldn't make that argument.
THE COURT: He's quibbling whether the "of course" necessarily follows.
Does it follow?
MS. COHEN: We are not going to be making the argument in closing that it was Archibald's fault that certain e-mails weren't provided to the government.
Is that what they are looking for?
THE COURT: I think so.
MR. MARK: Yes, your Honor. Given that, we have no objection to striking here -- and then I know your Honor would,



in the earlier portion of the introduction on the substantive offenses, I think there is a reference to willful causation so we'll probably need to catch that.
THE COURT: You'll call my attention to it before we break. So, then I believe that this whole section on willfully causing that starts at page 34 is history. Agreed?
MS. COHEN: Yes, your Honor. Agreed.
THE COURT: Okay. Finally an opportunity to shorten something. Is there anything else on the aiding and abetting instruction? Government?
MR. MARK: No, your Honor.
THE COURT: Ms. Cohen?
MS. COHEN: So, I would ask, your Honor, that line 22 through 26 be omitted. I don't think it is necessary.
THE COURT: From which page?
MS. COHEN: Sorry. Page 33, your Honor. There are a list of questions to ask themselves, I don't think it is necessary. It is very different from the rest of the charge.
THE COURT: Overruled.
Page 35, line 17 through page 36, line eight. Mr. Mark?
MR. MARK: Just two typos, since I'm on a roll. Page 35.
THE COURT: Your roll was interrupted.
MR. MARK: I know. It's true.

Page 35, line 20, it should be "if the guilt of the defendant."

THE COURT: Good one.

MR. MARK: And page 36, line four, it should just be --

THE COURT: Lowercased T.

How about you, Ms. Cohen, can you top that?

MS. COHEN: Your Honor, the defense would ask page 35, line 20, the middle of the sentence "if the guilt of the defendant is shown," we would ask that you add the words "for any count." And then at the end of the sentence, we would ask that you add the words "with respect to that count."

THE COURT: Fine. Okay.

Section Roman numeral II which starts on page 36, and ends on 37. Anybody have any problems, Mr. Mark?

MR. MARK: No, your Honor.

MS. COHEN: No, your Honor.

THE COURT: Roman numeral III, page 37, through the rest of that part. And let me just flip through, there are a few things I think we can deal with right off the top.

Anybody think we need this instruction on publicity?

MR. MARK: No, your Honor.

MS. COHEN: We do. There have been numerous news articles.

THE COURT: I'll give it.



The accomplice testimony is out, yes?

MR. MARK: Yes.

MS. COHEN: Correct, your Honor.

THE COURT: The falsus in uno, in or out, Mr. Mark?

MR. MARK: In.

THE COURT: Ms. Cohen?

MS. COHEN: Sorry, your Honor. I am just thinking a moment.

I don't think there has been any suggestion through any cross that any witness lied. May have been mistaken, but I don't think you need this.

MR. MARK: I mean, what Ms. Cohen might think somebody -- someone's mistaken, somebody else could consider they lied.

THE COURT: I'm going to take it out.

False exculpatory statements, in or out, government?

MR. MARK: In, your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: We would prefer it be out.

THE COURT: Sure you would. Overruled.

Similar acts?

MR. MARK: That doesn't seem applicable.

THE COURT: No, I don't think so either.

(Continued on next page)



THE COURT: No, I don't think so either.

MS. COHEN: The defense agrees, your Honor.

THE COURT: Investigative techniques? Out?

MR. MARK: I think somewhat it depends on what Ms. Cohen argues in her closing.

THE COURT: Fair point.

MS. COHEN: I was going to say, I don't think -- the defense is not going to argue that any search warrant or any particular technique used was not appropriate.

THE COURT: I'm going to leave it on the page. It will say, "if applicable," and I'll either read it or not, depending on the closing.

Searches? I guess that stays in?

MR. MARK: I think it should stay in, your Honor.

THE COURT: Charts and summaries? In.

MR. MARK: In. Only the charts and summaries for M, the ones that are admitted into evidence. There's no charts and summaries that were not admitted into evidence, there were no demonstrative charts. They were all 1006 charts.

THE COURT: Okay, that's correct.

Now, do I need to read these things about stipulations again? I instructed them during the trial. I'll read them if you want, but --

MS. COHEN: The defense doesn't think it's necessary, your Honor.



MR. MARK: I don't think it's necessary.

THE COURT: Okay. Out.

No character witnesses, we don't need that charge.

MS. COHEN: Correct, your Honor.

MR. MARK: Just your Honor skipped over Q, the redactions. You're going to include that one?

THE COURT: I don't remember anything with redactions.

MS. COHEN: The defense doesn't think there were any. I don't think we need to include that, your Honor.

MR. MARK: No, there are redactions. Obviously, we didn't draw the jury's attention to it, but on the subpoenas, there are redactions of my name on the subpoena, there are some redactions of my name from other emails. These are documents they might pull up --

THE COURT: So you want it?

MR. MARK: Yes.

THE COURT: Okay.

Obviously, the defendant's testimony is out.

With that once-over, is there anything else to talk about in section 3? Any objections?

MR. MARK: Unfortunately, a few little --

THE COURT: Typos.

MR. MARK: -- typos. That's it.

Page 38, line 27 — I think this is a relic of your Honor's prior limiting instruction — there's references to

"Ms. Ash" instead of "the defendant."
THE COURT: I'm sorry, where are you?
MR. MARK: Page 38, line 27.
THE COURT: I think you want "the defendant."
MR. MARK: It should be "the defendant." And the same on line -- sorry, page 39, line 3. It should be the defendant there as well.
THE COURT: Yes.
MR. MARK: Page 40, line 20, it should be "the fact that a witness." There's a missing "a."
And my last one for this section is page 51, line 4, it should be a "her," not a "him." "No adverse inference against her may be drawn."
THE COURT: Okay.
Ms. Cohen?
MS. COHEN: Your Honor, page 38, B1, disclosure forms, conduct as a state judge.
THE COURT: Yes.
MS. COHEN: Line 18, we would ask that you strike "training she may have received about those forms." There's no suggestion she did anything wrong with respect to not attending training she should have.
THE COURT: Mr. Mark?
MR. MARK: I think there is evidence about trainings, but if Ms. Cohen wants less in this limiting instruction,



that's fine.
THE COURT: If what?
MR. MARK: If Ms. Cohen wants less in this instruction, then the government doesn't have an objection to that.
THE COURT: I can't hear what you're saying. If she wants what?
MR. MARK: I think she just wants to strike language --
THE COURT: Yes.
MR. MARK: -- I said if she wants less in this instruction, less reference, the government doesn't have an objection, though the government just noted that I believe there was some evidence that came in about --
THE COURT: Yes, about training, but not about the forms.
MR. MARK: I think it generally covered financial disclosures but I'm not trying to quibble with that.
THE COURT: Okay. I'm taking it out.
Anything else, Ms. Cohen?
MS. COHEN: Yes, your Honor. Under number 2, "Benefits Or Items of Value," on page 39 --
THE COURT: Yes.
MS. COHEN: -- the sentence begins with the word "It" on line 15.



THE COURT: Yes.
MS. COHEN: "It was offered as evidence." We would suggest the rest of the sentence read: "It was offered as a potential explanation of the charged conspiracy."
THE COURT: I'll exchange it to read: "It was received as evidence of the background," et cetera.
MS. COHEN: I think it would be "the potential background" because that seems it make as if it actually did give the background, which is what the government alleges. We don't think it did.
THE COURT: That hair is too fine to split.
MR. MARK: I think, your Honor, it's so fine that I don't think it's legally accurate. But we have no objection to your Honor's proposal as you read it.
THE COURT: Okay.
Anything else on this section?
MS. COHEN: Yes. We would ask that you strike "and to complete the narrative of the crimes charged." I don't think that's why you admitted it. I think it was all to explain the background.
THE COURT: I'm going to leave it alone. I disagree with you.
Anything else on this section?
MS. COHEN: No, your Honor.
THE COURT: Okay.



Anything from either side on the balance of the charge?
MS. COHEN: No, your Honor.
MR. MARK: Sorry, just one second. Where did we get up to last?
THE COURT: We got all the way through everything, page 51.
MR. MARK: Okay.
The last one I have, actually, is a somewhat substantive one. On page 55, I think there's a little lack of clarity in this sentence. It's line 5, the sentence that says, "If you communicate with the Court before reaching a verdict, you must never indicate in a note to the Court how you are divided." I think it would be better --
THE COURT: I don't know what line you're referring to.
MR. MARK: Oh, sorry. Line 6. And I think, for clarity, it should read --
THE COURT: On which page?
MR. MARK: Oh. Page 55, your Honor.
THE COURT: Okay.
MR. MARK: So page 55, the sentence begins on line 5 and continues to line 6.
THE COURT: Okay.
MR. MARK: And for clarity, I would suggest that it

read: "You must never indicate in a note to the Court whether you are divided and, if so, how you are divided."

THE COURT: And I am going to add, "unless I specifically request that information."

Poor James is going to have to read my handwritten notes tonight.

Anything else? We're done with the charge?

Mr. Mark?

MR. MARK: The willful causation language up at the beginning, do you want us to point that out?

THE COURT: Yes. If you don't point it out, it's not going to happen.

MR. MARK: It looks like there's a reference to a page 6, line 13, I guess starting at line 13 through 19. So it should just be deleted on line 13 and then on line 18.

THE COURT: Yes.

Anywhere else?

MR. MARK: Not that I recall off the top of my head. If we notice anything else, we'll let Mr. Campbell know.

THE COURT: Okay. That takes care of the charge. Thank you for your help.

Now, let's just talk a minute about the verdict form.

On Count Three, there are two theories of liability. I haven't heard any suggestion of submitting special questions to the jury. Anybody want that? And, if so, why should I do



it?

MR. MARK: Your Honor, I don't think that's necessary because there are just two different ways of committing that offense.

THE COURT: Ms. Cohen?

MS. COHEN: We're not requesting a special verdict on that.

THE COURT: Okay.

Then we are done. The verdict form is blissfully simple, guilty or not guilty, on each of four counts.

MS. COHEN: We would just request a chance to look at it, your Honor.

Thank you, your Honor.

MR. MARK: Thank you, Mr. Mohan.

Your Honor, we have two little housekeeping matters before --

THE COURT: Do these have to be done now? Because I have a sentencing waiting.

MR. MARK: Oh. We could address these before our arguments tomorrow morning.

THE COURT: Oh, the assistants aren't here yet, so we have time.

MS. COHEN: Your Honor, on the verdict form, I'm a little worried that the jury is not going to be as familiar, copasetic, with what Count One, what Count Two, what Count



Three, what Count Four is. I understand, from the jury charge, you're intending to send the indictment back with them.

Am I correct on that?

THE COURT: I'm going to send in the charge and the indictment.

MS. COHEN: You're going to send the charge itself and indictment?

THE COURT: And the indictment.

MS. COHEN: I think I would rather there be a little more on the verdict form than just Count One, Count Two, Count Three, Four.

THE COURT: I have faith in them. With all that reference material, I don't see a need to do it. There's nothing wrong with the request — I don't fault you for making it — I just don't see any particular benefit.

MS. COHEN: I think it could be -- given that there's some overlap in the counts, it can be a little confusing. I just think they can get -- it would be better if it was a little more spelled out.

THE COURT: Look, what I'm concerned about is Count One. I can say, okay, Count One dash conspiracy; Count Two — obstruction; Count Three — obstruction. That doesn't differentiate between them. Then I have to -- I'm going to put some explanation on the verdict form. Now I have to summarize the indictment in some degree. I just would prefer not to do



that. It's just an invitation to a problem. And they will have the charge, and they will have the indictment, and they'll figure it out. If they can figure out guilty or not guilty, they can figure out of what.

MS. COHEN: Your Honor, we'll take a look at it. If we want to submit anything --

THE COURT: Sure.

MS. COHEN: -- we'll submit it tonight so you have a chance to look at it.

THE COURT: Okay.

How long do you expect to be on closings?

MR. MARK: I haven't gone through it yet, your Honor. My guess is probably -- I'm going to estimate, and I hope you don't cut me off, but an hour and a half.

THE COURT: Ms. Cohen?

MS. COHEN: I would estimate I would probably be about the same, although I may be much shorter. It's a little hard for me to tell because I don't know what the government's going to say.

THE COURT: Assuming everybody gets here on time, and we'll take an abbreviated lunch break, the jury probably gets the case around 3:30 or later, and then we break for the weekend. So that's where we are.

I thank you.

Are we ready on any of our next cases, Andy?

Let me hear from Ms. Cohen first.

MS. COHEN: We're starting at 9:30 tomorrow morning, your Honor?

THE COURT: Yes.

MS. COHEN: Thank you.

MR. MARK: So we'll deal with our housekeeping matters tomorrow morning, your Honor.

THE COURT: Yes.

MS. COHEN: Mr. Mohan, we'll put our binders on the back table. Is that okay?

THE DEPUTY CLERK: That would be fine. Thank you very much.

MS. COHEN: Thank you.

(Adjourned to December 8, 2021 at 9:30 a.m.)

* * *



INDEX OF EXAMINATION


| Examination of: | Page |
|---|---|
| S. NANA OSEI-BONSU | |
| Direct By Mr. Reilly | 793 |
| Cross By Mr. Mark | 798 |
| NORMAN KOHN | |
| Direct By Ms. Cohen | 799 |
| Cross By Mr. Rebold | 806 |
| Redirect By Ms. Cohen | 809 |


DEFENDANT EXHIBITS


| Exhibit No. | Received |
|---|---|
| B1 | 803 |

**In The Matter Of:**

*UNITED STATES OF AMERICA v.*
*SYLVIA ASH,*

---

*December 9, 2021*

---

*Southern District Court Reporters*

Original File LC9KASHF.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 9, 2021
9:45 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JANIE C. BUCKLEY



(Trial resumed; jury not present)

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, your Honor.

THE COURT: Bring in the jury.

Who is closing for the government?

MR. MARK: I will.

(Jury present)

THE COURT: Good morning, everyone. The record will reflect that the jurors all are present as is the defendant.

We're ready for closing arguments. Mr. Mark, you may proceed on behalf of the government.

MR. MARK: Thank you, your Honor.

The defendant, Sylvia Ash, was not duped, she wasn't tricked, it wasn't a mistake that she just happened to make again and again and again. She knew what she was doing, and she knew it was wrong.

That's why we are here, and that's why she's guilty.

You know that not because I say it. It doesn't matter what lawyers say. What we say isn't evidence. You know she obstructed and lied, and you know that she knew what she was doing was wrong, because you've seen the documents at trial and you've heard the witnesses that have testified before you. That is the evidence. And the evidence is clear, so let's talk about it.

"I've got your back 100 percent."



That was what the defendant told Kam Wong one day after a federal agent reached out to her to interview her about all the money that Kam Wong received. And Sylvia Ash meant it. She had his back. She was going to help him avoid federal scrutiny.

Only days earlier, she had signed a phony memo to cover up for Kam Wong. You've seen this memo several times, Government Exhibit 116. It was a memo to justify millions of dollars that Kam Wong had been taking from MCU for years with numbers that were pulled out of thin air. $3.7 million. And a lie that helped Wong falsely claim he was entitled to those millions of dollars.

Now, Wong and the defendant hoped that it would work, that it would protect Wong from the federal investigation, from the federal investigators, and there can be no doubt the defendant knew that the $3.7 million in that memo was a lie.

You heard from Monique Smith, who testified here, that she was uncomfortable before she signed the memo. And of course she was uncomfortable. But the defendant went ahead and signed the memo anyway. And then she did something else. She signed it a second time, because Wong needed a second copy because he had given his only copy to Special Agent Jackson.

That was no accident. People don't sign false documents twice by accident, much less do they do what they are uncomfortable with by accident. That was a choice. Actually,



it was two choices. First to sign the document, and second, to sign it again.

But as you know, the document didn't stop the federal investigation. It didn't work. It was apparent that federal investigators weren't buying the phony memo. So the defendant told lies to federal investigators about how MCU's general counsel, Thomas Siciliano, who you saw testify here, had supposedly signed off on Kam Wong taking cash instead of getting that insurance policy. Those were more lies about how it was all right for Wong to take all of that money.

Those were lies designed to protect Wong, and the defendant, too, who had been MCU's chair of the board at the time and was close to him.

And the defendant didn't just lie. She also worked to conceal information from the federal grand jury investigation. And she did it more than once. She did it many times. Those were choices, too.

She also lied on two different occasions that she had no materials to respond to the first grand jury subpoena she received in March 2018.

And she set out to destroy evidence. She deleted texts and e-mails to make sure no one would find them. She wiped the iPhone X that Kam Wong had given her when he had asked her to sign the false memo. She also wiped two other iPads that she got from MCU emblazoned with MCU's decals. She

deleted messages from her phone and from her iCloud account, with both Kam Wong and another person, Joseph Guagliardo, who we heard a bit about during this trial, a supervisory committee member who she was talking about this whole time.

And she also deleted e-mails she sent with Guagliardo after she had learned that he, Joseph Guagliardo, was also a focus of the federal investigation, and that investigators had done a search warrant of his home.

As you can hear, she did a lot over time. They were all choices. And those choices, ladies and gentlemen, were the actions of a guilty person. A person who wanted to cover up for Kam Wong, and for herself. People don't do all of those things by accident. It takes a plan, it takes thought, it takes decisions.

So now I want to step back for a moment and talk to you a little bit about what's really in dispute here and what is not really in dispute. Because there can't be any real disagreement about a number of the important facts that we just went over.

Now, I want to be very clear before I go over those facts. The government has the burden in this case. The defendant does not need to prove anything. But throughout this trial, there have been a number of facts that basically have not been disputed or really cannot be disputed. So, before we talk about what's really in dispute, about what you have to



decide, let's talk about what isn't really disputed or can't reasonably be disputed.

First, the defendant, when she did these actions, was an experienced state court judge. She had served on the civil court and the Supreme Court, eventually being promoted to the commercial division of the Kings County Supreme Court in January 2016. And you even heard she was appointed to the New York State commission on judicial conduct. She was a smart, sophisticated person when she engaged in the actions that are charged here.

Second, the defendant had served as a board member of MCU for many years. And you heard MCU is a nonprofit credit union that provided important financial services to hardworking New Yorkers. And she had served on that board for many years until she resigned on August 15, 2016. And it's that board service that led Kam Wong to contact her to help him in the federal investigation.

Third, the defendant received tens of thousands of dollars of benefits from MCU while she was on MCU's board. You saw a lot of evidence about that at trial.

You heard that Kam Wong drove the gravy train at MCU. And the defendant, she was on for the ride. She went to conferences all across the world, she took a $10,000 cruise for her and a guest to the Greek Isles, which she told a friend in one of her e-mails that you saw was a vacation. And you also



heard that there was no expense that was too small for her either. Like she had two personal cell phone lines on her family plan that she billed to MCU, even though she had an MCU phone. Or she had MCU pay for her cable and internet bills. Or she would get a $50 reimbursement regularly, which was the maximum a board member could get without any receipts.

So you heard that Wong turned on the spigot for the defendant, and the defendant kept coming back for more.

So fourth, the defendant enjoyed the perks of MCU's board position so much that she had been told not once, but twice, to resign from MCU's board of directors and you heard that she didn't. You heard she even went so far to ask the advisory committee on judicial ethics to withdraw an inquiry she submitted to them so they wouldn't publish a decision, a decision that would be public, saying she couldn't serve on MCU's board.

And you heard that she stayed on MCU's board for more than a year after she had been told to resign. And you know why. She enjoyed all of those benefits. And you also saw that even after she resigned, Kam Wong continued to give her more of them.

You also, I pause here just for a minute, and you note that here, you see that the defendant is once again a smart, sophisticated person who knows processes and thought. That she takes notes on what she does, and considers her actions. So



let's continue with what else is not reasonably in dispute in this case.

Fifth, the defendant filed annual financial disclosure forms that did not reference MCU. And you heard that she had to file these annual financial disclosure forms because she was a sitting state court judge, and these forms had detailed instructions and there were professional consequences for someone who doesn't fill them out accurately. And you saw that on those forms, she did not list that she was a MCU board member or that she had received gifts and income from MCU, even though she had for years. She had gotten gifts, and even though it was a non-paid position, you saw that she got 1099 forms indicating that some of that money that she got was miscellaneous income. Like this one, in 2015, showing of all the gifts and all benefits she received, some of that was income and a sizable amount. $8,778.60. That's a tax form she received from MCU.

On each of those financial disclosure forms from 2012, '13, '14, '15, '16, '17 and '18, there was no reference to MCU at all.

So let me just pause on this fact for a moment. Because there is no reasonable dispute that she got the goodies that she got from MCU, or she failed to disclose them. While I suspect the defense may dispute why that matters, let me pause to tell you why it's such an important part of this case.

