# 22-1048-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SYLVIA ASH, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT**
**Volume 4 of 5 (Pages A-841 to A-1086)**

JUSTINE A. HARRIS
NOAM BIALE
MAYA BRODZIAK
SHER TREMONTE, LLP
*Attorneys for Defendant-Appellant*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

## TABLE OF CONTENTS


| | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Ash's Memorandum of Law in Support of Motion to Suppress, dated March 20, 2020 | A-26 |
| Declaration of Carrie H. Cohen, for Ash, in Support of Motion to Suppress, dated March 20, 2020 | A-53 |
| Exhibit A to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated February 20, 2020 | A-59 |
| Exhibit C to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated March 11, 2020 | A-61 |
| Exhibit D to Cohen Declaration - E-mail from Carrie H. Cohen to Janie C. Buckley, dated March 16, 2020 | A-63 |
| Exhibit E to Cohen Declaration - Affidavit of Lavale Jackson, in Support of Application for Search Warrants for Stored Electronic Communications, filed March 18, 2019 [Redacted] | A-66 |
| Exhibit G to Cohen Declaration - Consent to Search – Devices | A-115 |
| Exhibit Q to Cohen Declaration - Document entitled "Reset Device Chain of Custody – DRAFT," dated February 4, 2019 [Redacted] | A-119 |

Page

Exhibit S to Cohen Declaration - Department of Financial Services Press Release: "Department of Financial Services Takes Possession of Municipal Credit Union and Names NUCA as Conservator" ............................ A-122

Memorandum Opinion of the Honorable Lewis A. Kaplan, dated June 2, 2020.................................... A-126

Superseding Indictment, filed July 21, 2021 ............ A-145

Ash's Memorandum of Law in Opposition to Government's Proposed 404(b) Evidence and in Support of Ash's Motion *in Limine*, dated October 29, 2021 .................................................. A-153

The Government's Motions *in Limine,* dated October 29, 2021 .................................................. A-181

Proposed Jury Instructions on behalf of Ash, dated November 9, 2021 ................................................ A-224

The Government's Request to Charge, dated November 9, 2021 ................................................ A-256

Ash's Memorandum of Law in Opposition to Government's Motions *in Limine*, dated November 12, 2021 .............................................. A-343

Exhibit A to Memorandum of Law - Copies of Judicial Documents .............................. A-363

Oral Argument Transcript, dated November 18, 2021 .............................................. A-381

Trial Transcript, dated November 30, 2021 .............. A-443

Trial Transcript, dated December 1, 2021 ................ A-471

Trial Transcript, dated December 2, 2021 ................ A-543

**Page**

Trial Transcript, dated December 6, 2021 ................. A-613

Trial Transcript, dated December 7, 2021 ................. A-667

Trial Transcript, dated December 8, 2021 ................. A-753

Trial Transcript, dated December 9, 2021 ................. A-803

Trial Transcript, dated December 13, 2021 ............... A-880

Government Exhibit 112 -
Letter from Eli J. Mark, dated June 18, 2018, with Attachment..................................................... A-891

Government Exhibit 113 -
Letter from Norman Kohn to the Honorable Sylvia Ash, dated June 19, 2018............................ A-896

Government Exhibit 114 -
Letter from Norman Kohn to the Honorable Sylvia Ash, dated July 13, 2018............................. A-897

Government Exhibit 117 -
E-mail from LaVale Jackson to sylviaash@aol.com, dated March 15, 2018, with Attachments [Redacted]......................................... A-898

Government Exhibit 401 -
MCU's Policy Manual ........................................... A-902

Government Exhibit 751 -
E-mail Chain from the Honorable Sylvia Ash to Monique Smith, dated May 15, 2018 .................... A-1190

Government Exhibit 769 -
E-mail Chain from the Honorable Sylvia Ash to RFarley@nymcu.org, dated February 20, 2018..... A-1192

**Page**

Government Exhibit 801 -
Department of Justice Press Release “CEO and President of New York Credit Union Charged with Embezzlement and Fraud,” dated May 8, 2018 .......... A-1193

Government Exhibit 901 -
Sylvia Ash’s Use of MCU Park Suites, 2010 through 2017 .......... A-1196

Sentencing Transcript, dated April 20, 2022 .......... A-1197

Notice of Appeal, filed May 10, 2022 .......... A-1237

Letter from Carrie H. Cohen to the Honorable Lewis A. Kaplan, dated June 10, 2022 .......... A- 1239

once a person is found to be a member of a conspiracy, that person is presumed to continue the person's membership in the venture until its termination, unless it is shown by some affirmative proof that the person withdrew and dissociated that individual from it.

The third element the government must prove beyond a reasonable doubt is the commission of an overt act in furtherance of the conspiracy.

To sustain its burden of proof on this issue, the government must demonstrate beyond a reasonable doubt that at least one overt act was committed in furtherance of the conspiracy by at least one of the coconspirators, and that person need not be the defendant. It can be anybody whom you find to have been a member of the conspiracy.

An overt act is an act that's intended to help achieve the object of the conspiracy. An overt act itself need not be a criminal act, but it must contribute to achieving the goals of the conspiracy.

Now, you will find in the jury room that Count One of the indictment contains a section starting on page 3, entitled "Overt Acts." These overt acts are examples of conduct alleged to have been undertaken by members of the conspiracy to promote the illegal objectives of the conspiracy. And I'm going to read them to you here, but you can refer to them in the jury room, and they are as follows:



In or about January 2018, the defendant signed a false and misleading memorandum about which we have spoken already.

Second, on or about March 1st, 2018, the defendant falsely stated to a special agent with the U.S. Attorney's Office that, after she became chair of the board of directors of MCU, the MCU's then general counsel informed the defendant that the chief executive officer had the option, under his employment contract, of receiving monetary payments to obtain a long-term disability insurance instead of having MCU purchase long-term disability insurance for him, although the general counsel did not consider that approach to be advisable.

Third, on or about April 6, 2018, the defendant informed the special agent, who at the time was in New York, New York, that the defendant did not have any materials to produce in response to a grand jury subpoena served on her on or about March 13, 2018.

Fourth, on or about June 8, 2018, the defendant again informed the special agent that she did not have any materials to produce in response to the federal grand jury subpoena served on her on or about March 13th, 2018.

Fifth, on or about June 23, 2018, the defendant caused an Apple iPhone X or 10, which had been provided to her by MCU, to be wiped.

Sixth, on or about July 6, 2018, the defendant caused an incomplete set of materials in response to a federal grand



jury subpoena served on her on or about June 18, 2018, to be produced to the United States Attorney's Office.

Seventh, on or about July 9, 2018, in New York, New York, the defendant falsely stated to the special agent that after she became chair of the board, she discussed with the general counsel the chief executive officer's interest in receiving monetary payments in lieu of a long-term disability insurance policy and that the general counsel advised that this was permissible but not advisable.

Now, here, I've read you the seven overt acts alleged in the indictment. You may consider the next to be sort of the punch line, if you will. You don't have to find that any of those overt acts was committed. This element is satisfied if you find that any overt act in furtherance of this conspiracy was committed by any member of the conspiracy, regardless of whether the overt act you find to have been committed — and find beyond a reasonable doubt to have been committed — was alleged in the indictment or not. The overt act requirement, in other words, serves as a requirement that any conspiracy that may have existed went beyond the mere talking stage, went beyond just an agreement.

The requirement of an overt act is a requirement only that some action be taken during the life of the conspiracy by one of the coconspirators in order to further the conspiracy.

In order to satisfy that requirement, the government,



as I say, doesn't have to prove any or all of the overt acts alleged in the indictment; they don't have to prove that the defendant committed any overt act, as long as they prove beyond a reasonable doubt that an overt act in furtherance of the conspiracy was committed by a coconspirator.

It is sufficient if you're convinced beyond a reasonable doubt that that occurred at or about the time or place stated, assuming it's one of the ones alleged in the indictment; that suffices. You should bear in mind that you are not obliged to be unanimous as to whether any particular overt act was committed. It's enough, in order to satisfy this requirement, if all 12 of you are satisfied that some conspirator committed an overt act in furtherance of the conspiracy, even if you don't agree unanimously on which one.

You should bear in mind also that the overt act, assuming there was one, can be considered, in and of itself, a totally innocent and lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it's a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme.

You're instructed, therefore, that the overt act does not have to be an act that, in and of itself, is criminal or constitutes an objective of the conspiracy.

The indictment, you will find — and I tell you in any case — alleges that the conspiracy charged in Count One existed

from at least in or about January 2018 up to and including July 2018. It is not essential that the government prove that the conspiracy started and ended within that specific time period; it is enough if you find that the conspiracy was formed, and that it existed for some time within the approximate period set forth in the indictment.

In sum, if you find that the government has met its burden of proof on all three elements, then you should find the defendant guilty on Count One. If you find the government has not met its burden with respect to all three elements — that is, if you're not convinced beyond a reasonable doubt that the conspiracy existed or, assuming it existed, you are not convinced beyond a reasonable doubt that the defendant knowingly and willfully became a member of the conspiracy, or, assuming it existed, you are not convinced beyond a reasonable doubt that at least one conspirator knowingly committed an overt act in furtherance of the conspiracy — then you should find the defendant — indeed you are obliged, you must, find — the defendant not guilty on Count One.

Now, there's one more law point -- well, actually, there are a couple more law points I need to talk to you about.

In addition to proving the essential elements of each crime charged beyond a reasonable doubt, the government must also establish, as to each charge, what is called venue; in other words, that some act in furtherance of the charge you're



considering occurred in the Southern District of New York. The Southern District of New York includes all of Manhattan and the Bronx, as well as Westchester, Rockland, Putnam, Dutchess, Orange and Sullivan Counties.

The government does not have to prove that the complete crime with respect to any of the counts occurred wholly within the Southern District of New York.

Now, I need to note also, with respect to Counts One and Three, that the government may demonstrate venue also by proving that the defendant intended to affect an official proceeding, whether or not that proceeding was pending or about to be instituted in this district, regardless of whether any act in furtherance of those offenses occurred in this district.

Unlike the elements of the offenses that I've talked about at length, each of which must be proved beyond a reasonable doubt, the government is required to prove venue only by a preponderance of the evidence. A "preponderance of the evidence" means the greater weight of the evidence, as distinguished from "beyond a reasonable doubt."

To establish a fact by a preponderance of the evidence means to prove that the fact is more likely than not true. If you find that the government failed to prove venue by a preponderance of the evidence as to any count, you must return a verdict of not guilty on that count.

During this trial, the defendant has contended or



suggested, through counsel, that her actions were motivated by considerations that were not unlawful. Even if that is true — and I don't mean to suggest one way or another whether it was true or is true — it is not a defense to any count that the defendant may have been motivated by both proper and improper motives. A defendant may be found to have the requisite intent even if she possesses a dual intent; in other words, if she possesses an unlawful intent and also a partly proper, or neutral, intent.

Now, with respect to Counts Two and Three, which charge the substantive offenses of falsifying evidence and obstructing justice, the defendant is charged also with having aided and abetted another person to commit each of those crimes.

Aiding and abetting is an alternative way by which a defendant may be found guilty of a crime, that is distinct from finding the defendant guilty as a principal. If you find the defendant guilty on either Count Two or on Count Three, as a principal, you don't have to consider the matter of aiding and abetting, but I'm going to instruct you on aiding and abetting against the possibility that you may not find that.

And, counsel, I will have to make a modification in the typed charge here, to be consistent with what I have said.

So let me explain aiding and abetting to you.

The aiding and abetting statute provides, in relevant



part, that whoever commits an offense, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal. What that means is, even if the defendant him or herself did not commit the offense, the government may meet its burden of proof by proving: First, that somebody else actually committed the offense with which the defendant is charged; and, second, that the defendant aided and abetted that person in committing the offense.

A person who aids or abets someone else to commit an offense is just as guilty of that offense as if the person committed the offense itself.

In order to prove a defendant guilty as an aider and abettor, the government must prove beyond a reasonable doubt: First, that one or more other persons committed the charged offense, that is, that some other person committed all of the elements that I previously described in Count Two or Count Three; second, that the defendant, knowing that such a crime was being committed, intentionally associated herself with that crime; and, third, that the defendant intentionally took some action to help the crime succeed.

To act intentionally means to act deliberately and purposefully rather than by mistake, accident, through negligence, or by some other innocent reason.

Please note that the mere presence of a defendant where a crime is being committed, or merely associating with

another who was committing a crime, is not sufficient to establish aiding and abetting.

One who has no knowledge that a crime is being committed, or is about to be committed, but who inadvertently does something that helps in the commission of a crime is not an aider and abettor and can't be convicted on that theory. An aider and abettor must know that the crime is being committed and act in a way that's intended to bring about the success of the crime, the success of the criminal venture.

To determine whether the defendant aided or abetted the commission of a crime with which the defendant is charged, ask yourself these questions: Did the defendant participate in the crime charged as something she wished to bring about? Did the defendant associate herself with the criminal venture knowingly and willfully? Did the defendant seek, by her actions, to make the criminal venture succeed?

If the defendant did, then she's an aider and abettor, and, therefore, guilty of the offense. On that basis, if the defendant did not, then the defendant is not an aider and abettor.

There's been some talk about motive in the course of the arguments. Proof of motive is not a necessary element of any of the crimes charged in this case. Proof of motive doesn't establish guilt, nor does lack of proof of motive mean that a defendant is not guilty. If the guilt of the defendant



is proved beyond a reasonable doubt for any count, it is immaterial that the defendant's motive for the crime, or crimes -- sorry, I misspoke, it is immaterial what the defendant's motive for the crime or crimes may be or whether the defendant's motive was shown at all with respect to that count. The presence or absence of motive, however, is a circumstance that you may consider as bearing on the intent of the defendant.

I've already talked to you about a variation in dates in the indictment. The indictment frequently charges that things occurred on or about a particular date. It doesn't matter if the evidence at trial indicates that a particular act occurred on a particular date. The law requires only a substantial similarity between the dates alleged in the indictment and the dates established by the evidence.

Now, that's the hard part. That's the long part. We're down to the trial process, things you might think about in evaluating the evidence and the manner in which you will conduct your deliberations, and I think I'm going to stand up for this again.

If anybody else has dodgy back, like I do, and wants to stand, do feel free to do that.

Your role, as I told you when we were selecting the jury, is that you are the sole and exclusive judges of the facts. I don't mean to indicate any opinion as to the facts or



as to what your verdict ought to be. The rulings that I've made during the trial, any questions that I might have asked, and any comments I might have made are no indication of any views I might have about what your decision ought to be or as to whether or not the government has proved its case.

In particular, you are to disregard any comments that I may have made to counsel in the course of managing the trial. When I do make comments to counsel, they are almost always directed as moving the case along and trying to bring things to a point more quickly than otherwise might have occurred. And I have no opinion on what verdict you should have in this case, and any attempt to psychoanalyze me on that would be wrong and also would be highly misleading to you, because I'm telling you, this is your call, this is not my call.

I remind you, you're obliged to follow my instructions on the law and to apply my instructions, whether you agree with them or not. You are to show no prejudice for or against any attorney or the attorney's client because objections were made, or sidebars asked for, or legal points raised with me.

In addition to whatever extent I've asked questions of witnesses, in no case did I intend to suggest that I believed or didn't believe a witness or had any view about how you should come out. You're to disregard entirely my questions, though of course you are entitled to consider any answers there were to my questions, just as you'll disregard the lawyers'



questions and pay attention only to the answers.

You should find the facts of this case without prejudice to any party. The case is brought in the name of the United States, but that doesn't mean the government is entitled to any greater consideration than the defendant. Both sides stand equal in a court of law, and I so instruct you.

Let's talk some about the evidence. The evidence is the sworn testimony of the witnesses, the exhibits that were received in evidence, and the stipulations among counsel. I've already instructed you about the stipulations, and I won't repeat that.

What is not evidence is: Questions, arguments, and objections by lawyers. You're not to consider any statements that I struck or told you to disregard, whether they came from witnesses or from the lawyers. Some of the evidence in this case was received for a limited purpose. In those cases, you may consider it only for the specific purpose or purposes that I explain to you; and it may not enter into your deliberations for any other purpose.

It's up to you to decide, entirely, the weight to be given all of the evidence.

Now, I do want to — at the risk and indeed the certainty of repetition, because it's important — speak to the limiting instruction that I gave before. There is evidence in this case relating to the defendant's conduct as a state court

judge, and it includes responses on financial disclosure forms and other evidence relating to interactions the defendant may have had with the state Commission on Judicial Conduct and the Advisory Committee on Judicial Ethics of the State of New York.

I repeat, for emphasis, that Ms. Ash is not charged in this case with any judicial ethics violations or any crime with respect to the performance of her judicial duties. She is on trial here only for the four crimes in the indictment, and you may not convict her of anything at all in this case on the basis that you think she violated her duties as a judge. Nor may you consider any evidence that you think proves or suggests that she violated, or may have violated, her duties as a judge as evidence that she has a propensity to engage in misconduct or criminal behavior. But that is not to say that the fact that the defendant was a state court judge during the period that concerns you in this case is entirely irrelevant.

You are entitled to consider any evidence concerning the defendant's knowledge, obligations, actions and inactions as a judge insofar as you find that evidence sheds light on her motive, knowledge and intent in doing what she's been charged with in the indictment. But that is the only purpose for which you may consider that evidence.

Similarly, the defendant is not on trial here for her performance as a board member of the MCU. She is not charged with any embezzlement. You are not being asked to decide



whether or not any benefits or items of value she may have received from MCU or from Kam Wong were unlawful or a breach of her duties as an MCU director.

As with evidence of her judicial conduct or -- I left a word out. As with -- I'll stop and start again.

As with evidence of her judicial conduct or financial disclosures, evidence regarding benefits or items of value she may have received was not offered for the purpose of proving that the defendant had a propensity to engage in misconduct or criminal behavior. It was received as evidence of the background of the charged conspiracy and to complete the narrative of the crimes charged, as well as for your consideration of the defendant's motive, knowledge, and intent with respect to what she has been charged with in the indictment. You may consider it only for those limited purposes.

Now, there are two kinds of evidence that you may use in reaching your verdict.

One is called direct evidence, and the other is called circumstantial evidence.

Direct evidence is something that a witness testifies to by virtue of something the witness knows because the witness observed it with his or her eyes, ears, taste, touch, something the witness personally perceived and comes into court and tells you what happened based on personal knowledge. Direct evidence



can also be in the form of an exhibit. We have plenty of exhibits in this case, and the exhibits are direct evidence of what they say, not necessarily the truth of what they say. Well, what they say? What color are the boxes on the texts? The photocopies are — the color. You can look at them. That's direct evidence of the color. Of course, that doesn't much matter in this case, but it's an example I use to illustrate the point.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of some other facts. It refers to the process of inferring, on the basis of reason and experience and common sense, from one established fact, the existence or nonexistence of some other. Every judge in this court uses the umbrella example, and these experienced lawyers have all heard it a hundred times.

Suppose it was bright and sunny this morning when we all came in. The drapes are all drawn, it's now ten minutes to 4:00, and the question came up: What's the weather doing out there? We can't see, the drapes are drawn, but if people started walking in the back door with dripping umbrellas, one after the other, you have direct evidence that you can observe wet umbrellas. You reason, through common sense and your own life experience, gee, it probably is raining. Is it always raining? Well, no, maybe there was a pipe burst; who knows? But you apply your logic to what you can see — in other words,



to the direct evidence — and you reason from it and you come to what you think is the right conclusion.

That's all that circumstantial evidence refers to, whatever they say on television, on Law & Order or any other show. And the important point is that the general rule in the law — and it applies in this case, as in all others — is that the law does not distinguish between direct and circumstantial evidence. It simply requires that your verdict be based on your conscientious appraisal of all the evidence, direct and circumstantial.

Now, there has at some point, I think, once upon a time — and there may be hereafter — a little press attention to this case. I instruct you that your verdict must be based solely on evidence you saw and heard in this courtroom. You are to disregard completely any report that you may have seen in the press, seen on television, or heard on the radio. It would be unfair of you to consider such reports. Those are not evidence. The parties have had no opportunity to answer whatever might have been said or to explain whatever might have been said in an appropriate way. So you would be violating your oath as jurors if you took anything of that character into account, assuming you were ever exposed to it.

Now, you've heard the testimony of a couple of law enforcement or government witnesses. The fact that someone is in law enforcement or a government employee doesn't mean that

that person's testimony is entitled to any more or any less weight than the testimony of anybody else.

At the same time, it's legitimate for defense counsel to try to attack the credibility of a law enforcement witness by suggesting that the testimony has been colored by some personal or professional interest in the outcome of the case. It's up to you, after reviewing all the evidence, whether to accept the testimony of those witnesses, as it is with respect to every other type of witness, and to give the testimony whatever weight you think it deserves.

You've heard evidence that witnesses have discussed the facts of the case and their testimony with lawyers before the witnesses appeared in court. You may consider that fact when you're evaluating a witness' credibility. I should tell you, however, that there's nothing unusual and nothing improper about a witness meeting or talking with lawyers before testifying, so that the witness can be aware of what subjects are going to come up in the questioning, focus on them, and have an opportunity to review relevant exhibits before examined in court.

Among other things, that sort of consultation helps conserve your time and my time. Indeed, it would be very unusual and very surprising for a lawyer to call a witness without that consultation, provided, of course, that the witness is willing to talk to them. The weight you give to the



fact or the nature of a witness' preparation for his testimony, and what inferences you draw from that, are matters completely within your discretion.

You've heard testimony that the defendant made statements in which the defendant claimed that her conduct was consistent with innocence and not with guilt. The government claims that these statements, in which the defendant tried to exculpate herself, were false. If you find that a defendant gave a false statement in order to divert suspicion from herself, you may infer that the defendant believed she was guilty. You may not, however, infer, on the basis of this alone, that the defendant in fact is guilty of anything with which she's charged. Whether or not the evidence as to a defendant's statements shows that the defendant believed she was guilty — as well as the significance, if any, to be attached to such evidence — is a matter for you to decide entirely.

I think Section H is out. Do we agree, counsel? Ms. Cohen?

MS. COHEN: That's fine, your Honor.

THE COURT: All right.

You will find, in the copy of the typewritten charge that comes in, that I've just drawn a big X through something on page 37, and you will ignore it. It's not relevant in light of the way the evidence came in.



You have also heard some testimony about evidence that was seized in connection with certain searches or seizures conducted by law enforcement, and, in particular, I suppose, of email and other electronic evidence obtained pursuant to court-approved search warrants. All of the evidence in this case, including the evidence obtained pursuant to those searches, was lawfully obtained, nobody's rights were violated, and the government's use of that evidence was completely lawful. Whether you approve or disapprove of the use of searches to obtain evidence should not enter into your deliberations. I instruct you the government's use of that evidence is perfectly proper and lawful.

Therefore, you're obliged to give that evidence your full consideration, along with all the other evidence in the case, as you determine whether the government has proved its case, count by count, beyond a reasonable doubt.

There have been some charts that came in in the form of summaries. I admitted those charts or summaries to save time and avoid unnecessary inconvenience. You'll consider them as you would any other evidence.

There were a couple of exhibits that came in that are redacted. That means some little part of it or another has been covered over or blacked out. Don't bother about that.

Whatever was obscured, was obscured because there was an appropriate legal reason for doing it. You shouldn't



speculate as to why or what was covered up or redacted. And I don't think there's anything very conspicuous of that nature anyway.

If you conclude that other persons may have been involved in criminal or other acts charged in the indictment, you are not to draw any inference, favorable or unfavorable, toward either the government or the defendant from the fact that those persons are not named as defendants in this indictment and are not being tried in this case. Those matters are entirely outside your concern. They have no bearing on your function.

There are several people whose names you heard during the course of the trial who did not appear as witnesses. I instruct you that both sides had an equal opportunity, or lack of opportunity, to call any of them. Therefore, you should not draw any inference or reach any conclusions as to what they would have said had they been called. Their absence shouldn't affect your judgment in any way.

You should, however, remember my instruction that the defendant is not obliged, in a criminal case, to call any witnesses or produce any evidence.

The defendant, of course, did not testify in this case. Under the Constitution, she had no obligation to do so, she had no obligation to present any evidence, and that's because it's always the government's burden to prove a

defendant guilty beyond a reasonable doubt. That burden is always with the government throughout the entire case. It never shifts to the defendant. A defendant is never required to prove innocence.

You may not attach any significance to the fact that the defendant didn't testify. You may not draw any inference against her because she didn't get on the witness stand. You may not consider that against her in any way.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. It would be improper for you to consider any personal feeling that you may have about a defendant's race, religion, national origin, ancestry, gender, sexual orientation, or age. It would be improper for you to consider any personal feelings you may have regarding any witness or anybody else involved in this case for all of those reasons. The defendant is entitled to a fair trial, free of any prejudice, and our system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Now we're down to final strokes.

You're going to retire in a few minutes to deliberate. It's your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourself, but you should do so only after considering the case with your fellow jurors, and you



should not hesitate to change your opinion if you're convinced that it's erroneous. Your verdict, whether guilty or not guilty, must be unanimous on each count, but you're not bound to surrender your honest convictions concerning the weight or the effect of the evidence merely to return a verdict or solely because of the views of other jurors.

Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and come to the conclusion which, in your good sense and good conscience, appears from the evidence to be in accordance with the truth.

I'm obliged to say a brief word about your notes. The notes you took are for your personal use only, assuming you took notes. You each may consult your own notes during deliberations, but any notes you may have taken are not to be relied upon during deliberations as a substitute for your collective memory. The notes should be used as memory aids but should not be given precedence over your independent recollection of the evidence. If you didn't take notes, you should rely on your independent recollection of the proceedings, and you should not be swayed or influenced by the notes of others. The notes are not entitled to any greater weight than the recollection or impression of each of you.

The question of possible punishment of the defendant or the possible consequences of conviction is not a proper



concern of yours, and shouldn't in any sense enter into your deliberation. In the event of a conviction, the duty of imposing sentence rests exclusively on the trial judge. Your function is to weigh the evidence and to determine whether or not the defendant is guilty beyond a reasonable doubt, solely on the basis of that evidence. Under your oath, you cannot allow consideration of punishment, in the event of conviction, to influence your verdict in any way.

All of you must be present whenever you're deliberating. Have I lost Juror No. 5? No you're writing avidly; I see that.

You're not to discuss the case unless all 12 of you are present. If one of you is off in the restroom, halt.

When you retire, you will elect one member of the jury as the foreperson. That person will preside over your deliberations and speak for you here in open court. The foreperson will send out any notes, and when you've reached a verdict, the foreperson will notify the marshal or the officer that there has been a verdict.

That person — that is, the officer or the marshal — is there to ensure confidentiality. He has no other authority.

And the foreperson and the foreperson's note is entitled to no greater weight than that of any other juror.

You are free to elect any person you like from the jury to serve as foreperson.



I also want to stress that when you notify the marshal or the officer that there is a verdict, you're not to tell that person what it is, just that there is a verdict, and the person will then inform me, we'll assemble everybody who has to be assembled, and bring you into the courtroom.

Now, I'm going to be submitting to you, when you go into the jury room, a verdict form, on which you'll record your verdict. I'll send in multiple copies. You approach your deliberations in any way you see fit. You don't have to follow the order on the verdict form.

Once you've reached a unanimous decision, you'll record your answers on one copy of the verdict form. From past experience, I tell you, do not add any commentary on the verdict form. You will see the verdict form is very simple. It says: Count One, guilty or not guilty; Count Two, guilty or not guilty. Your job is to check the appropriate boxes and then sign the verdict form, all of you, at the bottom, put it into an envelope, the foreperson will bring it into court, and clutch it to his or her chest until I ask for it. It will then be opened, and you should be aware that once the verdict is announced in court, it ordinarily can't be changed, or at least if it's been officially recorded.

Now, if you have any questions on the law during your deliberations, you should formulate a note. You will find that the written copy of the charge that we will send in has pages

and lines numbered, so the note, to the extent you're able to do it, should identify the page and line numbers about which your question relates. There's a very practical reason for that. When I get the note, the first thing is, I have to understand it, and then the lawyers have to understand it, and I must hear their views about what the right answer is; and if there's disagreement, I have to decide what the right answer is, and then I'll bring you into court to answer the question. Quite simply, the clearer the question is, and the more certain we all are about what you're asking about, the faster we can do that, and the less likely it is that we will answer something you haven't really asked and not answer what you're really interested in.

Now, you are going to receive a laptop -- right, Andy? A desktop, there is a desktop in the jury room. It has on it all of the exhibits that were received in evidence. This is a COVID precaution, so that we won't be shoveling in mountains of documents. So you have the documents in there in electronic form, and you will be able to refer to them.

I've told you we're sending in the charge. It will take a few minutes to do that because I made a few amendments in it as we went along, and we'll have to get it xeroxed.

In the event you want to hear any of the testimony again, we can do that, but I would ask you this: First of all, be sure you need it, because the process, when you send in a



note requesting testimony, is the same as I described with questions. The note's got to be very specific about what you want, at least to whatever extent you can be — who's the witness; direct or cross, if you know; what's the subject, because we have to consult and figure out what it is you are really asking for, and then prepare it. Sometimes we can prepare it so that we can just send the transcript in; other times, it may be more efficient to bring you in and actually read it back to you. So it can be a time-consuming process. We will certainly do it if you need it, but be sure you feel you need it.

Now, the first thing I want you to do, once you have gone back there, is send in a note telling me now late you want to sit tonight. Whatever you say, up to 6:00 o'clock, is okay with me. And before you go home, I will bring you back in the courtroom to say good night and remind you that we're meeting again on Monday and so forth.

I remind you folks that you took an oath to render judgment impartially and fairly, without prejudice or sympathy and without fear, based solely on the evidence in the case and the applicable law. If you don't follow these instructions, or if you let prejudice or sympathy interfere with clear thinking, there's a risk that you will not arrive at a fair and just verdict. Both sides are entitled to the fairest trial humanity can give them. I know you're going to make a fair and



impartial decision, so you will come to a just verdict.

And I see that there's some surplus at the end of this, and I don't think I need to read it, counsel.

Does everybody agree with that?

MR. MARK: Yes, your Honor.

THE COURT: Under the heading "Conclusion."

MS. COHEN: Agreed, your Honor.

THE COURT: I'm just going to cross it out, and so you'll know there are two places with cross-outs.

So now we'll swear the officer.

(Marshal sworn)

THE COURT: Now, before the jury retires, let me say a word to our alternates.

The five remaining alternates will now be sent home. We are all enormously appreciative of your time and attention, but I am not discharging you. You are still alternates, you are still subject to the direction that you not discuss the case with anyone, unless and until you know for a certain fact that this trial is over and the main jury discharged.

The reason for that — and it's an especially significant reason in this time of the pandemic — is that it is not unheard of that, for one reason or another, a sitting juror becomes unavailable; and if that happens, we may well have to call one or more alternates back, and you may have to deliberate. So we need to maintain you in a state of purity,



as you have been, if I may use that term.

So if the five alternates, with our thanks, now would go into the jury room with Andy and collect your things and leave any notes you may have taken, with Andy, who will preserve them for now, and when Andy comes back, the jury will retire.

(Alternate jurors not present)

THE COURT: This shouldn't take more than another minute.

(Pause)

THE DEPUTY CLERK: Okay, Judge, we're ready.

THE COURT: Okay, ladies and gentlemen, you will now retire to consider your verdict.

(Recess pending verdict)

THE COURT: You may be seated, folks.

I've been using this little intermission to run through corrections I made as I read the charge, and I will tell you what they are. And I propose that we'll just xerox this with the interlineations for the jury instead of running a revised WordPerfect document. So here we are:

Page 4, line 23, I struck the words "or causing."

Page --

MS. COHEN: Your Honor, I think you also struck the word "actual" before "commission."

THE COURT: Fine, I accept that.

Page 9, line 19, "and including," not "an including." I can't have Mr. Mark have all the proofreading glory.
Page 26, line 23, "should" I changed to "must."
Page 27, line 16, it ends "it is more likely than not."
Page 28, line 7, "also partly a proper or neutral intent."
Page 28, line 17, starting after the phrase "crime and you," I have interlineated the following in my handwriting: "Don't have to consider the matter of aiding and abetting if you find the defendant guilty on either Count Two or Count Three as a principal, but I'm going to instruct you on aiding and abetting against the possibility that you may not find that."
MR. MARK: Your Honor, can I just -- "against the possibility," could you do it as "in the event"?
THE COURT: Well, look, I'll do it if both sides agree, but that language is a direct question from what I said orally.
MR. MARK: Understood, your Honor.
THE COURT: Not all of it, but that particular phrase.
MS. COHEN: We would prefer you stuck with what your Honor said to the jury.
THE COURT: Okay, all right.
That said, we need 12 for the jury, two for counsel on



each side, one for Andy, one for the court reporter.
Anything else substantive tonight?
MS. COHEN: Your Honor, do you want a couple other typos you --
THE COURT: Yes. Well, look, if they're meaningless, there's no point --
MS. COHEN: I think they're obvious, but they have --
THE COURT: So tell me, what's on your mind?
MS. COHEN: Page 10, line 10 --
THE COURT: Mr. Mark, you started something?
MS. COHEN: I just wanted it on --
THE COURT: To sustain the charge?
MS. COHEN: Correct.
THE COURT: Yes, of course.
MS. COHEN: Let me just quickly scan.
MR. MARK: I just noticed, I thought I had such a close eye yesterday and now I realized I missed one. The only one of any substance I just noted was on page 18, line 12, there's the word "fabricate" instead of "falsify," which is the word used everywhere else.
THE COURT: I couldn't hear.
MR. MARK: Sorry. The word "fabricate" as opposed to "falsify," which is the word that's used throughout the indictment.
THE COURT: Yes, but this is what I said orally, isn't



it?
MS. COHEN: It is, your Honor, although I noted that too, because the statute does --
THE COURT: If you both want me to change it, I will; otherwise, I won't.
MS. COHEN: I think it should track the statute, so I agree with the government.
THE COURT: So I'll change that to "falsify."
Any others?
MS. COHEN: Yes, your Honor. There was another. Page 28, line 20, "commits an offense." You corrected yourself when you spoke.
THE COURT: Oh, yes.
MS. COHEN: And then there was one other one. I'm just looking for it. Sorry.
Oh. Page 14, line 8, "the purpose of the false statement," singular, which is what you said, which is correct, not "statements."
MR. MARK: I don't remember --
THE COURT: It really doesn't matter.
MR. MARK: I don't think it matters.
THE COURT: I'll do it.
Anything else?
MS. COHEN: No, your Honor.
THE COURT: Okay.



So we await the note. It's 4:25. We may as well remain.
MR. MARK: May we just step out to use the restroom?
THE COURT: Oh, yes.
(Recess)
THE COURT: The record will reflect the jurors and the defendant all are present.
Members of the jury, I brought you back in just simply to tell you that it's perfectly understandable you'd like to rest up after listening to all of us all day. We'll resume at 9:30 on Monday.
You are not to read, listen, do any research. If anybody talks to you, cut it off and report it to Andy.
Your deliberations will start in earnest on Monday.
I'm just curious as to whether you picked a foreman yet, foreperson.
Who's the foreperson?
Okay. Thank you. The record will reflect that's Juror No. 4.
Have a great weekend.
(Jury not present)
THE COURT: Okay. Thanks.
Anything else, folks?
MS. COHEN: No, your Honor.
MR. MARK: No, your Honor.

THE COURT: Okay. Enjoy your rest. You deserve it.
MR. MARK: Have a good weekend, your Honor.
THE COURT: You too.
MS. COHEN: Have a good weekend, your Honor.
(Adjourned to December 13, 2021 at 9:30 a.m.)
* * *

## $

**$1,000 (5)**
983:25;984:3;987:12,15,18
**$10,000 (3)**
878:23;897:20,24
**$20,000 (1)**
930:6
**$3.7 (12)**
875:10,16;886:13;895:19;906:10,24;932:25;933:17;934:17,23;971:7;988:24
**$50 (2)**
879:5;925:11
**$8,778.60 (1)**
880:16

## A

**abets (2)**
1028:1,9
**abetted (4)**
999:24;1027:13;1028:8;1029:10
**abetting (9)**
998:25;1027:15,20,20,24,25;1029:2;1049:10,13
**abettor (6)**
1000:8;1028:13;1029:6,7,17,20
**ability (1)**
1006:18
**able (6)**
885:19;888:4,23;960:21;1045:1,19
**above (5)**
906:21,22;907:20;929:16,16
**absence (2)**
1030:6;1040:17
**absolutely (1)**
977:8
**accept (3)**
990:5;1037:8;1048:25
**accepting (3)**
921:4,19;985:3
**access (3)**
946:24;947:6;985:19
**accident (13)**
875:23,24,25;877:13;908:4,5,7,9,11;920:17;985:12;1002:22;1028:22
**accidentally (2)**
988:21;1010:13
**accommodate (1)**
967:17
**accomplish (3)**
997:19;1012:8;1017:22
**accomplished (2)**
998:12;1020:24
**accomplishing (2)**
920:5;1006:15
**accomplishment (2)**
1016:9;1020:16
**accordance (1)**
1042:11
**according (1)**
939:9
**account (11)**
877:1;883:22,23;903:2,5;909:16;914:23;946:23,25;998:23;1036:22
**accounting (2)**
925:17;929:2
**accurate (5)**
895:12;901:15;906:22;954:24;980:13
**accurately (3)**
880:8;987:2;988:2
**accusation (1)**
995:6
**achieve (7)**
1015:2;1017:2,17;1018:5,7,20;1021:15
**achieved (1)**
1017:24
**achieving (1)**
1021:17
**acknowledged (1)**
982:1
**acquit (2)**
1001:14;1018:8
**across (2)**
878:23;936:10
**act (42)**
888:17;908:14;909:9;911:12;919:20;920:5,5;1001:5,9;1006:14,14;1010:12,14;1013:24;1019:24;1020:25;1021:7,11,15,15,16,17;1023:14,16,18,22;1024:3,4,11,13,15,17,18,21,22;1025:17,25;1026:13;1028:21,21;1029:8;1030:12
**acted (17)**
920:8,9;1002:6,7,20;1003:1,4,14,18,21;1005:1,4,17;1006:13;1007:4,18;1010:11
**action (3)**
1010:6;1023:23;1028:20
**actions (19)**
877:11;878:3,9;879:25;884:13;885:8;911:4;923:2;970:7;1002:24;1005:24;1006:1,6;1007:13,14;1016:2;1027:1;1029:16;1033:18
**activities (2)**
1010:2;1019:11
**acts (17)**
905:13;916:3,4;918:15;970:13;1002:25;1015:25;1016:5,16;1019:2,21;1021:21,21;1023:10,13;1024:1;1040:5
**actual (10)**
928:9;939:5,16;942:21;998:24;1011:4;1012:15,19;1014:13;1048:24
**Actually (34)**
875:25;910:3;913:24;916:23;938:5;942:25;943:20,23;950:21;951:21;953:20;955:8,9;960:23;961:14;972:15;974:22;977:10;984:16;990:11;993:13;995:20;998:15;999:3;1006:4,22;1010:4;1013:7;1016:12,15;1017:16;1025:20;1028:6;1046:8
**Adams (2)**
901:12;937:4
**add (2)**
1019:8;1044:13
**added (2)**
907:14;957:17
**addition (6)**
921:12;970:1;1006:8;1007:11;1025:22;1031:20
**additional (1)**
901:19
**address (4)**
923:10;969:12;985:18,22
**addressed (1)**
922:22
**addresses (2)**
1004:15,16
**Adjourned (1)**
1053:5
**admissions (3)**
895:6;913:2,4
**admit (12)**
882:4;888:18;895:18;906:17;907:3,3,10;912:22;933:5,10,13,14
**admits (6)**
895:6,10,11;912:23;913:1;916:15
**admitted (13)**
888:14;895:17;907:1;933:15,16;934:15,15,16,23;978:24,24;980:7;1039:18
**admitting (2)**
895:22;980:2
**advance (1)**
1018:20
**advances (1)**
984:23
**adverse (1)**
1008:9
**advice (1)**
927:23
**advisable (8)**
896:7,12,14;909:4;918:5;953:17;1022:11;1023:9
**advise (1)**
901:2
**advised (2)**
1020:19;1023:8
**advisory (6)**
879:13;926:20;927:20,23;950:11;1033:4
**affairs (1)**
1001:10
**affect (7)**
970:9;996:12;1006:1,3;1007:15;1026:10;1040:18
**affidavit (6)**
887:21;973:10,14;978:4,8;991:11
**affirmative (2)**
1020:25;1021:4
**afternoon (5)**
885:22;886:5;963:1;967:10,24
**afterwards (1)**
972:4
**again (73)**
874:15,15,15;876:2;879:23;882:24;889:14;895:17;899:9,9;905:3,3,23;910:21;913:2;914:7;916:1;920:18;921:24;923:7,7;926:9,15;928:19,20;929:3,5;930:16;932:7;936:22,25;946:17;947:17;949:4;953:5,7;956:11,18;959:10,20,21;960:19,19,20;961:12,23,23;964:25;965:1;975:8,18,24;976:2,9,22;978:11;980:5;984:20;985:1;986:13;989:6,11;993:5;994:5,6,6;1005:15;1006:11;1022:17;1030:20;1034:5;1045:24;1046:17
**against (9)**
983:10;992:22;1000:17;1027:21;1031:17;1041:7,8;1049:13,15
**age (1)**
1041:13
**agency (11)**
1002:9;1003:6,9,24;1005:20;1008:15,16;1009:21;1010:2,24;1011:1
**agent (86)**
875:2,22;882:23;884:9;885:13,19,25;886:3,5,6,9,10,11,16,17,20;888:7,8,19,21,24;889:21;890:22;891:1,3,6,7,9,10,17;894:10,16;895:3;896:16;898:1,8;899:8,15,23;902:24;903:7;905:3;906:14;907:7,10;908:14,16;909:10,13;910:1,17;912:24;915:8;916:13;917:10,15;918:22;931:12,16;935:9;938:9,13;939:8;940:8;947:5;956:23;957:1,10;958:6;959:10,11,14;970:22,24,25;972:6;975:14;977:13;979:8,17,19;986:5;1022:4,13,18;1023:4
**agents (25)**
881:1;893:18;949:7;971:17,17,20,25;972:2,16,20;977:11,11;979:5,6,13,14,22;981:2,12,21;984:9;985:13;990:18;993:2,5
**aggregate (3)**
906:10,11;907:19
**ago (4)**
881:19;949:16;953:23,23
**agree (16)**
895:18,20;907:20;926:21;933:17;979:9,13;985:7;998:16;1017:2;1024:14;1031:16;1038:18;1047:4;1049:18;1051:7
**agreed (16)**
887:13;888:10;889:3,13;906:22,23;920:13;933:20;951:23;

995:18;997:19;
1011:18;1012:17;
1017:21;1019:15;
1047:7
**agreeing (1)**
897:9
**agreement (35)**
919:15,16,19;922:6;
971:6;973:6;977:17;
988:23,24;997:22,23;
998:1,6,17;999:4,8;
1012:7,13;1013:18;
1014:6,12,21;1015:5,
10,11,19,21,21,25;
1016:6;1017:17;
1020:12,22;1023:21;
1041:23
**agreements (1)**
901:8
**agrees (2)**
991:5;992:7
**aha (1)**
947:25
**ahead (4)**
875:19;890:20;
892:3;912:4
**aid (1)**
1020:15
**aided (4)**
999:24;1027:13;
1028:7;1029:10
**aider (6)**
1000:8;1028:12;
1029:6,7,17,19
**aiding (10)**
998:24;1024:19;
1027:15,19,20,24,25;
1029:2;1049:10,12
**aids (3)**
1028:1,9;1042:17
**air (1)**
875:10
**AirPod (1)**
889:7
**albeit (1)**
973:8
**alert (1)**
949:19
**alleged (16)**
1004:21;1010:4;
1012:10;1015:18,21,
25;1016:16,21;
1018:20;1019:3;
1021:21;1023:10,18;
1024:2,8;1030:14
**allegedly (5)**
995:22;1000:8;
1012:17;1013:8;
1014:8
**alleges (6)**
995:16,20,24;996:6;
997:18;1024:25
**allotment (1)**
930:5
**allow (1)**
1043:7
**allowed (7)**
925:10;930:1,6;
950:25;951:2,21;
1006:21
**allows (1)**
995:8
**almost (7)**
882:21;891:16;
897:16;960:1;964:7;
982:24;1031:8
**alone (2)**
941:11;1038:12
**along (7)**
964:23;996:21;
997:18;1002:25;
1031:9;1039:14;
1045:22
**Alternate (2)**
963:5;1048:7
**alternates (5)**
1047:13,14,16,24;
1048:2
**alternative (1)**
1027:15
**although (8)**
899:19;952:5;998:3;
1003:10;1004:3;
1010:16;1022:10;
1051:2
**always (9)**
884:22;893:7;
905:19;982:24;998:16;
1031:8;1035:23;
1040:25;1041:2
**ambiguity (1)**
897:6
**ambit (1)**
1019:25
**amendment (1)**
951:19
**amendments (3)**
896:25;951:18;
1045:21
**America (1)**
961:3
**American (1)**
916:23
**among (2)**
1032:9;1037:21
**amount (7)**
880:16;906:10,11;
907:19;933:17,18;
987:17
**amounts (1)**
895:18
**Amper (1)**
900:11
**analyst (1)**
942:18
**analysts (1)**
903:24
**analyzed (1)**
942:18
**ancestry (1)**
1041:13
**and/or (2)**
900:15,17
**Andy (8)**
964:21;967:4;
1045:14;1048:3,4,5;
1050:1;1052:13
**angles (1)**
899:1
**announced (1)**
1044:21
**annual (7)**
880:3,5;893:10;
928:24;983:24;984:2,3
**answered (1)**
931:14
**AOL (2)**
985:21,24
**Apologies (1)**
977:23
**apologize (1)**
963:16
**apparent (3)**
876:4;1000:10;
1016:1
**apparently (2)**
937:8;1024:18
**appeal (2)**
928:9,13
**appear (6)**
882:20;896:20;
898:10;942:25;968:2;
1040:13
**appearance (1)**
926:21
**appeared (1)**
1037:13
**appears (2)**
994:8;1042:10
**Apple (32)**
883:8,8,14,16;889:9;
901:11,12,13;902:1,2;
918:11;923:1;924:9;
934:5;936:7,10,16,18;
937:2,3,5,6,9,14,17;
943:11;990:3;993:19,
22;1004:7;1011:25;
1022:22
**applicable (4)**
906:11,24;1016:3;
1046:21
**applies (3)**
919:25;999:21;
1036:6
**apply (7)**
961:14;994:17;
1007:10;1017:11;
1018:16;1031:16;
1035:25
**appointed (1)**
878:7
**appointment (1)**
901:21
**appraisal (1)**
1036:9
**appreciative (1)**
1047:15
**apprised (1)**
1019:10
**approach (5)**
895:20;906:22;
907:20;1022:11;
1044:8
**approached (1)**
893:18
**appropriate (3)**
1036:20;1039:25;
1044:16
**approval (1)**
888:14
**approve (3)**
946:23;954:11;
1039:9
**approved (16)**
882:4;886:10,21;
888:15;917:20;918:4;
925:18;929:3;934:16;
946:22;947:7,7;954:5;
955:16;971:1;977:12
**approving (3)**
934:23;977:15;
980:16
**approximate (1)**
1025:6
**approximately (2)**
889:12;906:10
**April (5)**
882:19;896:22;
898:12;910:1;1022:12
**arbitrary (1)**
1018:4
**arguably (1)**
946:11
**argue (2)**
883:13;993:15
**argued (2)**
927:25;976:18
**argues (1)**
969:24
**arguing (1)**
981:8
**argument (6)**
919:4;920:3;967:20;
978:23;979:2;984:23
**arguments (13)**
874:10;883:14;
919:1,2;932:11;
968:25;969:8,19;
978:20;990:6;994:12;
1029:22;1032:12
**around (9)**
890:14;892:8;
897:24;942:22;959:2;
972:25;991:24;993:24;
1014:23
**arranged (3)**
885:21;894:12,13
**arranging (1)**
907:9
**arrest (1)**
992:21
**arrested (11)**
882:22;883:1;
898:17;899:21;911:1,
7,10;914:22;922:21;
968:6;992:21
**arrive (1)**
1046:23
**Ash (267)**
874:13;875:3;881:2,
16;882:6,15;883:8;
886:22;887:1,12,23;
888:15,20,22;889:3,4,
9,13;890:4,4,12;
891:11;892:15,18,19;
893:7,16,19;894:3,11,
15,18;895:15;896:12,
13,16;897:16,22;
898:2;899:3,6,9,25;
900:19,25;901:9,17;
904:1,8;907:24,25;
914:5,19;915:9,12,15,
17,22;918:2,3;919:16;
921:3,13,16,19,22,25;
922:3,16;923:17,19;
924:9,15,15,16,25;
925:3,4,9,14,21;926:9,
13;927:10,22;928:1,4,
5,21;929:2,4,6,22;
930:10,12,17;931:3,7,
23,25;932:3,12;
933:23;934:6,7;935:3,
10,25;936:4;937:8,11,
16,24;938:2,8,21,23;
939:16,18,19;940:2,22;
941:1,12,19,20;942:9,
12,20,20;943:9,11,21,
22;944:7,21;945:3;
947:10;948:4;949:9,
18,20,23;951:5,16,23;
952:4,15,20;953:6,12,
21;954:1,4,9,21;
955:22;956:4,7,21;
957:8,21;958:2,5,12,
15,18,21;959:4,12,13,
16,23;960:24;961:7,9,
24;962:3;968:22;
969:21,23;970:7;
971:7,11;972:5,8,12,
25;973:6,20;974:1,8,
20,22;975:7;976:4,16,
20,24;977:18,21,22;
978:7,9,13,15,23;
979:12,22;980:15,19;
981:2,7,8,24;982:3,7,

12,17,20,22,24;983:5, 9,18;984:5,8,18,24; 985:2,8,18,21;986:1,4, 8,9,23;987:20;988:19, 20;989:1,7,13,16,20; 990:7,18,24;991:7,7, 20,22;992:2,18,20,22, 23;993:9,21,24,25; 994:1,10;995:4; 997:14;1033:5
**Ash's (16)** 883:22;887:4; 888:23,25;891:2,6; 903:5;922:24;923:12; 926:2;935:15;939:8; 973:3;983:14;987:4; 993:1
**aside (1)** 970:15
**assemble (1)** 1044:4
**assembled (1)** 1044:5
**assent (1)** 1015:16
**assistance (4)** 891:19;939:20,22; 944:4
**assisted (1)** 1020:19
**assisting (1)** 1024:19
**associate (1)** 1029:14
**associated (2)** 942:20;1028:18
**associating (1)** 1028:25
**association (2)** 1020:7,9
**assuming (8)** 967:12;1010:7; 1024:8,16;1025:12,15; 1036:22;1042:13
**attach (1)** 1041:5
**attached (1)** 1038:16
**attachment (2)** 892:16;1015:17
**attack (1)** 1037:4
**attempt (5)** 885:15;1005:11; 1011:22;1018:5; 1031:12
**attempted (5)** 999:3;1004:25; 1005:9;1007:3,7
**attend (4)** 925:10;928:23; 929:15;930:2
**attention (4)** 961:25;1032:1; 1036:12;1047:15
**attorney (7)** 904:22;931:9,11; 932:6,8;947:17; 1031:18
**attorney's (16)** 894:14;908:17; 915:23;931:13;975:15; 976:15;980:12;996:7; 1003:8,25;1007:25; 1010:25;1011:9; 1022:4;1023:2; 1031:18
**Audio (1)** 944:5
**audit (1)** 897:19
**auditors (1)** 900:12
**audits (1)** 897:21
**August (6)** 878:15;904:5; 916:25;982:14,16,18
**authority (2)** 901:2;1043:21
**authorized (4)** 971:7;986:6;1008:7; 1010:24
**availability (4)** 1004:8;1005:2,18; 1012:1
**available (2)** 982:13;1016:4
**avidly (1)** 1043:11
**avoid (5)** 875:4;963:19; 967:18;1011:13; 1039:19
**await (1)** 1052:1
**aware (11)** 972:24,25;973:20; 975:1,9;976:23,24; 999:14;1003:14; 1037:17;1044:20
**away (7)** 891:16;893:19; 898:23;941:18;969:2; 979:1,15

## B

**B1 (1)** 929:9
**back (51)** 874:25;875:4; 877:15;879:8;887:25; 891:22;894:8,12; 896:3;904:7;909:19; 912:9;914:6;925:11; 935:21,23;936:3; 937:1,2;942:9;944:9; 945:4;949:24;950:1,4, 13,18;951:18;955:13; 956:1,13;965:5; 967:18;970:19;973:13; 977:10,14;982:3,8,15; 992:1,3,10;1030:21; 1035:20;1046:9,13,15; 1047:24;1048:5; 1052:8
**background (1)** 1034:11
**bad (12)** 881:13;920:5;960:7; 983:9;990:7;991:17, 18;992:11;994:4,5; 1006:14;1010:16
**balls (1)** 914:4
**bank (12)** 915:12;940:9;946:8, 9,11,14,20,22;947:19; 951:2;956:15;980:10
**Bar (2)** 901:22;940:5
**Barclay's (1)** 893:6
**based (9)** 885:7;1001:2; 1010:6;1018:1; 1034:25;1036:8,13; 1041:9;1046:20
**basic (2)** 997:9,11
**basically (1)** 877:23
**basis (5)** 1029:18;1033:10; 1035:11;1038:11; 1043:6
**bear (3)** 977:21;1024:9,15
**bearing (4)** 1019:18;1020:3; 1030:7;1040:10
**became (9)** 887:17;952:15; 1013:21;1018:11,14; 1020:1;1022:5;1023:5; 1025:14
**become (2)** 903:18;1019:7
**becomes (2)** 1020:21;1047:23
**beforehand (1)** 971:23
**began (1)** 881:22
**begin (1)** 994:14
**beginning (7)** 885:3;921:2,8;949:6; 965:22;969:15;1020:5
**behalf (2)** 874:11;961:24
**behavior (2)** 1033:14;1034:10
**behind (1)** 941:20
**below (2)** 906:21;987:17
**bench (2)** 945:4;1006:21
**bend (1)** 969:3
**bends (2)** 976:20;977:6
**benefit (2)** 952:17;953:17
**benefits (15)** 878:19;879:19; 880:15;881:13;900:12; 928:21,21;951:20,22; 980:17;985:3,22; 996:24;1034:1,7
**best (2)** 889:11;967:17
**bet (2)** 949:10,10
**better (2)** 905:21;980:10
**beyond (53)** 922:9;923:23; 947:23;961:20,21; 970:7;997:4,10; 1000:13,21,25;1001:6, 18;1002:13,19;1003:3; 1004:23;1005:7,16; 1006:12;1007:1,6,17; 1008:13;1009:11,15, 23;1010:8,10,20; 1013:15;1014:5; 1016:20;1017:12; 1018:13;1021:6,10; 1023:17,20,21;1024:3, 6;1025:11,13,15,23; 1026:15,19;1028:13; 1030:1;1039:16; 1041:1;1043:5
**big (10)** 898:20;916:20; 917:7;932:17,23; 936:14;960:8,9,10; 1038:23
**bigger (1)** 897:13
**biggest (1)** 923:12
**billed (1)** 879:3
**billing (1)** 915:17
**bills (4)** 879:4;915:19; 925:11,11
**birthday (6)** 893:10;924:20; 943:14;946:16;949:17; 955:5
**bit (12)** 877:3,16;887:16; 928:19;934:14;935:19; 937:7;938:6;939:1,12; 944:15;958:4
**bits (1)** 884:21
**blacked (1)** 1039:23
**bless (2)** 941:21;964:11
**blindly (1)** 987:20
**blue (3)** 949:15;955:4;977:2
**board (88)** 876:12;878:11,14, 15,19;879:6,10,11,16, 17;880:9;881:7,13; 882:1,4;886:11,20; 888:14;889:17;893:20; 897:16;910:11;914:3; 916:9,14,18,20,25; 917:6,8;921:21; 924:21;925:2,6,8,15, 22;926:5,5,6,18,19; 927:8,10,12,16,19,24; 928:6,8,14,21,22,23; 929:5,12,14,22;930:2, 8,11;946:17,22,25; 950:14;951:6;952:16; 953:7;954:5;955:16; 956:1,10;961:9;971:1, 5;977:12,15,15;982:4; 983:18,20;987:9; 990:20;996:17,20; 1022:5;1023:5; 1033:24
**boardship (1)** 988:5
**Bonsu (6)** 955:24;956:4,8,13, 21;957:21
**Bonsu's (1)** 956:24
**booking (1)** 917:2
**Boris (3)** 903:23;914:16; 942:18
**both (16)** 877:2;883:10;904:3; 941:24,24;992:17; 999:7,11;1004:19; 1012:25;1027:5; 1032:5;1040:14; 1046:24;1049:17; 1051:4
**bother (1)**

1039:23
**bottom (5)**
904:5;930:5;957:11;
961:16;1044:17
**bound (1)**
1042:3
**box (5)**
889:19;926:17;
927:4,13;963:14
**boxes (2)**
1035:4;1044:16
**bracket (3)**
963:20,21,24
**breach (2)**
996:19;1034:2
**break (3)**
920:21;962:5,8
**breaks (1)**
965:22
**brief (1)**
1042:12
**briefly (6)**
918:9;919:5,5;
928:20;987:14;994:23
**bright (1)**
1035:16
**Bring (12)**
874:4;930:6;963:9;
966:3;1029:8,13;
1031:9;1044:5,18;
1045:8;1046:8,15
**bringing (1)**
923:1
**brings (1)**
1001:1
**Britney (1)**
929:11
**broad (2)**
905:7,9
**broader (1)**
897:14
**broke (1)**
963:13
**broken (1)**
923:24
**broker (1)**
954:8
**Bronx (1)**
1026:3
**Brooklyn (3)**
982:12;989:3,9
**brought (3)**
969:20;1032:3;
1052:8
**building (1)**
945:15
**bulk (1)**
920:2
**burden (20)**
877:21;918:17,23,
24;943:5;960:24,24;
961:3;994:20;997:3;
1000:12,13,22,24;
1021:9;1025:8,10;
1028:5;1040:25;
1041:1
**burst (1)**
1035:24
**business (16)**
885:17;938:11,13,
14,20;940:9;946:8,9,
11,15,20,22;947:19;
959:14;970:22;972:7
**butler (2)**
968:20,21
**buy (2)**
951:3;980:10
**buying (3)**
876:5;951:1;954:14
**Bye-bye (1)**
944:6

## C

**cable (4)**
879:4;915:17,19;
925:10
**cahoots (2)**
991:6;993:8
**calculated (1)**
910:25
**calculating (1)**
913:5
**calendar (6)**
887:4;899:16,22;
973:3;976:11;978:11
**call (46)**
888:24;891:8,20;
892:18;893:22;894:4;
898:9,12;899:14,15;
927:15;938:20;939:19,
20;943:20,22,23;
945:4;949:14;955:4,
11,15,17;971:12,13,14,
19;974:15,17,19;975:5,
12;976:13;977:19,19;
979:16,23;986:21;
993:2;999:20;1031:14,
14;1037:23;1040:15,
20;1047:24
**called (31)**
882:23;883:2;889:1,
17;890:15,15,16;
909:18;924:4,17;
926:7;931:12;945:3;
955:9,23;956:8;
957:14;958:6;974:4,4,
6;980:25;981:1,1;
993:20;995:5;997:12;
1025:24;1034:19,19;
1040:17
**caller (1)**
943:2
**calling (2)**
943:8;944:9
**calls (13)**
885:24;905:16;
931:12;939:14;942:22,
24,25;943:3,7,16;
944:12;968:11;971:11
**came (27)**
884:21;887:1;
895:24;896:1;902:13;
909:2;919:18;932:11,
12;937:4;938:21;
939:3;941:1;951:15;
953:5,7;954:8;958:13,
15;974:8;1016:22;
1032:14;1035:17,18;
1038:25;1039:17,21
**can (72)**
875:15;877:9;887:3;
891:19;892:21;894:5;
899:19;901:16;903:1,
2;904:9;906:19;
909:19;916:7;926:1;
929:25;930:19;935:22;
936:11;938:12;939:20;
941:16;944:11,23;
945:23;947:15;948:5;
949:17;952:13;953:3;
958:23;963:9,22;
964:23;965:13,18,24;
966:1;967:3,17;
968:25;969:1;972:15;
976:11;977:24;979:10,
13;985:7;986:16;
989:12;997:22,25;
999:5;1005:20;
1013:10;1015:9;
1021:13,24;1024:16;
1035:1,5,21,25;
1037:17;1045:10,24;
1046:3,6,7,9,25;
1049:15
**capable (2)**
994:4;1010:1
**capacity (1)**
926:11
**caps (1)**
891:19
**car (1)**
998:19
**card (9)**
885:17;916:23;
938:11,13,14,20;
959:14;970:22;972:7
**cards (3)**
900:21;913:12,13
**care (3)**
919:3;982:7;1011:10
**careful (6)**
986:10,16,24;
987:22;989:4,13
**carefully (8)**
934:20,25;970:4;
981:13;987:1;988:1,
21;1001:4
**careless (4)**
890:1;986:23;
988:20;989:4
**carelessly (2)**
905:15;913:19
**carelessnesses (1)**
1002:22
**Caribbean (1)**
930:22
**carried (1)**
1015:2
**carry (1)**
1016:1
**carrying (1)**
1024:19
**case (63)**
877:21;880:2,25;
881:5;882:25;885:4;
902:20;904:20;906:6;
918:17;919:4;920:12;
928:12;931:5;944:1;
949:6;961:2,21;962:7;
967:4,11;969:12;
970:18;971:17,18;
990:14;994:7;1002:10;
1003:7;1017:1,3;
1024:25;1029:23;
1031:5,9,11,21;1032:2,
3,16,25;1033:6,9,16;
1035:2,7;1036:6,13;
1037:6,12;1039:6,15,
16;1040:9,20,23;
1041:2,15,24,25;
1043:12;1046:20;
1047:18
**cases (1)**
1032:16
**cash (14)**
876:8;896:6,13;
951:1,2;952:9,19;
953:16;954:13;955:2;
971:2;980:10,16;992:7
**casing (1)**
998:18
**catch (1)**
998:25
**caught (3)**
888:17;904:14;
912:25
**cause (2)**
980:10;1001:5
**caused (2)**
1022:21,24
**causing (1)**
1048:21
**cell (4)**
879:2;901:4;925:11;
939:8
**Center (1)**
893:6
**central (1)**
988:18
**CEO (1)**
892:15
**certain (12)**
895:13;896:23;
903:23;954:1;997:9;
998:10;1004:3;
1008:12;1013:18;
1039:2;1045:9;
1047:18
**Certainly (5)**
939:5;948:9;989:15,
18;1046:10
**certainty (2)**
1006:3;1032:23
**chain (11)**
940:18,21,23,25;
941:14;942:1,11,18,21;
958:9;959:13
**chair (10)**
876:12;882:1;928:2;
930:4;951:5;952:15;
982:15;983:18;1022:5;
1023:5
**chance (1)**
963:17
**change (4)**
969:5;1042:1;
1051:4,8
**changed (2)**
1044:21;1049:3
**changes (2)**
964:3;971:3
**Channel (1)**
898:19
**character (3)**
1001:8;1024:18;
1036:21
**characterized (1)**
1015:8
**charge (25)**
964:9;995:1;996:18,
19;997:4,9,15,17;
998:13;1000:2;
1001:13,15;1004:21;
1006:19;1009:24;
1010:25;1025:24,25;
1027:11,23;1038:22;
1044:25;1045:20;
1048:17;1050:12
**charged (56)**
878:10;881:5,10;
918:22;919:22;921:19,
21,22;922:1,1,3,4;
923:22;924:6,19,23;
926:9,11;930:24;
962:3;994:10;995:5,
14;999:3,17;1000:6;
1008:4;1010:7;
1012:24;1013:11,14,
17,21;1014:9;1016:14,
23;1017:4,13,22;
1019:15;1024:25;
1025:23;1027:12;
1028:7,14;1029:11,13,
23;1033:5,20,24;

1034:11,12,14;
1038:13;1040:5
**charges (18)**
906:5;926:13;
996:12;997:14;998:23;
1000:12,17;1001:20,
22;1004:2,5,13;
1007:21,24;1011:14,
17;1017:14;1030:10
**chart (3)**
942:24;955:7;972:2
**charts (4)**
902:23;913:9;
1039:17,18
**cheaper (1)**
956:16
**check (3)**
925:19;926:17;
1044:16
**checked (6)**
926:17;927:4,5,8,14;
929:2
**chest (1)**
1044:19
**chief (2)**
1022:7;1023:6
**choice (5)**
875:25;883:20;
889:24;890:2;902:9
**choices (14)**
876:1,17;877:10,10;
885:10,10;902:17,17,
18,18;920:18,18,19;
994:9
**choose (2)**
948:9;979:18
**chose (5)**
881:16,17;884:17;
961:6;969:17
**Christmas (1)**
965:23
**circumstance (1)**
1030:7
**circumstances (2)**
1008:20;1015:12
**circumstantial (5)**
1034:20;1035:9;
1036:3,7,10
**city (1)**
955:14
**civil (2)**
878:4;1005:21
**claim (2)**
875:11;969:21
**claimed (3)**
896:2;949:4;1038:5
**claims (2)**
898:2;1038:7
**clean (1)**
912:20
**clear (20)**
874:23;877:20;
881:11;882:9;884:15;
897:5;901:1,6;902:15,
15;909:12;912:8;
964:13;974:13;976:10;
981:8;982:4,11;
989:17;1046:22
**clearer (1)**
1045:9
**clearly (4)**
882:13;909:12;
975:9;976:4
**clears (1)**
912:14
**CLERK (1)**
1048:11
**clever (4)**
935:11;950:21;
951:4;952:18
**click (2)**
987:23;988:6
**clicking (1)**
987:21
**client (1)**
1031:18
**close (4)**
876:13;914:19;
984:8;1050:17
**closed (1)**
985:18
**closing (12)**
874:5,10;921:11;
929:20;932:11;933:16;
937:8;939:7;944:2;
960:3;962:1;985:1
**closings (2)**
964:6,7
**clutch (1)**
1044:19
**coconspirator (5)**
938:1,15;941:15,15;
1024:5
**coconspirators (10)**
937:23;939:6;
942:21;968:6,12;
1015:18;1016:1;
1019:3;1021:12;
1023:24
**coded (2)**
973:8;991:9
**Cogan-Rupani (1)**
982:10
**COHEN (53)**
874:3;920:25;921:1;
944:6;949:1;963:7,11,
12;964:5,8,12,14,15,
19;965:2,12,18,21;
968:7;969:1,6,8,11,16,
20,24;971:12;972:5;
973:14;976:18;977:6;
981:25;985:17;990:6;
991:1;1038:19,20;
1047:7;1048:23;
1049:22;1050:3,7,9,11,
13,15;1051:2,6,10,14,
24;1052:24;1053:4
**coincidences (1)**
994:9
**colleague (3)**
881:18;920:12;985:9
**colleagues (1)**
968:9
**collect (2)**
967:4;1048:3
**collective (1)**
1042:17
**Collis (1)**
917:4
**color (3)**
1035:4,5,6
**colored (1)**
1037:5
**combination (2)**
1012:13;1014:12
**comfortable (1)**
995:2
**coming (4)**
879:8;932:20;945:7;
965:5
**command (1)**
896:19
**commanded (1)**
986:2
**commands (1)**
1028:2
**commentary (1)**
1044:13
**comments (3)**
1031:3,6,8
**commercial (2)**
878:6;989:2
**commission (15)**
878:8;926:3;927:1;
998:4,8,24,25;999:19;
1014:13;1021:7;
1028:2;1029:5,11;
1033:3;1048:24
**commit (12)**
984:25;995:17,18;
998:2,7,20,20;1011:15;
1012:18;1027:13;
1028:4,9
**commits (3)**
999:9;1028:1;
1051:11
**committed (40)**
908:13;922:11;
933:8;968:3,16,16;
979:21;980:3;981:15,
17;995:21;997:25;
998:9,15,19;999:3,16,
23;1013:7,24;1017:16;
1021:11;1023:13,15,
16,17;1024:3,5,11,13;
1025:16;1028:6,11,14,
15,18,25;1029:4,4,7
**committee (16)**
877:3;879:13;
887:16;893:14;897:15;
899:2,24;911:3;
926:20;927:12,20,23;
928:3,5;950:11;1033:4
**committing (5)**
950:2;999:24;
1004:19;1028:8;
1029:1
**common (15)**
905:17,21;919:3;
921:12;922:23,24;
932:3,8;969:16,18;
970:1;1001:3;1015:15;
1035:12,22
**communicate (1)**
890:10
**communicates (1)**
990:10
**communication (1)**
914:20
**compact (1)**
1014:24
**compared (1)**
957:16
**compelled (1)**
979:16
**compensated (1)**
987:8
**complacent (1)**
914:5
**complaints (1)**
901:16
**complete (2)**
1026:6;1034:11
**completed (1)**
967:6
**completely (9)**
895:12;902:14,15;
904:15;912:15;998:2;
1036:15;1038:2;
1039:8
**comply (5)**
882:13;912:2;916:2;
989:17,19
**complying (1)**
936:19
**conceal (3)**
876:15;905:20;
1005:11
**concealed (3)**
1004:6,24;1005:8
**concealing (3)**
920:10;995:25;
1011:24
**concepts (1)**
961:18
**concern (4)**
965:12;1010:24;
1040:10;1043:1
**concerned (3)**
894:2,3;968:4
**concerning (4)**
994:21;1016:9;
1033:17;1042:4
**concerns (1)**
1033:16
**concert (1)**
929:12
**concerts (1)**
910:13
**conclude (2)**
1016:13;1040:4
**concludes (1)**
994:12
**conclusion (3)**
1036:2;1042:9;
1047:6
**conclusions (1)**
1040:16
**conclusively (1)**
1016:7
**concocted (1)**
895:25
**conduct (24)**
878:8;881:10;
902:19;919:21;921:22;
923:2;926:3,9;932:5;
978:25;996:23;
1003:14;1006:3,4;
1015:12,25;1016:16;
1021:21;1030:19;
1032:25;1033:3;
1034:4,6;1038:5
**conducted (1)**
1039:3
**conference (13)**
925:8,9,10;928:24;
929:15,17,17,21;930:3,
4,12,16,22
**conferences (8)**
878:23;928:22,25;
929:10,13,18;930:2,13
**confessed (1)**
981:3
**confession (1)**
981:2
**confidence (1)**
961:5
**confident (2)**
961:6,14
**confidentiality (1)**
1043:21
**confirm (2)**
906:21;954:18
**conflict (4)**
910:11;917:1;
926:21;928:10
**confronted (4)**
906:17,18;916:12;
981:2
**confusing (1)**
904:9
**confusion (1)**
963:19
**conjured (1)**
992:23

**connected (1)**
971:15
**connection (13)**
882:12;974:9,20;976:6,7,25;995:21,25;996:4;1004:11;1006:22;1016:5;1039:2
**conscience (1)**
1042:10
**conscientious (1)**
1036:9
**conscious (1)**
986:8
**consequence (1)**
890:22
**consequences (6)**
880:7;885:11;911:9;912:2;1008:9;1042:25
**Consequently (1)**
998:13
**conserve (1)**
1037:22
**consider (26)**
881:8;964:3;996:9,22;1002:24;1016:15;1018:18;1022:11;1023:11;1027:19;1030:7;1031:24;1032:13,17;1033:11,17,22;1034:15;1036:17;1037:13;1039:19;1041:8,11,14;1048:13;1049:10
**consideration (8)**
995:11;1001:11,17;1032:5;1034:13;1039:14;1041:19;1043:7
**considerations (1)**
1027:2
**considered (1)**
1024:16
**considering (4)**
1016:20;1017:11;1026:1;1041:25
**considers (1)**
879:25
**Consistent (4)**
963:4;978:21;1027:23;1038:6
**conspicuous (1)**
1040:2
**conspiracy (142)**
918:20;931:10;932:17;935:5;936:15;937:19,21,21,22,23;938:2,8,17,24;939:4,18;941:2,12,17;942:2;944:9;945:20;946:3;949:21,25;950:3;960:11;961:16;963:21;991:19;995:17;997:14,16,17,21,23;998:2,5,6,9,10,11,13,15,20;999:7,10,12;1000:9;1011:11,15;1012:6,9,12,17,22,24;1013:4,6,9,14,17,21,24,25;1014:1,4,6,8,11,13,14,16,18,20,22,25;1015:4,6,7,9,10,17,19,23;1016:6,10,11,12,13,14,19;1017:1,3,13,14,18,22,25;1018:12,12,15,18,20,22;1019:1,7,13,15,25;1020:2,4,8,9,12,14,18,19,23;1021:1,8,12,14,16,18,22,23;1023:14,15,19,23,24;1024:5,14,23,25;1025:3,4,12,14,17;1034:11
**conspirator (4)**
1014:17;1020:22;1024:13;1025:16
**conspiratorial (1)**
1024:20
**conspirators (7)**
938:7,7;1013:22;1016:16,22;1017:2;1019:22
**conspirator's (1)**
1019:18
**conspired (2)**
922:12;1018:5
**conspiring (4)**
922:5;923:3;933:8;1013:13
**constantly (3)**
990:7,8,9
**constitutes (1)**
1024:23
**Constitution (1)**
1040:23
**consult (3)**
1041:22;1042:14;1046:5
**consultation (2)**
1037:21,24
**contact (12)**
878:16;885:18,20;889:11,15,16;891:14,16;906:8;958:5;959:11;976:14
**contacted (4)**
891:8,18;901:18;991:24
**contacts (4)**
898:14;905:6;936:8,21
**contained (1)**
988:23
**contains (1)**
1021:20
**contemplated (1)**
994:5
**contemplation (3)**
1002:10;1003:7,19
**contended (1)**
1026:25
**content (1)**
901:19
**continue (9)**
880:1;881:20;883:6;910:2;911:16;916:3,4;1020:24;1021:2
**continued (13)**
879:20;889:4,6,11;893:2;896:17;908:19;910:17;911:12;919:20;922:17;948:15;962:11
**continues (2)**
898:15,16
**continuing (3)**
890:24;899:12;909:1
**contract (13)**
886:12;896:25;899:5;947:9,21;950:25;951:16,17,20,20;977:16;980:21;1022:8
**contracts (1)**
971:5
**contribute (1)**
1021:17
**contrivance (1)**
1015:14
**control (1)**
924:13
**convened (1)**
893:14
**convenience (1)**
1000:1
**conversation (39)**
887:20,21;894:20,20,21;917:16,17,17;918:2;940:13,15;952:14;953:14;954:4,12,18;955:25;956:4,6,7,19,21;957:6,20;958:14,16,19,19,23;959:2;972:15;973:9,11;978:3,3,4,6;991:10,11
**conversations (7)**
905:4;943:4;953:22;956:3;958:24;968:10;975:10
**conversely (1)**
933:4
**convict (4)**
1001:19;1010:10;1018:9;1033:9
**convicted (1)**
1029:6
**Conviction (4)**
999:2;1042:25;1043:2,7
**convictions (1)**
1042:4
**convince (1)**
979:11
**convinced (5)**
1024:6;1025:11,13,15;1042:1
**convincing (1)**
1001:7
**convo (1)**
942:2
**cooperated (2)**
931:7;932:13
**cooperation (1)**
934:12
**copied (1)**
990:3
**copies (1)**
1044:8
**copy (21)**
875:21,22;890:24;891:1,2;892:20,21;901:3;908:9;935:4;959:19;964:22;990:1,4;995:12;1001:25;1011:21,21;1038:22;1044:12,25
**corrected (1)**
1051:11
**corrections (1)**
1048:17
**correspondence (6)**
897:1,6;900:7;911:24;913:22;993:11
**corrupt (3)**
905:17,24;912:17
**corruptly (7)**
908:12;920:5;1005:4;1006:13,14;1007:4,18
**cosmetic (1)**
964:2
**cost (1)**
930:3
**counsel (32)**
876:7;896:3,10;952:15;955:18;962:5;974:12;978:23;979:1;980:3;981:6;982:21;984:23;988:19;991:5,18;992:11;993:14,19;1022:6,11;1023:6,8;1027:1,22;1031:7,8;1032:9;1037:3;1038:18;1047:3;1049:25
**counsels (1)**
1028:2
**Count (80)**
906:6;910:20;963:20,21,24,25;995:16,20,24;996:6,9,10;997:13,16,16,21;999:2,17;1000:9,18,22,23;1001:18,19,20,22;1002:13;1003:2;1004:2,3,5,21;1005:5,14;1006:10,24;1007:10,18,20,21;1008:4;1009:10,25;1010:10;1011:11,14,17;1012:14;1013:15;1014:9;1015:21;1016:14,23;1017:4,8,10,13,14;1018:3,9;1021:19;1024:25;1025:9,19;1026:23,24;1027:4,18,18;1028:16,16;1030:1,6;1039:16,16;1042:3;1044:15,15;1049:11,11
**Counties (1)**
1026:4
**countless (2)**
982:2,19
**country (1)**
936:10
**counts (16)**
920:1;924:1;962:3;995:10;997:7,15;999:13,21;1000:2;1001:19,19;1011:10;1012:20;1026:6,8;1027:10
**County (1)**
878:6
**couple (11)**
919:6;949:3;950:2;955:14;956:3;959:19;1011:12;1025:21;1036:23;1039:21;1050:3
**coupled (1)**
1020:9
**course (32)**
875:19;902:19,19;905:14;918:14,16,16;920:2;926:4;937:6;943:2,8;946:24,25;953:6;959:13;960:20;972:11;993:17;998:3;999:6;1010:7;1016:9;1019:5;1029:21;1031:7,24;1035:6;1037:24;1040:13,22;1050:14
**COURT (78)**
874:2,4,8;878:4,5,5,6;880:6;920:20,23;926:10;962:5;963:3,4,9;964:2,6,10,14,16,21,25;965:6,14,17,20;966:3;967:2,9,23,25;968:8;981:1;994:11;996:17;1005:20;1006:9;1032:6,25;

1033:15;1034:24;
1035:14;1037:13,20;
1038:21;1043:16;
1044:18,21;1045:8;
1047:6,8,12;1048:8,12,
15,25;1049:17,21,24;
1050:1,5,8,10,12,14,21,
25;1051:4,8,13,20,22,
25;1052:4,6,22;1053:1,
3
**court-approved (1)**
1039:5
**courtroom (6)**
961:3;963:17;991:5;
1036:14;1044:5;
1046:16
**cover (30)**
875:7;877:11;885:9;
887:13,23;889:3;
897:10;902:1,6;
903:19;905:4;907:23;
912:15;923:3,18;
925:5;932:17;934:2;
937:8;938:24;941:3,6;
942:13;944:17;945:25;
949:6,8;954:3;961:16;
971:24
**covered (2)**
1039:23;1040:1
**coverup (2)**
932:10;936:14
**COVID (2)**
1006:20;1045:17
**crazy (2)**
955:9,10
**create (4)**
968:25;969:2,2;
995:7
**creates (1)**
928:9
**creative (2)**
955:10;969:9
**credibility (2)**
1037:4,14
**credit (9)**
878:12;900:17;
920:15;925:10;927:15;
929:18,21;979:25;
980:2
**crime (80)**
881:5;919:24;
923:19;924:19;926:11;
933:8;934:2;936:24;
938:16;940:14;944:17;
945:25;948:2;950:2;
961:17;968:3,16,16;
978:24;979:21,25;
980:3;981:10,11,12,12;
984:25;990:10;997:12;
998:2,3,4,4,6,7,8,11,14,
19,20,22;999:3,5,9,12,
17,19,20,23,25;1000:6;
1002:3;1004:19;
1008:24;1011:15;
1012:12,16,22;1013:5,
6;1014:11,18;1025:23;
1026:6;1027:16;
1028:17,19,20,25;
1029:1,3,5,7,9,11,13;
1030:2,4;1033:6;
1049:8
**crimes (28)**
900:4;922:9;923:19,
23;932:18;938:24,25;
941:6;942:13;952:24;
968:3;981:17;994:9;
997:15;998:14;1000:3;
1012:17;1013:1,2,8,11;
1014:14;1027:14;
1029:23;1030:3,4;
1033:8;1034:12
**criminal (29)**
882:14;890:7,13;
919:21,22;920:19;
923:11;936:14;961:2;
973:23;974:2;985:6;
994:6;997:9;1005:21;
1012:6;1015:6;1016:1;
1020:11,11;1021:17;
1024:22;1029:9,14,16;
1033:14;1034:10;
1040:5,20
**criminals (1)**
939:5
**critically (2)**
970:3,18
**cross (2)**
1046:4;1047:8
**cross-examination (4)**
919:1;935:9;980:5;
992:17
**cross-outs (1)**
1047:9
**cruise (4)**
878:23;929:19,21;
930:22
**cryptic (1)**
991:6
**crystal (1)**
974:13
**Cuba (2)**
897:20,22
**cure (3)**
927:3,5,16
**curious (1)**
1052:15
**customer (5)**
901:11,13,20,21;
902:13
**customer's (1)**
901:16
**cut (1)**
1052:13
**Cyclones (1)**
982:12

## D

**Damn (3)**
898:21,21,21
**dangling (2)**
972:9,11
**data (6)**
883:8,16;923:2;
936:11,18;937:1
**date (7)**
892:5;898:12;
914:10,24;1009:1;
1030:11,13
**dated (3)**
896:19;900:1;911:21
**dates (8)**
903:9,22;904:4;
970:20;982:13;1030:9,
14,15
**day (25)**
875:1;885:21,25;
886:24;888:10;889:20;
892:17;894:17,17,23;
900:23;930:14;936:10;
941:1;944:6,8;970:24;
971:3;972:10;973:1;
977:13;990:17;993:3,
6;1052:10
**days (33)**
875:6;889:12,22,23,
24;891:5,5;893:11;
895:9;900:23;902:8,9,
9;903:6;917:2;927:3,5,
16;944:16;949:3;
955:14;959:19;971:9;
975:12,20,20;978:16,
18;990:2;991:23,23;
993:1,18
**deal (2)**
916:20;917:7
**dealt (1)**
953:7
**death (1)**
964:17
**decals (1)**
876:25
**deceive (1)**
1009:20
**December (1)**
1053:5
**deceptive (1)**
1008:8
**decide (11)**
878:1;884:4,4,8;
932:14;933:23;
1032:20;1033:25;
1038:16;1041:24;
1045:7
**decided (2)**
988:6;989:10
**deciding (3)**
933:13;1003:1;
1018:17
**decision (8)**
879:14,15;952:8;
967:14;1010:6;1031:4;
1044:11;1047:1
**decisions (7)**
877:14;986:8;994:4,
5,5,6;1010:2
**defendant (230)**
874:9,13;875:1,13,
16,19;876:5,12,14;
877:22;878:3,11,18,22;
879:8,8,9,23;880:3;
881:5,23;882:1,2;
883:13,15,16,20;884:5,
15,24;885:9;887:6;
890:8;891:7,17;893:1;
898:20;901:9;902:17,
21;904:16,25;906:4,
23;909:10;910:17,19;
911:4;912:13;913:7;
914:21;915:2;916:4,7;
918:10,12,17,20,23;
919:8,13,21;920:8,13,
16,23;949:9;961:2;
971:4,23;973:24;
981:15,17,20;986:14;
992:22;993:7,17;
995:4,9,16,20,24;
996:11,16,25;997:2,11;
998:24;999:6,11,15,16,
19,23,24;1000:5,8,11,
14,16,20,22;1001:14,
15,23;1002:4,6,7,13,
20,23;1003:1,4,11,13,
18,21;1004:6,13,24;
1005:1,4,8,11,17;
1006:1,2,9,13;1007:2,
4,6,14,21,24;1008:16;
1009:2,11;1010:11,16;
1011:4,15,18;1012:24;
1013:6,10,14,20,23;
1015:20;1018:2,4,11,
17,19;1019:7,11,14,24;
1020:1,4,13,17,20;
1021:13;1022:1,3,6,12,
14,17,21,24;1023:4;
1024:3;1025:9,13,18,
19;1026:10,25;1027:5,
6,12,16,17,18;1028:4,
7,7,12,17,19,24;
1029:10,11,12,14,15,
17,19,19,25,25;1030:8;
1032:5;1033:2,15,23;
1034:9;1038:4,5,7,8,
10,12,14;1040:7,20,22;
1041:1,3,3,6,16;
1042:24;1043:5;
1049:11;1052:7
**defendants (1)**
1040:8
**defendant's (27)**
889:16;957:2;976:9;
989:24;992:4,9;995:7;
1001:12,18;1002:25;
1005:24;1006:4,6;
1007:13;1018:25;
1019:4,17,18;1020:2;
1030:2,4,5;1032:25;
1033:18;1034:13;
1038:14;1041:12
**defense (25)**
880:24;918:25;
919:6,7;929:9;940:19;
944:1;955:23;956:12;
974:12;978:20,23;
979:1;980:3;981:6;
982:21;984:23;988:18;
991:5,18;992:11;
993:14,19;1027:4;
1037:3
**defenses (1)**
990:5
**deficiency (1)**
927:2
**defined (2)**
1007:9,19
**Definitely (2)**
944:21;989:22
**definitions (3)**
882:10;1017:11;
1018:16
**delay (4)**
927:22,25;928:2,6
**delete (10)**
901:3;902:15,21;
903:19;912:10;913:16,
24;919:17;935:17;
968:13
**deleted (24)**
876:21;877:1,5;
883:21,24;884:7;
909:22;913:10,17,20,
23;914:1,13,15;923:1;
934:1,4;935:8,10;
940:7;948:6;993:12,
13;1004:7
**deletes (1)**
913:7
**deleting (4)**
920:10;940:10;
995:25;1011:24
**deletion (2)**
909:21;914:25
**deletions (1)**
914:8
**deliberate (11)**
965:4,5,7,16;967:12;
989:4;990:16,21;
1041:21,23;1047:25
**deliberately (1)**
1028:21
**deliberating (1)**
1043:10
**deliberation (3)**
902:18;965:9;1043:2

**deliberations (16)**
921:18;926:15;
994:14,24,24;996:24;
1000:19;1030:19;
1032:18;1039:11;
1042:15,16;1043:16;
1044:9,24;1052:14
**deliberative (3)**
894:20;910:24;
935:13
**demand (1)**
912:8
**demanded (1)**
901:24
**demonstrate (4)**
885:7;916:24;
1021:10;1026:9
**denial (1)**
910:20
**denied (2)**
903:7;910:23
**deny (2)**
910:23;969:24
**denying (1)**
911:6
**department (12)**
893:21;904:23;
908:16,18;917:13;
975:5,7,8,11;986:22;
991:23;1010:24
**departments (1)**
1008:8
**depended (1)**
889:1
**DEPUTY (1)**
1048:11
**describe (2)**
987:14;994:16
**described (2)**
1028:16;1046:1
**describing (1)**
1017:10
**deserve (1)**
1053:1
**deserves (1)**
1037:10
**designed (2)**
876:11;970:8
**desktop (2)**
1045:15,15
**destroy (4)**
876:21;1004:8;
1005:11;1011:25
**destroyed (5)**
902:22;903:22;
986:2;1004:24;1005:8
**destruction (1)**
918:11
**detail (4)**
961:23;995:15;
997:8;1014:2
**detailed (5)**
880:6;900:3;901:15;
920:7;986:10
**detail-oriented (4)**
986:16,24;987:6;
994:3
**details (6)**
889:17,18;938:3;
1015:1;1019:11,12
**determine (5)**
1004:17;1020:1;
1029:10;1039:15;
1043:4
**determining (2)**
1015:24;1016:14
**devastating (1)**
992:22
**developed (1)**
1041:10
**developments (1)**
882:25
**device (2)**
912:19;942:20
**devices (12)**
883:22;889:9;901:4,
5;904:1,3;911:14;
936:1,20;982:25;
989:21,25
**different (24)**
876:18;884:22,22;
892:22;903:5,25,25;
905:19;906:16;907:15,
17;914:24;918:15;
919:22;941:19,22;
956:3;957:12;983:12;
997:16;1004:14;
1012:22,23;1019:21
**differently (4)**
927:14;953:24;
956:1;981:18
**differs (1)**
1004:3
**difficulty (1)**
974:11
**digging (1)**
984:9
**digs (1)**
988:14
**diligence (1)**
962:1
**dinner (1)**
930:14
**direct (15)**
890:6;929:20;
1015:9;1016:8;
1034:19,21,25;1035:2,
6,21;1036:1,7,9;
1046:4;1049:18
**directed (1)**
1031:9
**direction (3)**
901:7;968:19;
1047:17
**directly (1)**
976:1
**director (1)**
1034:3
**directors (5)**
879:11;882:1;
886:11,20;1022:5
**directorship (1)**
987:7
**dirty (1)**
991:3
**disability (28)**
886:7;888:6;906:13;
942:7;947:9,10;
950:24;951:7,8,24,24;
952:7,17,17;953:2;
954:14;955:2,2;
956:15,20;957:20;
959:25;971:2;973:18;
980:9;1022:9,10;
1023:7
**disagree (1)**
963:6
**disagreement (2)**
877:18;1045:7
**disapprove (1)**
1039:9
**disbanded (1)**
899:24
**discharged (1)**
1047:19
**discharging (1)**
1047:16
**disclose (4)**
880:23;983:23;
984:2,4
**disclosed (2)**
984:1,14
**disclosure (12)**
880:3,5,18;926:18;
927:3;983:19,22,24;
987:4;988:11;996:23;
1033:1
**disclosures (1)**
1034:7
**disconnected (2)**
994:8;1016:5
**discretion (1)**
1038:3
**discuss (8)**
890:7;962:7;967:4;
973:23;994:23;1042:7;
1043:12;1047:17
**discussed (5)**
895:21;919:14;
954:1;1023:5;1037:11
**discussion (9)**
945:19;951:5,6,25;
952:3,7;954:19;955:1;
963:4
**discussions (5)**
926:20;927:21;
942:9;951:16;954:15
**disobey (1)**
1010:16
**dispassionately (1)**
1042:8
**displayed (1)**
914:7
**dispute (20)**
877:16,17,25;880:1,
22,24;881:21;882:6,
15;883:7,15;884:2,3;
940:22,24;956:18;
959:10;960:16;969:23;
981:25
**disputed (6)**
877:24,24;878:1,2;
884:2;1035:10
**disregard (5)**
1031:6,23,25;
1032:14;1036:15
**dissociated (1)**
1021:4
**distinct (4)**
1012:15;1013:5;
1019:21;1027:16
**distinguish (1)**
1036:7
**distinguished (1)**
1026:19
**District (12)**
896:21;976:16;
996:8;1003:8;1008:1;
1011:1,9;1026:1,2,7,
12,13
**divert (1)**
1038:9
**division (2)**
878:6;989:3
**document (41)**
876:1,3;890:17;
895:10,12,19;896:19;
912:3;926:13;974:6,9,
23;975:23;976:2,25;
977:2,3,4,21,23;978:9,
16,18;981:3,4;987:11;
988:22;989:8;992:19;
995:5;1001:21;1002:5,
14,14,15,16,18;
1004:25;1005:8;
1015:5;1048:20
**documenting (1)**
975:10
**documents (36)**
874:21;875:24;
882:7,16;883:2,4;
884:11;886:12;896:20,
23,24;898:3;900:15;
901:5;903:7;904:12,
17,20;905:10;909:11,
13,15;910:18,21;
911:21;916:6;919:12;
921:15;922:7;924:5;
926:8;951:9;968:14;
979:24;1045:18,18
**dodgy (1)**
1030:21
**DOJ (5)**
899:17;908:18;
975:7;976:11,13
**dollar (2)**
897:20;920:15
**dollars (11)**
875:9,12;878:19;
881:24;896:5;936:16;
960:13;983:21;984:11;
995:23;1011:22
**donations (2)**
900:15;911:25
**done (29)**
877:8;881:16;
891:14;899:6;905:5,
16;908:12;909:16;
913:18,19;925:6,15;
930:8,14,25;937:25;
939:25;948:2;964:7;
979:5;983:8;988:6;
990:11;1000:10;
1010:12,12,14,14;
1016:1
**door (3)**
938:11;970:23;
1035:20
**doubled (3)**
917:10,14,15
**doubt (79)**
875:15;922:9;
923:23,25;924:1;
928:18;931:6;934:13;
937:20;941:12;942:6,
15;946:2,5;947:23;
949:2;957:25;958:1;
959:4,22;960:2;
961:20,21,22,23,23;
970:7;975:1;997:4,11;
1000:13,21,25;1001:1,
2,2,3,4,7,12,18;
1002:13,20;1003:3;
1004:23;1005:7,17;
1006:13;1007:1,6,17;
1008:14;1009:11,15,
23;1010:8,10,20;
1013:16;1014:5;
1016:20;1017:12;
1018:13;1021:7,10;
1023:17;1024:4,7;
1025:11,13,16,23;
1026:16,19;1028:13;
1030:1;1039:16;
1041:1;1043:5
**down (12)**
905:2;917:10,14,15;
954:22;972:15;974:8;
982:11,16;1014:23;
1030:17;1041:20
**draft (3)**
907:14,15,20
**drapes (2)**
1035:17,19
**draw (6)**

958:19;1019:24;
1038:2;1040:6,16;
1041:6
**drawn (6)**
1016:17,17;1019:4;
1035:17,19;1038:23
**drink (1)**
940:4
**dripping (1)**
1035:20
**drop (1)**
938:11
**dropped (1)**
938:13
**drops (1)**
898:19
**drove (1)**
878:21
**dual (1)**
1027:7
**dupe (3)**
955:22;956:21;989:3
**duped (9)**
874:13;923:8;
939:14;942:12,23;
949:2;955:22;982:22;
991:1
**duration (2)**
1019:19;1020:2
**during (38)**
877:3;884:19;
885:12,23;890:6;
905:8;908:15;914:18;
916:12;917:9,12;
919:6;921:11,17;
922:10;923:10;929:19;
933:16;960:3;962:8;
970:19;971:8;974:17;
979:23;980:19,23;
982:1;983:8;992:6;
1013:25;1023:23;
1026:25;1031:2;
1033:15;1040:12;
1042:14,16;1044:23
**Dutchess (1)**
1026:3
**duties (7)**
881:6;926:13;
996:19;1033:7,10,12;
1034:3
**duty (3)**
961:6;1041:22;
1043:2
**dwelling (1)**
987:25

## E

**ear (1)**
943:13
**earbuds (1)**
945:23
**earlier (11)**
875:6;892:17;
894:10;897:17;918:16,
23;948:8;978:1;
993:22;996:15;
1014:12
**early (4)**
892:25;970:17,20;
971:8
**earnest (1)**
1052:14
**ears (1)**
1034:23
**easily (1)**
920:8
**easy (1)**
981:3
**easy-to-read (1)**
981:3
**Edward (1)**
940:18
**effect (4)**
978:23;985:1;
1006:7;1042:5
**effectively (1)**
976:19
**efficient (1)**
1046:8
**Eisner (1)**
900:11
**either (17)**
879:2;920:6;922:3;
940:23;942:20;943:1;
965:18;1004:18;
1005:21;1006:15;
1016:22;1017:18;
1020:24;1027:18;
1040:7;1042:9;
1049:11
**elaborate (3)**
932:14,20;936:13
**elect (2)**
1043:14,24
**electronic (7)**
901:4,5,8;982:25;
989:21;1039:4;
1045:18
**element (26)**
920:1;981:18;
1002:11,12,19;1003:2,
17,25;1005:5,14;
1006:10;1007:5,16;
1009:10,14,22;1010:9,
19;1011:6;1014:4,21;
1017:23;1018:10;
1021:6;1023:13;
1029:22
**elements (19)**
919:24;995:15;
997:12;1002:3;
1004:18,23;1007:1;
1008:12,23,25;
1013:16;1014:3;
1017:7,8;1025:8,10,22;
1026:14;1028:16
**else (19)**
875:20;880:1;882:6,
15;888:4;946:4;971:8;
973:20;998:1;1018:5;
1028:6,9;1030:21;
1037:2;1041:15;
1050:2,20;1051:23;
1052:23
**email (23)**
913:22;928:3;
935:24;946:11,23;
947:6,11,24,25;982:9,
11;985:18,21,21,21,22,
24;989:22,23;993:11;
1004:7;1011:25;
1039:4
**e-mail (2)**
901:18;903:2
**emailed (1)**
946:7
**emails (26)**
910:4,6;911:24;
913:7,10,16,24;936:8;
938:4,25;943:12;
946:5,8,19;947:3,7,8,
10,17,18,21;948:1,1;
982:19;985:15;996:1
**e-mails (12)**
876:22;877:5;
878:25;883:21,23;
897:2,6;900:7;901:5;
902:5;903:16;960:5
**embezzled (3)**
936:16;946:20;
950:21
**embezzlement (13)**
922:2;933:21;940:1;
946:10;947:20;950:17;
981:7,9,15,22;984:22;
996:19;1033:25
**embezzling (1)**
940:12
**emblazoned (2)**
876:25;904:1
**embrace (1)**
918:25
**emphasis (2)**
1000:15;1033:5
**employee (1)**
1036:25
**employment (3)**
896:25;980:21;
1022:8
**encouraged (1)**
928:23
**end (8)**
920:6;940:18;
968:19;969:15;984:19;
1006:15;1020:6;
1047:2
**ended (1)**
1025:3
**ends (1)**
1049:4
**enforcement (8)**
979:6;996:4;
1004:11;1012:4;
1036:24,25;1037:4;
1039:3
**engage (3)**
922:19;1033:13;
1034:9
**engaged (4)**
878:9;902:19;
995:16;1020:19
**engaging (1)**
936:14
**Enjoy (1)**
1053:1
**enjoyed (2)**
879:9,19
**enormously (1)**
1047:15
**enough (6)**
888:3;921:21;
955:17;1015:13;
1024:11;1025:4
**ensure (1)**
1043:21
**enter (4)**
1015:6;1032:18;
1039:10;1043:1
**entered (3)**
903:10;1014:23;
1015:20
**entertainment (2)**
928:24;930:15
**entire (3)**
995:11;1012:10;
1041:2
**entirely (8)**
918:24;967:15;
983:12;1031:23;
1032:20;1033:16;
1038:17;1040:10
**entitled (22)**
875:11;942:8;947:8;
950:24;951:6,13,23;
952:11,16;953:9;
956:19;957:8,20;
1021:20;1031:24;
1032:4;1033:17;
1037:1;1041:16;
1042:22;1043:23;
1046:24
**entries (2)**
887:4;976:11
**entry (5)**
899:22;906:8;973:3;
978:11;1002:4
**enumerate (1)**
1008:13
**envelope (1)**
1044:18
**equal (3)**
1019:23;1032:6;
1040:14
**equally (2)**
921:14;930:25
**erase (4)**
883:19;901:23;
902:4,5
**erased (3)**
883:9,16;904:2
**erasing (1)**
901:18
**erroneous (1)**
1042:2
**error (2)**
923:15;964:11
**errors (1)**
923:6
**especially (1)**
1047:20
**essence (2)**
998:6;1014:11
**essential (3)**
997:12;1025:2,22
**essentially (3)**
903:1;916:21;935:3
**establish (5)**
1008:11;1025:24;
1026:20;1029:2,24
**established (5)**
994:18;1019:1,6;
1030:15;1035:12
**establishes (2)**
968:15;976:4
**ethics (9)**
879:13;927:12,20,
23;928:3,5;996:18;
1033:4,6
**evaluating (2)**
1030:18;1037:14
**evaluation (1)**
994:22
**even (44)**
878:7;879:3,12,20;
880:10,11;900:4;
901:7;902:1;903:2;
911:14,21;912:22;
913:20;915:4;922:18,
20;923:15;927:4;
928:5;930:4;931:9;
932:7;959:18;961:5;
976:9;981:10,21,25;
984:21;986:18;990:19;
992:8;998:11,20;
1008:17;1013:6,12;
1019:24;1020:8;
1024:14;1027:2,7;
1028:3
**event (11)**
894:23;899:16;
904:24;906:5,7;
910:19;977:6;1043:2,
7;1045:23;1049:16
**events (7)**

885:4;893:6;905:7,
14;911:17;982:25;
986:15
**eventually (2)**
878:5;986:2
**everybody (5)**
991:5;992:7;993:24;
1044:4;1047:4
**everyone (6)**
874:2,8;927:7,11;
936:17;937:6
**everywhere (1)**
1050:20
**evidence (183)**
874:19,23,23;
876:21;878:20;881:9,
9;884:6,20,21,24;
885:7;887:3;889:15;
891:4;892:25;899:19;
902:22;903:11,21,22;
904:18,19,25;905:10;
906:1,1;907:12;916:1;
917:8;918:12,19,19,25;
919:2,3;920:10,13,16;
921:3,10,11;923:21,21,
24;929:9;936:24;
938:18;956:12,25;
957:16;958:2;959:15;
960:5,8,15;961:13,25;
965:16;968:2,15,18,24;
969:2,3,8;970:15;
976:4;978:19,21;
982:19;983:17;985:20;
986:2;988:12;990:13;
992:22;994:7,22;
995:6;996:1,22;
1001:4,12,17;1002:24;
1003:1;1004:9,9,15,22;
1005:6,15;1006:11;
1012:1,1,25,25;1013:3,
3;1014:9,10;1015:9;
1016:4,10,15,21;
1017:4,5,8,9,18,19;
1019:2;1026:17,18,18,
20,23;1027:11;
1030:12,15,18;1032:7,
7,9,12,15,21,24;
1033:2,11,13,17,19,22;
1034:4,6,7,10,17,19,20,
21,25;1035:2,6,9,9,21;
1036:1,3,8,9,14,18;
1037:7,11;1038:13,16,
25;1039:1,4,5,6,8,10,
12,13,14,20;1040:21,
24;1041:9,10,19;
1042:5,11,19;1043:4,6;
1045:16;1046:20
**exact (3)**
892:5;898:9;937:13
**exactly (8)**
921:7,9;952:10;
957:15;967:10;968:1;
987:5;994:7
**examination (1)**
890:6
**examine (1)**
919:2
**examined (1)**
1037:19
**example (12)**
965:19;982:18;
986:12;987:3,5;993:2;
998:16;999:5,7;
1018:4;1035:7,14
**examples (2)**
990:15;1021:21
**Except (1)**
957:11
**excess (6)**
983:21,25;984:3;
987:12,15,18
**exchange (2)**
972:8;982:9
**exchanged (2)**
968:11;971:11
**exclusive (1)**
1030:24
**exclusively (1)**
1043:3
**exculpate (1)**
1038:8
**excuse (4)**
909:2;967:2;
1008:20;1013:2
**excused (1)**
962:9
**executive (2)**
1022:7;1023:6
**Exhibit (24)**
875:8;887:6;892:17;
916:25;929:9;940:15;
955:3;957:1,2;971:10;
973:9;975:4;976:10,
12,14;977:25;980:11;
982:10;986:13;987:4;
993:9;1001:24;
1011:20;1035:1
**exhibits (8)**
884:22;985:19;
1032:8;1035:2,2;
1037:19;1039:21;
1045:16
**exist (2)**
938:22,23
**existed (14)**
969:5;988:25;
1012:10;1015:19,23;
1016:13,15;1017:13;
1023:20;1024:25;
1025:5,12,12,15
**existence (7)**
1013:17;1014:4;
1015:10,11;1016:11,
19;1035:13
**existing (2)**
1003:19,22
**exists (1)**
998:10
**expanded (1)**
911:22
**expect (9)**
881:4,8;907:2;
919:23;920:4;921:18,
24;926:14;961:1
**expected (3)**
921:5;929:13,15
**expenditures (1)**
987:15
**expense (1)**
879:1
**expenses (4)**
916:5,8;925:7,15
**expensive (4)**
917:4,5;953:2;
956:16
**experience (3)**
1035:12,23;1044:13
**experienced (2)**
878:4;1035:14
**expert (2)**
955:8,20
**explain (16)**
888:20;906:14;
921:24;932:12,16;
935:2;961:1;969:1;
983:14,15;995:14;
997:7;1004:17;
1027:24;1032:18;
1036:19
**explained (4)**
902:25;920:8;
921:17,23
**explaining (1)**
952:4
**explains (1)**
961:15
**explanation (4)**
888:12;916:16;
918:3;949:8
**explicit (1)**
1015:9
**explicitly (1)**
975:25
**exposed (1)**
1036:22
**Express (2)**
916:23;1015:15
**expressly (1)**
997:24
**extension (1)**
947:21
**extent (7)**
969:13;1019:17,19;
1020:2;1031:20;
1045:1;1046:3
**extra (1)**
957:18
**extraction (2)**
914:16,18
**extraordinary (1)**
1015:4
**eye (1)**
1050:17
**eyes (1)**
1034:23

## F

**fabricate (3)**
1012:25;1050:19,22
**face (1)**
912:3
**fact (41)**
880:21;890:21;
895:10;913:2,3;926:5,
18,19;927:8,13;929:11,
12;931:21;934:11;
940:7;951:4;952:11;
953:11;956:20;979:8,
8;981:16;985:17;
1002:15,16;1003:24;
1008:15;1017:24;
1018:17;1026:20,21;
1033:14;1035:10,12;
1036:24;1037:13;
1038:1,12;1040:7;
1041:5;1047:18
**factory (1)**
901:3
**facts (25)**
877:18,21,23;
889:17;912:23;923:5;
961:13,15;968:23;
969:2,5,5,7;978:21;
994:17,17;997:10,12;
1002:17;1019:6;
1030:25,25;1032:2;
1035:10;1037:12
**failed (9)**
880:23;882:8;
923:22;983:22;989:17,
19,20;990:3;1026:22
**failing (2)**
921:20,20
**fails (1)**
1000:21
**failure (3)**
882:13;912:2;
1014:16
**fair (7)**
962:2;1001:11,16;
1041:16,18;1046:23,25
**fairest (1)**
1046:24
**fairly (2)**
981:6;1046:19
**faith (2)**
923:12;985:4
**fake (1)**
1002:18
**fall (1)**
1010:22
**false (61)**
875:23;876:24;
881:23;884:5,9,10;
895:4;906:4,9,13;
908:14;909:2,6;916:4;
917:10;918:21;919:9;
922:6;963:22,25;
968:4,15;969:24;
976:5;979:20;985:9,
10;988:19,23;989:14;
991:20,25;995:22;
996:3,6;1001:21,23;
1002:4;1004:10;
1007:22;1008:4,6,15,
21,24;1009:3,6,15,17,
23;1010:4,6,8;1011:4,
7,19;1012:3;1022:1;
1038:8,9;1051:16
**falsely (8)**
875:11;898:2;
909:10;910:17;979:22;
1008:2;1022:4;1023:4
**falsified (1)**
1002:14
**falsify (3)**
1050:19,23;1051:8
**Falsifying (8)**
1002:14;1013:2,3;
1014:9;1017:4,8,18;
1027:11
**falsity (1)**
1008:17
**family (1)**
879:3
**far (1)**
879:12
**fast (2)**
893:12;921:21
**faster (1)**
1045:10
**fault (1)**
960:9
**favor (2)**
905:19;1042:9
**favorable (1)**
1040:6
**FBI (2)**
938:19;941:1
**fear (1)**
1046:20
**February (15)**
891:18;892:8,9,9,10,
14,25;893:5,16;894:17,
17;939:17;976:2,22;
991:23
**federal (142)**
875:2,4,14,15;876:3,
4,6,15;877:7;878:17;
881:1,22;882:15,18,20,
23;884:9,14,16,25;
886:1;889:1;890:7;
891:4,9,17,25;893:12,
18;894:16;895:2;

896:16;898:14,22,22;
905:3;908:2,10,14;
909:10;910:17;911:7;
912:24;914:11;918:22;
919:8;920:9,11,14;
922:4;925:24;927:6,
17;929:7;930:18;
938:10,21;944:8,18;
945:25;949:7;952:4;
954:22;957:23;958:3,
5,8;959:11,16;963:25;
969:21,25;970:8,11,13,
14,16;971:17,20;972:2,
16,20,24;973:21,23;
974:10,18,24;975:1,9;
976:1,8,17,23,25;
977:20;979:5,8,13,14,
19;981:2,12,21;
983:15;985:13,24;
988:9,22;990:4,18,22;
993:1,5,15;996:2,3,4,7;
1002:1;1003:12,15,20,
24;1004:10,11,12;
1005:20,20,20,21,23;
1006:9;1008:15;
1010:18;1011:23;
1012:2,3,16,19;
1022:19,25
**FedEx (1)**
989:23
**feel (2)**
1030:22;1046:10
**feeling (1)**
1041:11
**feelings (1)**
1041:14
**fell (1)**
922:16
**fellow (1)**
1041:25
**few (17)**
881:18;891:5;
893:11;899:2;903:6;
916:6;970:20;978:16;
981:22;984:24,24;
985:15;990:2,15;
1041:21;1045:21,21
**fictitious (6)**
1007:22;1008:21;
1009:3,6,16,17
**Fifth (7)**
880:3;900:14;
937:19;951:19;1009:8;
1010:19;1022:21
**figure (5)**
944:10;945:5;
946:20;965:3;1046:5
**file (1)**
880:5
**filed (1)**
880:3
**fill (1)**
880:8
**filled (1)**
988:19
**filling (4)**
987:2;988:1,2,15
**final (6)**
962:2;964:22,24;
1003:2;1010:19;
1041:20
**finally (1)**
994:23
**financial (9)**
878:13;880:3,5,18;
983:19;987:4;996:23;
1033:1;1034:6
**find (52)**
876:22;881:9;
892:10;893:25;981:14;
990:7;994:17;996:11;
999:15,16,22;1000:22;
1001:14;1003:21,23;
1008:19;1011:7;
1013:6,7,10,13,14;
1015:17,19,20,22;
1016:19;1017:21;
1018:2;1021:14,19;
1023:12,14,16,17;
1024:24;1025:4,7,8,9,
18,18;1026:22;
1027:17,21;1032:2;
1033:19;1038:8,22;
1044:24;1049:11,13
**finding (2)**
1018:1;1027:17
**finds (1)**
990:8
**Fine (3)**
948:2;1038:20;
1048:25
**fired (1)**
911:3
**firmly (1)**
992:5
**First (84)**
876:1,19;878:3;
882:17,19;885:5;
886:8,9;892:7,7,21,24;
893:18;895:7;896:18;
903:8,12;906:3;
907:14,15,20;908:15;
909:11;914:17;917:15,
19;919:8,9;924:2;
929:1;938:10,10;
940:22;951:20;952:5;
954:12;957:16;958:5;
959:11;970:1,25;
971:16;972:19;974:15,
23;975:20,25;977:9;
978:9;980:7;981:24;
985:14;988:6,7;989:8,
10,15,18;990:17;
991:24;994:16;995:13;
999:15;1000:2,4;
1002:4,12;1004:22,24;
1005:5,5,14;1006:10;
1007:2,5;1009:1,10;
1013:17;1014:4;
1028:5,14;1045:4,24;
1046:12
**fit (1)**
1044:9
**five (10)**
891:5;913:23;
953:23;975:12,20,20;
993:12;1008:24;
1047:14;1048:2
**flipped (1)**
968:18
**focus (9)**
877:7;884:25;
887:18;903:18;906:5;
910:20;919:25;997:21;
1037:18
**folks (5)**
988:4;994:12;
1046:18;1048:15;
1052:23
**follow (7)**
882:23;883:3;
964:23;970:3;1031:15;
1044:9;1046:21
**following (2)**
1013:16;1049:9
**follows (1)**
1021:25
**fondness (1)**
982:3
**forbids (1)**
1010:15
**foreman (1)**
1052:15
**forensic (1)**
903:24
**foreperson (8)**
1043:15,17,18,22,25;
1044:18;1052:16,17
**foreperson's (1)**
1043:22
**foreseeable (2)**
1005:25;1007:14
**form (19)**
880:16;927:3,18;
961:11;963:15,19;
964:9;987:4;988:21;
995:1;1035:1;1039:17;
1044:7,10,12,14,14,17;
1045:19
**formal (2)**
956:10;1015:5
**formally (1)**
995:5
**formed (5)**
1014:25;1018:12,12;
1020:23;1025:5
**former (2)**
896:10;968:9
**forms (22)**
880:4,5,6,9,13,18;
921:5,20;926:4,18;
983:19,22,24;984:14;
985:3;987:1,3;988:1,4,
11;996:23;1033:1
**formulate (1)**
1044:24
**forth (5)**
894:8;925:11;
1014:25;1025:6;
1046:17
**forward (3)**
902:11;912:14;958:2
**forwarded (1)**
940:23
**found (10)**
887:8;891:25;895:8;
907:4;951:22;993:9;
997:11;1021:1;1027:6,
16
**Four (24)**
910:20;919:22;
931:8,9,21;962:3;
963:25;971:14,15;
994:15;995:10,15;
996:6,12;997:1;
1000:3;1007:20,21;
1008:5;1009:10,25;
1010:10;1012:20;
1033:8
**four-family (1)**
987:25
**fourth (4)**
879:9;994:23;
1010:9;1022:17
**Fourthly (1)**
1009:6
**frame (1)**
1012:11
**fraud (5)**
893:14;920:15;
922:1,11;923:3
**fraudster (3)**
923:13;957:18;985:5
**fraudulent (6)**
1007:23;1008:21;
1009:4,6,16,19
**free (4)**
994:25;1030:22;
1041:17;1043:24
**Frequently (2)**
1024:17;1030:10
**Friday (3)**
965:14,21;967:19
**Fridays (1)**
965:7
**friend (10)**
878:24;916:10,10;
922:17;939:23;949:11;
952:23;960:10;982:5;
993:23
**friendly (1)**
1020:10
**friends (5)**
940:7;950:8;968:4;
981:24;982:4
**front (1)**
952:21
**fronted (1)**
983:11
**frustrate (1)**
935:17
**full (2)**
888:14;1039:14
**full-time (1)**
984:17
**fully (3)**
916:2;977:12;
1019:12
**function (3)**
1010:24;1040:11;
1043:4
**functions (1)**
1008:7
**funds (1)**
984:6
**further (12)**
886:18,22;918:11;
941:18,23;964:3,19;
982:10;984:12;988:14;
996:20;1023:24
**furtherance (9)**
1013:25;1021:8,11;
1023:14;1024:4,13;
1025:17,25;1026:13
**furthering (2)**
1018:23;1020:20
**Furthermore (1)**
996:11

## G

**Gagliardo (10)**
911:1,24;912:1;
913:8,11,15,17,20,25;
914:1
**Gagliardo's (3)**
883:1;899:21;914:10
**gain (1)**
924:10
**game (2)**
893:5,5
**games (1)**
930:23
**gather (1)**
967:6
**gave (32)**
881:23;883:10;
886:6,11,16;889:8,20;
891:6;899:9;900:25;
903:25;904:17;906:15;
915:6;924:9,15,25;
926:10,22;928:15;
934:18;937:2,8;939:8;
949:18;956:11;957:1;
958:25;969:11;983:3;

1032:24;1038:9
**gee (1)**
1035:23
**gender (1)**
1041:13
**general (10)**
876:6;896:2,10;952:15;955:18;1022:6,10;1023:6,8;1036:5
**generally (2)**
970:10;997:17
**Genius (2)**
901:21;937:13
**gentlemen (9)**
877:10;922:16;925:23;937:17;941:11;954:7;959:4;988:12;1048:12
**getaway (1)**
998:19
**gets (8)**
891:8;901:10;945:17;955:4;960:22;961:19;975:12;992:21
**gift (11)**
901:21,24,25;902:7;937:11,12;949:17;983:22;987:12;993:21,23
**gifts (15)**
880:10,11,15;900:15,19;911:25;921:4,19;922:13;924:9;925:1;983:20;984:11;985:3,22
**Gio (1)**
899:4
**Giovanni (5)**
900:17;907:16;917:19;956:4,22
**given (9)**
875:22;876:23;900:16;903:1;937:11;983:13;1013:4;1032:21;1042:18
**gives (9)**
902:1;912:15;916:16;925:23;941:11;953:8;959:22;970:4;971:4
**giving (8)**
888:1,5;901:25;924:23;941:9;944:13;959:24;991:13
**glory (1)**
1049:2
**Gmail (1)**
883:23
**goal (1)**
1017:1
**goals (4)**
1013:8;1017:1;1018:20;1021:17
**God (3)**
894:4;941:21;964:11
**goes (15)**
889:7;894:16;902:11,11;903:3;912:14;938:9;941:18;942:1;949:17;960:22;973:17;988:8,10;999:10
**gold (1)**
943:12
**Good (24)**
874:2,3,8;887:22;888:3;892:13;910:3;925:21,21;942:2;945:2;954:22;955:12;960:23;967:24;973:9;978:2;991:10,15;1042:10,10;1046:16;1053:2,4
**goodies (3)**
880:22;903:25;961:9
**governing (1)**
1012:16
**government (214)**
874:5,11;875:8;877:21;887:6;892:16;916:24;918:24;921:5,9;922:4,7,8,22,25;923:4,16,17,18,22;924:3,8,17;925:1,5,16,24;926:2,6,22,25;927:6,7,17,25;928:16,19;929:7,10,23;930:9,18,20;931:4,7,8,19;932:2,7,11,12,16,20,23,24;933:1,5,10,10,15,23;934:10,20;935:8,12,18,20;936:6,25;937:3,7,18;938:10,18,21,22;939:7,9,17;940:3,4,5,14;941:3,25;943:2,25;944:8,18;945:21;946:1,7,12,14,18,19;947:1,19,23;948:3,9,13;949:22;952:22;953:11;954:23;955:3;957:1,13,23;958:2,6,11,17;959:1,7,12;960:19,21,22,22,23;961:3,19;963:17;967:21;969:12;970:6;971:10;973:9;975:3;976:10,12,14;977:24;980:11;981:8,16,18;982:10;986:12;987:4;990:4;993:9;997:3,10;1000:12,20,21;1001:24;1002:12,19,23;1003:3,10,17;1004:18,23;1005:7,10,16;1006:8,12,23,25;1007:16;1008:7,12,14,22;1009:9,10,14,21,22;1010:2,3,5,9,19,23,25;1011:2,3,6,20;1012:9;1013:15;1014:22;1017:12,15;1018:13;1021:6,10;1023:25;1025:2,7,9,23;1026:5,9,16,22;1028:5,13;1031:5;1032:4;1036:24,25;1038:6;1039:15;1040:7;1041:2;1051:7
**government's (10)**
931:12;935:2;936:17;942:24;943:5;949:5;1000:24;1039:8,11;1040:25
**grand (39)**
876:15,19;882:7,12,17,20;883:11,24;884:12;887:8;889:5;891:24;896:18,20;898:5,10;899:11;900:1,4;902:6;903:8;904:7,10;909:24;911:20;912:6,12;920:11;945:19;985:14;986:3;989:17;996:2;1004:10;1005:21;1012:2;1022:15,19,25
**granddaughter (1)**
940:6
**gravity (1)**
993:6
**gravy (1)**
878:21
**great (7)**
940:6;944:6,8;949:17;958:22;961:23;1052:20
**greater (4)**
1026:18;1032:5;1042:22;1043:23
**Greek (5)**
878:24;897:25;929:19,20;930:22
**group (1)**
953:1
**G's (1)**
911:2
**Guagliardi (1)**
938:16
**Guagliardo (55)**
877:2,5,6;887:15,15,20,22,23;888:2;893:20;897:14,17;898:20;899:1;900:10,16,20;903:14,16,17,18,18;922:11;937:22;938:2,19;939:3;940:16,20;941:4,13,15,24;942:1,3,12,12;946:21;950:9;958:9;959:14,21,23;960:9,12;972:4;973:6,17;991:4,4,7,8,15;993:4,7
**Guagliardo's (1)**
922:3
**Guardian (1)**
954:17
**guest (2)**
878:24;930:7
**guilt (12)**
995:7,8;1000:13,25;1001:13,18;1014:17;1019:18;1020:3;1029:24,25;1038:6
**guilty (52)**
874:17;877:11;913:4;920:19;924:1;933:20;962:3;978:24;981:11;994:10;995:9;996:11,12;997:2,3,11;999:11,15,20;1000:5,8,12,20,22;1001:15;1013:6,10,13,14;1018:3;1025:9,19;1026:24;1027:16,17,18;1028:10,12;1029:18,25;1038:11,12,15;1041:1;1042:2,3;1043:5;1044:15,15,15,16;1049:11
**guy (1)**
991:4
**GX (2)**
881:24;963:23

**H**

**half-truth (1)**
933:13
**half-truths (3)**
932:21;934:3,8
**halt (1)**
1043:13
**Hamill (1)**
977:24
**hammer (2)**
898:19;979:1
**hand (2)**
998:23;1001:16
**handing (1)**
936:5
**handshake (4)**
971:6;977:17;986:6;988:24
**handwriting (1)**
1049:9
**happen (2)**
905:15;979:11
**happened (39)**
874:14;881:14;883:14,18;884:24;887:7,11,14;895:14;896:8,11,15;904:3;905:24;906:2,23;907:5,6;910:25;916:22,24;918:7;921:7;953:22;957:6;958:15;968:10,10;971:14;972:1;974:5,15,19;976:19;977:1;992:8,24,25;1034:25
**happening (8)**
897:19;899:13;920:18;934:22;959:3;968:13;971:8;977:7
**happens (5)**
902:12;903:14;970:11;973:5;1047:23
**happy (1)**
945:22
**hard (2)**
901:6;1030:16
**hardworking (1)**
878:13
**harmless (1)**
1024:18
**hay (1)**
985:17
**head (6)**
929:2;935:15;948:11;959:8;968:18;983:14
**heading (1)**
1047:6
**heads-up (1)**
993:10
**hear (13)**
877:9;893:25;907:2;919:7,15,23;964:15;991:18;993:14,19;1045:6,23;1050:21
**heard (67)**
874:22;875:17;877:3;878:7,12,21;879:1,7,11,12,17;880:4;882:3,24;883:3;885:8,12,19;886:4,8;887:17;888:8,13,20;890:2;891:2,10;892:2;899:8,11;901:11;906:14;908:16;909:7;910:9;914:9;917:23;918:7,8,13;919:12;923:21;924:20;925:17;926:25;927:20;929:1,19;930:13;945:3;955:23;969:1;971:13;977:10;978:14,22;983:17;992:16;1011:12;1035:15;1036:14,16,23;1037:11;1038:4;1039:1;1040:12
**hears (1)**
897:14
**held (1)**

998:21
**help (12)**
875:4;878:16;886:15;887:23;904:22;933:2,9,18;949:8;982:5;1021:15;1028:20
**helped (3)**
875:11;922:12;930:12
**helps (2)**
1029:5;1037:21
**hereafter (1)**
1036:12
**Here's (4)**
935:11;945:9;959:10;990:15
**herself (12)**
877:12;884:18;885:9;911:11;917:3;990:8;1020:11;1028:4,18;1029:14;1038:8,10
**hesitate (5)**
891:20;939:20;1001:5,8;1042:1
**hesitation (2)**
889:25;890:2
**Hi (1)**
944:19
**hide (12)**
881:3,16;884:12;899:7;904:15;925:4;932:9;946:5,18;947:13,17;948:4
**hiding (3)**
881:12;927:13;946:13
**higher (1)**
930:5
**highlight (3)**
905:12;910:3;930:21
**highlighted (4)**
906:9;907:18;929:14;930:5
**highly (1)**
1031:13
**himself (5)**
892:13,14;907:23;951:2;977:22
**hold (5)**
969:9;973:12;998:16;999:8,10
**holding (1)**
990:19
**holdup (2)**
998:21;999:8
**holiday (2)**
965:15,20
**holidays (1)**
965:23
**home (12)**
877:8;883:1;885:16,17;899:21;908:9;911:2;912:23;913:11;914:11;1046:15;1047:14
**homes (1)**
987:24
**honest (2)**
991:21;1042:4
**Honor (32)**
874:3,12;963:7,8,14,23;964:5,8,12,20,22;965:2,12,25;966:2;967:22;968:7;1038:20;1047:5,7;1048:23;1049:15,20,23;1050:3;1051:2,10,24;1052:24,25;1053:2,4
**hook (1)**
922:16
**hope (2)**
1015:2;1017:2
**hoped (1)**
875:13
**horrible (2)**
950:12,14
**horribly (1)**
990:9
**hours (3)**
971:15,15,16
**human (1)**
994:3
**humanity (1)**
1046:24
**hundred (1)**
1035:15
**hundreds (2)**
936:9;960:12
**hung (1)**
943:2

**I**

**iced (1)**
1006:20
**iCloud (7)**
877:1;883:22;891:25;902:14;909:16;914:9,23
**idea (1)**
943:3
**Identify (2)**
987:14;1045:2
**identities (1)**
1019:8
**ignorance (1)**
1002:22
**ignore (1)**
1038:24
**illegal (4)**
953:16;1017:23;1020:20;1021:23
**illustrate (1)**
1035:7
**image (1)**
901:3
**immaterial (2)**
1030:2,3
**immediately (1)**
939:9
**imminent (1)**
1003:13
**impair (4)**
1004:8;1005:2,17;1012:1
**impartial (4)**
1001:11,16;1041:18;1047:1
**impartially (1)**
1046:19
**impede (7)**
970:8;1002:1,8;1003:4,11,14,22
**impeded (2)**
1007:3,7
**implicates (1)**
933:1
**impliedly (2)**
997:24;1015:14
**imply (1)**
974:12
**importance (4)**
986:25;987:1,2;1001:6
**important (27)**
877:18;878:13;880:25;891:8;893:22;895:15;901:15;926:16;930:25;944:12;945:9;953:25;954:6;958:20;970:4,18,20;971:21;974:14;986:14;988:16,17;1001:9;1005:12;1018:25;1032:23;1036:5
**importantly (3)**
921:14;924:25;937:17
**imposing (1)**
1043:3
**Impossible (2)**
913:22;993:11
**impression (1)**
1042:23
**improper (6)**
972:12,23;1027:5;1037:15;1041:11,14
**inaccurate (12)**
933:1,7,7,11,14,19;934:16,21,25;952:6;980:15,22
**inaccurately (1)**
988:15
**inactions (1)**
1033:18
**inadvertently (1)**
1029:4
**inbox (2)**
947:18,21
**include (4)**
907:17,19,21;917:25
**included (2)**
932:22;1002:17
**includes (2)**
1026:2;1033:1
**including (15)**
897:2;900:7;922:20;930:3;994:20;996:1;1002:15;1003:25;1004:6,9;1012:1;1025:1;1039:6;1049:1,1
**income (8)**
880:10,14,16;984:2,3,12,17;987:17
**incomplete (2)**
915:3;1022:25
**incomprehensible (1)**
886:14
**inconvenience (1)**
1039:19
**incredibly (2)**
901:15;974:14
**incriminating (4)**
968:14;990:11,13,16
**Indeed (5)**
1015:4;1019:20;1025:18;1032:22;1037:22
**independent (7)**
996:13;1012:14;1013:5;1014:18;1019:2;1042:18,20
**indicate (3)**
974:11;1015:16;1030:25
**indicated (1)**
983:19
**indicates (2)**
913:18;1030:12
**indicating (1)**
880:13
**indication (2)**
942:19;1031:3
**indictment (36)**
910:20;918:22;926:12;995:5,6,11,12,14;996:17;997:1,6,8,14;999:18;1001:13;1004:13;1010:7;1011:14;1016:24;1017:23;1021:20;1023:11,18;1024:2,9,24;1025:6;1030:10,10,15;1033:8,21;1034:15;1040:5,9;1050:24
**individual (1)**
1021:5
**individually (1)**
1002:11
**induces (1)**
1028:2
**infer (3)**
1015:10;1038:10,11
**inference (6)**
995:8;1019:5,13;1040:6,16;1041:6
**inferences (3)**
1016:17;1019:4;1038:2
**inferring (1)**
1035:11
**influence (9)**
1002:1,8;1003:5,11,15,22;1010:1;1011:23;1043:8
**influenced (4)**
1006:5;1007:2,7;1042:21
**influencing (1)**
1010:1
**info (1)**
889:17
**inform (1)**
1044:4
**informal (2)**
917:24;956:9
**information (4)**
876:15;897:18;979:19;988:23
**informed (6)**
882:11;934:11;1019:12;1022:6,13,18
**informs (1)**
881:9
**initially (1)**
1000:4
**innocence (3)**
1014:17;1038:6;1041:4
**innocent (7)**
913:3;960:25;1000:16,18;1024:17,18;1028:23
**inquiry (1)**
879:13
**insisted (1)**
986:4
**insofar (1)**
1033:19
**instance (1)**
1014:7
**instead (13)**
876:8;886:8;896:6;906:12;951:1;953:16;954:14;965:5;980:10;990:2;1022:9;1048:19;1050:19
**instinct (1)**
972:19
**instituted (1)**
1026:12
**institution (1)**
890:25

**instruct (20)**
881:4,8;920:4;926:14;970:6;979:18;981:16;994:13,19;1000:1,4,6,17;1003:7;1027:20;1032:6;1036:13;1039:11;1040:14;1049:12
**instructed (7)**
883:18;996:15;1007:11;1017:7;1018:15;1024:21;1032:10
**instructing (2)**
989:25,25
**instruction (3)**
926:10;1032:24;1040:19
**instructions (16)**
880:7;882:10;896:23;900:2;909:12;912:7;964:23;970:3;981:13;983:13;994:15,21;996:21;1031:15,16;1046:21
**instructs (1)**
919:23
**insurance (22)**
876:9;888:1;892:15;896:6,24;941:10;954:2,2,3,8,14,17;955:8,20;956:15;959:25;973:18;980:11;991:14;1022:9,10;1023:8
**integrity (2)**
1005:2,18
**intend (6)**
884:12;969:21;970:12;984:25;1015:1;1031:21
**intended (5)**
970:9;1003:11;1021:15;1026:10;1029:8
**intending (1)**
1018:20
**intent (24)**
905:17;912:17;922:5;947:25;948:3;960:7;983:16;988:8;1001:25;1002:7;1003:4,21;1005:1,17;1009:20;1020:15;1027:6,7,8,9;1030:7;1033:20;1034:13;1049:7
**intention (2)**
1010:15;1018:23
**intentional (6)**
885:8;890:1;905:24;908:12;911:4;914:25
**intentionally (10)**
905:16;912:16;920:9,10;946:5;1002:21;1020:18;1028:18,19,21
**interactions (1)**
1033:2
**interest (5)**
910:12;917:1;984:18;1023:6;1037:6
**interested (2)**
948:13;1045:13
**interfere (1)**
1046:22
**interfering (1)**
1006:7
**interlineated (1)**
1049:9
**interlineations (1)**
1048:19
**intermission (1)**
1048:16
**internal (2)**
893:13;900:24
**internet (1)**
879:4
**intervene (1)**
888:4
**interview (21)**
875:2;885:15,22;886:19;888:9;894:11,12;908:15;916:12;917:9,12,20;970:25;971:3,16,20;972:6;978:15;980:20,23;1007:25
**interviews (2)**
931:23;986:5
**into (37)**
885:20;893:6;902:12;903:11;923:24;931:13;932:12;933:5;938:2;942:23;945:15;949:13;956:12;958:10,13;969:4;981:11;984:5,7,7;989:10;998:18;1014:2,23;1015:6,20;1032:18;1034:24;1036:21;1039:10;1043:1;1044:5,7,18,18;1045:8;1048:3
**introduced (1)**
982:9
**investigate (1)**
899:12
**investigated (2)**
895:7;944:7
**investigating (4)**
881:2;885:13;886:3;900:5
**investigation (104)**
875:14;876:4,15;877:7;878:17;881:17,22;882:12;884:14,17,25;886:2;887:18;889:18;890:7,13,24;891:4;893:12,13,13;896:17;898:14,16,22,23;900:24;903:19;908:3;911:8,22;914:2;915:6;919:9;920:11,14;922:5;932:4;935:18;940:10;948:3;950:12;958:3,8;959:16;968:13;969:22,25;970:8,10,11,11,13,14,16;971:9;972:24;973:21,23;974:2,10,18,21,24;975:1,9;976:1,7,8,17,23;977:1,20;979:21;981:11,20;983:5,6,15;984:5,7,13,19,21;986:15,20;988:9,14,22;990:22;993:6,16;996:5;1002:1,8;1003:5,12,13,15,19,23;1004:12;1005:21;1011:23
**investigator (1)**
889:1
**investigators (17)**
875:15;876:5,6;877:7;882:16,18,21;883:2;886:1,25;892:1;894:23;895:1;908:10;914:11;952:5;985:25
**invited (1)**
886:23
**involve (1)**
998:1
**involved (5)**
984:6;990:10;1015:12;1040:5;1041:15
**involves (1)**
1018:10
**iPads (5)**
876:25;903:22,25;918:11;936:2
**iPhone (52)**
876:23;883:9,9,17;886:22;887:5;889:8,16;895:10;901:20,20,21,24;905:6;911:18,19;912:22;914:21;935:20,20;936:2,23,23;937:10,12;943:13,15,17;944:10,14;945:11,13,17,23;949:16;950:20;951:12;957:9;958:15;972:9,21,21;978:17,17;983:4;986:18;990:19,23;993:18;1004:8;1011:25;1022:22
**iPhones (2)**
902:13;949:19
**irrefutable (1)**
912:24
**irrelevant (1)**
1033:16
**Island (4)**
885:16;929:19,21;930:22
**Isles (2)**
878:24;897:25
**Issue (8)**
902:12;950:23;952:12;954:13;999:23;1019:18;1020:3;1021:9
**issued (2)**
882:11,17
**item (6)**
975:4;986:13;987:6,11,14,22
**items (7)**
900:15;911:25;912:21;913:14;915:14;1034:1,7

**J**

**Jackson (72)**
875:22;885:13,19,25;886:3,5,6,9,10,12,17,17,20;888:7,8,19,21,24;889:21;890:23;891:1,3,6,7,10,17;894:10;895:3;898:2,8;899:9,15,23;903:7;906:14;907:7,10;908:17;909:13;910:1;915:8;916:13;917:10,15;931:12,16;938:9,13;939:8;940:8;947:5;956:23;957:2;958:6;959:10,11,14;970:22,24;971:1;972:6;975:13,21,22;976:2,15;977:13;978:14;979:15,17;980:5;986:5
**Jackson's (1)**
935:9
**jail (1)**
911:10
**January (63)**
878:7;885:12,22;886:24;887:5;889:20;890:8,14;891:5;892:8,24;895:9;897:3;906:9;907:7;940:25;943:23;955:5;958:6;959:12,13,18;969:3,4;970:21,21,21,24;971:2,12;973:1,13;974:3,5,16,22;975:4,5,21,22,24,25;976:19,21,22;977:1,7,9,11,23;978:2,9,10,14,17;983:4;990:17;991:8;1001:22;1004:5;1011:17;1022:1;1025:1
**Jedi (1)**
978:22
**Jeremy (1)**
902:24
**job (7)**
967:6,16;984:15,16,16;988:13;1044:16
**Joe (8)**
911:2;922:3;939:3;940:16,20;973:5,17;993:7
**join (2)**
946:2;1012:7
**joined (5)**
937:20;1015:18;1018:19;1020:4,5
**joint (1)**
998:18
**joke (1)**
913:21
**joked (1)**
913:21
**Joseph (18)**
877:2,6;883:1;887:14,15,19;893:19;897:14;898:20;899:21;900:10,16,20;903:13,16;911:1,24;993:4
**judge (40)**
878:4;880:6;881:4,6,8;919:23;920:4;921:1,17,23,23;926:10,12,14,14;927:3,5;944:1;961:1,15;970:3,5;979:18;981:13;983:12;986:25;989:1,2;994:3;996:17;1005:20;1015:25;1033:1,10,12,15,19;1035:13;1043:3;1048:11
**judges (1)**
1030:24
**judgment (4)**
923:6,15;1040:18;1046:19
**judicial (19)**
878:8;879:13;926:3;927:1,3,11,20,23;983:23;984:14;988:4;996:18,23;1033:3,4,6,7;1034:4,6
**Julia (1)**
917:4
**July (12)**
904:4;905:2;914:10,12;916:13;917:9;975:24;1004:6;1011:18;1022:24;1023:3;1025:2

**jump (1)**
944:14
**June (23)**
882:21;883:7,12;895:21;899:17;900:1;903:6,12;904:11;906:24;910:19;911:21,23;915:24;918:6;953:13;976:13;979:23;982:9;1007:24;1022:17,21;1023:1
**jurisdiction (9)**
1002:9;1003:5,24;1008:22;1009:9;1010:21,23;1011:5,8
**juror (6)**
961:7;967:8;1043:10,23;1047:22;1052:19
**jurors (9)**
874:9;920:23;964:21;1036:21;1041:22,25;1042:6;1048:7;1052:6
**jury (75)**
874:1,4,7;876:15,19;882:7,12,17,20;883:11,24;884:12;887:8;889:5;891:24;896:18,20;898:5,10;899:11;900:1,4;902:6;903:8;904:7,10;909:24;911:20;912:6,12;920:11;962:7,9;963:3,15;964:8,13,23;965:3,3,13;967:1,5,9,11;985:14;986:3;989:17;995:1,13;996:2;997:6;1000:19;1004:10;1005:21;1012:2;1021:19,24;1022:15,19;1023:1;1030:24;1043:14,25;1044:7;1045:15;1047:12,19;1048:3,5,19;1049:23,25;1052:8,21
**justice (30)**
893:21;904:23;908:16,18;917:13;918:21,21;963:21,22,24;975:5,7,8,11;986:22;989:2;991:24;995:17,19,21,25;1001:21;1004:3;1011:16,19;1012:13;1017:5,9,19;1027:12
**justification (5)**
888:12;895:23,24;918:3;952:19
**justify (5)**
875:8;881:24;895:17;1008:20;1019:13

## K

**Kam (196)**
875:1,3,7,9;876:8,23;877:2,12;878:16,21;879:20;881:2,23,25;882:21,25;883:10;884:17;885:9,14,15,18,20,22,24;886:1,2,4,6,9,18,19,21,22,24;887:2,10,13,14,19,23,25;888:5,9,10,10,11,19,22,24;889:3,3,4,6,19,20,23;890:15,23,23;891:6,18,20;892:3,12,12,19;893:3,5,18,18,20;894:7,9,19;895:16,20;896:1,12,14,24,25;897:3,9,13;898:15,17,25;899:21;900:9,12,16,18,25;903:13,25;906:12,23;907:15,21;909:8,17,23;910:5;911:1,3,7,24;912:1,5;913:14;914:3,6,15,17;917:19;919:16,20;921:4;922:6,17,19;923:13,18;933:18;938:9,11;939:17;940:3,16,19;943:7,22;945:7,19;947:8;951:16;953:25;958:25;960:10;970:22,25;971:3,19,21;972:1,2,6,7,11,19,24;973:4,5,8,17;974:4,9;975:4;977:9,11,14,16;978:2;981:7,9,24;982:7,13,13,15,20,21,24;983:2,6;984:5;985:4,9,23;986:7;988:24;989:3;990:17;991:15;992:3,7,21,21;993:2,8;995:23;1004:12;1011:22,23;1034:2
**Kam's (1)**
893:22
**Kaplan (11)**
881:4,8;919:23;920:4;921:17,23;944:1;961:1,15;970:5;979:18
**Kaplan's (3)**
970:3;981:13;983:12
**Katz (3)**
920:12;963:8;970:2
**Katz's (2)**
969:15;983:11
**keep (17)**
901:16;908:9;924:10;935:11,14,16;936:17,20;940:11;941:14;948:10,12;959:7;961:18;989:13;996:25;1006:21
**keeping (2)**
945:21,22
**keeps (2)**
937:6;993:24
**kept (10)**
879:8;887:6;904:25;920:17;943:21;951:18;986:14,18,21;992:4
**Kevin (1)**
940:18
**key (9)**
885:4;895:14;904:19,24;905:7,13;906:5,19;907:17
**kicking (1)**
969:9
**kickoff (1)**
965:22
**kind (2)**
935:7;1012:6
**kinds (1)**
1034:17
**Kings (1)**
878:6
**knew (62)**
874:15,16,20;875:16;884:15,16;886:2,19;887:23;888:22;893:19;899:20;903:18;908:1,2,2;909:6;911:6,12,13,17,17;912:2;922:19;927:7,11;936:15;941:24;942:5,6;943:10,10,13;944:13,22;945:10;948:13;949:11,11,12,12,13;954:4;955:20;958:2,21;959:16;960:13,14;970:7,17,17;974:8,23;981:5,15;1002:23;1006:1,9;1007:14;1008:17;1009:18
**Knicks (1)**
893:9
**Knowing (6)**
912:12,12,13;950:22;1020:21;1028:17
**knowingly (23)**
976:5;979:20,22;1002:4,6,14,16,20,21;1003:1;1007:21;1009:7;1010:11,12;1013:20,24;1015:20;1018:14,15,19;1025:14,16;1029:15
**knowledge (15)**
983:16;988:8;1011:4;1018:22;1019:5,14,15;1020:9,12,14;1029:3;1033:18,20;1034:13,25
**known (2)**
1004:15;1019:8
**knows (21)**
879:24;889:8;898:24;901:25;902:2;912:4;936:17;937:6;939:13;944:7;953:8;975:25;976:16,21;986:25;987:1,2;988:10,13;1034:22;1035:24
**Kohn (2)**
899:3;989:24

## L

**lack (3)**
1029:24;1040:14;1041:10
**ladies (9)**
877:10;922:15;925:23;937:17;941:11;954:7;959:4;988:11;1048:12
**Lambert (1)**
925:17
**language (3)**
973:9;1015:15;1049:18
**laptop (1)**
1045:14
**Las (3)**
916:5,11;925:8
**last (14)**
894:17;900:2,3;902:24;917:20;960:22,23;961:4,5,19,19;963:13;1000:9;1007:16
**lasted (1)**
1012:9
**Lastly (1)**
883:21
**late (7)**
894:18;949:16;964:2;965:11;966:1;967:14;1046:13
**later (31)**
886:24;887:17;889:12,20;891:5;893:11;894:24;899:8;900:23,23;903:9,14;910:14;917:2;945:4;949:4;955:14;958:16;959:19;965:10,14;970:23;971:15;975:12,22,23;977:13;989:23;990:2;993:3,6
**Laura (1)**
927:21
**LaVale (9)**
970:22;975:13,21,22;976:2,15;978:14;979:15;980:5
**law (42)**
905:16;920:19;961:15;968:17,22;970:10;979:6,19;981:1;989:1;994:13,16;996:3;1000:16;1004:11;1005:23;1007:11;1010:15,16,17,18,18;1012:3;1014:7,25;1015:15;1016:23;1019:23;1025:20,21;1030:13;1031:16;1032:6;1036:4,6,7,23,25;1037:4;1039:3;1044:23;1046:21
**lawful (3)**
1024:17;1039:9,12
**lawfully (1)**
1039:7
**laws (3)**
1012:16,19;1013:18
**lawyer (4)**
947:2;986:25;994:3;1037:23
**lawyers (10)**
874:19;893:20;897:20;968:25;1032:13,15;1035:14;1037:12,16;1045:5
**lawyers' (1)**
1031:25
**lead (1)**
938:2
**league (1)**
924:14
**learn (1)**
922:10
**learned (8)**
877:6;884:24;894:6;924:12;927:21;940:18;947:2;983:14
**learns (3)**
894:9;897:12;898:17
**least (16)**
997:23;1004:6;1011:18;1013:24;1016:21;1017:17,22;1018:21,23;1019:16;1021:11,12;1025:1,16;1044:21;1046:3
**leave (4)**
931:23;966:2;967:3;1048:4
**leaves (2)**
953:6;970:22
**led (1)**
878:16
**left (8)**

885:17;886:17;
904:5;947:24;954:4;
971:14;1015:6;1034:4
**legal (9)**
896:4,7,12,14;909:4;
912:3;918:5;1031:19;
1039:25
**legitimate (1)**
1037:3
**length (2)**
954:17;1026:15
**less (7)**
875:24;893:16;
914:20,22;973:8;
1037:1;1045:11
**lest (1)**
987:20
**letter (2)**
928:4;989:24
**letters (1)**
900:7
**liability (3)**
1000:4,7;1019:19
**liar (2)**
923:13;957:18
**lie (39)**
875:11,16;876:14;
886:20;888:12,18,19;
895:25;906:17,19;
908:6;913:1;917:14,
15;920:9;923:4,18;
925:1,5,23;926:22;
927:6,17;928:15;
929:7;930:17;931:4;
932:20;933:3,9;
937:16,18;939:24;
941:3,4,5;947:13;
953:14;958:21
**lied (9)**
874:20;876:18;
905:3,3,4;910:14;
941:6;953:12;981:21
**lies (7)**
876:6,9,11;894:24;
959:22;961:16;971:1
**lieu (4)**
951:1;955:2;980:16;
1023:7
**life (6)**
968:1;971:22;
1001:6;1013:25;
1023:23;1035:23
**light (4)**
993:15;1006:20;
1033:19;1038:24
**liked (10)**
889:10;893:4;
924:16,18;926:19;
928:14;943:11;944:22;
949:12,13
**likely (7)**
969:12;984:7;
1006:1;1007:15;
1026:21;1045:11;
1049:4
**limited (4)**
897:2;996:21;
1032:16;1034:15
**limiting (1)**
1032:24
**line (17)**
922:16;937:10;
957:11;958:12;988:18;
1023:12;1045:2;
1048:21;1049:1,3,4,6,
8;1050:9,18;1051:11,
16
**lines (2)**
879:2;1045:1
**liquor (9)**
998:17,21,21;999:4,
6,8,9,11,12
**list (6)**
880:9;976:10;987:6,
11,17,24
**listed (4)**
895:19;900:11;
933:17;997:1
**listen (3)**
970:4;981:13;
1052:12
**listening (1)**
1052:10
**listing (1)**
987:8
**lists (3)**
889:16;976:12;
987:24
**little (29)**
877:16;887:16;
890:21;893:17;900:2,
20;928:19;932:14;
934:14;935:1,19;
937:7;938:6;939:1,12,
13;944:15;945:8;
953:23;956:1;957:12;
958:4,16;959:6;
965:14;966:1;1036:12;
1039:22;1048:16
**live (1)**
968:22
**lives (1)**
968:23
**located (1)**
901:5
**location (1)**
887:5
**locked (1)**
982:16
**log (3)**
986:14,18,21
**logic (2)**
1000:9;1035:25
**logos (1)**
904:1
**logs (2)**
903:23;918:12
**Long (14)**
885:16;894:19,20;
898:16;939:19;940:15,
15;950:23;967:15;
970:13;1005:25;
1007:13;1024:3;
1030:16
**longer (4)**
899:3;916:9,14,18
**longterm (19)**
886:7;888:6;906:12;
950:24;951:7,7,24,24;
952:7,17,17;954:2,2,
13,14;955:2;956:14,
20;959:25
**long-term (9)**
942:7;947:9,9;971:2;
973:18;980:9;1022:9,
10;1023:7
**look (32)**
887:3;892:21;893:6;
894:7;905:20,21;
912:21;929:8,25;
937:21;940:13,14;
943:6;950:7;951:11,
20,21;952:13;958:23;
963:15;975:6;976:12;
978:1;982:22;985:19;
987:22;990:11,14;
991:17;1035:5;
1049:17;1050:5
**looked (9)**
894:2;899:5,20;
903:3;940:6;954:21;
957:9,15;977:2
**looking (6)**
938:7;941:14;
958:10;980:12;984:7;
1051:15
**looks (9)**
907:17;914:23;
940:13;951:11;955:8;
990:16,21,24;992:2
**Lord (1)**
886:15
**lost (3)**
946:24;947:6;
1043:10
**lot (35)**
877:9;878:20;884:1,
1;899:12;903:13;
904:18;905:12;909:12;
918:10,14,14,15,18,18,
19;921:6;922:12;
924:20;926:2,7,8,25;
927:7;928:19;929:19;
930:9;942:24;951:8;
953:11;954:15;957:19;
958:11;965:22,23
**lots (1)**
897:24
**louder (1)**
1016:2
**Louise (1)**
982:10
**loyal (5)**
950:9;952:21,21,22;
960:9
**loyalty (5)**
914:5,6,7;922:14;
952:23
**LTD (4)**
888:1;892:15;
941:10;991:14
**luck (1)**
992:4
**lunch (2)**
962:6,8
**lure (1)**
950:20
**lured (2)**
943:13;945:13
**luring (1)**
944:13
**lying (5)**
922:4;929:23;
937:16;951:14;981:12
**Lystra (1)**
917:4

**M**

**MacKoul (8)**
886:15;907:16;
954:8,15;955:8,17,20,
22
**Madam (1)**
982:15
**main (1)**
1047:19
**maintain (1)**
1047:25
**major (6)**
909:9;916:3;924:14;
968:12;969:19;
1019:22
**makes (12)**
881:13;891:9;913:2,
3;918:19;919:1;
933:20;944:8;946:24;
977:8;982:4;995:2
**making (16)**
890:2;922:6;923:11;
950:13;964:2;978:20;
985:6;989:5,13;
993:15;994:4;996:3;
1007:22;1008:20,24;
1012:3
**man (2)**
923:13;985:5
**managing (1)**
1031:7
**Manhattan (4)**
894:14;973:2;
989:10;1026:2
**manipulated (2)**
922:12;937:24
**manipulating (1)**
991:1
**manner (3)**
1015:14;1016:23;
1030:18
**manuals (1)**
901:7
**many (11)**
876:16;878:12,14;
884:5;889:9;906:16;
975:6;982:17,20;
991:6;994:6
**March (16)**
876:20;882:17;
883:11;894:14;895:1;
896:19;899:11;917:12;
954:23;979:24;980:20;
993:1;1008:3;1022:3,
16,20
**MARK (21)**
874:6,10,12;909:1;
920:20;964:22;965:1;
971:10;985:9;1047:5;
1049:2,15,20;1050:10,
16,22;1051:19,21;
1052:3,25;1053:2
**marketing (1)**
980:25
**Mark's (1)**
970:19
**marshal (4)**
1043:18,20;1044:1;
1047:11
**massive (4)**
922:1,11;923:3;
936:15
**matched (1)**
906:15
**material (5)**
1005:12;1009:5,24,
25;1014:16
**materially (2)**
979:20;1007:22
**materials (13)**
876:19;882:10;
884:12;896:23;897:1;
900:6,11;912:7;915:5,
23;1022:14,18,25
**math (1)**
976:3
**matter (27)**
874:18;884:13;
927:16;953:21;988:7;
998:7;1001:5;1002:8,
10;1003:5,7,23,23,24;
1008:16,21;1009:8;
1010:21;1011:5,8;
1019:5;1027:19;
1030:12;1035:7;
1038:16;1049:10;
1051:20

**mattered (2)**
881:4;884:16
**matters (5)**
880:24;988:7;
1038:2;1040:9;
1051:21
**maximum (1)**
879:6
**may (84)**
874:10;880:24;
881:8;920:25;923:16;
925:20,21;929:5;
935:16;939:3;944:19;
961:8,10;965:15;
967:25;969:13;974:12;
985:2;989:22;996:22;
997:11;998:4;999:15,
16,22;1001:24;
1002:24;1013:6;
1015:6,10,25;1016:10,
15,17;1019:4,20,21,24;
1020:5,10;1023:11,20;
1026:9;1027:5,6,16,21;
1028:5;1030:4,7;
1031:7;1032:17,18;
1033:2,9,11,12,22;
1034:1,8,15,17;
1036:12,15;1037:13;
1038:10,11;1040:4;
1041:5,6,8,11,14;
1042:14,15;1046:8;
1047:23,24;1048:1,4,
15;1049:13;1052:1,3
**Maybe (19)**
895:25;897:21,22;
900:23;913:21,21;
924:21,22;956:2,3,6,8;
959:2,3;979:10;
992:11,12,13;1035:24
**MCU (118)**
875:9;876:25;
878:12,12,19,21;879:3,
3,4;880:4,9,10,17,19,
23;881:2,7;883:18;
885:14;886:4,11;
887:5;889:17;890:25;
893:9;896:3;897:12,
15,16;900:19,24;
902:4;904:1;910:13,
13;911:14;912:1,8,13,
15,19,21,25;913:8;
915:20;916:9,11,15,17,
19;917:5;921:21;
922:2,11,13,18;924:10,
12,12;925:3,9,12,20;
927:8,10,24;928:12;
929:8,17;931:1,1;
932:25;935:21,25;
936:1,3,3,4,20;937:1;
941:24;946:12,15,23;
947:6,11;950:10,22;
952:15;954:9;972:22;
973:2;982:17;983:1,8,
10,22,25;984:3,12,15;
985:17,23;986:15;
988:5;989:21;993:19;
995:23;996:17,20,24;
1011:22;1022:6,9,22;
1033:24;1034:2,3
**MCU-issued (3)**
918:11;972:21;
990:23
**MCU's (19)**
876:6,12,25;878:19;
879:9,11,16,17;881:13,
24;882:1;887:2;
896:10;901:3,5;
910:11;917:6;984:6;
1022:6
**mean (11)**
884:12;893:7;
923:16;939:10;979:9;
1018:16;1027:3;
1029:24;1030:25;
1032:4;1036:25
**meaning (6)**
931:1;939:24,25;
952:23;953:16;959:11
**meaningless (1)**
1050:5
**means (21)**
892:2;920:5,7;922:6;
933:8;935:4;939:10;
942:3;950:18;999:18;
1002:14,21;1005:19;
1006:14,16;1015:1;
1026:18,21;1028:3,21;
1039:22
**meant (1)**
875:3
**measured (1)**
1019:19
**mechanics (1)**
994:24
**meet (13)**
886:1;887:1,10;
907:9;955:15;973:1;
974:8;975:16;979:6,8;
993:4,7;1028:5
**meeting (30)**
885:21;887:12,19;
888:9;889:2;917:18,
22,23,24;918:6;
925:12;930:10;956:9,
10;967:7;970:24;
971:5;972:9,20;
976:11;979:23;986:6,
21;990:17;992:5,6;
993:1,3;1037:16;
1046:16
**meetings (6)**
922:24;928:25;
971:22;972:1;979:3;
990:19
**meets (4)**
894:23;895:1;
904:23;977:11
**member (29)**
877:4;878:11;879:6;
880:10;881:7;887:16;
924:21;929:12;930:3;
996:17,20;1013:21,23;
1015:3;1018:11,14,18;
1019:7,9,20;1020:1,7,
8;1021:1,14;1023:15;
1025:14;1033:24;
1043:14
**Members (5)**
962:7;1012:17;
1020:25;1021:22;
1052:8
**membership (1)**
1021:2
**memo (131)**
875:6,7,8,16,18,20;
876:5,24;881:23,24;
882:2,3;889:13,19,21;
890:5,19,23;891:2,6;
892:3,10,11,15,16,21,
24;893:1,17;895:4,4,8,
9,23;906:4,8,19;907:8,
14,15,16,17,21;908:1,
5,6,8;909:2;919:9,19;
925:24;932:23,23;
933:1,6,7,11,14,17,19,
24;934:16,18,24;
935:1;937:25;941:8,9;
942:4,6,7,13,23;943:9,
19;945:18;949:3,14,15,
17,23;950:19,20,23;
951:10,11;952:5,19;
953:8;954:18,21;
955:24;956:5,11,12,22,
24;957:2,5,12,15,22;
958:3,7,14;959:2,5,5,
18,24;968:4;969:3,4,
24;973:21;974:20,25;
975:4;976:5,20;
977:10;980:8,11,22,24;
985:9;986:11;988:19;
989:15;991:20,25
**memorandum (6)**
963:22,23;995:22;
1001:23;1011:19;
1022:2
**memory (11)**
958:22;974:11;
992:12,14,15,16,24,24;
1001:24;1042:17,17
**memos (1)**
956:23
**mentally (1)**
891:21
**mentioned (10)**
890:15;929:19;
939:7;940:17;952:5;
974:4;997:13;1004:22;
1012:5;1014:12
**mere (4)**
908:5;1020:7;
1023:20;1028:24
**merely (2)**
1028:25;1042:5
**message (6)**
891:23,24;940:15;
966:2;993:9,13
**messages (49)**
877:1;883:21,23;
884:7;887:12,14;
897:2,7,8;900:8;902:5;
903:13;904:19;909:17,
18,19;910:5;913:17;
914:9,13,15,18,20,22;
915:1,9;919:17;934:1,
4;935:8,10,14;944:16;
968:11,13;972:8;
973:4,5;982:2,19,23;
991:3,6,9;996:1;
1004:7,7;1011:24,25
**met (15)**
886:5,24;895:9;
905:2;914:11;920:8;
930:14;931:17;979:4;
980:7;983:4;993:5;
998:10;1025:7,10
**method (2)**
920:6;1006:16
**middle (2)**
964:6;1020:6
**midst (2)**
988:22;990:22
**might (16)**
883:13;884:13;
895:13;919:7,15;
927:13;975:18;984:21;
1008:9;1030:17;
1031:2,3,4,10;1036:19,
19
**million (15)**
875:10,16;886:13;
895:19;897:20;906:10,
13,24;932:25;933:17,
20;934:17,23;971:7;
988:24
**millions (9)**
875:8,12;881:24;
896:5;936:16;960:13,
13;995:22;1011:21
**mind (8)**
947:12;961:18;
978:22;988:10;996:25;
1024:9,15;1050:8
**minor (1)**
1019:22
**minute (8)**
879:22;926:24;
928:17;929:25;935:1;
973:12;1008:13;
1048:9
**minutes (18)**
881:19;894:19;
913:23;934:19;951:11;
954:23;956:9;957:9;
962:6;968:20;971:5;
977:3,4,15;993:12;
1035:17;1041:21;
1045:21
**miscellaneous (1)**
880:14
**misconduct (5)**
881:2,6;922:19;
1033:13;1034:9
**misleading (13)**
963:22;995:22;
996:3;1001:21,23;
1002:17;1004:10;
1008:8,18;1011:19;
1012:3;1022:2;
1031:13
**misled (2)**
1008:15,17
**misremembered (3)**
953:21;992:18,19
**missed (1)**
1050:17
**Mission (2)**
913:22;993:11
**misspoke (1)**
1030:3
**mistake (35)**
874:14;905:18,19;
908:4,7,8,11;911:4;
920:16;923:12;934:24;
960:8,9,10;985:8,12,
13;986:1,4,10;988:20,
25;989:5,7,12,14,15,
16,18,20,23;990:1;
991:21;1002:22;
1028:22
**mistaken (1)**
895:4
**mistakenly (3)**
905:15;913:19;
1010:13
**mistakes (23)**
884:9;885:10;921:3,
3,4,6;923:6,7,11,16;
960:8;961:7,10;
984:24,24;985:2,2,3,3,
4,6;986:7;989:14
**misuse (1)**
984:6
**MO (1)**
922:15
**model (5)**
886:13,14,15,17;
906:15
**models (1)**
906:16
**modest (2)**
963:16,18
**modification (1)**
1027:22
**moment (5)**
877:15;880:21;

935:7,23;1006:20
**Monday (4)**
967:15;1046:17;
1052:11,14
**monetary (2)**
1022:8;1023:7
**money (24)**
875:3;876:10;
880:13;881:24,25;
882:4;885:14,16,23;
886:4,7,7,10,21;
888:13;895:17;900:12;
906:11;946:11,21,22;
950:22;956:17;986:7
**Monique (17)**
875:17;890:3,5;
919:13;935:24;958:12,
25;973:21;974:15,17;
982:1;989:6,21;
992:16,17,20,23
**month (6)**
882:21;893:16,17;
899:8;982:16;989:23
**months (4)**
902:19;905:14;
910:12;918:16
**more (64)**
876:9,16;879:8,17,
20;883:2;889:7;893:3,
17;899:2;900:3,4,4;
901:6;905:13,18;
911:21;913:7;914:12;
915:4;917:13;924:4,5;
934:14,20;935:1;
954:23;955:1,13;
957:19;958:17;960:18;
973:8;977:4;983:7;
984:9,10;995:18;
997:8,17,18;1012:5,7,
8;1013:11;1014:2,23;
1015:13,22;1016:8;
1017:21;1019:9,10;
1025:20,21;1026:21;
1028:14;1031:10;
1037:1;1045:9;1046:8;
1047:24;1048:8;
1049:4
**Moreover (1)**
1019:11
**morning (9)**
874:2,3,8;885:25;
886:23;887:1;943:23;
944:23;1035:16
**most (8)**
924:3;968:1;969:13;
971:21;982:22;988:18;
1001:9;1016:10
**motion (1)**
998:18
**motivate (1)**
930:17
**motivated (5)**
925:14;929:23;
931:4;1027:1,5
**motive (19)**
924:25;925:23;
926:22;927:6,17;
928:15;981:18;983:15;
988:9;1029:21,22,23,
24;1030:2,4,5,6;
1033:20;1034:13
**motives (1)**
1027:6
**mountains (1)**
1045:17
**move (4)**
957:24;964:17;
995:14;1011:11
**moving (2)**
893:12;1031:9
**much (12)**
875:24;879:10;
884:6;890:22;913:8;
921:14;924:9;929:11;
965:10;979:13;1015:6;
1035:6
**multimillion (1)**
920:14
**multiple (3)**
899:1;920:17;1044:8
**Municipal (2)**
900:17;927:15
**must (51)**
943:7;979:5;993:25;
996:9,25;1000:22;
1002:12,19;1003:3,10;
1004:23;1005:7,16;
1006:12,25;1007:5,16;
1008:12;1009:11,14,
22;1010:9,19,23;
1013:15;1014:5;
1016:20;1018:1,8,8,13,
18;1019:1,14;1020:18;
1021:6,10,17;1025:18,
23;1026:15,23;
1028:13;1029:7;
1036:13;1041:9,24;
1042:3;1043:9;1045:6;
1049:3
**mutual (1)**
1016:22
**myself (2)**
965:6;1007:19

## N

**name (2)**
917:3;1032:3
**named (1)**
1040:8
**namely (2)**
997:5;1001:23
**names (1)**
1040:12
**Nana (5)**
899:4;917:18,22,23;
918:8
**narrative (1)**
1034:12
**national (1)**
1041:12
**natural (2)**
1006:6;1009:25
**naturally (1)**
1000:25
**nature (8)**
934:12;987:17;
1003:16;1008:18;
1015:8;1020:18;
1038:1;1040:2
**necessarily (4)**
926:21;927:15;
1013:23;1035:3
**necessary (9)**
970:6;997:12;
1002:16;1006:2,4;
1011:3;1016:12;
1020:13;1029:22
**need (51)**
877:22;905:23,25,
25;912:6;928:2;
935:11,14,16;945:11;
948:7,10,11;954:20;
955:16;957:14;959:20;
961:12;970:5,12,12;
972:13,16;973:15;
975:8,19;977:9;
981:10,17;990:7;
998:1,13;1007:19;
1009:12;1010:16;
1013:12;1015:20;
1019:8,10,12;1020:4;
1021:13,16;1025:21;
1026:8;1045:25;
1046:10,11;1047:3,25;
1049:25
**needed (17)**
875:21;888:24;
895:16,23;907:22,22,
23;918:2,3;925:3;
942:4;943:18;945:13,
14;949:4,6;954:3
**needs (6)**
890:25;943:8;971:4;
972:17;981:18;
1017:16
**negligence (1)**
1028:23
**neither (1)**
995:6
**net (3)**
895:19;906:11,24
**Nets (3)**
893:5,9;910:8
**neutral (2)**
1027:9;1049:6
**New (30)**
878:7,14;888:12,12,
12;894:24;895:25;
896:2,21;924:14;
936:11,21;943:13;
944:14;969:17;976:16;
977:17;982:11;996:8;
1003:9;1008:1;1011:9;
1022:13,14;1023:3,3;
1026:1,2,7;1033:4
**newest (1)**
982:24
**news (2)**
898:18,20
**next (39)**
885:21,25;886:23;
887:1;894:22;906:20;
908:19;909:9;924:7;
926:1;930:19;935:22;
938:12;941:16;942:16;
944:24;945:6;947:4,
15;948:5,15;952:2,13,
25;953:3;954:25;
955:6;957:4;959:9;
960:4;962:11;965:15,
20;970:24;971:2;
972:10;973:1;984:23;
1023:11
**nice (2)**
889:8;929:22
**night (15)**
894:7,8,15,16,18,18;
895:25;909:23;930:15,
15;933:3;963:13;
965:11;970:23;
1046:16
**Nobody (2)**
979:16;984:21
**nobody's (2)**
967:16;1039:7
**None (26)**
881:11;903:15;
909:24,25;921:21;
924:23,23,25;925:22;
926:22;928:14,15;
930:23;944:18;945:21;
984:1;987:10,13,16,19,
21,21,21,21,23;988:7
**nonetheless (1)**
943:6
**nonexistence (1)**
1035:13
**non-paid (1)**
880:12
**nonprofit (2)**
878:12;920:15
**nor (6)**
995:6;1006:4;
1015:17;1019:10;
1029:24;1033:10
**normal (1)**
965:10
**Norman (2)**
899:3,3
**note (17)**
879:22;891:9;895:2;
901:17,19;914:23;
937:13;1018:25;
1026:8;1028:24;
1043:22;1044:24;
1045:1,4;1046:1,13;
1052:1
**notebooks (1)**
967:3
**noted (2)**
1050:18;1051:2
**notes (18)**
879:25;901:13,14,
15;902:12;976:9;
994:25;1042:12,13,14,
14,15,17,19,22,22;
1043:17;1048:4
**note's (1)**
1046:2
**notice (1)**
903:14
**noticed (2)**
939:3;1050:16
**notify (2)**
1043:18;1044:1
**number (21)**
877:18,23;888:23,
25;892:19;893:23;
896:25;898:13;900:9,
9;901:18;906:15,15;
939:8;960:2;971:3;
1015:18;1018:5,7,8,10
**numbered (2)**
882:9;1045:1
**numbers (3)**
875:10;955:20;
1045:2

## O

**oath (4)**
1009:13;1036:21;
1043:6;1046:18
**object (14)**
998:5,8;999:10;
1004:25;1005:9,12,12;
1014:14;1017:2,22,24;
1018:1,2;1021:16
**Objection (1)**
968:7
**objections (2)**
1031:18;1032:13
**objective (7)**
997:20;998:14;
1018:5,7,8;1020:24;
1024:23
**objectives (4)**
997:20;998:15;
1018:24;1021:23
**objects (10)**
1013:8;1014:8,14;
1015:2;1016:10,25;
1017:3,16,18;1019:16
**object's (2)**

1005:2,18
**obligation (3)**
931:19;1040:23,24
**obligations (1)**
1033:18
**obliged (10)**
994:17;1001:14;
1012:9;1014:22;
1024:10;1025:18;
1031:15;1039:13;
1040:20;1042:12
**obscured (2)**
1039:24,24
**observe (1)**
1035:21
**observed (1)**
1034:23
**obstruct (24)**
881:17;918:20;
919:16;920:14;922:5;
932:4;935:17;940:10;
948:3;959:17;963:21;
969:21;970:8,13;
1002:1,8;1003:4,11,15,
22;1011:19,23;
1012:13,25
**obstructed (8)**
874:20;918:21;
981:20;984:21;995:24;
1006:5;1007:2,6
**obstructing (11)**
981:11;993:16;
1013:3;1014:10;
1017:5,5,9,9,19,19;
1027:12
**obstruction (10)**
910:16;963:21,24;
995:17,18,21;1001:20;
1004:2,16;1011:15
**obstructive (5)**
905:13;908:14;
909:9;916:4;918:15
**obstructs (1)**
988:9
**obtain (2)**
1022:8;1039:10
**obtained (5)**
995:23;1011:22;
1039:4,6,7
**obvious (7)**
893:15;895:6,11;
907:4;921:25;955:19;
1050:7
**obviously (3)**
886:19;890:25;
1009:1
**occasions (1)**
876:18
**occur (1)**
958:17
**occurred (10)**
959:2;1008:18,19;
1024:7;1026:1,6,13;
1030:11,13;1031:10
**o'clock (1)**
1046:14
**off (17)**
876:8;901:4;902:16;
912:20;921:20;926:5,
5,6;927:19;928:2,6;
938:13;946:25;955:7;
987:22;1043:13;
1052:13
**offense (18)**
997:24;998:3,25;
1008:23;1012:14,20,
23,23;1028:1,4,6,8,10,
10,11,15;1029:18;
1051:11
**offenses (9)**
919:22;995:13,15;
997:1;1012:21;1013:5;
1026:13,14;1027:11
**offer (3)**
972:13;983:8,10
**offered (5)**
886:22;983:12,13;
996:22;1034:8
**offering (3)**
939:22;972:17,20
**offers (1)**
990:19
**office (22)**
892:19;894:14;
908:17;915:23;931:13;
943:15,17,18;949:13;
958:13;975:15;976:16;
980:12;987:7;996:7;
1003:8,25;1008:1;
1011:1,9;1022:5;
1023:2
**officer (5)**
1022:7;1043:18,20;
1044:2;1047:10
**officers (4)**
979:6;996:4;
1004:11;1012:4
**officer's (1)**
1023:6
**offices (1)**
887:2
**official (22)**
882:12;896:19;
1004:16;1005:2,18,19,
22,23;1006:3,5,7;
1007:3,7,9,12;1013:1,
4;1014:10;1017:6,10,
20;1026:10
**officially (1)**
1044:22
**officials (3)**
920:9;963:25;996:7
**offset (1)**
888:2
**offsets (2)**
941:10;991:14
**often (3)**
1015:8,8;1016:4
**OMG (1)**
894:3
**omissions (1)**
1002:25
**omitting (1)**
1002:16
**once (24)**
876:16;879:10,23;
882:2,18;889:13;
893:2;895:3,17;
905:23;910:21,23;
916:1;919:19;969:9;
1005:15;1006:11;
1012:5;1020:23;
1021:1;1036:11;
1044:11,20;1046:12
**one (150)**
875:1;876:22;
878:25;880:14;883:9,
11,12;886:12;888:17;
889:19;890:15;891:2;
892:7,7;895:25;896:2;
900:1,2,3,9,25;902:13,
14;903:5,10,23;904:5,
8,11;906:3,5,18;907:8;
910:7;911:8,20,23,23;
913:11,12,12;916:6;
918:9;919:25;923:10;
927:9;929:12,15,22;
930:9;931:2;934:3;
943:10,20,21;946:11,
15;950:2,14;956:4,6;
957:11,11;958:12;
959:20;960:2,18;
963:20;968:18;970:2;
971:21;974:4;976:23;
982:6,18;985:16,24;
987:23;988:15;990:7;
992:18;993:3;995:16,
18;996:12;997:13;
1001:25;1004:14;
1011:14,17;1012:8,14;
1013:11,15,24;1014:2,
9;1015:22,22;1016:15,
23;1017:2,4,13,14,17,
22;1018:1,2,3,5,8,9,9,
18,21,24;1019:16;
1021:11,12,19;
1023:24;1024:8,14,16,
25;1025:9,16,19,20;
1026:8;1027:3;
1028:14;1029:3;
1034:19;1035:12,20;
1041:22;1043:13,14;
1044:12,15;1047:22,
24;1050:1,1,17,18;
1051:14,14
**one-page (1)**
981:4
**ones (9)**
897:8;900:11;
907:13;910:6,8;
917:12;947:20;992:15;
1024:8
**ongoing (2)**
979:20;1003:13
**Only (43)**
875:6,22;893:11,17;
899:2;900:23,23;
907:9;912:5;918:9;
919:5,11;928:3;
938:17,17;943:20,21,
23;944:12;954:20;
976:6;977:2;984:10;
985:15;992:15;999:21;
1003:18;1008:4;
1012:10;1015:20;
1016:4;1017:17;
1023:22;1026:17;
1030:13;1032:1,17;
1033:8,21;1034:15;
1041:24;1042:13;
1050:17
**Open (6)**
893:8;928:7;930:23;
952:11;963:3;1043:16
**opened (2)**
930:21;1044:20
**opening (9)**
881:18;923:10;
924:3;949:5;979:2;
980:4;983:11;985:1;
990:6
**operated (1)**
925:2
**opinion (3)**
1030:25;1031:11;
1042:1
**opinions (1)**
1042:7
**opportunity (6)**
899:10;919:7;
1036:18;1037:19;
1040:14,15
**opposed (2)**
1010:13;1050:22
**option (2)**
987:23;1022:7
**orally (4)**
888:15;1014:24;
1049:19;1050:25
**Orange (1)**
1026:4
**order (22)**
884:23;885:5;940:4;
968:17,22;1003:17;
1006:25;1013:13;
1015:19,22;1016:13,
19;1018:2,9;1019:13;
1023:24,25;1024:11;
1028:12;1036:4;
1038:9;1044:10
**ordinarily (1)**
1044:21
**organize (1)**
923:23
**organizing (1)**
897:10
**orientation (1)**
1041:13
**origin (1)**
1041:12
**Osei-Bonsu (7)**
917:19,22,23;918:8;
956:12;992:9,12
**others (13)**
917:22;924:10;
930:7;932:15;996:5;
997:1;1002:2;1004:12;
1011:24;1019:22;
1036:6;1042:22;
1051:9
**otherwise (3)**
1003:20;1031:10;
1051:5
**ought (2)**
1031:1,4
**out (59)**
875:2,10;876:21;
880:8;885:15;891:7;
894:1,11;895:8;898:2;
899:9;907:4;910:12;
923:13;924:23;931:8;
944:11;945:5;946:20;
947:24;949:14;952:19;
955:4;958:19;965:3;
968:21;970:23;971:14;
972:5;977:2,14;979:2;
981:6;982:5,12;985:5,
17,18;987:2;988:1,2,
14,15,19;990:18,23;
1006:17;1015:3;
1016:1;1024:19;
1031:23;1034:5;
1035:18;1038:18;
1039:23;1043:17;
1046:5;1047:8;1052:3
**outcome (1)**
1037:6
**outline (1)**
905:9
**outlined (1)**
905:5
**outset (1)**
1020:4
**outside (3)**
950:11;992:2;
1040:10
**over (26)**
877:9,19,20;887:7;
889:9;890:11;902:19;
905:14;911:13;918:15;
920:2,18,18;928:5,12;
936:21;940:16;951:5;
972:7;973:25;985:24;
986:3;1039:23;
1042:18;1043:15;

1047:19
**overnight (1)**
963:16
**Overruled (1)**
968:8
**oversight (1)**
988:4
**overt (21)**
1013:24;1021:7,11,15,16,21,21;1023:10,13,14,16,18,22;1024:1,3,4,11,13,15,21;1025:17
**overwhelming (2)**
884:20;970:15
**own (13)**
889:16;931:14;932:5;956:17;973:3;978:11;992:9,9;1001:6,9;1019:2;1035:22;1042:14

## P

**page (21)**
886:12;908:19;948:15;962:11;987:6,11,22;1021:20;1038:24;1045:2;1048:21,22;1049:1,3,4,6,8;1050:9,18;1051:10,16
**pages (1)**
1044:25
**paid (11)**
896:14;910:13,14;915:19;916:11,15,17,19;917:5,7;961:25
**pain (1)**
922:14
**paint (1)**
983:9
**pair (1)**
945:23
**pandemic (1)**
1047:21
**papers (1)**
898:19
**paperwork (1)**
977:16
**paragraph (2)**
929:14,16
**paragraphs (1)**
929:16
**Park (3)**
893:9;946:13,15
**part (32)**
880:25;899:4;908:17;915:9,12;917:21;918:1;932:13;935:12;938:8,23;939:18;940:24;941:1,5,7;942:9,14,21;957:17;981:7,9,10,22;984:22;991:19;1006:14;1019:14;1028:1;1030:16,16;1039:22
**partial (1)**
932:21
**participant (1)**
1020:21
**participate (4)**
1018:21;1019:15;1020:12;1029:12
**participated (3)**
918:20;1007:25;1020:14
**participates (1)**
999:7
**participation (4)**
1019:1,17,20;1020:3
**particular (10)**
914:10;1015:18;1016:7;1024:10;1030:11,12,13;1031:6;1039:3;1049:21
**particularly (2)**
914:23;919:11
**parties (3)**
983:1;1015:12;1036:18
**partly (2)**
1027:8;1049:6
**partner (1)**
938:16
**partnership (1)**
1012:6
**parts (4)**
941:25;994:15;1015:3;1019:23
**party (6)**
893:10;924:21;928:12;946:16;1032:3;1042:9
**passenger (1)**
917:3
**past (2)**
967:12;1044:12
**pause (5)**
879:22;880:21,24;1006:17;1048:10
**pay (4)**
879:4;956:15;988:23;1032:1
**payments (8)**
886:8;888:2,16;891:12;917:21;975:17;1022:8;1023:7
**payout (6)**
895:20;906:22;907:20;971:2,7;992:7
**PBA (3)**
900:21;913:12,13
**penalties (1)**
882:14
**pending (4)**
1005:24;1007:12;1026:11;1048:14
**People (42)**
875:23;877:12;888:17;893:24;899:4;900:9;901:13;904:13;905:18;906:25;911:9;917:3;922:13,15;923:7;924:10;936:9;940:14,17;941:17;945:24;953:21;971:6;972:3;979:6,7,7;984:8,8;985:10;989:12,13;990:10;995:18;997:18,23;998:16;1014:23;1015:6,22;1035:19;1040:12
**people's (1)**
924:10
**Per (1)**
935:25
**perceived (1)**
1034:24
**percent (6)**
874:25;891:22;949:24;950:5,18;992:1
**perfect (3)**
923:10;946:24;947:22
**perfectly (2)**
1039:12;1052:9
**perform (2)**
1019:20,21
**performance (3)**
996:16;1033:7,24
**Perhaps (6)**
921:25;927:17;930:20;945:8;955:20;956:22
**period (7)**
897:3;914:19;1012:10,11;1025:4,6;1033:15
**perks (6)**
879:9;924:17,18,22;949:13;961:8
**permissible (2)**
925:13;1023:9
**permission (3)**
901:2;912:11;927:12
**permitted (2)**
928:23;929:22
**person (46)**
877:2,11,11;878:9;879:24;881:14;885:10;888:5;902:2;907:16;923:6,8,8;938:17;955:24;956:5;984:10;986:23;993:25;994:1,2,3;997:25;999:24;1001:3,5,8;1009:18,18;1020:7,8,10;1021:1,2,4,13;1027:13;1028:8,9,10,15;1043:15,20,24;1044:3,3
**personal (10)**
879:2;912:21;936:7;984:18;1001:6;1034:25;1037:6;1041:11,14;1042:13
**personally (1)**
1034:24
**persons (6)**
1012:7;1015:13;1017:21;1028:14;1040:4,8
**person's (2)**
1021:2;1037:1
**persuasive (1)**
1016:10
**pertaining (1)**
898:5
**phone (62)**
877:1;879:2,4;883:19;884:6;885:24;887:4,9;888:23;890:11,13;892:12,18;893:23;894:1;898:9,11,12,13;900:25;901:18;902:4,5,16,22;909:20;911:2;912:5,7,14;914:14,15,17;915:17,19;923:1;925:11;931:13;933:3;934:6,9,10;936:4,5,6,7,11,12,21;937:2,9;939:8;942:19,22;945:5;955:11;973:25;974:2;975:21;979:23;986:14;993:20
**phone/cable (1)**
928:25
**phone/laptop/iPad (1)**
901:4
**phones (4)**
883:22;925:2;942:19;975:3
**phony (2)**
875:6;876:5
**photo (1)**
938:16
**photocopies (1)**
1035:5
**photos (3)**
918:13;936:8,21
**phrase (2)**
1049:8,21
**pick (9)**
929:22;943:15;944:11,14,20,23;945:5,10;948:9
**picked (2)**
957:9;1052:15
**pieces (2)**
884:21;932:14
**pills (2)**
922:14;958:25
**pipe (1)**
1035:24
**pitcher (1)**
1006:19
**pivot (2)**
888:18;895:22
**place (10)**
905:14;918:15;952:18;953:4;954:3;958:24;988:6;1007:13;1020:10;1024:8
**places (2)**
892:23;1047:9
**placing (2)**
923:12;985:4
**plain (2)**
914:25;983:3
**plainly (1)**
883:23
**plan (4)**
877:13;879:3;930:12;965:25
**planned (1)**
990:21
**planning (6)**
910:10;925:7;928:24;929:17;930:10,13
**plans (2)**
965:23;1015:1
**play (6)**
943:25;944:1,2,2;1019:22,22
**playback (1)**
944:5
**played (2)**
938:20;1015:3
**pleaded (2)**
997:2;1000:11
**Please (14)**
894:4;906:21;921:25;924:7;926:1;930:19;947:15;952:13;959:9;961:18;970:4;972:15;977:24;1028:24
**plenty (2)**
900:19;1035:1
**plot (3)**
938:3,4;945:12
**plot/scheme (1)**
936:13
**plotted (2)**
939:19;997:19
**plotting (12)**
939:21;941:2,5;943:7,8;944:17,17;945:20,25;948:8;949:21;950:1
**Plus (3)**
914:21;953:22,23

**pm (4)**
894:18;963:2;972:5,7
**pocket (1)**
888:23
**pods (1)**
943:13
**point (10)**
940:23;981:14,14;1013:12;1025:20;1031:10;1035:8;1036:5,11;1050:6
**pointed (3)**
972:5;978:1;979:2
**points (8)**
884:20;968:18;971:12;976:24;978:19;981:6;1025:21;1031:19
**policy (22)**
876:9;886:7;901:7;906:13;925:6,9,12,15;928:23;929:8,14,23;930:1,6,8;931:1;951:2,3;954:16;983:10;984:15;1023:8
**politics (1)**
980:25
**Porcelli (7)**
900:17;907:16;917:19;956:5,22;957:2,22
**position (2)**
879:10;880:12
**positions (1)**
983:20
**possesses (2)**
1027:7,8
**possession (1)**
988:11
**possibility (3)**
1027:21;1049:13,16
**possible (4)**
981:23;984:20;1042:24,25
**Post (1)**
898:19
**postresignation (1)**
916:5
**potential (2)**
1003:19,22
**powering (2)**
903:23;918:12
**practical (1)**
1045:3
**practically (1)**
982:16
**practice (1)**
1008:8
**practices (1)**
1008:10
**precaution (1)**
1045:17
**precedence (1)**
1042:18
**precise (1)**
1010:17
**prefer (1)**
1049:22
**prejudice (6)**
1031:17;1032:3;1041:17;1042:9;1046:19,22
**premeditation (1)**
933:22
**premium (2)**
892:15;956:15
**preparation (1)**
1038:1
**prepare (2)**
1046:6,7
**prepared (2)**
965:10;967:11
**preponderance (4)**
1026:17,17,20,23
**presence (2)**
1028:24;1030:6
**present (14)**
874:1,7,9;897:4;920:24;943:14;963:3;967:1;1040:24;1043:9,13;1048:7;1052:7,21
**presented (2)**
902:23,24
**presents (3)**
900:15;911:25;918:25
**preservation (2)**
902:25;903:9
**preserve (1)**
1048:5
**preside (1)**
1043:15
**presided (1)**
928:12
**presiding (1)**
989:2
**press (3)**
898:18;1036:12,16
**pressed (3)**
906:25;913:1;916:2
**pressing (1)**
967:13
**pressure (2)**
967:13,17
**pressuring (1)**
893:21
**presumed (4)**
960:25;1000:18;1020:23;1021:2
**presumes (1)**
1000:16
**presumption (1)**
995:8
**pretty (2)**
891:8;1009:1
**prevail (2)**
1006:25;1007:17
**preview (1)**
963:18
**previously (3)**
1007:11;1017:7;1028:16
**prime (1)**
930:23
**principal (6)**
999:20;1000:5;1027:17,19;1028:3;1049:12
**print (1)**
901:4
**prior (2)**
914:10;916:19
**private (1)**
983:1
**probably (5)**
890:21;936:9;972:5;993:15;1035:23
**problem (6)**
888:4;927:24;928:1;984:14;988:13;992:16
**problematic (1)**
988:4
**problems (3)**
992:14,16,24
**proceed (3)**
874:11;920:25;967:25
**proceeding (27)**
1004:17;1005:3,13,18,19,19,22,24,25;1006:2,3,5,7,9;1007:3,7,9,12,15;1013:1,4;1014:10;1017:6,10,20;1026:11,11
**proceedings (1)**
1042:21
**proceeds (2)**
898:17;1006:24
**process (6)**
928:13;994:19;1030:17;1035:11;1045:25;1046:9
**processes (1)**
879:24
**procures (1)**
1028:2
**produce (20)**
882:8,16;883:4;884:6;896:20;898:3,7;900:10;909:24;915:9,12,17,22;947:25,25;948:1;990:4;1022:15,19;1040:21
**produced (12)**
889:5;891:23;896:24;897:1;900:6;904:11;916:7;947:3,16,17,22;1023:2
**production (7)**
915:3,10,13,22;947:22,24;948:2
**products (1)**
943:11
**professional (2)**
880:7;1037:6
**promote (1)**
1021:22
**promoted (1)**
878:5
**promoting (1)**
1024:19
**promptly (1)**
927:22
**proof (23)**
950:18;953:24;959:16;960:24;961:4,20;994:18,20;995:7;999:2,4;1001:6,7;1016:8,9;1021:4,9;1025:8;1028:5;1029:22,23,24;1035:10
**proofread (2)**
964:25;965:1
**proofreading (1)**
1049:2
**propensity (2)**
1033:13;1034:9
**proper (7)**
972:13,14;1027:5,8;1039:12;1042:25;1049:6
**property (1)**
987:25
**propose (2)**
963:20;1048:18
**protect (8)**
875:14;876:11;884:17,18;885:9;919:20;983:6;1008:7
**protecting (2)**
914:3;992:3
**protocol (1)**
935:25
**prove (62)**
877:22;922:8;923:22;947:23;961:2;969:12;970:6;975:8;981:17,19;997:3,10;998:14;1000:13,25;1002:12,19,23;1003:3,10,12,18;1004:23;1005:7,10,16;1006:8,12,25;1007:17;1008:12,14;1009:11,14,22;1010:3,5,9,20;1011:3;1012:9;1013:15;1014:20,20,22;1017:15,16;1018:13;1021:6;1024:1,2,3;1025:2;1026:5,16,21,22;1028:12,13;1035:10;1040:25;1041:4
**proved (13)**
1000:20;1004:18;1007:5;1010:8;1014:5;1015:9;1017:12;1018:7;1019:6;1026:15;1030:1;1031:5;1039:15
**proven (1)**
961:21
**proves (3)**
906:1;994:7;1033:11
**provide (4)**
884:11;927:6;979:19;983:3
**provided (8)**
878:13;891:25;982:20;983:2;985:15;1010:3;1022:22;1037:24
**providers (1)**
903:1
**provides (1)**
1027:25
**providing (1)**
897:18
**proving (5)**
999:18;1025:22;1026:10;1028:5;1034:8
**psychoanalyze (1)**
1031:12
**public (2)**
879:15;898:18
**publish (1)**
879:14
**pull (1)**
977:24
**pulled (2)**
875:10;975:18
**punch (1)**
1023:12
**punishable (2)**
998:11;1028:3
**punishment (2)**
1042:24;1043:7
**purchase (1)**
1022:9
**purchased (1)**
924:13
**purity (1)**
1047:25
**purpose (21)**
920:5;998:5,11;1006:15;1008:6;1009:24;1010:16;1012:8;1016:2,12;1017:23;1018:23;1020:15,16,19;1032:16,17,19;1033:21;1034:8;1051:16

**purposefully (1)**
1028:22
**purposely (1)**
1010:12
**purposes (7)**
996:21;1012:8;
1014:8;1016:25;
1020:16;1032:17;
1034:16
**Pursuant (9)**
913:21;925:6,15;
930:8,25;931:1;
993:11;1039:4,6
**pushed (2)**
904:13;915:4
**pushover (1)**
950:14
**put (14)**
907:21;926:17;
929:2;933:15;950:4;
951:10;953:4;954:21;
956:12;958:2;959:7;
963:23;998:17;
1044:17
**Putnam (1)**
1026:3
**puts (7)**
892:8;902:6;911:2;
912:3;918:5;952:18,21
**putting (2)**
967:16;970:15

## Q

**quickly (3)**
905:12;1031:10;
1050:15
**Quite (1)**
1045:9
**quote (2)**
936:23;991:9

## R

**race (1)**
1041:12
**radio (1)**
1036:16
**raided (2)**
911:2;913:12
**raining (2)**
1035:23,24
**raise (2)**
963:11;964:19
**raised (2)**
990:5;1031:19
**ran (6)**
925:3,20,22;929:5,6;
931:1
**range (1)**
914:24
**rather (3)**
965:16;1013:23;
1028:22
**reach (2)**
1040:16;1041:18
**reached (7)**
875:2;885:14;
894:11;899:9;997:23;
1043:17;1044:11
**reaches (5)**
891:7;898:2;970:23;
977:14;990:18
**reaching (3)**
990:23;1034:18;
1041:23
**read (14)**
927:14;929:15;
934:18,25;954:23;
977:5;988:21;995:11;
1021:24;1023:10;
1046:9;1047:3;
1048:17;1052:12
**reading (3)**
934:20;987:1;988:1
**ready (7)**
874:10;886:4;
888:11,11,12;993:4;
1048:11
**real (15)**
877:17;891:21;
911:9;913:21;937:21;
938:1,6,7,15,15,17;
951:11;968:2,23;
984:15
**realize (1)**
984:10
**realized (1)**
1050:17
**really (26)**
877:16,17,24,25;
878:1;884:3,7;889:8;
893:22;928:2,3;
942:17;954:20;960:2,
16;961:12;990:15,25;
991:17,17;993:21;
999:6;1045:12,12;
1046:6;1051:20
**reason (28)**
924:2;925:4;928:17;
931:6;934:13;937:19;
940:11;942:5;949:1;
951:13;955:21;957:24,
25;960:2,23;983:12;
988:15,17;1001:2;
1028:23;1035:11,22;
1036:1;1039:25;
1045:3;1047:20,21,22
**reasonable (77)**
880:22;883:15;
922:9;923:23,25,25;
928:18;931:6;934:13;
937:20;941:12;942:15;
946:2,4;947:23;949:2;
957:25;958:1;959:3,
22;960:2;961:20,21;
970:7;997:4,10;
1000:13,21,25;1001:1,
2,3,5,7,8,12,18;
1002:13,20;1003:3;
1004:23;1005:7,16;
1006:13;1007:1,6,17;
1008:13;1009:11,15,
23;1010:8,10,20;
1013:15;1014:5;
1016:17,20;1017:12;
1018:13;1019:3;
1021:7,10;1023:17;
1024:4,7;1025:11,13,
15,23;1026:16,19;
1028:13;1030:1;
1039:16;1041:1;
1043:5
**reasonably (6)**
878:2;880:1;881:21;
883:7;884:1,2
**reasons (9)**
920:7;923:25;
961:22,23;969:11;
980:15;981:23;984:20;
1041:16
**REBOLD (5)**
967:22,23,24;968:1,
9
**rebranding (1)**
980:25
**rebuttal (1)**
967:20
**recall (9)**
928:3;952:9,25;
953:5,20,20;956:2;
957:7;980:16
**recalled (7)**
951:10;952:7;
954:12;955:25;956:1,
17;980:8
**recalls (1)**
959:3
**receipt (1)**
996:23
**receipts (4)**
879:6;925:16;929:2;
985:22
**receive (3)**
888:14;952:16;
1045:14
**received (37)**
875:3;876:20;
878:18;880:10,15,17;
882:5,9;885:14;
886:21;890:23;891:12;
895:17;900:13,16;
901:8;903:11;904:8,
10;911:20;912:1;
975:5,17;976:13;
978:16,17;983:24;
984:3,11;986:18;
989:23;1032:9,16;
1034:2,8,10;1045:16
**receives (2)**
897:11,12
**receiving (5)**
881:12;888:15;
988:5;1022:8;1023:7
**Recess (4)**
920:22;962:10;
1048:14;1052:5
**reckless (1)**
889:25
**recollection (3)**
1042:19,20,23
**recommended (1)**
926:5
**reconsider (1)**
889:23
**record (10)**
874:8;892:13;
959:15;977:14;
1004:25;1005:8;
1044:7,12;1052:6,18
**recorded (2)**
943:4;1044:22
**records (23)**
887:6,7,8;890:25;
898:5,7,11;901:11,16,
17;902:3,8;903:20;
904:25;916:10,23;
936:18;937:4,5,6;
964:1;972:3;1008:2
**red (1)**
889:19
**redacted (2)**
1039:22;1040:1
**refer (6)**
963:24;995:3;
997:15;999:18;
1021:24;1045:19
**reference (6)**
880:4,19;890:12;
901:7;974:1;976:13
**referenced (3)**
899:4;923:9;980:4
**references (1)**
900:21
**referred (2)**
1000:24;1004:16
**referring (1)**
999:19
**refers (3)**
975:7;1035:10;
1036:3
**reflect (6)**
874:9;889:23;902:9;
916:10;1052:6,18
**reflected (3)**
903:10,23;905:10
**reflection (1)**
902:17
**reflective (1)**
902:18
**refused (3)**
931:15,25;954:16
**regard (5)**
1009:12;1010:21;
1011:8;1042:8,8
**regarding (9)**
900:8,15;917:11;
927:19;988:18;995:22;
1011:21;1034:7;
1041:15
**regardless (4)**
1017:24,25;1023:15;
1026:12
**regards (2)**
891:12;975:16
**regularly (1)**
879:5
**regulated (1)**
890:25
**Reilly's (1)**
992:17
**reimbursed (2)**
930:2;947:14
**reimbursement (4)**
879:5;925:7,20;
929:1
**reimbursements (5)**
910:8;925:13;
983:24;984:12;987:15
**related (14)**
881:6;898:24;908:6;
921:4;926:3,3,4,9;
930:4;934:12;985:2,
22,23;986:15
**relates (3)**
920:1;946:10;1045:3
**relating (6)**
898:14;921:4,22;
996:22;1032:25;
1033:2
**relation (3)**
972:23;1002:10;
1003:6
**relationship (2)**
888:3;985:23
**release (2)**
898:18;963:5
**relevant (6)**
999:17;1004:14;
1016:21;1027:25;
1037:19;1038:24
**relied (2)**
1010:4;1042:16
**religion (1)**
1041:12
**rely (5)**
905:23,25,25;
1001:8;1042:20
**remain (2)**
995:10;1052:2
**remaining (1)**
1047:14
**remember (24)**
886:14;897:16;
898:8;921:13,25;

934:22,23;940:25;
951:12;953:23;954:16;
955:12;956:24;957:7;
959:1;972:14;974:25;
977:11;982:9;991:4;
992:12,13;1040:19;
1051:19
**remembered (2)**
933:25;954:4
**remembers (4)**
887:20;978:3;
991:10;992:5
**remind (3)**
1031:15;1046:16,18
**removed (1)**
911:3
**render (2)**
962:2;1046:18
**rep (2)**
993:19,22
**repeat (5)**
1000:15;1007:19;
1013:12;1032:11;
1033:5
**repeatedly (2)**
979:2;983:19
**repetition (2)**
1011:13;1032:23
**report (5)**
921:20;983:20,22;
1036:15;1052:13
**reporter (1)**
1050:1
**reports (1)**
1036:17
**representation (2)**
1007:23;1009:16
**reps (1)**
901:14
**request (6)**
900:14;911:15;
912:13;915:4;935:4;
936:20
**requested (2)**
882:11;901:21
**requesting (3)**
913:14,15;1046:1
**requests (1)**
902:25
**require (4)**
999:4;1002:18;
1005:23;1007:12
**required (12)**
900:10;911:21;
935:25;1002:23;
1003:18;1005:10;
1010:3;1014:15;
1015:16,17;1026:16;
1041:3
**requirement (6)**
1023:18,19,22,22,25;
1024:12
**requirements (1)**
998:10
**requires (6)**
924:1;970:10;999:2;
1019:23;1030:13;
1036:8
**requisite (1)**
1027:6
**research (1)**
1052:12
**resemblance (1)**
895:14
**reset (1)**
901:3
**residential (1)**
987:25
**resign (2)**
879:11,18
**re-sign (1)**
949:3
**resigned (7)**
878:15;879:20;
897:16;910:11;916:25;
917:8;930:11
**resigning (1)**
916:19
**resolved (1)**
952:12
**respect (13)**
999:13;1000:2;
1001:13;1007:9;
1017:8;1025:10;
1026:6,8;1027:10;
1030:5;1033:7;
1034:14;1037:8
**respective (1)**
1042:7
**respects (1)**
1004:3
**respond (8)**
876:19;899:10;
904:14,14;909:13;
912:6;928:5;960:21
**responded (3)**
888:2;889:10;894:13
**responds (7)**
887:22;891:20,22;
893:6;898:21;904:22;
991:15
**response (20)**
882:16;883:4;
884:11;887:7;889:5;
891:24;903:7;904:12,
17;909:11,24;910:21;
915:3;916:7;922:8;
934:9;985:16;1022:15,
19,25
**responses (1)**
1033:1
**responsive (11)**
882:7;883:24;898:5,
7;904:20;910:5;
915:23;963:25;979:24;
985:14;1008:2
**rest (4)**
930:1;940:2;
1052:10;1053:1
**restore (2)**
901:3;902:14
**restroom (2)**
1043:13;1052:3
**rests (1)**
1043:3
**result (6)**
882:14;920:6;
1006:15;1008:9,15;
1016:7
**resume (3)**
962:6;967:15;
1052:10
**resumed (2)**
874:1;963:3
**retain (1)**
948:7
**retire (4)**
1041:21;1043:14;
1048:6,13
**retires (1)**
1047:12
**retreat (2)**
910:9,10
**retrieve (1)**
935:25
**return (9)**
900:25;912:19;
936:20;979:16;989:20,
25;996:9;1026:23;
1042:5
**returned (4)**
891:15;901:1;
931:11;936:4
**revealed (1)**
984:13
**reverse (1)**
965:6
**reversible (1)**
964:11
**review (8)**
944:15;947:5;
951:17;970:5,5;
985:20;988:12;
1037:19
**reviewed (2)**
925:18;961:22
**reviewing (1)**
1037:7
**revised (1)**
1048:20
**revision (1)**
963:18
**ride (1)**
878:22
**ridiculous (1)**
911:15
**Riefenhauser (1)**
967:2
**right (67)**
876:10;885:24;
889:19,24;891:16;
892:14,16;893:19;
894:6,9,15;904:19;
906:23;907:13;908:2,
16;909:8,23;910:3;
912:3,23;916:17;
923:17;929:13;935:24;
936:17;937:5;938:11;
942:7;943:24;945:22;
946:12;949:24;950:21,
21,24;951:1,3;953:5;
954:11,18;955:5;
956:13;957:5,8;958:1;
959:12,22;963:10;
971:19,22;972:1,3,6;
979:14,15;980:13,17,
21;991:24;992:12;
1036:2;1038:21;
1045:6,7,14;1049:24
**rights (1)**
1039:7
**risk (2)**
1032:22;1046:23
**risky (1)**
939:13
**robbed (1)**
999:6
**robbery (2)**
998:20;999:5
**robbing (1)**
999:12
**Robert (3)**
886:14;901:12;
907:16
**Rockland (1)**
1026:3
**role (2)**
1019:23;1030:23
**roles (1)**
1019:22
**room (8)**
995:2,13;997:6;
1021:19,25;1044:7;
1045:15;1048:3
**Rosenman (1)**
902:24
**rule (2)**
961:4;1036:5
**rules (1)**
968:17
**rulings (1)**
1031:1
**run (2)**
1006:17;1048:16
**running (1)**
1048:19
**ruse (7)**
932:14;933:22;
935:7,11;937:14;
948:8,10
**rush (2)**
889:25;965:15

## S

**sake (2)**
1000:1;1018:3
**same (20)**
888:20;889:20;
892:23;905:18;913:11,
12;919:2;935:3;
937:13;955:24;956:11,
23;957:5,11,16;
989:13;990:17;
1013:10;1037:3;
1046:1
**sat (3)**
905:2;954:22;
1014:23
**satisfactorily (1)**
1016:7
**satisfied (8)**
888:9;1000:20;
1001:17;1004:1;
1016:20;1017:23;
1023:13;1024:12
**satisfy (4)**
1003:17;1011:6;
1023:25;1024:11
**save (1)**
1039:18
**saved (3)**
898:13;899:16,22
**saves (1)**
976:14
**saving (1)**
956:16
**savvy (1)**
969:17
**saw (62)**
876:7;878:20,25;
879:19;880:8,12;
882:8;885:7,23;
887:13;892:16;896:9,
22;900:20;903:16,17,
21;904:11,19;905:8;
906:8,8;910:7;913:9,9,
10,18,25;914:5;915:14,
19;917:14;918:12,13;
923:22;924:15,15;
925:9;928:2,22;935:8,
24;936:3,6;937:4;
938:4,4;940:3,9,16;
943:11,11;946:8;
947:8;950:9;951:9;
958:8;970:19;982:17;
986:12;988:5;1036:14
**saying (12)**
879:15;886:15;
913:13;941:20;952:9;
953:20;978:7,7;
984:22;992:18,20;
1016:2
**scan (1)**
1050:15

**scared (7)**
911:5,6,10;932:5;
968:5;992:20,22
**scene (1)**
969:6
**schedule (2)**
954:11;982:11
**scheme (12)**
922:2;932:13,20,22;
935:13;939:10,12,14;
957:17,17;1019:23;
1024:20
**schemed (1)**
997:19
**scheming (3)**
933:2,12;939:21
**school (2)**
965:22;989:1
**scope (1)**
1019:13
**scratched (2)**
982:8,8
**screen (2)**
936:3;986:17
**scrutinized (1)**
898:25
**scrutiny (2)**
875:5;897:12
**SDNY (1)**
976:15
**search (3)**
877:8;909:16;1039:5
**searched (5)**
883:1;887:9;899:22;
914:11,21
**searches (3)**
1039:2,7,10
**season (2)**
924:12,13
**season's (1)**
982:12
**seat (1)**
930:23
**seated (1)**
1048:15
**second (54)**
875:21,21;876:1;
878:11;881:11;882:20;
883:12;892:9,10,20,24;
900:1;902:14;903:8,8,
15;904:8,10;907:8;
908:8;910:18,23;
911:20;915:3;917:17;
933:15;950:7;957:12,
15,25;974:17;975:2,
24;985:16;989:16,19;
991:25;994:19;999:21;
1000:7;1002:6,19;
1005:1,14;1006:23;
1007:4,16,17;1009:3,
14;1013:20;1022:3;
1028:7,17
**seconds (1)**
894:19
**secrecy (1)**
1015:8
**secret (2)**
927:9;940:1
**section (4)**
1004:14,22;1021:20;
1038:18
**sections (1)**
1004:14
**secure (1)**
1016:6
**seeing (1)**
984:18
**seek (3)**
1004:8;1011:25;
1029:15
**seem (2)**
949:18;981:25
**Seepersaud (3)**
925:17,19;929:1
**seized (2)**
914:21;1039:2
**seizures (1)**
1039:2
**selecting (1)**
1030:23
**selective (3)**
909:21;914:8,25
**selectively (2)**
913:18;914:13
**sell (1)**
949:8
**send (7)**
945:24;1043:17;
1044:8,25;1045:25;
1046:7,13
**sending (4)**
938:20;950:9;
987:21;1045:20
**sends (5)**
959:14;966:1;972:7,
8;991:8
**sense (25)**
905:17,22;919:3;
921:12;922:23,24;
932:3,8;936:19;
937:15;939:22;944:8;
946:24;955:9,21;
969:16,18;970:2;
972:22;977:8;1001:3;
1035:12,22;1042:10;
1043:1
**sent (10)**
877:5;892:12,14;
900:8;907:15;941:19;
989:21;991:6,22;
1047:14
**sentence (1)**
1043:3
**separate (7)**
986:5;996:10;998:3,
22;1012:15;1014:18;
1019:20
**separated (1)**
985:10
**separately (1)**
996:9
**series (6)**
900:9;971:11;
985:20;991:9;994:8,9
**serious (4)**
898:22;912:2;923:5,
15
**seriously (1)**
961:7
**serve (2)**
879:15;1043:25
**served (10)**
878:4,11,14;896:18;
899:25;961:9;1008:3;
1022:15,20;1023:1
**serves (2)**
1001:24;1023:19
**service (6)**
878:16;889:17;
901:11,13;927:16;
986:15
**services (2)**
878:13;921:23
**SESSION (1)**
963:1
**set (11)**
876:21;882:19;
894:13;902:13,14;
949:6;968:22;970:24;
975:15;1022:25;
1025:6
**sets (1)**
972:9
**setting (2)**
939:11;1014:25
**settings (1)**
901:19
**seven (1)**
1023:10
**seventh (2)**
931:6;1023:3
**several (4)**
875:7;919:24;969:1;
1040:12
**sexual (1)**
1041:13
**share (3)**
937:24,25;938:3
**shared (1)**
938:1
**shares (1)**
938:1
**sheds (2)**
1024:18;1033:19
**shifts (2)**
1000:14;1041:3
**short (9)**
884:8;899:25;
917:24;943:1;944:3;
962:6;976:15;981:3;
989:17
**shortly (6)**
882:19;897:11;
898:1,9;953:6;960:20
**shoveling (1)**
1045:17
**show (18)**
885:5;919:12;
920:13;921:3;923:5;
932:24;938:22,25;
943:6;944:12,16;
958:20;968:20,21;
982:19;1016:6;
1031:17;1036:5
**showed (17)**
905:9;921:10;924:4;
926:8;937:5,10;
938:18;940:3,4,5;
941:25;947:19;949:22;
957:13;960:5;969:6;
980:8
**showered (2)**
900:19;922:13
**showing (2)**
880:14;947:16
**shown (5)**
920:16;925:16;
1009:12;1021:3;
1030:5
**shows (16)**
889:15;892:25;
909:17;916:1;917:8;
923:7,22;938:8;960:7,
8,11,15;961:14;
968:17;969:8;1038:14
**Siciliano (42)**
876:7;896:2,4,6,10;
905:4;908:15;909:4,7;
917:11,17,18,20,21,25;
918:1,4,6,7;951:15,23;
952:3,10,14;953:1,3,
14,15,18,19,25;955:17;
956:2,2,7,8;986:6;
992:5,6,8,10,13
**side (1)**
1050:1
**sidebars (1)**
1031:19
**sides (4)**
1032:5;1040:14;
1046:24;1049:17
**sideshow (1)**
983:9
**sign (47)**
875:23;876:1,2,24;
887:21;889:13;890:17;
906:21;907:24;908:7;
937:25;941:8;942:5,
13;943:9,19;945:14;
949:3,14,15,17,18;
950:19;954:11;955:7;
956:5,12;957:2,22;
958:7;959:20,23;
973:11,15,16;974:6,9;
978:5,8,9,16;985:10;
989:10,11;990:24;
991:12;1044:17
**signatures (1)**
892:23
**signed (80)**
875:6,18,20,21;
876:8;881:23;882:2;
889:19;890:5;892:3,4,
5,6,7,7,9,24,24;893:2,2,
17;895:4,7,11,23;
906:7;907:8,8;908:1,5;
909:2;919:9,19;
925:25;933:6,19;
949:4,23;954:22;
955:24;956:22,24;
957:8,15,15;958:3;
959:5,18,18;963:22;
968:5,14;969:4,5,23;
973:14;974:20,22;
975:4;976:5;977:22;
978:7,10,18;980:24;
981:4;985:8;986:11;
988:22;989:7,14,16;
991:20,25;992:19;
1001:23,25;1011:21,
21;1022:1
**significance (2)**
1038:15;1041:5
**significant (10)**
893:15;894:23;
899:16;904:23;906:5;
908:13;910:19;930:7;
986:19;1047:21
**Signing (18)**
934:24;935:3,3;
941:8;942:23;958:14,
21;959:5;975:20,25;
976:20;977:7,20;
989:8;992:18;995:21;
1001:21;1011:19
**signings (1)**
899:5
**signs (9)**
906:4;945:17;
957:12;973:21;974:25;
975:2,23;976:2,22
**silver (1)**
944:19
**similarity (1)**
1030:14
**similarly (2)**
980:2;1033:23
**simple (4)**
976:3;983:3;998:16;
1044:14
**simply (4)**
995:6;1036:8;
1045:9;1052:8
**Singapore (1)**
940:5

**single (3)**
987:11;997:25;
1019:24
**single-page (1)**
977:4
**singular (1)**
1051:17
**sink (1)**
932:24
**sinker (1)**
922:16
**sit (3)**
965:18;967:18;
1046:14
**sitting (6)**
880:6;896:21;
934:20;965:7,14;
1047:22
**situation (1)**
990:8
**situations (1)**
990:9
**six (8)**
889:12,22,23,24;
895:8;918:16;1018:4,6
**Sixth (1)**
1022:24
**sizable (1)**
880:16
**slide (25)**
906:18,20;924:7;
926:1;930:19;933:16;
935:22;938:12;941:16;
942:16;944:24;945:6;
947:4,15;948:5;952:2,
13,25;953:4;954:25;
955:6;957:4;959:9;
960:4;975:6
**slight (1)**
965:12
**slightly (1)**
914:24
**sloppy (1)**
948:1
**small (1)**
879:1
**smart (8)**
878:8;879:23;
952:20;969:17;986:9,
24;989:12;994:3
**Smith (21)**
875:17;890:3,5;
919:13;927:21;928:4;
930:11;935:24;958:22,
25;973:22;974:10,15,
17;982:1;989:6,21;
992:16,17,20,23
**Smith's (1)**
958:12
**smooth (1)**
979:10
**snapshot (4)**
903:1,8,12,15
**snapshots (1)**
903:4
**sole (1)**
1030:24
**solely (5)**
1036:14;1041:9;
1042:5;1043:5;
1046:20
**solemn (1)**
1014:23
**somebody (6)**
901:11;907:2,3;
917:3;972:20;1028:6
**somehow (2)**
976:19,20
**someone (21)**
880:8;923:3,4,5;
932:3,4,5,5,9,16;
936:15;941:9;950:3,3;
956:14;958:10;972:21;
999:22;1018:4;1028:9;
1036:24
**someone's (3)**
888:1;959:24;991:13
**sometime (1)**
989:9
**Sometimes (3)**
898:16;904:9;1046:6
**somewhere (1)**
892:8
**sons (1)**
940:19
**sophisticated (8)**
878:9;879:24;902:2;
904:13;913:6;935:13;
948:10;994:2
**sorry (5)**
910:4;1012:5;
1030:3;1050:22;
1051:15
**sort (6)**
886:13,13;960:1;
978:22;1023:11;
1037:21
**sorts (2)**
885:13;968:25
**sought (3)**
1004:9;1012:2;
1018:7
**Sounds (3)**
945:2;955:12;991:19
**source (2)**
987:12,14
**Southern (10)**
896:21;976:16;
996:8;1003:8;1008:1;
1011:1,9;1026:1,2,7
**SP (2)**
910:9;916:8
**speak (14)**
885:20;888:11;
891:12;894:16;919:7;
975:16;979:9,12,14,16;
1006:18;1016:2;
1032:23;1043:16
**speaking (2)**
987:3;997:17
**speaks (1)**
960:19
**Spears (1)**
929:11
**Special (55)**
875:22;885:13,19,
25;886:3,5,6,9,10,11,
16,17,20;888:6,8,19,
21,24;889:21;891:1,3,
6,10;893:14;894:10;
898:1,8;899:8,15,23;
902:24;903:6;906:14;
907:7,10;908:16;
909:13;915:8;916:13;
917:10,14;963:14;
970:22,23,25;971:17;
972:6;975:14;977:13;
979:16;986:5;1022:4,
13,18;1023:4
**specific (8)**
1012:16,19;1015:5,
16;1018:23;1025:3;
1032:17;1046:2
**Specifically (2)**
1001:22;1007:23
**specified (1)**
1009:2
**speculate (1)**
1040:1
**spelled (1)**
937:13
**spend (9)**
913:8;921:6;923:20;
926:24;928:17;934:14;
935:19;939:1;951:3
**spent (9)**
921:15;924:3,8;
926:2,7,25;928:19;
929:10;968:19
**spigot (1)**
879:7
**spin (1)**
981:1
**spiritually (1)**
891:21
**spoke (20)**
885:24;888:10;
890:4,11,13;891:13,17;
892:18;903:6;907:7;
909:25;919:13;931:12,
21;938:14;942:25;
954:9;973:25;974:2;
1051:12
**spoken (4)**
895:2;909:8;
1016:22;1022:2
**sporting (2)**
893:4;982:25
**sports (3)**
924:12,14;930:23
**spread (1)**
984:7
**spreadsheet (1)**
886:13
**sprung (1)**
977:1
**spun (1)**
896:16
**stage (2)**
949:6;1023:20
**stamped (1)**
936:3
**stand (7)**
896:10;950:15;
961:12;1030:19,22;
1032:6;1041:7
**standard (1)**
961:20
**start (8)**
885:3;920:12;
921:19;969:9;997:5;
1004:20;1034:5;
1052:14
**started (7)**
881:1,25;924:3;
942:17;1025:3;
1035:20;1050:10
**starting (4)**
965:21;969:20;
1021:20;1049:8
**starts (4)**
965:21,22;972:9;
990:19
**state (16)**
878:4,8;880:6;921:5;
926:4,11,14,17;961:11;
988:10;996:16;
1032:25;1033:3,4,15;
1047:25
**stated (10)**
888:15;895:7;896:6;
898:6;909:10;910:17;
1008:2;1022:4;1023:4;
1024:8
**statement (43)**
881:18;906:21;
907:19,21;921:12;
924:3;962:1;963:25;
983:11;996:6;1002:5,
15;1007:23;1008:4,4,6,
16,18,19,21,24;1009:2,
3,5,7,8,12,12,15,16,18,
19,23,25;1010:4,6,8,
20,22;1011:4,7;
1038:9;1051:17
**statements (30)**
884:9;905:21;
907:13,14,18,22,22,23,
24;908:14;915:12,18;
916:5;917:11;918:21;
922:7;923:10;979:2,
20;980:4;996:3;
1004:11;1012:3;
1016:16;1019:2;
1032:13;1038:5,7,14;
1051:18
**States (12)**
975:7,11;1002:9;
1003:6,8,9;1008:22;
1010:22,23;1013:19;
1023:2;1032:4
**stating (1)**
1014:24
**statute (9)**
1004:14;1005:6,15;
1006:11;1008:6,11;
1027:25;1051:3,6
**statutes (1)**
900:4
**stay (8)**
881:13;889:11;
926:18;928:8;966:1;
967:11,14,15
**stayed (1)**
879:17
**steady (1)**
984:16
**step (7)**
877:15;926:5,5,6;
928:2;1024:19;1052:3
**Stephenson's (1)**
944:4
**stepped (2)**
927:19;946:25
**stepping (1)**
928:6
**still (16)**
897:15,17,18;899:1;
909:20,21;945:21;
950:7,8,8,10,16;
955:18;964:9;1047:16,
17
**stipulations (3)**
903:10;1032:9,10
**stole (2)**
932:25;946:21
**stolen (2)**
941:24;960:12
**stop (3)**
876:3;983:5;1034:5
**store (27)**
883:8,8,14,16;902:1,
12;923:1;934:6;936:7,
10,17,18;937:2,4,6,14,
17;990:3;998:17,21,
22;999:4,6,8,9,11,12
**story (16)**
886:6;896:16;902:1,
7;909:3,3;912:15;
937:9;949:7,9;954:3;
971:3,4,24;977:17;
992:10
**straightforward (1)**
919:24
**strange (1)**

930:17
**strategic (6)**
910:9;925:7;928:24;
929:17;930:10,13
**stress (1)**
1044:1
**stressed (1)**
930:9
**strike (1)**
1019:9
**strokes (1)**
1041:20
**struck (3)**
1032:14;1048:21,23
**stuck (1)**
1049:22
**stuff (3)**
913:14;980:23;988:3
**stumbles (1)**
990:7
**subject (6)**
887:5;899:17;
976:13;1012:13;
1046:4;1047:17
**subjects (1)**
1037:17
**submit (1)**
884:15
**submitted (2)**
879:14;925:15
**submitting (1)**
1044:6
**subpoena (43)**
876:19;882:17,24;
883:3,5;884:11;
896:18,22;897:11,12;
898:5,10;899:11;
900:1;902:6;903:8;
904:7,10,12,21;909:11,
14,18,25;910:5,22;
911:20;912:6,8,13;
915:4,14,24;916:7;
922:8;979:24;985:15;
986:3;989:18;1008:3;
1022:15,19;1023:1
**subpoenaed (1)**
996:2
**subpoenas (11)**
882:7,8,9;883:11,24;
887:8;889:6;891:24;
996:2;1004:10;1012:2
**substance (2)**
964:18;1050:18
**substantial (2)**
893:15;1030:14
**substantive (26)**
997:15,16,24;998:3,
4,4,23;999:2,5,9,13,17,
23;1000:3,6;1011:10;
1012:20,21,23;1013:1,
2,5,7,11;1027:11;
1050:2
**substitute (1)**
1042:16
**succeed (3)**
1016:12;1028:20;
1029:16
**succeeded (1)**
1017:25
**success (4)**
1014:13,16;1029:8,9
**successful (1)**
1005:11
**suddenly (1)**
990:18
**suffices (1)**
1024:9
**sufficient (6)**
1006:6;1011:6;
1019:24;1020:13;
1024:6;1029:1
**suggest (5)**
949:25;983:10;
991:7;1027:3;1031:21
**suggested (5)**
919:6;963:18;968:3;
979:3;1027:1
**suggesting (1)**
1037:5
**suggestion (1)**
926:12
**suggests (2)**
919:1;1033:11
**suite (5)**
893:9;924:21;
946:13,16;982:18
**suites (1)**
983:1
**Sullivan (1)**
1026:4
**sum (3)**
898:6;1020:17;
1025:7
**summaries (2)**
1039:18,18
**summarize (1)**
995:13
**summary (3)**
902:23;960:1,3
**summation (8)**
969:16,20;970:20;
976:18,24;982:1;
990:6;993:8
**sunny (1)**
1035:16
**supervisory (6)**
877:3;887:15;
897:15;899:2,24;911:3
**supplemental (7)**
947:9;951:7,24;
952:17;954:2,14;
956:20
**support (1)**
941:21
**supporters (1)**
891:21
**supporting (3)**
939:24,24,25
**Suppose (2)**
1035:16;1039:3
**supposed (6)**
898:10;983:18,20,
23;984:2;993:6
**supposedly (2)**
876:8;937:8
**Supreme (2)**
878:5,6
**sure (14)**
876:22;912:9;
929:22;930:15;934:24;
943:9;945:13;946:7;
947:22;951:13;965:10;
967:10;1045:25;
1046:10
**surfaces (1)**
938:10
**surplus (1)**
1047:2
**surprising (2)**
930:20;1037:23
**surrender (1)**
1042:4
**surrounding (1)**
993:1
**suspect (2)**
880:24;883:13
**suspended (6)**
893:11,19,20;894:9;
909:23;922:18
**suspicion (1)**
1038:9
**suspicious (3)**
885:14;949:18;
992:25
**sustain (5)**
1000:21;1004:21;
1006:19;1021:9;
1050:12
**swayed (4)**
961:7,8,10;1042:21
**swear (1)**
1047:10
**sweet (1)**
979:10
**switched (1)**
936:21
**sworn (2)**
1032:8;1047:11
**Sylvia (136)**
874:13;875:3;881:2,
16;883:7;886:22;
887:1,4,12,20,23;
888:20,22,23,25;889:3,
4,9,13;890:4,4;891:2,6,
11;892:15,18,18;893:7,
16,19;894:3,11,15,18;
895:15;896:16;897:16,
21;898:2;899:3,4,6,6,9,
25;900:19,25;901:9,
17;903:5;904:1,8;
907:23,25;914:5,19;
918:2,3;919:16;942:2;
944:19;968:22;969:21,
23;972:8,12,25;973:2,
6,10,20;974:8,19,22;
975:6;976:4,20,24;
977:18,22;978:3,6,8,
13,15,23;979:12,22;
981:2,7,8,24;982:3,7,
12,14,17,20,22,24;
983:14;984:5,8,18,24;
985:8,21;986:1,4,8,9,
23;987:20;988:19,20;
989:1,7,13,16,20;
990:7,18,24;991:10,10,
20,22;992:2,20,23;
993:8,21,24,25;994:1;
995:4
**sympathy (4)**
922:14;1042:8;
1046:19,22
**system (1)**
1041:17

**T**

**table (1)**
1014:23
**tablet (1)**
904:6
**tablets (1)**
904:5
**tacitly (1)**
1015:14
**talk (45)**
874:23;877:15,25;
878:1;885:16;888:3;
891:7,10;893:3;894:5,
24;898:15;904:9;
909:20;910:14;914:12;
918:9;919:5;924:2,8;
931:5,19;932:6,16;
935:1;937:19;938:6,
21;939:15,16;940:20;
941:17;946:4;955:13;
969:7,7;972:9;973:6;
979:10,11;993:20;
1025:21;1029:21;
1032:7;1037:25
**talked (32)**
887:16;893:3;
894:10;905:11;909:11;
911:19,23;913:16;
915:2;918:10;920:2;
931:8;942:7;943:3;
950:19,23;951:13;
952:10;953:9,13;
955:12,19;957:7;
958:11;960:3;963:13,
14;964:16;973:18;
1016:25;1026:14;
1030:9
**talking (20)**
877:4;893:24;894:8,
15,18;923:21;939:1;
940:21;942:17;950:6;
956:14;971:22;974:18;
976:1;977:20;980:9;
992:21;1014:21;
1023:20;1037:16
**talks (5)**
894:24;898:16;
929:10;930:1;1052:13
**tamper (1)**
1012:25
**tampering (11)**
1004:15,20,22;
1005:6,16;1006:12;
1013:3;1014:9;1017:5,
9,19
**tangible (2)**
1004:25;1005:9
**taste (1)**
1034:23
**tax (1)**
880:16
**taxes (3)**
895:19;906:11,24
**teams (1)**
924:14
**telephone (1)**
1007:25
**television (2)**
1036:4,16
**telling (10)**
889:14;904:24;
922:25;942:12;952:4;
959:23;979:9;997:5;
1031:13;1046:13
**tells (12)**
893:22;897:19;
901:12;924:16;935:14;
938:21;942:15;949:24;
973:20;989:6,7;
1034:24
**Tembeckjian (2)**
927:1;928:11
**ten (5)**
917:2;923:24,24;
969:11;1035:17
**tend (1)**
950:4
**tendency (1)**
1010:1
**tends (1)**
1035:9
**tens (1)**
878:18
**term (3)**
935:13;1002:21;
1048:1
**termination (2)**
1020:25;1021:3
**terms (3)**
896:15;898:4;952:22

**terrible (1)**
968:21
**testified (13)**
874:22;875:17;888:7;890:3,4;903:24;914:17;915:8;954:17;955:3;968:9;982:1;992:8
**testifies (3)**
974:17;975:13;1034:21
**testify (4)**
876:7;968:4;1040:22;1041:6
**testifying (2)**
953:22;1037:17
**testimony (25)**
885:8;905:9;918:13;921:15;929:20;951:8;957:19;958:12,23;960:6;974:10;978:14;1032:8;1036:23;1037:1,2,5,8,9,12;1038:1,4;1039:1;1045:23;1046:1
**texted (3)**
887:25;893:20;913:10
**texting (4)**
894:6;897:9;903:17;909:22
**texts (32)**
876:22;887:19;889:4;891:18;894:2;899:3;913:20;914:1;923:1;938:5,16,25;940:2,5,6,7,8;943:12;948:6;950:9,10,12,13;960:6;972:2,3,4,4;973:19;985:15;991:17;1035:4
**Thanks (3)**
993:10;1048:2;1052:22
**theft (1)**
922:3
**theories (1)**
999:14
**theory (15)**
932:12;999:16;1000:4,7,7;1004:20;1005:6,15;1006:12,23;1007:1,5,10,18;1029:6
**thereafter (2)**
953:6;989:9
**thereby (1)**
1020:20
**Therefore (10)**
959:17;978:25;997:3,21;1000:17;1001:7;1024:21;1029:18;1039:13;1040:15
**therefrom (1)**
1016:18
**thief (1)**
923:14
**thin (1)**
875:10
**thinking (2)**
968:20;1046:22
**Third (17)**
878:18;929:14;949:1;956:5;974:19;983:5;994:21;1002:7;1003:2,17;1005:4;1006:10;1009:22;1013:22;1021:6;1022:12;1028:19
**Thirdly (1)**
1009:5
**Thomas (8)**
876:7;896:2,9;905:4;908:15;909:3;917:25;918:1
**though (8)**
879:3;880:11,12;961:5;981:21;984:21;990:20;1031:24
**thought (16)**
877:13;879:24;914:2,2,4;922:19;925:4;928:14;931:2;936:14,15;954:21;973:12;1018:4,6;1050:16
**thoughtful (4)**
894:20;910:24;989:4;994:5
**thoughtfully (2)**
912:16;913:19
**thousand (1)**
983:21
**thousands (4)**
878:18;936:9;960:12;984:11
**threats (1)**
911:18
**three (34)**
931:8,11;932:7;949:15;953:22;963:24;971:8;976:11;984:20;995:24;997:14;999:22;1000:3;1002:3;1004:2,5,21,23;1005:5,14;1006:10,24;1007:10,18;1011:10;1012:20;1017:10;1025:8,10;1026:9;1027:10,18;1028:17;1049:12
**three-minute-and-seven-second (1)**
971:19
**throughout (6)**
877:22;915:6;996:24;1000:18;1041:2;1050:23
**Thursday (1)**
966:1
**Thus (1)**
1015:10
**tickets (10)**
893:4,8;910:8;917:4;924:12,13,14,20;925:1;982:25
**tight (1)**
887:24
**till (1)**
965:11
**time-consuming (1)**
1046:9
**timeline (12)**
885:6,6;905:7,12,13;910:16;919:11;935:2;959:6,7;970:19;975:3
**times (19)**
875:7;876:16;903:5;905:19;920:17;931:8,9,11,21;932:7;968:12;970:17;975:6;976:11;982:17,20;1019:21;1035:15;1046:8
**timing (1)**
965:3
**tires (1)**
969:10
**titled (1)**
892:15
**today (6)**
965:4,9,11;967:11,14,14
**together (3)**
997:19;1012:7;1016:5
**token (1)**
1013:10
**told (102)**
875:1;876:6;878:24;879:10,18;882:15,18,20;885:20;886:3,9,9,19;887:14;891:11;893:21;899:15,23;905:5;909:3,13;914:6;917:15,16,24;918:1;920:13;921:2,5,8;922:13,22;926:4;927:1;928:1,8,11;930:11;931:16;933:24,24;934:1,7,18,21;936:25;938:17,18;940:8;941:7;942:4,19;946:7,12,14,19;947:1,5;948:6;949:5;951:15;952:6;953:1,1,12,15,19;954:9,12;955:4,10,24;956:13,13,23;957:8,10,10;958:10;959:19,23;963:11;965:13,18,24;966:1;975:14,16;979:22;980:8,15;985:9,13;993:18;997:5;1000:11;1014:6,7,19;1030:23;1032:14;1045:20
**Tom (13)**
917:11;918:4,6,7;951:15;952:3;953:1,25;955:17;986:5;992:5,5,10
**tomorrow (5)**
913:23;965:5,8,19;993:10
**tonight (2)**
1046:14;1050:2
**tons (1)**
968:11
**took (23)**
878:23;893:23;905:14;910:10;916:8,9,10;917:5;918:12,15;925:8;928:4;947:14;951:5;957:5;982:7;1007:13;1010:6;1028:19;1036:21;1042:13,14;1046:18
**top (1)**
940:17
**topic (5)**
924:4,5;928:18;930:21;954:19
**topics (1)**
923:24
**total (1)**
983:25
**totally (2)**
976:23;1024:17
**touch (4)**
891:13;897:17;928:20;1034:23
**touched (3)**
928:18;934:14;948:7
**toward (1)**
1040:7
**towards (1)**
970:14
**track (1)**
1051:6
**train (1)**
878:21
**trained (2)**
901:13,14
**transcript (5)**
973:22;975:13,19;980:6;1046:7
**transfer (4)**
901:20;923:1;936:11,18
**transferred (1)**
937:1
**transferring (1)**
937:9
**transparent (1)**
928:7
**transport (1)**
925:11
**transportation (1)**
928:25
**travel (1)**
965:23
**traveled (1)**
989:9
**traveling (1)**
891:14
**Trial (46)**
874:1,21;877:3,23;878:20;881:7,21;882:8;884:3,7,19;885:12,23;905:8;919:6;921:2,8,13,14,15,16,18;922:10;924:4;940:19;963:3;969:15;973:22;975:13;994:19;996:15,16,25;1026:25;1030:12,17;1031:2,7;1033:8,23;1040:13;1041:10,17;1043:3;1046:24;1047:19
**trick (4)**
954:6,10;957:22;978:22
**tricked (3)**
874:14;923:8;982:22
**tried (9)**
920:14;930:21;954:10,10,16;974:12;979:1;1038:7;1040:9
**trip (13)**
894:12;897:22,24;910:9,10;916:5,8,13,15,17,19;917:2,5
**trips (5)**
897:20,21,24;917:5;947:14
**trouble (6)**
888:1,6;941:9;959:24;982:5;991:14
**true (16)**
890:20;916:22;917:8;919:10,11;937:11;942:8;947:6;980:24;981:4,5;990:25;1026:21;1027:2,4,4
**Truly (1)**
993:25
**trust (7)**
922:15;923:12;924:11;952:23;960:8,9;985:4
**trusted (3)**
949:12;950:16;951:14
**trusteeship (1)**
987:7
**truth (8)**

934:3,21;942:6;
979:7,10,12;1035:3;
1042:11
**truths (1)**
932:21
**try (12)**
885:5,16;895:16;
905:4;923:18,23;
925:4;935:2;958:19;
969:1;1011:12;1037:4
**trying (20)**
923:4;924:10;932:4;
933:2,18;934:2,2,8;
944:10;945:4;946:20;
947:13,13;957:22;
959:17;964:13;965:3;
967:17;990:24;1031:9
**turn (8)**
887:7;911:13;
942:22;949:8;969:4;
986:3;1004:2;1006:23
**turned (4)**
879:7;923:13;985:5,
24
**turns (1)**
968:21
**TV (1)**
968:17
**twice (12)**
875:24;879:11;
882:2,18;893:2;
919:19;974:25;985:10;
986:11;989:14;991:20,
21
**twists (1)**
968:19
**two (80)**
876:1,18,24;879:2;
890:10;892:6,21,23;
893:24;894:19;897:17;
900:9;902:8,8,9,13;
903:4,5,24,25;906:6;
917:3;929:16,25;
934:19;936:2;940:17;
951:11,22;952:16;
954:23;957:9;960:14;
963:21;971:3,16;
972:3,22;975:23;
977:3,4;982:7;986:5;
990:20;991:23,23;
992:19;995:20;997:18,
23;998:16;999:14,14,
21;1000:3;1001:20;
1003:2;1004:4,13;
1007:1;1008:13;
1012:7,20;1014:22;
1015:13;1016:21;
1017:3,8,21;1018:6,7,
10;1027:10,18;
1028:16;1034:17;
1044:15;1047:9;
1049:11,25
**type (4)**
945:24;954:1;
1008:8;1037:9
**typed (1)**
1027:23
**types (1)**
952:16
**typewritten (2)**
995:1;1038:22
**typo (2)**
937:14;999:1
**typos (1)**
1050:4

## U

**ultimate (1)**
1014:12
**umbrella (1)**
1035:14
**umbrellas (2)**
1035:20,22
**unanimous (5)**
1018:2,8;1024:10;
1042:3;1044:11
**unanimously (1)**
1024:14
**unavailable (1)**
1047:23
**unavoidable (1)**
1011:13
**uncertain (2)**
896:15;898:4
**unclear (2)**
958:14,16
**uncomfortable (17)**
875:18,19,25;
890:17,19;893:1;
895:16;907:13,25;
919:14;932:6;958:13;
959:5;974:7;985:11;
989:8;992:18
**uncovered (2)**
983:7,7
**undeniable (1)**
918:19
**under (15)**
947:8;950:25;
979:19;1004:13,21;
1005:5,14;1006:10,24;
1007:18;1009:13;
1022:7;1040:23;
1043:6;1047:6
**underlying (3)**
981:7,9,22
**undermines (2)**
976:23;988:18
**understandable (1)**
1052:9
**understands (3)**
887:22;991:16;993:5
**understood (11)**
885:10,11;917:1;
964:8;976:6;984:5,6,9,
12;986:19;1049:20
**undertaken (2)**
1010:21;1021:22
**undertaking (1)**
1020:20
**uneducated (1)**
986:23
**unexpressed (1)**
1015:7
**unfair (1)**
1036:17
**unfavorable (1)**
1040:6
**unfortunate (2)**
991:22;994:9
**unheard (1)**
1047:22
**unintentionally (1)**
905:15
**union (6)**
878:13;900:17;
920:15;925:10;927:15;
929:21
**unions (1)**
929:18
**United (12)**
975:7,10;1002:9;
1003:6,8,9;1008:22;
1010:22,23;1013:19;
1023:2;1032:4
**unlawful (26)**
920:6,6;997:19,22;
1002:24;1006:15,16;
1012:8,12;1014:8,11;
1015:2,21,21,24;
1017:3,16;1018:1,22;
1020:15,16,18,21;
1027:2,8;1034:2
**unless (7)**
967:5;997:23;999:5;
1021:3;1041:17;
1043:12;1047:18
**Unlike (1)**
1026:14
**unluckiest (2)**
993:25;994:1
**unlucky (5)**
990:9;991:2,18;
992:23;994:8
**unnecessary (1)**
1039:19
**unrecorded (1)**
992:6
**unsent (1)**
900:8
**unspoken (1)**
1016:23
**untrue (4)**
1002:15;1009:17,19,
20
**unusual (2)**
1037:15,23
**up (94)**
875:7;877:11;
882:23;883:3;885:9;
887:13;889:3;894:13;
895:24;896:1;897:10;
902:13,14;903:19;
905:5;907:9,23;908:6;
909:1,3;922:20;923:3,
9,18,20;925:5;932:11,
15,17,20;933:3,9,16;
934:2;938:24;939:11,
13;940:17;941:4,6;
942:13;943:2,15;
944:11,14,17,20,23;
945:5,10,25;948:8;
950:13,15;953:5,7;
957:9;959:7;960:18,
19;961:12,16,19;
967:16;969:6,9,19,20;
970:24;972:9;975:15,
18;977:16,24;992:10,
23;993:4,7;998:16,21,
25;999:8,11;1001:1;
1004:6;1025:1;
1030:19;1032:20;
1035:18;1037:7,18;
1040:1;1046:14;
1052:10
**upcoming (2)**
965:15,20
**upon (5)**
980:11;1001:9;
1036:11;1041:9;
1042:16
**USAO (1)**
976:15
**use (17)**
922:23,23;932:2,8;
969:16,18;983:1;
998:16;999:7;1034:17;
1035:7;1039:8,9,11;
1042:13;1048:1;
1052:3
**used (18)**
893:9;935:13;
939:14;949:19;954:6;
956:20;957:21;969:25;
970:13;974:20;976:6,
7,25;982:17;1006:19;
1042:17;1050:20,23
**uses (1)**
1035:14
**using (5)**
905:17;921:12;
970:1;985:21;1048:16
**utilized (1)**
1011:5

## V

**vacation (1)**
878:25
**value (7)**
900:16;912:1;
915:15;987:24,25;
1034:1,7
**variation (1)**
1030:9
**various (1)**
1008:7
**Vegas (5)**
916:5,11;917:2,4;
925:8
**venture (4)**
1021:3;1029:9,14,16
**venue (4)**
1025:24;1026:9,16,
22
**verdict (33)**
924:1;962:2;963:15,
19;996:10,13;1026:24;
1031:1,11;1034:18;
1036:8,13;1041:9,18;
1042:2,5;1043:8,18,19;
1044:2,3,7,8,10,12,14,
14,17,20;1046:24;
1047:1;1048:13,14
**version (1)**
908:8
**versions (3)**
892:21,23;964:23
**Vestfrid (3)**
903:23;914:17;
942:18
**Vienna (2)**
897:20,22
**view (2)**
1031:22;1041:23
**views (3)**
1031:4;1042:6;
1045:6
**violate (4)**
1013:18;1014:25;
1015:15;1016:23
**violated (5)**
926:13;1033:10,12,
12;1039:7
**violates (1)**
1014:7
**violating (5)**
1005:6,15;1006:11;
1010:17;1036:20
**violation (3)**
984:15;1008:11;
1012:19
**violations (3)**
996:18;1012:16;
1033:6
**virtue (1)**
1034:22
**visit (3)**
938:9,19;941:1
**visited (1)**
956:25
**voicemail (7)**
943:1,21,22;945:3;
971:13,16,18

**voicemails (1)**
943:1
**voluntarily (10)**
931:7,17,21;932:17;
934:1;979:4,12;980:1;
1002:21;1010:13
**voluntary (6)**
922:24;934:12;
979:3,4;980:19,23
**volunteer (2)**
907:5,6
**volunteered (5)**
895:3;934:6;980:19,
22,23
**vote (1)**
1001:19
**vouch (1)**
971:4

**W**

**wait (1)**
945:11
**waited (1)**
945:14
**waiting (1)**
965:2
**walk (4)**
884:23;885:3;958:4;
959:6
**walked (1)**
919:10
**walking (2)**
945:15;1035:20
**wants (14)**
901:20,23,23;
952:22;955:7;963:23;
964:25;967:11;971:23;
972:11;978:20;982:21;
988:19;1030:21
**warned (1)**
882:13
**warnings (1)**
900:3
**warrant (2)**
877:8;909:16
**warrants (1)**
1039:5
**watch (1)**
943:12
**water (1)**
1006:20
**way (22)**
905:18;925:13;
932:16;950:7;952:22;
955:12;956:16;983:9;
999:15,21;1000:10;
1006:11;1015:13;
1027:3,15;1029:8;
1036:20;1038:25;
1040:18;1041:8;
1043:8;1044:9
**ways (2)**
999:14;1004:19
**weak (1)**
914:4
**weather (1)**
1035:18
**website (1)**
927:11
**week (6)**
892:6;930:10;
949:23;965:15,20;
975:23
**weekend (3)**
1052:20;1053:2,4
**weeks (2)**
899:2;975:23
**weigh (2)**
1042:7;1043:4
**weighing (1)**
1001:4
**weight (8)**
1026:18;1032:20;
1037:2,10,25;1042:4,
23;1043:23
**weird (1)**
949:14
**well-plotted (1)**
935:13
**weren't (6)**
876:5;947:19,20,20,
22;952:18
**Westchester (1)**
1026:3
**wet (1)**
1035:22
**what's (19)**
877:16,25;884:1;
897:18;930:24;942:11;
943:3;945:9;947:12;
950:10;953:25;954:6;
965:17;1001:1;
1004:15;1020:13;
1035:18;1046:4;
1050:8
**whenever (1)**
1043:9
**whole (4)**
877:4;930:21;
940:23;1006:14
**wholly (1)**
1026:7
**who's (9)**
923:4;932:4,5,5;
937:21;982:23;994:4;
1046:3;1052:17
**whose (2)**
913:11;1040:12
**willfully (10)**
1007:22;1009:7;
1010:11,14;1013:20;
1018:14,16,19;
1025:14;1029:15
**willing (2)**
1020:21;1037:25
**wipe (7)**
883:19;901:3;
902:15,22;934:10;
990:1;993:18
**wiped (17)**
876:23,24;884:6;
904:2,4;911:18,19;
918:11;934:6,9;
935:21;936:6;937:2;
990:3;993:18;1004:7;
1022:23
**wipes (1)**
912:14
**wiping (5)**
912:20;936:5,23;
993:20;1011:25
**wireless (1)**
945:23
**wish (1)**
967:21
**wished (1)**
1029:13
**withdraw (1)**
879:13
**withdrew (1)**
1021:4
**withheld (1)**
986:1
**within (15)**
1002:9;1003:5,24;
1008:22;1009:9;
1010:21,22;1011:5,8;
1012:11;1019:24;
1025:3,5;1026:7;
1038:3
**without (14)**
879:6;888:4;931:9,
11;932:6;950:22;
1020:11,12;1032:2;
1037:24;1042:8,8;
1046:19,20
**witness (19)**
902:24;989:24;
992:9,9,11;1031:22;
1034:21,22,22,24;
1037:4,9,16,17,23,25;
1041:7,15;1046:4
**witness' (2)**
1037:14;1038:1
**witnesses (13)**
874:22;884:22;
924:4;926:7;1031:21;
1032:8,15;1036:24;
1037:8,11,13;1040:13,
21
**wondering (2)**
981:19,19
**Wong (309)**
875:1,3,7,9,11,13,14,
21;876:8,10,11,23;
877:2,12;878:16,21;
879:7,20;881:2,23,25;
882:3,21,25;883:10;
884:18;885:9,14,15,18,
20,22,24;886:1,2,4,6,9,
18,19,21,22,24;887:2,
10,13,14,19,23,25;
888:6,9,10,10,11,19,22,
24;889:3,4,4,6,20,23;
890:23,23;891:6,12,18,
20;892:3,12,19;893:3,
5,11,18,18;894:7,9,19;
895:6,16,20;896:1,5,
12,14,24;897:3,9,13;
898:15,25;899:21;
900:9,12,16,18,25;
903:13,25;906:12,24;
907:15,21;909:8,17,23;
910:5;911:1,3,7,24;
912:5;913:8,14,17;
914:3,6,15;917:19;
919:16,20;921:4;
922:6,10,12,17,19;
923:13;924:9,12,13,15,
22;925:3,25;931:1;
932:24,25;933:1,2,2,8,
8,18,20;934:18;935:5;
937:22,24;938:9,11,14,
15,17,18,21,24;939:8,
11,17;940:3,8,16,20;
941:1,4,6,13,15,20,23;
942:1,11,12,20,23;
943:8,10,13,22;944:7,
12,22;945:7,19;946:5,
7,9;947:3;948:7;949:3,
6,8,11,24;950:19,21;
951:6,10,16,21,23;
952:18,20;953:1,8,25;
954:3,10,13,15,16,21;
955:4,7,11,15,21;
956:5,7,11,13,19,20,24,
25;957:1,5,14,17,18,
18,20,22;958:7,9,25;
959:14,19,21,22;960:9,
10,12,13;970:23,25;
971:3,6,11,21;972:2,6,
7,11,24;973:4,5,8,17;
974:9;975:17;977:9,
11,14,16,21,22;978:2;
980:9;981:15,24;
982:7,13,15,20,22,24;
983:2,6;984:6,8,10;
985:4,23;986:7;
988:24;989:3;990:23;
991:1,4,6,7,8;992:3,7,
21;993:2,8;995:23;
996:5;1002:2;1004:12;
1011:22,23;1034:2
**Wong's (23)**
892:12;896:25;
898:17;906:4;914:17;
922:1;923:18;935:4;
940:12,19;946:10;
952:14;970:23;971:16,
19;972:1,19;980:20;
981:7,9;985:9;990:17;
992:21
**woo (1)**
990:24
**word (12)**
961:19,19;967:18;
1007:19;1034:5;
1042:12;1047:13;
1048:24;1050:19,20,
22,23
**WordPerfect (1)**
1048:20
**words (18)**
995:17;998:9;
999:10;1002:25;
1010:5;1012:12;
1014:20;1015:16;
1016:2;1018:3,22;
1020:11,22;1023:19;
1025:25;1027:7;
1035:25;1048:21
**work (14)**
875:13;876:4;
886:18,22;926:10;
929:17,18;930:13,16;
931:14;932:19;965:10,
13;1041:17
**worked (4)**
876:14;901:12;
946:17;972:21
**working (2)**
975:14;991:7
**works (2)**
908:17;932:10
**world (9)**
878:23;897:24;
932:10;968:2,23,23,23;
993:25;994:2
**worried (3)**
932:4;945:8;955:17
**worries (1)**
965:25
**worse (3)**
905:20;990:14;992:4
**write (1)**
982:15
**writes (1)**
982:13
**writing (3)**
950:4;1014:24;
1043:10
**written (2)**
927:11;1044:25
**wrong (42)**
874:16,21;889:24;
894:4;902:1;907:6;
908:2;913:13;921:9;
925:2,4,6,19,22;927:2,
18;928:15;929:3,4,24;
930:7;931:2,3,3,10;
935:6,16;940:1;948:4,
14;949:20;950:8;
953:19;966:1;972:18;
978:25;979:5;990:12;

993:20,22,24;1031:12
**wrote (1)**
950:23

## X

**xerox (1)**
1048:18
**xeroxed (1)**
1045:22

## Y

**year (13)**
879:18;893:10;925:8;928:5;982:7,8;983:21,21,25,25;984:3,4,4
**years (14)**
875:9;878:12,14;880:11;889:9;897:17;949:16;950:22;953:22,23;972:22;988:10,15;990:20
**yesterday (3)**
963:4;964:17;1050:17
**York (16)**
878:8;896:21;924:14;976:16;996:8;1003:9;1008:1;1011:9;1022:13,14;1023:3,4;1026:1,2,7;1033:4
**Yorkers (2)**
878:14;969:18
**you! (1)**
982:16

## 1

**1 (2)**
895:1;954:23
**1:40 (1)**
963:2
**10 (7)**
896:22;905:13,18;987:14;1022:22;1050:9,9
**100 (6)**
874:25;891:22;949:24;950:5,18;992:1
**1099 (1)**
880:12
**11:27 (1)**
894:18
**116 (6)**
875:8;881:24;963:23;980:11;1001:24;1011:20
**12 (4)**
1024:12;1043:12;1049:25;1050:18
**13 (7)**
880:19;896:19;903:6,12;1008:3;1022:16;1053:5
**139 (1)**
914:18
**13th (1)**
1022:20
**14 (2)**
880:19;1051:16
**15 (6)**
878:15;880:19;916:25;927:3,5,16
**150 (2)**
975:14,19
**15-minute (1)**
920:21
**16 (2)**
880:19;1049:4
**16th (1)**
965:24
**17 (4)**
880:19;885:12;987:22;1049:8
**17th (7)**
938:14,15;943:16;965:24;970:21,21;971:9
**18 (9)**
880:19;885:22;886:24;900:1;911:21;943:23;959:13;1023:1;1050:18
**18th (9)**
940:25;943:16;970:21,24;971:9,12;974:5;977:11;990:17
**19 (4)**
887:5;895:9;955:5;1049:1
**19th (18)**
969:4;970:21;971:2,9;973:1,13;976:21;977:1,7,9,13,23;978:2,9,14,17;983:4;991:8
**1st (6)**
892:9;894:14;897:3;980:20;993:1;1022:3

## 2

**2 (1)**
962:6
**2.08 (1)**
929:14
**2.09-7 (1)**
930:5
**2:54 (1)**
894:7
**20 (4)**
904:5;956:9;962:6;1051:11
**2012 (1)**
880:18
**2015 (28)**
880:14;895:21;896:3;897:3;906:24;918:6;934:22;942:7,10;951:5,12,18;952:7;953:1,9,14,18;954:13,19;955:1,20;956:1,14,19;957:6,20;987:5;992:6
**2016 (7)**
878:7,15;910:10;916:8,25;982:9,12
**2018 (73)**
876:20;882:17,19;883:11,12;885:13;887:5;889:20;890:8,14;891:5,18;892:15;894:14,17;896:19,22;898:12;899:17;900:2;903:6,13,14;904:4,6,11;905:2;910:1,19;911:21;914:10,12;915:24;916:13;938:25;939:17;940:2;943:23;953:13;955:5;959:12;970:25;974:3,16;975:4,5;976:14;978:2;979:23,25;989:22;990:22;991:23;993:1;1001:22;1004:5,6;1007:24;1008:3;1011:17,18;1022:1,3,12,16,17,20,21,24;1023:1,3;1025:1,2
**2021 (1)**
1053:5
**21-second (1)**
971:13
**22 (2)**
893:16;959:18
**23 (4)**
883:7;1022:21;1048:21;1049:3
**233 (1)**
980:6
**234 (2)**
887:6;976:12
**235 (3)**
975:4;976:10;986:13
**246D (1)**
892:17
**25 (6)**
889:20;892:8,24;906:9;914:10;975:4
**251A (1)**
940:15
**25th (8)**
969:3;974:22;975:21,24,24;976:19,22;978:10
**26 (2)**
893:5;1049:3
**27 (2)**
904:4;1049:4
**28 (4)**
894:17;1049:6,8;1051:11
**2nd (3)**
891:18;939:17;991:23

## 3

**3 (2)**
987:6;1021:20
**3.7 (3)**
906:13;907:19;933:20
**3:00 (1)**
993:10
**3:30 (1)**
965:13
**3:33 (1)**
894:8
**30 (3)**
891:5;956:9;975:5
**30th (2)**
975:22,25
**31 (3)**
907:7;958:6;959:12
**36 (1)**
894:19
**360-S (1)**
993:9
**364 (2)**
973:9;977:25
**36-minute (1)**
993:2
**37 (1)**
1038:24

## 4

**4 (7)**
896:25;898:19;987:6,11,22;1048:21;1052:19
**4:00 (1)**
1035:18
**4:25 (1)**
1052:1
**4:26 (1)**
972:5
**4:30 (2)**
967:12,12
**400 (1)**
985:20
**40-page (1)**
977:3
**439 (1)**
982:10
**441 (1)**
973:22

## 5

**5 (2)**
963:5;1043:10
**5:00 (1)**
984:16
**5:41 (1)**
972:7
**531 (1)**
987:4
**59 (1)**
968:20

## 6

**6 (6)**
892:9,10,14;898:12;1022:12,24
**6:00 (2)**
967:11;1046:14
**600 (1)**
916:25
**653 (1)**
976:14
**6S (1)**
914:21

## 7

**7 (2)**
901:20;1049:6
**710 (1)**
955:3
**72 (2)**
975:4;986:13

## 8

**8 (6)**
899:17;976:13;979:23;1007:24;1022:17;1051:16
**8:30 (1)**
945:1
**8th (1)**
910:19

## 9

**9 (4)**
905:2;987:11;1023:3;1049:1
**9:00 (2)**
945:1;984:16
**9:30 (2)**
1052:11;1053:5
**9:31 (1)**
971:13
**902 (3)**
942:24;971:10;972:2
**9th (3)**
914:12;916:13;917:9

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*SYLVIA ASH,*

*December 13, 2021*

*Southern District Court Reporters*

Original File LCDKASHF.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Defendant.

Trial

------------------------------x

New York, N.Y.
December 13, 2021
9:40 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: ELI J. MARK
JONATHAN A. REBOLD
Assistant United States Attorneys
-and-
ALONA S. KATZ
Special Assistant United States Attorney

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE H. COHEN
NATHAN D. REILLY
JAMIE C. BUCKLEY



(In open court; jury not present)
THE COURT: Good morning, everybody.
COUNSEL: Good morning, your Honor.
THE COURT: I hope you all had a somewhat restful weekend.
Let's get the jurors in.
(Jury present)
THE COURT: Good morning, folks. I hope you had a nice weekend.
The jurors all are present. The defendant is present.
I'm now going to send you back to deliberate.
I just want to add this sort of little housekeeping detail: I ask the lawyers to remain in the courtroom, or right around the courtroom, in case we get a note or a verdict, so we can respond quickly. The exception is: Lunch hour for them is going to be 12:45 to 2:00, and we will not be responding to notes or taking a verdict, should there be one, during that hour and a quarter because they're entitled to go get a bite.
Okay. Thank you. You will resume your deliberations.
(Jury not present)
THE COURT: Just for your information, I will not sit past 5:00 today.
Okay. Thank you.
(Recess pending verdict)
THE COURT: I called you back because I forgot to put



on the record and mark the copy of the charge that's going into the jury room.
There's also the note from Thursday night from the jury saying they wanted to go home. The note will be Court Exhibit I.
A copy of the charge which went into the jury room, or is about to go into the jury room, will be Court Exhibit J.
Have I left anything else out?
MR. MARK: I don't believe so, your Honor.
THE COURT: Okay, very good. Thank you.
MS. COHEN: Thank you, your Honor.
THE COURT: Sorry?
MS. COHEN: Thank you, your Honor.
THE COURT: Thank you.
(Recess pending verdict)
THE COURT: Hello, all.
MR. MARK: Hello.
THE COURT: You've already seen the note. We'll mark the original Court Exhibit K. As you know, it says, "Where is Ash's second signed, and name printed under her signature, letter, as referred to on slide Government Exhibit 246D?"
So I assume you have agreed on the answer?
MR. MARK: Correct, your Honor.
It's Government Exhibit 246G. And we have a copy for your Honor.



THE COURT: Well, I have one up here.
I take it you agree, right, Ms. Cohen?
MS. COHEN: Correct, your Honor.
THE COURT: Is there any reason we shouldn't just send this exhibit into the jury room?
MR. MARK: No, your Honor.
MS. COHEN: They will be able to pull it up on their computer. Maybe we should just tell them the exhibit rather than send them --
THE COURT: Well, then I have to bring them back into the courtroom.
MS. COHEN: Oh, you do? Then you can send it back in.
THE COURT: Okay. We will simply send --
MR. MARK: Should we have two copies for the jury or only one?
THE COURT: One is enough.
Okay. So we will not bring the jury in to answer the note. It's obvious.
Okay. Thanks, folks.
MS. COHEN: Thank you.
MR. MARK: Thank you.
(Recess pending verdict)
THE COURT: Good afternoon.
As you know, we now have a note from the jury, which I've marked Court Exhibit L.

Anybody want to express a view?

MR. MARK: So the first point appears that the jury would like a clear definition of "intent" here. And I note that --

THE COURT: Can't put one over on you.

MR. MARK: The obvious speaks to me.

I think the obvious answer might be the one that would be just how the law generally views "intent," which is that a person is presumed to intend the natural and probable consequences of his or her actions.

So we would propose that, as opposed to repeating what the instructions are, to give some clarity --

THE COURT: That doesn't fly here. This is a specific-intent crime, and the difficulty is that I think it expresses, almost as clearly as it could possibly do, what that specific intent is.

Ms. Cohen?

MS. COHEN: I agree, your Honor. I think you should just refer them to the charge.

MR. MARK: Well, I would note the one point that they do make, which is, they're talking about page 7, "Third," line 8, that's where, your Honor, I think, first was just laying out the elements, and then there's a longer discussion of that element a little bit later on, which is at --

THE COURT: Yes, there is. It starts at page 8 and



goes over to page 9.

MR. MARK: So to the extent we're trying to sort of focus them, it might be better to just refer them to element 3 on page 8 from 19 to 9, at line 8.

THE COURT: Okay. What do you have to say as to the second part of the note?

MR. MARK: On the second part of the note, the one thing I did notice is that your Honor, when your Honor was giving the instructions orally, made reference to the second copy of the memo. And I can quote that to your Honor, but I note that's not in the written form.

So it might be worth reemphasizing, and I can read the language that your Honor gave orally, because it might be, as they have this parenthetical on 246G, that they're just confused of where to place that since they see a reference to Government Exhibit 116 but not to that other.

THE COURT: Well, I'll hear Ms. Cohen first.

MS. COHEN: Your Honor, I do not think that we should change in any way the charge as written. After you gave the charge, you asked both parties if there was anything you said they wanted to be edited in the charge that would go back to the jury. Both sides gave you certain edits. That was not one of them. Court Exhibit J, I believe, is the charge that the jury has, and they should just refer to the charge.

MR. MARK: Well, your Honor, I would note the



indictment itself doesn't have a particular government exhibit number, and I think there should be some guidance that's given to them, either to refer to the indictment itself or to make reference, as your Honor orally did, so there might be a another copy so that they don't think they're purely limited to only Government Exhibit 116 in making their determination.

MS. COHEN: Your Honor, we had a charge conference. It was in the charge conference as Government Exhibit 116, and the government didn't object.

THE COURT: I am not going to touch the second question without a more specific inquiry from the jury.

But I do have a proposal with respect to the first, and I'll ask James to give each side two copies. And we'll mark that Court Exhibit M.

(Pause)

THE COURT: Off the record.

(Discussion off the record)

THE COURT: Ms. Cohen?

MS. COHEN: Your Honor, I believe the second part of Court Exhibit M tracks what's in the charge already, and I'm worried that it may further confuse or confuse the jury. I don't know that they're confused at all, actually, but the defense would request that you refer them, as you do in your first paragraph of Court Exhibit M, and then if you wanted to add the second paragraph of Court Exhibit M, that would be fine



with the defense. But I don't think the longer full paragraph is necessary, and I think it may confuse them.

MR. MARK: Your Honor, I think this whole instruction is appropriate and responsive to their question. We would only take issue with a single word that's in this, which we would propose be deleted, which is the second paragraph, what roughly is in between lines 6 and 7, it's the word "special mental element," I think I would take out the word "special." I think it's really just a mental element.

Do you see where I'm referring to?

THE COURT: No.

MR. MARK: Okay. It's the sentence that begins, "Some crimes require what we refer as a specific intent, which is a special mental element particular to the crime."

THE COURT: Now I see it. I would take that out.

I would also be inclined to change line 24 just a little so that it reads: "An existing investigation or an investigation that was within her contemplation," and then continue.

I think this would be -- Mr. Mark?

MR. MARK: We have no objection to that change.

THE COURT: I think this would be clearer, and so I inquire whether there's an objection to it, and, if there's an objection to it, what that is.

MS. COHEN: Your Honor, my objection is that I believe

LCDKASH3 Page 1062

it's already in the charge on page 8, going into page 9, under element three. I don't know why just referring them to what is already in the charge is not sufficient. I don't think that longer paragraph, the second half of Exhibit M, is necessary.

THE COURT: Anything else to say on this, Mr. Mark?

MR. MARK: No. It sounds like Ms. Cohen doesn't have any disagreement. This is legally appropriate, and I think it's responsive to the jury.

THE COURT: Last word, Ms. Cohen?

MS. COHEN: I disagree, your Honor. I think the charge that you --

THE COURT: So you object to it on the ground it's already there?

MS. COHEN: Correct, your Honor. And I haven't -- correct, your Honor.

THE COURT: Is there anything in my proposal that you think is erroneous, apart from the fact that you think it's there already?

MS. COHEN: And that I think it may confuse the jury.

THE COURT: Okay. I don't think it will confuse the jury; I think it will help the jury.

So let's bring in the jury. The objection is overruled.

MR. MARK: So, your Honor, on point 2, you're going to tell the jury that we just aren't sure what they're asking

LCDKASH3 Page 1063

and --

THE COURT: I'm just not going to say anything.

MR. MARK: Your Honor, may we just propose that -- I am concerned there might be some confusion by the jury reading the written instructions, given arguments, given the language of the indictment, and given your Honor's oral instructions, that they might have the mistaken impression that they only can consider Government Exhibit 116 in that charge.

That's why, as opposed to not just responding, I might suggest that we say, we're not sure what they're asking, so if they have a further question on that, that we could then respond to it later. I wouldn't want them to have the impression, which it seems to be, that they might not be able to consider 246G in assessing whether the defendant committed the offense charged in Count Two.

THE COURT: I understood that was your point.

(Jury present)

THE COURT: The jurors are all present. The defendant is present, as she has been through this prior conference.

Folks, I have your note. Your first question relates to my summary.

Andy, do you have the other mic, please?

I'd like to be able to see you all.

Your first question relates to my summary on page 8, beginning at line 8 of the third element of the crime charged

LCDKASH3 Page 1064

in Count Two. The note contains the phrase, and I quote, "clear definition of intent," which I take to mean that you would like me to amplify on what the word "intent", as I used it in describing the third element on Count Two, means.

I explained what I meant by that, beginning on page 8, line 19, and continuing to page 9, line 8.

I would add only this: Some crimes require what we refer to as a specific intent, which is a mental element that's particular to the crime of which the defendant is charged. For example, larceny requires not only the general mental state for the act of taking and carrying away property that belongs to somebody else, but also the specific mental state that the defendant possessed an intent to steal the property.

The crime of obstruction of justice charged in Count Two is a specific-intent crime. It requires that the defendant have acted with the conscious mental state of seeking to impede, obstruct, or influence an investigation of Kam Wong and others connected with MCU that was occurring at the time, or that the defendant contemplated or thought would occur. The government is not required, however, to prove that the investigation, or the possible investigation, that defendant had in mind, if she had such a thing in her mind, was, or would be, a federal investigation.

Accordingly, in order to satisfy the third element of Count Two, the government must prove beyond a reasonable doubt

LCDKASH4 Page 1065

that the defendant did the act with which she is charged for the purpose of impeding, obstructing, or influencing an investigation, whether an existing investigation or an investigation that was within her contemplation but that happened to be of a matter within the jurisdiction of an agency of the United States, whether or not she knew it was within federal jurisdiction.

And I remind you that the United States Attorney's Office is an agency of the federal government.

That's my answer to your note. You may resume deliberations. And for your information, we're going to break at 5:00 o'clock today unless there's a verdict previously.

Okay. Thank you.

(Jury not present)

THE COURT: Anything else, folks?

MS. COHEN: No, your Honor.

MR. MARK: No, your Honor.

THE COURT: Okay. Thank you.

MS. COHEN: Thank you, your Honor.

(Recess pending verdict)

THE COURT: I'm told we have a verdict.

Please bring the jury in.

(Jury present)

THE COURT: Mr. Foreman, I understand the jury has reached a verdict. Is that correct?

THE FOREPERSON: Yes.
THE COURT: Please give it to the clerk.
The clerk will publish the verdict in the usual way.
The defendant will please rise.
THE DEPUTY CLERK: As to Count One, the jury finds the defendant guilty.
As to Count Two, the jury finds the defendant not guilty.
As to Count Three, the jury finds the defendant guilty.
As to Count Four, the jury finds the defendant guilty.
THE COURT: You may be seated, folks.
Is there a request for a poll?
MS. COHEN: Yes, your Honor.
THE COURT: Please poll the jury.
THE DEPUTY CLERK: Juror No. 1, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 2, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 3, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 4, is that your verdict?
Could you speak, sir.
Juror No. 4, is that your verdict?
JUROR: It's hard to hear you. Sorry.



THE DEPUTY CLERK: Juror No. 4, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 5, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 6, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 7, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 8, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 9, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 10, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 11, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Juror No. 12, is that your verdict?
JUROR: Yes.
THE DEPUTY CLERK: Verdict unanimous, your Honor.
THE COURT: Thank you.
Is there any reason why the verdict should not be recorded and filed and the jury dismissed?
MR. MARK: No, your Honor.
MS. COHEN: No, your Honor.
THE COURT: All right.



Ladies and gentlemen, I want to thank you for your jury service. It is invariably my practice never to comment on the substance of a jury verdict, but especially in this time of COVID, you all deserve a great deal of credit for being willing to do this service and for having done it over the past eight or nine days, conscientiously, in circumstances that are, in some ways, less pleasant than they usually are, cooped up all day and so forth. But it's a very important job you have done. This is the heart of the American system of justice, and it is hugely important, and I at least thank you for that. And I'm sure all of the participants in the trial thank you for your careful and conscientious service.
In a minute, you will be discharged. Leave your notebooks in the jury room. Andy will deal with them.
Once you are discharged, you are free either to talk about the case or not talk about the case. If you are approached by anyone to talk about the case, what you do about that is entirely up to you. I simply like to remind jurors that they want to consider whether they should be discreet about what went on within the jury room and have a little regard for feelings that other jurors may have. The Golden Rule kind of applies, although it's not a binding rule; it's a rule of life maybe but it's not a rule of law, and just be cautious.
If anybody approaches you and you don't want to deal



with it, you don't want to talk to them and it's anybody involved with this case in any way, you have a perfect right to say, I'm sorry, I have nothing to say to you. And if anybody doesn't take "no" easily, please let Andy know, and I have a feeling I can take care of the situation, whatever it may be. I think for sure I can take care of it.
Okay. I think that does it. You are dismissed. Thank you for your service.
Thank you very much, and have wonderful holidays.
JUROR: You too. Thank you.
(Jury excused)
THE COURT: Be seated, folks.
Sentencing will be April 20, 2022, at 3:00 o'clock.
Is everybody clear for that date?
MS. COHEN: Yes, your Honor.
MR. MARK: Yes, your Honor.
THE COURT: Okay. Thank you. Anything else?
MR. MARK: Not from the government, your Honor.
MS. COHEN: Your Honor, I don't know if your Honor wants to set a briefing schedule. We will move for a new trial under Rule 33.
THE COURT: I'm confident that you will. Let's do it this way: I will leave to you, Ms. Cohen, to decide when you feel you need to file a notice of motion, but within reason I'll give you as much time to file your memorandum as you want.

So what do you have in mind for the memorandum?

MS. COHEN: Your Honor, I know the motion for a new trial has to be filed within 15 days of the verdict. We will take care of that. Given the holidays, perhaps I could confer with the government and send a letter to your Honor with a proposed briefing schedule?

THE COURT: That would be fine.

I'm going to want the matter fully submitted by, I think, the 1st of March, if we can get that done, because, at least at the moment, I have a heavy trial calendar in March and have to get to this, obviously, before we get to sentencing.

All right. Anything else from either counsel?

MR. MARK: No, your Honor.

MS. COHEN: No, your Honor.

THE COURT: All right.

Look, I'm very appreciative, counsel, of a well done, well tried, hard-fought, case in every way. I'm delighted that you were able to try it as efficiently as you were and get it in in less than two full trial weeks. That's great. I always think it's to the benefit of the parties to get it in quickly and efficiently, and it was a pleasure having all of you in this court. So I hope we'll see you again. Take care.

MS. COHEN: Thank you, your Honor. Have a wonderful holiday.

THE COURT: Thank you. And you too. (Adjourned)

## A

**able (4)** 1057:7;1063:13,23; 1070:18
**Accordingly (1)** 1064:24
**act (2)** 1064:11;1065:1
**acted (1)** 1064:16
**actions (1)** 1058:10
**actually (1)** 1060:22
**add (3)** 1055:12;1060:25; 1064:7
**Adjourned (1)** 1070:25
**afternoon (1)** 1057:23
**again (1)** 1070:22
**agency (2)** 1065:5,9
**agree (2)** 1057:2;1058:18
**agreed (1)** 1056:22
**almost (1)** 1058:15
**although (1)** 1068:22
**always (1)** 1070:19
**American (1)** 1068:9
**amplify (1)** 1064:3
**Andy (3)** 1063:22;1068:14; 1069:4
**apart (1)** 1062:17
**appears (1)** 1058:2
**applies (1)** 1068:22
**appreciative (1)** 1070:16
**approached (1)** 1068:17
**approaches (1)** 1068:25
**appropriate (2)** 1061:4;1062:7
**April (1)** 1069:13
**arguments (1)** 1063:5
**around (1)** 1055:14
**Ash's (1)** 1056:20
**assessing (1)** 1063:14
**assume (1)** 1056:22
**Attorney's (1)** 1065:8
**away (1)** 1064:11

## B

**back (5)** 1055:11,25;1057:10, 12;1059:21
**beginning (2)** 1063:25;1064:5
**begins (1)** 1061:12
**belongs (1)** 1064:11
**benefit (1)** 1070:20
**better (1)** 1059:3
**beyond (1)** 1064:25
**binding (1)** 1068:22
**bit (1)** 1058:24
**bite (1)** 1055:18
**both (2)** 1059:20,22
**break (1)** 1065:11
**briefing (2)** 1069:20;1070:6
**bring (4)** 1057:10,17;1062:22; 1065:22

## C

**calendar (1)** 1070:10
**called (1)** 1055:25
**can (8)** 1055:15;1057:12; 1059:10,12;1063:7; 1069:5,6;1070:9
**care (4)** 1069:5,6;1070:4,22
**careful (1)** 1068:12
**carrying (1)** 1064:11
**case (6)** 1055:14;1068:16,16, 17;1069:2;1070:17
**cautious (1)** 1068:24
**certain (1)** 1059:22
**change (3)** 1059:19;1061:16,21
**charge (15)** 1056:1,6;1058:19; 1059:19,20,21,23,24; 1060:7,8,20;1062:1,3, 11;1063:8
**charged (5)** 1063:15,25;1064:9, 14;1065:1
**circumstances (1)** 1068:6
**clarity (1)** 1058:12
**clear (3)** 1058:3;1064:2; 1069:14
**clearer (1)** 1061:22
**clearly (1)** 1058:15
**clerk (17)** 1066:2,3,5,16,18,20, 22;1067:1,3,5,7,9,11, 13,15,17,19
**COHEN (30)** 1056:11,13;1057:2, 3,7,12,20;1058:17,18; 1059:17,18;1060:7,18, 19;1061:25;1062:6,9, 10,14,19;1065:16,19; 1066:14;1067:24; 1069:15,19,23;1070:2, 14,23
**comment (1)** 1068:2
**committed (1)** 1063:14
**computer (1)** 1057:8
**concerned (1)** 1063:4
**confer (1)** 1070:4
**conference (3)** 1060:7,8;1063:19
**confident (1)** 1069:22
**confuse (5)** 1060:21,21;1061:2; 1062:19,20
**confused (2)** 1059:15;1060:22
**confusion (1)** 1063:4
**connected (1)** 1064:18
**conscientious (1)** 1068:12
**conscientiously (1)** 1068:6
**conscious (1)** 1064:16
**consequences (1)** 1058:10
**consider (3)** 1063:8,14;1068:19
**contains (1)** 1064:1
**contemplated (1)** 1064:19
**contemplation (2)** 1061:18;1065:4
**continue (1)** 1061:19
**continuing (1)** 1064:6
**cooped (1)** 1068:7
**copies (2)** 1057:14;1060:13
**copy (5)** 1056:1,6,24; 1059:10;1060:5
**COUNSEL (3)** 1055:3;1070:12,16
**Count (9)** 1063:15;1064:1,4, 14,25;1066:5,7,9,11
**court (61)** 1055:1,2,4,8,21,25; 1056:4,7,10,12,14,16, 18,19;1057:1,4,10,13, 16,23,25;1058:5,13,25; 1059:5,17,23;1060:10, 14,16,18,20,24,25; 1061:11,15,22;1062:5, 9,12,16,20;1063:2,16, 18;1065:15,18,21,24; 1066:2,12,15;1067:20, 25;1069:12,17,22; 1070:7,15,22,25
**courtroom (3)** 1055:13,14;1057:11
**COVID (1)** 1068:4
**credit (1)** 1068:4
**crime (6)** 1058:14;1061:14; 1063:25;1064:9,14,15
**crimes (2)** 1061:13;1064:7

## D

**date (1)** 1069:14
**day (1)** 1068:8
**days (2)** 1068:6;1070:3
**deal (3)** 1068:4,14,25
**decide (1)** 1069:23
**defendant (14)** 1055:10;1063:14,18; 1064:9,13,15,19,21; 1065:1;1066:4,6,7,9,11
**defense (2)** 1060:23;1061:1
**definition (2)** 1058:3;1064:2
**deleted (1)** 1061:6
**deliberate (1)** 1055:11
**deliberations (2)** 1055:19;1065:11
**delighted (1)** 1070:17
**DEPUTY (15)** 1066:5,16,18,20,22; 1067:1,3,5,7,9,11,13, 15,17,19
**describing (1)** 1064:4
**deserve (1)** 1068:4
**detail (1)** 1055:13
**determination (1)** 1060:6
**difficulty (1)** 1058:14
**disagree (1)** 1062:10
**disagreement (1)** 1062:7
**discharged (2)** 1068:13,15
**discreet (1)** 1068:19
**discussion (2)** 1058:23;1060:17
**dismissed (2)** 1067:22;1069:7
**done (4)** 1068:5,8;1070:9,16
**doubt (1)** 1064:25
**during (1)** 1055:17

## E

**easily (1)** 1069:4
**edited (1)** 1059:21
**edits (1)** 1059:22
**efficiently (2)**

1070:18,21
**eight (1)**
1068:5
**either (3)**
1060:3;1068:15;
1070:12
**element (10)**
1058:24;1059:3;
1061:8,9,14;1062:2;
1063:25;1064:4,8,24
**elements (1)**
1058:23
**else (6)**
1056:8;1062:5;
1064:12;1065:15;
1069:17;1070:12
**enough (1)**
1057:16
**entirely (1)**
1068:18
**entitled (1)**
1055:18
**erroneous (1)**
1062:17
**especially (1)**
1068:3
**everybody (2)**
1055:2;1069:14
**example (1)**
1064:10
**exception (1)**
1055:15
**excused (1)**
1069:11
**Exhibit (19)**
1056:5,7,19,21,24;
1057:5,8,25;1059:16,
23;1060:1,6,8,14,20,
24,25;1062:4;1063:8
**existing (2)**
1061:17;1065:3
**explained (1)**
1064:5
**express (1)**
1058:1
**expresses (1)**
1058:15
**extent (1)**
1059:2

**F**

**fact (1)**
1062:17
**federal (3)**
1064:23;1065:7,9
**feel (1)**
1069:24
**feeling (1)**
1069:5
**feelings (1)**
1068:21
**file (2)**
1069:24,25
**filed (2)**
1067:22;1070:3
**finds (4)**
1066:5,7,9,11
**fine (2)**
1060:25;1070:7
**first (7)**
1058:2,22;1059:17;
1060:12,24;1063:20,24
**fly (1)**
1058:13
**focus (1)**
1059:3
**folks (6)**
1055:8;1057:19;
1063:20;1065:15;
1066:12;1069:12
**Foreman (1)**
1065:24
**FOREPERSON (1)**
1066:1
**forgot (1)**
1055:25
**form (1)**
1059:11
**forth (1)**
1068:8
**Four (1)**
1066:11
**free (1)**
1068:15
**full (2)**
1061:1;1070:19
**fully (1)**
1070:8
**further (2)**
1060:21;1063:11

**G**

**gave (3)**
1059:13,19,22
**general (1)**
1064:10
**generally (1)**
1058:8
**gentlemen (1)**
1068:1
**given (5)**
1060:2;1063:5,5,6;
1070:4
**giving (1)**
1059:9
**goes (1)**
1059:1
**Golden (1)**
1068:21
**Good (5)**
1055:2,3,8;1056:10;
1057:23
**Government (13)**
1056:21,24;1059:16;
1060:1,6,8,9;1063:8;
1064:20,25;1065:9;
1069:18;1070:5
**great (2)**
1068:4;1070:19
**ground (1)**
1062:12
**guidance (1)**
1060:2
**guilty (4)**
1066:6,8,10,11

**H**

**half (1)**
1062:4
**happened (1)**
1065:5
**hard (1)**
1066:25
**hard-fought (1)**
1070:17
**hear (2)**
1059:17;1066:25
**heart (1)**
1068:9
**heavy (1)**
1070:10
**Hello (2)**
1056:16,17
**help (1)**
1062:21
**holiday (1)**
1070:24
**holidays (2)**
1069:9;1070:4
**home (1)**
1056:4
**Honor (43)**
1055:3;1056:9,11,
13,23,25;1057:3,6;
1058:18,22;1059:8,8,
10,13,18,25;1060:4,7,
19;1061:3,25;1062:10,
14,15,24;1063:3;
1065:16,17,19;
1066:14;1067:19,23,
24;1069:15,16,18,19,
19;1070:2,5,13,14,23
**Honor's (1)**
1063:6
**hope (3)**
1055:4,8;1070:22
**hour (2)**
1055:15,18
**housekeeping (1)**
1055:12
**hugely (1)**
1068:10

**I**

**impede (1)**
1064:17
**impeding (1)**
1065:2
**important (2)**
1068:8,10
**impression (2)**
1063:7,13
**inclined (1)**
1061:16
**indictment (3)**
1060:1,3;1063:6
**influence (1)**
1064:17
**influencing (1)**
1065:2
**information (2)**
1055:21;1065:11
**inquire (1)**
1061:23
**inquiry (1)**
1060:11
**instruction (1)**
1061:3
**instructions (4)**
1058:12;1059:9;
1063:5,6
**intend (1)**
1058:9
**intent (8)**
1058:3,8,16;
1061:13;1064:2,3,8,13
**into (6)**
1056:1,6,7;1057:5,
10;1062:1
**invariably (1)**
1068:2
**investigation (9)**
1061:17,18;1064:17,
21,21,23;1065:3,3,4
**involved (1)**
1069:2
**issue (1)**
1061:5

**J**

**James (1)**
1060:13
**job (1)**
1068:8
**jurisdiction (2)**
1065:5,7
**Juror (28)**
1066:16,17,18,19,20,
21,22,24,25;1067:1,2,
3,4,5,6,7,8,9,10,11,12,
13,14,15,16,17,18;
1069:10
**jurors (5)**
1055:6,10;1063:18;
1068:18,21
**jury (39)**
1055:1,7,20;1056:2,
4,6,7;1057:5,14,17,24;
1058:2;1059:22,24;
1060:11,21;1062:8,19,
21,21,22,25;1063:4,17;
1065:14,22,23,24;
1066:5,7,9,11,15;
1067:22;1068:2,3,14,
20;1069:11
**justice (2)**
1064:14;1068:9

**K**

**Kam (1)**
1064:17
**kind (1)**
1068:22
**knew (1)**
1065:6

**L**

**Ladies (1)**
1068:1
**language (2)**
1059:13;1063:5
**larceny (1)**
1064:10
**Last (1)**
1062:9
**later (2)**
1058:24;1063:12
**law (2)**
1058:8;1068:23
**lawyers (1)**
1055:13
**laying (1)**
1058:22
**least (2)**
1068:10;1070:10
**Leave (2)**
1068:13;1069:23
**left (1)**
1056:8
**legally (1)**
1062:7
**less (2)**
1068:7;1070:19
**letter (2)**
1056:21;1070:5
**life (1)**
1068:23
**limited (1)**
1060:5
**line (6)**
1058:21;1059:4;
1061:16;1063:25;
1064:6,6
**lines (1)**
1061:7
**little (4)**
1055:12;1058:24;
1061:17;1068:20

**longer (3)**
1058:23;1061:1;
1062:4
**Look (1)**
1070:16
**Lunch (1)**
1055:15

## M

**making (1)**
1060:6
**March (2)**
1070:9,10
**mark (28)**
1056:1,9,17,18,23;
1057:6,14,21;1058:2,6,
20;1059:2,7,25;
1060:14;1061:3,12,20,
21;1062:5,6,24;
1063:3;1065:17;
1067:23;1069:16,18;
1070:13
**marked (1)**
1057:25
**matter (2)**
1065:5;1070:8
**may (8)**
1060:21;1061:2;
1062:19;1063:3;
1065:10;1066:12;
1068:21;1069:5
**Maybe (2)**
1057:8;1068:23
**MCU (1)**
1064:18
**mean (1)**
1064:2
**means (1)**
1064:4
**meant (1)**
1064:5
**memo (1)**
1059:10
**memorandum (2)**
1069:25;1070:1
**mental (7)**
1061:7,9,14;1064:8,
10,12,16
**mic (1)**
1063:22
**might (9)**
1058:7;1059:3,12,
13;1060:4;1063:4,7,9,
13
**mind (3)**
1064:22,22;1070:1
**minute (1)**
1068:13
**mistaken (1)**
1063:7
**moment (1)**
1070:10
**more (1)**
1060:11
**morning (3)**
1055:2,3,8
**motion (2)**
1069:24;1070:2
**move (1)**
1069:20
**much (2)**
1069:9,25
**must (1)**
1064:25

## N

**name (1)**
1056:20
**natural (1)**
1058:9
**necessary (2)**
1061:2;1062:4
**need (1)**
1069:24
**new (2)**
1069:20;1070:2
**nice (1)**
1055:9
**night (1)**
1056:3
**nine (1)**
1068:6
**note (15)**
1055:14;1056:3,4,
18;1057:18,24;1058:3,
20;1059:6,7,11,25;
1063:20;1064:1;
1065:10
**notebooks (1)**
1068:14
**notes (1)**
1055:17
**notice (2)**
1059:8;1069:24
**number (1)**
1060:2

## O

**object (2)**
1060:9;1062:12
**objection (5)**
1061:21,23,24,25;
1062:22
**obstruct (1)**
1064:17
**obstructing (1)**
1065:2
**obstruction (1)**
1064:14
**obvious (3)**
1057:18;1058:6,7
**obviously (1)**
1070:11
**occur (1)**
1064:19
**occurring (1)**
1064:18
**o'clock (2)**
1065:12;1069:13
**Off (2)**
1060:16,17
**offense (1)**
1063:15
**Office (1)**
1065:9
**Once (1)**
1068:15
**one (10)**
1055:17;1057:1,15,
16;1058:5,7,20;1059:7,
22;1066:5
**only (6)**
1057:15;1060:6;
1061:4;1063:7;1064:7,
10
**open (1)**
1055:1
**opposed (2)**
1058:11;1063:9
**oral (1)**
1063:6
**orally (3)**
1059:9,13;1060:4
**order (1)**
1064:24
**original (1)**
1056:19
**others (1)**
1064:18
**out (4)**
1056:8;1058:22;
1061:8,15
**over (3)**
1058:5;1059:1;
1068:5
**overruled (1)**
1062:23

## P

**page (9)**
1058:21,25;1059:1,
4;1062:1,1;1063:24;
1064:5,6
**paragraph (5)**
1060:24,25;1061:1,
6;1062:4
**parenthetical (1)**
1059:14
**part (3)**
1059:6,7;1060:19
**participants (1)**
1068:11
**particular (3)**
1060:1;1061:14;
1064:9
**parties (2)**
1059:20;1070:20
**past (2)**
1055:22;1068:5
**Pause (1)**
1060:15
**pending (4)**
1055:24;1056:15;
1057:22;1065:20
**perfect (1)**
1069:2
**perhaps (1)**
1070:4
**person (1)**
1058:9
**phrase (1)**
1064:1
**place (1)**
1059:15
**pleasant (1)**
1068:7
**please (6)**
1063:22;1065:22;
1066:2,4,15;1069:4
**pleasure (1)**
1070:21
**point (4)**
1058:2,20;1062:24;
1063:16
**poll (2)**
1066:13,15
**possessed (1)**
1064:13
**possible (1)**
1064:21
**possibly (1)**
1058:15
**practice (1)**
1068:2
**present (10)**
1055:1,7,10,10,20;
1063:17,18,19;
1065:14,23
**presumed (1)**
1058:9
**previously (1)**
1065:12
**printed (1)**
1056:20
**prior (1)**
1063:19
**probable (1)**
1058:9
**property (2)**
1064:11,13
**proposal (2)**
1060:12;1062:16
**propose (3)**
1058:11;1061:6;
1063:3
**proposed (1)**
1070:6
**prove (2)**
1064:20,25
**publish (1)**
1066:3
**pull (1)**
1057:7
**purely (1)**
1060:5
**purpose (1)**
1065:2
**put (2)**
1055:25;1058:5

## Q

**quarter (1)**
1055:18
**quickly (2)**
1055:15;1070:20
**quote (2)**
1059:10;1064:1

## R

**rather (1)**
1057:8
**reached (1)**
1065:25
**read (1)**
1059:12
**reading (1)**
1063:4
**reads (1)**
1061:17
**really (1)**
1061:9
**reason (3)**
1057:4;1067:21;
1069:24
**reasonable (1)**
1064:25
**Recess (4)**
1055:24;1056:15;
1057:22;1065:20
**record (3)**
1056:1;1060:16,17
**recorded (1)**
1067:22
**reemphasizing (1)**
1059:12
**refer (7)**
1058:19;1059:3,24;
1060:3,23;1061:13;
1064:8
**reference (3)**
1059:9,15;1060:4
**referred (1)**
1056:21
**referring (2)**
1061:10;1062:2
**regard (1)**
1068:21
**relates (2)**
1063:20,24

**remain (1)**
1055:13
**remind (2)**
1065:8;1068:18
**repeating (1)**
1058:11
**request (2)**
1060:23;1066:13
**require (2)**
1061:13;1064:7
**required (1)**
1064:20
**requires (2)**
1064:10,15
**respect (1)**
1060:12
**respond (2)**
1055:15;1063:12
**responding (2)**
1055:16;1063:9
**responsive (2)**
1061:4;1062:8
**restful (1)**
1055:4
**resume (2)**
1055:19;1065:10
**right (6)**
1055:13;1057:2;
1067:25;1069:2;
1070:12,15
**rise (1)**
1066:4
**room (6)**
1056:2,6,7;1057:5;
1068:14,20
**roughly (1)**
1061:6
**Rule (5)**
1068:22,22,23,23;
1069:21

## S

**satisfy (1)**
1064:24
**saying (1)**
1056:4
**schedule (2)**
1069:20;1070:6
**seated (2)**
1066:12;1069:12
**second (9)**
1056:20;1059:6,7,9;
1060:10,19,25;1061:6;
1062:4
**seeking (1)**
1064:16
**seems (1)**
1063:13
**send (6)**
1055:11;1057:4,9,
12,13;1070:5
**sentence (1)**
1061:12
**Sentencing (2)**
1069:13;1070:11
**service (4)**
1068:2,5,12;1069:8
**set (1)**
1069:20
**side (1)**
1060:13
**sides (1)**
1059:22
**signature (1)**
1056:20
**signed (1)**
1056:20
**simply (2)**
1057:13;1068:18
**single (1)**
1061:5
**sit (1)**
1055:21
**situation (1)**
1069:5
**slide (1)**
1056:21
**somebody (1)**
1064:12
**somewhat (1)**
1055:4
**Sorry (3)**
1056:12;1066:25;
1069:3
**sort (2)**
1055:12;1059:2
**sounds (1)**
1062:6
**speak (1)**
1066:23
**speaks (1)**
1058:6
**special (3)**
1061:7,8,14
**specific (5)**
1058:16;1060:11;
1061:13;1064:8,12
**specific-intent (2)**
1058:14;1064:15
**starts (1)**
1058:25
**state (3)**
1064:10,12,16
**States (2)**
1065:6,8
**steal (1)**
1064:13
**submitted (1)**
1070:8
**substance (1)**
1068:3
**sufficient (1)**
1062:3
**suggest (1)**
1063:10
**summary (2)**
1063:21,24
**sure (4)**
1062:25;1063:10;
1068:11;1069:6
**system (1)**
1068:9

## T

**talk (4)**
1068:15,16,17;
1069:1
**talking (1)**
1058:21
**Thanks (1)**
1057:19
**Third (4)**
1058:21;1063:25;
1064:4,24
**thought (1)**
1064:19
**three (2)**
1062:2;1066:9
**Thursday (1)**
1056:3
**today (2)**
1055:22;1065:12
**told (1)**
1065:21
**touch (1)**
1060:10
**tracks (1)**
1060:20
**trial (5)**
1068:11;1069:20;
1070:3,10,19
**tried (1)**
1070:17
**try (1)**
1070:18
**trying (1)**
1059:2
**two (9)**
1057:14;1060:13;
1063:15;1064:1,4,15,
25;1066:7;1070:19

## U

**unanimous (1)**
1067:19
**under (3)**
1056:20;1062:1;
1069:21
**understood (1)**
1063:16
**United (2)**
1065:6,8
**unless (1)**
1065:12
**up (4)**
1057:1,7;1068:7,18
**used (1)**
1064:3
**usual (1)**
1066:3
**usually (1)**
1068:7

## V

**verdict (28)**
1055:14,17,24;
1056:15;1057:22;
1065:12,20,21,25;
1066:3,16,18,20,22,24;
1067:1,3,5,7,9,11,13,
15,17,19,21;1068:3;
1070:3
**view (1)**
1058:1
**views (1)**
1058:8

## W

**wants (1)**
1069:20
**way (5)**
1059:19;1066:3;
1069:2,23;1070:17
**ways (1)**
1068:7
**weekend (2)**
1055:5,9
**weeks (1)**
1070:19
**what's (1)**
1060:20
**whole (1)**
1061:3
**willing (1)**
1068:4
**within (7)**
1061:18;1065:4,5,6;
1068:20;1069:24;
1070:3
**without (1)**
1060:11
**wonderful (2)**
1069:9;1070:23
**Wong (1)**
1064:17
**word (5)**
1061:5,7,8;1062:9;
1064:3
**worried (1)**
1060:21
**worth (1)**
1059:12
**written (3)**
1059:11,19;1063:5

## 1

**1 (1)**
1066:16
**10 (1)**
1067:13
**11 (1)**
1067:15
**116 (4)**
1059:16;1060:6,8;
1063:8
**12 (1)**
1067:17
**12:45 (1)**
1055:16
**15 (1)**
1070:3
**19 (2)**
1059:4;1064:6
**1st (1)**
1070:9

## 2

**2 (2)**
1062:24;1066:18
**2:00 (1)**
1055:16
**20 (1)**
1069:13
**2022 (1)**
1069:13
**24 (1)**
1061:16
**246D (1)**
1056:21
**246G (3)**
1056:24;1059:14;
1063:14

## 3

**3 (2)**
1059:3;1066:20
**3:00 (1)**
1069:13
**33 (1)**
1069:21

## 4

**4 (3)**
1066:22,24;1067:1

## 5

**5 (1)**
1067:3
**5:00 (2)**
1055:22;1065:12

## 6

**6 (2)**
1061:7;1067:5

**7**

**7 (3)**
1058:21;1061:7;
1067:7

**8**

**8 (10)**
1058:22,25;1059:4,
4;1062:1;1063:24,25;
1064:5,6;1067:9

**9**

**9 (5)**
1059:1,4;1062:1;
1064:6;1067:11

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 18, 2018

Via Email (sylviaash@aol.com)
Sylvia Ash

Re: Grand Jury Subpoena

Please be advised that the accompanying grand jury subpoena has been issued in connection with an official criminal investigation of a suspected felony being conducted by a federal grand jury. The Government hereby requests that you voluntarily refrain from disclosing the existence of the subpoena to any third party. While you are under no obligation to comply with our request, we are requesting you not to make any disclosure in order to preserve the confidentiality of the investigation and because disclosure of the existence of this investigation might interfere with and impede the investigation.

Moreover, if you intend to disclose the existence of this subpoena to a third party, please let me know before making any such disclosure.

Thank you for your cooperation in this matter.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: Eli Mark
Eli J. Mark
Assistant United States Attorney
(212) 637-2431

GOVERNMENT EXHIBIT 112
S1 19 Cr. 780 (LAK)

Grand Jury Subpoena

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

TO: Sylvia Ash

GREETINGS:

WE COMMAND YOU that all and singular business and excuses being laid aside, you appear and attend before the GRAND JURY of the people of the United States for the Southern District of New York, at the United States Courthouse, 40 Foley Square, Room 220, in the Borough of Manhattan, City of New York, New York, in the Southern District of New York, at the following date, time and place:

Appearance Date: June 28, 2018 Appearance Time: 2:00 p.m.

to testify and give evidence in regard to an alleged violation of:
18 U.S.C. §§ 657, 1001, 1343, 1344, 1346, 1349, 1512

and not to depart the Grand Jury without leave thereof, or of the United States Attorney, and that you bring with you and produce at the above time and place the following:

**SEE ATTACHED RIDER.**

Personal appearance is required. Please produce the requested records on or before the return date to Special Agent LaVale Jackson (phone: 212-637-2555; email: LaVale.Jackson@usdoj.gov). **PLEASE PRODUCE THE RECORDS IN ELECTRONIC FORMAT, IF POSSIBLE.**

Failure to attend and produce any items hereby demanded will constitute contempt of court and will subject you to civil sanctions and criminal penalties, in addition to other penalties of the Law.

DATED: New York, New York
June 18, 2018

GEOFFREY S. BERMAN
*United States Attorney for the Southern District of New York*

Eli J. Mark/ Daniel C. Richenthal
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Telephone: 212-637-2431/2109
Eli.Mark@usdoj.gov/
Daniel.Richenthal@usdoj.gov

## RIDER-A

(Grand Jury Subpoena to Ash dated June 18, 2018)

**Definitions and Instructions:**

1. Unless otherwise specified, this subpoena covers the time period January 1, 2015 to the present.

2. This Subpoena calls for the production of specific documents—including emails and text messages—in the possession, custody or control of Sylvia Ash ("Ash").

3. This Subpoena applies to any responsive documents wherever they may be found, including any of personal electronic devices including any cellular phone or other telephone, pager, tablet, laptop computer, desktop computer, personal email, cloud storage, messaging or social media accounts.

4. With the exception of documents containing handwritten notes, please produce requested records in electronic form (native format where necessary to view the material in its full scope) in a manner that is OCR-searchable, and with all available electronic metadata. Please provide the originals of all papers, notepads, notebooks, diaries, or calendars upon which responsive handwritten notes may be found.

5. The term "documents" includes writings, emails, text messages, drawings, graphs, charts, calendar entries, photographs, audio or visual recordings, images, and other data or data compilations, and includes materials in both paper and electronic form.

6. This Subpoena does not call for the production of any documents protected by a valid claim of privilege, although any responsive document over which privilege is being asserted must be preserved. Any documents withheld on grounds of privilege must be identified on a privilege log with descriptions sufficient to identify their dates, authors, recipients, and general subject matter.

**Materials To Be Produced:**

1. Any and all correspondence (including emails, letters, and text messages, whether sent or unsent) with or regarding (i) Kam Wong, (ii) Joseph Guagliardo a/k/a Joseph Gagliardo, (iii) Giovanni Porcelli, (iv) Linda Lambert, (v) Kim Thompson, (vi) Nana Osei-Bonsu, (vii) Mark Brantley, (viii) James Durrah, (ix) Angel Audifred, and (x) Ana Puello.

2. Any and all correspondence (including emails, letters, and text messages, whether sent or unsent) with or regarding Eisner Amper (including any principal, officer, employee, contractor, agent and representative) relating to (i) Kam Wong's compensation, and (ii) any criminal or internal investigation of Kam Wong.

3. Any and all documents (including correspondence) related to money and/or benefits Kam Wong received from the Municipal Credit Union, including, but not limited to communications and documents regarding a June 2015 meeting with Kam Wong.

4. Any and all documents (including correspondence) regarding any criminal investigation, internal investigation or audit related to Kam Wong.

5. Any and all documents regarding any gifts, presents, donations and/or items of value received from or given to (i) Kam Wong, (ii) Joseph Guagliardo a/k/a Joseph Gagliardo, (iii) Giovanni Porcelli, and/or (iv) the Municipal Credit Union

**<u>RIDER B</u>– Advice of Rights**

(Grand Jury Subpoena to Sylvia Ash, dated June 18, 2018)

1. You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

2. Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding.

3. If you have a lawyer, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with your lawyer if you so desire.

4. If you would like a lawyer but do not have funds to retain one, you may make an application to the United States Magistrate Judge who will decide whether to appoint a lawyer to represent you.

MCU
MUNICIPAL CREDIT UNION
22 Cortlandt Street
New York, NY 10007
Tel: (212) 238-3300

June 19, 2018

**VIA FEDERAL EXPRESS and EMAIL**

Hon. Sylvia Ash
568 Westminster Road
Brooklyn, New York 11230-1409

Re: Return of MCU Devices and Materials

Dear Judge Ash:

It has come to the attention of Municipal Credit Union ("MCU"), that you are in possession of electronic devices owned by MCU, including, but not limited to, any iPads, iPhones, Apple Watches (iWatches), or other electronic devices issued to you by MCU or any of its current or former employees or representatives, including former President/CEO Kam Wong. MCU requests that you return all such devices to MCU immediately.

Please be advised that you do not have MCU's permission or authority to wipe, delete, reset, factory restore, image or copy any of MCU's electronic devices (cell phone/laptop/iPad, etc.) or to print off any emails or documents located on MCU's electronic devices. See MCU Policy Manual 10.15; 14.69-11; 14.69-12; 19.01 and MCU electronics agreements previously signed by you.

At this time, MCU also requests that you return any forensic copies, any images and/or printed-off emails or documents that you may have derived in any way from any of MCU's electronic devices and any other MCU materials in your custody or control.

Accordingly, please contact CarolAnn Cocchiere, Esq. at (212)238-3428 to make the necessary arrangements.

Very truly yours,

Norman Kohn
Acting President/CEO

*Visit our website at: www.nymcu.org*

GOVERNMENT EXHIBIT 113
S1 19 Cr. 780 (LAK)

MCU MUNICIPAL CREDIT UNION
22 Cortlandt Street
New York, NY 10007

**Norman Kohn**
Acting President/CEO

July 13, 2018

**VIA FEDERAL EXPRESS and EMAIL**

Hon. Sylvia Ash
568 Westminster Road
Brooklyn, New York 11230-1409

Re: Return of MCU Devices and Materials: Third Request

Dear Judge Ash:

I am writing to follow-up on my prior letters to you. Municipal Credit Union ("MCU") understands that you are still in possession of electronic devices owned by MCU, including, but not limited to, any iPads, iPhones, Apple Watches (iWatches and bands), and/or other electronic devices issued to you by MCU or any of its current or former employees or representatives, including former CEO/President Kam Wong.

Despite what you may have been informed, MCU continues to request that you return *all* such devices to MCU immediately. Any instruction to you that you could retain certain devices was incorrect and not authorized by me. To be clear, *any and all devices* must be returned, regardless of the age of the device. We understand that you are in possession of MCU-owned devices provided to you in the past year alone, including an iPhone X.

Please be advised that you do not have MCU's permission or authority to wipe, delete, reset, factory restore, image or copy any of MCU's electronic devices (cell phone/laptop/iPad, etc.) or to print off any emails or documents located on MCU's electronic devices. See MCU Policy Manual 10.15; 14.69-11; 14.69-12; 19.01 and MCU electronics agreements previously signed by you.

At this time, MCU also requests that you return any forensic copies, any images and/or printed-off emails or documents that you may have derived in any way from any of MCU's electronic devices and any other MCU materials in your custody or control.

Accordingly, please contact Bridget Cisneroz at (212) 238-2321 to make the necessary arrangements.

Very truly yours,

Norman Kohn
Acting President/CEO

GOVERNMENT EXHIBIT 114
S1 19 Cr. 780 (LAK)

**From:** Jackson, LaVale (USANYS)
**Sent:** Thursday, March 15, 2018 11:17 AM
**To:** sylviaash@aol.com
**Subject:** Grand Jury subpoena
**Attachments:** Sylvia Ash 2018 03 13 Subpoena.pdf; ATT00001.txt

Ms. Ash,

Attached is a grand jury subpoena.

GOVERNMENT EXHIBIT
117
S1 19 Cr. 780 (LAK)

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 13, 2018

Sylvia Ash

Re: Grand Jury Subpoena

Please be advised that the accompanying grand jury subpoena has been issued in connection with an official criminal investigation of a suspected felony being conducted by a federal grand jury. The Government hereby requests that you voluntarily refrain from disclosing the existence of the subpoena to any third party. While you are under no obligation to comply with our request, we are requesting you not to make any disclosure in order to preserve the confidentiality of the investigation and because disclosure of the existence of this investigation might interfere with and impede the investigation.

Moreover, if you intend to disclose the existence of this subpoena to a third party, please let me know before making any such disclosure.

Thank you for your cooperation in this matter.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: [redacted]
Assistant United States Attorney
[redacted]

Grand Jury Subpoena

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

TO: Sylvia Ash

GREETINGS:

WE COMMAND YOU that all and singular business and excuses being laid aside, you appear and attend before the GRAND JURY of the people of the United States for the Southern District of New York, at the United States Courthouse, 40 Foley Square, Room 220, in the Borough of Manhattan, City of New York, New York, in the Southern District of New York, at the following date, time and place:

Appearance Date: April 10, 2018 Appearance Time: 10:00 am

to testify and give evidence in regard to an alleged violation of:
18 U.S.C. § 657, 1001, 1343.

and not to depart the Grand Jury without leave thereof, or of the United States Attorney, and that you bring with you and produce at the above time and place the following:
**PLEASE SEE ATTACHED RIDER**.

**PLEASE PRODUCE THE RECORDS IN ELECTRONIC FORMAT, IF POSSIBLE.**

Failure to attend and produce any items hereby demanded will constitute contempt of court and will subject you to civil sanctions and criminal penalties, in addition to other penalties of the Law.

DATED: New York, New York
March 13, 2018

GEOFFREY S. BERMAN
*United States Attorney for the Southern District of New York*

[redacted]
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Telephone: [redacted]

# RIDER

(Grand Jury Subpoena to Ash dated March 13, 2018)

**Definitions and Instructions:**

1. This subpoena covers all responsive documents wherever they may be found, including on personal electronic devices, cellphones, laptop computers or flash drives.

2. Where possible, please produce the records requested herein in electronic form (native format where necessary to view the material in its full scope) in a manner that is OCR-searchable, and with all available electronic metadata.

3. The term "documents" includes, but is not limited to, emails, writings, work-papers, drawings, graphs, charts, calendar entries, photographs, audio or visual recordings, images, and other data or data compilations, and includes materials on both paper and electronic form.

4. This subpoena does not call for the production of any documents protected by a valid claim of privilege. Any documents withheld on grounds of privilege must be identified on a privilege log.

**Materials To Be Produced:**

1. Any and all documents related to any long term disability insurance for Kam Wong.

2. Any and all documents related to Kam Wong's income, compensation, bonuses, executive benefits, and/or other money or benefits received from MCU.

3. Any and all documents related to any amendments to Kam Wong's Employment Agreement.

4. Any and all correspondence (including, but not limited to, emails and text messages) with Kam Wong, between January 1, 2015 and the Present.

MUNICIPAL CREDIT UNION

# POLICY MANUAL

GOVERNMENT EXHIBIT 401
S1 19 Cr. 780 (LAK)

MCU
MUNICIPAL CREDIT UNION
Policy Manual

# OVERVIEW

MCU MUNICIPAL CREDIT UNION
**Policy Manual**

# OVERVIEW

## *Purpose*

This manual establishes a policy framework for the Municipal Credit Union. This Policy Manual is the authoritative source of the policies established and approved by the Board of Directors. The development, reproduction and maintenance of this manual is authorized by the Board of Directors. The purposes of this Policy Manual are to: provid e uniform, consistent policy statements; sustain the line of communication to the directors and management; give authority and responsibility to management; and to develop procedures integral to the operations of the Credit Union.

## *Policy Development*

To ensure a uniformly high standard in policy development and application, a process has been developed to identify issues, establish priorities, develop policy positions, and ensure that those positions are clearly understood and applied consistently. The development process will continue to evolve in response to opportunities for improvement and warranted circumstances. The basic policy development and approval stages are summarized as follows:

1. Identify issues with policy or situation implications.
2. Assess the risk/opportunity.
3. Prepare and present policy material for Board Committee consideration.
4. Committee Chairs prepare recommendation for full Board consideration.

5. Incorporate approved policy to this manual.

6. Implement Board Policy decision(s).

7. Monitor and report on policy application.

## *Preparation of Policy Amendments or Additions for Committees' Consideration*

Before Management presents amendments or changes to the policy to the Board Committees, the following will be considered:

- Congruency with overall mission, values, and strategic goals of the Credit Union
- Legal requirements and implications
- Cost/benefit implications
- Administrative and operative practicalities and/or impact analysis

## *Implementation of Board Policy Decisions*

To the extent practical, the implementation date will be determined by management to facilitate effective implementation. The Senior Management who made the policy recommendation in its development phase is responsible for the creation of both an implementation plan and procedures to carry out the policy. Prior to presenting to the Board any new policy or changes to the policy, the same shall be presented to the CEO for approval. In general, the implementation plan should be prepared in anticipation of Board approval, so that it can be efficiently and effectively implemented immediately after Board approval.



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT MCU-00028156

## *Monitor and Report on Policy Application*

Management has the responsibility to assure that the Board approved policies are being applied and adhered to as intended on a consistent basis. Managers should routinely monitor their operations for compliance with the policies. The Internal Audit Department conducts periodic reviews and audits of specific operations, which include policy application and compliance. After the policies have been in effect for a meaningful period of time, significant policies should be subject to review by management and the Compliance Officer.

## *Authorization and Authentication of this Policy Manual*

Policies included herein supersede any previously adopted policies. They should not be viewed as non-voidable, but rather as yielding to the evolving changes, conditions, and requirements of the overall financial industry and environment. Therefore, policies herein will be reviewed periodically and revised when circumstances warrant.

The Board delegated the responsibility of overseeing the adherence, monitoring, and the development of policies to the CEO. This Policy Manual is hereby authorized and authenticated by the President/Chief Executive Officer.

Kam Wong
President/Chief Executive Officer

A-907

MUNICIPAL CREDIT UNION
Policy Manual

# TABLE OF CONTENTS

Policy Manual

# TABLE OF CONTENTS

Page


**SECTION 1 NEW POLICIES, REVISIONS, AND CHANGES .................................. 1.1**

**SECTION 2 BOARD ADMINISTRATION....................................................................... 2.1**

| | | |
|---|---|---|
| 2.01 | BYLAW REVISIONS | 2.1 |
| 2.02 | ELECTION OF OFFICERS | 2.1 |
| 2.03 | BOARD COMMITTEES | 2.1 |
| 2.04 | COMMITTEE MEETINGS | 2.2 |
| 2.05 | BOARD OF DIRECTORS MEETINGS | 2.2 |
| 20.5A | REGISTERING OF VOTES AT BOARD MEETINGS | 2.3 |
| 2.06 | ANNUAL MEETING | 2.3 |
| 2.07 | CEO EVALUATION POLICY | 2.3 |
| 2.08 | BOARD TRAINING AND CONFERENCES | 2.3 |
| 2.09 | BOARD EXPENSE REIMBURSEMENT POLICY | 2.4 |
| 2.10 | BOARD CONTRIBUTION POLICY | 2.8 |
| 2.11 | INSIDER'S DISCLOSURE POLICY | 2.9 |
| 2.12 | CODE OF ETHICS | 2.10 |
| 2.13 | DIRECTOR STATEMENT OF DISCLOSURE | 2.13 |
| 2.14 | DIRECTOR EMERITUS PROGRAM | 2.13 |
| 2.15 | SCHOLARSHIP PROGRAM | 2.14 |

**SECTION 3 INVESTMENT POLICY ................................................................ 3.1**

| | | |
|---|---|---|
| 3.01 | POLICY STATEMENT | 3.1 |
| 3.02 | PURPOSE | 3.1 |
| 3.03 | RESPONSIBILITY | 3.1 |
| 3.04 | INVESTMENT PORTFOLIO COMPOSITION | 3.3 |
| 3.05 | AUTHORIZED INVESTMENTS | 3.3 |
| 3.06 | MATURITY LIMITS AND LIQUIDITY REQUIREMENT | 3.5 |
| 3.07 | DIVERSIFICATION REQUIREMENTS | 3.5 |
| 3.08 | PAYMENT, DELIVERY, SAFEKEEPING & VALUATION RESERVE | 3.8 |
| 3.09 | EXCEPTIONS & REVIEW | 3.8 |
| 3.10 | AUTHORIZED FINANCIAL INSTITUTIONS | 3.8 |
| 3.11 | APPROVED SECURITIES DEALERS | 3.10 |

**SECTION 4 ASSET/LIABILITY MANAGEMENT POLICY .......................................4.1**

| | | |
|---|---|---|
| 4.01 | ASSET/LIABILITY MANAGEMENT POLICY | 4.1 |
| 4.02 | ASSET/LIABILITY MANAGEMENT RESPONSIBILITY | 4.1 |
| 4.03 | INTEREST RATE RISK CONTROL | 4.2 |




CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT MCU-00028159

Policy Manual

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 4.04 | LIQUIDITY MANAGEMENT | 4.3 |
| 4.05 | INVESTMENT POLICY | 4.4 |
| 4.06 | LENDING POLICY (ALM) | 4.5 |
| 4.07 | ASSET/LIABILITY MANAGEMENT EXCEPTIONS AND REVIEW | 4.5 |
| **SECTION 5** | **ACCOUNTING POLICY** | **5.1** |
| 5.01 | ACCOUNTS PAYABLE | 5.1 |
| 5.02 | PREPAID EXPENSE & DEFERRED CHARGES | 5.1 |
| 5.03 | DIVIDEND RATES DETERMINATION | 5.1 |
| 5.04 | FIXED ASSET ACCOUNTING | 5.1 |
| 5.05 | ABANDONED PROPERTY/UNCLAIMED ACCOUNTS PAYABLE CHECKS | 5.2 |
| 5.06 | NET INCOME | 5.2 |
| 5.07 | SURPLUS | 5.2 |
| 5.08 | UNDIVIDED EARNINGS | 5.2 |
| 5.09 | DIVIDENDS PAYABLE | 5.3 |
| 5.10 | BUDGETING | 5.3 |
| 5.11 | INSURANCE | 5.4 |
| 5.12 | INSURANCE MANUAL | 5.4 |
| 5.13 | FINANCIAL REPORTS | 5.5 |
| **SECTION 6** | **INSTALLMENT LENDING** | **6.1** |
| 6.01 | POLICY STATEMENT | 6.1 |
| 6.02 | ELIGIBILITY | 6.1 |
| 6.03 | EQUAL OPPORTUNITY | 6.1 |
| 6.04 | LENDING AUTHORITY AND GUIDELINES | 6.2 |
| 6.05 | CO-MAKERS | 6.4 |
| 6.06 | EMPLOYEE LOANS | 6.4 |
| 6.07 | NOTE LOANS (Unsecured Installment Loans) | 6.5 |
| 6.08 | REFINANCES | 6.6 |
| 6.09 | OVERDRAFT CREDIT LINE | 6.6 |
| 6.10 | STEP LINE OF CREDIT | 6.6 |
| 6.11 | NEW VEHICLE LOANS | 6.8 |
| 6.12 | USED VEHICLE LOANS | 6.9 |
| 6.13 | MCU AUTO-NET LOANS | 6.10 |
| 6.14 | FINANCE IN ADVANCE | 6.11 |
| 6.15 | BOAT LOANS | 6.11 |
| 6.16 | LOAN VS. SHARES (Share and Certificate of Deposit Secured Loans) | 6.12 |
| 6.17 | DEBT CONSOLIDATION AND HOME IMPROVEMENT | 6.12 |
| 6.18 | LATE PAYMENT FEE | 6.13 |
| 6.19 | BANKRUPTCY PROGRAM | 6.13 |




CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT MCU-00028160

MCU Policy Manual

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 6.20 | LOAN RATES | 6.13 |
| 6.21 | EXTENSION AGREEMENTS | 6.13 |
| 6.22 | CREDIT DENIAL | 6.13 |
| 6.23 | CREDIT DENIAL APPEALS | 6.14 |
| 6.24 | CREDIT REPORTS | 6.14 |
| 6.25 | RISK BASED CREDIT PROGRAM | 6.14 |
| 6.26 | COLLATERAL RELEASE (OTHER THAN LOAN PAYOFFS) | 6.15 |
| 6.27 | TITLE TRANSFER | 6.15 |
| 6.28 | AUTO DEALER FILING | 6.15 |
| 6.29 | UCC1 FILING | 6.16 |
| 6.30 | SERVICE MEMBERS CIVIL RELIEF ACT OF 2004 | 6.16 |
| 6.31 | VISA/GENERAL POLICY | 6.16 |
| 6.32 | VISA/GENERAL RULES | 6.18 |
| 6.33 | VISA CREDIT LINE INCREASE | 6.19 |
| 6.34 | VISA CREDIT CARD RENEWAL | 6.19 |
| 6.35 | SECURED VISA CARD | 6.19 |
| **SECTION 7 MORTGAGE LENDING** | | **7.1** |
| 7.01 | TYPE OF MORTGAGE LOANS OFFERED | 7.1 |
| 7.02 | FIRST MORTGAGE LOANS/ADJUSTABLE RATE GUIDELINES | 7.5 |
| 7.03 | POST-APPLICATION DISCLOSURE REQUIREMENTS | 7.7 |
| 7.04 | REFINANCE OR EQUITY LOANS | 7.7 |
| 7.05 | PRIVATE MORTGAGE INSURANCE (PMI) | 7.8 |
| 7.06 | EQUAL OPPORTUNITY | 7.8 |
| 7.07 | EMPLOYEE MORTGAGE LOAN APPROVAL | 7.8 |
| 7.08 | S.A.F.E. ACT POLICY | 7.8 |
| 7.09 | FAIR AND ACCURATE CREDIT TRANSACTION (FACT) ACT | 7.10 |
| 7.10 | APPRAISAL POLICY | 7.10 |
| **SECTION 8 COLLECTION POLICY** | | **8.1** |
| 8.01 | DELINQUENCY CONTROL | 8.1 |
| 8.02 | TELEPHONE CONTACT GUIDELINES | 8.1 |
| 8.03 | FOLLOW UP | 8.1 |
| 8.04 | CO-MAKERS | 8.1 |
| 8.05 | VISA CREDIT CARD COLLECTIONS | 8.1 |
| 8.06 | SKIP TRACING/ASSET LOCATING | 8.2 |
| 8.07 | NEGATIVE BALANCE SHARE ACCOUNTS | 8.2 |
| 8.08 | LATE CHARGES AND OTHER FEES | 8.3 |
| 8.09 | COLLECTION AGENCIES/ATTORNEYS | 8.3 |




CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

MCU
Policy Manual

TABLE OF CONTENTS


Page

8.10 VEHICLE REPOSSESSION ........ 8.3
8.11 VEHICLE REPOSSESSION ........ 8.3
8.12 VEHICLE REPOSSESSION/Public Auction ........ 8.4
8.13 REAL PROPERTY FORECLOSURE ........ 8.4
8.14 BANKRUPTCY ........ 8.4
8.15 BANKRUPTCY REAFFIRMATION PROGRAM ........ 8.4
8.16 INSTALLMENT AND VISA LOANS CHARGE OFF POLICY ........ 8.5
8.17 REAL ESTATE LOANS CHARGE OFF POLICY *(Including Home Equity)* ........ 8.5
8.18 CHARGE OFF EXCEPTIONS ........ 8.5
8.19 RETURNED CHECKS ........ 8.5
8.20 SOLDIERS' AND SAILORS' RELIEF ACT ........ 8.5
8.21 CREDIT DISABILITY CLAIMS ........ 8.5
8.22 DEBT HARDSHIP RELIEF PROGRAM (DHRP) ........ 8.5

**SECTION 9 MARKETING POLICY ........ 9.1**

9.01 POLICY STATEMENT ........ 9.1

**SECTION 10 ELECTRONIC DATA PROCESSING POLICY ........ 10.1**

10.01 PURPOSE ........ 10.1
10.02 HARDWARE CONFIGURATION ........ 10.1
10.03 SYSTEM SECURITY ........ 10.2
10.04 COMPUTER (PC) AND APPLICATION MAINTENACE ........ 10.3
10.05 DISASTER RECOVERY ........ 10.3
10.06 MCU SOFTWARE LICENSE POLICY ........ 10.3
10.07 ACQUISITIONS OF SOFTWARE ........ 10.3
10.08 REGISTRATION SOFTWARE ........ 10.4
10.09 INSTALLATION OF SOFTWARE ........ 10.4
10.10 HOME COMPUTERS ........ 10.4
10.11 PURCHASES ........ 10.4
10.12 SECURITY ........ 10.4
10.13 VIRUS NOTIFICATION ........ 10.4
10.14 HARDWARE CHANGES ........ 10.5
10.15 INTERNAL AND INTER – OFFICE ELECTRONIC MAIL ........ 10.5
10.16 INTERNET ACCESS AND EXTERNAL E-MAIL ........ 10.6

**SECTION 11 BRANCH OPERATIONS ........ 11.1**

11.01 BANK SECRECY ACT ........ 11.1
11.02 FUNDS AVAILABILITY AND CHECK COLLECTIONS POLICY ........ 11.3




CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

Policy Manual

TABLE OF CONTENTS

Page

11.03 WITHDRAWALS/OFFICIAL CHECKS and CASH ..... 11.5
11.04 WITHDRAWALS/FASTRACK CHECKING ACCOUNTS ..... 11.5
11.05 CREDIT CARD CASH ADVANCES ..... 11.5
11.06 CHECK CASHING ..... 11.5
11.07 TRAVELER CHECKS AND GIFT CHECKS ..... 11.5
11.08 MONEY ORDERS ..... 11.6
11.09 REPORT OF CASH OVER/SHORT ..... 11.6
11.10 CASH IN BRANCH LIMIT ..... 11.6
11.11 TRUTH-IN-SAVINGS ..... 11.6

**SECTION 12 ELECTRONIC & PLASTIC CARD SERVICES ..... 12.1**

12.01 ELECTRONIC SERVICES OFFERED ..... 12.1
12.02 REGULATIONS COMPLIANCE ..... 12.1
12.03 E-COMMERCE SERVICE ..... 12.2
12.04 ONLINE BANKING ..... 12.4
12.05 TOUCH TONE TELLER ..... 12.8
12.06 CASH CONNECTION CARD (ATM Card) ..... 12.9
12.07 MCU CHECK CARD (Debit Card) ..... 12.11
12.08 VISA GIFT CARDS ..... 12.12

**SECTION 13 MEMBER SERVICE OPERATIONS ..... 13.1**

13.01 CONFIDENTIAL INFORMATION ..... 13.1
13.02 ACCOUNTS OFFERED ..... 13.1
13.03 POWER OF ATTORNEY ..... 13.7
13.04 RECEIPT OF LEGAL PROCESS ..... 13.7
13.05 COMPLAINT RESOLUTION POLICY ..... 13.8
13.06 FEES AND CHARGES ..... 13.8

**SECTION 14 HUMAN RESOURCES ..... 14.1**

14.01 DISCLOSURE ..... 14.1
14.02 EMPLOYEE SUPERVISION POLICY ..... 14.1
14.03 DEFINITION OF EMPLOYEE STATUS ..... 14.1
14.04 EQUAL EMPLOYMENT OPPORTUNITY ..... 14.2
14.05 EMPLOYMENT AT WILL ..... 14.2
14.06 EMPLOYMENT CONTRACTS/AGREEMENTS ..... 14.3
14.07 OUTSIDE EMPLOYMENT ..... 14.3
14.08 HIRING AND JOB PLACEMENT ..... 14.3
14.09 REHIRING FORMER EMPLOYEES ..... 14.4
14.10 JOB POSTING (See also Promotion) ..... 14.4
14.11 NEW HIRE ORIENTATION ..... 14.4
14.12 PROBATIONARY EMPLOYMENT ..... 14.5
14.13 PROMOTION (See also Job Posting) ..... 14.7



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 14.14 | REPLACING A DISABLED EMPLOYEE | 14.7 |
| 14.15 | AMERICANS WITH DISABILITIES ACT POLICY STATEMENT | 14.7 |
| 14.16 | CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT (COBRA) | 14.8 |
| 14.17 | FAIR LABOR STANDARDS ACT (FLSA) | 14.8 |
| 14.18 | HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) | 14.8 |
| 14.19 | TEMPORARY AND PART-TIME EMPLOYEES | 14.8 |
| 14.20 | TRANSFERS | 14.9 |
| 14.21 | NEPOTISM POLICY | 14.10 |
| 14.22 | EMPLOYEE COUNSELING | 14.11 |
| 14.23 | GRIEVANCE POLICY | 14.11 |
| 14.24 | EMPLOYEE ATTENDANCE AND PUNCTUALITY | 14.13 |
| 14.25 | CONFLICT OF INTEREST | 14.16 |
| 14.26 | CONFIDENTIAL NATURE OF CREDIT UNION AFFAIRS | 14.16 |
| 14.27 | DRUGS, NARCOTICS, AND ALCOHOL | 14.18 |
| 14.28 | SMOKING POLICY | 14.18 |
| 14.29 | PARTICIPATION IN TRADE AND PROFESSIONAL ASSOCIATIONS | 14.18 |
| 14.30 | PERSONAL APPEARANCE | 14.19 |
| 14.31 | PERSONAL BEHAVIOR | 14.20 |
| 14.32 | EMPLOYEE DISCIPLINE | 14.23 |
| 14.33 | PERSONAL BUSINESS (Telephone Calls, Mail, Email, Internet and Facsimile Equipment) | 14.25 |
| 14.34 | SEXUAL HARASSMENT | 14.25 |
| 14.35 | PERSONAL FINANCES | 14.26 |
| 14.36 | SOLICITATION | 14.27 |
| 14.37 | PERSONAL PROPERTY | 14.28 |
| 14.38 | SECURITY | 14.28 |
| 14.39 | KEYS | 14.29 |
| 14.40 | SEVERE WEATHER OR OTHER DISASTERS | 14.30 |
| 14.41 | EMPLOYEE HEALTH AND SAFETY | 14.30 |
| 14.42 | MEDICAL EMERGENCY | 14.31 |
| 14.43 | HOLIDAYS (See also Salary Administration) | 14.31 |
| 14.44 | PERSONAL DAYS | 14.32 |
| 14.45 | VACATION | 14.33 |
| 14.46 | COMPENSATORY TIME | 14.36 |
| 14.47 | LEAVE OF ABSENCE – SHORT-TERM | 14.36 |
| 14.48 | LEAVE OF ABSENCE – LONG-TERM | 14.39 |
| 14.49 | FAMILY AND MEDICAL LEAVE ACT | 14.40 |
| 14.50 | MILITARY LEAVE | 14.42 |
| 14.51 | MEAL AND REST BREAKS | 14.43 |



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

MCU
MUNICIPAL CREDIT UNION
Policy Manual

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 14.52 | BEREAVEMENT | 14.43 |
| 14.53 | VOLUNTARY TERMINATION | 14.44 |
| 14.54 | INVOLUNTARY TERMINATION | 14.44 |
| 14.55 | LAYOFF AND RECALL (See also current Union Contract) | 14.45 |
| 14.56 | RETIREMENT BENEFITS | 14.46 |
| 14.57 | EXIT INTERVIEWS | 14.48 |
| 14.58 | SALARY ADMINISTRATION (See also current Union Contract) | 14.48 |
| 14.59 | SEVERANCE ALLOWANCE (See also current Union Contract) | 14.51 |
| 14.60 | HOURS OF WORK | 14.52 |
| 14.61 | JOB EVALUATION | 14.53 |
| 14.62 | RECORDING HOURS WORKED (Hand Scanners) | 14.53 |
| 14.63 | AUTOMOBILE USAGE | 14.55 |
| 14.64 | BUSINESS EXPENDITURES | 14.55 |
| 14.65 | TRAVEL EXPENSES REIMBURSEMENT | 14.56 |
| 14.66 | ACCESS TO PERSONNEL FILES | 14.58 |
| 14.67 | TRAINING AND DEVELOPMENT | 14.58 |
| 14.68 | CAB VOUCHERS | 14.58 |
| 14.69 | PC AND COMPUTER NETWORK USERS POLICY | 14.58 |
| **SECTION 15** | **LEGAL DEPARTMENT** | **15.1** |
| 15.01 | CONTRACTS | 15.1 |
| 15.02 | LITIGATION | 15.1 |
| 15.03 | MISCELLANEOUS LEGAL MATTERS | 15.2 |
| 15.04 | BANKRUPTCY | 15.2 |
| 15.05 | RECEIPT OF SERVICE OF LEGAL DOCUMENTS | 15.3 |
| 15.06 | REGULATORY COMPLIANCE | 15.3 |
| 15.07 | MCU CONTRACT POLICY | 15.4 |
| 15.08 | PAPER RECORDS AND PHYCICAL EVIDENCE RETENTION POLICY | 15.5 |
| 15.09 | ELECTRONIC COMMUNICATIONS USE AND ARCHIVING POLICY | 15.5 |
| **SECTION 16** | **SECURITY AND PRIVACY POLICY** | **16.1** |
| 16.01 | SECURITY POLICY | 16.1 |
| 16.02 | SAFEGUARDING MEMBER INFORMATION POLICY | 16.5 |
| 16.03 | FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACT ACT) | 16.13 |
| 16.04 | EXPULSION AND SUSPENSION OF MEMBERSHIP | 16.21 |




CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

## TABLE OF CONTENTS

**Page**

**SECTION 17 COMPLIANCE POLICY ..........17.1**

17.01 COMPLIANCE MANAGER ..........17.1
17.02 AREAS OF REVIEW..........17.1

**SECTION 18 ENTERPRISE RISK MANAGEMENT ..........18.1**

18.01 VENDOR MANAGEMENT - POLICY STATEMENT..........18.1
18.02 AUTOMATED CLEARING HOUSE (ACH) RISK MANAGEMENT PROGRAM..........18.3



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT MCU-00028166

# SECTION 1
# NEW POLICIES, REVISIONS, AND CHANGES

1. Granted the Chief Executive Officer authority to adjust Loan rates as warranted by business conditions – *Approved 5/31/01 (See Section 6.19).*

2. Elimination of the $15 Secured Visa Card Annual Fee – *Approved 5/31/01 (Deleted from Section 6.34).*

3. Limit Debt Consolidation Loan amount to $15,000 and Home Improvement Loan amount to $50,000. Home Improvement Loan exceeding $15,000 requires a UCC-1 filing in the county where the property is located – *Approved 6/28/01 (See Section 6.35).*

4. Revised Board Expense Reimbursement Policy Sections 2.09-2, 2.09-4 and 2.09-9 – *Approved 6/28/01*

5. Revised Investment Policy Section 3.07-3 increased the limit of Empire Corporate Credit Union overnight investment unit from $65 million to $85 million – *Approved 4/25/02.*

6. Revised Installment Lending Policy Section 6.04-1 sub-section, Credit Investigation – *Approved 4/25/02.*

7. Inserted a new section – 2.05a: Registering of votes at Board Meeting – *Approved 4/25/02.*

8. Increase Minimum Balance Fee from $4.50 to $5.50, effective 8/1/02, *Approved 6/27/02.* (See section 13.06-1).

9. Adjusted the Money Market tier rate structure from 1% spread between tiers to 0.50% spread. – *Approved 8/29/02,* effective 9/1/02. (See section 13.02 - 6).

10. Revised Installment Lending Policy Section 6.25 – Risk Based Credit Program – *Approved 10/31/02.*

11. Revised Installment Lending Policy Section 6.02-2 – Share Balance – *Approved 12/19/02.*

12. Inserted Section 17 (New) – Compliance Policy – *Approved 1/30/03.*

13. Increased Empire Corporate Credit Union Overnight investment limit from $85 million to $95 million. Increased Citibank 7-day Money Market investment limit from $28 million to $35 million – *Approved 2/27/03* (See Section 3.07-3).

14. Increased Citibank overnight investment limit from $35 million to $65 million – *Approved 6/26/03* (See Section 3.07 – 3A).

*15.* Change the simulated Net Interest Income (NII) under the ± 3% rate shock scenario to – "Shall not decline more than 20% from the base-line NII." – *Approved 6/26/03* (See Section 4.03-4).

*16.* Increased Citibank short-term investment limit form $65 million to $75 million. – *Approved 11/25/03* (See Section 3.07 – 3A).

*17.* Changed the name of Prudential Securities to Wachovia Securities (result of merger) – *Approved 11/25/03* (See Section 3.11).

*18.* Changed the NEV tolerance limit from 40% from the base-line NEV to 50% from the base line NEV, and added the NEV to assets ratio limit of not less than 6% – *Approved 11/25/03* (See Section 4.03-3).

*19.* Changed the NII tolerance limit from 20% to 25% from the base-line NII.

*20.* Adjusted Section 6.09 – Overdraft Credit Line – changed the minimum of $500 to $250. *(Approved 2/26/04).*

*21.* Section 6.25 – Risk Based Credit program to expand to 5 levels. (*Approved 3/25/04).*

*22.* Revised Section 8.16 – Installment and Visa Loan charge off policy. (*Approved 3/25/04).*

*23.* Adjusted Section 13.06-1 – Minimum Balance Fee. Increased minimum balance fees from $5.50 to $7.00, and increased combined balance requirement for waiving the fees from $500 to $750. (*Approved 10/28/04*).

*24.* Adjusted Visa Cash Advance fee (6.31-3) to 3% and not more than $30; over-limit fee (6.31-5) to $20; late payment fee (6.32) to $25. (*Approved 10/28/04).*

*25.* Increased ATM surcharge from $1 to $1.25 – Section 12.06-4. (*Approved 10/28/04).*

*26.* Inserted Section 7.01-4a – Risk Based for Home Equity Line of Credit. (*Approved 11/23/04).*

*27.* Added 5-year and 7-year Adjustable Mortgage loan products – Section 7.01-2. (*Approved 12/21/04).*

*28.* NYCE Account-to-Account Transfer fee of $2 – Section 12.06-4. *(Approved 12/21/04).*

*29.* Increased the Fiscal Policy Committee's and the CEO's authorized limit for contributions to $2,500 and $1,000, respectively – Section 2.10-2 paragraphs 1 and 3. (*Approved 1/27/05).*

*30.* Adjusted Minimal Balance Fee – reduced the combined balance requirement for waiving the fee from $750 to $500 – Section 13.06-1. *(Approved 3/31/05).*

*31.* New Vehicle Loans – increased the financing amount from 100% of the selling price to 125% – Section 6.11. *(Approved 3/31/05).*

*32.* Used Vehicle Loans – increased the financing amount from 100% of the selling price to 125% – Section 6.12. *(Approved 3/31/05).*

*33.* A Pay-by-Phone Service fee of $10 will be charged for each payment – Section 6.31-6. *(Approved 3/31/05).*

*34.* A Foreign Exchange fee of 1% of the Visa purchase amount will be charged (this fee is charged by Visa USA). No approval is needed. (The Board was informed on 3/31/05) – Section 6.31-7.

*35.* A $7 direct-pay (Tellicheck) fee will be charged – Section 8.08B. (*Approved 3/31/05).*

*36.* Approval offering 40-year term Mortgage loans – Sections 7.01-1, 7.01-2, and 7.01-7. (*Approved 4/28/05).*

*37.* Approved the Contract Policy – Section 15.07. (*Approved 5/26//05).*

*38.* Approved a Board Policy for "Communication to Outside Parties" – Section 2.12-11. *(Approved 5/26/05).*

*39.* Approved the change of the daily ATM cash withdrawal limit from $800 to $1,000 -- Section 12.06-3 *(Approved 7/28/05).*

*40.* Approved the revised Auto-Net Loan policy – Section 6.13 and 6.13a *(Approved 7/28/05).*

*41.* Approved increasing the Fiscal Committee authorized contribution/donation limit from $2,500 to $10,000, and the CEO's authorized limit from $2,500 to $10,000 in unusual or extraordinary circumstances. – Section 2.10-2 paragraphs 1 and 3 *(Approved 9/29/05).*

*42.* Insert subsection 2.12- 11 "Communication to Outside Parties" as subparagraph 7 in section 2D of Code of Ethics. (*Approved 9/29/05*) (See #38 of this section- New Policies).

*43.* Approved the Policy of Response Program for Unauthorized Access to Member Information – Section 16.02-9 (*Approved 10/27/05*).

*44.* Approved the change in Personnel Policy to offer health benefits to new hires the first day of the month following their employment starting date – Section 14.12-7 (*Approved 10/27/05*).

45. Approved a correction (typographical error) in Section 13.02-5, that dividends should be compounded and paid monthly instead of quarterly.

46. Approved Governance Policy as subsection 2A of the Section 2-Board Administration. (*Approved 3/30/06*).

47. Approved a Liquidity Contingency Plan. Incorporated the plan into Asset Liability Management Policy (Section 4). Inserted the plan as section 4.04-2 (*Approved 6/29/06*).

48. Approved the increase of the Board of Directors and Supervisory Committee members corporate credit card line limit from $3,500 to $5,000 – Section 2.09-6 (Approved 8/24/06).

49. Approved increasing the unsecured loan cap from $50,000 to $75,000 and inserting- "The qualification for unsecured debt is subject to the underwriting guidelines and eligibility requirements established in accordance with the Installment Lending Policy"- Section 6.04 Note # 2. (*Approved 11/30/06*).

50. Approved different levels of contract signing authorities. – Subsection 15.07 item #5 (*Approved 3/29/07*).

51. Approved increasing overnight investment limits with Members United Corporate FCU and Citibank to $100 million each. – Subsection 3.07-3 and 3.07-3A (*Approved 4/26/07*).

52. Approved the Vice President of Finance as an authorized personnel in executing and managing the investment activities. – Section 3-Investment Policy (*Approved 4/26/07*).

53. Approved the expansion of the terms and amount for the Unsecured Installment and Home Improvement Loans. – Subsections 6.07-1 and 6.07-2 (*Approved 5/31/07*).

54. Approved changes to the meeting expense reimbursement policy to include meal, transportation, and other out-of –pocket expenses. – Subsection 2.09-8 (*Approved 5/31/07*).

55. Approved the expansion of share secured loans so that loans can also secured by Certificate of Deposit. – Subsection 6.16 (*Approved 8/30/07*).

56. Approved increasing the daily ATM/Debit card cash withdrawal/purchase aggregate limit from $1,000 to $1,500. – Subsection 12.06-3 (*Approved 8/30/07*).

57. Approved mortgage Lending and Asset/Liability Management Policies of limiting the aggregate of expanded approval mortgage loans, affordable housing loans, and 40-year mortgage loans to 10% of the total first mortgage loans portfolio. – Subsections 4.06 and 7.01 (*Approved 8/30/07*).

58. Approved changes to the Negative Balance Charge Off Policy. – Subsection 8.07 (*Approved 8/30/07*).

59. Approved and authorized the CEO to raise the non-member ATM withdrawal surcharge up to $2 per transaction from $1.25. – Subsection 12.06-4 (*Approved on 9/27/07*). (Note: CEO made a decision to raise to $1.75 to be competitive).

60. Approved CEO's recommendation to enhance the Life Insurance Benefits for staff- Refer to Human Resources Manual for details. (*Approved 11/29/07*).

61. Approved the revised Loan Late Payment fees. – Subsection 6.18 (*Approved 2/28/08*).

62. Approved the adopting of a policy statement-Full-Fair Disclosure of Executive Compensation. – Subsection (new) 14.58-13 (*Approved* 2/28/08).

63. Approved various changes in Mortgage Lending Policies and changes in Procedures were reported to the Board (see CEO Memo dated 4/18/08). *Approved 4/24/08*.

64. The Board granted the CEO the authority to approve or disapprove new SEGs recommended by Business Development. The Board will officially ratify his decisions at its monthly meeting *(Approved 4/24/08)*. – See Subsection 2.03-2 Membership Services and Loan Committee responsibilities.

65. Directors and Supervisory Committee Members may elect to fly business class to attend conferences or seminars if the flying time is five (5) hours or longer. The annual allotment for Directors to attend conferences increased from $10,000 per year to $20,000. See Subsection 2.09-7 (*Approved 5/29/08*).

66. The Board approved the addition of JPMorgan Chase to the list of banks/financial institutions that the Credit Union can make short-term (1 to 365 days) deposits. The aggregate (interest and non-interest bearing) deposits shall not exceed $100,000,000. See Investment Policy Subsection 3.07-3B *(Approved 6/26/08)*.

67. The entertainment allowance for each Director and Supervisory Committee Member will increase from $150 per conference to $300 per conference. – Subsection 2.09-1c. (*Approved 9/25/08)*.

68. Approved the fee for requesting legal document from $50 per request to $75. Subsection 13.06-5. *(Approved 9/25/08)*.

69. Approved opening a depository account with the Federal Reserve Bank – new Subsection 3.07-1A. *(Approved 9/25/08)*.

70. Approved the CEO's recommendation to adopt a new Debt Hardship Relief Program (DHRP) to allow management to arrange either deferment or reduce

payment amount for accounts that are delinquent up to 90 days. This recommendation is to prepare for the indirect impact from the financial crisis in the market place – new Subsection 8.22 *(Approved 9/25/08).*

*71.* Approved increasing the Directors' and Supervisory Committee Members' corporate credit card cash advance limit from $300 to $600. The change is warranted because the $300 cash advance can only be drawn one time during the billing cycle (one month). If a director attends more than one conference in a month, he/she cannot draw the cash advance again. – Subsection 2.0-9-6A *(Approved 10/30/08).*

*72.* Approved the adoption of the new Identity Theft Policy FACT Act) – Compliance Policy Subsection 16.03 *(Approved 10/30/08).*

*73.* Approved updating the Surplus and Undivided Earnings Policy to be in line with the NYSB Law and NCUA's Rules and Regulations. – See revised Subsection 5.06-1 *(Approved 11/21/08).*

*74.* The Board reviewed and approved various Installment Lending Policy changes and updates. The subsections that were changed or added are 6.01, 6.04, 6.04-1, 6.06, 6.06-4, 6.07-1, 6.07-2, 6.11, 6.11-1, 6.12-1, 6.18 (increased late fees to $25), 6.22 (changed from "20 days after receipt" to "30 days after receipt"), 6.24 (added CD secured loans, 6.25 (added LTV), 6.31-2 (increased minimum finance charge from .50¢ to $1.00. (*All of these changes were approved on 12/18/08*) For details refer to the memo submitted by the CCO to the CEO.

*75.* The Board reviewed and approved various Collection Policy changes or updates. The subsections that were changed or updated are 8.05, 8.08, 8.08, 8.09, 8.11, 8.15, and 8.16. Most revisions are numerical changes to trigger a more proactive collection process in order to manage the impact from credit risks. (*All of these changes were approved on 12/18/08*).

*76.* The Board approved a new structure for the Risked Based Credit Program based on credit scores and a separate loan-to-value (LTV) structure to differentiate interest add-ons or reductions. See Subsection 6.25 (*Approved 1/29/09*).

*77.* The Board approved a policy change in the number of allowable withdrawals from the Holiday/Vacation Club accounts from one (1) withdrawal to two (2) withdrawals during the 1-year term of the Holiday and Vacation Club accounts. See subsection 13.02-5A (*Approved 3/26/2009*).

*78.* The Board approved that management is authorized to adjust the variable rate Visa Cards in accordance to the market, the economy, and/or internal need to maintain interest rate spread. See subsection 6.31-2 (*Approved 4/30/2009*).

*79.* The Board approved changes in Visa Delinquency Management policy which includes reduction in number of days delinquent to trigger decrease in credit limit. See subsection 6.32 second paragraph. (*Approved 4/30/2009*).

*80.* The Board approved a new Corporate Credit Card Usage and Limitation policy. See subsection 14.65-4 (*Approved 5/28/2009*).

*81.* The Board approved the following fee changes: Returned item fees due to Insufficient Fund (Share Draft, ACH, and Online Bill Pay) increase from $20 to $25. Stop Payment fees increased from $15 to $20. See subsection 12.04-5, 13.06.3, and 13.06-5 (*Approved 5/28/2009*).

*82.* Approved the FHA (Federal Housing Administration) Program. See subsection 7.01-9 (*Approved 5/28/2009*).

*83.* The Board approved increasing the Directors' and Supervisory Committee members cards limit to be raised from $5,000 to $10,000. See subsections 2.09-6A (*Approved 7/30/2009*).

*84.* The Board approved a complete revision of the Visa General Policy. See subsections 6.31 and 6.31-1 (*Approved 7/30/2009*).

*85.* The Board reviewed the Investment Policy and approved adding Oppenheimer and CO, Inc. to the list of approved Securities Dealers. See subsection 3.11 (*Approved 9/24/2009*).

*86.* The Board approved and adopted the Policy and Procedures for Expulsion and Suspensions of MCU membership. See subsection 16.04 (*Approved 9/24/2009*).

*87.* The Board approved the development of an Enterprise Management Policy. The first section of the policy which Vendor Management was approved. A new section 18- Enterprise Risk Management Policy was created. New section 18.01 (*Approved 10/29/2009*).

*88.* The Board approved lowering the credit card cash advance limit from 50% to 25%. See subsection 6.31-3. (*Approved 10/29/2009*). (The change will go into affect as soon as possible after the Visa Card processor conversion).

*89.* The Board approved a Director Emeritus Program to recognize Directors who had served the Credit Union for a long period of time and made contributions to MCU. See new subsection 2.13 (*Approved 11/29/2009*).

*90.* The Board approved changes in Business Expenditures section to include defined limitations, circumstances, and authorization hierarchy. See subsection 14.64-2 to 14.64-5 (*Approved 12/17/2009*).

*91.* The Board approved inserting a paragraph to subsection 4.06 of the Asset Liability Management Policy. Management can extract up to 25% of the fixed rate mortgage loan portfolio (first mortgage and home equity) and classify the loans as Available-for-Sale portfolio. *(Approved 12/17/2009 and amended on 1/28/2010).*

*92.* The Board approved increasing the minimum balance fee from $7 to up to $9. The Board authorized the CEO to increase the fee within the range above. The CEO decided to increase the fee to $8.50 for accounts with aggregate balance of less than $500 on the last day of the month. See section 13.06-1 *(Approved 2/5/2010).*

*93.* Effective as of May 1, 2010, the Board approved the following changes to the Defined Benefit Pension Plan for MCU employees: a) Employees hired on or prior to March 31, 2011, the normal retirement age changes from 60 to 62. The annual pension benefit distribution is 68.5% of the first $833 of average monthly qualified compensation plus 78.5% of the remaining qualified average monthly qualified compensation of the employee's best continuous five-year average annual compensation. The aggregate distribution shall not exceed the IRS allowable limit; b) Employees hired on or after April 1, 2010, the normal retirement age will be 62. The annual pension benefit distribution will be calculated at 45% of the best continuous five-year average annual qualified compensation. Employees who have not earned 25 years of service at age 62 will have their normal retirement benefit reduced proportionately. The distribution shall not exceed the IRS allowable limit. See section 14.56 *(Approved 2/25/2010).*

*94.* The Board approved the increase in the Non-MCU ATM card withdrawal surcharge from $2.00 to $2.50. See Section 12.06-4, first paragraph. *(Approved 3/25/2010).*

*95.* The Board approved changes to the loan interest rate discount offered to employees as such that promotional loan interest rate cannot be further reduced by the discount rate. See section 6.06-4 *(Approved 5/27/2010).*

*96.* The Board approved offering a new deposit account called Young Executive Account to young adults between ages 18-24. The Office of Financial Empowerment approached the Credit Union, Chase and Citibank to bid on providing savings account relationship for its youth summer job program. The number of participants range from 18,000 to a maximum of 52,000. The Office of Financial Empowerment selected MCU to provide this relationship. See section 13.02-7C *(Approved on 5/27/2010).*

*97.* Non-Policy Approval Item- The Board approved the proposal from PFP where they can offer the Accidental Health Insurance product to MCU's members. The Board authorized the CEO to negotiate the terms. In addition, the CEO has the discretion to accept or reject PFP's proposal. (Approved on 6/24/2010).

*98.* The Board approved increasing the VISA minimum payment per cycle from $5 to $20. In addition, the late payment fee provision of waiving the fee if the balance is below $50 will change to: "the $25 late payment fee cannot exceed the payment amount due for the statement cycle. See section 6.32 *(Approved 7/29/2010)*

*99.* The Board approved the reduction of the individual Director's and Supervisory Committee member's conference expense allotment from $20,000 per year to $15,000 per year. See section 2.09-7 *(Approved 7/29/2010, effective starting 2011 Fiscal Year)*

*100.* The Board approved the CEO's recommendation to adopt a formalized policy of which the Chief Financial Officer and Chief Credit Officer can recommend to the CEO the selling of mortgage loans when circumstances warrant the sale. The sale must be approved by the Chief Executive Officer. See section 4.06 *(Approved 9/30/2010)*

*101.* The Board approved the increase in the ATM withdrawal fee MCU charges members when they use non-proprietary ATMs from $1.00 to $1.50, effective as soon as all the operational steps, including new disclosure statements, are ready. The fee will not be charged if the aggregate account balance is $2,000 or more after the withdrawal transaction (this provision remains the same). The fee was implemented on 11/16/2010. See section 12.06-4 *(Approved 9/30/2010)*

*102.* The Board approved the adoption of the Secure and Fair Enforcement (S.A.F.E.) for Mortgage Licensing Act policy. See new sub-section 7.08 *(Approved on 9/30/2010)*

*103.* The Board approved changes and additions to the MCU scholarship program. See sub-section 2.14 *(Approved on 9/30/2010)*

*104.* The Board approved the CEO's recommendation to apply for and become a member of the Federal Reserve Discount Window since the line-of-credit for liquidity management with Members United is no long a viable option. It is the CEO's intention to apply a line of credit of up to $50 million from the Federal Reserve. See sections 4.04-C and 4.04-2c *(Approved 10/28/2010)*

*105.* The Board approved the increase in the Chair of the Board's conference allotment to $20,000. Other Directors and Supervisory Committee member's allotment will remain at the $15,000 annual limit. The increase was transpired by the fact that the Chair may be required to attend more conferences, participate in lobbying efforts, and represent MCU to attend various National Credit Union Director Discussion forums. See sub-section 2.09-7b *(Approved on 12/20/2010)*

*106.* The Board approved the revised Member Expulsion Policy recommended by General Counsel. See sub-section 16.04 *(Approved on 12/20/2010).*

*107.* The Board approved changes to the post-retirement health benefit for eligible employees. Retirement age and years of service change from 60 years of age and 15 years of service to 62 years of age and 25 years of service, respectively. See sub-section 14.56-B *(Approved on 01/27/2011).*

*108.* The Board approved that the CEO has the authority to waive the expense reimbursement policy that exceeds the limit for the Board and Supervisory Committee conference expenditures as needed and on a case-by-case basis. See Section 2.09-10B (*Approved on 1/27/2011*).

*109.* Based on past and current practice, when Directors or Supervisory Committee members attend the exempt conferences, their traveling companions' (immediate family members) expenses are also exempt for the allotment purposes but the expenses may be subject to possible income tax reporting. The Board authorized the CEO to make minor changes to clarify the intent. Section 2.09-2A. Modification was made in 3/2011.

*110.* The Board approved the student Visa Credit Card program to expand the Credit Union's product line. See section 6.31-1B (*Approved on 4/28/2011*).

*111.* The Board approved the Policy of Fair and Accurate Credit Transaction (FACT) Act. The policy mandates accuracy and integrity in managing members' (consumers) credit reporting information. See section 7.09 (*Approved on 4/28/2011*).

*112.* The Board approved the Archiving Policy (record retention) for paper records and electronic communication. See sections 15.08 and 15.09 (*Approved on 5/26/2011*).

*113.* The Board approved a modification to the Archiving Policy for the Legal Department (including in-house attorneys and legal secretary) for retaining records up to 7 years. See sections 15.08 and 15.09 (*Approved on 6/30/2011*).

*114.* The Board approved a resolution where any one of the following individuals is an authorized signatory to sign, on behalf of MCU, contracts, deeds, and all documents with regard to the sale of real property which the Credit Union has obtained ownership by reason of foreclosure of an MCU mortgage loan. President/CEO, EVP/CFO, SVP/CCO, and General Counsel, or Deputy Counsel. See section 8.13c (*Approved on 6/30/2011*).

*115.* The Board approved the Holiday Club accounts annual cycle be changed to end in the first week of November instead of the first week of October. See section 13.02-5 (*Approved on 7/21/2011*).

*116.* The Board approved the Automated Clearing House (ACH) Risk Management Program be incorporated to the Credit Union's Policy. See section 18.02 (*Approved on 7/21/2011*).

*117.* The Board approved modifications to the Visa Credit Card line-of-credit. The line will be determined by credit score and debt-to-income ratio. The line may be reduced to 70% of the qualified line based on risk factors. See section 6.31-1A (*Approved on 8/25/2011*).

*118.* The Board approved the sale of Visa gift cards to MCU members at selected branches or through on-line banking. The fees associated with this service were also approved by the Board. See section 12.08 (*Approved on 8/25/2011 and 9/29/2011*).

*119.* The Board approved a modification to the Asset Liability Management (ALM) policy where the aggregated fixed rate mortgage loan portfolio cannot exceed 40% of the total assets. See section 4.06 (*Approved on 9/29/2011*).

*120.* The Board approved the modification to the Board Administration Policy section 2.11 pertaining to the Disclosure Policy. See sections 2.11 (*Approved 11/17/2011*).

*121.* The Board approved changes to the lending policy where new and old used vehicle loan application amount can include after-market additions and negative equity financing. See sections 6.11A-6.11B, and 6.12A-6.12B (*Approved on 12/15/2011*).

*122.* The Board approved a formalized Real Estate Appraisal Policy for mortgage loans. See section 7.10 (Approved on 12/15/2011).

*123.* The Board approved increasing entertainment expense allotment from $300 to $500 for conferences that have a duration of at least 3 days. It should be noted

that the entertainment expenses have not been increased for almost 10 years. See section 2.09-1C. (Approved 2/23/2012).

*124.* The Board granted the Chair of the Board authority to approve exceptions pertaining to directors' conference expenses on a case-by-case basis. See section 2.09-10A. (Approved 2/23/2012).

*125.* The Board approved the adjustments to the Real Property Loan Foreclosure policy. The 60-90 days delinquency criteria is replaced by a 90-day collection letter period. See section 8.13-A (Approved 2/23/2012).

*126.* The Board approved and formalized the Post Retirement Medical Plan Benefits. See section 14.56. (Approved 4/17/12).

*127.* Modification of Delinquent Visa account collection and loss mitigation process. See section 8.05. (Approved 9/26/12).

*128.* Modification of Home Equity account collection and loss mitigation process. See section 8.13B. (Approved 9/26/12).

*129.* The Board approved the CEO's recommendation of adjusting the tuition reimbursement program for employees. The old program provided a maximum reimbursement of $20,000 for undergraduate degrees and a maximum reimbursement of $25,000 for graduate degrees. The approved program will be adjusted to provide a maximum of $50,000 tuition reimbursement program for either undergraduate or graduate degree, or a combination of both. The CEO shall have the authority to grant tuition exceeding the maximum amount. This change will be incorporated into the employee manual. (Approved 8/30/12).

*130.* The Board approved the new section 2.13 of the Policy regardign the Board of Directors Statement of Disclosure. See section 2.13. (Approved on 2/21/13).

*131.* The Board approved increasing the non-suffiecient-fund (NSF) check returned fee, NSF ACH Debit returned the fee and BillPay NSF fee from $25 to $30. See section 12.04-7, 13.06-3, and 13.06-5 (Approved on 7/25/13).

*132.* The Board approved the changes in the minimum balance fee waivers: a) the Unsecured loan waiver to exclude line-of-credit loans, i.e. Overdraft loans and the Step loans, b) to qualify the secured loan as a balnce fee waiver, the loan must have an outstanding balance. See section 13.06-1. (Approved on 8/29/13).

*133.* The Board approved a change in the lending authority guideline whereby the loan decisionsing process will be more efficient. See section 6.04. (Approved on 12/19/13).

*134.* The Board approved increasing the Visa late payement fee from $25 to $30. It was estimated that after proper advance notice to card holders, the increase should go into effect in June 2014. See section 6.32. (Approved on 2/20/14).

*135.* The Board approved the following adjustments be made to the investement policy: a) section 3.4 to establish a framework for duration limits, interest rate risk recognition and importance for asset/liability integration with the investement policy, b) section 3.6 to establish maturity limits and liquidity requirement (see paragraphs 2 and 3 of section 3.6), c) section 3.07-1 to expand the policy to include GNMA Mortgage backed securities, Small Business Administration (SBA), US Agency Mortgage Backed Securities (MBS) and Collateralized Mortgage Obligation (CMO). Limit established in the proportion to the aggregate total Investment portfolio, cash and cash equivalents, and d) section 3.11 adding Morgan Stanley and CUNA Member Advisors to the list of approved brokers. (Approved 3/27/14).

*136.* Approved increasing the minimum balance from $9 to up to $11. The CEO decided to increase the fee to $10 in 2014 and to $11 in 2015, if necessary. The $10 fee increase will be effective 5/31/14. See section 13.06-1. (Approved on 3/27/14).

*137.* The Board approved the Social Media Policy recommended by the CEO. It is important to have a formalized policy to govern the internal control and response managment as the Credit Union is entering into the domains of Twitter and Facebook. See section 12.03-8. (Approved on 6/26/14).

*138.* The Board approved the change in the Home Equity Line of Credit Loan (HELOC) draw period from 5 years to 10 years for new HELOC loans, effective as soon as operationally ready. See section 7.01-4. (Approved on 9/23/14).

*139.* The Board adopted the modified Social Media Policy recommended by the General Counsel. Modifications are house-keeping changes. See section 12.03-7. (Approved on 10/30/14).

*140.* The Board approved changes to the Investment Policy sections 3.6, 3.07-1. The changes, clarified the maturity limits and liquidity requirement, tighten the consentration risk and interest rate risk management. (Approved on 11/20/14).

*141.* The Board approved reductions of dividend rates for Share, Youth Involvement and Club Accounts effective 1/1/15. (Approved on 11/20/14).

*142.* The Board approved increasing the fee for withdrawal at non-MCU ATMs from $1.50 to $2.00, effective as soon as operationally ready. See section 12.06-4. (Approved 11/20/14).

*143.* The Board approved the Certificate of Deposit early withdrawl penalty from 3 months of interest to 6 months of interest for Certificates of Deposit with a term of 12 months or longer. Effective as soon as operationally ready. See section 13.02-3c. (Approved on 11/20/14).

*144.* The CEO informed the Board that the minimum balance fee will increase from $10 to $11 (see #136 as the Board authorized in 5/20/14). See section 13.06-1. (Approved on 11/20/14). The $11 fee assessment will start based on the aggregate account balance as of 1/31/15.

*145.* The Board approved a new policy to be incorporated into the Board Corporate Governance and Human Resources policies to prevent directors and supervisory committee members from being employed as an employee or managerial position during the voluntary service term. See section 2.12-1 paragraph D3 and section 14.05B. This policy shall take effect on 1/1/15. (Approved on 11/20/15).

*146.* The Board approved the engagement of CUNA to provide wealth management services to the membership. (Approved on 12/18/14).

*147.* The Board approved a Contingency Funding Plan (CFP) for Liquidity Management. See section 4.04-3. (Approved on 12/18/14).

*148.* The Board approved increasing the daily combined ATM withdrawal and debit card usage limit from $1,500 to up to $2,500 effective as soon as operationally ready. (The CEO increased the limit to $2,000 and it took effect on 12/21/14). See section 12.06-3.(Approved on 12/18/14).

## SECTION 2
## BOARD ADMINISTRATION

### 2.01 BYLAW REVISIONS

Amendments to the bylaws will be submitted to the Superintendent of New York State Banking Department (NYSBD) for approval. Such amendments must be approved by the majority of the Board of Directors, prior to their forwarding to the Superintendent of NYSBD, at any duly held meeting. When required by law, revisions will then be submitted to the membership for ratification at the MCU annual shareholders meeting or one duly called membership meeting.

### 2.02 ELECTION OF OFFICERS

Each year four Directors' and one Supervisory Committee members' terms expire and an election must take place at the Annual Meeting to fill those vacancies. Candidates must have been members of the Credit Union for at least one (1) year at the time of the Annual Meeting. Candidates are elected for 3-year terms. The Election of Officers will be in accordance with Municipal Credit Union Bylaws, Article IV.

The Nominating Committee will nominate a number of candidates to the Board of Directors not to exceed the number of vacancies to be filled. Additional candidates may have their name placed on the official ballot by submitting a petition that is signed by at least ½ of 1% of the members of the Credit Union. An incumbent member of the Board of Directors not nominated by the Nominating Committee and who seeks reelection must declare his/her candidacy at least 45 days prior to the Annual Meeting.

### 2.03 BOARD COMMITTEES

The Chair of the Board of Directors following the Annual Meeting and election appoints committees subject to approval by the Board. One or more staff resource persons are named to each committee to act as liaison.

The Chair of the Board and the President/Chief Executive Officer of the Credit Union are ex officio members of all committees. Any Board member may attend any committee meeting.

Members appointed to the various committees are not required to be elected officials or staff. The Chair also appoints each committee chair. For each month during which a Committee has met, the chairperson is charged with making a formal report at the monthly Board of Directors meetings.

Special committee may be formed, as needed, to work on special projects and could consist of combinations of Board members and staff.

The committees and their functions are:

1. Fiscal Policy Committee – The primary responsibilities of the Committee are to develop, implement and review the financial statements, asset Liability management, annual budget, payroll refund, property leases, policy manual, to recommend the annual bonus for the Chief Executive Officer and perform such other duties as may be assigned from time to time.

2. Membership Services and Loan Committee – The primary responsibilities of the Committee are to plan the Annual Meeting of the members, to recommend the approval of new members and ratify CEO's decisions on new SEG Groups, to review and update lending and collection issues, and review marketing themes for the Credit Union, to become informed on current legislative issues affecting the credit union industry and perform such other duties as may be assigned from time to time.

3. Coordinating Committee – The Committee's primary responsibilities are to develop and coordinate the Strategic Planning Meeting, set the conference schedule, develop and implement volunteer training programs, and perform such other duties as may be assigned from time to time.

4. Pension Trustees Committee – The primary responsibilities of the Committee is to act as trustees for the employee pension fund and perform such other duties as may be assigned from time to time. The Committee is appointed by the Board of Directors.

5. Ethics Committee – The primary responsibility of the Committee is to receive, review and reach a determination of complaints alleging violations of MCU's Code of Ethics.

## 2.04 COMMITTEE MEETINGS

Prior to the monthly Board of Directors meeting, the committees meet. Each committee chair prepares and presents a detailed report on activities in his/her committee for that month, usually accompanied by an outline and any required attachments prepared in advance of the meeting.

## 2.05 BOARD OF DIRECTORS MEETINGS

Municipal Credit Union Board meeting are normally held the last Thursday of each month at 6:00 p.m. in the Board Room at the main office, 22 Cortlandt St., New York, NY.

Seven (7) of the twelve (12) Board members must be in attendance at the meeting to constitute a quorum.

## 20.5A REGISTERING OF VOTES AT BOARD MEETINGS

Each Board member will have the right to have the minutes of a meeting reflect how he or she voted on a motion, when the eventual result of such vote was in opposition to the way in which such Board Member voted.

## 2.06 ANNUAL MEETING

The Annual Meeting shall be held during the first six (6) calendar months of each year within New York County. The Annual Meeting or any other special meeting of the members requires no less than ten (10) days and no more than thirty (30) days written notice prior to the meeting.

For contested elections, members have the opportunity to cast their ballots at the end of the Annual Meeting following introduction of the candidates running for available Board and Supervisory Committee seat.

For uncontested elections, it is the duty of the Secretary to cast one vote for each individual nominated by Nominating Committee. Such votes are cast during the Annual Meeting.

## 2.07 CEO EVALUATION POLICY

The policy of Municipal Credit Union is to provide an annual CEO performance evaluation to be completed by December of the current year. The evaluation will cover the period of January to December of the current year.

A copy of the blank evaluation form will be sent to each Director to obtain their comments based on the criteria established for necessary CEO performance, which should be prepared by December of current year.

The Coordinating Committee is charged with the responsibility of compiling the information and submitting the report to the Fiscal Policy Committee, the Board and to the Chair. The Chair of the Board and the Secretary of the Board shall meet with the CEO to discuss the evaluation and secure the CEO's comments.

## 2.08 BOARD TRAINING AND CONFERENCES

Directors and Supervisory Committee Members are expected to stay informed on both the changes in credit union laws, rules, regulations and practices which affect the rights, effectiveness and efficiency of the credit unions and also of new, revised or improved benefits and service available to credit union and their members.

Conferences and training sessions sponsored by recognized professional associations and organizations in the credit union and banking industries are an excellent source of information and knowledge to keep Directors and Committee members informed and productive.

Information regarding specific conferences will be included with the monthly Board packets prepared by the Executive Assistant to the Board.

The senior management officials of Municipal Credit Union will identify the professional associations and organizations recognized as educational resources for the Board of Directors and Supervisory Committee members

All new Directors and Supervisory Committee members will go through an orientation period. Within the first six (6) months of his/her election or appointment, each Director or Supervisory Committee member is expected to attend an outside training session or conference that will include fiscal report training.

Each Director and Supervisory Committee member is expected to attend at least one (1) conference and/or training session each year.

Any Director and Supervisory Committee member may attend additional conferences held outside New York State within the same calendar year expensed within their annual conference budget. Attendance at Legislative and New York State conferences are encouraged since good working relations with the credit unions within the state are beneficial and are not charged against the members' allocation. Anyone exceeding the limits of his/her annual conference budget will bear all costs above the limit.

**The Directors and Supervisory Committee members are encouraged to bring meaningful materials or ideas back to the Credit Union from the conference/training attended.**

All Directors are encouraged to attend the New York State Credit Union League Conference and Convention. Attendance at this meeting is important to MCU in its relations with other New York State credit unions and its voting participation as a member of the League. Sufficient Directors should attend to satisfy delegate and alternate delegate requirements.

## 2.09 BOARD EXPENSE REIMBURSEMENT POLICY

The Expense Reimbursement Policy has been designed to allow the Credit Union to monitor, control, and reimburse expenses that have been incurred by members of the Board of Directors and Supervisory Committee members while operating on behalf of the Credit Union. All reimbursable expense incurred by the Board or Supervisory Committee members must be reasonable and necessary in nature.

**2.09-1**

A. For attendance at conferences and training sessions, the Credit Union shall pay or reimburse members of the Board of Directors and Supervisory Committee members for registration fees, hotel room or lodging, meals, necessary expenses for transportation, standard tipping, business meeting expenses, telephone

expenses, business supplies, and out-of-pocket expenses excluding the purchase of beauty supply, clothes, souvenirs, sporting equipment, gifts, etc.

B. The expenses for the annual NYS Credit Union League, Strategic Planning and Legislature Conferences, and registration fees for other conferences are excluded from the individual Director's annual conference allotment.

C. Personal entertainment expenses are limited to $500 for the entire conference.

D. Networking expense is considered as a business expense and shall not be charged against entertainment allocations.

E. "An immediate family member" shall be defined as the spouse, brother, sister, child or grandchild, or a significant other of the Director or Supervisory Committee member.

F. "Significant other" is defined as an individual or family member who is adversely affected by the absence of a Director or Supervisory Committee member from the household.

G. Friends, business associates and any other individuals not identified within the definition of family members are prohibited from accompanying Directors and Supervisory Committee members at credit union expense.

**2.09-2**

A. An immediate family member accompanying the Director and Supervisory Committee member is covered for all of the reimbursements listed in section 2.09-1 which will be charged against the individual Director's or Supervisory Committee member's budget allocation. All expenses (or estimated expenses) incurred by a family member shall be reported on a separate section of the expense report by the directors and Supervisory Committee members whereby by the possible income tax liability can be clearly reflected. It should be noted that the exempt conference expenses listed in section 2.09-1B are also applied to expenses incurred by immediate family member(s) accompanying the Director(s) and Supervisory Committee members. However, the expenses may be subject to income tax reporting.

B. Expenses incurred by the immediate family member which has no apparent business reasons for the attendance may be subject to income tax and reporting requirements, except in the case of Directors requiring assistance from the spouse or traveling companion due to his/her disability/medical condition.

**2.09-3** Car rentals must be justifiable and then coordinated through the Executive Assistant to the Board for approval by the Chair, President/Chief Executive Officer, or Treasurer prior to the conference or seminar. Obtaining prior approval will assist in cost control and ensure maximum utilization.

**2.09-4**

A. Expense reimbursement form consistent with Board policy must be completed and filed with the Treasurer or Chief Financial Officer within the sixty (60) days subsequent to a conference or seminar.

B. Documentary evidence must be attached to support expenditure.

C. Expenditures over $50.00 will not be reimbursed without documentary evidence.

D. Gratuities are exempt from the documentary evidence requirement.

**2.09-5** The hierarchy of approval for conference expense reimbursement is as follows:

| Expenses incurred by: | Authorization from: |
|---|---|
| Director | Chairman of the Board or Treasurer |
| Chairman of the Board | Treasurer or 1st Vice Chair |
| Supervisory Committee Chair | Chairman of the Board or Treasurer |
| Supervisory Committee Members | Supervisory Committee Chair |
| Treasurer | Chairman of the Board or 1st Vice Chair |
| CEO | Chairman of the Board or Treasurer |

**2.09-6**

A. Corporate credit cards shall be limited to credit union business purposes only. No expenditure shall exceed the individual budget allocation. The corporate credit cards have a maximum line of credit of $10,000.

B. Cash advances obtained with the corporate credit card are limited to $600 for each conference/seminar attended. The cash advance must be included in the expense report.

C. Directors and Supervisory Committee members are responsible to review and verify the charges reflected on their corporate credit card statements. Questionable charges should be reported to the CFO immediately. Payments will not be made by the Accounting Department without the signature of the cardholder.

**2.09-7** Air travel class can be upgraded from the coach level to business class if flight is five (5) hours or longer. Various levels of lodging shall be determined by the event the Director is participating in. It should be noted that the increased travel costs due to flying business class will be charged against the Director's allocation. In all other situations, Directors should seek out reasonable levels of travel and lodging.

a). The individual Director's conference costs (all inclusive) cannot exceed $15,000 per annum.

b). Due to the increasing needs for the Chair of the Board to attend conferences, lobby credit union issues, and represent the Board to attend Director's discussion forums, the annual conference/seminar allotment for the Chair is $20,000.

**2.09-8** Out of Pocket expenses for attending board and committee meetings (Board of Directors and supervisory committee members) are reimbursable. The limits and types of expenses are set forth as below: Meal allowance shall not exceed $35.

Transportation including vehicle parking costs, estimated mileage, and tolls.

Other out-of-pocket expenses up to $35, such as childcare expenses incurred due to attendance of meeting

**2.09-9** The Administrative Assistant is responsible for:

A. Maintaining a list of all outstanding expense reports within the time frame set forth in this policy.

B. The submission of a quarterly status report of outstanding expense reports, and

C. Updating the policy.

**2.09-10** Regarding all of the above, good judgment should be exercised on all matters involving the expense reimbursement policy.

A. Extenuating circumstances or exceptions to the policy may arise. Consultation and approval in advance are required. The Chairman of the Board shall have the authority to approve exceptions and extraordinary expenses on a case-by-case basis.

B. The CEO, designated by the Board, shall have the authority to waive immaterial overages in expenses incurred by the Board and Supervisory Committee members on a needed basis.

## 2.10 BOARD CONTRIBUTION POLICY

**Purpose**:

The contribution policy statement of the Municipal Credit Union sets forth policies and guidelines to ensure fairness, consistency, and integrity in contributing funds to organization that need monetary assistance. The policy is to be followed by the Fiscal Policy Committee, individual Directors, and President/Chief Executive Officer in evaluating the requests for contributions.

All contributions must be in compliance with the New York State Banking Law which provides that the Credit Union may make donations, irrespective of corporate benefit, for the public welfare or for community fund, hospital, charitable, educational, scientific, civic or similar purposes, and in time of war or other national emergency in aid thereof.

**Contribution Policy**:

It is the contribution policy of the Credit Union to contribute money as allowed by law, and within budgetary limitations, to needy organizations that request monetary assistance.

### 2.10-1 Criteria:

The Fiscal Policy Committee, individual Directors, and the President/Chief Executive Officer will only evaluate a contribution that, if made would be in compliance with New York State Banking Law Section 453 (21). The criteria to be used in evaluating request for contribution are as follows:

1. Affiliation of membership in MCU.
2. Benefits to children or senior citizens.
3. Benefits to the needy *e.g.* hungry or homeless.
4. The goals, philosophy or objectives of a receiving organization as compared with those of the Credit Union

**Contributions for political purposes are prohibited.**

### 2.10-2 Authorized Amount of Contribution (Within Budget)

1. The Fiscal Policy Committee shall have the authority to determine and approve the amount of contributions, which the Committee deem appropriate up to $10,000.
2. Individual Directors shall have the authority to make contributions that meet the criteria to one (1) or more organizations up to their budgeted annual personal allotment of contributions (increased from $1,000 to $1,500, effective

1/1/07). The unused annual personal allotment shall not be accumulated and carried over to the following year.

3. The President/Chief Executive Officer shall have the authority to approve up to $10,000 per contribution in unusual or extraordinary circumstances.

4. The total annual authorized amount of contribution shall be reviewed and adjusted annually.

5. A Director should utilize his/her personal allotment if he/she wishes the Board to increase the amount of contribution that was decided on and acted upon by the Fiscal Committee.

6. The Fiscal Policy Committee shall have the final authority in determining and approving actions and/or amount of the contribution request up to its limit. A report, for information only, will be made available to the Board as part of the fiscal meeting minutes.

7. Directors are advised to provide the Fiscal Policy Committee sufficient information and time in support of request for contributions they may favor in particular.

**2.10-3 Exceptions**:

Questions may arise and minor policy exceptions may be necessary from time to time. In such instances, the Fiscal Policy Committee must be consulted. Deviations from the policy statements must be avoided. This policy will be reviewed periodically by the Fiscal Policy Committee and the Board of Directors and amended as circumstances warrant.

## 2.11 INSIDER'S DISCLOSURE POLICY

Members of MCU's Board of Directors and Supervisory Committee may not do business with the MCU, either individually or as representative of any business entity.

Upon the realization or discovery of a board member or supervisory committee member that he or she has done business with MCU, either in an individual capacity or as a representative of a business entity, such board member or supervisory committee member shall immediately report such event, in writing, to the Board. Such board member or supervisory committee member will provide all relevant information and documentation, as may be required by the board, concerning the event in question.

Furthermore, upon the discovery of a conflict of interest, potential conflict of interest, or the appearance of a conflict of interest, involving MCU, a board member or supervisory committee member shall immediately report such incident, in writing, to the Board.

Failure of the member of the Board or Supervisory Committee to comply with the policy will subject the members to disciplinary action or subsequent removal from the Board.

## 2.12 CODE OF ETHICS

Municipal Credit Union's elected or appointed officials have an obligation to the credit union that extends beyond assuring that their actions do not violate applicable laws and regulations. They are fiduciaries who owe it to the credit union to act in good faith in the performance of their duties.

An elected official of Municipal Credit Union must recognize that the interests of the credit union have priority over his or her personal interest. An elected MCU official may not use his or her position for personal gain or profit.

### **2.12-1** ETHICS POLICY

A. All Municipal Credit Union's Directors and Supervisory Committee members should conduct themselves consistent with the highest ethical standards. Such conduct must be both legal and conform with their fiduciary responsibilities and duties to MCU.

B. MCU's elected officials must adhere to the guidelines established in this Code of Ethics. Adherence to these principles by all such persons will ensure that the general management and supervision of MCU is both professional and honest.

C. A person affected by the Code of Ethics must:

1. comply with the letter and spirit of relevant laws and regulations in the conduct of his or her MCU duties and responsibilities;
2. comply with the letter and spirit of MCU's by-laws and duly adopted policies;
3. maintain and promote MCU's good name and reputation;
4. report the discovery of any dishonesty or corruption;
5. be sensitive to a potential conflict of interest and the appearance of a conflict of interest.

D. PROHIBITED ACTIVITIES AND ACTIONS

1. Persons affected by the Code of Ethic must not:

    a. grant special favors to or for any person in return for any consideration;

b. use confidential information acquired in the performance of duties for personal benefit;

c. disclose MCU confidential information to those not entitled to access to such information;

d. request or accept gifts or benefits in connection with the performance of MCU duties from anyone doing business or seeking to do business with MCU (nothing herein is intended to prohibit the acceptance of gifts or benefits, such as promotional souvenir material of nominal value);

e. participate on behalf of MCU in any discussion or decision on any subject in which the affected subject has a financial interest;

f. conduct himself or herself in a manner which would give rise to a conflict of interest or the appearance of a conflict of interest.

2. No member of the Board of Directors of MCU shall make any oral or written statement, intended for public dissemination, without the expressed consent of the Board of Directors which: (a) purports to be a statement on behalf of the Board of Directors or on behalf of MCU; (b) may be reasonably interpreted by a third party be a statement which reflects a position of the Board of Directors or MCU; or (c) incorporates any information which is not public knowledge and which is gained or obtained through the individual's position on MCU's Board of Directors. Any alleged violation of this policy shall be referred to MCU's Ethics Committee for appropriate action.

3. For the purpose of avoiding breaches of fiduciary duty, conflicts of interest, Improprieties or any appearances thereof, Municipal Credit Union volunteers (e.g., Director, Supervisory Committee member, Nominating Committee member, etc.) shall not be eligible for consideration for paid employment with the Credit Union (even if he or she has the necessary job qualifications) during the term of such volunteer's service, and for a period of not less than two (2) years after the termination of the volunteer's service. Futhermore, no volunteer shall (by reason of or through his or her volunteer position) assume the title, position or responsibilities of or represent himself/herself as an operating officer or employee (e.g., President, Vice President, Manager, etc.) of the Credit Union.

E. SANCTIONS

Failure to adhere to the provisions of this Code of Ethics may result in disciplinary action (such as admonishment by the Board, written report to the Supervisory Committee, for possible further action up to possible removal from office, report to the nomination committee, etc.).

F. ETHICS COMMITTEE

a. There shall be an Ethics Committee consisting of five (5) members of the Board of Directors. The Ethics Committee shall be an ad hoc committee whose members shall be chosen, from the Board, by lot. Any director that may be the subject of, or otherwise involved in, the matter being reviewed shall not be eligible to serve on the Committee with regard to that matter. Once comprised, the Committee shall chose, from their number, a Chairperson. Upon issuance of its report, and conclusion of its business, that committee shall disband.

b. If after the Committee has been comprised, the Board should determine that a member or members of the Committee are ineligible to sit on the Committee to consider the issue being reviewed, the member or members found to be ineligible shall be excused from the Committee. A replacement or replacements, for the excused committee member(s), shall be chosen, by lot, from those remaining members of the Board eligible to sit on the Committee.

c. If the need for the same shall arise, the Committee has the ability to retain, with approval by the Board, outside consultants to serve at its pleasure.

d. The Committee shall meet as often as is needed. Three members of the Committee shall constitute a quorum and all acts of the Committee shall be by an affirmative vote of at least three members.

e. Only members of the Committee, and the committee invitees, may attend the committee meetings.

G. DUTIES OF THE ETHICS COMMITTEE

The Committee shall receive written and signed complaints alleging violations of MCU's Code of Ethics.

Whenever a written complaint is received by the Committee, it shall in an expeditious manner:

a. except when it is determined to be in the best interest of MCU not to do so, provide a copy of the written complaint to the party that is the subject of the same;

b. investigate the complaint;

c. provide the official who is the subject of the complaint, an opportunity to appear and make a statement before the Committee;

d. dismiss the complaint if it determines that no further action is required, or make an initial determination that there is probable cause to believe MCU's Code of Ethics has been violated.

e. Minutes of proceedings shall be maintained by the Committee and such minutes shall be maintained on permanent file with MCU.

H. REPORT

a. If the Committee makes an initial determination, based on a complaint, investigation or other information available to the Committee, that there is probable cause to believe that the official has violated MCU's Code of Ethics, it shall make a written report, concerning the same, to the Board of Directors. It shall be the responsibility for the Board of Directors to take whatever action it deems appropriate with regard to a report presented to it by the Committee.

b. The official shall have the right to appear and make a statement before the Board, prior to the Board determining what, if any, action is to be taken.

**SECTION 2.13 <u>BOARD OF DIRECTORS STATEMENT OF DISCLOSURE</u>**

In order to help ensure compliance with the Insider Disclosure Policy and Code of Ethics (Sections 2.11 and 2.12 herein respectively), as well as any other relevant sections of this Chapter of MCU's Policy manual, each Director shall file a written disclosure statement with the Board on or before the first day of July, each year. Directors should set forth, in such disclosure statement, such information as may be reasonably required by the Board. The disclosure statement shall be in a form as approved by the Board, and the form itself may be amended, by the Board, from time to time. Together with the information disclosed, the disclosure statement shall contain the name of the Director, the signature of the Director, and the date that the disclosure statement was signed.

Upon the filing of the disclosure statements with the Board, the Chair of the Board shall review each disclosure statement. If the Chair of the Board should determine that further review of, or additional inquiry into, any disclosure statement or statements is needed, the Chair of the Board shall forward such statement(s) to an appropriate board committee for further action.

After review by the Chair of the Board, completed disclosure statements shall be kept on file with the Office of the General Counsel.

With regard to the disclosure statement filed by the Chair of the Board, the Chair of the Coordinating Committee shall perform the above-mentioned duties of the Chair of the Board.

The information contained in the disclosure statements is deemed to be confidential, and shall only be reviewed by members of the Board, or a committee of the Board, upon direction of the Chair of the Board or by Board resolution.

Nothing herein shall be deemed to prevent or impede MCU's Regulators or MCU's Supervisory Committee from reviewing the disclosure statements in the performance of their respective duties and responsibilities.

Also, the Chair of the Board shall, from time to time, review disclosure statements completed by Supervisory Committee members. If the Chair of the Board shall determine that any further review of, or additional inquiry into, any Supervisory Committee member disclosure statement or statements is needed, the Chair shall forward such statements, together with his or her concerns, to the Supervisory Committee or an appropriate committee of the Board for further action.

## 2.14 DIRECTOR EMERITUS PROGRAM

It shall be the policy of this credit union to have a Director Emeritus Program so that individuals who have served MCU, as members of the Board of Directors, for extended periods of time can leave their official positions with the credit union and still contribute their experiences and knowledge towards improved service to MCU members, and the betterment of the institution.

Purpose:
The purpose of an emeritus position is to allow individuals with extensive experience and knowledge to continue to serve MCU and to have input into the credit union decisions. Those holding positions will provide advice to new Directors and Supervisory Committee Members, and will use the knowledge and contacts they have developed through their official positions with the institution to continue to assist MCU in attaining its goals and serving its members.

**2.14-1** DUTIES

1. To attend and participate at MCU Board Meetings
2. To attend and participate at MCU Committee Meetings
3. To attend and participate at MCU Board Strategic Planning Meetings
4. To attend and participate at NY State Governmental Affairs Meeting
5. To attend and participate at NY State Credit Union Annual Conference

It should be specifically noted that although Director Emeritus appointees will be encouraged to attend and participate at meetings, as indicated above, such appointees will have no vote.

**2.14-2** ELIGIBILITY & APPOINTMENT

In order to be eligible to be appointed to a Director Emeritus position, the candidate must have served MCU as a Director for a minimum of fifteen (15) continuous years, and must have been a member of the Board of Directors as of October 1, 2009. All candidates for these positions must be nominated by a standing committee of the Board of Directors and an appointment must be approved by the Board at a Board of Directors meeting. This process is to be followed each time a candidate is appointed as a Director Emeritus appointee. Each individual appointed a Director Emeritus, shall be required to execute an agreement, in a form approved by the Board of Directors, providing that the Director Emeritus shall maintain the confidentiality of all credit union matters coming to his or her attention by reason of his or her service as a Director Emeritus.

**2.14-3** TERMS AND OTHER CONDITIONS

The term of an emeritus position shall be for two years, and no Director Emeritus appointee may serve for more than two terms. Notwithstanding anything else contained herein to the contrary, a Director Emeritus appointee may, for cause, and upon prior written notice to such Director Emeritus appointee, be removed from such position by vote of the Board of Directors. There may be up to three Director Emeritus appointees serving MCU at any one time.

## 2.15 SCHOLARSHIP PROGRAM

Besides embracing the credit union movement and philosophy, MCU is also a strong advocate in fulfilling its social responsibility by re-investing resources back to MCU's members and their families. In observing this advocacy, MCU had established a scholarship program where MCU's members can apply for their children or themselves to pursue higher education. The scholarship funds are allocated as follow:

A) The Louise DeBow Memorial Scholarship- $5,000
B) The Julian I. Garfield Memorial Scholarship-$5,000
C) The Charles Faulding Memorial Scholarship-$5,000
D) The Willie James Memorial Scholarship-$5,000
E) The Mayor John P. Mitchel Memorial Scholarship-$5,000
F) The Malachy T. Higgins Memorial Scholarship-$5,000
G) The James McKeon Memorial Scholarship-$5,000
H) The Anna Mae Massy Memorial Scholarship-$5,000
I) Thirteen (13) scholarships at $2,000 each- $26,000

The aggregate amount of the above scholarship totals $66,000.

The application and selection processes are being administered independently by the Credit Union Association of New York. The detailed procedures for the scholarship program are maintained by MCU's Human Resources Department.

## SECTION 3
## INVESTMENT POLICY

### 3.1 POLICY STATEMENT

It is the policy of the Credit Union that the funds entrusted to it by its members shall be safeguarded and managed with care and prudence. Investment activities shall be consistent with the purposes and philosophy of the Credit Union, to provide its members with financial services not limited to appropriate deposit products, secured and unsecured loans and other financial services. Having funded these activities at appropriate levels, funds shall be established to meet the requirements for liquidity plus an additional amount for unforeseen contingencies.

It is also the policy of the Credit Union to maintain appropriate levels of currency and coin in its branch facilities for transaction. All other amounts shall be promptly deposited in authorized New York banks with amounts considered excess promptly converted into earning assets. It is recognized that the investment level will vary with the demand for loans, withdrawals, and deposits. Changes in the investment level shall be part of the periodic reporting to the Board by the Treasurer.

### 3.2 PURPOSE

The investment policy statement of the Municipal Credit Union sets forth policies and procedures to guide the day-to-day administration of all Credit Union investment activities. The contents of this statement have been established by the Fiscal Policy Committee and MCU personnel and reviewed and approved by the Board of Directors. The investment policy shall be consistent with the Banking Law of the State of New York, the regulations of the National Credit Union Administration, the requirements of the Credit Union Mutual Insurance Society, all of the applicable law and regulations, and the purposes for which this Credit Union was established. The policy shall describe the goals to be followed in investment activities, the allowable investments by type and maturity, the titles of the personnel executing this policy and their individual responsibilities.

### 3.3 RESPONSIBILITY

The Board of Directors is responsible for the formulation and implementation of investment policy. In accordance with normal operating procedures, the Board delegates the decision-making authority with respect to specific investments to the President/Chief Executive Officer and/or Chief Financial Officer for implementing investment policy and executing day-to-day investment decisions. The Vice President of Finance or Chief Financial Officer is authorized to invest up to $25 million in term-investments each month. (Term-investment is defined as investment with maturity greater than one month) The incremental investments exceeding the $25 million limit must be approved by the

President/CEO prior to the trade. This limit does not apply to the overnight investment activities. All investment decisions shall be consistent with this policy statement. The Fiscal Policy Committee shall act as a liaison between the Board and Management. The functions of the Fiscal Policy Committee in this area are as follows:

**3.03-1** Work with management on investment related issues, problems, and questions that may arise.

**3.03-2** Assist management in developing an approved list of financial institutions in which funds may be invested. Review the list on a periodic basis and make changes where deemed necessary. Approve any changes to the list recommended by management.

**3.03-3** Assist management in developing an approved list of securities dealers and other investment related firms with which the Credit Union may conduct business. Review the list on a periodic basis and make changes where deemed necessary. Approve any changes to the list recommended by management. The approved lists are subject to continuous review and may be changed by the Fiscal Policy Committee or the Board of Directors. Changes made by the Fiscal Policy Committee will be made known to the Board at the following Board meeting.

**3.03-4** Monitor investment decisions for compliance with the Policy Statement.

**3.03-5** Review the Policy Statement with management annually or when the circumstances warrant a review and recommend changes to the Board when appropriate.

**3.03-6** The Chief Financial Officer or Vice President of Finance will attend all Fiscal Policy Committee meetings and provide assistance when deemed necessary. The CEO, CFO and VP of Finance will maintain the investment policy subject to adjustment by the Fiscal Policy Committee and the Board.

### 3.4 INVESTMENT PORTFOLIO COMPOSITION

It is the intention of the Credit Union to invest cash prudently and conservatively. The investment policies are designed to insure a well-diversified, low risk portfolio. Therefore, the Credit Union's aggregate portfolio holdings, including all investment securities and overnight funds, will be measured using effective duration and have a long term target of less than 3.0 years. This will be measured monthly and reported during the ALCO meeting. The interest rate risk of the investment portfolio shall be considered in the context of its potential effect on capital and future earnings opportunities in both rising and falling interest rate environments. The investment portfolio shall be considered an integral part of the total asset/liability structure of the Credit Union.

The portfolio should be composed of securities with the following characteristics:

**3.04-1** A low degree of default or credit risk even though investments will usually yield a return associated with the degree of risk. Credit risk is interpreted as the availability of the issuer to repay principal and interest.

**3.04-2** A low degree of price risk resulting from changes in the level of interest rates. Market risk, the effect of market fluctuation (rates and the supply and demand of money) on investment value over time must be considered.

**3.04-3** A high degree of marketability (unless the maturity is short-term).

**3.04-4** The detailed characteristics limit the types of investments that may be acquired by the Credit Union. The emphasis is on the safety of principal and liquidity with respect to default risk and interest rate risk. These risks must be minimized. **The yield on investments is secondary to safety and liquidity**

MCU
MUNICIPAL CREDIT UNION



### 3.5 AUTHORIZED INVESTMENTS

The Credit Union may invest only in securities that are specifically authorized and outlined in this section. All other investments are prohibited by NYS Banking Law and/or Board Policy.

The following investments, subject to limitation provided for in the law, are legally permitted by State Banking Law regulations and authorized by the Board of Directors of Municipal Credit Union:

**3.05-1** Obligations of the United States such as U.S. Treasury Securities and U.S. Government Agency Securities. Some examples of U.S. Government Agency Securities are the Federal Home Loan Banks and Federal National Mortgage Association.

**3.05-2** Obligations of a State of the United States for which the faith of the State of the U.S. is pledged to provide for payment of interest and principal.

**3.05-3** Obligations of the State or City of New York for which the faith of the state or city is pledged to provide for payment of interest and principal.

**3.05-4** Bonds of any corporation incorporated under the laws of the U.S. or any State, and transacting the business of supplying electrical energy, gas or telephone service in the U.S. subject to certain limitations and conditions of the NYS Banking Law.

**3.05-5** Investments in the Corporate Credit Union of New York State, specifically Alloya Corporate Federal Credit Union.

**3.05-6** Investments in other federally insured credit unions located in New York State can be made up to the insurable limit.

**3.05-7** Investments in negotiable and non-negotiable CDs of:

a. One or more savings banks, savings and loan association, or trust companies incorporated and located out of New York State and insured by the FDIC are permitted. The investments shall not exceed the insured maximum in any one insured institution.

b. One or more commercial banks or trust companies incorporated and located in New York State are permitted if listed on Approved List #1A and 1B.

c. One (1) or more branches of foreign banking corporation located in New York State are permitted. The investment must mature within 18 months. The deposits must be insured by the FDIC, and the banks are listed on Approved List #2.

**3.05-8** National Credit Union Government Securities.

**3.05-9** Federal Funds which are short-term loans of immediately available funds, i.e. funds that can be transferred or withdrawn during one (1) business day. Sales of Fed Funds may be made only to those banks listed on Approved List #1A and #1B.

**3.05-10** Bankers Acceptances – Bankers Acceptances are used primarily to finance international trade. Assume that a U.S. company wishes to import goods from abroad; it requests its bank to issue a letter of credit on its behalf authorizing a foreign exporter to draw a time draft upon the bank in payment for the goods. Equipped with this authorization, the exporter ships the goods on an order bill of lading made out to himself and presents a time draft only with the endorsed shipping documents to his bank. The foreign bank in turn forwards the draft, and thus creates a bankers acceptance. The exporter discounts the draft with the accepting bank and receives payment for the transactions. The shipping documents are delivered to the importer who now may claim the shipments. The U.S. bank may either hold the acceptance until maturity as an investment, or sell the acceptance in the money market.

Investments in Bankers Acceptances of commercial banks must mature within 180 days and be listed on Approved List #3. The total combined investment in Bankers' Acceptances of any one (1) bank is $1,000,000.

### 3.6 MATURITY LIMITS AND LIQUIDITY REQUIREMENT

To control the risk of loss resulting from increases in the level of interest rates and the forced sale of securities, the maturity distribution of the investment portfolio must be controlled.

Investments are limited to instruments with a maturity or weighted average life (WAL) of less than 5 years. Management is prohibited to investment in instruments that have a maturity of greater than 5 years or have a WAL of greater than 5 years at the time of purchase without the approval from the board.

For variable rate investments, the average life will be the period until next coupon rate reset. This is consistent with the NCUA treatment of variable rate investments.

### 3.7 DIVERSIFICATION REQUIREMENTS

In order to avoid an unwarranted concentration of funds in a single entity that is subject to default risk, diversification requirements are imposed as follows:

**3.07-1 U.S. Treasury Securities and Agency Securities** – These may be held in unlimited amounts including GNMA mortgage backed securities and Small Business Administration (SBA) securities because of the full faith and credit of the US Government.

US Agency Mortgage Backed Security (MBS) and Collateralized Mortgage Obligations (CMO) may not exceed a current face of $5 million per issue at the time of purchase and the aggregate amount of each CUSIP in the investment portfolio may not exceed $5 million. MBSs and CMOs may not exceed 50% of the aggregate amount of the total investment portfolio, cash, and cash equivalents at the time of purchase. As per Section 3.6 of the Investment Policy, the WAL may not be greater than 5 years at the time of purchase.

Floating Rate Agency CMO Securities may not exceed a current face of $5 million per issue at the time of purchase and may not exceed 10% of the aggregate amount of the total investment portfolio, cash, and cash equivalents at the time of purchase. As per Section 3.6 of the Investment Policy, the WAL will be equal to the period until the next coupon rate reset and may not be greater than 5 years.

3.07-1A **Federal Reserve Bank** -- The Credit Union can deposit its liquid funds at the Federal Reserve Bank. The deposits are backed by the government; therefore, there is no limit on the deposits that the Credit Union can place with the bank.

**3.07-2** Obligations of States, the City of New York and bonds of corporations transacting business of supplying electrical energy, gas or telephone service – The total amount of funds invested in this type of instrument may not exceed $5,000,000.

**3.07-3 Central Credit Union of the State New York** – The total amount of funds invested

in and/or deposited with this institution shall not exceed $100,000,000. This investment includes the Capital Share, Plateau and Money Market Account with Alloya Corporate Credit Union. These interest-earning accounts are for ACH and other settlements, and liquidity management.

3.07-3A **Citibank** – The total aggregate amount of funds invested in short-term investments (1-365 days) shall be limited to $100,000,000. The permissible investments are the overnight interest and non-interest bearing accounts.

3.07-3B **JPMorgan Chase** – The total aggregate amount of funds invested in overnight investment shall be limited to $100,000,000. The permissible investments are the short-term (1-365 days) interest and non-interest bearing accounts.

**3.07-4 Other Credit Unions** – Investments in other credit unions are limited to the insured amount of $250,000, and an aggregate amount of $1,000,000. For credit unions that need seed deposits or liquidity needs, MCU can deposit in these credit unions up to the insurable amount of $250,000. The President/CEO or Chief Financial Officer shall have the authority to renew the matured seed deposits. The aggregate seed deposits in other credit unions shall

not exceed $1,000,000. The President/CEO shall have the authority to make investments in these credit unions at a zero (0%) interest rate.

**3.07-5 Certificates of Deposits**:

a. The total investment in the Certificates of Deposit of a savings and loan association and commercial bank located out of New York State is limited to the insured maximum. The total combined investments in all the out-of-state Certificates of Deposits are limited to the lesser of $3,000,000 or 5% of the investment portfolio. The bank must have a risk-based capital ratio of at least 8% based on the latest available publication at the time the investment is made.

b. The total combined investment in the Certificates of Deposit of major commercial banks located in New York State are limited to the lesser of $8,000,000 or 10% of the entire investment portfolio for the banks listed on Approved List #1A.

c. The total combined investment in the Certificates of Deposit of a major commercial bank located in New York State are limited to the lesser of $5,000,000 or 5% of the entire investment portfolio for the banks listed on Approved List #1B.

d. Investments in savings banks, savings and loan associations and commercial banks that are incorporated in New York State and are not listed in the Approved List #1A and 1B are permitted if their risk-based capital ratio is equal to or greater than 8%. The investment in a single bank is limited to the insured maximum. The total combined investment in this category shall not exceed the lesser of $10,000,000 or 10% of the investment portfolio.

Definition:

Risk-based capital ratio – total capital net of adjustments divided by risk-weighted assets.

e. The total combined investments in the Certificates of Deposit of a single bank are limited to $1,000,000 for the banks listed on Approved List #2. The total combined investment in all banks on Approved List #2 (Foreign Banks) is limited to the lesser of $5,000,000 or 8% of the investment portfolio.

**3.07-6 National Credit Union Government Securities and Federal Funds and Repos** – The total combined investment in these instruments on any one given day is limited to $10,000,000. Investments in Federal Funds are limited to the banks listed on Approved List #1A and #1B.

**3.07-7 Bankers Acceptance** – The total combined investment in any one (1) bank listed on Approved List #3 is limited to $1,000,000. The total combined investments in all banks on Approved List #3 (Bankers Acceptances) is limited to the lesser of $7,000,000 or 10% of the investment portfolio.

**3.07-8 Mutual Funds** – Investments in mutual funds are permitted. The investments are limited to the allowable limit and the types of funds prescribed by the New York State Banking Law for Credit Union.

The Credit Union will buy in even lots to the extent possible to obtain the best rates. The investment process will be kept simple so that the investment policy can be effectively implemented. The Credit Union will not over delegate the investment process so that it will avoid losing an effective concentration.

## 3.8 PAYMENT, DELIVERY, SAFEKEEPING & VALUATION RESERVE

With respect to payment, delivery and the safekeeping of securities, the following policies will be followed:

**3.08-1** When any security is purchased, evidence of the wire transfer of the funds shall be retained until the instrument matures and funds are returned.

**3.08-2** Securities not in the physical possession of the Credit Union will be held in a safekeeping account with Citibank, Federal Reserve Bank, and/or Morgan Stanley Custody accounts.

**3.08-3** All securities held in a safekeeping account will be evidenced by a safekeeping receipt from Citibank, Federal Reserve Bank, and/or Morgan Stanley in accordance with the custodial agreements.

**3.08-4** The Supervisory Committee of the Credit Union will, as part of its audit, confirm all securities held in safekeeping periodically.

**3.08-5** A valuation reserve account for the long-term utility bond portfolio is maintained. Quarterly adjustment, if material, is made to the reserve account with the offsetting entry to the Undivided Earnings Account.

**3.08-6 FINANCIAL ACCOUNTING STATEMENT (FASB 115) (ACCOUNTING FOR CERTAIN INVESTMENTS IN DEBT AND EQUITY SECURITIES)**

The accounting and classification of the investment portfolio shall be in accordance with FASB #115. The CFO and VP of Finance shall have the authority to determine the amount of investment in the classification of available-for-sale as part of the Asset/Liability and liquidity management planning.

**3.9 EXCEPTIONS & REVIEW**

The Board of Directors recognizes that questions may arise and minor policy exceptions may be necessary from time to time. In such instances, the Fiscal Policy Committee will be consulted.

Significant deviations from the Policy Statement must be avoided. This Policy Statement will be reviewed annually by the Fiscal Policy Committee and the Board of Directors and amended as circumstances warrant.

**3.10 AUTHORIZED FINANCIAL INSTITUTIONS**

The Credit Union has developed lists of approved financial institutions that are available for overnight or longer investment terms as funds become available. The lists are composed of financial institutions that have undergone financial analysis by the Credit Union and are approved for investments in amounts exceeding the applicable insurance limits.

CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

*Approved List*

**#1A Banks Limited to $8,000,000**

The following banks may be used by the Credit Union for transactions related to the investment and/or deposit of funds in Certificates of Deposit, and federal funds located in New York State.

Citibank, N.A. JPMorgan

Chase Bank of America

**#1B Bank Limited to $5,000,000**

The following banks may be used by the Credit Union for transactions related to the

investment and/or deposit of funds in Certificates of Deposit, and federal funds – located in New York State.

HSBC

Bank of New York

Amalgamated Bank

**Note:** The basis for a bank to be included on the Approved List #1 was (a) the bank's asset size, and (b) eligibility under the New York State Banking Law.

**#2 Bank Limited to $1,000,000**

The following banks may be used by the Credit Union for transactions related to the investment and/or deposit of funds in Certificates of Deposit.

| Name | Country |
|---|---|
| BNP Paribas | France |
| Barclays Bank | United Kingdom |

**Note:** The basis for a bank to be included on the Approved List #2 was (a) the bank's asset size and, (b) eligibility under the New York State Banking Law.

The total combined investment in all banks on this List #2 is limited to the lesser of $5,000,000 or 8% of the investment portfolio.

**#3 Bankers Acceptances Limited to $1,000,000**

The following banks may be used by the Credit Union for investment in Bankers Acceptances.

Citibank, N.A. Bank of

America

J.P. Morgan Chase HSBC

**Note:** The basis for a bank to be included on the Approved List #3 was (a) the bank's asset size, and (b) eligibility used the New York State Banking Laws.

The total combined investment in all banks of this List #3 is limited to the lesser of $7,000,000 or 10% of the investment portfolio.

## 3.11 APPROVED SECURITIES DEALERS & INVESTMENT ADVISORS

The following securities dealers may be used by the Credit Union for transactions related to the investment of funds in Certificates of Deposit, Government Securities, Commercial Paper, and Bankers Acceptances. The investment transactions will be conducted directly with these security firms.

Name:

1. Bank of America (formerly Merrill Lynch)
2. Wells Fargo (formerly Wachovia Securities)
3. Citibank, N.A.
4. JP Morgan Chase (formerly Bear Sterns)
5. Oppenheimer and Co, Inc.
6. MEMBERS Capital Advisors
7. Morgan Stanley

MCU
MUNICIPAL CREDIT UNION



# SECTION 4
# ASSET/LIABILITY MANAGEMENT POLICY

## 4.01 ASSET/LIABILITY MANAGEMENT POLICY

The Municipal Credit Union's Asset/Liability Management (ALM) Policy is to guide the management and board in the decisions regarding loans, investment, dividends, operating expense controls, and product pricing policies.

It is the policy of the Credit Union to avoid undue interest-rate risk exposure. The Credit Union, therefore, follows the matching principle whereby the Credit Union's ALM operating procedures will attempt to match the rate sensitivity of the total asset base to its total share, deposit, and liability base.

The ALM policy also establishes operating procedures that will ensure that spreads and pricing policies are sufficient over the full interest cycle to allow the Credit Union to build and maintain sufficient levels of capital (the sum of surplus, undivided profits and allowance for loan losses), after accounting for operating expenses and dividends.

In addition, the ALM operating procedures of the Credit Union must assure that the Credit Union maintains sufficient levels of liquidity to satisfy the loan demands and deposit flows of its members.

## 4.02 ASSET/LIABILITY MANAGEMENT RESPONSIBILITY

The Board of Directors is responsible for the formulation and implementation of the ALM Policy. In accordance with normal operating procedures, the Board delegates decision making authority to the President/Chief Executive Officer for implementing the ALM Policy and executing day-to-day operating decisions. The Fiscal Policy Committee shall act as liaison between the Board and Management.

The President/CEO delegates the responsibility to the Chief Financial Officer to administer the ALM via a financial management model program and generate the following reports and analyses and submit to the Fiscal Policy Committee for review:

1. Asset and Liability mixes
2. Asset Quality (delinquency report)
3. Capital Analysis
4. Cash Flow Statements (FASB #91)
5. Fee Income Report (financial statement)
6. Liquidity Trends (monthly)

7. Loan and Dividend Rate Reports

8. Monthly Investment Activity, Maturing and Yield Analysis

9. Spread Analysis

10. Operating Expenses Report (financial statements)

11. Operation Profitability – Return on Assets (ROA)

12. Rate Sensitivity (GAP ratios)

**4.02-1** The Fiscal Policy committee will also review current money market conditions and their possible effects on the Credit Union's spread in coming months. The Fiscal Policy Committee will report to the Board, and when warranted, recommend to the Board changes regarding the Credit Union's loans, investments, dividends, and operating-expenses controls, and pricing structures.

## 4.03 INTEREST RATE RISK CONTROL

The Fiscal Policy Committee and the management ALCO Committee will monitor the credit union's interest rate sensitivity on a regular basis. The following goals and measurements will be monitored and adhered to:

### 4.03-1 Risk-Based Net Worth Ratio

The Risk-Based Net Worth Ratio, calculated based on the NCUA's prescribed formula, **shall not exceed 80% of the credit union equity ratio**. The CFO will prepare, on a quarterly basis, the Risk-Based Net Worth Ratio analysis and submit to the Fiscal Policy and ALCO Committee for review. It is the credit union's goal to maintain its well-capitalized position.

### 4.03-2 Gap Ratio

Gap ratio analysis, which measures the matching of the Rate Sensitive Assets (RSA) and Rate Sensitive Liability (RSL), should be prepared and reviewed monthly. The 12-month gap between RSA and RSL, (includes member shares that are interest-bearing under the tier-rate structure in the first time-bucket), **shall not exceed +/- 30% of the total assets**.

### 4.03-3 Net Economic Value (NEV)

Net Economic Value (NEV) measures the effect of interest rate risk on capital. By using present value analysis of all future cash flows, NEV measures the balance sheet's value at a point in time. It equals the fair value of assets minus the fair value of liabilities. NEV analysis will be prepared, reviewed, and submitted to the Fiscal Policy and ALCO Committee.

Using a rate shock test of up to +/- 300 basis points, the computed NEV shall not decline more than 50% from the base-line NEV, and the NEV to assets ratio shall not be less than 6%.

The NEV is computed utilizing financial modeling software. The assumptions and parameters for the model are documented. Changes to the assumptions and parameters must be ratified by the ALCO Committee. The assumptions will be maintained by the Assistant Manager and the Assistant Vice President. The Fiscal Policy Committee will be informed of any changes and reasons for the changes. The Manager and the Assistant Vice President of the Finance Department are responsible for the maintenance of the software, updating the historical data and assumptions, and running the simulations. The CFO is responsible for the review of simulations and identifies any deviations from the goals set forth in this policy.

**4.03-4 Income Simulation**

Net interest income (NII) fluctuations due to interest rate movements should be minimized. The tools for measuring the risks and the goals/limits set forth in this policy should provide a reasonable safety net to minimize the effect of the interest rate risk on NII. By simulating a rate shock test of up to +/- 300 basis points, the simulated annual NII **shall not decline more than 25% from the base-line NII**. The simulation will be run at least quarterly.

The Fiscal Policy Committee will present the analyses to the Board of Directors at the Board Meeting. Any deviations/declinations from the established goals or parameters in the policy will be addressed in a timeframe consistent with the level of deviation/declination.

**4.04 LIQUIDITY MANAGEMENT**

It is the policy of the Credit Union to maintain adequate liquidity level to meet both expected and unexpected cash demands and cash outflows.

A. Consistent with the investment policy: (i) investments with maturities between one (1) and three (3) years are limited to no more than 40% of the total investment portfolio; (ii) investments with maturities of three (3) to five (5) years are limited to the lesser of $10,000,000 or 10% of the total investment portfolio; and (iii) investments with maturities of longer than five (5) years are prohibited.

**Note:** (The investment portfolio consists of short/long-term government securities, overnight deposits with banks and Empire Corporate Central Credit Union, Certificates of Deposits with banks and credit unions, Central Liquidity Facility, Utility Bonds, and the NCUA Government Securities Program.)

B. Highly liquid funds, defined in this policy as the sum of cash in banks and on hand, overnight investments, and investments with remaining maturities of less than three months, **shall not be less than 10% of the total member funds.**

C. The Credit Union shall maintain backup liquidity sources. The Credit Union will obtain credit lines up to $50 million from the Federal Reserve Discount Window and Central Liquidity Facility (up to 50% of the total **member's** funds). The credit line will be renewed and reviewed for adequate levels annually.

**4.04-1** A monthly report that compares the actual liquidity level and investment portfolio mix to the above goals and guidelines will be prepared and submitted to the Fiscal Policy and ALCO committee.

**4.04-2 Liquidity Contingency Plan**

Subject to safety and soundness considerations, and notwithstanding the preceding liquidity stipulations, in the event of liquidity crisis the following steps shall set forth the framework in mitigating any liquidity shortage that the Credit Union might face:

a. Liquidate the available-for-sale investment portfolio. This is the first source of liquidity provided that the market condition is conducive to the sale(s) and the discount (loss), if any, is lower than the cost of borrowing.

b. Liquidate the held-to-maturity investment portfolio. Same provisions as stated in paragraph (a) shall apply to this liquidity source.

c. Access the line-of-credit maintained at the Federal Reserve Discount Window.

d. Access the line-of-credit provided by Central Liquidity Facility (an NCUA affiliate).

Depending on severity level of the liquidity crisis, the above sources do not represent an exclusive list of resolutions. However, the utilization of these liquidity sources will have minimal impact on the Credit Union's members.

**4.04-3 Contingency Funding Plan**

This liquidity contingency plan ensures that the Credit Union effectively manages routine and extraordinary fluctuations in liquidity.

**A. Funding Sources**

The Credit Union's primary source of funding is member deposits, but in an event that this source is not sufficient to meet and manage day to day liquidity needs, the Credit Union will utilize the following alternative sources:

- Available for Sale securities in the Credit Union's investment portfolio
- Available for Sale mortgages in the Credit Union's mortgage portfolio
- Federal Reserve Discount Window
- NCUA Central Liquidity Facility

**B. Warning Indicators/Event Triggers**

The Credit Union has identified the following indicators and trigger points in an effort to quickly recognize growing liquidity pressures at the institution:

| Indicator | Trigger Point |
| --- | --- |
| Liquidity Ratio | May not fall below 10% |
| 12-Month Cumulative GAP Ratio | May not exceed +/- 30% |
| Loans/Assets | **80%**<br>*Note*: Oct'14 = 64.05%,<br>5 yr average = 69.33%<br>10 yr average = 72.47% |
| Long-Term Assets/Total Assets | **45%**<br>*Note*: Sept'14 = 37.17%<br>3 yr average = 32.33% |
| Total Loans to Members' Funds | **90%**<br>*Note*: Oct'14 = 69.88%,<br>5 yr average = 77.55%<br>10 yr average = 82.64% |
| Long-Term Investments/ Total Assets | **25%**<br>*Note*: Oct'14 = 8.66%,<br>5 yr average = 1.74%<br>10 yr average = 0.93% |

### C. Crisis Management Team

In the event that the liquidity indicators pass their trigger point, the CEO, the CFO, and the ALCO committee will be responsible for monitoring, analyzing, reporting, and planning a solution to a liquidity problem as described in the following levels of severity and plan of actions.

### D. Action Plan

The contingency plan is based on three different levels and actions required

1. ***Level One*** – *Two liquidity risk limits are triggered.* If this occurs, the CFO will conduct a review of the Credit Union's current and projected cash flow needs, and analyze the most efficient and cost effective alternative source for the situation at hand. The CFO will report this information to ALCO committee, who will then develop a plan to return the liquidity indicators back to an acceptable level. The CFO will communicate the plan and its ongoing results to the CEO and at the monthly Fiscal meeting.

2. ***Level Two*** – *Three or more liquidity risk limits are triggered.* If this occurs, the CFO will report the current level of liquidity and projections based on varying levels of severity and duration, and analyze all available funding sources. The CFO will immediately alert the CEO and the ALCO committee. The CFO will alert the Board of Directors immediately after the ALCO committee establishes a plan to stabilize the threat. The CFO will report to the CEO and ALCO committee on a weekly basis and to the Fiscal Committee on a monthly basis until the liquidity indicators are back to an acceptable level.

3. ***Level Three*** – *Liquidity Crisis. Confidence in funding sources is declining and the Credit Union is experiencing continued pressure in meeting its day-to-day obligations.* In addition to the requirements presented in Level Two, the CEO will immediately notify the Board of Directors. The CEO will also notify the regulator of the liquidity crisis and of the measures being taken by the Credit Union. The CFO will be responsible for compiling and monitoring all daily cash flow schedules. The CEO will meet with the Board of Directors and the ALCO Committee on a weekly basis to discuss the daily liquidity monitoring reports and the status of the action plan. At these meetings the CEO will make recommendations to the Board to revise the plan as they see fit. The daily monitoring and weekly meetings will continue until the liquidity indicators are back to an acceptable level.

**E. CFP Testing and Policy Review**

The credit union will periodically test components of its contingency plan in order to assess the plan's reliability under times of stress. As per section 4.04-1 of the liquidity management policy, actual liquidity levels will be reported to the Fiscal Committee on a monthly basis. The Credit Union will also conduct annual test borrowing transactions at the Federal Reserve Bank Discount Window and/or at the CLF in order to ensure that they function as outlined in the policy. Any issues identified will be revised as necessary.

## 4.05 INVESTMENT POLICY

The Credit Union's investment policy adheres to the matching principle in accordance with its ALM policy. Thus fixed-rate investments with weighted maturities exceeding **five (5) years** are not authorized, unless the Fiscal Policy Committee recommends them to the Board and the Board approves them.

## 4.06 LENDING POLICY (ALM)

The Credit Union's lending policy is in accordance with the ALM policy. Thus, the Credit Union's capacity to fund and retain fixed-rate mortgage as set forth below and non-mortgage loans that have original maturities exceeding seven (7) years is limited as set forth below.

Fixed Rate Mortgage loans (including Home Equity Loans) are limited to **40% of the quarterly moving average asset size** in order to reduce concentration and interest rate risks. The utilization of quarterly moving average is because of the monthly fluctuations of the total assets during the year.

The Credit Union's lending policy is in accordance with the ALM policy. Thus, the Credit Union's capacity to fund and retain fixed-rate mortgage and non-mortgage loans that have original maturities exceeding five (5) years are monitored closely.

Fixed Rate Mortgage loans (including Home Equity Loans) are limited to **40%** of the quarterly moving average asset size in order to reduce concentration and interest rate risks. The utilization of quarterly moving average is because of the monthly fluctuations of the total assets during the year.

The 40% limit calculation is inclusive of the Available-for-Sale (AFS) portfolio. The AFS portfolio is maintained for liquidity management purposes. The portfolio will be marked to market utilizing the discount cashflow method in accordance with FASB 115. The Credit Union will record unrealized loss, if any, on a monthly basis in accordance with FASB 130. Furthermore, if the Credit Union decides to sell Mortgage Loan(s) from the AFS portfolio, the loan(s) will be sold to institutions where arbitrage is not their core business.

In order to minimize credit, price and other inherent risks, the aggregate of expanded approval mortgage loans, affordable housing loans, and 40-year mortgage loans shall not exceed 10% of the total first mortgage loan portfolio.

## 4.07 ASSET/LIABILITY MANAGEMENT EXCEPTIONS AND REVIEW

Minor policy exceptions may be necessary from time to time. In such instances, the Fiscal Policy Committee will be consulted. Significant deviations for the policy statement must be avoided. The ALM Policy Statement will be reviewed by the Fiscal Policy Committee and the Board of Directors and amended as circumstances warrant.

## SECTION 5
## ACCOUNTING POLICY

### 5.01 ACCOUNTS PAYABLE

All disbursement checks require a debit voucher before a check may be cut. All expenses over $25,000 (with the exception of regularly recurring payments such as rent) must be approved by the President/Chief Executive Officer or Chief Financial Officer.

All expenses under $25,000 are approved by the Assistant Vice President of the Accounting/Finance Department. Checks must be made payable to a company or an individual. No check is made out to cash (except in the case of replenishing petty cash funds). The authority of approving payments under $25,000 may be delegated to the Assistant Manager or other qualified individual as determined by the Chief Financial Officer.

### 5.02 PREPAID EXPENSE & DEFERRED CHARGES

Prepaid expenses consist of various operational expenditures for goods and services that are not expensed entirely in the month they are purchased, but over the estimated useful life of the goods and services. The amount to be capitalized is determined by the Chief Financial Officer and outlined in the procedure manual.

### 5.03 DIVIDEND RATES DETERMINATION

It is the policy of Municipal Credit Union that it offers members attractive dividend rates that are competitive. Competitive dividend rates are reviewed regularly to determine that the Credit Union is offering competitive rates and are consistent with the ALM policy and parameters. Certificate and Money Market Account rates are reviewed biweekly; IRA rates are reviewed monthly. Rates may be reviewed more frequently if market conditions warrant the review. The Chief Financial Officer determines the dividend rates to be offered for Certificate of Deposits, IRAs and Money Market Accounts. Dividend rate changes for regular shares are recommended by the CEO and CFO and must be approved by the Board.

### 5.04 FIXED ASSET ACCOUNTING

Acquisitions of tangible fixed assets will be recorded at costs and depreciated over the estimated useful life in accordance with General Accepted Accounting Principles (GAAP). The costs of acquisition is the net purchase price of the asset plus all incidental costs necessary to put the asset in condition for use, such as freight, installation cost and sales tax.

If property is acquired without cost, the fair market value will be used as the cost. The amount of acquisition cost that is qualified to be capitalized and amortized or depreciated

over the useful life shall be determined by the CFO and is outlined in the procedure manual.

## 5.05 ABANDONED PROPERTY/UNCLAIMED ACCOUNTS PAYABLE CHECKS

The laws of the State of New York require Municipal Credit Union to periodically submit a list of abandoned property with appropriate remittance for all items that have been held by the Credit Union with no activity for five (5) years.

Accounts payable checks outstanding six (6) months or more are to be re-classified as unclaimed items. These checks remain in the Credit Union for five (5) years. If the items are not claimed at the beginning of the sixth year, the funds are sent to the New York State Comptroller Office of Unclaimed Funds.

## 5.06 NET INCOME

The net income or losses for the current accounting period represent the difference between all income and expense items, including dividends.

**Reserves and Undivided Earnings**

The Credit Union was required by Section 458 of the New York State Banking Law to maintain a statutory reserve (formerly designated as "Surplus") as defined. Such Reserve was substantially restricted and was not available for the payment of dividends. In 2004, the New York State Banking Law, Section 458-a, eliminated the need to transfer 10% of the Credit Union's gross income to this account. Effective October 1, 2004, the Credit Union discontinued such transfer and renamed the account from "Surplus" to "Reserves." However, the balance in the Reserves Account can neither be used to pay dividends nor can funds be transferred out of the Reserve Account without the approval of the New York State Banking Department.

## 5.07 SURPLUS

A surplus account is established and maintained as required by New York State Banking Law. This account is held to meet contingencies until such time as the Credit Union is dissolved. At which time the balance is distributed among the shareholders.

## 5.08 UNDIVIDED EARNINGS

An Undivided Earnings Account is established and maintained as required by the New York State Banking Law and is primarily used to pay dividends. No dividend shall be paid from this account unless Municipal Credit Union has:

1. Made good on any impairment of the capital base.

2. Transferred to the surplus account the amount required by law.

The undivided earnings account is regulated as follows:

1. Dividends are paid from undivided earnings.

2. The valuation allowance for a material decline in the value of long-term utility bond is charged directly to undivided earnings.

## 5.09 DIVIDENDS PAYABLE

Dividends are calculated based on the average daily balance method. If a dividend is declared in excess of the amount available for dividends, the party voting such a dividend may be held jointly and liable to the Credit Union for the excess declared.

**5.09-1** Dividends are declared monthly and quarterly by the Board of Directors. Upon declaration of a dividend, the actual amount payable is recorded as a liability unless the dividend is paid or credited to the depository accounts in the month of the dividend period. The offsetting charge is to dividend expense. Following are the frequencies of crediting dividends to various depository accounts.

| Type of Depository Accounts | Dividends are credited |
|---|---|
| Share | end of quarter |
| Money Market | end of month |
| Holiday and Vacation Club | end of month |
| Fixed Rate IRA | monthly from the opening date (Anniversary) |
| Variable Rate IRA | end of month |
| Certificate of Deposits | monthly from the opening date (Anniversary) |
| Youth Involvement | end of quarter |

The Accounting Department estimates dividend expense on a monthly basis based on outstanding balances. This estimate is recorded in the General Ledger for reporting purposes. The estimated dividend expense is adjusted to actual expense when dividends are paid.

## 5.10 BUDGETING

Accounting prepares an annual Credit Union budget by month and a departmental budget by month for use during the upcoming year. The budget is an attempt to quantify the

operations of the Credit Union for the period it will cover. One of the requirements of the budgetary process is that the accounting system provides timely and accurate financial information throughout the year.

## 5.11 INSURANCE

The Executive Department is responsible for providing insurance coverage for the Credit Union. Adequate bond coverage, fire, theft and other forms of insurance must be maintained. The Credit Union maintains the insurance under an all risk policy. An annual review of the Credit Union's insurance by the VP of Strategic Development and Chief Financial Officer is conducted to avoid uninsured losses to the Credit Union.

The Credit Union maintains a discovery bond, which indemnifies the Credit Union from the following losses subject to terms and limitations of the bonds:

1. Direct loss of, or damage to, property
2. Loss due to forgery ($5,000 deductible)
3. Loss due to robbery
4. Loss due to counterfeit money
5. Loss due to noncompliance with Truth-in-Lending Act

## 5.12 INSURANCE MANUAL

An insurance manual is maintained reflecting all insurance in force at any given time. This book is updated and changed as necessary and maintained by the VP of Strategic Development. The following information is recorded in this manual:

1. Name of insurance company
2. Type of insurance
3. Policy number
4. Place, item or persons covered
5. Amount of coverage
6. Covering periods
7. Premium amount

The insurance account is adjusted at the end of the year for the unused portion of premium and recorded as a prepaid asset.

## 5.13 FINANCIAL REPORTS

Municipal Credit Union has both internal and external reporting responsibilities. All financial reports prepared for use must be reviewed by the Chief Financial Officer. Generally, all of these reports are prepared in the Accounting Department. The financial reports are as follows:

| Name of Report | Frequency |
|---|---|
| MCU Annual Report | Annually |
| Budgets | Annually |
| Form 5500 Pension Plan | Annually |
| Form 5500 Life Plan | Annually |
| Form 5500 Health Plan | Annually |
| NCUA Form 5300 | Quarterly |
| Estimated Report to Declare Dividends | Monthly & Quarterly |
| Commercial Rent & Occupancy Tax Report | Quarterly |
| CUNA Premium Report – CU and Member Pay | Monthly |
| PFP | Monthly |
| Investment Reports | Monthly |
| FR2900 | Weekly |
| Cash Reports | Daily |

* **For other significant accounting related issues, refer to the Accounting Procedure Manual.**

## SECTION 6
## INSTALLMENT LENDING

### 6.01 POLICY STATEMENT

Municipal Credit Union is a state chartered, federally insured financial institution operating in a manner consistent with the Credit Union Movement's philosophy of "not for profit, not for charity, but for service". Municipal Credit Union seeks to lend to qualified members. Loans are made in a non-discriminatory manner at rates which are usually below market levels.

The Lending Policy must protect the funds on deposit. It must attempt to generate sufficient interest income to pay a dividend, cover operating expenses, and maintain an adequate reserve. Lending policies are established by the Board of Directors who must approve all changes to them. The President/CEO has been authorized by the Board of Directors to establish and approve lending authority for all lending personnel.

Lending policies cannot be overridden (except by the Senior Vice President/Chief Credit Officer, Vice President, Assistant Vice President of Credit Operations or the Vice President/Real Property as designated to them by the President/Chief Executive Officer and/or Board of Directors). Guidelines are designed as tools for lending officers but are flexible to allow for unique situations and conditions.

### 6.02 ELIGIBILITY

**6.02-1** Membership:

Loan applications will only be accepted and processed from members in good standing as defined by Municipal Credit Union's Bylaws.

**6.02-2 Share Balance:**

Members approved for a note loan (including VISA and Real Estate) must have a minimum balance of $5.00 in any of the MCU deposit accounts (under the same root account number) at the time of the loan closing and disbursement. At disbursement, loan proceeds can be allocated and deposited to satisfy the $5 balance requirement.

**6.02-3 Losses:**

Municipal Credit Union will not accept an application or grant credit to a member who has caused a loss to Municipal Credit Union.

### 6.03 EQUAL OPPORTUNITY

Municipal Credit Union is an equal opportunity lender. Municipal Credit Union will not discriminate against credit applications on the basis of race, color, religion, national origin,

disability, sex, marital status, military status, age (providing the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program, his/her sexual preference/orientation, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

## 6.04 LENDING AUTHORITY AND GUIDELINES

Individual loan officer(s) will be assigned specific dollar credit limits with a minimum of $500 and a maximum of $40,000 assigned to the most experience loan officer. Credit requests in excess of a loan officer's authorized limit must be approved by the Vice President of Credit Operations, Assistant Vice President of Credit Operations, or the Manager of the Loan Operations Department.

The Vice President/Credit Operations will determine the limits assigned to each loan officer with the approval of the Senior Vice President/Chief Credit Officer and the President/CEO.

Unsecured loans in excess of an amount to be approved by the CEO but less than $75,000 require the secondary approval of either the Chief Credit Officer, Vice President, Assistant Vice President, Manager or the Assistant Manager of Loan Operations. In addition, if the aggregate unsecured indebtedness would be in excess of an amount to be approved by the CEO, then the loan would also require the approval of the CEO or CCO.

### 6.04-1 Income Verification

Signature & Overdraft Line of Credit:

A current pay stub (within 14 days) of the date the loan is being funded. Income can be waived if the member(s) meets the following criteria:

1. Credit scores Tier A+, A, or B loan officer will waive proof of income.
2. Member must have account > 5 years and have ACH Direct deposit or Payroll deduction.

If account has not been waived by loan officer, verification clerk will notify loan officer for waiver.

Vehicle loan:

A current pay stub (within 14 days) of the date the loan is being funded. For Indirect loans, the current pay stub needs to be within 14 days of the signed contract. Income can be waived if the member(s) meets the following criteria:

1. Current member:
    a. Credit auto score 680+ with a previous MCU loan

2. New member:
   a. Credit auto score 730+

If account has not been waived by loan officer, verification clerk will notify loan officer for waiver.

Visa:

All Visa applications will automatically pull the Trans Union credit bureau. The credit bureau includes an income score which is calculates the applicants estimated income.

Exceptions must be documented and approved by a manager or senior official.

(2) The aggregate unsecured indebtedness is limited to a cap of $75,000. However, any aggregate unsecured indebtedness in excess of $45,000 will also require the approval of either the CEO or CCO. The qualification for unsecured debt is subject to the underwriting guidelines and eligibility requirements established in accordance with the Installment Lending Policy.

(3) New York City and/or State pensions are accepted as bona-fide sources of income on all MCU credit requests.

## 6.05 CO-MAKERS

Co-makers, when requested, must be a member of MCU.

A member may have any number of credit accounts for which he/she qualifies. The total unsecured debt on which he/she is obligated to MCU may not exceed $75,000, including VISA. However, any aggregate unsecured indebtedness in excess of $45,000 will also require the approval of either the CEO or CCO.

## 6.06 EMPLOYEE LOANS

**Members of the Official Family are defined as:**

- Employees
- Board of Directors
- Supervisory Committee
- Nominating Committee
- Immediate Family Members of the above

Loans to members of the Official Family must meet all eligibility requirements established by these policies and guidelines. Board of Director approval is required for unsecured credit in excess of $20,000 (or aggregate unsecured loans in excess of $20,000 made to an official family member). The approval of the Board must be a majority vote. Board approval is not required for secured installment loans to members of Official Family. However, the Board of Directors may request a report of these loans.

### 6.06-1 Employee Share Secured Loans (LVS)

MCU will grant LVS loans to its employees under the following conditions:

Employee LVS loans – Branch Manager, Assistant Manager or Branch Operation Officer are authorized to approve employee LVS loans.

### 6.06-2 Employee Unsecured and Auto Loans

Requirements:

Employees may not be on probation or have a current disciplinary warning in their personnel file.

**6.06-3 Line of Credit**:

Open-end credit lines (e.g. VISA) to members of the official family may be expanded as part of systematic expansion of credit lines providing that the account meets the minimum performance standards for such expansion. The Board of Directors may request a report of the expanded insider loans.

**6.06-4 Special Rate for Employee Loans**:

The policy allows the Municipal Credit Union to offer a ½% rate of interest reduction on unsecured loans, a ¼% interest reduction on auto loans and 1/8% one-time interest rate reduction on mortgage loans to its employees. Interest rate reductions for employees cannot be combined (further reduced) with promotional rates where the employee qualifies for an offered promotional rate.

** Vice Presidents and above, Supervisory Committee Members, and the Board of Directors are not eligible for the special rates.

**6.07 <u>NOTE LOANS</u> (Unsecured Installment Loans)**

Municipal Credit Union Note Loans are available to all members who are over the age of 18 and are members in good standing.

**6.07-1 Maximum Amount and Terms**:

| **Amount** | **Up to terms of** |
|---|---|
| $1,000 – $2,499 | 30 months |
| $2,500 – $4,999 | 48 months |
| $5,000 – $9,999 | 60 months |
| $10,000 – $24,999 | 72 months |
| $25,000 – $75,000 | 84 months |

**6.07-2** Members can repay loans early without payment penalties.

**6.07-3 Home Improvement Loans**

**Maximum Amount and Terms**:

| **Amount** | **Up to terms of** |
|---|---|
| $1,000 – $2,499 | 30 months |
| $2,500 – $4,999 | 48 months |
| $5,000 – $9,999 | 60 months |

| | |
|---|---|
| $10,000 – $24,999 | 72 months |
| $25,000 – $75,000 | 84 months |

Joint Credit Life Insurance is available up to $50,000 maximum. Premiums are added to the loan balance monthly.

**Joint** Credit Disability Insurance is **available up** to $30,000 maximum.

### 6.08 REFINANCES

Refinancing is available for proceeds in excess of $1,000 after six (6) months on the books. The loan must be in a current status.

### 6.09 OVERDRAFT CREDIT LINE

MCU offers an overdraft credit line to qualified applicants from a minimum overdraft line of $250 to a maximum of $2,000. A member in good standing will automatically qualify for a $250 overdraft line of credit in connection with a new or existing share draft account when direct deposit is authorized regardless of the amount. MCU will not grant credit to a member who is in default or caused a loss to the Credit Union.

### 6.10 STEP LINE OF CREDIT

The Step Line of Credit is a Credit Union salary advance alternative. This loan is designed to help members whose credit histories preclude them from qualifying for loans under Municipal Credit Union lending criteria. The program features include the following:

**Program Features**

1. Available to applicant only (Joint applicant does not apply)
2. Applicant must be at least 18 years old
3. Applicant must be an MCU member for at least 180 days
4. Applicant must be in Good Standing at the time of loan application and/or at the time of each advance
5. Applicant cannot be delinquent on an existing MCU loan, have a negative fund balance in an MCU account, or have caused a loss to the Credit Union
6. Applicant must provide verifiable income (current paystub dated within two(2) weeks from application date)
7. Step Line of Credit can only be opened at branch locations using Step Line Signature Card sym forms
8. The sym forms will be stored in Synergy and supporting documentation will be stored in SharePoint
9. Derogatory credit with other lenders will not be a basis for loan disqualification
10. Loan deferments/amendments, modifications, extensions or forbearance will not be granted on these loans
11. Bi-weekly installment loan payment cannot exceed 15% of the net monthly income
12. Applicant must have a minimum gross income of $1,500 per month

MCU
MUNICIPAL CREDIT UNION



13. Applicant must provide full information on two references when applying for a Step Line of Credit
14. Approval will not be based on credit history or credit score. A credit report will be pulled on each applicant to determine ability to repay
    a. Maximum debt ratio 55% with housing expenses
    b. Maximum debt ratio 45% without housing expenses
15. Applicant must not be in the process of filing for bankruptcy under any chapter of the bankruptcy code
16. Step Line of Credit is not eligible for credit life or disability insurance coverage.

**Loan Limits**

1. Applicant is only eligible for $250.00 if Direct Deposit or Payroll does not exist or coupon is chosen as the repayment method
2. Applicant is only eligible for $250.00 if he/she has an active loan with MCU. Loan is considered active if balance >$5.00. Excludes L 26 and L 27
3. Applicant is eligible for $500.00 if active Payroll or Direct Deposit exists and covers monthly payment
4. Applicant is eligible for $750.00 if active Payroll or Direct Deposit exists and covers monthly payment

**Derogatory Status**

1. Member cannot reapply if Denial Date < 90 days
2. The account will be closed if Delinquent Days > 60
3. If Step Line is closed due to derogatory status, member will not be permitted to apply for another Step Line

## 6.11 NEW VEHICLE LOANS

Municipal Credit Union New Vehicle Loans are available to all members who are over the age of 18 and are members in good standing. A new vehicle includes new automobiles, motorcycles and vans within two (2) model years of the current year.

The Annual Percentage Rate is the same for new vehicle loans for the current vehicle year and one (1) year prior with mileage of no more than 15,000 miles per year. Proof of comprehensive insurance coverage (fire/theft/collision) with MCU designated as Loss Payee and proof of liability insurance must be presented at the time of the loan payout.

MCU must be listed as the first lien holder on the vehicle's title.

- Joint Credit Life Insurance is available up to $30,000 maximum offered to the primary borrower and co-borrower. Premiums are added to the loan balance monthly.
- **Joint** Credit Disability Insurance is available with a maximum monthly payment coverage of $500.

**6.11-1** Maximum Amount and Terms:

| **Amount** | **Up to Terms** |
|---|---|
| $2,500 and above | 84 months |

* The interest rate for a loan with a term in excess of 60 months may be up to 2% higher.

## 6.12 USED VEHICLE LOANS

Municipal Credit Union offers loans to its members that will enable them to purchase used vehicles. Used Vehicle Loans can be used for the purchase of automobiles, vans, trucks and motorcycles.

Loss Payee and proof of Liability Insurance must be presented at time of loan payout. MCU must be listed as first lien-holder on the vehicle's title. The minimum loan amount is $2,500.

Joint Credit Life Insurance is available up to $30,000 maximum. Premiums are added to the loan balance monthly.

**Joint** Credit Disability Insurance is available with a maximum payment coverage of $500.

MCU
MUNICIPAL CREDIT UNION



**6.12-1 Maximum Amount and Terms**:

| Amount | Up to Terms |
|---|---|
| $2,500 – 4,999 | 48 months |
| $5,000 – 9,999 | 60 months |
| $10,000 – 24,999 | 72 months |
| $25,000 and above | 84 months |
| $2,500 – 4,999 | 48 months |

* The interest rate for a loan with a term in excess of 60 months will be up to 2% higher.

## 6.13 MCU AUTO-NET LOANS

The MCU AutoNet consists of a network of local area dealerships providing Credit Union members with a convenient point-of-purchase service for new and used automobiles. Dealers agreeing to participate in the program are not under a contractual obligation to provide specific discounts on vehicles financed by the Credit Union.

The Credit Union pays a referral fee or "dealer reserve" in exchange for completing the required documentation and loan applications forwarded to MCU for financing. MCU AutoNet dealers are reputable New York/New Jersey metropolitan area licensed dealers and are not affiliates or subsidiaries of Municipal Credit Union. It shall be the policy of MCU to only enter into point-of-purchase AutoNet program with dealers that offer credit options to MCU members in compliance with the Equal Credit Opportunity Act and Regulation B of the Federal Reserve Board. Municipal Credit Union reserves the right to refuse financing any vehicle with or without cause. Participating dealers may be terminated from the point-of-purchase program at the sole discretion of the Credit Union. Each purchase contract is reviewed to insure the member has received a competitive price including the purchase price of the vehicle in addition to extended warranty and anti-theft device. The participating dealers are not authorized to underwrite and make loan decisions.

| Amount | Up to Terms |
|---|---|
| $8,000 and above | 84 months |

**6.13-1 Quality Control and Assurance**

In order to ensure the existence of a sound internal control and avert risks associated with indirect lending, the following due diligence steps are included in the program procedures:

1. Random loan confirmations are mailed to dealers and members verifying the vehicle purchases financed by the Credit Union.

2. The Credit Union will periodically engage an independent third party to conduct mystery shopping of participating dealers.

3. The Credit Union independently perfects and audits all vehicle liens held as collateral within 45 days after funding.

4. Vehicles repossessed as a result of payment default will not be sold back to the same dealer who originated the sale.

5. The Credit Union will periodically solicit independent evaluation reports of the dealers, such as the Department of Consumer Affairs, Better Business Bureau, and their Statements of Financial Condition, if available.

## 6.14 FINANCE IN ADVANCE

For the convenience of the membership, Municipal Credit Union will approve new or used vehicle financing in advance for members who are over the age of 18, in good standing, and qualify for a Vehicle Loan.

"Finance in Advance Loan" shall expire sixty (60) days from the date of commitment.

## 6.15 BOAT LOANS

Members may apply for financing for the purchase of new and used boats.

Municipal Credit Union will finance a minimum of $5,000 and a maximum of 95% of the average retail value of the vessel. The maximum term is 12 years (if greater than $50,000). Requests for terms exceeding 12 years may be financed as a Real Estate loan and must meet all existing requirements for consideration.

The member must provide MCU with the following documents associated with a boat purchase:

1. Survey or appraisal

2. Proof of comprehensive insurance, naming MCU as loss payee

3. Proof of Coast Guard documentation, if applicable

4. Copy of Sales Agreement

5. UCC1 Filing in county of residence, as well as county where vessel is moored

6. UCC1 Filing in state of residence

7. Engine serial numbers must be documented along with hull number on all security instruments.

8. Ship mortgage (as required)

Joint Credit Life Insurance is available up to $30,000 maximum offered to the primary borrower and co-borrower. Premiums are added to the loan balance monthly.

**Joint** Credit Disability Insurance is available with maximum monthly payment coverage of $500.

## 6.16 LOAN VS. SHARES (Share and Certificate of Deposit Secured Loans)

Members may pledge up to 100% of their eligible savings held on deposit at Municipal Credit Union. Eligible savings include available shares in a share account or certificate of deposit. The minimum amount that can be financed is $500. Funds are available for withdrawal if those funds are not pledged as collateral against a share secured loan. Funds held in a certificate of deposit are not available for withdrawal until such time that the certificate has matured and the loans has been satisfied.

Joint Credit Life Insurance is available up to $30,000 maximum offered to the primary borrower and co-borrower. Premiums are added to the loan balance monthly. **Joint** Credit Disability Insurance is available with a maximum monthly payment coverage of $500.

If the payment on a share secured loan is late, MCU may automatically transfer the loan payment from the member's share account only if there are sufficient share funds available in excess of the total shares pledged. If the payment is late for three (3) consecutive months, MCU will accelerate the loan and transfer the full amount of the loan balance from the member's secured shares to satisfy the outstanding balance.

Branch Officers and Loan Administrators at the branches are authorized to approve Share Secured Loans.

**6.16-1** Minimum Amount and Terms:

| **Amount** | **Up to Terms** |
|---|---|
| $500 | * 120 months |

* Terms in excess of five (5) years require the approval of the Vice President, Assistant Vice President, or the Manager of Loan Operations.

## 6.17 DEBT CONSOLIDATION AND HOME IMPROVEMENT

Debt Consolidation and Home Improvement Loans are available to members subject to the following limits:

| Type | Maximum Amount |
|---|---|
| Debt Consolidation | *$15,000 |

MCU
MUNICIPAL CREDIT UNION



| | |
|---|---|
| Home Improvement | **$15,000 |

* Loan approvals exceeding **$20,000** but less than $75,000 require the secondary approval of either the Chief Credit Officer, the Vice President, Assistant Vice President, Manager or Assistant Manager of Loan Operations. In addition, if the aggregate unsecured indebtedness would be in excess of $45,000, then the loan would also require the approval of the CEO or CCO.

** Home Improvement Loans exceeding $15,000 may require a UCC-1 filing in the county where the property is located.

## 6.18 LATE PAYMENT FEE

A late payment fee of up to $25 will be charged to unsecured and secured installment loans, if the loan balance is greater than or equal to $250 and thirty (30) or more days delinquent. The late payment fees are deducted from the payments collected with each payment posted.

## 6.19 BANKRUPTCY PROGRAM

The Credit Union offers a Bankruptcy Program, which encourages members who have filed for bankruptcy to reaffirm the debt they have with MCU. See Collection Policy for more details.

## 6.20 LOAN RATES

Loan rates not to exceed 18% are recommended to the Chief Executive Officer by the Asset Liability Management Committee or Chief Financial Officer. The Chief Executive Officer shall have the authority to adjust loan rates as warranted by business conditions. The Board will be notified of the changes.

## 6.21 EXTENSION AGREEMENTS

A completed application and applicant's existing loan file must be reviewed by a Loan Officer, Assistant Manager or Manager and forwarded to the Vice President of Credit Operations for approval. Extension agreements will only be granted to loans that are in current status.

The Extension Agreement's only purpose is to assist the member through a difficult financial period. Extension agreements are not to be used when it has been determined that the loan obligation is in jeopardy of not being collected and/or the loan may be uncollectible in the future.

## 6.22 CREDIT DENIAL

Written notification of a credit denial must be mailed to the member at his residential address within 30 days after receipt of the completed application. This must be done even if the member was previously notified of the denial in person or by phone.

MCU
MUNICIPAL CREDIT UNION



## 6.23 CREDIT DENIAL APPEALS

A member who has had a loan application denied may appeal the decision through the appellate process. All appeals must be in writing. If a counter-offer is made, the member has 30 days to respond. If no response is received, the counter offer is void and the denial stands.

## 6.24 CREDIT REPORTS

Credit reports will be obtained through Municipal Credit Union's subscription as a member of Experian, Equifax and Trans Union Credit Bureaus. The basic criteria for obtaining credit information from these credit bureaus are the member's residential address, name and social security number.

Credit reports must be obtained on all members applying for loans, except LVS loans and CD Secured Loans, with Municipal Credit Union. New reports must be pulled every time a member applies for a loan, unless it has been less than one month since the last application.

## 6.25 RISK BASED CREDIT PROGRAM

The Credit Union employs a risk based credit program that determines the interest rates based upon empirically derived credit score results analyzing the repayment histories of large numbers of our members. The program is designed to ensure competitive interest rates for applicants demonstrating little or no risk while assisting members with past credit difficulties or no credit history. The credit score and LTV are used to determine the risk level associated with each applicant approved as follows.

| Credit Score Range | Rate Base Ratio, Rate Add-on or Discount |
|---|---|
| 740 and above | Determined by |
| 710 - 739 | Management |
| 670 - 709 | |
| 620 -669 | and |
| 581 - 619 | Market Conditions |
| 580 and below | |

**Note: * Rate spread will not exceed the maximum interest rate allowed by New York State Banking Regulations.**

### 6.26 COLLATERAL RELEASE (OTHER THAN LOAN PAYOFFS)

Loan Officers, the Assistant Manager, or the Assistant Vice President of Loan Operations can recommend releases within the limits of their credit authority based on the remaining unsecured balance after the release of collateral. Final approval and/or exception require the authorization of the Vice President of Credit Operations. These exceptions should include review of situations in which the Credit Union might incur a greater loss if a release is not granted.

It is necessary to process the release of collateral on an unpaid loan in the same manner as processing a new loan application.

### 6.27 TITLE TRANSFER

There are three (3) primary situations in which Municipal Credit Union must apply for vehicle title:

1. The Credit Union finances a vehicle that was purchased from another private party.

2. A free and clear vehicle title is offered as collateral on a loan.

3. The Credit Union finances a vehicle, paying off another financial institution. The Credit Union pays the filing fee as well as any other applicable fee.

### 6.28 AUTO DEALER FILING

When a member purchases a vehicle from an auto dealer, the dealer must file for the new title showing Municipal Credit Union as lien holder. The loan proceed check must have the

restrictive endorsement stamped on the back. Filing fees are paid by Municipal Credit Union and collected by the dealer.

## 6.29 UCC1 FILING

Municipal Credit Union must file a Uniform Commercial Code Financing Statement when untitled collateral is financed for a member.

**Note:** If a vessel is 1987 or newer or over 14' long but under documented vessel size (26' or 5 net tons), title is issued by Department of Motor Vehicles – (MV -900, @ $5.00) can file DMV lien in favor of MCU. Older than 1987 or under 14' transferable registration is issued and no lien through DMV can be filed.

Recording of the UCC1 Form is done both with the Secretary of State, the County Recorder from the county of residence of the purchaser and the county in which the boat is moored. The member must pay all documentation fees.

## 6.30 SERVICE MEMBERS CIVIL RELIEF ACT OF 2004

Service members must notify the Municipal Credit Union in writing of their intent to invoke the 6% interest cap. Notification must include proof of mobilization/activation to active-duty status, as well as documentation of reduced income, such as a leave and earnings statement.

Service members are required to notify the Municipal Credit Union after their active duty service has ended. The interest rates held prior to deployment will be reinstated.

Guaranteed Student Loans are exempt from the SCRA.

## 6.31 VISA/GENERAL POLICY

The Municipal Credit Union VISA Classic has a minimum credit line of **$300** and a maximum credit line of **$5,000**. A minimum credit line of **$1,000** to a maximum of **$10,000** is available for Visa Gold. A minimum credit line of **$2,000** to a maximum of **$25,000** is available for Visa Platinum.

**6.31-1** A The qualifications for a VISA card are:

- Minimum credit score of **550** for Visa Classic
- Minimum credit score of 650 for Visa Gold
- Minimum credit score of 700 for Visa Platinum
- No credit obligation that is 60 days or more in arrears in the past year
- All public records must be satisfied

- Bankruptcy (outside of MCU) – satisfactory credit must be reestablished for a period of not less than 3 years

- Verification of stable residency to include a history of not less than 3 years.

**Note:** Exceptions to the above can be made by the Vice President, Assistant Vice President or Manager of the Loan Operations, but justifications must be documented.

The credit lines are determined by credit score and debt-to-income ratio. Based on all risk factors, including the above, the credit lines can be reduced to 70% of the qualified credit lines.

6.31-1B **MCU Student Visa Card**

The Credit Union offers a Student Visa Card program to provide financial services to young members at the age group indicated in parameter #2 below. In general, this program requires parental sponsorship, except in the event where parameter #4 below is applicable.

1. Classic Credit Card
2. Applicants 18 to 24 years of age
   a) At age 25, applicants will be transferred to a regular card.
3. High School or College student
4. No Cosigner required if applicant qualifies to make the minimum payment on their own
5. No annual fee
6. No balance transfer fee
7. Maximum cash advance not to exceed 20% of credit limit
8. $500 minimum line
9. $3,000 maximum line

**6.31-2** The VISA program offers:

- The rates for the VISA programs including Classic, Gold, and Platinum are derived from the Wall Street Journal Prime Rate plus a margin. Management is authorized to adjust the VISA credit card interest rates based on the economic environment and prevailing market conditions.

- The finance charge is based on the average daily balance.

- 25-day grace period on all purchases. There is no grace period on cash advances.
- The minimum finance charge is $1.00.
- No annual fee.

**6.31-3** Cash Advance Transaction Fee is charged each time a cash advance is obtained. The transaction fee will be 3% of the amount advanced but not less than **$2.00** or more than $30.00. VISA cash advances are limited to 25% of the credit line.

**6.31-4** A **$20.00** Returned Item Fee will be charged whether a payment is returned for insufficient funds or any other reason.

**6.31-5** A $10 Pay-by-Phone service fee will be charged for each payment.

**6.31-6** VISA USA is charging a foreign exchange fee of 1% of the VISA purchase amount to VISA cardholders.

## 6.32 VISA/GENERAL RULES

At any time, and without penalty, a member may repay all or part of the amount owed. However, the minimum payment must be sent each month. The minimum payment will be the total of the greater of: a) 1/60 of the outstanding principal cash advances, purchases and credit card fees, or, b) the greater of $20 (minimum payment) or the payment due; unless the outstanding balance is less than $20.

When a Visa account becomes 31 days delinquent for the first time, the Visa credit line will be reduced to the outstanding balance or $3,000, whichever is greater. When a Visa account's credit score declines at greater 50 points within a three (3) month period (quarterly), the Visa credit line will be reduced to the outstanding balance or $3,000, whichever is greater. Members with credit scores greater than 680 will be excluded from the credit line change evaluation.

Municipal Credit Union imposes a late payment fee of up to $30.00 on a delinquent VISA account. However, the late payment fee cannot exceed the minimum payment amount due.

**6.32-1** Additional VISA Card

VISA accounts are restricted to only one card per member. Members with multiple accounts will have their balances and credit limits combined on their most active card carrying over the lowest rate.

Both the primary and additional cardholder must complete and sign an additional Cardholder Request/Acknowledgment form. The additional cardholder also signs an Additional VISA Cardholder notice.

### 6.32-2 VISA/Overdraft Line of Credit Account Closure

A VISA and/or Overdraft Line of Credit account may be closed by the Credit Union for various reasons including, but not limited to:

1. Member Request
2. 60 Day delinquency
3. MCU is served with a restraining notice
4. Accountholder files a petition in bankruptcy
5. Unsecured debts exceed the legal limit
6. Member is deceased
7. Judgments are recovered against the cardholder
8. Present delinquency with other creditors
9. Member is no longer in good standing with MCU

## 6.33 VISA CREDIT LINE INCREASE

A member must have a VISA account with Municipal Credit Union for a minimum of one (1) year before a credit line increase will be considered. Telephone requests for line increases can be granted up to $2,000. Requests for increases in excess of $2,000 must be in writing.

## 6.34 VISA CREDIT CARD RENEWAL

Credit cards expire up to three (3) years at the end of the month specified in the expiration date. Credit cards are automatically renewed if the account has been handled in a responsible manner and meet certain reissue criteria.

## 6.35 SECURED VISA CARD

Secured VISA Card must be secured by an 18-month deposit and is renewable after 18 months. Secured VISA Card holder may be eligible for a classic card after evaluation of his/her credit worthiness.

**SECTION 7**
**MORTGAGE LENDING**

## 7.01 TYPE OF MORTGAGE LOANS OFFERED

It is the policy of Municipal Credit Union to offer a wide variety of quality mortgage loans to its members to enable them to purchase or refinance a home. However, there are limitations set forth in subsection 4.06 of the Asset/Liability Management Policy. These limitations must be adhered to in order to mitigate or minimize the inherent risks.

The types of mortgage loans offered are:

### 7.01-1 First Mortgage, Fixed Rate

**Single family and Owner Occupied multi-family homes up to four (4) units**

| | |
|---|---|
| Terms | 10, 15, 20, 25, 30, and 40 years |
| Points | 0 to 3 points including lock-in option. Different interest rates apply to different points |
| Minimum Amount | $25,000 |
| Maximum Amount | Conform to Fannie Mae guidelines |
| Maximum LTV | 100% |
| Fee | The applicant is responsible for all closing costs and an application fee. The Credit Union may waive certain fees at its discretion for promotional purposes. |

### 7.01-2 First Mortgage, Adjustable Rate

**One (1), three (3), five (5), and seven (7) year adjustable**

| | |
|---|---|
| Term | 30 years |
| Points | Up to 2 points |
| Minimum Amount | $25,000 |
| Maximum Amount | Conform to Fannie Mae guidelines |
| Annual Cap | 2% |
| Lifetime Cap | 6% |
| Margin | See current rate sheet |
| Fees | The applicant is responsible for all closing costs and all application fees. The Credit Union may waive |

| | |
|---|---|
| | certain fees at its discretion for promotional purposes. |
| Maximum LTV | 100% |

**7.01-3 Homeowner's Equity Loan, Fixed Rate**

| | |
|---|---|
| Term | 5, 10, 15, and 20 years |
| Minimum Amount | $10,000 (lower amount may be considered) |
| Maximum Amount | $500,000 |
| Fees | The applicant is responsible for all closing costs and all application fees. The Credit Union may waive certain fees at its discretion for promotional purposes. |
| Maximum LTV | Up to 90% if first mortgages is with MCU<br>Up to 85% if first mortgage is not with MCU |

**7.01-4 Line-of-Credit Home Equity Loans, Adjustable Rate**

| | |
|---|---|
| Terms | 10-year draw and 20-year repayment |
| Minimum Amount | $10,000 (lower amount may be considered) |
| Maximum Amount | $500,000 |
| Fees | The applicant is responsible for all closing costs and all application fees. The Credit Union may waive certain fees at its discretion for promotional purposes. |
| Maximum LTV | Up to 90% if first mortgage is with MCU<br>Up to 85% if first mortgage is not with MCU |
| Rate | Adjust monthly based on Prime Rate |

**7.01-4a** The following risk based levels are applied to the Line of Credit Home Equity Loans:

| TIER LEVEL | RISK CATEGORY | CREDIT SCORE | RATE RANGE SPREAD | FIRST MORTGAGE STATUS | MAX FINANCED | MAX LTV |
|---|---|---|---|---|---|---|
| 1 | LOW | 700 | PRIME | Mortgage w/outside Lender | $500,000 | 85% |
| 2 | LOW | 700 | PRIME | Mortgage w/MCU | $500,000 | 90% |
| 3 | MINIMUM | 640-699 | PRIME + .25% | MCU or Outside Lender | $450,000 | 85% |
| 4 | MODERATE | 639-620 | PRIME + 1% | MCU or Outside Lender | $350,000 | 85% |
| 5 | MODERATE TO HIGH | 619-600 | PRIME+ 1.5% | MCU or Outside Lender | $300,000 | 80% |
| 6 | HIGH | 580-600 | PRIME + 3% | MCU or Outside Lender | $250,000 | 75% |

**7.01-5** **Vacation or Leisure Properties, First Mortgage Single Family Home Only**

| | |
|---|---|
| Terms | 10, 15, 20, 25 and 30 years |
| Rate | 50 basis points higher than regular rate |
| Minimum Amount | $25,000 |
| Maximum Amount | Conform to Fannie Mae guidelines |
| Fees | The applicant is responsible for all closing costs and an application fee. The Credit Union may waive certain fee at its discretion for promotional purposes. |
| Maximum LTV | Up to 90% |

**7.01-6** **Co-op Loans**

| | |
|---|---|
| Terms | 10, 15, 20, 25 and 30 years |
| Points | 0 to 3 points including lock-in option. Different interest rates apply for different points. |
| Minimum Amount | $20,000 (lower amount may be considered) |
| Maximum Amount | Conform to Fannie Mae guidelines |

| | |
|---|---|
| Fees | The applicant is responsible for all closing costs and an application fee. The Credit Union may waive certain fees at its discretion for promotional purposes. |
| Maximum LTV | Up to 100% |

**7.01-7 Condo Loans**

| | |
|---|---|
| Terms | 10, 15, 20, 25, 30, and 40 years |
| Points | 0 to 3 points. Different interest rates apply for different points. |
| Minimum Amount | $25,000 |
| Maximum Amount | Conform to Freddie Mac guidelines |
| Fees | The applicant is responsible for all closing costs and an application fee. The Credit Union may waive certain fees at its discretion for promotional purposes. |
| Maximum LTV | Up to 100% |

**Jumbo Loans**

**For homes exceeding maximum conforming mortgage amount**

| | |
|---|---|
| Terms | 10, 15, 20, 25 and 30 years |
| Points | 0 to 3 points. Different interest rates apply to different points. |
| Rate | Jumbo rates may be higher than regular mortgage rates |
| Maximum Amount | Up to the Legal Limit |
| Maximum LTV | Up to 90% |
| Fees | The applicant is responsible for all closing costs and an application fee. The Credit Union may waive certain fees at its discretion for promotional purposes. |

Submit to the Deputy Superintendent, Community and Regional Banks Division, various pieces of information.

1. Summary of the Specific Loan
   a. Details about the borrower

   b. Proposed loan amount

c. Purpose

d. Type of Collateral

e. Sources of repayment

f. Loan terms

2. Borrower's aggregate credit exposure to the credit union

a. Exposures before the loan is granted both in dollar amount and as percentage of the institution's net worth

b. Exposure after the loan is granted both in dollar amount and as a percentage of the institution's net worth

3. Credit unions analysis of the loan application

4. Loan Approval Document

**7.01-9 FHA Mortgage Loan**

| | |
|---|---|
| Term | 10, 15, 20, 25, and 30 years |
| Points | 0 to 3 points including lock-in option. Different rates apply for different options. |
| Minimum Amount | $25,000 |
| Maximum Amount | Conform to Investor Guidelines (Fannie Mae) |
| Maximum LTV | 96.75% |
| Fee | .75% Origination Fee |
| Property Type | FHA property types include 1-4 family home, mixed use (part commercial, part residential) property and up to a 6-unit property building also called multifamily. Owner-Occupancy is required for all FHA loans. |

## 7.02 FIRST MORTGAGE LOANS/ADJUSTABLE RATE GUIDELINES

Municipal Credit Union offers the following adjustable mortgages: 1-year, 3-year, 5-year, and 7-year ARMs.

1. The maximum loan amount conforms to Fannie Mae guidelines.

2. Term of the ARM is 30 years.

3. The index used is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one (1), three (3), five(5), or seven (7) years as made available by the Federal Reserve Board as of the date 45 days before each Change Date.

4. In accordance with the rate "Change Date" as stated on the Adjustable Rate Rider the first "Payment Change Date" on the ARM is either one (1), three (3), five (5), or seven (7) years from the date of the first payment due date-one (1) month after the "Change Date".

5. MCU currently uses the program that has a 2% annual cap and a 6% lifetime cap.

6. No prepayment penalties.

7. No negative amortization.

8. The loan can be on primary residence or Investment Property.

9. Loan to Value: the maximum loan to value on a Purchase Money loan is up to 100%.

Loan Document Contents:

Loan document requirements are detailed in the procedure manual.

**7.02-1** **Change in Terms Notice**:

Before a change in terms becomes effective, the Credit Union must give notice to the members of the following:

1. The base index.

2. The most recently published index at the date of the change.

3. The interest rate in effect as a result of the change.

4. Any change in the monthly installment and the effective date or the new payment, if applicable.

5. The amount of the unpaid principal balance.

**7.02-2** In order to comply with federal pre-application disclosure requirements, the Credit Union must disclose the following information, in writing, when the lender first provides written information concerning ARM or provides a loan application form to the prospective ARM borrowing member, whichever is earlier:

1. The fact that the interest rate may change and a brief description of the general nature of an ARM.

2. The index used and the name of at least one readily available source from which the index may be obtained and verified.

3. The frequency with which the interest rate and payment levels will be adjusted.

4. A statement, if appropriate, that the initial monthly payment may differ from the fully amortizing payment, and the effect of this difference on the loan's amortizing payment, and the effect of this difference on the loan's amortization schedule.

5. Any rule relating to changes in the interest rate, installment payment amount, and/or increases in the outstanding loan balance.

**7.02-3 Purchase-Money/Real Estate Settlement and Procedure Act (RESPA) Transactions** – Transactions involving the purchase of residential real property which are covered by RESPA require that the lender give a Truth-In-Lending (TIL) disclosure, a good faith estimate of settlement costs disclosure, and a federal government mandated booklet in advance of the loan closing. These disclosures must be given within three days of receipt of an application.

## 7.03 POST-APPLICATION DISCLOSURE REQUIREMENTS

The lender must re-disclose under Truth-In-Lending at the time of loan closing if the Annual Percentage Rate calculated at the time of loan closing varies by more than $1/8^{th}$ of (1) percentage point from the Annual Percentage Rate disclosing in the advance disclosures. (This 1/8% tolerance applies to regular transactions. For irregular transactions, like those with irregular payment period or payment amounts, the tolerance increases to ¼ of 1%.) Many creditors follow a policy of furnishing disclosures at the time of closing in all circumstances. Re-disclosure is required, however, only when the APR varies by more than the permitted tolerance.

## 7.04 REFINANCE OR EQUITY LOANS

In any refinance transaction in which a security interest is retained in a member's principal dwelling, a member must be given a right to rescind the transaction. The Notice of Right to Cancel form, together with a copy of the TIL disclosure, must be given to each member who has an ownership interest in the subject property. The Notice of Right to Cancel form should be given in two-part copy to each member/borrower entitled to receive one. A third copy should be retained on file at the Credit Union as evidence of delivery of the form.

The Credit Union must not fund the loan until at least three (3) business days after all appropriate disclosures have been given.

Although a member can waive the right of rescission, a pre-printed form for that purpose is strictly prohibited.

HELOC Loans — The line of credit home equity loan requires open-end disclosures. But a right of rescission must be given. Unless the right of rescission form is properly worded and the credit line structured properly, the consumer has the right to rescind every advance in a line of credit transaction.

### 7.05 PRIVATE MORTGAGE INSURANCE (PMI)

PMI is required for all Mortgage loans whose LTV exceeds 80%. The Credit Union will comply with the Federal and State regulations pertaining to terminations of PMI.

The Credit Union may entertain applications made by individual borrowers to terminate the PMI at a date earlier than required by Federal and State regulations under certain circumstances, such as upon proof of increased appraised value of the property.

### 7.06 EQUAL OPPORTUNITY

Municipal Credit Union is an equal opportunity lender. Municipal Credit Union will not discriminate against credit applicants on the basis of race, creed, color, religion, national origin, sexual orientation, military status, disability, sex, marital status, familial status, age (providing the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program or because the applicant has in good faith exercised any rights under the Consumer Credit Protection Act.

### 7.07 EMPLOYEE MORTGAGE LOAN APPROVAL

Employee mortgage loan applications must be presented to the Real Property Department's management, either the Vice President of Real Property, the Assistant Manager of Mortgage Originations or the Supervisor of Mortgage Originations, for review. All such applications must receive final approval from either the Chief Credit Officer or the Chief Executive Officer.

### 7.08 S.A.F.E. ACT POLICY

It is the policy of Municipal Credit Union to comply with the requirements of the Secure and Fair Enforcement for Mortgage Licensing Act (S.A.F.E. Act) and the statute's implementing regulations. The S.A.F.E. Act requires any credit union employee who acts as a residential

"mortgage loan originator" (as defined in this policy) to register with the Nationwide Mortgage Licensing System and Registry ("Registry"), to use the Registry's unique identifier as required, and maintain this registration. Municipal Credit Union requires all mortgage loan originators to follow its written policies and procedures to ensure compliance with these requirements.

1. Municipal Credit Union's Chief Credit Officer will be designated as "S.A.F.E. Act Administrator" – the individual who will have full access to credit union and employee data. The S.A.F.E. Act Administrator will promulgate and maintain procedures implementing the requirements of this Policy and the NCUA Regulation, including , but not limited to, procedures to:

A. Register the credit union, keep registration information updated, and renew the information on an annual basis.

B. Identify new and existing employees who meet the definition of "mortgage loan originator" (MLO) and ensure that they are registered before performing any MLO duties.

C. Train new mortgage lending department staff on S.A.F.E. Act requirements prior to registration, and review requirements with existing staff prior to renewal.

D. Confirm the adequacy and accuracy of employee registrations, including updates and renewals, by comparisons with the credit union's own records.

E. Develop systems for monitoring compliance with employees' registration and renewal requirements and procedures.

F. Review employee criminal history background reports received through the Registry and maintain records of these reports and any actions taken with respect to applicable employees.

2. If the Credit Union uses third parties in the origination of residential mortgage loans, the S.A.F.E. Administrator will insure that such third parties comply with the S.A.F.E. Act, including license and registration requirements.

3. Annually, an independent test will be conducted on MCU's compliance with the S.A.F.E. Act as required by the Act. This testing can be done by independent outside auditors or internally by MCU's Internal Auditing Department.

### 7.09 FAIR AND ACCURATE CREDIT TRANSACTION (FACT) ACT

MCU will comply with the FACT ACT including:

A) Insuring the accuracy and integrity of consumer information being reported to a Consumer Reporting Agency (CRA) and,

B) Promptly investigating any disputes received from a consumer and responding within the regulatory timeframes

**7.09-1 Definitions:**

Accuracy: information that a credit union provides to a CRA about an account or other relationship with the consumer correctly: (1) reflects the terms of and liability for the account or other relationship; (2) reflects the consumer's performance and other conduct with respect to the account or other relationship; and (3) identifies the appropriate consumer.

Integrity: information provided to a credit bureau about an account or consumer relationship: (1) is substantiated by the CU's records at the time it is provided; (2) is furnished in a form and manner designed to minimize the likelihood that the information may be incorrectly reflected in the credit report; and (3) includes information in the CU's possession about the account or consumer relationship that the relevant government agency has: (a) determined that the absence of which would likely be materially misleading in evaluating creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living; and (b) otherwise listed in the guidelines, which currently only includes the credit limit if applicable and in the CU's possession at the time the CU provides the information to the credit bureau.

### 7.10 APPRAISAL POLICY

MCU, as required by AIRS (Appraisal Independence Requirements of Secondary Market), the Reg Z Appraisal Independence & Interagency Guidance, and the former HVCC (Home Valuation Code of Conduct), is proposing to formalize as policy our appraisal and property evaluation program which has already been implemented by Mortgage Operations.

**APPRAISAL POLICY**

A. MCU will adopt and implement into its appraisal process AIRS (Appraisal Independence Requirements of Secondary Market), the Reg Z Appraisal Independence & Interagency Guidance, and the former HVCC (Home Valuation Code of Conduct). All of these regulations are intended to promote independence in the appraisal process and help ensure that appraisers and the appraisal process may be relied upon as part of sound underwriting for financial institutions.

B. Requests for loans secured by real estate will be supported by an appraisal. NCUA regulations mandate that an appraisal be performed by an independent appraiser for any transaction exceeding $250,000.

C. All appraisals performed in connection with a request for a residential first or second mortgage will be prepared by a state licensed independent appraiser whose credentials have been approved by the VP of Mortgage Lending and/or the SVP/Chief Credit Officer. Copies of appraisal licenses and E&O insurance coverage required to be carried by Appraisers will be obtained on an annual basis. Annually, the CEO will inform the Board of Directors of the list of appraisers that Mortgage Operations is using.

D. No director, officer, employee or agent of the lender shall influence the development, reporting, result or review of an appraisal through coercion, extortion, collusion, compensation, inducement, intimidation, bribery or in any other manner as noted in the regulations.

E. The borrower will be allowed to receive a copy of the appraisal on their loan prior to closing (as long as it has been paid for), or can waive this right. Our Application Disclosure has been updated acknowledging our practice and the borrower's option.

F. The lender will be responsible for selecting, retaining, and providing payment to the appraiser. The applicant may not choose the appraiser.

G. The lender's employees responsible to select appraisers from an approved list must be appropriately trained and qualified in the area of real estate appraisals and independent of the loan production staff and process.

H. Employees of the lender's loan production staff, as well as any person compensated on a commission basis or who reports to an officer not independent of the loan production staff and process, shall be forbidden from selecting, retaining, recommending or influencing the selection of any appraiser for a particular assignment, or for inclusion on a list of approved appraisers. They are forbidden from having any substantive communications with appraiser relating to or having an impact on the valuation including ordering or managing an appraisal assignment.

I. MCU will utilize an Appraiser Rotation Log (ARL) for the purpose of promoting independence of the appraisal process. To create full independence, the ARL and appraisal ordering process will be handled by the Quality Control Unit. The VP of Mortgage Operations and the Management of the Quality Control Unit will have authority over the ARL.

J. All appraisals will be written and reviewed in accordance with appraisal standards established by the NCUA and the Federal National Mortgage Association (Fannie Mae). All real estate appraisals received by the Credit Union will be thoroughly reviewed by an underwriter and processor to ensure that they comply with this policy and contain sufficient information on which to make a prudent lending decision.

**7.10-1 Appraiser List**

| APPRAISAL COMPANY | CONTACT PERSON | PHONE # | EMAIL ADDRESS |
|---|---|---|---|
| Al Lama | Al Lama | 718-368-3223 | Lamaapraisals33@yahoo.com |
| National Realty Adv. Group | Gregory Brann | 914-242-0881 | NRAGrp@bestweb.net |
| Stanley Jay Appraisals | Mike Davey | 732-669-0606 | mike.davey@verizon.net |
| East Coast Appraisal Service | Mike Pavlakos | 718-834-1700 | mpavlakos@eastcoastappraisal.com |
| R & M Appraisal | John McCullagh | 718-347-6700 | mccullagh@appraisals.com |

## SECTION 8
## COLLECTION POLICY

### 8.01 DELINQUENCY CONTROL

It is the policy of the Credit Union to actively pursue the collection of any delinquent accounts, negative balances or losses caused by members. The Credit Union shall operate a delinquency control system to identify accounts by the number of days payments are overdue.

### 8.02 TELEPHONE CONTACT GUIDELINES

The telephone is the primary method of contacting and interviewing delinquent members. The collector must be familiar with limitations and regulations established to protect the member's rights and privacy.

Members may be contacted by telephone at their residence or place of business when possible. No telephone call will be made to the member's residence before 8:00 a.m. or after 9:00 p.m.

### 8.03 FOLLOW UP

When a promise to pay or other arrangement is made on an account, the Collector will suspend collection attempts on the account until the promised date. The arrangements are to be entered into the collection system with a contact date to be noted.

Timely follow up is important to the collection process. The Procedure Manual details the follow up process.

### 8.04 CO-MAKERS

Co-makers are equally responsible for the loan. Co-makers are to be contacted in the same manner as makers.

### 8.05 VISA CREDIT CARD COLLECTIONS

- The collection process for VISA accounts begins at 16 days past due excluding the 25 day grace period.
- Accounts at 60 days delinquent are suspended until the delinquent amount is paid.
- Accounts at 120 days or more delinquent are subject to closure.

## 8.06 SKIP TRACING/ASSET LOCATING

All skip tracing must conform with the city, state and federal regulations. In accordance with the New York City Department of Consumer Affairs Regulation 10, Collectors will adhere to the following:

- Acquisition of Location Information

- Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer in order to collect a debt, after the institution of debt procedure shall:

**8.06-1** Identify himself/herself, state that he/she is confirming or correcting location information about the consumer and identify his/her employer when the identification connotes debt collection only if expressly requested.

**8.06-2** Not state or imply the consumer owes any debt.

**8.06-3** Not communicate more than once, unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct complete location information; for the purpose of this subsection, the debt collector need not count as a communication returned unopened mail or a message left with a party other than the person the debt collector is attempting to reach in order to acquire location information about the consumer, as long as the message is limited to a telephone number, the name of the debt collector and a request that the person telephone the debt collector.

**8.06-4** Not use any language or symbol on any envelope or in the contents of any communication effected by mail or telegram that indicates that the debt collector is in the debt collection business or that the communication relates to the collection of a debt; provided that a debt collector may use his/her business name or the name of a department within his/her organization as long as any name used does not connote debt collection.

**8.06-5** If the debt collector knows the consumer is represented by an attorney regarding the subject debt and if the debt collector has knowledge of the attorney's name and address, the Collector may not communicate with any person other than the attorney for the purpose of acquiring location information about the consumer unless the attorney fails to provide the consumer's location within a reasonable period of time after a request for the consumer's location from the debt collector.

## 8.07 NEGATIVE BALANCE SHARE ACCOUNTS

On a quarterly basis, negative balance accounts are charged off if there has been no activity in the past six (6) months.

Collection process for negative balance accounts is detailed in the Collection procedure.

**8.08 LATE CHARGES AND OTHER FEES**

A. Municipal Credit Union, at its discretion, may implement late fees for various loan products. This fee may only be waived by the Assistant Manager or Assistant Vice President of Collections (See Section 6.18 for late payment fees).

B. A $7 direct-pay fee will be charged to members who request to make payment over the phone.

**8.09 COLLECTION AGENCIES/ATTORNEYS**

Municipal Credit Union utilize outside attorneys or collection agencies to collect delinquent loans, negative balances, charged off loans, or other losses caused by members after all internal collection efforts have been exhausted.

**8.10 VEHICLE REPOSSESSION**

Collateral held as security against a loan may be repossessed if the payments on the loan become delinquent or the member is in default of the loan terms. A decision to repossess is approved by the Management of Collection Department.

Municipal Credit Union will use repossession agencies which have adequate and secure garage space and auction facilities whenever possible.

**8.11 VEHICLE REPOSSESSION**

In accordance with regulation protecting consumer rights, Municipal Credit Union notifies members of their Right of Redemption. This notice is mailed to the member on the day after the vehicle is repossessed. It gives members fourteen (14) business days to redeem their vehicles.

If the member wishes to redeem the vehicle, all the arrears, including repossession expenses, must be collected in cash or certified check.

## 8.12 VEHICLE REPOSSESSION/Public Auction

New York law allows for private sale of repossessed vehicles, however, Municipal Credit Union dictates that at least one (1) attempt must be made to sell the vehicle at public auction. This policy insures that any possible fraud by MCU employees in "sweetheart" sales is avoided. The vehicle may be sold to the highest bidder by auction, however if the loan balance exceeds the bid, the deficiency balance is the responsibility of the member in default. In such a situation, the proceeds from the sale are applied to the loan and the member is sent a Deficiency Collection Letter requesting immediate payment.

## 8.13 REAL PROPERTY FORECLOSURE

The Mortgage Delinquency Advisory Committee oversees the real property foreclosure process.

A. Foreclosure should be initiated when: 1) all of the required collection letters have been sent to the member, 2) the New York State required 90-day collection letter period has expired and, 3) satisfactory up-to-date payment arrangements cannot be obtained, or when a real estate secured loan is determined to be uncollectible for any other reason.

B. Home Equity Lines of Credit will be suspended at 30 days delinquent until the delinquent amount has been satisfied. Home Equity Lines of Credit will be closed at 90 days delinquent.

C. Any one of the following individuals is empowered and authorized to sign on behalf of the Credit Union contracts, deeds, and other papers and documents with regard to the sale of real property (including houses and condominium units) and cooperative apartments which the Credit Union has obtained ownership by reason of foreclosure of an MCU mortgage loan: President/Chief Executive Officer, Executive Vice President/Chief Financial Officer, Senior Vice President/Chief Credit Officer, General Counsel, Deputy General Counsel.

## 8.14 BANKRUPTCY

Under the United States Bankruptcy Code, Municipal Credit Union must discontinue any and all collection activity on a delinquent account once written notification is received that the member has filed for bankruptcy.

## 8.15 BANKRUPTCY REAFFIRMATION PROGRAM

If a member reaffirms 50% of all unsecured balances (including credit card balances) subject to a bankruptcy filing, the Credit Union may establish a new credit line in the amount of 50% of the unsecured balances subject to the bankruptcy filing with a minimum credit line of $500 up to a maximum of $3,000.

## 8.16 INSTALLMENT AND VISA LOANS CHARGE OFF POLICY

The Credit Union will charge off delinquent installment and VISA loans on a quarterly basis commencing on or about the 18th day of the third month. On the charge off date, loans that meet the following criteria will be charged off:

- Loan accounts that are delinquent six (6) months or more with no payment activity in the last three (3) months.
- Loan accounts that are delinquent eight (8) or more months regardless of payment activity.

Delinquent loan accounts that do not meet the criteria on the scheduled charge off date will be subject to charge off the following quarter.

## 8.17 REAL ESTATE LOANS CHARGE OFF POLICY *(Including Home Equity)*

The portion of any delinquent Real Estate Loan balance that is unsecured due to insufficient appraised value of the property and lack of Private Mortgage Insurance (PMI) is subject to same charge off policy as installment and VISA Loans.

## 8.18 CHARGE OFF EXCEPTIONS

A loan account may not be charged off if there is sufficient evidence that the account was (a) paying, (b) pending an insurance claim or (c) in unresolved dispute.

## 8.19 RETURNED CHECKS

It is the policy to collect any returned checks that caused losses to the Credit Union.

## 8.20 SOLDIERS' AND SAILORS' RELIEF ACT

It is the policy of Municipal Credit Union to attempt to work out a repayment plan with the member. Cases can be taken to court and if it can be proven that the ability of the member to pay is not adversely affected by reason of entry into the military services. However, this procedure is lengthy and usually not in the best interest of MCU or of the member. The direct approval of the Collection Manager is needed to pursue legal remedy.

## 8.21 CREDIT DISABILITY CLAIMS

The process of credit disability claim is detailed in the collection procedure manual.

## 8.22 DEBT HARDSHIP RELIEF PROGRAM (DHRP)

It is the policy of MCU to practice responsible lending activities to ensure the asset quality. However, due to various circumstances and in line with the mission of people-

helping-people, the Credit Union can grant debt hardship assistance to its members by deferring or adjusting loan repayments for those members encountering genuine temporary financial hardship. Management will grant the relief program on a case-by-case basis. Management shall disclose to the CEO and document the decision for granting the DHRP.

# SECTION 9
# MARKETING POLICY

## 9.01 POLICY STATEMENT

The Marketing Department of Municipal Credit Union is responsible for the advertising and promotion of MCU products and services and is geared to the achievement of annual strategic plan goals.

As a marketing resource for all operating departments within MCU, the Marketing Department serves the needs of its internal clients in an advisory capacity and assumes a leadership role in the creation, development and positioning of external member and non-member communication.

The Marketing Department ensures all external communication are in compliance with NCUA and other regulatory standards submitting all such work to our internal MCU Legal Department for final approval prior to distribution.

The Marketing Department utilizes internal administrative and creative resources in the development and execution of marketing programs as well as external advertising agencies, direct mail houses, printers etc.

The Marketing Department routinely incorporates both qualitative and quantitative research in evaluating key market opportunities and shares these findings with MCU management and operating departments.

## SECTION 10
## ELECTRONIC DATA PROCESSING POLICY

### 10.01 PURPOSE

Municipal Credit Union utilizes Symitar's Episys software and IBM P series mainframe to satisfy its data processing and record keeping needs for member share and loan accounts. The main purpose of this policy is designed to maintain the integrity of both software and hardware, and to protect the credit union from unauthorized use, destruction, theft, and unauthorized modification of programs and information.

### 10.02 HARDWARE CONFIGURATION

The components of the data processing hardware are detailed in both the procedure and disaster recovery manuals. Only authorized staff and management are permitted to have access to these manuals.

**10.03 SYSTEM SECURITY**

**10.03-1** The unauthorized access to and use of information generated by the computer system of Municipal Credit Union is strictly prohibited. All employees are responsible for information security, and all member information entered, stored, or reproduced in any form will be treated as confidential and used only for business purposes.

**10.03-2** The system administration is under the direction and supervision of the SVP of MIS. The SVP of MIS coordinates the development and implementation of security, and the Data Control unit of the Finance Department is responsible for maintaining the security system. The maintenance of the security system is detailed in the Data Control procedure.

**10.03-3** The need to acquire new desktop computers, servers, peripherals, communication systems (including modems, routers etc), software, new releases, and upgrades must be coordinated, verified, and approved by the SVP of MIS. The Chief Executive Officer (CEO) or Chief Financial Officer (CFO) authorizes all purchases.

**10.03-4** The SVP of MIS, internal personnel or designated outside consultants will supervise program development, testing, and installations. The final installations of new hardware, software, and new releases must be approved by the SVP of MIS.

**10.03-5** The Data Control unit maintains the Symitar Episys software system privileges levels. The levels are assigned and requested by department heads. The department heads evaluate their staff's responsibilities and functions and determine adequate access levels, which will not compromise internal controls and segregation of duties. The Chief Financial Officer or Security and Fraud Officer will periodically review the access levels. In addition, MIS is responsible for the control of access levels to the IBM mainframe.

**10.03-6** Terminated employees shall be removed from all software access to the Episys system by the Data Control unit. Human Resources shall inform Data Control immediately of any employee who is or will be separated from the credit union.

**10.03-7** To maintain integrity and sound internal control, Operators of MIS are not provided access to particular levels of system transactions or functions, such as posting monetary transactions and modifying programs. In addition, MIS Programmers are not permitted nor allowed access to perform Operator's functions.

MCU
MUNICIPAL CREDIT UNION



**10.04 COMPUTER (PC) AND APPLICATION MAINTENACE**

All computers are connected to the Credit Union's network fileservers. All widely used application programs are installed and centralized in the fileservers. The technical team of the MIS department is responsible to maintain the fileservers and the daily backup of the data. Employees are not permitted to install any application software to their local storage drive without the approval from the SVP of MIS or an authorized designee. Employees must inform MIS immediately if they encounter or discover that their PCs are or may be virus infected. Uploading of any program(s) to the fileservers is strictly prohibited.

**10.05 DISASTER RECOVERY**

The Credit Union has developed a comprehensive disaster recovery plan, which is part of the Credit Union's Master Disaster Recovery Plan. A copy of this plan is stored with other critical Credit Union Documents in the Tape Library room, second copy with the SVP of MIS, and a third copy in the offsite storage facility. Refer to the MIS Disaster Recovery Plan for detail recovery and testing procedures, and frequency of testing.

**10.06 MCU SOFTWARE LICENSE POLICY**

The Municipal Credit Union (MCU) licenses personal and network computer software from a variety of third parties. Such software is normally copyrighted by the software developer and, unless authorized to do so, the Credit Union has no right to make copies except for backup and archival purposes. One of the purposes of this policy is to prevent copyright infringement.

It is the policy of MCU to respect all computer software copyrights and to adhere to the terms of all software licenses to which the company is a party. MCU employees may not duplicate any licensed software or related documentation for use either on MCU premises or elsewhere unless they are authorized to do so by MCU. Unauthorized duplication of software may subject employees and/or MCU to both civil and criminal penalties under the United States Copyright Act. Employees may not give software to any outsiders including clients, contractor, members and others. MCU employees may use software on PCs and computer networks only in accordance with applicable license agreements. Violation by employees of applicable license agreements will result in disciplinary actions, up to and including termination of employment and that employee(s) will be held responsible for any fines or penalties incurred by MCU.

**10.07 ACQUISITIONS OF SOFTWARE**

All personal and network computer software (either proprietary or commercial) acquired by MCU must be approved by the CEO or the CFO and purchased through the MIS Department. Users will be provided with MCU's standard suite of software applications needed to perform their particular functions. Software acquisition channels are restricted to ensure that MCU has a complete record of all software that has been purchased for the Credit Union computers and can register the software accordingly. It is the policy to keep

software legal and virus free. Employees are strictly prohibited from bringing, installing or copying software from home or other outside sources on MCU's PCs or network systems without prior approval from the Management of the MIS Department.

**10.08 REGISTRATION SOFTWARE**

When software is delivered, it must first be delivered to MIS to complete registration requirements. MIS will maintain a library of software licenses.

**10.09 INSTALLATION OF SOFTWARE**

After the registration requirements have been met, the software will either be installed by MIS or alternatively, in cases where the MIS department considers software installation to be routine, the MIS department will permit a non-MIS employee to complete the installation. If it is determined that a user no longer needs a software package, MIS will be notified to schedule a time to uninstall the software. At that time, any manuals related to the software must be returned.

**10.10 HOME COMPUTERS**

If work is authorized to be done at home or on any MCU or non-MCU PC, the data pertaining to such work product, which is contained on a storage device such as tape or the hard drive of the home computer, is the property of MCU. The data must be kept confidential and returned to the Credit Union's systems for storage.

**10.11 PURCHASES**

All computers and related purchase (hardware or software) requests must be made to MIS by completing a purchase requisition form. The purchases must be reviewed and evaluated by SVP of MIS for adequacy, uniformity, and/or security.

**10.12 SECURITY**

Passwords are the Local Area Network's (LAN) first line of defense against unauthorized users gaining access to MCU information. Network passwords are automatically set to expire. The system will notify you when your password is expired. Passwords should never be written down and placed in an area that others can easily access.

**10.13 VIRUS NOTIFICATION**

All storage devices or files from an outside source must be checked for viruses prior to being transferred to an MCU system. All incidents of virus attacks are to be reported immediately to MIS.

**10.14 HARDWARE CHANGES**

All storage devices or files from an outside source must be checked for viruses prior to being transferred to an MCU system. All incidents of virus attacks are to be reported immediately to MIS.

**10.15 INTERNAL AND INTER – OFFICE ELECTRONIC MAIL**

All computers and internal electronic mail are the property of MCU and should be used for business purposes only. Inter-office electronic mail is provided to employees to assist and facilitate business communications. Inappropriate use may result in disciplinary action up to and including dismissal. Inappropriate use includes, but is not limited to, the actions and activities set forth in this Policy Manual entitled Examples of Inappropriate and Prohibited Actions and Activities.

Municipal Credit Union reserves, and will exercise, the right to review, intercept, access, delete, discard and disclose all communications, messages and records on the company's internal e-mail systems at any time, with or without employee notice, and such access may occur during or after working hours.

**10.16 INTERNET ACCESS AND EXTERNAL E-MAIL**

Internet access to global electronic information resources on the World Wide Web is provided by MCU to assist employees in obtaining work-related data and technology.

**10.16-1** The unauthorized access to and use of information generated by the computer system of Municipal Credit Union is strictly prohibited. All employees are responsible for information security, and all member information entered, stored, or reproduced in any form will be treated as confidential and used only for business purposes.

**10.16-2** The system administration is under the direction and supervision of the SVP of MIS. The SVP of MIS coordinates the development and implementation of security, and the Data Control unit of the Finance Department is responsible for maintaining the security system. The maintenance of the security system is detailed in the Data Control procedure.

**10.16-3** The need to acquire new desktop computers, servers, peripherals, communication systems (including modems, routers etc), software, new releases, and upgrades must be coordinated, verified, and approved by the SVP of MIS. The Chief Executive Officer (CEO) or Chief Financial Officer (CFO) authorizes all purchases.

**10.16-4** The SVP of MIS, internal personnel or designated outside consultants will supervise program development, testing, and installations. The final installations of new hardware, software, and new releases must be approved by the SVP of MIS.

**10.16-5** The Data Control unit maintains the Symitar Episys software system privileges levels. The levels are assigned and requested by department heads. The department heads evaluate their staff's responsibilities and functions and determine adequate access levels, which will not compromise internal controls and segregation of duties. The Chief Financial Officer or Security and Fraud Officer will periodically review the access levels. In addition, MIS is responsible for the control of access levels to the IBM mainframe.

**10.16-6** Terminated employees shall be removed from all software access to the Episys system by the Data Control unit. Human Resources shall inform Data Control immediately of any employee who is or will be separated from the credit union.

**10.16-7** To maintain integrity and sound internal control, Operators of MIS are not provided access to particular levels of system transactions or functions, such as posting monetary transactions and modifying programs. In addition, MIS Programmers are not permitted nor allowed access to perform Operator's functions.

## SECTION 11
## BRANCH OPERATIONS

### 11.01 BANK SECRECY ACT

**11.01-1 Policy Statements**

In compliance with Section 748.2 of the NCUA Rules and Regulations, it is the policy of the Credit Union to implement procedures to assure and monitor compliance with the record keeping and reporting requirements of the Bank Secrecy Act (BSA).

**11.01-2 Goals**

Procedures were developed to:

- provide internal controls for ongoing compliance
- provide independent testing for compliance
- designate personnel who will be responsible for day-to-day monitoring of transactions affected by BSA requirements
- provide continuing education to all personnel who may come in contact with or handle large currency transactions as to their responsibilities under BSA

**11.01-3 Responsibilities**

The Compliance Officer for the Credit Union assumes responsibility for ongoing compliance with the BSA. This individual shall conduct regular internal audits to ensure that the Credit Union is in full compliance with all reporting and record keeping requirements. These audits will be independent of the Credit Union's internal audit function.

**11.01-4 Reporting Requirements**

MCU employees will comply with the following reporting requirements:

A. Currency Transaction Reports (CTR) filed within 15 days of the date of the transaction, using the directions and procedures specified on the CTR.

B. Currency or Monetary Instrument Reports (CMIR) – filed within 15 days of receipts with the Commissioner of Customs.

C. Suspicious Activity Reports (SAR) – filed within 30 calendar days after the activity is discovered with Financial Crimes Enforcement Network (FinCEN), Detroit Computing Center, P.O. Box 33980, Detroit, MI 48232.

**11.01-5 Exemptions**

Currency Transaction Reports (CTR) are not required for cash transactions over $10,000 involving:

- Other U.S. financial institutions
- Federal, State or local governments
- Most publicly traded corporations (nonprofit organizations such as universities and hospitals are still covered by CTR requirements)

**11.01-6 Records Retention Requirements**

The credit union will adhere to the following records retention schedule for all reports required under the Bank Secrecy Act:

- Currency Transaction Reports – five years from the date of the report
- Currency or Monetary Instrument Report – five years from the date of the report
- Suspicious Activity Report – five years from the date of the report

**11.01-7 Counterfeit Money**

Federal law requires that counterfeit money be reported at once to the Secret Service, an agency of the Treasury Department. Municipal Credit Union is not obliged in any way to compensate the member for the loss of confiscated bill(s).

**11.01-8 Mutilated and Damaged Currency**

Municipal Credit Union does not accept mutilated or damaged currency under any circumstances.

**11.01-9 Deposits**

Members may make deposits to their accounts in person, at designated ATMs, electronically, or through the mail. Checks received for deposit are subject to the applicable Funds Availability Policy. Cash back on deposits is permitted.

## 11.02 FUNDS AVAILABILITY AND CHECK COLLECTIONS POLICY

### 11.02-1 Policy Statement

It is the policy of the Municipal Credit Union to fully comply with all provisions of the Expedited Funds Availability Act (EFAA) as implemented by Regulation CC with regard to FasTrack Checking Account only. For all other deposit accounts, the Credit Union will fully comply with the applicable New York State Banking regulations. Each branch and the Branch Operations Department will maintain copies of the regulation for reference and implementation.

### 11.02-2 Funds Availability

The Credit Union will generally make deposits to transaction accounts available to members on the first business day after receipt of the deposit. On a case-by-case basis, the Credit Union may decide to delay the availability of deposited funds until the second business day for local checks and until the fifth business day after the day of deposit for non-local checks.

In certain circumstances, the Credit Union may extend the hold period an additional five business days for local checks and an additional six business days for non-local check (in additional to the case-by-case hold period.) if one of the following situations occurs:

- There is a specific reason the Credit Union feels the check is uncollectible.
- Check deposits, in aggregate, more than $5,000 on any one day. (Delayed availability may only be applied to the amount over $4,900).
- A previously returned check is re-deposited.
- The account has had frequent overdrafts during the last six months.
- The account is less than 30 days old.
- An emergency situation exists such as a communications or computer failure.
- The account has a history or experience of returned checks.

Regardless of the above, the first $100 or all deposits must be available on the first business day after the day of deposit.

**11.02-3** 11.02-2A **Same Day Availability**

The following types of deposits to transaction accounts will receive same day availability:

- Cash
- U.S. Treasury Checks
- U.S. Postal Service Money Orders
- Federal Reserve and Federal Home Loan Bank Checks
- Cashiers, certified, and teller's checks
- On-us checks
- Wire Transfers

**11.02-4** 11.02-2B **Next Day Availability**

- Checks drawn by a State or unit of Local Government
- Checks drawn on a qualified SEG group

**11.02-5 Disclosures**

All required EFAA disclosures and notices will conform to the samples provided in Regulation CC. Any deviation from the language used in these samples must be approved by the Credit Union's legal counsel. These disclosures and notices include:

- The initial funds availability disclosure
- The branch and ATM notices
- Subsequent disclosure
- Changes in policy notices

**11.02-6 Branch and ATM Notices**

A notice of the Credit Union's availability policy will be posted at each branch location and at proprietary ATMs. Notices will be in a conspicuous location in branch lobbies and at each ATM.

**11.02-7 Record Retention**

Records showing compliance with all EFAA and New York State Banking Department requirements will be retained for a period of two years.

The cutoff hour by which deposits must be made will be 3:00 p.m. for deposits received at branches and up to 7:00 p.m. for certain branches on the late nights. Funds will be subject to withdrawal at 8:00 a.m. on the day they are to be made available.

Municipal Credit Union will not require that a special deposit slip accompany cashier's certified, teller or government checks and postal money orders in order for the same to be given immediate availability. Municipal Credit Union will otherwise comply with and follow all other provisions and requirements of the Expedited Funds Availability Act and Federal Reserve Board Regulation CC.

## 11.03 WITHDRAWALS/OFFICIAL CHECKS and CASH

Members may withdraw funds in the form of check or cash. Members requesting withdrawals must present proper identification as outlined in the procedure manual. Joint owners may also withdraw funds after presenting proper identification.

## 11.04 WITHDRAWALS/FASTRACK CHECKING ACCOUNTS

Members may withdraw funds in the form of cash from their checking account by presenting a pre-printed check. There is no minimum or maximum withdrawal amount on checking accounts. Municipal Credit Union does not cash checks for nonmembers, including those checks drawn on MCU accounts.

## 11.05 CREDIT CARD CASH ADVANCES

Municipal Credit Union Tellers will provide cash advances to anyone holding an MCU VISA card. The Teller must obtain authorization through the use of the POS terminal. The amount an individual may receive is determined by the amount available to them.

## 11.06 CHECK CASHING

The Credit Union will cash checks for members against their account balances if they have sufficient funds to cover the check in their share accounts. It is the policy of the Credit Union that checks payable to business entities are not accepted.

## 11.07 TRAVELER CHECKS AND GIFT CHECKS

American Express Travelers Checks are available to Municipal Credit Union members and non-members in accordance with the agreement with American Express.

### 11.08 MONEY ORDERS

A Money Order is limited amount instrument that a member may purchase over the counter for cash plus a nominal service fee.

Municipal Credit Union guarantees the payment of these items and has set $1,000 as the maximum amount for a Money Order.

### 11.09 REPORT OF CASH OVER/SHORT

It is the policy of Municipal Credit Union that all cash differences of $2,500 be reported to the Internal Audit Department after all efforts to locate the errors have been exhausted. All steps taken to resolve the error must be carefully noted on the Report of Cash Over/Short Form.

### 11.10 CASH IN BRANCH LIMIT

The Vice President of Branch Operations/Member Service Operations will evaluate the branch cash level periodically and recommends to the CFO for approval for adjustment to the cash level, if necessary.

### 11.11 TRUTH-IN-SAVINGS

#### 11.11-1 Policy Statements

It is the Credit Union's policy to comply with the Truth-in-Savings Act (TISA), which requires disclosures to members and potential members specific information regarding the members accounts. These disclosures are required to be in writing, and in a form the member or potential member may keep. They must be mailed or delivered on request before and at the time of account opening. Disclosures must also be provided:

- On periodic statements
- When there are changes in account terms
- At account maturity
- In advertisements for deposit accounts

#### 11.11-2 Annual Percentage Yield and Annual Percentage Earned

The annual percentage yield (APY) and the annual percentage earned are calculated using the formulas set forth in Appendix A, parts I and II of part 707 of the NCUA Rules and Regulations.

### 11.11-3 Fees

The Credit Union will disclose any fee assessed against the account(s). Each fee will be expressed as a line item on periodic statements, and the reason for the fee will be stated.

### 11.11-4 Changes in Accounts Terms

The Credit Union provides advance notice to members of any change in terms whenever the change reduces the APY or otherwise adversely affects the members. The notice of a change in terms is mailed to the members at least thirty calendar days before the effective date of the change.

No notice of a change in terms is required for rate changes in variable-rate accounts, for short-term share accounts with maturities of one month or less, or for share draft and check printing fees.

### 11.11-5 Account Maturity – Automatic Renewals

The Credit Union will provide a Notice of Account Maturity to automatically renewing term share accounts with terms longer than one month. The notice and disclosures will be mailed at least 20 calendar days before the account maturity date.

The advertising of share products will not contain any misleading or inaccurate information. When an advertisement includes an APR, including advertisements posted on the Internet, it will also include the following:

- If an account is a variable-rate account, a statement that the rate may change after the account is opened
- A statement that the APY is accurate as of a specific date
- The minimum balance required in the account to earn the advertised APY, and for tiered-rate accounts, the minimum balance for each tier in close proximity and with equal prominence to the applicable APY
- The minimum balance to open an account
- For term share accounts, the term of the account and a statement that a penalty may be imposed for early withdrawal

### 11.11-6 Training

All personnel responsible for opening and administering the various share accounts of the Credit Union are to be thoroughly trained in the TISA requirements. This includes, but is not limited to, member services representatives, new account clerks, marketing personnel, and staff members assigned to responsibilities that may cause them to come into contact with members or potential members by telephone or in person.

### 11.11-7 Record Retention

It is the policy of the Credit Union to comply with the requirements of Part 707 of the NCUA Rules and Regulations and section 458 of the New York State Banking Law. The Credit Union will retain records showing full compliance with TISA for a minimum period of two years after the disclosures or actions under TISA are made or taken.

## SECTION 12
## ELECTRONIC & PLASTIC CARD SERVICES

### 12.01 ELECTRONIC SERVICES OFFERED

The Credit Union recognizes the importance of service delivery channels through electronic means and its evolution. The Credit Union offers the following Electronic Services to satisfy the members' needs, attract new members, and retain existing members:

1. World Wide Web for informational and E-Commerce purposes,
2. Online Banking for online access and transactions,
3. ATM Cards for convenient access to information, withdraw, and deposit.
4. Debit Cards for convenient purchases.
5. Touch Tone Teller for information, check withdrawals, transfers, and loan payments from remote touch tone phone.
6. Kiosks

### 12.02 REGULATIONS COMPLIANCE

Various rules and regulations that apply to the traditional service delivery channels are also applicable to electronic service delivery channels. It is the Credit Union policy to comply and adhere to all applicable Federal and State regulations but not limited to the following:

A. Deposit Services

| | | | |
|---|---|---|---|
| 1. | Regulation E | – | Electronic Fund Transfer Act |
| 2. | NCUA Regulation Part 707 | – | Truth in Savings Act |
| 3. | Regulation CC | – | Expedited Funds Availability Act |
| 4. | Regulation D | – | Reserve Requirements of Depository Institutions |

B. Loan/Leasing Services

| | | |
|---|---|---|
| 1. | Regulation Z | Truth in Lending Act |
| 2. | Regulation M | Consumer Leasing Act |
| 3. | Regulation B | Equal Credit Opportunity Act |
| 4. | Fair Housing Act | |
| 5. | Regulation C | Home Mortgage Disclosure Act |
| 6. | Fair Credit Reporting Act | |
| 7. | Fair Debit Collection Practices Act | |

In addition, advertising statements through electronic medium shall comply to the NCUA Rules and Regulations Part 740.

## 12.03 E-COMMERCE SERVICE

The MCU Web Site provides general information about the credit union, its products and services, and useful member information. Individuals may use the web site to request membership applications, apply for loans, obtain mortgage pre-qualification certificates, reorder checks, and send general e-mails or e-mails containing personal information via the secured correspondence form.

### 12.03-1 Web Site Development and Content

The web design, content and development are periodically reviewed by the operating and Legal Departments for compliance.

### 12.03-2 E-Mail and Forms

General e-mails are sent to the e-mail address of the appropriate department. E-mails sent via the secured correspondence form are received by MIS and directed to the appropriate departments. All e-mails should receive immediate acknowledgement when opened and responded to, where possible, within one business day. The operating departments will apply their department procedures for handling requests, inquiries and complaints in the required turnaround time. It is the Credit Union's policy that all applications (forms) and e-mails sent through the general correspondence form on the secured server are encrypted to secure the information. These inquiries are automatically directed to the appropriate departmental e-mail address.

**12.03-3 Information Pages**

Dividends and Interest Rates posted on the web site must be in compliance with the Truth in Savings disclosure requirements. Product information, promotions and advertising must be in compliance with various regulatory disclosure requirements and Part 740 of the NCUA Rules and Regulations.

**12.03-4 Security and Privacy**

In recognition of the importance of privacy as it relates to member information, the Credit Union adopted the following interest privacy policy (12.03-5). The policy is posted on the MCU Web Site.

**12.03-5 Internet Privacy Policy Disclosed to Members**

At Municipal Credit Union (MCU) your privacy is important to us. This Internet Privacy Policy is intended to explain how we treat information received from our MCU web site.

No personal information, such as your name or address, is collected automatically when you visit our web site. We automatically collect no information which would identify you personally.

**12.03-6 Information Collected and Stored Automatically**

For site security purpose

s and to ensure that this service remains available to all users, Municipal Credit Union utilizes software programs to monitor network traffic in order to identify unauthorized attempts to upload or change information, or otherwise cause damage.

Web site management information is collected for statistical purposes. Computer software programs are used to create summary statistics, which are used for such purposes as assessing what information is of most and least interest, determining technical design specifications, and identifying system performance or problem areas.

Only the following information is automatically collected and stored when you visit our web site:

- The Internet domain (e.g., AOL, or MSN) from which you access our Web site
- The make and model of Internet browser software that you have used when accessing our Web site

- The number of times that you have visited our Web site during the current month (MCU utilizes "cookies". A "cookie" is a file placed on your hard drive by a Web site that allows it to monitor your visit. You can set your browser to warn you when placement of a cookie is requested and decide whether or not to accept it.)

**12.03-7 Information Collected from E-mails and Web Forms**

When you send us personally identifying information, for example, in an electronic mail message containing a question or comment or by filling out a form that e-mails us information, we use this information to fulfill or respond to your requests. We may store these requests to provide us with information for future improvements to our Web site. We may forward your e-mail to third parties who provide specific products that you are requesting information about. We do not create individual profiles with this information you provide. MCU does not give, sell or transfer personal information to third parties unless: a) it is necessary for completing a transaction, or b) it is required to verify the existence and condition of your account for a third party, or c) it is required by law or, d) you give MCU your permission.

**12.03-8 Social Media Policy**

The growth of social media has exploded over the past few years. As social media has become more mainstream, online conversations about MCU have become more frequent. Since many MCU employees use these online tools personally, it is important that employees understand their responsibility to protect the privacy of MCU, our members, and themselves.

This policy is to guide employees' participation in social media as it relates to the Credit Union and its activities. This policy should be followed to ensure responsible participation in a) social networking sites like Facebook, Twitter, LinkedIn and Foursquare; b) personal blogs; c) news sharing and bookmarking sites like Delicious and Digg; d) open online content such as forums, wiki, listservs and newsgroups; e) photo, audio, and video sharing sites like Instagram and YouTube; f) discussion groups and g) any other internet FTP (File Transfer Protocol) or data exchange such as Dropbox or Google Docs.

These guidelines will continue to evolve, change, and update as new technologies and social networking tools emerge. They will be maintained in alignment with the FFIEC Information Security IT Booklet, as well as NCUA Part 748 or any other beneficial guidance needing to be incorporated. MCU will also seek guidance from other sources such as the New York State Department of Financial Services, the Department of Homeland Security, etc. MCU will notify you whenever the policy is updated.

MCU



## A. GUIDELINES FOR MCU EMPLOYEES' PERSONAL BEHAVIOR IN ONLINE SOCIAL MEDIA ACTIVITIES:

MCU respects the free speech rights of all of its employees and respects the rights of its employees to use social media tools outside of work. However, it is important that all employees are aware of the consequences of taking part in forms of social media and online conversations that refer to MCU and/or the employee's relationship with MCU. Employees should also recognize that MCU might be held responsible for their behavior in certain personal online social media situations.

The guidelines outlined below refer to your **personal** or **unofficial** online activities, apply to all MCU employees, and pertain to blogging/social media/social networking:

- Performed both on and off MCU time;
- Performed both on and off MCU's premises; and
- Regardless of whether it is performed on MCU equipment (computers, blackberries, PDAs, etc.), or on the employee's or any third party's equipment.

1) **Follow MCU's policies as outlined in the MCU Policy Manual.** All MCU employees are subject to MCU's business policies in every public setting. Employees should pay particular attention to Section 10.16 Internet Access and External Email; Section 14.33 Personal Business (Telephone Calls, Mail, Email, Internet and Facsimile Equipment); and Section 14.69.5 Home Computers.
2) **You are responsible for your actions.** Anything you post that purposefully or unintentionally exposes MCU's confidential or proprietary information will ultimately be your responsibility and may result in disciplinary action up to and including termination.

When interacting in Social Media, MCU employees should **avoid** the following:

a. Speaking on "behalf of MCU" in personal online social media communications. Employees should not associate MCU with their private accounts, nor should they give the appearance of speaking *for* MCU. You should also not imply that your account is an official MCU account or use MCU's logo in your personal social media communications. Employees should not provide a link from their social media page to MCU.
b. Disclosing MCU's security protocols. Examples include detailing how member information is protected, the methods of computer security we employ, specific branch opening and closing processes, when the pick up or delivery of cash occurs or any other information that, if revealed, might endanger you or your co-workers or breach the security of MCU's offices, the branch network or computer systems.
**c.** Disclosing confidential, proprietary, or personally identifiable customer information (PII).
**d.** Identifying MCU members and/or disclosing member information.

**e.** Disclosing MCU Intellectual Property.
**f.** Distributing copies of documents in violation of copyright laws.
g. Accessing, storing, or transmitting material that is defamatory or libelous or might be construed as harassment or disparagement in violation of MCU policy on the basis of race, color, religion, sex, sexual orientation, national origin, age, disability, genetic information, or any other status protected by applicable law.
h. Using information resources to conduct the operations of a business other than Municipal Credit Union business (e.g. selling products or services, running a multi-level marketing business, etc.).
**i.** Transmitting cardholder data including the primary account number (PAN). It is explicitly prohibited without exception (PCI DSS 4.2).
**j.** Using or misusing cardholder data in a violation of law.
**k.** Discussing issues related to MCU's computer hardware, software systems, or network telecommunications. Examples include posting about issues such as: a virus on your work computer, phishing attacks, computer system outages, etc.
l. Posting photos or videos taken on-site at any MCU office or branch or at any official off-site event without first receiving the written permission of your supervisor.
m. Sending or forwarding chain mail, known hoax information, rumor, or information detrimental to the reputation of MCU's services and products.
n. Posting material that is adverse to the reputation of the products and/or services provided by MCU.
o. Spending excessive amounts of time, as determined by the respective department or staff manager, utilizing social networking web sites or blogging.
p. Supporting a competitor of MCU or its affiliates or otherwise conflicts with an employee's duties to MCU; or

The following are permitted only with the express prior written permission of both an employee's manager and the MCU's Legal Department:

q. Blogs or social networking that imply sponsorship or support by MCU;

r. Blogs or social networking that use any logos or trademarks of MCU or its affiliates in any manner that expresses or implies that the communication is from or is endorsed by MCU; or

s. Blogs or social networking that use MCU s time, facilities, resources, or supplies.

Additionally,

t. You should not attempt to post under a fake name/alias as a way to get around the restrictions in this policy.
u. You should not create a Municipal Credit Union entry nor edit an existing MCU entry in any type of wiki open-content project (e.g. Wikipedia).
**v.** If you blog or discuss topics related to MCU's business, be upfront and explain that you work for MCU. If you are not an official company spokesperson, add a disclaimer to the effect: **"The opinions and positions expressed are my own and don't necessarily reflect those of Municipal Credit Union."**

w. Be aware that taking positions through social media on public issues which are counter to MCU's business interest may create a conflict of interest for you.

3) **Let MCU respond to negative posts.** As you participate in social media, you may come across negative posts about MCU or see third parties trying to spark negative conversations about MCU. Do not attempt to defend MCU by posting a response on MCU's behalf (by using your real name or a false name). Only an authorized and designated MCU employee should respond to these types of posts or conversations. You can alert us about any posts of this type that you come across by sending an email to **socialmedia@nymcu.org.**

4) **Keep in mind that you are more likely to resolve work-related complaints by speaking directly with your coworkers or by utilizing MCU's internal procedures than by posting complaints to a social media outlet**. Nevertheless, if you decide to post complaints or criticism, you must avoid using statements, photographs, and video or audio that reasonably could be viewed as malicious, obscene, and threatening or intimidating, that disparage members, associates or suppliers, or that might constitute harassment in violation of MCU policies.

When participating in social media, we urge you to exercise sound judgment and common sense. Online postings and conversations are not private. You never know who might see them. What you post has the potential to be around for a long time and could be shared by others. By providing this policy, we hope you understand that, while your participation in social media might occur outside of your job, you still have a responsibility to protect the privacy of MCU, our employees and our members.

Employees are subject to discipline, which may include termination, for violating this policy. Nothing in this policy is intended to limit any rights you may have under any applicable law or regulation.

Nothing in this policy is meant to prevent employees from discussing the terms and conditions of their employment as permitted by law or engaging in any other activities protected under Section 7 of the National Labor Relations Act or any other applicable federal, state or local law.

**B. Definitions and Terms:**

**FFIEC** – Federal Financial Information Examination Council. The Council is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the National Credit Union Administration (NCUA), the Office of the Comptroller of the Currency (OCC), and the Consumer Financial Protection Bureau (CFPB), and to make recommendations to promote uniformity in the supervision of financial institutions.

**FFIEC Information Security IT Booklet** – The Information Security Booklet issued by the FFIEC that provides national banks and their technology service providers with a comprehensive security framework.

**FTP** – File Transfer Protocol (FTP) is a standard network protocol used to transfer files from one host to another host over a TCP-based network, such as the Internet or local and wide area networks.

**NCUA** –The **National Credit Union Administration (NCUA)** is the independent federal agency created by the U.S. Congress to regulate, charter, and supervise federal credit unions.

**NCUA Part 748** – Guidance on Response Programs for Unauthorized Access to Member Information and Member Notice.

**PAN** –Primary Account Number or **Payment card numbers** are found on payment cards, such as credit cards and debit cards, as well as stored-value cards, gift cards and other similar cards.

**PII** – Personally Identifiable Information as used in US privacy law and information security, is information that can be used on its own or with other information to identify, contact, or locate a single person, or to identify an individual in context. The abbreviation PII is widely accepted in the US context, but the phrase it abbreviates has four common variants based on *personal /personally*, and *identifiable / identifying information*

**PCI DSS** – Payment Card Industry Security Standard Data Security Standard, (PCI DSS) is a proprietary information security standard for organizations that handle cardholder information for the major debit, credit, prepaid, e-purse, ATM, and POS cards.

**PCI DSS Req. 4.2** – Requirement that prohibits sending unencrypted PANs (primary account numbers) by end user messaging technologies (for example, email instant messaging, chat).

## 12.04 ONLINE BANKING

### 12.04-1 Member Data and Access Security

It is the Credit Union's policy that all member data and other sensitive data must be stored on the Credit Union's host computer located behind a firewall. All requests for access to the host through the firewall are through Secured Socket Layering (SSL). The SSL is using a 128-bit encryption. Access to the account from the World Wide Web can only be gained with an account number/pin/password combination. The access is only limited to account for the account number entered. The PIN must contain 4 numeric digits. The password must have minimum of 6 and maximum of 10 alpha and/or numeric characters.

If access is gained and no activity is sensed for a period of four (4) minutes by the host system, the access will automatically shut down by closing the SSL connection. Three (3) invalid access attempts will result in an account being frozen from any further attempted access. No member data or sensitive information will be stored on the web server.

Members are required to establish their PIN numbers through the Credit Union Touch Tone Teller System. Initial passwords are sent to the members by U.S. Mail. Members are instructed to change their passwords after the initial access to the Online Banking System.

**12.04-2** 12.04-1A *Firewall*

It is the Policy of the Credit Union to keep up-to-date with the latest firewall software available. The Credit Union is using Cisco PIX firewall software. Outside consultants are hired for the sole purpose of attempting to breach firewall protection of the Credit Union. The Credit Union will check for vulnerabilities in the firewall system identified by the outside consultants by contacting them on a regular basis. All patches to resolve the identified vulnerabilities are loaded as soon as they are made available by Cisco. In the situation where an identified vulnerability that would have the potential to compromise any sensitive data and no patch is available for the resolution, it is the Credit Union's policy to immediately disconnect the firewall from World Wide Web access. The access will remain disconnected until new software is available to resolve the vulnerability.

The Credit Union also acquired Microsoft Internet Security and Accelerator (MISA) software to control employee access to the World Wide Web. This software is capable of producing a daily report tracking all employee access to the World Wide Web. The report will identify what sites are visited, and what files are downloaded. Microsoft exchange software will produce a report to track sources of e-mail to and from the credit union. Management will review these reports on a regular basis. The Cisco's Policy Manager software produces a daily "alert" report revealing any changes or attempted changes to the configuration files and data files of the firewall and the firewall and the web server. This report reports the Internet Protocol (IP) address changes originated from, the time and date the changes were made.

**12.04-3** 12.04-1B *Online Loan Applications Security*

The Credit Union provides the capability for members to apply for loans over the World Wide Web. The collection and transmission of the sensitive data contained in the application is utilizing the Extendable Markup Language (XML). The data is written to a temporary file on the member's computer for transmission to the Credit Union once the form is completed. The XML will script the data transmission, and the transmission can only be completed through the Secure Socket Layer channels. The collected data cannot reside, even temporarily, for later retrieval on the web server.

**12.04-4 Eligibility for Online Banking Service**

To be eligible to use the Online Banking services, the following conditions must be met:

- Member must be in good standing and must have at least one account relationship with the Credit Union.

- Complete a separate application
- Must obtain a Touch Tone Teller PIN
- A temporary password will be provided, and member will be instructed to change the password at the first access.
- Each joint account owner must agree that he/she is jointly and separately liable for all charges and other responsibilities, which may arise under the MCU Online agreement *(see disclosure for details).*

**12.04-5 Types of Services**

Members can use the Online Banking Service to access and perform certain information and transactions. The Online Banking allows members to:

- view account balance
- review recent transactions
- transfer money between certain accounts
- transfer money to pay balances on certain credit accounts with the Credit Union
- order copies of certain documents
- order checks for FasTrack checking account
- open a share certificate account
- communicate with the Credit Union via e-mail
- request stop payments on FasTrack checking account checks
- apply for certain types of loans
- view certain loan and savings rates
- pay bills (separate sign up required)

**12.04-6 Limitations on Transfers**

Pursuant to Regulation D Section 204. (d) (2), the Credit Union is required to limit, either by contact or in practice, the number of certain types of transfers from savings and money market accounts. Members are limited to six (6) preauthorized electronic funds transfers and telephone transfers, including Online

Banking transactions and checks per month. Of these six (6) transactions, members are limited to no more than three (3) transactions per month by check or point of sale. Each funds transfer or payment through Online Banking from member's share or money market account is counted as one of the six limited transfers. Payments to loan accounts with the Credit Union are not counted toward this limit for share or money market accounts.

**12.04-7 Fees**

There are currently no fees for using the Online Banking Services. The Bill Payment service is also free. In order to enroll in the Bill Payment service, members must maintain a checking account. There will be a $30 fee if the bill-pay order returned due to insufficient funds.

**12.04-8 Responsibilities**

Members' rights and responsibilities and the Credit Union's responsibilities are detailed in the disclosure and agreement. This disclosure and agreement is in full compliance with the rules and regulations, and is subject to regular review by the Credit Union for continued compliance with new regulations or enactments.

**12.04-9 Consumer Privacy and Confidentiality**

The following policy has been sent to the members and is posted on the Credit Union web site:

**12.04-10 Privacy Policy and Practices**

Municipal Credit Union is committed to protecting the privacy of each member's financial records consistent with state and federal laws. The Credit Union will take prudent and reasonable measures to safeguard the accuracy and privacy of each of its member's information, including information used while conducting business via the Internet, ATM networks, telephone, the United States mail and other means of communication.

The Credit Union will collect only personal information that is necessary to conduct our business. That means that we will collect only the information that is necessary to provide competitive financial products and services.

Municipal Credit Union collects non-public, personal information about you from the following sources:

- Information we receive from you on membership cards, loan applications or other forms;

- Information specific to your transactions with us, or others; and

- Information we receive from consumer reporting agencies.

Municipal Credit Union does not disclose any non-public personal information about our members or former members to anyone except as permitted or required by law.

MCU restricts access to non-public personal information about you to those employees or agents who need to know that information to provide products or services to you. MCU maintains physical, electronic, and procedural safeguards that comply with federal regulations to guard your non-public personal information.

## 12.05 TOUCH TONE TELLER

MCU provides its members with Touch Tone Teller (TTT) service which enable them to access certain account information, make transfers between accounts or loan payments, and withdraw by check.

### 12.05-1 Information and Transaction Capability

The TTT will provide the following information:

- Saving and checking account balances
- Last twelve checking account transactions
- Transfer funds between accounts
- Obtain status of loan application
- Obtain a loan payment schedule by loan rate, term, and dollar amount requested
- Transfer funds from share or checking accounts for loan or visa payments
- Withdraw from shares -- with check mailed by next business day

### 12.05-2 Statement Mailing

Touch Tone Teller users receive a statement each month in which a monetary Touch Tone transaction has been made.

### 12.05-3 Agreement and Activation

Members are required to complete and sign a separate agreement for the Touch Tone Teller Service. The service will be activated once the Credit Union receives

the signed agreement. The member will be instructed to select a 4-digit PIN number.

**12.05-4 Privacy**

See Privacy Policy and Practices in the Online Banking Section.

**12.05-5 Responsibilities**

Members' rights and responsibilities, and the Credit Union's responsibilities are detailed in the disclosure and agreement. This disclosure and agreement is in full compliance with the rules and regulations, and is subject to regular review by the Credit Union for continued compliance with new regulations or enactments.

## 12.06 CASH CONNECTION CARD (ATM Card)

The Credit Union offers Cash Connection Cards (ATM cards) to its members. Members can perform various financial transactions through various ATM networks or the Credit Union's proprietary ATMs.

**12.06-1 Application and PIN Number**

Members are required to complete a separate application agreement. The plastic card and a secret PIN are sent separately to the member via U.S. Mail.

**12.06-2 Types of Cash Connection Card Transactions**

Member may use his/her card and PIN at participating network ATMs (including proprietary ATMs) for the following purposes.

- Cash withdrawals from Share or FasTrack checking accounts
- Make balance inquiries with regard to Share and FasTrack checking accounts
- Transfer money between Share and FasTrack checking account
- Purchase goods and services from any merchant participating in the NYCE network or other participating network point-of-sale (POS) program. When a POS transaction is made, there will be an immediate electronic withdrawal from the FasTrack checking account.
- Make payments on VISA card account by cash, check or transfer from share or FasTrack checking account (proprietary ATMs only)
- A to A transfers

**12.06-3 Limitations on Cash Connection Card**

- Card and PIN may only be used to conduct transactions and obtain access to those accounts the Credit Union has approved in advance.
- Account must have enough collected funds to cover a transaction.
- Combined Limit for Debit/Cash withdrawal and post transaction is $2,000 per day (the Board approved up to $2,500).
- The Credit Union may limit or refuse to complete a Cash Connection Card transaction for various reasons, such as security.

**12.06-4 Charges**

- There is no charge for withdrawals, transfers, denials or inquires made at the Credit Union's proprietary ATMs by MCU members. A $3.00 surcharge will be imposed to non-MCU members for each proprietary ATM withdrawal.
- There is no charge for POS purchase transactions at participating merchants.
- $2.00 for each withdrawal, $0.50 for each transfer, $0.50 for each withdrawal or transfer denial and $0.50 each inquiry made at ATMs not owned by the Credit Union. These fees will be waived if the combined balance in Share, FasTrack Checking, Money Market, Vacation and Holiday Club Account, Share Certificate Accounts and IRAs (under the same root accounts number used to obtain the card) is at least $2,000 at the time of the transaction.
- Account-to-Account (A2A) money transfer service is provided by NYCE. The service is available to MCU members for transferring money from MCU accounts to other participating financial institutions. A $2 fee will be charged to members who maintain less than $2,000 in combined balances. The service can be transacted through ATMs, Kiosks, or Home Banking. A $2 surcharge will be charged to non-MCU cards for using the A2A service or MCU's ATMs.

**12.06-5 Reporting Unauthorized Use of Card**

If the Cash Connection Card/or PIN has been lost or stolen, and the member informs MCU within the two (2) business days after member first suspects the

loss or theft, member can lose no more than fifty dollars ($50) if someone used the member's card or PIN without his/her permission.

If member does not inform MCU within two (2) business days and MCU can prove that it could have stopped someone from using the card or PIN without the member's permission if the member had informed us, the member can lose as much as $500.

If member statement shows unauthorized transfers or transactions, and member does not inform MCU within 60 days after the statement was mailed, the member may not get back any money lost after the sixty (60) days if MCU can prove that MCU could have stopped someone from taking money had the member informed the Credit Union in time.

**12.06-6 Disclosure of Account Information to Third Parties**

The Credit Union will disclose information to third parties about the member's account or the transactions made, for the following reasons:

- to verify the existence and condition of account for a third party, such as a credit bureau;
- to comply with government agency or court orders;
- if member gives written permission; or when it is necessary to complete a transaction;
- when it is permitted or required by law.

**12.06-7 Limitations on MCU's Responsibility to Member**

See disclosure statement for details.

## 12.07 MCU CHECK CARD (Debit Card)

The MCU Check Card has basically the same functionalities as the Cash Connection Card except that the check cardholder can also make purchases at any merchant, which accepts VISA Cards (check card transaction with signature purchase). When a Check Card transaction is made, funds in the amount of the transaction are immediately placed on hold, and then later withdrawn, from the FasTrack checking account.

**12.07-1 Limitations on Check Card Transaction**

Same as Cash Connection Card

**12.07-2 Charges**

Same as Cash Connection Card

**12.07-3 Reporting of Unauthorized Use of Card**

The conditions for reporting unauthorized use of the VISA check cards, specifically cash withdrawals and transfers, are the same as those for the Cash Connection Card. If an unauthorized VISA (debit card) transaction is made, member will have no liability for the transaction, unless the member was grossly negligent in handling the account or card. The member is still responsible to report any unauthorized transactions. Charge back process will take place when member reports an unauthorized transaction or disputes a transaction. The charge back process is detailed in the procedure manual and is subject to the rules of VISA USA.

**12.07-4 Limitations on MCU's Responsibility to Member**

See disclosure statement for details.

## 12.08 VISA GIFT CARDS

### VISA GIFT CARDS

**Overview**
The Credit Union offers Visa Gift Cards for sale to members and joint owners. The cards are non-reloadable gift cards and can be used worldwide anywhere Visa debit cards are accepted. The Gift Cards have pre-assigned card numbers and expiration dates. Gift Cards can be purchased at our branches or through on-line banking. The cards are available in a variety of designs. They are available in denominations ranging from $20.00 to $500.00. The sale is available to MCU members only.

**12.08-1 Fees**

A $5.00 fee will be charged for the initial issuance of the Card.

- **Inactivity Fee**: A $2.50 fee will be charged each time the Card is inactive for 12 consecutive months and every consecutive month thereafter in which the Card remains inactive.
- **Lost or Stolen Replacement Fee**: A $10.00 fee will be charged to replace a lost or stolen Card.
- **Reissue Fee**: A. $10.00 fee will be charged to reissue an expired Card or issue a refund check for the remaining balance of an expired Card.

- **Foreign Transactions**: If a transaction is made in a currency other than U.S. Dollars, the transaction will be converted to U.S. Dollars in accordance with applicable Visa® operating regulations for international transactions and may include a margin and/or fees charges directly by Visa®.

**12.08-2 Gift Card Usage**

The Card is a prepaid card and may be used only for signature-based (non-PIN) purchases where Visa® debit cards are accepted. The Card may not be used to obtain cash from an ATM or financial institution per Visa® rules and regulations. The Card may not be used for internet gambling or at gambling establishments. Some merchants like restaurants, hotels and car rental agencies may attempt to submit authorizations against the Card for an amount greater than the actual purchase amount. If a merchant attempts an authorization greater than the balance remaining on the Card, it may be declined. The Card may not be used for automatic recurring, installment billing transactions or any illegal transactions. The Card is not a credit card. The card can only be used when there is a balance remaining on the Card and only up to the balance o the Card. Purchases will be deducted from the Card until the balance reaches zero. The Card is not re-loadable and cannot be reused.

## SECTION 13
## MEMBER SERVICE OPERATIONS

### 13.01 CONFIDENTIAL INFORMATION

The unauthorized disclosure of the affairs of the members of Municipal Credit Union is strictly prohibited. Credit Union staff must treat member relationships in the strictest confidence, and every effort must be made to avoid a breach of this responsibility. Public discussion of the affairs of members must always be avoided.

Municipal Credit Union will respond in general terms to traditional credit inquiries. The basic policy of the Credit Union, however, is that no information concerning a member's account shall be disclosed to any person not connected with the Credit Union other than to the member, or his/her duly authorized legal representative without prior written authorization form the member. In this case, the Credit Union will notify the member of the disclosure.

Under no circumstance is a deviation from this policy appropriate.

### 13.02 ACCOUNTS OFFERED

It is the policy of Municipal Credit Union to offer the membership a full range of financial products.

**13.02-1 Regular Share Account**

Regular Share accounts may be opened at any branch office by a Member Service Representative or through the mail by the New Accounts Unit. Regular Share accounts may be opened with a minimum of $5.00.

Regular Share accounts earn dividends on a day-of-deposit to day-of-withdrawal basis. Dividends are credited on a quarterly basis. *(See Truth-In-Savings in the Branch Operations section)*

**13.02-2** Regular Share Account Closing

Regular Share accounts may be closed by either the member or the joint owner. Accounts cannot be closed until Municipal Credit Union receives confirmation that any and all payroll deduction has been canceled and no other services exist.

**13.02-3 Certificates of Deposit**

A Certificate of Deposit (CD) is a savings instrument that offers competitive rates on funds that remain on deposit for a specified period of time. Municipal Credit Union offers fixed rate CDs with terms of 6, 12, 24 and 36 months. The minimum deposit requirement for these term-CDs is $500. Additional deposits

may be made at the beginning of a term only. The Credit Union also offers a fixed-rate 18-month Deposit Plus CD with an initial deposit of $250. For the 18-mo Deposit Plus CD only, additional deposits may be made via electronic funds transfer or payroll deduction in amounts totaling at least $50 per month.

13.02-3A *Certificates of Deposit Dividends and Payments*

Dividends are posted on a monthly basis (in monthly intervals from the opening date). The certificate must be set up in the tax identification number of the primary member. CDs may be opened by Member Service Representatives at branch offices or by a Special Accounts Clerk in the Member Service Operations Department. CDs may also be purchased via Home Banking. The member has seven days from the date the account is opened to rescind the transaction and withdraw the funds without a penalty.

13.02-3B *Certificates of Deposit Maturity Notification*

Refer to Truth-In-Savings in the section of Branch Operations.

13.02-3C *Certificates of Deposit Early Withdrawals and Redemptions Penalty*

Members may choose to withdraw from or close their certificates prior to the maturity date. The equivalent of 180 days dividends on the amount withdrawn will be forfeited.

**13.02-4 Individual Retirement Accounts (IRA)**

Municipal Credit Union members may establish Roth, Contributory IRAs for themselves and Spousal IRAs for non-working spouses. Members may transfer or rollover funds from other qualified retirement plans to Municipal Credit Union. Credit Union members may deposit to their IRAs via direct deposit, payroll deduction or lump sum deposits. Deposits to 6, 12, 24, and 36 month fixed-rate IRA certificates may be made at the beginning of a term only. Deposits to the 18-month variable-rate IRA certificate may be made at any time by automatic payroll deduction or electronic funds transfer for a minimum amount of $5.00 per pay period.

IRA dividends are compounded and paid monthly. Dividends for fixed-rate accounts are paid on the anniversary of the purchase or renewal date. Dividends for the variable-rate accounts are paid on the last day of the calendar month.

13.02-4A *Individual Retirement Accounts Withdrawals*

Members may withdraw funds in the form of a check or cash. Members requesting withdrawals must present proper identification. As per the IRS reporting requirements, the member must sign a special withdrawal form. A

transfer of IRA funds to another institution does not constitute a withdrawal, and is not reported to IRS.

13.02-4B *Individual Retirement Accounts Closing*

Members may close their IRAs at any time. The Internal Revenue Service may assess a penalty. Municipal Credit Union may also impose a penalty if the certificate is closed prior to maturity.

**13.02-5 Holiday and Vacation Club Accounts**

Members may wish to establish separate savings accounts designated for holiday or vacation purposes. Deposits may be made by direct deposit, payroll deduction or over-the-counter. Members have the option of transferring the funds to either the Share or FasTrack checking accounts upon the completion of up to a one-year cycle. These accounts may be opened at any time during the year with a minimum opening deposit of $5.00.

Upon the completion of the one-year cycle, the funds for Holiday Club accounts are transferred to the Share or FasTrack checking accounts during the first week of November, and the funds for Vacation Club accounts are transferred during the first week of May, unless the member specifically requests that the funds remain in the Holiday or Vacation Club account. The dividends on these accounts are compounded and paid monthly.

13.02-5A *Holiday and Vacation Club Withdrawals*

Up to two (2) withdrawals are permitted per term from any Municipal Credit Union Holiday or Vacation Club Account. If the first withdrawal is less than the account balance, the account may remain open. Any subsequent withdrawal must be for the full balance of the account and will require the closure of the club. The club can be reestablished after the original maturity date has passed.

**13.02-6 Money Market Accounts (MMA)**

Municipal Credit Union offers a Money Market account requiring a minimum opening deposit of $2,500 and earning money market rates. The dividend on this account is a variable rate set weekly. The applied dividend rate is calculated based on the averaging of the weekly rates. MMA dividends are paid on the average daily balance, compounded and paid monthly. MMA dividend rates are paid on the following tier-rate structure:

| | Average Balance | |
|---|---|---|
| Tier 1 | $2,500 - $9,999 | The Base rate set by the Credit Union |

| | | |
|---|---|---|
| Tier 2 | $10,000 - $24,999 | Rate Set by Management |
| Tier 3 | $25,000 or more | Rate Set by Management |

Pre-authorized, automatic and telephonic withdrawals are limited to six (6) per calendar month and no more than three (#) of these withdrawals may be made by checks. Unlimited mail or branch withdrawals are allowed.

If the member's average daily balance falls below $2,500, there is a $5.00 service fee. However, dividends are still earned on the account.

**13.02-7 Custodian, Smart Apple Savers and Future Investors Accounts**

13.02-7A *Custodian Accounts*

A Custodian Account is an account that is established for the benefit of a minor under The New York State Uniform Transfers to Minors Act.

Under the Law, during his/her lifetime, a person may give a total of up to $30,000 distributed among any number of beneficiaries plus an additional sum of up to $30,000 a year each to as many beneficiaries as he/she wishes and have these gifts be free of Federal Gift Tax.

13.02-7B *Smart Apple Savers and Future Investors Accounts*

The Smart Apple Savers account is for minors under the age of 13. If a minor is 13 years of age or older at the time the account is opened, he or she will be enrolled in the Future Investors account. All Smart Apple Savers account holders will be automatically enrolled in the Future Investors account once they reached the age of 13. When the minor turns 21 years of age, this account must be closed and the balance in this account transferred to one of the Credit Union's other depository accounts. At such time, new account signature cards will need to be completed. A notice reminding the minor/custodian of this agreement will be mailed at lease thirty days (30) prior to the minor's 21st birthday. Whether or not the minor/custodian receives such notice, the balance in this account will be automatically transferred to a regular Share account which bears all the prevailing terms and conditions applicable to such account, unless the minor/custodian gives the credit union other written instruction prior to or within (10) days after the minor's 21st birthday.

Future Investors accounts can also be opened as single accounts owned by a minor 13-20 years of age (subject to membership eligibility requirements) and as joint accounts with the minor as primary owner and the adult member as joint owner. Single and jointly-owned Future Investor accounts are not subject to the NY State Uniform Transfers to Minors Act.

13.02-7C Young Executive Accounts

The Young Executive account is for young adults between the ages of 18-24. When the individual turns 25 years of age, this account must be closed and the balance in this account will be transferred to one of the Credit Union's other depository accounts.

A notice reminding the member will be mailed at least thirty (30) days prior to the member's 25th birthday. Whether or not the member receives such notice, the balance in this account will be automatically transferred to a regular share which bears all the prevailing terms and conditions applicable to such account. This account can be opened as a single account owned by the young adult or as a joint account with the young adult as the primary owner and a second person as a joint owner.

13.02-7D *Trust Accounts*

A Trust Account (irrevocable trust) is a regular share account placed in trust for a beneficiary designated by the account holder.

**13.02-8 FasTrack Checking Account**

Municipal Credit Union offers FasTrack Checking accounts to its qualified members. This is a checking account that features no monthly service fee, no per check charges, and unlimited check writing. There is no minimum balance requirement on this account. The members will receive the first order of 150 checks at no charge when the account is first opened.

The statement cycle on this account is from the 1st day of every month to the last day of every month.

13.02-8A *FasTrack Checking Accounts Opening*

To open a FasTrack account, an individual must be age of 18 or older and have a valid social security number. The members may be subject to various verifications, such as signature verifications. Members may designate joint owners on the account. Members may order personalized checks. Statements are generated on the last day of every month or the following business day and include all account activity for that cycle.

13.02-8B *FasTrack Checking Accounts Closing*

Members may close a FasTrack Checking account at any time. It is the members' responsibilities to ensure all outstanding checks have cleared before closing the account. Any payroll deductions or ACH deposits coming into the account will

be deposited into the member's regular share account. The Credit Union will consider reopening a checking account closed for cause on a case by case basis after it has been closed for one year. The Credit Union may close a member's account for the following reasons:

- Twelve (12) NSF checks per year. Warning letters are sent after 6 and 10 NSF returns.
- If a member-drawn check from another financial institution was deposited into any MCU account and was insufficient due to that account being closed, member's MCU FasTrack account may be closed. Exceptions to this policy must be approved by management.
- If a member deposits second-party checks into any MCU account, and those checks are insufficient, after the second occurrence, the member's MCU account may be closed.

13.02-8C *Copy of Cancelled Check Requests*

Member may request copies of any of their paid checks. There is a $1.50 fee for this service. MCU will accept telephone requests for this service.

If a member has been subpoenaed from the court for records and provides a copy of the subpoena, along with all the other information necessary to get the copies, there is no charge.

13.02-8D *Automatic Payments/Pre-Authorized Payments*

Municipal Credit Union offers automatic payments from the Checking account if the other party offers the receiving end of the service. The receiving party MUST be able to initiate the paper work for ACH entry.

Some of the automatic payments available include: life insurance premiums, mortgage payments, health insurance premiums, health club memberships, cash management account withdrawals, and funds for needy children.

13.02-8E *Stop Payments on Checks Drawn*

The member may place a stop payment on a check for a $20.00 fee. A written payment remains in effect for six (6) months unless the member specifically requests otherwise. The member may request a stop payment in three (3) ways:

1. In person at any office.
2. By mail.

3. By telephone. If a member requests a stop payment by telephone, a stop order is entered into the system immediately. The member has 14 days to complete a stop payment form and return it to the Credit Union. If completed form is not received, the stop payment order is removed.

13.02-8F *Forgery of Endorsement*

An endorsement signed by someone other than the payee is considered a forgery. When a member has reason to believe that a forgery has been perpetrated against his/her account, he/she must file a forgery claim with the Credit Union immediately. The claim process will begin immediately after the notification.

Once a decision is rendered, a letter is sent to the member and a copy is forwarded to the branch that initiated the claim. The letter will advise the member when the funds will be restored to his/her account or notify him/her that the claim will not be honored.

## 13.03 POWER OF ATTORNEY

A Power of Attorney (POA) Form that is properly completed allows a member (Appointer), for whatever reason, to designate another person (Agent) to transact Credit Union business on his or her behalf.

The law states that the Credit Union will not incur any liability for honoring a POA unless it has received a written revocation or termination.

Credit Union members should be encouraged to use the POA form specifically designed by MCU's Legal Department. If a different form is presented, the Legal Department must be contacted for an approval.

## 13.04 RECEIPT OF LEGAL PROCESS

During the normal course of business, Municipal Credit Union may be served with various types of legal documents including subpoenas, summons and complaints, levies and executions. This service may be accomplished in person or through the mail, and the action may be against the Credit Union, an employee, or a member.

The Manager and Operations Officer are the only employees at the branch sites who are authorized to accept legal process on behalf of the Credit Union. It is important that these items be handled in a timely manner since certain types of service may require the restraint of money in an account.

Upon acceptance of service of legal process, the individual receiving the papers will note on the original document:

1. The date of receipt

2. The time of receipt

3. The method of receipt (mail/person)

4. The name of the person upon whom the service was made

Forward the papers to the responsible division as follows:

| | | |
|---|---|---|
| **Legal Department** | – | An action against the Credit Union<br>An action against a member |
| **MSO Subpoena & Restraint** | – | An action against a member |
| **Human Resources** | – | An action against an employee |

Managers are advised to contact the Legal Department immediately should they encounter questions concerning this process.

## 13.05 COMPLAINT RESOLUTION POLICY

Complaint/priority correspondence will be classified as any communication indicating dissatisfaction with either individual or departmental job performance, account errors, Credit Union practice or all Banking Department inquiries. Communications of these types are directed to the Board of Directors, the Supervisory Committee, the Executive Officers or the Member Service Operations management.

When complaint letters are received, these letters should be date stamped, read for specific problems or concerns, and forwarded to the appropriate department head or division supervisor with an inter-office mail receipt for investigation and resolution.

When the complaint letter is received, the mail receipt must be signed and a copy forwarded to the originating department. The letters are to be logged with date received, member's name, account number and categorized by complaint type.

The response time should be within 72 hours. If this time frame is impossible due to retrieval of additional information such as a check copy or obtaining a document stored off-site, this is to be communicated to the office where the correspondence originated and to the member.

* **For details of Complaint Process, refer to Member Service Operations Procedure Manual**.

## 13.06 FEES AND CHARGES

**13.06-1** Minimum Balance Fee – $11.00

At the end of any calendar month in which a member does not have a minimum combined balance of $500.00 in one or a combination of his/her MCU deposit

account (under the same root account number), his/her share account will be assessed a minimum combined balance charge of $11.00. This minimum balance charge will be waived for the following reasons:

- If the member has a secured loan with outstanding balance on a new/used car loan, secured VISA Card, or Home Equity line with the Credit Union and maintains at least $5.00 in his/her share accounts.

- If the member has an unsecured loan with outstanding balance on an unsecured loan or unsecured VISA Card loan (except other unsecured line-of-credit loans) with the Credit Union and maintains at least $250.00 in combined balances.

- If the member is 62 years of age or older, or 21 years of age or younger, (In the case of a joint account, eligibility will be based on the age of the primary accountholder.)

- If the member has only opened his/her share account less than one full year ago.)

**13.06-2** Setoff Service Charge (Delinquent Loan payment transfer fee) – $10.00

Each time the Credit Union exercises its right of setoff and transfers shares from a member account to his/her delinquent account, a $10.00 service charge may be assessed.

**13.06-3 FasTrack and MMA Checking Account Fees**

A. NSF Charge FasTrack and MMA – $30.00

Each time a check (share draft) a member draws, or ACH debit request a member authorizes, is returned as unpayable for any reason, a $30.00 service charge will be assessed.

B. Check Image Fee (FasTrack and MMA) – $2.50

If a member elects to obtain images of paid checks, a $2.50 fee will be assessed each month, unless he/she has a combined balance of $2,000 or more in all of his/her MCU accounts (under the same root account number) as of the last day of the calendar month.

C. MMA Low Balance Fee – $5.00

If the average daily balance in the MMA account is less than $2,500 in any monthly statement cycle, a $5.00 fee will be assessed.

### 13.06-4 Cash Connection/Check Card Fees

See Cash Connection Card in the Electronic Services Section of this manual.

### 13.06-5 Other Fees and Charges

- Statement Copy Fee: $2.00 per statement
- Check Copy Fee: $1.50 per check (share draft)
- Check Printing Charge: $16.24 per 150 checks for FasTrack. Checking Accounts (varies depending on style of check ordered): $8.60 per 25 checks for Money Market Accounts (varies depending on style of check ordered)
- NG Check Charge (for depositing check which is later returned as unpaid for any reason): $10.00
- NSF Charge (for ACH debit request member authorizes, or check member draws, which must be returned for any reason): $30.00 per item
- Legal Document Fee (for processing a legal document served upon Credit Union pertaining to any of the member's account): $75.00
- Money Order Fee: $1.50 per money order
- ATM Card Fee (for replacing Cash Connection Card): $5.00
- ATM PIN Replacement Fee: $3.00
- Stop Payment Charge: $20.00 per order
- Traveler's Checks Fee: 1% of amount purchased
- Gift Checks Fee: $2.50 per gift check
- Abandoned Property Fee: (for processing the turnover of abandoned property to the State of New York): $10.00
- Official Teller Check payable to a third party: $5.00 for each issuance. The fee will be waived if the member has a combined deposit balance of $2,000 or more after the check withdrawal.
- Members over age of 60 should not be charged. The fee is only charged when the check is made payable to a third party.

## SECTION 14
## HUMAN RESOURCES

### 14.01 DISCLOSURE

Management reserves the right at any time to modify, revoke, suspend, terminate, or change any or all terms of its regulations, plans and procedures, in whole or in part, for non-bargaining unit employees without having to consult or reach agreement with anyone, at any time, with or without notice. Employees have the right at any time to terminate their employment with or without cause and management reserves the right at any time to terminate their employment with or without cause. This policy does not constitute a contract and, therefore, management is not bound by the contents of this document.

The term regular full-time employee or full-time employee shall be construed to be a full-time employee who has completed his/her new hire probation.

For Union employees, in the event that there is a conflict between information contained in this policy and the Union contract with OPEIU, Local 153, the Union contract shall prevail. Otherwise, the terms of this policy shall apply to Union employees.

### 14.02 EMPLOYEE SUPERVISION POLICY

It is the policy of the Credit Union that the work of all employees shall be assigned, directed, and reviewed by supervisory personnel.

**14.02-1** The supervisor is the link between management and non-management employees. They communicate to the employees under their supervision the goals and policies of management, and the supervisor communicates to management the attitudes, suggestion, and complaints of employees. Effective supervision depends primarily on the ability of supervisors to motivate employees.

**14.02-2** It is the responsibility of each supervisor to ensure that the goals regarding work output established by management are achieved, and that the personnel policies established by this manual are followed.

### 14.03 DEFINITION OF EMPLOYEE STATUS

The purpose of this policy is to define terminology and insure common understanding in references. The terms below shall be interpreted as indicated:

**14.03-1** Regular Full-Time: Employees who work a normal workweek which consists of 35 hours and who has successfully completed new hire probation.

**14.03-2** Part-Time Hourly: Employees who work less than 1,000 hours per year (calculated on plan year of employee pension plan) and are paid on an hourly basis.

**14.03-3** Probationary: Employees who have not yet completed the probationary period (6 months following initial hire).

**14.03-4** Temporary: Employees whose services are intended to be of limited duration and not to exceed 6 months. Management reserves the right to extend the duration of a temporary employees' employment based upon operational needs.

**14.03-5** Cooperative Student: Employees who are hired for a limited time period and predicated on the student's participation in the Board of Education's Cooperative Student Program.

**14.03-6** Exempt: Employees who are exempt from the overtime and other provisions of the Fair Labor Standards Act. Overtime is not paid to employees in this classification.

**14.03-7** Non-Exempt: Employees who are not exempt from the overtime and other provisions of the Fair Labor Standards Act.

### 14.04 EQUAL EMPLOYMENT OPPORTUNITY

The policy of the Credit Union is to provide equal employment opportunities to all applicants and employees without regard to race, color, religion, sex, age, national origin, sexual preference, handicapped condition, or status as a disabled Veteran of the Vietnam Era and to affirmatively seek to advance the principles of equal employment opportunity.

Any communication from an applicant for employment, an employee, a government agency or an attorney concerning any equal employment opportunity matter should be referred to the Human Resources Department.

While the overall authority for implementing this policy is assigned to the Vice President of Human Resources, supervisors and department heads should understand that their equal employment efforts and results are a part of their overall supervisory work performance.

### 14.05 EMPLOYMENT AT WILL

A. It is the policy of the Credit Union that employment is "at will". During the recruitment, hiring and orientation process, no statement will be made promising permanent or guaranteed employment and no document will be called a contract unless an employment contract is to be used.

B. For the purpose of avoiding breaches of fiduciary duty, conflicts of interests, improprieties or any appearances thereof, Municipal Credit Union volunteers (e.g., Director, Supervisory Committee Member, Nominating Committee Member, etc.) shall not be eligible for consideration for paid employment with the Credit Union (even if he or she has the necessary job qualifications) during the term of such volunteer's service, and for a period of no less than two (2) years after the termination of the volunteer's service. Furthermore, no volunteer shall (by reason of or through his or her volunteer position) assume the title, position, or responsibilities of or represent himself/herself as an operating officer or employee (e.g., President, Vic-President, Manager, etc.) of the Credit Union.

**14.06 <u>EMPLOYMENT CONTRACTS/AGREEMENTS</u>**

It is the policy of the Credit Union that the need for employment contract for executives, senior managers, and special employees will be decided upon on an individual basis by the Chief Executive Officer. These agreements will be a condition of employment or continued employment. Such documents require the approval of the Chief Executive Officer.

The Chief Executive Officer's employment contract is approved by the Board of Directors.

**14.07 <u>OUTSIDE EMPLOYMENT</u>**

It is the policy of the Credit Union to allow its employees to hold second jobs, subject to certain restrictions. Outside employment for full-time employees is not encouraged.

The Credit Union recognizes the right of its employees to spend their nonworking time away from the job as they please. However, these activities must not adversely affect the employee's job performance or compromise the Credit Union's interests.

Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, refusal to travel, or refusal to work overtime or different hours.

Employees are prohibited from engaging in any activity that competes with the Credit Union or compromises its interest. These include performing services for members on nonworking time that are normally performed by Credit Union personnel and the unauthorized use or application of any confidential trade information or techniques. In addition, employees are not to conduct any outside business during paid working time.

Employees who have accepted outside employment are not eligible for paid sick absence when the absence is used to work on the outside job.

**14.08 <u>HIRING AND JOB PLACEMENT</u>**

Municipal Credit Union is an equal opportunity employer and hires individuals who possess the necessary qualifications to perform a specific job successfully without regard to race, color, religion, sex, age, national origin, sexual preference, handicapped condition, marital status, or status as a disabled or Vietnam Era Veteran.

In no event will the hiring of an employee be considered as creating a contractual

relationship between the employee and the Credit Union; and unless otherwise provided in writing, such relationship will be defined as "employment at will," where either party may dissolve the relationship. (For bargaining unit employees, "employment at will" relationship will be subject to the terms of the bargaining unit agreement).

## 14.09 REHIRING FORMER EMPLOYEES

It is the Policy of the Credit Union that while it is not a common practice to rehire former employees, individuals who left the Credit Union in good standing may be considered for re-hire. A previously terminated employee who is re-hired will be considered a new employee from the date of re-hire unless the break in service is less than 30 days, in which case the employee will retain seniority and other applicable benefits. Exceptions can only be made by the Chief Executive Officer or Executive Vice President. Any former employee who resigned without adequate notice, or who was terminated with cause, will not be considered for re-hire.

**14.10 JOB POSTING (See also Promotion)**

In general, the Credit Union hires employees for entry level positions and trains and develops them for promotion to higher level jobs. If certain non-exempt jobs above entry level are vacant and where circumstances allow, employees will be given the opportunity to apply for such vacancies before outside recruitment is utilized.

There shall be a 90-day probationary period for employees promoted under this policy, but the employee will be paid immediately within the salary range for the new position. Employees may bid laterally but not bid downward.

The records of all candidates will be reviewed by the appropriate Department Head. Supervisors and Department Heads will recommend employees for consideration as candidates for promotion.

In the absence of candidates for bidding, or being recommended for job openings, the Human Resources Department will Utilize Outside Sources.

**14.11 NEW HIRE ORIENTATION**

The Credit Union conducts various orientation and training programs to familiarize employees with the Credit Union and to teach the skills necessary for efficient job performance.

All newly hired employees will participate in an orientation program that is designed to acquaint them with the Credit Union.

All employees are encouraged or required in some cases to participate in continuing education and training programs as determined by management to enhance job performance. The Credit Union's training programs are designed to develop staff and prepared individuals for advancement in keeping with the "promotion" from within philosophy.

Supervisory level employees are responsible for on-the-job training of their staff, teaching them the skills necessary to perform their day-to-day job functions. Supervisors

may designate a staff trainer, if appropriate. Whenever possible, instructional aides will be provided by the Human Resources Department.

**14.12 PROBATIONARY EMPLOYMENT**

It is the policy of the Credit Union that all new employees shall be placed on probation for a period of six (6) months. Upon successful completion of the probationary period, the employee will be given regular full-time, part-time, or cooperative student status.

**14.12-1** During the probationary period, the employee's job performance will be observed by the supervisor and weaknesses in performance or attitude will be brought to the employee's attention.

**14.12-2** Within the first (6) months of the probationary period, the supervisor shall prepare a written evaluation of the employee's job performance. The evaluation should include a recommendation as to granting the employee regular status. Copies of the evaluation shall be forwarded to the department head and the Human Resources Department. The probation period may be extended at management's discretion.

**14.12-3** New employees whose job performance is deemed to be unsatisfactory after reasonable efforts have been made to improve their performance may be terminated during or at the end of the probationary period. A written evaluation shall be prepared by their supervisor, along with a statement of action taken to assist the employees in adjusting to their jobs. Copies of these evaluations shall be forwarded to the department head and the Human Resources Department.

**14.12-4** If the results of a background investigation indicate that a new employee is not suited for employment with the Credit Union, the employee will be terminated. New employees who are terminated during or at the end of the probationary period are not eligible for severance pay.

**14.12-5** During their probationary period, new employees shall not be eligible for paid absences or for such other employee benefits, such as vacation, educational assistance, etc. The probationary employee will be eligible for paid holidays if the conditions cited in the holiday policy are met.

**14.12-6** Regular full-time employees are granted regular status after having satisfactorily completed a six (6) month new hire probationary period. The employee's department supervisor will prepare a written evaluation. Regular employees are entitled to all applicable employee benefits, rights and privileges currently offered by Municipal Credit Union.

**14.12-7** The effective date of health insurance coverage for eligible newly hired employees will be the first day of the month following their original date of hire. In addition, employees will be entitled to personal days, vacation, and paid sick leave that they have earned during the new hire probationary period. Exceptions may be approved by executive management.

**14.12-8** Part-time employees must satisfactorily complete the six (6) month new hire probationary period, and are subject to the new job training, probationary period and corrective action. Part-time, cooperative students and temporary employees will not be eligible for these benefits.

**14.12-9** An employment status change to regular full-time constitutes a new employment cycle for purposes of performance review, and salary review.

**14.12-10** Employees on new hire or corrective action probation (formal or final) are not eligible for transfer, promotion or salary increases.

**14.13 PROMOTION (See also Job Posting)**

The Credit Union hires employees for various positions. It is the Credit Union's intention to train and develop them for promotion to higher level positions. If certain non-exempt job vacancies above entry level occur, and where circumstances allow, employees will be given the opportunity to apply for such vacancies before outside recruitment is utilized. These positions will be posted on the Human Resources Department intranet site.

**14.13-1** At the end of the probationary period, the supervisor will prepare a written evaluation of the employee's performance with a recommendation for regular status if applicable. Copies of the evaluation will be forwarded to the department head and the Human Resources Department.

**14.13-2** A promoted employee, whose performance is unsatisfactory on his /her new job, during or at the end of his /her probation period, may be returned to his/her original job. The salary will be adjusted back to the former position's level. Exceptions can only be authorized by the Chief Executive Officer or designee.

**14.13-3** If the employee's former position is not available or he/she cannot be placed in a suitable position, the employee may be placed on layoff status subject to recall into the former job.

**14.13-4** No employee will be permitted to bid for promotion to a new position until he/she has been in their present job for a minimum of six (6) months after the probationary period. Exceptions may be granted by Chief Executive Officer or designee.

**14.14 REPLACING A DISABLED EMPLOYEE**

The Credit Union reserves the right to fill positions of disabled employees based on business necessity. Upon their return to work, the Credit Union will place such employees in comparable open positions in the same locality or other localities in available jobs.

**14.15 AMERICANS WITH DISABILITIES ACT POLICY STATEMENT**

MCU is committed to complying with all applicable provisions of the Americans with Disabilities Act (ADA). It is MCU's policy not to discriminate against any qualified employee or applicant with regard to any terms or conditions of employment because of such individual's disability or perceived disability, so long as the employee can perform the essential functions of the job. Consistent with this policy of nondiscrimination, the Credit Union will provide reasonable accommodations to a qualified individual with a disability, as defined by the ADA, who has made the Credit Union aware of his or her disability, provided that such accommodation does not constitute an undue hardship on

the Credit Union. Employees with a disability who believe they need a reasonable accommodation to perform the essential functions of their job should contact the Human Resources Department. MCU encourages individuals with disabilities to come forward and request reasonable accommodations.

## 14.16 CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT (COBRA)

MCU is committed to complying with all applicable provisions by the Consolidated Omnibus Budget Reconciliation Act (COBRA). The Act mandates that employers (with more than 20 employees on 50% of the business days of the previous year) continue health care coverage for employees enrolled in the benefit plan for a certain number of months (usually 18) after they suffer a loss of health care benefits. The loss of benefits is usually caused by termination of employment or a reduction in hours that makes employees ineligible for the benefit plan. All persons covered by a plan, including spouses and children, for example, are eligible for COBRA. Health care continuation coverage premiums are paid in full by the employee, and the employer may charge the employee 2% of the premium for administrative costs. The Act mandates the length of time employees have to elect COBRA benefits, as well as response time for employers, and what notices must be provided.

## 14.17 FAIR LABOR STANDARDS ACT (FLSA)

MCU is committed to complying with all applicable provisions of the Fair Labor Standards Act (FLSA).

## 14.18 HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)

MCU is committed to complying with all applicable provisions of the Health Insurance Portability and Accountability Act (HIPAA) which states employers with group health plans that have two or more plan participants who are current employees must abide by this law. HIPAA limits group health insurance preexisting exclusions, prohibits excluding individuals from coverage based on their health status, and guarantees renewal of group health plans.

## 14.19 TEMPORARY AND PART-TIME EMPLOYEES

The Credit Union supplements the regular work force with temporary or part-time employees when necessitated by periods of peak work loads, employee absences, or other situations as determined by management.

A temporary employee is an individual who is hired full-time for a limited period not to exceed 190 days. However, exceptions may be granted based on operational staffing needs as determined by management.

A part-time employee is an individual whose work hours should not exceed 20 hours per week. A cooperative student employee is hired for a limited period, predicated on his/her participation in the Board of Education's Cooperative Student Program.

Requests for temporary, part-time, or cooperative employees should be submitted to the Chief Executive Officer or designee for approval.

The Human Resources Department will attempt to satisfy approved requests by the temporary transfer of employees from another department if possible; alternatively, outside hiring may be approved.

A federal certificate of age must be obtained in advance of employment for all new hires under age 18 to verify that they are age 16 or over.

Special assignment personnel will not be eligible for any of the benefits, rights, and privileges currently offered by the Credit Union, unless they are authorized by the Chief Executive Officer.

**14.20 TRANSFERS**

The Credit Union may transfer employees from one job to another, either at their own request or as a result of a decision by management.

Reasons for transfer include, but are not limited to, fluctuations in department work loads or production flow, the more efficient utilization of personnel, increased career opportunities, personality conflicts, or reasons of health. Temporary transfers may be made for periods of up to six (6) months.

Eligibility for transfer is determined by the requirements of the new job. An employee must have been performing in a satisfactory manner in his/her current job for at least six (6) months prior to the transfer request.

An employee transferred temporarily to a higher paying job will be compensated at the rate of the new job. An employee transferred temporarily to a lower paying job will continue to be paid at his/her existing rate for the duration of the transfer. If the employee has not been returned to his/her permanent job after 90 days, the Human Resources Department will review the situation and recommend to either return the employee to his/her former position, extend the period of temporary transfer, or make the transfer permanent.

Employees are considered as candidates for transfer in the following order:

1. Eligible employees in the same department as the job opening.
2. Eligible employees in other departments who have submitted transfer requests in accordance with this policy.

3. Eligible employees who are being considered for layoff due to a reduction in work force in their present position or job elimination.

Transferring employees will be placed on three (3) months probation. At the end of three (3) months, the supervisor will prepare a written evaluation of the employee's job performance. The evaluation should include a recommendation granting the employee regular status. Copies of the evaluation will be forwarded to the department head and the Human Resources Department.

Unsatisfactory performance will be a cause for returning a transferred employee to his/her former job, if available, or layoff status.

Transferred employees will retain their former job seniority until satisfactorily completing their probationary period.

An employee transferred to a comparable paying job will continue to receive his/her existing rate of pay.

An employee transferred to a higher paying job will be paid at the higher rate effective the official date of the transfer.

An employee transferred to a lower paying job at the initiative of management may continue to be paid at his/her former job rate.

Involuntary unilateral transfer (transfer directed by management, not including promotion) of any employee who is unable to perform satisfactorily during or at the end of their probation period will, if practical, be returned to their original job. If the employee's former position is not available, he/she will be placed in an available position.

An employee who requests a transfer to a lower paying job will be paid at the lower rate upon commencing the new job. A three (3) month probation period will be enforced.

Non-exempt job openings which management intends to fill from within will be posted on the Human Resources Department intranet site.

**14.21 NEPOTISM POLICY**

The Credit Union may employ a relative of an employee, elected official, or appointed official of the Credit Union, provided the individual possesses the necessary qualifications for the position available. However, no favoritism will be shown based on the fact that the individual is a relative of an employee, elected official, or appointed official. Those persons will not be given work assignments, which require one to direct, review or process the work of the other.

However, regardless of the above, a prospective applicant will be required to disclose on his or her employment application, whether or not his or her spouse (or other individual

living in the same household in a spousal type relationship), child, father, mother, grandparent, grandchild, sister, brother, or spouse of any of these relatives, is presently an employee, elected official, or appointed official of MCU. Furthermore, any employee, elected official, or appointed official of MCU, upon learning that his or her spouse (or other individual living in the same household in a spousal type relationship), child, father, mother, grandparent, grandchild, sister, brother, or spouse of any of these relatives, has applied for employment within, or is employed by, the Credit Union, will immediately disclose that fact to the Human Resources Department.

Executive Management shall be notified by the Human Resources Department and must approve of any individuals who fall within the above referred to classes. In the case where the relationship is to executive management, the Board Secretary shall be notified by the Human Resources Department and will present such names to the Board at its next regularly scheduled meeting.

Any breach of this policy may result in immediate disciplinary action including termination of employment.

**14.22 EMPLOYEE COUNSELING**

The Credit Union will provide employees with counseling and referral services to aid them in career planning, coping with and solving personal problems. All employees counseling will be confidential.

Personal difficulties such as marital, family, emotional, psychological, interpersonal, medical, financial, legal, or alcohol and drug abuse, can adversely affect the employee job performance. Employees experiencing these or similar problems are encouraged to seek assistance from their supervisors or from the Human Resources Department.

If an employee receives less than satisfactory performance evaluations, the supervisor will conduct a performance review, which will include counseling the employee as to the actions required to improve performance.

If an employee is subject to disciplinary action for minor or first time infractions of Credit Union rules and regulations or standards of conduct, the supervisor will counsel the employee on the necessary steps to correct the misbehavior.

**14.23 GRIEVANCE POLICY**

The Credit Union encourages employees to bring to the attention of management their complaints about work related situations through a formal grievance procedure.

Grievances will be resolved fairly and promptly and will be held in the strictest confidence.

MCU
MUNICIPAL CREDIT UNION



A grievance is defined as an employee's expressed feeling of dissatisfaction concerning conditions of employment, treatment by management, supervisors, or other employees. Examples of actions which may cause grievances include:

**14.23-1** Application of the Credit Union's policies, practices, rules, regulations, and procedures believed to be to the detriment of an employee.

**14.23-2** Treatment considered unfair by an employee, such as coercion, reprisal, harassment, or intimidation.

**14.23-3** Alleged discrimination because of race, color, sex, age, religion, national origin or marital status.

**14.23-4** Improper or unfair administration of employee benefits or conditions of employment such as vacations, fringe benefits, promotions, retirement, holidays, performance review, salary or seniority.

**14.23-5** Should an employee believe that he/she has a grievance, the employee should bring the matter to the attention of his/her supervisor. It is the responsibility of the supervisor to investigate the grievance, attempt to resolve it, and communicate a decision to the employee within a reasonable time period. If the employee's problem concerns his/her immediate supervisor, the employee will be permitted to initially discuss the problem with the department head.

**14.23-6** If the aggrieved employee is not satisfied with the supervisor's decision, he/she may appeal to the next level. The supervisor will document the grievance, facts, and the decision for review by the department head.

**14.23-7** The department head will discuss the matter with the employee, the supervisor, and any other involved party he/she deems necessary, make a decision and prepare appropriate documentation. If the aggrieved employee is not satisfied with the department head's decision, he/she may appeal to the next level.

**14.23-8** A representative of management will review the grievance and discuss the matter with the employee. A final decision will be communicated to the employee within five (5) business days. Time spent by aggrieved employees in discussions with management will be during normal working hours and considered hours worked for pay purposes.

**14.23-9** Whenever two (2) or more employees have a similar complaint, the Credit Union may select one (1) or more of them to represent the group, and the final decisions on grievance will be binding on all group members. Management decisions on grievances will not be precedent-setting nor binding on future grievances unless they are officially stated as Credit Union policy. The Chief Executive Officer has the option to make the decisions retroactive to the date of the employee's official complaint.

## 14.24 EMPLOYEE ATTENDANCE AND PUNCTUALITY

It is the policy of the Credit Union to encourage habits of good attendance and punctuality by its employees. Management recognizes that circumstances beyond an

employee's control may cause him/her to be absent from work for all or part of a day. Unauthorized absence or tardiness will not be tolerated and may result in corrective action.

**14.24-1** Employees are expected to report for work as scheduled and should notify their supervisor in advance whenever they are unable to report. As much advance notice as possible should be given to permit a replacement to be scheduled. If their immediate supervisor, assistant manager, or manager is unavailable, employees should contact the Human Resources Department. Failure to notify the Credit Union of any anticipated absence or delay in reporting for work on a continuous basis may be grounds for corrective action. Employees may be compensated during authorized absences in accordance with policy. Authorized absences in excess of the number of days paid absence accumulated by an employee will not be compensated, but will not jeopardize the employee's employment status, unless it is in direct violation of the absenteeism policy.

**14.24-2** Employees must be at their work stations at the starting hour and at the prescribed time after coffee and lunch breaks. Employees who, for any reason, will be late reporting for work are required to call their supervisor promptly.

**14.24-3** Excessive absenteeism and chronic tardiness are patterns of behavior that are easily identified. These behavior patterns should be documented. Supervisors should keep a record of employees' absences/lateness and evaluate them periodically. Attention should be directed to:

A. **Reasons for absences/lateness.**

B. **Total number of absences/lateness.**

C. **Number of continuous periods of absences/lateness.**

D. **Patterns of absences/lateness such as a Monday or Friday, day after holiday, and absences after pay day.**

**14.24-4** Non-exempt employees should not be permitted to work beyond their normal quitting or starting time for the purpose of making up time lost due to unauthorized absence, or authorized absence for which the employee is not eligible to receive compensation.

**14.24-5** Non-exempt employees may be permitted to make up time lost due to tardiness during the same pay period provided that prior approval of the department head is obtained.

**14.24-6** When a non-exempt employee works five (5) hours in a given day and leaves early due to a family emergency, illness, or medical appointment, the employee can be paid for the full day at the discretion and approval of the department head.

**14.24-7** If a non-exempt employee leaves before they have worked five (5) hours, they will be allowed to make up the difference in time during the same pay period at the discretion and approval of the department head or be paid for the actual hours worked on that specific day. Any employee who abuses this process will not be allowed to make up lost time.

**14.24-8** Employees absent from work for two (2) consecutive days without good cause or without giving proper notice will be considered as having resigned. It is considered excessive if a new hire probationary employee is absent two (2) occasions, to a maximum of five (5) days in the first six (6) months of employment.

A. Two (2) absence occasions in the first six (6) months will result in formal warning.

B. Four (4) absence occasions in the first six (6) months will result in final warning.

C. Five (5) absence occasions in the first six (6) months will result in termination.

**14.24-9** It is considered excessive if an employee with more than six (6) months of employment is absent four (4) occasions in any three (3) months period, to a maximum of 12 occasions in any 12-month period.

A. Four (4) absence occasions in any three (3) months will result in informal written warning.

B. Six (6) absence occasions in any six (6) months will result in formal written warning.

C. Nine (9) absence occasions in any nine (9) months will result in final written warning.

D. Twelve (12) absence occasions in any twelve (12) months will result in termination.

**14.24-10** It is considered excessive if a new hire probationary employee is late three (3) times, to a maximum of seven (7) times in the first six (6) months of employment.

A. Three (3) latenesses in the first six (6) months will result in an informal warning.

B. Five (5) latenesses in the first six (6) months will result in formal warning.

C. Seven (7) latenesses in the first six (6) months will result in termination.

**14.24-11** It is considered excessive if any employee with more than six (6) month of employment is late five (5) times in any three (3) month period to a maximum of 16 times in any 12 month period.

A. Five (5) latenesses in any three (3) months will result in an informal warning.

B. Nine (9) latenesses in any six (6) months will result in formal warning.

C. Fourteen (14) latenesses in any nine (9) months will result in final warning.

D. Sixteen (16) latenesses in any twelve (12) months will result in termination.

## 14.25 CONFLICT OF INTEREST

**14.25-1** No employee shall accept employment in any organization which does business with the Credit Union or is a competitor of the Credit Union.

**14.25-2** No employee or a member of his/her immediate family shall have a financial interest in an organization which does business with the Credit Union if the interest is sufficient to affect the employee's decisions or actions.

**14.25-3** No employee will accept gifts from any person or firm doing or seeking to do business with the Credit Union under circumstances from which it might reasonably be inferred that the purpose of the gift is to influence the employee in the conduct of Credit Union business with the donor. Such gifts should be returned with a note of explanation. Employees may accept advertising novelties such as pens, pencils and calendars or other gifts of nominal value when circumstances show that gifts are offered for reasons of personal esteem and affection.

**14.25-4** Employees will be required to file a report with the Executive office detailing any gift received or given with a dollar value of $100 or more. When any employee has a question concerning a possible conflict of interest, the employee is expected to request advice from management.

## 14.26 CONFIDENTIAL NATURE OF CREDIT UNION AFFAIRS

It is the policy of the Credit Union to prohibit unauthorized disclosure of the affairs of the members of the Credit Union.

**14.26-1** No employee may discuss the operations of the Credit Union with outsiders unless expressly approved by management. Confidential information concerning the Credit Union should be regarded as trade secrets, the disclosure of which, to unauthorized persons would be harmful to the Credit Union. Access to certain sensitive Credit Union information and operating procedures will be limited to those employees who "need to know". Unauthorized employees are prohibited from attempting to obtain confidential information.

**14.26-2** Unless authorized by the law or by a member's permission, no employee shall divulge information concerning the activities or operations of the Credit Union's members. Employees handling confidential information are responsible for its security. Extreme care must be exercised to ensure that public discussion regarding member affairs is avoided and that such information is safeguarded to protect the Credit union and its members. Specific information concerning a member's account will be held in strict confidence and will not be disclosed to outside parties unless:

A. **The affected member agrees, in writing, to the disclosure.**

B. **The disclosure is pursuant to appropriate legal process. In such case, the Credit Union will notify the member of the disclosure.**

**14.26-3** The Credit Union will not honor requests for information because the individual requesting the information may ultimately have the availability to obtain a subpoena or because the Credit Union is trying to be "cooperative".

Under no circumstance is a deviation from this policy appropriate.

## 14.27 DRUGS, NARCOTICS, AND ALCOHOL

**14.27-1** It is the policy of the Credit Union to prohibit the use, sale, or dispensing of alcohol, drugs, and narcotics on its premises. This policy covers all illegal drugs, alcohol and legal drugs, which impair an employee's ability to perform his/her job.

**14.27-2** An employee reporting to work under the influence of alcohol, drugs, or narcotics, will not be permitted to enter the premises.

**14.27-3** Any employee found to be selling, using, possessing, or distributing illegal drugs or alcohol while on Credit Union premises will be subject to immediate termination.

**14.27-4** Supervisors who observe behavior patterns indicating alcohol or substance abuse on the part of their employees will notify their department head, who will inform the Human Resources Department.

**14.27-5** An employee who is medically determined to be a drug addict or alcoholic may be granted a leave of absence (without pay) to undertake rehabilitation treatment, the cost of which will be borne by the employee.

## 14.28 SMOKING POLICY

It is the policy of the Credit Union to comply with the New York City Clean Indoor Act. Smoking is not permitted in any work area (training facilities, elevators, hallways, restrooms, photocopying areas, file rooms storage rooms, vaults, and all areas containing office equipment used in common by employees, reception area an other areas accessible to the membership) at any time.

## 14.29 PARTICIPATION IN TRADE AND PROFESSIONAL ASSOCIATIONS

The Credit Union encourages employees to participate in trade and professional associations if the participation does not present a conflict of interest.

**14.29-1** The Credit Union encourages employees to apply for membership and take active interest in trade and professional associations. Time spent in such activities normally should be outside of the employee's working hours and will not be compensated. Time spent participating in trade and professional associations at the Credit Union's request or under its direction or control will be compensated.

**14.29-2** Subject to prior approval or recommendation by management, employees will be reimbursed for membership fees in trade and professional associations, subject to annual evaluation by management.

**14.29-3** Subject to prior approval or recommendation by management, employees will be compensated for registration fees and reasonable expenses to attend meetings and conferences of trade and professional associations.

**14.29-4** Employees are encouraged to contribute articles, present papers, or give presentations to trade and professional associations and their publications. However, should any such communication be construed as representing the Credit Union's position on any subject or involve information which is confidential, prior management approval must be obtained.

**14.29-5** Employees who are invited or seek to serve in any official position in a trade or professional association for which the Credit Union has paid a membership fee must obtain the prior approval of management before accepting. These employees will be reimbursed for reasonable expenses incurred in attending to such duties, in addition to compensating them for working time lost. Prior approval of the Chief Executive Officer or Executive Vice President is required for all time away from work.

**14.29-6** Employees may be requested to submit written reports following local meeting/seminars.

### 14.30 PERSONAL APPEARANCE

It is the policy of the Credit Union that employees' dress and grooming should be appropriate to the work situation. Radical departures from conventional dress or personal grooming are not permitted regardless of the nature of the job performed.

**14.30-1** Employees are expected to dress in a manner that is normally acceptable in business establishments. The wearing of dungarees, jeans, shorts, sandals, sneakers, t-shirts, and similar items of casual attire is not permitted as they do not present a businesslike appearance. Men are required to wear ties. Hats or head coverings of any description are not permitted unless worn for religious purposes and on a consistent basis.

**14.30-2** Hair should be clean, combed, and neatly trimmed or arranged. Shaggy, unkempt hair is not permissible regardless of length.

**14.30-3** Sideburns, moustaches, and beards should be neatly trimmed. Eccentric styles of facial hair, hairstyles, or haircuts are not permissible.

**14.30-4** Dress and grooming of non-office workers will govern by the requirements of safety and comfort.

**14.30-5** If an employee reports for work improperly dressed or groomed, the supervisor will instruct the employee to return home to change clothes or take other appropriate corrective action. There will be no compensation for such time away from work. Repeated violations of this policy will be cause for disciplinary action.

**14.30-6** The CEO shall have the authority to approve corporate casual attire.

## 14.31 PERSONAL BEHAVIOR

It is the policy of the Credit Union that certain rules and regulations regarding employee behavior are necessary for the efficient operation of the Credit Union and for the benefit and protection of the rights and safety of all. Conduct that interferes with business operations, brings discredit to the Credit Union, or is offensive to members or fellow employees will not be tolerated.

All employees are expected to conduct themselves and behave in a manner conducive to the efficient operation of the Credit Union. An employee who commits offenses which include, but are not necessarily limited to, those starred (*) below will find him/herself subject to immediate suspension or discharge for the first Offense. Other misconduct or repetition of previous offenses will cause the offending employee to be disciplined in a manner that ranges from warning to discharge, depending upon Management's judgment as to the seriousness of the offense or frequency of the unacceptable behavior and/or work performance.

### 14.31-1 Misconduct

A.* Insubordination or refusal to perform work assigned or refusal to carry out orders.

B.* Withholding of pertinent information on employment application or of other personal data requested by Management.

C.* Gambling or participating in games of chance on Credit Union property and use of telephones, telegrams or facsimile equipment in the Credit Union for placing bets.

D.* Use of or possession of alcoholic beverages or illegal narcotics while on Credit Union property. (Any employee found to be selling or distributing illegal drugs will be subject to immediate termination. In other cases of drug abuse, management will consider the employee's work record and his/her willingness to undergo treatment before deciding whether termination is appropriate).

E.* Reporting for work while under the influence of alcohol or narcotics.

F.* Damaging, destroying, stealing or pilfering Credit Union's or fellow employees' property.

G.* Alteration or falsification of time worked, i.e. arrival, departure or compensation status

H.* Threatening, intimidating, coercing, or using abusive or obscene language toward others.

I.* Instigation or participation in a fight on Credit Union property; disorderly conduct.

J.* Reading books, magazines or newspapers unrelated to employee's work while on duty.

K.* Use or possession of Credit Union equipment assigned to another employee without permission.

L.* Disreputable behavior outside of Credit Union followed by arrest and conviction of felony.

M.* Possession of a firearm or other weapons on Credit Union property unless expressly authorized in writing by Management.

N.* Failure to treat members and visitors to the Credit Union with respect and courtesy.

O.* Violation of security regulations.

P.* Theft of Credit Union property or another employee's property.

Q.* Falsifying any records or report.

R.* Committing any illegal act against the Credit Union or fellow employee.

S.* Deliberate destruction or defacement of Credit Union property, records, facilities, or equipment.

T.* Assault on a fellow employee or member.

U.* Disruptive conduct while on duty or while on Credit Union property.

V.* Loss or suspension of license or loss of any other qualification for the performance of assigned duties.

W.* Conviction of a felony.

The foregoing examples are illustrative of the type of behavior that will not be permitted, but are not all-inclusive. Questions regarding this policy should be directed to the Vice President of Human Resources.

**14.31-2 Work Performance**

A. Unsatisfactory work (such as low output, poor quality, etc.).

B. Creating or contributing to unsanitary conditions; poor housekeeping.

C. Dishonesty in relation to job duties, such as falsifying records, withholding necessary information, or presenting false claims for benefit.

D. Carelessness or negligence, which potentially or actually causes damage to equipment, buildings, property and/or records of Management.

E. Falsifying any record or report such as an application for employment, a production record, time sheet or shipping or receiving record.

**14.31-3 Safety and Health**

A. Violation of safety or health rules and/or regulations.

B. Practices or actions, which cause endangerment to the safety of self and other employees, or to equipment, buildings, or records.

C. It is the policy of the Credit Union to comply with the New York City Clean Indoor Act.

D. Eating, except in designated areas.

E. Wearing clothing inappropriate for the work being performed.

F. Failure to maintain work area cleanliness and orderliness.

G. Non-compliance with all Management Safety and Health regulations.

**14.31-4 Attendance**

A. Stopping work before quitting time, and not being at work place at starting time.

B. Absence from work place without permission of the supervisor, except in emergency.

C. Overstaying coffee and lunch breaks.

D. Employees who will be late in reporting to work are required to call their supervisor promptly.

E. Failure to report for overtime work without good reason.

**14.32 EMPLOYEE DISCIPLINE**

It is the policy of the Credit Union that employees who violate any Credit Union rules and regulations or standards of employee performance, conduct, and behavior may be subject to corrective action as follows:

A period of 1-year during which an employee experiences no disciplinary problems will nullify any previous violations for purposes of implementing the disciplinary procedure.

A supervisor may place an employee on corrective action probation for three (3) months when his/her performance has deteriorated. Employees who improve satisfactorily during this period may be restored to regular status. Failure to gain a performance rating of satisfactory or better during probation may result in a transfer to another job more suited to the employee's capabilities, additional corrective action being taken against the employee, or termination.

Regular employees on either new hire probation or corrective action probation (formal or final) are not eligible for transfer, promotion, or salary increases. Regular employees placed on corrective action probation are not eligible for employee loans, refinance of existing employee loans, educational assistance, or renewal of educational assistance until satisfactory completion of the probation.

**14.32-1 Informal Warning** – Upon the first breach, the supervisor should:

A. Meet with the employees to discuss the matter.

B. Inform the employee of the problem and discuss corrective measures, policy, procedure, or performance standards that apply to the corrective action.

C. Prepare a memorandum for the supervisor's own records indicating the nature of the meeting, substantiating that it took place.

**14.32-2 Formal Warning** – Should a second breach occur, the supervisor will hold a meeting with the employees as follows:

A. Issue a reprimand to the employee – with a period of up to a three (3) month corrective action probation.

D. Inform the employee of the problem. Secure from the employee his/her commitment and plan of action for improvement. The plan must have the supervisor's concurrence.

E. Review with the employee the policy, procedure or performance standard that applies to the breach.

F. Prepare and forward to the Human Resources Department a written report describing the first and second violations summarizing the action taken during meetings.

**14.32-3 Final Warning** – Should a third breach occur, the supervisor shall hold a meeting with the employees as follows:

A. Issue the final reprimand to the employee – with a period of up to 3-month corrective action probation.

B. Inform the employee of the nature of the continued problem. Secure from the employee his/her commitment and plan of action for improvement. The employee's plan must have the supervisor's concurrence.

C. Review with the employee the policy, procedure or performance standard that applies to the breach.

D. Inform the employee that if another breach occurs, it may be basis for recommendation of termination.

E. Prepare and forward to the Human Resources Department a written report describing the first, second, and third violations summarizing the action taken during the meetings with the employee.

F. If it becomes necessary for the supervisor to recommend termination, prepare and forward to the Human Resources Department a memorandum describing the violations. Summarize the actions taken and their justification, indicating the timing between violations, the employee's commitment towards improvement, and what the supervisor has done to assist the employee's improvement. All terminations are subject to the approval of the CEO or designee.

## 14.33 PERSONAL BUSINESS (Telephone Calls, Mail, Email, Internet and Facsimile Equipment)

Telephone, mail, email, the internet and facsimile are available for communicating with the Credit Union's members and business associates. They should not be used for personal reasons except in cases of emergency.

A. Use of telephone lines should be confined to business calls. Personal telephone calls should be limited to those which are absolutely necessary and should be as brief as possible. This also applies to making unnecessary personal calls to fellow employees. When it is necessary that an employee make a personal long distance call, the call should be placed through the telephone company operator and charged to the individual's home number, or placed collect.

B. Incoming personal calls should be avoided.

C. Employees should not use the Credit Union's address to receive personal mail.

D. Credit Union stationary should not be used for personal correspondence.

E. The use of Federal Express or telegrams or facsimile equipment for personal business is prohibited.

F. Employees should not use their Credit Union email address to receive or send personal mail.

## 14.34 SEXUAL HARASSMENT

It is the policy of the Credit Union to prohibit sexual harassment of its employees in the work place by any person and in any form.

**14.34-1** Supervisors are required to maintain a work place free of sexual harassment which includes discussing this policy with employees and assuring them that they are not required to endure insulting, degrading, or exploitative sexual treatment.

**14.34-2** No supervisor shall threaten or insinuate, either explicitly or implicitly, that an employee's refusal to submit to sexual advances will adversely affect the employee's employment, evaluation, wages, advancement, assigned duties, shifts, or any other condition of employment or career development.

**14.34-3** Other sexually harassing conduct in the work place, whether committed by supervisory or non-supervisory personnel, is also prohibited. Such conduct includes but not limited to:

A.* Unwelcome sexual flirtations, advances, or propositions.

B.* Verbal abuse of a sexual nature.

C.* Graphic verbal comments about an individual's body.

D.* Sexually degrading words used to describe an individual.

E.* The display in the work place of sexually suggestive objects or pictures.

**14.34-4** An employee who believes that he/she has been the subject of sexual harassment should contact his/her supervisor immediately. Complaints of sexual harassment should be resolved promptly and effectively. If his/her supervisor is involved, the matter should be reported to the Vice President of Human Resources.

**14.34-5** If the employee is not satisfied with the supervisor's actions, the supervisor should advise the employee to bring the complaint to the attention of the Vice President of Human Resources for investigation who will confer with Executive Management. The employee will be advised of the findings and conclusions.

**14.34-6** All actions taken to resolve complaints will be conducted confidentially.

**14.34-7** Any supervisor, agent, or employee who is found, after appropriate investigation, to have engaged in sexual harassment of another employee will be subject to discipline, and depending on the circumstances, termination.

**14.35 PERSONAL FINANCES**

It is the policy of the Credit Union that all employees are expected to discharge their financial obligations promptly so that creditors will not request the Credit Union's assistance in collecting debts.

**14.35-1** When the Credit Union is served with a writ of garnishment or attachment, notice of levy by the Internal Revenue Service or other tax authority or any other similar order requiring payment of a portion of an employee's compensation to someone other than the employee, it must be referred to the Human Resources Department. Failure to act promptly may render the Credit Union legally liable.

**14.35-2** In the event that a garnishment or similar proceeding is instituted against an employee, the Credit Union will deduct the required amount from the employee's paycheck. The amount deducted from an employee's disposable earnings will not exceed that permitted by law. No employee will be terminated because his/her earnings have been subjected to garnishment.

**14.35-3** All employees are expected to conduct their financial affairs in a manner that will not bring discredit upon themselves or the Credit Union.

**14.35-4** Employees experiencing financial difficulties because of unusual expenses or other reasons are encouraged to discuss their situation with their Supervisors, Managers or the Vice President of Human Resources (the discussion will be treated confidentially).

**14.36 SOLICITATION**

It is the policy of the Credit Union to prohibit solicitation on its premises, whether made by employees, individuals, or groups not associated with the Credit Union.

**14.36-1** Certain recognized charities, identified by the Chief Executive Officer, will be permitted to solicit contributions at specified times. Other solicitations of funds, signatures, membership drives, distributions of literature or gifts, and offers for sale of merchandise or tickets by individuals or groups not associated with the Credit Union are prohibited.

**14.36-2** Solicitations for gifts or expressions of sympathy to fellow employees or their families may be permitted on certain occasions, provided the proper approval of Management is obtained. Requests should be forwarded to the employee's department heads.

**14.36-3** No solicitations and distributions authorized under this policy are to be conducted if they interfere with the duties of fellow employees. All activity in violation of this policy shall be reported to the Vice President of Human Resources.

### 14.37 PERSONAL PROPERTY

**14.37-1** The Credit Union does not assume responsibility for the loss or theft of personal belongings. Employees are advised not to carry large sums of cash or other valuables with them when they come to work.

**14.37-2** Articles of personal property found on the premises should be returned to the owner, if known, or turned in to the Human Resources Department.

**14.37-3** Employees must exercise reasonable care with respect to their purses, which should not be left unattended on their desks or work stations.

**14.37-4** Employees will be reimbursed for damage to their personal property resulting from an accident on the job, provided the accident is not caused by the negligence of the employee. Personal property is defined as the personal belongings of an employee such as work clothing and glasses. Watches, jewelry, and similar articles not necessary for the performance of work are not covered under this policy. Accidents must be reported immediately and damage verified by the supervisor.

### 14.38 SECURITY

It is the policy of the Credit Union to provide security for its property, employees, and persons visiting its premises. Security is the responsibility of all employees. The Credit Union assumes no responsibility for employee losses resulting from robbery or theft.

**14.38-1** All new employees will be required to be fingerprinted at the time of hire and will be required to meet bonding, legal, citizenship, and security clearances for work in these areas.

**14.38-2** Employees taking packages off the premises may be required to obtain a "Package Pass" from their supervisor as authorization to remove personal or Credit Union Property, and are subject to search by designated security.

**14.38-3** Employees may enter the Credit Union outside of normal working hours with the permission of their supervisor. Employees are permitted only in the areas where their work requires them or in designated employee rest areas. Visits to other departments for causal conversation are not permitted.

**14.38-4** Visits by friends, family members or acquaintances of employees are not encouraged, and personal visitors are not permitted in work areas. Should a friend/relative need to speak with an employee during working hours, the individual must wait in the lobby or employee rest area. Off-duty employees are classified as visitors and are subject to these regulations.

**14.38-5** Violations of security procedures and instances where identification badges or keys have been lost or stolen must be reported immediately to the Security Officer.

**14.38-6** Management will attempt to protect employees and their property while on the premises. Employees must exercise reasonable care for their own protection as well as personal property. Unauthorized possession of property belonging to another employee, visitor, or member will be considered a breach of security and will subject the employee to disciplinary action.

**14.38-7** All proper steps will be taken to work with the authorities to obtain the releases of any employee kidnapped during or after working hours. Such steps do not include an obligation to pay ransom for the release of any kidnapped employee.

**14.39 KEYS**

Keys for gates, doors, desks, file cabinets, vehicles, and other Credit Union equipment are issued to employees whose duties require them. Other keys will be retained within the respective operating department. Issuance and security of keys and maintenance of day records are the responsibility of the Security Officer. Employees will be required to return keys when their job changes or employment terminates. Unauthorized duplication of keys will subject the employee to disciplinary action.

Violation of security procedures and instances where identification badges or keys have been lost or stolen must be reported immediately to the Security Officer.

### 14.40 SEVERE WEATHER OR OTHER DISASTERS

It is the policy of the Credit Union to provide needed services to members in spite of the obstacles generated by natural disasters such as blizzards, hurricanes, tornadoes, electrical outages, etc. Our facilities will normally be open for business except in the most dire circumstances, and employees are expected to make every reasonable effort to be at work whenever the facility is open.

**14.40-1** Decision to close with regard to the 'elements' will be made by the CEO or EVP and communicated to the Vice President who will be responsible for notifying the respective Branch Manager(s). Other 'local' situations will be assessed by the Branch Managers and discussed with the Vice President for further discussion with executive management.

**14.40-2** If employees are officially sent home, that period of lost time will be paid. If an employee requests and receives permission to leave early when the rest of the staff is expected to continue to work, that period of lost time may not be paid.

**14.40-3** If a situation has developed so that it is realistic that some specific employees are prevented from reaching the work site, on the first day of absence the employee may elect to use accrued vacation/personal time to cover the absence. On subsequent days, the Manager must evaluate the situation to determine if it is reasonable to expect all employees to reach the worksite. If good judgment indicates that employees should be able to arrive, employees who do not report for work that day will receive no pay for the time lost. In the event that an employee calls in sick when it is reasonable to expect employees to reach the worksite, the employee will be required to produce a note from his/her physician.

### 14.41 EMPLOYEE HEALTH AND SAFETY

It is the policy of the Credit Union to provide a safe and healthy work environment for all employees. Employees are expected to comply with all safety and health requirements, whether established by management or by Federal, State, or Local Law.

**14.41-1** Safety and health violations and accidents resulting in injuries to employees or members will be reported immediately to the Vice President of Human Resources. Employees are encouraged to submit suggestions to the Vice President of Human Resources concerning safety and health matters.

**14.41-2** If safety equipment, such as safety glasses, is required by OSHA regulations, the Credit Union will either provide this without cost to employees or reimburse employees for expense upon presentation of a sales receipt. The Credit Union will likewise replace damaged or broken safety equipment, provided the damage is not caused by the negligence of the employee.

**No employee will be discharged or discriminated against for instituting a proceeding.**

### 14.42 MEDICAL EMERGENCY

**14.42-1** Employees who become ill on the job or who suffer any work-connected injury should report the illness or injury to their supervisor. Whenever possible, employees should notify their supervisor before leaving their work station for medical reasons. Time spent by an employee waiting for and receiving such medical attention will be considered hours worked for pay purposes.

**14.42-2** Employees who are seriously injured during the course of their employment will be offered immediate medical treatment and hospitalized if required. The employee's immediate supervisor, or any other member of management has the authority to arrange for transportation and accompany an injured employee to a medical facility for treatment. Nothing herein shall be deemed as an assumption by management of any liability or expense incurred by an employee as a result of his/her being injured during their course of his/her employment.

### 14.43 HOLIDAYS (See also Salary Administration)

It is the policy of the Credit Union to observe holidays each year as determined by management and designated by the New York State Banking Department. Eligible employees will receive the following holidays with pay:

New Year's Day

Martin L. King, Jr.'s Birthday

President's Day

Memorial Day

Independence Day

Labor Day

Columbus Day

Veteran's Day

Thanksgiving Day

Christmas Day

**14.43-1** Part-time employees shall be entitled to four (4) hours pay for Independence Day, Thanksgiving and Christmas Day.

A. A schedule of legal holidays to be observed during each calendar year will be distributed by management.

B. Full-time employees will receive their regular rate of pay for each holiday.

C. Employees on unpaid leaves of absence or layoff are not eligible to receive holiday pay.

D. In order to be eligible for holiday benefits, an employee must have worked the last scheduled work day before and first scheduled work day after the holiday, except in the case of illness or accident preventing the employee from working as evidenced by written certificate of a physician or other proof if requested by the Credit Union.

E. All holidays falling on a Saturday or Sunday shall be observed on the days designated by the New York State Banking Department. If no such designation is made for a Saturday holiday, employees will receive an additional personal day. The additional personal day is required to be taken in the calendar year it is earned.

F. When a holiday falls during an employee's vacation, the vacation shall be extended by one (1) day or at the employee's option, another day may be scheduled within the calendar year of that holiday, with the approval of the employee's supervisor.

**14.44 PERSONAL DAYS**

It is the policy of the Credit Union that eligible employees be entitled to receive pay for personal days as follows:

Exempt and non-exempt full-time employees shall accrue personal days in the initial year of hire as follows:

| Month Hired | |
|---|---|
| January – March | 3 days |
| April – June | 2 days |
| July – September | 1 day |
| October – December | 0 days |

**14.44-1** Personal days may be used for periods of worship or commemoration and may be scheduled in accordance with the employee's preference and must be taken in the year in which they are earned. Employees will not be paid for the unused personal days remaining at the end of the year. Personal days must be taken at a mutually agreeable time and shall be requested at least seven (7) days in advance, except in the case of emergency.

## 14.45 VACATION

It is the policy of the Credit Union to grant annual paid vacation to eligible employees.

**14.45-1** The established vacation period is form January 1st through December 31st of the same year. Employees must select their vacation period by February 1st and be approved by the Credit Union no later than February 28th/29th. Should circumstances compel a change in vacation plans, reasonable notice must be given to the supervisor which will be subjected to their approval.

**14.45-2** Full-time employees will be eligible for vacation after completing their probationary period. During the initial year of employment, an employee hired before May 1st will receive two (2) weeks vacation for the year at the end of the probationary period. Employees hired on or between—May 1st and June 1st will receive on (1) week of vacation for the year at the end of the probationary period. Employees hired on or after June 1st will not receive any vacation leave until the next calendar year.

**14.45-3** Full-time employees will be entitled to accrue paid vacation according to the following schedule:

| Year of Service | Vacation Entitlement |
|---|---|
| 1 – 6 as of June 1st | 2 weeks |
| 6 – 14 as of June 1st | 3 weeks |

| Year of Service | Vacation Entitlement |
|---|---|
| 14 – 20 as of June 1st | 4 weeks |
| 20 and Over as June 1st | 5 weeks |

There shall be an additional one (1) week of paid vacation for each fulltime employee who reaches his or her 25th year of service with the Credit Union by June 1st of that year. This extra week of paid vacation must be used during that year, cannot be carried over into another calendar year and will not be available in any subsequent year. If an employee reaches his or her 25th year of service after June 1st, he or she will be given the additional one (1) week, but may only use in the following calendar year. Such one (1) week cannot be carried over into another calendar year and will not be available in any subsequent years.

In the 30th, and each subsequent 5th year anniversary, one additional bonus week will be granted following the same terms as defined above.

**14.45-4** Vacation is earned for each full month of service up to a maximum of 10 months per year according to the following schedule:

| Normal Vacation Entitlement | Vacation earned for each full month of service up to a maximum of 10 months |
|---|---|
| 1 week | ½ day per month |
| 2 weeks | 1 day per month |
| 3 weeks | 1 ½ day per month |
| 4 weeks | 2 day per month |
| 5 weeks | 2 ½ day per month |

Employees terminated involuntarily and employees who give two (2) weeks notice of voluntary termination shall be entitled to accrued vacation pay. An employee who has taken unearned vacation and who is subsequently terminated shall be required to reimburse the Credit Union for unearned vacation.