# 22-1048-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SYLVIA ASH, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT**
**Volume 5 of 5 (Pages A-1087 to A-1243)**

JUSTINE A. HARRIS
NOAM BIALE
MAYA BRODZIAK
SHER TREMONTE, LLP
*Attorneys for Defendant-Appellant*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

## TABLE OF CONTENTS


| | Page |
|---|---|
| District Court Docket Entries .................................... | A-1 |
| Ash's Memorandum of Law in Support of Motion to Suppress, dated March 20, 2020........................ | A-26 |
| Declaration of Carrie H. Cohen, for Ash, in Support of Motion to Suppress, dated March 20, 2020 ...................................................... | A-53 |
| Exhibit A to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated February 20, 2020 ...................................................... | A-59 |
| Exhibit C to Cohen Declaration - Letter from Carrie H. Cohen to Daniel C. Richenthal and Eli Mark, dated March 11, 2020 ..................................................... | A-61 |
| Exhibit D to Cohen Declaration - E-mail from Carrie H. Cohen to Janie C. Buckley, dated March 16, 2020 ............................ | A-63 |
| Exhibit E to Cohen Declaration - Affidavit of Lavale Jackson, in Support of Application for Search Warrants for Stored Electronic Communications, filed March 18, 2019 [Redacted] .................................. | A-66 |
| Exhibit G to Cohen Declaration - Consent to Search – Devices ................................ | A-115 |
| Exhibit Q to Cohen Declaration - Document entitled "Reset Device Chain of Custody – DRAFT," dated February 4, 2019 [Redacted] ............................................................ | A-119 |

**Page**


Exhibit S to Cohen Declaration - Department of Financial Services Press Release: "Department of Financial Services Takes Possession of Municipal Credit Union and Names NUCA as Conservator" ............................. A-122

Memorandum Opinion of the Honorable Lewis A. Kaplan, dated June 2, 2020 .................................... A-126

Superseding Indictment, filed July 21, 2021 ............. A-145

Ash's Memorandum of Law in Opposition to Government's Proposed 404(b) Evidence and in Support of Ash's Motion *in Limine*, dated October 29, 2021 .................................................. A-153

The Government's Motions *in Limine,* dated October 29, 2021 .................................................. A-181

Proposed Jury Instructions on behalf of Ash, dated November 9, 2021 ................................................ A-224

The Government's Request to Charge, dated November 9, 2021 ................................................ A-256

Ash's Memorandum of Law in Opposition to Government's Motions *in Limine*, dated November 12, 2021 .............................................. A-343

Exhibit A to Memorandum of Law - Copies of Judicial Documents ............................... A-363

Oral Argument Transcript, dated November 18, 2021 .............................................. A-381

Trial Transcript, dated November 30, 2021 ............... A-443

Trial Transcript, dated December 1, 2021 ................. A-471

Trial Transcript, dated December 2, 2021 ................. A-543

**Page**

Trial Transcript, dated December 6, 2021 ................. A-613

Trial Transcript, dated December 7, 2021 ................. A-667

Trial Transcript, dated December 8, 2021 ................. A-753

Trial Transcript, dated December 9, 2021 ................. A-803

Trial Transcript, dated December 13, 2021 ............... A-880

Government Exhibit 112 -
Letter from Eli J. Mark, dated June 18, 2018, with Attachment..................................................... A-891

Government Exhibit 113 -
Letter from Norman Kohn to the Honorable Sylvia Ash, dated June 19, 2018............................ A-896

Government Exhibit 114 -
Letter from Norman Kohn to the Honorable Sylvia Ash, dated July 13, 2018............................. A-897

Government Exhibit 117 -
E-mail from LaVale Jackson to sylviaash@aol.com, dated March 15, 2018, with Attachments [Redacted]......................................... A-898

Government Exhibit 401 -
MCU's Policy Manual ........................................... A-902

Government Exhibit 751 -
E-mail Chain from the Honorable Sylvia Ash to Monique Smith, dated May 15, 2018 .................... A-1190

Government Exhibit 769 -
E-mail Chain from the Honorable Sylvia Ash to RFarley@nymcu.org, dated February 20, 2018..... A-1192

**Page**

Government Exhibit 801 -
Department of Justice Press Release "CEO and President of New York Credit Union Charged with Embezzlement and Fraud," dated May 8, 2018 ........ A-1193

Government Exhibit 901 -
Sylvia Ash's Use of MCU Park Suites, 2010 through 2017 ........ A-1196

Sentencing Transcript, dated April 20, 2022 ........ A-1197

Notice of Appeal, filed May 10, 2022 ........ A-1237

Letter from Carrie H. Cohen to the Honorable Lewis A. Kaplan, dated June 10, 2022 ........ A- 1239

**14.45-5** Employees who have completed the probationary period but did not work the full year due to termination or leave of absence are entitled to unused vacation as follows:

Total earned vacation minus vacation already taken

**14.45-6** No part of an employee's scheduled vacation may be charged to sick leave. Vacations shall be taken each year and may not be accumulated, unless the vacation may not be taken because of the Credit Union's direction.

**14.45-7** To determine an employee's length of service for vacation eligibility, the first June 1st after his/her hire date becomes the effective anniversary date.

**14.45-8** Vacation pay when requested shall be prepared in advance by the Credit Union and paid to the employee on his/her last day worked prior to the vacation period, provided the employee has completed and returned the necessary forms to the Human Resources Department ten (10) working days prior to the employee's requested vacation.

**14.45-9** Vacation pay for full-time employees shall be calculated at the employee's regular straight time rate of pay.

**14.45-10** Employees may not receive vacation pay in lieu of time off without prior approval of the CEO or his designee.

**14.45-11** Selection of employees' initial one (1) or two (2) week vacation period shall be based on seniority. Any additional vacation will be selected by seniority after every employee has made their initial selection.

**14.45-12** Part-time employees shall be eligible to receive one (1) week's vacation each calendar year equal to the number of hours they were hired to work per week.

**14.45-13** Vacations normally must be taken in the vacation year in which they are earned. Employees will not be paid for unused vacation remaining at the end of the vacation year. However, when an employee is requested by the Credit Union to cancel vacation plans and the vacation cannot be rescheduled before the end of the vacation year, the employee shall be permitted to reschedule the vacation between January 1st and March 1st of the following year or may be paid for the vacation at the discretion of the CEO or EVP.

**14.45-14** All employees with three (3) or more weeks of vacation are required to schedule two (2) weeks vacation consecutively; one week may be taken in individual days. Employees who are entitled to a vacation of two (2) weeks or less may be permitted to schedule their vacation in increments of one (1) week with approval from management.

**14.45-15** Vacation schedules are subject to operating requirements of the Credit Union. Department Heads can decide to restrict the scheduling of vacations during peak periods e.g. promotional campaigns, heavy branch traffic, etc. Vacations may not be taken during new hire probation.

## 14.46 COMPENSATORY TIME

It is the policy of the Credit Union to give compensatory time under certain circumstances. No employee is entitled to both a compensatory day and premium pay.

**14.46-1** An exempt regular full-time employee who is required to work the day on which a holiday is observed will be entitled to one (1) compensatory day, in addition to regular pay for the day worked.

**14.46-2** Supervisory employees who are required by the Credit Union to report for work on a Saturday, Sunday, or holiday will be eligible for compensatory time for hours worked. Managers and above earn compensatory time for working on holidays. This time can be utilized by the employee following the same approval procedures as vacation time. Compensatory time must be taken in the year in which earned, and employees will not be paid for compensatory time earned but not taken.

**14.46-3** Overtime worked by exempt employees will not be considered for compensatory time since it is considered part of their job description and responsibilities. All exempt employees are expected to work overtime in order to complete their job responsibilities as quickly and efficiently as possible.

## 14.47 LEAVE OF ABSENCE – SHORT-TERM

Employees may be authorized to be absent from work on a short-term basis under certain circumstances.

To be eligible, an employee must be classified as regular full-time and have completed the new hire probationary period. The employee must obtain approval from his/her immediate supervisor in advance of the absence. In the event of an emergency which causes an employee to be absent without advance notice, the employee is required to notify his/her supervisor or the Human Resources Department as soon as possible. Failure to do so may be grounds for disciplinary action.

Part-time, cooperative students and temporary employees are not eligible for paid short-term absences.

Authorized short-term absences include, but are not limited to:

A. Sickness or injury resulting in temporary disability of the employee.

B. Personal business which cannot be conducted outside of normal working hours.

C. Death in employee's immediate family (as defined).

D. Jury duty or testifying as a witness in a judicial proceeding.

E. Emergency closing of Credit Union premises.

F. Approved participation in community projects.

**14.47-1** Absences resulting from death in the family (as defined), jury duty, voting, testifying as a witness, emergency Credit Union closing, and approved participation in community projects will not be charged against an employee's accumulated days of paid absence.

**14.47-2** Compensation during authorized absences will not be granted before days of paid absences have accrued. Authorized absence without pay will be permitted in certain circumstances.

**14.47-3** Compensation during periods of authorized absences will be granted to the extent of the number of sick days that they have accrued. After which time, employees will be compensated under the terms of the Credit Union's short term disability plan.

**14.47-4** Employees will not be compensated during periods of unauthorized absences. Such absences will not be tolerated and may be considered grounds for disciplinary action.

A. In continued employment, days of paid absences are not convertible into cash (holidays, personal, sick or vacation days).

B. If employment is terminated for cause or resignation without notice, pay for accrued unused days of paid absence (personal, vacation days) will not be granted.

C. On separation of employment, provided the requirements of resignation are met, eligible employees may receive pay for earned and unused vacation days, and unused personal days.

## 14.47-5 Sick Leave

Employees with more than one (1) year of service are eligible to receive up to twelve (12) paid sick days per calendar year upon completion of the new hire probation period. Eligible employees shall accrue such paid sick leave at the rate of one (1) day per calendar month at the end of each month.

Sick leave is defined as an absence of a full-time employee from work by reason of illness or accident which is non-work related or is not compensable under a worker's compensation statue.

Employees with more than six (6) months, but less than 12 months of service:

Completion of New Hire Probation – Sick Day Leave

| | |
|---|---|
| January – March 1st | 9 days |
| April – June 30th | 6 days |
| July – September 30th | 3 days |
| October – December 31st | None until next calendar year |

To qualify for paid sick days, the employee must (a) be able to produce written certification from their personal physician after the third day of continuous absence, and (b) have accrued sufficient paid sick days.

Unpaid sick days may be granted so long as (a) above is provided. Full-time employees will be paid at their regular rate of pay for time lost during periods of authorized absence to the extent they have accumulated days of paid absence.

In order to limit possible abuses of paid absences, the Credit Union reserves the right to schedule doctor visits for employees while on sick leave. Such examinations are to be conducted by a physician selected by the Credit Union.

An employee who is absent must notify his/her supervisor within 30 minutes of the start of their regularly scheduled work day, unless proper excuse is presented for the employee's inability to call. The Credit Union may require written certification by a physician of three (3) days duration or longer, which period may be less in cases where a pattern of abuse is indicated. Employees who have been on sick leave may be required to be examined by a physician designated by the Credit Union before being permitted to return to work.

Part-time employees shall be entitled to four (4) sick days, four (4) hours pay for each day per calendar year.

Unused paid sick days may be accumulated to a maximum of 70 days for use in future years and may be used only for absences resulting from an employee's sickness or injury. Employees will not be compensated or reimbursed for unused sick days.

## 14.48 LEAVE OF ABSENCE – LONG-TERM

Requests for a leave of absence or extensions, including the reason, must be made in writing to the Vice President of Human Resources as far in advance as possible, but in no event later than 30 calendar days prior to the requested leave, except when the leave is for medical reason, in which case notice will be given as soon as the disability is known. All leaves or extensions must be approved in writing by the Chief Executive Officer or a designee prior to the commencement of the leave.

A. While on an unpaid leave of absence, an employee will not accrue sick, personal, or vacation days, or seniority. In addition, all medical benefits will cease unless the employee is able to make arrangements for paying the full cost of such benefits. Management reserves the right to make exceptions as it deems necessary.

B. An employee returning from an unpaid leave of absence may be returned to his/her former position, if available, or to any other comparable position for which the employee is qualified to perform; otherwise, an employee will be placed on layoff and able to exercise the recall rights.

C. If an employee fails to return to work at the conclusion of his/her leave of absence after being medically certified, employment will be terminated. Effective date of termination will be the last day worked.

D. Any employee who falsifies the reason given to the Credit Union for a leave of absence is subject to disciplinary action, including discharge. An employee who engages in gainful employment during a leave of absence will be deemed to have resigned.

**14.48-1** Eligibility: A full-time employee must have completed one (1) year of service to be eligible, except in cases of sickness, for which the employee must have completed their probationary period. At least one (1) year must elapse between successive maximum leaves, except in case of sick leave.

**14.48-2** Sick Leave: An employee who is sick or injured and presents satisfactory proof of such sickness or injury may be granted a leave of absence for a period not to exceed six (6) months. The Credit Union reserves the right to have the employee examined by its own physician prior to granting such leaves and at the completion thereof, before the employee is permitted to return to work.

**14.48-3** Personal Leave: A personal leave of absence may be granted in cases where an extended period of time away from the job is in the best interest of the Credit Union and the employee.

**14.48-4** Educational Leave: An educational leave of absence may be granted when an employee desires to continue his/her education in order to prepare for added responsibilities in the Credit Union.

**14.48-5** Arrest/Incarceration: An employee who is unable to report for work because of arrest and incarceration will be placed on unpaid leave of absence. If the employee is unable to secure bail, the leave of absence will continue until final disposition of the charges. If the employee is freed on bail, resumption of active employment pending disposition of the charges will be decided after consultation between the employee's department head, General Counsel, and the Vice President of Human Resources to determine whether employment would be consistent with the safe and efficient operation of the Credit Union's business.

**14.48-6** Union Leave: An unpaid leave of absence for a period not to exceed six (6) months will be granted to bargaining unit employees with at least one (1) year of seniority in order to accept a full-time position with the Union, provided such leave will not interfere with the operation of the Credit Union or a particular department, division or branch. In no event will the number of employees on this leave exceed one (1) at a time.

**14.49 FAMILY AND MEDICAL LEAVE ACT**

It is the policy of the Credit Union to allow eligible employees up to twelve (12) weeks of unpaid leave during any twelve-month period due to:

A. The birth of a child or placement of a child for adoption or foster care. Such leave cannot be taken beyond the first twelve (12) months following the birth or placement, but can begin before the birth if the mother is medically unable to work.

B. To provide care for a child, spouse, or parent with a serious health condition.

C. A serious illness of the employee or to receive treatment for a serious health condition.

**14.49-1 Eligibility**

To be eligible, an employee must have worked for the Credit Union at least twelve (12) months and worked at least 1,250 hours during that period (approximately 25 hours per week). All requests for medical leave must be approved by the President/CEO or VP of HRD, and be submitted at least thirty (30) days in advance, except in the case of emergency situations. In such event, the employee is required to provide the Credit Union with the appropriate documentation from their health care provider. If both spouses are employed by the Credit Union, the total amount of leave they (spouses) may take jointly is twelve (12) weeks during any 12 month period.

When medically necessary, an employee may be permitted to take leave on an intermittent basis or work on a reduced schedule. In which case, the twelve (12) week period is reduced by the actual amount of leave taken. However, the Credit Union may temporarily transfer an employee taking intermittent leave to an alternative position that would better accommodate certain recurring periods of leave than the employee's regular position.

Employees taking family leave are required to utilize their accrued vacation and personal days. Employees taking family leave pursuant to their own serious health condition or for a seriously ill family member must first use any accrued vacation, personal, and sick days. In addition, employees must use any accrued paid vacation or personal days (but not sick days) to care for a newborn or newly placed child. Employees returning to work from a leave due to their own serious health condition are required to provide the Credit Union with medical certification that they are able to resume work. Employees granted medical leave are required to make a reasonable effort to schedule the treatment so as not to unduly disrupt the operations of the Credit Union.

The Credit Union may require that a request for medical leave be supported by a certification from the employee's (or relative's, as the case may be) health care provider. In addition, the Credit Union may require that the employee submit recertification on a reasonable basis. Provided that the leave is approved by the President/CEO, or VP of HRD, the existing medical coverage and employee contribution will continue. Under certain circumstances, an employee who fails to return to work after the leave may be required to reimburse the Credit Union for health insurance premiums paid during the leave. Upon the employee's return from leave, the Credit Union will reinstate the employee in the same or equivalent position and at the same rate of pay. Reinstatement of employees who are among the highest paid 10% of the work force will be subject to the approval of the President/CEO or designee.

Employees taking family leave will maintain any benefits accrued prior to the start of the leave. Paid vacation, personal, and sick days will not accrue during the leave.

The U.S. Department of Labor is authorized to investigate and resolve employee complaints of violations of this Act.

**14.49-2 Jury Duty**

It is the policy of the Credit Union to grant employees a short-term leave of absence for jury duty.

To be eligible, an employee must be classified as a regular full-time and have satisfactorily completed the new hire probationary period.

A. Employees are expected to report to work for any reasonable portion of a day on which he/she is released by the court.

B. Employees serving on jury duty will receive their regular base pay for the period of jury duty.

C. Upon completion of jury duty, employees shall remit to the Credit Union the amount of money received for such jury services from the court. In no instance will employees be required to remit an amount of their salary for the period of jury duty leave.

**14.50 MILITARY LEAVE**

It is the policy of the Credit Union that an employee inducted into or has enlisted in the US Armed Forces, or is performing active or inactive military duty for a Reserve Unit of the US Armed Forces, or attends National Guard duties, will be granted a leave of absence. Any employee receiving such notification must present the original notice to their immediate supervisor.

To be eligible, an employee must be classified as regular full-time and have at least one (1) year of service.

Eligible employees shall be granted a leave of absence for such purpose, not in excess of two (2) weeks, and will receive (2) weeks regular salary for the period of duty less the amount of two (2) weeks military pay.

Military leave not exceeding two (2) weeks will be granted in addition to the employee's regular vacation.

### 14.51 MEAL AND REST BREAKS

It is the policy of the Credit Union to allow employee meal/rest breaks to eligible employees during the course of each workday. Full-time employees are allowed a meal break near the middle of the workday. All back office staff (defined as employees who do not interact directly with the membership) must begin and complete their lunch hours between 11:00 a.m. and 2:00 p.m. Productivity as well as departmental communication suffers when information cannot be obtained because an employee is out to lunch after 2:00 p.m. Department heads have the authority to make exceptions only on a day-to-day basis, work conditions permitting. In departments operating on single shifts, the meal break is 60 minutes. In departments operating on two (2) or three (3) shifts, the meal break may be 30 minutes, depending on operating requirements.

Part-time employees scheduled to work more than five (5) consecutive hours during any workday will receive a meal break of the same duration as full-time employees in the department.

Full-time employee will be eligible to receive a 15-minute rest break provided the work schedule permits. This time is compensated. Part-time employees scheduled to work at least four (4) hours, but less than seven (7) hours in a day will be eligible to receive a ten (10) minute rest break provided work schedule permits. This break time is compensated.

Employees required to work more than 10 hours in any workday are allowed a second meal break four (4) hours after the first meal break.

Employees will not be compensated for meal breaks unless asked to remain at their workstations while eating.

### 14.52 BEREAVEMENT

It is the policy of the Credit Union to grant bereavement leave to eligible employees as follows:

**14.52-1** Full-time regular employees shall be entitled to time off with pay for up to four (4) scheduled work days paid absence in the event of death in the employee's immediate family. Immediate family is defined as father, mother, grandparents, spouse, children, grandchildren, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law. Such days must be taken consecutively at the time of the funeral and will be paid for at the employee's regular compensation rate, and will not be used for purposes of computing overtime pay. The Credit Union reserves the right to require proof of death and relationship as a condition of payment.

A full-time employee shall be entitled to time off with pay for one (1) scheduled work day's paid absence in the event of the death of the employee's aunt or uncle. The term aunt or uncle shall be limited only to the siblings of the employee's mother and father.

**14.52-2** Full-time new hire probationary employees, part-time and cooperative student employees may be granted up to four (4) work days off, as a result of death in the family. The four (4) day leave will be without pay and subject to approval of the Chief Executive Officer or designee.

## 14.53 VOLUNTARY TERMINATION

It is the policy of the Credit Union to terminate employment because of any employee's resignation or retirement. In the absence of a specific agreement, employees are free to resign at any time and the Credit Union reserves the right to terminate employment at any time and for any business reason.

A. All employees are expected to give written notice of their intent to resign.

B. Managerial and professional employees are expected to give four (4) weeks' notice.

C. Supervisory and administrative employees are expected to give three (3) weeks' notice,

D. All other employees are expected to give two (2) weeks' notice.

E. Failure to give the required notice may result in forfeiture of unused accrued vacation pay and ineligibility for re-employment.

F. An employee who is absent from work without having notified the immediate supervisor of his/her absence or the reason for it will be considered as having resigned after the second consecutive day of absence.

## 14.54 INVOLUNTARY TERMINATION

It is the policy of the Credit Union to terminate employment because of an employee's discharge for reasons deemed unsatisfactory to the Credit Union, retirement, or as result of permanent reduction in the work force. In the absence of a specific agreement, employees are free to resign at any time and the Credit Union reserves the right to terminate employment at any time and for any business reason.

Employees terminated involuntarily because of a permanent reduction in work force will be given notice of the termination or pay in lieu of notice.

A. Prior to the termination, the Credit Union will make a reasonable effort to transfer the employee.

B. Separation pay equal to one (1) week's pay for each year of employment will be granted up to maximum of 15 weeks. Exceptions can be made by the Chief Executive Officer or Executive Vice President.

C. Unused accrued vacation pay up to the date of termination will be paid.

D. Unused accrued pay for personal days up to the date of termination will be paid.

All terminations must be approved in advance by the Chief Executive Officer or designee. Supervisors will forward notices of resignation or termination to the Human Resources Department together with a written performance appraisal or evaluation for each employee.

The Credit Union reserves the right to require an employee to leave the premises immediately upon termination.

**14.55 LAYOFF AND RECALL (See also current Union Contract)**

It is the policy of the Credit Union to stabilize employment so that employees may be provided with regular and continuous work. In the event of a reduction in the work force, employees will be selected for layoff by reverse order of seniority.

Employees will be selected for layoff in the following order:

A. Special assignment employees.

B. Employees who have not completed the new hire probation period.

C. Cooperative student employees.

D. Part-time employees.

E. Regular full-time employees with the least favorable past and present job performance, and ability to perform the remaining work. When employees are equally qualified with regard to job performance and ability, seniority will be the deciding factor.

**14.55-1** Should it become necessary to eliminate the job of a more senior employee, that employee will be permitted to displace an employee with less seniority in a lower job classification provided an extensive period of retraining is not required. The more senior employee will be paid at an appropriate rate within the salary range of the lower classification.

Affected employees will be given at least two (2) weeks notice before the layoff, and will be advised of the reason for the layoff, estimated length of layoff, and employees' chances for recall.

**14.55-2** Employees will remain on the recall list for one (1) year following the layoff and are required to report their availability for recall to the Human Resources Department every 30 days. Failure to report for work within five (5) business days after recall will cause employees to lose their recall rights and will be considered as having quit voluntarily. An employee who accepts severance pay will not be eligible for recall.

**14.55-3** Employees will be recalled in the reverse order of layoff subject to department needs. Notice of recall will be sent by registered mail, return receipt requested, to the most current home address.

**14.55-4** No vacation days or days of paid absence will be earned during layoff. When an employee returns to work following recall, he/she may use any vacation days or days of paid absence accumulated prior to lay off. At the employee's request, vacation pay equal to the number of days earned during the vacation year, minus the number of days taken, will be paid at the time of layoff.

**14.55-5**

**14.56 RETIREMENT BENEFITS**

A. Pension Benefits

a. Effective May 1, 2010, the normal retirement age is age 62.

b. Effective 5/1/10, for employees hired on or prior to March 31, 2010, the employee's normal monthly retirement benefit is calculated at 68.5% of the first $833 of average monthly qualified compensation of the employee's best continuous 5-year average annual compensation plus 78.5% of the remaining average monthly qualified compensation of the participants' best continuous 5-year average annual compensation reduced proportionately if (a) actual years of service worked at the normal retirement date is less than 18 years, or (b) if the number of actual years of service worked is less than the number of years of service the employee could have worked to normal retirement age.

Early retirement is at age 55 and the benefit penalty is calculated at 1/12th of 5.5% for each month that the early retirement date precedes the normal retirement date up to a maximum of 38.5%.

c. Effective 5/1/10, for employees hired on or after 4/1/10, the participants normal monthly retirement benefit is calculated at 45% of average monthly qualified compensation of the participants' best continuous 5-year average annual compensation reduced proportionately if (a) actual years of service worked at the normal retirement date is less than 25 years or, (b) if the number of actual years of service worked is less than the number of years of service the employee could have worked to normal retirement age.

Early retirement is at age 57 and the benefit penalty is calculated at 1/12th of 5.5% for each month that the early retirement date precedes the normal retirement date up to a maximum of 27.5%.

d. For employees who have already reached age 60 years as of May 1, 2010, age 60 will remain the employee's normal retirement age with normal retirement benefits calculated under the pension formula that was in effect, for MCU employees, prior to May 1, 2010.

e. Accrued benefits that an employee has already earned based on service and average compensation as of April 30, 2010 will not be reduced. The accrued benefit will remain frozen until benefits under the new retirement age and new benefit rates produce a benefit with greater value.

f. The aggregate pension calculation formula and distribution shall not exceed IRS allowable limits.

g. For all terms and conditions of MCU's Deferred Benefit Pension Plan, see Municipal Credit Union Intergrated Defined Benefit Pension Plan and Trust Adoption Agreement.