That's because when federal agents started investigating Kam Wong and misconduct at MCU, Sylvia Ash had something to hide. And not just something, something that mattered. As I expect Judge Kaplan will instruct you, the defendant is not charged in this case with any crime or misconduct related to her duties as a judge or her time as an MCU board member. That's not what this trial is about. But as I expect Judge Kaplan will instruct you, you may consider this evidence if you find the evidence informs what she did when in the conduct that she is charged with.

Now, I want to be clear about a second thing. None of what I've said about what she did in receiving and hiding benefits or wanting to stay on MCU's board makes her a bad person. But to understand what happened here, you have to understand why she did what she did. You have to understand that Sylvia Ash wanted to hide what she had done, and she chose to do that. She chose to obstruct an investigation. And as my colleague said in her opening statement, and I said a few minutes ago, that is why we're here.

So let me continue with what I believe is not reasonably in dispute at this trial.

So after the federal investigation began, the defendant signed a false memo that Kam Wong gave her. It was a memo, GX 116, to justify millions of dollars of MCU's money that Kam Wong had taken, and money that he started taking when



the defendant was the chair of MCU's board of directors. And that the defendant signed that memo, not once, but twice.

And you heard that Mr. Wong got that memo after he had to admit that the board never approved all the money he had received.

So what else is not in dispute? Well, Ash had documents that were responsive to grand jury subpoenas and she failed to produce them. You saw those subpoenas at trial. And the subpoenas she received were clear with numbered instructions, with definitions, and materials that were requested. They informed her that they were issued in connection with an official grand jury investigation, and they also clearly warned her that a failure to comply with them could result in criminal penalties.

What else is not in dispute? Ash told federal investigators that she had no documents to produce in response to the first grand jury subpoena issued to her in March 2018. And she told federal investigators this, not once, but twice. The first time was in April 2018, shortly before she was set to appear in the grand jury. And the second time she told federal investigators that was in June, almost a month after Kam Wong was arrested.

When a federal agent called to follow up with her on that subpoena again, and you heard that there had been developments that had been going on in the case. Kam Wong had



been arrested, Joseph Gagliardo's home was searched, the investigators had gotten more documents, and they called to follow up with her on that subpoena. And you heard that she said she had no documents to produce in response to that subpoena.

So let me continue.

It's not reasonably in dispute that on June 23, Sylvia Ash went to an Apple store, and at that Apple store, data was erased from her iPhone X. And that iPhone X was the one that Kam Wong had gave her, and that she did that after she got both grand jury subpoenas. After the one in March 2018, and after the second one in June of 2018.

And I suspect the defendant might argue or make arguments about what happened at that Apple store or what the defendant wanted. But there is no reasonable dispute that the defendant went to the Apple store, and there was data erased from the iPhone X there.

And that happened after she was also instructed by MCU not to wipe or erase anything from that phone. But the defendant made a choice to do that anyway.

Lastly, there were e-mails and text messages deleted from Ash's phones and devices, her iCloud account, and her Gmail account. These e-mails and text messages were plainly responsive to the grand jury subpoenas, but they were deleted anyway.



That's a lot. That's a lot of what's not reasonably in dispute here or can't reasonably be disputed.

So, what is really in dispute at this trial? What are you going to have to decide? You're going to have to decide why the defendant did these things. Why she said so many false things, didn't produce so much evidence, wiped her phone, and deleted her messages. That's what this trial is really about.

In short, it's for you to decide, did she just make mistakes when she made false statements to a federal agent? Did she know that she were false when she made them? When she didn't provide documents in response to a subpoena, did she mean or intend to hide materials from the grand jury? And when she did all of those actions, did she think they might matter to the federal investigation?

The answers, I submit, are clear. The defendant knew what she was doing, and she knew it mattered to the federal investigation. She chose to do what she did to protect Kam Wong, and to protect herself.

And because you were here during this trial, you know that the evidence on these points is overwhelming. But also, because the evidence came in in bits and pieces through different witnesses, and different exhibits, and not always in order, I want to take some time now to walk you through that evidence and what happened when the defendant learned about the federal investigation. And I'm going to focus not just on what

she did, but on why she did what she did and how she did the things that she did.

So let me start at the beginning and walk you through what I believe are the key events in this case. And I'm going to try to go through them first in order, and show with a timeline. And after I go through the timeline, I will demonstrate to you why, based on the evidence you saw, and the testimony that you heard, these were intentional actions by the defendant to cover up for Kam Wong, and to protect herself. Not mistakes. Choices. Choices by a person who understood them, and understood the consequences.

So as you heard during this trial, on January 17, 2018, Special Agent Jackson, who was investigating all sorts of suspicious money that Kam Wong had received from MCU, reached out to Kam Wong in an attempt to interview him about this money. And he went to his home in Long Island to try to talk to him. He wasn't home, so he left his business card and asked Kam Wong to contact him.

You heard that Special Agent Jackson was able to get into contact with Kam Wong. He told him why he wanted to speak with him, and arranged for a meeting the next day, on January 18 in the afternoon, to interview Kam Wong about the money. What you also saw during trial here is that there are phone calls that Kam Wong was having right before he spoke with Special Agent Jackson and the next day, in the morning, before



Kam Wong was going to meet with those federal investigators. You know that Kam Wong knew what the investigation was about, because Special Agent Jackson told him he was investigating money from MCU. And you heard that Kam Wong was ready for Special Agent Jackson when he met with him in the afternoon.

And so, Kam Wong gave Special Agent Jackson a story. He said this money was money for a longterm disability policy that he got instead of payments. And you heard that he first told Special Agent Jackson -- this is Kam Wong -- first told Special Agent Jackson that this money had all been approved by the board of directors of MCU, and he gave Special Agent Jackson some documents. One page of his contract, a spreadsheet with some sort of model about $3.7 million, sort of an incomprehensible model. I think we all remember Robert MacKoul when he got that model saying "Lord help me," because he didn't know what was in it. But he gave Special Agent Jackson a model, and Special Agent Jackson left.

But, Kam Wong further went to work. After that interview, obviously Kam Wong knew that what he had told Special Agent Jackson was a lie. The board of directors had never approved all of that money that Kam Wong received. So Kam Wong further went to work. He offered Sylvia Ash an iPhone X, and invited her to come in the next morning to get it. This is January 18 later in the day after Kam Wong had met with investigators.



So the next morning, Sylvia Ash came in to meet with Kam Wong at MCU's offices. And you know that, not because I say it, you know that because you can look at the evidence. Like Sylvia Ash's calendar entries from her phone, which say January 19, 2018, subject iPhone X, location, MCU. That's Government Exhibit 234. You see, the defendant kept records of what happened, records she didn't turn over in response to grand jury subpoenas, but records that were found when her phone was searched.

So, you know that she went to meet with Kam Wong, and you also know what happened then. You know that, because there is text messages about that. And at that meeting, Sylvia Ash agreed with Kam Wong to cover up for him. You saw those text messages because Kam Wong, after it happened, told Joseph Guagliardo about it. And Joseph Guagliardo was the supervisory committee member that we talked a little bit about before. He was in on all of this, and you heard that he also later became a focus of the investigation.

So after the meeting, Kam Wong texts Joseph Guagliardo: Sylvia remembers our conversation. She said if anyone asks for an affidavit for our conversation, she'll sign it. And Guagliardo responds: It's all good. She understands. Guagliardo knew that Sylvia Ash would help cover for Kam Wong, because that's how tight they were.

So Kam Wong then texted back. He said: I just said



to her that someone's giving me trouble for the LTD insurance offset payments. And Guagliardo responded: She and I have a good enough relationship that if you can't talk to her or anyone else, I'll be able to intervene without a problem.

And you know who that person was who was giving Kam Wong trouble with the longterm disability. It was Special Agent Jackson who testified before you.

And so you heard that Special Agent Jackson wasn't satisfied with his meeting and his interview of Kam Wong the day before, so he spoke with Kam Wong, and Kam Wong agreed to speak with him. And this time, Kam Wong was ready, ready with a new lie, ready with a new explanation and a new justification for why he got this money. And this time, you heard, he said and he admitted he didn't receive full board approval. He stated that Ms. Ash orally approved him receiving these payments.

And this is how people act when they get caught in one lie. They admit what they did, and then they pivot to another lie. Kam Wong did that with Special Agent Jackson, and as you heard and as I'll explain, Sylvia Ash did the same thing with Special Agent Jackson, too.

And because Kam Wong knew that Sylvia Ash was in his pocket, he was able to give Sylvia Ash's phone number to Special Agent Jackson if he needed to call her. Kam Wong wouldn't give Sylvia Ash's number if he didn't know that she

could be depended on when the federal investigator called her.

What you also know is that after this meeting between Sylvia Ash and Kam Wong where she agreed to cover up for Kam Wong, Kam Wong and Sylvia Ash continued to text, texts that, as you know, were never produced in response to a grand jury subpoenas. And they continued to text because Kam Wong says I've got some more things for you like an AirPod which goes really nice with the iPhone X he gave her. He knows because Sylvia Ash has asked for so many Apple devices over the years, that these were things she liked. And she responded "You're the best." So they continued to stay in contact.

And, you also know that later, approximately six days after Sylvia Ash agreed to sign the memo, she did. And once again, you know that not because I'm telling you that. You know that because the evidence shows it. Things like contact lists from the defendant's own iPhone. She had a contact called MCU facts board info that had details about her service, and it also had details about this investigation. Like this one, right here, in a red box, "Signed memo for Kam. January 25, 2018." The same day that Kam Wong later gave that memo to Special Agent Jackson.

She had six days to think about what she was going to do for Kam Wong, six days to reflect, reconsider whether what she was doing was right or wrong. Six days to make a choice. Not a rush, not a hesitation, nothing that was reckless or



careless. This was intentional. And you know that she had hesitation about making this choice, because you heard about that from Monique Smith who testified about that. She testified that she spoke with Sylvia Ash before Sylvia Ash signed the memo. And she was asked -- this is Monique Smith during her direct examination:

"Q. Did you also discuss the federal criminal investigation with the defendant in January 2018?
"A. Yes.
"Q. How did the two of you communicate about it?
"A. We spoke over the phone about it.
"Q. What, if anything, did Ms. Ash say in reference to the criminal investigation when you spoke with her by phone in or around January of 2018?
"A. She called one time and she mentioned that Kam had called her. And she -- that he called her, and he wanted her to come in and sign a document, and she was uncomfortable with what he was asking."

You know why she was uncomfortable, because the memo wasn't true. But she went ahead and did it anyway.

You also know, and this is a little fact that probably wasn't of much consequence at the time. But that after Agent Jackson received the memo from Kam Wong, Kam Wong wanted another copy. Because the investigation was continuing, and obviously, MCU is a regulated institution, he needs records.



And he asks Special Agent Jackson if he could get a copy of the one copy of Sylvia Ash's memo that he had. And you heard Special Agent Jackson did not do that, because this was evidence in the federal investigation.

So a few days later, on January 30, 2018, five days after Kam Wong gave Sylvia Ash's memo to Special Agent Jackson, Agent Jackson reaches out to talk with the defendant, and she gets a call from him. It's pretty important to get contacted by a federal agent. You see she makes a note of that too. And you heard Special Agent Jackson tell you why he wanted to talk with her. And he told that to Sylvia Ash. He said I wanted to speak with her in regards to payments Mr. Wong received. And they spoke. And she said she would be in touch, but not until after she was done traveling, and she would contact him when she returned.

But you know who she did contact almost right away after Federal Agent Jackson spoke with the defendant? She contacted Kam Wong. February 2nd, 2018. She texts him: If I can be of any -- "any" in all caps -- assistance, do not hesitate to call. And Kam Wong responds: Now I know who are my real supporters, mentally and spiritually. And she responds: Know that I got your back 100 percent.

This is another text message that was not produced in response to the grand jury subpoenas. A message that was also found on iCloud, but it wasn't provided by her to federal



investigators.

So, what you heard is she means it. She went and she signed, just like Kam Wong wanted, another memo, she went ahead and signed it.

We don't know the exact date that she signed it. But she said that she signed it about a week or two after she signed the first one. So she signed the first one on February -- on January 25, so that puts it somewhere around February 1st to February 6 or so that she signed the second memo. And February 6, you know, is where we find the second memo.

It is in Kam Wong's phone. Kam Wong sent it to himself so he had a good record of it because he wanted it. You see it right there. He sent it to himself on February 6, 2018, titled Sylvia G. Ash CEO LTD insurance premium memo, and the attachment we saw right there was that memo, Government Exhibit 246D and G. And you also know that earlier that day, Sylvia Ash spoke with -- there was a phone call between Sylvia Ash and Kam Wong at her office number.

You know that this is a second copy. It's not the first copy because you can look at the two versions of the memo and you see that they're different. You see that the signatures are not in the same places. Two versions of the memo. The first signed in January 25, and the second signed some time in early February. That is what the evidence shows.

The defendant was uncomfortable with the memo and she signed it not once, but she signed it twice. And she continued to talk with Kam Wong. They talked about getting more of the things that she liked from him, like sporting tickets to the Nets game for a game on February 26. As you see how Kam Wong responds, I'll look into the Barclay's Center events, you know what I mean. Because he always would give Sylvia Ash the tickets that she wanted. Whether it was the U.S. Open, it was the Nets, Knicks, or the MCU Park suite that she used every year for her annual birthday party.

But only a few days later, Wong was suspended. The investigation was moving fast. There was a federal investigation, and there was an internal investigation with a special committee that was convened. And the fraud here was significant, it was substantial, and it was obvious.

So by February 22, less than a month after Sylvia Ash signed the memo, and only a little more than a month before federal agents first approached Kam Wong, Kam Wong was suspended and Sylvia Ash knew about that right away. Joseph Guagliardo texted her. "The board just suspended Kam. Lawyers told him the justice department was pressuring them." He also tells her something really important. "Don't call Kam's number, they took that phone also."

These were two people who were talking about things that they didn't want anybody to hear about, anybody to find



out about. Don't text his phone, because you don't want those texts to be seen and to be looked at. They are concerned.

And you see that Sylvia Ash was concerned. "OMG," oh my God, "that is so wrong. Please call me any time when you can talk."

And right after she learned about that, she's texting with Kam Wong all through the night. Look at this. 2:54 a.m. through 3:33 a.m. All night they are talking back and forth right after she learns that Kam Wong was suspended.

Now, we had talked earlier that Special Agent Jackson had reached out to Sylvia Ash to interview her and they arranged an interview. When she got back from her trip, she responded. They set it up and it was arranged to be on March 1st, 2018, in the U.S. attorney's office in Manhattan.

And who is Sylvia Ash talking with on the night right before she goes to speak with a federal agent? The night before. February 28, 2018, last day of February, day before, at night, late at night, 11:27 p.m., Sylvia Ash is talking with Kam Wong for 36 minutes and two seconds. That's a long conversation. A long, deliberative conversation. A thoughtful conversation.

And you know what that was about. Because the next day, she meets with investigators, a significant event for her. We're going to talk later about some of the new lies she talks about there.



But so on March 1, she meets with investigators. And she's questioned. Note that she's spoken before with Federal Agent Jackson. And not once has she volunteered that she signed a memo that was mistaken, a memo that was false. So, she's questioned by him. But when she's questioned, she has to make admissions. So, she admits the obvious. That Mr. Wong stated that he was being investigated when she first signed that memo. And you know that because she found that out six days before the memo, when they met on January 19, and she got the iPhone X. And she admits that the document in fact was signed by her, and she admits also what is obvious. That the document wasn't completely accurate.

Now, there might be certain things that have some resemblance to what happened. But not the key things, not the important things, not the things that made Sylvia Ash uncomfortable, not the things that Kam Wong needed to try to justify, the money he received. So once again, she admitted what she had to admit. That she didn't agree to the amounts listed in the document, like the $3.7 million net of taxes. And that she didn't agree to the payout approach that Kam Wong had discussed in June 2015.

But, admitting to that, she then had to pivot. She needed a justification for why she had signed that memo. A justification for why she did what she did. And she came up with a new lie. Maybe this was the one concocted the night



before with Kam Wong. We don't know. But she came up with a new one, and what she claimed is that Thomas Siciliano, general counsel of MCU, had said this was all okay back in 2015. She said that she had asked Mr. Siciliano if it was legal for Mr. Wong to do what he wanted to do, to get millions of dollars of cash instead of insurance. And Mr. Siciliano stated that it was legal, but not advisable.

And you know that never happened. And you know that not because I tell you. You know that because you saw Thomas Siciliano, MCU's former general counsel, take the stand and tell you that that never happened. He was asked: Did you ever tell Ms. Ash that it was legal but not advisable for Kam Wong to get cash? No, I didn't. Did you ever tell Ms. Ash it was legal but not advisable for Kam Wong to get paid? No, I didn't. It never happened in no uncertain terms.

So, Sylvia Ash spun this story to the federal agent. But the investigation continued.

She was served with the first grand jury subpoena, it's dated March 13, 2018. An official document. A command to produce documents and to appear before a grand jury that was sitting in the Southern District of New York, and to do that by April 10, 2018. And you saw that the subpoena asked for certain documents. It had instructions, too, and materials to be produced, documents about insurance for Kam Wong, about amendments to Kam Wong's employment contract, and number 4.

Materials to be produced. Any and all correspondence (including, but not limited to, e-mails and text messages) with Kam Wong between the period of January 1st, 2015, and the present.

"Any and all." It was clear. And if there was any ambiguity about correspondence, it said e-mails and text messages.

Text messages, as you know, like ones that she was texting with Kam Wong about when she was agreeing and organizing to cover up for him.

So, she receives this subpoena, and shortly after she receives the subpoena, she learns that the scrutiny of MCU is not just of Kam Wong. It's getting bigger and it's getting broader. She hears about that from Joseph Guagliardo, who is still on the supervisory committee of MCU at the time. Because remember, Sylvia Ash had resigned from the board of MCU almost two years earlier. But she's still in touch with Guagliardo, and he's still providing her information about what's happening. And he tells her they are now doing an audit of the Cuba and Vienna trips. "Million dollar lawyers doing $10,000 audits." You know, some of those trips that -- maybe Sylvia Ash didn't take a trip to Cuba or Vienna, maybe she did. I don't know. But I do know, and you did see, that she had taken lots of trips all around the world, like a $10,000 trip to the Greek Isles.



So shortly after this, you know that Special Agent Jackson reaches out to Sylvia Ash. And she falsely claims that she had no documents to produce.

She was asked in no uncertain terms if she had any responsive records pertaining to the grand jury subpoena. And what did she say? In sum she stated she did not have any responsive records to produce.

I think Special Agent Jackson didn't remember the exact time of this phone call. But you know it was shortly before she was supposed to appear in the grand jury subpoena, and you also know from the phone records that it was on April 6, 2018. Because on that date there was a phone call between her and a phone number that she had saved in her contacts as relating to the federal investigation.

So, after this, she continues to talk with Kam Wong. Sometimes long talks. And the investigation continues and it proceeds. And Kam Wong's arrested. She learns about this. There is a press release. It's public. It is on the news. It's in the papers. Channel 4, The Post, the hammer drops. This is big news to the defendant and to Joseph Guagliardo. And you see how she responds. "Damn, damn, damn."

This federal investigation is serious. This federal investigation is not going away.

And she did things that related to it. She knows that now it's not just Kam Wong that's being scrutinized. It's her.



And it's from multiple angles. Guagliardo, who is still, as I said, on the supervisory committee only for a few more weeks longer, he texts Sylvia Ash: Norman -- Norman Kohn -- referenced Sylvia, Nana and Gio as people who were part of contract signings that are being looked at.

Sylvia had done something. Sylvia Ash had something to hide.

And you heard that about a month later, Special Agent Jackson reached out again to Sylvia Ash, and asked again, gave her another opportunity. Do you have anything to respond to this -- to the March grand jury subpoena? And you heard that he had been continuing to investigate, and you know a lot of things were happening.

And you know that he had that call, not just because Special Agent Jackson told you, but they had that call because it was a significant event that she saved on her calendar. June 8, 2018. Subject: DOJ.

She said she had nothing. And what you also know, although it's not here but you can see it in the evidence and we looked at it before, is that by this time, she knew that not just Kam Wong had been arrested, but Joseph Gagliardo's home had been searched. Because she saved a calendar entry on that, too. By this time, as Special Agent Jackson also told you, the supervisory committee had now been disbanded.

So, a short while after, Sylvia Ash was served with



the second grand jury subpoena. This one was dated June 18, 2018. It had instructions, just like the last one. A little more detailed. It had warnings like the last one. And it had even more statutes, more crimes that the grand jury was investigating now.