B. Post Retirement Health Benefits

a) The requirement for an active employee to receive post retirement medical benefits (PRMB) under the program is the attainment of age 62, the completion of at least 25 years of service, and the attainment of the title of Assistant Manager or higher by the actual retirement date.

b) Only the employee and spouse are covered under the PRMB plan. No other dependents are covered.

c) The retiree will pay 100% of the required employee contribution from ages 62 - 65 or until the retiree reaches the required Medicare age, whichever is later, and 50% of the required employee contribution from the age when the employee is eligible to receive Medicare benefits, currently age 65.

d) The retiree is eligible to continue to receive the health plan coverage being provided to him/her by MCU one year prior to the actual retirement date, either the POS or PPO plan, subject to meeting the other eligibility requirements.

e) If the retired employee predeceases the spouse and the spouse is younger than age 57, the spouse loses PRMB coverage until the spouse reaches age 57. The surviving spouse will be entitled to COBRA coverage for up to 36 months. At age 57, the spouse will again be covered by the PRMB plan. The spouse will be expected to pay 100% of the required employee contribution from ages 57-65 or until the spouse reaches the required Medicare eligibilityage, whichever is later, and 50% of the required employee contribution from the age when the employee is eligible to receive Medicare benefits, currently age 65.

f) The spouse will be eligible and entitled to PRMB even if the employee becomes deceased prior to actual retirement as long as the employee had already attained age 62, had completed 25 years of service, and had an Assistant Manager title or higher.

g) If an employee is single at their retirement date, and the employee marries after their retirement date, the spouse will not be covered.

h) If the retiree does not apply for Medicare coverage at the Medicare eligibility age, the Credit Union reserves the right to cancel their PRMB coverage.

i) If the employee does not comply with the Medicare drug plan application requirements, the Credit Union reserves the right to cancel their PRMB coverage.

j) Once the retiree reaches the Medicare eligibility age, the MCU medical plan will become secondary to the Medicare plan.

## 14.57 EXIT INTERVIEWS

It is the policy of the Credit Union that, if requested by the employee, the Human Resources Department will conduct an exit interview no later than the employee's last working day.

## 14.58 SALARY ADMINISTRATION (See also current Union Contract)

It is the policy of the Credit Union to pay wages and salaries which are based upon the nature of the job performed and competitive with rates being paid for similar work by other employers in the community. Salary increases are based on the merit progression plan and are intended to reward above average job performance.

**14.58-1** Employees are paid on a biweekly basis on Thursdays. There are 26 pay periods each year. Certain deductions are made as required by law, in accordance with employee benefit plans or as requested by the employee.

**14.58-2** If the regular payday occurs on a holiday, employees will be paid on the last working day immediately preceding the regular payday.

**14.58-3** New employees are generally hired at the minimum rate assigned to their job. Managers may recommend higher starting rates based on the employee's experience or education. These recommendations will be reviewed by the Human Resources Department and are subject to final approval of the Chief Executive Officer or his designee.

**14.58-4** Overtime compensation will be paid to employees who work in excess of 40 hours during the normal work week at one and one-half (1½) times their regular hourly rate. Time away from the job during the work week, such as vacation, approved absences or special hours worked at premium pay will not be counted as hours earned for the purposes of computing overtime pay.

**14.58-5** An observed holiday will be considered a day of work for the purpose of calculating weekly overtime. The Credit Union reserves the right to schedule work on an observed holiday and employees will be paid as if the day was an overtime day.

**14.58-6** Employees required to work overtime on an otherwise observed holiday will be paid as if the day was the sixth consecutive day of work in the work week. All work performed on a holiday or a Sunday shall be paid for at the rate of two (2) times the regular rate of pay except in the case of regularly scheduled hours.

**14.58-7** All employees called to work on a Saturday, Sunday, or holiday shall be paid a minimum of four (4) hours or the actual number of hours worked excluding meals, whichever is greater at the overtime rate for that day.

**14.58-8** A non-exempt employee called from home to perform work during off-duty hours will be paid one and one-half (1 ½) times the regular hourly rate for the hours worked.

**14.58-9** A minimum of four (4) hours of work is guaranteed. No employee may be called in to perform work during off-duty hours without the prior authorization of the employee's department head.

**14.58-10** Non-exempt employees will be paid for all hours worked and are not entitled to compensatory time, unless taken within the week in which it is earned. This requires the written approval of the department head.

**14.58-11** Employees who are regularly or alternatively assigned to late shifts will receive shift differential pay for the actual hours worked between 8:00 p.m. and 7:00 a.m. A shift differential will be paid as follows:

A. 10% of regular base salary.

B. Non-exempt and exempt employees (excluding employees at the Assistant Manager level and higher) are entitled to shift differential, providing the normal scheduled work hours fall between 8:00 p.m. and 7:00 a.m.

C. Shift schedule and any changes to the schedule will be submitted regularly to the Human Resources Department.

Exempt employees are expected to work overtime in order to complete their job responsibilities as quickly and efficiently as possible. Overtime is not paid to employees in this category.

If death occurs during an employee's term of employment, pay for unused accrued vacation will be paid in a lump sum to the deceased employee's estate.

**14.58-12 Salary Increases**

Recommendation for a salary increase must be accompanied by a recent performance appraisal (not older than two (2) months). A salary review does not mean that an increase in salary will result.

An employee's salary may not exceed the maximum rate in their job grade. An employee whose salary exceeds the maximum rate shall be red-circled at their maximum salary and any increases shall be paid to them in a separate, prorated payment each pay period which will not be added to the employees' base annual salary. However, an employee will receive an increase provided that:

A. The employee is promoted.

B. There is an increase in the job salary range.

C. The Chief Executive Officer or Executive Vice President may authorize that an employee's salary be increased to exceed the maximum salary range.

At management's prerogative, predicated on the current financial condition of the Credit Union, salaries under the minimum may be reviewed. The maximum percentage increase in the case of below minimum salaries should not exceed 20% of the base salary over a period of 12 months. The CEO has the authority to exceed the 20% guideline.

**14.58-13 Compensation Disclosure**

The President/CEO shall disclose to the Board of Directors, at least once a year, the executive management team's compensation (Vice Presidents and above).

## 14.59 SEVERANCE ALLOWANCE (See also current Union Contract)

It is the policy of the Credit Union to grant a severance allowance to terminated employees under certain circumstances in order to provide them with an income while seeking other employment.

**14.59-1** An employee will be eligible for a severance allowance if he/she is permanently terminated after one (1) year of full-time service because of:

A. Reduction in the work force.

B. Elimination of the job.

C. Insufficient aptitude for continued employment, not attributable to willful cause.

**14.59-2** An employee will not be eligible for a severance allowance if he/she:

A. Leaves voluntarily.

B. Is terminated for misconduct.

**14.59-3** An employee denied a severance allowance on the basis of Management's belief that the layoff period would not exceed three (3) continuous months, may apply for severance upon the expiration of the three (3) months period.

**14.59-4** The amount of severance will be one (1) week's regular straight-time pay for each full year of continuous service, with a minimum of two (2) weeks and a maximum of 15 weeks, minus any separation allowance paid on any previous occasion. The CEO shall have the authority to approve severance pay exceeding the 15-week maximum. Severance allowances will be paid on regular paydays and are subject to federal and state tax deductions and withholdings.

**14.59-5** The employee may be required to execute a signed agreement to the effect that the severance allowance will be terminated should the employee find employment prior to the end of the severance allowance period.

**14.59-6** An employee will be required to notify the Credit Union once he/she has obtained new employment. Failure to do so will obligate the employee to refund all amounts paid to him/her under this policy. The notice must be in writing and received by the Credit Union within seven (7) days of the commencement of employment.

**14.59-7** The severance allowance will be granted to eligible employees in addition to pay for unused vacation and personal days that have accrued during the year in which termination occurs. Sick days are not compensable. An employee receiving the severance allowance will be considered ineligible for unemployment compensation during that period.

**14.59-8** Employees who are terminated because of a Credit Union merger or acquisition will not be entitled to the severance allowance.

**14.59-9** Employees laid off because of conditions beyond the control of the Credit Union such as fire, flood, earthquakes, strikes, electrical interruptions or equipment failure, are not eligible for severance pay.

## 14.60 HOURS OF WORK

It is the policy of the Credit Union to establish working hours as required by work load and production flow, member service needs, and the efficient management of personnel resources.

**14.60-1** The normal workweek is Monday through Sunday, beginning and ending at midnight on Sunday and consisting of 35 hours.

**14.60-2** The normal workday will consist of eight (8) consecutive hours, which includes an unpaid one (1) hour meal period. Rest or coffee breaks are considered as time worked.

**14.60-3** When a department is required to work more than one (1) shift per day, the hours of work for each shift will be determined by the department head.

**14.60-4** Employees may be required to work overtime whenever it is deemed necessary by their department head. Overtime will be assigned by the supervisor. No employees will be permitted to work overtime without prior approval of their supervisor and Department Head. (See Salary Administration for overtime pay calculation).

**14.60-5** Part-time employees' scheduled work hours should not exceed 20 hours per week or 1,000 per year, whichever is less.

**14.60-6** Cooperative student employees scheduled work hours should not exceed 35 hours per pay period; total work hours should not exceed 1,000 per year.

**14.60-7** Temporary employees scheduled work hours may consist of:

A. Eight (8) consecutive hours of work per day, including an unpaid one (1) meal period.

B. 35 hours per work week, including appropriate unpaid meal periods.

C. 70 hours per pay period, including appropriate unpaid meal periods.

## 14.61 JOB EVALUATION

It is the policy of the Credit Union to adopt a job evaluation plan to measure all jobs to establish job grades. Rates of pay are set for each job grade on the basis of internal and external salary surveys. The Board delegated the authority to the Chief Executive Officer to determine salary ranges and grades for all positions within the organization.

## 14.62 RECORDING HOURS WORKED (Hand Scanners)

It is the policy of the Credit Union that all non-exempt employees must record their hours daily. Supervisors are responsible for reviewing the time records and determining the accuracy of the recorded time submitted for payment. The following rules must be adhered to:

A. Employees will record their starting and quitting times.

B. Employees are not permitted to indicate on their time record that they are quitting more than 15 minutes after their normal quitting time without the prior approval of the supervisor.

C. All employees are required to take a lunch or meal break excluding part-time employees who work less than five (5) hours in a day.

D. All employees' time records will be checked and signed by their supervisor or designee. Unworked time, for which an employee is entitled to be paid, will be entered by the supervisor on the time record. Authorized overtime also will be identified by the supervisor.

E. Unapproved absences will not be considered as hours worked for pay purposes. The supervisor will inform the employee if he/she will not be paid for certain hours of absence.

F. Completing another employee's time record or falsifying one's own time record is prohibited and may be grounds for disciplinary action including termination.

Nonexempt and exempt employees are required to scan in and out each day for work and for their lunch break periods. Supervisors and above are required to scan in at least once a day. Supervisors are responsible for ensuring their employees' hours are accurately reflected on the punch detailed reports. Supervisors are responsible for completing and submitting the Payroll Exception report each pay period detailing vacation, sick, personal, jury duty, bereavement leaves or any other absence for their department.

**14.63 AUTOMOBILE USAGE**

It is the policy of the Credit Union that an employee may use his/her own car for Credit Union business if necessary, in accordance with the following guidelines.

**14.63-1** Employees required to travel by car in the course of their daily work assignments may use their own cars with the prior approval of their supervisors. Credit Union cars are not to be used by employees for personal use without prior approval of management.

**14.63-2** The cost of gasoline or other expenses directly related to a vehicle paid for by the employee will be reimbursed at an allowance up to the IRS allowable limit to cover the cost of gasoline, oil and depreciation. Claims for reimbursement must be approved by the employee's department head before being submitted to the Accounting Department. Employees using their own vehicles for Credit Union business must carry adequate insurance to cover damage to the vehicle, other property damage, and injuries sustained by individuals as a result of an accident. The Credit Union will bear no responsibility for the employee's personal automobile insurance payment and will not be responsible for related accidents or injuries.

**14.63-3** Every employee whose duties require the operation of an automobile on Credit Union business will be required to possess a valid driver's license. Any fines incurred as a result of driving or parking violations will be paid by the employee. Time spent by an employee driving a Credit Union or a personal automobile on Credit Union business during normal working hours will be considered hours worked for pay purposes. An employee using a Credit Union automobile is responsible for its proper maintenance. Malfunctions or maintenance requirements must be reported to a supervisor immediately.

**14.63-4** A report of any accident, regardless of the extent of damage or the lack of injuries, must be made if a Credit Union vehicle or personal vehicle used on Credit Union business is involved. Such report must be made to the supervisor within 48 hours of the accident. In the event of an accident, employees should make no voluntary statements. They should respond only to questions of the investigating officers.

**14.64 BUSINESS EXPENDITURES**

The Credit Union may reimburse employees for expenses incurred for business entertainment as follows:

CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT

**14.64-1** Entertainment of business associates will be conducted by management. Where circumstances justify business entertainment by non-management employees, the prior approval of the employee's department head must be obtained.

**14.64-2** Entertainment expenses can include business meals and be reimbursed, or in areas where the entertainment is directly related to, or associated with, the Credit Union's business.

**14.64-3** Since it is difficult to establish precise guidelines distinguishing business and personal entertainment, management relies on the judgment and good faith of employees. The reimbursements are subject to the approval of the Senior management.

**14.64-4** Entertainment expenses must be reasonable and will not be reimbursed to the extent that they are lavish or extravagant. An unusual or large expenditure for entertainment, such as a dinner or cocktail party, must be approved by management prior to the event. Expenses below $25 can be reimbursed without receipt. However, proper approval and description of the expenses are required.

**14.64-5** Expense report is required for expenditures over $300. The expense report must be filed within two months after the date of incurrence. Expenditures below $300 can be reimbursed by submitting a petty cash voucher with supporting receipts. All business expenses are subject to the review and approval of the CEO and/or the designee. Exception can only be made upon approval from the CEO.

## 14.65 TRAVEL EXPENSES REIMBURSEMENT

It is the policy of the Credit Union to reimburse employees for travel expenses, including the cost of transportation, meals, and lodging for long-distance overnight trips, provided such travel is performed in the course of conducting Credit Union business.

**14.65-1** *Long distance* – Overnight travel activities which justify the reimbursement of travel expenses include, but are not limited to: calling on members' agencies, member prospects, suppliers, and the attendance at business meetings, conventions, and seminars or other selected educational functions related to the employee's job. Prior approval must be obtained from the employee's department head, Chief Executive Officer, or Chief Financial Officer.

**14.65-2** *Local travel* – Activities which justify reimbursement of local travel expenses include calling on members' agencies, prospects and suppliers and the attendance at business meetings, conventions, and seminars or other selected educational functions related to the employee's job. The employee will be reimbursed for that part of the travel, which exceeds the employee's normal travel between his/her residence, and their usual place of business. Employees are expected to use public transportation whenever practical. The mileage reimbursement shall be limited to the IRS reimbursement allowance for automobile.

**14.65-3** Common carrier transportation will be utilized for trips 200 miles or more, provided suitable scheduling is available. Employees are expected to exercise prudence in their selections of local transportation to their destinations. For trips involving shorter distances, employees may use their own cars with the Credit Union's approval. If employees wish to use their own cars for trips of 200 miles or more, the amount reimbursed will not exceed the amount the trip would have cost had air transportation been used.

**14.65-4** Corporate Credit Card Usages and Limitation- Executives (Senior Vice Presidents and above) who received corporate credit cards ("the cards") approved by the CEO must adhere to the following guidelines:

1. Usages of the cards are limited to business related purposes only.
2. All charges to the cards must be substantiated by providing copies of the bills and attached to the monthly statements, except recurring charges such as monthly charges for internet access and high speed internet lines (cable or DSL).
3. Executive management is expected to exercise their good judgment in any purchases or services utilizing the card. Any charges that exceed $500 must be approved by the CEO in advance. The approval can be granted verbally by the CEO, and the card holders shall indicate on the statement that the CEO has given his verbal approval.
4. All executives' card monthly statements must be presented to the CEO for his review and approval.
5. In the event of mistakenly using the card for personal charges/purchases, the CEO must be notified immediately and reimbursed to the Credit Union on or before the same statement cycle that the personal charges took place.
6. The Chief Executive Officer's corporate card statements will be reviewed and approved by the Chair of the Board or the Treasurer. The $500 notification requirement will not apply to the CEO's card. However, other limitations listed above will apply to the CEO's card as well.

## 14.66 ACCESS TO PERSONNEL FILES

Employees shall have the right to inspect their personnel file, except for reference inquiries and replies solicited by the employer in the course of the recruitment and hiring. Employees shall be given notice of any evaluation material placed in their file and shall have the right to respond in writing thereto. Such responses shall be included in their file. All personnel files are deemed the property of the Credit Union.

## 14.67 TRAINING AND DEVELOPMENT

It is the policy of the Credit Union that the Human Resources Department is responsible to bring quality training programs to the credit Union and continually conduct "Needs Surveys" to ensure that the staff and management are receiving the type of training it wants and needs to deliver quality, professional service to the members of the Credit Union.

## 14.68 CAB VOUCHERS

Employees are eligible to utilize the services of the Credit Union's authorized taxi service provided that they have worked nine (9) consecutive hours and passed 8 PM. Exceptions can be made by the CEO or department head which will be dependent upon justifiable circumstances.

## 14.69 PC AND COMPUTER NETWORK USERS POLICY

### 14.69-1 MCU Software License Guidelines

The Municipal Credit Union licenses personal and network computer software from a variety of third parties. The software developer normally copyrights such software and, unless authorized to do so, the Credit Union has no right to make copies except for backup and archival purposes. One of the purposes of this agreement is to prevent copyright infringement.

It is the policy of MCU to respect all computer software copyrights and to adhere to the terms of all software licenses to which the company is a party. MCU employees may not duplicate any licensed software or related documentation for use either on MCU premises or elsewhere unless you are authorized to do so by MCU. Unauthorized duplication of software may subject employees and/or MCU to both civil and criminal penalties under the United States Copyright Act. Employees may not give software to any outsiders including clients, contractor, members and others. MCU employees may use software on PCs and computer networks only in accordance with applicable license agreements. Violation by employees of applicable license agreements will result in disciplinary actions, up to and including termination of employment and that employee(s) will be held responsible for any fines or penalties incurred by MCU.

**14.69-2 Acquisition of Software**

All personal and network computer software (either proprietary or commercial) acquired by MCU must be approved by the CEO, President/CFO or the SVP of Technology and purchased through the MIS Department. Users will be provided with MCU's standard suite of software applications needed to perform their particular functions. Software acquisition channels are restricted to ensure that MCU has a complete record of all software that has been purchased for company computers and can register the software accordingly. MCU's PCs, laptops, PDA, Handhelds, Blackberry, cellular phones and Wireless devices are company assets and must keep software legal and virus free.

**14.69-3 Registration of Software**

When software is delivered, it must first be delivered to MIS to complete registration requirements. MIS will maintain a library of software licenses.

**14.69-4 Installation of Software**

After the registration and licensing requirements have been met, the software will either be installed by MIS or alternatively, in cases where the MIS department considers software installation to be routine, the MIS department will permit a non-MIS employee to complete the installation. If it is determined that a user no longer needs a software package, MIS will be notified to schedule a time to uninstall the software. At that time, any manuals related to the software must be returned. Employees are strictly prohibited from bringing, installing or copying software from home or other outside sources on MCU's PCs, laptops, PDA, handhelds, Blackberry, cellular phones, Wireless devices or network systems without prior approval of the MIS Department.

**14.69-5 Home Computers**

If work is done at home on any MCU owned equipment or devices or non-MCU PC, the data pertaining to such work product, which is contained on any equipment or any external storage devices i.e. DVD, CD, Diskette, and USB Drive etc., is the property of MCU. The data must be kept confidential and returned to the MIS department for storage.

**14.69-6 Purchases**

All technological purchases (PC, laptop, PDA, Handheld, Blackberry, cellular phones or Wireless devices) requests must be made to MIS in writing along with the business justification and appropriate approval by the department head.

### 14.69-7 Security

Passwords are MCU's networks first line of defense against unauthorized users gaining access to MCU information. Network passwords are set to automatically expire on a regular basis. The system will notify you when your password is about to expire. Passwords should never be written down and placed in an area that others can easily access. Passwords should never be shared with anyone for any reason.

### 14.69-8 Virus Notification

All files or external storage devices containing files from an outside source must be checked for viruses prior to being transferred to an MCU system. All incidents of virus attacks are to be reported immediately to MIS.

### 14.69-9 Data and Removable Media

Employees are not permitted to remove private information or software licenses from MCUs network. Flash drives, compact disks or other forms of removable media are not permitted unless authorized by MIS. Devices that connect to MCU equipment via USB, Firewire, WiFi or Bluetooth or not permitted unless authorized or installed by MIS.

### 14.69-10 Hardware Changes

Personal computers or peripherals should not be installed or relocated by anyone other than MIS or individuals authorized by MIS. In addition all moves or acquisitions must be coordinated with the MIS department in advance.

### 14.69-11 Electronic Mail (E-Mail)

All computers, handhelds, cellular phones, Wireless devices, PDAs, and Blackberrys and e-mail are the property of MCU and should be used for business purposes only. Email access is provided to employees to assist and facilitate business communications. Inappropriate use may result in disciplinary action up to and including dismissal. Inappropriate use includes, but is not limited to, the actions and activities set forth below in the Section entitled Examples of Inappropriate and Prohibited Actions and Activities.

Municipal Credit Union reserves, and will exercise, the right to review, intercept, access, delete, discard and disclose all communications, messages and records on the company's e-mail systems at any time, with or without employee notice, and such access may occur during or after working hours.

**14.69-12 External Access and E-Mail**

Access to external e-mail accounts is prohibited unless authorized for business purposes by employee department head. Access to global electronic information resources on the Internet is provided by MCU to assist employees in obtaining work-related information.

If an employee has been approved for Internet access, that employee must utilize the Internet with good judgment. Use of the Internet by employees is a privilege, not a right. This privilege may be revoked at any time. Keep in mind that many viruses are often transferred and or linked to files downloaded from the Internet. Therefore, no employee may download any programs from the Internet without prior permission from the MIS Department.

Internet data that is composed, transmitted or received via MCU's computer communications systems may be considered to be part of the official records of MCU and, as such, may be subject to disclosure to law enforcement or other third parties. Consequently, employees should always ensure that the business information contained in e-mail messages and other transmissions is accurate, appropriate, ethical, and lawful.

The equipment, services and technology provided to access the Internet remain at all times the property of MCU. As such, MCU reserves the right to monitor Internet access, and retrieve and read any data composed, sent, or received through our online connections and stored in our computer systems for legitimate business reasons. "Legitimate business reasons" include, but are not limited to, retrieving business information, trouble shooting hardware and software problems, preventing system misuse, assuring compliance with software distribution policies and complying with legal and regulatory requests for information.

In utilizing computer equipment and systems owned by MCU or an internet account provided by MCU, employees waive their right to privacy in their e-mail and consent to access and disclosure of their e-mail messages for any lawful purpose. Please note, however, that only authorized persons within MCU's MIS Department will conduct e-mail monitoring and the information contained in e-mail messages shall only be disclosed on a need-to-know basis. Supervisors and employees will be subject to discipline for interfering with a co-worker's electronic communications for any reason other than legitimate business purposes. MCU reserves the right to delete and discard any e-mail messages transmitted by or stored on MCU's computer networks or storage equipment for any legitimate business reason.

Data that is composed, transmitted, accessed, or received via the Internet must not contain content that could reasonably be considered discriminatory, offensive, obscene, threatening, harassing, intimidating, or disruptive to any employee or

other person. Examples of unacceptable content may include, but are not limited to, sexual comments or images, racial slurs, gender-specific comments, or any other comments or images that could reasonably offend someone on the basis of race, age, sex, religious or political beliefs, national origin, disability, sexual orientation, or other characteristic protected by law.

The unauthorized use, installation, copying, or distribution of copyrighted, trademarked, or patented material on the Internet is expressly prohibited. As a general rule, if an employee did not create material, does not own the rights to it, or has not received authorization for its use, it should not be put on the Internet. Employees are also responsible for ensuring that the person sending any material over the Internet has the appropriate distribution rights.

Employees may not install copy or download any files from the Internet or contained/attached to an e-mail without prior approval from MIS. In the event that MIS gives express permission, anti-virus precautions must be taken before downloading any file from the Internet. All compressed files are to be checked before and after decompression.

Upon request of the employee, MCU may permit personal use of an MCU Internet account at home. The request for such permission will be made to the head of the MIS Department. Employees who use their Internet account at home may not partake in unlawful activity or misrepresent oneself or MCU. Employees must not represent ones personal views as representative of MCU.

Abuse of the Internet access provided by MCU in violation of law or MCU policies may result in disciplinary action, up to and including termination of employment. Employees may also be held personally liable for any violations to MCU or third parties.

**14.69-13** Examples of Inappropriate and Prohibited Actions and Activities

The following behaviors are examples of network/e-mail and Internet-related actions and activities, which are prohibited and can result in disciplinary action (up to and including termination) and/or legal liability:

- Sending or posting discriminatory, harassing, or threatening messages or images;
- Stealing, using, or disclosing someone else's security code (VPN, User ID etc.) or password without authorization;
- Copying, pirating, or downloading software and various types of electronic files, in violation of intellectual property laws;
- Sending or posting outside of MCU any confidential or privileged material, trade secrets, or proprietary information belonging to

MCU or its business associates including, but not limited to, member personal or financial information (Proprietary information should not be sent over the Internet unless first properly encrypted and then approved by the MIS Department or an appropriate member of senior management. Employees may encrypt their e-mail and files only with software approved by the MIS Department. The MIS Department may require a copy of any key necessary to access encrypted e-mail messages and files.):

- Engaging in unauthorized transactions that may incur a cost to MCU or initiate unwanted Internet services and transmissions;
- Sending or posting messages or material that could damage the image or reputation of MCU or its business associates;
- Participating in the viewing or exchange of pornography or obscene materials;
- Sending or posting messages that defame or slander others;
- Attempting to break into the computer system of another organization or person;
- Refusing to cooperate with a security investigation;
- Sending or posting chain letters, solicitations, or advertisements not related to business purposes or activities;
- Engaging in political causes and activities, religious proselytizing or gambling activities;
- Jeopardizing the security of MCU's electronic communications systems;
- Sending or posting messages that disparage another organization's products or services;
- Passing off personal views as representing those of MCU; sending anonymous e-mail messages; engaging in any other illegal activities.
- These examples are meant to be illustrative and are not to be deemed all-inclusive.

## SECTION 15
## LEGAL DEPARTMENT

### 15.01 CONTRACTS

All contracts forwarded to the Legal Department are reviewed by an attorney. If the Legal Department is made aware that time is of the essence, such contract is reviewed immediately.

All contracts are then critiqued and discussed with the party forwarding such contract to the Legal Department. If the contract affects any MCU department besides the forwarding department, such department will be made aware of the existence and substance of such contract. The contract is then discussed and negotiated with the party wishing to enter into a contractual relationship with MCU. In some instances, the Operating Department will negotiate the contract subject to the Legal Department's final review.

All contracts of substance are discussed with the Chief Executive Officer or Chief Financial Officer. If such contract is executed, an original copy is kept on file in the Legal Department.