And it had materials to be produced:

Any and all correspondence (including e-mails, letters and text messages, whether sent or unsent) with or regarding a series of people, and number one was Kam Wong, number two was Joseph Guagliardo. And it required her to produce those materials listed, as well as other ones about Eisner Amper, about the auditors, about other money and benefits Kam Wong received.

And it also had a fifth request: Any and all documents regarding any gifts, presents, donations and/or items of value received from or given to Kam Wong, Joseph Guagliardo, or Giovanni Porcelli, and/or the Municipal Credit Union.

And, you know, because you've been here, that Kam Wong showered Sylvia Ash with gifts. She got plenty from MCU. And there was also some from Joseph Guagliardo. We saw little references of those before. Like the PBA cards that she wanted to get from him.

So only days later, or maybe only a day later, also MCU, which is doing the internal investigation, asks her to return her phone, the one that Kam Wong gave to Sylvia Ash.

And they wanted it returned and they also make it very clear, they advise her that you don't have permission or authority to wipe, delete, reset, factory restore, image or copy of MCU's electronic devices (cell phone/laptop/iPad) or print off any e-mails or documents located on MCU's electronic devices.

It is hard to see there would be a more clear direction than that. And even reference policy manuals and electronic agreements. And this is what she received.

But what does Sylvia Ash do? What does the defendant do when she gets this? And you know because you see it from the Apple customer service records. You heard from somebody who worked at Apple, Robert Adams, who tells you that they take these notes, they're trained Apple people, customer service reps are trained on how to take these notes because it is incredibly important to take accurate and detailed notes about what a customer's complaints are, so they can keep records of it. And you've seen these records which note that Sylvia Ash, with her phone number and her e-mail, contacted about erasing all content and settings, and there is an additional note. It says customer wants to transfer iPhone X to iPhone 7 and give iPhone X as a gift. Customer requested appointment with Genius Bar.

So, she wants to erase it, and she wants to give her iPhone X as a gift. Well, you know that it's been demanded. She's not giving it as a gift. She knows what she is going to



do with the Apple store is wrong. She even gives a cover story to Apple, because she's a sophisticated person. She knows there are records taken, and you don't want to say, oh, I'm going to erase my phone before I give it to MCU. Oh, I want to erase all the e-mails and text messages I have on my phone because I have a grand jury subpoena. No, she puts a cover story. I'm going to give it as a gift. You know from the records what she does. She has two days to think about it, two days to make a choice, two days to reflect on what she is doing.

And she does that. And she goes forward and she goes into the store, and you see in the notes what happens. Issue. Customer came in with two iPhones. Would like to set one up completely. Set one up with iCloud restore and a second to clear completely. To clear it. To wipe it. To delete everything off that phone.

Choices the defendant made. Choices with reflection, choices with deliberation. Choices that are reflective of a course of conduct that she engaged in over the course of months in this case.

And you know that the defendant didn't just delete, didn't just wipe her phone. She destroyed evidence as well. That was presented to you by some of the summary charts that the last witness, Special Agent Jeremy Rosenman, presented. And he explained to you there are preservation requests that



can be given to providers that will essentially take a snapshot in time of an e-mail account. So you can see even when time goes by what it looked like.

And there are were two snapshots that were taken of Sylvia Ash's account at two different times. One was on June 13, 2018, just a few days after she spoke with Special Agent Jackson and denied having any documents in response to the first grand jury subpoena. And a second snapshot, a second preservation that was taken some time later. And the dates of those are reflected in one of the stipulations that was entered and received into evidence.

And you see that in the first snapshot, on June 13, 2018, there are messages with Kam Wong, and a lot with Joseph Guagliardo in 2018. And what do you notice that happens later on? When the second snapshot is taken? There is none with Joseph Guagliardo. Well, you saw some of those e-mails that she had with Guagliardo. You saw how she was texting with Guagliardo. She knew also that Guagliardo had become a focus of the investigation, and she wanted to delete and cover up those records.

Also, what you saw evidence of is that after this, she also destroyed evidence on her iPads. Those dates were reflected in certain powering logs that Boris Vestfrid, one of the forensic analysts, testified about. And those were two different iPads, two different goodies that Kam Wong gave



Sylvia Ash. And they were emblazoned with MCU logos. Devices that shouldn't have been wiped or anything like that or erased. And what did he tell you happened? That both of these devices had been wiped. And you see the dates of those, July 27, 2018, in the bottom left for one of those tablets, and August 20, 2018, for another tablet.

So, let me take you back to the grand jury subpoena that Sylvia Ash received. This is the second one, and sometimes we talk about them and it can get confusing. But this was the second grand jury subpoena that she received, the one in June 2018. And what you saw is that she produced some documents in response to this subpoena. Because what sophisticated people do when they get pushed and they know they're caught, is they respond. But they don't respond completely when they have something to hide. And that's what the defendant did.

So she gave some documents in response. Those are in evidence. But what she didn't give were a lot -- were the text messages, right. Some of the key evidence that you saw in this case. And she didn't give other documents that were responsive to the subpoena.

So she responds through the help of an attorney. And she meets with the Department of Justice. Another significant key event that I'm not just telling you about, that you see it in the evidence, you see the defendant kept records of what she

was doing.

So on July 9, 2018, she sat down and met with a federal agent again. And she lied again. She lied about her conversations with Thomas Siciliano. She lied to try to cover up what she had done. And as I told you about, she outlined all of this on her iPhone, in her contacts.

So that is a broad timeline of the key events that you saw during this trial.

A broad outline of what the testimony showed, and what the documents reflected that are in evidence here.

So now I'm going to go through and we talked about a lot of these in the timeline, but just highlight them quickly the more than 10 key obstructive acts in that timeline that took place over the course of those months. And these events did not just happen unintentionally, mistakenly, carelessly. Each was done intentionally, and with what the law calls corrupt intent. Because as you know, using your common sense, people don't make a mistake in the same way more than 10 different times, always in favor of them. It's not a mistake when they conceal things that make them look worse, and then make statements that make them look better. That's common sense.

But, once again, you don't need to rely just on that to know what happened here was intentional and corrupt. You don't need to rely on what I say. You need to rely on the



evidence, and the evidence on each of these things proves that that is what happened.

So let's go through the first one.

The defendant signs Wong's false memo. That is a significant key event. It's also a focus of one of the charges in this case, Count Two.

So you have seen this event. You know when she signed it because you saw the memo and you saw her contact entry. January 25. And you know that it was false. We've highlighted that here. The aggregate amount is approximately $3.7 million net of applicable taxes. The aggregate amount of the money that Kam Wong was going to take instead of a longterm disability policy was 3.7 million, and it was false, because you had heard Special Agent Jackson explain that that was a number that matched a number and a model he gave, and there were many different models, but you also know, because when she was confronted with that lie, she had to admit it. That was on the slide, the one before. And she was also confronted about another key lie in this memo. Where it says -- we can go to the next slide. Thank you.

Please sign below to confirm the above statement is accurate and you agreed with the above payout approach. Now that never happened. Right? The defendant never agreed to Kam Wong getting $3.7 million net of applicable taxes in June 2015.

And when pressed on that, she did what people do. She



admitted it.

Now, I expect that you'll hear that why would somebody admit, why does somebody admit what they do? You know why they did. Because they were found out. It was obvious what happened. And you know that she didn't just volunteer what happened. She didn't just volunteer that this was wrong. Not when Special Agent Jackson spoke with her on January 31, after she signed the memo, before she signed the second one. Not when she was arranging to meet up. Only when she was questioned by Special Agent Jackson did she admit what she had to.

And, you also have seen in the evidence here that those statements right there, ones that made her uncomfortable, were statements that were added to the first draft of the memo. Because Kam Wong sent a first draft of the memo for a different person, Giovanni Porcelli, to Robert MacKoul. That memo, it looks different. That memo doesn't include those key statements. We've highlighted them here for you. The aggregate amount is 3.7. It doesn't include that statement. If you agree to the above payout approach, that first draft of the memo doesn't include that statement. Kam Wong put those statements in because he needed those statements. He needed those statements to cover up for himself, and he needed Sylvia Ash to sign them. And those were the statements that made Sylvia Ash uncomfortable.



And when she signed that memo, she knew it wasn't right, she knew it was wrong, and she knew about the federal investigation.

Now, it wasn't a mistake, it wasn't an accident that she signed that memo. Because if it was a mere accident, why make up a lie about other things that related to this memo? And if it was all a mistake and all an accident, why sign a second version of that memo? And if it is all a mistake and all an accident, why do you keep a copy of it at your home that you never give to federal investigators.

Because it wasn't a mistake. It wasn't an accident. It was intentional. It was done corruptly.

After she did that, she committed another significant obstructive act. She made false statements to a federal agent about Thomas Siciliano during her first interview with the Department of Justice. Right. Because you heard Special Agent Jackson works for the U.S. attorney's office, and that's part of the Department of Justice or DOJ.

(Continued on next page)

MR. MARK: (Continuing) And she had to come up with an excuse for why she signed a memo that was false, so she came up with a story, the story we told about before, about Thomas Siciliano, that she said it was legal, but not advisable, for him to do it.

And you know that she knew that that was false at the time because you heard it from Siciliano, and you know that right before that, she had spoken with Kam Wong. So let's go to the next major obstructive act.

The defendant falsely stated to a federal agent about the documents in response to the first subpoena. We talked about that a lot. The instructions were clear, and she clearly told Special Agent Jackson that she had no documents to respond to that subpoena.

And she had documents at the time. You know that because there was a search warrant done of her iCloud account that shows that she had text messages with Kam Wong, text messages that were called for by the subpoena. You know that because, if we can go back, she also had text messages that were still on her phone, and we'll talk about some of the selective deletion, but there was still some that she hadn't deleted. And you know that because she had been texting all through the night with Kam Wong, right after she was suspended. And none of that does she produce in response to the grand jury subpoena, and none of that did she say she had when she spoke



with Agent Jackson in April of 2018.

So let's continue.

Actually, this is a good highlight right here. She didn't just have emails -- sorry, she didn't just have text messages with Kam Wong that were responsive to the subpoena, she also had emails. Some of these are some of the ones that she had. Like the one that we saw before where she's getting Nets tickets, or ones about reimbursements that she wanted for a trip to the SP retreat, which you heard is the strategic planning retreat, in 2016, a trip that she took after she resigned from MCU's board, because it was a conflict of interest, after — months after — and that she went out there, and it was paid for by MCU, and she went to concerts, and MCU paid for all of it. And as I will talk about later, she lied about that, too.

So as you see in the timeline, the obstruction continued. The defendant falsely stated to a federal agent that she had no documents for the second time — that's June 8th, 2018 — a significant event for the defendant, and that is the focus of Count Four of the indictment, her denial that she had, once again, any documents in response to the subpoena.

She didn't just deny it once; she denied it a second time. This was thoughtful, it was deliberative, it was calculated. And this time, as you know, this had happened



after Kam Wong was arrested and after Joseph Gagliardo, who she puts in her phone as Joe G.'s, home was raided, after the supervisory committee was removed, after Kam Wong was fired. Intentional actions by the defendant. It wasn't a mistake.

And you know that she was scared. When she was denying that she had anything, she was scared, because she knew that Kam Wong had now been arrested. This federal investigation was not just something that one would think about, it was real, it had consequences, people were getting arrested, they could go to jail, and she was scared for herself.

She knew all of that when she continued to act. And she knew all of that when she didn't want to turn over her devices to anybody, even MCU, because that would be a ridiculous request.

Continue on.

And she knew all of that, she knew all the events and all the threats to her when she wiped her iPhone.

Now, before she wiped her iPhone, we talked about that she had received the second grand jury subpoena. This one was dated June 18, 2018, and it required even more documents than before, because this investigation had been expanded. And we talked before about how this one, the June one, asked for all emails or correspondence about Kam Wong and Joseph Gagliardo, about the gifts and presents, donations, and other items of



value she received from Kam and Gagliardo and MCU. And she knew that failure to comply with this had serious consequences because it puts it right on the face of this legal document.

And what does she go ahead and do? And she also knows that she has a phone from Kam Wong, and she can't -- not only does she need to respond to a grand jury subpoena with materials that are on that phone, because the instructions on that subpoena are clear, but there's also a demand from MCU. They want it back, and they want to make sure that she doesn't delete anything on it, because she doesn't have their permission to do that.

Knowing all that, knowing about the grand jury subpoena, knowing about the request from MCU, the defendant goes forward anyway and wipes that phone. She clears it completely, and she gives a cover story to MCU. She is doing this intentionally, she's doing it thoughtfully, and she's doing it with corrupt intent.

And if you had any question about why is she doing it, you know it wasn't to return that device to MCU. She wasn't just wiping that off so that it would be clean because she didn't want her personal items for MCU to look through, because even if she did all that, the iPhone X, she had to admit, was right there at her home. She admits these facts because they're irrefutable. Because if the federal agent were to go to MCU and ask, do you have something, she'd get caught. So

when she is pressed about a lie, she admits what she has to, time and time again. The fact that she makes these admissions doesn't make her innocent. The fact that she makes these admissions is how you know that she is guilty, it's how you know she is calculating, it's how you know that she's sophisticated in what she does.

And she does more. The defendant deletes emails with Gagliardo and Wong about MCU — I won't spend much time on this — but you saw that, you saw that in the charts, that she deleted all of her emails, and you also saw that she had texted with Gagliardo because he's the same one whose home had been raided. He's the same one who she got PBA cards from. No one is saying there's anything wrong with getting PBA cards at all, but she got items, and she was requesting stuff from Kam Wong, and she was requesting it from Gagliardo, too.

So she didn't just delete emails. We talked about she also deleted text messages with Gagliardo and Wong. And you saw that these were done selectively, which indicates that they were done thoughtfully, not mistakenly, not carelessly.

She deleted texts with Gagliardo where she even joked — maybe it wasn't a joke, maybe it was real — "Pursuant to Mission Impossible, these email correspondence will be deleted in five minutes. See you tomorrow."

Well, you know that she actually did delete her emails with Gagliardo because you saw them.



And she deleted texts with Gagliardo about what she thought about the investigation, about what she thought about how the board was not protecting Kam Wong, about how they were very weak and they had no balls. She thought they were complacent. They have no loyalty. You saw Sylvia Ash had loyalty to Kam Wong. She told him she had his back, and she displayed that loyalty to him time and time again.

You also know that these were selective deletions because you heard that there were no text messages on iCloud prior to a particular date, on July 25, 2018, after Gagliardo's home was searched, after she met with federal investigators another time, on July 9th, 2018, which we'll talk about more, and that she also selectively deleted those messages on her phone.

And she deleted messages with Kam Wong on her phone, and we see that there were -- from the extraction that Boris Vestfrid testified about, that the first time Kam Wong's phone, there was an extraction of it, there were 139 messages during a period of time with Sylvia Ash — they were in close communication — and that there were less messages on the iPhone 6S Plus that was seized and searched from the defendant after she was arrested, and there were less messages on the iCloud account. It looks like we note here, particularly, that the date range is slightly different for each, but what you see is plain, that there was intentional and selective deletion of



messages.

And, also, the defendant, we talked about before, she did an incomplete production in response to the second subpoena. She was pushed with a request for even more materials than before, and so she had to give something, as she did throughout this investigation. So she gave something, but it wasn't everything.

And Special Agent Jackson testified about that:

"Q. Did Ms. Ash produce any text messages as part of this production?

"A. No, she did not.

"Q. Did Ms. Ash produce any of her bank statements as part of this production?"

And you saw that this subpoena had asked for items of value that Ms. Ash had.

"A. No, she did not.

"Q. Did Ms. Ash produce any cable or phone billing statements?"

And you saw that the phone and cable bills were paid for by MCU.

"A. No, she did not.

"Q. And after this production, does Ms. Ash produce any other materials to the U.S. Attorney's Office that are responsive to the June 2018 subpoena?

"A. No, she did not."



So what the evidence shows is that, once again, she is pressed, and she doesn't fully comply.

So let's continue on because her major acts, her obstructive acts, continue. The defendant then made false statements about a postresignation Las Vegas trip expenses. So this, as I said, was one of those few documents that the defendant produced in response to the subpoena — we can see it here — the 2016 SP expenses for the trip that she took after she was no longer on the MCU board that she took with a friend -- which the records reflect that she took with a friend to Las Vegas, and that it was paid for by MCU.

And so she's confronted during the interview on July 9th, 2018, with Special Agent Jackson about this trip, because she's no longer on the board. And so what does she say? She said MCU paid for the trip — she admits what she has to — and then she says -- she gives an explanation for why. When she's asked about why MCU paid for that trip — right, because you know she was no longer on the board -- what did she say about that? MCU paid for the trip prior to her resigning from the board. It's not a big deal, nothing to see here, essentially.

But that's not true. That's not what happened, because you actually have the American Express card records that demonstrate what happened. Those are Government Exhibit 600. She resigned from the board on August 15, 2016,

because she understood it was a conflict of interest, and then just about ten days later, she's booking a trip to go to Vegas for two people, herself and somebody with the passenger name of Julia Lystra Collis, to go to Vegas, expensive tickets to go on a trip paid for by MCU. Just like she took expensive trips when she was on MCU's board. But nothing to see here, not a big deal, because she was on -- this is all paid for before she resigned the board. The evidence shows that is not true.

And during the July 9th interview that she had with Special Agent Jackson, she also doubled down on the false statements that she made regarding Tom Siciliano, not just the ones that she made before during the March interview she had with the Department of Justice, but there's more.

And you saw how she doubled down on that lie. Special Agent Jackson first told you how she doubled down on that lie because she said that she had a conversation, she told about a conversation, a second conversation she had with Mr. Siciliano, and she said that this was a meeting with Mr. Siciliano, Nana Osei-Bonsu, Giovanni Porcelli, and Kam Wong. So she first said, in the last interview, that Siciliano approved all these payments, and now she said that Siciliano was part of this meeting with Nana Osei-Bonsu and others.

But you heard from Nana Osei-Bonsu what that meeting was. It was an informal meeting, short. And he also told you who was there, and who it was did not include Thomas Siciliano.



Thomas Siciliano wasn't there. He told you he was not part of any conversation like that. But Sylvia Ash needed a justification, Sylvia Ash needed an explanation, so what does she do? She didn't just say that Tom Siciliano had approved all of these, that it was all legal, not advisable. She puts Tom Siciliano in that meeting in June 2015. And you know that never happened because you heard from Tom Siciliano and you heard from Nana Osei-Bonsu.

And so let me only talk about this one briefly — because we've talked about this a lot — the defendant also wiped her MCU-issued Apple iPads, further destruction of evidence the defendant took. You saw the powering logs, you saw the photos, you heard the testimony.

Now, of course, this is a lot. These are a lot of different obstructive acts, a lot that took place over the course of six months. Now, of course, as I said earlier, the defendant has no burden in this case.

So before I -- this is a lot, this is a lot of evidence, and it's a lot of evidence that makes it undeniable that the defendant participated in a conspiracy to obstruct justice, and she obstructed justice and made false statements to a federal agent, as charged in the indictment.

As I said earlier, the defendant has no burden here; the government has the burden entirely, and as you see, we embrace it. But when the defense presents evidence to you or



suggests things in cross-examination or makes arguments, you should examine that evidence and those arguments with the same care and common sense that you would any other evidence or argument in this case.

So I will talk briefly, and only briefly, about a couple of things the defense has suggested during this trial or you might hear when the defense has an opportunity to speak.

First, the defendant didn't know about the federal investigation when she signed the false memo the first time: You know that's not true because we walked through the timeline. And you know that's particularly not true not only because of what the documents show, because you heard from Monique Smith that she spoke with the defendant, and they had discussed it, she was uncomfortable.

You might hear that, oh, there's no agreement between Sylvia Ash and Kam Wong to obstruct, there's no agreement between them to delete. But you've seen those text messages, and you know what they did, and you know that they came to an agreement, because she signed the memo, not once, twice, and she continued to act to protect Kam Wong.

Now, for her criminal conduct, the defendant is charged here with four different criminal offenses. And I expect you'll hear, when Judge Kaplan instructs you, that each crime has several elements, and they're straightforward. I just want to focus on one of them that applies to some of the



counts, not all, because it's the element that relates to the bulk of what I just talked to you about over the course of my argument.

I expect that Judge Kaplan will instruct you that to act corruptly means to act with a bad purpose of accomplishing either an unlawful end or result by some unlawful method or means. And for all of the reasons that I just detailed and explained, this is easily met here because the defendant acted intentionally to lie to federal officials and acted intentionally in deleting and concealing evidence from the federal grand jury investigation.