### 15.02 LITIGATION

All litigation, whether MCU is the plaintiff or a named defendant, is under the constant attention and supervision of an attorney. Both the laws and facts in each individual matter are researched fully. All non-collection related litigation is prosecuted or defended with the utmost care and attention to detail.

In situations where the Credit Union retains outside legal counsel to handle a particular matter, the Legal Department will review MCU's insurance coverage to determine if such coverage is available.

When a matter is forwarded to MCU's insurance company, with a demand to defend and hold MCU harmless, the insurance claim will be monitored by the Legal Department. Also, if the insurance company should, in turn, retain outside counsel to represent the Credit Union in a given matter, the Legal Department will monitor such outside counsel's activities in connection with the matter in question, and the Legal Department will work directly with such law firm.

**15.03 MISCELLANEOUS LEGAL MATTERS**

All other matters forwarded to the Legal Department are reviewed as quickly as possible. If necessary, both the fact and law concerning such matters are researched. Each matter is discussed fully with both the party presenting it to the Legal

Department and with any other MCU department such matter may affect. The Chief Executive Officer and Chief Financial Officer are briefed on any and all material matter.

If time is of the essence, such matters are immediately reviewed by an attorney.

It is the policy of the Legal Department to attempt to respond quickly to inquiries made by all MCU departments, and to express its legal opinions, where possible, in lay terms.

The Legal Department also works closely with MCU's Board of Directors on issues on which they seek legal counsel.

The General Counsel's office will be in attendance at all MCU monthly Board of Directors Meetings.

**15.04 BANKRUPTCY**

If the Collection Department believes a particular bankruptcy filing merits special review, the debtor's petition in bankruptcy is obtained from the court by the Collection Department personnel and, together with the debtor's loan file, is reviewed by an attorney. Upon such review, the Legal Department will determine whether it would be prudent to attend the first creditor's meeting.

Upon a review of the testimony from the first creditor's meeting, the Legal Department will determine whether or not to request an examination of the debtor.

Upon completion of discovery, a determination will be made as to whether an adversary proceeding should be instituted against the debtor. If an adversary proceeding is initiated, the Legal Department will litigate the proceeding through trial or until settlement.

### 15.05 RECEIPT OF SERVICE OF LEGAL DOCUMENTS

**15.05-1** Upon receipt by authorized personnel of any personally served papers, the date and time of receipt should be noted on the bottom of the document.

**15.05-2** Any fees accompanying the documents should be forwarded to the Accounting Department and a copy of the check or cash should be forwarded along with documents to the appropriate department.

**15.05-3** When the documents are served by mail, they should be forwarded as quickly as possible to the appropriate department.

**15.05-4** The appropriate department to forward each document is as follows:

A. Restraining Notices or Restraining Orders – MSO Department

B. Information Subpoenas – MSO Department

C. New York State and City Social Service and Mental Health Department Information Requests – MSO Department

D. Levy of Execution or Execution with Notice to Garnishee – Restraints and Levies, MSO Department

E. IRS Notice of Levy – Restraints and Levies, MSO Department

F. Income Execution or IRS Levy on Salary and Wages of MCU Employees – Human Resource Department

G. Subpoena *Duces Tecum* – Research-MSO Department

H. Order to Show Cause – Legal Department

I. Summons – Legal Department

J. Any and all other legal documents – Legal Department

**15.05-5** When any of the documents referred to in 15.05-4 above are personally served upon MCU, only authorized personnel should accept the papers. "Authorized Personnel" would be the officers, managers and assistant managers of the Credit Union and anyone else who is specifically authorized by the Credit Union to accept service.

### 15.06 REGULATORY COMPLIANCE

It is the policy of the Credit Union to be in compliance with all federal, state and local laws, rules and regulations. Although individual departments are primarily responsible

for compliance as to their specific programs and products, the Legal Department will supply, when required, legal guidance in the area of compliance.

The Legal Department reviews new compliance regulations and legislation, and provides department heads with the information and documentation necessary for compliance with regulatory mandates applicable to their responsibilities.

**15.07 MCU CONTRACT POLICY**

It shall be the policy of Municipal Credit Union (MCU), with regard to contractual relationships to be entered into by the Credit Union, that:

1. Contracts shall be entered into by MCU for the purpose of obtaining goods and services for the operations of the Credit Union.

2. All written contracts shall be reviewed by the department head (or his or her designee) and business terms concerning the same will be discussed with the vendor or service provider proposing the contract.

3. After the Department Head (or his/her designee) discusses such contract with the vendor or service provider, the contract shall be forwarded to the Legal Department, together with a memo from the head of the department detailing: (i) the purpose of the contract; (ii) business terms of the contract negotiated; and (iii) any suggestion or needs of MCU not reflected in the proposed contract.

4. The Contract shall be reviewed by the Legal Department and, where appropriate, further negotiation, with the party proposing such contractual relationship, shall be undertaken.

5. Contract signing authority:

    a. all contracts which are at a cost up to $5,000 must be signed by appropriate department heads (managers).
    b. all contracts which are at a cost up to $10,000 must be signed by Vice Presidents,
    c. all contracts which are at a cost up to $25,000 must be signed by Senior Vice Presidents,
    d. all contracts which are at a cost up to $50,000 must be signed by the Executive Vice Presidents, and
    e. all contracts which are at a cost in excess of $50,000 must be signed by the President/CEO

6. The Department Head must send the original executed contract to the Legal Department and maintain a copy for his/her records.

## 15.08 PAPER RECORDS AND PHYCICAL EVIDENCE RETENTION POLICY

A. This Policy governs the retention of all written correspondence, records, and other physical evidence which is sent by, produced or received by you during the course of performing your job duties at the Credit Union.

B. The following should be retained in your personal or office files for a period of at least five (5) years, and the retention period of the same for in-house attorneys and legal secretary is seven (7) years:

1. Original incoming business correspondence or memoranda addressed to you or received by you (except advertising materials).
2. Copies of outgoing business correspondence or memoranda sent by you.
3. Copies of reports prepared or issued by you or your department (unless copies of such report or electronic versions of the same are being elsewhere retained for future possible retrieval).
4. All other physical work product relative to business conducted for or on behalf of the Credit Union and all other MCU related written material sent or received by you (unless electronic versions of the same are being elsewhere retained for possible future retrieval).

C. From time to time, MCU's Counsel may issue a Preservation Notice requiring that paper records and other physical evidence in your possession with regard to a particular matter be retained by you for an indefinite period or turned over to the Legal Department. If you receive such a Preservation Notice, you will be required to confirm in writing your receipt of such Notice and acknowledge that you will take appropriate steps to comply with the same. All Preservation Notices issued by Counsel shall remain in effect until further written notice from Counsel.

D. It is critical that this Paper Records and Physical Evidence Retention Policy be followed at all times as a failure to abide by the directives set forth herein may result in spoliation of evidence. Spoliation may expose Municipal Credit Union to severe sanctions including monetary penalties, preclusion of evidence, adverse inference rulings and jury charges, punitive damages, dismissal of pleadings, and default judgments.

## 15.09 ELECTRONIC COMMUNICATIONS USE AND ARCHIVING POLICY

**Preamble**

This Electronic Communications Use and Archiving Policy (hereinafter also referred to as the "Policy") governs all communications which are sent and/or received by means of Municipal Credit Union-provided electronic devices including, but not limited to, desktop computers, servers, laptop/notebook/netbook computers, and SmartPhones or other handheld devices. The Policy also governs all voicemail messages received through MCU's telephonic network.

The Policy sets forth the permissible means by which MCU business-related communications may be sent and received by its employees and volunteers and the time periods for which those permissible electronic communications shall be maintained in the regular course of MCU's business. Finally, this Policy addresses when and how such electronic communications shall be preserved beyond the regular retention period in the event that MCU becomes aware that a lawsuit or government investigation has been initiated or MCU reasonably believes that same may be initiated.

### 15.09-1 Definitions

For the purposes of the Policy, the following terms shall have the meanings set forth hereinbelow:

A. "Administrator" – the MCU employee charged with the responsibility for overseeing the archiving and preservation of Electronic Communications. The Administrator shall take all steps necessary to systematically archive all Electronic Communications, be charged with the task of producing all such archived communications upon direction from MCU's General Counsel or Deputy General Counsel, and be responsible for other duties specifically set forth in this Policy.

B. "Archive" – to retain/store copies of Electronic Communication in accord with the provisions of the Electronic Communications Use and Archiving Policy. Information that is systematically archived constitutes "Archived Information."

C. "Electronic Communications" – those communications that are effected without paper.

D. "Computers" – includes MCU-owned/leased desktop computers, laptop computers, notebook computers, netbook computers, SmartPhones, and other handheld devices which have been distributed to MCU employees and volunteers by MCU's Information Technology Department ("IT") for the purposes of facilitating communications relative to MCU's business objectives.

E. "Impermissible Electronic Communications" – Electronic Communications effected via MCU Computers or other MCU-provided electronic devices (including cell phones) and which were transmitted by and through non-MCU email accounts, text messaging (via cell phones or handheld devices) and instant messaging programs (e.g., Windows Messenger, AIM, Yahoo Messenger, Google Chat, etc.) that relate to MCU business or work-related matters. Such messages are strictly prohibited by this Electronic Communications Use and Archiving Policy.

F. "Local/Locally" – the storage of information on an MCU Computer or other MCU-provided electronic device (as defined herein) which has been assigned by IT to a

specific MCU employee or volunteer as opposed to the storage of information on a remotely-located server (or other similar device utilized to store information).

G. "Log" – the Administrator's written record of any audio files (i.e., voicemails) archived on CD or DVD beyond the regular Retention Period.

H. "Metadata" – information about Permissible Electronic Communications which may describe how, when, and by whom it was created, sent, received, accessed, or modified and the manner in which such Electronic Communication is formatted.

I. "Permissible Electronic Communications ("PEC")" – those Electronic Communications relating to MCU business or work-related matters that are effected via MCU Computers (including MCU-provided electronic devices) and/or MCU portals which are not Impermissible Electronic Communications (i.e., transmitted by or through the impermissible means identified in the above definition of Impermissible Electronic Communications).

J. "Electronic Preservation Notice" – A directive issued by MCU's General Counsel or Deputy General Counsel to the Administrator in order to ensure that all necessary steps are taken in order to preserve all Electronic Communications relating to specified subject matters, employees, and/or volunteers, officers and employees until further notice. In addition, a separate Preservation Notice may be issued which will direct all employees and volunteers whom are likely to possess information regarding pending or reasonably-anticipated litigation or governmental investigation to preserve all Electronic Communications and other evidence (in whatever form) in their possession that may be germane to same.

K. "Preserved Information" – those Electronic Communications and other documentation which have been preserved/retained following a Preservation Notice or Electronic Preservation Notice issued by MCU's General Counsel or Deputy General Counsel.

L. "Retention Period" – the duration for which Permissible Electronic Communications are to be archived by the Administrator following their transmission and/or receipt."Server" – a combination of hardware and software dedicated to archiving copies of Permissible Electronic Communications.

M. "Spoliation" – the intentional or inadvertent destruction, mutilation, concealment, or alteration of evidence that would have otherwise been discoverable with respect to a litigated matter or governmental investigation, or a matter for which litigation or governmental investigation is reasonably anticipated.

## 15.09-2 Archiving of Permissible Electronic Information in the Orginary Course of Business

MCU volunteers and employees shall only use permissible electronic communications to electronically communicate on matters relating to MCU.

A. The Administrator shall ensure that a copy of each Permissible Electronic Communication (along with any attendant metadata that may have been generated in connection therewith) is archived on a server dedicated to the archiving of such Permissible Electronic Communications on a "real time" basis. Accordingly, even though a Permissible Electronic Communication may be deleted "locally" on a given MCU Computer or other MCU-provided electronic device, a copy of such Permissible Electronic Communication will remain on the server for the duration of the Retention Period (or longer, if dictated by an Electronic Preservation Notice).

B. The Retention Period for all Permissible Electronic Communications archived in the manner described hereinabove shall be five (5) years. After the applicable five-year period has elapsed with respect to any Permissible Electronic Communication, the Administrator shall see that it is systematically/programmatically deleted from both the archive server and the "local" users' hard drives in order to free up space for the storing and archiving of newer Permissible Electronic Communications. This automated deletion process will help control the costs that would be associated with acquiring and maintaining additional servers and hard drives required for the storing and archiving of larger volumes of Permissible Electronic Communications.

C. Any typewritten Permissible Electronic Communications (i.e., emails or memos received through electronic means, etc.) which are desired to be retained beyond the Retention Period should be printed on paper and stored on MCU premises or at MCU-designated storage facilities by the employee or volunteer desiring the extended retention.

D. Furthermore, if an Electronic Communication is an audio or video file, the employee or volunteer may make a request to the Administrator to archive the same on a DVD or CD. These Electronic Communications shall be kept beyond the Retention Period *only* when approved in writing by the Administrator and archived in accordance with the following procedures: A record of each Electronic Communication archived on CD/DVD shall be entered in a log maintained under the supervision of the Administrator (the "Log"). The log entries should include, at a minimum, the names of the sender and receiver of such Electronic Communications and the date and time the same were transmitted. Additionally, the Administrator will at all times retain a backup copy of the CD/DVD that has been created at the employee's/volunteer's request. Should the individual who requested the CD/DVD copy thereafter wish to discard same, the individual must forward the CD/DVD to the Administrator who will review its contents to determine if it is subject to any outstanding Legal Hold. If the Administrator concludes that the contents of the CD/DVD are not germane to a pending Legal Hold, the Administrator shall promptly

destroy the employee's/ volunteer's CD/DVD and the Administrator's backup CD/DVD copy. The destruction of both shall thereafter be recorded in the Administrator's Log.

E. The Administrator shall at all times ensure that MCU possesses and maintains adequate technological resources in order to retain all such information in accord with the Policy. A comprehensive evaluation of same shall be conducted at the direction of the Administrator no less than on an annual basis to ensure that: 1) Permissible Electronic Communications are being archived as dictated by the Policy, 2) the archived Permissible Electronic Communications are authentic and have not been tampered with, and 3) that MCU's facilities for the archiving of Permissible Electronic Communications are both technologically adequate and secure (so as to prevent the unauthorized access to same).

It should be noted that the above statements should also apply to the Legal Department's record retention policy, except the retention period is seven (7) years rather than five (5) years.

**15.09-3 Electronic Preservation Notice**

A. Electronic Preservation Notices shall only be issued by MCU's General Counsel or Deputy General Counsel (hereinafter referred to as "Counsel") and, when appropriate, shall instruct the Administrator to ignore the regular Retention Period (and disable the automatic deletion protocol described hereinabove) in favor of indefinitely retaining all Permissible Electronic Communications (in all locations where such Permissible Electronic Communications are likely to be stored such as servers, individual desktop computers, and handheld devices) relative to specified individual employees, volunteers and subject matters detailed within the Electronic Preservation Notice. Collectively, this information is the "Preserved Information."

B. Immediately upon receiving an Electronic Preservation Notice, the Administrator will meet with Counsel to determine the initial scope of, and means by which, Electronic Communications are to be gathered, stored and maintained for safekeeping and possible production in the future ("Legal Hold Parameters"). This process will include consideration of the means and extent to which Impermissible Electronic Communications stored on MCU Computers and MCU-provided electronic devices (including cell phones) are to be obtained and archived for safekeeping and possible future production. In making these determinations, the Administrator and Counsel will: (1) determine how to define "relevant"; (2) identify all custodians of potentially relevant evidence; (3) identify location of evidence; (4) determine whether metadata is relevant; and (5) determine appropriate time frames.

C. The Administrator will confer with Counsel on at least a quarterly basis to review and reconsider the scope of the existing Legal Hold Parameters.

Once the appropriate Legal Hold Parameters are established, it is the responsibility of the Administrator to enforce and monitor the same.

All Electronic Preservation Notices issued by Counsel shall remain in effect until further written notice from Counsel.

**15.09-4 Summary**

It is critical that the Electronic Communications Use and Archiving Policy be followed at all times as a failure to abide by the directives set forth herein may result in spoliation of evidence. Spoliation may expose Municipal Credit Union to severe sanctions including monetary penalties, preclusion of evidence, adverse inference rulings and jury charges, punitive damages, dismissal of pleadings, and default judgments.

# SECTION 16
# SECURITY AND PRIVACY POLICY

## 16.01 SECURITY POLICY

The President/CEO has delegated the responsibility of security to the Vice President of Security and Fraud and the Manager of General Services. They are the designated Security Officers of the Credit Union.

It is the policy of the Credit Union that the security procedures and manual are reviewed periodically, at least annually. The review shall include a security survey covering all offices of the Credit Union and the adequacy of the security systems and controls.

Testing of security devices (such as bells, money clips, contract devices, etc.) shall be performed periodically, and at least semiannually, in conjunction with the firm(s) providing security services to the Credit Union. Rules and regulations issued by the regulatory agencies must be reviewed annually, or as modified, to ensure that the Credit Union's security policies and procedures remain in compliance. Proposed changes to the security manual should be presented to the Board of Directors for approval as deemed appropriate.

### 16.01-1 Opening Branch Policy

Only certain individuals, selected by the Vice President of Branch Operations/Member Service Operations or designee, are authorized to open or close an MCU branch. The names of these individuals must be on file with our outside security company (the ADT Protection Company). At least two of these individuals must always be present during the opening process. No other employees are to have knowledge of alarm codes, vault combinations or access to duplicate sets of keys. In addition, each branch is required to maintain a daily record of the opening and closing activity by completing a premises and vault record.

Important:

If, after opening the branch, the individual charged with opening finds unusual or suspicious circumstances, that individual should leave immediately and call the police.

In the event of an emergency, the Vice President or designee will be authorized to open a particular branch.

* See Branch Operations Procedure Manual for details.

**16.01-2 Vault Security**

It is the policy of the Credit Union that every Municipal Credit Union vault is under dual control. This means that it requires a minimum of two (2) individuals to open the vault. The branch managerial team, with the approval of the Vice President of Branch Operations/Member Service Operations, may select the employees who will perform that function. No other branch personnel are to be allowed to have knowledge of or access to vault combinations, security code or keys.

**16.01-3 Robbery Prevention**

Planning how to effectively deal with a robbery and implementing prudent procedures and practices may actually reduce the odds of a robbery occurring. Adequate practice and review of these procedures can reduce the risk of danger in the event of a robbery.

* Refer to the Security Manual for the robbery prevention and after robbery procedures.

**16.01-4 Holdup Alarm Test**

It is the policy that Branch managers are required to test their alarm systems at least once a month and keep a detailed record of each test. Branch employees are required to know the location of each alarm in their working area and how to activate it.

**16.01-5 Bomb Threat Reporting**

The Credit Union's primary concern is the safety of its staff and members. It is the Credit Union's policy that when a bomb threat is received, treat it seriously and report to the police or other law enforcement authorities immediately. Advise the Credit Union Security Officer and/or Vice President as soon as possible of the impending threat.

**16.01-6 Contingency Site Rating List**

In the event of an emergency that would require relocation, the following rating list should be used as per the policy of the Credit Union.

RATINGS

A. Urgent need for immediate relocation, no down time permitted.

B. Relocation necessary without extended delay, minimal down time permitted.

C. Relocation with delay, acceptable down time permitted.

D. No relocation, merge with other unit(s), prolonged down time permitted, possible reconstruction.

E. No relocation, reconstruction implemented, prolonged down time permitted.

| DEPARTMENT | RATING |
|---|---|
| Accounting: | A |
| Data Control | A |
| Purchasing | C |
| Payroll Input | A |
| Administrative | |
| President/CEO, EVP/CFO, COS | A |
| Board of Directors | B |
| Auditing | C |
| Branches | D |
| Collections | B |
| EDP: | |
| Operations Refer to EDP Recovery Plan | |
| Programming Refer to EDP Recovery Plan | |
| General Services: | |
| Mail Room/Messengers | B |
| Human Resources: | |
| Employee Benefits | A |
| Employee Payroll | B |
| Training | D |
| Legal | B |
| Member Services: | |

CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

| | |
|---|---|
| Communications | A |
| Electronic Banking | A |
| Mail Banking | A |
| Payroll | B |
| Research | C |
| Microfilming | B |
| Special Accounts | C |
| Loan Operations: | |
| Processing and Verifications | A |
| Loan Officers | A |
| VISA | A |
| Marketing | C |
| Mortgage/Home Equity | A |

**16.01-7 Internal Controls**

Surety Bond Coverage will be reviewed regularly, and at least annually, to determine if coverage is adequate.

Loan applications will be randomly checked to verify authenticity of the applicant.

Currency within the Credit Union will be maintained at a working minimum and funds flowing to or from the vault will require dual control.

Investment placement and funding controls will be reviewed by the Fiscal and ALCO Committee at least annually. The Supervisory Committee will verify custodial records on investments at least annually.

**16.01-8 Reporting Suspected Embezzlement**

The Municipal Credit Union believes that the trust placed in its employees is well founded, based on the character of the individuals it employs. Individuals proven to have violated this trust will be dismissed and if criminal wrongdoing has occurred, the Credit Union will prosecute to the full extent of the law. If an employee is approached by someone who wishes to involve them in an illegal

transaction or should they have good reason to suspect illegal activities, they have an obligation to report the incident.

* For other details of security issues, refer to the Disaster Recovery Plan.

## 16.02 SAFEGUARDING MEMBER INFORMATION POLICY

### 16.02-1 Purpose

The Gramm-Leach-Bliley Act and Part 748 of the MCUA Rules impose an obligation on credit unions to protect the security and confidentiality of member information. To comply with these requirements, Municipal Credit Union establishes this policy setting standards addressing administrative, technical, and physical safeguards in order to: (1) insure the security and confidentiality of member records and information; (2) protect against and reasonably anticipate threats or hazards to the security or integrity of such records; and (3) protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any member.

### 16.02-2 Policy Statement

Municipal Credit Union will take steps to protect member information as required by the Gramm-Leach-Bliley Act and Part 748 of the NCUA Rules. The Credit Union will implement a comprehensive information security program that will assess existing risks to member information; develop ways to manage and control the existing risks, and monitor third-party outsourcing arrangements to ensure compliance with the Credit Union's policies and procedures.

### 16.02-3 Information Security Program Responsibility

Management will assure that annual reviews include appropriate testing of the Credit Union's compliance with the Gramm-Leach-Bliley Act and Part 748 of the NCUA Rules & Regulations.

To assure compliance, the management team will:

1. Assess existing risks to member information;
2. Develop ways to manage and control the existing risks;
3. Monitor third-party outsourcing arrangements to ensure compliance with the Credit Union's policies and procedures;
4. Draft policies for board review and adoption, where appropriate, to ensure compliance;

5. Monitor, evaluate and suggest adjustments to the policy to the Board of Directors, as appropriate, in light of (i) relevant change in technology; (ii) the sensitivity of member information; (iii) internal or external threats to information; (iv) the Credit Union's own changing business arrangements, such as (a) mergers and acquisitions; (b) alliances and joint ventures; (c) outsourcing arrangements; and (d) changes to member information systems.

6. Brief the Board of Directors annually on the status of the comprehensive information security program, addressing issues including (i) risk assessment; (ii) risk management and control decisions; (iii) service provider arrangements; (iv) results of testing; (v) security breaches or violations, along with management's responses; and (iv) recommendations for changes in the information security program.

**16.02-4 Risk Assessment**

When assessing the risks presented to member information, the management team will identify reasonably foreseeable internal and external threats that could result in unauthorized disclosure, misuse, alternation, or destruction of member information or member information systems.

The management team will assess the likelihood and potential damage of these threats, taking into consideration the sensitivity of member information.

The management team will assess the sufficiency of policies, procedures, member information systems, and other arrangements in place to control risks and, where appropriate, draft appropriate policies for review and adoption by the Board of Directors.

**16.02-5 Specific Security Measures**

Management will continually monitor the types of member information maintained and reasonably anticipate breaches of member information. The Credit Union must balance the needs of members to receive timely and convenient service with their needs for privacy and security. The Credit Union's duty is to provide reasonable safeguards to member privacy to reasonably foreseeable threats to member privacy. To provide these reasonable safeguards, the Credit Union establishes the following security procedures, which will be revised as needed to provide continued protection to member privacy.

**16.02-6** 16.02-5A <u>Premises Access Restrictions</u>

1. Employees will be allowed in the Credit Union premises only during their normal working hours. Exceptions may be made on an "as needed" basis and must be approved by Department Management.

- Access control cards to areas of the Administration building will be issued to employees and will be used to enter the premises daily. Lost or misplaced cards must be reported immediately to the security officer. Lost or misplaced branch office keys must be reported immediately to Branch Operations Management and the Security Officer.

- Alarm codes and access keys to provide access to the building outside of normal business hours will be permitted at the discretion of Department Management.

- The Security Officer will periodically review open and close reports to monitor building access.

2. Access to areas where cash is maintained will be limited to Branch Management and Teller Unit personnel.

    - Access to the Teller Units is restricted to Branch Management and Teller Unit personnel.

    - No other employees will be permitted in a Teller Unit except when necessary to conduct official Credit Union business.

    - Non-authorized personnel who are in Teller Unit must be escorted at all times by authorized personnel of Supervisory rank or above.

3. No entry by non-employees and non-officials is permitted to non-public areas of the Credit Union at any time.

    - Employees may be in the non-public areas of the Credit Union only during their normal working hours or during exception periods approved by Management.

    - Officials may be in the non-public areas of the Credit Union only while conducting official duties.

    - Vendors and official visitors who enter non-public areas of the Credit Union must be escorted at all times.

    - Due to security concerns, public access to restrooms in the Administration Building is restricted to the 26th floor. Restroom access at branch facilities is at the discretion of Branch Management.

4. MIS Department and computer room access is restricted.

- Department access is restricted to Management on a "needs" basis.
- The computer room will be kept locked at all times.
- Employees will not enter the computer room except as necessary to complete their assigned duties.

**16.02-7** 16.02-5B **Information Systems Access Restrictions**

1. Access to the Credit Union's electronic information processing and storage system will be controlled by user name and password.
   - System access control devices should not be shared with entities outside the Credit Union and should be safeguarded against eavesdropping or observation.
   - Passwords are known only to the system user and should be kept confidential at all times.
2. Privileges on the Credit Union's information processing and storage system will be restricted based on the employee's need to access information in fulfilling their job functions.
   - User privileges will be reviewed annually by Departmental Management and written confirmation provided to Data Control.
3. Ability to access the Credit Union's electronic information system remotely will be limited to a "needs" basis controlled by the SVP of MIS.
   - Remote access to the Credit Union's LAN is permitted on an "as needs" basis. Such access is given at the discretion of the SVP of MIS and is restricted by use of a random secure number generator.
   - Member initiated transactions authenticated by a PIN or password are excluded from this restriction.
   - Remote access to the Credit Union's electronic information processing and storage system by employees of system software vendors or consultants employed by the Credit Union in order to maintain, trouble shoot, or install software or hardware is permitted at the discretion of the SVP of MIS. All such cases will be monitored by a representative of the MIS Department appointed by the SVP of MIS.