So at the start of this case, my colleague, Ms. Katz, told you that the evidence would show that the defendant agreed and tried to obstruct a federal investigation of a multimillion dollar fraud at a nonprofit credit union. And that's what the evidence has shown. The defendant didn't make a mistake multiple times. This wasn't an accident which just kept happening over and over again. She made choices, choices that the law says are criminal, choices that make her guilty.

THE COURT: Thank you, Mr. Mark.

We'll take a 15-minute break.

(Recess)

THE COURT: The defendant and the jurors all are present.

You may proceed, Ms. Cohen.

MS. COHEN: Thank you, Judge.

At the beginning of this trial, I told you that the evidence would show that Ms. Ash made some mistakes, mistakes relating to accepting gifts from Kam Wong, mistakes related to state forms. And I told you that I expected the government would spend a lot of time on those mistakes. And that is exactly what happened here.

At the beginning of this trial, I also told you that the government got it wrong. And that is exactly what the evidence showed.

As we go through the evidence during this closing statement, in addition to using your common sense, I ask you to think about, and remember, what Ms. Ash is on trial for, and, equally importantly, what she is not on trial for, and how much of this trial was spent with testimony and documents about things that Ms. Ash is not on trial for.

And Judge Kaplan has explained to you during the trial — and I expect will do so before your deliberations start — that Ms. Ash is not charged here with accepting gifts or failing to report them on forms, or failing to get off the MCU board fast enough. None of that is charged here.

Ms. Ash also is not charged with any conduct relating to her services as a judge. Judge Kaplan has explained that to you, and I expect will explain it again.

Perhaps obvious, but please remember, Ms. Ash is not



charged here with Wong's massive fraud, she's not charged here with his embezzlement scheme from the MCU, and she's not charged with Joe Guagliardo's theft either. What Ms. Ash is charged with here is lying to the federal government with the intent to obstruct their investigation, conspiring — which means an agreement — to do so with Kam Wong, and making false statements to the government about not having any documents in response to the subpoena. But the government didn't prove any of those crimes beyond a reasonable doubt.

What we did learn during this trial is that Wong committed a massive fraud on the MCU, and that Guagliardo helped him, that they conspired. Wong manipulated a lot of people at the MCU, showered them with gifts, told them he was in pain to get pills, got their sympathy, got their loyalty, got people to trust him. That was his MO, ladies and gentlemen, and Ms. Ash fell for it — hook, line, and sinker. She so believed in her friend, Kam Wong, and she continued to believe in him, even after he was suspended from the MCU. The Kam Wong she thought she knew couldn't engage in misconduct — she believed that — even including up to the time he was arrested.

When the government addressed you, they also told you to use your common sense. And you should, because if you use your common sense, all of Ms. Ash's voluntary meetings with the government, answering all their questions, telling them she



deleted texts, bringing her phone to an Apple Store to transfer the data, all of that is not the conduct or the actions of someone who is conspiring to cover up a massive fraud or someone who's trying to lie to the government.

What those facts show you is someone who made serious errors in judgment, a person who made mistakes, and, yes, people could make mistakes again and again. It shows you a person who was duped, a person who was tricked.

And I believe I also referenced, when I got up here to address you during opening statements, that no one is perfect, but that making mistakes doesn't make you a criminal, and that Ms. Ash's biggest mistake was placing her trust, her faith, in Kam Wong, a man who turned out to be a fraudster, to be a liar, and to be a thief.

But that serious error in judgment, and even the other mistakes she may have made, that doesn't mean the government has it right, because the government does not. Ms. Ash did not lie to the government. She didn't try to cover up Kam Wong's crimes. No crime here by Ms. Ash.

I'm going to spend the time that I have up here talking about the evidence, and how the evidence you heard, you saw, shows that the government failed to prove the charged crimes beyond a reasonable doubt. And to try to organize the evidence, I've broken it into ten topics. These are ten reasons why there's reasonable doubt here, and that reasonable



doubt requires a verdict of not guilty on all counts.

Let's talk about the first reason. It's where I started this opening statement. The government spent most of this trial, called more witnesses on this topic, showed you more documents on this topic, about things that are not charged.

Next slide, please. Thank you.

Let's talk about the things that the government spent so much time on. Apple gifts that Wong gave to Ms. Ash and others at the MCU, trying to keep people -- gain people's trust.

MCU season sports tickets. You learned the MCU, Wong purchased or Wong had control of tickets, they had season tickets, to the major league sports teams in New York. And you saw that Wong gave those to Ms. Ash. You saw Ms. Ash asked for them. And all of that tells you is that Ms. Ash liked the perks. I think that's what the government called them — she liked the perks. You know what? She did. But that's not what she's charged with here. And that's not a crime.

So you heard a lot about the tickets, the birthday party, and the suite. And maybe a board member shouldn't have asked for all those perks, maybe Wong should not have been giving them out, but none of that — none of that — is charged here.

And none of that, importantly, gave Ms. Ash a motive

to lie to the government. The tickets, the gifts of the phones, that was not wrong, that was how the board operated, that is how Wong ran the MCU. Nothing that Ms. Ash needed to hide, nothing that Ms. Ash thought was wrong, no reason to try to lie to the government to cover up things that were not wrong, things that were done pursuant to board policy. All those reimbursement of her expenses, the strategic planning conference that the board took every year at Las Vegas, the other conference that Ms. Ash — you saw on the MCU policy — was allowed to attend of a credit union conference. The cable bills, the cell phone bills, the transport back and forth, $50 for every meeting — all of that was MCU policy, that was all permissible. There's no way that any of those reimbursements could have been what motivated Ms. Ash, because they were all done pursuant to board policy. Her expenses were all submitted with the receipts; you were shown those by the government. You heard Ms. Seepersaud tell you, Ms. Lambert in accounting approved all of those, reviewed them all, and then they went to Ms. Seepersaud to check. There's nothing wrong with any of that reimbursement. That was how MCU ran. You may not think it was good. It may not be good. But to Ms. Ash, that was how the board ran, and there was nothing wrong with it. So none of that, ladies and gentlemen, gives her a motive to lie to the federal government when they come to ask her about a memo she signed for Wong.



If we can go to the next slide, please.

The government also spent a lot of time on Ms. Ash's conduct related to the judicial commission, related to the state forms. And, of course, related to when she was told to step off the board, recommended to step off the board, the fact that she didn't want to step off the board, the government spent a lot of time — they called witnesses about it, they showed you a lot of documents about it.

Again, Ms. Ash is not charged with any conduct related to her work as a judge. The Court gave you that instruction. She's not charged with any crime in her capacity as a state judge. And there's no suggestion in the indictment, which is the document that charges Ms. Ash, that she violated her duties as a state judge. And I expect the judge will instruct you again on that before your deliberations.

And why it's important here is because whatever she put, whatever box she checked or didn't check on the state disclosure forms, the fact that she wanted to stay on the board because she liked being on the board, and the fact that she had discussions with the advisory committee about that and didn't necessarily agree that there was any appearance of conflict, none of that gave her any motive to lie to the government about it.

I just want to spend a minute on this because the government spent a lot of time on it. You heard from



Mr. Tembeckjian from the judicial commission, and he told you that if there is a deficiency, there's something wrong on a judicial disclosure form, a judge has 15 days to cure it. And so, here, even if a box should have been checked yes, and it was checked no, the judge had 15 days to cure it. It doesn't provide any motive to lie to the federal government.

And everyone knew the government made a lot about the fact that the MCU, being on the board, she should have checked yes to one of those questions. But I think there was no secret that Ms. Ash was on the board of the MCU. She was on their website, everyone knew it. She had written to the judicial ethics committee to ask permission to be on the board. She wasn't hiding that. So the fact that a box might have been checked no because the question was read differently or the question didn't call necessarily for Municipal Credit Union board service, it doesn't matter. She has 15 days to cure it. No motive to lie to the federal government because perhaps there was something wrong on the form.

Regarding when she stepped off the board and the judicial ethics advisory committee, and you heard from Ms. Laura Smith about those discussions, and what you learned from that was that there was a delay, that Ms. Ash promptly asked the judicial ethics advisory committee for advice — I've asked to be on the MCU board; is that a problem.

And then the government argued there was delay by



Ms. Ash when she was told, it's now a problem, you're the chair, you need to step off. But, really, the delay you saw was really only in the ethics committee. You recall that email or the letter from Ms. Smith to Ms. Ash where it took the ethics committee over a year to even respond to Ms. Ash.

There's no delay in her stepping off the board. There's no "there" there. She was open, she was transparent with them, she wanted to stay on the board, she told them, I want to appeal it, I don't believe it creates an actual conflict.

And Mr. Tembeckjian told you he didn't know of any case that she presided over where the MCU was a party. So she wanted process, she wanted to appeal it, because, yes, she liked being on the board. But none of that, she thought, was wrong. None of that gave her a motive to lie to the government.

And let me spend a minute on another reason why there's no reasonable doubt. And I touched on this topic a little bit, but since the government, again, spent a lot of time, let me just briefly touch on it again.

All the board benefits, the benefits that Ms. Ash got by being on the board, the conferences that you saw in the board policy, were permitted and encouraged to attend, the annual strategic planning conference, entertainment conferences, transportation to meetings, phone/cable

reimbursement — first of all, you heard from Ms. Seepersaud, Ms. Ash put in all the receipts, head of accounting checked it all, it was approved. Again, there's nothing wrong there. Ms. Ash didn't think there was anything wrong there, because there wasn't; that's how the board ran. Again, you may not like it, but that's how it ran. But that is not why Ms. Ash would lie to the federal government.

If we could just look at the MCU policy. Thank you.

You have it, it's in evidence as Defense Exhibit B1. And it talks about those conferences that the government spent so much time on and the fact that she went to a Britney Spears concert at one of them. But, in fact, as a board member, she was expected to go to these conferences, and it's right there, that third highlighted paragraph in the board policy 2.08. She was expected to attend one conference. If you read the paragraph above, the two paragraphs above, these are not the strategic planning conference, which is an MCU work conference, these are conferences about how credit unions work. And you heard, they mentioned that Greek island cruise a lot during their direct testimony and also in the closing. That Greek island cruise was a credit union conference. And, yes, did Ms. Ash pick a nice one to go to? Sure. Permitted by board policy. It couldn't have motivated lying to the government because there was nothing wrong with it.

If we can just look for another minute or two at the



rest of the policy, because it talks about what you're allowed to be reimbursed for when you attend conferences as a board member — the cost of the conference, including everything related to the conference. You see as chair, you even have a higher allotment, in 2.09-7 highlighted at the bottom, of $20,000. In the policy, it says you're allowed to bring significant others as your guest. Nothing wrong with any of that; all done pursuant to board policy.

And the government stressed a lot about this one strategic planning meeting that Ms. Ash went to in the week after she resigned from the board. And Ms. Smith told you why Ms. Ash went to that conference. She helped plan it. And you heard that these strategic planning conferences, there was work done, they met all day. And, yes, did they have dinner at night? Did they go to some entertainment at night? Sure, they did, just like every other work conference. Again, nothing strange, nothing that would motivate Ms. Ash to lie to the federal government.

If we can just have the next slide, please.

So it's perhaps not surprising that the government opened on this whole topic and tried to highlight for you the Greek island cruise and the Caribbean conference and all the sports games, the prime seat at the U.S. Open. None of that is what's charged here.

But, equally important, all of it was done pursuant to



MCU policy, and pursuant to meaning how Wong ran the MCU. Nothing was wrong with it at the time. No one thought it was wrong. Ms. Ash didn't think it was wrong. It couldn't have motivated her to lie to the government.

Now, let's talk about what this case is about and the seventh reason you know there's reasonable doubt.

Ms. Ash voluntarily cooperated with the government. She talked to the government four times, three out of those four times without even an attorney. That's because she didn't think she did anything wrong. She wasn't in on any conspiracy. She went in without an attorney three times. She returned the government's calls every time Agent Jackson called. She spoke to them on the phone, she went into the U.S. Attorney's Office after work, on her own, answered every question they asked, never refused to answer any question.

And Agent Jackson, he told you that:

"Q. She met with you voluntarily?
"A. Yes, she did.
"Q. No obligation to talk with the government?
"A. No, she didn't.
"Q. In fact, she spoke to you voluntarily four times?
"A. Yes."

Ms. Ash never asked to leave any of those interviews. No, she did not.

Ms. Ash never refused to answer any question, did she?



No, she didn't.

And this is where I -- the government asked you to use your common sense, and so does Ms. Ash. As someone who is trying to obstruct an investigation, someone who's worried about her own conduct, someone who's scared, someone who's uncomfortable, do they go in without an attorney and talk to the government three times, and then go in again even after they get an attorney? Use your common sense. That's not what someone who thinks they have anything to hide or is in on any coverup does. That's just not how the world works.

And the government, in closing arguments, came up with a theory to explain why Ms. Ash came into the government and cooperated. They said it was just part of her scheme, some elaborate ruse, that she would decide little pieces to tell them, not tell them others, because they have to come up with a way to explain to you why someone would talk to the government voluntarily if they're in on some big conspiracy to cover up crimes.

But that doesn't work, you see, because if you were coming up with some elaborate scheme to lie to the government, to go in and tell them half-truths or partial truths, there are some things that wouldn't be included in that scheme. You wouldn't tell the government that the memo, this big memo that is going to sink Wong, is going to show the government that Wong stole $3.7 million from the MCU, you wouldn't tell the

government that memo was inaccurate. That implicates Wong. If you're trying to help Wong, if she's scheming with Wong on the phone the night before, that's not the lie you would come up with. That's not what you would -- or, conversely, that's not what you would admit. You wouldn't go into the government and say, yes, that memo, I signed it, and you know what, it's inaccurate. You know what, that memo being inaccurate, that means Wong committed a crime. So if she's conspiring with Wong to help him, the lie she would come up with to tell the government or what she would admit to the government would not be that memo is inaccurate.

Also, think about it, if she was scheming to tell them a half-truth or deciding what to admit to them, the thing she wouldn't admit to them — the memo is inaccurate. And then the second thing she admitted to them, and the government put this slide up for you during closing, she admitted to them the amount listed in the memo, the $3.7 million, she didn't agree to that amount. If what you're trying to do is help Kam Wong, you don't tell them the memo you signed is inaccurate and you never agreed to 3.7 million, because that makes Wong guilty of embezzlement.

There was no ruse, there was no premeditation by Ms. Ash to decide what to tell the government or not. You know that because of what she told them about the memo; she told them what she remembered. But you also know, because she



voluntarily told them, I deleted text messages.

If you're trying to cover up a crime, if you're trying to go in and say half-truths, the one truth you don't go in and tell them is that you deleted text messages.

You also don't tell them, oh, I went to the Apple Store and wiped my phone. Ms. Ash volunteered that to them. Ms. Ash told them that.

If you're trying to tell half-truths, you don't tell them you went and wiped the phone. It wasn't in response to a question from the government, did you wipe the phone; she informed them of that fact.

Related to the voluntary nature of her cooperation, the other reason you know that there's reasonable doubt, and I touched on it a little bit, but I'm going to spend some more time on it now — she admitted what she did to them. Admitted the memo is inaccurate, admitted she had never approved $3.7 million.

She also told them she'd read the memo when Wong gave it to her for all of, I think she said, two minutes. And sitting there with the government, reading it more carefully, she told them the truth. She said, yeah, this is inaccurate, this is not what I remember happening in 2015. And, yeah, I don't remember approving $3.7 million. She admitted that.

Signing the memo? Sure, that was a mistake, because it was inaccurate. She didn't read it carefully. I'm going to



talk a little more in a minute about that memo, the government's timeline, and try to explain to you why there's nothing about Ms. Ash signing it, signing essentially the same copy at Wong's request, there's nothing about that that means that she was in a conspiracy with Wong or that she did anything wrong.

Just for a moment, I said what kind of ruse is that when you tell the government I deleted text messages? You saw Agent Jackson's. Cross-examination: What, if anything, did Ms. Ash say about why she deleted the text messages?

Here's the clever ruse: No need to keep them.

This is not part of anything -- I think the government used the term deliberative, sophisticated, well-plotted scheme. No need to keep any messages. That tells you what was in Ms. Ash's head.

She may have been wrong, that there was a need to keep them. She didn't delete them to frustrate or obstruct any government investigation.

Let's just spend a little bit of time on this iPhone X. So the government had asked her for her iPhone X, and she wiped it. The MCU asked her for it back.

If we can just have the next slide, and then I'll go back to this for a moment.

Right? You saw the email from Monique Smith to Ms. Ash: Per MCU protocol, we are required to retrieve all the



MCU devices.

So that's the iPhone X, there's also those two iPads, you saw on the screen, stamped MCU. The MCU wanted them back. And you know that Ms. Ash returned the phone to the MCU. She wasn't wiping the phone because she was handing it in to the government. She wiped the phone because you saw she went to the Apple Store — this was her personal phone — she wanted her photos, she wanted her contacts, she wanted her emails. So she did what probably hundreds, if not thousands, of people do every day across the country — she went to the Apple Store, and she said, can you transfer the data from this phone to my new phone?

Nothing, no elaborate plot/scheme there. If you thought you were engaging in some big criminal coverup, some massive conspiracy, with someone you knew or thought would have embezzled millions of dollars, you don't go to the Apple Store — where the government's right, everyone knows, they keep records — you don't go to the Apple Store to transfer the data. That doesn't make any sense at all. No, she was complying with the MCU request to return the devices. She wanted to keep her photos and her contacts, so she switched over to the new phone. Again, there's no "there" there. There's nothing there with the iPhone X. This, quote, wiping of the iPhone X is not evidence of any crime.

Again, this is what she told the government. She said

the MCU wanted it back, so I went, transferred the data, and gave them back a wiped phone. And I went to the Apple Store to get it. And then you know the government went to the Apple Store and got the records, and you saw Mr. Adams came from Apple, right, and he showed you those records, because, of course, the Apple store keeps records — everyone knows that. And the government made a little bit about this on their closing, that apparently Ms. Ash supposedly gave some cover story to Apple about why she was transferring the phone, and they showed you that line that says, I was give the iPhone X as a gift, but what you know is that was true, Ms. Ash was given the iPhone as a gift. So there's no N on "give," just like in that same exact note, "genius" is spelled with an O. It's just a typo. There's no ruse to the Apple Store. It just doesn't make any sense.

Ms. Ash isn't lying to anyone. She didn't lie to the Apple Store but, importantly, here, ladies and gentlemen, she didn't lie to the government.

So let's talk about this conspiracy, the fifth reason you know that there is reasonable doubt that she ever joined a conspiracy. Let's look at the real conspiracy. You know who's in a conspiracy? Wong and Guagliardo. They are coconspirators, they are in a conspiracy.

Wong manipulated Ash, didn't share why he wanted her to sign the memo, didn't share what he had done with her. No,



he shared it with the real coconspirator; he shares it with Guagliardo. They don't lead Ms. Ash into their conspiracy, they don't share the details, they don't plot with her. No, they plot with each other. And you saw those emails; you saw, actually, their texts.

So let's talk a little bit about the real conspirators, because by looking at what real conspirators do shows you that Ms. Ash wasn't part of that conspiracy.

When Agent Jackson goes to visit Kam Wong for the first time, the first time the federal government surfaces to Kam Wong, they drop a business card at his door, right?

If we can go to the next slide.

There's that business card. Agent Jackson dropped off the business card on the 17th, and he spoke to Wong on the 17th. Who does Wong tell? The real coconspirator, his real partner in crime, Guagliardi. Texts him a photo of it. That's the real conspiracy here. The only person Wong told, the only evidence the government showed you of who Wong told about the FBI visit? It's Guagliardo. There's no text, there's no sending of a business card, there's no call played for you where Wong tells Ms. Ash the federal government came to talk to me. It doesn't exist. The government didn't show you it because it doesn't exist, because Ms. Ash wasn't part of any conspiracy with Wong to cover up his crimes. She didn't know about his crimes. And all her emails and texts in 2018 show



you that. And I am going to spend a little bit of time talking about those as well.

You may have noticed Joe Guagliardo came on. They didn't come here to tell you about who was in their conspiracy. Certainly didn't. They're the actual criminals. They are coconspirators.

The government, in its closing, also mentioned that Mr. Wong, he gave Ash's cell phone number to Agent Jackson immediately, according to the government. And he did. But that doesn't mean she was in on the scheme. That means that Wong was setting her up, because, you know, if you just think about it a little bit, if you're in on the scheme, it's a little risky to give her up, who knows what she'll say when he calls. She wasn't in on the scheme. He used her, and he duped her. And let's talk about that.