16.02-5C **Physical Records Access**

1. All physical records of the Credit Union containing member information will be maintained in secured areas, with access restricted as noted elsewhere in this policy.

   - Employees will not leave member information in view of other members or the general public.

   - Employees will not leave member information within the physical reach of other members or the general public without safeguarding the information.

2. Physical records of the Credit Union containing member information may not be removed from the Credit Union premises except for normal document retention purposes or as required by law.

3. All media containing any member information including, but not limited to, name, telephone number, address, account number, social security number, and account balances must be destroyed. Paper documents must be shredded and electronic media erased.

16.02-5D **Identity Authentication**

1. All persons seeking to transact business on an account must be identified as an account owner.

   - For in-office transactions, identity will be verified using the person's photo identification or other acceptable documentation as provided for in the Branch Operations Procedure Manual.

   - For telephone transactions, identity will be verified by requesting information known to the member but not likely to be known by others. This information may include the member's social security number, the member's mother's maiden name, names of other owners listed on the account, and details of recent transaction histories.

   Even after the member is identified, only routine transactions may be conducted by telephone. File maintenance requests, such as to change the member's address, will not be accepted by telephone. Such requests must be submitted by mail.

   If an employee does not believe the caller is actually the person they identified themselves as our member or account holder, the employee should not give out any account information. Instead, the employee will

call the member back at the telephone number of record, not a number given by the caller.

Information that should be known to the member already should not be given out over the telephone. This includes, but is not limited to, the member's address, telephone number, and social security number. If the member wishes to verify such information over the telephone, the employee will call the member back at the telephone number of record, not a number given by the caller.

- Mail requests for file maintenance and withdrawals will be verified by comparing signatures. If the employee does not believe the request is authentic, the employee should consult with a supervisor for direction. Mail receipts will be mailed only to the address of record.

2. Skip tracing calls will be handled by the Collections Department, using call back procedures.

3. Verifications of deposit require an original (not faxed), written release. If a member or vendor needs immediate verification, suggest to the member or vendor that they use the member's last statement.

**16.02-8** 16.02-5E **Information Disclosure**

1. Employees should be aware of "pretext" calling. This is a fraudulent method of identity theft where someone pretends to be another person (i.e., our member or account owner) and attempts to obtain information about that person by calling a financial institution or other entity.

   To combat identity theft by "pretext" calling, employees will verify identity for all callers as described elsewhere in this policy before disclosing any information. Even after verifying identity, employees will not provide information back to callers that they should already know if they are a legitimate caller (i.e., our member or account owner). If information needs to be verified by the member, our employee will call the member back at the phone number of record, not a number provided by the caller.

2. Employees cannot verify any information about a member or a member's account to anyone, including law enforcement agencies, without the member's original written authorization, a subpoena, or a court order.

3. Skip tracing requests should be forwarded to the Collections Department.

4. Requests for verification of funds for a particular check will be handled if the call appears to be legitimate (i.e., merchant knows correct information

form face of check, check number appears to be in line). For these requests, the response should be simply that the check would be paid if presented now (or would not be paid if presented now, as the case may be). The member's balance or other account information should not be disclosed.

**16.02-9** 16.02-5F **Change of Address**

Change of address and change of phone number requests must be submitted in writing. Account takeover and identity theft is commonly accomplished by changing the address for accounts to an address in control of the fraudster. In order to protect the member, such information change requests must be submitted in writing.

**16.02-10** 16.02-5G **E-Mailing**

1. Member information will not be e-mailed, since e-mail is not a secure method of communication.

2. Information can be attached to an e-mail and secured for transmission if the attachment is encrypted. The Credit Union will transmit member information in this manner to known receivers.

**16.02-11** 16.02-5H **Attempt Monitoring**

1. With the offering of Home Banking, the Credit Union has established adequate firewall protection against unauthorized access to member records and general Credit Union electronic information.

   Periodically, penetration testing will be obtained from a third party vendor and attempt monitoring will be in place.

2. Remote access to the Credit Union's primary data processing system will be disabled at all times except when enabled to permit remote access by an authorized user or when transmitting information. All remote access is logged and requires a user name and password for access.

3. Remote access via telephone (Touch Tone Teller) and Home Banking for member accounts will be disabled after multiple invalid attempts for a particular account number (Refer to Operating Procedures).

**16.02-12** 16.02-5I **System Changes**

System access or security parameter changes must be authorized by the Data Control Department. Symitar profile changes will be reviewed by the MIS Department to assure that the changes have not compromised system security or member information.

MCU
MUNICIPAL CREDIT UNION



**16.02-13** 16.02-5J **Disaster Recovery**

The credit union maintains a plan to minimize inconvenience to members and loss of information in the event of a disaster. This plan includes off-site storage of backups from the main data processing system, fireproofing of valuable records and assets, and maintenance of both a data processing hot site and a business recovery site. See separate disaster recovery plan for details.

**16.02-14 Training**

During each employee's initial training period with the Credit Union and annually thereafter, the employee will be trained on the Credit Union's safeguarding member information policy. Employees will be required to sign a statement that they have read and understood the policy and agree to abide by the policy.

**16.02-15 Vendor Arrangements**

Management will seek written assurances from existing and prospective vendors that they are in compliance with the Gramm-Leach-Bliley Act and NCUA Rules & Regulations, Part 748. Existing vendors to whom the Credit Union provides any member information will be asked to provide written assurance by 7/31/02. New vendors will be asked to provide written assurance as part of the vendor acquisition process.

Depending on the extent of information shared/housed by the vendor, the volume of business, and the size of the contract being considered, the Credit Union may request that evidence of an independent third party review be provided by the vendor.

**16.02-16 Annual Certification of Compliance**

As required by the NCUA, Municipal Credit Union will file an annual statement certifying compliance with Part 748 of the NCUA Rules.

**16.02-17 Response Program for Unauthorized Access to Member Information**

Management will take preventative measures to safeguard member information against attempts to gain unauthorized access to the information. When the credit union becomes aware of incidents of unauthorized access to member information, the credit union will:

1. Assess the nature and scope of the incident and identify the member information systems and types of information that have been accessed or misused.

2. Notify the New York State Banking Department as soon as possible of any incident involving unauthorized access or use of sensitive member

information. Sensitive member information includes a member's name, address, or telephone number, in conjunction with the member's Social Security Number, driver's license number, account number, credit or debit card number, or a personal identification number or password that would permit access to the member's account. It also includes any combination of components of member information that would allow someone to log onto or access the member's account, such as a user name with a password or a password with an account number.

3. File a Suspicious Activity report (SAR), if within guidelines, and notify appropriate law enforcement authorities.

4. Take appropriate measures to prevent further unauthorized access or use of member information, such as by monitoring, freezing, or closing affected accounts, while preserving records and other evidence.

5. Notify members when warranted.

Any new contracts entered into with service providers will require the service provider to disclose any and all breaches in security resulting from intrusions into its processing system(s) that might result in unauthorized access to Municipal Credit Union member account information.

## 16.03 FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACT ACT)

Under the Fair and Accurate Credit Transactions Act (FACT Act), financial institutions that offer or maintain "covered accounts" (defined below) must develop and implement a written identity theft prevention policy that is appropriate to the size and complexity of the institution, as well as the nature and scope of its activities. This policy requires reasonable staff training, oversight of service providers, written and documented policies and procedures, and oversight by the Municipal Credit Union (MCU) Board of Directors.

The rules also require credit and debit card issuers to establish reasonable policies and procedures to assess the validity of a change of address where there is also a request for additional or replacement card within a short period of time. Users of consumer reports who receive a notice of an address discrepancy from a credit bureau must have procedures in place in order to form a reasonable belief of the member's identity.

***Policy Statement***

The purpose of this policy is to set forth the guidelines for Municipal Credit Union (MCU) management and staff to use in establishing and maintaining policies and procedures in order to comply with the FACT Act's guidelines on detecting, preventing and mitigating identity theft.

## 16.03-1 Definitions

**A. Account** – A continuing relationship established by a person with Municipal Credit Union to obtain a product or service for personal, family, household or business purposes.

1. Although this definition includes business accounts, the risk-based nature of the final rules allows Municipal Credit Union flexibility to determine which business accounts will be covered by its Program through a risk evaluation process.

2. The obligations of the final rule apply not only to existing accounts, where a relationship already has been established, but also to account openings, when a relationship has not yet been established.

**B. Covered Account**

1. An account primarily for personal, family, or household purposes, that involves or is designed to permit multiple payments or transactions, or

2. Any other account for which there is a reasonably foreseeable risk to members or the safety and soundness of Municipal Credit Union from identity theft, including financial, operational, compliance, reputation or litigation risks.

**C. Identity Theft** – A fraud committed or attempted using the identifying information of another person without authority. The Federal Trade Commission (FTC) defines the term "identifying information" to mean, "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person, including any of the following:

1. Name, Social Security Number (SSN), date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

2. Unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

3. Unique electronic identification number, address or routing code; or

4. Telecommunication identifying information or access device.

D. Red Flag – A pattern, practice or specific activity that indicates the possible existence of identity theft.

E. Service Provider – A person / company that provides a service directly to MCU.

### 16.03-2 Periodic Identification of Covered Accounts

Municipal Credit Union will periodically determine whether it offers or maintains any covered accounts. As part of this determination, Municipal Credit Union will conduct a risk assessment to determine whether it offers or maintains covered accounts, taking the following into consideration:

A. The methods it provides to open its accounts;

B. The methods it provides to access its accounts; and

C. Its previous experience with identity theft.

### 16.03-3 Development and Implementation of Identity Theft Prevention Program

Identification of Red Flags. In determining which Red Flags may be relevant, the following factors will be considered:

1. The types of covered accounts offered or maintained;
2. The methods provided to open these accounts;
3. The methods provided to access covered accounts; and
4. Previous experiences with identity theft.
5. The relevant Red Flags will be incorporated from the following sources:
    a. Previous experiences with identity theft;
    b. Changes in the methods of identity theft that reflect changes in the risk; and
    c. Applicable supervisory guidance.

### 16.03-4 Detection of and Response to Red Flags

**Detection.** Municipal Credit Union will address the Red Flags in connection with the opening of covered accounts by obtaining and verifying information about the identity of a person opening a covered account (for example, by using the existing MIP rules set forth in the Bank Secrecy Act). Municipal Credit Union will address the detection of Red Flags in connection with existing covered accounts by authenticating members, monitoring transactions, and verifying the validity of change of address requests.

**Responding.** In order to respond appropriately, Municipal Credit Union will assess whether the Red Flag detected evidence or a risk of identity theft, and will

have a reasonable basis for concluding that a Red Flag does not evidence such a risk.

**Updating the Program.** Municipal Credit Union will periodically update its policies, procedures and risk assessment to reflect changes in identity theft risks to members and to the safety and soundness of MCU.

**16.03-5 Administration of the Program**

**Involvement of the Board of Directors and Senior Management.** The Board or an appropriate committee of the Board must approve the Identity Theft Red Flag Policy. In addition, the Board or an appropriate committee of the Board, and/or Senior Management will be responsible for approving any changes to the Identity Theft Red Flag Policy. Oversight will include the following:

1. Assigning specific responsibility for the program's implementation;

2. Reviewing annual reports prepared by the individual designated with responsibility for administration of the program regarding compliance with the Red Flags rules. These reports will address the following matters related to the Program:

   a. The effectiveness of the policies and procedures that address the risk of identity theft in connection with the opening of covered accounts or existing covered accounts;

   b. Service provider arrangements;

   c. Significant incidents of identity theft and management's response to these incidents; and

   d. Recommendations for material changes to the Program; and

3. Approving material changes to the Program, as necessary, to address changing identity theft risks.

**16.03-6 Responsibility for Administration of the Program.** The Credit Union's *Fraud/Security Officer* will be responsible for the development, implementation, and day to day administration of the Identity Theft Program. These duties will include the following:

a. Reporting directly to the Supervisory Committee regarding any changes or updates to the program. The Supervisory Committee in turn will inform the entire Board of Directors of any changes or updates that have occurred.

b. Ensuring that the Credit Union's develops a comprehensive Identity Theft Program and that the program is implemented properly.

c. Ensuring that the Credit Union follows all policies and procedures related to the Credit Union's Identity Theft Prevention Program.

d. Updating and modifying the Program as necessary to ensure that the program continually monitors and assesses new ways to detect, prevent, and mitigate Identity Theft and remain in compliance with regulatory requirements.

e. Preparing reports to the Board and/or Senior Management on a periodic basis that detail the following:

- The effectiveness of the Program
- Any "significant events" of identity theft and management's response to such incidents
- Recommendations for any material changes to the Program due to evolving risks and methods of identity theft

f. Ensuring that the all relevant Credit Union staff is obtaining proper training with regards to the Program

**16.03-7 Oversight of Third Party Service Providers**. If a service provider is used in connection with covered accounts, Municipal Credit Union will ensure that the activity of the service provider is conducted pursuant to reasonable policies and procedures that are designed to detect, prevent and mitigate the risk of identity theft.

**16.03-8 Other Applicable Legal Requirements.** Municipal Credit Union will follow other applicable legal requirements, such as:

1. The requirement to file a Suspicious Activity Report;
2. The requirements under the Fair Credit Reporting Act (FCRA) regarding the circumstances under which credit may be extended when fraud or an active duty alert is detected;
3. The requirements under the FCRA of furnishers of information to credit bureaus to correct or update inaccurate or incomplete information, and not to report information that the furnisher reasonably believes is inaccurate; and
4. The FCRA prohibitions against the sale, transfer and placement for collection of certain debts resulting from identity theft.

**16.03-9 Red Flags**

As part of its identity theft prevention program, Municipal Credit Union will monitor activity for the detection of the following Red Flags. Municipal Credit Union will periodically update this list as new experiences are encountered.

A. A fraud or active duty alert is included with the credit report.

B. A credit bureau provides a notice of a credit freeze in response to a request for a credit report.

C. A credit bureau provides a notice of address discrepancy.

D. A credit report or account usage that indicates a pattern of activity is inconsistent with the history or pattern of activity usually associated with the member, such as:

1. A recent and significant increase in the volume of inquiries;

2. An unusual number of recently established credit relationships;

3. A material change in the use of credit, especially with respect to recently established credit relationships; or

4. An account that was closed for cause or identified for abuse of account privileges by a financial institution or creditor.

E. Documents provided for identification appear to be forged or altered.

F. The photograph, description of the consumer, or other information on the identification is inconsistent with the appearance of the consumer who is presenting the identification.

G. Other information on the identification is not consistent with the information on the identification provided by the person when the account is opened or by the consumer presenting the identification.

H. Other information provided is inconsistent with information on file with MCU, such as a signature card or recent check.

I. An application appears to be altered, or destroyed and reassembled.

J. Personal information provided is inconsistent when compared to external information sources, such as:

1. The address does not match any address in the credit report; or

2. The SSN has not been issued, or is listed on the Social Security Administration's Death Master File.

K. Personal information is internally inconsistent, such as an SSN that is inconsistent with a consumer's date of birth.

L. Personal information is provided that has also been provided on a fraudulent application.

M. Personal information that is provided is of a type associated with fraudulent activity, such as a fictitious address (i.e., mail drop or a prison) and an invalid phone number (i.e., pager or answering service).

N. The address, SSN, and phone numbers have been submitted by other consumers.

O. The consumer fails to provide all required information on an application.

P. Personal information is not consistent with information on file with MCU.

Q. The consumer cannot provide authenticating information, other than what would be available from a wallet or credit report.

R. There is a request for additional authorized users for the account or a request for new, additional, or replacement cards shortly after a request for a change of address.

S. A new, revolving credit account is used in a manner associated with fraud, such as credit used for cash advances or for merchandise that is easily converted to cash, or the member fails to make the initial due payment.

T. An account is used in a manner inconsistent with established patterns of activity, such as:

1. Nonpayment when there is no history of late or missed payments;

2. A material increase in the use of available credit;

3. A material change in purchasing or spending patterns;

4. A material change in electronic fund transfer patterns in connection with a deposit account; or

5. A material change in telephone call patterns in connection with a cellular phone account.

U. An account that has been inactive for a reasonably lengthy period of time is used (taking into consideration the type of account, the expected pattern of usage and other relevant factors).

V. Mail sent to the member is returned repeatedly as undeliverable even though transactions on the account continue to be conducted.

W. Municipal Credit Union is notified that the member is not receiving paper account statements.

X. Municipal Credit Union is notified of unauthorized charges or transactions in connection with the account.

Y. Municipal Credit Union has been notified that it has opened a fraudulent account for a person engaged in identity theft.

**16.03-10 Special Rules for Card Issuers**

Municipal Credit Union will not issue an additional or replacement credit or debit card if such a request is received within a short time period (which must be at least 30 days) after receiving notification of a change of address for that account, unless Municipal Credit Union does the following:

1. Notifies the cardholder of the request either (1) at the cardholder's former address; or (2) by any other means of communication that Municipal Credit Union and the cardholder have previously agreed to use; and provides the cardholder with a reasonable means of promptly reporting incorrect address changes; and

2. Otherwise assess the validity of the change of address in accordance with Credit Union's policies and procedures.

Any written or electronic notice that is provided under these rules will be "clear and conspicuous," and provided separately from the regular correspondence that is sent to the member. "Clear and conspicuous" is defined as "reasonably understandable and designed to call attention to the nature and significance of the information." Verbal notices may also be provided, if outlined in the policies and procedures that Municipal Credit Union has established under the Red Flag rules.

These rules apply only to credit and debit cards, including payroll cards. They do not apply to gift cards or other prepaid card products.

**16.03-11 Rules on Duties of Users of Credit Reports Regarding Address Discrepancies**

As a user of credit report information, Municipal Credit Union will do the following:

1. Compare the information in the credit report provided by the credit bureau with the information that MCU:

   a. Obtains and uses to verify the member's identity in accordance with the CIP rules under the Patriot Act;

b. Maintains in its own records, such as applications, change of address notifications, other member account records, or retained CIP documentation; or

c. Obtains from third-party sources.

2. Verify the information in the credit report provided by the credit bureau.

**16.03-12** Municipal Credit Union will also use reasonable procedures for furnishing to the credit bureau, from which it received a notice of address discrepancy, the address for the member that MCU has reasonably confirmed as accurate, when MCU:

1. Can form a reasonable belief that the report relates to the member about whom the report was requested;

2. Establishes a continuing relationship with the member; and

3. Regularly and in the ordinary course of business furnishes information to the credit bureau from which the notice of address discrepancy was obtained.

**16.03-13** Municipal Credit Union may reasonably confirm that an address is accurate by any of the following methods:

1. Verifying the address with the member;

2. Reviewing its own records to verify the address of the member;

3. Verifying the address through third party sources; or

4. Using other reasonable means.

**16.03-14** Municipal Credit Union will provide the member's address (that Municipal Credit Union has reasonably confirmed is accurate) to the credit bureau as part of the information it regularly furnishes for the reporting period in which it establishes a relationship with the member.

## 16.04 EXPULSION AND SUSPENSION OF MEMBERSHIP

The Board of Directors may expel or suspend any member who has not carried out his or her engagements with the credit union, or has been convicted of a criminal offense, or who neglects or refuses to comply with the provisions of Article XI of the New York State Banking Law, or of the bylaws, or who habitually neglects to pay his or her debts, or becomes insolvent or bankrupt, or who is physically or verbally abusive to credit union members or staff.

**16.04-1** Procedure for Expulsion of Members

a. Any employee of the Municipal Credit Union who believes that grounds exist for the expulsion or suspension of a member of the Municipal Credit Union may, through his or her manager, submit in writing to the Chief Executive Officer a statement of the grounds for possible expulsion or suspension, including the name of the member, his/her account number, if available, and a full and detailed account of the facts and circumstances which are believe to comprise the grounds for possible expulsion. Members may also request that another member be expelled or suspended from membership. Such request should be sent directly to the Chief Executive Officer.

b. If the CEO decides grounds may exist for the expulsion or suspension of the member, the Chief Executive Officer will forward the matter, including the charges levied against the member, to the Membership Committee of the Board of Directors.

c. The Membership Committee shall, in writing, inform the charged member of the charges against him or her. The notice shall formally notify the member that such member may submit a written statement explaining the facts of the situation, as perceived by the member, and all pertinent arguments. The notice shall set forth the date by which any written statements of the member must be filed with the committee. The due date of the filing of a written statement shall be no sooner than 30 days from the date of the mailing or delivery of such notice.

d. At a meeting of the Membership Committee at which at least a quorum must be present, the charges levied against the member, evidence supporting such charges, and the written submissions by the member will be reviewed. The Membership Committee, if necessary, may request statements from any member of employee involved in the incident or circumstances which led to the allegations.

e. After considering the information and explanations presented, the Membership Committee shall make a recommendation to the entire Board of Directors whether or not to expel or suspend the member. The Board of Directors shall receive and act on such recommendation, and inform the charged member of its disposition of the matter, and the reasons therefore, in writing.

f. An expelled or suspended member, within 30 days of the date of the Notice of Expulsion has been mailed to him or her, may seek a reconsideration of the decision by submitting to the entire Board of Directors a written statement containing all pertinent information and arguments. The Board of Directors shall respond to such a request for reconsideration within a reasonable time.

MCU
MUNICIPAL CREDIT UNION



16.04-1A **Consequence of Expulsion**

Expulsion shall not operate to relieve any member of any liability to the Municipal Credit Union. All amounts deposited in a share savings, or other type account by an expelled member prior to their expulsion, shall be paid to them, but only as funds become available and only after deducting there from any amounts due from such members to the Municipal Credit Union

**16.04-2** Member Conduct Policy

All members of Municipal Credit Union are expected and required, when dealing with MCU, to conduct themselves in an appropriate and businesslike manner.

It is the policy of Municipal Credit Union to protect both Municipal Credit Union members and employees from disruptive or abusive behavior and to take the proper and necessary steps to manage unacceptable member conduct. The Member Conduct Policy is enacted to address certain unacceptable conduct.

UNACCEPTABLE CONDUCT

For purposes of this policy, "unacceptable conduct" includes, but is not limited to, any of the following conduct:

a. Any type of harassment, including sexual, ethnic, or racial harassment; engaging in verbal abuse; making graphic of degrading comments about an individual or his or her appearance; engaging in offensive or abusive physical contact; making false, vicious or malicious statements about any Municipal Credit Union members or employee, or the credit union and its services, operations, policies, practices, or management; using profane, abusive, intimidating or threatening language toward Municipal Credit Union members or employees; attempting to coerce or interfere with Municipal Credit Union employees in the performance of their duties at any time;

b. Conducting or attempting to conduct or engage in any fraudulent, dishonest or deceptive activity of any kind involving Municipal Credit Union employees or credit union services;

c. Any posting, defacing or removing notices or signs on Municipal Credit Union premises; writing on Municipal Credit Union bulletin boards without management authorization;

d. Appropriation or misappropriation of credit union funds, property or other material; any misuse or damage of credit union property;

e. Immoral conduct or indecency on Municipal Credit Union property;

f. Deliberate or repeated violations of security procedures or safety rules;

g. Possession, use of being under the influence of illegal drugs or alcoholic substances on Municipal Credit Union premises;

h. Fighting on or outside any Municipal Credit Union premises;

i. Possession of weapons, except by those authorized by law to carry weapons.

j. Any other activity which a reasonable person would believe is inappropriate, dishonest or unbusinesslike.

**16.04-3**

16.04-2A

Pursuant to Banking Law (refs & Annos) Chapter 2 of the Consolidated Laws, Article XI Credit Unions (Refs & Annos). The Municipal Credit Union is following policy and procedures.

Upon evaluation a member's action or actions within the guidelines of the Banking Department regulation stated above, the Security and Fraud Department will implement the following procedure.

a. The Security and Fraud Department will investigate the allegations lodged against the member. If the allegations are confirmed, the following steps will follow:
b. A "Notice of Expulsion of MCU Membership with the Right to Appeal" form will be mailed to the member's residence.
c. The member is offered (30) thirty days to file an appeal.
d. A "Request for Expulsion / Suspension of MCU Membership" form will be sent by inter- office mail to the President / CEO to present to the Board of Directors for approval.
e. The Security and Fraud Department will wait (30) days or until we receive a copy of the appeal (Whichever comes first) and offer our findings / or notification of appeal to the Board of Directors in a timely manner.
f. With the approval of the President / CEO and the Board of Directors, the Security and Fraud Department will notify the member that his / her membership has been expelled / suspended.

**16.04-4 Sanctions**

In the event that any member of Municipal Credit Union shall engage in any type of unacceptable conduct, the President/CEO or his/her designee, at their sole discretion are hereby authorized, on behalf of the Board, to impose sanctions against any member who engages in any type of unacceptable conduct whether it be over the phone, in person or through electronic media.

In that regard, any or all of the following sanctions may be imposed against a member who has engaged in unacceptable conduct:

a. Denial of services other than the right to maintain a share account and the right to vote at annual and special meetings;

b. Denial of services which involve personal contact with Municipal Credit Union employees;

c. Denial of access to the credit union premises;

d. Recommending expulsion to the Board of Directors as outlined in Municipal Credit Union Bylaws; and/or

e. Taking any other action that is not expressly precluded by the New York Finance Code, New York Credit Union Department Rules for Credit Unions or Municipal Credit Union Bylaws.

**16.04-5 Compliance**

Municipal Credit Union will adhere to and comply with the provisions set forth under the Municipal Credit Union Bylaws.

**16.04-6 Policy Review**

The Member Conduct Policy will be reviewed and revised periodically by the Board of Directors to ensure compliance with any changes to existing regulations and to ensure that provisions of this policy have been implemented.

## SECTION 17
## COMPLIANCE POLICY

It is the policy of Municipal Credit Union to comply with all laws, rules and regulations applicable to New York State chartered and federally insured credit unions.

### 17.01 COMPLIANCE MANAGER

It is the responsibility of the Compliance Manager to administer, coordinate and help implement the appropriate systems of internal controls and monitoring programs necessary to ensure that Municipal Credit Union is in compliance with applicable laws, regulations, and regulatory requirements. The Compliance Manager will examine and review Municipal Credit Union's operations and procedures to identify areas of non-compliance and make findings and recommendations intended to bring the Credit Union in full compliance with applicable regulations. The Compliance Manager will recommend changes to Credit Union management that will facilitate the Credit Union's compliance program. The Compliance Manager will disseminate information regarding laws and regulations to various Credit Union departments. Furthermore, the Compliance Manager is responsible to recommend changes or corrective actions to policies and procedures necessary to ensure continual compliance.