Let's talk about the actual text between Ms. Ash and Kam Wong. This is February 2nd, 2018. The government says Ms. Ash is already part of the conspiracy, they already had that long call where they plotted, but what does Ms. Ash say to him? If I can be of any assistance, do not hesitate to call. If she was already plotting and scheming with him, she wouldn't be offering him assistance. It doesn't make any sense. And that's because she wasn't. She was his friend, she was supporting him, supporting him not meaning to lie for him; supporting him meaning she didn't think he had done anything



wrong. She didn't know about any of his secret embezzlement.

And then the rest of the texts in 2018 between Ms. Ash and Kam Wong, you saw them, the government showed them to you. The government showed you that text about what drink to order at a bar in Singapore, the government showed you the texts with a granddaughter and how she looked great — they're texts between friends. And, in fact, those are the texts she deleted with Wong, the texts she told Agent Jackson had nothing to do with bank business. And you saw them. They didn't. She wasn't deleting them to obstruct any investigation. She didn't think there was a reason to keep them. They had nothing to do with Wong's embezzling.

So let's now look at what a conversation looks like between people who are in on a crime. Let's look at Government Exhibit 251A. That's that long text message, long conversation over text, between Kam Wong and Joe Guagliardo. And you saw there were two people mentioned up top that are also on this chain, Kevin and Edward. Well, you learned at the end of the trial, from the defense, those were Kam Wong's sons.

So let's talk about what Wong and Joe Guagliardo are talking about in this text chain.

First of all, no dispute, Ms. Ash isn't on this text chain at any point. It's not forwarded to her, either in whole or in part. That's also not in dispute.

And what is the text chain on January 18th? Remember,

the FBI came the day before to visit Wong? If Ms. Ash is part of their conspiracy, if she's in on it and plotting with them about how should we lie to the government and cover all of this up, Wong wouldn't tell Guagliardo that he had to lie to her. Why would he have to lie to her if she's part and plotting with them to cover up these crimes? No. Wong lied to her because she wasn't part of it. He told her, I just said to her -- and this is about signing the memo. How did you get her to sign the memo? I just said to her that someone is giving me trouble for the LTD insurance offsets.

Ladies and gentlemen, that text alone gives you reasonable doubt that Ash was ever in on any conspiracy with Wong or Guagliardo.

And then let's keep looking at this text chain between Coconspirator Wong and Coconspirator Guagliardo.

If we can have the next slide. Thank you.

This is how people who are in a conspiracy talk: We want this to go away before it goes any further. That's not a text sent to Ms. Ash. Very different from the text that Ms. Ash and Mr. Wong have where she's saying, I'm behind you, support you, God bless you, get through this. Very, very different.

Before we go any further is because Wong and Guagliardo had both stolen from the MCU, and they both knew that. And the government showed you other parts of this text



chain as well, and it goes on. And Wong says to Guagliardo: I had a good convo with Sylvia. And he did, for the conspiracy between him and Guagliardo. What that means, you know, is I got her -- I told her I needed this memo, and she's going to sign it because he knew she believed in him. She had no reason to doubt him. And he also knew that the memo had some truth in it, right? The memo talked about 2015 and long-term disability that he wasn't entitled to, and we all know that that was true, and that Ms. Ash had been part of those discussions back in 2015.

And so what's going on in this text chain between Wong and Guagliardo is Wong is telling Guagliardo, I duped Ash, she's going to sign the memo and cover up our crimes. But what it doesn't tell you is that she was part of that, and that's what tells you there's reasonable doubt.

Next slide.

This is really where I started talking about this text chain, and Boris Vestfrid, the analyst who analyzed all the phones, he told you, there's no indication on any phone or any device associated with either Ms. Ash or Mr. Wong that Ms. Ash was part of that text chain between the actual coconspirators.

So now let me just turn to the phone calls around the time Wong duped her into signing the memo. That's the government's chart, 902. And you see a lot of these calls appear not to actually be calls where anyone spoke, they're too



short — they're either voicemails or they went to voicemail and the other caller hung up. And, of course, the government has no idea what's being talked about in any of those calls. They don't have recorded conversations here. And it's the government's burden.

But, nonetheless, they show, look, there's all these calls, they must have been plotting. But you know what? Kam Wong was plotting, so, of course, he was calling, he needs to make sure that Ms. Ash is going to sign the memo. And how is he going to do that? Well, if Wong knew one thing, he knew that Ms. Ash liked Apple products. We all saw that, we saw all the texts and the emails about getting a gold watch or getting a new iPhone, getting ear pods. Wong knew that. So he lured her — oh, that birthday present, I have it now, I have the iPhone X, come to the office and pick it up. And that's what all these calls — 17th, 18th — that's what they're about, come get the iPhone X, come to the office. And you know why he wanted her to come to the office, because he also needed her to sign the memo.

There's actually only one call that we know what was said, because Ms. Ash kept the voicemail. There's only one call, and it's a voicemail from Ms. Ash to Kam Wong on January 18, 2018, in the morning. The only call we actually know what was said, right?

The government didn't play it for you, did they? And



I believe I asked to play it on the defense case, Judge Kaplan said I would play it in my closing, so we're going to play it for you now. It's short.

So with Ms. Stephenson's assistance.

(Audio playback)

MS. COHEN: "Have a great day. Bye-bye."

Ms. Ash knows that Wong is being investigated by the federal government. It makes no sense to say have a great day. She wasn't in on the conspiracy. She was calling back because he had said I have your iPhone, and they're trying to figure out when she can go pick it up. That's it, that's all those calls are. They're important only because they show Mr. Wong was luring her, giving her something that he knew she would jump to come pick up, a new iPhone X.

So let's review, because we do have a little bit of text messages between them on those days, just to show you that they're not plotting to cover up a crime, they're not plotting what to say to the federal government, none of that.

Hi, Sylvia. I have the silver X that you may like. Do you want to come pick it up?

Ms. Ash: Definitely, yes.

Mr. Wong knew what she liked.

Can I pick it up in the morning?

Next slide.

Okay. What time?

Between 8:30 and 9:00.

Sounds good. I'll see you then.

And you heard the voicemail where Ms. Ash called to say I'm going on the bench, I'll call you back later, trying to figure out when is she going to come by to pick up the phone.

Next slide.

This is Kam Wong now. Are you coming? Getting a little worried perhaps.

And here's what's important: When you come, and if I'm not here — because all she knew is I'm going to pick up an iPhone, she doesn't need him to be there to do that — just wait for me. She doesn't know why. She's not in on any plot. No, he lured her with the iPhone X, but he needed to make sure she waited because he needed her to sign that.

So she says: Just walking into the building.

Oh, okay.

She comes in, she gets the iPhone X, she signs the memo.

And then Kam Wong didn't have some grand discussion plotting for a conspiracy, what are we going to tell the government, none of that. He's still just keeping her -- keeping her happy, right? I have some -- you'll like the wireless earbuds, that I can get you a pair with the iPhone.

Not the type of text that people send when they're plotting about how to cover up crime from the federal



government.

So there's reasonable doubt. She didn't join the conspiracy.

Let's talk about something else there's reasonable doubt about. She did not intentionally hide emails from Wong to her.

She told the government, sure, I emailed with Wong, it's not about bank business. And you saw the emails between her and Wong, and they're not about bank business. They're not anything about anything that relates to Wong's embezzlement of money. The one email that arguably was about bank business, right, and she told the government about it, was about the MCU Park suite. That was it. She wasn't hiding anything from the government. She told them, you know, they're about bank business, and you know what, there's one about the MCU Park suite and my birthday party.

Again, that was how the board worked. She didn't have to hide it from the government.

And she told the government, you know, my emails about bank business, if you're trying to figure out if he embezzled money and how he did it or if he did, if Guagliardo stole money, all the bank business and what the board approved and didn't approve, it would be in my MCU email account, which, of course, makes perfect sense. And she lost access to that account, of course, when she stepped off the board. And she



told that to the government.

And then you learned she got a lawyer, and she produced emails with Wong.

Next slide.

Just to review what she told Agent Jackson, she said she lost access to her MCU email. True. And that's where emails about what was approved, what wasn't approved, that's where all those emails you saw about Kam being entitled under his contract to long-term disability and supplemental long-term disability, those emails that Ms. Ash was, on they're all on the MCU email. That's where they were. She said, I don't have those, I don't have what you want. That's what's in her mind. She's not trying to lie to them. She's not trying to hide that she took trips and got reimbursed for them.

Then can we have the next slide, please? Thank you.

This is just showing she produced -- when she got an attorney, she produced the emails. Again, nothing to hide.

You know, there were emails in her inbox that the government showed you. They weren't about bank business, they weren't about embezzlement, they weren't the ones about the contract extension. Were there some emails in an inbox that weren't produced? Sure. So was the production perfect? No. But the government didn't prove beyond a reasonable doubt that there was any email left out of the production that was some aha email. There's no intent to not produce -- to produce some



emails and not produce other emails. Was it a sloppy production? Fine. That's not a crime, because it wasn't done with any intent to obstruct the government investigation. Ms. Ash did nothing wrong, she had nothing to hide.

And then if we can have the next slide?

She also told them, she said, I deleted my texts with Wong because there was no need to retain them. I touched on this earlier. If you're plotting to come up with some ruse and pick and choose what you tell the government, this certainly is not some sophisticated ruse, I didn't have a need to keep them. No. That's what was in her head — she didn't have a need to keep them, they didn't have to do with anything.

Or nothing she knew the government would be interested in, nothing because she didn't do anything wrong.

(Continued on next page)

MS. COHEN: Let's go to the third reason you know that there is reasonable doubt. And this is that she was duped by Wong to sign that memo, and then to re-sign it a couple days later when he claimed he needed it signed again.

The government's opening they told you at the beginning of this case, to set the stage, Wong needed a cover story for federal agents who were questioning him, an explanation. And who did Wong turn to, to help sell his cover story? The defendant. Ms. Ash.

Yeah, you bet. You bet.

Because Wong knew that she was his friend, he knew she liked him. He knew she trusted him. He also knew that she liked the perks. So he knew how to get her into the office to sign the memo. It would have been weird to call her out of the blue to say, Come sign some memo about something you did three years ago. So, no. Come, I have an iPhone X, it is your late birthday gift. Great. She goes in, sign this memo. Can you sign it. Doesn't seem suspicious to Ms. Ash. He gave her iPhones. That was what she was used to. Nothing to alert Ms. Ash that this is anything wrong. That's because she wasn't plotting with him and wasn't in a conspiracy.

You know, the government also showed you a text, you know, a week or so after she signed the memo where Ms. Ash tells Wong "I got your back 100 percent." Right. And they suggest that's because they are in this conspiracy and they're



plotting and so she's got his back.

A couple things. One is if you're committing a crime with someone and you are in a conspiracy with someone, you don't tend to put that in writing. "I got your back 100 percent." You would already know that, because they were talking about it.

Second thing, another way to look at it is, she still doesn't believe he did anything wrong. Still friends, still loyal to him. You saw those texts with Guagliardo sending her texts about what's going on at the MCU while he's still there on the advisory committee and there is this outside investigation. He texts her, this is so horrible, they are making up all these things. And she texts back all the time. This is horrible, the board is a pushover, no one is going to stand up for him.

Yeah, she still believed in him. She trusted him. She didn't know anything about his embezzlement. That's all "I got your back 100 percent" means. Not proof of anything.

So how did Wong get her to sign a memo. We talked about the lure with the iPhone X. What about what the memo actually, said. Right. Wong was clever. Right. He embezzled money from the MCU for years without anyone knowing it. So he wrote this long memo, and he talked about this issue of longterm disability. Right. And that he was entitled to it under his contract. He hadn't taken it, so he was allowed to



take cash in lieu of it. Right. So instead of buying a policy, he was allowed to give himself the cash that the bank would have had to spend to buy the policy. Right.

That was clever, because, in fact, there was a discussion in 2015 when Ms. Ash took over as chair of the board, there was a discussion about Wong being entitled to longterm disability, but then also supplemental longterm disability. There was a lot of testimony here about that. And you saw all the documents about that.

So Wong recalled that too, so he put that in the memo. So it looks real. If you look at the memo for two minutes while you are getting your iPhone X, yeah, I remember 2015 we talked about you being entitled to this. Sure. No reason he is lying to her about any of that because she trusted him.

So Tom Siciliano came here and he told you about those discussions with Kam Wong and with Ms. Ash about the contract. And that there had been a review of his contract, because they kept doing amendments. So they he went back in 2015, at the time they were doing the fifth amendment. And they wanted to look at the contract, the first contract, and see what benefits Wong was allowed to get. And then look and see if he actually got them. And the two benefits they found -- and by "they," Siciliano, Wong, and Ash -- they all agreed he was entitled to longterm disability and supplemental longterm disability and he had never gotten them. And there was discussion about what to



do about it.

And if we could have the next slide.

And the discussion here, and this is Tom Siciliano explaining it to you. Not Ms. Ash telling the federal investigators. Although she mentioned it, the first memo, when they asked her why was it inaccurate. She told them, I recalled the discussion in 2015 about longterm disability, but I didn't think we made a decision. Because she said that she doesn't recall saying taking cash was okay.

This is exactly what Mr. Siciliano says. We talked about the fact that he was entitled to it. It was an open issue. And it wasn't resolved.

If we can look at the next slide, please.

So Mr. Wong's conversation with him, Mr. Siciliano, general counsel of the MCU and Ms. Ash, when she became chair of the board. He was entitled to receive these two types of benefit, longterm disability, supplemental longterm disability, but they weren't in place. Clever. So Wong puts that in the memo as the justification as to why he had to take out cash. Smart, because Ms. Ash is not going to question what Mr. Wong puts in front of her. She's loyal to him. Not loyal in the way the government wants you to think about it. Loyal in terms of loyalty to a friend. Meaning, I believe you, I trust you, and that's because she doesn't know about his crimes.

You recall -- if we just have the next slide -- that

Wong told this group in 2015, this is what Tom Siciliano told you. He didn't want the disability. It was too expensive. And you know from Mr. Siciliano -- can we have the next slide -- that he never put it in place. And that he didn't recall it ever came up again. Right?

But of course, shortly thereafter, Ms. Ash leaves the board so she doesn't know if it came up again and was dealt with. All she knows when Wong gives her the memo is, oh yeah, 2015, we talked about you were entitled to this and you didn't get it.

Let me just say the government made a lot of the fact that they believed Ms. Ash lied to them because she told them, when she talked to them in June of 2018, about this conversation in 2015 with Mr. Siciliano. And the lie they think she told them was that Mr. Siciliano said I don't think it's illegal for him to take that, meaning take cash instead of the benefit, but it's not advisable.

Whether Mr. Siciliano said that in 2015, whether he didn't say it, whether Mr. Siciliano is wrong when he told you he doesn't recall saying that or he actually doesn't recall it or Ms. Ash misremembered it, doesn't matter. People are testifying about conversations that happened three plus years ago, now five plus years ago. That they remember it a little differently is not at all proof of anything.

What's important here is that Tom Siciliano, Kam Wong



and Ms. Ash discussed that he didn't have a certain type of insurance, supplemental longterm insurance, and the longterm insurance in place. So that when Wong needed a cover story, he remembered that conversation, he knew Ms. Ash had left the board so she wouldn't know whether it ever got approved or not, and that's what he used to trick her. That's what's important here, ladies and gentlemen.

Mr. MacKoul came. He was the insurance broker for the MCU. Told you he never spoke to Ms. Ash. Didn't know her. What he did tell you is Wong tried to trick him, too. Tried to get him to sign that schedule and approve it. Right. What he told you first was that he also recalled a conversation with Wong in 2015 about this issue of getting cash for longterm instead of buying a supplemental longterm disability insurance. That Wong and MacKoul had a lot of discussions about it. Remember they tried to get a policy. Wong got refused by Guardian Insurance. He testified at length about it. There was a memo to confirm the conversation about it. Right. So this was a topic of discussion in 2015.

That's really the only thing you need to know, which is why Wong put it in that memo, why Ms. Ash thought it looked good and signed it. And when she sat down with the federal government on March 1 and read it for more than two minutes, she was, like, oh, that's not accurate.

So if we could have the next slide.



This is more about the discussion in 2015 about this longterm disability and getting cash in lieu of the disability. Government Exhibit 710, and he testified about it and then he told you that out of the blue, he gets a call from Wong on his birthday. Right. January I think 19, 2018.

If we could have the next slide.

And Wong wants him to sign off on this chart. MacKoul, who actually is an insurance expert, thinks it looks crazy. It doesn't make any sense. He called it, actually, not crazy. "Very creative." And he didn't understand it. He told you he had a phone call with Wong and he wasn't just like, oh, okay, that sounds good. I remember we talked about that way back. He wanted to talk to him more about that. He said I was going to come to the city a couple days later, I said I was going to meet with him. Then I call him and Wong said I don't need it. The board already approved it.

MacKoul wasn't worried enough to call Tom Siciliano about it. He was still the general counsel. Wasn't such an obvious thing, because it was something they talked about in 2015. But MacKoul, insurance expert, knew the numbers perhaps didn't make sense. And you know the reason why Wong, he didn't dupe MacKoul, but by then, he had duped Ms. Ash.

And you also heard and the defense called another person who signed the same memo, Mr. Bonsu. And he, too, told you about a conversation that he recalled when he was on the



board back in 2015, and he recalled it a little differently than Mr. Siciliano. He didn't recall Siciliano there. Maybe there were a couple different conversations. Maybe there was one conversation with Ms. Ash, Mr. Bonsu, and Mr. Giovanni Porcelli, the third person that Wong got to sign the memo. Maybe there is one conversation they were in, then there was this other conversation between Siciliano, Wong, and Ms. Ash. Or maybe Mr. Siciliano was in that -- Mr. Bonsu called it informal meeting. That was 20 or 30 minutes, just wasn't a formal board meeting.

But again, Mr. Wong gave the same memo to Mr. Osei-Bonsu to sign. Defense put that memo into evidence. Right. And Mr. Bonsu told you that what Mr. Wong told him back in 2015 was that he had been talking to someone to get longterm disability insurance, the bank would have to pay a premium, it was going to be expensive, there was a cheaper way of saving money if he got it on his own. He recalled that too.

Again, so, you know, there is no dispute that there was a conversation in 2015 about Wong being entitled to get supplemental longterm disability. And that Wong used the fact of that conversation to dupe Ms. Ash, Mr. Bonsu, and also perhaps Giovanni Porcelli who also signed that memo.

And Agent Jackson told you the memos are the same. And he got Mr. Bonsu's memo he signed for Wong, remember he visited, he got it from Mr. Wong. And that it's evidence as

Government Exhibit C. And then Mr. Wong also gave Agent Jackson the memo he got Porcelli to sign, Defendant's Exhibit D.

If we could have the next slide.

They're all the same memo. Right. Wong took a conversation that had happened in 2015, so they all would remember, oh yeah, I recall we talked about it, you are entitled to it, and they signed it. Right. Ms. Ash told you she looked at it for two minutes when she picked up her iPhone X. That's what she told the agent who told you. They are all the same. Except there is one that one line at the bottom of the second memo, when she signs it, it is a little different. The government showed you that.

Well, you know, Mr. Wong called her and said I need a second memo signed. So she signed it. It looked exactly the same as the first. No evidence here she compared them. Not part of any scheme. Wong had a scheme and he added something extra, because Wong is a liar, and because Wong is a fraudster.

This is just more, there was a lot of testimony about the 2015 conversation about Wong being entitled to disability, and that's why he used that to get Ms. Ash, Mr. Bonsu, and also Porcelli, to sign the memo. Because Wong was trying to trick the federal government.

Let's move to another reason that you know that there is reasonable doubt, and that is the second reason there.



Right. There is reasonable doubt here because there is no evidence that the government put forward that Ms. Ash knew of the federal investigation when she signed the memo.

So let's walk through this a little bit.

The first contact Ms. Ash had with the federal government was when Agent Jackson called her on January 31. When Wong asked her to sign the memo, he didn't tell her anything about the federal investigation. You saw that in that text chain between Guagliardo and Wong, where he said I just told her someone was looking into it.

And I know the government talked a lot about Ms. Monique Smith's testimony. It was one line that Ms. Ash, when she came into the office, said she was uncomfortable signing the memo. It was unclear whether that conversation happened at the time when Ms. Ash came to get the iPhone X, or if it was later. Little unclear when did that conversation occur. The government didn't ask her any more questions about it. Didn't ask her what did Ms. Ash say, what did you say. Didn't try to draw out that conversation, that conversation that they now say was very, very important to show you that Ms. Ash knew she was signing something that was a lie.

That's because Ms. Smith doesn't have a great memory of that conversation. You can look at her testimony. She's like, oh, there was some conversations. She doesn't place them in time. You also know Monique Smith gave pills to Kam Wong.



So you know the government wanted her to remember that conversation occurred around the time of the memo. Maybe she recalls it happening then, maybe she doesn't. But reasonable doubt, ladies and gentlemen, Ms. Ash never said she was uncomfortable signing the memo at the time she signed the memo.