### 17.02 AREAS OF REVIEW

Areas of review will include, but are not limited to, the following: Truth-In-Lending (Regulation Z), Truth-In-Savings (Regulation DD), Bank Secrecy Act, Equal Credit Opportunity Act (Regulation B), Fair Credit Reporting Act, Home Mortgage Disclosure Act (Regulation C), Electronic Funds Transfer (Regulation E), Privacy Regulations, NCUA Rules and Regulations, Fair Housing Act, Flood Disaster Protection Act, Real Estate Settlement (Procedures Act (RESPA), Electronic Signatures Act, Bank Bribery Act, Fair Debt Collection Act, Reserve Requirement (Regulation D), Unfair or Deceptive Acts or Practices (Regulations AA), USA PATRIOT Act.

## SECTION 18
## ENTERPRISE RISK MANAGEMENT

### 18.01 VENDOR MANAGEMENT - POLICY STATEMENT

It is the policy of Municipal Credit Union (MCU) to minimize risks associated with third party vendor or service provider relationships. Senior management and the Board of Directors recognize that the development of relationships with third party vendors is to benefit the Credit Union through reduced costs, improved performance, increased business competitiveness, access to a superior knowledge base and the need to limit in-house staff to support the Credit Union's day-to-day operations and product needs.

The purpose of this policy is to provide guidance relative to the management of vendor relationships. Wherever possible, management will encourage competition among vendors to ensure that the Credit Union is receiving maximum value, in addition to considering the ability and effectiveness of the vendor or service provider to perform the required services. MCU will evaluate service providers to determine their ability, both operationally and financially, to meet MCU needs. Management will also review the service provider's significant supporting agents (subcontractors, support vendors, etc.). Management will ensure that a contingency plan (see Disaster Recovery Plan) is in place to support the business should the vendor supporting their mission-critical systems fail to perform. The following process and requirements will help identify issues and protect MCU interests:

### 18.01-1 RISK EVALUATION

In vendor selection process, management will first identify, evaluate, and prioritize potential risks a vendor poses. The potential risk impact is to be placed in the broader framework of the potential affect on the realization of MCU's objectives. In this risk assessment process, management will determine whether a vendor should be categorized as tactical — those that are small in cost and exposure, or operate in a commodity environment, or strategic – those that pose a high operational risk, financial risk, reputation risk, and strategic risk. Management shall use a standardized due diligence questionnaire for tactical third party vendors and a more comprehensive or expanded questionnaire for strategic vendors. In instances approved by the CEO or senior executives (SVP's and above), management can accept SAS 70 type II report in-lieu of performing an in-house due diligence review. Contracts that are valued below $20,000 may be totally exempted (depending on the potential risk the vendors services may encompass) from the review process provided the waiver is recommended by the relevant department head and approved by CEO, CFO, or COO.

**18.01-2 DUE DILIGENCE IN VENDOR SELECTION**

Management will assess the risk nature of the project and apply appropriate due diligence process to protect MCU's interests and minimize MCU's potential risk exposure to the third party while achieving MCU's objectives. The basic steps needed to be taken include:

a. A reasonable background check and a completed due diligence checklist are required before executing a contract.
b. At a minimum, the background check must include a review of recent financial statements and the checking of independent references. Other data may be reviewed as deemed appropriate in each circumstance.
c. The vendor must demonstrate proficiency and ability, and adequate qualified staff to deliver satisfactory performance.
d. It is the responsibility of the management of each department to ensure that the initial cost and any related expense are part of the approved budget. Exception can only be made by the CEO's authorization.
e. A SAS 70 type 2 report may be accepted in-lieu of MCU questionnaire for specific projects as provided hereinbefore.
f. Upon completion of a background check, due diligence checklist and written Contract, a final approval must be obtained from the President/CEO, Chief Operating Officer, or Chief Financial Officer.
g. For contracts in excess of $50,000, management must solicit other competitive bids. In the absence of competing bids, management should properly document the reasons for the lack of competing bids. If management seeks an exemption from competitive bidding, written authorization must be obtained from the President/CEO.

**18.01-3 DOCUMENTING THE VENDOR RELATIONSHIP**

a. All material (in excess of $25,000) or critical third party relationships must be addressed in written contract. (see Contract Policy subsection 15.07)
b. Risk Assessment and Reporting must be conducted by the Enterprise Risk Management (ERM) Department.
c. The manager seeking the third party vendor services must read the proposed contract and understand the basic obligations, risks, and benefits of the contract. The manager must seek ERM Department's assistance or review if circumstances warranted.
d. Legal counsel must review all contracts in line with the policy set forth in subsection 15.07- Contract Policy.
e. Only those specifically authorized by the President/CEO shall execute contracts on behalf of the Credit Union. (see subsection 15.07-Contract Policy)
f. Contract renewal terms and conditions are to be monitored by the applicable department head, and any renewal of a contract must be authorized by such Vice

President of the department. The decision to renew or go out to bid must be documented and retained in the appropriate file.

**18.01-4 SUPERVISION AND MONITORING OF VENDORS**

The degree of oversight activities will vary depending upon the nature of the services outsourced. Listed below are some of the oversight activities management will take into consideration while administering a third party relationship. MCU management will consider the extent to which the service provider conducts similar oversight activities for any of its significant supporting agents (e.g., subcontractors, support vendors, and other parties) and the extent to which MCU may need to perform oversight activities on the service provider's significant supporting agents or subsidiaries.

The ERM Department, based on information provided by the requesting department, will:

a. periodically evaluate the financial condition and operations of the third party,
b. periodically assess the quality of service and support provided to MCU during the term of the contract upon user-department's request,
c. periodically monitor contract compliance and document contract revision needs (legal review or assistance may be required),
d. ensure the third party provides and maintains a business resumption contingency plan,
e. conduct any and all other reviews appropriate under the circumstances.

Operating department heads or Vice President will complete the Due Diligence and Oversight Questionnaire developed by the ERM department.

## 18.02 AUTOMATED CLEARING HOUSE (ACH) RISK MANAGEMENT PROGRAM

**Overview**

Pursuant to National Automated Clearinghouse Association (NACHA) rules, every financial institution including Originating Debit Financial Institution (ODFI) engaging in ACH transaction activity is required to establish and maintain an ACH risk management program based on the results of an ACH risk assessment.

**A. Implementation**

The controls in this document are effective as of July 1, 2011, and have been communicated to all personnel with management responsibility for ACH operations. All ACH transactions and services performed on or after July 1, 2011, must comply with these controls.

**B. Risk Assessment – Summary of Results**

The most recent assessment of risks associated with ACH activities was completed on July 1, 2011. Risk ratings were calculated for nine (9) areas on a percentage scale of 0-100 with 0% representing no risk. Following are the results:

| Risk Category | Rating |
|---|---|
| Policies and Procedures | 5% |
| Credit | 11% |
| Compliance | 8% |
| High-Risk Activities | 10% |
| Third-Party Senders | 0% |
| Vendors | 13% |
| Direct Access Participants | 0% |
| Operations and Transactions | 5% |
| Information Technology | 18% |

**18.02-1** RISK MANAGEMENT CONTROLS

**A. Policies and Procedures**

- ACH transaction processing does not commence and is not offered as part of a service product to members until all of the following are in place:
  - o authorization of the CEO or CFO to commence operations;
  - o comprehensive written procedures for all associated functions;
  - o written procedures for contingency processing;
  - o clearly defined duties and responsibilities of clerical and administrative personnel;
  - o key personnel have demonstrated satisfactory ability to perform required functions;
  - o all critical processes have been tested successfully.
- All employees associated with ACH operations receive training necessary to achieve and maintain proficiency.
- Monitoring reports of ACH activity are reviewed by management on a regular basis and made available to the CEO, and upon request, to the Board of Directors for review.
- A risk-based audit of ACH operations is conducted annually with results reported to the CEO.

**B. Credit**

- ACH transactions are not originated for commercial or business accounts.
- Underwriting or overdraft services are not available for originating ACH transactions. This does not include the $10.00 courtesy overdrawing privilege available for received ACH debit transactions.
- Before originating an ACH credit for a member, the member's account is debited for the full amount. If sufficient funds are not available at the time the transaction is processed, the ACH transaction is cancelled.
- Monitoring reports are reviewed on a daily basis by management to ensure credit risk controls are being complied with.
- The ACH Origination Agreement form includes language approved by the Legal Dept. covering the following:
  - the right to debit a member's account to reverse a credit or loan payment if the corresponding ACH debit is returned within 60 calendar days after the settlement date; and
  - MCU is not responsible for any charges or penalties assessed by another financial institution as a result of an ACH debit being dishonored at the other institution for non-sufficient funds; and
  - the right to terminate or suspend a member's ACH origination privileges.
- The ACH Stop Payment Request form includes "hold harmless" language approved by the Legal Dept. limiting MCU's liability for failing to stop a debit transaction.
- The following activity is monitored on a monthly basis by management for each member originating ACH transactions:
  - Notification of Change (NOC) transactions received;
  - returns received; and
  - unauthorized returns received.
- A report of unauthorized ACH transaction returns is prepared on a monthly basis and reviewed by a designated officer to determine whether any originating members may be abusing ACH origination privileges.

**C. Compliance**

- General/ACH Rules:
  - The Internal Audit Dept. performs an ACH compliance audit before December 1st annually with results reported to the CEO.
  - Internal auditors have sufficient knowledge to conduct a comprehensive ACH audit.
  - ACH processes are subject to review as part of BSA/AML and IT audits.
  - ACH employee training covers ACH rules and federal regulations applicable to their duties and responsibilities.
  - Staff are trained to report any possible violations of ACH Rules or federal regulations to management promptly.

- BSA/AML:
  - The system for monitoring and reporting suspicious transactions includes ACH activity.
  - The OFAC screening policy includes ACH transactions.
  - All received International ACH Transactions (IATs) are screened on the posting date.
  - IATs are not originated. All originated ACH transactions are to U.S. financial institution accounts.
- Reg D:
  - ACH transactions are counted toward a member's Reg D transaction limit.
- Reg E:
  - The Electronic Funds Transfer Disclosure Statement covers ACH transactions.
  - ACH procedures cover the processing of unauthorized transaction claims within NACHA and Reg E timeframes.
  - ACH procedures cover the timely processing of ACH stop payment requests.
- Reg CC:
  - The overdraft and funds availability policies include ACH transactions.
- Reg GG:
  - This regulation applies to ACH transactions only for financial institutions that originate them from commercial or business accounts; therefore, no monitoring is required to detect unlawful internet gambling transactions.

**D. High-Risk Activities**

- MCU does not:
  - engage the services of any third-party sender (refer to following section);
  - originate international (IAT) ACH transactions;
  - process ACH transactions for any commercial or business entities.
- Policies and procedures are in place for the following:
  - performing due diligence during the account opening process for new members, and before agreeing to originate an ACH transaction for an existing member;
  - monitoring unauthorized return activity and notifying originators who have a high level of unauthorized returns;
  - suspending or terminating ACH origination privileges for a member.
- Industry-accepted methods are used authenticate members who authorize ACH transactions via telephone and internet (TEL and WEB transactions).
- For telephone-initiated (TEL) ACH transactions, audio recordings are made of all member verbal authorizations and retained as required.
- When audio recording is not available at the time an ACH TEL transaction is authorized verbally, a written notice is provided to every member prior to the settlement date of the transaction.

### E. Third-Party Senders

- MCU does not engage or accept the services of any third-party sender, which is an entity that would enter into direct agreements with members to originate ACH transactions using our routing number. All ACH transactions are originated based on a direct agreement between MCU and a member.

### F. Vendors

- Due diligence is performed on all third-party service providers that provide ACH services to members, such as online bill payment.
- The current SAS 70 type 2 reports from all third-party service providers are on file.
- ACH audit reports are requested annually from each third-party service provider.
- The service agreements in effect for all ACH third-party service providers stipulate that they are acting in compliance with ACH Rules.
- ACH third-party service agreements are reviewed annually.
- ACH transaction volume processed by third-party service providers is monitored daily to ensure service-level standards are met.
- Management maintains an incident log for each third-party service provider.
- No MCU employees have access to any computer systems used by a third-party service provider to originate ACH transactions.

### G. Direct Access Participants

- MCU does not allow any member or third-party service provider to have direct access to the ACH network to originate an ACH transaction using our routing number. The third-party service providers we use for online bill payment and other services originate ACH transactions using other financial institutions as the ODFI.

### H. Operations and Transactions

- All ACH transaction volume is monitored on a daily basis.
- Comprehensive written procedures are in place for every ACH function.
- Procedures for critical functions are stored at a backup location for contingency purposes.
- The Disaster Recovery Manual includes instructions for ACH processing in a contingency situation.
- Critical ACH functions are segregated and controlled by the Member Service Operations (MSO), Information Technology (IT) and Accounting departments.
- Access to ACH functions and information is restricted based on an employee's duties and responsibilities.
- Clerical processing is monitored by management on a daily basis.

- Exceptions such as rejected transactions, received returns and unprocessed aging items are reviewed by management on a daily basis.

**I. Information Technology**

- The annual internal audit of IT operations includes a review of ACH file processing by IT personnel.
- System access rights are restricted based on an employee's duties and responsibilities.
- All employees are assigned individual access credentials and each use of an employee's access credentials is recorded.
- The access rights to assign and maintain user IDs and passwords, and the access rights to ACH transaction processing functions are segregated.
- Industry-accepted data security controls are utilized for all ACH applications.
- ACH files are stored in two secure locations to safeguard transaction information.
- Access to the ACH network from the back-up recovery location has been tested successfully.

A-1160

MUNICIPAL CREDIT UNION
Policy Manual

# INDEX

MCU
Policy Manual

# INDEX

PAGE PAGE

**A**

Abandoned Property/Unclaimed Accounts Payable Checks ........ 5.2
Access to Personnel Files ........ 14.58
Account Definition ........ 16.14
Account Maturity ........ 11.7
Accounting Policy ........ 5.1
Accounts Offered ........ 13.1
Accounts Payable ........ 5.1
Accrued Paid Vacation ........ 14.33
Acquisition of Software – Restrictions ........ 14.59
Acquisitions of Software ........ 10.3
Address Confirmation ........ 16.21
Agreement and Activation ........ 12.8
Air Travel Class - Board ........ 2.7
ALM Policy ........ 4.4
Amalgamated Bank ........ 3.9
Americans with Disabilities Act Policy Statement ........ 14.7
Annual Certification of Compliance ........ 16.12
Annual Meeting ........ 2.1, 2.2, 2.3
Annual Percentage Earned ........ 11.6
Annual Percentage Yield (APY) ........ 11.6
Application and PIN Number ........ 12.9
Approval Extraordinary Expenses - Board ........ 2.7
Approved List ........ 3.4, 3.5, 3.7, 3.9, 3.10
Approved List #1A and 1B ........ 3.7
Approved List #2 ........ 3.7
Approved List #3 ........ 3.7
Approved Securities Dealers ........ 3.10
Arrest/Incarceration ........ 14.40
Asset/Liability Management Exceptions and Review ........ 4.5
Asset/Liability Management Policy ........ 4.1
Asset/Liability Management Responsibility ........ 4.1
ATM Cards ........ 12.1
Attempt Monitoring ........ 16.11
Authorized Amount of Budgeted Contribution Policy ........ 2.8
Authorized Financial Institutions ........ 3.8
Authorized Investments ........ 3.3
Auto Dealer Filing ........ 6.14
Automatic Payments/Pre-Authorized Payments ........ 13.6
Automatic Renewals ........ 11.7
Automobile Usage ........ 14.55
Auto-Net Loans Amounts and Terms ........ 6.9

**B**

Bank Bribery Act, Fair Debt Collection Act ........ 17.1
Bank of America ........ 3.9, 3.10
Bank of New York ........ 3.9
Bank Secrecy Act (BSA) ........ 11.1
Bank Secrecy Act, Equal Credit Opportunity Act (Regulation B) ........ 17.1
Bankers Acceptances ........ 3.5, 3.7, 3.10
Bankruptcy ........ 6.12, 8.4
Bankruptcy Delinquency Account ........ 8.4
Bankruptcy Legal Review and Process ........ 15.2
Bankruptcy Program ........ 6.12
Bankruptcy Reaffirmation Program ........ 8.4
Bereavement ........ 14.43
Blackberrys ........ 14.60
Board Administration ........ 2.1
Board Administrative Assistant Responsibilities ........ 2.7
Board and Senior Management - FACT Act Involvement ........ 16.16
Board Committees ........ 2.1
Board Contribution Policy ........ 2.8
Board Directors ........ 2.3
Board Disciplinary Action ........ 2.10
Board Expense Reimbursement Policy ........ 2.4



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

MCU
Policy Manual

# INDEX

PAGE PAGE PAGE

Board of Directors - Contested Elections ........ 2.3
Board of Directors Meetings ........ 2.2
Board of Directors- Statemnt of Disclosure ... 2.13
Board Training and Conferences ........ 2.3
Boat Loans ........ 6.10
Bomb Threat Reporting ........ 16.2
Branch and ATM Notices ........ 11.4
Branch Operations ........ 11.1
Branch Operations Responsibilities ... 12.7, 12.9
BSA Policy Statements ........ 11.1
Budgeting ........ 5.3
Business Entertainment ........ 14.55
Bylaw Revisions ........ 2.1

## C

Cab Vouchers ........ 14.58
Card Transaction Charges ........ 12.12
Cash Advances - Board ........ 2.6
Cash Connection Card (ATM Card) ........ 12.9
Cash Connection/Check Card Fees ........ 13.10
Cash in Branch Limit ........ 11.6
Central Credit Union of the State New York ........ 3.6
CEO Evaluation Policy ........ 2.3
Certificates of Deposit ........ 3.6, 3.7, 3.9, 13.1
Certificates of Deposit Dividends and Payments ........ 13.2
Certificates of Deposit Early Withdrawals and Redemptions Penalty ........ 13.2
Certificates of Deposit Maturity Notification ........ 13.2
Chair of the Board ........ 2.1
Change of Address ........ 16.11
Changes in Accounts Terms ........ 11.7
Charge Off Exceptions ........ 8.5
Charges - ATM ........ 12.10
Charities Recognized ........ 14.27
Check Cashing ........ 11.5
Check Image Fee ........ 13.9
Citibank ........ 3.6, 3.8, 3.9, 3.10
Code of Ethics ........ 2.2, 2.10, 2.11, 2.12, 2.13
Collateral Release (Other Than Loan Payoffs) ........ 6.14
Collection Agencies/Attorneys ........ 8.3
Collection Policy ........ 8.1
Co-Makers ........ 6.4, 8.1
Committee Meetings ........ 2.2
Compensation Disclosure ........ 14.51
Compensatory Time ........ 14.36
Complaint Process ........ 13.8
Complaint Resolution Policy ........ 13.8
Completion of New Hire Probation ........ 14.38
Compliance Areas of Review ........ 17.1, 18.8
Compliance Manager ........ 17.1, 18.8
Compliance Policy ........ 17.1, 18.1
Computer (PC) and Application Maintenance ........ 10.3
Computer Acquisitions Coordination, Verification, and Approval ........ 10.2, 10.6
Confidential Information ........ 13.1
Confidential Nature of Credit Union Affairs ........ 14.16
Conflict of Interest ........ 14.16
Consolidated Omnibus Budget Reconciliation Act (COBRA) ........ 14.8
Consumer Leasing Act ........ 12.2
Consumer Privacy and Confidentiality ........ 12.7
Contingency Site Rating List ........ 16.2
Contract Signing Authority ........ 15.4
Contracts ........ 15.1
Contribution Policy - Board ........ 2.8
Cooperative Student ........ 14.2, 14.9
Coordinating Committee ........ 2.2, 2.3
Copy of Cancelled Check Requests ........ 13.6
Corporate Credit Cards - Board ........ 2.6
Counterfeit Money ........ 11.2
Covered Account Definition ........ 16.14
Credit Card Cash Advances ........ 11.5
Credit Denial ........ 6.12, 6.13
Credit Denial Appeals ........ 6.13
Credit Disability Claims ........ 8.5
Credit Reports ........ 6.13
Credit Union Touch Tone Teller System ........ 12.4
Criteria - Board Contributions ........ 2.8
Currency or Monetary Instrument Report ........ 11.2
Currency or Monetary Instrument Reports (CMIR) ........ 11.1
Currency Transaction Reports (CTR) ........ 11.1, 11.2
Currency Transaction Reports (CTR) - Exemption ........ 11.2
Custodian Accounts ........ 13.4

Policy Manual

# INDEX

PAGE PAGE PAGE

Custodian, Smart Apple Savers and Future Investors Accounts ..... 13.4

## D

Data and Removable Media ..... 14.60
Data Control Unit ..... 10.2, 10.6
Data Control Unit – Terminated Employees ..... 10.2, 10.6
Debit Cards ..... 12.1
Debt Consolidation and Home Improvement ..... 6.11
Debt Hardship Relief Program (DHRP) ..... 8.5
Debt to Income Ratio Guidelines ..... 6.2
Definition of Employee Status ..... 14.1
Definitions – FACT Act ..... 16.14
Delinquency Control ..... 8.1
Delinquent Loan Payment Transfer Fee ..... 13.9
Deposit Services ..... 12.1
Depository Accounts ..... 5.3
Deposits ..... 11.2
Detection of and Response to Red Flags - FACT Act ..... 16.15, 16.25
Development and Implementation of Identity Theft Prevention Program ..... 16.15, 16.24
Director ..... 6.4
Director Emeritus Program ..... 2.14
Disaster Recovery ..... 16.5, 16.12
Disaster Recovery – Master Plan ..... 10.3
Disclosure -- Human Resources ..... 14.1
Disclosure of Account Information to Third Parties ..... 12.11
Disclosure Statement ..... 12.12
Diversification Requirements ..... 3.5
Dividend Rates Determination ..... 5.1
Dividends Payable ..... 5.3
Drugs, Narcotics, and Alcohol ..... 14.18
Duties of the Ethics Committee ..... 2.12

## E

E-Commerce Service ..... 12.2
EDP Purpose ..... 10.1
EDP System Security ..... 10.2
EFAA - FasTrack Checking Account ..... 11.3
Election of Officers ..... 2.1
Electronic Data Processing Policy ..... 10.1
Electronic Mail (E-Mail) ..... **14.60**
Electronic Services ..... 12.1
Electronic Services Offered ..... 12.1
Eligibility ..... 6.1, 12.5, 14.40
Eligibility for Online Banking Service ..... 12.5
E-Mail and Forms ..... 12.2
E-Mailing - Safeguarding Member Information ..... 16.11
Employee Absence 14.35, 14.38, 14.44, 14.46, 14.54
Employee Absence – Outside Employment ..... 14.3
Employee Absence - Rehabilitation ..... 14.18
Employee Attendance ..... 14.23
Employee Attendance and Punctuality ..... 14.13
Employee Counseling ..... 14.11
Employee Discipline 6.4, 10.3, 10.5, 14.11, 14.20, 14.23
Employee Discipline – Repeated Violations ..... 14.20
Employee Final Warning ..... 14.24
Employee Formal Warning ..... 14.24
Employee Health and Safety ..... 14.30
Employee Informal Warning ..... 14.23
Employee Loans ..... 6.4
Employee Misconduct ..... 14.20
Employee Mortgage Approval ..... 7.8
Employee Safety and Health ..... 14.22
Employee Share Secured Loans (LVS) ..... 6.4
Employee Supervision Policy ..... 14.1
Employee Unsecured and Auto Loans ..... 6.4
Employee Work Performance ..... 14.22
Employment at Will ..... 14.2
Employment Contracts/Agreements ..... 14.3
Employment Transfers ..... 14.9
Enterprise Risk Management ..... 18.1
Equal Credit Opportunity Act ..... 12.2
Equal Employment Opportunity ..... 14.2
Equal Opportunity ..... 6.1, 7.8
Ethics Committee ..... 2.2
Ethics Committee - Board ..... 2.11
Ethics Policy – Board and Supervisory Committee ..... 2.10
Exceptions - Authorized Contributions ..... 2.9

Policy Manual

# INDEX

PAGE PAGE

Exceptions & Review .... 3.8
Excessive Lateness .... 14.16
Executed Contract .... 15.4
Executive Assistant to the Board .... 2.4, 2.6
Exempt .... 14.2, 14.33, 14.50
Exemptions .... 11.2
Exit Interviews .... 14.48
Expedited Funds Availability Act .... 12.1
Expense Reimbursement - Board .... 2.7
Expense Reimbursement – Board and Supervisory Committee .... 2.4
Expense Reimbursement - Board Approval for Conferences .... 2.6
Extension Agreements .... 6.12
External Access and E-Mail .... 14.61
External Access and E-Mail - Examples of Inappropriate and Prohibited Actions and Activities .... 14.62

## F

FACT Act - Red Flags .... 16.18
FACT Act - Responsibility for Administration of the Program .... 16.16
FACT Act Program Administration 16.16, 16.25
Fair and Accurate Credit Transactions Act (FACT Act) .... 16.13, 16.21
Fair Credit Reporting Act .... 12.2
Fair Credit Reporting Act, Home Mortgage Disclosure Act (Regulation C) .... 17.1
Fair Debit Collection Practices Act .... 12.2
Fair Housing Act .... 12.2
Fair Housing Act, Flood Disaster Protection Act .... 17.1
Fair Labor Standards Act .... 14.2
Fair Labor Standards Act (FLSA) .... 14.8
Family and Medical Leave Act .... 14.40
Family and Medical Leave Employee Eligibility .... 14.41
FasTrack - Online .... 12.6
FasTrack Checking Account .... 12.11, 13.5
FasTrack Checking Accounts Closing .... 13.5
FasTrack Checking Accounts Opening .... 13.5
FasTrack Fees .... 13.9
Federal Funds .... 3.5
Federal Funds and Repos .... 3.7
Federal Reserve Bank .... 3.6
Fees – Truth-in-Savings .... 11.7
Finance in Advance .... 6.10
**Financial Accounting Statement (FASB 115)** .... **3.8**
Financial Reports .... 5.5
Firewall .... 12.5
First Mortgage Loans/ Adjustable Rate Guidelines .... 7.5
Fiscal Policy Committee 2.2, 2.3, 3.1, 3.2, 3.8, 4.1, 4.2, 4.3, 4.5
Fiscal Policy Committee – Board Contribution Policy .... 2.8
Fiscal Policy Committee - NEV .... 4.3
Fiscal Policy Committee and Board – Policy Reviews .... 2.9
Fixed Asset Accounting .... 5.1
FLSA .... 14.8
Follow Up .... 8.1
Forgery of Endorsement .... 13.7
Funds Availability .... 11.3
Funds Availability and Check Collections Policy .... 11.3
Funds Availability/Check Collections Policy Statement .... 3.2, 3.8, 4.5
Funds Disclosures .... 11.4
Funds Next Day Availability .... 11.4
Funds Same Day Availability .... 11.4
Future Investors Accounts .... 13.4