So let's just walk a little through the timeline. I know the government put up that timeline so keep that in your head as I go through it as well.

The next slide, please.

Here's Agent Jackson. Again, no dispute about this. First contact Agent Jackson -- meaning the federal government -- had with Ms. Ash, January 31, 2018. Right. And of course, Ash is not on the text chain on January 18 where Wong sends Guagliardo the business card of Agent Jackson. She's not on that. Nothing in the record, no evidence, no proof that Ms. Ash knew that there was a federal investigation. Therefore, she couldn't have been trying to obstruct it when she signed the memo on January 22 or even when she signed it a couple days later and was told by Wong it is a copy, I just need another one. Sign it again.

Again, that's that text between Wong and Guagliardo that gives you reasonable doubt where Wong lies to her. Right. He's telling Guagliardo what he told Ash to get her to sign the memo. "I just said someone's giving me trouble for that longterm disability insurance."



So now, just to sort of -- it's almost a summary -- the number one reason there is reasonable doubt. It is really a summary of everything I've talked about during this closing.

If we could have the next slide.

It's all the evidence showed. It is all the e-mails, the texts, the testimony that we just went through. All of it shows she had no bad intent here.

The evidence shows mistakes. Big mistake to trust Wong. Big mistake to trust Guagliardo. Loyal to a fault to her friend Kam Wong. Big mistake.

Nothing here shows that she was in a conspiracy with Wong and Guagliardo who had stolen hundreds and thousands, and for Wong, millions on millions of dollars, and they all knew it. The two of them knew about that. She didn't know anything about that and there is no evidence that shows you that she did, because she didn't, and there is really no dispute about that.

So one more thing, because I don't get to get up here again. I don't get to get up again after the government speaks to you again, which they'll do shortly. Of course I'd like to. I'd like to be able to respond to what the government says. But the government gets to go last. And the government goes last for a good reason, actually. Because the government has the burden of proof. Ms. Ash has no burden at all. She is presumed innocent.

As Judge Kaplan I expect will explain to you, a defendant in a criminal case doesn't have to prove anything. Not in any courtroom in America. The government has the burden of proof, and so that's why the rule is they go last.

But even though they go last, we've confidence in you. We chose you. We were confident you would take your duty as a juror seriously, and you wouldn't be swayed by mistakes Ms. Ash may have made. You wouldn't have been swayed by the perks or the goodies that Ms. Ash got when she served on the board. You wouldn't have been swayed by mistakes that may have been made on a state form.

And so, I really don't need to stand up here again. You know what the facts are. You know what the evidence actually shows. And we are confident that you will apply the law that Judge Kaplan explains to you to those facts.

At bottom, no lies, no cover up, no conspiracy, no crime.

Those concepts, please keep them in mind as the government gets up to have the last word. The last word because the standard of proof is beyond a reasonable doubt. And this case has not been proven beyond a reasonable doubt. There are reasons to doubt, I just reviewed them with you in great detail. Reasons to doubt and doubt again and again.

On behalf of Ms. Ash, we thank you for all the attention you have paid to all the evidence, and to this



closing statement. We thank you for your diligence. And our final ask is that you render a just and a fair verdict. That Ms. Ash is not guilty on any of the four charged counts.

Thank you.

THE COURT: Thank you, counsel. We're going to break for a short lunch. We'll resume at 20 minutes to 2.

Members of the jury, you are not to discuss the case during the lunch break.

(Jury excused)

(Recess)

(Continued on next page)



AFTERNOON SESSION

1:40 P.M.

(Trial resumed; in open court; jury not present)

THE COURT: Consistent with the discussion yesterday, I think it's time to release Alternate 5.

Anybody disagree?

MS. COHEN: No, your Honor.

MS. KATZ: No, your Honor.

THE COURT: Okay. Bring them in. You can let her go right now.

Ms. Cohen, I'm told you have something to raise?

MS. COHEN: Yes. Thank you.

I know we talked last night before we broke about the special -- I'll go to the box, your Honor. We talked about the jury verdict form, and I said we were going to look at it overnight. We have a very modest — and I apologize, the government wasn't in the courtroom, I didn't get a chance to preview this with them — a very modest suggested revision of the verdict form just to avoid confusion.

We would propose Count One, there be a bracket, conspiracy to obstruct justice; Count Two, bracket, obstruction of justice, signed false and misleading memorandum — we can just put memorandum or GX 116 or however your Honor wants to refer to it — Count Three, bracket, obstruction of justice; and Count Four, false statement to federal officials, no responsive



records.

THE COURT: It's too late to be making cosmetic changes like this. I'm not going to consider it any further.

The answer is no.

MS. COHEN: Okay. Thank you, your Honor.

THE COURT: We're in the middle of closings. We're almost done with closings.

MS. COHEN: Understood, your Honor, but the jury doesn't have the form yet. You still have to charge them.

THE COURT: I understand that. Now, if you think that's reversible error, God bless you. I don't.

MS. COHEN: I didn't say that, your Honor. I was just trying to, so that the jury is clear as to what --

THE COURT: Ms. Cohen --

MS. COHEN: I hear you.

THE COURT: -- not everything has to be talked to death. Let's move on. I said no to that yesterday, in substance.

MS. COHEN: I have nothing further to raise, your Honor.

THE COURT: Andy is getting the jurors.

MR. MARK: Your Honor, do you have a final copy of the versions of the jury instructions so we can follow along with the final?

THE COURT: He wants to proofread it again.

MR. MARK: No, I don't want to proofread it again.
MS. COHEN: Your Honor, while we're waiting for the jury, I'm trying to figure out on timing if you think the jury is going to deliberate at all today and if they're going to want to deliberate tomorrow instead of coming back --
THE COURT: Well, I'm not going to reverse myself — I'm not sitting on Fridays — so they're not going to deliberate tomorrow.
I think they will have deliberation today — some, I'm not sure how much — and I'm prepared to work later than normal today, but not like till late at night or anything.
MS. COHEN: I have a slight concern, your Honor, that the jury getting it at 3:30 or so, and being told they can work a little later, and then the Court is not sitting on Friday, the upcoming holiday next week, that they may rush through the evidence and not deliberate, and I would rather --
THE COURT: What's --
MS. COHEN: -- they're either told they can sit tomorrow, for example --
THE COURT: What is the upcoming holiday next week?
MS. COHEN: Well, starting on Friday, it starts the beginning of a lot of school breaks, and it starts the kickoff to the Christmas holidays. A lot of them have travel plans — the 16th, the 17th — which they told us about, and they can plan for. It just worries me, your Honor, getting it on a



Thursday, being told you can stay a little late sends the wrong message. I'll leave it at that, your Honor.
THE COURT: Okay. Bring them in.



(Jury present)
THE COURT: Ms. Riefenhauser, I'm going to excuse you now, and you can leave. If you have any notebooks or anything, Andy will collect it. I would ask you not to discuss the case with anyone unless and until you know that the jury has completed its job here. And I thank you, and I gather you have a meeting to go to.
JUROR: Thank you.
THE COURT: The other thing I'll say to the jury, I'm not sure exactly what time this afternoon you will get the case. I'm prepared to stay today until 6:00, if the jury wants to deliberate past 4:30, assuming you get it before 4:30. There is no time pressure on you at all. I'm not pressing you to stay late today. If there is no decision today, we'll just resume on Monday and stay as long as you take. It's entirely up to you. It's your job, and nobody's putting you on any time pressure at all. I'm just trying to accommodate as best I can and to avoid going back on my word that we would not sit on Friday.
With that, time for rebuttal argument from the government, if they wish to do that.
MR. REBOLD: Yes, your Honor.
THE COURT: Mr. Rebold.
MR. REBOLD: Good afternoon.
THE COURT: You may proceed.



MR. REBOLD: Most things in life are exactly as they appear to be. In the real world, where all of the evidence suggested that you committed a crime or crimes, where your friends testify that you were concerned about that false memo before you signed it, where they say you were scared when your coconspirators got arrested --
MS. COHEN: Objection, your Honor.
THE COURT: Overruled.
MR. REBOLD: -- when your former colleagues testified that the conversations you say happened never happened, when you've exchanged tons of text messages and calls with coconspirators at the very times when major things were happening in an investigation, when you delete those messages and they're incriminating, when the documents that you signed are false — when all of the evidence establishes that you committed a crime, it's because you committed a crime.
Now, on TV shows, like Law & Order, the rules get flipped on their head. If all the evidence points in one direction, there's some twists at the end because if you spent 59 minutes of the show thinking that the butler did it, and it turns out that the butler did it, it would be a terrible show. But Sylvia Ash doesn't live on the set of Law & Order. She lives in the real world, the world of facts, a world of evidence.
Now, as lawyers, we can create all sorts of arguments.

You just heard several from Ms. Cohen. We can try to explain away the evidence, but we can't create facts, we can't create evidence. We can't bend time and take a January 25th memo that you signed and turn it into a January 19th memo that you signed. We can't change the facts, because the facts existed before Ms. Cohen ever showed up on the scene.

So let's talk about the facts. Let's talk about the evidence and how it shows that the arguments that Ms. Cohen just made, while creative, don't hold up once you start kicking the tires.

Now, Ms. Cohen just gave you ten reasons why the government didn't prove its case, and I will likely address most of them — I may not get to all of them — but to the extent I don't, we just ask that you do what we asked you to do from the very beginning of this trial, at the end of Ms. Katz's summation, use your common sense. As Ms. Cohen said, that's why we chose you, because you are smart, savvy, you're all New Yorkers — use your common sense.

So I'd like to take up some of the major arguments that Ms. Cohen brought up in her summation, starting with the claim that Sylvia Ash didn't intend to obstruct a federal investigation.

Now, there is no dispute that Sylvia Ash signed a false memo. She can't deny that. So Ms. Cohen argues that she didn't know it would be used in a federal investigation.



Now, first of all, in addition to using your common sense, one of the other things that Ms. Katz asked you to do is to follow Judge Kaplan's instructions. They're critically important, so please listen carefully when he gives them, review them, if you need to review them. But Judge Kaplan will instruct you that it's not necessary that the government prove beyond a reasonable doubt that Ms. Ash knew that her actions were designed to impede or obstruct a federal investigation; she just has to know that it was intended to affect an investigation generally. And the law just requires that that investigation happens to be a federal investigation. She doesn't need to know that, she doesn't need to intend to obstruct a federal investigation, as long as her acts are used towards that federal investigation.

But putting that aside, there is overwhelming evidence that she did know that there was a federal investigation, and that she knew it early on, and that she knew it at the times that she did critically important things in this case.

So, going back the timeline you saw during Mr. Mark's summation, you have a few very important dates early on — January 17th January 18th, and January 19th. On the 17th, Special Agent LaVale Jackson leaves his business card at Kam Wong's door. Later that night, Mr. Wong reaches out to Special Agent Jackson to set up a meeting. The next day, January 18th, 2018, Kam Wong has his first interview with Special Agent



Jackson, where he lies and says that the board approved of this long-term disability cash payout. And January 19th, the next day, is interview number two, where Kam Wong changes the story, where he gives the story that he needs the defendant to vouch for, that there were no board meeting minutes, no contracts, just a handshake agreement between people like Mr. Wong and Ms. Ash who authorized this $3.7 million payout.

So what else is happening during these three early days in the investigation, the 17th, 18th, and 19th? Well, you see it in Government Exhibit 902. As Mr. Mark said, there were a series of calls exchanged between Ms. Ash and Mr. Wong.

Now, Ms. Cohen points to the call on January 18th at 9:31 a.m., the 21-second call. And you heard the voicemail for that. What she left out was the call that happened about four hours later when they connected, four hours after that voicemail and about two hours before Mr. Wong's first interview with the special agents in this case, the federal agents in this case. And that's not a voicemail; that is a three-minute-and-seven-second call, right before Kam Wong's interview with federal agents.

Kam Wong is about to have one of the most important meetings in his life. And who is he talking to right beforehand? The defendant. Because he wants to know whether she's going to be there to cover him for the story he's about to give to the agents.



And what happened right after Kam Wong's meetings with federal agents? Kam Wong texts — it's not on this chart, 902, but you have the records — he texts with two people right afterwards. He texts with Mr. Guagliardo, and he texts with Ms. Ash. As Ms. Cohen pointed out, at 4:26 p.m., probably right after the interview with Special Agent Jackson, Kam Wong sends a business card over to him, and at 5:41 p.m., Kam Wong sends the exchange of text messages with Sylvia Ash where he starts dangling an iPhone X and sets up a meeting to talk the next day.

Of course, Kam Wong is dangling that because he wants Sylvia Ash to do something for him, to do something improper for him, because if it was proper, he wouldn't need to offer her anything. If it was proper, he'd just say, remember that conversation we actually had? Can you please come down, I just need you to be there if the federal agents ask questions.

He's offering something to her because he needs her to do something wrong.

That is Kam Wong's first instinct after he has a meeting with federal agents. And why is he offering somebody an iPhone, an MCU-issued iPhone, to someone who hasn't worked at MCU for two years? Does that make sense to you at all if he isn't asking her to do something improper in relation to the federal investigation that Kam Wong is already aware of, and which, around that time, he's made Sylvia Ash aware of?

And then on January 19th, the next day, they meet at MCU here in Manhattan. We know that because it's in Sylvia Ash's own calendar entry, we know it because of the text messages between her and Kam Wong, we know it because of what happens after the text messages between Kam Wong and Joe Guagliardo where they talk about Sylvia Ash and the agreement that they just made.

And Kam Wong more or less says it, albeit in coded language, in Government Exhibit 364: I had a good conversation with Sylvia. She said if anyone asks for an affidavit for our conversation, she'll sign it.

Okay. Now, just hold that thought for a minute because we'll get back to it, but it's January 19th. He didn't say she just signed an affidavit, as Ms. Cohen would want you to believe, he said if — if — I need her to sign it, she'll sign it.

And then Kam Wong goes on to tell Joe Guagliardo that they talked about the long-term disability insurance. That's in their texts as well.

Now, who else tells you that Sylvia Ash is aware of the federal investigation before she signs that memo? Monique Smith. It's trial transcript 441:

"Q. Did you also discuss the federal criminal investigation with the defendant?
"A. Yes. We spoke over the phone about it.



"Q. What, if anything, did Ms. Ash say in reference to the criminal investigation when you spoke to her by phone in January of 2018?
"A. She called one time, and she mentioned that Kam had called her" -- and which you know happened on January 18th — "and that he called her and he wanted her to come in and sign a document, and she was uncomfortable with what he was asking."

Sylvia Ash knew before she ever came down to meet with Kam Wong that he wanted her to sign a document in connection with a federal investigation. That's the testimony. Ms. Smith didn't indicate she had any difficulty with her memory. Defense counsel may have tried to imply that through their questions. She was crystal clear.

Now, this is incredibly important:

First, as Monique Smith says, the call happened in January of 2018;

Second, Monique Smith testifies that during that call, they were talking about the federal investigation;

And, third, the call happened before — before — Sylvia Ash signed that memo which was going to be used in connection with the investigation.

So by January 25th, when Sylvia Ash actually signed that document for the first time, she already knew about the federal investigation.

But, remember, she signs the memo twice. And there's



no doubt that she's aware of the federal investigation by the time she signs it a second time.

Now, we see her timeline from her phones. Government Exhibit 235, item 72, signed memo for Kam on January 25, 2018; received call from Department of Justice on January 30, 2018. And while we're on this slide, look how many times that Sylvia Ash refers to DOJ, Department of Justice, the United States Department of Justice. Again, we don't need to prove that she was aware of the federal investigation, but, clearly, she was. She's documenting that her conversations are with the United States Department of Justice.

So she gets the call five days later, and that's what LaVale Jackson testifies to. He says this in trial transcript 150. He says: I told her I was a special agent working for the U.S. Attorney's Office and I wanted to set up a time to meet her. I told her I wanted to speak to her in regards to payments Wong received.

Again, it might not have pulled up there, but it's transcript 150 if you need to see it.

So five days — five days — after the first signing on January 25th, LaVale Jackson was on the phone with her, January 30th. And what does she later tell LaVale Jackson? That it's a week or two weeks later that she signs the document again for the second time. So July 25th -- January 25th, the first signing; January 30th, she knows explicitly there's a



federal investigation because she's talking directly with LaVale Jackson, and in February, she signs the document again.

It's simple math.

The evidence clearly establishes that Sylvia Ash knowingly signed a false memo, and that when she did so, she not only understood it would be used in connection with an investigation, but it would be used in connection with a federal investigation.

And, again, as I said, even the defendant's notes make it clear, not just from Government Exhibit 235, which list her calendar entries, meeting with the DOJ three times, but you can also look at Government Exhibit 234, where she lists the subject DOJ in reference to a call that she received on June 8, 2018, and Government Exhibit 653, where she saves the contact for LaVale Jackson as USAO SDNY, short for U.S. Attorney's Office Southern District of New York. Ms. Ash knows that this is a federal investigation.

Now, what Ms. Cohen argued in her summation was effectively that somehow nothing happened on January 25th. She somehow bends time and has Sylvia Ash signing that memo on January 19th. And she does that because she knows that if she signs it on January 25th and again in February, after she's aware of the federal investigation, that totally undermines one of the points of her summation, that Sylvia Ash wasn't aware that this document would be used in connection with a federal

investigation. She says it happened on January 19th, he sprung this document on her out of the blue, she only looked at it for two minutes, as if this was a 40-page document. It's a single-page document. It wouldn't take more than two minutes to read anyway.

But, in any event, Ms. Cohen bends time and has this signing happening on January 19th.

That makes absolutely no sense.

First of all, on January 19th, Kam Wong didn't need the memo yet. He hadn't yet actually heard back from the agents. Remember, January 18th, Kam Wong meets with the agents and said the board fully approved it. Okay? It's not until the 19th that -- later in the day, that Special Agent Jackson reaches back out to Kam Wong and says, there's no record of the board approving this, there's no board minutes, there's no contract paperwork. And that's when Kam Wong comes up with this new story, that there was this handshake agreement with Sylvia Ash.

But before that call — before that call — they're already talking about the federal investigation and signing the document. Wong says that Ash -- bear with me.

Wong himself says that Sylvia Ash hadn't signed that document on January 19th. Apologies.

Mr. Hamill, can you please pull up Government Exhibit 364?



We pointed at this earlier. This is, look, January 19th of 2018. Kam Wong says: I had a good conversation with Sylvia. She remembers our conversation. She said that if anyone asks for an affidavit for our conversation, she'll sign it.

So this is after the conversation he's had with Sylvia Ash, and he's not saying she just signed it, he's saying if — if — she's asked for an affidavit, she will sign it. Sylvia Ash did not sign this document on January 19th for the first time. She signed it on January 25th.

And, again, her own calendar entry says that she did it.

And Sylvia Ash said that she did it after January 19th. You heard testimony from LaVale Jackson about the interview that he had with Sylvia Ash where she said she didn't sign the document until a few days after she received the iPhone X. She received the iPhone X on January 19th. She signed the document days after.

So which is it? What all of the evidence points to or what defense wants you to believe by making arguments that are not consistent with the facts or with the evidence?

Now, in another sort of Jedi mind trick, you heard an argument from defense counsel to the effect of Sylvia Ash admitted the crime, so she's not guilty of it. She admitted the conduct, so, therefore, she didn't do anything wrong.



Defense counsel has tried to hammer away at this argument since opening statements. They repeatedly pointed out that the meetings were voluntary, and they suggested that because they were voluntary, because she voluntarily met with federal agents, she must have done nothing wrong.

People meet with agents, law enforcement officers, all the time. Some people tell the truth, some people don't. The fact that you meet with a federal agent, the fact that you agree to speak with them, doesn't mean that you're telling the truth. Maybe you think that you can sweet talk them or smooth talk them to convince them of something that didn't happen.

But the truth is, Sylvia Ash did voluntarily speak with federal agents. On that much, we can all agree. She didn't have to speak with federal agents. She had every right to tell LaVale Jackson to go away. She had every right not to return his call. Nobody compelled her to speak with Special Agent Jackson.

But, as Judge Kaplan will instruct you, if you choose to provide information to a federal agent, under our law, if you knowingly make materially false statements about an ongoing investigation, you've committed a crime.

So when Sylvia Ash knowingly and falsely told Agents during a June 8, 2018 meeting or phone call that she did not have any responsive documents to the subpoena for March of 2018, that was a crime. She doesn't get any credit because she



said it voluntarily.