## G

Gap Ratio .... 4.2
Garnishment or Attachment .... 14.27
Goals - BSA .... 11.1
Gramm-Leach-Bliley Act .... 16.5, 16.12
Grievance Policy .... 14.11

## H

Hardware Changes .... 14.60
Hardware Changes - MIS .... 10.5
Hardware Configuration .... 10.1
Health Insurance Portability and Accountability Act (HIPAA) .... 14.8
Hiring and Job Placement .... 14.3
Holdup Alarm Test .... 16.2
Holiday and Vacation Club Accounts .... 13.3



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT

MCU
Policy Manual

# INDEX

PAGE PAGE PAGE

Holiday and Vacation Club Withdrawals .......... 13.3
Holidays (See also Salary Administration) .......... 14.31
Home Banking .......... 12.10, 13.2, 16.11
Home Computers .......... 10.4, 14.59
Home Equity Loans .......... 4.5
Home Improvement Loans .......... 6.5, 6.11, 6.12
Home Mortgage Disclosure Act .......... 12.2
Hours of Work .......... 14.52
HSBC .......... 3.9, 3.10
Human Resources .......... 14.1
Human Resources - MSO .......... 13.8
Human Resources Department - Notification .......... 14.18

I

Identity Authentication .......... 16.9
Identity Theft Definition .......... 16.14
Income Simulation .......... 4.3
Individual Retirement Accounts (IRA) .......... 13.2
Individual Retirement Accounts Closing .......... 13.3
Individual Retirement Accounts Withdrawals .......... 13.2
Information and Transaction Capability .......... 12.8
Information Collected and Stored Automatically .......... 12.3
Information Collected from E-mails and Web Forms .......... 12.4
Information Disclosure .......... 16.10
Information Pages .......... 12.3
Information Security Program Responsibility .......... 16.5
Information Systems Access Restrictions .......... 16.8
Insider's Disclosure Policy - Board and Supervisory Committee .......... 2.9
Installation of Software .......... 10.4, 14.59
Installment and VISA Loans Charge Off Policy .......... 8.5
Installment Lending .......... 6.1
Insurance Coverage .......... 5.4
Insurance Manual .......... 5.4
Interest Rate Risk Control .......... 4.2
Internal and Inter – Office Electronic Mail - MIS .......... 10.5
Internal Controls – Security Policy .......... 16.4
Internet .......... 11.7, 14.25, 14.63
Internet Access and External E-Mail .......... 10.6
Internet Privacy Policy Disclosed to Members .......... 12.3
Investment Policy .......... 3.1, 4.4
Investment Portfolio Composition .......... 3.3
Investments .......... 3.4, 3.5, 3.6, 3.7
Involuntary Termination .......... 14.44

J

Job Evaluation .......... 14.53
Job Posting (See also Promotion) .......... 14.4
JPMorgan Chase .......... 3.6, 3.9
Jury Duty .......... 14.42

K

Keys .......... 14.29
Kiosks .......... 12.1, 12.10

L

Late Charges and Other Fees .......... 8.3
Late Payment Fee .......... 6.12
Layoff and Recall (See also Current Union Contract) .......... 14.45
Leave of Absence – Long-Term .......... 14.39
Leave of Absence – Short-Term .......... 14.36
Legal Department .......... 15.1
Legal Department – Marketing Department .......... 9.1
Legal Department – MSO .......... 13.8
Legal Requirements Other - FACT Act .......... 16.17
Lending Authority and Guidelines .......... 6.2
Lending Policy .......... 4.5
Limitations on Cash Connection Card .......... 12.10
Limitations on Check Card Transaction .......... 12.11
Limitations on MCU's Responsibility to Member .......... 12.11, 12.12
Limitations on Transfers .......... 12.6
Line of Credit .......... 6.5
Liquidity Contingency Plan .......... 4.4
Liquidity Management .......... 4.3
Litigation .......... 15.1



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT MCU-00028417

# INDEX

PAGE PAGE PAGE

Loan Rates .................................................. 6.12
Loan vs. Shares (Share and Certificate of Deposit Secured Loans) .................................................. 6.11
Loan/Leasing Services .................................................. 12.2
Losses .................................................. 6.1
LVS loans .................................................. 6.4, 6.13

## M

Marketing Policy .................................................. 9.1
Maturity Limits and Liquidity Requirement .................................................. 3.5
Maximum Amount and Terms........ 6.5, 6.7, 6.9
MCU Check Card (Debit Card) ................ 12.12
MCU Contract Policy .............................. 15.10
MCU Software License Guidelines .......... 14.58
Meal Allowance - Board .............................. 2.7
Meal and Rest Breaks .............................. 14.43
Medical Emergency .............................. 14.31
Member Data and Access Security ............ 12.4
Member Service Operations ...................... 13.1
Member Service Operations Procedure Manual .............................. 13.8
Membership Services and Loan Committee .............................................. 2.2
Microsoft Internet Security and Accelerator (MISA) .............................. 12.5
Military Leave .............................................. 14.42
Minimum Amounts and Terms .................. 6.11
Minimum Balance Fee .............................. 13.8
Minutes of Board of Directors ...................... 2.3
MIS ...................... 10.2, 10.3, 10.6, 14.63, 16.7
Miscellaneous Legal Matters ...................... 15.2
MMA Checking Account Fees .................. 13.9
MMA Low Balance Fee .............................. 13.9
Money Market Accounts (MMA) .............. 13.3
Money Orders .............................................. 11.6
Mortgage Lending .............................................. 7.1
MSO Subpoena & Restraint ...................... 13.8
Municipal Credit Union Note Loans .............................................. 6.5
Mutilated and Damaged Currency ............. 11.2
Mutual Funds .............................................. 3.7

## N

National Credit Union Government Securities .............................................. 3.5, 3.7
NCUA Rules and Regulations11.1, 11.6, 11.8, 12.2, 12.3, 16.12, 17.1
Negative Balance Share Accounts ................ 8.2
Nepotism Policy .............................................. 14.10
Net Economic Value (NEV) .............................. **4.2**
Net Income .............................................. 5.2
New Hire Orientation .............................. 14.4
New Hire Probationary Employee - Lateness .............................................. 14.16
New Vehicle Loans .............................................. 6.7
New York State Credit Union League Conference and Convention .............................................. 2.4
Non-Exempt .............................................. 14.2
Non-Exempt Employee .............................. 14.49
Normal Vacation Entitlement .................... 14.34
Note Loans (Unsecured Installment Loans) .............................................. 6.5
NYCE .............................................. 12.9, 12.10
NYS Banking Law .............................. 3.3, 3.4

## O

Obligations of a State .............................. 3.4
Obligations of States .............................. 3.6
Obligations of the State or City of New York .............................................. 3.4
Obligations of the United States .................. 3.4
Official Family Loans .............................. 6.4
Online Banking ............... 12.1, 12.4, 12.6, 12.7
Online Banking Fees .............................. 12.7
Online Banking Services .............................. 12.7
Online Loan Applications Security ............ 12.5
Online Privacy .............................................. 12.9
OPEIU, Local 153 .............................................. 14.1
Opening Branch Policy .............................. 16.1
Operators of MIS – Integrity and Internal Control .............................. 10.2, 10.6
Other Charges .............................................. 13.10
Other Credit Unions .............................. 3.6
Other Fees .............................................. 13.10
Out of Pocket Expenses - Board .................. 2.7
Outside Employment .............................. 14.3
Overdraft Credit Line .............................. 6.6
Oversight of Third Party Service Providers - FACT Act .............................. 16.17

## P

Part 748 of the NCUA Rules & Regulations .............................................. 16.5



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

MCU
Policy Manual

# INDEX

PAGE PAGE PAGE

Participation in Trade and Professional Associations .......... 14.18
Part-Time Hourly .......... 14.2
Payment, Delivery, Safekeeping & Valuation Reserve .......... 3.8
PC and Computer Network Users Policy .......... 14.58
PDA .......... 14.59
Pension Trustees Committee .......... 2.2
Periodic Identification of Covered Accounts .......... 16.15
Personal Appearance .......... 14.19
Personal Behavior .......... 14.20
Personal Business (Telephone Calls, Mail, Email, Internet and Facsimile Equipment) .......... *14.25*
Personal Days .......... 14.32
Personal Finances .......... 14.26
Personal Property .......... 14.28
Physical Records Access .......... 16.9
POA .......... 13.7
POA – MCU's Legal Department .......... 13.7
Policy Statement .......... 3.1, 6.1, 9.1, 11.3
Policy Statement - Funds Availability/Check Collections .......... 16.13
Policy Statement - Safeguarding Member Information .......... 16.5
Policy Statements – Truth-in-Savings .......... 11.6
Post Application Disclosure Requirements .......... 7.7
Power of Attorney (POA) .......... 13.7
Premises Access Restrictions .......... 16.6
Prepaid Expense & Deferred Charges .......... 5.1
Privacy Policy .......... 16.1
Privacy Policy and Practices .......... 12.7
Private Mortgage Insurance (PMI) .......... 7.8
Probationary .......... 14.2
Probationary Employment .......... 14.5
Procedures Act (RESPA), Electronic Signatures Act .......... 17.1
Procedures For Furnishing Information To The Credit Bureau .......... 16.21
Professional Associations .......... 2.4, 14.18
Professional Associations - Board .......... 2.3
Prohibited Activities and Actions .......... 2.10
Promotion (See also Job Posting) .......... 14.7

Purchases - MIS .......... 10.4, 14.59
Purpose – Investment Policy .......... 3.1
Purpose - Safeguarding Member Information .......... 16.5

## Q

Quality Control and Assurance – AutoNet .......... 6.9
Questionable Charges Procedures - Board .......... 2.6

## R

Real Estate Loans Charge Off Policy (Including Home Equity) .......... 8.5
Real Estate Settlement .......... 17.1
Real Property Foreclosure .......... 8.4
Receipt of Legal Process .......... 13.7
Receipt of Service of Legal Documents .......... 15.3
Record Retention .......... 11.5, 11.8
Recording Hours Worked (Hand Scanners) .......... 14.53
Records Retention Requirements .......... 11.2
Red Flag Definition .......... 16.14
Red Flags – FACT Act .......... 16.18
Refinance or Equity Loans .......... 7.7
Refinances .......... 6.6
Registering of Votes at Board Meetings .......... 2.3
Registration of Software .......... 14.59
Registration Software .......... 10.4
Regular Full-Time .......... 14.2
Regular Share Account .......... 13.1
Regulation B .......... 12.2
Regulation D Section 204 .......... 12.6
Regulation M .......... 12.2
Regulation Z .......... 12.2
Regulations Compliance .......... 12.1
Regulatory Compliance .......... 15.3
Rehiring Former Employees .......... 14.4
Remote Access to MCU's Electronic Information System .......... 16.8
Replacing a Disabled Employee .......... 14.7
Report of Cash Over/Short .......... 11.6
Reporting of Unauthorized Use of Card .......... 12.12
Reporting Requirements - BSA .......... 11.1



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

MCU

Policy Manual

# INDEX

PAGE PAGE PAGE

Reporting Suspected Embezzlement ........ 16.4
Reporting Unauthorized Use of Card ........ 12.10
Reports – Ethics Policy ........ 2.13
Reserve Requirement (Regulation D) ........ 17.1
Reserve Requirements of Depository Institutions ........ 12.1
Reserves and Undivided Earnings ........ 5.2
Responding – Red Flag Detection and Response ........ 16.15
Response Program for Unauthorized Access to Member Information ........ 16.12
Responsibilities -BSA ........ 11.1
Responsibility - Investment Policy ........ 3.1
Retirement Benefits ........ 14.46
Returned Checks ........ 8.5
Risk Assessment - Safeguarding Member Information ........ 16.6
Risk Based Credit Program ........ 6.13
Risk-Based Capital Ratio ........ 3.7
Risk-Based Net Worth Ratio ........ 4.2
Robbery Prevention ........ 16.2
Rules on Duties of Users of Credit Reports Regarding Address Discrepancies ........ 16.20

## S

S.A.F.E. Act Policy ........ 7.12
Safeguarding Member Information Policy ........ 16.5
Salary Administration (See also current Union Contract) ........ 14.48
Salary Increases ........ 14.50
Sanctions - Board ........ 2.11
Scholarship Program ........ 2.15
Secured VISA Card ........ 6.18
Security ........ 14.28, 16.1, 16.13
Security – Local Area Network (LAN) ........ 10.4
Security - Passwords ........ 14.60
Security and Privacy ........ 12.3
Security Officer ........ 14.29
Security Policy ........ 16.1
SEG Groups ........ 2.2
Service Members Civil Relief Act of 2004 ........ 6.15
Service Provider Definition ........ 16.14
Setoff Service Charge ........ 13.9
Severance Allowance (See also current Union Contract) ........ 14.51
Severe Weather or Other Disasters ........ 14.30
Sexual Harassment ........ 14.25
Sexual Harassment - Other ........ 14.25
Share Balance ........ 6.1
Sick Day Leave ........ 14.38
Sick Leave ........ 14.38, 14.40
Skip Tracing/Asset Locating ........ 8.2
Smart Apple Savers ........ 13.4
Smoking Policy ........ 14.18
Software License Policy ........ 10.3
Soldiers' and Sailors' Relief Act ........ 8.5
Solicitation ........ 14.27
Solicitations Gifts or Expressions of Sympathy ........ 14.27
Special Rate for Employee Loans ........ 6.5
Special Rules for Card Issuers ........ 16.20
Specific Security Measures - Safeguarding Member Information ........ 16.6
Statement Mailing ........ 12.8
Step Line of Credit ........ 6.6

Stop Payments on Checks Drawn ........ 13.6
Supervisory Committee2.1, 2.3, 2.11, 3.8, 6.4, 13.8, 16.4, 16.16
Supervisory Committee Member ........ 2.3
Surplus ........ 5.2
Suspicious Activity Report ........ 11.2
Suspicious Activity Reports (SAR) ........ 11.2
SVP of MIS – Installation Approval ........ 10.2, 10.6
Symitar Episys ........ 10.2, 10.6
Symitar's Episys Software and IBM P ........ 10.1
System Changes ........ 16.11

## T

Telephone Contact Guidelines ........ 8.1
Temporary ........ 14.2, 14.9, 14.53
Temporary and Part-Time Employees ........ 14.8
Termination - Immediate ........ 14.18
Term-investment ........ 3.1
Title Transfer ........ 6.14
Touch Tone Teller ........ 12.1, 12.6, 12.8, 16.11
Training ........ 11.8
Training – Safeguarding Member Information ........ 16.12

MCU Policy Manual

# INDEX

PAGE PAGE PAGE

Training and Development ........ 14.58
Travel Expenses Reimbursement........ 14.56
Traveler Checks and Gift Checks ........ 11.5
Trust Accounts ........ 13.5
Truth in Lending Act ........ 12.2
Truth-In-Lending (Regulation Z)........ 17.1
Truth-In-Savings ........ 11.6
Truth-In-Savings (Regulation DD) ........ 17.1
Type of Mortgage Loans Offered ........ 7.1
Types of Cash Connection Card Transactions........ 12.9
Types of Online Services ........ 12.6

U

U.S. Treasury Securities and Agency Securities........ 3.6
UCC1 Filing........ 6.15
Unauthorized Disclosure – Confidential Information ........ 13.1
Unauthorized Disclosure – Union Affairs........ 14.16
Undivided Earnings ........ 5.2
Unfair or Deceptive Acts or Practices (Regulations AA) ........ 17.1
Unusual or Suspicious Circumstances........ 16.1
Updating the Program – Red Flag Detection and Response ........ 16.16
USA PATRIOT Act ........ 17.1
Used Vehicle Loans ........ 6.8

V

Vacation ........ 14.33
Vault Security........ 16.2
Vehicle Repossession ........ 8.3, 8.4
Vehicle Repossession/Public Auction........ 8.4
Vehicle Repossession/Redemption ........ 8.3
Vendor Arrangements ........ 16.12
VENDOR MANAGEMENT - POLICY STATEMENT ........ 18.1
Virus Notification........ 14.60
Virus Notification - MIS ........ 10.4
VISA Card........ 6.15, 6.17, 11.5
VISA Credit Card Collections........ 8.1
VISA Credit Card Renewal........ 6.18
VISA Credit Line Increase ........ 6.18
VISA Program........ 6.16
VISA/General Policy........ 6.15
VISA/General Rules........ 6.17
VISA/Overdraft Line of Credit Account Closure ........ 6.18
Voluntary Termination ........ 14.44

W

Web Site Development and Content........ 12.2
Withdrawals/FasTrack Checking Accounts ........ 11.5
Withdrawals/Official Checks and Cash ........ 11.5
World Wide Web ........ 10.6, 12.1, 12.4, 12.5
Written Notices to Board Members........ 2.3



CONFIDENTIAL PROPRIETARY INFORMATION-FOIA EXEMPT 

A-1172

MUNICIPAL CREDIT UNION
Policy Manual

# Section 1

# NEW POLICIES, REVISIONS, AND CHANGES

MUNICIPAL CREDIT UNION
Policy Manual

# Section 2

# BOARD ADMINISTRATION

MUNICIPAL CREDIT UNION
Policy Manual

# Section 3

# INVESTMENT POLICY

A-1175

MUNICIPAL CREDIT UNION
Policy Manual

# Section 4

# ASSET/LIABILITY MANGEMENT

MUNICIPAL CREDIT UNION
Policy Manual

# Section 5

# ACCOUNTING

MUNICIPAL CREDIT UNION

Policy Manual

# Section 6

# INSTALLMENT LENDING

A-1178

MUNICIPAL CREDIT UNION

Policy Manual

# Section

# 7

# MORTGAGE LENDING

A-1179

MUNICIPAL CREDIT UNION
Policy Manual

# Section 8

# COLLECTION

A-1180

MUNICIPAL CREDIT UNION

Policy Manual

# Section 9

# MARKETING

A-1181

Policy Manual

# Section 10

# ELECTRONIC DATA PROCESSING

A-1182

MUNICIPAL CREDIT UNION

Policy Manual

# Section 11

# BRANCH OPERATIONS

MCU MUNICIPAL CREDIT UNION
Policy Manual

# Section 12

# ELECTRONIC & PLASTIC CARD SERVICES

MUNICIPAL CREDIT UNION
Policy Manual

# Section 13

# MEMBER SERVICE OPERATIONS

MUNICIPAL CREDIT UNION
Policy Manual

# Section 14

# HUMAN RESOURCES

A-1186

MUNICIPAL CREDIT UNION
Policy Manual

# Section 15

# LEGAL DEPARTMENT

A-1187

MUNICIPAL CREDIT UNION

Policy Manual

# Section 16

# SECURITY AND PRIVACY

A-1188

MUNICIPAL CREDIT UNION

Policy Manual

# Section 17

# COMPLIANCE

# Section 18

# ENTERPRISE RISK MANAGEMENT

**From:** Hon Sylvia G Ash <SylviaAsh@aol.com>
**Subject:** Re: MCU Devices/Equipment
**Sent:** Tue, 15 May 2018 13:11:36 -0400
**Bcc:** Hon Sylvia G Ash <SylviaAsh@aol.com>
**To:** Monique Smith <Mosmith@nymcu.org>

No comment!!!

Hon. Sylvia G. Ash

On May 15, 2018, at 12:55 PM, Monique Smith <Mosmith@nymcu.org> wrote:

Hi Sylvia,

As per the Acting CEO, since you've had the devices for 3 years or more, there is no need to return them. Therefore, please disregard my original email.

Thank you.
Monique

Monique Smith | Executive Operations Manager | Municipal Credit Union
22 Cortlandt Street
New York, NY 10007
Ph: (212) 238-3369 | Fax: (212) 416-7347
mosmith@nymcu.org
<image001.gif>

**From:** Hon Sylvia G Ash [mailto:SylviaAsh@aol.com]
**Sent:** Monday, May 14, 2018 5:01 PM
**To:** Monique Smith <Mosmith@nymcu.org>
**Subject:** Re: MCU Devices/Equipment

Nicely written letter.
Call me

Hon. Sylvia G. Ash
On May 14, 2018, at 4:13 PM, Monique Smith <Mosmith@nymcu.org> wrote:

Hi Sylvia,

Hope all is well.

As per MCU's protocol, we are required to retrieve all MCU devices/equipment that are given to Board members once they have departed MCU. Unfortunately, at the time of your departure, we did not collect your devices. Therefore, for your convenience, we will make the necessary arrangements to pick-up the equipment via MCU carrier. Please let me know at your earliest convenience when and where is best for you.

Sorry for any inconvenience this may have caused.

Warm regards,
Monique

GOVERNMENT EXHIBIT 751
S1 19 Cr. 780 (LAK)

Monique Smith | Executive Operations Manager | Municipal Credit Union

22 Cortlandt Street
New York, NY 10007
Ph: (212) 238-3369 | Fax: (212) 416-7347
mosmith@nymcu.org
<image001.gif>

**Sent:** Tue, 20 Feb 2018 12:58:08 -0500
**Cc:** kwong@nymcu.org
**To:** RFarley@nymcu.org
**From:** ""Hon. Sylvia G. Ash" <sylviaash@aol.com>" <sylviaash@aol.com>
**Subject:** Re: Nets Tickets

Thank you very much.

Judge Ash

-----Original Message-----
From: Rebecca Farley <RFarley@nymcu.org>
To: 'SylviaAsh' <sylviaash@aol.com>
Cc: Kam Wong <kwong@nymcu.org>
Sent: Tue, Feb 20, 2018 12:09 pm
Subject: Nets Tickets

Judge Ash,
Please see attached Nets tickets from Kam for the February 26th game against Chicago.

Thank you,

**Rebecca Farley**
*Executive Office Operations Manager*
*Office of the President/ CEO*
Municipal Credit Union
22 Cortlandt St, 27th Floor | New York, NY 10007
Tel: 212-238-3340
E-mail: rfarley@nymcu.org
Website: www.nymcu.org

GOVERNMENT EXHIBIT 769
S1 19 Cr. 780 (LAK)

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT of NEW YORK

GOVERNMENT EXHIBIT 801
S1 19 Cr. 780 (LAK)

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE Tue day, May 8, 2018

# CEO And President Of New York Credit Union Charged With Embezzlement And Fraud

Geoffrey S. Berman, the United States Attorney for the Southern District of New York, announced today that KAM WONG, the chief executive officer and president of the oldest New York credit union (the "Credit Union"), a non-profit financial institution, was charged in Manhattan federal court with fraud, embezzlement, and aggravated identity theft offenses related to defrauding the Credit Union in connection with hundreds of thousands of sham expense reimbursements. WONG was arrested this morning and is scheduled to appear before U.S. Magistrate Judge James L. Cott in Manhattan federal court later today.

U.S. Attorney Geoffrey S. Berman said: "As alleged, the CEO and president of New York's oldest credit union abused his position of trust as a guardian of municipal, state, and federal workers' financial accounts to enrich himself. Kam Wong allegedly stole money from the credit union's earnings that were intended to reward the credit union's members, not line Wong's pockets. I want to thank my Office's Special Agents for their dedicated efforts in this ongoing investigation."

According to the allegations contained in the Complaint[1] unsealed today in Manhattan federal court and publicly available documents:

KAM WONG, the defendant, is the CEO and president of the Credit Union, a non-profit financial institution headquartered in New York, New York, which is federally insured. The Credit Union is the oldest credit union in New York State and one of the oldest and largest in the country, providing bank services to more than 425,000 members, including municipal, state, and federal workers in New York City. The Credit Union's earnings are intended to be directed back to its members in the form of more favorable rates and fewer and lower fees for products and services.

From at least 2013 through January 2018, WONG engaged in a long-running multi-faceted scheme to obtain money from the Credit Union to which he was not entitled, and took steps to seek to conceal what he had done. Among other things, WONG allegedly embezzled from and defrauded the Credit Union by submitting sham invoices (the "Sham Invoices") for dental work never performed on him or paid by him, and, as a result, obtained reimbursement for hundreds of thousands of dollars of such nonexistent dental work, as well as for his alleged personal tax liability for these and other payments or benefits.

In addition to the alleged fraud in connection with dental reimbur ement , the ongoing inve tigation ha revealed that WONG obtained numerou other payment from the Credit Union under u piciou or questionable circumstances. These include millions of dollars in cash payments in lieu of a long-term disability insurance policy, as well as millions more for taxes to cover those payments; reimbursement payments for repairs to a luxury vehicle the Credit Union leased to WONG, which repair work was already covered by insurance; cash withdrawals from a Credit Union business credit card for purportedly “testing” the Credit Union’s ATMs; substantial educational, housing, and living expenses for two of WONG’s friend’s relatives, whom the Credit Union hired at his direction to be interns; tens of thousands of dollars in annual cash advances, for which WONG provided no supporting documentation; and payments for 320 days of purportedly unu ed ick leave, in violation of WONG’ contract and the Credit Union’ policie

WONG generally deposited the proceeds of his scheme into a Credit Union account, from which, between July 2013 and January 2018, he then withdrew approximately $1.9 million from ATMs, over the course of more than 2,500 transactions, an average of more than one-and-a-half transactions per day. From this account, WONG also spent at least approximately $3.55 million on New York State Lottery tickets.

In or about January 2018, after WONG learned about the investigation, WONG misled federal agents and Credit Union Board members in order to, after the fact, explain and justify some of these payments. On or about February 22, 2018, WONG was placed on leave by the Credit Union’s Board of Directors upon the recommendation of a Special Committee overseeing an internal investigation prompted by this criminal investigation.

* * *

WONG, 62, of Valley Stream, Long I land, i charged with one count of embezzlement from a federally insured credit union, one count of bank fraud, one count of wire fraud, each of which carries a maximum penalty of 30 years in prison, and one count of aggravated identify theft, which carries a mandatory two-year consecutive term in prison.

The ma imum potential entence in the e ca e are pre cribed by Congre and are provided here for informational purpo e only, a any entencing of the defendant will be determined by a judge

Mr. Berman praised the work of the Special Agents of the United States Attorney’s Office for the Southern District of New York.