And, similarly, she doesn't get credit for admitting the crime she already committed. And defense counsel referenced this, too, in their opening statements. And they did it again through cross-examination of LaVale Jackson, and this is transcript 233:

"Q. She admitted to you that the first time she met with you, and you showed her the memo, and she told you she recalled talking to Mr. Wong about the long-term disability, and it would be better to get cash instead of, cause the bank, to buy the insurance, that the memo, Government Exhibit 116, upon looking at it at the U.S. Attorney's Office, wasn't that accurate, right?
"A. Correct.
"Q. Ms. Ash told you it was inaccurate and the reasons why was because she didn't recall ever approving cash in lieu of those benefits, right?
"A. Correct.
"Q. And Ms. Ash also volunteered to you, during that voluntary interview on March 1st, that she had never seen Mr. Wong's employment contract, right?"

She volunteered that the memo was inaccurate. She volunteered, during the voluntary interview, that the stuff in the memo that she signed was not true.

In marketing, that's called rebranding. In politics,

that's called spin. In a court of law, that's called a confession. Sylvia Ash was confronted by federal agents and confessed that the document — the short, easy-to-read, easy to understand, one-page document — that she signed was not true, and she knew that it was not true.

Now, defense counsel also points out, fairly, that Sylvia Ash was not part of Kam Wong's underlying embezzlement. And, to be clear, the government is not arguing that Sylvia Ash was part of Kam Wong's underlying embezzlement. But she did not need to be a part of that crime, or even know about that crime, to be guilty of obstructing the investigation into that crime or lying to federal agents about that crime.

Listen carefully to Judge Kaplan's instructions. At no point — at no point — will he tell you that you have to find that the defendant knew that Wong committed embezzlement. And, in fact, he'll also instruct you that the government does not need to prove why the defendant committed these crimes. But, differently, motive is not an element that the government needs to prove, but if you're wondering why — if you're wondering why — the defendant would have obstructed this investigation, why she would have lied to federal agents, even though she wasn't part of the underlying embezzlement, here are just a few possible reasons:

First, Sylvia Ash and Kam Wong were friends. That doesn't seem to be in dispute. I think Ms. Cohen even



acknowledged it during her summation. Monique Smith testified about this. We've seen countless text messages between them. The fondness between them back when Sylvia Ash was on the board. It all makes it clear — they were friends, and her friend was in trouble, and she wanted to help him out.

That's one.

Two, Kam Wong took care of Sylvia Ash, year after year. He scratched her back, and now she scratched his. Remember this June 2016 email exchange that was introduced through Louise Cogan-Rupani as Government Exhibit 439. Further down in the email, it's made clear that the new schedule for the Brooklyn Cyclones 2016 season's come out, and so Sylvia Ash writes to Kam Wong: Kam, what available dates do you have in August? Sylvia.

What does Kam Wong write back? Madam Chair, I practically locked down the month of August for you!

And you saw how many times Sylvia Ash used the MCU suite in August. This is just one example. But there are countless emails and text messages in evidence that show how many times Kam Wong provided for Sylvia Ash.

Now, defense counsel wants you to believe that Kam Wong duped Sylvia Ash, that he tricked her. But look at most of these messages. Who's asking whom for these things? It is almost always Sylvia Ash asking Kam Wong for the newest electronic devices and the tickets to the sporting events, and



the use of the MCU suites for private parties.

Kam Wong provided for her, and now she was going to provide for him. Plain and simple. That's why he gave her the iPhone X when they met on January 19th.

And, third, Ms. Ash wanted the investigation to stop, not just to protect Kam Wong, but before that investigation uncovered more and uncovered some of the things that she had done during her time at MCU. We didn't offer that as a sideshow about -- to paint Ms. Ash in a bad way, we didn't offer that to suggest that that was against MCU policy. We fronted that to you from Ms. Katz's opening statement. It was offered for a different reason entirely, and Judge Kaplan's given you instructions on that already. It was offered to explain what was going on in Sylvia Ash's head when she learned about the federal investigation to explain her motive, her knowledge, and her intent.

And you know from all the evidence that you heard, that Ms. Ash wasn't supposed to be the chair of the board, yet her financial disclosure forms repeatedly indicated that she had no board positions. She was supposed to report any gifts in excess of a thousand dollars, yet year after year, her disclosure forms failed to report any gift from MCU.

She was supposed to disclose, in her judicial disclosure forms, any annual reimbursements that she received from MCU in excess of a total of $1,000. Yet, year after year,



she disclosed none of them.

She was supposed to disclose the annual income, any annual income she received from MCU in excess of $1,000 a year. And year after year, she didn't disclose any of it.

Sylvia Ash understood that the investigation into Kam Wong involved the misuse of MCU's funds. And she understood that that investigation was likely to spread into looking into the people that were close with Wong, people like Sylvia Ash. And she also understood that the more digging that agents did, the more they would realize that Wong wasn't the only person who had received thousands of dollars in gifts and reimbursements and income from MCU. And she further understood that if the investigation revealed that, and she hadn't disclosed it on her judicial forms, that would be a problem — not in violation of MCU policy, but with her real job, her steady job, her 9:00 to 5:00 job, where she actually got full-time income.

So Sylvia Ash had a personal interest in seeing the investigation come to an end.

Again, those are just three possible reasons why she might have obstructed this investigation even though nobody is saying she was part of the embezzlement.

Now, the next argument that defense counsel advances is Sylvia Ash made a few mistakes. She made a few mistakes here and there, but she didn't intend to commit a crime. In

opening and again in closing, she said something to the effect of Ms. Ash may have made some mistakes — mistakes related to benefits she got, mistakes on forms, mistakes accepting gifts, and mistakes from placing her trust and faith in Kam Wong, a man who turned out to be a fraudster — and she went on to say, making mistakes doesn't make you a criminal.

And on that, we can all agree.

But Sylvia Ash didn't make a mistake when she signed Kam Wong's false memo. As my colleague, Mr. Mark, told you, people don't sign false things twice, separated by time, when they're uncomfortable in doing so. They don't make that mistake. It's not an accident.

She didn't make a mistake when she told federal agents that she had nothing responsive to the first grand jury subpoena, or when she only provided a few emails, and no texts, in response to the second one.

Now, Ms. Cohen made hay out of the fact that the MCU email address had been closed out and Ms. Ash didn't have access to it. Well, look at all of the exhibits that are in evidence in the 400 series, ask for them, review them. There's email after email after email with Sylvia Ash using her AOL email address, all related to receipts and benefits, gifts that she got at MCU, all related to her relationship with Kam Wong.

One AOL email, I think, she turned over to federal investigators.



Sylvia Ash didn't make a mistake when she withheld, and eventually destroyed, evidence that she was commanded to turn over by a grand jury subpoena.

Sylvia Ash didn't make a mistake when she insisted, at two separate interviews with Special Agent Jackson, that Tom Siciliano was at this handshake meeting where it was authorized to give money to Kam Wong. Those were not mistakes. Those were conscious decisions made by Sylvia Ash.

And we also know that Sylvia Ash is not just smart, but she's careful, and she's detailed. So it wasn't a mistake when she signed that memo twice.

So, for example, as you saw through Government Exhibit 235 — that's item 72 if you want to see it again — the defendant kept a log in her phone of all of the important events related to her service at MCU and the investigation itself. She's careful, she's detail-oriented. You can see it on your screen there.

She even kept a log of when she received the iPhone X., because she understood that was significant in this investigation.

She kept a log of every call and meeting she had with the Department of Justice.

Sylvia Ash is not a careless, uneducated person. She is smart, she is detail-oriented, she is careful. She's not just a lawyer, she's a judge. She knows the importance of



reading things carefully, she knows the importance of forms, she knows the importance of filling them out accurately.

And speaking of forms, let's take another example, Government Exhibit 531, Ms. Ash's financial disclosure form for 2015. This will give you another example of exactly how detail-oriented she is. This is from page 3, item 4, "List any office or trusteeship or directorship that you have, whether compensated or not." This is where she should be listing that she's on a board.

Answer: None.

Page 4, item 9, which is a single document: "List every source of gift in excess of $1,000."

Answer: None.

Item 10: "Identify and briefly describe the source of any reimbursements for expenditures in excess of $1,000."

Answer: None.

"List below the nature and amount of any income in excess of $1,000."

Answer: None.

But lest you think that Sylvia Ash is just blindly clicking none, none, none, none on all of these and sending it off because she's not careful, look at page 4, item 17. She doesn't click none in this one, which is an option. When she's asked to list the value of any homes that she has, she lists the value of her property, a four-family residential dwelling.



She's reading the forms. She's filling them out carefully. She's just not filling them out accurately.

So when she's asked about all of the stuff on these forms that would be problematic if the judicial oversight folks saw that she was receiving it from MCU, a boardship she should never have done in the first place, she decided to click "none." Why does that matter? Well, first, it matters because, as we've said, it goes to her knowledge and her intent and motive when she obstructs the federal investigation. It goes to her state of mind. She knows that there were years of these disclosure forms. And they're in your possession, ladies and gentlemen. Ask for them, review them; they're in evidence. But she knows it's going to be a problem with her job if the investigation digs any further and it comes out that she's been filling them out inaccurately for years. So that's one reason why it's important.

But there's another reason why it's important, because it undermines the most central line of defense regarding that false memo that Sylvia Ash filled out. Counsel wants you to believe that Sylvia Ash made a mistake, that she was careless, and she didn't read the form too carefully, so she accidentally signed this document in the midst of a federal investigation that contained false information, such as an agreement to pay Kam Wong $3.7 million, a handshake agreement that never existed. That was no mistake.

Sylvia Ash went to law school. She was a judge. Not just any judge, she was the presiding justice of the commercial division in Brooklyn. She was no dupe for Kam Wong. She was careful, she was thoughtful, she was deliberate, not careless. She was not making a mistake.

And, again, Monique Smith tells that it wasn't a mistake, but Sylvia Ash tells you, before she ever signed that document the first time, that she was uncomfortable signing it, and yet she traveled anyway sometime thereafter from Brooklyn into Manhattan to sign it the first time, and she decided to sign it again.

Now, anyone can make a mistake. But smart people and careful people, like Sylvia Ash, don't keep making the same mistakes twice. It wasn't a mistake when she signed that false memo the first time, but it certainly wasn't a mistake when she signed it the second time. It wasn't a mistake when Sylvia Ash failed to comply with a very clear and short grand jury subpoena the first time, but it certainly wasn't a mistake when she failed to comply with it the second time.

It wasn't a mistake when Sylvia Ash failed to return her electronic devices to MCU when Monique Smith sent her that email in May of 2018. But if it was, it definitely wasn't a mistake when a month later, she received, by FedEx and email, another letter from the defendant's witness, Mr. Kohn, instructing her to return those devices and instructing her not



to wipe them and not to copy them. And it wasn't a mistake a few days later when, instead of doing that, she went to an Apple Store, and she wiped it and copied it and then failed to produce anything in that copy to the federal government.

For you to accept the defenses that were raised by Ms. Cohen in her summation, in her opening arguments, you would need to find that Sylvia Ash constantly stumbles from one bad situation to another, constantly finds herself in these horribly unlucky situations, that she constantly does and says and communicates with people that are involved in the crime, and says things that look incriminating, but had actually done nothing wrong.

If you think about all of the incriminating evidence in this case, do all of these things just look worse than they really are? Here's a few examples:

It looks deliberate and incriminating when, on January 18th, the same day as Kam Wong's first meeting with federal agents, he suddenly reaches out to Sylvia Ash and offers her an iPhone and starts holding meetings with her, even though she hasn't been on the board for two years. All of that looks planned and deliberate.

In the midst of a 2018 federal investigation, why would Wong be reaching out to give an MCU-issued iPhone to Sylvia Ash? It looks like he's trying to woo her to sign something that's not true. But, really, if you believe



Ms. Cohen, she's just getting duped, Wong is manipulating, she's just unlucky.

What about those dirty text messages between Guagliardo and Wong? Remember Guagliardo, the guy that everybody in this courtroom — defense counsel, too — agrees was in cahoots with Wong? Many of those cryptic messages sent by Guagliardo to Ash -- to Wong suggest that Ash is working with them. Like on January 19th, when Wong sends Guagliardo a series of coded text messages about how he, quote, "Just had a good conversation with Sylvia, and Sylvia remembers our conversation, and that if anyone asks for an affidavit, she'll sign it."

Or "I just said to her that someone's giving me trouble for the LTD insurance offsets."

Or when Guagliardo responds: It's all good, Kam. She understands.

Each of those texts look really, really bad. But to hear defense counsel, she's just unlucky. It's not as bad as it sounds. She's not part of the conspiracy.

Or the false memo that Sylvia Ash signed twice, was that an honest mistake? Twice?

Or that unfortunate text that Sylvia Ash sent on February 2nd, 2018, two days — two days — after the Department of Justice first contacted her, and right around when she signed the false memo for a second time: Know that I got your



back 100 percent.

From the outside, this text looks like Sylvia Ash is protecting Kam Wong — I've got your back.

But the defendant's luck kept getting worse. You see, she firmly remembers meeting with Tom Siciliano, that Tom Siciliano was there in 2015 during some unrecorded meeting when everybody agrees that Kam Wong should get this cash payout. But Siciliano testified that that never happened. Even their own witness, the defendant's own witness, Mr. Osei-Bonsu, says Tom Siciliano wasn't there, doesn't back up the story. What does defense counsel say? Well, maybe our witness had a bad memory, maybe Mr. Osei-Bonsu doesn't remember it right, and Mr. Siciliano doesn't remember it. Maybe they all just have memory problems.

But they're not the only ones who have memory problems. Monique Smith has a memory problem, too. You heard Mr. Reilly's cross-examination of Monique Smith. She both misremembered, one, Ash saying she was uncomfortable signing a document before she signed it; and, two, she misremembered — Monique Smith — Sylvia Ash saying that she was scared when talking about Kam Wong's arrest. Kam Wong gets arrested, the defendant is scared, it's devastating evidence against Ms. Ash, but Sylvia Ash is just unlucky. Monique Smith conjured up this memory that never happened because she's got memory problems.

What about the suspicious things that happened in the

days surrounding Ms. Ash's March 1st, 2018 meeting with federal agents? For example, the 36-minute call she had with Kam Wong just before the meeting? Or the text one day later when she was getting ready to meet up with Joseph Guagliardo? Okay, again, she's just met with federal agents. She understands the gravity of this investigation. A day later, she's supposed to meet up with Joe Guagliardo, who, the defendant says, in her summation, is in cahoots with Kam Wong. And what does Sylvia Ash say in the text message found in Government Exhibit 360-S? "I will be there at 3:00 tomorrow. Thanks for the heads-up. Pursuant to Mission impossible, these email correspondence will be deleted in five minutes."

You know, the text message that she actually deleted.

But to hear defense counsel say it, they would probably argue she was just making light of the federal investigation, not obstructing it.

And then, of course, there was the time the defendant wiped her iPhone X just days after she was told not to wipe it by MCU. And you hear defense counsel say it — the Apple rep got it wrong when she called to talk about wiping the phone. See, what Sylvia Ash really said was, I got this as a gift earlier, and the Apple rep got it wrong and said, I'm going to give it as a gift to a friend.

Everybody around Sylvia Ash keeps getting it wrong. Truly, Sylvia Ash must be the unluckiest person in the world.



So is that it? Is Sylvia Ash the unluckiest person in the world? Or is she just a person, a sophisticated, detail-oriented, smart person, a lawyer, and a judge, a human being who's capable of making bad decisions, and who did make bad decisions, thoughtful, contemplated decisions, again and again and again? Many of those decisions being criminal.

The evidence proves that this case is exactly what it appears to be. It's not a series of unlucky, disconnected, unfortunate coincidences; it is a series of choices and crimes. Ms. Ash is guilty as charged.

THE COURT: Thank you.

Okay, folks. That concludes the arguments, and it's now time for me to instruct you on the law, and then for you to begin your deliberations.

My instructions will be in four parts:

First, I'm going to describe the law that you're obliged to apply to the facts as you find the facts to be established by the proof;

Second, I'll instruct you about the trial process, including the burden of proof;

Third, I'll give you instructions concerning your evaluation of the evidence;

And, fourth, and finally, I'll discuss briefly your deliberations or the mechanics of your deliberations.

Let me tell you, also, you're free to take notes, but



you will also have the charge in typewritten form in the jury room. So do whatever makes you comfortable, but you'll have it to refer to.

Now, as you know, the defendant, Sylvia Ash, is formally charged in a document called an indictment. An indictment is simply an accusation. It's neither evidence, nor proof of a defendant's guilt. It doesn't create any presumption of guilt, and it allows no inference that the defendant is guilty.

There are four counts here that remain for your consideration. I'm not going to read the entire indictment to you at this time — you will have a copy of the indictment in the jury room — but I'm first going to summarize the offenses charged in the indictment, and then I'll move on to explain in detail the elements of each of the four offenses.

Count One alleges that the defendant engaged in a conspiracy to commit obstruction of justice; in other words, she agreed with one or more other people to commit obstruction of justice.

Count Two alleges that the defendant actually committed obstruction of justice in connection with signing an allegedly false and misleading memorandum regarding millions of dollars that Kam Wong obtained from MCU.

Count Three alleges that the defendant obstructed justice in connection with concealing and deleting text



messages and emails, including evidence that had been subpoenaed from her by federal grand jury subpoenas, and by making false and misleading statements to federal law enforcement officers in connection with the federal investigation of Wong and others.

Count Four alleges that she made a false statement to federal officials with the U.S. Attorney's Office for the Southern District of New York.

You must consider each count separately and return a separate verdict on each count.

Furthermore, whether you find the defendant guilty or not guilty as to any one of the four charges should not affect your verdict as to any other. They're independent of each other.

As I instructed you earlier in the trial, the defendant is not on trial here for her performance as a state court judge or as an MCU board member. The indictment doesn't charge her with any violations of judicial ethics, it does not charge her with any embezzlement, or any breach of her duties as a board member at MCU. I'm going to give you further instructions as I go along about the limited purposes for which you may consider the evidence that's been offered relating to her judicial conduct, financial disclosure forms, and receipt of benefits from MCU. But throughout your deliberations, you must keep in mind that the defendant is on trial here for the

four offenses listed in the indictment and not for any others.

The defendant, as you know, has pleaded not guilty. The burden, therefore, is on the government to prove her guilty on each charge beyond a reasonable doubt. Before -- well, I've already told you what I was about to start telling you, namely, that you will have the indictment in the jury room.

Now I'm going to explain each of the counts in the indictment in more detail.

With any criminal charge, there are certain basic facts that the government has to prove beyond a reasonable doubt before a defendant may be found guilty. Those basic, necessary facts are called the essential elements of the crime.

Now, as I've mentioned already, Count One of the indictment charges Ms. Ash with conspiracy. The other three counts charge what we refer to as substantive crimes. A conspiracy count is different from a substantive count. A conspiracy charge, generally speaking — and I will say more about this as we go along — alleges that two or more people plotted, schemed, or agreed together to accomplish an unlawful objective or objectives.

The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. There can be no conspiracy unless at least two people reached an agreement, whether expressly or impliedly. A substantive offense, however, can be committed by a single person, and it doesn't



need to involve any agreement with anybody else.

A conspiracy to commit a crime is a completely separate offense from a substantive crime, although, of course, a substantive crime, the commission of a substantive crime, may be an object or a purpose of a conspiracy. And since the essence of the crime of conspiracy is an agreement or an understanding to commit a crime, it doesn't matter if the crime, the commission of which was the object of the conspiracy, never was committed. In other words, if a conspiracy exists and certain other requirements are met, the conspiracy is punishable as a crime even if its purpose is never accomplished.

Consequently, in a conspiracy charge, there's no need to prove that the crime or crimes that were the objective or objectives of the conspiracy ever actually were committed. I always use a simple example: If two people agree to hold up a liquor store, and they do anything at all to put that agreement into motion — it could be casing the joint, it could be getting a getaway car, whatever — they have committed the crime to commit -- the crime conspiracy to commit robbery even if the liquor store was never held up. The holdup of the liquor store, that's a separate crime.

A substantive account, on the other hand, charges a defendant with the actual commission or with aiding and abetting the commission of an offense. Just let me catch up



with a typo.

Conviction on a substantive count requires proof that the crime charged actually was committed or attempted. It does not require proof of an agreement. To take my liquor store example, there can be no substantive crime of robbery unless the liquor store really is robbed. Of course, if a defendant both participates in a conspiracy — to use my example, the liquor store holdup -- that is, the agreement to hold up the liquor store — and then commits the substantive crime that was the object of the conspiracy — in other words, goes on to hold up the liquor store — the defendant would be guilty both of the conspiracy and of the crime of robbing the liquor store.