The case is being prosecuted by the Office’s Public Corruption Unit. [redacted].

The charge contained in the Complaint are merely accu ation , and the defendant i pre umed innocent unless and until proven guilty.

[1] A the introductory phra e ignifie , the entirety of the text of the Complaint and the de cription of the Complaint set forth below constitute only allegations, and every fact described should be treated as an allegation.

---

**Attachment(s):**
Download Kam Wong complaint.pdf

**Topic(s):**
Financial Fraud

Public Corruption

**Component(s):**
USAO - New York, Southern

**Press Release Number:**
18-148

Updated May 8, 2018

**Sylvia Ash Use of MCU Park Suites**

2010 through 2017

| DATE | COST TO MCU |
|---|---|
| 8/27/2010 | $490.00 |
| 8/19/2011 | $839.00 |
| 9/2/2011 | $700.00 |
| 8/11/2012 | $866.00 |
| 8/10/2013 | $1,471.76 |
| 8/11/2013 | $1,530.92 |
| 8/22/2013 | $1,485.68 |
| 9/1/2013 | $874.36 |
| 8/14/2014 | $1,876.00 |
| 8/21/2014 | $1,596.40 |
| 8/22/2014 | $1,749.52 |
| 8/23/2014 | $809.92 |
| 8/24/2014 | $1,302.92 |
| 8/13/2015 | $2,241.36 |
| 8/14/2015 | $2,241.36 |
| 8/16/2015 | $1,442.12 |
| 8/20/2015 | $1,203.16 |
| 8/1/2016 | $1,120.22 |
| 8/14/2016 | $1,783.16 |
| 8/24/2016 | $1,987.32 |
| 8/5/2017 | $1,740.82 |
| **Total** | **$29,352.00** |

GOVERNMENT EXHIBIT 901
S1 19 Cr. 780 (LAK)

Sources: GX 402, 403 (403-A), 404 (404-A), 407, 420 (420-A), 452 (452-A), 457, 458 (458-A), 460 (460-A), 469 (469-A), 472 (472-A), 482-A, 482-B, 482-D, 482-E, 482-F, 482-G, 482-I, 482-J, 482-K, 482-L, 498, 499, 951, 954

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 780 (LAK)

SYLVIA ASH,

Sentence

Defendant.

------------------------------x

New York, N.Y.
April 20, 2022
3:00 p.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
ELI J. MARK
ALONDRA SARAH KATZ
DANIEL RICHENTHAL
Assistant United States Attorneys

MORRISON & FOERSTER LLP
Attorneys for Defendant
BY: CARRIE HEATHER COHEN
NATHAN DANIEL REILLY

(Case called)

THE DEPUTY CLERK: Government, are you ready?

MR. MARK: Yes. Good afternoon, your Honor. Eli Mark on behalf of the government. With me at counsel table is Special Assistant U.S. Attorney Alondra Katz and Assistant U.S. Attorney Daniel Richenthal.

THE COURT: Good afternoon.

THE DEPUTY CLERK: Counsel, are you ready?

MS. COHEN: Yes. Carrie Cohen and Nathan Reilly from Morrison & Foerster, for defendant Sylvia Ash, who is present in court.

THE COURT: Afternoon, folks.

Ms. Cohen, have you and Ms. Ash had the presentence report for the necessary period?

MS. COHEN: Yes, we have, your Honor.

THE COURT: Ms. Ash, have you read it, every word of it? You can remain seated.

THE DEFENDANT: Yes.

THE COURT: Have you read every word of it?

THE DEFENDANT: Yes, your Honor, I have.

THE COURT: Have you discussed it with Ms. Cohen?

THE DEFENDANT: Yes, your Honor, I have.

THE COURT: All right. The presentence report will be sealed and made available to counsel in the event of an appeal.

Now, I know, of course, of the disagreement about the

guideline computation, but apart from that, are there any material objections to the presentence report?

MS. COHEN: No, your Honor.

MR. MARK: No, your Honor.

THE COURT: Thank you.

Let's deal with the objections. If anybody wants to be heard further on them, I'll do it, otherwise we'll go ahead.

MS. COHEN: Your Honor, we set forth our objections both in the draft presentence report to probation and then in our sentencing memorandum to your Honor. I'll just briefly address them. I'm happy, of course, to answer any questions your Honor has about our objections.

Specifically, the level 19 range, we believe, is too high. Ms. Ash was not a participant in nor a beneficiary of Wong's embezzlement scheme, but yet her base offense level is keyed off of the loss amount that the MCU suffered as a result of Wong's embezzlement. We think that is way too high and is unfair and not correct.

We also have an objection to the two-level enhancement for use of a special skill. The special skill relied on for the enhancement is Ms. Ash's skills as an attorney. There was nothing about her skills as an attorney, your Honor, that enabled her to lie to the government or delete emails. So we think the special skill enhancement does not apply. Those are the two objections we have to the calculation as set forth in

the presentence report of the guidelines.

THE COURT: I overrule them, but I do want to be clear that, unless I indicate otherwise, the sentence that will be imposed will make that ruling immaterial. The sentence will be the same under either guideline range.

Now, I have received more than the usual amount of correspondence and filings in relation to the sentence. Let me enumerate them for you.

I have the presentence report. I have a letter from Ms. Cohen with attachments yesterday. I have the government's sentencing memorandum. I have an April 13 letter from MCU. I have one that has the exhibits and one that doesn't have the exhibits. I have Ms. Cohen's prodigious sentencing memorandum and all the exhibits, including the letters about which I may say a few things in due course.

Is there anything else that I ought to be aware of?

MR. MARK: No, your Honor, and I want to confirm that the final PSR is the one revised April 15, 2022, since we had several different versions from probation.

THE COURT: Yes, we did, and that is, to be sure, the one I have this afternoon.

Now, we have an issue, I think, about whether someone from MCU is to be permitted to address the Court on the sentencing. So I've read the submissions, at least from Ms. Cohen, on that. Mr. Mark, what's your position?

MR. MARK: Your Honor, you have the authority to hear from Robert Bedford, who's the general counsel from MCU, based on both statute and case law.

First, as to 18 U.S.C. Section 3661, which deals with what the Court can consider in regards to sentencing, it specifically provides that no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing appropriate sentence. That is supported by case law, such as those cases cited in our sentencing submission as to -- that the Court is free to consider all evidence in determining the appropriate sentence.

The letter that was submitted from MCU clearly went to the Section 3553(a) factors, and the Court similarly should be able to consider the representative of MCU in connection with sentencing.

THE COURT: Now, is it the proposal that he speak today? Is that the idea?

MR. MARK: Yes. So that would be one, as the Court, obviously, has the authority to hear it. Further, if the Court were to determine if MCU was a victim of the crime, which we don't think is an issue that needs to be determined today because the Court doesn't need to determine restitution here, but if the Court were to determine MCU is a crime victim here,

then the Court would further be required to hear from MCU at sentencing under the Crime Victims' Rights Act under Section 3771(e)(2)(A), which talks about who is a crime victim, and the Federal Rules of Criminal Procedure under Rule 32(i)(4)(B), which requires the court to hear from a victim.

THE COURT: Well, you say I don't have to resolve that today. Don't I have to resolve it in order to say, no, I won't hear from him?

MR. MARK: If your Honor was to not hear from them, yes, your Honor, would have to make a finding that they are not a crime victim. And in particular, if that is a determination your Honor is going to consider, obviously, MCU puts forth in their letter dated April 13 several ways in which they were directly and proximately harmed by the conduct in the offense of conviction here, which harmed not just the government's investigation but also harmed MCU at the same time because they were conducting an internal investigation here so that the conduct had multiple objectives and multiple harms.

THE COURT: It's not inconceivable I have to take evidence to decide if they're a crime victim, right?

MR. MARK: I think it's inconceivable that your Honor would have to do that. I think there is evidence in the form of trial evidence and evidence in the form of their letter that your Honor could consider here.

If I may have one moment, your Honor?

(Counsel confer)

MR. MARK: Your Honor, I don't think your Honor needs to take any evidence further to make a determination that they would be a crime victim here based on the trial evidence, based on the evidence in the PSR, and based on their letter. Obviously, we are not seeking restitution here, and that's because --

THE COURT: That's down the road.

MR. MARK: That's down the road, of which I would expect that your Honor would need to do because the question of how do you quantify the particular harm and whether that particular harm is compensable under the restitution statute. That's a different determination than your Honor would need to make here. And if your Honor does reach it, the issue of whether they are a crime victim under the Crime Victims' Rights Act, the government does believe that there is a factual basis in the record for your Honor to make that decision, and in that case, the Court must hear from the victim here.

THE COURT: Well, here's what we'll do. I've read the letter. It's not going to affect the sentence, putting aside restitution. I will hear him for up to five minutes under 3661, and we'll leave all these other questions for another day.

Is there any objection to that, Ms. Cohen?

MS. COHEN: I do object to that, your Honor. I do not believe that the current general counsel of the MCU has any knowledge about Ms. Ash's background, character, conduct other than what he has learned in his current position. He was not the general counsel at the time.

THE COURT: That's true of everyone whose letter you submitted to me, isn't it?

MS. COHEN: No. Those people have actual personal knowledge of their interactions with Ms. Ash. Almost every single one of them knows Ms. Ash personally and is talking to the Court based on their personal knowledge.

THE COURT: To some extent.

MS. COHEN: The current general counsel was not the general counsel at the time because the former general counsel testified at the trial. So I don't believe it's appropriate at all for him to speak.

THE COURT: Well, I'll stand by it. Five minutes.

MR. MARK: Thank you, your Honor.

THE COURT: Now is the time.

MR. MARK: Mr. Bedford, may he approach the lectern?

THE COURT: Yes. If he's fully vaccinated, he can take off his mask at the lectern.

MR. BEDFORD: Yes, I am.

Thank you, your Honor, for the opportunity to address this Court at Ms. Ash's sentencing today. My name is Robert

Bedford. I'm the current general counsel at Municipal Credit Union, and the credit union would like to provide the Court with some additional details on the defendant's tenure at MCU and the extent to which Ms. Ash's obstruction has contributed to the substantial financial and intangible costs incurred by MCU, its membership, and its employees alike.

I have been in the general counsel for just over two years. I joined in early 2020, and I've witnessed and continue to witness the harm that was caused by Ms. Ash, as well as Mr. Wong and Mr. Guagliardo.

I'll forgo background on the credit union given the time constraints. Safe to say that MCU is a financial cooperative that serves MCU -- serves the New York City civil service agencies and their employees as its members, including FDNY, NYPD, sanitation, and numerous others.

Ms. Ash served on MCU's board starting in May of 2008 and became chair of the board of directors in May of 2015. During her tenure on MCU's board and long after her resignation, Ms. Ash was the recipient of tens of thousands of dollars in reimbursements and other benefits from the credit union because of her close relationship with the now-incarcerated Mr. Wong. Mr. Wong funded her lifestyle and purchased her loyalty, an arrangement that led to why we're here today.

Ms. Ash conspired with Mr. Wong to obstruct the

federal investigation, but also conspired to obstruct the internal investigation at MCU being conducted by MCU and its outside law firm. During that time, MCU was forced to spend significant amounts of money, time, and manpower on specific and specialized forensic investigations, attorneys to review submissions, attorneys to respond to subpoenas, and other demands. And, again, this caused a significant financial -- significant financial effect on MCU. That financial effect is felt by its members, the hard-working employees of New York City, in that every dollar that's spent on that is a dollar that is not spent on providing products and services to those members of MCU.

It's important to note that Ms. Ash was recipient -- during her tenure on the board was the recipient of lavish and improper perks funded by MCU's members. This includes tickets to numerous sporting events; entertainment expenses, including concerts, lavish meals, trips, airfare, hotels for herself and guests to places like the Greek isles, Puerto Rico, Cuba, Las Vegas; expensive electronic devices, such as an iPhone X; payment for personal utilities, such as phone and cable bills; and, finally, an annual birthday party fully catered and hosted at a minor league ballpark, again funded by MCU and the members.

Additionally, Ms. Ash caused the credit union to donate thousands of dollars to charities and community

organizations that she was involved with. These are the same organizations that she seeks to present her affiliation with today.

It's important to note that Ms. Ash financially benefited from the culture created by Mr. Wong and that she helped proliferate during her time on the board at MCU, during which that time Mr. Wong was looting the credit union. The costs incurred by the credit union, both financial and tangible, would have been avoided or could have been avoided had Ms. Ash fulfilled her fiduciary duty to MCU throughout the entirety of her tenure on the board. Additionally, the harm to the credit union would have been avoided if Ms. Ash simply cooperated with both the federal and internal investigations in the first place. This was not evident and -- Ms. Ash's lack of concern for MCU and her decision to obstruct both the federal and internal investigations resulted in additional --

THE COURT: Look, a lot of the money was stolen long before the obstruction happened, right?

MR. BEDFORD: In regards to Mr. Wong and Mr. Guagliardo, yes.

THE COURT: Yes.

MR. BEDFORD: However, during that time of the investigation, MCU was forced to expend additional moneys to conduct those investigations which would not have been necessary had cooperation been forthcoming.

THE COURT: I think you're running up against five minutes.

MR. BEDFORD: Your Honor, my last request would be for our counsel to be heard with regard to these issues, either today or at a further date.

Thank you, your Honor.

THE COURT: OK. Thank you.

There's one more -- two more, actually, more or less mechanical things that I'd just like to get out of the way. We are going to defer everything to do with restitution to a later date.

Now, as I see it, the first question is whether MCU is entitled to restitution, which turns on whether it was a crime victim, and the second issue is assuming that it is entitled to restitution, either as a matter of right or as a matter of discretion, what's the amount? Does anybody see it any differently?

Mr. Mark?

MR. MARK: No, your Honor, I agree.

THE COURT: Ms. Cohen?

MS. COHEN: No, your Honor, I agree as well.

THE COURT: So let's set a schedule for doing this. It seems to me to make sense to break this down and do it one piece at a time. I think the first is probably principally, maybe entirely, a matter of briefing, but it may require some

affidavits or evidence. I was thinking in terms of maybe 30 days for an opening submission on that. Is that doable?

MR. MARK: Thirty days sound appropriate.

THE COURT: And maybe two weeks to respond?

MS. COHEN: That's fine, your Honor.

THE COURT: Once those papers come in, if there's need for a hearing or an argument, we'll set it, and then we'll work with the amount, but the objective is to get this all resolved within 90 days.

Secondly, there is a suggestion, a recommendation from probation, for a fine in this case which seems to be in order. Let me hear from Ms. Cohen about the question of a payment schedule, if that's required, because my reading of the presentence report suggests that, while there's a fair amount of net worth here, it's not entirely liquid.

MS. COHEN: Your Honor, your reading of the presentence report is accurate, and the facts are that Ms. Ash, the bulk of her assets are tied up in real estate, which is obviously not liquid. She would require a payment schedule to pay any substantial fine that your Honor imposes. I don't actually think a fine here is warranted. For the reasons that we put forward in our sentencing memorandum, I don't think a fine necessarily is necessary for any of the reasons of sentencing, but I understand your Honor has decided a fine is appropriate. Ms. Ash is prepared, of course, and will pay

whatever fine is ordered on whatever payment schedule your Honor thinks is appropriate.

THE COURT: Well, the latter implies that she'd be prepared to pay a substantial fine immediately, which doesn't seem to me consistent with --

MS. COHEN: No, your Honor.

THE COURT: -- the financial information.

MS. COHEN: If I said that, I misspoke. She does not have the financial ability with liquid assets.

THE COURT: So if I wind up, and I haven't decided, but if I wind up imposing a substantial fine, let's start off the discussion by saying suppose I divided it into quarters and made it a quarter June 1 and a quarter every three months thereafter?

MS. COHEN: I guess it's a little hard for me in the abstract because I don't know, substantial, what your Honor is thinking. What could be substantial to -- I don't know what substantial means, and I would have to confirm.

THE COURT: The guideline range is 20,000 to 200,000.

MS. COHEN: Which is a big range.

THE COURT: I understand. That's why I'm raising the question.

MS. COHEN: Your Honor, if I could have a moment to confer, that would make better sense so I can give you an accurate answer.

THE COURT: Of course.

(Counsel confer)

MS. COHEN: Your Honor, just to give your Honor some additional information as you consider a payment schedule, Ms. Ash's sole source of income at this point is really her pension, which is $4,000 a month. So if you factor into quarterly payments, that is what she has to live on because, again, the assets are tied up at the moment in real estate. I'm not saying that -- and it's complicated the way the different -- the two properties are held. She's not the sole decision maker on those properties.

So it would -- quarterly, it would depend how much the fine would be. I don't want her to get in a situation where she's defaulting on any judgment you have. So it depends how many -- the time period out you can extend and what the fine is. It's just hard for me to do the calculation to figure out what she can pay when I don't know --

THE COURT: As I understood the financial information, this property's all unencumbered, right?

MS. COHEN: Correct.

THE COURT: So it's mortgageable or saleable. Now, I understand that at least one property is held in common --

MS. COHEN: Right.

THE COURT: -- with some other people.

MS. COHEN: Right.

THE COURT: Not quite clear how many or who, but there are other interests. Are they both held that way or only one?

MS. COHEN: Only one, your Honor.

THE COURT: Only one.

All right. Let's pass that for just now. We'll get to the issue of the sentence, and I'll hear Ms. Cohen.

MS. COHEN: Your Honor, first I want to note and thank Ms. Ash's family members and friends, some of whom are in the gallery today. Many more wanted to come, but Ms. Ash did not want them to witness what is a very -- beyond very difficult day for her.

Your Honor, she stands before this Court basically a broken woman. She's broken professionally, mentally, and also in part physically. Ms. Ash was the American dream. She came to this country an immigrant, a woman of color. She was the first in her family to attend college. She overcame countless barriers as a black woman to become a lawyer, and she served as a lawyer serving the community, city workers for more than 20 years. She then was privileged enough to be elected to the bench, and while a member of the bench, she continued to give back to her community in a variety of ways.

She was extremely active in a number of associations, Bar Associations but also community organizations. She strove her whole professional life to help others who looked like her succeed and achieve their goals. That was all ruined by

mistakes that she made. She's now resigned from the bench. She's resigned her license to practice law. She no longer can be and no longer will be a part of the profession that has defined her entire adult life and how she has defined herself and her identity.

She spent a lifetime, your Honor, building that reputation, and now she sits before you. She's 64 years of age. She lives alone, her son is in California, and her life is basically in tatters.

Importantly, your Honor, she does still play a very critical role to her family. Her brother is severely, severely disabled. He operates mentally like a seven-year-old. She is his guardian, legally and emotionally. She acts as his mother. She is the only one that he can turn to when he is distressed, which is often. He lives in a residential home. She is the one who has a room in her house for him.

THE COURT: Excuse me. The residential home is in England, right? Is that correct?

MS. COHEN: No, your Honor.

THE COURT: No. Where is it?

MS. COHEN: Hold on. I believe it's in -- it's in Sunset Park, Brooklyn, your Honor.

THE COURT: Oh. Well, I don't know where I got that idea, but I did.

MS. COHEN: Your Honor, he was born, as was Ms. Ash,

in London, but they moved here when they were --

THE COURT: That's obviously where it comes from.

MS. COHEN: No, no, your Honor, he has been here basically his whole adult life.

THE COURT: I stand corrected.

MS. COHEN: He is in Brooklyn. He is close to where Ms. Ash lives. She visits him weekly. When he does spend weekends at her home, she is the one everyone in the home -- the caretakers, the nurses, the doctors -- all call when there are problems, and there are ongoing problems mentally and physically. A lot of that is detailed in the letters. It's detailed in our brief.

But anyone who has ever had to care for someone else who is very severely mentally and physically disabled knows that when they trust one person, that is their person, and they latch on to that person, and that is their sort of lifeline, so to speak. He is not able to comprehend if she disappears for six months, for four months, or for a year. He can't understand that. I cannot imagine what will happen to him if Ms. Ash is incarcerated.

In addition, her aunt, who is 77 with whom she is very close, has been undergoing chemotherapy treatment. She's been battling cancer for the last several years. She's currently undergoing chemotherapy as recently as yesterday. Ms. Ash is the one who accompanies her to chemo treatments. Ms. Ash is

the one that talks to the doctors and helps make the medical decisions for her aunt.

In addition, and unfortunately, the father of her son with whom she is still close suffered a completely debilitating stroke, and she is the one that alternates visiting him in his long-term care facility. He can't talk. He can't walk. He can't feed himself. It is unclear if he ever will recover in any way.

THE COURT: Where is that facility?

MS. COHEN: Also in Brooklyn, your Honor.

Ms. Ash has accepted full responsibility for her conduct, and given the vital role she plays in her family's life and her brother Keith, her aunt, and the father of her son, she respectfully begs for mercy from your Honor for a noncustodial sentence. She asks that, your Honor, not to belittle in any way -- or minimize is perhaps a better word, her conduct, but in order that she can serve her family members who desperately need her and need her now.

A noncustodial sentence, your Honor, also would serve the goals of sentencing. Specific deterrence is not an issue here, your Honor. She has been more than deterred, and a crime like this will never present the opportunity to happen again, nor would it happen again.

General deterrence, her public humiliation, every time she is in court, every time there's a filing on the docket,

there are articles written in all the legal papers about it. The legal community is deterred by the prosecution, the conviction, and the sentencing today of Ms. Ash.

She also has resigned from the bench. She has resigned from the bar. That is more than sufficient to deter anyone in public service who is thinking about or is debating or is talked to by the government about what they should do when that happens.

Ms. Ash is not a danger to the community, but importantly, she still has a lot to give to the community. She has throughout her time as a lawyer and as a judge, she spent a lot of time doing community service, and that's reflected in the letters your Honor received from the various -- not various, the numerous organizations for which she provided and donated her time, her knowledge, her experience, and helped numerous immigrants, people of color, succeed in this city.

Your Honor, if she was given a noncustodial sentence, we have identified at least three -- and I'll tell your Honor, as recently as yesterday there are several more organizations that are willing to take whatever time she has, and she has every day all day except for when she's caring, of course, for her aunt and her Keith, but she has a lot of time she can give and do substantial community service to the organization -- with the organizations we've identified, which she already has relationships with and has done community service for. So she

knows the organizations, she knows the people that they serve, and she knows how to serve them, and she has been serving them. So it wouldn't be something new. It would be continuing the good works. That is a service to the community. That meets the goals of sentencing. The goals of locking her up behind bars does not help the community in any way, shape, or form.

Your Honor, as to Ms. Ash's mental and physical health, I'll touch on them briefly because they're important, of course. And your Honor has letters from her treating therapist. She is suffering greatly mentally, as I'm sure you have seen. You saw throughout the trial the toll it takes. And granted, she takes responsibility for the conduct that led her there, but that does not mean that it doesn't take a very serious toll on her mental health, and she's undergoing mental health treatment and she needs to keep undergoing that treatment in order to help her healing process.

She also, your Honor has observed, has a lot of mobility issues related to her various surgeries. She still walks with great difficulty and with a cane. She is undergoing physical therapy. That again needs to continue in order for her to physically heal.

Your Honor, I realize fullheartedly that as a public servant her conduct was unacceptable. She has paid a very steep price for not talking to the government, deleting emails, most of which she did without an attorney. There's not a day

that goes by that I sat through this trial that I didn't wish I represented her from day one, because then we wouldn't have been here. But she accepts the choices she made, but she does beg for mercy. Jail here just does not serve any purpose, whereas a noncustodial sentence with substantial community service does serve the goals of sentencing and will allow her to serve her community and be a positive influence to all those that she has helped in the past in the community in which we all live.

Your Honor, Ms. Ash does want to make a statement to the Court.

THE COURT: Of course.

MS. COHEN: It is going to be very hard for her to get through it, so I have told her, with your Honor's permission, that I would ask if she could read from it.

THE COURT: Of course.

MS. COHEN: But it is her words. It is not our words. It's not her attorney's words. They're her words, but I think she can't get through it without having it in front of her to read.

THE COURT: Fine.

MS. COHEN: Thank you.

With permission, because of her mobility, if she could stay seated to read it?

THE COURT: Yes.

MS. COHEN: Thank you, your Honor.

THE COURT: Ms. Ash.

THE DEFENDANT: Good afternoon and thank you very much, your Honor, for giving me the opportunity to be heard.

It is very difficult and hard for me to be sitting here before you today asking for forgiveness and leniency. Not a day goes by that I do not revisit the events that led to me being here before you. I don't know where to begin, and no amount of words can truly express my remorse, shame, and embarrassment.

Most of all, I will never get over the fact that I have disappointed so many who believed in me, trusted me, looked up to me, and on whose shoulders I stood. I know that I alone am responsible for my actions, actions that essentially have ruined my life.

As a little girl growing up in the Caribbean, I dreamed of a life where I will be in a position to make a difference in the lives of others. Because of the sacrifices of my parents and family, I was blessed with a life beyond my imagination. I had essentially achieved the American dream. Being a lawyer and a judge was more than a job. It was my calling, my vocation, and a privilege.

I am now 64 years old, and that is all gone. I have resigned from the bench and the bar and have lost the privilege and the honor of those respected titles. Because of my

actions, the reputation that I spent a lifetime building has been destroyed, and I have no one to blame but myself.

I love the law, the legal profession, and the court on which I sat. To think that I have harmed those institutions or made people lose faith in them in any way because of my conduct pains me more than I can tell you. Today is a sad day not only for me but for my family and others who depend on me and whose lives will be irretrievably affected should I be sent to jail.

You've heard my attorney refer to my relationship with my younger sibling, Keith Ash. Keith was born in London, England, with an umbilical cord wrapped around his neck, and as a result of that, he suffered brain damage. For the majority of his life, he has lived in an assistance home. When my parents passed, I made a promise to my mother that I will step in her shoes and ensure that Keith will be taken care of, that he will receive the best care medically that is available to him. I took that promise very seriously, and I am proud to say I have lived up to it for the past 25 years.

Keith is more -- I refer to him as my second son as opposed to my brother, because that's how I feel about him. The maternal bond that I have with him far outweighs any sibling bond. Part of my biggest regret is to think that my actions might separate me from him should I be incarcerated. In that event, I can't imagine how Keith will survive and continue.

In addition to Keith, I have been the caretaker to my 77-year-old aunt who had a double mastectomy in 2019 -- 2020. I have been with her through all her chemotherapy, have held her when she undergo the sickness as a result of the treatment. I have taken care of all her day-to-day needs, her medical expenses, her living expenses, etc. It also pains me to think that should I be incarcerated, there will be no one there to assist her in that continued care.