Now, with respect to the substantive counts, you should be aware that there are two ways, or two theories, on which you may find the defendant guilty. The first way, or theory, is that you may find that the defendant committed the substantive crime charged in the relevant count of the indictment. I'm going to refer to that means of proving commission of the crime as referring to the defendant being guilty of the crime as what we call a principal.

The second way, which applies only to Counts Two and Three, is that you may find that someone other than the defendant committed the substantive crime at issue, and that the defendant aided and abetted that other person in committing the crime.



For the sake of convenience, I'm going to instruct you first with respect to those of the counts that charge substantive crimes — that is, Two, Three, and Four — I'll instruct you initially on the first theory of liability — that is, that the defendant is guilty as a principal of the substantive crime charged — and I'll then instruct you on the second theory of liability — that is, the theory that the defendant allegedly is guilty as an aider and abettor.

I'll come to the conspiracy count last. The logic of doing it that way will be apparent to you by the time I'm done.

Now, the defendant, as I've told you, has pleaded not guilty of all charges. The burden is on the government to prove guilt beyond a reasonable doubt. That burden never shifts to the defendant.

As I've said before, and I repeat it for emphasis, the law presumes that the defendant is innocent of each of the charges against her, and I, therefore, instruct you that she is presumed innocent on each and every count throughout your deliberations until such time, if ever, that you as a jury are satisfied that the government has proved the defendant guilty beyond a reasonable doubt. If the government fails to sustain its burden on any count, you must find the defendant not guilty on that count.

Now, I just referred to the government's burden to prove guilt beyond a reasonable doubt. So that naturally

brings up the question of what's a reasonable doubt?

A reasonable doubt is a doubt based on reason and common sense. It's a doubt that a reasonable person has, after carefully weighing all the evidence. It's a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her own personal life. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character, that a reasonable person would not hesitate to rely on and act upon it in the most important of his or her own affairs.

If, after fair and impartial consideration of all the evidence, you have a reasonable doubt about the defendant's guilt with respect to a charge in the indictment, you are obliged to acquit the defendant — that is, to find the defendant not guilty — of that charge.

On the other hand, if, after a fair and impartial consideration of all the evidence, you are satisfied of the defendant's guilt beyond a reasonable doubt, on any count or counts, you should vote to convict on that count or counts.

So we get to Count Two, which charges obstruction of justice by signing a false or misleading document. Specifically, this count charges that in or about January 2018, the defendant signed a false and misleading memorandum, namely, Government Exhibit 116, and if memory serves, there may be another one that she signed — another copy — with the intent to



impede, obstruct, or influence a federal investigation of Mr. Wong and others.

This crime has three elements:

First, that the defendant knowingly made a false entry or statement in a document;

Second, that the defendant acted knowingly;

And, third, that the defendant acted with the intent to impede, obstruct, or influence an investigation or matter within the jurisdiction of an agency of the United States, or in relation to or in contemplation of any such matter or case.

So let me go through each element individually.

The first element that the government must prove beyond a reasonable doubt on this count is that the defendant falsified a document. Falsifying a document means knowingly including in a document any untrue statement of fact or knowingly omitting from the document any fact that is necessary to make the facts that are included not misleading. It does not require that the document itself be fake.

The second element the government must prove beyond a reasonable doubt is that the defendant acted knowingly. The term knowingly means voluntarily and intentionally and not because of ignorance, mistake, accident, or carelessnesses. The government is not required to prove that the defendant knew that her actions were unlawful. You may consider evidence of the defendant's words, acts, or omissions along with all other



evidence in deciding whether the defendant acted knowingly.

The third, and final, element as to Count Two that the government must prove beyond a reasonable doubt is that the defendant acted with the intent to impede, obstruct, or influence an investigation of a matter within the jurisdiction of an agency of the United States or in relation to or in contemplation of any such matter or case. I instruct you that the United States Attorney's Office for the Southern District of New York is an agency of the United States.

Now, although the government must prove that the defendant intended to impede, obstruct, or influence an investigation, it does not have to prove that a federal investigation was ongoing or imminent at the time the defendant acted, or that she was aware that her conduct would impede, obstruct, or influence an investigation that was federal in nature.

In order to satisfy this third element, the government is required to prove only that the defendant acted in contemplation of an existing or potential investigation, whether federal or otherwise.

If you find that the defendant acted with the intent to impede, obstruct, or influence an existing or potential investigation of a matter, and if you find that the matter, in fact, was a matter within the jurisdiction of a federal agency, including the U.S. Attorney's Office, then this element has



been satisfied.

I turn to Count Three, which also charges obstruction of justice, although it differs in certain respects from Count Two.

Count Three charges that from in or about January 2018 up to and including at least July 2018, the defendant concealed and deleted text messages and email messages and wiped an Apple iPhone to seek to destroy and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and made false and misleading statements to federal law enforcement officers in connection with a federal investigation of Kam Wong and others.

The indictment charges the defendant under two different sections of the relevant statute. One section addresses what's known as evidence tampering, and the other addresses obstruction of what is referred to as an official proceeding. As I'll explain, you are being asked to determine whether the government has proved the elements of either or both ways of committing the crime.

So I'm going to start with the tampering theory.

To sustain the charge as alleged in Count Three, under the first section I've mentioned, evidence tampering, the government must prove beyond a reasonable doubt three elements:

First, that the defendant destroyed or concealed a record, document, or tangible object or attempted to do so;

Second, that the defendant acted with the intent to impair the object's integrity or availability in an official proceeding;

And, third, that the defendant acted corruptly.

The first element as to Count Three, under the first theory of violating the statute, evidence tampering, that the government must prove beyond a reasonable doubt is that the defendant destroyed or concealed a record, document, or tangible object or attempted to do so.

The government is not required to prove that the defendant was successful in an attempt to destroy or conceal an object or that the object was material or important to the proceeding.

The second element as to Count Three under the first theory of violating the statute — once again, evidence tampering — that the government must prove beyond a reasonable doubt is that the defendant acted with the intent to impair the object's integrity or availability in an official proceeding.

An official proceeding means a proceeding before a federal court, federal judge, or a federal agency. It can be either civil or criminal. A federal grand jury investigation is an official proceeding.

The law does not require that the federal or official proceeding be pending at the time of the defendant's actions, as long as the proceeding was foreseeable, such that the



defendant knew that her actions were likely to affect the proceeding. It is not necessary for the defendant to know with certainty that her conduct would affect an official proceeding, nor is it necessary that the defendant's conduct actually obstructed or influenced an official proceeding. It is sufficient that the defendant's actions would have the natural effect of interfering with the official proceeding. In addition, the government does not have to prove that the defendant knew that the proceeding would be in federal court.

The third element as to Count Three under the first way of violating the statute — once again, the evidence tampering theory — and the government must prove it beyond a reasonable doubt, is that the defendant acted corruptly. To act corruptly means to act, in whole or in part, with a bad purpose of accomplishing either an unlawful end or as a result by some unlawful means or method.

Now, I'm just going to pause there before I run out of ability to speak.

To sustain the charge -- we used to have a pitcher of iced water for just this moment, but in light of COVID, we're not allowed to keep it on the bench. I don't get that connection, actually, but there it is.

I turn to the second theory on which the government proceeds under Count Three.

The government must prove, in order to prevail on that



theory, two elements beyond a reasonable doubt:

First, that the defendant obstructed, influenced, or impeded an official proceeding, or attempted to do so;

And, second, that the defendant acted corruptly.

The first element on this theory that must be proved beyond a reasonable doubt is that the defendant obstructed, influenced, or impeded an official proceeding, or attempted to do so.

I've already defined official proceeding in respect of the other theory on Count Three. You will apply that here.

In addition, as I have previously instructed, the law does not require that the official proceeding be pending at the time of the defendant's actions took place, as long as it was foreseeable, such that the defendant knew her actions were likely to affect the proceeding.

The second, and last, element that the government must prove beyond a reasonable doubt, to prevail on the second theory under Count Three, is that she had acted corruptly. I've already defined that word; I don't need to repeat myself.

So that takes us to Count Four.

Count Four charges that the defendant was knowingly and willfully making a materially false, fictitious, or fraudulent statement or representation. Specifically, it charges that on or about June 8, 2018, the defendant participated in a telephone interview with the U.S. Attorney's



Office for the Southern District of New York in which she falsely stated that she did not have any records responsive to the subpoena that was served on her on or about March 13, 2018. That statement is the only false statement charged in Count Four.

The purpose of the false statement statute is to protect the authorized functions of the various government departments from any type of misleading or deceptive practice and from the adverse consequences that might result from such practices.

To establish a violation of the statute, the government must prove certain elements — which I'm going to enumerate for you in a minute or two — beyond a reasonable doubt. However, the government does not have to prove that any federal agency, in fact, was misled as a result of any false statement by the defendant. It doesn't matter if the agency was or was not misled, or even if it knew of the falsity or misleading nature of the statement at the time it occurred, should you find that such a statement occurred. Those circumstances would not excuse or justify the making of a false, fictitious, or fraudulent statement about a matter within the jurisdiction of the United States Government.

Now to the elements of this offense:

The crime of making a false statement has five elements:

First, and pretty obviously, that on or about the date specified, the defendant made a statement;

Second, that the statement was false, fictitious, or fraudulent;

Thirdly, that the statement was material;

Fourthly, that the false, fictitious, or fraudulent statement was made knowingly and willfully;

And, fifth, that the statement was made in a matter within the jurisdiction of the U.S. Government.

The first element as to Count Four that the government must prove beyond a reasonable doubt is that the defendant made a statement. In this regard, the statement need not be shown to have been made under oath.

The second element is that the government must prove beyond a reasonable doubt that the statement was false, fictitious, or fraudulent. A statement or representation is false or fictitious if it was untrue when it was made, and the person who made the statement knew, at the time the person made it, that it was untrue. A statement is fraudulent if it was untrue when made and was made with the intent to deceive the government agency to which it was made.

The third element that the government must prove beyond a reasonable doubt is that the false statement was material. For the purpose of this charge — that is to say, Count Four — the statement was material if it had a natural



tendency to influence or was capable of influencing the decisions or activities of the government agency to which it was provided. However, the government is not required to prove that anyone actually relied on the alleged false statement. In other words, the government doesn't have to prove that anybody made a decision or took any action based on the false statement charged in the indictment, assuming, of course, that there was such a false statement proved beyond a reasonable doubt.

The fourth element that the government must prove beyond a reasonable doubt to convict on Count Four is that the defendant acted knowingly and willfully.

An act is done knowingly if it's done purposely and voluntarily, as opposed to mistakenly or accidentally.

An act is done willfully if it's done with an intention to do something that the law forbids, that is, with a bad purpose to disobey the law, although the defendant need not know of the precise law that he or she was violating or that the law was a federal law.

The fifth and final element that the government must prove beyond a reasonable doubt is that the statement was made or undertaken with regard to a matter within the jurisdiction of the United States. For a statement to fall within the jurisdiction of the government of the United States, it must concern an authorized function of a department or agency of the U.S. Government, and I charge you that the U.S. Attorney's



Office for the Southern District is an agency of the U.S. Government.

It is not necessary for the government to prove that the defendant had actual knowledge that the false statement was to be utilized in a matter that was within the jurisdiction of the U.S. Government. It's sufficient to satisfy this element if you find that the false statement was made or taken with regard to a matter within the jurisdiction of the U.S. Attorney's Office for the Southern District of New York.

So that takes care of the three substantive counts, and we're going to move on now to the conspiracy count, about which you've already heard a couple of things. And I'll try to avoid repetition, but some is unavoidable.

As you know, Count One of the indictment charges the defendant with conspiracy to commit the crime of obstruction of justice.

Count One charges that from in or about January 2018 through at least in or about July 2018, the defendant agreed to obstruct justice by signing a false and misleading memorandum — that is to say, Government Exhibit 116, and if there is another signed copy, the other signed copy — regarding millions of dollars that Kam Wong obtained from MCU, in an attempt to obstruct and influence a federal investigation of Kam Wong and others, and also by concealing and deleting text messages and email messages and wiping an Apple iPhone to seek to destroy



and impair the availability of evidence, including evidence that had been sought from her by federal grand jury subpoenas, and by making false and misleading statements to federal law enforcement officers.

Now, as I have mentioned more than once, I'm sorry to say, a conspiracy is a kind of a criminal partnership, an agreement between two or more persons to join together to accomplish one or more unlawful purpose or purposes. The government is not obliged to prove that the conspiracy lasted through the entire period alleged, but only that it existed for some period within that time frame.

The crime of conspiracy — in other words, an unlawful combination or agreement — to obstruct justice is the subject of Count One. As I said before, it is an independent offense; that is to say, it's separate and distinct from the actual violations of specific federal laws governing the crime or crimes that members of a conspiracy allegedly have agreed to commit.

The actual violation of specific federal laws, as I said, is a substantive offense. Counts Two, Three, and Four are substantive offenses.

The crime of conspiracy is different. It's a different offense from the substantive offense.

Now, here, the defendant is charged with a conspiracy both to fabricate evidence, tamper with evidence, and obstruct

an official proceeding, and with the substantive crimes of falsifying -- excuse me, and with the substantive crimes of falsifying evidence, tampering with evidence, and obstructing an official proceeding. Given that a conspiracy and a substantive crime are distinct and independent offenses, you may find the defendant guilty of the crime of conspiracy, even if you find that she never actually committed the substantive crimes that allegedly were the objects or goals of the conspiracy.

By the same token, you can find the defendant guilty of one or more substantive crimes with which she's charged here — and I don't need to repeat what they are at this point — even if you find her not guilty of conspiring to do so. In order for you to find the defendant guilty of the conspiracy charged in Count One, the government must prove beyond a reasonable doubt the following elements:

First, the existence of the conspiracy charged, that is, an agreement or understanding to violate certain laws of the United States;

Second, that the defendant knowingly and willfully became a member of the conspiracy charged;

And, third, that any of the conspirators — not necessarily the defendant, but, rather, any member of the conspiracy — knowingly committed at least one overt act in furtherance of the conspiracy during the life of the



conspiracy.

So let me go, in more detail, into each one of these elements.

The first element is the existence of the conspiracy that must be proved beyond a reasonable doubt. I've already told you that a conspiracy is an agreement to do something that violates the law. In this instance, I have told you that the unlawful purposes that allegedly were objects of the conspiracy charged in Count One are falsifying evidence, tampering with evidence, and obstructing an official proceeding.

The essence of the crime of conspiracy is the unlawful combination or agreement. As I mentioned earlier, the ultimate success of the conspiracy, or the actual commission of the crimes that are the object or objects of the conspiracy, is not required.

The success or failure of a conspiracy is not material to the question of guilt or innocence of the conspirator because a conspiracy is a separate and independent crime, as I've told you.

Now, to prove a conspiracy — in other words, to prove the agreement that I'm talking about as an element of the conspiracy — the government is not obliged to prove that two or more people sat down around a table and entered into a solemn compact, whether orally or in writing, stating that they have formed a conspiracy to violate the law, and setting forth all



the details of the plans and the means by which they intend or hope to achieve the unlawful objects that are to be carried out, or the parts to be played by each member of the conspiracy. Indeed, it would be extraordinary if there were such a formal document or such a specific agreement. When people enter into a criminal conspiracy, much may be left to unexpressed understanding. Since conspiracy, by its very nature, often is characterized by secrecy, it is not often that a conspiracy can be proved by direct evidence of that explicit agreement. Thus, you may infer the existence of a conspiracy — that is, the existence of the agreement — from the circumstances and the conduct of the parties involved.

It is enough if two or more persons in some way or manner, through any contrivance, impliedly or tacitly, come to a common understanding to violate the law. Express language or specific words are not required to indicate assent or attachment to a conspiracy. Nor is it required that you find that any particular number of alleged coconspirators joined in the conspiracy in order to find that such an agreement existed. You need find only that the defendant knowingly entered into an unlawful agreement -- the unlawful agreement alleged in Count One with one or more other people in order to find that a conspiracy existed.

In determining whether there's been an unlawful agreement, you may judge acts and conduct of the alleged



coconspirators that are done to carry out an apparent criminal purpose. The saying that "actions speak louder than words" is applicable here.

Often, the only evidence available is that of disconnected acts, that, when taken together in connection with each other, show a conspiracy or agreement to secure a particular result as satisfactorily and conclusively as would more direct proof.

Of course, proof concerning the accomplishment of the objects of the conspiracy may be the most persuasive evidence of the existence of the conspiracy itself. But it is not necessary that the conspiracy actually succeed in its purpose in order for you to conclude that the conspiracy existed.

In determining whether the conspiracy charged in Count One actually existed, you may consider all the evidence of the acts, conduct, and statements of the alleged conspirators and the reasonable inferences to be drawn that may be drawn therefrom.

In order to find the existence of a conspiracy, you must be satisfied beyond a reasonable doubt, after considering all of the relevant evidence, that at least two alleged conspirators came to a mutual understanding, either spoken or unspoken, to violate the law in the manner charged in Count One of the indictment.

Now, I've talked about objects, or purposes, of a

conspiracy. Those are the goals, or the goal in the case of one object, that the conspirators agree or hope to achieve. In this case, there are two unlawful objects of the conspiracy charged in Count One. They are falsifying evidence and obstructing justice by evidence tampering or obstructing an official proceeding.

Now, I've previously instructed you on the elements of falsifying evidence with respect to Count Two and the elements of obstructing justice by evidence tampering or obstructing an official proceeding in describing Count Three, and you will apply those definitions here in considering whether the government has proved beyond a reasonable doubt that the conspiracy charged in Count One existed.

However, because Count One charges a conspiracy, the government, as I've said before, doesn't have to prove that anyone actually committed the unlawful objects; it needs prove only that there was an agreement to achieve at least one of the objects of the conspiracy, that is, either falsifying evidence or obstructing justice by evidence tampering or obstructing an official proceeding.

If you find that two or more persons agreed to accomplish at least one object of the conspiracy charged in the indictment, the illegal purpose element will be satisfied regardless of whether or not that object was in fact achieved, that is, regardless of whether the conspiracy succeeded. If



your finding is based on one unlawful object, you must be unanimous on that one object in order to find the defendant guilty on Count One. In other words, if, for the sake of arbitrary example, six of you thought the defendant and someone else conspired to attempt to achieve objective number one but not two, and the other six of you thought that it had been proved that they sought to achieve objective number two but not objective number one, you must acquit; you must be unanimous as to one of them in order to convict on Count One.

Okay. We get to element number two, which involves the question of whether the defendant became a member of any conspiracy that was formed, if a conspiracy was formed.

The government must prove beyond a reasonable doubt that she knowingly and willfully became a member of any such conspiracy. I already instructed you on what knowingly and willfully mean, and you should apply those definitions here.

In deciding whether the defendant, in fact, was a member of the conspiracy, if there was one, you must consider whether the defendant knowingly and willfully joined the conspiracy intending to achieve or advance its alleged goals, or at least one of them. Did she participate in the conspiracy, in other words, with knowledge of its unlawful purpose and with the specific intention of furthering at least one of its objectives?

It's important for you to note that the defendant's



participation in the conspiracy must be established by independent evidence of her own acts or statements as well as those of the other alleged coconspirators, and the reasonable inferences that may be drawn from them. A defendant's knowledge, of course, is a matter of inference to be established from the facts that were proved.

To become a member of a conspiracy, the defendant, I should add, need not have known the identities of each and every other member, if there were more than -- well, strike "if there were more than," nor need she have been apprised of all of the details of their activities. Moreover, the defendant need not have been fully informed as to all the details or the scope of the conspiracy in order to justify an inference of knowledge on her part. The defendant must, however, have agreed to participate in the conspiracy charged with knowledge of at least one of the objects.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his or her participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles while others play minor parts in a scheme. An equal role is not what the law requires. Even a single act may be sufficient to draw a defendant within the ambit of a conspiracy.



If you determine that the defendant became a member of the conspiracy, the duration and extent of the defendant's participation has no bearing on the issue of guilt. A defendant need not have joined the conspiracy at the outset; he or she may have joined it at any time, at the beginning, in the middle, or at the end.

Mere association by a person with a member of a conspiracy doesn't make that person a member, even when that association is coupled with knowledge that a conspiracy is taking place. A person may know, or be friendly with, a criminal without being a criminal herself. In other words, knowledge of a conspiracy, without agreement to participate in it, is not sufficient. What's necessary is that the defendant have participated in the conspiracy with the knowledge of its unlawful purpose and with an intent to aid in the accomplishment of its unlawful purpose or purposes.

In sum, the defendant, with an understanding of the unlawful nature of the conspiracy, must have intentionally engaged, advised, or assisted in the conspiracy for the purpose of furthering an illegal undertaking. The defendant thereby becomes a knowing and willing participant in the unlawful agreement; in other words, a conspirator.

A conspiracy, once it's formed, is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by its members. So, too,