And lastly, and very surprisingly, in January of this year, my son who lives in California as a firefighter, his father suffered a stroke which left him paralyzed on the right side of his body, unable to talk, and is being fed through a feeding tube. He has one sister here in New York, and she and I have taken on the responsibility of providing care for him, care in the form of visiting him on a daily basis, we alternate, and making sure that he receives the proper care since he has been transferred to a nursing facility.

I have undertaken the care for my aunt and my son's father despite the fact that I myself have severe physical challenges, but there comes a time when you have to put the needs of others ahead of your own needs. And that is what I have strived my entire life to do in terms of being an asset to my community, in terms of the organizations that I have been affiliated with, and in terms of the work that I tried to do to be of service to others.

Your Honor, I hope you can see beyond my actions that have brought me before you here today. I have tried to live my life as a role model for others and to extend a hand to those in need. As this Court well know, I have not been perfect, and I have engaged in conduct which was inexcusable, especially given the trust that was placed in me. If lessons are learned through pain and remorse, I have endured enough to have learned some powerful life lessons, lessons that will remain with me for the remainder of my life, never to be repeated.

I have prayed to God for his mercy and forgiveness. I now look to this Court to exercise mercy upon a good person who strayed along the path of her blessed life journey, but who now, stripped of all her life's accomplishments, remains remorseful yet nervously hopeful for the future.

I have attempted to make my life about service. I am asking your Honor for the opportunity to continue that work so that some good can come from the terrible mess that I created and my debt to society can be paid off by positive work for those most in need.

Lastly, with deepest remorse, I extend heartfelt apologies to my family, my friends, my former colleagues on the bench, the bar, MCU, and my community, and I sincerely ask for their forgiveness.

Thank you for giving me the opportunity to address you, your Honor.

THE COURT: Thank you, Ms. Ash.

Mr. Mark.

MR. MARK: Your Honor knows this case very well from presiding over the trial and from the lengthy submission that were emblematic of the litigation in this case. So I want to briefly address a few points that distinguish this case and particularly merit a significant sentence of imprisonment as we have requested.

First is the duration and escalating nature of the defendant's criminal conduct. The defendant didn't engage in mistakes, which was once again a word that was used by Ms. Cohen today. These were choices. It was deliberative, premeditated conduct. It was engaged in over more than six months. Time and time again the defendant doubled down on her obstructive conduct in an effort to thwart the investigation.

Just a few examples from that which we spent a lot of time on trial on. For example, after she signed Kam Wong's memo, she signed it a second time. After that memo was given to federal investigators and it didn't stop the investigation, she then lied to the investigators about what Tom Siciliano had told her and Kam Wong, that he had OK'd the money that Kam Wong had received.

She was pivoting and escalating her conduct. She did the same thing after she received the first subpoena from the grand jury. She lied to investigators that she didn't have any

documents, and then after she received a second subpoena, she doubled down, and she then deleted documents both from her email account and then she wiped her phone. Once again escalating conduct over time.

The same thing happened when she ultimately produced some documents to the government. For instance, she produced documents that demonstrated the MCU paid for her taking a trip to Las Vegas after she was no longer a board member, and when she was confronted with that, she lied and she said that it had already been authorized and paid for by MCU before she had stepped down, which was directly contradicted by other documents that the government had to obtain and from witness testimony. All this was egregious conduct, and it substantially interfered with the government's investigation of a nonprofit credit union, and that merits significant punishment.

The examples I gave just now seem to almost have been recurring here today when your Honor asked about the payment schedule for a fine. Your Honor asked, in determining that, about the defendant's ability to pay for a payment, and Ms. Cohen said that the defendant's income is primarily from her retirement, yet the financial statement that she gave to the PSR, even crediting her position, indicates that her primary source of income is rental income from -- and that's $4,958 of rental income, which is more than what she gets from

her pension right now. So once again there is minimization and pivoting in order to avoid the consequences of her actions. But your Honor doesn't even have to consider that in determining and considering the defendant's conduct and an appropriate sentence here.

The second I want to highlight is the broad range of harms caused by the defendant's conduct. There obviously was significant harm to the government's investigation by the defendant's lying, lies, and obstruction. And whether or not your Honor determines that MCU was technically a crime victim under the statute dealing with restitution, that conduct plainly hurt MCU and its members too. MCU is not a faceless corporation but a nonprofit institution that's dedicated to serving hard-working New Yorkers, and the defendant's obstruction of the government's investigation of misconduct at MCU delayed and harmed efforts to protect members of MCU who had been hurt by the misconduct that occurred there for many, many years, including many years where the defendant served on the board and where the defendant served as the chair of MCU's board.

Third is a particularly aggravating factor, is the defendant's educational and professional background, which distinguishes her from so many defendants that get sentenced in this courthouse. The defendant was a lawyer and a judge, and she knew exactly what she was doing. She didn't need Ms. Cohen

as a lawyer to prevent her from doing that. She engaged in misconduct knowingly and intentionally, and she continued to engage in that conduct even after she retained counsel. She continued to conceal, delete, wipe materials, and lie to investigators.

Fourth, I want to highlight the defendant's abuse of trust in committing the offense. I was struck that in many of the letters I read submitted by the defendant how she wanted people to address her by her first name, and I read every one of those letters. That, however, was not the case in this investigation. As the Court heard at trial, when the defendant was first contacted by law enforcement, she identified herself as a judge, and then when she was interviewed, she wanted to be addressed as Judge Ash. That's from page 156 of the trial transcript. She knew what she was doing was wrong here, and she sought to drape herself in the prestige of her judicial position to get away with the conduct as she was continually questioned by federal investigators.

Fifth is the defendant's apparent lack of remorse for her conduct, and I think that's continually emblematic by her response to the defendant's -- to MCU's request, MCU's letter to be submitted, which she asked to be disregarded by the Court, and the request to speak here and, particularly, her effort to essentially blame MCU for what had happened while Kam Wong and Joseph Guagliardo raided the institution. Because as

I noted, she was there on the board of directors. She was the chair of the board of directors for years while that conduct happened. And as they highlighted and as MCU highlighted, she profited and benefited significantly, and basically turned a blind eye and didn't effectively oversee that organization when she was there. So when she was confronted by the investigation, as she told Kam Wong, I've got your back 100 percent, and she meant that.

Lastly, I want to talk about general deterrence, and there's a need to impose a sentence that will be sufficient to deter others, to make other people, everybody -- but of course members of the bar, judiciary, everyone -- think twice before engaging in the sort of conduct the defendant did. As your Honor has noted in other circumstances, general deterrence is particularly important when presented with a hard-to-detect crime. And indeed, lying about attorney advice, deleting and concealing documents is particularly difficult conduct to detect. It's the sort of conduct that is difficult to catch, and therefore a significant sentence is required when imposing judgment here.

So, your Honor, for these reasons and for the reasons in our sentencing submission, and certainly based on everything your Honor heard throughout trial, we submit that a substantial sentence of imprisonment is necessary. And we respectfully request that, given the defendant's financial situation and

ability to pay, a significant fine is imposed on whatever payment schedule your Honor deems appropriate.

THE COURT: Thank you, Mr. Mark.

I have some remarks by way of explanation of the sentence. Some of what I have to say has been anticipated. This is as tragic a case as I have seen in almost 28 years here. It's a tragedy, Ms. Ash, because, as you acknowledged, it reflects the fact that you have destroyed your career, you have destroyed your reputation, and you have destroyed so much good that I readily acknowledge you've accomplished in your life.

You rose from modest origins to be elected to the New York Supreme Court and appointed presiding judge of the Commercial Division in Kings County Supreme, one of the most important judicial positions in the state. You did it by hard work, by dedication to your community, and by your God-given talent.

You spoke of being a role model, and although that's an overused phrase, it truly isn't in your case. You have served as a model of what determination and hard work and service can accomplish. You have been admired and respected, justifiably, by so many for your accomplishments and your service. I have read every letter that's been submitted. I know they are heartfelt and they are impressive statements to the Sylvia Ash that the writers knew before this all came to

light, but you've lost it all. You've lost your position. You've lost your exemplary place in the community. You've lost all or most of that respect and admiration. It's gone. You know it. I know it. Everyone in this room knows it. And that is a just consequence of your own dishonest, corrupt, and, frankly, outrageous actions.

As has been said, you obstructed a federal investigation of Mr. Wong, the chief executive officer of MCU, a financial institution that serves primarily city employees. Mr. Wong, it turns out, had embezzled close to $10 million from MCU. You signed a false document for the purpose of covering up part of that embezzlement. You did it to persuade, initially, federal investigators that you, in your capacity as chair of the board, had authorized Mr. Wong to take more than $3.7 million in cash from MCU, supposedly to satisfy an obligation owed by MCU under Wong's employment contract, when you knew that you had never authorized that. And then when that ploy didn't shut down the investigation, and perhaps also when you concluded that it really was not very clever to put the responsibility for the missing $3.7 million on your own shoulders, you manufactured a brand-new full story. The new story put the responsibility on MCU's then-general counsel, Mr. Siciliano, I believe, someone from whom, as you probably knew, would have been very difficult for federal investigators to get the information because he had an obligation of

confidentiality to MCU, and his testimony on this point probably could not have been subpoenaed because of the attorney-client privilege, or at least there was a good chance that that would be the case.

But that story also was a lie. It was a lie for the purpose of protecting Wong, who you knew embezzled the $3.7 million, and for the purpose of protecting yourself.

There's a lot more to this tale. It's all spelled out in the presentence report. There's much more to what you did voluntarily, as Mr. Mark said, over a period of many months. It was not aberrational. It was calculating.

These crimes struck at the heart of the criminal justice system. They were done to cover up the theft of a lot of money from a financial institution that is owned and that exists to serve the hard-working cops and firefighters and correctional officers and sanitation workers and health workers and every other government employee who makes the lives of all New Yorkers safer and cleaner and better. They're very serious crimes, and they call for a serious sentence.

But as you know, there's a lot more that goes into determining a sentence than the nature of the crimes in question. The law requires that I consider the nature and circumstances of the offender, that is you, of course, not just the crimes themselves, as well as a long list of other factors. And I've considered all of them, and I readily acknowledge that

there are circumstances here that argue significantly for leniency. I don't for a minute underestimate the extent to which the loss of your position, your reputation, and the esteem in which you've long been held is a punishment in and of itself. In many ways that's immeasurable.

I certainly accept and respect everything you have done and everything you do and in the future will do for your ailing relatives whose ability to care for themselves is limited, your brother Ken, your aunt, and the father of your son. I know how hard it would be to replace everything you do for them even for a short while.

I understand that your health over the past five years has suffered and that you're still coping with some of those problems. And I certainly agree with Ms. Cohen that there is no need here to impose a sentence or even a part of a sentence for the purpose of what lawyers and judges call specific deterrence, in other words, to prevent you from committing additional crimes. That's not to say I'm wholly sure that you are truly remorseful for what you did in the sense that you truly accept your guilt and want to make amends. I am sure that you are very sorry for the fact that you got caught. But I am persuaded that specific deterrence probably is not necessary for exactly the reasons Ms. Cohen mentioned. You are unlikely ever again to occupy a position of trust in which you will have an opportunity to commit new crimes. So specific

deterrence is really unnecessary.

So I get to the bottom line, the sentence to be imposed. It's purely a matter of judgment. There isn't a right or wrong answer. The sentencing guidelines, depending upon whether one accepts the defense or the government position, call for a sentence of somewhere between 30 and 57 months in jail. Everybody agrees, in terms of the advocates and probation, that the sentence should be shorter than the bottom of that range. Probation has recommended a sentence of 12 months. The government argues for a lot more. Ms. Cohen, understandably and properly, argues for zero.

As I say, there's no right or wrong answer. The best I can do is try to pass the thread through the needle. And in the last analysis, I don't fully agree with any of them.

It is the judgment of this Court that you be committed to the custody of the Attorney General of the United States or his designee for a term of imprisonment of 15 months, that you thereafter serve a term of supervised release of two years, and that you pay the mandatory special assessment of $300.

It is further adjudged that you pay a fine of $80,000 and that you pay restitution in such amount, if any, and on such terms as I hereafter may direct on or before 90 days from the date of the entry of judgment in this case. The fine shall be payable in installments, $10,000 on or before May 1, 2022; $35,000 on or before November 1, 2022; and $35,000 on or before

May 1, 2023.

The term of supervised release shall be subject to the mandatory and the standard conditions of supervision set forth at pages 41 to 45 of the presentence report dated April 15, 2022, which you have stated you have read, and to two additional special conditions. The first is that you perform at least 20 hours per week of community service specified by the probation officer during each week of your term of supervised release. The second is that you remain in compliance with the payment schedule in respect of the fine.

I decline to impose the special condition of supervision recommended in the presentence report. The mandatory drug testing condition is suspended because I find a low risk of substance abuse.

I advise you that you have the right to appeal from the judgment imposing this sentence. If you wish to appeal, you must file a written notice of appeal within 14 days after the date on which judgment is entered. If you wish to appeal and you can't afford to pay the fees necessary to do so, you have the right to move for leave to appeal as a poor person. If that application were granted, you'd be permitted to appeal without payment of the fees. And if you couldn't afford a lawyer, a lawyer would be appointed for you at government expense.

I want to reiterate that this sentence would be the

same regardless of which side's view of the guidelines range was the correct one. It's substantially below either of those ranges. It's below either of those ranges for all of the reasons that suggest leniency to which I alluded before.

It is below those range also because wherever anyone is incarcerated nowadays, by which I mean basically since St. Patrick's Day of 2020 when the COVID pandemic struck full force, no fault of the Irish, I hasten to say, just coincides, the conditions of confinement are more onerous than they used to be. One hopes that situation changes rapidly, but I can't count on it. None of us can count on very much where the pandemic is concerned.

I wanted to say one other thing. Yes, I did not take into account either the letter from MCU or the remarks made by its counsel today in determining the sentence. I afforded the opportunity to be heard against the possibility that it was a right that he had and against the possibility that it turns out that MCU is a crime victim entitled to be heard on restitution. They'll be afforded an opportunity to be heard on the issue of whether that's the case, and we'll deal with that down the road.

Have I omitted anything, counsel?

MS. COHEN: I don't know if your Honor included mental health treatment as a condition.

THE COURT: I did not as a condition of supervision.

Obviously, she needs it and she's free to have it, but I didn't see the point in including it as a condition of supervision. She's perfectly capable of attending to that without the help of the probation office.

MS. COHEN: Your Honor, the only other thing I would request is that you make a request to the Bureau of Prisons in order to keep her as close as possible to family and friends. I think Danbury is the closest minimum security facility.

THE COURT: Yes, I so recommend, and I recommend that she be incarcerated in a minimum security facility. And at an appropriate time I'll entertain an application with respect to voluntary surrender.

Mr. Mark, you look like you're bursting out of your chair.

MR. MARK: I'm trying not to, but just as one administrative matter at the end, the government would move, in light of your Honor's judgment, to dismiss the open counts in the underlying indictment.

THE COURT: Granted.

Ms. Cohen.

MS. COHEN: Your Honor, we would request voluntary surrender at least 60 days out. I would ask your Honor to extend that perhaps to 90 days. There are -- because of the people she cares for, she needs to put in place some substitution.

THE COURT: Sure.

Ms. Ash, you are directed to surrender to the Bureau of Prisons at the institution designated by it for the service of your sentence on the date and by the time it directs, which shall not be any earlier than July 20, 2022. Compliance with that condition is also a bail condition. Should you fail to comply with it, obviously, your bail can be revoked. You could be prosecuted for escape. Nobody wants that to happen.

In addition, as I'm sure Ms. Cohen has heard in other cases a million times, if you find yourselves coming towards sometime in July and the designation hasn't come through for some reason with the Bureau of Prisons and you want me to roll the surrender date, get in touch with my chambers, and unless there's any sort of reason suggesting that I shouldn't do so, I'm inclined to be extremely receptive.

MS. COHEN: Thank you, your Honor.

THE COURT: Anything else, folks?

MR. MARK: Not from the government, your Honor.

MS. COHEN: Not from the defense, your Honor.

THE COURT: I thank you both for excellent presentations. I'm not looking for sympathy, but this sentence required that I be as fully informed as I possibly could be, and I couldn't have asked for anything more from counsel.

Thank you.

(Adjourned)

A-1237



Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Southern District of New York

Caption:
United States v.

Sylvia Ash

Docket No.: 19-CR-780-001 (LAK)

(District Court Judge)

Notice is hereby given that Sylvia Ash appeals to the United States Court of Appeals for the Second Circuit from the judgment ✓, other [ ] (specify)

entered in this action on April 26, 2022 (date)

This appeal concerns: Conviction only [ ] Sentence only [ ] Conviction & Sentence [✓] Other [ ]

Defendant found guilty by plea [ ] trial [✓] N/A [ ]

Offense occurred after November 1, 1987? Yes [✓] No [ ] N/A [ ]

Date of sentence: April 20, 2022 N/A [ ]

Bail/Jail Disposition: Committed [✓] Not committed [ ] N/A [ ] (Surrender date: July 20, 2022)

Appellant is represented by counsel? Yes ✓ No [ ] If yes, provide the following information:

Defendant's Counsel: Justine Harris

Counsel's Address: Sher Tremonte LLP, 90 Broad St., 23rd Fl
New York, NY 10004

Counsel's Phone: 212-202-2600

Assistant U.S. Attorney: Eli Mark

AUSA's Address: 1 St. Andrews Plaza
New York, NY 10007

AUSA's Phone: (212)-637-2431

Signature

FILED U.S. DISTRICT COURT S.D. OF N.Y. 2022 MAY 10

5/10/22 $505.00 ST 465401298079

Court Name: District Court
Division: 1
Receipt Number: 465401298879
Cashier ID: Stran
Transaction Date: 05/10/2022
Payer Name: SYLVIA ASH

---

NOTICE OF APPEAL/DOCKETING FEE
For: SYLVIA ASH
Amount: $505.00

---

CREDIT CARD
Amt Tendered: $505.00

---

Total Due: $505.00
Total Tendered: $505.00
Change Amt: $0.00

19CR780
LAK

MORRISON FOERSTER

250 WEST 55TH STREET
NEW YORK
NEW YORK 10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON, BRUSSELS, DENVER, HONG KONG, LONDON, LOS ANGELES, NEW YORK, PALO ALTO, SAN DIEGO, SAN FRANCISCO, SHANGHAI, SINGAPORE, TOKYO, WASHINGTON, D.C.

June 10, 2022

Writer's Direct Contact
+1 (212) 468-8049
CCohen@mofo.com

*By ECF and Hand Delivery*

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: *United States v. Sylvia Ash*, 19 Cr. 780 (LAK)

Dear Judge Kaplan:

We respectfully submit this letter on behalf of defendant Sylvia Ash in the above-referenced matter. Pursuant to Rule 46(c) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3143(b)(1), we hereby request that Ms. Ash continue to be released on bail pending appeal. While Ms. Ash has not yet received notification of the designation of her detention facility, she is scheduled to surrender to her designated facility on July 20, 2022 and thus we request expedited consideration of this request. Pursuant to Rule 38(c) of the Federal Rules of Criminal Procedure, we also request that the Court stay the fine imposed on Ms. Ash as part of her sentence. The government objects to Ms. Ash's requests for bail pending appeal and for a stay of the fine.

Ms. Ash has filed a Notice of Appeal from her judgment of conviction in the United States Court of Appeals for the Second Circuit, (*see United States v. Ash*, 22-1048 (2d Cir.)), and now has retained appellate counsel to represent her in that appeal. Appellate counsel currently is reviewing the record and determining all appropriate grounds for appeal. It is likely that appellate counsel will raise some or all of the issues previously raised before and decided by this Court as well as potential new issues raised in the record of the trial and at sentencing. Bail

pending appeal is appropriate here because Ms. Ash is neither a flight risk nor a danger to the community and the legal issues presented in pretrial motions, motions *in limine*, at trial, and at sentencing present close and novel questions that could result in vacatur of the conviction or a reduced sentence that would be fewer months than the expected duration of the appeal. Indeed, if bail pending appeal is not granted, Ms. Ash likely will serve the entirety of her sentence before a decision is rendered on her appeal.

*Applicable Law*

A court "shall order" bail pending appeal if (a) there is "clear and convincing evidence that the [defendant] is not likely to flee or pose a danger to the safety of any other person or the community if released" and (b) "the appeal is not for the purpose of delay and raises a substantial question of law or fact" likely to result in reversal . . . [or] a reduced sentence to a term of imprisonment less than . . . the expected duration of the appeal process." 18 U.S.C. § 3143(b). When a defendant satisfies this standard, bail is "mandatory." *United States v. Abuhamra*, 389 F. 3d 309, 319 (2d Cir. 2004).

Courts have held that an appeal is not for the purpose of delay where it is brought in good faith and raises substantial questions of law or fact. *See, e.g.*, *United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995). To be "substantial," a question need only be "one of more substance than would be necessary to a finding that it was not frivolous" – in other words, "a 'close' question or one that very well could be decided the other way," or one that is "novel, which has not been decided by controlling precedent." *United States v. Randell*, 761 F. 2d 122, 125 (2d Cir. 1985) (internal quotation marks omitted). In this regard, a defendant need not prove that she is likely to succeed on the substantial questions she raises – and the Court should not base its decision on its prediction of the "probability of reversal" – rather, it is sufficient that if she does succeed, reversal would be likely. *Id.* at 124-25.

*Ms. Ash Is Not a Flight Risk or Danger to the Community*

As the Court is aware, Ms. Ash is 64 years old. (Presentence Report ("PSR") ¶ 105.) She and her family immigrated to this country 50 years ago and have lived in Brooklyn ever since. (*Id.* ¶¶ 107, 109.) Ms. Ash is close with her siblings and serves as a caretaker and legal guardian for her younger brother Keith, who has severe developmental disabilities and lives in a group home in Brooklyn. (*Id.* ¶ 108.) Ms. Ash also is a caretaker for her elderly aunt and the father of her son, both of whom struggle with ongoing health issues. (*See* Sentencing Transcript ("Sentencing Tr.") at 35.) She herself has various health issues that affect her mobility. (*Id.* at 21.) Her only child, her son Ashton, lives in California and Ms. Ash owns property in Brooklyn jointly with him and her siblings and separately owns her home in Brooklyn. (PSR ¶¶ 110, 124.) Ms. Ash attended each court appearance in this case, including, of course, the trial and her sentencing.

In addition, as the Court noted at sentencing, before this case, Ms. Ash held a prominent position in the community, which she has lost along with her reputation, profession, and livelihood, and consequently this is not a case in which specific deterrence is needed. (Sentencing Tr. at 35.) Accordingly, there is "clear and convincing evidence that [Ms. Ash] is not likely to flee or pose a danger to the safety of any other person or the community" if bail is continued pending appeal. 18 U.S.C. § 3143(b); *see Hart*, 906 F. Supp. at 105 (finding no risk of flight or danger where defendant had adhered to bail conditions, made all required appearances, and had strong community ties).

*Ms. Ash's Appeal Is Not for the Purpose of Delay and Presents Close and NovelIssues*

Ms. Ash is not pursuing her appeal for dilatory purposes. Rather, her appeal raises substantial questions of law, including an issue of first impression in the Second Circuit, that is, whether the involvement of the government in a civil or internal investigation may warrant suppression of evidence even without a showing of coercion. In addition, the *in limine* issues concerning admission of testimony and evidence regarding perks and benefits provided to Ms. Ash by the

Municipal Credit Union ("MCU") – with the concomitant denial of Ms. Ash's motion to introduce evidence that other members of the MCU Board received similar benefits – raise a substantial issue implicating Ms. Ash's right to present a complete defense under *Chambers v. Mississippi*, 410 U.S. 284 (1973) and its progeny. The Court could not have known when it denied that motion the extent to which testimony about those perks and benefits would dominate the trial. Assuming the Second Circuit finds error in this Court's evidentiary rulings, it is a close question, given the jury's acquittal on Count Two of the Superseding Indictment, whether any such error was harmless. *See* Mem. & Order at 5, *United States v. Kaufman*, 19-CR-504 (LAK) (S.D.N.Y. Oct. 27, 2021) (ECF No. 263) ("I am inclined to think it doubtful that Kaufman will succeed on either count, let alone both. Nevertheless, it is not impossible. . . . Most of the questions he proposes to raise are non-frivolous. So I will give him the benefit of the doubt."). And, because the sentence imposed in this case was 15 months' incarceration, the bulk, if not entirety, of the time Ms. Ash will spend in custody (approximately 12.75 months with good time credit) will have lapsed by the time the Second Circuit rules on her appeal. *See* U.S. Admin. Office of Courts, U.S. Court of Appeals Summary, Mar. 31, 2022 (noting that the median time from filing of a notice of appeal to disposition is 12.5 months).

*The Court Should Stay the Imposition of the Fine*

Rule 38(c) of the Federal Rules of Criminal Procedure provides that if a defendant appeals, the court "may stay a sentence to pay a fine." Fed. R. Crim. P. 38(c). "Such a stay may be granted based upon the court's discretion after considering whether a defendant would, suffer irreparable harm should the stay be denied." *United States v. Shkreli*, No. 15-CR-637 (KAM), 2018 WL 3425286, at *2 (E.D.N.Y. July 10, 2018). In *United States v. Silver*, Judge Caproni granted a motion to stay execution of a fine where the defendant showed "possibly meritorious legal basis for his appeal" and "irreparable harm should the stay be denied because to pay the fine he would be forced to sell his two residences and to incur substantial tax liability associated with liquidating his retirement account." 203 F. Supp. 3d 370, 385 (S.D.N.Y. 2016). In so holding, Judge Caproni noted that "the Court cannot confidently calculate that [the defendant] has sufficient

available assets to pay the $1.5 million absent selling both residences and liquidating his retirement account," and therefore granted the requested stay. *Id.* at 386.

Here, as the Court knows from the PSR and recent correspondence, Ms. Ash's assets are largely illiquid (property and retirement accounts) and she is engaged in good faith efforts to pay what she can afford to satisfy the fine, while working to sell and/or obtain financing on her properties. Indeed, on May 31, 2022, she made an initial payment of part of the fine. (ECF No. 188.) Similar to the defendant in *Silver*, albeit on a much more modest scale, she does not have sufficient assets to pay the fine without liquidating her interest in at least one of the properties she owns. Accordingly, we respectfully request that the Court stay payment of the outstanding balance of the fine while Ms. Ash's appeal is pending.

*Conclusion*

For the foregoing reasons, the Court should grant bail pending appeal and stay the imposition of the fine.

Respectfully submitted,

*/s/ Carrie H. Cohen*

Carrie H. Cohen

cc: Counsel of record (by ECF and email)